UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>TERRAFORM LABS PTE LTD. and DO HYEONG KWON,<br><br>　　　　Defendants. | No. 1:23-cv-1346 (JSR) |

**BRIEF OF PARADIGM OPERATIONS LP
AS *AMICUS CURIAE* IN SUPPORT OF NEITHER PARTY**

Of Counsel:

Rodrigo Seira
PARADIGM OPERATIONS LP
548 Market Street
San Francisco, CA 94104
(415) 986-9283
rodrigo@paradigm.xyz

Andrew Kim
GOODWIN PROCTER LLP
1900 N Street, N.W.
Washington, D.C. 20036
(202) 346-4000
AndrewKim@goodwinlaw.com

Meghan K. Spillane
GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018
(212) 813-8800
mspillane@goodwinlaw.com

*Counsel for Amicus Curiae
Paradigm Operations LP*

Dated: April 21, 2023

**TABLE OF CONTENTS**

**Page**

INTEREST OF THE *AMICUS CURIAE* ...................................................................................1
INTRODUCTION ...........................................................................................................................2
ARGUMENT ...................................................................................................................................3
I.  The SEC's theory for treating stablecoins as securities would radically and impermissibly expand the definition of "security." ...........................................................3
    A.  Whether an asset is a security depends on whether the asset's features—or the transaction leading to its purchase—evince an investment made in the hopes of obtaining a profit from the asset. ..............................................................5
    B.  A stablecoin is designed to have its value pegged to a reference asset, so, by design, it cannot deliver a profit. .......................................................................6
    C.  Stablecoins are not "securities" because they do not promise profits—the fact that a stablecoin can be used to purchase a security does not alter that conclusion. .............................................................................................................9
CONCLUSION..............................................................................................................................15

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*City of Lafayette v. La. Power & Light Co.*,
   435 U.S. 389 (1978) ..................................................................................................................11

*Hector v. Wiens*,
   533 F.2d 429 (9th Cir. 1976) .....................................................................................................11

*Int'l Brotherhood of Teamsters,*
   *Chauffeurs, Warehousemen & Helpers of Am. v. Daniel*,
   439 U.S. 551 (1979) ..................................................................................................................13

*Landreth Timber Co. v. Landreth*,
   471 U.S. 681 (1985) ..................................................................................................................12

*Marine Bank v. Weaver*,
   455 U.S. 551 (1982) ..................................................................................................................12

*Mechigian v. Art Cap. Corp.*,
   612 F. Supp. 1421 (S.D.N.Y. 1985) ..........................................................................................14

*Reves v. Ernst & Young*,
   494 U.S. 56 (1990) ................................................................................................................5, 10

*SEC v. Belmont Reid & Co.*,
   794 F.2d 1388 (9th Cir. 1986) ...................................................................................................13

*SEC v. C.M. Joiner Leasing Corp.*,
   320 U.S. 344 (1943) ..................................................................................................................12

*SEC v. W.J. Howey Co.*,
   328 U.S. 293 (1946) ................................................................................................5, 10, 12, 13

*Tcherepnin v. Knight*,
   389 U.S. 332 (1967) ..................................................................................................................12

*Union Planters Nat'l Bank of Memphis v. Com. Credit Bus. Loans, Inc.*,
   651 F.2d 1174 (6th Cir. 1981) .....................................................................................................6

*United Hous. Found., Inc. v. Forman*,
   421 U.S. 837 (1975) ..............................................................................................2, 6, 10, 11, 13

**Statutes**

15 U.S.C. § 77b(a)(1) .................................................................................................................2, 12

15 U.S.C. § 77s(a) .................................................................................................................... 1

15 U.S.C. § 78c(a)(10) ......................................................................................................... 2, 12

**Other Authorities**

H.R. Rep. No. 85, 1st Sess. (1933) .......................................................................................... 5

Garth Baughman et al., Board of Governors of the Federal Reserve System, *FEDS Notes: The Stable in Stablecoins* (Dec. 16, 2022), https://www.federalreserve.gov/econres/notes/feds-notes/the-stable-in-stablecoins-20221216.html. ................................................................................. 7, 8, 9

Ryan Browne, *$40 Billion Payments Giant Checkout.com Leaps Into Crypto with Stablecoin Payments Feature* (June 7, 2022), https://www.cnbc.com/2022/06/07/checkoutcom-jumps-into-crypto-with-stablecoin-payments-feature.html ................................................................ 11

Vitalik Buterin, *Two Thought Experiments to Evaluate Automated Stablecoins* (May 25, 2022), https://vitalik.eth.limo/general/2022/05/25/stable.html ................................. 9

Written Testimony of Jake Chervinsky, Chief Policy Officer of the Blockchain Association before the House Committee on Financial Services, Subcommittee on Digital Assets (Apr. 19, 2023), https://docs.house.gov/meetings/BA/BA21/20230419/115753/HHRG-118-BA21-Wstate-ChervinskyJ-20230419.pdf ................................................................... 4

Circle, *USDC Reserve Report* (Mar. 30, 2023), https://www.circle.com/hubfs/USDCAttestationReports/2023%20USDC_Circle%20Examination%20Report%20February%202023.pdf. ................................... 8

Dai 1.0 (last visited Apr. 19, 2023), https://developer.makerdao.com/dai/1/ ............................. 8

Dai Collateralization (last visited Apr. 19, 2023), https://daistats.com/ .................................. 8

Press Release, House Fin. Servs. Comm., *Hill Delivers Remarks at Hearing on Stablecoins' Role in Payments and the Need for Legislation* (Apr. 19, 2023), https://financialservices.house.gov/news/documentsingle.aspx?DocumentID=408714 ...................................................... 3

Rajat Kapur, *What to Know If You Want to Pay Employees with Cryptocurrencies*, Ernst & Young (Mar. 23, 2022), https://www.ey.com/en_us/tmt/blockchain-solutions-promote-digital-ecosystems/what-to-know-if-you-want-to-pay-employees-with-cryptocurrencies ............................................................... 11

Gordon Y. Liao & John Carmichael, Board of Governors of the Federal Reserve System (Staff), *Stablecoins: Growth Potential and Impact on Banking* (Jan. 2022), https://www.federalreserve.gov/econres/ifdp/files/ifdp1334.pdf .......................... 7, 9

MakerDAO Poll ID No. 982, *PSM Parameter Normalization* (Mar. 20, 2023),
https://vote.makerdao.com/polling/QmQ1fYm3 ........................................................................8

President's Working Group on Financial Markets et al.,
*Report on Stablecoins* (Nov. 2021) ......................................................................................6, 7

Amit Rajpal & Paul Marshall, *Op-ed: Stablecoin is the Future of Virtual
Payments. How Wise Regulation Can Foster Its Growth*, CNBC (July 13,
2021, 8:24 AM), https://www.cnbc.com/2021/07/13/op-ed-the-future-is-
stablecoin-wise-regulation-can-foster-its-growth.html ...............................................................3

Response of the Office of Chief Counsel, Division of Corporation Finance re:
Las Sendas Golf Club, Inc. (Mar. 2, 2004), *available at*
https://www.sec.gov/divisions/corpfin/cf-noaction/lassendas030204.htm ...............................6

**INTEREST OF THE *AMICUS CURIAE*[1]**

Paradigm Operations LP ("Paradigm") is an investment firm that backs companies offering disruptive and innovative crypto/Web 3 products and protocols. Paradigm takes a hands-on approach to helping these projects achieve their full potential, and provides a variety of services that range from the technical (mechanism design, smart contract security, engineering) to the operational (recruiting and regulatory strategy).

Paradigm has never owned any of the digital assets referenced in the Complaint, nor has it otherwise participated in the Terra ecosystem. It takes no position on the ultimate merits of Defendants' motion to dismiss.

This case, however, presents important securities-law issues that could have a seismic impact on the digital assets industry. Paradigm has a strong interest in ensuring that those issues are discussed and decided in a way that allows innovation to continue thriving while staying within the bounds of existing law.

Congress gave the SEC the power to provide regulatory guidance on what constitutes a security. 15 U.S.C. § 77s(a). But instead of using that power to set bright-line parameters on when digital assets fall within the securities laws, the SEC is using this case to attempt a radical expansion of the securities laws (and its own enforcement authority), without any of the benefits or protections of notice-and-comment rulemaking. The SEC's post-hoc-regulation-by-litigation deprives members of the industry who might be adversely affected by the SEC's litigation campaign of the opportunity to air their concerns about the SEC's regulatory positions. Amicus

---

[1] This Court granted Paradigm Operations LP leave to file this amicus brief on April 20, 2023. No counsel for any party authored this brief in whole or in part, and no entity or person, aside from *amicus curiae* and its counsel, made any monetary contribution intended to fund the preparation or submission of this brief.

participation therefore becomes the only means by which industry members can meaningfully voice such concerns.

Here, the SEC seeks to upend settled rules governing the offer and sale of securities and expand the reach of the securities laws to uncharted waters.  In particular, the SEC advances the boundless theory that if an instrument can be exchanged for a so-called "crypto asset security," the instrument itself becomes a "crypto asset security." This theory contradicts decades of guidance from federal courts on what makes an instrument a "security."  If this Court accepts the SEC's invitation to redraw longstanding lines, the results could have far-reaching implications that could fundamentally disrupt the innovation economy, with no benefit to the investing public.

## INTRODUCTION

A security can come in one of many different forms—a "note," "stock," "investment contract," or one of the other instruments identified in the definitions of "security" in Securities Act, 15 U.S.C. § 77b(a)(1), and Exchange Act, 15 U.S.C. § 78c(a)(10) (collectively, "Securities Laws").  But to properly identify a security, a court must not only consider what an instrument is called and what it is supposed to do, but also the circumstances surrounding the transaction leading to the purchase and sale of the instrument.  One essential characteristic of a security is the prospect of profits—if there is no promise or expectation that, by buying an instrument, the instrument itself will yield profits of some kind, the instrument is generally not a security.[2]

In this case, the SEC claims that a type of crypto asset that is profitless by design—a *stable*coin—becomes a "crypto asset security" because it can be exchanged for another crypto asset that is alleged to be a security.  By that reasoning, virtually every barterable good or

---

[2] *United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 852 (1975) ("profits to come solely from the efforts of others" are part of "the essential attributes that run through all of the Court's decisions defining a security").

property in the world can be a security—gold bars, paintings, and diamonds among them. Congress never intended for the Securities Laws (or the SEC) to have such reach.[3]  The underlying premise of the SEC's argument, *i.e.*, that using an asset to buy a security makes the asset itself a security, has no basis in caselaw, and would potentially inject the Securities Laws (and the SEC) into innumerable commercial transactions.

This Court should resist the radical expansion that the SEC proposes.  The question whether an instrument is a security has always turned on whether the instrument itself is promised to deliver returns of some kind, not how the instrument may be used.  By that measure, a stablecoin—a digital asset designed to always be worth the same amount—is not a security.

## ARGUMENT

**I.     The SEC's theory for treating stablecoins as securities would radically and impermissibly expand the definition of "security."**

Stablecoins are an important innovation intended to solve a problem of modern finance. When a payment is made from one place to another using traditional payment methods, that payment gets bogged down by a number of inefficiencies.  The payment is, in effect, passed along through middlemen, which makes the transmission of that payment "expensive, slow and restrictive."  Amit Rajpal & Paul Marshall, *Op-ed:  Stablecoin is the Future of Virtual Payments. How Wise Regulation Can Foster Its Growth*, CNBC (July 13, 2021, 8:24 AM), https://www.cnbc.com/2021/07/13/op-ed-the-future-is-stablecoin-wise-regulation-can-foster-its-growth.html.

---

[3] That is not to say, however, that stablecoins should go unregulated.  There are legislative efforts underway to create a new regulatory environment for stablecoins, *e.g.*, Press Release, House Fin. Servs. Comm., *Hill Delivers Remarks at Hearing on Stablecoins' Role in Payments and the Need for Legislation* (Apr. 19, 2023), https://financialservices.house.gov/news/documentsingle.aspx?DocumentID=408714, and Paradigm supports reasonable regulation that balances the need for stability and the advancement of innovation.

3

Stablecoins are digital assets designed to eliminate those inefficiencies. They "seek[] to maintain a stable value" by being pegged "to a reference asset, typically a national currency." Written Testimony of Jake Chervinsky, Chief Policy Officer of the Blockchain Association before the House Committee on Financial Services, Subcommittee on Digital Assets, at 3 (Apr. 19, 2023), https://docs.house.gov/meetings/BA/BA21/20230419/115753/HHRG-118-BA21-Wstate-ChervinskyJ-20230419.pdf. So, if a stablecoin is pegged to the U.S. dollar, one stablecoin "seeks to maintain a stable value of $1 per unit." *Id.*

These assets reflect a "categorical improvement" on "legacy payment infrastructure," as the blockchain technology backing stablecoins allows "users to transfer any amount of value to any person anywhere in the world nearly instantly and at nearly zero cost." *Id.* at 5. Because stablecoins eliminate intermediaries, and because of the transparency and accountability that public blockchains provide, stablecoins provide an affordable and reliable means of sending money worldwide, thereby "enabling billions of people around the world who lack financial services to join the global economy for the first time." *Id.* While stablecoins are often used to buy digital assets, they are used for many other things as well. For example, stablecoins are the means by which "internally displaced persons and other war-affected people in Ukraine" receive aid from the United Nations Refugee Agency, and how "family members working and living abroad" make remittance payments to those back home. *Id.*

Stablecoins are not, however, instruments that generate any kind of revenue or profit. Such a feature would be antithetical to the purpose of stablecoins, which is to deliver the *same* value—that is what allows stablecoins to serve as a reliable medium of payment and exchange. Despite the SEC's suggestion that stablecoins can be "crypto asset securities" subject to the

Securities Laws, decades of caselaw interpreting the Securities Laws make clear that stablecoins, standing alone, are not "securities."

### A. Whether an asset is a security depends on whether the asset's features—or the transaction leading to its purchase—evince an investment made in the hopes of obtaining a profit from the asset.

In the wake of the Great Depression, Congress enacted the Securities Act of 1933 to protect investors from making uninformed decisions based on "[a]lluring promises of easy wealth," and to prevent the "wanton misdirection of the capital resources of the Nation." H.R. Rep. No. 85, 1st Sess., at 2-3 (1933). Congress defined "security" in "sufficiently broad and general terms so as to include within that definition the many types of instruments that *in our commercial world* fall within the ordinary concept of security." *Id.* at 11 (emphasis added).

While the concept of a security is "a flexible rather than a static" one, it still requires, at its core, "the use of the money of others on the promise of profits." *SEC v. W.J. Howey Co.*, 328 U.S. 293, 299 (1946). In other words, a security requires, at a minimum, (1) the giving of money to be used by someone else and (2) the promise of profits. The well-trodden *Howey* test for investment contracts, for example, requires a "contract, transaction, or scheme," through which a "person invests his money" and "is led to expect profits solely from the efforts of the promoter or a third party." *Id.* at 298-99. Another example: one of the critical factors that makes an instrument a "note" classified as a security under *Reves v. Ernst & Young*, 494 U.S. 56 (1990), is whether the instrument's "purpose is to raise money for the general use of a business enterprise or to finance substantial investments," and "the buyer is interested primarily in the profit the note is expected to generate." *Id.* at 66.

By contrast, when an asset is purchased and sold for reasons other than making a profit, it is not a security. "Shares" of a nonprofit housing cooperative, for example, are not securities, because the purchaser typically buys those shares to live in the co-op—in other words, "to use or

consume the item purchased"—rather than to make a profit. *United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 853-54 (1975). A commercial loan from a bank to a small business (and the resulting note memorializing that loan) is not a "security"; the lender receives only interest in accordance with a fixed rate, not varying amounts of return (or an appreciation in loan value) based on the business's financial performance. *Union Planters Nat'l Bank of Memphis v. Com. Credit Bus. Loans, Inc.*, 651 F.2d 1174, 1184 (6th Cir. 1981); *see also Forman*, 421 U.S. at 855 ("no basis in law for the view that the payment of interest … constitutes income or profits"). "Equity" membership in a country club is likewise not a security under the Securities Laws, as a person pays for membership to obtain access to the club's premises and for social privileges, not because club membership might lead to a profit by appreciating in value or generating passive income. *E.g.*, Response of the Office of Chief Counsel, Division of Corporation Finance re: Las Sendas Golf Club, Inc. (Mar. 2, 2004), *available at* https://www.sec.gov/divisions/corpfin/cf-noaction/lassendas030204.htm.

As the Supreme Court made clear in *Forman*, a reasonable expectation of some form of profit—"either capital appreciation resulting from the development of the initial investment … or a participation in earnings resulting from the use of investors' funds," is necessary to turn an asset into a security. 421 U.S. at 852 (discussing the "essential attributes that run through all of the Court's decisions defining a security").

**B.     A stablecoin is designed to have its value pegged to a reference asset, so, by design, it cannot deliver a profit.**

As explained above, a stablecoin is a digital asset that is "designed to maintain a stable value relative to a national currency or other reference assets." President's Working Group on Financial Markets et al., *Report on Stablecoins* 1 (Nov. 2021) ("Working Group Report"), https://home.treasury.gov/system/files/136/StableCoinReport_Nov1_508.pdf. Stablecoin issuers

generally "offer a promise or expectation that the coin can be redeemed at par upon request"—in other words, the amount of fiat currency (or other reference asset) paid for the stablecoin is the amount received upon redemption or for a sale on the secondary market. *Id.* at 4. There are a variety of mechanisms by which a stablecoin "maintains its peg against the real-world asset," *see* pp. 7-9, *infra*, but the value proposition remains the same: a stablecoin is designed to closely track the value of another asset. Garth Baughman et al., Board of Governors of the Federal Reserve System, *FEDS Notes: The Stable in Stablecoins* (Dec. 16, 2022), https://www.federalreserve.gov/econres/notes/feds-notes/the-stable-in-stablecoins-20221216.html. In the case of a stablecoin pegged to the U.S. dollar, that means a dollar in, a dollar out.

Stablecoins provide a quick, efficient, and transparent means of exchanging value. For the moment, they are mostly used to facilitate transactions involving digital assets, Working Group Report at 1, but they have a "high potential for innovation," and may help drive "more inclusive payment and financial systems, tokenized financial markets, and the facilitation of microtransactions for technological advancements such as Web 3." Gordon Y. Liao & John Carmichael, Board of Governors of the Federal Reserve System (Staff), *Stablecoins: Growth Potential and Impact on Banking* 2, 7 (Jan. 2022), https://www.federalreserve.gov/econres/ifdp/files/ifdp1334.pdf.

There are three types of generally recognized stablecoins: crypto-collateralized stablecoins, fiat-collateralized stablecoins, and algorithmic stablecoins. While there are differences in structure and implementation between them, all three categories have at least one thing in common: they are designed to be *stable*, *i.e.*, maintaining the same value, to be bought and sold for the same amount.

A crypto-collateralized stablecoin is backed by cryptocurrency and typically attempts to track the U.S. dollar or another major fiat currency. Because the cryptocurrency held in reserve may fluctuate in value relative to the reference asset to which it is "pegged," the value of the cryptocurrency held in reserve will usually far exceed the value of the stablecoins in circulation. MakerDAO's Dai stablecoin, for example, is bought and redeemed for the equivalent of $1 USD, but is backed by a mix of Ether (which fluctuates in value),[4] USD Coin ("USDC," which itself is a fiat-collateralized stablecoin),[5] and other cryptocurrency assets. Dai is collateralized at 150% of the value of the Dai tokens in circulation—meaning, if 1 billion Dai worth $1 billion USD are in circulation, there is at least $1.5 billion held in cryptocurrency reserves.[6]

Fiat-collateralized stablecoins operate in a similar way, except they can be backed by relatively less collateral because a fiat-collateralized stablecoin experiences little, if any, price volatility compared to its reference asset, which is typically the same fiat currency. Reserves are typically held at a 1-to-1 ratio—one unit of the fiat currency for every token in circulation. For example, USDC is bought and redeemed at $1 per USDC. On February 28, 2023, there were 42.4 billion USDC in circulation, and Circle, USDC's issuer, held $42.45 billion in cash and U.S. treasury securities.[7]

Unlike crypto- and fiat-backed stablecoins, which are either fully collateralized or overcollateralized, algorithmic stablecoins—which make up the third category of stablecoins—are generally *un*collateralized. Baughman et al., *supra*. Instead, they maintain the same value by

---

[4] Dai Collateralization (last visited Apr. 19, 2023), https://daistats.com/.
[5] MakerDAO Poll ID No. 982, *PSM Parameter Normalization* (Mar. 20, 2023), https://vote.makerdao.com/polling/QmQ1fYm3 (MakerDAO vote choosing to "Maintain USDC as the Primary Reserve").
[6] Dai 1.0 (last visited Apr. 19, 2023), https://developer.makerdao.com/dai/1/.
[7] Circle, *USDC Reserve Report* (Mar. 30, 2023), https://www.circle.com/hubfs/USDCAttestationReports/2023%20USDC_Circle%20Examination%20Report%20February%202023.pdf.

8

"employing a set of rules and strategies, usually implemented by smart contracts, to dynamically match the supply of the stablecoin with user demand." *Id.* If an algorithmic stablecoin is in demand, thus driving the price above the peg, smart contracts issue new stablecoins, which brings the price of the stablecoin back down to the peg. *Id.* If supply outpaces demand, which would lower the price below the peg, smart contracts effectively buy back the stablecoins and "burn" the stablecoin (*i.e.*, remove them from circulation) until the price returns to the target. *Id.*



Vitalik Buterin, *Two Thought Experiments to Evaluate Automated Stablecoins* (May 25, 2022), https://vitalik.eth.limo/general/2022/05/25/stable.html.

As the SEC alleges, UST, Terraform's stablecoin, is one example of an algorithmic stablecoin. UST was part of a two-token system: the stablecoin itself, UST, and another token with a fluctuating value, LUNA, which was used to "maintain a one-to-one peg to the U.S. dollar by virtue of an algorithm." SEC Am. Compl. ¶¶ 4, 33. Terraform's two-token system ultimately failed, but other algorithmic stablecoins may prove to be successful.

> C. **Stablecoins are not "securities" because they do not promise profits—the fact that a stablecoin can be used to purchase a security does not alter that conclusion.**

Because of the pegged value—the "stable" part of a stablecoin—there is no profit to be had in buying, holding, or selling stablecoins. Yet the SEC's Amended Complaint suggests that

9

a "stablecoin" can be a "crypto asset security," even if it is "designed to maintain a one-to-one peg" to fiat currency.  SEC Am. Compl. ¶ 4.

While this part of the SEC's dogma is not central to its claims here, it is an assertion in need of correction—under no definition of "security" can a stablecoin, standing alone, be considered a security.  As explained above, an instrument must bear the expectation of profits in order to be a security.  A "true" stablecoin that is premised on delivering one-for-one value cannot be an "investment contract," for example, because the stablecoin does not provide any means of "capital appreciation resulting from the development of the initial investment . . . or a participation in earnings resulting from the use of investors' funds."  *Forman*, 421 U.S. at 852-83.  Stablecoins do not appreciate in value—otherwise, they would not be "stable."  Nor do stablecoins give their holders the right to any earnings.  A stablecoin entitles its holder to one thing only:  the right to redeem the stablecoin for the amount paid for the stablecoin.  All told, a stablecoin does not give rise to *any* profits, never mind "profits to come solely from the efforts of others."  *Howey*, 328 U.S. at 301.  A stablecoin asset therefore cannot be an investment contract.

The fact that stablecoins do not generate a profit also means they are not "notes."  At the outset, an instrument must first be "denominated a 'note'" in order to even fall within the *Reves* framework.  494 U.S. at 67.  That aside, a critical factor under *Reves* is that the buyer of an instrument must be "interested primarily in the profit the note is expected to generate" in order for the instrument to be "likely … a 'security'."  *Id.* at 66.  Again, a stablecoin asset is not capable of generating any income by itself—it does not appreciate in value, and offers nothing to the holder except the right to redeem (or sell) it for the price paid.  It follows that purchasers of stablecoins could not reasonably be motivated by profits that simply do not exist.

10

Lack of profit aside, stablecoins also do not represent an "investment" in anything. To borrow Justice Stewart's description: "An investment in a corporation is essentially a business decision; a shareholder takes the risks of corporate losses in the hope of corporate profits." *City of Lafayette v. La. Power & Light Co.*, 435 U.S. 389, 441 n.32 (1978) (Stewart, J., dissenting); *accord Hector v. Wiens*, 533 F.2d 429, 432 (9th Cir. 1976) (an "investment of money" means "the investor … commit[s] his assets to the enterprise in such a manner as to subject himself to financial loss"). A purchaser of a stablecoin does not agree to such a bargain; instead, it seeks the stability of access to the same pegged value at the point of purchase and the point of redemption. And the stablecoin does not entitle its holder to any income or profits.

Instead, the purpose of a stablecoin is to provide a medium of exchange and a store of value, irrespective of the use case—whether it be the purchase of another digital asset, a purchase of everyday goods and services on an e-commerce platform,[8] or the making of payroll to overseas employees without the red tape of cross-border transactions.[9] As stablecoins are bought to be "use[d] or consume[d]" for this function, they are not securities. *Forman*, 421 U.S. at 852-53.

Implicitly recognizing that stablecoins do not generate profits or income, the SEC's Amended Complaint relies on the faulty premise that a stablecoin can be a so-called "crypto-asset security" if it is used to purchase a security. SEC Am. Compl. ¶¶ 71-84. That premise has

---

[8] Ryan Browne, *$40 Billion Payments Giant Checkout.com Leaps Into Crypto with Stablecoin Payments Feature*, CNBC.com (June 7, 2022), https://www.cnbc.com/2022/06/07/checkoutcom-jumps-into-crypto-with-stablecoin-payments-feature.html (reporting that Checkout.com allows e-commerce merchants to accept and make payments in USD Coin).

[9] Rajat Kapur, *What to Know If You Want to Pay Employees with Cryptocurrencies*, Ernst & Young (Mar. 23, 2022), https://www.ey.com/en_us/tmt/blockchain-solutions-promote-digital-ecosystems/what-to-know-if-you-want-to-pay-employees-with-cryptocurrencies (explaining that using digital assets, particularly stablecoins, to make a payroll payment could save between 68.9% to 80% in fees).

no basis in any caselaw, and could potentially turn any asset in the world—digital or otherwise—into a "security" subject to the Securities Laws.

Under longstanding precedent, whether an instrument is a security turns on the characteristics of the asset itself, as well as the underlying transaction leading to the asset's purchase. As the Supreme Court explained in *SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344 (1943):

> In the Securities Act the term 'security' was defined to include by name or description many documents in which there is common trading for speculation or investment. … Instruments may be included within any of these definitions, as matter of law, if on their face they answer to the name or description. However, the reach of the Act does not stop with the obvious and commonplace. Novel, uncommon, or irregular devices, whatever they appear to be, are also reached if it be proved as matter of fact that they were widely offered or dealt in under terms or courses of dealing which established their character in commerce as 'investment contracts,' or as 'any interest or instrument commonly known as a 'security. " The proof here seems clear that these defendants' offers brought their instruments within these terms.

*Id.* at 351-52. *C.M. Joiner* teaches that the analysis focuses on the "instrument," and the "terms or course[] of dealing" through which a "device[]" is "offered." *Id.* Such an approach makes obvious sense, given that the Securities Laws define "security" in a way that focuses on the "interest or instrument" at hand. 15 U.S.C. § 77b(a)(1); 15 U.S.C. § 78c(a)(10) ("instrument"). And since *C.M. Joiner*, the Supreme Court has reaffirmed the notion that whether an asset is a security turns on either the asset itself, or representations on how the asset specifically might generate a profit.[10] *See Marine Bank v. Weaver*, 455 U.S. 551, 560 n.11 (1982) ("Each

---

[10] *Howey*, 328 U.S. at 298-99 (to determine whether there is an "investment contract" subject to the Securities Act, consider whether, under "a contract, transaction or scheme[,] … a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party"); *see also Landreth Timber Co. v. Landreth*, 471 U.S. 681, 693 (1985) (looking to the "name and characteristics" of an instrument to determine whether it falls within the securities laws); *Tcherepnin v. Knight*, 389 U.S. 332, 336-38 (1967) (assessing the

12

transaction must be analyzed and evaluated on the basis of the content of the instruments in question, the purposes intended to be served, and the factual setting as a whole.").

The SEC seeks to rewrite the definition of "security" so that it includes not only an instrument that may, standing alone, resemble an "investment contract," a "note," or some other type of security, but also instruments that are used as a means of exchange to acquire a security. But the Supreme Court has already cautioned that an asset's classification as a security should not be based on "speculative" uses, *i.e.*, what *could be done* with an asset. *Forman*, 421 U.S. at 856 (rejecting as "too speculative and insubstantial" the notion that the co-op shares could be securities because the co-op had commercial facilities that could be leased out at a net profit); *see also Int'l Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of Am. v. Daniel*, 439 U.S. 551, 562 (1979) (rejecting as "too speculative" the argument that an employee is motivated by profit to participate in a pension plan, as the employee would need to overcome the "principal barrier … [of] meet[ing] the fund's eligibility requirements").

If the SEC's thesis is right—that an asset is a security if it *could be used* to buy a security, even though it might buy other things as well—then that would turn virtually any asset in the world into a security. Say, for example, that a person agrees to trade a troy pound of gold in exchange for a plot of land bearing orange trees, along with the seller's agreement to tend to the land, sell the oranges borne from the land, and provide the net earnings from the sale of oranges harvested from the plot. *Howey*, 328 U.S. at 299. The *agreement* might be an "investment contract" that falls within the Securities Laws. The gold, as an asset of exchange, is not. *Cf. SEC v. Belmont Reid & Co.*, 794 F.2d 1388, 1391 (9th Cir. 1986) (holding that the sale of gold

---

"legal character imparted to … shares" and whether the shares resemble "instruments designated as securities," including "investment contracts");

coins is "not a security within the meaning of the federal security laws," even though profits may have been delivered based "upon the fluctuations of the gold market").

The SEC alleges here that UST was a security either because it could be used in conjunction with the Anchor Protocol, SEC Am. Compl. ¶¶ 74-83, or it could be used to purchase LUNA, which the SEC claims was a security, *id.* ¶ 84.  But as explained above, an asset and the transaction in which the asset may be used are distinct and must be evaluated separately under the Securities Laws.  Whether (1) deposits made into the Anchor Protocol or (2) LUNA tokens were "securities," as the SEC alleges, has no bearing on whether UST, the asset used to make those deposits or acquire those tokens, was itself a "security."  The SEC is wrong to suggest otherwise.

Whatever their breadth and reach, the Securities Laws do not give the SEC the ability to turn virtually any barterable good (or other type of property) in the world into a security, merely because that good or property is used to buy a security.  This Court should reject the SEC's attempt to expand its jurisdiction under the Securities Laws to reach any asset that crosses paths with a security in a transaction.  As another judge on this Court warned decades ago:

> The expansion of the scope of the securities laws … seems … to be unwarranted and even perhaps detrimental to the common good.  In our mercantile economy, we should not try to turn every 'thing' which might be purchased and sold into a 'security.'  If we did, every commercial contract would end up being enforced in the Federal Courts in what some plaintiffs and their attorneys would turn into class actions.  Clearly this is not what was intended by Congress in passing the Securities laws.

*Mechigian v. Art Cap. Corp.*, 612 F. Supp. 1421, 1428 (S.D.N.Y. 1985).

## **CONCLUSION**

Paradigm respectfully submits that this Court should reject the argument that an asset becomes a "security" merely because it is used to acquire a security. If this Court adopts the SEC's proffered reasoning, that could have devastating consequences for stablecoins and the innovation of digital assets.

Dated: April 21, 2023

Of Counsel:

Rodrigo Seira
PARADIGM OPERATIONS LP
548 Market Street
San Francisco, CA 94104
(415) 986-9283
rodrigo@paradigm.xyz

Andrew Kim
GOODWIN PROCTER LLP
1900 N Street, N.W.
Washington, D.C. 20036
(202) 346-4000
andrewkim@goodwinlaw.com

Respectfully submitted,

/s/ Meghan K. Spillane
Meghan K. Spillane
GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018
(212) 813-8800
mspillane@goodwinlaw.com

*Counsel for Amicus Curiae
Paradigm Operations LP*