**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>     Plaintiff,<br><br>  v.<br><br>TERRAFORM LABS, PTE. LTD. and DO HYEONG KWON,<br><br><br>     Defendants. | Civil Action No. 1:23-cv-01346-JSR<br><br><br>Hon. Jed S. Rakoff |

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ............................................................................................ 1

STATEMENT OF FACTS ................................................................................................... 2

STANDARD OF REVIEW ................................................................................................. 4

ARGUMENT ...................................................................................................................... 5

I.      THE AC SHOULD BE DISMISSED FOR LACK OF PERSONAL
JURISDICTION ...................................................................................................... 5

II.     THE DIGITAL ASSETS AT ISSUE ARE NOT SECURITIES ............................... 7

       A.      The Major Questions Doctrine Forecloses The SEC's Claims ............................ 7

       B.      The Due Process Clause Forecloses the SEC's Claims ....................................... 10

       C.      The APA Forecloses the SEC's Claims ............................................................... 11

       D.      Even If *Howey* Applies to Digital Assets, The Digital Assets At Issue Are
Not Securities ...................................................................................................... 12

III.    THE REGISTRATION COUNTS FAIL EVEN IF ANY DIGITAL ASSETS
WERE SECURITIES ............................................................................................... 20

       A.      The SEC Has Not Plead a Violation of '33 Act Sections 5(a) and (c) ................ 20

       B.      The SEC Has Not Plead a Violation of '33 Act Section 5(e) or '34 Act
Section 6(I) .......................................................................................................... 25

IV.    THE FRAUD COUNTS FAIL EVEN IF ANY DIGITAL ASSETS WERE
SECURITIES ........................................................................................................... 27

       A.      The SEC Has Not Pled a Violation of '33 Act Section 17(a)(2) or (a)(3). ........... 27

       B.      The SEC Has Not Pled a Violation of '34 Act Section 10(b) or '33 Act
Section 17(a)(1). ................................................................................................... 34

       C.      The SEC Has Not Pled a Violation of '34 Act Section 20(a). .............................. 37

CONCLUSION .................................................................................................................... 38

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Absolute Activist Master Value Fund, Ltd. v. Ficeto*,
09 civ. 8862 (GBD), 2013 U.S. Dist. LEXIS 45883 (S.D.N.Y. Mar. 28, 2013) .....................6

*Alibaba Grp. Holding Ltd. v. Alibabacoin Found.*,
No. 18-CV-2897 (JPO), 2018 WL 2022626 (S.D.N.Y. Apr. 30, 2018) ..................................7

*In re Alstom SA Sec. Litig.*,
406 F.Supp.2d 433 (S.D.N.Y.2005)......................................................................................37

*In re Aluminum Warehousing Antitrust Litig.*,
No. 13-md-2481 (KBF), 2015 WL 6472656 (S.D.N.Y. Oct. 23, 2015)..............................4, 5

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009).................................................................................................5, 29, 33

*Axon Enterprise, Inc. v. FTC*,
No. 21-86, Slip Op. (Gorsuch, J. concurring in the judgment) (U.S. Apr. 14,
2023) .....................................................................................................................................17

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007).................................................................................................5, 29, 33

*Berdeaux v. OneCoin Ltd.*,
561 F. Supp. 3d 379 (S.D.N.Y. 2021).....................................................................................6

*Bittner v. U.S.*,
143 S. Ct. 713 (2023)..........................................................................................................10, 11

*Burger King Corp. v. Rudzewicz*,
471 U.S. 462 (1985).................................................................................................................5

*CFTC v. Rashawn Russell*,
Civil Action No. 23-cv-2691 (filed Apr. 11, 2023), ECF No. 1 ..............................................9

*CFTC v. Wilson*,
No. 13 CIV. 7884 (RJS), 2018 WL 6322024 (S.D.N.Y. Nov. 30, 2018)..............................25

*Charles Schwab Corp. v. Bank of Am. Corp.*,
883 F.3d 68 (2d Cir. 2018)......................................................................................................6

*Chiarella v. United States*,
445 U.S. 222 (1980)...............................................................................................................31

*Christopher v. SmithKline Beecham Corp.*,
  567 U.S. 142 (2012)................................................................................10

*Cmty. Television of S. Cal. v. Gottfried*,
  459 U.S. 498 (1983)................................................................................11

*Debruin v. Andromeda Broad. Sys., Inc.*,
  465 F. Supp. 1276 (D. Nev. 1979)........................................................23

*FCC v. Fox Television Stations, Inc.*,
  567 U.S. 239 (2012)................................................................................10

*Gen. Elec. Co. v. EPA*,
  53 F.3d 1324 (D.C. Cir. 1995)..............................................................10

*George v. McDonough*,
  142 S. Ct. 1953 (2022)...........................................................................13

*In re J.P. Jeanneret Assocs., Inc.*,
  769 F. Supp. 2d 340 (S.D.N.Y. 2011)...................................................15

*Jazini v. Nissan Motor Co.*,
  148 F.3d 181 (2d Cir. 1998)....................................................................5

*Jones v. Tyson*,
  No. 00 Civ. 7382 (CM), 2001 WL 401438 (S.D.N.Y. 2001) ..................5

*Keady v. J.P. Morgan Chase & Co.*,
  No. 07 CIV 9896JSR, 2008 WL 638444 (S.D.N.Y. Mar. 3, 2008) (Rakoff, J.),
  *aff'd*, 328 F. App'x 23 (2d Cir. 2009)....................................................2

*Landsgraf v. USI Film Prods.*,
  511 U.S. 244 (1994)................................................................................27

*Marini v. Adamo*,
  812 F. Supp. 2d 243 (E.D.N.Y. 2011) ..................................................15

*McBoyle v. United States*,
  283 U.S. 25 (1931)..................................................................................11

*In re MF Glob. Holdings Ltd. Sec. Litig.*,
  982 F. Supp. 2d 277 (S.D.N.Y. 2013)...................................................37

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983)..................................................................................11

*NLRB v. Bell Aerospace Co. Div. of Textron*,
  416 U.S. 267 (1974)................................................................................12

*Noa v. Key Futures, Inc.*,
  638 F.2d 77 (9th Cir. 1980) ............................................................................18

*Patel v. INS*,
  638 F.2d 1199 (9th Cir. 1980) ........................................................................12

*Pehlivanian v. China Gerui Advanced Materials Grp., Ltd.*,
  153 F. Supp. 3d 628 (S.D.N.Y. 2015)............................................................31

*Pfaff v. U.S. Dep't of Hous. & Urban Dev.*,
  88 F.3d 739 (9th Cir. 1996) .....................................................................11, 12

*Prime Mover Capital Partners L.P. v. Elixir Gaming Techs., Inc.*,
  761 F. Supp. 2d 103 (S.D.N.Y. 2011)..............................................................6

*In re Refco Capital Mkts., Ltd. Brokerage Customer Sec. Litig.*,
  586 F. Supp. 2d 172 (S.D.N.Y. 2008)............................................................36

*Revak v. SEC Realty Corp.*,
  18 F.3d 81 (2d Cir. 1994).........................................................................12, 15

*Reves v. Ernst & Young*,
  949 U.S. 56 (1990)...........................................................................................7

*Rice v. Branigar Org., Inc.*,
  922 F.2d 788 (11th Cir. 1991) .................................................................15, 16

*Robinson v. Overseas Military Sales Corp.*,
  21 F.3d 502 (2d Cir. 1994)..............................................................................5

*Royalty Network v. Dishant.com*,
  638 F.Supp.2d 410 (S.D.N.Y. 2009)................................................................7

*SEC v. Belmont Reid & Co.*,
  794 F.2d 1388 (9th Cir. 1986) .................................................................17, 18

*SEC v. City of Victorville*,
  No. EDCV1300776JAKDTBX, 2013 WL 12133651 (C.D. Cal. Nov. 14,
  2013) ..............................................................................................................36

*SEC v. DiMaria*,
  207 F. Supp. 3d 343 (S.D.N.Y. 2016)............................................................34

*SEC v. Espuelas*,
  698 F. Supp. 2d 415 (S.D.N.Y. 2010)............................................................34

*SEC v. Ginder*,
  752 F.3d 569 (2d Cir. 2014)............................................................................34

*SEC v. Life Partners, Inc.*,
  87 F.3d 536 (D.C. Cir. 1996) ...........................................................16, 17, 18, 19

*SEC v. Lyon*,
  529 F. Supp. 2d 444 (S.D.N.Y. 2008)...............................................................20, 34

*SEC v. One or More Unknown Traders in Sec. of Onyx Pharms., Inc.*,
  296 F.R.D. 241 (S.D.N.Y. 2013) ......................................................................35

*SEC v. Ralston Purina Co.*,
  346 U.S. 119 (1953).........................................................................................24

*SEC v. Rio Tinto, plc*
  41 F.4th 47, 53 (2d Cir. 2022) ........................................................................34

*SEC v. Sason*,
  433 F. Supp. 3d 496 (S.D.N.Y. 2020)...........................................................37, 38

*SEC v. Syron*,
  934 F. Supp. 2d 609 (S.D.N.Y. 2013)..............................................................33

*SEC v. Telegram Grp. Inc.*,
  No. 19-CV-9439 (PKC), 2020 WL 1547383 (S.D.N.Y. Apr. 1, 2020) ...................13

*SEC v. Thompson*,
  238 F. Supp. 3d 575 (S.D.N.Y. 2017)..............................................................35

*SEC v. W.J. Howey, Co.*,
  328 U.S. 293 (1946)................................................................................. *passim*

*SEC v. Wahi*,
  No. 2:22-cv-01009-TL (W.D. Wa.) ....................................................................6

*SEC v. Wey*,
  246 F. Supp. 3d 894 (S.D.N.Y. 2017)..............................................................33

*SNR Wireless LicenseCo, LLC v. FCC*,
  868 F.3d 1021 (D.C. Cir. 2017) ......................................................................10

*Spy OSUS Ltd. v. UBS AG*,
  114 F. Supp. 3d 161 (S.D.N.Y. 2015) (Rakoff, J.) ...............................................5

*State v. Heath*,
  153 S.E. 855 (N.C. 1930)................................................................................13

*Troma Entm't Inc. v. Centennial Pictures Inc.*,
  729 F.3d 215 (2d Cir. 2013)..............................................................................5

*Underwood v. Coinbase Glob., Inc.*,
   No. 21 CIV. 8353 (PAE), 2023 WL 1431965 (S.D.N.Y. Feb. 1, 2023)................................26

*United Housing Foundation, Inc. v. Forman*,
   421 U.S. 837 (1975)........................................................................................15, 18

*Util. Air Regul. Grp. v. E.P.A.*,
   573 U.S. 302 (2014)........................................................................................7

*W. Virginia v. Env't Prot. Agency*,
   142 S. Ct. 2587 (2022).....................................................................................7

*Whitman v. Am. Trucking Ass'n*,
   531 U.S. 457 (2001).........................................................................................9

*Wiwa v. Royal Dutch Petroleum Co.*,
   226 F.3d 88 (2d Cir. 2000)...............................................................................6

**United States Constitution**

U.S. Const. Amend. V ....................................................................................1, 10, 11

**Statutes**

Securities Act of 1933
   Section 2.....................................................................................7, 13, 14, 23
   Section 4(a) ...............................................................................21, 23, 24
   Section 5.................................................................................... *passim*
   Section 17(a) ............................................................................27, 33, 34, 35

Securities Act of 1934
   Section 3....................................................................................8, 13, 14, 16
   Section 6(l)..................................................................................25
   Section 10(b)..............................................................................34, 35, 37
   Section 20(a) .............................................................................37
   Section 39....................................................................................9
   Section 23...................................................................................12

**Rules and Regulations**

Federal Rules of Civil Procedure
   Rule 8(a).....................................................................................20
   Rule 12(b)(6)...............................................................................5

SEC Regulations
   Regulation D................................................................................21, 24
   Regulation S................................................................................21, 22, 24
   Rule 10b-5..................................................................................35

Rule 144 ...................................................................................................................21

Rule 144A ...............................................................................................................21

**Other Authorities**

Lewis R. Cohen, Gregory Strong, Freeman Lewin, and Sarah Chen, *The Ineluctable Modality of Securities Law: Why Fungible Crypto Assets Are Not Securities* (Nov. 10, 2022), https://ssrn.com/abstract=4282385 ..............................................14

Satoshi Nakamoto, *Bitcoin: A Peer-to-Peer Electronic Cash System* (2008) https://bitcoin.org/bitcoin.pdf ........................................................................................8

SEC, *In re Plutus Financial Inc.*, Securities Act Release No. 33-10801 (July 13, 2020) .......................................................................................................................25, 26

SEC, Supplemental Information and Reopening of Comment Period for Amendments to Exchange Act Rule 3b-16 Regarding the Definition of "Exchange," Release No. 34-97309 (Apr. 14, 2023).............................................10

Terra Docs, *Fees on Terra*, https://docs.terra.money/learn/fees ...........................................................................28

*Virtual Currencies: The Oversight Role of the U.S. Securities and Exchange Commission and the U.S. Commodity Futures Trading Commission*, S. Comm. on Banking, Hous., and Urb. Affs. (Feb. 6, 2018), https://www.banking.senate.gov/hearings/virtual-currencies-the-oversight-role-of-the-us-securities-and-exchange-commission-and-the-us-commodity-futures-trading-commission ..........................................................................................9

*What is batch credit card processing?*, NCR (Apr. 12, 2021), https://www.ncr.com/blogs/payments/batch-credit-card-processing......................................30

## GLOSSARY

| '33 Act | Securities Act of 1933 |
|---|---|
| '34 Act | Securities Exchange Act of 1934 |
| AC | Amended Complaint (ECF No. 24) |
| APA | Administrative Procedure Act |
| BTC | Bitcoin |
| Defendants | Terraform Labs Pte. Ltd. and Kwon Do Hyeong |
| ETH | Ether |
| Ex. __. | Exhibit __ to the Declaration of Douglas W. Henkin dated April 21, 2023 |
| ICO | Initial Coin Offering |
| KrT | TerraKR (stablecoin pegged to KrW) |
| KrW | Korean Won |
| LFG | Luna Foundation Guard |
| Mirror | Mirror Protocol |
| QIB | Qualified Institutional Buyer |
| SEC | Securities and Exchange Commission |
| TFL | Terraform Labs Pte. Ltd. |
| UST | TerraUSD (stablecoin pegged to U.S. dollar) |
| wLUNA | Wrapped LUNA |

Defendants respectfully submit this memorandum of law in support of their Motion to Dismiss the AC.

## PRELIMINARY STATEMENT

TFL created UST, a stablecoin designed to maintain a price equal to one dollar, and LUNA, a companion digital asset, to support a new decentralized financial system on the Terra blockchain.  UST is a currency—not a security—and TFL and other members of the Terra community developed decentralized applications providing additional use cases for UST and LUNA, including the Mirror Protocol and the Anchor Protocol.  The AC asserts violations of the registration and antifraud provisions of the federal securities laws with respect to UST, LUNA, wLUNA, mAssets, and MIR tokens.  According to the AC's own allegations, as well as the materials incorporated by reference, those claims fail.

*First*, the SEC has failed to plead facts sufficient to support personal jurisdiction over Defendants.  The alleged "U.S. sales" were private sales to institutional purchasers made by a non-U.S. entity not named as a defendant.  Every product or protocol the SEC complains about was available to the world and not directed at U.S. persons.

*Second*, the major questions doctrine, the Due Process clause, and the APA prohibit the SEC from using federal securities law to assert jurisdiction over the digital assets in this case.  Moreover, the digital assets at issue are not "securities" under the test articulated in *SEC v. W.J. Howey, Co.*, 328 U.S. 293 (1946).

*Third*, TFL conducted no public offerings requiring SEC registration.  The AC does not allege that Defendants solicited any sales of digital assets to the general public anywhere.  The challenged LUNA and MIR token sales were exempt from registration under multiple exemptions.  And Defendants had no involvement in the programmatic minting of mAssets by the Mirror Protocol nor did they solicit transactions on the protocol by U.S.-based persons.

*Fourth*, the SEC fails to plead material misrepresentations or omissions.  The SEC concludes without sufficient factual allegations, that statements that Chai, a Korean mobile payment service, used KrT stablecoins were false.  The SEC also claims that after UST depegged in May 2021, Defendants failed to disclose the supposed "real reason" UST repegged.  The SEC

1

does not allege sufficient facts to support either claim.

The Court should dismiss the AC in its entirety with prejudice.

## STATEMENT OF FACTS

TFL Is Founded:  TFL is a Singaporean open-source software development firm.  AC ¶ 15.  Mr. Kwon served as TFL's CEO and lived outside the U.S. at all relevant times.  AC ¶ 16. TFL was founded to address the fact that the price volatility of cryptocurrencies like BTC interfered with the ability to use them as a medium of exchange.[1]  Beginning in 2018, TFL developed a novel approach to this problem by creating the Terra protocol, a decentralized and open-source application for algorithmic stablecoins, and the Terra blockchain on which the protocol would operate.  Terra stablecoins targeted a 1:1 exchange rate to fiat currencies through smart contracts operating on the blockchain, with the open-source code for those contracts adjusting money supply in response to changes in demand.  TFL did not operate a market (like FTX) or have customers or customer funds (like FTX, Celsius, or Voyager).

UST Launches:  In September 2020, TFL announced the launch of UST.  AC ¶ 35.  UST served as a store of value and could be used as payment for goods and services.  As explained in the April 2019 white paper, the Terra protocol would stabilize UST and other Terra stablecoin prices through an "elastic money supply."  Ex. A.  If the market price of UST fell below $1, then decreasing the supply of UST should move its price back up towards $1.  *Id.* at 4.  Conversely, if the market price of UST rose above $1, increasing the supply of UST should move its price back down towards $1.  *Id.*  Thus "[t]he protocol adjusts the supply of [UST] in response to changes in demand to keep its price stable," *Id.* at 13, and uses the price and supply of LUNA to do so.

The supplies of UST and LUNA are adjusted through transactions between users and Terra protocol smart contracts using a mint-burn mechanism.  *Id.* at 4.  When UST falls below $1, UST holders can burn UST and receive $1 of minted LUNA, and when UST is above $1, LUNA holders can mint UST by burning $1 worth of LUNA.  *Id.* at 5-6.  The opportunity to

---

[1] *See* Ex. A at 1.  Documents relied on in the AC may be considered on this motion.  *See Keady v. J.P. Morgan Chase & Co.*, No. 07 CIV 9896JSR, 2008 WL 638444, at *2 (S.D.N.Y. Mar. 3, 2008) (Rakoff, J.), *aff'd*, 328 F. App'x 23 (2d Cir. 2009).

arbitrage between the price of UST and $1 incentivizes users to interact with the protocol to decrease and increase the supplies of UST and LUNA to normalize the price of UST relative to $1. *Id.* All these interactions are between users and the Terra protocol, not users and TFL.

LUNA tokens, in addition to serving as a stabilizer of UST, were the staking and governance token of the Terra blockchain. Terra is a proof-of-stake blockchain: transactions are recorded and verified on the blockchain by consensus of validators. To process transactions on the blockchain, validators are required to stake LUNA tokens. Validators, and those who delegate their LUNA to validators to be staked, earn rewards from staking. LUNA stakers can also vote their tokens on governance proposals for the network. Additional uses for the tokens were later developed in connection with the Mirror and Anchor Protocols.

The SEC does not allege that TFL earned fees or commissions from user activity on the Terra protocol. Although UST, LUNA, and MIR were later traded on global markets, TFL did not operate a market for such trading or earn any remuneration from third party trading.

Mirror Launches: In December 2020, TFL announced the launch of Mirror. Mirror allowed users to choose any real-world asset with a live price feed and create a digital asset that mirrored its price movements. AC ¶ 37; Ex. OO at C.3.1. Users created mirrored assets, or "mAssets," referencing a range of financial assets, including U.S. equities, indices, and cryptocurrencies. mAssets could be traded in peer-to-peer transactions and on trading platforms.

The Mirror community decided which mAssets to create through governance proposals. Users who staked MIR tokens (Mirror's governance token) could make and vote on proposals. The protocol granted MIR tokens to users for activities such as providing liquidity for mAsset trading and voting on governance proposals. Users minted mAssets by depositing collateral with the protocol, which locked the collateral and delivered the mAsset to the user. The SEC does not allege that TFL earned fees or commissions from Mirror Protocol user activity or that TFL maintained custody or control over digital assets deposited in the protocol.

Anchor Launches: In March 2021, TFL announced the launch of the Anchor Protocol. AC ¶ 35. The protocol accepted deposits from staking users in the form of UST stablecoins, and lent out UST deposits to users who wished to borrow UST, with those borrowers pledging digital

assets as collateral for the loans.  Ex. B at 1.  The yield earned by the protocol from its programmatic use of that collateral was paid to the staking users as "interest."  *Id.* at 1, 4; AC ¶ 35.  The SEC does not allege that TFL earned fees or commissions from Anchor Protocol user activity or maintained custody or control over digital assets staked in the Anchor Protocol.

<u>May 2021 Depeg</u>:  In May of 2021, the market price of UST had declined from its peg, but then recovered.  Almost immediately following the May 2021 depeg, there was public discussion of the risk of UST losing its price peg as a result of market activity and public calls for external support of the UST price peg.  *See* Ex. P.

On January 19, 2022, a non-profit organization called LFG announced its formation to help address the publicly-discussed risk that UST might lose its peg again and require additional support to prevent its collapse.  AC ¶ 41; Ex. C at 1.  LFG built reserve fund of several billion dollars to purchase UST and support the peg "where protracted market sell-offs deter buyers from restoring the UST peg's parity and deteriorate the Terra protocol's open market arbitrage incentives."  Ex. D at 1.

<u>May 2022 Depeg</u>:  In May 2022, the publicly-known risk of another depeg materialized.  UST experienced a market event and lost its peg.  While this was happening, and as it had promised to do, LFG expended roughly $2.8 billion to defend the UST peg.  *See* Ex. E.  TFL also spent hundreds of millions of its own dollars trying to defend the peg.  *See* Ex. F.

<u>SEC Files Suit</u>:  In May 2021, the SEC issued a formal order of investigation commencing an investigation into potential securities registration issues relating to Mirror.  *See* Ex. G.  Without obtaining an order expanding the scope of its Mirror investigation, the SEC began investigating the Anchor protocol, UST, LUNA tokens, and other matters.  The SEC questioned Mr. Kwon for more than 15 hours and collected hundreds of thousands of documents and communications from more than 60 parties.  On February 16, 2023, the SEC filed this action without having provided TFL or Mr. Kwon a Wells notice.

## **STANDARD OF REVIEW**

In assessing personal jurisdiction, the Court may "look beyond the pleadings to affidavits and supporting materials submitted by the parties."  *In re Aluminum Warehousing Antitrust*

4

*Litig.*, No. 13-md-2481 (KBF), 2015 WL 6472656, at *2 (S.D.N.Y. Oct. 23, 2015).  To survive under Rule 12(b)(6), the AC must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  "A claim has facial plausibility" only "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The Court need not "draw argumentative inferences in the plaintiff's favor," *Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502, 507 (2d Cir. 1994), or accept as true "a legal conclusion couched as a factual allegation," *Jazini v. Nissan Motor Co.*, 148 F.3d 181, 185 (2d Cir. 1998).

## ARGUMENT

## I.      THE AC SHOULD BE DISMISSED FOR LACK OF PERSONAL JURISDICTION

The SEC bears the burden of establishing that Defendants have the necessary contacts with the U.S. to support the exercise of specific jurisdiction.  *See Troma Entm't Inc. v. Centennial Pictures Inc.*, 729 F.3d 215, 217 (2d Cir. 2013).[2]  A defendant cannot be subject to specific jurisdiction unless the litigation results from alleged injuries that "arise out of or relate to" activities the defendant purposefully *directed* at the U.S.  *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985); *Spy OSUS Ltd. v. UBS AG*, 114 F. Supp. 3d 161, 169 (S.D.N.Y. 2015) (Rakoff, J.).[3]  The AC's allegations fail to meet this requirement:

- The alleged token sales to U.S.-based firms do not show purposeful availment by TFL or Mr. Kwon.  The counterparty on those sales (AC ¶ 18) was not TFL, but a BVI entity that is not a defendant, as the SEC acknowledges.  *See* AC ¶ 152.

- The SEC fails to distinguish among the individuals it alleges traveled to the U.S., broadly alleging that "Kwon and other Terraform employees" attended meetings to make sales and "to speak at an industry conference and events."  AC ¶ 43.  The SEC does not plead how many such events there supposedly were, which ones Mr. Kwon attended, or which events related to the sale of which digital assets at issue (if any).  Infrequent trips unrelated to the alleged violations cannot establish jurisdiction, *Jones v. Tyson*, No. 00 Civ. 7382 (CM)(MDF), 2001 WL 401438, at

---

[2] Because SEC does not suggest that Defendants are subject to general jurisdiction, this memorandum does not address general jurisdiction.

[3] Unless otherwise indicated, internal citations and quotation marks are omitted.

*2 -3 (S.D.N.Y. 2001), and trips allegedly related to an asserted violation regarding one asset cannot support jurisdiction with respect to a different asset, *Berdeaux v. OneCoin Ltd.*, 561 F. Supp. 3d 379, 396 (S.D.N.Y. 2021).

- The SEC does not allege that either Defendant made any materially false or misleading statements to any actual or prospective purchaser of digital assets while in the U.S.  *See, e.g., Absolute Activist Master Value Fund, Ltd. v. Ficeto*, 09 civ. 8862 (GBD), 2013 U.S. Dist. LEXIS 45883, *36 (S.D.N.Y. Mar. 28, 2013) ("These trips did not '[give] rise to the episode-in suit' because neither [defendant] made any fraudulent statement to the [plaintiffs] on these trips … .").

- Allegations that "several" of the assets at issue were listed on "major crypto asset trading platforms, including a prominent U.S.-based trading platform" (AC ¶ 43) cannot support personal jurisdiction.  Even with respect to equity securities, courts have consistently held that activities related to listing on a stock exchange cannot, without more, support personal jurisdiction.  *See, e.g., Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 97 (2d Cir. 2000).  The SEC concedes that all but one of the platforms discussed in the AC were not U.S. entities.  *See* AC ¶ 43. As for the one platform the SEC describes as "U.S.-based," it is Coinbase, which operates a *global* trading platform.[4]

For these reasons, the SEC's allegations do not establish specific jurisdiction.[5]

It is not sufficient, as the SEC alleges, that conduct abroad by a defendant had a "foreseeable substantial effect" in the United States (AC ¶ 19), because a defendant must have "expressly aimed" its conduct at the U.S.  *See Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 87 (2d Cir. 2018).  The SEC's allegations all concern conduct aimed at the world, not

---

[4] As Coinbase has explained, it does "Does Not List Securities, Period."  *See SEC v. Wahi*, No. 2:22-cv-01009-TL (W.D. Wa.), Brief of Amicus Curiae Coinbase, Inc. in Support of Defendants Ishan Wahi and Nikhil Wahi's Motion to Dismiss at 12 (ECF No. 78-2).  Moreover, an agreement to *allow* one token (MIR) to be listed on a global trading platform is not purposeful availment.  And the agreement the SEC relies on is not remotely similar to the sort of agreement that governs equity securities being listed on a U.S. securities exchange.  *Compare* Ex. V *with* Ex. T.  The former is a consent for tokens to be listed on Coinbase's platform, whereas the latter is a request for statutorily enumerated securities to be listed on a registered securities exchange. If the latter is not purposeful availment (*Wiwa*, 226 F.3d at 97), then neither is the former.

[5] The SEC's claims do not arise out of an agreement to have the word "Terra" placed on seats at a baseball stadium (AC ¶ 43).  The alleged token sales and misrepresentations occurred *prior to* the agreement's announcement in February 2022, and thus the agreement does not support specific jurisdiction.  *See Prime Mover Capital Partners L.P. v. Elixir Gaming Techs., Inc*., 761 F. Supp. 2d 103, 106-07 (S.D.N.Y. 2011).

conduct expressly aimed at the United States.[6]  Not even the alleged loans of LUNA to what the SEC calls the "U.S. Trading Firm" suffice, not least because the loans themselves have no U.S. nexus—*both* parties were outside the U.S.  *See* Ex. H.

Because it cannot allege a public token sale through an ICO, the SEC alleges that these loans were "in essence, public distributions of LUNA" (AC ¶ 110), but that allegation fails because it is not supported by the loan agreements, the SEC does not allege that TFL directed the firm to resell LUNA into U.S. markets, and when the loans were entered into LUNA was not listed on U.S. platforms.  *See* AC ¶¶ 108–109.  The SEC has failed to plead specific jurisdiction.

## II.    THE DIGITAL ASSETS AT ISSUE ARE NOT SECURITIES

### A.    The Major Questions Doctrine Forecloses The SEC's Claims

Congress has not granted the SEC the power to regulate the digital assets at issue here. "Agencies have only those powers given to them by Congress, and enabling legislation is generally not an open book to which the agency [may] add pages and change the plot line."  *W. Virginia v. Env't Prot. Agency*, 142 S. Ct. 2587, 2609 (2022).  When an agency "claims to discover in a long-extant statute an unheralded power to regulate a significant portion of the American economy," it must come bearing "clear congressional authorization."  *Util. Air Regul. Grp. v. E.P.A.*, 573 U.S. 302, 324 (2014); *see also W. Virginia*, 142 S. Ct. at 2607–09.  The "major questions doctrine" reins in "agencies asserting highly consequential power beyond what Congress could reasonably be understood to have granted."  *Id.* at 2609.

Whether something is a security is determined by the text of the '33 and '34 Acts.  Both define "security" by enumerating lists of instruments such as "stocks" and "bonds," and those lists are functionally equivalent.  *See* 15 U.S.C. § 77b *et seq.*; *Reves v. Ernst & Young*, 949 U.S. 56, 61 n.1 (1990).  But neither contains any phrase remotely like "digital asset," which is not a surprise given that the first general purpose digital computer was not built until over a decade

---

[6] *Compare* AC ¶ 114 (alleging that the "website for the Mirror Protocol … could be accessed in the U.S.") *with Alibaba Grp. Holding Ltd. v. Alibabacoin Found.*, No. 18-CV-2897 (JPO), 2018 WL 2022626, at *4 (S.D.N.Y. Apr. 30, 2018) *and Royalty Network v. Dishant.com*, 638 F. Supp. 2d 410, 418 (S.D.N.Y. 2009).

later.  *See* Ex. U.  Lacking relevant statutory text or a rule, the SEC relies on the catch-all term "investment contract," which appears in both statutes but is defined in neither, and takes the position that whether a digital asset is a "security" should be decided using the interpretation of "investment contract" set forth in *Howey* in 1946, decades before the Internet and technology underpinning cryptocurrencies could have been contemplated by the SEC or the courts.[7]

The cryptocurrency industry is a large and innovative part of the global and American economies,[8] and there is no evidence that the 1930s statutory structure contemplated it.  SEC commissioners disagree about *how* to regulate cryptocurrencies, executive agencies disagree *who* should regulate *which* cryptocurrencies, and Congress has not decided what to do about any of it:

- Not all members of Congress believe the '33 and '34 Acts gave the SEC authority to regulate digital assets.  *See Hearing: Oversight of the Securities and Exchange Commission*, U.S. House Financial Services Committee (Apr. 18, 2023) at 5:43:20-5:44:18, https://financialservices.house.gov/calendar/eventsingle.aspx?EventID=408690 ("Congress has never given you a framework for regulating digital assets."); Ex. HH.

- The current SEC chairman has taken inconsistent positions regarding whether the SEC needs additional Congressional authority to regulate digital assets.  *Compare* Ex. W (asserting the need for additional legislation) *with* Ex. GG at 4–5 (opposite).

- SEC Commissioner Peirce stated that the *Howey* test may not apply to any secondary transactions at all.  Ex. X.  She noted that the statutory definition of "exchange" is based on the concept of a "stock exchange as that term *is* generally understood," 15 U.S.C. § 78c(a)(1) (emphasis added), meaning when the '34 Act was enacted, whereas the SEC's new definition "seems to extend to systems well beyond anything generally understood to be an exchange, an impression heightened by the Commission's refusal … to provide any clarity around what the outer bounds of the amended definition might be."  Ex. Y at n.12.

---

[7] The first cryptocurrency was defined in 2008.  *See* Satoshi Nakamoto, *Bitcoin: A Peer-to-Peer Electronic Cash System* (2008) (https://bitcoin.org/bitcoin.pdf).  It took more than 60 years after the first general purpose digital computer was developed because cryptocurrencies depend on developments in both computer technology and mathematics (with respect to the latter, cryptocurrencies use public key cryptography, which was invented in 1976, *see id.* at 2, 7, 9).

[8] Michelle Neal, Advances in Digital Currency Experimentation, Fed. Res. Bank N.Y. (Nov. 4, 2022), https://tinyurl.com/d4bfkeb4; Cristina Polizu et al., *A Deep Dive Into Crypto Valuation*, S&P Global (Nov. 10, 2022), https://tinyurl.com/yc6h9k79 ("As of August 2022, $1.1 trillion); COINMARKETCAP, https://tinyurl.com/bdkc6dta  (last visited Feb. 3, 2023).

- The CFTC Chairman has changed his mind about whether cryptocurrencies are securities, and currently asserts that stablecoins (like UST) are not. *See* Ex. Z; *see also CFTC v. Rashawn Russell*, Civil Action No. 23-cv-2691 (filed Apr. 11, 2023), ECF No. 1 ¶ 62 (alleging that certain stablecoins are commodities).

- A presidential working group recommended that stablecoins be regulated by federal bank regulators and the Federal Reserve. *See* Ex. AA.

- Congress has at least 7 committees and subcommittees evaluating how and by whom cryptocurrencies should be regulated without stifling innovation. *See, e.g.,* Exs. BB & CC. There are pending legislative proposals that would make cryptocurrencies expressly <u>not</u> subject to federal securities laws. *See* Ex. DD. The SEC's Investor Advisory Committee recently "encourage[d]" the SEC to oppose such legislative proposals, *see* Ex. EE, an odd position for a statutory committee (15 U.S.C. § 78pp) to take if the agency thinks its authority is "clear."

Some of the SEC's arguments here are the inverse of prior public statements. In 2019 Chairman Clayton stated that "the analysis of whether a digital asset is offered or sold as a security is not static and does not strictly inhere to the instrument" and "[a] digital asset may be offered and sold initially as a security ... but that designation may change over time … ." Ex. FF. Here the SEC asserts the opposite—that the launch of the Anchor Protocol seven months after UST became available made UST a security (*see infra* at 14). But the SEC has never asserted that stocks or bonds—enumerated in the statutory definition—can ever not be securities. Just as Congress "does not hide elephants in mouseholes," *Whitman v. Am. Trucking Ass'n*, 531 U.S. 457, 468 (2001), it does not hide boundless executive agency powers in hoary statutes.

The application of the major questions doctrine to prohibit the SEC's attempt to regulate digital assets with 1930s statutes is even clearer here, where (a) the executive agencies disagree about what should be considered a "security," (b) the leaders of the executive agencies have frequently changed their stances about that issue, (c) the executive branch overall has conflicting ideas about which agency should regulate which assets, and (d) Congress, which has been considering the issue for years,[9] has not acted. The SEC's improper assertion of power here by trying to shoehorn all cryptocurrencies into its definition of a "security" fails.

---

[9] *E.g., Virtual Currencies: The Oversight Role of the U.S. Securities and Exchange Commission and the U.S. Commodity Futures Trading Commission*, S. Comm. on Banking, Hous., and Urb. Affs. (Feb. 6, 2018), https://www.banking.senate.gov/hearings/virtual-currencies-the-oversight-

**B.      The Due Process Clause Forecloses the SEC's Claims**

The Due Process Clause prevents the SEC from bringing this enforcement action because it has not provided Defendants with fair notice of its retroactive application of the interpretation of securities laws it now asserts in this case. Because "clarity in regulation is essential to the protections provided by the Due Process Clause," an agency cannot punish a regulated party if the agency "fails to provide a person of ordinary intelligence fair notice of what is prohibited." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253-54 (2012).

Fair notice is particularly implicated when an agency announces and enforces a new policy in an enforcement proceeding where it seeks to apply that view retroactively. *See Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 158–59 (2012). In *Bittner v. U.S.,* 143 S. Ct. 713 (2023), the IRS took a litigation position inconsistent with prior proposed rulemakings, instructions issued with the forms for the type of reporting at issue in that case, and related "Fact Sheets." *Id*. at 721-22. As Justice Gorsuch explained in rejecting the IRS's position, the agency's prior "warnings, fact sheets, and instructions" expressed one view of the relevant law, whereas the IRS sought to penalize Bittner based on an inconsistent theory it had never before announced and thus violated Bittner's due process rights. *See id*. at 722.[10]

*Bittner* presents similar problems for the SEC: The SEC has never previously taken the position that all cryptocurrencies other than BTC are securities, nor has it promulgated any regulations that do so. To the contrary, it suggested, including in written guidance similar to *Bittner*, that cryptocurrencies were *not* all securities, a position it reiterated as recently as *April 14, 2023* in revising a proposed rule amendment and calling for additional comments.[11] And

---

role-of-the-us-securities-and-exchange-commission-and-the-us-commodity-futures-trading-commission.

[10] The SEC's "considerable difficulty" in interpreting its organic statute over many years, and the "considerable uncertainty" that has resulted from that, "heighten[s]" the fair-notice problem here. *See Gen. Elec. Co. v. EPA*, 53 F.3d 1324, 1332 (D.C. Cir. 1995); *SNR Wireless LicenseCo, LLC v. FCC*, 868 F.3d 1021, 1044 (D.C. Cir. 2017).

[11] *See* Supplemental Information and Reopening of Comment Period for Amendments to Exchange Act Rule 3b-16 Regarding the Definition of "Exchange," Release No. 34-97309 at 10 n.26 (Apr. 14, 2023).

other agencies have publicly expressed the view that not all cryptocurrencies are securities.  *See supra* at 9.  This case thus presents the same fair notice problems as *Bittner*.

The SEC also argues that UST is a security because it could be used to buy LUNA.  But the SEC has not previously asserted that something is a security merely because it can be used to buy something else the SEC calls a security.  Putting aside that this position would enable the SEC to assert that nearly anything that could be traded for a "security" should be under its jurisdiction, this position poses the same "fair notice" problem Justices Gorsuch and Jackson discussed in *Bittner*:  Nowhere do the securities laws give a hint of such an interpretation, no regulations address the issue, and the SEC's prior "guidance" does not suggest so broad a view.  Due Process bars the SEC's attempt to use this enforcement action to apply retroactively this definition of "security."  *See* 143 S. Ct. at 725; *McBoyle v. United States*, 283 U.S. 25, 27 (1931).  Because the SEC has failed to provide fair notice to the Defendants, the Due Process clause requires that the AC be dismissed.

### C.      The APA Forecloses the SEC's Claims

Notice-and-comment rulemaking "give[s] notice of proposed changes before they occur," *Pfaff v. U.S. Dep't of Hous. & Urban Dev.*, 88 F.3d 739, 748 n.4 (9th Cir. 1996), and is the "better, fairer, and more effective method of implementing" a "new industry-wide policy" for cryptocurrencies, *Cmty. Television of S. Cal. v. Gottfried*, 459 U.S. 498, 511 (1983).  Rulemaking allows for input from a wide range of stakeholders and judicial review of proposed rules before they go into effect, facilitates transparent and orderly policy development, and results in clear rules and fair notice to all market participants.  *See Pfaff*, 88 F.3d at 748 n.4.  An agency must consider all important aspects of a purported problem before asserting jurisdiction over an entire industry, *see Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), which can only be done properly through notice-and-comment rulemaking.  *Cf.* Ex. Y ("I wish we had proceeded differently.  Given … our still limited understanding of the area we are regulating (which the release repeatedly acknowledges), we should have gone back to square one and issued a concept release instead.").

An agency's reliance on adjudication can be an abuse of discretion under the APA.  *See NLRB v. Bell Aerospace Co. Div. of Textron*, 416 U.S. 267, 294 (1974).  When an agency purporting to interpret a statute tries to take a "great lea[p] forward," "prospectively pronounce[] a broad, generally applicable requirement," and none of the traditional justifications for adjudication apply, it is an abuse of discretion to use adjudication instead of rulemaking.  *See Patel v. INS*, 638 F.2d 1199, 1204 (9th Cir. 1980).  This is particularly so when the new standard proposed via adjudication departs from the agency's previous interpretation of the law, where the public has relied substantially and in good faith on the previous interpretation and practice, where fines or damages are involved, and where the new standard is very broad and general in scope and prospective in application.  *See Pfaff*, 88 F.3d at 748.  That is this case.

As demonstrated more fully below, *see infra* at 14–20, the effect of the definitions of "security" that the SEC seeks to pursue here make clear that the SEC is trying to achieve rulemaking without going through the APA notice-and-comment process.  Many commenters, *including SEC Commissioners*, have expressed the view that the SEC has not provided sufficient guidance regarding how it determines what digital assets it considers securities, and have specifically asserted that the SEC's approach does not provide such guidance.  *See, e.g.,* Ex. Y ("The Commission does seem to anticipate that its interpretation will drive decentralized protocols toward centralization, extinction, or expatriation.").  That violates the '34 Act and the APA.  Rules of wide and general application—a rule that would make all cryptocurrencies "securities" is definitely such a rule—are precisely what the notice-and-comment rulemaking provisions of 15 U.S.C. § 78w(a) and the APA are designed for:  To examine the boundaries of a proposed rule, including its potential effects on markets, *before* such a rule is put into effect.

### D.     Even If *Howey* Applies to Digital Assets, The Digital Assets At Issue Are Not Securities

The SEC argues that the digital assets in this case are "investment contracts" (*see* AC ¶ 23), which are "(i) an investment of money (ii) in a common enterprise (iii) with profits to be derived solely from the efforts of others."  *Revak v. SEC Realty Corp.*, 18 F.3d 81, 87 (2d Cir. 1994); *Howey*, 328 U.S. at 298–99.  But the SEC's arguments fail.

### 1. The Proper Understanding of *Howey*

*Howey* involved a transaction that included (a) the sale of a land in an orange grove *plus* (b) the seller's contractual promise to cultivate that land and give a share of profits *created by the seller's cultivation* to the purchaser; the Supreme Court held that that *transaction* was an "investment contract" and thus a security.  *See* 328 U.S. at 295-96, 299.  But the fact that an asset is, at some point, part of a transaction that constitutes an investment contract does not make *the asset* a security.  Indeed, the Supreme Court explained that had the orange groves in *Howey* been resold on their own, without the associated rights to have the groves cultivated and receive profits from that cultivation, they would *not* have been securities.  *See id.* at 295-96, 299; *SEC v. Telegram Grp. Inc.*, 2020 WL 1547383, at *1 (S.D.N.Y. Apr. 1, 2020) (the "security" was neither the token purchase agreement nor the token).

That *Howey* requires a "contract" is plain from the text of 15 U.S.C. §§ 77b(a)(1) and § 78c(a)(10).  And it is compelled by the meaning of "investment contract" that Congress imported into the '33 and '34 Acts.  Congress did not invent the term "investment contract," it incorporated a well-understood term from state blue sky laws whose meaning had been "crystallized" and was "uniformly applied by state courts."  328 U.S. at 298; *see generally State v. Heath*, 153 S.E. 855, 857 (N.C. 1930) ("The term … implies the apprehension of an investment as well as of a contract.").  By choosing that term, Congress brought its settled meaning with it.  *See George v. McDonough*, 142 S. Ct. 1953, 1959 (2022) ("Where Congress employs a term of art obviously transplanted from another legal source, it brings the old soil with it.").  *Howey* thus did not abandon the contract requirement; indeed it emphasized that the "contract" requirement was satisfied by multiple agreements between the promoter and his purchasers, "land sales contracts, warranty deeds and service contracts."  328 U.S. at 300.

Until recently, this was how the SEC discussed *Howey*.  In 2018, the Director of the Division of Corporate Finance stated that "the token … all by itself is not a security, *just as the orange groves in Howey were not*," because "[t]he digital asset itself is simply code" and whether it is a security depends on how it is sold.  *See* Ex. II (emphasis added).  In a 2019 letter, the then-Chairman expressed the same position.  *See supra* at 9.  This made clear the SEC's

13

recognition that the developers of digital assets do not necessarily owe continuing legal obligations to the asset holders or any secondary-market purchasers, and secondary-market purchasers lack any legal entitlement to a share in the developers' "profits" (if there are any).

One thing thus ties together all enumerated categories of "security": The presence of a legal relationship voluntarily established by an identifiable legal entity acting as the "issuer" of the security and various other parties who, from time to time, own that security. *See* Lewis R. Cohen, Gregory Strong, Freeman Lewin, and Sarah Chen, *The Ineluctable Modality of Securities Law: Why Fungible Crypto Assets Are Not Securities* at 62 (Nov. 10, 2022), https://ssrn.com/abstract=4282385 ("Cohen"). IBM common stock is always a security because it was issued by IBM and includes whatever obligations run from IBM to owners of IBM stock. But including digital assets would require the federal securities laws to include the concept of a "security" that is not dependent on an issuer, *see id*. at 12, which they do not do.

## 2. UST Are Not Securities

UST are not securities because stablecoins are currency and thus specifically exempt from the federal securities laws. *See* 15 U.S.C §§ 78c(a)(10), 77b(a)(1). Like other currencies, UST served as a unit of account, a store of value, and a medium of exchange. *See supra* at 2–3. Indeed, the expectation that UST would remain stable and not fluctuate significantly in value precludes alleging any expectation of "profit" from UST (as opposed to from an individual, extrinsic use of UST), which is essential to something being an "investment contract." The SEC's theory that UST *later became* an investment contract when deposited in the Anchor Protocol (AC ¶ 71) fails. *First*, Anchor is legally irrelevant to what UST was when it launched. Anchor could not have been the transaction related to the launch of UST that would need to be examined under *Howey* because Anchor launched seven months *after* UST launched.

*Second*, UST was never required to be deposited in Anchor, and vast quantities of UST were used for other purposes. Anyone who deposited UST into Anchor (a) made that decision on their own and (b) either acquired it in a separate transaction or purchased it on a secondary market, which can never satisfy *Howey* because, as demonstrated above, *Howey* does not apply

14

to secondary market token purchases.  The only relationship an Anchor depositor had was with the protocol (and perhaps the governance community), not Defendants.

That means that the SEC has failed to allege that UST purchasers who elected to deposit their UST in Anchor were invested in a common enterprise.  A common enterprise can be demonstrated through "horizontal commonality," the pooling of investor assets into an investment such that investors share in profits and losses pro rata, or through "strict vertical commonality," the tying of the defendant's financial compensation to the fortunes of the investors.  *Revak*, 18 F.3d at 87; *Marini v. Adamo*, 812 F. Supp. 2d 243, 256 (E.D.N.Y. 2011).  The SEC fails to explain how any one UST depositor's interest was dependent on the deposits of any other depositor such that they were joined in a pooled investment.  The SEC must also distinguish Anchor depositors from brick-and-mortar bank depositors, which it has not done; if being able to deposit UST into Anchor makes UST a security, then why does being able to deposit US dollars into bank accounts and CDs not make U.S. dollars securities?  The SEC's argument is overbroad.  Likewise, allegations that Defendants deposited UST in Anchor as users (AC ¶ 72) cannot establish vertical commonality.  Vertical commonality typically requires that a defendant earn a performance fee equal to a percentage of the profits of an investor's account.  *See In re J.P. Jeanneret Assocs., Inc.*, 769 F. Supp. 2d 340, 360 (S.D.N.Y. 2011).  The SEC does not allege that Defendants earned fees or commissions from Anchor user activity.

Nor has the SEC pled that Anchor depositors had a reasonable expectation of profits derived primarily from TFL's managerial efforts.  *First*, the SEC has not plausibly alleged that users acquired UST primarily with an investment intent specific to Anchor rather than for its other consumptive uses, which is fatal.  *See Rice v. Branigar Org., Inc.*, 922 F.2d 788, 790 (11th Cir. 1991) ("Where those who purchase something with the primary desire to use or consume it, the securities laws do not apply.") (citing *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 852-53 (1975)).  UST could be used as a means of payment, to mint mAssets on the Mirror protocol, in other protocols developed by other developers, or simply as a store of value for later uses.  Alleging that at a single point in time, "[j]ust prior to the collapse of [UST] in May 2022," more UST was deposited in Anchor than used for other purposes (AC ¶ 75) does not establish

that UST was used primarily for Anchor deposits from the time of UST's launch in September 2020, particularly because Anchor did not become available until March 2021.  Likewise, a generalized allegation that "many" users—the SEC purports to identify five—acquired UST "for the sole purpose of earning a return on the Anchor Protocol" (AC ¶ 81) cannot suffice to establish that users in general acquired UST primarily for that purpose.

Even if five users acquired UST just to deposit it into Anchor, the SEC has not plausibly alleged that such users expected to earn a return on their deposits from the managerial efforts of *Defendants*.  A contract for investment is not an investment contract unless the defendant's managerial efforts are the primary, if not sole, driver of investor profits.  *See SEC v. Life Partners, Inc.*, 87 F.3d 536, 546 (D.C. Cir. 1996).  TFL's efforts in initially "building out its front-end user access and back-end features" or "facilitating user access to the protocol" (AC ¶ 76) did no more than facilitate global users' choice to interact with the protocol or not, they did not drive profits and in any event were embedded in the system at the time of release.  *See Life Partners, Inc.*, 87 F.3d at 547.  Nor were one-time subsidies by TFL (AC ¶ 75) or a third party (AC ¶ 78) primary drivers of interest payments on Anchor.  *Despite all the focus on Anchor, at no point has any litigant, in any jurisdiction, alleged that the **protocol** failed to pay any scheduled interest on any deposits*.

Finally, the SEC alleges that UST are securities because they are like stock warrants (AC ¶ 84).  But a stock warrant is a security because it is specifically enumerated in the definition, *see* 15 U.S.C § 78c(a)(10), which does not help the SEC here.  *First*, unlike stock warrants (which are acquired for investment purposes and have no consumptive use), UST was designed for consumptive use and the SEC has not alleged that anyone acquired UST primarily to convert it into LUNA rather than for its consumptive uses.  *See Rice*, 922 F.2d at 790.  *Second*, the protocol mechanism that allowed users to burn UST to mint LUNA does not make UST a warrant because LUNA is not a security.  *See infra* Section II.B.3.  *Third*, this argument goes too far:  At its core, the SEC argues that if token A can be converted into token B and the SEC believes that token B is a security, then *ipso facto* so is token A.  Because any token can be converted into any other token, on some platform, in at most one exchange (for example,

*token A → stablecoin → token B*), the SEC could use this theory to argue that any token is a security, without engaging in the *Howey* analysis, simply by asserting that it could be converted into some other token the SEC deemed a security, even through a settled enforcement action.[12] But this theory is even inconsistent with the SEC's (current) view that BTC is not a security, because almost every token can be directly converted into BTC on one or more platforms. *See, e.g.,* Ex. JJ (showing all tokens directly exchangeable for BTC on Coinbase). If this is the SEC's operative theory, why is BTC not a security? And if BTC is not a security, why is anything exchangeable for BTC also not a security? The SEC has painted itself into a corner.

### 3.     LUNA Tokens Are Not Securities

The SEC cannot satisfy vertical commonality between LUNA purchasers and TFL or Mr. Kwon on the basis that they all held LUNA at some point. *See* AC ¶ 48. Although their separate holdings may have "paralleled" one another in valuation, they were not "intertwined such that [their] fortunes *had* to rise and fall together," because the parties were free to hold or sell at their discretion. *Marini*, 812 F. Supp. 2d at 257–58. Similar reasoning precludes horizontal commonality among LUNA purchasers merely because they held the same digital asset. *See* AC ¶ 46. Like the SEC's other arguments, this one goes too far: Were it correct, purchasers of, for example, gold could be said to be holding assets in a common enterprise with other gold purchasers where there is plainly no enterprise. Some people buy gold to use it in manufacturing (a consumptive use), some buy it as an investment, and some buy it as a unit of exchange or storage. That precludes horizontal commonality.

Nor does horizontal commonality exist if some early LUNA sale proceeds were "pooled" by TFL and used to "fund operations" and develop new projects. *See* AC ¶¶ 46–47. Horizontal commonality requires more than the aggregation or "commingling" of sale proceeds or the use of proceeds to fund operations. *See Life Partners, Inc.*, 87 F.3d at 544; *SEC v. Belmont Reid & Co.*,

---

[12] This is an example of the one-way ratchet system that the SEC appears to be using to build its jurisdictional base through coerced settlements in ways not contemplated by Congress. *See Axon Enterprise, Inc. v. FTC*, No. 21-86, Slip Op. at 13 & n.4 (Gorsuch, J. concurring in the judgment) (U.S. Apr. 14, 2023) (discussing "regulatory extortion").

794 F.2d 1388, 1389 (9th Cir. 1986).  There must be an "interdependency among investors" such that profits depend upon "completion of the larger deal" between other investors and the promoter.  *Life Partners*, 87 F.3d at 544.  The SEC has identified no such interdependency among LUNA purchasers.

The SEC also fails to plead that LUNA purchasers acquired their tokens with the requisite investment expectations.  Mentioning the words "investment" or "investors" in a few sales (AC ¶ 53) is not enough.  In *Forman*, for example, the Supreme Court held that an instrument labeled "stock" was not a security.  421 U.S. at 851-52.  LUNA was created to stabilize UST, validate transactions on the Terra blockchain, and enable voting for governance proposals.  *See supra* at 2–3.  The SEC must do more to plead around those features.

Thus even if some LUNA purchasers acquired LUNA because they considered it an investment, that would not matter.  Where purchasers acquire an asset to speculate on fluctuations in global market prices (or markets generally), courts hold that profits are not driven primarily by the managerial efforts of others.[13]  *See Belmont Reid & Co.*, 794 F.2d at 1389-91; *Noa v. Key Futures, Inc.*, 638 F.2d 77, 79-80 (9th Cir. 1980).

### 4.    wLUNA Are Not Securities

The SEC's inclusion of wLUNA (AC ¶¶ 59–68) is mystifying.  wLUNA runs on the Ethereum blockchain, which was not developed by and is not affiliated with TFL.  AC ¶ 60.  The SEC does not and cannot allege that Defendants created wLUNA or even the concept of wrapping tokens.  In any event, as the SEC concedes, wLUNA's status as a security stands or falls on whether LUNA is a security (AC ¶¶ 67–68)—and it falls, as LUNA is not a security.

### 5.    MIR Tokens Are Not Securities

The SEC cannot establish horizontal commonality among MIR token holders by alleging that the proceeds from the sale of farmed MIR tokens were "pooled together to develop and fund … the Mirror Protocol," the success of which would determine their profits.  AC ¶ 87.  The AC

---

[13] That some tokens may have been sold at a discount to the then-prevailing market price (AC ¶ 54) is irrelevant, because any discount is incorporated into the price at the time of purchase.  *See Life Partners*, 87 F.3d at 547; *Belmont Reid & Co.*, 794 F.2d at 1389.

contains no specific facts indicating that the Mirror Protocol required further development at the time of the sale or required funding. The SEC knows from its investigation that TFL used the sale proceeds solely to acquire MIR tokens through farming to satisfy the purchase agreements.

The SEC also fails to plead that users acquired MIR tokens with the expectation of profits, let alone profits from TFL's efforts. Nowhere does the SEC allege that users acquired MIR tokens primarily as an investment rather than for their use as the governance token for the Mirror Protocol. Even as to the small set of purchasers the SEC alleges purchased farmed MIR tokens from TFL for "investment purposes," the SEC has not alleged that they reasonably expected to reap profits primarily from the efforts of TFL. Allegations that TFL "engineered, launched, and upgraded versions of the Mirror Protocol" and posted relevant information online (AC ¶¶ 94–95) are pre-sale activities that are baked in at point of sale and "ministerial" post-sale activities, neither of which has the "predominant influence" on the investment's future value necessary for an investment contract. *Life Partners*, 87 F.3d at 546-47. The SEC does not allege that the Mirror Protocol was still in development at the time of the alleged purchases.

The SEC's allegation that TFL represented that it "would heavily promote the Mirror Protocol, which would increase the price of the MIR tokens" and increase profits for the token purchasers (AC ¶ 91) is misleading. One document this allegation is based on includes a single bullet point that read "Heavily marketed to users in Asia with low accessibility to US equities," and a separate document discussed how the value of MIR tokens might grow with greater usage of the Mirror Protocol. *See* Ex. I and J (emphasis added). In neither did TFL say it would expend efforts to drive the value of MIR tokens up as the SEC alleged. Isolated tweets about "being active contributors in the community to help mirror_protocol succeed" or "working hard to improve Mirror and rely[ing] on our brilliant community for feedback and ideas" (AC ¶¶ 96–97) are far too vague and refer to no specific projects that could be connected to purchaser expectation of profits. The SEC has thus not pleaded that MIR tokens are securities.

*     *     *     *

Each of these four arguments is, independently, sufficient to preclude the digital assets at issue from being securities.  Because the SEC cannot bring claims about things that are not securities and repleading cannot fix this, it requires dismissal of the AC with prejudice.

## III.   THE REGISTRATION COUNTS FAIL EVEN IF ANY DIGITAL ASSETS WERE SECURITIES

Even if the Court were to view any digital assets at issue as securities, this case is not about ICOs made to the public, and that critical distinction means that the legal analysis of the SEC's registration claims is significantly different than the SEC's prior ICO cases.[14]

### A.   The SEC Has Not Plead a Violation of '33 Act Sections 5(a) and (c)

The Fourth Claim should be dismissed because the SEC has not pled that Defendants conducted a public offering of securities in violation of Section 5.  A Section 5 violation requires (1) lack of a registration statement as to the subject securities, (2) the offer or sale of the subject securities, and (3) the use of interstate transportation or communication and the mails in connection with the offer or sale.  *SEC v. Lyon*, 529 F. Supp. 2d 444, 453 (S.D.N.Y. 2008).

As an initial matter, the SEC only alleges that TFL offered or sold LUNA and MIR. With respect to UST, the SEC alleges that purchasers "tendered fiat currency or crypto assets in exchange for UST," but does not allege that anyone purchased UST *from TFL.  See* AC ¶ 69. With respect to wLUNA, the SEC does not allege that TFL offered or sold it at all.  UST and wLUNA are thus not included in the Fourth Claim, meaning that the Fourth Claim must be limited to LUNA and MIR.  Even if LUNA or MIR could be considered securities (they cannot),[15] the AC does not allege that SEC registration was required.

### 1.   LUNA Tokens

The SEC's claim that TFL and Mr. Kwon violated Section 5 in 2018 by entering into private agreements to sell LUNA tokens (AC ¶ 107) fails.  Those sales were exempt from

---

[14] And although the SEC alleges that UST, LUNA, wLUNA, MIR, and mAssets were securities, it does not specify which count applies to which tokens, which means that these claims fail under Fed. R. Civ. P. 8(a) because the SEC has not provided a "plain" statement of these claims.

[15] The SEC does not allege a registration violation in connection with UST or Anchor, further demonstrating that the combination is not a security.

registration under Section 4(a)(2) as transactions "not involving any public offering."  15 U.S.C. § 77d(a)(2).  Rule 506(b) of Regulation D deems an offering to accredited investors, regardless of dollar value, an exempt private offering, so long as there is no general solicitation.  17 C.F.R. § 230.506(b).  The SEC *pleads* that all purchasers it discusses were "institutional investors" (AC ¶ 107) but does not allege that TFL conducted a general solicitation.

Recognizing this, the SEC tries to transform an exempt private offering into a Section 5 violation by asserting that TFL and Mr. Kwon "expect[ed] that most, if not all, of these purchasers would sell their LUNA into public markets" such that "Defendants were *essentially* embarking on a large-scale unregistered public distribution of LUNA."  AC ¶ 107 (emphasis added).  This fails for two reasons.  *First*, the SEC alleges no facts to support this theory, and its deliberate use of the word "essentially" makes clear that this is a conclusion, not a fact.

*Second*, if a private purchaser decided to resell LUNA tokens, it was the purchaser's obligation to do so in compliance with applicable rules.  *See, e.g.*, 17 C.F.R. § 230.144.  Indeed, the SEC's assertion that Defendants "expected" the tokens to be sold on public markets (AC ¶ 107) is directly contradicted by the transaction documents and other allegations in the AC:

- The vesting period precluded immediate resale, as did the fact that LUNA was not listed on any trading platform at the time of purchase.  Ex. K at 23.
- To the extent a purchaser at some point intended to resell its tokens, it could have done so without violating Section 5.  Purchasers could have sold on any of several foreign platforms under Regulation S's exemption for "offers and sales that occur outside the United States."  17 C.F.R. § 230.901.  Indeed, that result would have been far more likely given that not until August 2021—three years after these sales—did LUNA become listed (and then not by TFL) on a "U.S.-based" trading platform.  *See* AC ¶ 109.
- If for some reason a purchaser was intent on re-selling in the U.S., it could have sold to any QIB.  *See* 17 C.F.R. § 230.144A.

The allegation that TFL "expected" a small group of institutional purchasers to sell LUNA to non-QIBs inside the U.S. in violation of the relevant law is not supported by well-pled facts and is contradicted by the documents the SEC relies on.

The SEC's claim that alleged sales between August 2019 and February 2022 "directly into secondary markets through transactions on crypto asset trading platforms, including those

available to U.S. investors" (AC ¶ 111) violated Section 5 also fails.  Tellingly, the SEC does not allege that TFL ever sold LUNA on the one "U.S.-based" platform it alleges supported trading in LUNA.  Any sales falling into this category were thus plainly trades on foreign markets exempt under Rule 901 of Regulation S as "offers and sales that occur outside the United States."  17 C.F.R. § 230.901.  The SEC's contention that some foreign markets might have been "available to U.S. investors" does not change the analysis.  Beyond the contention's speculative nature, U.S. investors can trade on the Hong Kong Stock Exchange, the London Stock Exchange, and numerous other non-U.S. trading venues.  That does not make trading in stock not registered with the SEC on such venues a Section 5 violation.  The SEC has no authority to regulate market activity outside the U.S., as Rule 901 of Regulation S expressly recognizes.

The SEC's claim that two agreements with a trading firm to facilitate secondary trading on foreign markets were "in *essence*, public distributions of LUNA" into the U.S. (AC ¶ 110, emphasis added) fails.  *First*, the SEC once again uses the word "essence" to try to hide the lack of well-pled facts supporting this theory.  *Second*, this was not a public offering.  The SEC does not allege that TFL hired the Cayman Islands-registered trading firm (the "Trading Firm") to access U.S. capital markets or solicit purchases of LUNA.  Rather, the SEC alleges that TFL transferred LUNA to the Trading Firm to "improve liquidity" (AC ¶ 110) in the aftermarket— that is, to provide market participants on non-U.S. markets who were already intent on buying and selling LUNA a ready counterparty to trade against and thereby reduce their cost to trade.  The agreements also did not violate Section 5 because TFL did not direct the firm to resell into the U.S. market.  Indeed, when these contracts were entered into, in November 2019 and September 2020, LUNA could be traded only on non-U.S. platforms.  *See* AC ¶¶ 108-109.  Not until a year later could LUNA be traded for the first time on a "U.S.-based" platform.  *See id.* Thus any and all trading within the contemplation of the parties at the time of their agreement would have been foreign transactions exempt under Regulation S.  If the Trading Firm made a unilateral decision to sell on a U.S. platform once that became possible, it was that firm's obligation to comply with any applicable law.

### 2.    MIR Tokens

The allegation that TFL "made [MIR tokens] available on the Terraform-controlled website for the Mirror Protocol that could be accessed in the U.S." (AC ¶ 114) fails to state a Section 5 violation because, due to a misunderstanding of how the Mirror Protocol worked, it lacks the core element of an alleged offer or sale.  The Mirror Protocol does not *sell* MIR tokens, it programmatically distributes them to users, and the SEC does not allege otherwise.  Providing access to the Mirror Protocol is not an offer or sale of anything, let alone securities.

The allegations that TFL sold farmed MIR tokens to a small international group of purchasers in exchange for a few million dollars (AC ¶ 112) also cannot support a Section 5 violation for at least two reasons.  *First*, the sales were exempt under Section 4(a)(1) as "transactions by any person other than an issuer, underwriter, or dealer."  15 U.S.C. § 77d(a)(1):

- TFL was not an issuer because it owned no MIR tokens when the protocol launched.  As the SEC concedes, TFL had to "farm" the tokens from the Mirror Protocol as an ordinary user of the Mirror Protocol.  AC ¶ 89.  Indeed, the SEC does not deny that any of these counterparties could have farmed the MIR tokens themselves by doing exactly what TFL did; none of the purchasers needed to purchase MIR tokens from TFL.

- TFL was not an underwriter pursuant to 15 U.S.C. § 77b(a)(11).  TFL could not purchase MIR tokens from the Mirror Protocol, nor can it be said that it offered or sold MIR tokens for an issuer given that TFL received no allocation of MIR tokens at launch.

- TFL was not a dealer of MIR tokens pursuant to 15 U.S.C. § 77b(a)(12).  The SEC alleges that TFL sold only the MIR tokens it acquired in connection with satisfying the SAFT agreements, *see* AC ¶ 89, which does not make it a dealer.  *Debruin v. Andromeda Broad. Sys., Inc.*, 465 F. Supp. 1276, 1279 (D. Nev. 1979).

Section 4(a)(1) thus bars this claim in its entirety.

*Second*, the farmed MIR token sales were an exempt private offering.  15 U.S.C. § 77d(a)(2).  The SEC speculates that some purchasers *may not* have been accredited investors, but does plead that any was not in fact an accredited investor.  AC ¶ 113.  Even if the SEC had tried to plead that, Rule 506(b) exempts sales to up to 35 non-accredited investors if there is no general solicitation.  17 C.F.R. § 230.506(b).  The farmed MIR token sales satisfy Rule 506(b) because, as the SEC concedes, "there is no indication of general solicitation" (AC ¶ 113), and

there were fewer than 35 purchasers *in total*.  The SEC, having all the SAFT agreements in its possession, does not allege otherwise.  *See* AC ¶ 112.  In addition to the Rule 506(b) safe harbor, the sales were exempt under Section 4(a)(2).  Private offerings to persons with economic sophistication who have available to them the kind of information that a registration statement would disclose do not require a safe harbor from SEC registration requirements.  *SEC v. Ralston Purina Co.*, 346 U.S. 119, 125-27 (1953).  Each purchaser represented that it understood digital assets and their risks, the agreements disclosed risks specific to the Mirror Protocol, and TFL provided additional financial information.  AC ¶ 91; Ex. K.  Nothing more was required.

The SEC's scattershot allegations regarding the secondary market for MIR tokens have nothing to with whether there was a primary offering that required registration.  The SEC alleges that after satisfying its obligations under the SAFT agreements TFL sold "excess" farmed MIR tokens "through crypto asset trading platforms."  AC ¶¶ 89, 114.  However, such transactions in already farmed MIR tokens are exempt under Section 4(a)(1) as ordinary trading.  They were also exempt under Regulation S as "offers and sales that occur outside the United States," 17 C.F.R. § 230.901, as the SEC tacitly concedes that the "trading platforms" on which they occurred were foreign.  The allegation that TFL "entered into a listing agreement with at least one U.S. crypto asset trading platform for the listing of MIR tokens on the platform" (AC ¶ 114) fails because the SEC does not connect it to an offer or sale requiring registration.  Indeed, the SEC does not allege that TFL offered or sold any MIR tokens on that platform.  And any sales by third parties would not support a claim because (a) TFL would not have been a party and (b) they would be exempt under Section 4(a)(1) as "transactions by persons other than an issuer, underwriter, or dealer."  Finally, the allegation that TFL loaned MIR tokens to a market maker "who then sold the loaned MIR upon receipt on U.S.-based crypto asset trading platforms and other crypto asset trading platforms that are available to U.S. investors" (AC ¶ 114) does not involve an initial distribution requiring registration.  And if TFL acquired MIR tokens in the secondary market, that would not support a Section 5 claim for the same reason.

**B.    The SEC Has Not Pled a Violation of '33 Act Section 5(e) or '34 Act Section 6(I)**

The Fifth and Sixth Claims should be dismissed for failure to state a claim because the SEC has not pled that TFL or Mr. Kwon offered unregistered security-based swaps in violation of Section 5(e) of the '33 Act or Section 6(I) of the '34 Act. *See* 15 U.S.C. § 77e(e); 15 U.S.C. § 78f(l). The SEC has not plausibly alleged that mAssets qualify as security-based swaps, that they were sold by TFL or Mr. Kwon, or that they were sold to non-eligible contract participants.

An mAsset that mirrors an equity security's price is not a security-based swap because it does not function as a "swap." The SEC defines a security-based swap as a contract that (1) provides for one or more payments based on the value of a security (or securities) and (2) transfers the financial risk associated with a future change in value of the security without also conveying an ownership interest in the underlying security. *Plutus Financial Inc.*, Securities Act Release No. 33-10801, *9 (July 13, 2020).[16] The SEC tries to argue that mAssets meet this definition because users who minted mAAPL tokens "provided a payment in the form of collateral equal to at least 150%" of the share price of Apple, and the mAsset transferred financial risk without ownership by mirroring movements in Apple's share price. AC ¶¶ 101–102. That argument fails because the payment is not "as a result of" the future change in value of the reference security, and swaps require that linkage between the two elements in the definition, as the SEC's own guidance on security-based swaps makes clear. Ex. KK. A swap is a "contract in which two parties agree to exchange cash payments at predetermined dates in the future." *CFTC v. Wilson*, No. 13 CIV. 7884 (RJS), 2018 WL 6322024, at *2 (S.D.N.Y. Nov. 30, 2018). *In other words, every security-based swap has a counterparty.*

That is not how mAssets work. When a user mints an mAsset, the Mirror Protocol does not agree to make a cash payment to the user if at a predetermined date in the future the mAsset has increased in value. *Cf. Plutus Financial Inc.*, Securities Act Release No. 33-10801, *1-2

---

[16] As noted above, much of the "authority" the SEC relies on is in the form of settled enforcement actions (like *Plutus*), as opposed to judicial decisions based on full adversarial litigation. Defendants' citations to such resolutions to demonstrate the SEC's views are not agreements with the results in those cases or the way the SEC arrived at them.

(July 13, 2020) (when security-based swap reached its settlement date, "[i]f the market price for the reference asset had increased, then the customer would receive the collateral plus a payment (in Bitcoin) equivalent to the increase").  The protocol programmatically adjusts the price of the mAsset based on the price feed while the mAsset is outstanding, but no payments are made to the user (for example, if an mAsset mirrors a stock that pays a dividend, the user does not get a payment relating to the dividend, as the protocol documentation expressly states).  The only ways a user can capture price change in an mAsset is by (a) selling it (in which case the transaction price reflects the price change, as determined by the price feed, between the original mint time and the time of the peer-to-peer transaction) or (b) burning the mAsset and recovering the collateral.  But in neither case are payments *swapped* with a swap *counterparty*.  Thus the SEC's theory that mAssets are security-based swaps fails under the SEC's own definition.

Even if mAssets could be considered security-based swaps, the SEC's allegation that Defendants "offered and sold mAssets" to U.S.-based persons (AC ¶ 115) fails.  The Mirror Protocol mints mAssets programmatically, without involvement from Defendants, and users of mAssets exchange them on a peer-to-peer basis.  None of developing the protocol, publishing accurate information about it, or providing an interface to it (AC ¶ 115) is equivalent to issuing, passing title to, or soliciting sales of mAssets.  *See Underwood v. Coinbase Glob., Inc.*, No. 21 CIV. 8353 (PAE), 2023 WL 1431965, at *9 (S.D.N.Y. Feb. 1, 2023).  Indeed, because the Mirror Protocol community decided what mAssets should exist, only that community could even plausibly be viewed as doing anything remotely resembling the "solicitation" requirement.  In any event, the SEC has not alleged that any such activities were directed at U.S.-based persons. The Mirror Protocol was accessible globally and designed to address the interests of foreign investors who lack the same access to U.S. equity markets as U.S.-based investors.[17]

The Sixth Claim fails because mAssets were not security-based swaps.  But it also fails because, as demonstrated above, neither TFL nor Mr. Kwon "effected" transactions in mAssets

---

[17] *See* Ex. R ("value proposition" includes "accessibility," as "[i]n most markets outside of Europe & North America, access to foreign equities and forex markets is highly limited.") & Ex. I ("Heavily marketed to users in Asia with low accessibility to US equities.").

with anyone; users purchased mAssets by interacting with the Mirror Protocol smart contracts, not TFL. The SEC pleads nothing about anyone who purchased mAssets, and thus has not pled that any of them were or were not "eligible contract participants." Finally, there is no requirement in the '34 Act that protocols like the Mirror Protocol register as a national securities exchange. The SEC has proposed rule amendments that would, *if enacted as proposed*, require certain protocols to register as exchanges or Alternative Trading Systems, but those proposed amendments have not been enacted.[18] And even if they were enacted in the future, they could not be applied retroactively to the Mirror Protocol. *See Landsgraf v. USI Film Prods.*, 511 U.S. 244, 265 (1994). The SEC thus has not pled any of the elements of the Sixth Claim.

## IV.  THE FRAUD COUNTS FAIL EVEN IF ANY DIGITAL ASSETS WERE SECURITIES

Even if the Court were to view any digital assets as securities, the "securities fraud" claims fail because the SEC has failed to satisfy the claims' pleading requirements.

### A.  The SEC Has Not Pled a Violation of '33 Act Section 17(a)(2) or (a)(3).

The SEC has not alleged facts establishing a material misrepresentation or omission under Section 17(a)(2) or a deceptive act under Section 17(a)(3).

#### 1.  The SEC Has Not Pled A Material Misrepresentation or Omission

The Chai Payment Service: The SEC fails to plead falsity with respect to any statement by TFL or Mr. Kwon regarding the TFL-Chai partnership. The SEC principally challenges the use of the word "settled" by Mr. Kwon in referring to Chai's use of the Terra blockchain.[19] *See*

---

[18] *See* Amendments to Exchange Act Rule 3b-16 Regarding the Definition of "Exchange"; Regulation ATS for ATSs That Trade U.S. Government Securities, NMS Stocks, and Other Securities; Regulation SCI for ATSs That Trade U.S. Treasury Securities and Agency Securities, Rel. No. 34-94062, File No. S7-02-22.

[19] The AC discusses other statements regarding Chai but does not appear to challenge their veracity. For instance, the AC includes statements about the total number of Chai users and transaction volume (AC ¶¶ 129, 131), but does not allege that those figures were wrong. The AC also discusses statements that refer generally to Chai using the Terra blockchain (AC ¶¶ 131–33), but does not assert that such statements were false. Indeed, the SEC concedes that Chai transactions were recorded on the Terra blockchain. *See, e.g.*, AC ¶ 141.

AC ¶¶ 128–129.  But Chai transactions are "settled" on the Terra blockchain:  When a consumer purchases something using Chai, the consumer's digital wallet transacts with the merchant's digital wallet, the transaction is validated on the blockchain (which is, by definition, how value is transferred using cryptocurrency), and the merchant later receives the money it is owed.

The SEC insists that use of the word "settled" here is false because Chai "used traditional payment methods of receiving Korean Won from its customers and paying Korean Won to participating merchants."  AC ¶¶ 134, 142.  But those two things are not inconsistent because the publicly stated goal of Chai was to enable payments using the Terra blockchain without users having to interact with the blockchain directly.  *See* Ex. MM.

The SEC seems to believe that recording a transaction on the Terra blockchain could be something other than an actual transfer of value—this is the only way to understand the SEC's assertions that purchases were "accounted for" on the blockchain but "paid for" with KrW.  AC ¶¶ 135, 142.  But that was not how the Terra blockchain worked.  As the Terra protocol documentation made clear from the beginning, if a transaction appears on the blockchain, it means that value has been transferred from one wallet to another.  *See* Ex. LL.[20]  So the SEC's claim that Chai did not "settle" transactions using the blockchain requires the SEC to plead that (a) transactions recorded on the Terra blockchain were something other than a transfer of value from user to merchant and (b) merchants were paid in KrW through an entirely separate payment system that only ever took KrW from users and paid *that* KrW to merchants.  It has not done so.

*First*, (a) is inconsistent with the SEC's public statements about blockchain function.  As the SEC stated as recently as April 14, 2023, digital assets "generally" use blockchains "to record ownership and transfers."  *See* Release No. 34-97309 at 10.  The SEC has conspicuously *not* pled that the Terra blockchain functioned differently.

*Second*, when announcing its partnership with Chai in July 2019, TFL highlighted that Chai had "partnered up with 15 major local banks to facilitate convenient fiat on- and off-ramp,"

---

[20] *See also* https://docs.terra.money/learn/fees ("Gas is a small computational fee that covers the cost of processing a transaction.  ...  Any transaction that does not contain enough gas will not process.").

allowing it to receive KrW from customers (the "on-ramp") and pay KrW to merchants (the "off-ramp").  Ex. L.  And in April 2020, when describing Chai as "seamless user facing experiences built with our blockchain powered infrastructure," TFL again highlighted that Chai was built around a fiat on-ramp for consumers and a fiat off-ramp for merchants.  Ex. M.  Those public statements disclosed that Chai used KrW and KrT.

The SEC alleges that transactions were "replicated" on the blockchain "as if they had originally 'settled' on the Terraform blockchain" when in fact they "had *already happened* in the real world using Korean Won."  AC ¶¶ 135, 142.  But the SEC does not allege that Terra blockchain entries are not themselves transfers of value; when a KrT transaction appears in the Terra blockchain it means that KrT has moved from the user's wallet to the merchant's wallet. That is a transfer of value from the user (who originally owned the KrT) to the merchant (who owns it after the transfer).  The SEC alleges nothing to contradict that, which is not surprising given that *after* the SEC commenced this case it reiterated that digital assets generally use blockchains "to record ownership and transfers."  *See* Release No. 34-97309 at 10.  The SEC also *assumes* that merchants were paid in KrW *prior to* transactions being recorded on the Terra blockchain, but does not plead any facts to support that assumption.  Moreover, the SEC concedes that the Terra blockchain confirms transactions in KrT in six seconds (AC ¶ 143) and that merchants are paid KrW later.  The SEC's allegations are thus consistent with (a) its previously expressed statements about blockchain operations and (b) Chai actually using the Terra blockchain to effect—"settle"—payments, meaning the fraud claim fails because it does not meet the *Iqbal/Twombly* standards.

As for the SEC's assertion that "no Chai transactions occurred on the blockchain" because in "five instances between October 2021 and March 2022, there were one or more days when no transactions whatsoever were confirmed on the blockchain" "[y]et there is no evidence that the Chai payment application was not functioning during those periods (AC ¶ 143), that is false.  The *public* blockchain data does *not* show one or more days when no transactions whatsoever were confirmed on the Terra blockchain, let alone "five instances."

Nor has the SEC shown that Mr. Kwon's tweets inviting users to identify "which wallet address belongs to which merchant" using Chai and confirming that a user had done so (AC ¶¶ 138–39) were false or misleading.  The SEC does not dispute that the user did correctly identify which wallet belonged to which merchant.  That the merchants' wallets were managed for them by TFL does not render Mr. Kwon's tweets that they belonged to the merchants false.[21]  Because TFL disclosed that it managed all wallets for users and merchants to effectuate Chai's goal of allowing users and merchants to effect payments without themselves interacting directly with the blockchain, the tweets are consistent with that *disclosed* design specification for Chai.[22]

Finally, the SEC's reference to comments by third parties does not support its theory. The allegation that "Chai itself has denied in emails to its own investors that it used a blockchain to process its payments" (AC ¶ 144) is meaningless without context to explain what was meant by "to process"—assuming Chai used that phrase and it is not the SEC's inaccurate rendition. And the allegation that an unnamed TFL employee said "[b]asically chai doesn't need Terra to work" (AC ¶ 145) is irrelevant.  Chai's payment system obviously worked on its own when the TFL partnership was announced in July 2019, so of course Chai did not "need" the Terra blockchain.  But that says nothing about whether Chai chose to and did incorporate the Terra blockchain into its system.  The only relevant issue is what Chai *did*, not what it "need[ed]."

The May 2021 Depeg:  The SEC fails to plead any misstatement or omission regarding UST regaining its peg in May 2021.  The SEC alleges that Defendants "falsely reported that the peg was restored due to the success of UST's algorithm" and "misleadingly omitted the real

---

[21] The SEC's focus on the Chai "LP server" allegedly batching Chai data before sending it to the Terra blockchain (AC ¶¶ 135, 142) is a red herring.  The SEC identifies nothing misleading about batch processing payments, which is not surprising given that it is *normal* in the payment processing industry.  *See, e.g,* https://www.ncr.com/blogs/payments/batch-credit-card-processing ("When it comes to credit card processing, there are a few different ways merchants can run their transactions. The two main types are real-time processing and batch payment processing.").

[22] The SEC's contention that because these were managed accounts "these blockchain transactions do not reflect real-world, arms-length transfers of KRT between consumers and merchants" (AC ¶ 141) is supported by no factual allegations and is a pure conclusion.  Mr. Kwon's tweets did not assert that consumers sent KrT directly to merchants, and the Chai public disclosures discussed above made clear disclosure to the contrary.

reason for the re-peg—the deliberate intervention by a third party … to buy large amounts of UST to restore its value."  AC ¶ 118.  The SEC does not allege that Defendants omitted to state that the Trading Firm purchased UST in an effort to restore the peg in May 2021, nor could it. Prior to the May 2021 depeg, TFL publicly disclosed that open market purchases might be made to support stablecoin pegs in both 2020 and 2021.  Ex. S at 2; Ex. N.  Rather, the SEC alleges that Defendants failed to declare that the Trading Firm's purchasing of UST was the "the real reason" UST regained its peg, and that statements that "UST's algorithm" contributed to UST regaining its peg were false.  The SEC's theory fails for several reasons.

*First*, there was no general duty to disclose any and all information about open market purchases that may have been made to support the peg in May 2021.  "When an allegation of fraud is based upon nondisclosure, there can be no fraud absent a duty to speak," and a duty to disclose does not arise "from the mere possession of nonpublic market information."  *Chiarella v. United States*, 445 U.S. 222, 235 (1980).  The SEC must identify a material fact whose disclosure was "necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading."  15 U.S.C. § 77q(a)(2).  The SEC does not identify any statements by Defendants *regarding the depeg* that the SEC claims were rendered false or misleading by the alleged failure to disclose the alleged open market purchases.

Searching for a hook to hang its omission theory on, the SEC grasps at a few tweets and a podcast interview.  *First*, the tweets did not address how UST regained its peg because they were posted on May 23 and early May 24, *one week before UST fully regained its peg on May 31.  See* AC ¶¶ 158, 163–64.  *Second*, none of the tweets are actionable:

- With respect to the May 23 tweet (AC ¶ 163), the SEC does not dispute that, as Mr. Kwon tweeted, TFL held a nominal amount of the total UST in circulation at the time ($59 million of over $2 billion).

- The other tweets (one by Mr. Kwon that "[b]uilding pure, unbiased and decentralized money is the long game," AC ¶ 163 and one by TFL that "[a]lgorithmic, calibrated adjustments of economic parameters are more effective than faxes and suits in meetings" among central bankers, AC ¶ 164) are non-actionable expressions of opinion, expectations, or declarations of intention.  *See Pehlivanian v. China Gerui Advanced Materials Grp., Ltd.*, 153 F. Supp. 3d 628, 647 (S.D.N.Y. 2015).  Such "general statements of corporate optimism" that the

Terra protocol's "strategies would be successful" are not representations as to existing facts and are thus non-actionable. *Id.* at 648-49.

The SEC has also not pled that the third statement it challenges—made in March *2022*, during a podcast unrelated to the May 2021 depeg—was inaccurate. The SEC's assertion that Mr. Kwon falsely represented that UST recovered its peg without any human involvement when he said "the protocol automatically self-heals" (AC ¶ 165) takes Mr. Kwon's words entirely out of context. From the beginning, descriptions of the peg maintenance system explicitly relied on human intervention (the decentralized community of users) to support the peg by using the mint-burn mechanism supplemented by open market purchases. *See supra* at 2–3. And on that podcast, Mr. Kwon briefly reflected on the mint-burn mechanism a year earlier:

> Similar to what happened in May of 2021, where there were too many UST redemptions that we're looking to happen against LUNA, in which case the AMM slippage costs[23] rose the other way. And it took a few days for the slippage cost to naturally heal back to spot. So that's another feature of the market module where when the exchange rate has deviated from the peg, the protocol automatically self-heals the exchange rate back to whatever the spot price is being quoted by the oracle. So that's why it took several days for the peg to recover.

Ex. O. The SEC has not alleged any facts to show that Mr. Kwon's actual statement was in any way false or explained why disclosure of alleged open market purchases was necessary to make his statement not misleading. The statement at issue did not purport to be a comprehensive description about how UST recovered its peg in May 2021, but was instead a narrowly focused comment on issues specific to the speed of the mint-burn mechanism. In any event, TFL did tweet an extensive analysis explaining why the algorithm did not provide instant recovery, *see* Ex. P, and the SEC has not alleged that anything therein was false or misleading.

The SEC's theory also fails because the allegedly omitted "fact"—that the Trading Firm caused UST to regain its peg—is the SEC's opinion, not a well-pled fact. *First*, publicly available blockchain data shows that users did burn UST in exchange for LUNA, which did

---

[23] "Slippage costs" generally refers to refers to the difference between the expected price of a transaction and the price actually received upon execution. In periods of high volatility, low liquidity, or increased demand, slippage can increase, which increases the transaction costs borne by traders. Slippage costs are a feature of nearly all financial markets.

contract the supply of UST, which did raise UST's price, during this period.  *See* Ex. NN.  From the date UST began to lose its peg to the date it regained its peg, circulating UST supply declined from $2.12 billion to $1.95 billion, reflecting the fact that users burned about $170 million of UST (net of minting).  The SEC's unsupported assertion that the mint-burn mechanism did not contribute to UST regaining its peg (AC ¶ 166) is thus insufficient to support the SEC's claim.

That the Trading Firm was the "exclusive cause" of UST regaining its peg is also not a well-pled fact, because even accepting the SEC's opinions as facts, the firm's alleged purchases were a fraction of total UST transactions at the time.  Publicly available blockchain data shows that users bought $861 million worth of UST on global markets and burned an additional net $139.3 million worth of UST on the Terra protocol while the Trading Firm was supposedly buying UST.  But the SEC alleges that the Trading Firm purchased just $60 million of UST.  *See* Ex. NN.  The SEC's allegation that the Trading Firm caused 100% of the price recovery with 6% of open market UST transactions is not plausible and thus does not satisfy *Iqbal* and *Twombly*.

### 2.        No Use of a Statement to Obtain Money or Property

The SEC's Section 17(a)(2) claim also fails because the SEC has not alleged that Defendants used alleged misrepresentations or omissions to obtain money or property.  "It must be plausibly alleged that the money was obtained 'by means of' the false statement."  *SEC v. Wey*, 246 F. Supp. 3d 894, 915 (S.D.N.Y. 2017) (quoting 15 U.S.C. § 77q(a)).  The SEC has pled no connection between any alleged false statement and any money made by Defendants.

The one instance in which the SEC alleges that Defendants mentioned Chai in a meeting with an institutional purchaser fails to plead that LUNA tokens were purchased as a result of any allegedly false statement.  The SEC merely alleges that Defendants "told the investor that the Terraform blockchain was being used to process Chai transactions" and that the purchaser cited "Chai's purported transactions on the Terra[] blockchain" in an internal memo.  AC ¶ 151.  That fails to plead falsity for the reasons demonstrated above.  But even if the SEC has alleged a misstatement, it does not allege that Mr. Kwon personally obtained any money from it; at most the SEC alleges that a private LUNA token purchase was correlated with an alleged misstatement, but that is not enough.  *See SEC v. Syron*, 934 F. Supp. 2d 609, 640 (S.D.N.Y.

2013); *SEC v. DiMaria*, 207 F. Supp. 3d 343, 358 (S.D.N.Y. 2016).  Because the SEC does not even try to allege that Defendants used the alleged omission about the Trading Firm to obtain money or property, the Section 17(a)(2) claim fails.

### 3.  No Deceptive Act Under Section 17(a)(3)

Alleged misstatements or omissions alone cannot support a claim for scheme liability; the SEC must allege a deceptive act.  *SEC v. Rio Tinto plc*, 41 F.4th 47, 53 (2d Cir. 2022).  Here, the SEC has pled none.  The one supposedly "deceptive act" alleged by the SEC is Chai's use of the Terra blockchain.  *See* AC ¶ 134.  The SEC's first problem is that it concedes that Chai did use the Terra blockchain, it just has a different opinion (unsupported by factual allegations) about *how* Chai used it.  And the SEC offers no explanation for how anyone could have been deceived into thinking Chai did not use KrW when TFL publicly disclosed Chai's use of KrW.  Because the SEC has not alleged any deceptive acts, it has not pled a Section 17(a)(3) claim.

### 4.  No Requisite State of Mind Under Section 17(a)(2) or (a)(3)

Both Section 17 claims fail because the SEC has not alleged facts capable of establishing that anything was done with the requisite state of mind, which is at least negligence.  *SEC v. Ginder*, 752 F.3d 569, 575 (2d Cir. 2014).  The SEC's threadbare allegation that TFL and Mr. Kwon acted "negligently" (AC ¶ 175) is not enough.  The AC contains no non-conclusory allegations articulating why any challenged statement or act was "sloppy or ill-calculated." *Ginder*, 752 F.3d at 575.  Indeed, the SEC's only allegations of "knowledge" are made in connection with the claim asserted under Section 10(b), which fails for other reasons.  *See infra* at 35–37.  The SEC therefore has not adequately pled the requisite state of mind.

### B.  The SEC Has Not Pled a Violation of '34 Act Section 10(b) or '33 Act Section 17(a)(1).

 "To state a claim pursuant to section 10(b) and Rule 10b–5, the SEC must adequately allege that a defendant '(1) made a material misrepresentation or a material omission as to which he had a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities.'"  *SEC v. Lyon*, 529 F. Supp. 2d 444, 450 (S.D.N.Y. 2008).  This claim fails because the SEC does not adequately allege any misstatements or omissions.

The Second Claim—and the First Claim to the extent it asserts a claim for scheme liability under Section 17(a)(1), which mirrors Rule 10b-5(a), *SEC v. Thompson*, 238 F. Supp. 3d 575, 591 (S.D.N.Y. 2017)—should also be dismissed because the SEC has not pled scienter.  To adequately plead scienter, the SEC must "allege facts that raise a strong inference" that a defendant knew or was reckless in not knowing that its conduct was deceptive.  *SEC v. One or More Unknown Traders in Sec. of Onyx Pharms., Inc.*, 296 F.R.D. 241, 250 (S.D.N.Y. 2013).  A reckless disregard for the truth is "highly unreasonable conduct that is an extreme departure from the standards of ordinary care." *Id.*  The SEC has not carried that burden here.

<u>Chai Payment Service</u>:  The SEC relies on near-miss allegations in the hope that the Court will infer more than those allegations can support:

| **What The SEC Alleges** | **What The SEC Wants The Court To Infer** |
|---|---|
| That Mr. Kwon "wrote much of the Terraform blockchain code." (AC ¶ 146) | That Mr. Kwon wrote some or all of the Chai codebase. |
| That Mr. Kwon "demonstrated knowledge of the location of Chai-related files." (AC ¶ 147) | That Mr. Kwon reviewed specific Chai-related files. |
| That Mr. Kwon supervised and instructed employees who programmed "the LP server." (AC ¶ 147) | That Mr. Kwon instructed employees in programming "the LP server." |
| That Mr. Kwon "held the most senior technical position at Terraform" and was "responsible for Terraform's coding and engineering strategy decisions." (AC ¶ 146) | That Mr. Kwon performed the same functions at Chai. |

If, after conducting a nearly two-year investigation, the SEC could have made specific factual allegations supporting the inferences in the righthand column, it would have, but "coming close" is not enough for a regulator that must allege fraud with particularity.[24]  At best, the SEC

---

[24] *See, e.g., SEC v. Espuelas*, 698 F. Supp. 2d 415, 436 n.26 (S.D.N.Y. 2010) (dismissing Section 10(b) claims with prejudice because "the SEC ha[d] conducted a lengthy investigation" and thus "amendment would be futile"); *In re Refco Capital Mkts., Ltd. Brokerage Customer Sec. Litig.*, 586 F. Supp. 2d 172, 186 (S.D.N.Y. 2008) ("The absence of any such allegations [of deceptive conduct] is particularly glaring since Capital Management (as well as other plaintiffs) already possesses the internal ... records necessary to plead a factually adequate claim."); *see also SEC v. City of Victorville*, 2013 WL 12133651, at *13 (C.D. Cal. Nov. 14, 2013) ("Given that the SEC has engaged in a three-year investigation into this matter, ... its decision to present no allegations to support of the request for disgorgement is significant and telling.").

alleges that Mr. Kwon had something more than secondhand knowledge about some parts of Chai's payment process.  But the SEC makes no allegations that support inferences that anything Mr. Kwon said about Chai was untrue or that, if it was, he knew that it was.

The May 2021 Depeg:  The SEC also fails to plead scienter with respect to the alleged misstatement or omission regarding the supposed true cause of UST regaining its peg in May 2021.  The SEC's assertion that Defendants knew that the Trading Firm "had intervened to buy up UST because Terraform and Kwon discussed it with the U.S. Trading Firm at the time" (AC ¶ 167) does not suffice.  *First*, the alleged omission is not that the Trading Firm tried to restore the peg by buying UST, it is that the Trading Firm was "the real reason" (AC ¶ 118) the peg was restored (as opposed to the 94% of UST transactions no one attributes to the Trading Firm).  The AC alleges no facts establishing that Mr. Kwon knew that the Trading Firm restored the peg.  It bears emphasis that the Trading Firm was subpoenaed in the SEC's investigation, and if the SEC had discovered facts that supported the allegation that the Trading Firm was "the real reason" the peg was restored, it would have pled them.  That it did not speaks volumes.

*Second*, the AC contains no well-pled allegations establishing that Mr. Kwon knew that the Trading Firm had purchased UST or how much.  All the SEC alleges is that on May 23, 2021 Mr. Kwon "discussed" with the Trading Firm how to restore the peg and then *concludes* that the Trading Firm "responded by purchasing large quantities of UST."  AC ¶¶ 157–58.  The SEC does not allege that the firm advised Mr. Kwon at any time that it would buy UST to restore the peg, that it had begun buying up UST (as the SEC's demonstrative tries to suggest), or that it advised Mr. Kwon it had done anything specific with respect to the peg.  *See* AC ¶ 158.  Again, if the SEC had such information from the Trading Firm, one would have expected a detailed recitation of what the Trading Firm did, when, how that was communicated to Mr. Kwon, and how it related to the price response of UST.  Yet the AC is silent.

In the absence of relevant factual allegations, the SEC instead tries to raise suspicion by pointing to a transaction between TFL and the Trading Firm *after* UST regained its peg.  *See* AC ¶¶ 159–60.  But that transaction was a modification of a preexisting agreement by which TFL had loaned the firm LUNA tokens with an option to buy.  The parties entered into the agreement

nearly a year earlier, and the agreement was subject to multiple re-negotiations, with the first modification occurring *seven weeks prior to* the May 2021 depeg.  Ex. H.  The second modification, signed a full *two months after* the May 2021 depeg, on July 21, 2021, was simply a continuation of these negotiations.  The SEC's suggestion that the modification "rewarded" the Trading Firm for restoring the peg is specious because the modification did not change the economics of the *pre-depeg* deal.  It did not give the Trading Firm more LUNA tokens, modify the option to buy the tokens, or change the $0.40 strike price that was initially agreed to (when LUNA was, as the SEC omits to mention, trading *at less than $0.30*).  Ex. Q.  But speaking of omissions, the *SEC's allegations* omit discussion of what the Trading Firm gave up in the renegotiation.  Rather than receiving the tokens in sets of 5 to 10 million when it achieved benchmarks over which it had absolute control, the modification forced the Trading Firm to accept distribution of 1 million tokens per month over a longer period of time.  Ex. Q.  The SEC's attempt to paint the modification as a sweetheart deal does not support scienter.

### C.    The SEC Has Not Pled a Violation of '34 Act Section 20(a).

 "To state a claim for control person liability, the SEC must plead facts showing: (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud."  *SEC v. Sason*, 433 F. Supp. 3d 496, 514 (S.D.N.Y. 2020).  This claim fails at the gate for lack of any primary violation of Section 10(b).  The claim also fails because the SEC has not pled facts sufficient to show that Mr. Kwon possessed the requisite control over, or was a culpable participant in, any challenged statements made or acts performed by others at TFL.

The SEC cannot establish control person liability simply by pointing to Mr. Kwon's title, because Section 20(a) demands "actual control over the transaction in question."[25]  The SEC's allegations do not establish that Mr. Kwon had actual control over any challenged statement by TFL, as he is not even alleged to have reviewed let alone approved any tweet published by TFL's

---

[25] *See In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 307 (S.D.N.Y. 2013); *In re Alstom SA Sec. Litig.*, 406 F.Supp.2d 433, 487 (S.D.N.Y.2005).

twitter feed.  Nor do the SEC's allegations establish that Mr. Kwon had actual control over the one challenged act by TFL employees.  The SEC does not allege that Mr. Kwon directed or approved how anyone integrated Chai's processes with the Terra blockchain.[26]

## CONCLUSION

For all the foregoing reasons, the Court should dismiss the AC in its entirety with prejudice.

Dated:  April 21, 2023                              Respectfully submitted,

                                                    */s/ Douglas W. Henkin*
                                                    **DENTONS US LLP**
                                                    Douglas W. Henkin
                                                    David L. Kornblau
                                                    1221 Avenue of the Americas
                                                    New York, New York 10020
                                                    Tel: (212) 768-6700
                                                    douglas.henkin@dentons.com
                                                    david.kornblau@dentons.com

                                                    Mark G. Califano
                                                    Nicholas W. Petts (admission forthcoming)
                                                    1900 K Street, NW
                                                    Washington, DC 20006-1102
                                                    Tel: (202) 496-7500
                                                    mark.califano@dentons.com
                                                    nicholas.petts@dentons.com

                                                    Stephen J. Senderowitz (admitted *pro hac vice*)
                                                    233 S. Wacker Drive
                                                    Chicago, Illinois 60606
                                                    Tel: (312) 876-8141
                                                    stephen.senderowitz@dentons.com

                                                    *Counsel for Defendants Terraform Labs Pte. Ltd.
                                                    and Kwon Do Hyeong*

---

[26] Culpable participation requires "particularized facts of the controlling person's conscious misbehavior or recklessness"  *Sason*, 433 F. Supp. 3d at 514–15.  Because the SEC has not alleged that Mr. Kwon reviewed any tweets by TFL before they were published or reviewed or participated in writing any Chai code, it has not pled that he had the requisite state of mind with respect to such activities.