# EXHIBIT K

Luna Token Sale Agreement, September 13, 2018.

# EXHIBIT K

*[Draft dated 12.09.18]*

---

# TOKEN SALE AGREEMENT
# (PRIVATE SALE)

---

**PLEASE READ THE TERMS SET OUT HEREIN CAREFULLY. THE TOKENS (AS DEFINED HEREIN) ARE NOT INTENDED TO CONSTITUTE SECURITIES OF ANY FORM, UNITS IN A BUSINESS TRUST, UNITS IN A COLLECTIVE INVESTMENT SCHEME OR ANY OTHER FORM OF INVESTMENT IN ANY JURISDICTION. THIS AGREEMENT DOES NOT CONSTITUTE A PROSPECTUS OR AN OFFER DOCUMENT OF ANY SORT AND IS NOT INTENDED TO CONSTITUTE AN OFFER OF SECURITIES OF ANY FORM, UNITS IN A BUSINESS TRUST, UNITS IN A COLLECTIVE INVESTMENT SCHEME OR ANY OTHER FORM OF INVESTMENT, OR A SOLICITATION FOR ANY FORM OF INVESTMENT IN ANY JURISDICTION. NO REGULATORY AUTHORITY HAS EXAMINED OR APPROVED OF THIS AGREEMENT, AND NO ACTION HAS BEEN OR WILL BE TAKEN IN RESPECT OF OBTAINING SUCH APPROVAL BY THE VENDOR (AS DEFINED HEREIN) UNDER THE LAWS, REGULATORY REQUIREMENTS OR RULES OF ANY JURISDICTION. THE PROVISION OF THIS AGREEMENT TO YOU DOES NOT IMPLY THAT THE APPLICABLE LAWS, REGULATORY REQUIREMENTS OR RULES HAVE BEEN COMPLIED WITH.**

**NO TOKEN SHOULD BE CONSTRUED, INTERPRETED, CLASSIFIED OR TREATED AS ENABLING, OR ACCORDING ANY OPPORTUNITY TO YOU TO PARTICIPATE IN OR RECEIVE PROFITS, INCOME, OR OTHER PAYMENTS OR RETURNS ARISING FROM OR IN CONNECTION WITH THE VENDOR, THE PROJECT GROUP, THE PROJECT, THE TOKENS (EACH AS DEFINED HEREIN), OR THE PROCEEDS OF THE TOKEN SALE (AS DEFINED HEREIN), OR TO RECEIVE SUMS PAID OUT OF SUCH PROFITS, INCOME, OR OTHER PAYMENTS OR RETURNS.**

**PLEASE NOTE THAT THE VENDOR WILL NOT OFFER OR SELL TO YOU, AND YOU ARE NOT ELIGIBLE TO PURCHASE ANY TOKENS IN THE TOKEN SALE IF YOU ARE AN EXCLUDED PERSON (AS DEFINED HEREIN).**

**THE OFFER AND SALE OF THE TOKENS HAVE NOT BEEN AND WILL NOT BE REGISTERED WITH ANY REGULATORY AUTHORITIES OR UNDER ANY LAW, REGULATORY REQUIREMENT, OR RULES OF ANY JURISDICTION, IN PARTICULAR IN THE U.S. (AS DEFINED HEREIN), UNDER THE SECURITIES ACT (AS DEFINED HEREIN) OR WITH ANY SECURITIES REGULATORY AUTHORITY OF ANY STATE OR OTHER JURISDICTION OF THE U.S..**

*[Draft dated 12.09.18]*

## TOKEN SALE AGREEMENT
## (PRIVATE SALE)

**THIS TOKEN SALE AGREEMENT (PRIVATE SALE)** (this "**Agreement**") is entered into this 9/13/2018 2:59:40 AM PDT by and between:

(1)     **THE VENDOR (AS DEFINED HEREIN)**; and

(2)     **THE PERSON / CORPORATION WHOSE PARTICULARS ARE SET OUT IN SCHEDULE 1** (the "**Buyer**"),

in connection with the intended distribution by the Vendor of certain cryptographic tokens known as "Luna tokens" ("**Luna Tokens**") and "Terra tokens" ("**Terra Tokens**") (Luna Tokens and Terra Tokens collectively, the "**Tokens**", further details of which are set out in **Schedules 1** and **4**) in furtherance of the development of a decentralised protocol to facilitate mass adoption of a price-stable cryptocurrency for everyday commerce (the "**Project**") to be developed by a company designated by the Vendor and/or its Affiliate(s) (as defined below) (the "**Project Group**").

The "**Vendor**" means Terraform Labs Limited (Company Number: 1983529), a company incorporated in the British Virgin Islands.

Each of the Vendor and the Buyer shall hereinafter be referred to as a "**Party**", and collectively, the Vendor and the Buyer shall hereinafter be referred to as the "**Parties**".

**NOW, THEREFORE**, in consideration of the mutual agreements contained below, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

## 1.     DEFINITIONS

1.1.    The terms defined in this Clause 1, whenever used in this Agreement shall have the respective meanings indicated below.

| | |
|---|---|
| "**Accepted Digital Asset**" | means such Digital Asset-type(s) as set out in **Schedule 1** |
| "**Accepted Fiat**" | means currency-types(s) as set out in **Schedule 1** |
| "**Affiliate**" | with respect to any Person, any other Person directly or indirectly controlling, controlled by or under common control with such Person |
| "**Aggregate Purchase Consideration**" | shall have the meaning ascribed to it in **Schedule** 1 |
| "**Agreement**" | shall have the meaning ascribed to it in the Recitals |
| "**Applicable Digital Asset Exchange**" | means https://coinmarketcap.com, or such other cryptocurrency exchange or price aggregator website as the Vendor may notify the Buyer in writing |
| "**Applicable Exchange Rate**" | in respect of a specified date and an amount denominated in Accepted Digital Asset and an amount denominated in an Accepted Fiat, means such exchange rate as quoted on the Applicable Digital Asset Exchange for exchange of |

DocuSign Envelope ID: 2612B437-4572-4BA8-B546-64F8E53F6958

*[Draft dated 12.09.18]*

|  |  |
|---|---|
|  | such Accepted Digital Asset and such Accepted Fiat, at 1000 hrs on such specified date |
| "**Applicable Fiat Exchange**" | means [••name of fiat exchange / reference such as Bloomberg], or such other fiat exchange as the Vendor may notify the Buyer in writing |
| "**Base Luna Tokens**" | shall have the meaning ascribed to it in **Schedule 1** |
| "**Bonus Terra Tokens**" | shall have the meaning ascribed to it in **Schedule 1** |
| "**BTC**" | means bitcoin, the cryptographic token associated with the Bitcoin core blockchain |
| "**Buyer Tokens**" | shall have the meaning ascribed to it in **Schedule 1** |
| "**Buyer Tokens Receiving Address**" | shall have the meaning ascribed to it in **Schedule 1** |
| "**Claim Period**" | shall have the meaning ascribed to it in paragraph 4 of **Schedule 3** |
| "**Conditions**" | shall have the meaning ascribed to it in Clause 5.1 |
| "**Constitutive Documents**" | in relation to a Person that is a body corporate, means the articles of incorporation, certificate of incorporation, charter, by-laws, articles of formation, certificate of formation, regulations, operating agreement, certificate of limited partnership, partnership agreement and all other similar documents, instruments or certificates executed, adopted or filed in connection with the creation, formation or organisation of such Person, including any amendments thereto |
| "***De minimis* Claim**" | shall have the meaning ascribed to it in paragraph 2 of **Schedule 3** |
| "**Digital Asset**" | means cryptographic assets including the Accepted Digital Asset and the Settlement Digital Asset |
| "**Encumbrances**" | in relation to any Buyer Tokens or Purchase Consideration (to the extent denominated in Digital Asset), means any lien, charge, mortgage, pledge, option, rights of pre-emption, hypothecation, claims, restrictions on transfer, encumbrances, priority or security interest, over or in such Buyer Tokens or Purchase Consideration (to the extent denominated in Digital Asset), or any agreement or arrangement for or to similar effect, and each an "**Encumbrance**" |
| "**ETH**" | means Ether, the cryptographic token native to the Ethereum blockchain, which for the avoidance of doubt does not refer to the Ethereum Classic token |
| "**Excluded Jurisdictions**" | means the jurisdictions stipulated in **Schedule 2**, and each an "**Excluded Jurisdiction**" |

DocuSign Envelope ID: 2612B437-4572-4BA6-B546-645F53F6965B

*[Draft dated 12.09.18]*

| | |
|---|---|
| "**Excluded Persons**" | shall have the meaning ascribed to it in Clause 4.1 |
| "**Formula**" | shall have the meaning ascribed to it in **Schedule** 1 |
| "**Governmental Authority**" | means any nation or government, any state or other political subdivision thereof, any entity exercising legislative, executive, judicial or administrative functions of or pertaining to government, including, without limitation, any government authority, agency, department, board, commission or instrumentality, and any court, tribunal or arbitrator(s) of competent jurisdiction, and any self-regulatory organisation. |
| | For the avoidance of doubt, Governmental Authority may include private bodies exercising quasi-governmental, regulatory or judicial-like functions to the extent they relate to any Party, the Project Group, the Tokens, and/or the Project |
| "**Indemnified Persons**" | shall have the meaning ascribed to it in Clause 6.2 |
| "**Laws**" | means the laws, statutes, ordinances, rules, regulations, judgments, injunctions, orders and decrees of any Governmental Authority, including amendments thereto |
| "**Luna Tokens**" | shall have the meaning ascribed to it in the Recitals |
| "**MAS**" | means the Monetary Authority of Singapore |
| "**Network Fees**" | means such transaction cost payable, whether denominated in Digital Asset or otherwise, for the use of or execution of transactions on a network (including but not limited to the Bitcoin or Ethereum network) |
| "**Party**" | shall have the meaning ascribed to it in the Recitals |
| "**Person**" | an individual or legal entity or person, including without limitation a Governmental Authority |
| "**Proceeds Receiving Designated Bank Account**" | as set out in **Schedule 1** |
| "**Proceeds Receiving Designated Blockchain Address**" | as set out in **Schedule 1** |
| "***Pro Rata* Unutilised Proceeds**" | shall have the meaning ascribed to it in **Schedule** 1 |
| "**Project**" | shall have the meaning ascribed to it in the Recitals |
| "**Project Channels**" | shall mean amongst others: |
| | (a)    the Project's website accessible at https://terra.money; |

*[Draft dated 12.09.18]*

| | (b) | the Project's Medium page accessible at https://medium.com/terra-money; |
|---|---|---|
| | (c) | the Project's Telegram channel accessible at https://t.me/terramoney; |
| | (d) | the Project's Discord channel accessible at https://discordapp.com/invite/bYfyhUT; and |
| | (e) | the Project's Twitter channel accessible at https://twitter.com/terra_money. |

| | |
|---|---|
| "**Project Documents**" | means collectively the White Paper and/or such other documents as may be amended from time to time in the sole and absolute discretion of the Vendor and/or the Project Group, explaining, among other things, the Project and the Tokens, and including but not limited to, the information about relevant personnel of the Vendor and the Project Group |
| "**Project Group**" | shall have the meaning ascribed to it in the Recitals |
| "**Purchase Consideration**" | shall have the meaning ascribed to it in **Schedule** 1 |
| "**Receiving Addresses**" | shall have the meaning ascribed to it in **Schedule 5** |
| "**Remaining Token Sale Proceeds**" | shall have the meaning ascribed to it in **Schedule** 1 |
| "**Sanctions**" | shall have the meaning ascribed to it in Clause 4.10(b)(ii) |
| "**Securities Act**" | The U.S. Securities Act of 1933, as amended |
| "**Settlement Date**" | shall have the meaning ascribed to it in **Schedule 1** |
| "**Settlement Digital Asset**" | shall have the meaning ascribed to it in **Schedule 1** |
| "**Settlement Fiat**" | shall have the meaning ascribed to it in **Schedule 1** |
| "**SIAC**" | Singapore International Arbitration Centre |
| "**Singapore**" | The Republic of Singapore |
| "**Termination**" | shall have the meaning ascribed to it in Clause 7.1 |
| "**Termination Notice**" | shall have the meaning ascribed to it in Clause 7.1 |
| "**Terra Tokens**" | shall have the meaning ascribed to it in the Recitals |
| "**Token Delivery Dates**" | shall have the meaning ascribed to it in **Schedule** 1 |
| "**Token Distribution Date**" | means such date whereby the Tokens are distributed to the general public pursuant to the Token Distribution Event as may be notified by the Vendor via the Project Channels |

[Draft dated 12.09.18]

| | |
|---|---|
| "**Token Distribution Event**" | means distribution of Tokens by the Vendor or its Affiliate(s) to the general public |
| "**Token Sale**" | shall have the meaning ascribed to it in Clause 2.1 |
| "**Tokens**" | shall have the meaning ascribed to it in the Recitals |
| "**TUSD**" | means TrueUSD, the asset-backed stable cryptocurrency as described in the following web link: https://www.trusttoken.com/ (last accessed on 10 September 2018); |
| "**U.S.**" | means the United States of America, its territories and possessions, any State of the United States, and the District of Columbia |
| "**USD**" or "**US$**" | means United States Dollars, the lawful currency of the United States of America for the time being |
| "**USDT**" | means Tether, the asset-backed stable cryptocurrency as described in the following web link: https://tether.to/wp-content/uploads/2016/06/TetherWhitePaper.pdf; |
| "**Vendor**" | shall have the meaning ascribed to it in the Recitals |
| "**Vendor's Warranties**" | shall have the meaning ascribed to it in paragraph 1 of **Schedule 3** |
| "**Wallet**" | shall have the meaning ascribed to it in **Schedule 5** |
| "**White Paper**" | means one or more documents (whether or not entitled "White Paper"), as may be amended from time to time in the Project Group's sole and absolute discretion, explaining among other things, the Project and the Tokens, and including, but not limited to, the intended Token Distribution Date, and information about relevant personnel of the Project Group. |

1.2.    Unless otherwise stated:

(a)    references to "Recitals", "Clauses", and "Schedules" are to recitals, clauses, and schedules of this Agreement;

(b)    reference to a time of a day or date in this Agreement shall be a reference to Korea Standard Time (KST);

(c)    any settlement to be made hereunder between Vendor and Buyer shall, if such settlement is to be made in:

(i)    fiat, be rounded up to the nearest two (2) decimal places if necessary; and

(ii)    Digital Assets or Tokens, be rounded up to the nearest ten (10) decimal places if necessary; and

(d)    any reference to Applicable Exchange Rate in relation to an amount denominated in Accepted Digital Asset and an amount denominated in an

DocuSign Envelope ID: 2612B437-4572-4BA6-B546-B4F8F53F0958

*[Draft dated 12.09.18]*

Accepted Fiat shall, where such Accepted Fiat be denominated in USD, refer at the election of Vendor to (i) such USD-Accepted Digital Asset exchange rate as quoted on the Applicable Digital Asset Exchange; (ii) USDT-Accepted Digital Asset exchange rate as quoted on the Applicable Digital Asset Exchange on the basis of one USDT being deemed equivalent to one USD; or (iii) TUSD- Accepted Digital Asset exchange rate as quoted on the Applicable Digital Asset Exchange on the basis of one TUSD being deemed equivalent to one USD.

## 2.     SALE OF BUYER TOKENS

2.1.     <u>Sale and distribution of Buyer Tokens</u>. Subject to the Vendor's receipt of the Buyer's payment of the Purchase Consideration and the Buyer's compliance with the terms of this Agreement, the Vendor shall deliver to the Buyer the Buyer Tokens at the Buyer Tokens Receiving Address on or before the Token Delivery Dates in accordance with Schedule 1, free of Encumbrances (the "**Token Sale**").

2.2.     <u>Settlement of Purchase Consideration</u>. Subject to the terms and conditions set forth in Clause 5, the Purchase Consideration shall be paid by the Buyer to the Vendor on or before the Settlement Date, in either Settlement Fiat or Settlement Digital Asset, at the Vendor's election which shall be notified to the Buyer in writing at least five (5) days prior to the Settlement Date. To the extent that:

(a)     payment of the Purchase Consideration is to be made pursuant to this Clause in Settlement Fiat, the Buyer shall transfer the Settlement Fiat equivalent of the Purchase Consideration to the Proceeds Receiving Designated Bank Account on or before the Settlement Date; and

(b)     payment of the Purchase Consideration is to be made pursuant to this Clause in Settlement Digital Asset, the Buyer shall transfer the Settlement Digital Asset equivalent of the Purchase Consideration (as determined based on the Applicable Exchange Rate as at the date of such transfer) to the Proceeds Receiving Designated Blockchain Address on or before the Settlement Date free of Encumbrances **PROVIDED THAT** such transfer would be considered effected only if there are at least 10 confirmations on the blockchain or digital ledger applicable to the Accepted Digital Asset.

2.3.     <u>Obligation of the Buyer to provide information</u>. To the extent that the Vendor determines in its sole and absolute discretion that it is necessary to obtain certain information about the Buyer in order to comply with any applicable Law or regulations in connection with the Token Sale, the Buyer shall provide the Vendor with such information promptly upon such request, and acknowledges and accepts that the Vendor may refuse to proceed with the Token Sale or withhold delivery of the Buyer Tokens to the Buyer until such requested information has been provided to the satisfaction of the Vendor. The Buyer undertakes to notify the Vendor of any change in the documents and information provided by the Buyer to the Vendor pursuant to this Agreement and in the absence of any notification in writing notifying of any change, the Vendor is entitled to assume that the documents and information provided by the Buyer remain true, correct, accurate, not misleading and unchanged.

2.4.     <u>Reliance</u>. Each of the Parties acknowledges that it has entered into this Agreement in reliance upon the other Party's representations and warranties being true, accurate, complete, and non-misleading in all respects. Save to the extent set out in this Agreement, no Party makes any other representations or warranties, express or implied, to the other Party and each Party acknowledges to the other Party that it has not relied on or been induced by any other warranties or representations made by the other Party to enter into this Agreement.

[Draft dated 12.09.18]

3.     **REPRESENTATIONS AND WARRANTIES OF THE VENDOR**

The Vendor hereby represents and warrants to the Buyer, as of the date hereof as follows:

3.1.    <u>Formation and standing</u>. The Vendor is a corporation duly incorporated, validly existing, and in good standing under the Laws of the Vendor's jurisdiction of incorporation, and will have all requisite corporate power and authority to carry on the transactions contemplated of the Vendor under this Agreement.

3.2.    <u>Authorisation of agreement, etcetera</u>. The Vendor has all requisite power and authority to execute and deliver this Agreement and to sell the Buyer Tokens to the Buyer and to carry out and perform its obligations under this Agreement, and this Agreement will constitute a legal, valid, and binding obligation of the Vendor enforceable against the Vendor in accordance with its terms, except that such enforceability may be limited by applicable bankruptcy, insolvency, reorganisation, moratorium, and similar Laws of general application relating to or affecting creditors' rights generally and by equitable principles (regardless of whether enforcement is sought in a proceeding in equity or at law).

3.3.    <u>Compliance with Laws and other instruments</u>. The execution of, and performance by the Vendor of the Vendor's obligations under this Agreement will not result in:

(a)     any violation of, be in conflict with in any material respect, or constitute a material default under:

(i)     any provision of the Vendor's Constitutive Documents;

(ii)    any provision of any permit, licence, judgment, decree or order to which the Vendor is a party, by which it is bound, or to which any of its material assets are subject;

(iii)   any material contract, obligation, or commitment to which the Vendor is a party or by which it is bound; or

(iv)    any Laws applicable to the Vendor; or

(b)     the creation of any material lien, charge or Encumbrance upon any material assets of the Vendor.

3.4.    <u>No consents or approvals</u>. The execution and delivery of, and performance under this Agreement require no approval or other action from any Governmental Authority or Person within the Vendor's jurisdiction of incorporation.

4.     **REPRESENTATIONS AND WARRANTIES OF THE BUYER**

The Buyer hereby represents, warrants, and undertakes to the Vendor, as of the date hereof up to and including the Token Distribution Date, as follows:

4.1.    <u>Eligibility</u>. The Buyer is not:

(a)     where Buyer is an individual, a person who is a citizen of, domiciled in, resident of, or physically present / located in an Excluded Jurisdiction;

(b)     where Buyer is a body corporate, a body corporate:

DocuSign Envelope ID: 2812B4374572-4BA01B548-B1F3F63F895B

*[Draft dated 12.09.18]*

       (i)      which is incorporated or organised in, or operates out of, an Excluded Jurisdiction, or

       (ii)     which is under the control of one or more individuals who is/are citizen(s) of, domiciled in, residents of, or physically present / located in, an Excluded Jurisdiction; and/or

(c)     an individual or body corporate which is otherwise prohibited or ineligible in any way, whether in full or in part, from participating in any part of the transactions contemplated in this Agreement,

(collectively, "**Excluded Persons**").

4.2.    <u>Formation and standing</u>. The Buyer is either an individual or an entity duly incorporated, validly existing, and in good standing under the Laws of the Buyer's jurisdiction of incorporation, and has full right, corporate, partnership, limited liability company or similar (as the case may be) power and authority to enter into and consummate the transactions contemplated by this Agreement and otherwise to carry out its obligations hereunder and thereunder.

4.3.    <u>Authorisation of agreement, *et cetera*</u>. The Buyer has all requisite power and authority to execute and deliver this Agreement and purchase the Buyer Tokens and to carry out and perform its obligations under this Agreement, and this Agreement will constitute a legal, valid, and binding obligation of the Buyer enforceable against the Buyer in accordance with its terms, except that such enforceability may be limited by applicable bankruptcy, insolvency, reorganisation, moratorium, and similar Laws of general application relating to or affecting creditors' rights generally and by equitable principles (regardless of whether enforcement is sought in a proceeding in equity or at law)

4.4.    <u>Compliance with Laws and other instruments</u>. The execution of, and performance by the Buyer of the Buyer's obligations under this Agreement will not result in:

(a)     any violation of, be in conflict with in any material respect, or constitute a material default under:

       (i)      to the extent that the Buyer is a corporation, any provision of the Buyer's Constitutive Documents;

       (ii)     any provision of any permit, licence, judgment, decree or order to which the Buyer is a party, by which it is bound, or to which any of its material assets are subject;

       (iii)    any material contract, obligation, or commitment to which the Buyer is a party or by which it is bound; and/or

       (iv)    any Laws applicable to the Buyer; and/or

(b)     the creation of any Encumbrance upon any material assets of the Buyer.

4.5.    <u>No consents or approvals</u>. The execution and delivery of and performance under this Agreement require no approval or other action from any Governmental Authority or Person.

4.6.    <u>The Project Documents</u>. The Buyer has received a copy of the current version of the Project Documents prepared in relation to the Project and has carefully read it. The Buyer acknowledges that the Project Documents may change during the time leading up to the Token Distribution Date in the Vendor's sole and absolute discretion, and the Buyer accepts the obligation to promptly read new versions of the Project Documents,

DocuSign Envelope ID: 2812B437-4572-4BA0-B546-B4E3F63F095B

which will be made available to the Buyer via any of the Project Channels. Notwithstanding anything to the contrary in this Agreement, the Buyer acknowledges, agrees, and warrants that the Vendor shall not have any obligation to provide or to procure the provision of any refund to the Buyer under this Agreement notwithstanding any amendment to the Project Documents, including but not limited to amendments to the Token characteristics.

4.7. <u>Evaluation of and ability to bear risks</u>. The Buyer has such knowledge and experience in financial matters, business, and technology, including but not limited to blockchain technology and other considerations relating thereto to be able to evaluate the risks and merits of:

(a) this Agreement;

(b) the Project in such structure or form as it may take from time to time, including any changes, revisions or amendments; and

(c) the Buyer Tokens to be purchased by the Buyer pursuant to this Agreement, including but not limited to the risks outlined in Clause 4.8, and is able to bear such risks.

4.8. <u>Significant risks</u>. The Buyer acknowledges and understands that the Project and the creation and distribution of the Tokens (including the Buyer Tokens) involve significant risks, including, but not limited to, the risk that:

(a) the technology associated with the Project may not function as intended;

(b) the Project may fail to attract interest or adoption, either from key stakeholders or the broader community;

(c) the Token Distribution Event may not occur;

(d) the Vendor and/or the Project Group may fail to adequately fund their respective operations and/or the Project;

(e) the Buyer Tokens may decrease in value over time and/or lose all monetary value, and there is no guarantee as to the price per Buyer Token purchased by the Buyer being equal or higher than the price per Token determined by the market; and

(f) the Vendor, the Project Group, the Tokens, and/or the Project may be subject to investigation and enforcement actions from Governmental Authorities, and these Governmental Authorities may make changes to existing Laws, regulations, and/or rules that will affect cryptographic tokens, digital assets, blockchain technology and its applications. Further, the Buyer has carefully read and considered the risk factors and other information relating to the Vendor, the Project Group, the Tokens, and the Project contained herein, including **Schedule 5**. The Buyer acknowledges and understands that the risks set forth in **Schedule 5** do not exhaustively contain all of the risks relating to the purchase of the Buyer Tokens, and that the Vendor bears no liability or responsibility to the Buyer with respect to the risks associated with or relating to the purchase of the Buyer Tokens.

4.9. <u>Taxes</u>. The Buyer acknowledges and understands that:

(a) the purchase and receipt of Buyer Tokens may have tax consequences for the Buyer;

*[Draft dated 12.09.18]*

    (b)    the Buyer is solely responsible for the Buyer's compliance with the Buyer's tax obligations;

    (c)    the Vendor bears no liability or responsibility with respect to any tax consequences to the Buyer; and

    (d)    to the extent that the Vendor bears or is otherwise subject to any tax consequences of the Buyer, the Buyer undertakes to indemnify the Vendor for all such tax consequences of the Buyer borne by the Vendor, and all associated costs and expenses incurred by the Vendor arising therefrom.

4.10.    <u>Anti-money laundering and Sanctions compliance</u>.

    (a)    *Anti-money laundering & counter-terrorism financing*. The Buyer represents and warrants to the Vendor that the Buyer complies with all anti-money laundering and anti-terrorism-financing requirements in all applicable jurisdictions.

    (b)    *Sanctions compliance*. Neither the Buyer, nor any Person having a direct or indirect beneficial interest in the Buyer or the Buyer Tokens being purchased by the Buyer, nor any Person for whom the Buyer is acting:

        (i)    is listed by the MAS as designated individuals or entities defined in the respective regulations promulgated under the Monetary Authority of Singapore Act (Chapter 186) of Singapore, the United Nations Act (Chapter 339) of Singapore, the Terrorism (Suppression of Financing) Act (Chapter 325) of Singapore or such other Law, regulation or rule as may be prescribed by the MAS from time to time;

        (ii)    is the subject of sanctions administered or enforced by Singapore, the U.S. (including without limitation the U.S. Department of the Treasury's Office of Foreign Asset Control), the United Kingdom of Great Britain and Northern Ireland, the European Union or any other Governmental Authority (collectively, "**Sanctions**");

        (iii)    is located, organised or resident in a country or territory that is the subject of country-wide or territory-wide Sanctions (including, without limitation, the Democratic People's Republic of Korea, the Democratic Republic of Congo, Eritrea, Iran, Libya, Somalia, South Sudan, Sudan, and Yemen);

        (iv)    has engaged in and is not now engaged in any dealings or transactions with any government, Person, entity or project targeted by, or located in any country or territory, that at the time of the dealing or transaction, is or was the subject of any Sanctions; or

        (v)    is otherwise a party with which the Vendor is prohibited from dealing under applicable Laws.

4.11.    <u>Truth and Accuracy</u>. All the documents and information furnished by the Buyer to the Vendor pursuant to this Agreement are true, accurate, complete, and non-misleading in all respects, and there is no matter, event, circumstance or any other information which has arisen which would make any documents and information provided misleading or incomplete, or any fact or information the omission of which would make any documents and information provided misleading or incomplete.

*[Draft dated 12.09.18]*

**5.      CONDITIONS PRECEDENT**

5.1.    The obligations of the Vendor to consummate the Token Sale and all other transactions contemplated hereby shall be subject to ("**Conditions**"):

(a)      receipt by the Vendor on or before Token Distribution Date of a legal opinion from its Singapore legal advisor that the Tokens are not "securities" within the definition of Part XIII of the Securities and Futures Act (Chapter 289) of Singapore by virtue of the functions of the Tokens;

(b)      receipt by the Vendor of the Purchase Consideration in full in accordance with this Agreement on or before Settlement Date;

(c)      there being no breach or non-compliance by the Buyer of the terms of or the Buyer's obligations under this Agreement; and

(d)      the Buyer's representations and warranties under Clause 4 being true and accurate,

but shall remain subject to all other provisions of this Agreement, including without limitation the right to terminate this Agreement pursuant to Clause 7.1.

5.2.    The Parties agree and confirm that the Conditions in Clause 5.1 are for the sole benefit of the Vendor, and accordingly, the Vendor shall be fully entitled in its sole and absolute discretion, by written notice to the Buyer, to waive any or all of the Conditions in Clause 5.1 either in whole or in part. Any such waiver by the Vendor shall be without prejudice to any remedies or rights that may have accrued in respect of such Condition's non-satisfaction.

5.3.    The waiver of a breach or non-fulfilment in respect of any of the Conditions in Clause 5.1 does not constitute a waiver of a breach or non-fulfilment of any other Condition in Clause 5.1 resulting from the same event, or a waiver of a breach or non-fulfilment of that Condition resulting from any other event.

**6.      DISCLAIMER, LIMITATIONS, AND INDEMNITY**

6.1.    <u>No claim, loan or ownership interest</u>. Neither this Agreement nor the purchase of the Buyer Tokens:

(a)      provides the Buyer with any claim whatsoever with respect to the Vendor, the Project Group, their respective Affiliates, and/or their respective assets:

(b)      is a loan or other indebtedness to the Vendor, and/or the Project Group;

(c)      provides the Buyer with any ownership or economic interest whatsoever in the Vendor, and/or the Project Group; and/or

(d)      provides the Buyer with any rights of a member of the Vendor, and/or the Project Group or any right to vote for the election of directors or upon any matter submitted to members at any meeting thereof, or to give or withhold consent to any corporate action or to receive notice of meetings, or to receive subscription rights or otherwise, or to receive any dividend or other distribution from the Vendor, and/or the Project Group.

6.2.    <u>Indemnification by the Buyer</u>. The Buyer shall defend, indemnify, and hold harmless the Vendor, the Project Group, their Affiliates, and their respective officers, directors, employees, agents, successors and assigns (collectively, the "**Indemnified Persons**")

*[Draft dated 12.09.18]*

from and against, and pay or reimburse the Indemnified Persons for a breach or any claim, any and all losses resulting from:

(a)     any inaccuracy in or breach of any representation or warranty when made or deemed made by the Buyer in or pursuant to this Agreement; or

(b)     any wilful or negligent breach of or default in performance by the Buyer under this Agreement.

6.3.     <u>Limitation of liability</u>. The liability of the Vendor in respect of a breach or any claim under this Agreement is subject to the limitations and qualifications as set out in **Schedule 3**.

7.     **MISCELLANEOUS**

7.1.     <u>Termination</u>. The Vendor shall be entitled by notice in writing to the Buyer ("**Termination Notice**") to terminate this Agreement if:

(a)     the Buyer does not comply with its obligations under this Agreement;

(b)     the Buyer engages in negative publicity against the Project, the Project Group or its representatives or denounces the same;

(c)     the development of the Project is required by any applicable Law to cease or terminate before the Token Distribution Date;

(d)     the development of the Project discontinues before the Token Distribution Date as a result of any event beyond the control of the Vendor and/or the Project Group before the Token Distribution Date, which cannot be resumed within three (3) months of such discontinuation;

(e)     prior to the Token Distribution Date, the creation, distribution or issuance of Tokens is illegal, invalid, prohibited by any government in any jurisdiction, or forced by any applicable Law to cease, or becomes subject to any approval, registration, filing or other statutory procedure or requirement that the Vendor and/or the Project Group are unable or choose not to meet;

(f)     the Vendor and/or the Project Group in their sole and absolute discretion elect to abort the development of the Project prior to the Token Distribution Event;

(g)     prior to the Token Distribution Event, an order has been made or petition presented for the winding up or insolvency of the Vendor and/or Project Group, whether in Singapore or elsewhere; and/or

(h)     prior to the Token Distribution Event, a composition in satisfaction of the Vendor's and/or Project Group's debts or compromise or arrangement between the Vendor and/or Project Group has been proposed, sanctioned or approved, whether in Singapore or elsewhere.

Upon any such termination pursuant to this Clause 7.1 ("**Termination**") with the exception of (a) and (b), the Buyer shall not be entitled to receive any Buyer Tokens, and the Vendor shall disburse to the Buyer part of the Purchase Consideration in accordance with Schedule 1 ("Refund Formula").

In any event, this Agreement shall terminate on the full receipt by the Buyer of the Buyer Tokens whereupon the Buyer shall have no claim to any part of or refund of the Purchase Consideration, **PROVIDED THAT** Clauses 6 and 7 shall survive any Termination hereof and upon receipt of the Buyer Tokens pursuant to this Agreement.

[Draft dated 12.09.18]

7.2.   Governing Law. This Agreement shall be governed in all respects, including as to validity, interpretation, and effect, by the Laws of Singapore, without giving effect to its principles or rules of conflict of laws, to the extent such principles or rules are not mandatorily applicable by statute and would permit or require the application of the Laws of another jurisdiction.

7.3.   Successors and assigns. This Agreement shall be binding upon and inure to the benefit of the Parties and their respective heirs, successors, and permitted assigns. This Agreement shall not be assignable or otherwise transferable without the prior written consent of the other Party, **PROVIDED THAT** the Vendor may assign or transfer this Agreement to an Affiliate, and the Buyer shall sign, execute and deliver any and all deeds, instruments, agreements and/or other documents in connection with such assignment or transfer and do all other acts and things and take all such steps as may be necessary, desirable or expedient to give effect to such assignment or transfer. The Buyer acknowledges and agrees that the Vendor shall not be obliged to deliver the Buyer Tokens unless and until the Buyer complies with its obligations under this provision. Any purported assignment in violation of this provision or in violation of applicable Laws shall be void.

7.4.   Entire agreement. This Agreement constitutes the entire agreement between the Parties and supersedes all prior or contemporaneous agreements and understandings, both written and oral, between the Parties with respect to the subject matter hereof.

7.5.   Construction. The Parties agree that any applicable rule requiring the construction of this Agreement or any provision hereof against the Party drafting this Agreement shall not apply.

7.6.   Reasonableness. Each Party confirms that it has received independent advice (legal or otherwise) relating to all the matters provided for in this Agreement, and agrees that the provisions of this Agreement (including all documents entered into pursuant to this Agreement) are fair and reasonable.

7.7.   Severability. If any provision of this Agreement is determined by a court of competent jurisdiction to be invalid, inoperative or unenforceable for any reason, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby be consumed as originally contemplated to the fullest extent possible.

7.8.   Counterparts. This Agreement may be executed in several counterparts, each of which shall be deemed an original and all of which shall together constitute one and the same document.

7.9.   No partnership and no agency. Nothing in this Agreement and no action taken by the Parties pursuant to this Agreement shall constitute, or be deemed to constitute, a partnership, association, joint venture or other co-operative entity between any of the Parties. Nothing in this Agreement and no action taken by the Parties pursuant to this Agreement shall constitute, or be deemed to constitute, either Party as the agent of the other Party for any purpose. No Party has, pursuant to this Agreement, any authority or power to bind or to contract in the name of the other Party.

7.10.  Third party rights. Save for the Vendor, the Project Group, and/or their respective Affiliates who shall have rights and benefits to the extent accorded thereto under this Agreement, any Person who is not a party to this Agreement shall have no right under the Contracts (Rights of Third Parties) Act (Chapter 53B) of Singapore to enforce any provisions of this Agreement.

*[Draft dated 12.09.18]*

7.11.  <u>Dispute resolution</u>. The Buyer and the Vendor shall cooperate in good faith to resolve any dispute or claim arising out of or in any way relating to this Agreement. If the Parties are unable to resolve such dispute or claim within ninety (90) days, such dispute or claim shall be finally settled by arbitration, and judgment upon the award may be entered by any court having jurisdiction thereof or having jurisdiction over the relevant Party or its assets. The arbitration shall be conducted under the rules of the SIAC. The arbitration tribunal shall consist of a sole arbitrator to be appointed by the President of the SIAC. The language of the arbitration shall be English.

7.12.  <u>Publications and notifications, fees and expenses</u>. The Parties shall agree to any press release or publication which the Vendor or its Affiliates may require that jointly involves the names, brands and/or officers of all Parties. Written correspondence and notifications between the Parties, whether as a result of a dispute or otherwise intended to be official correspondence, may be through email, the Project Channels, or other common forms of social media. Each Party shall be solely liable for all of its own fees, costs and otherwise in connection with negotiation and execution of this Agreement and any future dealings between the Parties and/or future publications regarding the Parties.

7.13.  <u>Electronic communications</u>. The Buyer agrees and acknowledges that all agreements, notices, disclosures and other communications that the Vendor provides the Buyer pursuant to this Agreement or in connection with or related to the Buyer's purchase of Buyer Tokens, including this Agreement, may be provided by the Vendor in its sole and absolute discretion to the Buyer, in electronic form.

7.14.  <u>Confidentiality</u>. This Agreement shall remain confidential between the Parties in perpetuity, except to the extent required to be disclosed pursuant to applicable Laws.

*[Draft dated 12.09.18]*

## SCHEDULE 1
## Particulars of Buyer / Token Sale

| 1. | **Particulars of Buyer** | **Name:** ███████████████ |
| --- | --- | --- |
| | | **Nationality / Place of Incorporation:** Hong Kong |
| | | **Identification Number / Unique Entity Number:** ███████ |
| | | **Address:** ████████████████████████ |
| | | **Email:** ██████████ |
| 2. | **Buyer Tokens** | The aggregate of: |
| | | (a) such number of Luna Tokens (rounded down to the nearest ten (10) decimal places) determined as follows (the "**Base Luna Tokens**"): |
| | | $$\frac{Purchase\ Consideration}{Purchase\ Price}$$ |
| | | where: |
| | | "**Purchase Price**" means the price per Luna Token hereunder, being **US$0.70**; and |
| | | (b) such number of bonus Terra Tokens (rounded down to the nearest ten (10) decimal places) determined as follows (the "**Bonus Terra Tokens**"): |
| | | *Purchase Consideration x 50% x Terra Peg Price* |
| | | where: |
| | | "**Terra Peg Price**" means an effective USD<>Terra exchange rate designed and declared by the Vendor. |
| 3. | **Purchase Consideration** | US$ 1,000,000.00 |
| 4. | **Accepted Digital Asset** | ETH or BTC (or such other Digital Assets which the Vendor may agree in writing) |
| 5. | **Accepted Fiat** | USD (or such other currency which the Vendor may agree in writing) |
| 6. | **Settlement Fiat** | USD (or such other Accepted Fiat as the Vendor may agree in writing) |
| 7. | **Settlement Digital Asset** | ETH or BTC (or such other Accepted Digital Asset as the Vendor may agree in writing) |
| 8. | **Settlement Date** | September 24th, 2018 |

DocuSign Envelope ID: 2812B4879572-4BA9-B546-B4E3E63F095B

*[Draft dated 12.09.18]*

| 9. | **Token Delivery Dates [#Dentons: Clients to review delivery arrangement set out in this row.]** | The Buyer shall deliver the Base Luna Tokens over six (6) tranches in such proportion of Base Luna Tokens as set out in Column (a) of the table below on or before to each corresponding delivery date ("**Luna Delivery Dates**") as set out in Column (b) of the table below: |
|---|---|---|

**Base Luna Tokens Delivery Schedule**

| | (a) | (b) |
|---|---|---|
| 1. | $P_1^{(1)}$ | $T^{(3)}$ |
| 2. | $P_2^{(1)}$ | 30th day after T |
| 3. | $P_3^{(1)}$ | 60th day after T |
| 4. | $P_4^{(1)}$ | 90th day after T |
| 5. | $P_5^{(1)}$ | 120th day after T |
| 6. | $P_6^{(2)}$ | 150th day after T |

**Notes:**
(1)   16.66% of the Base Luna Tokens rounded down to the nearest ten (10) decimal places.
(2)   Such amount of Luna Tokens equivalent to the t otal Base Luna Tokens less the number of Base Luna Tokens delivered in tranches $P_1$ to $P_5$.
(3)   "**T**" means the 91st day after the Token Distribution Date.

The Buyer shall deliver the Bonus Terra Tokens over twelve (12) tranches in such proportion of Bonus Terra Tokens as set out in Column (a) of the table below on or before to each corresponding delivery date ("**Terra Delivery Dates**") as indicated in Column (b) of the table below :

**Bonus Terra Tokens Delivery Schedule**

| | (a) | (b) |
|---|---|---|
| 1. | $P_1^{(1)}$ | $T^{(3)}$ |
| 2. | $P_2^{(1)}$ | 30th day after T |
| 3. | $P_3^{(1)}$ | 60th day after T |
| 4. | $P_4^{(1)}$ | 90th day after T |
| 5. | $P_5^{(1)}$ | 120th day after T |
| 6. | $P_6^{(1)}$ | 150th day after T |
| 7. | $P_7^{(1)}$ | 180th day after T |
| 8. | $P_8^{(1)}$ | 210th day after T |
| 9. | $P_9^{(1)}$ | 240th day after T |
| 10. | $P_{10}^{(1)}$ | 270th day after T |
| 11. | $P_{11}^{(1)}$ | 300th day after T |
| 12. | $P_{12}^{(2)}$ | 330th day after T |

**Notes:**
(1)   8.33% of the total Bonus Terra Tokens rounded down to the nearest ten (10) decimal places.
(2)   Such amount of Terra Tokens equivalent to the t otal Bonus Terra Tokens less the number of Bonus Terra Tokens delivered in tranches $P_1$ to $P_{11}$.
(3)   "T" means the 183rd day after the Token Distribution Date.

(the Luna Delivery Dates and the Terra Delivery Dates collectively, the "**Token Delivery Dates**").

| 10. | **Proceeds Receiving Designated Blockchain Address** | Such blockchain or digital ledger address compatible for receipt of Settlement Digital Asset as may be designated by Vendor and informed by Vendor to Buyer in writing. |
|---|---|---|
| 11. | **Proceeds Receiving Designated Bank Account** | Name of Account Holder: TERRAFORM LABS PTE. LTD.<br><br>Account Number: ▮▮▮▮▮▮<br><br>Bank Name: ▮▮▮▮▮ |

DocuSign Envelope ID: 2812B4874572-4BA9-B546-B4E3E53F995B

*[Draft dated 12.09.18]*

|  |  | SWIFT Code: ███████ |
|---|---|---|
|  |  | Bank Code: ███████ |
|  |  | Bank Address: ███████ |
|  |  | Address of Account Holder: U███████ |
|  |  | (or such other bank account as may be designated by the Vendor and notified by the Vendor to the Buyer in writing prior to Settlement Date). |
| 12. | **Buyer Tokens Receiving Address** | An address on the blockchain or digital ledger applicable to the Buyer Tokens as may be designated by the Buyer and notified by the Buyer to the Vendor in writing at least ten (10) calendar days prior to Token Distribution Event) |
| 13. | **Refund Formula** | (1)   Upon Termination, the Buyer shall not be entitled to receive any Tokens, and the Vendor shall disburse to the Buyer 80% of the Purchase Consideration, payable to a USDT compatible wallet address of the Buyer's choosing, at a 1:1 USDT<>USD exchange rate. |
|  |  | (2)   For the avoidance of doubt, any administrative costs and expenses (including but not limited to the Network Fees) which may be incurred by the Vendor in the course of such disbursement shall be borne by the Buyer. |
|  |  | (3)   Notwithstanding anything to the contrary in this Agreement, any obligation of Vendor in relation to disbursing *Pro Rata* Unutilised Proceeds to Buyer shall, to the extent any Token has been distributed to the Buyer ("**Distributed Tokens**") prior to Termination pursuant to this Agreement, be conditional on the Buyer's return of such Distributed Tokens to such blockchain or digital ledger address compatible for receipt of such Distributed Tokens as may be designated by Vendor and informed to Buyer in writing. |

*[Draft dated 12.09.18]*

**SCHEDULE 2**
**Excluded Jurisdictions**

1.      U.S.

2.      The People's Republic of China (which for the purpose of this Agreement shall exclude the Hong Kong Special Administrative Region of the People's Republic of China, the Macau Special Administrative Region of the People's Republic of China, and the Republic of China (Taiwan))

3.      Democratic People's Republic of Korea[#][^]

4.      Democratic Republic of the Congo[^]

5.      Eritrea[^]

6.      Ethiopia[#]

7.      Iran[#][^]

8.      Iraq[#]

9.      Libya[^]

10.     Somalia[^]

11.     Serbia[#]

12.     Sri Lanka[#]

13.     South Sudan[^]

14.     Sudan[^]

15.     Syria[#][^]

16.     Trinidad and Tobago[#]

17.     Tunisia[#]

18.     Vanuatu[#]

19.     Yemen[#][^]

20.     Any jurisdiction in which the Token Sale is prohibited, restricted or unauthorised in any form or manner whether in full or in part under the Laws, regulatory requirements or rules in such jurisdiction

[#]      *Jurisdictions with strategic anti-money laundering / counter-financing of terrorism deficiencies most recently identified by the Financial Action Task Force at <http://www.fatf-gafi.org/countries/#high-risk> (last accessed on [••] 2018)*

[^]      *Jurisdictions in which designated individuals and entities are identified by the MAS for the purposes of regulations promulgated under the Monetary Authority of Singapore Act (Chapter 186) of Singapore, the United Nations Act (Chapter 339) of Singapore or the Terrorism (Suppression of Financing) Act (Chapter 325) of Singapore*

DocuSign Envelope ID: 2812B4874572-4BA9-B546-B4E3E63F695B

[Draft dated 12.09.18]

**SCHEDULE 3**
**Limitation of liability**

Notwithstanding anything in this Agreement to the contrary, the provisions of this **Schedule 3** shall operate to limit the liability of the Vendor in respect of any claim by the Buyer.

1.  <u>Warranties</u>. The representations and warranties of the Vendor ("**Vendor's Warranties**") and such other covenants, undertakings and indemnities expressly set out in this Agreement are the only representations, warranties, undertakings or other assurances of any kind given by or on behalf of the Vendor to the Buyer and all other warranties, expressed or implied by law, trade, custom, usage or otherwise to be given by the Vendor are hereby expressly excluded by the Vendor.

2.  <u>*De minimis* claims</u>. No liability shall in any event arise in respect of any claim for breach of the Vendor's Warranties or any claim pursuant to any other provision of this Agreement unless the aggregate amount of the claim (together with the aggregate amount of any previous claims made against the Vendor) exceeds five per cent (5%) of the Purchase Consideration ("*De minimis* **Claim**"). For the avoidance of doubt, the *De minimis* Claim shall be based on the Settlement Fiat-denominated value of the Purchase Consideration as stated in **Schedule 1**, notwithstanding the Buyer making payment for the Buyer Tokens by way of Accepted Digital Asset pursuant to Clause 2.2(b).

3.  <u>*De maximis* claims</u>. The aggregate liability of the Vendor in respect of claims by the Buyer made for breach of the Vendor's Warranties shall not in any event exceed one hundred per cent (100%) of the Purchase Consideration.

4.  <u>Time limitation</u>. The Vendor shall not be liable in any way or in any event in respect of any claim under this Agreement if such claim was not made in the period commencing from the Settlement Date to the date falling 18 months thereafter (such period being the "**Claim Period**"). Any claim or indemnity claim which has been made before the expiration of the Claim Period shall, if it has not been previously satisfied in full, settled or withdrawn, be deemed to have been withdrawn and shall become fully barred and unenforceable on the expiry of the period of one (1) year commencing from the date on which such claim was made, unless proceedings in respect thereof shall have been commenced against the Vendor and for this purpose proceedings shall not be deemed to have been commenced unless they shall have been issued and served upon the Vendor.

5.  The Buyer shall not be entitled to recover or otherwise obtain reimbursement or restitution from the Vendor under this Agreement more than once in respect of the same damage suffered.

6.  For the avoidance of doubt, nothing in this **Schedule 3** shall limit the Buyer's obligation (at law or otherwise) to mitigate its loss in respect of any claim under this Agreement, and the Buyer shall not be entitled to recover damages in respect of any claim (as the case may be) if, and to the extent that, the Buyer has already recovered damages in respect of the same fact or subject matter.

7.  The Vendor shall not be liable under any circumstances for any indirect, incidental, special or consequential loss arising from any breach of the Vendor's Warranties.

*[Draft dated 12.09.18]*

**SCHEDULE 4**
**Token Characteristics**

In this Agreement, the "**Tokens**" shall mean the Luna Tokens and Terra Tokens, the characteristics of which are described further in this **Schedule 4**, and "**Token**" shall be construed accordingly.

**Luna Tokens**

<u>Token name</u>                          :        Luna tokens (singular: Luna token)


**Luna Tokens functions**:\*\*

☐     **Provide governance and stability for the Terra network**

**Terra Tokens**

<u>Token name</u>                          :        Terra tokens (singular: Terra token)


**Terra Tokens functions**:\*\*

☐     Price-stable cryptocurrency

*\*\*The exact governance mechanisms are yet to be developed.\*\**

*\*\*Functionality may be modified by the development team as research and development around the Project continues. Information on such functionality will be made available to the Buyer on updated versions of the Project Documents which may be made available to the Buyer via any of the Project Channels.\*\**

[Draft dated 12.09.18]

**SCHEDULE 5**
**Risk Factors**

1.  **RISKS RELATING TO PARTICIPATION IN THE TOKEN DISTRIBUTION EVENT**

    *Purchase of products, including but not limited to cryptocurrencies / cryptographic tokens, from start-ups such as the Vendor and the Project Group involve a high degree of risk*

    Financial and operating risks confronting start-ups are significant and the Vendor and the Project Group are not immune to these. Start-ups often experience unexpected problems in the areas of product development, marketing, financing, and general management, among others, which frequently cannot be solved.

    *The Vendor and/or the Project Group may be forced to cease operations*

    It is possible that, due to any number of reasons, including, but not limited to, an unfavourable fluctuation in the value of cryptographic and fiat currencies, the inability of the Vendor and/or the Project Group to establish the Project or the Tokens utility, the failure of commercial relationships, or intellectual property ownership challenges, the Vendor and/or the Project Group may no longer be viable to operate and the Vendor and/or the Project Group may dissolve or take actions that result in a dissolution of the Vendor and/or the Project Group.

    *This Agreement may not be transferred without the consent of the Vendor*

    The terms of this Agreement provide that the Buyer may not transfer or assign this Agreement without the consent of the Vendor and only if such transfer is in compliance with the Laws of applicable Governmental Authorities.

    *The tax treatment of this Agreement and the Tokens are uncertain and there may be adverse tax consequences for the Buyer upon certain future events*

    The tax characterisation of this Agreement and the Tokens are uncertain, and the Buyer must seek its own tax advice in connection with a purchase of Tokens. A purchase of Tokens pursuant to this Agreement may result in adverse tax consequences to the Buyer, including withholding taxes, income taxes, and tax reporting requirements. The Buyer should consult with and must rely upon the advice of its own professional tax advisors with respect to tax treatment of a purchase of Tokens pursuant to this Agreement.

    *There is no prior market for the Tokens and the Token Distribution Event may not result in an active or liquid market for the Tokens*

    Prior to the Token Distribution Event, there has been no public market for the Tokens and the Tokens are not traded, whether on any cryptocurrency exchange or otherwise the event that the Tokens are traded on a cryptocurrency exchange, there is no assurance that an active or liquid trading market for the Tokens will develop or if developed, be sustained after the Tokens have been made available for trading on such cryptocurrency exchange. There is also no assurance that the market price of the Tokens will not decline below the Purchase Consideration at which the Buyer acquired the Tokens. The Purchase Consideration may not be indicative of the market price of the Tokens after they have been made available for trading on a cryptocurrency exchange.

    A Token is not a currency issued by any central bank or national, supra-national or quasi-national organisation, nor is it backed by any hard assets or other credit. The

DocuSign Envelope ID: 2813B4874572-4BA9-B546-B4E3F63F895B

[Draft dated 12.09.18]

Vendor and/or the Project Group is/are not responsible for nor does it / do they pursue the circulation and trading of Tokens on the market. Trading of Tokens merely depends on the consensus on its value between the relevant market participants, and no one is obliged to purchase any Token from any holder of the Token, including the purchasers, nor does anyone guarantee the liquidity or market price of Tokens to any extent at any time. Accordingly, the Vendor and/or the Project Group cannot ensure that there will be any demand or market for Tokens, or that the Purchase Consideration is indicative of the market price of Tokens after they have been made available for trading on a cryptocurrency exchange.

### *Future sales of the Tokens could materially and adversely affect the market price of Tokens*

Any future sale of the Tokens (which were not available for sale in the Token Distribution Event) would increase the supply of Tokens in the market and this may result in a downward price pressure on the Tokens. The sale or distribution of a significant number of Tokens outside of the Token Distribution Event, or the perception that such further sales or issuance may occur, could adversely affect the trading price of the Tokens.

### *Negative publicity may materially and adversely affect the price of the Tokens*

Negative publicity involving the Vendor, the Project Group, the Project, the Tokens and/or any of the key personnel of the Vendor and/or the Project Group may materially and adversely affect the market perception or market price of the Tokens, whether or not such negative publicity is justified.

### *There is no assurance of any success of the Project*

The value of, and demand for, the Tokens hinges heavily on the performance of the Project. There is no assurance that the Project will gain traction after its launch and achieve any commercial success.

The Project has not been fully developed, finalised, and integrated and is subject to further changes, updates, and adjustments prior to its launch. Such changes may result in unexpected and unforeseen effects on its projected appeal to users, and hence impact its success.

While the Vendor has made every effort to provide a realistic estimate, there is also no assurance that the cryptocurrencies raised in the Token Distribution Event will be sufficient for the development and integration of the Project. For the foregoing or any other reason, the development and integration of the Project may not be completed and there is no assurance that it will be launched at all. As such, distributed Tokens may hold little worth or value, and this would impact its trading price.

If and when the Project is fully developed, there is no assurance that its systems, protocols, or products will be widely adopted or utilised by its target users.

### *The trading price of the Tokens may fluctuate following the Token Distribution Event*

The prices of cryptographic tokens in general tend to be relatively volatile, and can fluctuate significantly over short periods of time. The demand for, and correspondingly the market price of, the Tokens may fluctuate significantly and rapidly in response to, among others, the following factors, some of which are beyond the control of the Vendor and/or the Project Group:

(a)      new technical innovations;

23

[Draft dated 12.09.18]

(b)    analysts' speculations, recommendations, perceptions or estimates of the Token's market price or the financial and business performance of the Vendor and/or the Project Group;

(c)    changes in market valuations and token prices of entities with operations similar to that of the Vendor and/or the Project Group that may be made available for sale and purchase on the same cryptocurrency exchanges as the Tokens;

(d)    announcements by the Vendor and/or the Project Group of significant events, for example, partnerships, sponsorships, or new product developments;

(e)    fluctuations in market prices and trading volume of cryptocurrencies on cryptocurrency exchanges;

(f)    additions or departures of key personnel of the Vendor and/or the Project Group;

(g)    success or failure of the management of the Vendor and/or the Project Group in implementing business and growth strategies; and

(h)    changes in conditions affecting the blockchain or financial technology industry, the general economic conditions or market sentiments, or other events or factors.

***The funds raised in the Token Distribution Event are exposed to risks of theft***

The Vendor will make every effort to ensure that the funds received from the Token Distribution Event will be securely held at such addresses as directed by the Vendor ("**Receiving Addresses**"). Further, upon receipt of the funds, the Vendor will make every effort to ensure that the funds received will be securely held through the implementation of security measures. Notwithstanding such security measures, there is no assurance that there will be no theft of the cryptocurrencies as a result of hacks, mining attacks (including but not limited to double-spend attacks, majority mining power attacks, and "selfish-mining" attacks), sophisticated cyber-attacks, distributed denials of service or errors, vulnerabilities or defects on the Receiving Addresses, the blockchain(s) applicable to the Accepted Digital Asset, or any other blockchain, or otherwise. Such events may include, for example, flaws in programming or source code leading to exploitation or abuse thereof. In such event, even if the Token Distribution Event is completed, the Vendor may not be able to receive the cryptocurrencies raised and the Vendor may not be able to utilise such funds for the development of the Project, and the launch of the Project might be temporarily or permanently curtailed. As such, the issued Tokens may hold little worth or value, and this would impact their trading price. The Tokens are uninsured, unless the Buyer specifically obtains private insurance to insure them. In the event of any loss or loss of value of the Tokens, the Buyer may have no recourse.

2.    **RISKS RELATING TO THE RECEIVING ADDRESSES AND WALLETS**

***The Receiving Addresses may be compromised and the cryptocurrencies may not be able to be disbursed***

The Receiving Addresses are designed to be secure. However, in the event that the Receiving Addresses are, for any reason compromised (including but not limited to scenarios of the loss of keys to such Receiving Addresses), the funds held by the Receiving Addresses may not be able to be retrieved and disbursed, and may be permanently unrecoverable. In such event, even if the Token Distribution Event is

successful, the Vendor and/or the Project Group will not be able to receive the funds raised and the Vendor and/or the Project Group will not be able to utilise such funds for the development of the Project, and the implementation of the Project might be temporarily or permanently curtailed. As such, distributed Tokens may hold little worth or value, and this would impact their trading price.

***The loss or compromise of information relating to the Buyer's wallet may affect the Buyer's access and possession of the Tokens***

The Buyer's access to the Tokens in a cryptocurrency wallet ("**Wallet**") depends on, among other things, the safeguards to the information to such Wallet, including but not limited to the user account information, address, private key, and password. In the event that any of the foregoing is lost or compromised, the Buyer's access to the Wallet may be curtailed and thereby adversely affect the Buyer's access and possession to the Tokens, including such Tokens being unrecoverable and permanently lost.

***The Wallet or Wallet service provider may not be technically compatible with the Tokens***

The Wallet or Wallet service provider may not be technically compatible with the Tokens which may result in the delivery of Tokens being unsuccessful or affect the Buyer's access to such Tokens.

3.  **RISKS RELATING TO THE VENDOR AND THE PROJECT GROUP**

    The Project is initiated by the Vendor and the Project Group. Any events or circumstances which adversely affect the Vendor and/or the Project Group may have a corresponding adverse effect on the Project if such events or circumstances affect the Vendor's and/or the Project Group's ability to launch the Project. This would correspondingly have an impact on the trading price of the Tokens.

    ***There may be weaknesses, vulnerabilities or bugs in the protocols, systems, and smart contracts in connection with the Token Sale and/or the Project***

    The Project Group will make reasonable efforts to ensure that the protocols, systems, and smart contracts in connection with the Token Sale and/or the Project are audited, tested, and approved by technical experts. However, as smart contract technology is still in its early stage of development and its application of experimental nature carries significant operation, technological, financial, regulatory and reputational risks, there are inherent risks that such protocols, systems and/or smart contracts could contain weaknesses, vulnerabilities or bugs.

    Purchasers of Tokens should understand and accept that there are no warranties that Tokens are fit for a particular purpose or do not contain any weaknesses, vulnerabilities or bugs which would cause loss in their worth or value. In the event that any of the aforementioned risks materialises, the business strategies, results of operations and outlook of the Vendor and/or the Project Group may also be adversely affected.

    ***The Vendor and/or the Project Group may experience system failures, unplanned interruptions in their network or services, hardware or software defects, security breaches or other causes that could adversely affect the infrastructure network of the Vendor and/or the Project Group, and/or the Project***

    The Vendor and/or the Project Group is/are unable to anticipate when there would be occurrences of hacks, cyber-attacks, mining attacks (including but not limited to double-spend attacks, majority mining power attacks, and "selfish-mining" attacks), distributed denials of service or errors, vulnerabilities or defects in the Project, the Tokens, the Receiving Addresses, the Wallet or any technology (including but not

DocuSign Envelope ID: 2812B487-4572-4BA9-B546-B4E3E63F895B

[Draft dated 12.09.18]

limited to smart contract technology) on which the Project Group, the Project, the Tokens, the Receiving Addresses, and the Wallet rely or on the blockchain(s) applicable to the Accepted Digital Asset, or any other blockchain. Such events may include, for example, flaws in programming or source code leading to exploitation or abuse thereof. The Vendor and/or the Project Group may not be able to detect such hacks, mining attacks (including but not limited to double-spend attacks, majority mining power attacks, and "selfish-mining" attacks), cyber-attacks, distributed denials of service errors vulnerabilities or defects in a timely manner, and may not have sufficient resources to efficiently cope with multiple service incidents happening simultaneously or in rapid succession.

The network or services of the Vendor and/or the Project Group, which would include the Project, could be disrupted by numerous events, including natural disasters, equipment breakdown, network connectivity downtime, power losses, or even intentional disruptions of their services, such as disruptions caused by software viruses or attacks by unauthorised users, some of which are beyond the control of the Vendor and/or the Project Group. Although the Vendor and the Project Group will be taking steps against malicious attacks on their appliances or infrastructure, which are critical for the initiation and maintenance of the Project and its other services, there can be no assurance that cyber-attacks, such as distributed denials of service, will not be attempted in the future, and that any of the enhanced security measures of the Vendor and/or the Project Group will be effective. The Vendor and/or the Project Group may be prone to attacks on their infrastructure intended to steal information about its technology, financial data or user information or take other actions that would be damaging to the Vendor, the Project Group, and/or users of the Project. Any significant breach of the security measures of the Vendor and/or the Project Group or other disruptions resulting in a compromise of the usability, stability and security of the network or services of the Vendor and/or the Project Group (including the Project) may adversely affect the trading price of the Tokens.

### The Vendor and/or the Project Group are dependent in part on the location and data centre facilities of third parties

The infrastructure network of the Vendor and/or the Project Group is in part established through servers which they own and house at the location facilities of third parties, and servers that they rent at data centre facilities of third parties. If the Vendor and/or the Project Group is/are unable to renew its data facility lease on commercially reasonable terms or at all, the Vendor and/or the Project Group may be required to transfer their servers to a new data centre facility, and may incur significant costs and possible service interruption in connection with the relocation. These facilities are also vulnerable to damage or interruption from, among others, natural disasters, arson, terrorist attacks, power losses, and telecommunication failures. Additionally, the third party providers of such facilities may suffer a breach of security as a result of third party action, employee error, malfeasance or otherwise, and a third party may obtain unauthorised access to the data in such servers. As techniques used to obtain unauthorised access to, or to sabotage systems change frequently and generally are not recognised until launched against a target, the Vendor, the Project Group, and/or the providers of such facilities may be unable to anticipate these techniques or to implement adequate preventive measures. Any such security breaches or damages which occur that impact upon the infrastructure network of the Vendor and/or the Project Group, and/or the Project may adversely impact the price of the Tokens.

### General global market and economic conditions may have an adverse impact on the operating performance, results of operations and cash flows of the Vendor and/or the Project Group

The Vendor and/or the Project Group have/has been and could continue to be affected by general global economic and market conditions. Challenging economic conditions

DocuSign Envelope ID: 2B12B4B7-4572-4BA9-B546-B4E3F63F695B

*[Draft dated 12.09.18]*

worldwide have from time to time, contributed, and may continue to contribute, to slowdowns in the information technology industry at large. Weakness in the economy could have a negative effect on the business, operations and financial condition of the Vendor and/or the Project Group, including decreases in revenue and operating cash flows. Additionally, in a down-cycle economic environment, the Vendor and/or the Project Group may experience the negative effects of increased competitive pricing pressure and a slowdown in commerce and usage of the Project. Suppliers on which the Vendor and/or the Project Group rely for servers, bandwidth, location and other services could also be negatively impacted by economic conditions that, in turn, could have a negative impact on the operations or expenses of the Vendor and/or the Project Group. There can be no assurance, therefore, that current economic conditions or worsening economic conditions or a prolonged or recurring recession will not have a significant adverse impact on the business, financial condition and results of operations of the Vendor and/or the Project Group, and hence the Project, which may indirectly impact the trading price of the Tokens.

### *The Vendor, the Project Group, the Tokens, the Project, and/or the Project may be affected by newly implemented regulations*

Cryptocurrency trading is generally unregulated worldwide, but numerous regulatory authorities across jurisdictions have been outspoken about considering the implementation of regulatory regimes which govern cryptocurrency or cryptocurrency markets. The Vendor, the Project Group, the Project, and/or the Tokens may be affected by newly implemented regulations relating to cryptocurrencies or cryptocurrency markets, including having to take measures to comply with such regulations, or having to deal with queries, notices, requests or enforcement actions by regulatory authorities, which may come at a substantial cost and may also require substantial modifications to the Project. This may impact the appeal of the Project for users and result in decreased usage of the Project. Further, should the costs (financial or otherwise) of complying with such newly implemented regulations exceed a certain threshold, launching the Project may no longer be commercially viable and the Vendor and/or the Project Group may opt to discontinue the Project and/or the Tokens. Further, it is difficult to predict how or whether governments or regulatory authorities may implement any changes to Laws and regulations affecting distributed ledger technology and its applications, including the Project and the Tokens. The Vendor and/or the Project Group may also have to cease operations in a jurisdiction that makes it illegal to operate in such jurisdiction, or make it commercially unviable or undesirable to obtain the necessary regulatory approval(s) to operate in such jurisdiction. In scenarios such as the foregoing, the trading price of Tokens will be adversely affected or Tokens may cease to be traded.

### *The regulatory regime governing blockchain technologies, cryptocurrencies, tokens, and token offerings such as the Token Distribution Event, the Project, and the Tokens is uncertain, and regulations or policies may materially adversely affect the development of the Project and the utility of the Tokens*

Regulation of tokens (including the Tokens) and token offerings (such as the Token Distribution Event), cryptocurrencies, blockchain technologies, and cryptocurrency exchanges is currently undeveloped and likely to rapidly evolve, varies significantly among international, federal, state and local jurisdictions, and is subject to significant uncertainty. Various legislative and executive bodies in Singapore and other countries may in the future adopt Laws, regulations, guidance, or other actions, which may severely impact the development and growth of the Project, the adoption and utility of the Tokens or the issue, offer, and sale of the Tokens by the Vendor. Failure by the Vendor and/or the Project Group or users of the Project to comply with any Laws, rules and regulations, some of which may not exist yet or are subject to interpretation and may be subject to change, could result in a variety of adverse consequences, including civil penalties and fines.

DocuSign Envelope ID: 2812B4874572-4BA9-B546-B4E3E63F065B

[Draft dated 12.09.18]

Blockchain networks also face an uncertain regulatory landscape in many foreign jurisdictions such as the European Union, China, South Korea, and Russia. Various jurisdictions may, in the near future, adopt Laws, regulations or directives that affect the Project. Such Laws, regulations or directives may directly and negatively impact the business of the Vendor and/or the Project Group. The effect of any future regulatory change is impossible to predict, but such change could be substantial and materially adverse to the development and growth of the Project and the adoption and utility of the Tokens.

New or changing Laws and regulations or interpretations of existing Laws and regulations may materially and adversely impact the value of the currency in which the Tokens may be sold, the liquidity of the Tokens, the ability to access marketplaces or exchanges on which to trade the Tokens, and the structure, rights and transferability of Tokens.

### Token holders will have no control over the Vendor and/or the Project Group

The holders of Tokens are not and will not be entitled to vote or receive dividends or distributions and are not and will not be treated as the holder of shares in the Vendor and/or the Project Group for any purpose, nor will anything be construed to confer on the Buyer any of the rights of a member of the Vendor and/or the Project Group or any right to vote for the election of directors or upon any matter submitted to members at any meeting thereof, or to give or withhold consent to any corporate action or to receive notice of meetings, or to receive subscription rights or otherwise.

### The Buyer may lack information in respect of the Vendor, the Project Group, the Project, the Tokens, and/or the Project

The Buyer may not be able to obtain all the information it would want regarding the Vendor, the Project Group, the Project, the Tokens, and/or the Project, on a timely basis or at all. It is possible that the Buyer may not be aware on a timely basis of material adverse changes that have occurred. Information in relation to the development of Tokens may also be highly technical by nature. As a result of these difficulties, as well as other uncertainties, the Buyer may not have accurate or accessible information about the Vendor, the Project Group, the Project, the Tokens, and/or the Project.

### There may be risks relating to acts of God, natural disasters, wars, terrorist attacks, riots, civil commotions widespread communicable diseases and other force majeure events beyond the control of the Vendor and/or the Project Group

The Token Distribution Event and the performance of the activities of the Vendor, the Project Group, and/or the Project may be interrupted, suspended or delayed due to acts of God, natural disasters, wars, terrorist attacks, riots, civil commotions, widespread communicable diseases and other force majeure events beyond the control of the Vendor and/or the Project Group. Such events could also lead to uncertainty in the economic outlook of global markets and there is no assurance that such markets will not be affected, or that recovery from the global financial crisis would continue. In such events, the business strategies, results of operations and outlook of the Vendor and/or the Project Group may be materially and adversely affected. Further, if an outbreak of such infectious or communicable diseases occurs in any of the countries in which the Vendor, the Project Group, the developers, data providers and/or data consumers have operations in the future, market sentiment could be adversely affected and this may have a negative impact on the Project and community.

### There may be unanticipated risks arising from the Tokens

DocuSign Envelope ID: 2812B487-4572-4BA9-B546-B4E3F63F095B

*[Draft dated 12.09.18]*

Cryptographic tokens such as the Tokens are a relatively new and dynamic technology. In addition to the risks included herein, there are other risks associated with the Buyer's purchase, holding and use of the Tokens, including those that the Vendor and/or the Project Group cannot anticipate. Such risks may further materialise as unanticipated variations or combinations of the risks discussed herein.

**IN WITNESS WHEREOF**, the Parties have duly executed this Agreement as of the date first above written.

<u>**THE VENDOR**</u>

SIGNED by ▮▮▮▮▮▮           )
**[••]**                   )
for and on behalf of       )
**TERRAFORM LABS LIMITED** )
in the presence of:        )

▮▮▮▮▮▮▮▮▮▮▮  _____

Name:


<u>**THE BUYER (IF BUYER IS A CORPORATION)**</u>

SIGNED by ▮▮▮▮▮▮           )
                           )
for and on behalf of ▮▮▮▮▮▮▮▮▮▮▮▮▮
                           )
in the presence of:        )

▮▮▮▮▮▮▮▮▮▮▮  _____

Name:

**OR**

<u>**THE BUYER (IF BUYER IS AN INDIVIDUAL)**</u>

SIGNED by                  )
                           )
in the presence of:        )


_____

Name:


SIGNING PAGE TO TOKEN SALE AGREEMENT (==Private Sale==)