# EXHIBIT W

Gary Gensler, SEC Chair, *Remarks Before the Aspen Security Forum*, August 3, 2022.

# EXHIBIT W

# Speech

## Remarks Before the Aspen Security Forum



**Chair Gary Gensler**

**Washington D.C.**

**Aug. 3, 2021**

Thank you for that kind introduction. It's good to join the Aspen Security Forum.

As is customary, I'd like to note that my views are my own, and I'm not speaking on behalf of the Commission or the SEC staff.

Some might wonder: What does the SEC have to do with crypto?

Further, why did an organization like the Aspen Security Forum ask me to speak about crypto's intersection with national security?

Let me start at the beginning.

It was Halloween night 2008, in the middle of the financial crisis, when Satoshi Nakamoto published an eight-page paper[1] on a cypherpunk mailing list that'd been run by cryptographers since 1992.[2]

Nakamoto — we still don't know who she, he, or they were — wrote, "I've been working on a new electronic cash system that's fully peer-to-peer, with no trusted third party."[3]

Nakamoto had solved two riddles that had dogged these cryptographers and other technology experts for a couple of decades: first, how to move something of value on the internet without a central intermediary; and relatedly, how to prevent the "double-spending" of that valuable digital token.

Subsequently, his innovation spurred the development of crypto assets and the underlying blockchain technology.

Based upon Nakamoto's innovation, about a dozen years later, the crypto asset class has ballooned. As of Monday, this asset class purportedly is worth about $1.6 trillion, with 77 tokens worth at least $1 billion each and 1,600 with at least a $1 million market capitalization.[4]

Before starting at the SEC, I had the honor of researching, writing, and teaching about the intersection of finance and technology at the Massachusetts Institute of Technology. This included courses on crypto finance, blockchain technology, and money.

In that work, I came to believe that, though there was a lot of hype masquerading as reality in the crypto field, Nakamoto's innovation is real. Further, it has been and could continue to be a catalyst for change in the fields of finance and money.[5]

At its core, Nakamoto was trying to create a private form of money with no central intermediary, such as a central bank or commercial banks.

We already live in an age of digital public monies — the dollar, euro, sterling, yen, yuan. If that wasn't obvious before the pandemic, it has become eminently clear over the last year that we increasingly transact online.

Such public fiat monies fulfill the three functions of money: a store of value, unit of account, and medium of exchange.

No single crypto asset, though, broadly fulfills all the functions of money.

Primarily, crypto assets provide digital, scarce vehicles for speculative investment. Thus, in that sense, one can say they are highly speculative stores of value.

These assets haven't been used much as a unit of account.

We also haven't seen crypto used much as a medium of exchange. To the extent that it is used as such, it's often to skirt our laws with respect to anti-money laundering, sanctions, and tax collection. It also can enable extortion via ransomware, as we recently saw with Colonial Pipeline.

With the advent of the internet age and the movement from physical money to digital money several decades ago, nations around the globe layered various public policy goals over our digital public money system.

As a policy matter, I'm technology-neutral.

As a personal matter, I wouldn't have gone to MIT if I weren't interested in how technology can expand access to finance and contribute to economic growth.

But I am anything but public policy-neutral. As new technologies come along, we need to be sure we're achieving our core public policy goals.

In finance, that's about protecting investors and consumers, guarding against illicit activity, and ensuring financial stability.

So how does the SEC fit into all this?

The SEC has a three-part mission — to protect investors, facilitate capital formation, and maintain fair, orderly, and efficient markets in between them. We focus on financial stability as well. But at our core, we're about investor protection.

If you want to invest in a digital, scarce, speculative store of value, that's fine. Good-faith actors have been speculating on the value of gold and silver for thousands of years.

Right now, we just don't have enough investor protection in crypto. Frankly, at this time, it's more like the Wild West.

This asset class is rife with fraud, scams, and abuse in certain applications. There's a great deal of hype and spin about how crypto assets work. In many cases, investors aren't able to get rigorous, balanced, and complete information.

If we don't address these issues, I worry a lot of people will be hurt.

First, many of these tokens are offered and sold as securities.

There's actually a lot of clarity on that front. In the 1930s, Congress established the definition of a security, which included about 20 items, like stock, bonds, and notes. One of the items is an investment contract.

The following decade, the Supreme Court took up the definition of an investment contract. This case said an investment contract exists when "a person invests his money in a common enterprise and is led to expect profits

solely from the efforts of the promoter or a third party."[6] The Supreme Court has repeatedly reaffirmed this Howey Test.

Further, this is but one of many ways we determine whether tokens must comply with the federal securities laws.

I think former SEC Chairman Jay Clayton said it well when he testified in 2018: "To the extent that digital assets like [initial coin offerings, or ICOs] are securities — and I believe every ICO I have seen is a security — we have jurisdiction, and our federal securities laws apply."[7]

I find myself agreeing with Chairman Clayton. You see, generally, folks buying these tokens are anticipating profits, and there's a small group of entrepreneurs and technologists standing up and nurturing the projects. I believe we have a crypto market now where many tokens may be unregistered securities, without required disclosures or market oversight.

This leaves prices open to manipulation. This leaves investors vulnerable.

Over the years, the SEC has brought dozens of actions in this area,[8] prioritizing token-related cases involving fraud or other significant harm to investors. We haven't yet lost a case.

Moreover, there are initiatives by a number of platforms to offer crypto tokens or other products that are priced off of the value of securities and operate like derivatives.

Make no mistake: It doesn't matter whether it's a stock token, a stable value token backed by securities, or any other virtual product that provides synthetic exposure to underlying securities. These products are subject to the securities laws and must work within our securities regime.

I've urged staff to continue to protect investors in the case of unregistered sales of securities.

Next, I'd like to discuss crypto trading platforms, lending platforms, and other "decentralized finance" (DeFi) platforms.

The world of crypto finance now has platforms where people can trade tokens and other venues where people can lend tokens. I believe these platforms not only can implicate the securities laws; some platforms also can implicate the commodities laws and the banking laws.

A typical trading platform has more than 50 tokens on it. In fact, many have well in excess of 100 tokens. While each token's legal status depends on its own facts and circumstances, the probability is quite remote that, with 50 or 100 tokens, any given platform has zero securities.

Moreover, unlike other trading markets, where investors go through an intermediary like the New York Stock Exchange, people can trade on crypto trading platforms without a broker — 24 hours a day, 7 days a week, from around the globe.

Further, while many overseas platforms state they don't allow U.S. investors, there are allegations that some unregulated foreign exchanges facilitate trading by U.S. traders who are using virtual private networks, or VPNs.[9]

The American public is buying, selling, and lending crypto on these trading, lending, and DeFi platforms, and there are significant gaps in investor protection.

Make no mistake: To the extent that there are securities on these trading platforms, under our laws they have to register with the Commission unless they meet an exemption.

Make no mistake: If a lending platform is offering securities, it also falls into SEC jurisdiction.

Next, I'd like to turn to stable value coins, which are crypto tokens pegged or linked to the value of fiat currencies.

Many of you have heard about Facebook's efforts to stand up a stablecoin called Diem (formerly known as Libra).

Due to the global reach of Facebook's platform, this has gotten a lot of attention from central bankers and regulators. This is not only due to general policies and concerns with crypto, but also due to Diem's potential impact on monetary policy, banking policy, and financial stability.

Maybe less well known to this audience, though, is that we already have an existing stablecoin market worth $113 billion,[10] including four large stablecoins — some of which have been around for seven years.

These stablecoins are embedded in crypto trading and lending platforms.

How do you trade crypto-to-crypto? Usually, somebody uses stablecoins.

In July, nearly three-quarters of trading on all crypto trading platforms occurred between a stablecoin and some other token.[11]

Thus, the use of stablecoins on these platforms may facilitate those seeking to sidestep a host of public policy goals connected to our traditional banking and financial system: anti-money laundering, tax compliance, sanctions, and the like. This affects our national security, too.

Further, these stablecoins also may be securities and investment companies. To the extent they are, we will apply the full investor protections of the Investment Company Act and the other federal securities laws to these products.

I look forward to working with my colleagues on the President's Working Group on Financial Markets on these matters.[12]

Next, I want to turn to investment vehicles providing exposure to crypto assets. Such investment vehicles already exist, with the largest among them having been around for eight years and worth more than $20 billion.[13] Also, there are a number of mutual funds that invest in Bitcoin futures on the Chicago Mercantile Exchange (CME).

I anticipate that there will be filings with regard to exchange-traded funds (ETFs) under the Investment Company Act ('40 Act). When combined with the other federal securities laws, the '40 Act provides significant investor protections.

Given these important protections, I look forward to the staff's review of such filings, particularly if those are limited to these CME-traded Bitcoin futures.

The final policy area has to do with custody of crypto assets. The SEC is seeking comment on crypto custody arrangements by broker-dealers and relating to investment advisers.[14] Custody protections are key to preventing theft of investor assets, and we will be looking to maximize regulatory protections in this area.

Before I conclude, I'd like to note we have taken and will continue to take our authorities as far as they go.

Certain rules related to crypto assets are well-settled. The test to determine whether a crypto asset is a security is clear.

There are some gaps in this space, though: We need additional Congressional authorities to prevent transactions, products, and platforms from falling between regulatory cracks. We also need more resources to protect investors in this growing and volatile sector.

We stand ready to work closely with Congress, the Administration, our fellow regulators, and our partners around the world to close some of these gaps.

In my view, the legislative priority should center on crypto trading, lending, and DeFi platforms. Regulators would benefit from additional plenary authority to write rules for and attach guardrails to crypto trading and lending.

Right now, large parts of the field of crypto are sitting astride of — not operating within — regulatory frameworks that protect investors and consumers, guard against illicit activity, ensure for financial stability, and yes, protect national security.

Standing astride isn't a sustainable place to be. For those who want to encourage innovations in crypto, I'd like to note that financial innovations throughout history don't long thrive outside of our public policy frameworks.

At the heart of finance is trust. And at the heart of trust in markets is investor protection. If this field is going to continue, or reach any of its potential to be a catalyst for change, we better bring it into public policy frameworks.

Thank you. I look forward to your questions.

---

[1] *See* Satoshi Nakamoto, "Bitcoin: A Peer-to-Peer Electronic Cash System," *available at* https://bitcoin.org/bitcoin.pdf.

[2] *See* Haseeb Qureshi "The Cypherpunks" (Dec. 29, 2019), *available at* https://nakamoto.com/the-cypherpunks/.

[3] *See* "Bitcoin P2P e-cash paper" (Oct. 31, 2008), *available at* https://satoshi.nakamotoinstitute.org/emails/cryptography/1/.

[4] Numbers as of Aug. 2, 2021. *See* CoinMarketCap, *available at* www.coinmarketcap.com. Crypto asset figures are not audited or reported to regulatory authorities.

[5] *See* Michael Casey, Jonah Crane, Gary Gensler, Simon Johnson, and Neha Narula, "The Impact of Blockchain Technology on Finance: A Catalyst for Change" (2018), *available at* https://www.sipotra.it/wp-content/uploads/2018/07/The-Impact-of-Blockchain-Technology-on-Finance-A-Catalyst-for-Change.pdf.

[6] *See* SEC v. Howey Co., 328 U.S. 293 (1946), "Framework for 'Investment Contract' Analysis of Digital Assets," *available at* https://supreme.justia.com/cases/federal/us/328/293/.

[7] *See* Jay Clayton, Testimony United States Senate Committee on Banking, Housing, And Urban Affairs, "Virtual Currencies: The Oversight Role of the U.S. Securities and Exchange Commission and the U.S. Commodity Futures Trading Commission" (Feb. 6, 2018), *available at* https://www.banking.senate.gov/hearings/virtual-currencies-the-oversight-role-of-the-us-securities-and-exchange-commission-and-the-us-commodity-futures-trading-commission (see approx. 32:00 mark).

[8] *See* Cornerstone Research, "Cornerstone Research Report Shows SEC Establishes Itself as a Key U.S. Cryptocurrency Regulator" (May 11, 2021), *available at* https://www.cornerstone.com/Publications/Press-Releases/Cornerstone-Research-Report-Shows-SEC-Establishes-Itself-as-a-Key-U-S-Cryptocurrency-Regulator.

[9] *See* Alexander Osipovich, "U.S. Crypto Traders Evade Offshore Exchange Bans" (July 30, 2021), *available at* https://www.wsj.com/articles/u-s-crypto-traders-evade-offshore-exchange-bans-11627637401.

[10] Numbers as of Aug. 1. *See* The Block, "Total Stablecoin Supply," *available at* https://www.theblockcrypto.com/data/decentralized-finance/stablecoins.

[11] *See* The Block, "Share of Trade Volume by Pair Denomination," *available at* https://www.theblockcrypto.com/data/crypto-markets/spot.

[12] *See* "Readout of the Meeting of the President's Working Group on Financial Markets to Discuss Stablecoins" (July 19, 2021), *available at* https://home.treasury.gov/news/press-releases/jy0281.

[13] *See* Grayscale® Bitcoin Trust, *available at* https://grayscale.com/products/grayscale-bitcoin-trust/.

[14] *See* Securities and Exchange Commission, "Staff Statement on WY Division of Banking's 'NAL on Custody of Digital Assets and Qualified Custodian Status'" (Nov. 9, 2020), *available at* https://www.sec.gov/news/public-statement/statement-im-finhub-wyoming-nal-custody-digital-assets. *See* Securities and Exchange Commission,

"SEC Issues Statement and Requests Comment Regarding the Custody of Digital Asset Securities by Special Purpose Broker-Dealers" (Dec. 23, 2020), *available at* https://www.sec.gov/news/press-release/2020-340.