# EXHIBIT Y

Hester M. Peirce, SEC Comm'r, *Rendering Innovation Kaput: Statement on Amending the Definition of Exchange*, April 14, 2023.

# EXHIBIT Y

# Statement

# Rendering Innovation Kaput: Statement on Amending the Definition of Exchange



**Commissioner Hester M. Peirce**

**April 14, 2023**

Thank you, Mr. Chair. Stagnation, centralization, expatriation, and extinction are the watchwords of this release. Rather than embracing the promise of new technology as we have done in the past, here we propose to embrace stagnation, force centralization, urge expatriation, and welcome extinction of new technology. Accordingly, I dissent.

Over thirty years ago, the Commission faced a challenge: Firms were developing innovative ways to bring together buyers and sellers. These exchange alternatives did not promise continuous liquidity or commit to maintain an active market in particular securities, but they did provide more flexibility than market participants had on a traditional exchange.[1] The Commission could have required them to register as national securities exchanges,[2] but doing so would have rendered the innovation "kaput", as the Seventh Circuit put it when it upheld the Commission's action to permit one of these systems to operate.[3] Why? Well, they were incompatible with exchange regulation of that era. For example, the Seventh Circuit noted that the so-called Delta system, which involved a firm that issued options, a registered broker-dealer that matched counterparties, and a bank that cleared the trades, could not "register as an exchange" because it was not controlled, as exchange registration required at that time, by members that were also registered as brokers.[4]

In other words, faced with a choice between fostering innovation or stifling it with an inflexible and expansive interpretation of the statutory definition of "exchange," the Commission chose innovation.[5] In permitting the Delta system to continue operation, the Commission grappled honestly with the real-world consequences of its exercise of authority. It recognized that "an expansive interpretation of" the statutory exchange definition would harm "innovation and competition."[6] Accordingly, the Commission determined that it was "not constrained to apply a particular provision of a statute so expansively as to produce absurd consequences" and instead adopted a sensible narrower interpretation.[7]

This narrower interpretation facilitated further innovation. Through a series of no-action letters over the next several years, the staff gave the green light to a number of other alternative trading systems.[8] Then, in 1998, after a number of such systems had emerged, the Commission set about to create a tailored regulatory framework. [9] It created Regulation ATS by combining a more-expansive definition of exchange with a prudent exercise of the exemptive authority that Congress had provided two years earlier.[10]

While the origin story for Regulation ATS is a sound blueprint for how the SEC should handle emerging technologies, today's comment reopener confirms that the Commission of that era is a relic of by


Return to Top

one commenter on the proposal noted, this is "a tale of two Commissions."[11] No longer does this Commission consider the real-world effects of its exercise of authority. No longer does this Commission think creatively about regulatory alternatives that advance the Commission's mission while preserving space for potentially disruptive innovation. No longer does this Commission worry that regulatory bullheadedness often produces absurd consequences.

Rather, today's Commission aggressively expands its regulatory reach to solve problems that do not exist. Today's Commission treats its basic approach to exchange regulation as something that must not—indeed cannot—be altered to allow room for new technologies or for new ways of doing business. Today's Commission tells entrepreneurs trying to do new things in our markets to come in and register. When entrepreneurs find they cannot, the Commission dismisses the possibility of making practical adjustments to our registration framework to help entrepreneurs register, and instead rewards their good faith with an enforcement action. Today's Commission treats the notice-and-comment rulemaking process not as a conversation, but as a threat.

Today's comment reopener perfectly captures the Commission's new way of doing things. Rather than responding to commenters' serious concerns about the breadth, ambiguity, unworkability, and potential disruption of the proposal, the reopener, with few exceptions, doubles down on the defects identified by commenters. We stretch the statutory definition of "exchange" beyond a reasonable reading to reach a poorly defined set of activities with no evidence that investors will benefit. We do so with an insouciant laugh at the consequences. Even if one grants for the sake of argument that this proposed amendment to the definition of exchange under our rules is within our authority,[12] the Commission's cavalier approach stands in marked contrast to its approach a quarter-century ago. The release sends a message that we are uninterested in facilitating innovation and competition in the financial markets and instead seek to protect incumbents.[13] Accordingly, although I am generally supportive of reopening comment periods where it is clear that the Commission will benefit from further good faith engagement with the public, I cannot support what the Commission is doing in this release.

\*\*\*

The specific problems lurking in these nearly 170 pages are too many to enumerate in this meeting, but let me mention a few high-level issues:

- *The release does not propose to define the ambiguous term, "Communication Protocol System."*

  Numerous commenters asked us to define "Communication Protocol System," but this release demurs. In contrast to the extensive examples the Commission provided in 1998 when it initially adopted Rule 3b-16 and Regulation ATS, the Commission still declines to list examples that fall within or outside the definition. Instead, it asks commenters whether the Commission should provide additional examples and, if so, what examples it should provide. Asking commenters to resolve the ambiguity in a novel term of our own creation is inappropriate, particularly given that many commenters have no idea what we are trying to achieve with the proposal.[14] Perhaps the Commission finds value in keeping the term ambiguously broad. This flexibility comes at the cost of unnecessary increased regulatory risk, particularly for new and small firms which may not even realize they have tripped over the hazy communications protocol system threshold.

- *This release does not grapple with the possibility that "Communication Protocol System" may capture hundreds of systems.*

  Several commenters have suggested that the breadth of the proposed rule may encompass several hundred systems.[15] The release nowhere analyzes the likelihood of this concern and does not grapple with the potential disruption to the market and to various service providers, or with questions about whether these entities will be able to register as broker-dealers or exchanges, or about the capacity of the Commission and FINRA to process registration applications and to monitor and examine these systems for compliance with the rules governing exchanges or ATSs.

⊙ Return to Top

Beyond these two broad concerns about the rule's application to both the traditional financial markets and the crypto markets, let me mention some of the crypto-specific concerns raised by the reopening release.

- *This release articulates confusing and unworkable standards for decentralized activity, participants in that activity, and providers of the underlying technologies, including validators and miners.*

    The Exchange Act and our rules define an exchange to be "an organization, association, or group of persons" that, among other things, provides a market place for the trading of securities.[16] In this release, the Commission struggles to articulate what "group" means in the context of a decentralized trading venue, where the venue is a piece of software and participants do not necessarily know other participants. The release repeatedly suggests that persons may form a group if they are acting "in concert" with each other and further explains that one indication of acting "in concert" with each other may be the presence of a formal or informal agreement among these persons.[17] But the release also explains that this is just "one factor to consider,"[18] which suggests that no agreement, formal or informal, or even concerted action is required, In fact, the release goes on to say that "[i]f the activities of any combination of actors constitute, maintain, or provide, together, a market place or facilities for bringing together buyers and sellers for securities," they may already be considered a group for purposes of the exchange definition. [19] This group, the release suggests, could designate a member to register the group, "form[] an organization to register as an exchange," or become an ATS,[20] but each member of the group "would be collectively responsible for ensuring that the designated member of the group fulfills its regulatory responsibilities."[21]

    This definition of "group" is so expansive as to drain the word of any meaning and therefore of any limitation on its scope.[22] The release hints that the relevant "group" may include anybody who has even a purely ministerial role with respect to defi activity. For example, the economic analysis notes that validators and miners may "choose to discontinue processing [defi] transactions" or to "cease processing transactions of a blockchain" altogether to avoid the costs of the rule, which strongly implies that they could be liable for doing what they do for all sorts of transactions on the blockchain.[23] The release's suggestion that validators and miners could "form a single entity . . . and register with the Commission" carries a similar implication.[24] One request for comment lends further credence to this interpretation, stating that a group of persons under the rule could include, "*for example*, the provider(s) of the DeFi application or user interface, developers of AMMs or other DLT code, DAO validators or miners, and issuers or holders of governance or other tokens."[25] The release does not even provide comfort to persons trading tokens using peer-to-peer protocols that they will not be liable as a member of a group constituting an exchange.

    The Commission's approach here is as if back in the 1990s, the Commission had insisted that internet service providers and the developers of internet protocols "would be collectively responsible" for ensuring that the electronic communication network complied with the federal securities laws merely because the ECN could not operate without those services.

- *The release's ambiguity undermines fundamental First Amendment protections.*

    Because the release makes everybody involved in the relevant blockchain ecosystem part of a "group," it creates significant ambiguity around what speech requires government pre-approval, which will unavoidably chill constitutionally-protected speech. The reopener suggests that an *individual*, who, "acting independently and separate from an organization" and without any agreement for that code to be used in a trading venue, publishes code "may be *less* likely" to be part of a group for these purposes.[26] On the other hand, an *organization* that "deploys" such code likely would be part of a group that would trigger registration requirements.[27] An

are a paid developer, you "could be acting in concert with a group of persons to provide a market place or facilities for bringing together buyers and sellers."[28]

What does all of this mean? Do First Amendment protections extend only to code published by hobbyist coders? Does a university professor who, as part of her research publishes such code, risk triggering the exchange definition merely because she is paid for that research? Is a non-profit organization subject to First Amendment protections different from those available to individuals? Is such an organization that deploys experimental code subsequently used by others, perhaps in slightly modified form, to create a decentralized trading venue part of the group? My T-shirt might even get me in trouble: It is not just a pretty design; this shirt republishes the code submitted by a commenter who explained that buyers or sellers of tokens could use it to express non-firm trading interest.[29] If I wear my T-shirt out in public after this rule takes effect, do I have to register? What if I sell this T-shirt to someone who then deploys the code?

- *The release does not seriously consider whether compliance is possible.*

  During my time as a Commissioner, this agency repeatedly has urged firms seeking to sell crypto tokens or build crypto businesses to come in and register. Many firms have responded to this call; they have engaged with staff and Commissioners intensively to determine whether they need to register and, if so, how they might do so. With the exception of a few token registrations and a very small number of ATSs employing a clunky (to satisfy regulatory demands) method of facilitating trades, no firm has been able to do so.[30]

  A Commission serious about regulating—and not destroying—this market would reflect on this near unblemished record of regulatory failure and do something about it. We would consider the possibility that our rules, which in the past have evolved to address the needs of, and the risks presented by, investors and firms in the traditional securities markets, might require some tweaking to permit firms to offer innovative ways of doing finance using novel technologies. The Commission of the 1990s understood this basic principle and created space for significant innovations in securities trading. This release, on the other hand, takes the view that any business model that cannot meet the specific requirements of our existing regulatory model does not belong in our markets.

  Commenters raised serious questions about whether any person involved in defi would be able to satisfy the exchange registration requirements or, if seeking to operate as an ATS, the broker-dealer registration requirements.[31] The release responds by stating that many defi systems may already fall within the current definition of "exchange" in our rule[32] and that others may fall under the proposed definition.[33] But it offers no clarity as to *how* these systems are to be registered or why registration even makes sense. Instead, the release insists that centralized markets regulated under the securities laws are preferable to peer-to-peer markets. The release fails to recognize the protections that come with decentralized, open-source protocols, and to consider whether such protections might obviate the need of some or all of the protections of the securities laws. The release also fails to recognize the freedom that is lost when, before a person interacts with a peer or a disintermediated protocol, she must register with the Commission.

  The Commission does seem to anticipate that its interpretation will drive decentralized protocols toward centralization, extinction, or expatriation. It blithely acknowledges at one point that those involved in these systems "may instead choose to operate outside the U.S. or exit the market."[34]

I wish we had proceeded differently. Given commenters' concerns over the ambiguity and scope of the proposed rule and our still limited understanding of the area we are regulating (which the release repeatedly acknowledges), we should have gone back to square one and issued a concept release instead. We also could

from roundtables to bring together people from all parts of our market to discuss these issues and help us understand them better.

My deep reservations about the SEC's policy judgments reflected in this document are not directed toward the staff charged with implementing this policy. Staff in the Divisions of Trading and Markets and Economic and Risk Analysis, the Office of General Counsel, the Strategic Hub for Innovation and Financial Technology, and elsewhere in the Commission work hard on the projects assigned them. While I would have assigned them a different project, I appreciate their herculean efforts nonetheless.

---

[1] *See*, *e.g.*, Delta Government Options Corp.; Order Granting Temporary Registration as a Clearing Agency, Rel. No. 34-27611, 55 Fed. Reg. 1890, 1897-98 (Jan. 19, 1990) ("Delta Release") (describing operation of a system for trading options on government securities with different functions performed by a registered broker-dealer, an entity that would be registered as a clearing agency, and a clearing bank).

[2] *See Bd of Trade of the City of Chicago v. SEC*, 923 F.2d 1270, 1273 (1991) (stating that "the Delta system differs only in degree and detail from an exchange" and therefore noting that "the Commission could have interpreted [the definition of exchange in the Exchange Act] to embrace the Delta system").

[3] *Id*. (noting that, if designated as an exchange, "[t]he [Delta] system would be *kaput*" (italics in original)).

[4] *Id*. at 1272-73. *See also* Delta Release, 55 Fed. Reg. at 1899 (noting that "[e]xchanges are composed of 'members'").

[5] The Seventh Circuit, as noted above, acknowledged that the Commission could have adopted a broader definition of exchange had it wanted to do so, but the Court seemed to suggest that the Commission's pragmatic approach should be preferred, noting that "one must question an interpretation of the definitional provision that would automatically prevent competition for the exchanges from an entity that the exchanges are unable to show poses a threat to the safety of investors by virtue of not being forced to register and assume the prescribed exchange format." *Id*. at 1273.

[6] Delta Release, 55 Fed. Reg. at 1900.

[7] *Id*. at 1898.

[8] *See* Regulation of Exchanges and Alternative Trading Systems, Rel. No. 34-40760, 63 Fed. Reg. 70844, 70898-99 (Dec. 22, 1998) ("Reg ATS Adopting Release").

[9] *See id*. at 70901 (stating that the proliferation of no-action requests from alternative trading systems made this approach no longer workable and that "codifying a regulatory framework" would allow "technological improvements and enhanced services [to] become available more rapidly").

[10] *See id*. at 70900-01. In 1996, Congress enacted Section 36 of the Exchange Act, which gives the Commission authority to "conditionally or unconditionally exempt any person, security, or transaction, or any class or classes of persons, securities, or transactions, from any provision or provisions of" the Exchange Act, subject to certain limitations, including a determination "that such exemption is necessary or appropriate in the public interest, and is consistent with the protection of investors." 15 U.S.C. § 78mm(a). *See also* Reg ATS Adopting Release, 63 Fed. Reg. at 70846 (noting that the "new exemptive authority . . . provides the Commission with the tools it needs to adopt a regulatory framework that addresses its concerns about alternative trading systems without jeopardizing the commercial viability of these markets").

[11] Comment Letter of LeXpunK (Apr. 18, 2022), at 7, https://www.sec.gov/comments/s7-02-22/s70222-20123955-280110.pdf. *See also id*. ("The adoption of Regulation ATS was a watershed moment for the Commission's regulatory framework governing markets. Previously, the regulatory framework was at odds with emerging electronic markets. The Commission, to its great credit, recognized the need

▲ Return to Top

barriers to entry that prohibited market participants from taking advantage of new technologies that could benefit investors and make markets more efficient.").

[12] In the *Chicago Board of Trade* opinion, the court suggested that the Commission has broad authority to define the term "exchange." At the same time, the amendments proposed last year by the Commission seem materially different in quality from the interpretation upheld by the court in that case or the amended interpretation that the Commission adopted in 1998. Neither of these interpretations came anywhere as close as the proposal does to stretching the boundaries beyond any reasonably interpretation of the statutory definition, which is grounded in a concept of "stock exchange *as that term is generally understood*." 15 U.S.C. § 78c(a)(1) (emphasis added). Unlike either of those prior interpretations, the definition as proposed to be amended last year seems to extend to systems well beyond anything generally understood to be an exchange, an impression heightened by the Commission's refusal either in that release or in this reopener to provide any clarity around what the outer bounds of the amended definition might be.

[13] Comment Letter of DeFi Education Fund (Apr. 18, 2022), at 4, https://www.sec.gov/comments/s7-02-22/s70222-20123960-280119.pdf ("Requiring DeFi protocol developers or other market participants to register as exchanges or broker-dealer/ATSs would advantage existing incumbents and technologies while stunting continued modernization of the U.S. securities markets, to the detriment of all market participants and to the benefit of competing markets abroad.").

[14] In one request for comment, the Commission asks whether "communication protocol" should be replaced with "negotiation protocols." Supplemental Information and Reopening of Comment Period for Amendments to Exchange Act Rule 3b-16 Regarding the Definition of "Exchange," Rel. No. 34-97309, 49-50 (Apr. 14, 2023) ("Supplemental Release"), https://www.sec.gov/rules/proposed/2023/34-97309.pdf. Commenters may find this apparently narrower term an improvement, though the Commission still provides no examples to help clarify what it might mean by this term. Moreover, like "communications protocol," "negotiation protocols" standing alone do not immediately appear to constitute a "stock exchange *as that term is generally understood*."

[15] *See*, *e.g.*, Letter from SIFMA at 8 (dated Apr. 18, 2022).

[16] Exchange Act § 3(a)(1); Exchange Act rule 3b-16.

[17] *See* Supplemental Release at 23-24.

[18] *Id*. at 24.

[19] *Id*. at 29. Notably, the release provides no support for this remarkable proposition. Indeed, aside from the proposing release, this release cites only to language in the Regulation ATS Adopting Release referring to "an organization *arrang[ing]* for separate entities to provide different pieces of a trading system." *Id*. at 29, n. 79 (quoting Regulation ATS Adopting Release at 70852).

[20] *Id*. at 26.

[21] *Id*. at 26, n. 70.

[22] In a recent opinion addressing the scope of this definition, the D.C. Circuit warned against over expansive interpretations of the phrase "group of persons." *See Intercontinental Exchange, Inc. v. SEC*, 23 F.4th 1013, 1025 (2022) ("In short, the outer boundary of the term 'group of persons' remains murky, and vigilance is necessary to ensure the term is not stretched too far.")

[23] *Id*. at 128.

[24] *Id*. at 130.

[25] *Id*. at 163-64.

[26] *Id*. at 28-29 (emphasis added).



[27] *Id*. at 30. The release helpfully adds that the organization may be liable for deploying this code even if "the organization cannot significantly alter or control" it once it is deployed. *Id*.

[28] *Id*. at 29, n. 78.

[29] *See* Letter from Coin Center (Apr. 14, 2022), 6-7, https://www.sec.gov/comments/s7-02-22/s70222-20123684-279908.pdf.

[30] *See*, *e.g.*, Crypto Industry Council at 7, https://www.sec.gov/comments/s7-02-22/s70222-20123996-280136.pdf (noting that centralized crypto entities seeking to comply with Regulation ATS have found that "the process has been significantly more complex, time consuming, and costly for FINRA applicants if the applicant's business model or services relate even in small ways to crypto, blockchain, or digital assets. . . . [V]arious FINRA applicants with crypto- or blockchain-related business plans . . . hit roadblocks with FINRA during the 2018-2021 timeframe and, ultimately, seeing no actual path forward, withdrew their applications").

[31] *See id*. at 30-31, nn. 82-84 (citing several comment letters raising these concerns).

[32] *See id*. at 18-19 ("Today, many systems, some of which are described as 'DeFi' by commenters, bring together buyers and sellers of securities, including crypto asset securities, and could meet the existing criteria of Exchange Act Rule 3b-16(a). . . . The proposed amendments to Rule 3b-16(a) would not, in any way, change whether such activities constitute exchange activity under section 3(a)(1) and Rule 3b-16(a).")

[33] *See id*. at 19.

[34] *Id*. at 139.

⬆ Return to Top