# EXHIBIT GG

Gary Gensler, SEC Chair, *Prepared Testimony before the United States House of Representatives Committee on Financial Services*, April 18, 2023.

# EXHIBIT GG

4/21/23, 8:06 AM	SEC.gov | Testimony of Chair Gary Gensler before the United States House of Representatives Committee on Financial Services

Case 1:23-cv-01346-JSR   Document 30-33   Filed 04/21/23   Page 2 of 12

## Testimony

# Testimony of Chair Gary Gensler before the United States House of Representatives Committee on Financial Services



**Chair Gary Gensler**

**Washington D.C.**

**April 18, 2023**

Good morning, Chairman McHenry, Ranking Member Waters, and members of the Committee. Thank you for inviting me to testify today. As is customary, I will note that my views are my own, and I am not speaking on behalf of my fellow Commissioners or the staff.

## Sam Rayburn and the U.S. Securities Laws

Walking into the Rayburn building, I couldn't help but stop by the statue of Sam Rayburn, the longest serving Speaker of the House. He had a historic career of public service, including as Chair of the House Committee on Interstate and Foreign Commerce. In that role, he worked closely with President Franklin Roosevelt to establish the nation's first federal securities laws.

After Roosevelt's call to action in March of 1933, Rayburn sponsored the House version of what became the Securities Act of 1933. They both knew how important it was to protect investors and promote our capital markets.

Rayburn was not new to the issues of stocks and bonds. In his first term in Congress, he sponsored a bill on railroad stocks and bonds that passed the House but failed in the Senate.[1] In his 11th term 20 years later, in the wake of the market crash of 1929, he was successful in getting a bill through to bring full, fair, and truthful issuer disclosures to the investing public. As Rayburn noted, though, "the biggest and boldest, the richest and most ruthless lobby Congress had ever known" came after that bill.[2]

Roosevelt and Rayburn knew the job wasn't done. A year later, the Fletcher-Rayburn bill, better known today as the Securities Exchange Act of 1934, became law. That statute covers intermediaries, such as exchanges and broker-dealers, as well as requires ongoing disclosures by companies trading on the stock exchanges. It also established this important agency I'm honored to chair, the Securities and Exchange Commission.

Rayburn later had an important hand as Majority Leader in the passage of the Investment Company Act and Investment Advisers Act of 1940. Shortly thereafter, his colleagues, who often referred to him as Mr. Sam, selected him to be Speaker.

4/21/23, 8:06 AM — SEC.gov | Testimony of Chair Gary Gensler Before the United States House of Representatives Committee on Financial Services

Case 1:23-cv-01346-JSR Document 30-33 Filed 04/21/23 Page 3 of 12

## American Leadership in the Capital Markets

The foundational work of Rayburn, the rest of Congress, and Roosevelt has been part of our nation's economic success and global standing ever since.

First, we have the deepest, most liquid, most trusted capital markets in the world.

We can't, though, take this leadership for granted.

As Rayburn and Roosevelt understood, beyond these foundational laws, we've needed the oversight of an independent agency to protect investors and issuers alike.

Second, technology, markets, and business models constantly change. Rayburn and Roosevelt helped birth this agency in the age of radio. We now live in the age of electronic trading and generative AI. Further, we've had dramatic growth in the scale, size, and interconnectedness of our capital markets, with individual investors participating more than ever before.

Third, there are other fast-growing economies that, if they can, may seek to supplant us.

Given these challenges, we've got to update regularly the rules of the road.

I now will talk briefly about the critical role of this agency and then turn to some of our efforts in modernizing our rules to meet these challenges.

## The SEC's Role

At this remarkable agency, we serve investors building for a better future and issuers raising money to fund innovation, while overseeing the $100 trillion capital markets in the middle where they meet. The essence of this is captured in our three-part mission to protect investors, maintain fair, orderly, and efficient markets, and facilitate capital formation.

The SEC is the cop on the beat watching out for your constituents. In the last two years, we've filed nearly 1,500 enforcement actions and conducted more than 6,000 examinations of registrants. We engage with more than 40,000 registrants—asset managers, brokers, dealers, exchanges, fund complexes, public companies, and many more.

The dedicated staff of this agency has done remarkable work with limited resources. In the face of significant growth in registrants, more individual investor involvement in our markets, and increased complexity, the SEC's headcount actually shrunk from 2016 through last year. With Congress's help, our headcount this year now is approximately three percent larger than in 2016. I support the President's FY 2024 request of $2.436 billion, to put us on a better track for the future.[3]

I am proud of this agency. Despite increasing demands on SEC staff, we just were named the third-best place to work among midsized federal agencies, moving two spots up the list and building on being in the top five for the previous five years.[4]

## Updating Our Rules to Meet the Challenges of Our Time

In every generation since Rayburn and Roosevelt's, Congress and this agency have looked to update the laws and rules to meet the challenges of the time.

In ensuring that markets best serve investors and issuers alike, the middle part of our mission speaks to promoting fair, orderly, and efficient markets. In that context, I'll speak to our work to enhance the efficiency, integrity, and resiliency of the markets.

4/21/23, 8:06 AM	SEC.gov | Testimony of Chair Gary Gensler Before the United States House of Representatives Committee on Financial Services

Case 1:23-cv-01346-JSR   Document 30-33   Filed 04/21/23   Page 4 of 12

We do so through rulemaking that is grounded in legal authorities granted by Congress, robust economic analysis, and a public comment process. The length of comment periods has averaged more than 70 days from when we put a proposal on the SEC website. With the closing of a formal comment period, staff begins its work to account for this important public input but continues to receive additional comments, which the Commission may consider. We greatly benefit from public input and consider adjustments that the staff, and ultimately the Commission, think are appropriate.

## Efficiency and Competition

Congress updated Rayburn's work in the 1970s and again in the 1990s to mandate that, in addition to investor protection and public interest, our agency consider efficiency and competition, as well as capital formation, in formulating our rules.[5] They understood that lowering the cost in the middle of our capital markets would help lower costs for issuers and raise returns for investors.

In this context, I would note we have proposals with regard to securities lending,[6] short sale disclosures,[7] and large position reporting for securities-based swaps.[8] Further, the Financial Industry Regulatory Authority is working to enhance post-trade transparency in the fixed-income markets to facilitate greater competition.[9]

I will take a moment to elaborate on our work regarding equity markets and private funds.[10]

## Equity Markets

Given the 68 million American households investing,[11] the importance to issuers, the more than $40 trillion size, and rapidly changing technology, it's appropriate that the SEC freshen up its rules to promote efficiency and competition in the equity markets.

Key aspects of our rules for the national market system haven't been updated since 2005. Yet so much has changed. Not only have we seen the electrification of markets, but also a significant share of the markets has moved to wholesalers and other means of trading, otherwise known as the dark markets.

First, we put out a proposal that brokers meet a Commission best execution standard—in essence that brokers seek the best execution for investors when they place orders. This rule proposal would cover all sectors of the securities markets, including equity, fixed-income, and crypto asset securities.[12]

Second, we proposed updating a 23-year-old rule, known as Rule 605, on order execution quality.[13]

Third, we have a proposal to better level the playing field between dark and lit markets. We are seeking to harmonize the minimum price increment where stocks can be quoted and transacted as well as lower these minimum increments across the markets.[14]

Lastly, we put out a proposal to bring greater competition for a segment of the market related to individual investors' marketable orders.[15]

## Private Funds

Private fund advisers and the funds they manage play an increasingly important role in our capital markets. With more than $25 trillion of gross assets under management, private funds now have surpassed the size of our entire $23 trillion commercial banking system.[16]

Private fund investors often are retirement funds and endowments. Standing behind those entities are a diverse array of teachers, firefighters, municipal workers, students, and professors. On the other side, the funds are investing in a wide array of companies. Issuers raising money from private funds range from startup entrepreneurs and small businesses to late-stage companies and nearly all sectors of our capital markets.

That's why we proposed a rule to require private fund advisers to provide detailed reporting to investors of fees, expenses, performance, and preferential treatment, such as side letters.[17] Efficiency and competition amongst

4/21/23, 8:06 AM    SEC.gov | Testimony of Chair Gary Gensler Before the United States House of Representatives Committee on Financial Services

Case 1:23-cv-01346-JSR   Document 30-33   Filed 04/21/23   Page 5 of 12

these advisers is important for issuers and investors alike.

## Integrity and Disclosure

Two core motivations for Rayburn and Roosevelt in enacting the securities laws were the lack of market integrity and disclosure. The markets were rife with fraud and manipulation. Investors lacked full, fair, and truthful disclosures from issuers.

Market integrity and disclosure help protect investors and build trust in capital markets. Disclosure and trust lower the cost of capital for issuers and raise returns for investors. They also help increase participation in the capital markets. This is good for those investing for their future and for issuers. Integrity and disclosure facilitate what can be the best of capital markets and guard against the worst.

In this context, we have been successful in completing rules related to how insiders trade and sell their stock,[18] clawing back senior executives' compensation when based on faulty financials,[19] and disclosure of executive pay versus performance.[20] We have released issuer-disclosure proposals for cyber risk and stock buybacks, as well as proposals regarding fraud and manipulation in the securities-based swaps market.[21]

We also have proposals with regard to special purpose acquisition companies, investment fund names, and funds and advisers that incorporate environmental, social, and governance factors.[22]

In this section, I'm going to focus on proposals regarding two areas of emerging technology—predictive data analytics and crypto—and then turn to the Commission's issuer disclosure proposal related to climate risk.

### Artificial Intelligence and Predictive Data Analytics

Artificial intelligence and predictive data analytics are transforming so much of our economy. Finance is no exception.

AI already is being used for call centers, account openings, compliance programs, trading algorithms, and sentiment analysis, among others. It's also fueled a rapid change in the field of robo-advisers and brokerage apps. When the predictive data analytics and algorithms behind these apps are optimizing for investor interests, this can bring benefits in market access, efficiency, and returns.

As commenters to our request for comment on digital engagement practices noted, however, the use of predictive data analytics also can lead to potential conflicts.[23] In particular, conflicts may arise to the extent that advisers or brokers are optimizing for their own interests as well as others.

Thus, I've asked staff to make recommendations for the Commission's consideration for rule proposals regarding how best to address any of these potential conflicts.[24]

### Crypto

Congress gave the Commission a mandate to protect investors, regardless of the labels or technology used.[25] Nothing about the crypto markets is incompatible with the securities laws.

As I've said numerous times, the vast majority of crypto tokens are securities.

The investing public generally is buying crypto tokens because those investors are anticipating a profit and hoping for a better future. These thousands of tokens often are supported by websites and social media accounts, and generally there are entrepreneurs backing them. The public generally is counting on the efforts of other humans behind these tokens to generate profits on their investment.

Given that most crypto tokens are securities, it follows that many crypto intermediaries are transacting in securities and have to register with the SEC.

4/21/23, 8:06 AM   SEC.gov | Testimony of Chair Gary Gensler Before the United States House of Representatives Committee on Financial Services

Case 1:23-cv-01346-JSR  Document 30-33  Filed 04/21/23  Page 6 of 12

Crypto intermediaries—whether they call themselves centralized or decentralized—often provide an amalgam of services that typically are separated from each other in the rest of the securities markets: exchange functions, broker-dealer functions, custodial and clearing functions, and lending functions. The commingling of the various functions within crypto intermediaries creates inherent conflicts of interest and risks for investors—risks and conflicts the Commission does not allow in any other marketplace.[26]

Crypto investors should benefit from compliance with the same laws that Rayburn and Roosevelt laid out to protect against fraud, manipulation, front-running, wash sales, and other misconduct. As Justice Thurgood Marshall put it so well, "Congress's purpose in enacting the securities laws was to regulate investments, in whatever form they are made and by whatever name they are called."[27]

It's the law; it's not a choice. Calling yourself a DeFi platform, for instance, is not an excuse to defy the securities laws.

Right now, unfortunately, this market is rife with noncompliance. This noncompliance not only puts investors at risk, but also puts at risk the public's trust in our capital markets.

The Commission has spoken directly to crypto market participants in enforcement actions[28] and a number of rule proposals. The best execution rule I noted earlier would cover all securities, including crypto asset securities.[29] While our current investment adviser custody rule already applies to crypto funds and securities, our recent proposal updating that rule would cover all crypto assets and enhance the protections that qualified custodians provide.[30] I also note that staff has stated their view on public company accounting related to crypto assets and disclosure regarding significant crypto asset market developments.[31] Lastly, we just issued a release reopening a comment period on a proposal related to trading platforms, which focused specifically on comments from crypto market participants, among others.[32]

Forsaking investor protection puts real people's life savings at risk. The goal is to protect our "clients": U.S. investors.

## Climate Risk Disclosure

In calling the 1933 securities law the "Truth in Securities Act," Roosevelt knew that the essence was for companies offering securities to the public to provide full, fair, and truthful disclosure. Investors get to decide what investments they make and risks they take based upon that disclosure. Over the decades, the SEC has updated the disclosure rules with that basic bargain in mind.[33]

In this vein, the Commission has proposed a rule for consistent and comparable climate-risk disclosure by public companies.[34] Hundreds of companies today already are making climate-risk disclosures. Investors managing tens of trillions of dollars in assets are making investment decisions relying on those disclosures.

The SEC, as designed by Rayburn and Roosevelt, is merit neutral. We don't take a view on particular companies or investments. Thus, the SEC has no role as to climate risk itself. But we do have an important role with regard to ensuring for public companies' full, fair, and truthful disclosure about material risks.

We carefully will take into consideration the nearly 15,000 comments we've received on the proposal so far. Just as with any proposal, we greatly benefit from public input and will consider adjustments that the staff, and ultimately the Commission, think are appropriate.

## Resiliency

History is replete with times when tremors starting in one corner of the financial system or at one financial institution spill out to the broader economy. When this happens, the American public—bystanders to the highways of finance—inevitably gets hurt. Investors and issuers inevitably get hurt.

4/21/23, 8:06 AM  SEC.gov | Testimony of Chair Gary Gensler Before the United States House of Representatives Committee on Financial Services

Case 1:23-cv-01346-JSR   Document 30-33   Filed 04/21/23   Page 7 of 12

Lest we forget, eight million Americans lost their jobs, millions of families lost their homes, and small businesses across the country folded as a result of the financial crisis of 2008. Recent market events are yet another reminder of such risks.

That's why the Commission has taken up a number of important projects with regard to resiliency and financial stability.

We already have adopted a rule to shorten the settlement cycle in securities markets in half, which lowers risk and promotes efficiency as well as greater liquidity in the markets.[35]

There are ongoing projects with regard to clearinghouse governance, risk management, use of service providers, and recovery and wind-down plans.[36] We have a proposal regarding the most active, liquidity-providing participants in our markets.[37]

We also have projects related to cybersecurity and technological resiliency in the financial sector.[38]

In this section, I am going to focus on the Treasury markets as well as funds, including registered investment funds and private funds.

### Treasury Markets

The $24 trillion Treasury markets are the base upon which so much of our capital markets are built. Myriad markets and financial products are priced off of treasuries. Treasuries are embedded in money market funds. They are integral to monetary policy. They are how we, as a government and as taxpayers, raise money: We are the issuer.

Though Rayburn and Roosevelt initially didn't give the SEC a significant role in the Treasury markets, market events and failures at government securities firms in the early 1980s led Congress to give us an important role with regard to these markets.[39] In normal times these markets function well, but they have had repeated moments of instability, whether the flash crash in 2014, repo problems in 2019, or the dash for cash in 2020. The events of the recent months yet again are a reminder that even the vast Treasury markets can experience significant volatility and lessened liquidity.

All of this is why the SEC has worked with the Department of the Treasury, the Federal Reserve System, and other agencies to enhance the efficiency and resiliency of the $24 trillion Treasury markets.[40] These projects include registering and regulating Treasury dealers and platforms, as well as facilitating greater clearing of treasuries in both cash and funding markets.[41]

### Money Market Funds and Open-End Funds

Money market funds and open-end funds are important investment vehicles for tens of millions of Americans. They also play a critical part in facilitating capital formation.

In times of stress, when many investors may redeem their shares in a fund at once, a fund might need to sell less-liquid securities quickly to generate cash. When done in volume, this can raise issues for investor protection, our capital markets, and the broader economy. We saw such systemic issues during the onset of the Covid-19 pandemic, when many investors sought to redeem their investments from open-end funds and money market funds. The resulting challenges contributed to stress across our financial system.

We also have seen significant growth in these funds. Money market funds, which can operate as deposit alternatives, have grown more than $660 billion just since last June, from about $5 trillion to about $5.7 trillion.[42] That highlights one reason why it's so important to ensure that these key parts of our capital markets are resilient.

That's why I'm pleased we put out proposals for public comment on both money market funds and open-end fund liquidity.[43] The proposals intend to address these structural issues and enhance liquidity risk-management.

4/21/23, 8:06 AM	SEC.gov | Testimony of Chair Gary Gensler Before the United States House of Representatives Committee on Financial Services

Case 1:23-cv-01346-JSR   Document 30-33   Filed 04/21/23   Page 8 of 12

## Form PF

After the financial crisis of 2008, Congress gave the SEC important new authorities to collect information from private funds "as necessary and appropriate in the public interest and for the protection of investors, or for the assessment of systemic risk by the FSOC."[44] Based on those new authorities, working with other agencies, the SEC put Form PF in place 12 years ago.[45] Since that time, the private fund industry has grown and evolved even further.

As last year's FSOC annual report notes, hedge funds can create risks for financial stability through the use of leverage and through counterparty exposures.[46] We also understand that hedge fund exposures to repurchase agreements, reverse repurchase agreements, and Treasury securities have increased in recent years. Moreover, in the last few years, many hedge funds are receiving repo financing in the non-centrally cleared bilateral market, where haircuts or initial margin requirements are not necessarily applied.[47]

In light of changes in the market, I'm pleased that we put out proposals to improve systemic risk reporting through updates to Form PF.[48]

## Conclusion

As I leave the Rayburn building, I again look forward to passing by Mr. Sam.

Coincidentally, my dad sometimes also was called Mr. Sam. He had a vending machine business, and he regularly would stop by the bars to check on his machines. The Baltimore bar owners would often call him Mr. Sam. While my dad was not a public figure like Rayburn—he never even went to college—he was a big believer in our American system, and that the system could help make a better life for Americans.

I think of both Mr. Sams as the SEC works to ensure that our markets work for investors and issuers alike—and not the other way around.

---

[1] *See* Alexander Shanks, "Sam Rayburn in the Wilson Administrations, 1913-1921" (1968), *available at* https://scholarworks.sfasu.edu/cgi/viewcontent.cgi?referer=&httpsredir=1&article=1147&context=ethj.

[2] *See* Securities and Exchange Commission Historical Society, "431 Days: Joseph P. Kennedy and the Creation of the SEC (1934-35)" (Dec. 1, 2005), *available at* https://www.sechistorical.org/museum/galleries/kennedy/politicians_c.php.

[3] *See* Securities and Exchange Commission, "Fiscal Year 2024 Congressional Budget Justification" (March 13, 2023), *available at* https://www.sec.gov/files/fy-2024-congressional-budget-justification_final-3-10.pdf.

[4] *See* Partnership for Public Service, "Best Places to Work in the Federal Government: Securities and Exchange Commission" (March 29, 2023), *available at* https://bestplacestowork.org/rankings/detail/?c=SE00.

[5] *See* Gary Gensler, "'Competition and the Two SECs': Remarks Before the SIFMA Annual Meeting" (Oct. 24, 2022), *available at* https://www.sec.gov/news/speech/gensler-sifma-speech-102422.

[6] *See* Securities and Exchange Commission, "SEC Proposes Rule to Provide Transparency in the Securities Lending Market" (Nov. 18, 2021), *available at* https://www.sec.gov/news/press-release/2021-239.

[7] *See* Securities and Exchange Commission, "SEC Proposes Short Sale Disclosure Rule, Order Marking Requirement, and CAT Amendments" (Feb. 25, 2022), *available at* https://www.sec.gov/news/press-release/2022-32.

[8] *See* Securities and Exchange Commission, "SEC Proposes Rules to Prevent Fraud in Connection With Security-Based Swaps Transactions, to Prevent Undue Influence over CCOs and to Require Reporting of Large Security-Based Swap Positions" (Dec. 15, 2021), *available at* https://www.sec.gov/news/press-release/2021-259.

[9] *See* Financial Industry Regulatory Authority (FINRA), "Notice: Enhancements to Aggregated Reports and Statistics for U.S. Treasury Securities – Updated Date" (Dec. 28, 2022), *available at* https://www.finra.org/filing-reporting/trace/enhancements-weekly-aggregated-reports-statistics-122822. *See also* "FINRA Requests Comment on Proposed Changes to TRACE Reporting Relating to Delayed Treasury Spot Trades" (Nov. 29, 2022), *available at* https://www.finra.org/rules-guidance/notices/22-26. *See also* "Proposed Rule Change to Amend FINRA Rule 6730 (Transaction Reporting) to Enhance TRACE Reporting Obligations for U.S. Treasury Securities" (2022), *available at* https://www.finra.org/rules-guidance/rule-filings/sr-finra-2022-013. See also "FINRA Requests Comment on a Proposal to Shorten the Trade Reporting Timeframe for Transactions in Certain TRACE-Eligible Securities From 15 Minutes to One Minute" (Aug. 2, 2022), *available at* https://www.finra.org/rules-guidance/notices/22-17.

[10] *See* Gary Gensler, "'Competition and the Two SECs': Remarks Before the SIFMA Annual Meeting" (Oct. 24, 2022), *available at* https://www.sec.gov/news/speech/gensler-sifma-speech-102422.

[11] The Federal Reserve Board's 2019 Survey of Consumer Finance finds that 53 percent of families own stock. "Family" as used in the Survey is similar to "household" as defined in Census data. 2019 Census data estimate that there are 128.6 million households in the U.S; 53 percent of this figure is approximately 68 million households. *See* Federal Reserve Board, "Changes in U.S. Family Finances from 2016 to 2019: Evidence from the Survey of Consumer Finances," *available at* https://www.federalreserve.gov/publications/files/scf20.pdf. *See also* United States Census Bureau, "Historical Household Tables" (Nov. 2022), *available at* https://www.census.gov/data/tables/time-series/demo/families/households.html.

[12] *See* Securities and Exchange Commission, "SEC Proposes Regulation Best Execution" (Dec. 14, 2022), *available at* https://www.sec.gov/news/press-release/2022-226.

[13] *See* Securities and Exchange Commission, "SEC Proposes Amendments to Enhance Disclosure of Order Execution Information" (Dec. 14, 2022), *available at* https://www.sec.gov/news/press-release/2022-223.

[14] *See* Securities and Exchange Commission, "SEC Proposes Rules to Amend Minimum Pricing Increments and Access Fee Caps and to Enhance the Transparency of Better Priced Orders" (Dec. 14, 2022), *available at* https://www.sec.gov/news/press-release/2022-224.

[15] *See* Securities and Exchange Commission, "SEC Proposes Rule to Enhance Competition for Individual Investor Order Execution" (Dec. 14, 2022), *available at* https://www.sec.gov/news/press-release/2022-225.

[16] Based on Form ADV filings through March 31, 2023. Represents sum of Registered Investment Adviser GAV and Exempt Reporting Adviser GAV, less estimated overlap. *See also* Board of Governors of the Federal Reserve System, "Assets and Liabilities of Commercial Banks in the United States" (April 14, 2023), *available at* https://www.federalreserve.gov/releases/h8/current/default.htm. Total assets of approximately $22.9 trillion as of April 14, 2023 (Table 2, Line 33).

[17] *See* Securities and Exchange Commission, "SEC Proposes to Enhance Private Fund Investor Protection" (Feb. 9, 2022), *available at* https://www.sec.gov/news/press-release/2022-19.

[18] *See* Securities and Exchange Commission, "SEC Adopts Amendments to Modernize Rule 10b5-1 Insider Trading Plans and Related Disclosures" (Dec. 14, 2022), *available at* https://www.sec.gov/news/press-release/2022-222.

[19] *See* Securities and Exchange Commission, "SEC Adopts Compensation Recovery Listing Standards and Disclosure Rules" (Oct. 26, 2022), *available at* https://www.sec.gov/news/press-release/2022-192.

4/21/23, 8:06 AM SEC.gov | Testimony of Chair Gary Gensler before the United States House of Representatives Committee on Financial Services

Case 1:23-cv-01346-JSR Document 30-33 Filed 04/21/23 Page 10 of 12

[20] *See* "SEC Adopts Pay Versus Performance Disclosure Rules" (Aug. 22, 2022), *available at* https://www.sec.gov/news/press-release/2022-149.

[21] *See* Securities and Exchange Commission, "SEC Proposes Rules to Prevent Fraud in Connection With Security-Based Swaps Transactions, to Prevent Undue Influence over CCOs and to Require Reporting of Large Security-Based Swap Positions" (Dec. 15, 2021), *available at* https://www.sec.gov/news/press-release/2021-259.

[22] *See* Securities and Exchange Commission, "SEC Proposes Rules to Enhance Disclosure and Investor Protection Relating to Special Purpose Acquisition Companies, Shell Companies, and Projections" (March 30, 2022), *available at* https://www.sec.gov/news/press-release/2022-56.

[23] *See* Securities and Exchange Commission, "SEC Requests Information and Comment on Broker-Dealer and Investment Adviser Digital Engagement Practices, Related Tools and Methods, and Regulatory Considerations and Potential Approaches; Information and Comments on Investment Adviser Use of Technology" (Aug. 27, 2021), *available at* https://www.sec.gov/news/press-release/2021-167.

[24] *See* Gary Gensler, "Prepared Remarks Before the Investor Advisory Committee" (March 2, 2023), *available at* https://www.sec.gov/news/speech/gensler-remarks-iac-030223. *See also* "Testimony Before the United States Senate Committee on Banking, Housing, and Urban Affairs" (Sept. 15, 2022), *available at* https://www.sec.gov/news/testimony/gensler-testimony-housing-urban-affairs-091522.

[25] *See* Gary Gensler, "Kennedy and Crypto" (Sept. 8, 2022), *available at* https://www.sec.gov/news/speech/gensler-sec-speaks-090822.

[26] *See* Gary Gensler, "Getting Crypto Firms to Do Their Work within the Bounds of the Law" (March 9, 2023), *available at* https://thehill.com/opinion/congress-blog/3891970-getting-crypto-firms-to-do-their-work-within-the-bounds-of-the-law/.

[27] *See* Reves v. Ernst & Young, 494 U.S. 56, 60-61 (1990).

[28] *See* Securities and Exchange Commission, "Crypto Assets and Cyber Enforcement Actions," *available at* https://www.sec.gov/spotlight/cybersecurity-enforcement-actions.

[29] *See* "SEC Proposes Regulation Best Execution" (Dec. 14, 2022), *available at* https://www.sec.gov/news/press-release/2022-226.

[30] *See* Securities and Exchange Commission, "SEC Proposes Enhanced Safeguarding Rule for Registered Investment Advisers" (Feb. 15, 2023), *available at* https://www.sec.gov/news/press-release/2023-30.

[31] *See* Securities and Exchange Commission, "Staff Accounting Bulletin No. 121" (March 31, 2022), *available at* https://www.sec.gov/oca/staff-accounting-bulletin-121. *See also* "Sample Letter to Companies Regarding Recent Developments in Crypto Asset Markets" (Dec. 8, 2022), *available at* https://www.sec.gov/corpfin/sample-letter-companies-regarding-crypto-asset-markets.

[32] *See* Securities and Exchange Commission, "SEC Reopens Comment Period for Proposed Amendments to Exchange Act Rule 3b-16 and Provides Supplemental Information" (April 14, 2023), *available at* https://www.sec.gov/news/press-release/2023-77.

[33] *See* Gary Gensler, "'Building Upon a Long Tradition'—Remarks before the Ceres Investor Briefing" (April 12, 2022), *available at* https://www.sec.gov/news/speech/gensler-remarks-ceres-investor-briefing-041222.

[34] *See* Securities and Exchange Commission, "SEC Proposes Rules to Enhance and Standardize Climate-Related Disclosures for Investors" (March 21, 2022), *available at* https://www.sec.gov/news/press-release/2022-46.

[35] *See* Securities and Exchange Commission, "SEC Finalizes Rules to Reduce Risks in Clearance and Settlement" (Feb. 15, 2023), *available at* https://www.sec.gov/news/press-release/2023-29.

4/21/23, 8:06 AM SEC.gov | Testimony of Chair Gary Gensler Before the United States House of Representatives Committee on Financial Services

Case 1:23-cv-01346-JSR Document 30-32 Filed 04/21/23 Page 11 of 12

[36] *See* Securities and Exchange Commission, "SEC Proposes Rules to Improve Clearing Agency Governance and to Mitigate Conflicts of Interest" (Aug. 8, 2022), *available at* https://www.sec.gov/news/press-release/2022-138. See also "Agency Rule List—Fall 2022: Clearing Agency Recovery and Wind-Down," *available at* https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=202210&RIN=3235-AN19.

[37] *See* Securities and Exchange Commission, "SEC Re-Proposes Amendments to Exemption From National Securities Association Membership" (July 29, 2022), *available at* https://www.sec.gov/news/press-release/2022-133.

[38] *See* Securities and Exchange Commission, "SEC Reopens Comment Period for Proposed Cybersecurity Risk Management Rules and Amendments for Registered Investment Advisers and Funds" (March 15, 2023), *available at* https://www.sec.gov/news/press-release/2023-54. *See also* "SEC Proposes New Requirements to Address Cybersecurity Risks to the U.S. Securities Markets" (March 15, 2023), *available at* https://www.sec.gov/news/press-release/2023-52. *See also* "SEC Proposes to Expand and Update Regulation SCI" (March 15, 2023), *available at* https://www.sec.gov/news/press-release/2023-53.

[39] *See* Gary Gensler, "Prepared Remarks at U.S. Treasury Market Conference" (Nov. 17, 2021), *available at* https://www.sec.gov/news/speech/gensler-us-treasury-market-conference-20211117.

[40] *See* Gary Gensler, "'The Beatles and the Treasury Market': Remarks Before the U.S. Treasury Market Conference" (Nov. 16, 2022), *available at* https://www.sec.gov/news/speech/gensler-speech-treasury-market-conference-111622.

[41] *See* Securities and Exchange Commission, "SEC Proposes Rules to Improve Risk Management in Clearance and Settlement and to Facilitate Additional Central Clearing for the U.S. Treasury Market" (Sept. 14, 2022), *available at* https://www.sec.gov/news/press-release/2022-162. *See also* "SEC Proposes Amendments to Include Significant Treasury Markets Platforms Within Regulation ATS" (Jan. 26, 2022), *available at* https://www.sec.gov/news/press-release/2022-10. *See also* "SEC Reopens Comment Period for Proposed Amendments to Exchange Act Rule 3b-16 and Provides Supplemental Information" (April 14, 2023), *available at* https://www.sec.gov/news/press-release/2023-77.

[42] Per Form N-MFP filings.

[43] *See* Securities and Exchange Commission, "SEC Proposes Amendments to Money Market Fund Rules" (Dec. 15, 2021), *available at* https://www.sec.gov/news/press-release/2021-258. *See also* "SEC Proposes Enhancements to Open-End Fund Liquidity Framework" (Nov. 2, 2022)*, available at* https://www.sec.gov/news/press-release/2022-199.

[44] 15 U.S.C. 80b-4(b); 15 U.S.C. 80b-11(e).

[45] *See* Securities and Exchange Commission, "SEC Approves Confidential Private Fund Risk Reporting" (Oct. 26, 2011), *available at* https://www.sec.gov/news/press/2011/2011-226.htm.

[46] *See* Gary Gensler, "Prepared Remarks Before the Financial Stability Oversight Council: Annual Report" (Dec. 16, 2022), *available at* https://www.sec.gov/news/speech/gensler-remarks-fsoc-annual-report-121622. *See also* Department of the Treasury, "Financial Stability Oversight Council Releases 2022 Annual Report" (Dec. 16, 2022), *available at* https://home.treasury.gov/news/press-releases/jy1171.

[47] As a recent G30 report put it, "In principle, if all repos were centrally cleared, the minimum margin requirements established by FICC would apply marketwide, which would stop competitive pressures from driving haircuts down (sometimes to zero), which reportedly has been the case in recent years." *See* Group of 30 Working Group on Treasury Market Liquidity, "U.S. Treasury Markets: Steps Toward Increased Resilience" (2021), *available at* https://group30.org/publications/detail/4950. In addition, as a 2021 Federal Reserve Board report said, "Most of hedge fund repo is transacted bilaterally, with only 13.7% of the repo centrally cleared." *See* Federal Reserve Board Division of Research & Statistics and Monetary Affairs, "Hedge Fund Treasury Trading and Funding

4/21/23, 8:06 AM	SEC.gov | Testimony of Chair Gary Gensler before the United States House of Representatives Committee on Financial Services

Case 1:23-cv-01346-JSR   Document 30-33   Filed 04/21/23   Page 12 of 12

Fragility: Evidence from the COVID-19 Crisis" (April 2021), *available at* https://www.federalreserve.gov/econres/feds/files/2021038pap.pdf.

[48] *See* Securities and Exchange Commission, "SEC Proposes Amendments to Enhance Private Fund Reporting" (Jan. 26, 2022), *available at* https://www.sec.gov/news/press-release/2022-9. *See also* "SEC Proposes to Enhance Private Fund Reporting" (Aug. 10, 2022), *available at* https://www.sec.gov/news/press-release/2022-141.