UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

v.

TERRAFORM LABS PTE LTD. and
DO HYEONG KWON,

Defendants.

No. 1:23-cv-1346 (JSR)

---

**SECURITIES AND EXCHANGE COMMISSION'S MEMORANDUM OF
LAW IN OPPOSITION OF DEFENDANTS' MOTION TO DISMISS**

## TABLE OF CONTENTS

**PRELIMINARY STATEMENT** ............................................................................................1

**SUMMARY OF THE ALLEGATIONS** ...........................................................................2

**ARGUMENT** ....................................................................................................................3

    I.      The Court Has Personal Jurisdiction Over Defendants. ..........................................3

          A.     Legal Standard for Determining Personal Jurisdiction. ..............................3

          B.     Defendants Purposefully Availed Themselves of the U.S. ...........................4

                1.     Terraform Targeted the U.S. By Contracting With U.S. Firms to Sell Its Crypto Asset Securities. ............................................................4

                2.     Defendants Traveled to the U.S, Promoted Their Crypto Asset Securities to U.S. Investors, and Employed Numerous U.S. Persons. ........5

                3.     Defendants Defrauded U.S. Investors and Used the U.S. Banking System to Effectuate Their Fraud. .............................................7

                4.     The Second Circuit Has Already Held That the Defendants' Contacts With the U.S. Support Personal Jurisdiction ...............................8

          C.     Defendants Jurisdictional Arguments Lack Merit and Ignore Their Extensive Contacts With the United States. ........................................................8

    II.     The Major Questions Doctrine Does Not Apply. .......................................................10

    III.    This Action Does Not Violate Due Process..............................................................12

    IV.    The SEC's Claims Do Not Violate the Administrative Procedure Act ("APA"). .......13

    V.     The AC States Claims for Relief Under the Federal Securities Laws and Defendants' Counterfactual Arguments to the Contrary Must be Rejected. ..............14

          A.     Legal Standard. ..........................................................................................14

          B.     The AC Establishes That Each of Terraform's Crypto Assets Were Offered and Sold as Securities. ...........................................................................15

                 1.     *Howey* Does Not Require a Common Law Contract. ...............................15

                 2.     UST Was Offered and Sold as a Security....................................................16

3.       LUNA was Offered and Sold as a Security. ...............................................22

4.       wLUNA was Offered and Sold as a Security. ...........................................25

5.       MIR Tokens Were Offered and Sold as Securities. ...................................26

C.    The SEC Has Pled a *Prima Facie* Case Under Section 5 of the Securities Act. ...28

D.    The SEC Adequately Pled Defendants Violated the Registration Provisions of Section 5(e) of the Securities Act and Section 6(l) of the Exchange Act. .............31

E.    The SEC Has Sufficiently Pled That Defendants Violated the Anti-Fraud Provisions.........................................................................................................................35

1.       The AC Contains Particularized Allegations of Defendants' Fraud..........35

2.       The SEC Has Adequately Pled Falsity .....................................................35

3.       The SEC Has Adequately Pled that Defendants Used False Statements to Obtain Money or Property ....................................................................37

4.       The SEC Has Adequately Pled a Violation of 17(a)(3) ............................38

5.       The SEC Has Adequately Pled Scienter ...................................................39

F.    Kwon is Liable Under Exchange Act Section 20(a) .............................................40

**CONCLUSION** ...........................................................................................................40

## TABLE OF AUTHORITIES

*Ashcroft v. Iqbal*,
　　556 U.S. 662 (2009) .......................................................................................................14

*Balestra v. ATBCOIN LLC*,
　　380 F. Supp. 3d 340 (S.D.N.Y. 2019) .................................................................6, 9, 22, 23

*Bell Atl. Corp. v. Twombly*,
　　550 U.S. 544 (2007) .......................................................................................................14

*Best Van Lines, Inc. v. Walker*,
　　490 F.3d 239 (2d Cir. 2007) ..............................................................................................4

*Bittner v. United States*,
　　143 S. Ct. 713 (2023) .....................................................................................................13

*Boguslavsky v. Kaplan*,
　　159 F.3d 715 (2d Cir. 1998) ............................................................................................40

*Burger King Corp. v. Rudzewicz*,
　　471 U.S. 462 (1985) .........................................................................................................4

*Calder v. Jones*,
　　465 U.S. 783 (1984) .....................................................................................................4, 7

*D.H. Blair & Co. v. Gottdiener*,
　　462 F.3d 95 (2d Cir. 2006) ................................................................................................5

*Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*,
　　722 F.3d 81 (2d Cir. 2013) ................................................................................................3

*Eberhardt v. Waters*,
　　901 F.2d 1578 (11th Cir. 1990) ......................................................................................11

*Friel v. Dapper Labs, Inc.*,
　　No. 21-civ-5837, 2023 WL 2162747 (S.D.N.Y. Feb. 22, 2023) ....................................17

*Gary Plastic Packaging Corp. v. Merrill Lynch, Inc.*,
　　756 F.2d 230 (2d Cir. 1985) ...........................................................................................27

*Geiger v. SEC*,
　　363 F.3d 481 (D.C. Cir. 2004) ........................................................................................34

*Global Network Commc'ns, v. City of N.Y.*
    458 F.3d 150 (2d Cir. 2006)..................................................................15

*Golden v. Garafalo,*
    678 F.2d 1139 (2d Cir. 1982)...............................................................16

*Goldfarb v. Channel One Russia,*
    442 F. Supp. 3d 649 (S.D.N.Y. 2020).....................................................7

*Hocking v. Dubois,*
    885 F.2d 1449 (9th Cir. 1989) .............................................................16

*Jones v. Tyson,*
    No. 00 CIV. 7382(CM)(MDF), 2001 WL 401438 (S.D.N.Y. Apr. 18, 2001)....................9

*Leonard F. v. Israel Disc. Bank of N.Y.,*
    199 F.3d 99 (2d Cir.1999)...................................................................15

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL,*
    732 F.3d 161 (2d Cir. 2013)............................................................7, 10

*In re MF Glob. Holdings Ltd. Sec. Litig.,*
    982 F. Supp. 2d 277 (S.D.N.Y. 2013)...................................................40

*Mirlis v. Greer,*
    952 F.3d 51 (2d Cir. 2020)....................................................................6

*Myers v. Casino Queen, Inc.,*
    689 F.3d 904 (8th Cir. 2012) ................................................................6

*Nissan Motor Co. v. Nissan Comput. Corp.,*
    89 F. Supp. 2d 1154 (C.D. Cal. 2000) ...................................................5

*Novak v. Kasaks,*
    216 F.3d 300 (2d Cir. 2000)................................................................39

*Owen v. Elastos Foundation,*
    19-cv-5462-GHW, 2021 WL 5868171 (S.D.N.Y. Dec. 9, 2021) ....................6, 9

*Pfaff v. U.S. Dept. of Housing and Urban Devel.,*
    88 F.3d 739 (9th Cir. 1996) ................................................................14

iv

*R.A. Holman & Co., Inc. v. SEC*,
   366 F.2d 446 (2d Cir. 1966)..............................................................................29, 31

*Reich v. Valley Nat. Bank of Arizona*,
   837 F. Supp. 1259 (S.D.N.Y. 1993)..............................................................14

*Revak v. SEC Realty Corp.*,
   18 F.3d 81 (2d Cir. 1994)........................................................................22, 24

*Reves v. Ernst & Young*,
   494 U.S. 56 (1990)........................................................................................11

*SEC v. Apuzzo*,
   689 F.3d 204 (2d Cir. 2012)..........................................................................14

*SEC v. Aqua-Sonic Prods.*,
   524 F. Supp. 866 (S.D.N.Y. 1981) ................................................................16

*SEC v. Arbitrade Ltd.*,
   No. 22-CV-23171, 2023 WL 2785015 (S.D. Fla. Apr. 5, 2023) ....................18

*SEC v. Aronson*,
   No. 11 Civ. 7033(JSR), 2013 WL 4082900 (S.D.N.Y. Aug. 6, 2013) ............18

*SEC v. Brigadoon Scotch*,
   480 F.2d 1047 (2d Cir. 1973).........................................................................12

*SEC v. Bronson*,
   14 F. Supp. 3d 402 (S.D.N.Y. 2014)..............................................................30

*SEC v. Cavanagh*,
   1 F. Supp. 2d 337 (S.D.N.Y. 1998) .........................................................28, 30

*SEC v. Cavanagh*,
   445 F.3d 105 (2d Cir. 2006)...........................................................................30

*SEC v. Chenery Corp.*,
   332 U.S. 194 (1947).......................................................................................14

*SEC v. C.M. Joiner Leasing Corp.*,
   320 U.S. 344 (1943).................................................................................11, 16

*SEC v. Constantin*,
    939 F. Supp. 2d 288 (S.D.N.Y. 2013) ..................................................................40

*SEC v. DiMaria*,
    207 F. Supp. 3d 343 (S.D.N.Y. 2016) ..................................................................38

*SEC v. Dunn,*
    587 F. Supp. 2d 486 (S.D.N.Y. 2008) ....................................................................9

*SEC v. Edwards*,
    540 U.S. 389 (2004) ............................................................................................11

*SEC v. Glen-Arden Commodities, Inc.*,
    493 F.2d 1027 (2d Cir. 1974) .......................................................................24, 25

*SEC v. Kik Interactive Inc.*,
    492 F. Supp. 3d 169 (S.D.N.Y. 2020) ...............................................12, 13, 22, 24

*SEC v. LBRY, Inc.*,
    No. 21-cv-260-PB, 2022 WL 16744741 (D.N.H. Nov. 7, 2022) ...........12, 19, 25

*SEC v. Life Partners, Inc.*
    87 F.3d 536, 544 (D.C. Cir. 1996) .....................................................................24

*SEC v. MiMedx Group, Inc.*,
    19 Civ. 10927 2022 WL 902784 (S.D.N.Y. March 28, 2022) ...........................38

*SEC v. Mut. Benefits Corp.*,
    408 F.3d 737 (11th Cir. 2005) .....................................................................27, 28

*SEC v. NAC Foundation, LLC*,
    512 F. Supp. 3d 988 (N.D. Cal. 2021) ...............................................................23

*SEC v. PlexCorps*,
    17-CV-7007 (CBA) (RML), 2018 WL 4299983 (E.D.N.Y. Aug. 9, 2018) ...........6, 10, 13

*SEC v. Ralston Purina Co.*,
    346 U.S. 199 (1953) ............................................................................................29

*SEC v. Sason,*
    433 F. Supp. 3d 496 (S.D.N.Y. 2020) ................................................................30

*SEC v. SG Ltd.*,
    265 F.3d 42 (1st Cir. 2001) ................................................................................12

*SEC v. Stoker*,
    865 F. Supp. 2d 457 (S.D.N.Y. 2012) ..............................................................38

*SEC v. Straub*,
    921 F. Supp. 2d 244 (S.D.N.Y. 2013) ..............................................................10

*SEC v. Sugarman*,
    No. 19-cv-5998, 2020 WL 5819848 (S.D.N.Y. Sept. 30, 2020) ...........................15, 38, 39

*SEC v. Syron,*
    934 F. Supp. 2d 609 (S.D.N.Y. 2013) ..............................................................38

*SEC v. Telegram Grp., Inc.*,
    448 F. Supp. 3d 352 (S.D.N.Y. 2020) .................................................15, 17, 18, 20, 23, 27

*SEC v. Terraform Labs Pte Ltd.*,
    No. 22-368, 2022 WL 2066414 (2d Cir. June 8, 2022) ...........................................1, 4, 5, 8

*SEC v. Universal Express, Inc.*,
    475 F. Supp. 2d 412 (S.D. N.Y. 2007) ..............................................................29, 31, 34

*SEC v. Wey*,
    246 F. Supp. 3d 894 (S.D.N.Y. 2017) ..............................................................39

*SEC v. W.J. Howey Co.,*
    328 U.S. 293 (1946) ................................................................2, 11, 15, 16, 18, 19

*SEC v. Xia,*
    No. 21-cv-5350, 2022 WL 17539124 (E.D.N.Y. Dec. 8, 2022) ....................................20

*In re Time Warner Inc. Sec. Litig.*,
    9 F.3d 259 (2d Cir. 1993) ............................................................................37, 39

*Underwood v. Coinbase Glob., Ind.,*
    No. 21-civ-8353 (PAE), 2023 WL 1431965 (S.D.N.Y. Feb. 1, 2023) ...........................34

*United States v. Martoma*,
    No. 12-cr-973 (PGG), 2013 WL 6632676 (S.D.N.Y. Dec. 17, 2013) ...........................26

*United States v. Smith*,
  985 F. Supp. 2d 547 (S.D.N.Y. 2014) ............................................................................12

*United States v. Zaslavskiy*,
  No. 17-cr-647 (RJD), 2018 WL 4346339 (E.D.N.Y. Sept. 11, 2018) .............12, 13, 14, 20

*U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co.*,
  241 F.3d 135 (2d Cir. 2001) ......................................................................................4, 5

*In re Vivendi, S.A. Secs. Litig.*,
  838 F.3d 223 (2d Cir. 2016) .........................................................................................37

*West Virginia v. EPA*,
  142 S. Ct. 2587 (2022) ..................................................................................................10

*Wiwa v. Royal Dutch Petroleum Co.*,
  226 F.3d 88 (2d Cir. 2000) .............................................................................................9

## STATUTES

7 U.S.C. § 1a(18) ......................................................................................................................32

7 U.S.C. § 1(a)(47) ....................................................................................................................32

15 U.S.C. § 77b(a)(1) ..................................................................................................15, 21, 25

15 U.S.C. § 77e(a) .....................................................................................................................28

15 U.S.C. § 77e(c) ......................................................................................................................28

15 U.S.C. § 77e(e) ......................................................................................................................31

15 U.S.C. § 77q .........................................................................................................................35

15 U.S.C. § 77t(b) ......................................................................................................................11

15 U.S.C. § 77v ............................................................................................................................4

15 U.S.C. § 78c(a)(10) ................................................................................................15, 21, 25

15 U.S.C. § 78c(a)(65) ...............................................................................................................32

15 U.S.C. § 78c(a)(68) ...............................................................................................................32

15 U.S.C. § 78f(*l*) ................................................................................................................32

15 U.S.C. § 78j .....................................................................................................................35

15 U.S.C. § 78u(d)(1) ...........................................................................................................11

15 U.S.C. § 78aa ....................................................................................................................4

**RULES**

FRCP 9(b) .............................................................................................................................14

17 C.F.R. § 230.502(d) .........................................................................................................32

17 C.F.R. § 230.903(a) .........................................................................................................32

17 C.F.R. § 240.10b-5 ..........................................................................................................35

31 C.F.R. § 1010.100(m) ......................................................................................................20

**OTHER AUTHORITY**

*FinCEN Guidance, Application of FinCEN's Regulations to Certain Business Models*
(May 9, 2019) .......................................................................................................................21

SEC Rel. No. 6863, *Offshore Offers and Sales* (Apr. 24, 1990) .......................................31

SEC Rel. No. 81207 *Report of Investigation Pursuant to Section 21(a) of the Securities
Exchange Act of 1934: The DAO* (July 25, 2017) ...............................................................13

## PRELIMINARY STATEMENT

Defendants Terraform Labs Pte Ltd. ("Terraform") and Do Hyeong Kwon ("Kwon") (collectively, "Defendants") orchestrated a multibillion dollar fraud, engaging in unregistered offers and sales of crypto asset securities to U.S. investors, while misrepresenting key aspects of those securities. Defendants told investors that the value of those securities would grow based on increased usage of the Terraform blockchain, but faked millions of transactions to make the blockchain appear more active than it really was. Kwon also lied about the stability of UST, which Terraform described as the "lynchpin for the entire [Terraform] ecosystem." When UST slipped below $1 in May 2021, Kwon struck a side deal with a U.S. Trading Firm to push UST back up to $1 and then told investors that UST had "self-healed" due to the supposed ingenuity of a blockchain algorithm. Investors bought in, purchasing additional billions in UST and other Terraform securities, only to see UST's price plummet to zero in May 2022, and exposing Defendants' fraud and harming investors worldwide, while Defendants cashed out with over $100 million. The Amended Complaint ("AC") describes all of this misconduct in detail.

In their Motion to Dismiss ("Def. Mot."), Defendants attempt to throw every conceivable challenge they can muster at the AC, hoping that something will stick. Each of their arguments lacks merit; collectively they leave no doubt that the Motion should be denied.

*First*, the Court has personal jurisdiction over Defendants because of their countless significant U.S. contacts, as the Second Circuit has already concluded in a related action. *SEC v. Terraform Labs Pte Ltd.*, No. 22-368, 2022 WL 2066414 (2d Cir. June 8, 2022), *cert. denied* 143 S. Ct. 1020 (2023).

*Second*, the major questions doctrine, the Due Process Clause, and the Administrative Procedure Act do not bar the Securities and Exchange Commission's ("SEC's") claims. In the

federal securities laws, Congress, not the SEC, defined the term "security" broadly, to include "investment contracts," a term that captures the "countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *SEC v. W.J. Howey Co.,* 328 U.S. 293, 299 (1946). As the AC alleges, investors across the U.S., and indeed, around the world, invested money in Defendants' schemes and reasonably expected to earn profits from Defendants' managerial efforts. The crypto asset offerings alleged in the AC are thus investment contracts under *Howey*.

*Third*, the AC more than sufficiently pleads several unregistered securities offerings in violation of Section 5 of the Securities Act of 1933 ("Securities Act") and 6(l) of the Securities Exchange Act of 1934 ("Exchange Act"). These offerings include Defendants' public distribution of LUNA through a U.S. Trading Firm. Defendants' arguments to the contrary improperly contest factual allegations, arguing, for instance, that they had "no involvement" with crypto asset securities that they sold from their own website. Def. Mot. at 2.

*Fourth*, the AC sets forth particularized allegations of Defendants' egregious fraud, which Defendants counter improperly with documents outside the AC; even if the Court were to consider them, they do nothing to rebut SEC's sufficient allegations.

## SUMMARY OF THE ALLEGATIONS

Defendants launched the Terraform blockchain on April 24, 2019, together with one of their first crypto assets, LUNA. AC ¶ 34. Thereafter, Defendants developed, maintained, and promoted at least five crypto assets to investors worldwide, including to U.S. investors: (1) LUNA; (2) wrapped LUNA ("wLUNA"), (3) UST together with the Anchor Protocol; (4) MIR; and (5) security based swaps involving mAssets. *Id.* ¶¶ 3, 15, 39-117, 127-133, 138-140, 149-152, 163-165, 169. Defendants marketed these crypto assets as securities, representing that

Terraform would create, maintain, and grow a Terraform "ecosystem," in which the assets would increase in value and generate profit for investors. *Id*. Defendants also offered, sold, and/or effected transactions in LUNA, MIR, and security based swaps involving mAssets to investors worldwide, including U.S. investors, without registering them with the SEC. *Id*. ¶¶ 105-117.

To promote trading in Terraform crypto asset securities, Defendants engaged in a scheme to mislead and deceive investors about two key aspects of the Terraform ecosystem. *Id*. ¶ 118. First, Defendants told investors that the Terraform blockchain was being used in "real world" transactions by the Korean payment platform Chai – when it was not. *Id*. ¶¶ 118, 121-152. Second, Defendants misled investors about the reliability of the algorithm that purportedly kept the price of UST pegged to $1. *Id*. ¶¶ 118, 153-169. Because the prices of UST and LUNA were intertwined, Defendants' false representations regarding UST led investors to buy billions of dollars of both Terraform crypto assets. *Id*. ¶¶ 1, 5-9, 81-84, 152, 169. When Terraform's ecosystem crashed in May 2022, both UST and LUNA became worthless. *Id.* ¶¶ 170-172. Immediately after the crash, Defendants began funneling their Terraform proceeds through un-hosted blockchain wallets. *Id*. ¶ 172. As of February 2023, they had withdrawn at least $100 million from those wallets. *Id*.

## ARGUMENT

I.      The Court Has Personal Jurisdiction Over Defendants.

A.   Legal Standard for Determining Personal Jurisdiction

A motion to dismiss on the basis of personal jurisdiction under Federal Rule of Civil Procedure ("FRCP") 12(b)(2) is properly denied if a plaintiff makes a *prima facie* showing that jurisdiction exists. *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 85 (2d Cir. 2013). Courts "construe the pleadings and affidavits in the light most favorable to plaintiffs, resolving all doubts in [plaintiffs'] favor." *Id*. (citation omitted).

The Due Process Clause permits a court to exercise specific personal jurisdiction when a non-resident defendant has "certain minimum contacts . . . such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Calder v. Jones,* 465 U.S. 783, 788 (1984) (citation omitted). Courts may analyze a defendant's minimum contacts by looking at both (1) "overall activity within the forum state,"[1] or the (2) "in-state effects of out-of-state activity." *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 243 (2d Cir. 2007). Minimum contacts are established if a defendant purposefully availed herself of the forum, including the privileges of its markets or laws. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985).

B. Defendants Purposefully Availed Themselves of the U.S.

As alleged in the AC, Defendants purposefully availed themselves of the privileges of U.S. markets and laws by, among other things, contracting with U.S.-based entities to sell or otherwise distribute Terraform's crypto asset securities, including on a U.S.-based trading platform (AC ¶¶ 43, 107, 112, 115, 155); traveling to the U.S. to offer and sell their crypto asset securities to U.S. investors (*id.* ¶¶ 16, 43); directing promotional efforts specifically at the U.S. (*id.* ¶¶ 42-43); and making and disseminating materially false and misleading statements to U.S. investors (*id.* ¶¶ 129-130, 151-152).[2]

1. Terraform Targeted the U.S. By Contracting
   With U.S. Firms to Sell Its Crypto Asset Securities.

From the start, Defendants targeted the U.S. by directly selling securities to U.S.-based entities and by contracting to offer and sell securities to U.S. investors. AC ¶¶ 107-109. For

---

[1] When, as here, personal jurisdiction is based upon federal statutes providing worldwide service, *see* 15 U.S.C. §§ 77v, 78aa, the relevant inquiry is whether the defendant has had sufficient minimum contacts with the U.S. as a whole. *U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co.*, 241 F.3d 135, 152 n.12 (2d Cir. 2001).

[2] Terraform's contacts are also imputed to Kwon. *Terraform*, 2022 WL 2066414 at n.2 (citing *EMI Christian Music Grp., Inc. v. MP3tunes, LLC*, 844 F.3d 79, 98 (2d Cir. 2016)).

example, in July 2018, Terraform entered into agreement with a California firm, in a contract signed by Kwon, under which Terraform sold the firm $3 million of LUNA tokens. Ex. PP, QQ;[3] AC at ¶ 107. Four months later, Terraform contracted with another California-based company to distribute LUNA tokens to investors. Ex. TT. In that contract, Terraform agreed to submit to the personal jurisdiction of U.S. courts, *id*. at § 10.10, a "factor alone . . . sufficient to establish purposeful availment." *Nissan Motor Co. v. Nissan Comput. Corp.*, 89 F. Supp. 2d 1154, 1159 (C.D. Cal. 2000); *see also D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 103 (2d Cir. 2006).

The following year, Terraform contracted to loan U.S. Trading Firm 30 million LUNA tokens in order to "improve liquidity" due to the "lackluster performance" of LUNA. AC ¶ 108; Exs. RR, SS. In May 2021, Terraform also contracted with a U.S.-based trading platform to list MIR, UST, and wLUNA for sale in the U.S., contracts in which Terraform again consented to the jurisdiction of U.S. courts. AC ¶¶ 43, 114; Ex. UU, § 14.2; Ex. VV, § 13.2.

By entering into these contracts, which directly relate to the SEC's claims, Defendants purposefully availed themselves of U.S. markets and laws, as the Second Circuit has already found. *Terraform Labs*, 2022 WL 2066414 at *4 (Defendants purposefully availed themselves of the U.S. forum by "enter[ing] into agreements with U.S.-based entities to facilitate the trade" of Terraform's crypto asset securities); *see also U.S. Titan*, 241 F.3d at 152 (finding personal jurisdiction based on "negotiating and forming a contract" with U.S.-based corporation).

### 2. Defendants Traveled to the U.S, Promoted Their Crypto Asset Securities to U.S. Investors, and Employed Numerous U.S. Persons.

Kwon also traveled to the U.S., including to San Francisco and New York, to meet with investors and solicit investments in Terraform's crypto asset securities. AC ¶¶ 16, 43. In 2021,

---

[3] "Ex. __." is a reference to exhibits attached to the Declaration of James P. Connor, solely in support of personal jurisdiction arguments, as permitted under Rule 12(b)(2).

Kwon appeared at a conference in New York, where he promoted Terraform's crypto asset securities to a New York audience by, among other things, chanting "UST, UST, UST, UST." AC ¶ 43; Ex. WW at 47:2-7; 49:8-10 (Kwon stating that Terraform "build[s] Anchor to make sure that Terra stablecoins were the best way to earn yield on stablecoins in the entire world."); *see also* https://www.youtube.com/watch?v=vKpKsoHGVow (Kwon promoting Terraform's crypto asset securities and discussing Chai).[4] Defendants targeted the U.S. in other marketing efforts, including a $40 million sponsorship deal with the Washington Nationals, involvement the placement of "Terra" advertisements around the stadium. AC ¶ 43.[5]

These acts are exactly the sort of targeted conduct that supports personal jurisdiction. *Owen v. Elastos Foundation*, No. 19-cv-5462-GHW, 2021 WL 5868171, at *8 (S.D.N.Y. Dec. 9, 2021) (personal jurisdiction over defendant alleged to have "promot[ed] … Elastos and ELA Tokens in the United States"); *Balestra v. ATBCOIN LLC*, 380 F. Supp. 3d 340, 350 (S.D.N.Y. 2019) (personal jurisdiction over co-founders of digital asset company when they "targeted the U.S. market in an effort to promote the sale of ATB coins, the very unregistered security at issue"); *SEC v. PlexCorps*, No. 17-cv-7007-CBA-RML, 2018 WL 4299983 at *10, 19 (E.D.N.Y. Aug. 9, 2018) (personal jurisdiction over a crypto asset company and founder that did "business while traveling in the United States, utilizing United States–based payment services, and marketing their products to United States consumers via the Internet"); *Myers v. Casino Queen, Inc.*, 689 F.3d 904, 913 (8th Cir. 2012) (advertisement at baseball stadium was targeted effort to attract customers from the jurisdiction).

---

[4] The Court may take judicial notice of publicly available websites. *See Mirlis v. Greer*, 952 F.3d 51, 63 n.11 (2d Cir. 2020).

[5] *See also* https://curlyw.mlblogs.com/nationals-terra-create-first-ever-sports-partnership-with-decentralized-autonomous-organization-20843cc704d3 (quoting Kwon discussing the Nationals sponsorship deal as a way for Terraform to "engage" the U.S. market).

Terraform's physical presence in the U.S. further supports jurisdiction. During the relevant period, multiple Terraform employees worked in the U.S., including its General Counsel, Head of Research, and Director of Special Projects. AC ¶ 15; *see Goldfarb v. Channel One Russia*, 442 F. Supp. 3d 649, 664 (S.D.N.Y. 2020) (exercising specific personal jurisdiction over a Russian entity that "purposefully availed itself of the privilege of conducting business within the forum state" by having an employee and a studio in New York). Like Kwon, these U.S. based employees repeatedly promoted Terraform's crypto asset securities to U.S. investors. *See, e.g.*, Ex. FFF; Decl. of James P. Connor at ¶ 26.

      3.  **Defendants Defrauded U.S. Investors and Used the U.S. Banking System <u>to Effectuate Their Fraud.</u>**

Defendants also purposefully directed their conduct toward the U.S. by making materially false and misleading statements to U.S. investors. When soliciting investments from U.S.-based firms, Kwon claimed, falsely, that Chai used the Terraform blockchain to process and settle transactions, and U.S. firms purchased LUNA on that basis. AC ¶¶ 129-130, 151-152. Kwon also made false and misleading statements regarding Chai on his public Twitter and YouTube accounts available to U.S. investors, and in a television interview broadcast in the U.S. *Id*. ¶¶ 128, 131-33. In May 2021, Defendants further negotiated with a U.S.-based representative of a trading firm to restore UST's price back to $1, culminating in a contract with that firm, signed by Kwon. *Id*. ¶¶ 157-162. Terraform then received $26 million from the firm's U.S. bank account. *Id*. ¶ 160. These intentional and fraudulent acts directed at U.S. investors and utilizing the U.S. markets further support the exercise of personal jurisdiction. *Calder*, 465 U.S. at 789 (personal jurisdiction proper where the defendant took "intentional, and allegedly tortious, actions [that] were expressly aimed" at the forum state); *Licci ex rel. Licci v. Lebanese Canadian*

*Bank, SAL*, 732 F.3d 161, 172 n.7 (2d Cir. 2013) (use of forum banking system in connection with alleged wrongs constitutes purposeful availment).

    4.   The Second Circuit Has Already Held That the Defendants'
           Contacts With the U.S. Support Personal Jurisdiction

During the investigation preceding this action, the SEC subpoenaed documents from Defendants regarding their Mirror Protocol. When Defendants refused to comply with those subpoenas, the SEC instituted a subpoena enforcement action. In response, Defendants argued – just as they argue here – that the court lacked personal jurisdiction because of insufficient U.S. contacts. *Terraform*, 2022 WL 2066414 at *1. The district court found personal jurisdiction over Defendants and the Second Circuit affirmed, holding that Defendants "purposefully availed themselves of the U.S." *Id*. at *3. The Second Circuit identified "seven contacts with the U.S." supporting jurisdiction over Defendants, all of which are alleged in the AC or supported by exhibits hereto. AC ¶¶ 15, 16, 42, 55, 96, 114, 115, 127; Exs. XX, UU, ZZ, AAA, BBB, DDD, EEE, and YY; Decl. of James P. Connor ¶¶ 13-20. Defendants do not even attempt to explain why this Court should reach a different conclusion. The exercise of personal jurisdiction is only more compelling here, as the SEC has now established far more purposeful availment of the U.S. than those contacts previously deemed sufficient by the Second Circuit. *Terraform*, 2022 WL 2066414 at *4.

    C.  Defendants Jurisdictional Arguments Lack Merit and Ignore
         Their Extensive Contacts with the Unites States.

Defendants' jurisdictional arguments (Def. Mot. at 5-7) mischaracterize the AC's allegations and rely on inapposite cases:

- Defendants argue that a wholly-controlled subsidiary of Terraform made the sales to U.S. investors. But the AC alleges – and the record shows – that Terraform itself made sales. AC ¶¶ 107, 152, 155; *see also* Pl. Ex. PP (agreement between

Terraform and California firm); Ex RR (agreement between Terraform and U.S. Trading Firm with a Chicago address).[6]

- Defendants argue that the SEC "fails to distinguish" between Kwon's trips to the U.S. and those of other Terraform employees. But the AC pleads that Kwon *himself* took trips to San Francisco and New York (AC ¶¶ 16, 43). That other Terraform employees also visited the U.S. (and worked here) to promote Terraform's crypto asset securities only further supports the exercise of personal jurisdiction.[7] *Owen*, 2021 WL 5868171, at *8 (S.D.N.Y. Dec. 9, 2021).

- Defendants argue the AC does not allege that Defendants made any false or misleading statements while in the U.S. But Kwon did make such statements directly to U.S. investors. AC ¶¶ 129-130; *Balestra*, 380 F. Supp. 3d at 350.

- Defendants argue that their sponsorship deal with the Washington Nationals is irrelevant because Defendants' sales and misrepresentations allegedly "occurred prior to" the February 2022 deal. But the AC alleges Defendants made false statements and unregistered sales into May 2022. *See, e.g.,* AC ¶¶ 105, 152, 165.

- Defendants rely upon *Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88 (2d Cir. 2000), to argue that their efforts to list Defendant's crypto asset securities on a U.S.-based trading platform do not support personal jurisdiction. But *Wiwa* held that there *was* jurisdiction because defendant's contacts were not "merely 'incidental'" to the stock exchange listing and reflected a choice to establish a broader relationship with New York. *Id.* at 97. Defendants wrongly suggest that Terraform only entered into a listing agreement with a U.S.-based crypto asset trading platform for MIR tokens. Def. Mot. 6 n.4.  In fact, they also executed contracts with the platform to list UST and wLUNA, agreements in which they consented to the jurisdiction of U.S. courts. Ex. VV.

- Defendants argue that the SEC cannot establish jurisdiction by showing that their conduct would have foreseeable effects in the U.S. But Defendants ignore allegations in the AC detailing their direct contacts with the U.S. *See, e.g.,* AC ¶¶ 18-19.  And they are simply wrong when they suggest that whether an out-of-state defendant's conduct had reasonably foreseeable effects in the U.S. is irrelevant. *E.g.*, *SEC v. Dunn,* 587 F. Supp. 2d 486, 509 (S.D.N.Y. 2008).

---

[6] Sales by the wholly-owned subsidiary also support personal jurisdiction because Terraform controlled the subsidiary, Ex. GGG, and Kwon signed the agreements in any event. AC ¶¶ 89, 107, 112, 155, 160, Ex. CCC.

[7] Defendants cite *Jones v. Tyson*, No. 00-cv-7382-CM-MDF, 2001 WL 401438, at *2 (S.D.N.Y. Apr. 18, 2001), for the proposition that infrequent trips cannot establish jurisdiction. But Kwon's trips were not of a "personal nature," *id* at 2, but, rather, were to solicit investors in Terraform's securities. AC ¶¶ 16, 43.

- Defendants allege that Terraform's loans to the U.S. Trading Firm have "no U.S. nexus." To support that argument, they attach an unsigned loan agreement between the U.S. Trading Firm and Terraform, with U.S. Trading Firm's Chicago address redacted out, fail to mention that Kwon negotiated the loan agreements with the U.S. Trading Firm, and ignore that the firm paid Terraform from its U.S. bank account. AC ¶¶ 155, 160; Ex. RR; *PlexCorps*, 2018 WL 4299983, at *11.[8]

## II.    The Major Questions Doctrine Does Not Apply.

Defendants argue that the "major questions doctrine" bars the Commission's claims because the definition of "security" under the Securities Act and the Exchange Act does not contain the words "digital asset." Def. Mot. at 7-9 (citing *West Virginia v. EPA,* 142 S. Ct. 2587 (2022)). Defendants misunderstand the reach and purpose of the major questions doctrine and, in any event, overlook Congress's mandate to the Commission to regulate investments in whatever form they might take.

In *West Virginia*, the Supreme Court relied on "an identifiable body of law that has developed over a series of significant cases" in which "agencies assert[ed] highly consequential power beyond what Congress could reasonably be understood to have granted" to strike down an EPA rule to reduce carbon emissions that "represent[ed] a transformative expansion in [the EPA's] regulatory authority" without a "clear congressional authorization to regulate in that manner."  142 S. Ct. at 2609, 2614–16 (cleaned up). The Court explained that the major questions doctrine is rooted in "separation of powers principles" and constrains agencies' "regulatory assertions." *Id.* at 2609; *see also id.* at 2614 ("[T]he government must—under the major questions doctrine—point to clear congressional authorization to regulate in [the

---

[8] When, as here, a defendant has sufficient minimum contacts with the forum, the exercise of jurisdiction must also be reasonable. *Licci*, 732 F.3d at 169. Terraform had the burden to show unreasonableness, *SEC v. Straub*, 921 F. Supp. 2d 244 (S.D.N.Y. 2013), and has not even attempted to do so here. The Court's exercise of personal jurisdiction over Defendants is reasonable. *Id.* at 259.

challenged] manner.") (cleaned up). It has no bearing on the Commission's exercise of enforcement authority in this case.

Congress unambiguously granted the Commission authority to bring the claims it asserts in this civil law enforcement action for violations of provisions of the Securities Act and the Exchange Act. *See* 15 U.S.C. § 77t(b); 15 U.S.C. § 78u(d)(1). And even if this exercise of enforcement authority were subject to the major questions doctrine, Congress's definition of "security" in the Securities Act and the Exchange Act to include, among other things, "investment contract[s]" "embodies a flexible rather than a static principle, one that is capable of adaption to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *Howey* 328 U.S.at 299.  As the Supreme Court has repeatedly recognized, "Congress' purpose in enacting the securities laws was to regulate *investments,* in whatever form they are made and by whatever name they are called." *SEC v. Edwards*, 540 U.S. 389, 393 (2004) (cleaned up). It therefore enacted a definition of "security" that is "sufficient to encompass virtually any instrument that might be sold as an investment." *Id.* (cleaned up).

In doing so, Congress "necessarily" employed "general" "descriptive terms" like "investment contract" to ensure that the definition of "security" reached "[n]ovel . . . devices." *SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344, 351 (1943). And contrary to defendants' insistence otherwise (Def. Mot. at 8), "Congress painted with a broad brush" precisely *because* "[i]t recognized the virtually limitless scope of human ingenuity, especially in the creation of countless and variable schemes"— and not in spite of such advances. *Reves v. Ernst & Young*, 494 U.S. 56, 60–61 (1990) (cleaned up). Congress thus clearly intended that investments like those here at issue would fall within the definition of "security" in the Securities Act and the

Exchange Act. That the instruments are based on technology unknown at the enactment of the Securities Act and the Exchange Act is beside the point. *See, e.g., Eberhardt v. Waters*, 901 F.2d 1578, 1579 (11th Cir. 1990) (arrangement involving the sale of cattle embryos constituted an investment contract); *SEC v. SG Ltd.*, 265 F.3d 42, 44 (1st Cir. 2001) (virtual shares of an online fantasy investment game were investment contracts).

In short, the major questions doctrine has no bearing on the SEC's claims in this case.[9]

III.    This Action Does Not Violate Due Process.

Defendants argue they did not have "fair notice" that their misconduct was illegal under the securities laws. Def. Mot. at 10. Due process requires that laws "provide a person of ordinary intelligence fair notice of what is prohibited," and thus not be impermissibly vague. Def. Mot. 10 (quoting *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012)).

Courts have repeatedly rejected the argument that the statutory term "investment contract" is unconstitutionally vague, given the Supreme Court's decades-long jurisprudence construing the term. *See, e.g., SEC v. Brigadoon Scotch*, 480 F.2d 1047, 1052 n.6 (2d Cir. 1973) ("untenable" to claim the term "investment contract" was void for vagueness); *United States v. Zaslavskiy*, No. 17-cr-647-RJD, 2018 WL 4346339, at *8-9 (E.D.N.Y. Sept. 11, 2018) (rejecting argument that the "securities laws are unconstitutionally vague . . . as applied to cryptocurrencies"); *SEC v. Kik Interactive Inc.*, 492 F. Supp. 3d 169, 183 (S.D.N.Y. 2020) (same); *SEC v. LBRY, Inc.*, No. 21-cv-260-PB, 2022 WL 16744741, at *8 (D.N.H. Nov. 7, 2022)

---

[9] Defendants' reliance on cherry-picked statements by, among others, individual members of Congress and one of five SEC Commissioners, fares no better. Those statements are extraneous to the AC and not relevant in any event. *See Kik*, 492 F. Supp. 3d at 183.

(same); *see also United States v. Smith*, 985 F. Supp. 2d 547, 588-589 (S.D.N.Y. 2014) (judicial decisions can provide notice of statute's import).

Defendants seek a different result here by arguing that the SEC is "tak[ing] the position that all cryptocurrencies other than [Bitcoin] are securities," an alleged departure from prior SEC statements. Def. Mot. at 10. But this case is not about "all cryptocurrencies"; it only concerns Defendants' crypto asset securities. *Cf. Kik*, 492 F. Supp. 3d at 183 ("every cryptocurrency, along with the issuance thereof, is different and requires a fact-specific analysis").

Nor has the SEC ever taken the position that crypto assets are *not* securities. In 2017, the SEC issued a public report that analyzed the offer and sale of "DAO tokens" and concluded they were offered and sold as investment contracts based on *Howey* and later cases. SEC Rel. No. 81207, *Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO* (July 25, 2017). Since then, the SEC has issued staff guidance[10] on the application of *Howey* to the sales of crypto assets and filed dozens of actions alleging violations based on the unregistered offers and sales of crypto assets securities, including cases filed before Defendants launched Terraform blockchain launched in April 2019. AC ¶ 34; *see, e.g., PlexCorps*, 2018 WL 4299983, at *2-3 (August 9, 2018); *Zaslavskiy*, 2018 WL 4346339, at *8-9 (September 11, 2018). *Howey* and the SEC's consistent guidance provide more than fair notice of what the securities laws require.[11]

---

[10] https://www.sec.gov/corpfin/framework-investment-contract-analysis-digitalassets (Apr. 3, 2019).

[11] Defendants' reliance on *Bittner v. United States*, 143 S. Ct. 713 (2023) is misplaced. The Supreme Court did not hold that the Government's interpretation of an IRS penalty provision "violated Bittner's due process rights," as Defendants state. Def. Mot. at 10 (citing *Bittner*, 143 S. Ct. at 722). The Court simply construed a statute while considering prior agency statements, noting that the "guidance documents do not control [the] analysis." *Bittner*, 143 S. Ct. at 722.

IV.     The SEC's Claims Do Not Violate the Administrative Procedure Act ("APA")

Defendants APA argument fails for the same reasons: the SEC is not announcing "a new industry-wide policy." Def. Mot. at 11. Courts reject APA challenges in identical circumstances. *Reich v. Valley Nat. Bank of Arizona*, 837 F. Supp. 1259, 1301 (S.D.N.Y. 1993) (holding that "the APA is not applicable" to a Department of Labor's enforcement action because the lawsuit was a "fact-intensive application of a statutory standard . . . not a rule subject to the confines of congressionally mandated rule making procedures."); *cf. SEC v. Chenery Corp.,* 332 U.S. 194, 203 (1947) ("[The] choice made between proceeding by general rule or by individual, ad hoc litigation is one that lies primarily in the informed discretion of the administrative agency."). The AC applies no new legal standards, let alone a "radical departure" from the long-standing "investment contract" analysis and its application to new types of investment offerings.[12]

V.     The AC States Claims for Relief Under the Federal Securities Laws
       and Defendants' Counterfactual Arguments to the Contrary Must be Rejected.

       A.   Legal Standard.

To withstand a motion to dismiss under FRCP 12(b)(6), a complaint need only plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). "A claim has facial plausibility when, accepting all factual allegations as true, the plaintiff "pleads factual content that allows the court to draw the reasonable inference

---

[12] Defendants rely on *Pfaff v. U.S. Dept. of Housing and Urban Devel.*, 88 F. 3d 739 (9th Cir. 1996), but it has no bearing here. In *Pfaff*, the HUD Secretary announced a new legal standard *in an agency adjudication* that "depart[ed] radically from the agency's previous interpretation of the law." *Id*. at 748. Here, the SEC did not announce a new legal standard in an agency adjudication, instead it has brought an enforcement action in this Court based on statutes enacted by Congress, and relies on decades of federal court precedent interpreting those statutes. There are no "radical departures" here. Defendants defrauded investors in connection with the purchase, offer, or sale of five crypto asset securities. *See Zaslavskiy*, 2018 WL 4346339, at *8-9 ("[S]tripped of the 21st-century jargon" the case . . . the challenged Indictment charges a straightforward scam, replete with the common characteristics of many financial frauds.").

that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up); *SEC v. Apuzzo*, 689 F. 3d 204, 207 (2d Cir. 2012). Under FRCP 9(b), a complaint "must state with particularity the circumstances constituting fraud or mistake," but "intent, knowledge, and other conditions of a person's mind may be alleged generally."

Defendants challenge all of the SEC's claims, relying heavily on "evidence," consisting of 41 exhibits and spanning more than 400 pages. The Court should ignore that extraneous material. *See Global Network Commc'ns v. City of N.Y.*, 458 F.3d 150, 156 (2d Cir. 2006) (complaint citation to a document insufficient to permit court to consider it on a motion to dismiss); *Leonard F. v. Israel Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir.1999) (quotations omitted) (courts are confined on a Rule 12(b)(6) motion "to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken").[13] On the allegations of the SEC's well-pleaded complaint, Defendants' arguments all fail.

B. The AC Establishes That Each of Terraform's
Crypto Assets Were Offered and Sold as Securities

1. *Howey* Does Not Require a Common Law Contract.

Under Securities Act Section 2(a)(1) and Exchange Act Section 3(a)(10), an "investment contract" is a security. 15 U.S.C. §§ 77b(a)(1); 78c(a)(10). As described above, the *Howey* Court established a test to determine when an "unconventional scheme or contract" constitutes an investment contract and therefore a security. *SEC v. Telegram Grp., Inc.*, 448 F. Supp. 3d 352, 365 (S.D.N.Y. 2020). That test requires that a scheme involve an investment of money in a

---

[13] While the SEC will refute Defendants' proffered evidence at the appropriate time, "a court's function on a motion to dismiss is not to weigh the evidence that might be presented at a trial." *SEC v. Sugarman*, No. 19-cv-5998, 2020 WL 5819848, at *8 (S.D.N.Y. Sept. 30, 2020) (cleaned up).

common enterprise with a reasonable expectation of profits to be derived from the efforts of a promoter or third party. *Howey*, 328 U.S. at 298–99. As noted, the test embodies a "flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *Id.* at 299. The focus is on economic reality. *SEC v. Aqua-Sonic Prods.*, 524 F. Supp. 866, 876 (S.D.N.Y. 1981) *aff'd* 687 F.2d 577 (2d Cir. 1982).

Defendants seek to add a new requirement to *Howey*'s definition of an investment contract: the existence of a formal written contract between the promoter and investors. Def. Mot. at 13. But in *Howey*, the Supreme Court held that "an investment contract for purposes of the Securities Act means a contract, *transaction or scheme*." *Id.* at 298-99 (emphasis added); *see also Hocking v. Dubois*, 885 F.2d 1449, 1457 (9th Cir. 1989) ("In defining the term investment contract, *Howey* itself uses the terms 'contract, transaction or scheme,' . . . leaving open the possibility that the security not be formed of one neat, tidy certificate, but a general 'scheme' of profit seeking activities.") (citations omitted). Defendants' invented requirement finds no support in *Howey* or in any case applying it.[14]

### 2. <u>UST Was Offered and Sold as a Security</u>

As detailed in the AC, Defendants offered and sold UST as part of an investment scheme in connection with the Anchor Protocol. *See* AC ¶¶ 69-84. The AC alleges that this scheme involved: an investment of money (*id.* ¶ 69); in a common enterprise (*id.* ¶¶ 70-73); and, a

---

[14] Defendants' passing suggestion that all securities, including investment contracts, have to possess the characteristics of "stocks" and "bonds" is meritless.  Def. Mot. at 7.  This argument ignores the Securities Act's plain text, which defines "security" to include specific terms like "stock," which have "well settled meaning[s]," but also separately lists the more general term "investment contracts." *Joiner* 320 U.S. at 351 (holding that courts should not, in construing "investment contracts," "read out of the statute these general descriptive designations merely because more specific ones have been used to reach some kinds of documents."; *see also Golden v. Garafalo*, 678 F.2d 1139, 1143 (2d Cir. 1982) ("investment contract" is a "catch-all phrase").

reasonable expectation of profits based on Defendants' managerial efforts (*id*. ¶¶ 74-83). These facts are sufficient to defeat Defendants' motion to dismiss. *See Friel v. Dapper Labs, Inc.*, No. 21-cv-5837, 2023 WL 2162747, at *8 (S.D.N.Y. Feb. 22, 2023).

Specifically, in September 2020, Defendants began marketing UST as a "yield bearing" asset together with the Anchor Protocol. AC., ¶ 35. As advertised, investors could purchase UST and deposit it into a smart contract associated with the Anchor Protocol and "earn" close to 20% in annual returns. *See id.* ¶¶ 69, 75. All investors would profit equally in proportion to their investment. *Id.* ¶ 71. And Defendants deposited tens of millions of their own UST into the Anchor Protocol, tying their fortunes to those of investors. *Id.* ¶ 72; *Telegram* 448 F. Supp. 3d at 369-71 (vertical commonality existed where "Telegram's fortunes are directly tied to the fortunes of the [investors], which will rise and fall with the success or failure of the [enterprise]."). Investors reasonably expected profits to come from Defendants' managerial efforts because Defendants publicly touted their support for the Anchor Protocol (including subsidizing the reserve that paid UST investors their promised returns). AC ¶ 79.

Here, Defendants offered and sold an instrument whose notional value would supposedly remain stable based upon Defendants' efforts[15], but which would yield returns to investors, based upon Defendants' creation and support of the Anchor Protocol's profit-earning opportunities and the liquidity of the UST secondary market. AC ¶¶ 74-83. UST purchasers were not just buying software code, but an opportunity to participate in the Anchor Protocol and, crucially, to profit. AC ¶ 75. Defendants argue that the Anchor Protocol they marketed to UST investors is "irrelevant" to whether UST is a security and that the Court must cabin its *Howey*

---

[15] Indeed, Defendants acknowledge that they undertook extensive efforts to support the value of UST. Def. Mot. at 4 ("[Terraform] also spent hundreds of millions of its own dollars trying to defend the peg.").

analysis to the standalone UST token. *E.g.*, Def. Mot. at 14. But *Howey* and it progeny require

the opposite, instructing courts to analyze "the full set of contracts, expectations, and

understandings centered on the sales or distribution" of the instrument. 328 U.S. at 379. For that

reason, courts have consistently rejected similar efforts to confine the *Howey* analysis. *See e.g.*,

*Telegram Grp., Inc.*, 448 F. Supp. 3d at 379 ("The Court rejects Telegram's characterization of

the purported security in this case. While helpful as a shorthand reference, the security in this

case is not simply the Gram, which is little more than alphanumeric cryptographic sequence.").[16]

Defendants "sought the use of money of others on the promise of profits." *SEC v.*

*Aronson*, No.11-cv-7033-JSR, 2013 WL 4082900, at *9 (S.D.N.Y. Aug. 6, 2013) *on*

*reconsideration in part on other grounds*, 2013 WL 6501324 (S.D.N.Y. Dec. 11, 2013).  And

Terraform promised profits of 19-20 percent to investors that deployed their UST into the

Anchor Protocol. AC ¶ 35. Defendants also touted their efforts to engineer, develop, and support

the Anchor Protocol, for the purpose of maintaining the promised returns to investors. *Id.* ¶ 76.

   In *Howey*, the promoter sold parcels of land with orange trees to purchasers that receive

the rights to the parcel. 328 U.S. at 295.  However, purchasers were told by the promoter that

investing in a parcel would not be fruitful, unless they also made arrangements to service the

land: services the promoter helpful offered in contracts that involved cultivating the land, and

harvesting and marketing the crop. *Id*. at 295-96. Although land purchasers were free to hire a

separate service provider, 85 percent of land purchasers also entered into the service contract

simultaneously offered by the promoter.  *Id*. at 295.  The Supreme Court held that "the

transactions in this case clearly involve investment contracts, as so defined."  *Id*. at 299. The

---

[16]  *See also SEC v. Arbitrade Ltd*., No. 22-cv-23171, 2023 WL 2785015, at *6 (S.D. Fla. Apr. 5, 2023) ("The SEC argues – and the Court agrees – that 'the entire scheme' involving DIG tokens, as alleged in the complaint constitutes an 'investment contract' under the *Howey* test.").

Court rejected the notion—advanced by the promoter and the dissent—that the promoter was just offering fee simple interests in land, coupled with services. "They are offering an opportunity to contribute money and to share in the profits of a large citrus fruit enterprise managed and partly owned by respondents." *Id*.

The UST/Anchor Protocol scheme is remarkably similar to the *Howey* arrangement. As described above and in the AC, investors were offered the chance to purchase UST coupled with the opportunity to stake it to the Anchor Protocol and earn large rates of return. Although in theory investors did not have to deposit their UST in the Anchor Protocol, as detailed in the AC *nearly 74 percent* of the almost 19 billion UST issued was deposited in the interest-generating Anchor Protocol at the time the Terraform ecosystem collapsed in May 2022. *Id.* ¶ 75. Here, as in *Howey*, the Court's analysis should be "unaffected by the fact that some purchasers choose not to accept the full offer of an investment contract by declining to enter into a service contract with the respondents." 328 U.S. at 300-01. "The Securities Act prohibits the *offer* as well as the sale of unregistered, non-exempt securities." *Id*. at 301 (emphasis added). Thus, it is sufficient that, as alleged in the AC, Defendants offered purchasers of UST a chance to partake in their profit sharing venture via the Anchor Protocol, an offer that most UST investors accepted.

Defendants also suggest that UST's purported "consumptive use" somehow undermines UST's status as an investment contract. Def. Mot. at 15. But this suggestion is contrary to the well-pled facts in the AC. The SEC has alleged that "many domestic retail investors purchased UST for the sole purpose of earning a return on the Anchor Protocol developed and maintained by Defendants." AC ¶ 81. And in any event, "[n]othing in the case law suggests that a token with both consumptive and speculative uses cannot be sold as an investment contract." *LBRY, Inc.*, 2022 WL 16744741, at *7.

Defendants also argue that the SEC's allegation that many investors purchased UST solely to earn a return through the Anchor Protocol "cannot suffice to establish that users in general acquired UST primarily for that purpose." Def. Mot. at 16. But the SEC need not show that "users in general" acquired UST "primarily" for investment purposes. The inquiry into whether investors expected profits "is an objective one focusing on the promises and offers made to investors; it is not a search for the precise motivation of each individual participant." *Telegram,* 448 F. Supp. 3d at 371. Here, Defendants repeatedly promised investors that if they purchased UST, they could deposit it in the Anchor Protocol and earn nearly 20 percent returns. AC ¶¶ 3, 25, 71, 76. As alleged in the AC, Defendants own sustained marketing of UST as an investment opportunity created the expectation of profit required under *Howey. See SEC v. Xia*, No. 21-cv-5350, 2022 WL 17539124, at *20 (E.D.N.Y. Dec. 8, 2022) (holding under *Howey* that marketing materials "created an objective expectation that purchasers would profit by investing in the [p]rojects,"), *appeal filed*, No. 22-3137 (2d Cir. Dec.14, 2022).

Defendants also argue that UST is not a security because "stablecoins are currency and thus specifically exempt from the federal securities laws." Def. Mot. at 14. But, simply labeling something a "currency" does not make it so (just as labeling UST "stable" clearly did not make it so). *See Zaslavskiy,* 2018 WL 4346339 at *7 ("[Defendant] overlooks the fact that simply labeling an investment opportunity as 'virtual currency' or 'cryptocurrency' does not transform an investment contract—a security—into a currency."). Although the Exchange Act excludes "currency" from the definition of "security," it does not define the term. However, Treasury Department regulations define "currency" as "[t]he coin and paper money of the United States or of any other country that is designated as legal tender." 31 C.F.R. § 1010.100(m). UST is plainly not "currency" under this definition, and the Treasury Department's Financial Crime

Enforcement Network ("FinCEN") has distinguished "virtual currency" such as UST from "real currency" since before Defendants first minted UST in June 2019. *See FinCEN Guidance, Application of FinCEN's Regulations to Certain Business Models* (May 9, 2019), at 24 n. 75 (observing that "federal securities law may apply to the issuance of [virtual currency] as securities regardless of other intended purposes . . . .").

The AC also alleges that UST was a security because it gave investors a "right to subscribe or purchase" another security—namely LUNA. AC ¶ 84; 15 U.S.C. §§ 77b(a)(1), 77c(a)(10). Defendants complain that under this theory every crypto asset would be a security because any token can be converted into any other token. Def. Mot. at 16-17. But it is the Defendants who are oversimplifying matters; the SEC does not allege anywhere in the AC that any token that can be traded for another token is automatically a security. Rather, as alleged in the AC, it is the fact that a holder of UST had the *right* (programmed into the Terraform algorithm itself) —no matter the then-present value of UST—to exchange one UST for one dollar's worth of a crypto asset security (LUNA) that makes UST a security.  AC ¶ 33. This innate structure – and not simply the ability to convert UST to LUNA without anything more – is what made UST like a stock warrant that entitles the holder to purchase shares at a specific price, regardless of the warrant's market price when it is exercised. [17]

---

[17]  For this reason, the *amicus* brief submitted by Paradigm Operations LP (Dkt No. 27) is largely irrelevant. Its focus is the standalone UST token—a purported "stablecoin" that supposedly does not change in value (itself a myth, as Defendants' persistent efforts to push the token's price to $1 show). But UST's purposed status as a "stablecoin" is wholly inapposite here. The SEC has alleged that UST was offered and sold as part of an investment scheme of which UST was a part—namely UST's direct pairing with Defendants' Anchor Protocol. Alternatively, the SEC alleges that UST alone was a security, because it gave an investor a "right to subscribe or purchase" another security, namely LUNA. Paradigm incorrectly asserts that the SEC's position is that UST is a security because it could be used to purchase *any* crypto asset security. In fact, what the SEC has claimed is that a holder of UST could, on demand, exchange one UST for one dollar's worth of LUNA (a crypto asset security), no matter the current value of UST (be it one

3.  <u>LUNA was Offered and Sold as a Security</u>

The AC's allegations establish that LUNA is also an investment contract under *Howey*.

First, the SEC alleges that investors tendered money or crypto assets in exchange for LUNA. *See*

AC ¶ 44. Second, the AC's allegations demonstrate that LUNA involved a common enterprise.

As to horizontal commonality, LUNA investors shared equally in LUNA price increases, such

that if one investor profited, all investors did so. AC ¶ 46. Defendants also pooled the funds

received from LUNA investors to develop the Terraform ecosystem and increase the value of

LUNA for the purpose of launching and developing Terraform's business. *See* AC ¶¶ 34, 46, 47;

*see also Revak v. SEC Realty Corp.*, 18 F.3d 81, 87 (2d Cir. 1994) (horizontal commonality is

established by a pooling of assets and sharing profits and risks of the enterprise). Courts in this

District have found that such allegations establish a common enterprise. *See, e.g.*, *Balestra*, 380

F. Supp. 3d at 353 (denying motion to dismiss because proceeds from token purchases "were

pooled together to facilitate the launch of the [blockchain], the success of which, in turn, would

increase the value" of purchasers' coins); *see also Kik*, 492 F.Supp.3d at 169, 178 (finding

horizontal commonality where promoter pooled funds and used the funds for its operations,

including construction of its digital ecosystem).

Contrary to Defendants' suggestion (Def. Mot. at 17), the SEC need not establish vertical

commonality with respect to LUNA to meet the requirements of *Howey*—horizontal

commonality alone is enough. *See Revak*, 18 F.3d at 87; *see also Kik*, 492 F. Supp. 3d at 178, n.5

(horizontal commonality alone sufficient). Nonetheless, the AC also establishes strict vertical

commonality. Terraform owned hundreds of millions of LUNA throughout the relevant time

period, and Kwon personally owned a substantial amount from the inception of the blockchain

---

dollar or one cent); that characteristic made UST akin to a stock warrant and therefore a security.

launch, AC ¶ 48, aligning Defendants' fortunes with those of LUNA investors and establishing vertical commonality. *See Telegram* 448 F. Supp. 3d at 369-71.

Finally, the AC more than adequately pleads that LUNA investors had a reasonable expectation of profits based upon Defendants' efforts. Defendants solicited investors in LUNA by repeatedly claiming in public statements that LUNA would grow in value as the Terraform business grew based upon Defendants' efforts. AC ¶¶ 3, 31-33, 42, 49-57. Defendants also promised investors that Defendants would undertake considerable efforts to grow the business and increase the LUNA's value, including by building out the Terraform blockchain, updating, engineering and developing the ecosystem, reinvesting the proceeds of early fundraising capital to grow the business, and creating resale value for LUNA. *Id.* ¶¶ 31, 47, 50-55, 57-58.

Kwon himself frequently touted LUNA on Twitter as a profit making opportunity, specifically tied to his own efforts: "But in the long run, Luna value is actionable – it grows as the ecosystem grows…as a holder of [LUNA], you have three choices, [including] "sit[ting] back and watch[ing] me kick ass." *Id*. ¶ 51. Other Terraform employees made similar statements regarding LUNA (*id*. ¶ 52), and Terraform publically distributed regular investor updates describing the myriad steps that Terraform was taking to grow the business. *Id*. ¶ 57. Under these alleged facts, a potential investor would have reasonably expected Defendants to expend efforts to improve the value of the proffered investment. And courts have consistently held that representations like these satisfy the expectation of profits element of the *Howey* test. *See e.g.*, *Balestra*, 380 F. Supp. 3d at 355-57 (complaint sufficient given allegations concerning "content of Defendants' marketing materials" and their responsibility for "developing and launching the [blockchain] – the performance of which largely dictated the value of ATB Coins[.]"); *SEC v. NAC Foundation, LLC*, 512 F. Supp. 3d 988, 998 (N.D. Cal. 2021) (expectation of profits

sufficiently pled based upon statements about promoters' efforts). Defendants' suggestion that purchasers acquired LUNA "to speculate on fluctuations in global market prices (or markets generally)" (Def. Mot. at 18), and that this precludes a finding of expectation of profits based upon Defendants' efforts, is both counterfactual and incorrect as a matter of law.

Because Defendants cannot argue that the AC's well-pled allegations regarding LUNA fail to satisfy the *Howey* test, Defendants instead manufacture additional elements not required by law. First, they argue that no common enterprise can exist because "the parties were free to hold or sell [the assets] at their discretion." Def. Mot. at 17. But the Second Circuit has expressly held that investment schemes satisfy *Howey* even when investors may hold or sell at separate times and at their own discretion. *See SEC v. Glen-Arden Commodities, Inc*., 493 F.2d 1027, 1031 (2d Cir. 1974) (finding that investment contracts existed despite purchasers being able to individually sell out of investments); *Kik*, 492 F. Supp. 3d at 179 (same).[18]

Second, Defendants argue that the AC fails to demonstrate "interdependency among investors" with respect to profits and thus fails to establish horizontal commonality. Def. Mot. at 17-18. No such requirement exists.[19] Instead, horizontal commonality is established by a pooling of assets and shared profits and risks of the enterprise. *See Revak*, 18 F. 3d 87. The well-pled

---

[18]  Defendants analogy to "gold" is inapt. Def. Mot. at 17. Unlike gold, LUNA has no intrinsic value apart from Defendants' promises to take actions to increase its value.

[19] Defendants cite *SEC v. Life Partners, Inc.*, for their invented "interdependency" requirement. There, the Court used the term "inter-dependency" to describe the specific arrangement involved in that case. *See* 87 F.3d 536, 544 (D.C. Cir. 1996). The Court found that the arrangement was sufficient to satisfy horizontal commonality, but never held that interdependency was an independent requirement for horizontal commonality. *Id.* Instead, the *Life Partners* court cited the Second Circuit's *Revak* decision for the proposition that "horizontal commonality—defined by the pooling of investment funds, shared profits, and shared losses—is ordinarily sufficient to satisfy the common enterprise requirement." *Id*. at 543-44 (citations omitted).

allegations of the AC establish just that – investors shared equally in LUNA price fluctuations, (AC ¶¶ 46, 56).

Third, Defendants' suggestion that LUNA may have had some non-investment "use" (Def. Mot. at 18) improperly ignores the allegations in the AC that Defendants invited investors in LUNA to expect to profit based on Defendants' efforts. *See* AC ¶¶ 3, 49-57. And putting aside, some utility does not foreclose the existence of an investment contract. *LBRY, Inc.*, 2022 WL 16744741, at *7; *Glen-Arden,* 493 F. 2d at 1034-35.

### 4.   wLUNA was Offered and Sold as a Security

The AC also demonstrates that wLUNA meets the requisite *Howey* elements of: an investment of money (AC ¶ 62); in a common enterprise (*id.* ¶¶ 63-64) and a reasonable expectation of profits from Defendants' managerial efforts (*id.* ¶¶ 65-67). Defendants offer nothing regarding wLUNA apart from counterfactual arguments that should be ignored for purposes of this Rule 12(b)(6) motion.

For instance, that wLUNA may "run" on the Ethereum blockchain is irrelevant. wLUNA tokens were created by being "bridged" from the Terraform blockchain. AC ¶ 60, 62. wLUNA was therefore created from LUNA deposited and pooled on the Terraform blockchain, *id.* ¶ 62-63, and both wLUNA and LUNA were exchangeable on a one-to-one basis such that the price of wLUNA mimicked the rise and fall of the price of LUNA. *Id.* ¶ 64-65. wLUNA's value flowed directly from LUNA's value, and its value was therefore also dependent on the success of the Terraform ecosystem. Investors would have reasonably understood this economic reality (or would have reasonably believed they were purchasing LUNA). *Id.* ¶ 66.

wLUNA also constitutes a security because it is a "receipt for" LUNA. 15 U.S.C. §§ 77b(a)(1), 77c(a)(10). Here, as alleged, wLUNA was created when an investor deposited LUNA into an address on the Terraform blockchain. AC ¶ 63. For each LUNA deposited into the pool, a

wLUNA was created. *Id*. The owner of the wLUNA had the right and ability at any time to

exchange the wLUNA for LUNA, which was offered and sold as a security. *Id*. ¶ 68. wLUNA

was thus a receipt for a security and therefore, itself, a security. *Cf. United States v. Martoma*,

No. 12-cr-973-PGG, 2013 WL 6632676, at *3 (S.D.N.Y. Dec. 17, 2013) (concluding that there

could be "no dispute" that American Depositary Receipts ("ADRs") that allow American

investors to invest in instruments that represent a certain number or fraction of shares of foreign

stock are themselves securities).

### 5. MIR Tokens Were Offered And Sold As Securities

The AC demonstrates that Defendants offered and sold MIR tokens as securities. AC

¶¶ 85-97. The offering of MIR tokens involved: an investment of money (*id*. ¶ 85); in a common

enterprise (*id*. ¶¶ 86-89); and, a reasonable expectation of profits based on Defendants'

managerial efforts (*id*. ¶¶ 90-97).  As described in the AC, Defendants operated websites that

promoted, explained, and facilitated the use of the Mirror Protocol by the general public. *Id*. ¶

94. Defendants also engineered, launched, and upgraded the Mirror Protocol, for which they

employed engineers and a "product manager," and Defendants also controlled a price check

mechanism for the assets underlying mAssets on the Mirror Protocol. *Id*. ¶ 95.

Defendants improperly attempt to dispute the facts alleged in the AC relating to MIR,

including with documents not included in or incorporated by reference into the AC. Def. Mot. At

18-19 (discussing Def. Exs. I and J). Defendants also contend that the AC "contains no specific

facts indicating that the Mirror Protocol required further development at the time of the sale or

required funding," and thus fails to allege horizontal commonality. *Id*. But the AC specifically

alleges, that "proceeds of the sales of MIR tokens were pooled together to develop and fund

Terraform operations and, specifically, the Mirror Protocol." AC ¶ 87. The SEC further alleges

that Defendants "engaged in myriad efforts to facilitate and support" the Mirror Protocol and details those specific efforts, such as employing a product manager and engineers. *Id.* ¶ 95.

The Mirror Protocol scheme is indistinguishable from the investment scheme the Second Circuit held to be an investment contract in *Gary Plastic Packaging Corp. v. Merrill Lynch, Inc.*, 756 F.2d 230, 240-41 (2d Cir. 1985). There, Merrill Lynch offered a scheme whereby investors purchased highly illiquid certificates of deposit with fixed notional amounts as to which third party banks that Merrill enlisted paid fixed rates of interest. Merrill earned a fee from the CD sales and marketed and undertook efforts to support investors' profits, including "marketing the CDs," "creating a secondary market" for their resale, and "affording the investor a high degree of liquidity that it would not otherwise have." *Id.*

Defendants contend that some of the efforts described above, such as their engineering and upgrading of the Mirror Protocol and their operation of a Mirror Protocol website are "pre-sale activities or "'ministerial' post-sale activities not relevant to the *Howey* analysis. Def. Mot. at 19. Defendants are mistaken. The activity alleged in the AC was not ministerial. *See, e.g.,* AC ¶ 94 (describing Defendants efforts to facilitate the use of the Mirror Protocol by the general public); *id.* ¶ 96 (describing Defendants efforts to promote the Mirror Protocol "following the launch")). And in any event, pre-sale efforts are relevant to analyzing whether a scheme is an investment contract under *Howey*. *See Telegram*, 448 F. Supp. 3d at 375 ("efforts of promotors, undertaken either before or after gaining control over investor funds, are relevant considerations due to *Howey's* focus on economic realities.") (citing *SEC v. Mut. Benefits Corp.*, 408 F.3d 737, 743–44 (11th Cir. 2005).[20]

---

[20] Defendants cite to the D.C. Circuit decision in *Life Partners* for their argument that pre-sale activities are not relevant to the *Howey* analysis. The Eleventh Circuit in *Mutual Benefits Corp.* expressly rejected *Life Partners*' reasoning, and relied on the Second Circuit's decisions in *Gary*

Defendants further claim that "the SEC also fails to plead that users acquired MIR tokens with the expectation of profits, let alone profits from [Defendants'] efforts." Def. Mot. at 19. Yet the AC alleges that "Defendants told investors that the price of the MIR was directly correlated with Terraform's and Kwon's efforts to increase the usage of the Mirror Protocol because its value was dependent on the fees generated by usage of the Mirror Protocol." AC ¶ 91. The AC also details how Defendants used promotional materials to induce investors into believing that "Defendants would heavily promote the Mirror Protocol, which would increase the price of the MIR tokens." *Id.* Indeed, Defendants, though improperly citing to a document outside the AC, represent that the document "discussed how the value of MIR tokens might grow with greater usage of the Mirror Protocol." Def. Mot. at 19 (citing Def. Ex. J).

### C. The SEC Has Pled a *Prima Facie* Case Under Section 5 of the Securities Act

Section 5(a) and (c) of the Securities Act prohibit any person, directly or indirectly, to make use of the mail or interstate commerce to offer or sell a security unless a registration statement has been filed with the SEC, and to sell a security unless a registration statement has been filed and is in effect. 15 U.S.C. § 77e(a),(c). To establish its *prima facie* case under Section 5, the SEC properly alleged that: (1) no registration statement was filed or was in effect as to the securities in question; (2) the defendant, directly or indirectly, sold or offered to sell these securities; and (3) in connection with the offer or sale, there was a use of interstate transportation, or communication in interstate commerce, or of the mails. *SEC v. Cavanagh*, 1 F. Supp. 2d 337, 361 (S.D.N.Y. 1998) aff'd 155 F. 3d 129 (2d Cir. 1998). No scienter is required.

---

*Plastic* and *Glen-Arden* to hold that pre-sale efforts are important to the *Howey* analysis. *Mut. Benefits Corp.*, 408 F.3d at 743–44; *see also Matter of Living Benefits Asset Mgmt., L.L.C.*, 916 F.3d 528, 538 (5th Cir. 2019) (observing that "with rare exceptions, federal district courts and state courts have sided with the Eleventh Circuit's analysis over the D.C. Circuit's analysis).

*Id.* Once the SEC meets this *prima facie* burden, the burden shifts to the defendant to show that an exemption applies. *SEC v. Ralston Purina Co.*, 346 U.S. 199, 124-26 (1953).

Defendants are liable for violating Section 5 because they "'engaged in steps necessary to the distribution of [unregistered] security issues.'" *SEC v. Universal Express, Inc.*, 475 F. Supp. 2d 412, 422 (S.D.N.Y. 2007) (quoting *SEC v. Chinese Consol. Benev. Ass'n, Inc.*, 120 F.2d 738, 741 (2d Cir. 1941)). A distribution "comprises 'the entire process by which in the course of a public offering the block of securities is dispersed and ultimately comes to rest in the hands of the investing public.'" *R.A. Holman & Co., Inc. v. SEC*, 366 F.2d 446, 449 (2d Cir. 1966) (quoting *Lewisohn Copper Corp.*, 38 S.E.C. 226, 234 (1958)).

Here, the AC alleges a *prima facie* case that Defendants repeatedly violated Section 5 in connection with public offerings of LUNA and MIR. First, no registration statement was filed or in effect as to these offerings. AC ¶¶ 106-114, 117.  Second, Defendants offered and sold LUNA and MIR by, among other things, (1) executing agreements for sales and "loans" of LUNA and MIR (the purpose of which was to effectuate large public distributions of LUNA and MIR into secondary markets through conduits who could immediately resell them); (2) directly selling LUNA and MIR continuously into the public market; and (3) selling MIR tokens from Terraform's website to the public. *Id.*  ¶¶ 1, 38, 92, 105-114, 155, 159-160. Finally, Defendants do not dispute the allegations that they used the means and instrumentalities of interstate commerce and the mails to conduct their offers and sales. *See e.g.*, *Id.* ¶¶15, 20, 42-43, 50-53, 55, 57, 66, 79, 96-97, 107-109, 111-114, 155, 159, 160.

Defendants argue that the AC does not sufficiently plead violations of Section 5 because the *SEC* did not show that Defendants' sales *were not* exempt from registration. Def. Mot. at 20-24. But it is Defendants' burden, not the SEC's, to affirmatively plead an entitlement to an

exemption from registration. *SEC v. Cavanagh*, 445 F.3d 105, 111 n.13 (2d Cir. 2006). Defendants have failed to meet their burden.

Nor may a court dismiss a properly pled Section 5 claim based upon a purported exemption from registration unless the exemption is "clear on the face of the complaint." *SEC v. Sason,* 433 F. Supp. 3d 496, 514 (S.D.N.Y. 2020); *see also SEC v. Bronson*, 14 F. Supp. 3d 402, 407 (S.D.N.Y. 2014). Here, the AC alleges no facts showing Defendants are entitled to an exemption from registration. Defendants seek shelter for their offerings of LUNA and MIR as private exempt offerings to institutional purchasers, but they used intermediaries who could resell to the public without restriction. These were therefore public offerings involving conduits that require registration. *See* Section 4(a)(1) and 2(a)(11); *Cavanagh*, 1 F. Supp. 2d at 368-69. As alleged, the sales and "loans" of LUNA and MIR by Terraform were an essential part of a securities distribution to the investing public. The "loans" to the U.S. Trading Firm described in the AC were precisely the type of "disguised public distribution" that bars issuers from claiming any exemption to the registration requirements. *See e.g.*, AC ¶¶ 108-110, 155, 159-160; *see also Cavanagh*, 1 F. Supp. 2d at 368-69. Similarly, the 2018 LUNA sales to institutional investors were structured to encourage purchasers to be conduits for public resales, (AC ¶¶ 54, 107), and likewise, the sale of the MIR tokens through SAFT agreements with no resale restrictions upon delivery invited resale to the public. *Id*. ¶¶ 92, 112-114. Given that the sales were understood to be but a preliminary step in a broader public distribution scheme, Defendants cannot demonstrate that the LUNA or MIR at issue "came to rest" in the hands of the purchasers or that any care was taken to ensure that the purchasers would not immediately resell to the public upon delivery. *See*

17 C.F.R. § 230.502(d); *R.A. Holman*, 366 F.2d at 449.[21] On the contrary, the sales and loans invited the opposite.

Nor can Defendants meet the requirements of the Regulation S safe harbor for exclusively foreign offerings, which prohibit the issuer from engaging in directed selling efforts in the U.S., and require that that the issuer take steps to ensure that securities sold to non-U.S. persons do not "flow back" into the U.S. for a period of time. *See* 17 C.F.R. § 230.903(a); SEC Rel. No. 6863, *Offshore Offers and Sales* (Apr. 24, 1990). The AC alleges that Terraform sold LUNA and MIR directly to the public through crypto asset trading platforms that were accessible to U.S. investors (AC ¶¶ 111, 114) and that, throughout the relevant period, Defendants engaged in aggressive, directed efforts to market their crypto asset securities, including LUNA and MIR, in the U.S. *Id*. ¶¶ 42-43, 50, 55, 96-97, 107-109, 112; *see also supra,* pp. 4-7. Thus, Regulation S cannot apply.

### D.  The SEC Adequately Pled Defendants Violated the Registration Provisions of Section 5(e) of the Securities Act and Section 6(l) of the Exchange Act

Defendants argue that the SEC has not pled a violation of Section 5(e) of the Securities Act or Section 6(l) of the Exchange Act regarding unregistered transactions in security-based swaps with respect to mAssets. Def. Mot. 25. Securities Act Section 5(e) makes it "unlawful for any person, directly or indirectly to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell, offer to buy, or purchase or sell a security-based swap to any person who is not an eligible contract participant" without an

---

[21] Defendants also try to claim a Section 4(a)(1) exemption, arguing that they are not the issuer of MIR. *See, e.g.,* Def. Mot. 23. The Court should not entertain Defendants' repeated attempts to disavow legal responsibility for the Mirror Protocol. The AC alleges that Defendants created the investment opportunity through their services and platform, and therefore Defendants "engaged in steps necessary to the distribution of [unregistered] security issues." *See* AC ¶¶ 94-97, 114-115); *Universal Express, Inc.*, 475 F. Supp. 2d at 422.

effective registration statement. 15 U.S.C. § 77e(e). Exchange Act Section 6(*l*) also makes it unlawful for any person to effect transactions in security-based swaps to any person who is not an "eligible contract participant" unless the transaction is effected on a registered national securities exchange. 15 U.S.C. § 78f(*l*). "Eligible contract participants" are defined to include high-net-worth individuals and certain types of sophisticated and regulated entities. 7 U.S.C. § 1a(18); 15 U.S.C. § 78c(a)(65).

The definition of a security-based swap includes an agreement, contract or transaction that satisfies the definition of "swap" under Section 1a of the Commodity Exchange Act ("CEA") and is based on a single security, including on the value thereof. *See* 15 U.S.C. § 78c(a)(68). Section 1a(47) of the CEA defines "swap" to include "any agreement, contract, or transaction" that "provides on an executory basis for the exchange . . . of 1 or more payments based on the value or level of 1 or more . . . securities . . . and that transfers, as between the parties to the transaction, in whole or in part, the financial risk associated with a future change in any such value or level without also conveying a current or future direct or indirect ownership interest in [the] asset . . . ." 7 U.S.C. § 1(a)(47).

The AC alleges the necessary elements to establish these claims. First, Defendants offered, sold, and effected transactions in security-based swaps because transactions creating mAssets involved an exchange of payments on an executory basis (*e.g.*, there were ongoing obligations to make payments). The transactions were based on the value of one security—namely, whichever U.S. equity the particular mAsset in the transaction purported to track. *Id.* ¶¶ 98, 101-103. Moreover, the financial risk associated with the underlying U.S. equity was transferred to the investor (if the U.S. equity price rose, the investor had to add collateral or the existing collateral was liquidated), but no actual interest in the underlying security was conveyed

to the investor. *Id* ¶¶ 98-103. Second, Defendants made these offers to persons who were not eligible contract participants, including retail investors, and made no effort to determine whether potential or actual investors were in fact eligible contract participants. *Id.* ¶¶ 115-116. And, all of this was done without a registration statement filed or in effect with respect to any transaction. *Id.* ¶ 117. Third, these transactions were not processed through a registered national securities exchange. Instead, they were effected through the Mirror Protocol, which was launched, engineered, and maintained by Terraform via websites controlled by Terraform. *Id.* ¶¶ 94-95, 104, 115. Finally, Defendants used communications in interstate commerce and the mails in connection with these transactions, including those published on their website and social media accounts. *Id.* ¶¶ 15, 20, 42-43, 96-97, 115.

Defendants' claim that "the SEC has not plausibly alleged that mAssets qualify as security-based swaps." Def. Mot. at 25. However, the AC alleges that each mAsset *transaction* between investors and the Mirror Protocol are security-based swaps, not that the mAssets themselves are security-based swaps. The SEC contends that "each transaction offering or selling an mAsset . . . constituted a security-based swap." AC ¶ 102. Defendants' arguments about how the underlying mAssets themselves function are therefore irrelevant.

The Court should also reject Defendants' claims that they did not offer and sell mAssets to U.S.-based persons because Defendants supposedly had no "involvement" in the mAsset transactions.[22] Defendants offered, sold, and/or effected transactions in mAssets through the Mirror Protocol by, for example, (i) engineering, launching, upgrading, and controlling the Mirror Protocol (AC ¶¶ 95, 97, 115), (ii) promoting the Mirror Protocol in blog posts, tweets and

---

[22] Again, Defendants' phrasing here misapprehends the allegations. It is the transaction between the investor and the protocol that result in the mAssets that were offered, sold, or effected by Defendants through the protocol (AC ¶¶ 98-104) The mAsset itself is not the swap.

interviews (including in the U.S.) (*id*. ¶¶ 96-97, 115), and (iii) making mAsset transactions

available on Terraform-controlled websites or through crypto asset trading platforms (*e.g.*, *id*.

¶¶ 95, 115). Defendants need not be involved in the final step of the distribution to be liable

under Section 5. *See Geiger v. SEC*, 363 F.3d 481, 487 (D.C. Cir. 2004). Thus, Defendants are

liable for violating Section 5 because they "engaged in steps necessary to the distribution of

[unregistered] security issues." *Universal Express, Inc.*, 475 F. Supp. 2d at 422 (internal

quotations omitted).  Without Defendants' efforts, these transactions could not occur.[23]

Further, even accepting Defendants' faulty premise that the transactions were conducted

through the "magic" of the Mirror Protocol such that Defendants did not "offer or sell" security-

based swaps, "effecting" a security-based swap transaction is broad and not limited to being a

party to the transaction. *See, e.g.*, *Registration Process for Security-Based Swap Dealers and

Major Security-Based Swap Participants* ("SBS Entity Registration Adopting Release"),

Exchange Act Release No. 75611 (Aug. 5, 2015), 80 FR 48963 at 48976 (Aug. 14, 2015).

Within this broad definition, Defendants "effected" transactions in mAssets.

Finally, contrary to Defendants' suggestion, the SEC is not required at the pleading stage

to identify specific purchasers or participants in mAssets transactions to demonstrate that they

were not eligible contract participants. Def. Mot. at 26-27. The Court may reasonably infer that a

website accessible worldwide to retail investors -- offered through an application whose stated

purpose (as promoted by Terraform's U.S.-based Director of Special Projects) was to "create a

---

[23] Defendants' reliance on *Underwood v. Coinbase Glob., Ind.*, No. 21-cv-8353-PAE, 2023 WL
1431965 (S.D.N.Y. Feb. 1, 2023) is inapposite. The analysis in *Underwood* involved a
determination of whether a crypto asset trading platform was a "statutory seller" of securities as
that term is defined under Securities Act Section 12(a)(1) and Exchange Act Section 29(b),
applicable for private liability, not when the SEC sues to enforce the securities laws.

very delightful and magical experience . . . for users providing a Robinhood-like interface" – was not limited to "high-net-worth" individuals. AC ¶ 97.

### E. The SEC Has Sufficiently Pled That Defendants Violated the Anti-Fraud Provisions.

#### 1. The AC Contains Particularized Allegations of Defendants' Fraud.

The AC alleges with particularity that Terraform and Kwon each engaged in a scheme to defraud investors about Chai's use of the Terraform blockchain, and the U.S. Trading Firm's role in restoring UST's peg following the temporary depeg in May 2021, that they made materially false and misleading statements, and that they did so knowingly or recklessly and in connection with the purchase, offer, or sale of a security. AC ¶¶ 118-169. These allegations more than adequately state violations of the antifraud provisions of Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10(b)-5, thereunder. 15 U.S.C. §§ 77q(a) & 78j; 17 C.F.R. § 240.10b-5.

Largely ignoring these well-pled allegations, Defendants assert that the AC fails to allege that Defendants: (1) made false or misleading statements; (2) obtained money or property through these statements; (3) committed a deceptive act; and (4) had the requisite scienter. Def. Mot. 27-37. The Court should reject these arguments, which are based on Defendants' mischaracterization of the allegations and attempts to insert new purported facts outside the AC.

#### 2. The SEC Has Adequately Pled Falsity.

Defendants acknowledge that Terraform and Kwon told investors that Chai transactions were processed and settled on the Terraform blockchain, but assert that the SEC "fails to plead falsity" with respect to those statements. Def. Mot. at 27. To the contrary, the AC specifically alleges that "Chai transactions were neither processed nor settled on the Terraform blockchain" but rather, were "processed in Korean Won." AC ¶¶ 121, 134. Defendants quibble with the

words "process" and "settle" – arguing that "recording a transaction on the Terra blockchain" is the same as processing and settling a transaction, even though, as Defendants concede, Chai processed payments by "receiv[ing] KrW from customers" and then "pay[ing] KrW to merchants." Def. Mot. at 28-29. Defendants also suggest that their statements about Chai were not false, or at least that victims were on notice of their falsity, by pointing to self-serving documents not referenced in the AC, such as Terraform's own press releases (Def. Mot. Exs. L & M) and information on its own website (Def. Mot. at 28, fn. 20 & Def. Ex. LL).  These cannot be considered for purposes of this motion. In any event, Defendants never address the core allegation that Chai did not *use* the blockchain at all. Rather, Terraform recorded sham transactions on the blockchain using its own wallets and KRT for the purpose of misleading investors into believing those transactions were Chai transactions. AC ¶¶ 140-142.

Similarly, with respect to the restoration of the May 2021 re-peg of UST, Defendants admit that they made the alleged statements, but argue the AC does not adequately plead falsity. First, Defendants misleadingly claim that the alleged statements did not relate to the May 2021 repeg and, thus, that they had no duty to disclose Kwon's arrangement with U.S. Trading Firm. Def. Mot. at 31-32. But, Defendants concede that Terraform's tweets on May 24, 2021, were "an extensive analysis explaining why the algorithm did not provide instant recovery" during the May 2021 depeg.  Def. Mot. at 32, Ex. P. As the AC alleges, these tweets touted the superiority of "[a]lgorithmic, calibrated adjustments of economic parameters" over the "cumbersome nature of stress-induced decision-making of human agents." AC ¶ 164. Viewed in the light most favorable to the SEC, the obvious implication of these tweets was that UST was stable and the algorithm worked. Yet, Defendants failed to disclose that, when the peg began to fail, Kwon secretly arranged with U.S. Trading Firm to intervene. AC ¶¶ 157-159, 169. This critical

omission rendered the statement about the supposed efficiency of "algorithmic calibrated adjustments" highly misleading. *See In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 268 (2d Cir. 1993) ("[a] duty to disclose arises whenever secret information renders prior public statements materially misleading, not merely when that information completely negates the public statements"); *In re Vivendi, S.A. Secs. Litig.*, 838 F.3d 223, 258 (2d Cir. 2016) ("once a company speaks on an issue or topic, there is a duty to tell the whole truth").

Defendants also claim that the AC's allegations relating to the U.S. Trading Firm's role in the restoration of UST's peg is "the SEC's opinion, not a well-pled fact." Def. Mot. at 32. Yet, Defendants fail to explain what makes the allegation an "opinion," and merely dispute its truth, by again improperly pointing to purported information outside the scope of the AC, including charts of unknown provenance. Def. Mot. at 32-33. The SEC plainly alleges *as fact* that Kwon secretly arranged for the U.S. Trading Firm to intervene and that "UST's price went back up as a result of th[ose] efforts." AC ¶ 154. Defendants do not dispute the omission here: that they failed to disclose Kwon's secret arrangement with the U.S. Trading Firm to prop up UST's price.

### 3. The SEC has Adequately Pled that Defendants Used False Statements to Obtain Money or Property

Defendants next assert that the SEC failed to plead that Defendants obtained money or property by means of a false or misleading statement under Securities Act Section 17(a)(2). Def. Mot. at 33.  Defendants then refute their own argument by recounting the AC's clear allegation that Terraform made false statements about Chai to solicit an investment in LUNA, for which Terraform received $57 million. *Id.* Defendants also argue that even if the AC adequately pleads a 17(a)(2) violation against Terraform, the SEC has not pled that Kwon personally obtained money or property, citing cases suggesting that company employees that do not personally

receive money or property are not liable under Section 17(a)(2).[24]  *See, e.g.*, *SEC v. Syron,* 934 F. Supp. 2d 609, 640 (S.D.N.Y. 2013); *SEC v. DiMaria*, 207 F. Supp. 3d 343, 358 (S.D.N.Y. 2016).

But, Kwon was not a mere employee of Terraform, with only attenuated connections to the company's fortunes, but the founder, CEO, and majority shareholder of 92% of Terraform's shares. AC ¶ 16. As Terraform's 92% owner, Kwon, at least indirectly, benefits from all funds received by Terraform, including those obtained from investors that he misled. *See Syron,* 934 F. Supp. at 639 (recognizing that "the statute clearly creates liability where a defendant 'indirectly' obtains money or property"); *SEC v. MiMedx Group, Inc.*, No. 19-cv-10927-NRB, 2022 WL 902784, at *10-11 (S.D.N.Y. March 28, 2022) (denying motion to dismiss because allegations that CFO defendant received equity and other compensation affected by fraudulent claims satisfies "obtain money or property" requirement). In fact, as alleged, Kwon ultimately transferred Bitcoin to a Swiss account and cashed it out.  AC ¶ 173.

### 4.   The SEC Has Adequately Pled a Violation of 17(a)(3)

Defendants next assert that the SEC fails to allege a deceptive act under Securities Act Section 17(a)(3) because "Chai's use of the Terra blockchain" is not a deceptive act. Def. Mot. at 34. To establish a violation of Section 17(a)(3) the SEC must show that Defendants, in the offer or sale of a security, engaged "in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser." *Sugarman*, 2020 WL 5819848, at *5.

The AC alleges that Terraform and Kwon recreated Chai transactions on the blockchain using dummy accounts controlled and funded by Terraform, to deceive investors into believing

---

[24]  Defendants ignore competing cases holding that company employees may be liable when a company obtains money or property from the false statement – which the AC alleges Terraform did. *See, e.g.*, *SEC v. Stoker*, 865 F. Supp. 2d. 457, 462-463 (S.D.N.Y. 2012) (Rakoff, J.).

Chai used the Terraform blockchain. AC ¶¶ 135-142. These were nothing more than sham transactions, an inherently deceptive market manipulation designed to give the false appearance of blockchain activity. *See Sugarman*, 2020 WL 5819848 at *9 (discussing authority explaining that sham transactions are "inherently deceptive"). And, as alleged, Kwon and Terraform used these sham Chai transactions to artificially inflate Terraform blockchain activity and deceive investors that people in the "real world" used the blockchain. AC ¶ 118.

### 5.  The SEC has Adequately Pled Scienter

Defendants finally claim that the SEC fails to plead scienter as to both Chai and the May 2021 depeg. Securities Act Sections 17(a)(2) and (3) do not require a showing of scienter. *See SEC v. Wey*, 246 F. Supp. 3d 894, 910 (S.D.N.Y. 2017) (noting that "a showing of negligence is sufficient"). Under Exchange Act Section 10(b) and Securities Act Section 17(a)(1), scienter can be pled either by "alleg[ing] facts establishing a motive to commit fraud and an opportunity to do so" or by "alleg[ing] facts constituting circumstantial evidence of either reckless or conscious behavior." *In re Time Warner*, 9 F. 3d at 269. The AC's allegations more than adequately plead facts to support both theories of scienter.

Kwon had motive to mislead investors because Chai was his purported "real world" use for the Terraform blockchain – which he used to solicit investors. AC ¶¶ 121-122, 132. The AC also contains multiple facts from which one could reasonably infer Kwon had direct access to the truth about Chai, including that: Kwon was a founder and board member of Chai until at least May 2022 (*id.* ¶ 125); Kwon was the technical lead for Terraform at the time it was developing Chai (*id.* ¶ 146); Kwon directly supervised and instructed the Terraform employees that programmed the LP server to fabricate Chai transactions on the blockchain (*id.* ¶¶ 135-136, 147); and Kwon made statements reflecting a detailed understanding of how Chai transactions

appeared on the blockchain (*id*. ¶¶ 137-140). *See Novak v. Kasaks,* 216 F. 3d 300, 308 (2d Cir. 2000) (complaints can "state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements.").

The SEC alleges that Kwon and Terraform knew that the statements implying that the algorithm alone restored UST's peg were false because Kwon personally negotiated the arrangement with the U.S. Trading Firm to buy up UST for the express purpose of restoring the peg. AC ¶¶ 166-167. *SEC v. Constantin*, 939 F. Supp. 2d 288, 308 (S.D.N.Y. 2013).

F.   Kwon is Liable under Exchange Act Section 20(a)

The SEC has more than adequately pled control person liability for Kwon. To establish liability under Exchange Act Section 20(a), the SEC must show "(1) a primary violation by a controlled person; (2) control of the primary violator by the defendant; and (3) that the controlling person was in some meaningful sense a culpable participant in the primary violation." *Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998) (internal quotations omitted).

Despite Defendants' claims to the contrary, the AC pleads that Kwon was directly involved and exercised "actual control over the transaction[s] in questions."  *In re MF Glob. Holdings Ltd. Sec. Litig.,* 982 F. Supp. 2d 277, 307 (S.D.N.Y. 2013). With respect to the Chai fraud, Kwon personally made false statements about Chai to the investing public (AC ¶¶ 128-129, 133, 138-140) and directly supervised the people and controlled the systems involved in recreating the sham Chai transactions on the Terraform blockchain (*id*. ¶¶ 134-142). Similarly, with respect to the May 2021 depeg fraud, Kwon personally negotiated the arrangement between Terraform and the U.S. Trading Firm (*id.* ¶¶ 157-159) and then told investors that the algorithm worked on its own to restore the peg. *Id*. ¶¶ 163, 165.

**CONCLUSION**

For the foregoing reasons, Defendants' Motion to Dismiss should be denied.

40

Dated:  May 12, 2023                    Respectfully submitted,

                                        /s/ Devon L. Staren
                                        Jorge G. Tenreiro
                                        Christopher J. Carney
                                        James P. Connor, admitted *pro hac vice*
                                        Laura E. Meehan
                                        Devon L. Staren, admitted *pro hac vice*
                                        Attorneys for Plaintiff
                                        U.S. SECURITIES AND EXCHANGE
                                        COMMISSION
                                        100 F Street NE
                                        Washington, DC 20549
                                        Tel: (202) 551-5346
                                        Email: StarenD@sec.gov

Of counsel:
Elisabeth Goot
Kathleen Hitchins
Roger J. Landsman
Reid A. Muoio
James F. Murtha
100 F Street NE
Washington, DC

**CERTIFICATE OF SERVICE**

I, hereby certify that on May 12, 2023, I filed the foregoing through the Court's CM/ECF system, which will send notifications of such filing to all counsel of record.

<u>/s/ James P. Connor</u>
James P. Connor