# EXHIBIT PP

DocuSign Envelope ID: 391ECE82-95B4-404C-A525-8F198C18FCE1

## TOKEN SALE AGREEMENT (SEED ROUND)

PLEASE READ THE TERMS SET OUT HEREIN CAREFULLY. THE TOKENS ARE NOT INTENDED TO CONSTITUTE SECURITIES OF ANY FORM, UNITS IN A BUSINESS TRUST, UNITS IN A COLLECTIVE INVESTMENT SCHEME OR ANY OTHER FORM OF INVESTMENT IN ANY JURISDICTION. THIS AGREEMENT DOES NOT CONSTITUTE A PROSPECTUS OR OFFER DOCUMENT OF ANY SORT AND IS NOT INTENDED TO CONSTITUTE AN OFFER OF SECURITIES OF ANY FORM, UNITS IN A BUSINESS TRUST, UNITS IN A COLLECTIVE INVESTMENT SCHEME OR ANY OTHER FORM OF INVESTMENT, OR A SOLICITATION FOR ANY FORM OF INVESTMENT IN ANY JURISDICTION. NO REGULATORY AUTHORITY HAS EXAMINED OR APPROVED OF THIS AGREEMENT, AND NO ACTION HAS BEEN OR WILL BE TAKEN IN RESPECT OF OBTAINING SUCH APPROVAL BY VENDOR (AS DEFINED HEREIN) UNDER THE LAWS, REGULATORY REQUIREMENTS OR RULES OF ANY JURISDICTION. THE PROVISION OF THIS AGREEMENT TO YOU DOES NOT IMPLY THAT THE APPLICABLE LAWS, REGULATORY REQUIREMENTS OR RULES HAVE BEEN COMPLIED WITH.

PLEASE NOTE THAT VENDOR (AS DEFINED HEREIN) WILL NOT OFFER OR SELL TO YOU, AND YOU ARE NOT ELIGIBLE TO PURCHASE ANY TOKENS (AS DEFINED HEREIN) IN THE TOKEN SALE (AS DEFINED HEREIN) IF:

(A) YOU ARE LOCATED IN THE PEOPLE'S REPUBLIC OF CHINA OR IF YOU ARE A CITIZEN OR RESIDENT (TAX OR OTHERWISE) OF, OR DOMICILED IN, THE PEOPLE'S REPUBLIC OF CHINA;

(B) YOU ARE LOCATED IN THE UNITED STATES OF AMERICA OR IF YOU ARE A CITIZEN, RESIDENT (TAX OR OTHERWISE) OR GREEN CARD HOLDER OF, OR DOMICILED IN, THE UNITED STATES OF AMERICA, UNLESS YOU ARE A U.S. QUAFLIED PERSON (AS DEFINED HEREIN); OR

(C) SUCH TOKEN SALE IS PROHIBITED, RESTRICTED OR UNAUTHORIZED IN ANY FORM OR MANNER WHETHER IN FULL OR IN PART UNDER THE LAWS, REGULATORY REQUIREMENTS OR RULES IN THE JURISDICTION IN WHICH YOU ARE LOCATED,

AT THE TIME OF YOUR INTENDED PURCHASE OR PURCHASE OF THE TOKENS PURSUANT TO THIS AGREEMENT.

FOIA Confidential Treatment Requested by Polychain

DocuSign Envelope ID: 391ECE82-95B4-404C-A525-8F198C18FCE1

## TOKEN SALE AGREEMENT (SEED ROUND)

**THIS TOKEN SALE AGREEMENT (SEED ROUND)** (this "**Agreement**") is entered into this 11th day of July 2018, by Vendor (as defined below) and **THE PERSON/CORPORATION WHOSE PARTICULARS ARE SET OUT IN SCHEDULE 1 HERETO** ("**Buyer**"), in connection with certain cryptographic tokens (as set out in Exhibit 1 herein) ("**Tokens**") to be created and distributed by Vendor in furtherance of the establishment and operation of the systems (as described in White Paper (as defined below)) (the "**Project**") to be developed by a company to be incorporated in Singapore ("**Project Company**"). The Tokens are intended to function as the cryptographic currency for use within the Project as described in the version or draft of the White Paper entitled "Terra: A price-stable and democratic money-as-protocol" and accessible at http://terra.money.

"**Vendor**" shall be a company incorporated in the British Virgin Islands to be named "Terraform Labs Limited" (or if such name is unavailable, such other similar name as determined by the Project Company).

Pursuant to Section 104 of the BVI Companies Act ("**BVI Section 104**") "*a person who enters into a written contract in the name of or on behalf of a company before the company is incorporated, is personally bound by the contract…except where…the company adopts the contract…*", and "*a company may, by any action or conduct signifying its intention to be bound by a written contract entered into in its name or on its behalf before it was incorporated, adopt the contract…*", and when "*…a company adopts a contract… the company is bound by, and entitled to the benefits of, the contract as if the company had been incorporated at the date of the contract and had been a party to it…*".

Terraform Labs Pte. Ltd. (Singapore Company Number: 201813807M) ("**Proxy**") is entering into this Agreement on behalf of Vendor prior to Vendor's incorporation, with the intention that this Agreement will be ratified by Vendor after its incorporation ("**Ratification**").

Each of Vendor and Buyer shall hereinafter be referred to as a "**Party**", and collectively, Vendor and Buyer shall hereinafter be referred to as the "**Parties**".

NOW, THEREFORE, in consideration of the mutual agreements contained below, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree as follows :

## 1.     DEFINITIONS

1.1.    <u>Definitions of Certain Terms</u>. The terms defined in this Article 1.1, whenever used in this Agreement shall have the respective meanings indicated below.

<u>Affiliate</u> : with respect to any Person, any other Person directly or indirectly controlling, controlled by or under common control with such Person.

<u>BTC</u> : means Bitcoin core, the cryptographic token native to the Bitcoin core blockchain.

<u>Buyer Tokens</u> : as defined in Schedule 1.

<u>Claim Period</u> : as defined in Schedule 2.

<u>Designated Digital Asset</u> : means such Digital Asset-type as set out in Schedule 1.

<u>Digital Asset</u> : means BTC, ETH or such other cryptographic assets that Vendor may agree.

1

DocuSign Envelope ID: 391ECE82-95B4-404C-A525-8F198C18FCE1

Encumbrances : in relation to any Buyer Token, means any lien, charge, mortgage, pledge, option, rights of pre-emption, hypothecation, claims, restrictions on transfer, encumbrances, priority or security interest, over or in such Buyer Token, or any agreement or arrangement for or to similar effect.

ETH : means the cryptographic token native to the Ethereum blockchain, which for the avoidance of doubt does not refer to the Ethereum Classic token.

Governmental Authority : any nation or government, any state or other political subdivision thereof, any entity exercising legislative, executive, judicial or administrative functions of or pertaining to government, including, without limitation, any government authority, agency, department, board, commission or instrumentality, and any court, tribunal or arbitrator(s) of competent jurisdiction, and any self-regulatory organization. For the avoidance of doubt, Governmental Authority may include private bodies exercising quasi-governmental, regulatory or judicial-like functions to the extent they relate to any Party, the Tokens and/or the Project.

Incorporation : means the incorporation of the Vendor.

Initial Token Launch : means the online sale and/or distribution of Tokens by the Vendor to the general public in a campaign to be initiated and conducted by the Vendor.

Intellectual Property : means all of the following in any jurisdiction throughout the world: (a) all inventions (whether patentable or unpatentable and whether or not reduced to practice), including without limitation the Project technology, all improvements thereto, and all patents, patent applications, and patent disclosures, together with all reissuances, continuations, divisions, continuations in-part, revisions, and extensions; (b) all trademarks, service marks, trade names, trade dress, logos, business and product names, corporate names, Internet domain names, slogans, other source identifiers, together with all translations, adaptations, derivations, and combinations thereof and including all goodwill associated therewith, and all applications, registrations and renewals in connection therewith; (c) all copyrightable works, all copyrights and all applications, registrations and renewals in connection therewith, and all moral rights (and similar non-assignable rights) and all benefits of waivers of moral rights (and similar non-assignable rights) therein; (d) all trade secrets and confidential technical and business information (including but not limited to ideas, research and development, algorithms, compositions, processes, designs, drawings, formulae, trade secrets, know-how, industrial models, business methods, technical data and information, engineering and technical drawings, product specifications and confidential business information); (e) mask work and other semiconductor chip rights and all applications, registrations and renewals in connection therewith; (f) software; (g) all other intellectual property and proprietary rights; and (viii) copies and tangible embodiments thereof (in whatever form or medium, including electronic media).

Laws : means laws, statutes, ordinances, rules, regulations, judgments, injunctions, orders and decrees of any Governmental Authority, including any amendments thereto.

Maximum Claim : defined in Schedule 2.

Network Launch : means the public release of the Project main net.

Organizational Documents : means the articles of incorporation, certificate of incorporation, charter, by-laws, articles of formation, certificate of formation, regulations, operating agreement, certificate of limited partnership, partnership agreement and all other similar documents, instruments or certificates executed, adopted or filed in connection with the creation, formation or organization of a Person, including any amendments thereto.

2

FOIA Confidential Treatment Requested by Polychain

DocuSign Envelope ID: 391ECE82-95B4-404C-A525-8F198C18FCE1

People's Republic of China or PRC : means the People's Republic of China, which for the purposes of this Agreement and the Token Distribution, shall include the Hong Kong Special Administrative Region of the PRC, the Macau Special Administrative Region of the PRC and Taiwan, Republic of China.

Person : mans an individual or legal entity or person, including without limitation a Governmental Authority.

Project Plan : means the plan containing a detailed overview of major milestones to be achieved and approximate dates of execution and launch of the blockchain-enabled network of the Project.

Purchase Consideration : as defined in Article 2.1.

Refund Formula : as defined in Article 7.1.

Sanctions : as defined in Article 4.12(b)(i).

Securities Act : the U.S. Securities Act of 1933, as amended.

Seed Round Designated Settlement Addresses : as set out in Schedule 1.

Seed Round Refund Amount : as defined in Article 7.1.

Settlement Date : as defined in Schedule 1.

SIAC : as defined in Article 7.12.

Termination Event : as defined in Article 7.1.

Token Distribution : the sale of Tokens by Vendor to (a) in the initial phase, certain buyers of Tokens, including Buyer; and (b) in the Initial Token Launch phase, the public.

Token Distribution Dates : as set out in Schedule 1.

Token Sale : as defined in Article 2.1.

U.S. Qualified Person : means a Person who is an "Accredited Investor" as defined in Rule 501(a) of Regulation D under the Securities Act, as may be modified, amended or supplemented from time to time.

US$ : means United States Dollars, the lawful currency of the United States of America for the time being.

Vendor's Indemnities : as defined in Article 6.2.

Vendor's Warranties : as defined in Schedule 2.

Wallet : as defined in Exhibit 2.

White Paper: means one or more documents (whether or not entitled "White Paper"), as may be amended from time to time in Vendor's sole discretion, explaining, among other things, the Project and the Tokens, and including, but not limited to, the Project Plan, intended timing of the Token Distribution and information about relevant Vendor personnel.

3



DocuSign Envelope ID: 391ECE82-95B4-404C-A525-8F198C18FCE1

## 2.   SALE OF TOKENS

2.1.   <u>Sale and Distribution of Tokens</u>. On or about the Token Distribution Dates, Vendor shall deliver to Buyer such number of Tokens as specified in Schedule 1 hereof ("**Buyer Tokens**") for the US$-denominated purchase consideration amount specified in Schedule 1 hereof ("**Purchase Consideration**") payable in the Designated Digital Asset in accordance with Article 2.2, free of Encumbrances ("**Token Sale**").

2.2.   <u>Settlement of Purchase Consideration</u>. Subject to the terms and conditions set forth in Article 5, an amount equal to such Purchase Consideration shall be paid by Buyer to Vendor by way of transfer by Buyer of such amount of Designated Digital Asset equivalent to the Purchase Consideration (based on a US$-Designated Digital Asset exchange rate as agreed between the Vendor and the Buyer in writing) to the applicable Seed Round Designated Settlement Address as designated by Vendor for the receipt of Purchase Consideration denominated in the Designated Digital Asset, on or before the Settlement Date.

2.3.   <u>Obligation of Buyer to provide Information</u>. To the extent that Vendor determines, in its sole discretion, that it is necessary, prior to the Token Sale, to obtain certain information about Buyer in order to comply with any applicable law or regulation in connection with the Token Sale, Buyer shall provide Vendor with such information promptly upon such request, and acknowledges and accepts that Vendor may refuse to proceed with the Token Sale or withhold delivery of Tokens to Buyer until such requested information has been provided to the satisfaction of Vendor. Buyer undertakes to notify Vendor of any change in the documents and information provided by Buyer to Vendor pursuant to this Agreement and in the absence of any notification in writing notifying of any change, Vendor is entitled to assume that the documents and information provided by Buyer remain true, correct, not misleading and unchanged.

2.4.   <u>Reliance</u>. Each of the Parties acknowledges that it has entered into this Agreement in reliance upon the other Party's representations and warranties being true, accurate, complete and non-misleading. Save to the extent set out in this Agreement, no Party makes any other representations or warranties, express or implied, to the other Party and each Party acknowledges to the other Party that it has not relied on or been induced by any other warranties or representations made by the other Party to enter into this Agreement.

## 3.   REPRESENTATIONS AND WARRANTIES OF VENDOR

Vendor hereby represents and warrants to Buyer, as of the date hereof and subject to Incorporation and Ratification, as follows:

3.1.   <u>Formation and Standing</u>. Vendor shall on Incorporation be a corporation duly organized, validly existing and in good standing under the Laws of Vendor's country of incorporation, and has all requisite corporate power and authority to carry on the transactions contemplated of Vendor under this Agreement.

3.2.   <u>Authorization of Agreement, etc</u>. Vendor shall on Incorporation and Ratification have all requisite power and authority to execute and deliver this Agreement and Vendor has all requisite power and authority to sell the Buyer Tokens to Buyer and to carry out and perform its obligations under this Agreement, and this Agreement will constitute a legal, valid and binding obligation of Vendor enforceable against Vendor in accordance with its terms, except that such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium and similar laws of general application relating to or affecting creditors' rights generally and by equitable principles (regardless of whether enforcement is sought in a proceeding in equity or at law).

4

DocuSign Envelope ID: 391ECE82-95B4-404C-A525-8F198C18FCE1

3.3.  **Compliance with Laws and Other Instruments**. The execution, delivery and performance of this Agreement will not result in (a) any violation of, be in conflict with in any material respect, or constitute a material default under, with or without the passage of time or the giving of notice (i) any provision of Vendor's Organizational Documents; (ii) any provision of any permit, franchise, judgment, decree or order to which Vendor is a party, by which it is bound, or to which any of its material assets are subject; (iii) any material contract, obligation, or commitment to which Vendor is a party or by which it is bound; or (iv) any Laws applicable to Vendor, or (b) the creation of any material lien, charge or Encumbrance upon any material assets of Vendor.

3.4.  **No Consents or Approvals**. The execution and delivery of and performance under this Agreement require no approval or other action from any Governmental Authority or Person within Vendor's jurisdiction of incorporation.

3.5.  **Intellectual Property**. Vendor shall on Incorporation have good and valid title to all owned Intellectual Property. To the extent that could be reasonably known to Vendor, it has not infringed, diluted, misappropriated or otherwise violated the rights of any third party in respect of any Intellectual Property. None of such Intellectual Property owned by Vendor is subject to any outstanding order, ruling, decree, judgment or stipulation by or with any court, tribunal, arbitrator or Governmental Authority.

## 4.  REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents, warrants and covenants to Vendor, as of the date hereof up to and including the Token Distribution Dates, as follows:

4.1.  Accredited Investor or Non-U.S. Investor

  (a)  **For U.S. Persons**. If Buyer is a "U.S. Person" as defined in Rule 902(k) of Regulation S of the Securities Act, then Buyer understands the definition of an "Accredited Investor" as defined in Rule 501(a) of Regulation D under the Securities Act, and represents that Buyer is an "Accredited Investor" and and has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of the purchase of Tokens to be made by it hereunder.  Buyer understands that that Buyer will be required to provide documentation to the Vendors and/or their authorized agent(s) to verify Buyer's status as an "Accredited Investor" and failure to provide such documents will disqualify the Buyer from purchasing Tokens and the Vendors will not accept subscriptions from Buyers who fail to verify their status as an "Accredited Investor".

  (b)  **Non-U.S. Persons**. If Buyer is not a person as described in Article 4.1(a) above, Buyer understands the definition of "U.S. Person" as defined in Rule 902(k) of Regulation S of the Securities Act and represents that Buyer is not a U.S. Person.

4.2.  **Eligibility.** Buyer is not:

  (a)  located in the People's Republic of China or a citizen or resident (tax or otherwise) of, or domiciled in, the People's Republic of China;

  (b)  located in the United States of America or a citizen, resident (tax or otherwise) or green card holder of, or domiciled in, the United States of America, unless Buyer is a U.S. Qualified Person; or

FOIA Confidential Treatment Requested by Polychain          POLY00000103

DocuSign Envelope ID: 391ECE82-95B4-404C-A525-8F198C18FCE1

(c)   located in a jurisdiction where the Token Sale is prohibited, restricted or unauthorized in any form or manner whether in full or in part under the Laws, regulatory requirements or rules in such jurisdiction.

4.3.   **Formation and Standing.** Buyer is either an individual or an entity duly incorporated or formed, validly existing and in good standing under the Laws of Buyer's jurisdiction of incorporation or formation, and has full right, corporate, partnership, limited liability company or similar (as the case may be) power and authority to enter into and consummate the transactions contemplated by this Agreement and otherwise to carry out its obligations hereunder and thereunder.

4.4.   **Authorization of Agreement, etc.** Buyer has all requisite power and authority to execute and deliver this Agreement and purchase the Buyer Tokens and to carry out and perform its obligations under this Agreement, and this Agreement will constitute a legal, valid and binding obligation of Buyer enforceable against Buyer in accordance with its terms, except that such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium and similar laws of general application relating to or affecting creditors' rights generally and by equitable principles (regardless of whether enforcement is sought in a proceeding in equity or at law).

4.5.   **Compliance with Laws and Other Instruments.** The execution, delivery and performance of this Agreement will not result in (a) any violation of, be in conflict with in any material respect, or constitute a material default under, with or without the passage of time or the giving of notice (i) to the extent Buyer is a corporation, any provision of Buyer's Organizational Documents; (ii) any provision of any permit, franchise, judgment, decree or order to which Buyer is a party, by which it is bound, or to which any of its material assets are subject; (iii) any material contract, obligation, or commitment to which Buyer is a party or by which it is bound; or (iv) any Laws applicable to Buyer, or (b) the creation of any Encumbrance upon any material assets of Buyer.

4.6.   **No Consents or Approvals.** The execution and delivery of and performance under this Agreement require no approval or other action from any Governmental Authority or Person.

4.7.   **Prohibition on Syndication.** Buyer is purchasing Buyer Tokens in its personal capacity as principal and not on behalf of or jointly with another person, and Buyer has not entered into any agreement or arrangement for or in connection with, and is not purchasing Buyer Tokens with the view of entering into any agreement or arrangement with another person prior to the Token Distribution Dates for or in connection with resale or transfer of the Buyer Tokens to such person. Buyer will not, directly or indirectly, transfer Buyer Tokens except in accordance with applicable Laws and the provisions hereof. Buyer understands that Buyer must bear the economic risk of Buyer's purchase of Buyer Tokens for an indefinite period of time. Buyer also understands that to the extent Tokens (which includes Buyer Tokens) are securities under the Laws of any jurisdiction in which Tokens are to be traded or subject of transfers, such trades or transfers of Tokens may be restricted by such Laws, and that no market exists or is expected to develop for the Tokens.

4.8.   **The White Paper.** Buyer has received a copy of the current White Paper prepared in relation to the Project and has carefully read it. Buyer acknowledges that the White Paper may change during the time leading up to the Token Distribution Dates, and Buyer accepts the obligation to promptly read new versions of the White Paper, which will be made available to Buyer via this website: http://terra.money. Buyer acknowledges that Vendor has the sole and absolute discretion in revising the characteristics of the Tokens. Notwithstanding anything to the contrary in this

FOIA Confidential Treatment Requested by Polychain

POLY00000104

DocuSign Envelope ID: 391ECE82-95B4-404C-A525-8F198C18FCE1

Agreement, Buyer acknowledges, agrees and warrants that Vendor shall not have any obligation to provide or to procure the provision of any refund to you under this Agreement notwithstanding any amendment to the White Paper including but not limited to amendments to the Token characteristics.

4.9. <u>Evaluation of and Ability to Bear Risks</u>. Buyer has such knowledge and experience in financial matters, business and technology, including but not limited to blockchain technology and other considerations relating thereto to be able to evaluate the risks and merits of (a) this Agreement and (b) the Buyer Tokens to be purchased by Buyer pursuant to this Agreement, including but not limited to the risks outlined in Article 4.10 herein, and is able to bear such risks. Buyer is an "accredited investor" as such term is defined under the Laws of such jurisdiction where they legally reside and/or which apply to the Token Sale under this Agreement and will provide such documentation and other evidence as may be requested by Vendor to establish such status.

4.10. <u>Significant Risks</u>. Buyer understands that the Project and the creation and distribution of the Tokens involve significant risks, including, but not limited to, the risk that (a) the technology associated with the Project may not function as intended; (b) the Project may fail to attract interest or adoption, either from key stakeholders or the broader community; (c) the Initial Token Launch may not occur; (d) Project Company and/or Vendor may fail to adequately fund their respective operations and/or the Project; (e) the Tokens may decrease in value over time and/or lose all monetary value, as there are no guarantees as to the price of Tokens purchased by Buyer and no guarantees that the price per Token determined by the market will be equal to or higher; and (f) Project Company, Vendor and/or the Project may be subject to investigation and enforcement actions from Governmental Authorities, and these Governmental Authorities may make changes to existing Laws, regulations and/or rules that will affect cryptographic tokens, digital assets, blockchain technology and its applications. Further, Buyer has carefully read and considered the risk factors and other information relating to Vendor, Project Company and the Project contained herein, including Exhibit 2 hereto. Buyer acknowledges and understands that that the risks set forth in Exhibit 2 do not exhaustively contain all of the risks relating to the purchase of Tokens, and that Vendor bears no liability or responsibility to Buyer with respect to the risks associated with or relating to the purchase of the Tokens.

4.11. <u>Taxes</u>. Buyer acknowledges, understands and agrees that: (a) the purchase and receipt of Tokens may have tax consequences for Buyer; (b) Buyer is solely responsible for Buyer's compliance with Buyer's tax obligations; and (c) Vendor bears no liability or responsibility with respect to any tax consequences to Buyer.

4.12. <u>Anti-Money Laundering and Sanctions Compliance</u>.

(a) <u>Anti-Money Laundering and Counter-Terrorism Financing</u>. To the extent required by applicable Laws, Buyer represents and warrants to Vendor that Buyer complies with all anti-money laundering and anti-terrorism-financing requirements.

(b) <u>Sanctions Compliance</u>. Neither Buyer, nor any person having a direct or indirect beneficial interest in Buyer or the Tokens being purchased by Buyer, nor any person for whom Buyer is acting, is (i) the subject of sanctions administered or enforced by the United States of America (including without limitation the U.S. Department of the Treasury's Office of Foreign Asset Control), the United Kingdom, the European Union or any other Governmental Authority (collectively, "**Sanctions**"), (ii) organized or resident in a country or territory that is the subject of country-wide or territory-wide Sanctions, or (iii)



          POLY00000105

DocuSign Envelope ID: 391ECE82-95B4-404C-A525-8F198C18FCE1

otherwise is a party with which Vendor is prohibited from dealing under applicable Laws.

4.13.   Truth and Accuracy. Buyer represents and warrants to Vendor that all the documents and information furnished by Buyer to Vendor pursuant to this Agreement are true, accurate and complete in all respects, and there is no matter, event, circumstance or any other information which has arisen which would make any documents and information provided misleading or incomplete, or any fact or information the omission of which would make any documents and information provided misleading or incomplete.

### 5.    CONDITIONS PRECEDENT

5.1.   Conditions to Obligation of Vendor. The obligations of Vendor to consummate the Token Sale and all other transactions contemplated hereby shall be subject to:

(a)     receipt by Vendor of a legal opinion from its legal advisor that Part XIII of the Securities and Futures Act, Cap. 289 of Singapore, is not applicable to the Token Sale on or before the Token Distribution Dates;

(b)     receipt by Vendor of Purchase Consideration in full in accordance with this Agreement on or before Settlement Date;

(c)     compliance by Buyer of its obligations under this Agreement; and

(d)     the truth and accuracy of Buyer's representations and warranties (which are continuing obligations and remain true and accurate post-Settlement Date),

but shall remain subject to all other provisions of this Agreement, including without limitation the termination right pursuant to Article 7.1.

### 6.    DISCLAIMER; LIMITATIONS; INDEMNITY

6.1.   No Claim, Loan or Ownership Interest. Neither this Agreement nor the purchase of the Buyer Tokens (i) provides Buyer with any claim whatsoever with respect to Proxy, Vendor, its Affiliates and/or their respective assets; (ii) is a loan to Vendor; (iii) provides Buyer with any ownership interest whatsoever in Vendor; and (iv) provides Buyer with any rights of a stockholder of Vendor or any right to vote for the election of directors or upon any matter submitted to stockholders at any meeting thereof, or to give or withhold consent to any corporate action or to receive notice of meetings, or to receive subscription rights or otherwise.

6.2.   Indemnification by Buyer. Buyer shall defend, indemnify and hold harmless Proxy, Vendor, its Affiliates and their officers, directors, employees, agents, successors and assigns (collectively, the "**Vendor's Indemnities**") from and against, and pay or reimburse the Vendor's Indemnities for, any and all losses resulting from (a) any inaccuracy in or breach of any representation or warranty when made or deemed made by Buyer in or pursuant to this Agreement, (b) any wilful or negligent breach of or default in performance by Buyer under this Agreement.

6.3.   Limitation of Liability. The liability of Proxy and Vendor for a breach or any claim under this Agreement is subject to the limitations and qualifications set out in Schedule 2.

### 7.    MISCELLANEOUS

8

DocuSign Envelope ID: 391ECE82-95B4-404C-A525-8F198C18FCE1

7.1.   Termination.

(a)   Vendor shall be entitled by notice in writing to Buyer to terminate this Agreement if (i) Buyer does not comply with its obligations under this Agreement; (ii) the development of Project is required by any applicable law to cease or terminate before the Token Distribution Dates; (iii) the development of Project discontinues as a result of any event beyond the control of Project Company and/or Vendor, which cannot be resumed within three (3) months; (iv) the creation, distribution or issuance of Tokens is illegal, invalid, prohibited by any government in any jurisdiction, or forced by any applicable law to cease, or becomes subject to any approval, registration, filing or other statutory procedure or requirement that Project Company and/or Vendor are unable or choose not to meet.

(b)   The Buyer shall be entitled by notice in writing to Buyer to terminate this Agreement if the Network Launch does not occur on or prior to 30 September 2019 ("**Network Launch Termination Clause**").

Upon any such termination (whether pursuant to Article 7.1(a) or (b)) ("**Termination Event**"), Buyer shall not be entitled to receive any Tokens, and Vendor shall refund to Buyer such part of the Purchase Consideration ("**Seed Round Refund Amount**") as determined in accordance with the following formula ("**Refund Formula**"):

$$\text{Second Round Refund Amount} = \frac{\text{Seed Round Remaining Token Sale Proceeds}}{\text{Seed Round Total Token Sale Proceeds}} \times \text{Purchase Consideration}$$

where :

"**Applicable Website**" means :

(a)   the historical snapshot portal on the Coinmarketcap website, which as at the date of this Agreement can be found at : www.coinmarketcap.com/historical;

(b)   the Bitfinex website, which as at the date of this Agreement can be found at : https://www.bitfinex.com/; or

or any other Digital Asset exchange or price information aggregation website that the Parties may agree to in writing;

"**Seed Round Remaining Token Sale Proceeds**" means the Seed Round Total Token Sale Proceeds to the extent not utilized or expended by Vendor in connection with the Project as at the Termination Event; and

"**Seed Round Total Token Sale Proceeds**" means the US$-denominated amount in BTC and ETH received from all purchasers of Tokens (including Buyer) at the Seed Round Designated Settlement Addresses for the sale of Tokens up to the Termination Event, which shall be determined based on the relevant US$:Digital Asset exchange rate as specified on Applicable Website at 10:00 hours Korea Standard Time (KST) at the election of the Vendor, on (a) the Settlement Date; or (b) the date of occurrence of Termination Event.

9

DocuSign Envelope ID: 391ECE82-95B4-404C-A525-8F198C18FCE1

Notwithstanding that Purchase Consideration is payable/had been paid by way of Designated Digital Asset pursuant to Article 2.2, the Vendor shall have the right to elect in its sole and absolute discretion to :

(a)     refund the Seed Round Refund Amount in US$; or

(b)     refund the Seed Round Refund Amount in the Designated Digital Asset, in which event, the amount of Designated Digital Asset comprised in the Seed Round Refund Amount shall be determined by applying the Designated Digital Asset amount as was received by the Vendor from the Buyer pursuant to Article 2.2 to the "Purchase Consideration" component of the Refund Formula.

In any event, this Agreement shall terminate on the full receipt by Buyer of Buyer Tokens, *provided* that Articles 6 and 7 of this Agreement shall survive any termination hereof and upon receipt of Buyer Tokens pursuant to this Agreement, Buyer shall not be entitled to any refund of Purchase Consideration (save to the extent of Buyer's rights under Network Launch Termination Clause).

7.2.    Governing Law. This Agreement shall be governed in all respects, including as to validity, interpretation and effect, by the Laws of Singapore, without giving effect to its principles or rules of conflict of laws, to the extent such principles or rules are not mandatorily applicable by statute and would permit or require the application of the Laws of another jurisdiction.

7.3.    Successors and Assigns. This Agreement shall be binding upon and inure to the benefit of the Parties, and their respective heirs, successors and permitted assigns. This Agreement shall not be assignable or otherwise transferable without the prior written consent of the other Party, *provided* that Vendor may assign or transfer this Agreement to an Affiliate, and Buyer shall sign, execute and deliver any and all deeds, instruments, agreements and/or other documents in connection with such assignment or transfer and do all other acts and things and take all such steps as may be necessary, desirable or expedient to give effect to such assignment or transfer. Buyer acknowledges and agrees that Vendor shall not be obliged to deliver the Buyer Tokens unless and until Buyer complies with its obligations under this provision. Any purported assignment in violation of this provision or in violation of applicable Laws shall be void.

7.4.    Release. In the event that Vendor adopts this Agreement pursuant to BVI Section 104, the Proxy shall be released from all obligations under this Agreement from such execution.

7.5.    Entire Agreement. This Agreement constitutes the entire agreement between the Parties and supersedes all prior or contemporaneous agreements and understandings, both written and oral, between the Parties with respect to the subject matter hereof.

7.6.    Construction. The Parties agree that any applicable rule requiring the construction of this Agreement or any provision hereof against the Party drafting this Agreement shall not apply.

7.7.    Reasonableness. Each Party confirms it has received independent advice (legal or otherwise) relating to all the matters provided for in this Agreement, and agrees that the provisions of this Agreement (including all documents entered into pursuant to this Agreement) are fair and reasonable.

7.8.    Severability. If any provision of this Agreement is determined by a court of competent jurisdiction to be invalid, inoperative or unenforceable for any reason, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the

FOIA Confidential Treatment Requested by Polychain

POLY00000108



DocuSign Envelope ID: 391ECE82-95B4-404C-A525-8F198C18FCE1

Parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby be consumed as originally contemplated to the fullest extent possible.

7.9.  Counterparts. This Agreement may be executed in several counterparts, each of which shall be deemed an original and all of which shall together constitute one and the same document.

7.10.  No Partnership and No Agency. Nothing in this Agreement and no action taken by the Parties pursuant to this Agreement shall constitute, or be deemed to constitute, a partnership, association, joint venture or other co-operative entity between any of the Parties. Nothing in this Agreement and no action taken by the Parties pursuant to this Agreement shall constitute, or be deemed to constitute, any Party as the agent of the other Party for any purpose. No Party has, pursuant to this Agreement, any authority or power to bind or to contract in the name of any other Party.

7.11.  Third Party Rights. Save for Proxy and Vendor's Affiliates who shall have rights to the extent accorded thereto under this Agreement, any person who is not a party to this Agreement shall have no right under the Contracts (Rights of Third Parties) Act, Chapter 53B of Singapore to enforce any provisions of this Agreement.

7.12.  Dispute Resolution. Parties shall cooperate in good faith to resolve any dispute or claim arising out of or in any way relating to this Agreement. If the Parties are unable to resolve such dispute or claim within ninety (90) days, such dispute or claim shall be finally settled by arbitration, and judgment upon the award may be entered by any court having jurisdiction thereof or having jurisdiction over the relevant Party or its assets. The arbitration shall be conducted under the rules of the Singapore International Arbitration Centre ("SIAC"). The arbitration tribunal shall consist of a sole arbitrator to be appointed by the President of the SIAC. The language of the arbitration shall be English.

7.13.  Publications and Notifications, Fees and Expenses. The Parties shall agree to any press release or publication that jointly involves the names, brands or officers of all Parties. Written correspondence and notifications among the Parties, whether as a result of a dispute or otherwise intended to be official correspondence, may be through email or other common forms of social media (including but not limited to Skype, Slack, WeChat and WhatsApp). Each Party shall be solely liable for all its own fees, costs and otherwise in connection with negotiation and execution of this Agreement and any future dealings between the Parties and/or future publications regarding the Parties.

7.14.  Electronic Communications. Buyer agrees and acknowledges that all agreements, notices, disclosures and other communications that Vendor provides Buyer pursuant to this Agreement or in connection with or related to Buyer's purchase of Buyer Tokens, including this Agreement, may be provided by Vendor, in its sole discretion, to Buyer, in electronic form.

7.15.  Confidentiality. This Agreement shall remain confidential among the Parties in perpetuity, except to the extent required to be disclosed pursuant to applicable Laws.



FOIA Confidential Treatment Requested by Polychain

POLY00000109

DocuSign Envelope ID: 391ECE82-95B4-404C-A525-8F198C18FCE1

**SCHEDULE 1**
**Particulars of Buyer / Token Sale**

| | |
|---|---|
| **Particulars of Buyer** | Name:<br>Nationality / Place of Incorporation:<br>Identification Number / Company Registration Number:<br>Address:<br>Email:<br>Fax: |
| **Buyer Tokens** | Such number of Tokens (rounded up to the nearest whole Token) as determined as follows :<br><br>$$\frac{\text{Purchase Consideration}}{\text{US\$230,000,000}} \text{ x Total Initial Token Supply}$$<br><br>where :<br><br>"**Total Initial Token Supply**" means 1,000,000,000 Tokens or such other amount of Tokens declared by the Vendor to be the total amount of Tokens that will be created during the initial token generating event in connection with the Initial Token Launch. |
| **Designated Digital Asset** | BTC |
| **Purchase Consideration** | US$3,000,000.00 |
| **Settlement Date** | July 13th, 2018 or such other date as agreed by Vendor in writing. |
| **Token Distribution Dates** | 1. The equivalent of 10% of the Buyer Tokens on such date that Vendor will be distributing the Tokens to other buyers of Tokens, which will be announced by Vendor via such channel(s) as Vendor may inform Buyer in writing ("**First Distribution Date**");<br><br>2. the equivalent of 10% of the Buyer Tokens on or prior to such date falling 30 days from the First Distribution Date ("**Second Distribution Date**");<br><br>3. the equivalent of 10% of the Buyer Tokens on or prior to such date falling 30 days from the Second Distribution Date ("**Third Distribution Date**"); and<br><br>4. the balance of the Buyer Tokens on or prior to the 300th day from the First Distribution Date ("**Final Distribution Date**"),<br><br>(the First Distribution Date, Second Distribution Date, Third Distribution Date and Final Distribution Date collectively, the "**Token Distribution Dates**"). |
| **Seed Round Designated Settlement Addresses** | Such blockchain address compatible for receipt of Designated Digital Asset as may be designated by Vendor and informed by Vendor to Buyer in writing. |

12

FOIA Confidential Treatment Requested by Polychain

POLY00000110

DocuSign Envelope ID: 391ECE82-95B4-404C-A525-8F198C18FCE1

## SCHEDULE 2

### Limitation of Liability

Notwithstanding anything in this Agreement to the contrary, the provisions in this Schedule 2 shall operate to limit the liability of Vendor and Proxy in respect of any claim by Buyer.

1. <u>Warranties</u>
   The several representations and warranties of Vendor ("**Vendor's Warranties**") and such other covenants, undertakings and indemnities expressly set out in this Agreement are the only representations, warranties, undertakings or other assurances of any kind given by or on behalf of Vendor to Buyer and all other warranties, expressed or implied by law, trade, custom, usage or otherwise are hereby expressly excluded by Vendor.

2. <u>De Minimis Claims</u>
   No liability shall in any event arise in respect of any claim for breach of the Vendor's Warranties or any claim pursuant to any other provision of this Agreement unless the aggregate amount of the claim (together with the aggregate amount of any previous claims made against Vendor and/or Proxy) shall exceed 5% of the Purchase Consideration.

3. <u>De Maximis Claims</u>
   The aggregate liability of Vendor and Proxy in respect of claims by Buyer made for breach of the Vendor's Warranties shall not in any event exceed 100 per cent. of the amount of the Purchase Consideration ("**Maximum Claim**"). For the avoidance of doubt, the Maximum Claim shall be based on the US$-denominated value of the Purchase Consideration as stated in Schedule 1, notwithstanding the Buyer making payment for the Buyer Tokens by way of Designated Digital Asset pursuant to Article 2.2.

4. <u>Time Limitation</u>
   Vendor and/or Proxy shall not be liable in any way or in any event in respect of any claim under this Agreement if such claim was not made in the period commencing from the Settlement Date to the date falling one (1) year after the Settlement Date (such period being the "**Claim Period**"). Any claim or indemnity claim which has been made before the expiration of the Claim Period shall, if it has not been previously satisfied in full, settled or withdrawn, be deemed to have been withdrawn and shall become fully barred and unenforceable on the expiry of the period of one (1) year commencing from the date on which such claim was made, unless proceedings in respect thereof shall have been commenced against Vendor and/or Proxy and for this purpose proceedings shall not be deemed to have been commenced unless they shall have been issued and served upon Vendor and/or Proxy.

5. Buyer shall not be entitled to recover or otherwise obtain reimbursement or restitution from Vendor and/or Proxy under this Agreement more than once in respect of the same damage suffered.

6. For the avoidance of doubt, nothing in this Schedule 2 shall limit Buyer's obligation (at law or otherwise) to mitigate its loss in respect of any claim under this Agreement, and Buyer shall not be entitled to recover damages in respect of any claim (as the case may be) if, and to the extent that, Buyer has already recovered damages in respect of the same fact or subject matter.

7. Vendor and/or Proxy shall not be liable under any circumstances for any indirect, incidental, special or consequential loss arising from any breach of the Vendor's Warranties.

13



DocuSign Envelope ID: 391ECE82-95B4-404C-A525-8F198C18FCE1

14

DocuSign Envelope ID: 391ECE82-95B4-404C-A525-8F198C18FCE1

## EXHIBIT 1

### Token Characteristics

In this Agreement, the "**Tokens**" shall mean the Luna Tokens (LUN), the characteristics of which are described further in this Exhibit 1, and "**Token**" shall be construed accordingly.

### Luna Tokens

Token name: Luna Tokens (singular: Luna Token)
Token symbol: LUN

**Luna Tokens Functions:**\*\*

- Provide voting-by-stake functionality in Terra's decentralized price oracle
- Other relevant governance features

\*\*The exact governance mechanisms are yet to be developed.\*\*

\*\*Further functionality may be added by the development team as research and development around the platform continues. Information on such functionality will be made available to Buyer on updated versions of the White Paper which will be made available to Buyer via the website: http://terra.money\*\*

15



DocuSign Envelope ID: 391ECE82-95B4-404C-A525-8F198C18FCE1

**EXHIBIT 2**

**Risk Factors**

<u>**RISKS RELATING TO PARTICIPATION IN THE TOKEN DISTRIBUTION**</u>

*Investments in startups such as the Vendor and the Project Company involve a high degree of risk.*

Financial and operating risks confronting startups are significant and the Vendor and the Project Company are not immune to these. Startups often experience unexpected problems in the areas of product development, marketing, financing, and general management, among others, which frequently cannot be solved.

*The Vendor and/or the Project Company may be forced to cease operations.*

It is possible that, due to any number of reasons, including, but not limited to, an unfavorable fluctuation in the value of cryptographic and fiat currencies, the inability by the Vendor and/or the Project Company to establish the Project or the Tokens' utility, the failure of commercial relationships, or intellectual property ownership challenges, the Vendor and/or the Project Company may no longer be viable to operate and the Vendor and/or the Project Company may dissolve or take actions that result in a dissolution of the Vendor and/or the Project Company.

*This Agreement may not be transferred without the consent of Vendor.*

The terms of this Agreement provide that Buyer may not transfer or assign this Agreement without the consent of Vendor and only if such transfer is in compliance with the Laws of applicable Governmental Authorities.

*The tax treatment of this Agreement, the purchase rights contained therein and the Token Distribution is uncertain and there may be adverse tax consequences for Buyers upon certain future events.*

The tax characterization of this Agreement and the Tokens is uncertain, and Buyer must seek its own tax advice in connection with an investment in the Tokens. An investment pursuant to this Agreement and the purchase of Tokens pursuant thereto may result in adverse tax consequences to Buyer, including withholding taxes, income taxes and tax reporting requirements. Buyer should consult with and must rely upon the advice of its own professional tax advisors with respect to tax treatment of an investment in the Tokens pursuant to this Agreement.

*There is no prior market for Tokens and the Token Distribution may not result in an active or liquid market for the Tokens*

Prior to the Token Distribution, there has been no public market for the Tokens. In the event that the Tokens are traded on a cryptocurrency exchange, there is no assurance that an active or liquid trading market for the Tokens will develop or if developed, be sustained after the Tokens have been made available for trading on such cryptocurrency exchange. There is also no assurance that the market price of the Tokens will not decline below the Purchase Consideration at which Buyer acquired the Tokens at. The Purchase Consideration may not be indicative of the market price of the Tokens after they have been made available for trading on a cryptocurrency exchange.

A Token is not a currency issued by any central bank or national, supra-national or quasi-national organisation, nor is it backed by any hard assets or other credit. The Vendor is not responsible for nor does it pursue the circulation and trading of Tokens on the market. Trading of Tokens merely depends on the consensus on its value between the relevant market participants, and no one is obliged to purchase any Token from any holder of the Token, nor does anyone guarantee the liquidity or market price of Tokens to any extent at any time. Accordingly, the Vendor cannot ensure that there will be any demand or market for Tokens, or

16

DocuSign Envelope ID: 391ECE82-95B4-404C-A525-8F198C18FCE1

that the Purchase Consideration is indicative of the market price of Tokens after they have been made available for trading on a cryptocurrency exchange.

### Future sales of the Tokens could materially and adversely affect the market price of Tokens

Any future sale of the Tokens (which were not available for sale in the Token Distribution) would increase the supply of Tokens in the market and this may result in a downward price pressure on the Token. The sale or distribution of a significant number of Tokens outside of the Token Distribution, or the perception that such further sales or issuance may occur, could adversely affect the trading price of the Tokens.

### Negative publicity may materially and adversely affect the price of the Tokens

Negative publicity involving (a) the Vendor and/or the Project Company; (b) the Project; (c) the Tokens; or (d) any of the key personnel of the Vendor and/or the Project Company, may materially and adversely affect the market perception or market price of the Tokens, whether or not such publicity is justified.

### There is no assurance of any success of Project

The value of, and demand for, the Tokens hinges heavily on the performance of the Project. There is no assurance that the Project will gain traction after its launch and achieve any commercial success.

The Project has not been fully developed, finalised and integrated and is subject to further changes, updates and adjustments prior to its launch. Such changes may result in unexpected and unforeseen effects on its projected appeal to users, and hence impact its success.

While the Vendor has made every effort to provide a realistic estimate, there is also no assurance that the cryptocurrencies raised in the Token Distribution will be sufficient for the development and integration of the Project. For the foregoing or any other reason, the development and integration of the Project may not be completed and there is no assurance that it will be launched at all. As such, distributed Tokens may hold little worth or value, and this would impact its trading price.

### The trading price of the Tokens may fluctuate following the Token Distribution

The prices of cryptographic tokens in general tend to be relatively volatile, and can fluctuate significantly over short periods of time. The demand for, and correspondingly, the market price of, the Tokens may fluctuate significantly and rapidly in response to, among others, the following factors, some of which are beyond the control of the Vendor and/or the Project Company:

(a)     new technical innovations;

(b)     analysts' speculations, recommendations, perceptions or estimates of the Token's market price or the Vendor's and/or the Project Company's financial and business performance;

(c)     changes in market valuations and token prices of entities with operations similar to that of the Vendor and/or the Project Company that may be made available for sale and purchase on the same cryptocurrency exchanges as the Tokens;

(d)     announcements by the Vendor and/or the Project Company of significant events, for example partnerships, sponsorships, new product developments;

FOIA Confidential Treatment Requested by Polychain



DocuSign Envelope ID: 391ECE82-95B4-404C-A525-8F198C18FCE1

(e)     fluctuations in market prices and trading volume of cryptocurrencies on cryptocurrency exchanges;

(f)     additions or departures of key personnel of the Vendor and/or the Project Company;

(g)     success or failure of the management of the Vendor and/or the Project Company in implementing business and growth strategies; and

(h)     changes in conditions affecting the blockchain or financial technology industry, the general economic conditions or market sentiments, or other events or factors.

## RISKS RELATING TO THE WALLET

***The loss or compromise of information relating to your Wallet (as defined below) may affect your access and possession of the Tokens***

For purposes of receipt of your Tokens, you are to establish and maintain access to a cryptocurrency wallet ("**Wallet**"). Your access to the Tokens in the Wallet depends on, among other things, the safeguards to the information to such Wallet, including but not limited to the user account information, address, private key and password. In the event that any of the foregoing is lost or compromised, your access to the Wallet may be curtailed and thereby adversely affecting your access and possession to the Tokens, including such Tokens being unrecoverable and permanently lost.

***The Wallet or Wallet service provider may not be technically compatible with the Tokens***

The Wallet or Wallet service provider may not be technically compatible with the Tokens which may result in the delivery of Tokens being unsuccessful or affect your access to such Tokens.

## RISKS RELATING TO THE VENDOR AND THE PROJECT COMPANY

*The Project is intended to be developed, operated and maintained by the Vendor and/or the Project Company. Any events or circumstances which adversely affect the Vendor and/or the Project Company may have a corresponding adverse effect on the Vendor and/or the Project Company if such events or circumstances affect the Vendor's and/or the Project Company's ability to maintain the Project. This would correspondingly have an impact on the trading price of the Tokens.*

***The Vendor and/or the Project Company may be materially and adversely affected if they fail to effectively manage its operations as their business develops and evolves, which would have a direct impact on their ability to maintain the Project and consequently the trading price of the Tokens.***

The financial technology and cryptocurrency industries and the markets in which the Vendor and the Project Company compete in have grown rapidly and continue to grow rapidly, and continue to evolve in response to new technological advances, changing business models and other factors. As a result of this constantly changing environment, the Vendor and/or the Project Company may face operational difficulties in adjusting to the changes, and the sustainability of the Vendor and the Project Company will depend on their ability to manage their respective operations, adapt to technological advances and market trends and ensure that they hire qualified and competent employees, and provide proper training for their personnel.

As their respective business evolves, the Vendor and the Project Company must also expand and adapt its operational infrastructure. The Vendor's and the Project Company's respective businesses rely on blockchain-based software systems, cryptocurrency wallets or other related token storage mechanisms, blockchain technology and smart contract technology, and to

FOIA Confidential Treatment Requested by Polychain

POLY00000116

DocuSign Envelope ID: 391ECE82-95B4-404C-A525-8F198C18FCE1

manage technical support infrastructure for the Project effectively, the Vendor and the Project Company will need to continue to upgrade and improve their data systems and other operational systems, procedures and controls. These upgrades and improvements will require a dedication of resources, are likely to be complex and increasingly rely on hosted computer services from third parties that the Vendor and/or the Project Company do not control. If the Vendor and/or the Project Company are unable to adapt their respective systems and organisation in a timely, efficient and cost-effective manner to accommodate changing circumstances, its business, financial condition and results of operations may be adversely affected. If the third parties whom the Vendor and/or the Project Company rely on are subject to a security breach or otherwise suffer disruptions that impact the respective services the Vendor and/or the Project Company utilise, the integrity and availability of their respective internal information could be compromised, which may consequently cause the loss of confidential or proprietary information, and economic loss. The loss of financial, labour or other resources, and any other adverse effect on the Vendor's and/or the Project Company's respective business, financial condition and operations, would have a direct adverse effect on the Vendor's and the Project Company's ability to maintain the Project. As the Project is the main product to which the Tokens relate to, this may adversely impact the trading price of the Tokens.

***The Vendor and/or the Project Company may experience system failures, unplanned interruptions in its network or services, hardware or software defects, security breaches or other causes that could adversely affect the Vendor's and/or the Project Company's infrastructure network, and/or the Project***

The Vendor and the Project Company are unable to anticipate when there would be occurrences of hacks, cyber-attacks, mining attacks (including but not limited to double-spend attacks, majority mining power attacks and "selfish-mining" attacks),  distributed denials of service or errors, vulnerabilities or defects in the Project, the Tokens, the Wallet or any technology (including but not limited to smart contract technology) on which the Vendor and/or the Project Company, the Project, the Tokens and the Wallet relies or on the Ethereum blockchain or any other blockchain. Such events may include, for example, flaws in programming or source code leading to exploitation or abuse thereof. The Vendor and/or the Project Company may not be able to detect such hacks, mining attacks (including but not limited to double-spend attacks, majority mining power attacks and "selfish-mining" attacks), cyber-attacks, distributed denials of service errors vulnerabilities or defects in a timely manner, and may not have sufficient resources to efficiently cope with multiple service incidents happening simultaneously or in rapid succession.

The Vendor's and/or the Project Company's respective network or services, which would include the Project, could be disrupted by numerous events, including natural disasters, equipment breakdown, network connectivity downtime, power losses, or even intentional disruptions of their respective services, such as disruptions caused by software viruses or attacks by unauthorised users, some of which are beyond the Vendor's and/or the Project Company's control. Although the Vendor and the Project Company will be taking steps against malicious attacks on their respective appliances or infrastructure, which are critical for the maintenance of the Project and their respective other services, there can be no assurance that cyber-attacks, such as distributed denials of service, will not be attempted in the future, and that any of the Vendor's and the Project Company's intended enhanced security measures will be effective. The Vendor and the Project Company may also be prone to attacks on their respective infrastructure intended to steal information about their respective technology, financial data or user information or take other actions that would be damaging to the Vendor, the Project Company and users of the Project. Any significant breach of the Vendor's and/or the Project Company's intended security measures or other disruptions resulting in a compromise of the usability, stability and security of the Vendor's and/or the Project Company's network or services (including the Project) may adversely affect the trading price of the Tokens.

FOIA Confidential Treatment Requested by Polychain

POLY00000117

DocuSign Envelope ID: 391ECE82-95B4-404C-A525-8F198C18FCE1

*The Vendor and the Project Company are dependent in part on the location and data centre facilities of third parties*

The Vendor's and the Project Company's infrastructure network will be in part established through servers which they respectively own and house at the location facilities of third parties, and servers that they respectively rent at data centre facilities of third parties. If the Vendor and/or the Project Company are unable to renew their respective data facility lease on commercially reasonable terms or at all, the Vendor and/or the Project Company may be required to transfer their respective servers to a new data centre facility, and may incur significant costs and possible service interruption in connection with the relocation. These facilities are also vulnerable to damage or interruption from, among others, natural disasters, arson, terrorist attacks, power losses, and telecommunication failures. Additionally, the third party providers of such facilities may suffer a breach of security as a result of third party action, employee error, malfeasance or otherwise and a third party may obtain unauthorised access to the data in such servers. As techniques used to obtain unauthorised access to, or to sabotage systems change frequently and generally are not recognised until launched against a target, the Vendor, the Project Company and the providers of such facilities may be unable to anticipate these techniques or to implement adequate preventive measures. Any such security breaches or damages which occur which impact upon the Vendor's and/or the Project Company's infrastructure network and/or the Project may adversely impact the price of the Tokens.

*General global market and economic conditions may have an adverse impact on the Vendor's and/or the Project Company's operating performance, results of operations and cash flows*

The Vendor and/or the Project Company could be affected by general global economic and market conditions. Challenging economic conditions worldwide have from time to time, contributed, and may continue to contribute, to slowdowns in the information technology industry at large. Weakness in the economy could have a negative effect on the Vendor's and/or the Project Company's respective business, operations and financial condition, including decreases in revenue and operating cash flows. Additionally, in a down-cycle economic environment, the Vendor and/or the Project Company may experience the negative effects of increased competitive pricing pressure and a slowdown in commerce and usage of the Project. Suppliers on which the Vendor and/or the Project Company rely for servers, bandwidth, location and other services could also be negatively impacted by economic conditions that, in turn, could have a negative impact on the Vendor's and/or the Project Company's respective operations or expenses. There can be no assurance, therefore, that current economic conditions or worsening economic conditions or a prolonged or recurring recession will not have a significant adverse impact on the Vendor's and/or the Project Company's respective business, financial condition and results of operations and hence the Project, which would correspondingly impact the trading price of the Tokens.

*The Vendor, the Project Company and/or the Tokens may be affected by newly implemented regulations*

Cryptocurrency trading is generally unregulated worldwide, but numerous regulatory authorities across jurisdictions have been outspoken about considering the implementation of regulatory regimes which govern cryptocurrency or cryptocurrency markets. The Vendor, the Project Company and/or the Tokens may be affected by newly implemented regulations relating to cryptocurrencies or cryptocurrency markets, including having to take measures to comply with such regulations, or having to deal with queries, notices, requests or enforcement actions by regulatory authorities, which may come at a substantial cost and may also require substantial modifications to the Tokens and/or the Project. This may impact the appeal of the Tokens and/or the Project for users and result in decreased usage of the Tokens and/or the Project. Further, should the costs (financial or otherwise) of complying with such newly implemented regulations exceed a certain threshold, maintaining the Tokens and/or the Project may no

FOIA Confidential Treatment Requested by Polychain

DocuSign Envelope ID: 391ECE82-95B4-404C-A525-8F198C18FCE1

longer be commercially viable and the Vendor and/or the Project Company may opt to discontinue the Tokens and/or the Project.

Further, it is difficult to predict how or whether governments or regulatory authorities may implement any changes to laws and regulations affecting distributed ledger technology and its applications, including the Tokens and the Project. The Vendor and/or the Project Company may also have to cease their respective operations in a jurisdiction that makes it illegal to operate in such jurisdiction, or make it commercially unviable or undesirable to obtain the necessary regulatory approval(s) to operate in such jurisdiction. In scenarios such as the foregoing, the trading price of Tokens will be adversely affected or Tokens may cease to be traded.

***The regulatory regime governing the blockchain technologies, cryptocurrencies, tokens and token offerings such as Token Distribution, the Project and the Tokens is uncertain, and regulations or policies may materially adversely affect the development of the Project and the utility of the Tokens***

Regulation of tokens (including the Tokens) and token offerings such as the Token Distribution, cryptocurrencies, blockchain technologies, and cryptocurrency exchanges currently is undeveloped and likely to rapidly evolve, varies significantly among international, federal, state and local jurisdictions and is subject to significant uncertainty. Various legislative and executive bodies in Singapore and other countries may in the future, adopt laws, regulations, guidance, or other actions, which may severely impact the development and growth of the Project and the adoption and utility of the Tokens. Failure by the Vendor, the Project Company or users of the Project to comply with any laws, rules and regulations, some of which may not exist yet or are subject to interpretation and may be subject to change, could result in a variety of adverse consequences, including civil penalties and fines.

Blockchain networks also face an uncertain regulatory landscape in many foreign jurisdictions such as the European Union, China, South Korea and Russia. Various foreign jurisdictions may, in the near future, adopt laws, regulations or directives that affect the Project. Such laws, regulations or directives may directly and negatively impact the Vendor's and/or the Project Company's respective business. The effect of any future regulatory change is impossible to predict, but such change could be substantial and materially adverse to the development and growth of the Project and the adoption and utility of the Tokens.

New or changing laws and regulations or interpretations of existing laws and regulations may materially and adversely impact the value of the currency in which the Tokens may be sold, the value of the distributions that may be made by the Vendor and/or the Project Company, the liquidity of the Tokens, the ability to access marketplaces or exchanges on which to trade the Tokens, and the structure, rights and transferability of Tokens.

***Token holders will have no control on the Vendor or the Project Company***

The holders of Tokens are not and will not be entitled, to vote or receive dividends or be deemed the holder of capital stock of the Vendor or the Project Company for any purpose, nor will anything be construed to confer on Buyer any of the rights of a stockholder of the Vendor or the Project Company or any right to vote for the election of directors or upon any matter submitted to stockholders at any meeting thereof, or to give or withhold consent to any corporate action or to receive notice of meetings, or to receive subscription rights or otherwise.

FOIA Confidential Treatment Requested by Polychain

POLY00000119

DocuSign Envelope ID: 391ECE82-95B4-404C-A525-8F198C18FCE1

***Buyer may lack information for monitoring their investment***

Buyer may not be able to obtain all information it would want regarding the Vendor, the Project Company, the Tokens, or the Project, on a timely basis or at all. It is possible that Buyer may not be aware on a timely basis of material adverse changes that have occurred. While the Vendor has made efforts to use open-source development for Tokens, this information may be highly technical by nature. As a result of these difficulties, as well as other uncertainties, Buyer may not have accurate or accessible information about the Project.

***There may be unanticipated risks arising from the Tokens***

Cryptographic tokens such as the Tokens are a relatively new and dynamic technology. In addition to the risks included in this section, there are other risks associated with the purchase, holding and use of the Tokens, including those that the Vendor and the Project Company cannot anticipate. Such risks may further materialise as unanticipated variations or combinations of the risks discussed in this Agreement.

22



FOIA Confidential Treatment Requested by Polychain

DocuSign Envelope ID: 391ECE82-95B4-404C-A525-8F198C18FCE1

**IN WITNESS WHEREOF**, the Parties have duly executed this Agreement as of the date first above written.

<u>**VENDOR**</u>

SIGNED by
**DANIEL HYUNSUNG SHIN & KWON DO HYEONG**
for and on behalf of
**TERRAFORM LABS PTE. LTD.**

)
)
)
)
)

DocuSigned by:

*Daniel Shin*

91A033EE7A1D49E

Daniel Hyunsung Shin

DocuSigned by:

*Do kwon*

4C2CCD053600400

Do Hyeong Kwon

<u>**BUYER (IF BUYER IS A CORPORATION)**</u>

SIGNED by *Olaf Carlson-Wee*

for and on behalf of *Polychain Fund 1 LP*

)
)
)

<u>**BUYER (IF BUYER IS AN INDIVIDUAL)**</u>

SIGNED by

)
)

SIGNING PAGE TO TOKEN SALE AGREEMENT