# EXHIBIT XX

M2H8USSC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

U.S. SECURITIES AND EXCHANGE
COMMISSION,

                    Petitioner,

            v.                          21 MC 0810 (JPO)

TERRAFORM LABS PTE, LTD. and
DO KWON,

                    Respondents.        Remote Conference

------------------------------x

                                        February 17, 2022
                                        11:00 a.m.

Before:

                    HON. J. PAUL OETKEN,

                                        District Judge

                        APPEARANCES

U.S. SECURITIES AND EXCHANGE COMMISSION
BY:  JAMES P. CONNOR

DENTONS US LLP
     Attorneys for Defendants
BY:  DOUGLAS W. HENKIN

M2H8USSC

1          (The Court and all parties appearing telephonically)

2          (Case called)

3          THE DEPUTY CLERK:  Starting with the petitioner,

4     counsel, please state your name for the record.

5          MR. CONNOR:  Good morning.  This is James Connor for

6     the SEC.

7          THE COURT:  Good morning.

8          MR. HENKIN:  Good morning, your Honor.  This is

9     Douglas Henkin for Mr. Kwon and Terraform Labs.

10          THE COURT:  Good morning.

11          All right.  Thanks for joining.  I would appreciate it

12     if you would all state your names before speaking so the

13     transcript is clear as to who is speaking.

14          I scheduled this call in response to the briefing, as

15     we discussed at the last conference, which was back on December

16     3rd, and this matter is an application by the SEC to enforce an

17     administrative subpoena.  The respondents are Terraform Labs

18     and Mr. Do Kwon.

19          I have read the briefing and the subsequent letters,

20     and I will start with the SEC.  And I guess -- well, maybe I

21     won't start with the SEC actually.  Maybe I will start with Mr.

22     Henkin.  You're the one that really wanted oral argument.  So

23     here it is.

24          MR. HENKIN:  Thank you, your Honor.

25          Look, I will not go over everything that was said in

M2H8USSC

1    the papers, but the case here is that the SEC wants this Court

2    to condone what is a very crystal-clear violation of one of

3    their own rules that they wrote and they are now unhappy with

4    because of the way it applies in this case.  If they don't like

5    the way the rule works, there is a way to try to change it, but

6    this proceeding isn't that way.

7          The SEC has known that Mr. Kwon and TFL are

8    represented by Dentons since just days after the SEC sent Mr.

9    Kwon a request for voluntary cooperation, months before it

10   tried to serve the subpoenas that are at issue.  The SEC's

11   regulations prohibit the SEC staff from serving subpoenas on

12   people who are represented by counsel.

13         THE COURT:  Wrong.

14         What the rule says is, whenever service is required to

15   be made upon a person represented by counsel who has filed a

16   notice of appearance.

17         Have you filed a notice of appearance -- had you, at

18   the time it was served before the SEC?

19         MR. HENKIN:  Before that, your Honor, we had provided

20   the SEC -- and you can see this in the exhibits to Mr.

21   Senderowitz's declaration -- we had provided them with all the

22   contact information that was required by a notice of

23   appearance.  And in the *Deloitte* case, the SEC took the

24   position that that is sufficient to become a notice of

25   appearance.

1          And with respect to --

2          THE COURT:  I don't care what the SEC said in that

3     case.  It's not binding on me.  Plus, in that case, it was

4     completely different, because in that case, the party had

5     agreed to accept service and then was reneging.

6          I don't know how you can get around this language.  It

7     says, whenever service is required to be made upon a person

8     represented by counsel who has filed a notice of appearance.

9     Then it goes on and says, other methods of service, i.e., in

10    situations where no one has filed a notice of appearance,

11    service may be made by delivering a copy, handing a copy to the

12    person required to be served.  That's what happened.

13         MR. HENKIN:  That's the difference between this case

14    and the ordinary circumstances in which that rule applies.  The

15    service on counsel idea applies only in circumstances in which

16    the SEC has gotten jurisdiction over someone.  Remember that in

17    this instance, this started with the SEC sending requests for

18    voluntary cooperation to Mr. Kwon and TFL.  Mr. Kwon and TFL

19    then immediately retained counsel to represent them in

20    connection with the underlying proceeding and responding to

21    those requests.

22         THE COURT:  If we are not in the world where the SEC

23    has acquired jurisdiction and notices of appearances are being

24    filed, then why doesn't (c) of 150 apply allowing personal

25    service?  Because it was just really annoying and bad?

M2H8USSC

1          MR. HENKIN:  No.  It doesn't apply because when you

2     read through the full rule, starting with 203.8, it directs you

3     to (b).  And that's how you get there.  The way you get there

4     is that 203.8 of the SEC's rules relating to investigations

5     say, service of subpoenas issued in formal investigations,

6     investigative proceedings, shall be effected in the manner

7     prescribed by Rule 232(c).

8          Then you jump to 232(c) of the Rules of Practice,

9     which say the provisions of this paragraph (c) shall apply to

10     the issuance of subpoenas for purposes of investigations, and

11     instructs that service shall be made pursuant to the provisions

12     of Rule 150(b) through (d).  So it expressly includes 150(b).

13          And then 150(b) says, upon a person represented by

14     counsel, whenever service is required to be made upon a person

15     represented by counsel, who has filed a notice of appearance

16     pursuant to Rule 201.102, service shall be made pursuant to,

17     and then it continues as your Honor was discussing.

18          There was no place to file a formal appearance form

19     here because of the way that this had begun.

20          THE COURT:  What is the first thing you cited, 203

21     point what?

22          MR. HENKIN:  203.8 of the SEC's rules relating to

23     investigations, which are separate from the Rules of Practice,

24     your Honor.

25          THE COURT:  Right.  Service of subpoenas issued in

M2H8USSC

1    formal investigative proceedings shall be effected in the

2    manner prescribed by 232(c).

3              MR. HENKIN:  Of the Rules of Practice, your Honor.

4              THE COURT:  Right.  So what does that then say?

5              MR. HENKIN:  Then that says, the provisions of this

6    paragraph (c), so 232(c), shall apply to the issuance of

7    subpoenas for purposes of investigations.  And it goes on to

8    say that service shall be made pursuant to the provisions of

9    201.150(b) through (d), which is Rule 150(b) through (d) that

10   we have been talking about.

11             THE COURT:  So that includes (c).

12             MR. HENKIN:  It includes (c), but it starts with (b).

13   And so the question is --

14             THE COURT:  That's because (b) comes before (c) in the

15   alphabet.

16             MR. HENKIN:  In the way the rule is structured.

17             What you have here, though, is you have a situation in

18   which the genesis of this dispute started with the SEC seeking

19   voluntary cooperation, and counsel appearing and being

20   recognized in the proffer letter, by the way, which was drafted

21   by the SEC.

22             THE COURT:  So your view is that when someone

23   cooperates and can have counsel for a limited purpose, that

24   they then shield themselves from being subject to service by

25   the SEC?

M2H8USSC

1           MR. HENKIN:  Well, I wouldn't say for a limited

2     purpose.  The retention was for -- we knew that there was a

3     formal order of investigation, and so Dentons was retained for

4     that purpose.  And if you look at the SEC's proffer letter,

5     which is an exhibit to Mr. Senderowitz's declaration -- by the

6     way, which was written by the SEC, recognizing Dentons as

7     counsel for both Mr. Kwon and TFL in connection with the

8     investigation and the responses to the voluntary request.

9           What you have here is a circumstance in which the SEC

10    would like to get to a place where it doesn't have to abide by

11    Rule 150(b) when it starts out this way.  And there is a

12    reason, by the way, your Honor, that it started out with

13    requests for voluntary cooperation.  If it really believed that

14    there is personal jurisdiction over Mr. Kwon and TFL, then why

15    at the very beginning -- and this is going back to May of

16    2021 -- didn't it try to serve subpoenas on Mr. Kwon and TFL?

17    Why did it continue with additional voluntary requests for

18    information sent to Dentons as counsel for Mr. Kwon and TFL?

19          There was a very clear recognition by the SEC that we

20    were acting as counsel for TFL and Mr. Kwon in connection with

21    this entire inquiry.  And then, in the midst of it, because the

22    SEC got unhappy with the way things were going, and you know

23    this from reading Mr. Landsman's declaration, he was monitoring

24    Mr. Kwon's Twitter feed, took this upon himself and took a

25    shortcut.

1              And there is a reason, by the way, an ethical reason,

2    which we point out in our brief, why Rule 150(b) should be

3    interpreted this way.  A lawyer in a case should never directly

4    contact a party opponent he knows to be represented by counsel

5    unless authorized by law.  And that comes from Rule of

6    Professional Conduct 4.2(a), which directly applies to the SEC

7    staff, as we noted in our brief.  And that, by the way,

8    explains precisely why, as soon as we identified ourselves to

9    the SEC staff, all the communications after that were between

10   the staff and counsel.

11             THE COURT:  You have segued a bit into personal

12   jurisdiction, which I think is the real issue here.  And all

13   your argument about how to interpret Rule 150 is, once you know

14   somebody has counsel, you have to serve them through counsel,

15   but then we can also reject service.  And that's just not a

16   reasonable reading of the rule.  You're saying that the rule

17   creates this gap between being able to serve someone.

18             Now, you might believe that 150(c) is not operative

19   when there is no personal jurisdiction.  Obviously, that's the

20   argument.  But I just don't think your reading of the rule is

21   tenable at all.  Because you're arguing that we should rely on

22   this section (a) that says, when you file a notice of

23   appearance, service is through them.  But when you file a

24   notice of appearance, you are agreeing to the jurisdiction.

25   You can't reject service then.  So you're saying there is this

M2H8USSC

1    gap in the rule that is not there.

2            MR. HENKIN:  Well, no, actually, I am not saying that

3    there is a gap.  I am actually saying the opposite, your Honor.

4            The problem here is that there is an assumption in

5    connection with the idea that we declined to accept service.

6            First of all, the question was never asked.  One of

7    the things that we pointed out in our submission is that the

8    SEC never asked us to accept service of anything.  In fact,

9    they never notified us about the subpoenas until the e-mail

10   that was sent, which you also have in the record, by the way,

11   that's Exhibit 4 to Mr. Senderowitz's declaration, that

12   notified us that they believed that they had served Mr. Kwon.

13           So there was never a request.  So the idea that we

14   were asked to accept service and declined is false.  That never

15   happened.  The SEC doesn't know what would have happened if

16   they had asked us to accept it.  And your Honor knows from

17   private practice what happens when there are requests, but that

18   didn't happen here.  And you have a situation where there is

19   counsel representing parties in the context of what has been

20   identified as a formal order of investigation.  Everything that

21   your Honor has seen in the record talks about the fact that

22   there is a formal order of investigation.  And when there is

23   counsel under those circumstances, it's our view that the only

24   reading that makes sense is the reading that they are required

25   to either ask counsel, which didn't happen, so we put that one

off to the side because they just never asked, or get an order

from the Commission, which they didn't do.  So neither of the

things that 150(b) says, and it's either/or, neither of those

things happened.

THE COURT:  So 150(b) does say service shall be made

electronically in the form and manner to be specified by the

office of the secretary on the Commission's website.  Why

doesn't the courtesy copy, which was electronically made to you

after the personal service, why doesn't that satisfy (b)?

Because it didn't come with the magic words "we hereby serve

you"?

MR. HENKIN:  No.  It's not a question of magic words,

your Honor.  It's a question of reading that e-mail.  It says,

"Please see the attached subpoenas for Do Kwon and Terraform

Labs Pte Ltd. that were served this morning personally on Do

Kwon.  If you would like to discuss further, please e-mail me

some proposed times to speak."

That's the entirety of that e-mail.  It didn't say,

and this qualifies as service on you.  It didn't ask the

question.  It didn't do anything other than assert that they

had been properly served on Mr. Kwon that morning.  And so if

that service was in fact not proper, because it didn't comply

with 150(b), that's the end of the inquiry.  That's the

argument that we are making with respect to 150(b).

The e-mail just doesn't say what the SEC would like it

M2H8USSC

1    to say.  And there was never a follow-up saying, well, will you

2    accept them nunc pro tunc, or can we try again, or any of the

3    other various things that they could have done.  That's the sum

4    total of the e-mail.

5         THE COURT:  Let me give Mr. Connor a chance to respond

6    to any of those points briefly.  I want to leave personal

7    jurisdiction to the side for now.

8         Mr. Connor.

9         MR. CONNOR:  Thank you, your Honor.  This is James

10   Connor for the SEC.

11        Your Honor, whether the question is under 150(b),

12   150(c), or 150(d), the SEC unquestionably effected proper

13   service on Mr. Kwon.

14        Rule 150(d) -- and this is the only portion of the

15   rule that specifically references investigative

16   investigations -- says, service of an investigative subpoena

17   may be made by delivering a copy of the filing.  And then it

18   defines delivery as personal service handing a copy of the

19   person required to be served.

20        That's exactly what the SEC did here.  The SEC hired a

21   process server -- did not communicate with Mr. Kwon, as

22   respondents' counsel incorrectly stated, but actually hired a

23   process server to effect service of the subpoena.  That alone

24   under 150(d) should end the inquiry.

25        But if the Court looks at 150(b), every part of that

M2H8USSC

1     rule supports the SEC's position.  As your Honor pointed out,

2     it says, Whenever service is required to be made upon a person

3     represented by counsel who has filed a notice of appearance.

4     There is no dispute now that respondents' counsel did not file

5     a notice of appearance.  But even if a formal filing of a

6     notice of appearance is not required, Rule 150(b) references 17

7     C.F.R. 201.102 when it references a notice of appearance.  And

8     that section, the title of that section, subpart (d), says

9     designation of address for service.  The entire point of Rule

10    150(b) is to allow for service through counsel.  Counsel's

11    supposed partial representation does not allow them to not

12    accept service if they claim that they entered an appearance in

13    the case.

14         Again, whereas here, counsel does not agree to accept

15    service, they have not entered an appearance in the

16    investigation for purposes of Rule 150(b).  So, therefore, it

17    was fully proper for the SEC to serve Mr. Kwon personally.

18         They claim they provided the business address and

19    e-mail address, but again, they wouldn't accept service through

20    those addresses.  So the SEC was not required to get an order

21    from the Commission.

22         Counsel for respondents I think attempts to be a

23    little coy in whether they would or would not accept service,

24    but their filings are very clear on the issue.  On page 15 of

25    their opposition brief, they quote a case that says service of

M2H8USSC

1    process on an attorney not authorized to accept service for his

2    client is ineffective.  And then, in paragraph 8 and 21 of the

3    complaint that they filed, they state the SEC knew it could not

4    serve subpoenas on Mr. Kwon or TFL.

5            So, essentially, what respondents' counsel has stated

6    is that they were not authorized to accept service.  And since

7    they are not authorized to accept service, it was fully

8    appropriate for the SEC to serve Mr. Kwon personally.

9            Now, even if respondents' counsel is correct about

10   everything they said, regarding a notice of appearance,

11   regarding Rule 150(b), the dispute here is academic because the

12   SEC served counsel through electronic means, which is

13   specifically allowed for in Rule 150(c).

14           Now, counsel makes the argument that the SEC didn't

15   provide the, quote, magic words necessary to effect service.

16   But the rules answer this question.  Rule 150(e) specifically

17   states that electronic service is complete upon transmission.

18   So the SEC does not have to say, attached is a copy for

19   service.  All the SEC is required to do is actually send the

20   subpoenas electronically to respondents' counsel, and that is

21   exactly what the SEC did here.

22           So because the SEC has followed the administrative

23   steps in serving the subpoenas, the Court should enforce the

24   subpoenas.

25           The only other point I will raise about the *Deloitte*

M2H8USSC

1    case that counsel relies very heavily in their briefing was in

2    a completely different circumstance in which the attorney in

3    that case had actually agreed to accept service.  So because

4    counsel agreed to accept service, that's why the SEC served

5    upon counsel, and then they tried to renege that years after

6    the fact.  So the *Deloitte* case and this case bear no

7    resemblance.  The SEC followed Rule 150, and so, therefore, the

8    Court should enforce the subpoenas.

9          Thank you.

10         MR. HENKIN:  Your Honor, can I jump back to just a few

11   quick things about that?

12         THE COURT:  Sure.

13         MR. HENKIN:  I am actually glad that Mr. Connor

14   focused on our citation of the *Zherka* case because what that

15   really shines a light on is the fact that there was never a

16   request for acceptance of service.  Because, as your Honor

17   knows from being in private practice, when counsel for an

18   opposing party makes a request, will you accept service of A,

19   B, C or D, on behalf of your client, you then go to your

20   client, talk about it with your client, and decide how to

21   respond.  That request was never made here.  And that request

22   is particularly important here because the idea of electronic

23   service being effected as soon as something is sent means one

24   thing, when jurisdiction has been gotten over a party, and it

25   means something entirely different when the document that you

1    are attempting to serve is the document -- when it is in itself

2    a compulsory process document.

3            That's what they attempted to serve here, and that's

4    why we cited the *Zherka* case and specifically service of

5    process on an attorney not authorized.  Essentially, the

6    argument that Mr. Connor made would turn any lawyer, who

7    appears on behalf of an entity that is asked to provide

8    voluntary cooperation with the SEC, into an authorized agent

9    for service of process for anything that the SEC then wants to

10   serve on them.  And that's not the way any of this works.  That

11   would mean, if you took it to its logical conclusion, that the

12   SEC could decide to commence an enforcement proceeding and just

13   e-mail a copy of it to Dentons, and according to the SEC's

14   reasoning, that would count as service on Mr. Kwon or TFL, for

15   example.  That cannot be and isn't the way the law works.

16           The last two things I will say is Rule 150(b), if you

17   read it, specifically relates to investigative subpoenas.

18   That's something that I noted before.  And the notice of

19   appearance in an investigative proceeding is exactly what we

20   provided because when all that is going on is voluntary

21   cooperation, that's all there is, and then you get to where we

22   are now.

23           THE COURT:  OK.  Thank you for those arguments.  I

24   would like to move on to the personal jurisdiction issue, if we

25   could.

M2H8USSC

1          I think again I will start with Mr. Henkin, if you

2     don't mind, because you had addressed the issue of potentially

3     filing a reply brief and really wanted to be heard after what

4     you suggested were some new points made in the reply.  What we

5     are really talking about is any of the bases for purposeful

6     availment of United States by Kwon and Terraform such that

7     personal jurisdiction for purposes of the subpoena would be

8     appropriate.

9          So, Mr. Henkin.

10          MR. HENKIN:  Sure.  Thank you, your Honor.

11          So let me address that in two steps.

12          The first step, and we alluded to this in the letter,

13     but I just want to highlight it, there are a number of things

14     that are stated in Mr. Landsman's reply declaration where he

15     talks about, for example, in paragraphs 3, 4 and 5, evidence

16     that is not before the Court that the SEC wants the Court to

17     rely on with respect to the personal jurisdiction arguments

18     that it makes in the reply brief.  And they all start with

19     actually the same phrase:  the staff has obtained evidence of

20     an agreement or a document, and so on.  But those documents are

21     not in the record, and the only things that are in the record

22     are Mr. Landsman's characterizations about those documents.  We

23     don't think that the Court should be relying on any of that for

24     a number of reasons.  One, it's hearsay, possibly multiple

25     levels depending upon which document we are talking about; and

M2H8USSC

1   also, Mr. Landsman isn't competent to testify about those

2   documents.  None of them are SEC documents, for example.

3            So that's the overall point that I wanted to make with

4   respect to that.  And that applies to all of the assertions

5   that are in Mr. Landsman's reply declaration.

6            With respect to jurisdiction itself, I was surprised,

7   frankly, that the SEC argued in the reply brief that there is

8   general jurisdiction over Mr. Kwon, because as your Honor

9   knows, it's not at all clear that general jurisdiction can

10  apply to individuals.  In the *Burnham v. Superior Court* case

11  from 1990, the Supreme Court said it may be that general

12  jurisdiction only applies to corporations.  And in the *Hoechst*

13  *Celanese* case, from the Middle District of Florida, from 1995,

14  the court said it's not clear that general jurisdiction can

15  ever be held over a private nonresident defendant.  And your

16  Honor in the *Reich v. Lopez* case, from 2014, this was applying

17  New York law and citing the Second Circuit's decision in the

18  *Roman Catholic Diocese* case, you noted that for an individual,

19  the paradigm forum for the exercise of general jurisdiction is

20  the individual's domicile.  And for Mr. Kwon, that was Korea

21  and is now Singapore.  So the idea that there is general

22  jurisdiction over Mr. Kwon just doesn't fly here.

23            I guess I should pause there and ask if your Honor has

24  any questions.

25            THE COURT:  I guess I am wondering about what that

means in terms of the *Kidder, Peabody* case that the SEC cites,

which says that Exchange Act, Section 27 confers personal

jurisdiction over a defendant who is served anywhere within the

United States, that is, that service alone covers personal

jurisdiction.

MR. HENKIN:  I think that flips the issue on its head,

your Honor, because essentially that's making general

jurisdiction over an individual apply on -- essentially tag

jurisdiction or happening to travel through the United States.

Whereas I think the ordinary course definition, going all the

way back to *Burnham*, is that for general jurisdiction -- and

this is also true under pretty much every state law that I am

aware of -- is that in order for general jurisdiction to exist

as opposed to specific jurisdiction, that is limited to the

domicile.  And to allow the SEC to just assert general

jurisdiction over somebody by the happenstance of them

happening to be in some sort of the U.S., continental U.S., at

some point, when their domicile is outside the United States, I

think that would raise some fairly significant due process

issues.

THE COURT:  OK.

MR. HENKIN:  I think the best way to read that statute

is it is a territorial limitation on what the SEC can do, not

as something that creates general jurisdiction in circumstances

where it otherwise wouldn't exist.

M2H8USSC

1          THE COURT:  OK.

2          So let's get into specific personal jurisdiction.  I

3    don't know that there is a lot of daylight between how that

4    would apply with respect to Mr. Kwon and with respect to

5    Terraform Labs, because he is the cofounder and CEO and what he

6    is alleged to have done, in terms of United States-focused

7    activities, was really all coextensive with Terraform Labs, or

8    doing it for Terraform Labs.

9          So how do you respond to the various ways in which the

10   SEC contends Kwon and Terraform were availing themselves of

11   U.S. markets and activity?

12         MR. HENKIN:  So two points about that.  One general

13   and then I will get into the actual assertions of the contacts

14   themselves.

15         The first part -- and we fully briefed this and there

16   essentially was not a response to it -- there is a little bit

17   of daylight between Mr. Kwon and TFL, in the sense that even if

18   jurisdiction could be had, even if service was proper of the

19   subpoena directed to Mr. Kwon, handing him a subpoena when he

20   is transiting the United States for TFL is not effective

21   service.  And the SEC didn't really have a response to that.

22   We cited multiple cases saying that just handing a subpoena to

23   an officer of a company, when he or she happened to be

24   transiting through the United States, is not sufficient to get

25   jurisdiction over the entity as opposed to the individual.

M2H8USSC

1          Now just getting into the specific issues, I think

2     what you have to do is you have to look at the subpoenas and

3     the underlying investigation.  The subpoenas, like the

4     investigation, are focused on whether mAssets or MIR tokens

5     might be securities that TFL might have sold or marketed to

6     U.S. investors.  And nothing that the SEC has focused on shows

7     either Mr. Kwon or TFL marketing or selling those things to

8     U.S. persons.  So they don't count for the purpose of

9     establishing specific jurisdiction.

10          What they point to, for example, on page 6 of the

11     reply, is that Mr. Kwon spoke at a New York event as the

12     cofounder and CEO of Terraform.  That's the way they phrase it.

13     That's not purposeful availment.  He was speaking on a panel

14     about emerging blockchain technology, not conducting business.

15     It's not even related to the Mirror Protocol.  The SEC, by the

16     way, did not challenge this in its reply papers.  The panel

17     that he spoke on was called "The Multichain Future is Here,"

18     and it was about how leading blockchains inter-operate with

19     each other and various developments in cross-blockchain

20     technology.  That's not purposeful availment with respect to

21     the Mirror Protocol or MIR tokens.

22          They argue also that Mr. Kwon promotes the Mirror

23     Protocol through TFL's website, web app, social media, podcast

24     interviews and U.S. media.  But they don't identify anything he

25     said on any of those platforms to promote the Mirror Protocol

M2H8USSC

1   to U.S. investors as opposed to just around the world, which,

2   as your Honor is aware, is not sufficient.  The SEC only

3   identifies two items even in the U.S. media about Mr. Kwon, and

4   neither of them involves marketing to U.S. investors.

5          Then they say that Mr. Kwon talked to Coinbase, which

6   led to a contract to list MIR tokens on Coinbase.  A couple of

7   things about that.

8          First of all, Mr. Kwon wasn't a party to the agreement

9   between Coinbase and Terra.  He didn't sign it.  Two, his

10  communications with Coinbase didn't cause the SEC to issue the

11  subpoenas.  The subpoenas don't even ask about those

12  communications.

13         Then they also point to a contract whereby a U.S.

14  digital -- and this is actually in paragraph 3 of

15  Mr. Landsman's reply declaration -- a U.S. digital asset

16  trading platform paid a Terra subsidiary $200,000 for MIR

17  tokens.  But, first of all, as I pointed out, in general, there

18  is no competent evidence about this in the record.  All of this

19  is from statements by Mr. Landsman about a document he claims

20  to have reviewed.  So that's hearsay.  And he is not competent

21  to testify about it.  It's also irrelevant because the most

22  that this shows is that some U.S. entity purchased MIR tokens

23  from a subsidiary of TFL, and that doesn't establish

24  jurisdiction over TFL or Mr. Kwon.

25         And I would refer your Honor back to your own opinion

M2H8USSC

1    in *Alibaba v. Alibabacoin*, which held that contracting with a

2    company in the forum doesn't support jurisdiction unless the

3    case relates to that contract.  And specifically what your

4    Honor said in that case was that Alibaba had contracted with

5    Digital Ocean LLC, which was headquartered in New York City, to

6    host the website.  But even if Alibaba's websites were hosted

7    in New York, that alone is insufficient to establish personal

8    jurisdiction.  That covers everything that the SEC has argued

9    here and means that it is not sufficient to support the

10   exercise of specific jurisdiction.

11           There is also, by the way, a line of cases going back

12   130 years that hold that listing -- let me take a step back

13   here and say, I am going to talk about equity securities

14   because that's what the cases that I am about to describe cite.

15   I am not acknowledging or admitting or agreeing that anything

16   that we are talking about in this proceeding is an equity

17   security or is a security at all.  But these cases are

18   interesting because for 130 years people have been trying to

19   argue that merely choosing to list an equity security on a U.S.

20   equity exchange, such as NYSE or AMEX or NASDAQ, is sufficient

21   to create jurisdiction in some U.S. forum.

22           Literally, going back to 1890, and this is discussed

23   in the *Wiwa v. Royal Dutch Petroleum* case in the Second

24   Circuit, and in a whole series of other cases that I can give

25   you, but even doing that, even listing your securities on a

M2H8USSC

1   U.S. market is not sufficient to establish specific

2   jurisdiction.  And that's been the rule quite literally since

3   1890.  You can look at a case called *Law Debenture v. Maverick*

4   *Tube*, which is 2008 WL 4615896, and several other cases which I

5   could read to you, but if you would like, I can provide them in

6   a supplemental letter.  The point is that that sort of

7   activity, and that's the most that you could say that the SEC

8   has asserted here, is not sufficient for specific jurisdiction.

9   So the idea of there is a listing agreement.  It's not enough.

10          Also, and this further distinguishes this case from

11  all of those cases that went before, in all of those cases

12  there were payments to the listing exchange, listing fees, for

13  example.  Here, TFL paid the platform nothing and TFL earned

14  nothing from the listing agreement.  So it's even less of a

15  support.

16          THE COURT:  What is the entity that it's listed by?

17          MR. HENKIN:  The one that they referred to is

18  Coinbase.

19          THE COURT:  OK.

20          MR. HENKIN:  So that can't be sufficient.  If listing

21  on an equities exchange can't be sufficient for personal

22  jurisdiction, then MIR tokens, when it's not even a paid

23  listing, couldn't possibly be sufficient.

24          THE COURT:  But why wouldn't it be sufficient, when

25  you list on Coinbase, that entity pays $200,000 for MIR tokens,

M2H8USSC

1   and you have several employees in the United States, including

2   the general counsel.  Why else would it have a general counsel

3   in the United States?

4              MR. HENKIN:  It's interesting, your Honor, and that's

5   one of the other reasons that I wanted to bring up these cases

6   because they also go to exactly those questions.  Among the

7   things that are alleged in some of them, not all of them, are

8   things like paying someone, having employees in the area, and

9   things like that, as opposed to purposeful availment with

10  respect to the specific issues that are in dispute.  And in all

11  of the cases in which those are addressed, and I will give you

12  an example, some of the cases, for example, had situations

13  where underwriters were hired in the same jurisdiction, or

14  where investor relations companies were hired in the same

15  jurisdiction, or where there were small numbers of employees in

16  the same jurisdiction, and again, your Honor, if you want, I

17  can give you a quite long string cite with these cases, but

18  what they uniformly hold is that those things even put together

19  aren't enough.

20              The reason for that is, if you think about it from a

21  policy perspective, that would discourage companies from coming

22  into the United States, or from even -- essentially, it would

23  make companies do everything they possibly could to avoid

24  contact with the United States, to avoid those things giving

25  rise to personal jurisdiction.

M2H8USSC

1          THE COURT:  There is also a 2019 custodial services

2     agreement.  Is that also with Coinbase or is that with somebody

3     else?

4          MR. HENKIN:  That I believe is with somebody else,

5     although I don't remember off the top of my head because I

6     haven't seen the specific document that's being referred to.

7     But again, that is the equivalent of the cases in which

8     plaintiffs have alleged having a bank account and appointing a

9     transfer agent or a registrar is not sufficient.  So, for

10    example, in a case called *Gilson v. Pittsburgh Forgings*, the

11    allegations were, Oh, there is an NYSE listing and there is the

12    appointment of a New York-based transfer agent and registrar,

13    and the court said, no, that's not enough.

14         THE COURT:  You're pointing to four different areas

15    where it's not enough, but here we have all of those things.

16         MR. HENKIN:  No.  Actually, in that case, it was the

17    combination was not sufficient.

18         THE COURT:  The second declaration by the SEC, which I

19    realize you have problems with, I think it says 15 percent or

20    some percent of customers are in the United States.  Do you

21    have a response to that?

22         MR. HENKIN:  I am trying to find where that is.

23    Notice that it doesn't say customers.  What it says -- and this

24    is one of the problems with it.  What that paragraph says is,

25    The staff obtained evidence of an e-mail from a Terraform

M2H8USSC

1  employee to the U.S.-based digital asset trading platform and

2  U.S.-based outside representatives of the trading platform

3  indicating that about 15 percent of users of the Mirror

4  Protocol come from the U.S.

5       Now, that's a very, very vague statement because users

6  of the Mirror Protocol doesn't necessarily mean that they were

7  buying or selling mAssets.  It also doesn't mean that they were

8  using the Mirror Protocol through a TFL interface.  One of the

9  important parts about the Mirror Protocol is that it's just a

10 protocol that operates on the internet.  It's essentially been

11 released into the wild, one way of thinking about it, by TFL.

12 TFL doesn't control it.  TFL doesn't control what mAssets are

13 minted or how they trade.  That is controlled by the Mirror

14 Protocol community.  So nothing in that statement says anything

15 about what those users are doing.  Another way of thinking

16 about it is those users are not customers of TFL.  They are

17 simply using the protocol in ways that TFL has no control over.

18       THE COURT:  Right.  That's kind of the brave new world

19 of the blockchain that is what makes this unlike prior cases,

20 right?

21       MR. HENKIN:  It's one of the things, yes.

22       THE COURT:  I want to give a chance to Mr. Connor to

23 address personal jurisdiction as well.  Did you cover

24 everything you wanted to, Mr. Henkin?

25       MR. HENKIN:  The only other thing that I would throw

M2H8USSC

1    in, your Honor, is that we think that the 2021 case *Blockchange*

2    *Ventures v. Blockchange, Inc.* is another case that supports our

3    argument that there is no jurisdiction.  In that case, the

4    defendant provided digital asset investment services and the

5    plaintiff had pointed to a partnership between the defendant

6    and a New York company for the New York company to share

7    customer information with the defendant, but the court found

8    that there was no jurisdiction because the plaintiff hadn't

9    shown that its case arose out of that partnership.  And I think

10   that the cases that the SEC cites do not show the existence of

11   personal jurisdiction here.

12          THE COURT:  All right.  Thank you.

13          Mr. Connor.

14          MR. CONNOR:  Yes, your Honor.  Thank you.

15          I would like to start with personal jurisdiction over

16   Mr. Kwon.

17          We don't think this is a close question.  The court

18   has personal jurisdiction over Kwon because he was served with

19   the subpoena while he was found in the United States.  And that

20   "found" language comes from Exchange Act, Section 27, 15 U.S.C.

21   78aa.  And we included the reference to the *Kidder* case, which

22   squarely addresses this question and held that when a person is

23   found in the United States, that it's proper for a court to

24   exercise jurisdiction over that person.

25          We also cited the *Edelman* case, 295 F.3d 171, that

M2H8USSC

1    says, when a potential witness comes to the United States, it

2    is neither unfair nor inappropriate under the statute to

3    undertake his discovery here.

4              THE COURT:  What was that cite of *Edelman*?

5              MR. CONNOR:  295 F.3d 171.

6              I think there might be a misunderstanding on the

7    *Burnham* case.  Because in *Burnham*, which was a plurality

8    opinion, the court held jurisdiction, based on physical

9    presence alone, constitutes due process.  I am just reading

10   from the case.  And it reaffirmed a century of judicial

11   practice that serving a person while they are found in the

12   location comports with due process.

13             I think the confusion is that that doctrine doesn't

14   always apply to corporations, and that's something that the

15   Supreme Court found in *Daimler*.  And to be clear, we are not

16   saying that the Court has general jurisdiction over the

17   corporation.  We are just saying it has it over Kwon because he

18   was found in the location.

19             So our position there is supported Supreme Court case

20   law, Second Circuit case law, and the statute itself.

21             Just turning to specific personal jurisdiction over

22   Mr. Kwon and Terraform, there's numerous minimum contacts that

23   establish purposeful availment of the forum.  And I will just

24   tick through a few of these because I think it's important.

25             First, Mr. Kwon travelled to the United States to

M2H8USSC

1    speak at a digital asset conference where he was identified as

2    the founder and CEO of Terraform.  He signed an agreement with

3    what we termed as a U.S. digital asset trading platform, but

4    which counsel has identified now as Coinbase, under which the

5    digital asset platform paid a Terraform subsidiary at least

6    $200,000 for MIR mirrors.  Again, that was an agreement that

7    was signed by Mr. Kwon personally.

8              THE COURT:  I thought he said he didn't sign it.

9    Maybe I'm wrong.

10             MR. CONNOR:  Yes.  Mr. Kwon signed the agreement.  I

11   think the caveat there was that the agreement was with a

12   wholly-owned Terraform subsidiary.

13             MR. HENKIN:  Just to be clear, your Honor, the

14   agreement he didn't sign was the listing agreement.

15             THE COURT:  Got it.

16             So the agreement that you're talking about, the

17   listing of MIR tokens, when was that?

18             MR. CONNOR:  The agreement that I am referring to is

19   not for the listing.  It's called a SAFT, which is a simple

20   agreement for future token, and that was signed in 2021.  And

21   that was where the U.S. digital asset platform agreed to pay

22   $200,000 for the MIR tokens.

23             THE COURT:  For the tokens.

24             MR. CONNOR:  Yes.  Just to be clear, that's separate

25   and apart from the custody agreement and the listing agreement.

M2H8USSC

1    This is a third agreement.

2                THE COURT:  So they were buying the tokens from the

3    Terraform subsidiary?

4                MR. CONNOR:  Yes.

5                THE COURT:  All right.

6                And Coinbase is a U.S.-based entity?

7                MR. CONNOR:  It is.

8                THE COURT:  But this wasn't a listing agreement.  They

9    weren't reselling the tokens.

10               MR. CONNOR:  No.  But there was also a listing

11   agreement between Terraform and Coinbase as well.

12               THE COURT:  And tell me about that.

13               MR. CONNOR:  That is an agreement, Terraform

14   contracted with Coinbase under which -- and this just addressed

15   the MIR tokens, not the mAssets.  But the MIR tokens were,

16   through this listing agreement, made available for trading in

17   the U.S.  To be clear, when they enter into the agreement, it's

18   Coinbase that's actually -- once that agreement is made, it's

19   Coinbase that is making them available for sale.

20               THE COURT:  So if I go on, I can purchase MIR tokens

21   through a Coinbase platform now?

22               MR. CONNOR:  Yes.

23               THE COURT:  But what about the argument that there is

24   no ongoing role of Terraform in that situation?

25               MR. CONNOR:  Well, Terraform is -- they call MIR token

1    the, quote, governance token of the Mirror Protocol, which,

2    again, Terraform developed and continues to maintain.  So there

3    still is a relationship between Terraform and the governance

4    token for the Mirror Protocol.

5          And that's putting aside the fact that, again,

6    Terraform created the Mirror Protocol, which also allowed for

7    the creation of these mAssets.  And these mAssets, they mimic

8    the price of U.S.-based equity securities.  So, for example,

9    they talk about something called mApple and mTesla.  So these

10   are things that Terraform created the infrastructure, and

11   created the Mirror Protocol through which these mimicked assets

12   are developed.

13         Also, with respect to the custody agreement, Terraform

14   signed a contract, and I think we have identified it as

15   Coinbase, for -- actually, this agreement is with a trust

16   associated with Coinbase.  So the custody agreement is not with

17   Coinbase, but with the trust.  And that's for the trust to

18   custody and store digital assets on Terraform's behalf.  So,

19   again, that's a contract between Terraform and the U.S.-based

20   entity, in which the U.S.-based entity is storing and

21   custodying digital assets on Terraform's behalf.  That's

22   continuing, ongoing conduct that's memorialized in an

23   agreement, and that is sufficient for purposes of availment.

24         That's not even to mention, again, at least four

25   individuals, it's growing, Terraform just hired an additional

1  general counsel, but there's at least four individuals residing

2  in the United States that are employed by Terraform and press

3  reports -- I will just throw this out there.  There's also

4  press reports that Mr. Kwon and Terra-related entities have a

5  new sponsorship agreement with the Washington Nationals.  There

6  is section behind home plate called The Terra Club.

7          So there is significant minimum contacts between

8  Terraform, Mr. Kwon, and the United States that are more than

9  sufficient for the Court to exercise jurisdiction.

10          I will also point out, Terraform in its briefing tries

11  to minimize the fact that its website and web application

12  allowed U.S. investors to purchase MIR tokens and mAssets.  And

13  the way they do this is sort of retroactively.  If you look at

14  the declaration of the Terraform employee, it states that the

15  website has been open-sourced and is no longer even hosted by

16  Terraform.  But that only changed on November 14, 2021, two

17  days after we filed the subpoena enforcement action.  So up

18  until that time, a U.S. investor could go to Terraform's

19  website and purchase these MIR tokens and these mAssets on a

20  website hosted by Terraform.  Terraform's belated attempt to

21  kind of eliminate this contact does not change the fact that it

22  hosted the website.  And this is just in addition to all the

23  other contacts that I also discussed.

24          I will also point out, the last point is that Mr. Kwon

25  also promotes the mAssets and MIR tokens in U.S. media.  We

M2H8USSC

included a cite to a Yahoo! News article and Mr. Kwon is quoted

as saying, So we have things like Mirror Protocol, which

creates synthetic assets that track the price of real-world

assets.  So this would be, for example, MIR Tesla or MIR Apple,

referring to the equity securities of U.S.-based companies

Apple, Inc. and Tesla, Inc.

        In the end, the question on jurisdiction over Mr. Kwon

and Terraform boils down to this.  Should the Court exercise

personal jurisdiction over a digital asset company, when that

company has multiple contracts with a U.S.-based trading

platform, markets of digital assets, which mimic U.S.

securities to U.S. investors, through U.S. media, employs at

least four individuals residing in the U.S. in key positions,

and has a CEO who travels to the U.S. on behalf of Terraform to

speak at digital asset conferences?  We believe the answer is

clear and the Court should exercise specific personal

jurisdiction over both Kwon and Terraform.

        THE COURT:  Let me just ask you if you would like to

respond to Mr. Henkin's objections to the hearsay and personal

knowledge points, particularly with respect to the second SEC

declaration.

        MR. CONNOR:  Sure.  With respect to the agreement, as

a practical matter, I think counsel has essentially confirmed

what we said in the declaration that these agreements exist.

He said that they do have agreements with Coinbase.  And so

M2H8USSC

1     that's the point that we were laying out in the second

2     declaration.  We didn't attach the actual agreements to the

3     declaration.  We are happy to do that.  We have them.  We did

4     provide the Bates numbers so that the Court can have some

5     confidence that they do exist, and we will certainly provide

6     them if need be.

7              As far as of sort of the timing of it, when we

8     initially filed the petition for enforcement of the subpoenas,

9     we did not believe that jurisdiction was going to be a large

10    issue because of all of these contacts with the U.S.  So that's

11    why in our initial papers we focused on the Rule 150 issue,

12    which is the issue that respondents filed the complaint on, and

13    so that's what we focused on.  We did include some of the

14    contracts.  But given that in their response brief respondents

15    described their contacts with Coinbase as a one-shot contract,

16    that's what they said, that was just inaccurate.  So we needed

17    to correct that inaccuracy, that there were more than one

18    contract; there were multiple contracts.  And again, counsel

19    has confirmed what we have said here about these contracts with

20    Coinbase.  There is no dispute about the facts here.  And so I

21    think we have provided more than enough indicia of liability

22    for these agreements, and it's more than enough for the Court

23    to exercise jurisdiction over Kwon and Terraform.

24              MR. HENKIN:  Your Honor, can I respond?

25              THE COURT:  Sure.

M2H8USSC

1          MR. HENKIN:  A few things.

2          First of all, we didn't confirm the content or what

3     the SEC would like the Court to infer from these contracts.  I

4     would like to mention that Terraform is a fairly large company

5     that does a lot of things besides having created the Mirror

6     Protocol, part of which is the MIR token.  It has a lot of very

7     much more substantial products and projects that it works on

8     that have nothing to do, for example, with the Mirror Protocol.

9     So it's the SEC's burden to demonstrate that what it is

10    investigating here, which is only mAssets and the MIR tokens,

11    are related to the things that it has identified as contacts

12    with the U.S.  And it hasn't done that.  That's one of the

13    reasons why I focused on the listing cases and investor

14    relations and other contacts-type cases because those sorts of

15    things in a generic context are not the same.

16          So, for example -- and, of course, this is not in the

17    record, but because Mr. Connor brought it up I will also bring

18    it up -- he referred to discussions with the Washington

19    Nationals.  Two things about that.  One, that started months

20    after the service of the subpoenas was attempted.  But, two,

21    it's got nothing to do with the Mirror Protocol or MIR tokens.

22    It has to do with a completely separate -- and I apologize for

23    the fire engines in the background.  It has nothing to do with

24    mAssets or MIR tokens.  It has to do with a separate

25    cryptocurrency digital asset that TFL had created.

M2H8USSC

1        THE COURT:  It's a DSL thing called cryptocurrency

2   Terra USD.  So it stands for Terra USD.

3        MR. HENKIN:  It's a stable coin.  It's not the MIR

4   token and it's not mAssets.

5        THE COURT:  It's based on the Mirror Protocol as well.

6        MR. HENKIN:  No.  It can interact with the Mirror

7   Protocol, but Terra USD is separate from the Mirror Protocol.

8   And I don't think that's subject to dispute here.

9        The second thing is, neither TFL nor Mr. Kwon creates

10  mAssets.  Those are created and they are traded by people who

11  use the Mirror Protocol.  So it's not up to Mr. Kwon whether

12  mApple or M any other U.S. equity is created.  Those are

13  proposed by and voted on by the community.  TFL doesn't have

14  control over whether one mAsset gets created; if it does get

15  created, who trades it; if it gets destroyed, or anything like

16  that.  In a sense, the Mirror Protocol, one thing that you

17  might analogize it to is a 3D printer, and what somebody who

18  buys a 3D printer makes with it is up to them, not to the

19  company that sells it.  At the end of the day, none of this has

20  been linked to the investigation.  They are just throwing out

21  contacts.  And that's why I think it's very important to focus

22  on, have they demonstrated that any of these contacts are

23  actually related to the things that they are investigating?

24  Because that's what is relevant for specific jurisdiction.

25       Of course, all of this assumes that service was proper

M2H8USSC

1   in the first place.  And I just want to say one brief thing

2   about that.  We provided all the information, and I don't think

3   it's disputed, that is required by the SEC's Rule 102(b).

4   There is no docket, in the context of a situation like this, in

5   which to file a notice of appearance or any other kind of a

6   form.  You provide it to the SEC staff the way we did provide

7   it.  They recognized that we were counsel for TFL and Mr. Kwon.

8   And you can't knock out Rule 150(b) by disagreeing with that.

9   It would essentially write the rule out of existence.

10          That's all I have to say, unless your Honor has

11   further questions.

12          THE COURT:  Thank you.

13          Let me ask Mr. Connor one more thing, and that is,

14   this Nationals deal, do you agree that because it involves a

15   different product, I guess, cryptocurrency Terra USD is not

16   within what would be a basis for specific jurisdiction because

17   it's not within what the SEC is investigating here?

18          MR. CONNOR:  Your Honor, I think, from our

19   perspective, we don't have those agreements.  We can only read

20   what is in the press.

21          What I will say is, with respect to specific

22   jurisdiction and the contacts between Mr. Kwon in the United

23   States, Mr. Kwon is quoted very heavily in these press releases

24   announcing a deal between his company and a major sports

25   franchise here in Washington, D.C.  So I think that does

M2H8USSC

1    support our position.  We think the Court has general

2    jurisdiction over Mr. Kwon, but also specific jurisdiction over

3    Mr. Kwon.  And I think, as Mr. Henkin said, the Terra-related

4    entities that he claims were sort of party to the sponsorship

5    agreement, there is some interaction between those entities and

6    the Mirror Protocol.  We can't speak with any more specificity

7    on that because we don't have those agreements yet.  But I was

8    just sort of pointing that out as an example of the fact of the

9    contacts between at least Mr. Kwon and Terra-related entities

10    with the United States that continue to be ongoing, in addition

11    to the litany of contacts that we described earlier.

12           THE COURT:  What is the scope of the SEC's

13    investigation?

14           MR. CONNOR:  The SEC's investigation is named *In re*

15    *Mirror Protocol* and is investigating whether there were

16    potential violations of the securities laws regarding Mirror

17    Protocol; and as we lay out in our papers, under the Mirror

18    Protocol, MIR tokens are created, and mAssets, which mimic

19    U.S.-based securities, are also created.

20           So I think that's in our papers, and I think that's

21    all that -- yes.  To be clear, that is what our subpoena

22    relates to that's at issue here.

23           So, again, the subpoena relates to the Mirror Protocol

24    through which the MIR tokens and mAssets are created.

25           MR. HENKIN:  Just to get back to the general

M2H8USSC

1    jurisdiction point, because Mr. Connor focused on it so much, I

2    would again refer back to *Burnham*, *Hoechst*, and the *Reich*

3    cases, which make clear, although Mr. Connor is correct that

4    *Burnham* was a plurality case, was a plurality decision, the

5    Supreme Court stated it may be that general jurisdiction

6    applies only to corporations.  And then the *Hoechst* case said

7    that it wasn't clear that general jurisdiction could ever be

8    held over a private nonresident defendant, i.e., an individual.

9    So there is significant doubt, at least at the federal level

10   and also at the state level, whether general jurisdiction can

11   ever be asserted over a two-legged entity as opposed to a

12   corporate entity.

13          THE COURT:  All right.  Thank you for your arguments.

14   I am going to rule.

15          There are two issues before me.  One is whether there

16   was proper service.  And on this, I rule that there was proper

17   service.  I think Rule 150(a) applies, specifically by its

18   terms, when service is required to be made upon a person

19   represented by counsel who has filed a notice of appearance,

20   and (c) provides for and allows service by handing a copy of

21   the person required to be served, and I think that does require

22   proper service.

23          Mr. Henkin is a very smart lawyer and has made clever

24   arguments about how, because the respondents were represented

25   by counsel, service had to be made kind of as service through

M2H8USSC

1    counsel, but I just don't think Rule 150(a) applies by its

2    terms.  And there really is no authority for respondents'

3    position, other than a reply brief by the SEC which is not

4    authority.  In any event, I think that that is distinguishable.

5    It's not binding on me.  In any event, I think the plain

6    language of Rule 150 permits the service that was made here.

7    And I think the reading proposed by respondents would read out

8    Rule 150(c).  This purported gap that respondents' position

9    would create between being personally served and being served

10   through counsel that has "appeared" is illusory and reflects a

11   misreading of SEC rules.

12        With respect to personal jurisdiction, I don't need to

13   decide the general jurisdiction question because I find that

14   there is specific personal jurisdiction with respect to both

15   Kwon and Terraform Labs because they purposely availed

16   themselves of the privilege of doing business in the United

17   States in several respects that are directly causally connected

18   to the basis for the subpoena at issue here in the sense of

19   but-for causation.

20        They promoted the Mirror Protocol and MIR tokens

21   through Terraform's website, web application, social media

22   accounts, interviews, and U.S. media.

23        Second, Kwon corresponded with U.S. digital asset

24   trading platform Coinbase regarding a listing of MIR tokens,

25   which is the governance token of the Mirror Protocol, leading

M2H8USSC

1    to a contract between Terraform and the U.S.-based trading

2    platform on the listing of MIR tokens.

3           Third, Kwon and a Terraform subsidiary entered into an

4    agreement with the U.S.-based digital trading platform under

5    which the U.S. entity paid at least $200,000 for MIR tokens.

6           Fourth, there was a custody agreement entered with a

7    U.S.-based entity for storing digital assets on behalf of

8    Terraform.

9           Fifth, there are employees in United States, including

10   the general counsel, which I think is telling.

11          Sixth, the mAssets mimic U.S. stocks and are plainly

12   being offered to U.S. customers.

13          And, finally, there is this sponsorship.  I note that

14   there is an NBC Sports online article from February 9, which

15   says, "The Nationals announced Wednesday a partnership with the

16   cryptocurrency community Terra, a decentralized autonomous

17   organization run by stakeholders rather than a traditional

18   corporate structure.  As part of the agreement, the

19   cryptocurrency Terra USD could be accepted at Nationals Park as

20   a form of payment as early as next season."

21          Finally, I note that some of the cases that Mr. Henkin

22   has, understandably and quite persuasively, relied on are

23   different because this is a different kind of entity, and that

24   is exactly what is being explored by the SEC.  And the fact

25   that this is something that was sort of kicked off and then

M2H8USSC

1    managed on an ongoing basis by the community makes it different

2    from a lot of prior case law, and that is exactly what the SEC

3    I think is exploring.

4           Taken all together, I think that there are clearly

5    sufficient contacts and sufficient personal availment

6    authorizing specific jurisdiction over both Kwon and Terraform,

7    and I find that service is proper, and therefore the

8    application to enforce the subpoena is granted.

9           MR. HENKIN:  Your Honor, at this point, Mr. Kwon and

10   TFL would like to seek a stay of your order pending appeal

11   under FRAP 8.  Would you like us to address that now while we

12   are on the call or in some other manner?

13          THE COURT:  How long would you like a stay?  I can't

14   remember if the rule provides a specific period.

15          MR. HENKIN:  The rule does not provide a specific

16   period.  We will obviously be filing a notice of appeal, and we

17   will ask for expedited treatment, expedited handling of the

18   appeal.  So we can get the notice of appeal filed as soon as

19   there is an order from which we can appeal, and we will get

20   that done expeditiously.  If your Honor filed it today, I would

21   promise you that we will get the notice of appeal filed no

22   later than Monday, or Tuesday, actually, because Monday is a

23   holiday, so to have the stay pending.  We would also file a

24   request for an expedited hearing by the Second Circuit.  So we

25   would ask for the stay to last for at least three months or

M2H8USSC

1   until the Second Circuit addresses it otherwise.

2                THE COURT:  All right.

3                Do you want to respond, Mr. Connor?

4                MR. CONNOR:  Your Honor, I have to confess I was not

5   prepared to address the law and the standards for a stay

6   pending appeal.  What I can say is that this is a very

7   important investigation to the SEC, and through respondents'

8   failure to comply with the subpoenas, our investigation

9   continues to be delayed.  So we would reserve all our rights in

10  opposing a motion for stay of your Honor's order.  So I think

11  our position is that the subpoena should be enforced in

12  accordance with the proposed order that we filed along with our

13  application.  But we are happy to address, if plaintiffs want

14  to file something, we are happy to research the issue and

15  respond in kind.

16               THE COURT:  OK.  For now I will issue the order

17  granting the application, and I will stay my decision for a

18  period of 14 days pending the request by respondents to submit

19  anything requesting more time.  But for now I will

20  automatically stay it for 14 days, and you can file either a

21  letter motion or formal motion, letter motion is fine,

22  requesting a longer stay and then the SEC can respond as soon

23  as possible to that.  What I would like is, whenever you file

24  it, if the SEC could respond within four business days, then I

25  can determine whether and how long to grant a longer stay.

M2H8USSC

1              Does that work?

2              MR. HENKIN:  That's perfect, your Honor.  Thank you.

3              THE COURT:  Anything else from Mr. Henkin today?

4              MR. HENKIN:  No, your Honor.

5              THE COURT:  From Mr. Connor?

6              MR. CONNOR:  Nothing from us.  Thank you, your Honor.

7              THE COURT:  Thanks, everyone.

8              We are adjourned.  Have a good day.

9              (Adjourned)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25