# EXHIBIT HHH

Brief of Amicus Curiae from the Chamber of
Commerce of the United States,
*In re: Coinbase, Inc.*, No. 23-1779
(3rd Cir. May 9, 2023)

No. 23-1779

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

_____

IN RE: COINBASE, INC.,

*Petitioner.*

_____

**On Petition for a Writ of Mandamus to the
United States Securities and Exchange Commission**

_____

**BRIEF OF *AMICUS CURIAE* THE CHAMBER OF
COMMERCE OF THE UNITED STATES OF AMERICA
IN SUPPORT OF PETITIONER**

_____

Tyler S. Badgley
Kevin R. Palmer*
U.S. CHAMBER LITIGATION
CENTER
1615 H Street N.W.
Washington, DC 20062
Telephone: (202) 463-5337

* Admitted only in Massachusetts.
Practicing under the supervision of
members of the D.C. bar.

Yaakov M. Roth
James M. Burnham
Alexis Zhang
JONES DAY
51 Louisiana Avenue N.W.
Washington, DC 20001
Telephone: (202) 879-3939
Facsimile: (202) 626-1700
yroth@jonesday.com

*Counsel for* Amicus Curiae

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Third Circuit Local Appellate Rule 26.1.1, *amicus* discloses that:

The Chamber of Commerce of the United States of America is a nonprofit, tax-exempt organization incorporated in the District of Columbia. The Chamber has no parent corporation, and no publicly held company has 10% or greater ownership in it.

## RULE 29 STATEMENTS

*Amicus* files this brief with the consent of all parties. *See* Fed. R. App. P. 29(a)(2). No party or party's counsel authored this brief in whole or in part or contributed money that was intended to fund preparing or submitting the brief. No person other than *amicus* and its counsel contributed money that was intended to fund preparing or submitting the brief. *See* Fed. R. App. P. 29(a)(4)(E).

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT .................................................................. i

RULE 29 STATEMENTS ........................................................................................... i

TABLE OF AUTHORITIES ...................................................................................... iii

INTEREST OF *AMICUS CURIAE* ............................................................................ 1

INTRODUCTION ..................................................................................................... 2

ARGUMENT ........................................................................................................... 4

I.  THE SEC'S DELAY IS CAUSING GREAT ECONOMIC HARM ...................................... 5

    A.  Regulatory Uncertainty Chills Economic Growth And Innovation .............. 5

    B.  The SEC's Refusal To Respond To Coinbase's Rulemaking Petition Or Otherwise Engage In Rulemaking Has Destabilized The Regulatory Environment For Digital Assets ................................. 8

II.  THE SEC'S APPROACH ABRIDGES REGULATED PARTIES' RIGHT TO FAIR NOTICE AND THE PUBLIC'S RIGHT TO NOTICE AND COMMENT .............. 12

CONCLUSION ...................................................................................................... 16

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Alaska Pro. Hunters Ass'n v. FAA,*
    177 F.3d 1030 (D.C. Cir. 1999) ...................................................................13

*Am. Broad. Co. v. FCC,*
    191 F.2d 492 (D.C. Cir. 1951) .............................................................. 5, 16

*Azar v. Allina Health Servs.,*
    139 S. Ct. 1804 (2019) ...................................................................15

*Balt. Gas & Elec. Co. v. FERC,*
    954 F.3d 279 (D.C. Cir. 2020) ...................................................................13

*Bell Tel. Co. of Pa. v. FCC,*
    503 F.2d 1250 (3d Cir. 1974) ...................................................................13

*Buckley v. Valeo,*
    424 U.S. 1 (1976) ...................................................................5

*Cmty. Nutrition Inst. v. Young,*
    818 F.2d 943 (D.C. Cir. 1987) ...................................................................15

*Cmty. Television of S. Cal. v. Gottfried,*
    459 U.S. 498 (1983) ...................................................................13

*Conn. Light & Power Co. v. NRC,*
    673 F.2d 525 (D.C. Cir. 1982) ...................................................................16

*Council Tree Commc'ns, Inc. v. FCC,*
    619 F.3d 235 (3d Cir. 2010) ...................................................................15

*Cutler v. Hayes,*
    818 F.2d 879 (D.C. Cir. 1997) .......................................................... 4, 5, 16

*De Niz Robles v. Lynch,*
    803 F.3d 1165 (10th Cir. 2015) ...................................................................8

*FCC v. Fox Television Stations, Inc.,*
    567 U.S. 239 (2012) ...................................................................12

*Fina Oil & Chem. Co. v. Norton,*
    332 F.3d 672 (D.C. Cir. 2003) ...................................................................16

*Fortyune v. City of Lomita,*
    766 F.3d 1098 (9th Cir. 2014) ...................................................................12

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*In re Voyager Digit. Holdings, Inc.*,
  649 B.R. 111 (Bankr. S.D.N.Y. 2023) ............................................................................. 10

*Mack Trucks, Inc. v. EPA*,
  682 F.3d 87 (D.C. Cir. 2012) ........................................................................................ 15

*MedImmune, Inc. v. Genentech, Inc.*,
  549 U.S. 118 (2007) ........................................................................................................ 5

*Mendoza v. Perez*,
  754 F.3d 1002 (D.C. Cir. 2014) ................................................................................... 15

*Nazareth Hosp. v. Sec'y U.S. Dep't of HHS*,
  747 F.3d 172 (3d Cir. 2014) ......................................................................................... 15

*NLRB v. Bell Aerospace Co. Div. of Textron, Inc.*,
  416 U.S. 267 (1974) ...................................................................................................... 12

*NRDC, Inc. v. U.S. EPA*,
  683 F.2d 752 (3d Cir. 1982) ................................................................................... 15, 16

*Oil, Chem. & Atomic Workers Union v. OSHA*,
  145 F.3d 120 (3d Cir. 1998) ........................................................................................... 4

*Patel v. INS*,
  638 F.2d 1199 (9th Cir. 1980) ...................................................................................... 14

*PBW Stock Exch., Inc. v. SEC*,
  485 F.2d 718 (3d Cir. 1973) ......................................................................................... 13

*SEC v. Chenery*,
  332 U.S. 194 (1947) ................................................................................................. 8, 14

*SNR Wireless LicenseCo, LLC v. FCC*,
  868 F.3d 1021 (D.C. Cir. 2017) ................................................................................... 13

*United States v. Harra*,
  985 F.3d 196 (3d Cir. 2021) ......................................................................................... 13

**STATUTES**

5 U.S.C. § 553 ................................................................................................................. 14

5 U.S.C. § 555 ................................................................................................................... 4

5 U.S.C. § 704 ................................................................................................................. 12

5 U.S.C. § 706 ............................................................................................................. 4, 12

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

**OTHER AUTHORITIES**

*4th Annual Global Crypto Hedge Fund Report 2022*, PwC (2022) ...........................6

Karen Brettell & Gertrude Chavez-Dreyfuss, *Crypto Market Cap Surges
    Above $1 Trillion for First Time*, Reuters (Jan. 7, 2021) ........................6

Center for Capital Markets Competitiveness, *Digital Assets: A Framework
    for Regulation to Maintain the United States' Status as an Innovation Leader*,
    U.S. Chamber of Commerce (Jan. 2021) ..........................6, 7, 8, 11

Center for Capital Markets Competitiveness, *Growth Engine*,
    U.S. Chamber of Commerce (Nov. 16, 2020).........................5

*Crypto Assets and Cyber Enforcement Actions*, SEC ...........................14

Nikhilesh De, *SEC Chair Gensler Declines to Say If Ether Is a Security in
    Contentious Congressional Hearing*, CoinDesk (Apr. 19, 2023)...................10

Jon Evans, *Vapor No More: Ethereum Has Launched*, TechCrunch
    (Aug. 1, 2015) ...........................9

Gary Gensler, *Testimony Before the United States House of Representatives
    Committee on Financial Services*, SEC (Oct. 5, 2021) ...................5

Carol R. Goforth, *Regulation by Enforcement: Problems with the SEC's
    Approach to Cryptoasset Regulation*, 82 Md. L. Rev. 107 (2022)...............10, 11

Paul Grewal, *Coinbase Takes Another Formal Step to Seek Regulatory Clarity
    from SEC for the Crypto Industry*, Coinbase (Apr. 24, 2023) ....................3

Paul Grewal, *The SEC Has Told Us It Wants to Sue Us Over Lend. We
    Don't Know Why*, Coinbase (Sept. 7, 2021) ....................10

Kevin Helms, *Crypto Exchange Bittrex Shuts Down US Operations Due to
    Regulatory Uncertainty*, Bitcoin.com News (Apr. 2, 2023) ...................7

Alyssa Hertig, *What Is Ether?*, CoinDesk ...........................9

William Hinman, *Digital Asset Transactions: When Howey Met Gary (Plastic)*,
    SEC (June 14, 2018) ...........................9

Ankush Khardori, *Can Gary Gensler Survive Crypto Winter? D.C.'s Top
    Financial Cop on Bankman-Fried Blowback*, N.Y. Mag (Feb. 23, 2023)...............9, 10

Paul Kiernan, *Republicans Pummel SEC's Gary Gensler Over Crypto Crackdown*,
    Wall Street J. (Apr. 18, 2023) ...........................3

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

Letter from Division of Corporation Finance, Office of Finance, SEC,
to Brian Armstrong, Chief Executive Officer, Coinbase Global, Inc.
(Dec. 7, 2020) ...................................................................................................9

Letter from Paul Grewal, Chief Legal Officer, Coinbase Global, Inc.,
to Vanessa A. Countryman, Secretary, SEC (July 21, 2022) ...........................3

Letter from Tom Quaadman, Executive Vice President, Center
for Markets Competitiveness, U.S. Chamber of Commerce,
to Vanessa A. Countryman, Secretary, SEC (Jan. 19, 2023) ...........................3

Ari Levy & MacKenzie Sigalos, *SEC's Gensler Says 'The Law Is Clear'*
*for Crypto Exchanges and that They Must Comply with Regulators*,
CNBC (Apr. 27, 2023) .................................................................................. 3, 14

Cheyenne Ligon, *SEC Chairman Gensler Suggests Again That Proof-of-Stake*
*Tokens Are Securities: Report*, CoinDesk (Mar. 16, 2023) ...............................10

Jordan Major, *Ripple Has Spent 'Over $100 Million on Legal Fees Fighting*
*SEC', the CEO Says*, Finbold (July 16, 2022) ..................................................11

Michael McSweeney, *Regulatory Uncertainty Keeps Traditional Asset Managers*
*Out of the Crypto Space, Survey Takers Say*, The Block (May 31, 2020) ............6

Dave Michaels, *Stablecoins Attract Scrutiny in SEC's Drive to Control Crypto*,
Wall Street J. (Feb. 22, 2023) ..........................................................................11

*Oversight of the Securities and Exchange Commission: Hearing Before the H. Fin.*
*Servs. Comm.*, 118th Cong. (2023) .............................................................. 3, 10

Hester M. Peirce, *Kraken Down: Statement on* SEC v. Payward Ventures,
Inc., et al., SEC (Feb. 9, 2023) ..........................................................................7

Hester M. Peirce, *On the Spot: Remarks at "Regulatory Transparency Project*
*Conference on Regulating the New Crypto Ecosystem: Necessary Regulation or*
*Crippling Future Innovation?"*, SEC (June 14, 2022) ........................................2

Hester M. Peirce, *Rendering Innovation Kaput: Statement on Amending the*
*Definition of Exchange*, SEC (Apr. 14, 2023) ...................................................6

Press Release, *Kraken to Discontinue Unregistered Offer and Sale of Crypto Asset*
*Staking-As-A-Service Program and Pay $30 Million to Settle SEC Charges*,
SEC (Feb. 9, 2023) ............................................................................................7

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

Release No. 8051-19, *In Case You Missed It: Chairman Tarbert Comments on Cryptocurrency Regulation at Yahoo! Finance All Markets Summit*, CFTC (Oct. 10, 2019) .................................................................................. 9

Mengqi Sun, *Regulatory Uncertainty Is a Barrier for Wider Bitcoin Adoption*, Wall Street J. (Apr. 6, 2022) ......................................................................... 6

Andrew Throuvalas, *CFTC Chair Says Ethereum Is a Commodity—Despite Gensler's 'Bitcoin Only' Position*, Decrypt (Mar. 8, 2023) ............................ 9

*Today's Cryptocurrency Prices by Market Cap*, CoinMarketCap ....................... 9

Jeff Wilser, *US Crypto Firms Eye Overseas Move Amid Regulatory Uncertainty*, CoinDesk (Mar. 30, 2023) ............................................................................ 7

David Yaffe-Bellany, *Inside a Crypto Nemesis' Campaign to Rein in the Industry*, N.Y. Times (Nov. 21, 2022) ........................................................................ 2

## INTEREST OF *AMICUS CURIAE*

The Chamber of Commerce of the United States of America is the world's largest business federation. It represents approximately 300,000 direct members and indirectly represents the interests of more than three million businesses and professional organizations of every size, in every industry sector, and from every region of the country. An important function of the Chamber is to represent the interests of its members in matters before Congress, the Executive Branch, and the courts. To that end, the Chamber regularly files *amicus curiae* briefs in cases, like this one, that raise issues of concern to the business community. The Chamber's members have a strong interest in regulatory clarity, and many of its members are companies subject to U.S. securities laws that may be adversely affected by the Securities and Exchange Commission's current approach to digital assets.

# INTRODUCTION

As it stands today, nobody knows for certain which digital assets, if any, are "securities" under federal law. That is no small question. It has immense implications for every person involved in the $1 trillion digital-asset economy, and it is the threshold regulatory question from which all others flow. But remarkably, the Securities and Exchange Commission—despite proclaiming itself the primary regulator of digital assets—has refused to resolve this threshold question. The Commission has instead offered a series of one-off enforcement actions, supplemented by public speeches and other statements that one commissioner broadly described as "confusing, unhelpful, and inconsistent."[1] And it has refused to engage in any rulemaking or other systematic process to explain what its claimed authority means.[2] By eschewing all formal, prospective processes, the SEC has also largely disabled the federal courts from reviewing the extremely contestable legal arguments underlying its expansive claimed authority. This strategy subverts basic tenets of due process, administrative law, and

---

[1] Hester M. Peirce, *On the Spot: Remarks at "Regulatory Transparency Project Conference on Regulating the New Crypto Ecosystem: Necessary Regulation or Crippling Future Innovation?"*, SEC (June 14, 2022), https://bit.ly/3VFVpVc.

[2] *See, e.g.*, David Yaffe-Bellany, *Inside a Crypto Nemesis' Campaign to Rein in the Industry*, N.Y. Times (Nov. 21, 2022), https://bit.ly/42eKVPc.

good governance. It amounts to a campaign to "punish[] digital-asset firms for allegedly not adhering to the law when they don't know it will apply to them."[3]

Seeking to improve this untenable situation, Coinbase petitioned the SEC in July 2022 to initiate a rulemaking regarding digital-asset securities.[4] It urged the Commission to answer basic questions, such as "which digital assets are securities"?[5] More than 1,700 commenters, including the Chamber, echoed Coinbase's call.[6]

The SEC has expressed no interest in addressing Coinbase's requested rulemaking. Rather, the Commission's Chairman has asserted that the securities laws are unambiguous as applied to blockchain-based digital assets.[7] Yet despite constructively denying Coinbase's petition, the SEC has refused to memorialize its decision in a formal response. As Coinbase's petition for mandamus explains, this

---

[3] Paul Kiernan, *Republicans Pummel SEC's Gary Gensler Over Crypto Crackdown*, Wall Street J. (Apr. 18, 2023), https://bit.ly/42qniCK (quoting *Oversight of the Securities and Exchange Commission: Hearing Before the H. Fin. Servs. Comm.*, 118th Cong. (2023) (statement of Rep. Patrick McHenry, Chairman, H. Fin. Servs. Comm.)).

[4] Letter from Paul Grewal, Chief Legal Officer, Coinbase Global, Inc., to Vanessa A. Countryman, Secretary, SEC (July 21, 2022), https://bit.ly/41eh7R8.

[5] *Id.*

[6] *See* Paul Grewal, *Coinbase Takes Another Formal Step to Seek Regulatory Clarity from SEC for the Crypto Industry*, Coinbase (Apr. 24, 2023), https://bit.ly/3NVtezw; Letter from Tom Quaadman, Executive Vice President, Center for Markets Competitiveness, U.S. Chamber of Commerce, to Vanessa A. Countryman, Secretary, SEC (Jan. 19, 2023), https://bit.ly/42xFElr.

[7] *See, e.g.*, Ari Levy & MacKenzie Sigalos, *SEC's Gensler Says 'The Law Is Clear' for Crypto Exchanges and that They Must Comply with Regulators*, CNBC (Apr. 27, 2023), https://bit.ly/3VANo3X.

monthslong recalcitrance violates the SEC's obligation to timely respond to petitions for rulemaking and warrants mandamus relief. *See* 5 U.S.C. §§ 555(b), 706(1); Mandamus Pet. at 17–22.

The Chamber submits this *amicus* brief to elaborate on one mandamus factor that renders relief particularly necessary here—"the consequences of the agency's delay." *Oil, Chem. & Atomic Workers Union v. OSHA*, 145 F.3d 120, 123 (3d Cir. 1998). Courts have identified the consequences of delay as "perhaps [the] most critical[]" consideration in assessing whether delay has become unreasonable, and this case is clearly one where "injury likely will result from avoidable delay." *Cutler v. Hayes*, 818 F.2d 879, 898 (D.C. Cir. 1997). This Court should grant Coinbase a writ of mandamus.

## ARGUMENT

An agency's justifications for delay "must always be balanced against the potential for harm." *Cutler*, 818 F.2d at 898. Here, harm is a certainty, for two reasons. *First*, the SEC's continued refusal to resolve Coinbase's rulemaking petition—and its attendant refusal to engage in rulemaking specific to digital assets—is causing substantial economic harm to both Coinbase and the broader business community. *Second*, the SEC's inaction substantially nullifies rights guaranteed by the Due Process Clause and the Administrative Procedure Act. For both reasons, the Court "must act

to make certain that what can be done is done." *Id.* (quoting *Am. Broad. Co. v. FCC*, 191 F.2d 492, 501 (D.C. Cir. 1951)).

## I.    THE SEC'S DELAY IS CAUSING GREAT ECONOMIC HARM.

### A.    Regulatory Uncertainty Chills Economic Growth And Innovation.

Legal uncertainty deters productive conduct and stifles innovation—a reality the courts have long understood. "[V]ague laws … operate to inhibit protected [conduct] by inducing citizens to steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked." *Buckley v. Valeo*, 424 U.S. 1, 41 n.48 (1976) (cleaned up). Quite understandably, very few people want to "bet the farm" and put themselves at risk of substantial liability. *See MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 129 (2007).

That is particularly true in the business community. As the SEC has elsewhere acknowledged, "[c]ompanies and investors alike … benefit from clear rules of the road."[8] Without clarity, firms are left to guess whether "they are in compliance with applicable … laws, or need to be in compliance with them at all," making it "difficult for [them] to operate for fear of an enforcement action."[9]

---

[8]    Gary Gensler, *Testimony Before the United States House of Representatives Committee on Financial Services*, SEC (Oct. 5, 2021), https://bit.ly/42qEmII.

[9]    Center for Capital Markets Competitiveness, *Growth Engine*, U.S. Chamber of Commerce, at 74 (Nov. 16, 2020), https://bit.ly/3NKoVXO.

The digital-asset industry offers a case study in how regulatory uncertainty undermines innovation. Before the Commission began rattling its saber, the industry grew quickly—reaching a trillion dollars in market capitalization by early 2021.[10] But the current Commission-fostered uncertainty has lowered the industry's growth ceiling by discouraging further investment in digital-asset endeavors and inhibiting broader adoption of digital-asset products.[11] For example, a recent survey of traditional hedge funds found that the majority were not investing in digital assets, and fully 83% of these firms cited regulatory uncertainty as a reason for not doing so.[12]

This regulatory cloud puts digital-asset companies to hard choices, leaving them to bear "unacceptable risk[s]" despite good-faith efforts at compliance.[13] Industry confusion about the rules—and whether they can even be satisfied—hampers innovation.[14] For existing products, there is an ever-present risk that the SEC will

---

[10] Karen Brettell & Gertrude Chavez-Dreyfuss, *Crypto Market Cap Surges Above $1 Trillion for First Time*, Reuters (Jan. 7, 2021), https://bit.ly/3B6omAc.

[11] Michael McSweeney, *Regulatory Uncertainty Keeps Traditional Asset Managers Out of the Crypto Space, Survey Takers Say*, The Block (May 31, 2020), https://bit.ly/3M27eli; Mengqi Sun, *Regulatory Uncertainty Is a Barrier for Wider Bitcoin Adoption*, Wall Street J. (Apr. 6, 2022), https://bit.ly/44BNdJt.

[12] *4th Annual Global Crypto Hedge Fund Report 2022*, PwC, at 3, 41 (2022), https://bit.ly/3HMdgUI.

[13] Center for Capital Markets Competitiveness, *Digital Assets: A Framework for Regulation to Maintain the United States' Status as an Innovation Leader*, U.S. Chamber of Commerce, at 10 (Jan. 2021), https://bit.ly/3M3h8mU.

[14] Hester M. Peirce, *Rendering Innovation Kaput: Statement on Amending the Definition of Exchange*, SEC (Apr. 14, 2023), https://bit.ly/41cTbxB.

suddenly file an enforcement action seeking a massive penalty.  In one recent action, for instance, the SEC punished an asserted violation of its registration requirements by not only ordering $30 million in penalties,[15] but enjoining the company at issue "from ever offering a staking service in the United States, registered or not."[16]  As a result, digital-asset companies have no choice but to consider the possibility of relocating or refocusing abroad, abandoning U.S. operations in favor of countries with more favorable regulatory environments.[17]

This dynamic does not just injure digital-asset businesses—it undermines broader American economic and strategic interests.  "[W]ith less innovation, investors have fewer opportunities for growing their retirement savings, and fewer jobs are created to drive the economy and promote growth."[18]  Americans lose out on the practical benefits that digital-asset products can provide, such as making the financial system more inclusive for the previously unbanked.[19]  And continued uncertainty has

---

[15]  Press Release, *Kraken to Discontinue Unregistered Offer and Sale of Crypto Asset Staking-As-A-Service Program and Pay $30 Million to Settle SEC Charges*, SEC (Feb. 9, 2023), https://bit.ly/416L8Cw.

[16]  Hester M. Peirce, *Kraken Down: Statement on* SEC v. Payward Ventures, Inc., et al., SEC (Feb. 9, 2023), https://bit.ly/3M3rUJI.

[17]  *See, e.g.,* Jeff Wilser, *US Crypto Firms Eye Overseas Move Amid Regulatory Uncertainty*, CoinDesk (Mar. 30, 2023), https://bit.ly/41aFnE0; Kevin Helms, *Crypto Exchange Bittrex Shuts Down US Operations Due to Regulatory Uncertainty*, Bitcoin.com News (Apr. 2, 2023), https://bit.ly/3NLsPQ9.

[18]  *Digital Assets* Report, *supra* note 13, at 47–48.

[19]  *Id.* at 49.

7

implications for our nation's geopolitical interests and the continued primacy of the dollar, given the increasing relevance of digital assets to international monetary policy.[20]

**B. The SEC's Refusal To Respond To Coinbase's Rulemaking Petition Or Otherwise Engage In Rulemaking Has Destabilized The Regulatory Environment For Digital Assets.**

This regulatory chaos is by design, not happenstance. The SEC has deliberately muddied the waters by claiming sweeping authority over digital assets while deploying a haphazard, enforcement-based approach. The Commission's attempt to pocket veto Coinbase's petition is just the latest example of its broader obfuscating strategy.

Agencies ordinarily provide regulatory clarity by promulgating rules of general applicability. In one of its seminal decisions on administrative law, the Supreme Court exhorted that "[t]he function of filling in the interstices of the [securities laws] should be performed, as much as possible, through th[e] quasi-legislative promulgation of rules." *SEC v. Chenery*, 332 U.S. 194, 202 (1947). This preference for rulemaking has important benefits: It forces agencies to put to paper their regulatory plans, and it provides for fixed, prospective effective dates that ensure parties can bring their conduct into conformance with the law rather than be held liable later for violating duties they did not know existed. *See id.*; *see also De Niz Robles v. Lynch*, 803 F.3d 1165, 1173 (10th Cir. 2015) (Gorsuch, J.) ("rulemaking offers more notice (due process) and better protects against invidious discrimination (equal protection)").

---

[20] *Id.* at 48.

As a new industry built atop unique technological innovations that enable novel economic arrangements, digital assets are ripe for rulemaking. Fundamental questions about the industry remain unresolved. For example, take ether—the world's second most popular digital asset. Ether has been around for almost a decade,[21] has a market capitalization exceeding $220 billion,[22] and is a fundamental building block in the industry.[23] Yet despite the ubiquity of ether, regulators *still* cannot agree on what it is. The Commodity Futures Trading Commission's consistent position has been that ether is a CFTC-regulated commodity.[24] But while the SEC once seemed to agree,[25] its Chairman recently suggested that actually ether is a security, and it thus falls under SEC jurisdiction.[26] And even more recently, this same Chairman zagged again—refusing to

---

[21] Jon Evans, *Vapor No More: Ethereum Has Launched*, TechCrunch (Aug. 1, 2015), https://bit.ly/3NQDUPX.

[22] *Today's Cryptocurrency Prices by Market Cap*, CoinMarketCap, https://bit.ly/3IFcoSs (last visited May 9, 2023).

[23] *See generally* Alyssa Hertig, *What Is Ether?*, CoinDesk, https://bit.ly/3MgZJY5 (last updated Aug. 19, 2022).

[24] *See, e.g.*, Release No. 8051-19, *In Case You Missed It: Chairman Tarbert Comments on Cryptocurrency Regulation at Yahoo! Finance All Markets Summit*, CFTC (Oct. 10, 2019), https://bit.ly/44E8geD; Andrew Throuvalas, *CFTC Chair Says Ethereum Is a Commodity—Despite Gensler's 'Bitcoin Only' Position*, Decrypt (Mar. 8, 2023), https://bit.ly/3M2fdyR.

[25] *See, e.g.*, William Hinman, *Digital Asset Transactions: When Howey Met Gary (Plastic)*, SEC (June 14, 2018), https://bit.ly/3HKviGV; Letter from Division of Corporation Finance, Office of Finance, SEC, to Brian Armstrong, Chief Executive Officer, Coinbase Global, Inc. (Dec. 7, 2020), https://bit.ly/3M7RFso.

[26] *See, e.g.*, Ankush Khardori, *Can Gary Gensler Survive Crypto Winter? D.C.'s Top Financial Cop on Bankman-Fried Blowback*, N.Y. Mag (Feb. 23, 2023),

clarify ether's status when questioned at a congressional hearing, and intoning only that "[i]t depends on the facts and the law."[27] These confused and conflicting pronouncements have created a regulatory environment that one judge recently described as "highly uncertain," with a future trajectory that is "virtually unknowable." *In re Voyager Digit. Holdings, Inc.*, 649 B.R. 111, 119 (Bankr. S.D.N.Y. 2023).

Instead of clarifying these issues via a simple rulemaking, the SEC has dribbled out its legal views *seriatim*, interjecting broad pronouncements in informal speeches between fact-specific, one-off enforcement actions.[28] Regulated parties are left to reconcile the agency's bold and sometimes contradictory public posturing (such as its Chairman's recent claim that almost *all* digital assets are securities[29]) with the more fact-specific positions the agency has taken or declined to take in particular proceedings (such as in refusing to explain *why* particular assets are securities[30]). And because the

---

https://bit.ly/3HPkDdU; Cheyenne Ligon, *SEC Chairman Gensler Suggests Again That Proof-of-Stake Tokens Are Securities: Report*, CoinDesk (Mar. 16, 2023), https://bit.ly/3VDGzyi.

[27] Nikhilesh De, *SEC Chair Gensler Declines to Say If Ether Is a Security in Contentious Congressional Hearing*, CoinDesk (Apr. 19, 2023), https://bit.ly/41bIzPE (quoting *Oversight of the Securities and Exchange Commission: Hearing Before the H. Fin. Servs. Comm.*, 118th Cong. (2023) (statement of Gary Gensler, Chairman, SEC)).

[28] *See generally* Carol R. Goforth, *Regulation by Enforcement: Problems with the SEC's Approach to Cryptoasset Regulation*, 82 Md. L. Rev. 107 (2022).

[29] Khardori, *supra* note 26.

[30] *See, e.g.*, *Voyager*, 649 B.R. at 120–22; Paul Grewal, *The SEC Has Told Us It Wants to Sue Us Over Lend. We Don't Know Why*, Coinbase (Sept. 7, 2021), https://bit.ly/42yoBQg.

SEC resolves most enforcement actions through settlement, its legal claims are rarely tested in court.[31]

This puts businesses and their customers to a difficult choice:  They can accept the risk of future litigation—and the associated financial burdens—or they can stop engaging in conduct that the agency might or might not ultimately target.[32]  The stakes for this choice are high, as many securities violations are strict-liability offenses.[33]  And even for companies willing to discontinue conduct the agency is likely to target, it is "difficult in many cases to determine with confidence" how the SEC's views translate to different factual contexts. [34]  Nor does the absence of a comparable prior enforcement action offer a safe harbor, as the absence of enforcement precedent is no assurance the agency will not take action in the future.[35]  Yet little else exists to guide regulated parties.

The SEC's inaction on Coinbase's petition for rulemaking prolongs this uncertainty and worsens its economic toll.  By constructively, but not formally, denying

---

[31]  Goforth, *supra* note 28, at 146–47.

[32]  *Cf.* Jordan Major, *Ripple Has Spent 'Over $100 Million on Legal Fees Fighting SEC', the CEO Says*, Finbold (July 16, 2022), https://bit.ly/41afSCB.

[33]  *Digital Assets* Report, *supra* note 13, at 54.

[34]  *Id.* at 56.

[35]   *Compare, e.g.*, Goforth, *supra* note 28, at 137–43 (discussing the uncertainty created by SEC inaction regarding "stablecoin" products), *with* Dave Michaels, *Stablecoins Attract Scrutiny in SEC's Drive to Control Crypto*, Wall Street J. (Feb. 22, 2023), https://bit.ly/44Dl7xB.

Coinbase's request for rulemaking, the SEC has withheld any semblance of regulatory clarity while preempting judicial scrutiny of both its specific interpretation of the securities laws and its broader regulatory strategy. *See* 5 U.S.C. § 704 (making *final* agency actions reviewable). That intransigence warrants mandamus to ensure Coinbase may obtain the review to which it is entitled. *See id.* § 706(1) (allowing courts to "compel agency action unlawfully withheld"); *NLRB v. Bell Aerospace Co. Div. of Textron, Inc.*, 416 U.S. 267, 294 (1974) ("there may be situations where [an agency's] reliance on adjudication [over rulemaking] would amount to an abuse of discretion").

## II. THE SEC'S APPROACH ABRIDGES REGULATED PARTIES' RIGHT TO FAIR NOTICE AND THE PUBLIC'S RIGHT TO NOTICE AND COMMENT.

The SEC's actions are not just harmful policy; they are unlawful; and the consequences of the SEC's continued delay are severe for that reason too. The SEC's unwillingness to announce the rules of the road *ex ante*, combined with its use of enforcement actions to impose or threaten liability *ex post*, conflicts with the Due Process Clause and basic principles of administrative law. And the SEC's continued inaction on Coinbase's rulemaking petition compounds these violations.

Most fundamentally, the SEC's approach contravenes digital-asset companies' right to fair notice of their regulatory obligations—a "fundamental principle in our legal system." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). Under the Due Process Clause, "[e]ntities regulated by administrative agencies have a … right to fair notice of regulators' requirements." *Fortyune v. City of Lomita*, 766 F.3d 1098, 1105 (9th

Cir. 2014). The Administrative Procedure Act further codifies this right by "incorporat[ing] basic principles of fair notice and equal treatment" in its mandate that agencies act reasonably. *Balt. Gas & Elec. Co. v. FERC*, 954 F.3d 279, 286 (D.C. Cir. 2020); *see also Alaska Pro. Hunters Ass'n v. FAA*, 177 F.3d 1030, 1035 (D.C. Cir. 1999) ("Those regulated by an administrative agency are entitled to 'know the rules by which the game will be played.'"). Thus, an agency cannot sanction regulated parties unless there is "ascertainable certainty" about "the standards with which the agency expects them to conform." *SNR Wireless LicenseCo, LLC v. FCC*, 868 F.3d 1021, 1043 (D.C. Cir. 2017) (cleaned up); *accord United States v. Harra*, 985 F.3d 196, 213 (3d Cir. 2021).

Where a regulatory regime is instead marked by "considerable uncertainty," *SNR Wireless LicenseCo*, 868 F.3d at 1044, the principle of fair notice establishes that rulemaking is the proper channel for agency action. *See Cmty. Television of S. Cal. v. Gottfried*, 459 U.S. 498, 511 (1983) (given notice problems, "rulemaking is generally a 'better, fairer, and more effective' method of implementing a new industry-wide policy"). After all, rulemaking is how agencies set generally applicable policies that will govern prospectively, whereas enforcement actions seek to sanction particular parties for conduct that has already occurred. *PBW Stock Exch., Inc. v. SEC*, 485 F.2d 718, 722 (3d Cir. 1973). This Court has accordingly recognized as "logical" and "persuasive" a judicial preference for "rule-making over adjudication for the formulation of new policy." *Bell Tel. Co. of Pa. v. FCC*, 503 F.2d 1250, 1265 (3d Cir. 1974) (citing cases).

13

Nor does the digital-asset industry *writ large* present one of the "limited circumstances" in which the Supreme Court has conceded that "adjudication would be preferable to rulemaking." *Patel v. INS*, 638 F.2d 1199, 1204 (9th Cir. 1980). The SEC has been filing digital-asset-related enforcement actions for 10 years now,[36] so it cannot be said that the need for regulatory clarity in this sphere is "not reasonably foresee[able]" or that the SEC lacks "sufficient experience" to provide more than a "tentative judgment." *Chenery Corp.*, 332 U.S. at 202. And even if particular issues within the industry are too "specialized and varying in nature" to allow for general rulemaking, it cannot be said that *all* problems related to digital assets are so varied, especially when the SEC's (implausible) position is that digital assets do *not* present regulatory ambiguities.[37] *Id.* at 203. Put frankly, there are no special characteristics of the digital-asset industry that relieve the SEC of its statutory and constitutional duty to regulate with clarity.

Moreover, the SEC's evasion of its rulemaking procedures does not affect regulated parties alone; it deprives the entire public of its right to be heard under the APA. One of the core requirements of the APA is that, before an agency issues a new rule, it must publish a notice of proposed rulemaking in the Federal Register and invite public comment from all interested persons. 5 U.S.C. § 553(b)–(c). This process is

---

[36] *See Crypto Assets and Cyber Enforcement Actions*, SEC, https://bit.ly/419sABv (last updated Mar. 9, 2023).

[37] Levy & Sigalos, *supra* note 7.

14

important both to uphold "democratic values served by public participation," *Cmty. Nutrition Inst. v. Young*, 818 F.2d 943, 951 (D.C. Cir. 1987) (Starr, J., concurring in part and dissenting in part), and to improve the quality of agency decision-making, *Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1816 (2019). Particularly in an innovation-focused sector like the digital-asset industry, this latter benefit is "especially valuable" because agency decisions "can impact millions of people and billions of dollars in ways that are not always easy for regulators to anticipate." *Id.*

Accordingly, the APA framework contains numerous checks to ensure that agencies do not give the notice-and-comment process short shrift. The Act allows agencies to skip over the process only in "rare" circumstances, *NRDC, Inc. v. U.S. EPA*, 683 F.2d 752, 764 (3d Cir. 1982) (quotation marks omitted), such as in "emergency situations" of "life-saving importance," *Mack Trucks, Inc. v. EPA*, 682 F.3d 87, 93 (D.C. Cir. 2012) (quotation marks omitted). Otherwise, agencies must not only invite public input, but also respond to all significant comments and seek additional comment if their plans evolve too far from the original proposal. *Nazareth Hosp. v. Sec'y U.S. Dep't of HHS*, 747 F.3d 172, 185 (3d Cir. 2014); *Council Tree Commc'ns, Inc. v. FCC*, 619 F.3d 235, 249–50 (3d Cir. 2010). And courts have not hesitated to reject agency actions that circumvent notice-and-comment procedures. *See Allina Health Servs.*, 139 S. Ct. at 1812 ("Agencies have never been able to avoid notice and comment simply by mislabeling their substantive pronouncements."); *see also, e.g.*, *Mendoza v. Perez*, 754 F.3d 1002, 1025

(D.C. Cir. 2014); *Fina Oil & Chem. Co. v. Norton*, 332 F.3d 672, 676 (D.C. Cir. 2003); *NRDC*, 683 F.2d at 768.

By proceeding through enforcement, the SEC has denied the public any opportunity to comment on its invocation of Depression-era laws to assert jurisdiction over a trillion-dollar industry predicated on an entirely new technological innovation. And by sitting on Coinbase's rulemaking petition, the SEC is disregarding *sub silentio* more than 1,700 commenters' warnings about the harms of its enforcement-based approach. These evasions do not comport with the "process of reasoned decision-making" that the APA requires. *See Conn. Light & Power Co. v. NRC*, 673 F.2d 525, 528 (D.C. Cir. 1982).

## CONCLUSION

"[I]f an agency's failure to proceed expeditiously will result in harm or substantial nullification of a [protected] right …, 'the courts must act to make certain that what can be done is done.'" *Cutler*, 818 F.2d at 898 (quoting *Am. Broad. Co.*, 191 F.2d at 501). The Court should grant Coinbase a writ of mandamus.

May 9, 2023                            Respectfully submitted,

                                         __s/ Yaakov M. Roth__

Tyler S. Badgley                          Yaakov M. Roth

Kevin R. Palmer*                      James M. Burnham

U.S. CHAMBER LITIGATION        Alexis Zhang

CENTER                                    JONES DAY

1615 H Street N.W.                    51 Louisiana Avenue N.W.

Washington, DC 20062            Washington, DC 20001

Telephone: (202) 463-5337       Telephone: (202) 879-3939

                                         Facsimile: (202) 626-1700

* Admitted only in Massachusetts.    yroth@jonesday.com

Practicing under the supervision of

members of the D.C. bar.

*Counsel for* Amicus Curiae

## COMBINED CERTIFICATIONS

1.      Pursuant to Third Circuit L.A.R. 28.3(d), at least one of the attorneys whose names appear on this motion, including the undersigned, is a member in good standing of the bar of this Court.

2.      This brief complies with the word limit of Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 3,798 words. This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced 14-point serif font (Garamond), using Microsoft Word.

3.      Pursuant to Third Circuit L.A.R. 31.1(c), the text of the electronic version of this document is identical to the text of the paper copies filed with the Court.

4.      Pursuant to Third Circuit L.A.R. 31.1(c), Microsoft Safety Scanner version 1.389.757.0 has been run on this electronic file and no virus was detected.


Dated:  May 9, 2023


   **s/ Yaakov M. Roth**   
Yaakov M. Roth

*Counsel for* Amicus Curiae

## CERTIFICATE OF SERVICE

I hereby certify that, on May 9, 2023, I filed the foregoing using this Court's CM/ECF system, which effected service on all parties.

Dated: May 9, 2023

**__s/ Yaakov M. Roth__**
Yaakov M. Roth

*Counsel for* Amicus Curiae