# EXHIBIT JJJ

Representative Patrick Henry, Letter to Representatives Kay Granger and Rosa DeLauro, May 9, 2023.

PATRICK McHENRY, NC
CHAIRMAN

MAXINE WATERS, CA
RANKING MEMBER

United States House of Representatives
One Hundred Eighteenth Congress
Committee on Financial Services
2129 Rayburn House Office Building
Washington, DC 20515

May 9, 2023

The Honorable Kay Granger
Chairwoman
Committee on Appropriations
H-307, the Capitol
Washington DC 20515

The Honorable Rosa DeLauro
Ranking Member
Committee on Appropriations
1016 Longworth HOB
Washington D.C. 20515

Dear Chairwoman Granger and Ranking Member DeLauro:

I write regarding the Committee on Appropriations (Committee)'s upcoming work on the fiscal year 2024 spending packages and offer the following insights. Beginning in 2021, Washington Democrats used their then one-party rule to push through massive spending bills that sent inflation to levels not seen since the 1980s. The trillions of dollars in reckless spending have endangered a fragile economy and created more economic hardship for working families trying to emerge from a global pandemic.

To get our economy back on track, Congress must be united in reining in wasteful spending. It must get back to the free-market principles that helped grow our economy prior to the pandemic. This means encouraging entrepreneurship and strengthening our capital markets. It means embracing technology to nurture innovation and fostering a strong and vibrant financial system that can support small businesses, community financial institutions, and households.

A strong economy and financial system projects strength abroad. The United States can't outcompete China by being more like China. It can only counter China's growing threat by sticking to the policies and principles that support long-term economic growth and prosperity.

As you prioritize spending for FY 2024, I urge you to consider the following:

1. **Rescind unspent "emergency" funds and provide for greater transparency and accountability in future spending bills**

Three years ago, Congress passed the bipartisan CARES Act and later the 2020 Consolidated Appropriations Act to support the economy during the government imposed shut down. The

funding was timely, targeted, and tied to Covid. It also created a multi-layered oversight ecosystem to protect the funds against waste, fraud, and abuse. The Special Pandemic Recovery Inspector General (SPRIG) was created and continues to monitor the use of these funds.

In contrast, much of the $1.9 trillion Democrats injected into the economy, under the guise of "emergency relief," remains unspent. For example, earlier this year, it was reported that more than a third of the $350 billion made available to state and local governments was unspent. As of March, billions more made available for the "emergency" State Small Business Initiative (SSBCI) remained unobligated.

- o The Committee should rescind these and any additional, unspent "emergency" funds immediately. Separately, Congress should bring the obligated "relief" spending under the purview of the Special Pandemic Recovery Inspector General (SPRIG) to ensure these funds are used as intended.

- o Additionally, the Committee should ensure the trillions spent on infrastructure in 2021 and to reduce inflation in 2022 are scrutinized. The Committee should ensure the respective agency Inspector Generals (IGs), which are established to combat waste, fraud, and abuse in the programs and operations of that agency, and the SPRIG are fully funded.

2. **Strengthen public markets, support retail investors, and encourage entrepreneurship**

The Securities and Exchange Commission (SEC) has a tripartite mandate to protect investors; maintain fair, orderly, and efficient markets; and facilitate capital formation. Under Chair Gensler's tenure, the SEC has failed to uphold this mission, threatening the vibrancy of our capital markets.

For example, the SEC's proposed mandatory Swing Pricing rule would harm millions of American investors. The SEC proposal requires mutual funds to impose a "hard close" cut-off time on when investors can buy and sell their shares. This means that millions of American investors will not get the best price for their trades.

- o The Committee should prohibit funds from being made available to the SEC to develop, promulgate, or implement final regulations regarding "Open-End Fund Liquidity Risk Management Programs and Swing Pricing: Form N-Port Reporting" (Release Nos. 33-11130; File No. S7-26-22).

Separately, the SEC is proposing to rewrite the regulations governing the structure of our equity markets, including how orders are priced, executed and displayed to the public, without pointing to any market failure.

- o The Committee should prohibit funds from being made available to the SEC to develop, promulgate, or implement final regulations regarding "Regulation Best Execution"

(Release No. 34-96496; File No. S7-32-22); "Order Competition Rule" (Release No. 34-96495; File No. S7-31-22); and "Regulation NMS: Minimum Pricing Increments, Access Fees, and Transparency of Better Priced Orders" (Release No. 34-96494; File No. S7-30-22).

Chair Gensler and others continue to attack our public markets with mandatory disclosures - redefining the well-established role of materiality. Gensler and Democrat efforts to deviate from this standard will overload investors with immaterial, incomparable, and unreliable data. This will raise a public company's compliance costs as well as deter companies from going public.

- o The Committee should prohibit making funds available to the SEC to develop, promulgate or implement final regulations regarding "The Enhancement and Standardization of Climate-Related Disclosures for Investors" (Release No. 33-11042; File No. S7-10-22) or any other regulations relating to ESG, political spending, and/or climate disclosures for issuers that the SEC may propose.

Relatedly, the SEC's costly rulemaking proposals have resulted in higher compliance costs, making public markets less attractive. To force companies to go public, the SEC may now recommend a series of proposals, including changes to the "held of record" definition. [1]

- o The Committee should prohibit funds from being made available to the SEC to develop, promulgate, or implement final regulations that would, directly or indirectly (by changing the definition of securities held of record or otherwise), force private companies to go public before they would otherwise choose to.

3. **Nurture Innovation in the United States**

Digital assets, and their underlying blockchain technology, hold promise as the building blocks for the next generation of internet technology. But it's the job of lawmakers—not unelected bureaucrats—to legislate a regulatory framework. Moreover, it is critical that the Committee prevent the SEC from continuing its effort to regulate by enforcement. Establishing clear rules of the road ensures this innovation will remain in the United States.

- o The Committee should prevent a budget increase for the SEC Enforcement Division. The SEC has already brought 130 enforcement actions against crypto assets using its existing budget. It does not need an additional 50 staff to add further uncertainty to this nascent industry.

---

[1] Previously, under the Exchange Act, a company that had more than $10 million in total assets and a class of equity securities "held of record" by 500 or more persons was required to register under the Exchange Act and was subject to corresponding compliance and reporting obligations. The JOBS Act amended Section 12(g)(1) of the Exchange Act to raise the threshold for the number of holders of record triggering registration to either 2,000 holders of record or 500 holders of record that are not accredited investors, whichever first occurs.

- o The Committee should prohibit funding for Staff Accounting Bulletin 121. SAB 121, issued late last year, precludes banking organizations from serving clients seeking digital asset safeguarding services. This has the effect of deterring market participants from entering or staying in the digital asset ecosystem. Moreover, such policy decisions made by staff circumvent the notice and comment requirements set forth in the Administrative Procedure Act and should not be funded.

- o Finally, the Committee should prohibit funding to enforce the custody rule. Under the proposed custody rule, investment advisors may not be able to rely on crypto platforms as qualified custodians. This in effect reduces the number of qualified crypto custodians, which will result in less consumer protection in this space.

**4. Counter China's growing influence and strengthen national security**

The Chinese Communist Party (CCP) continues to deliberately undermine United States interests and are contrary to core United States values and the values of other nations. The U.S. must recommit to free markets and free people, preventing China from rewriting the international rules of the road, and maintaining an open, vibrant, and resilient economic system.

- o The Committee should prohibit any new authorizations or capital increases for the International Financial Institutions. Specifically, the Committee should resist efforts to fund the IMF's Resilience and Sustainability Trust (RST).

- o The Committee should resist efforts to support or fund any executive order to support an outbound investment screening initiative. It is not the job nor should the Committee on Foreign Investments in the United States (CFIUS) block U.S. investors from taking over Chinese companies.

Separately, three years ago, Congress made clear its agreed-upon framework for reporting and collecting beneficial ownership information in Division F of the National Defense Authorization Act, Fiscal Year 2021. Disconcertingly, the Financial Crimes Enforcement Network (FinCEN) has failed to implement this statutory directive as intended.

- o The Committee should prohibit funds from going to FinCEN to implement or promulgate the beneficial ownership reporting rules that do not currently reflect Congressional intent.

**5. Fostering a strong and vibrant Financial System**

Since its creation, the Democrats have sought to weaponize the Consumer Financial Protection Bureau (CFPB). In establishing the CFPB, Democrats made it the most powerful agency -- unaccountable to Congress. In 2020, the Supreme Court held, in *Seila Law LLC v. Consumer Financial Protection Bureau*, that the CFPB's leadership structure is unconstitutional as a

violation of the separation of powers.[2]  Next term, the constitutionality of the CFPB's funding structure will be heard by the U.S. Supreme Court. In the interim, the Committee should:

- Put the CFPB on an annual appropriations cycle.
- Fund a separate dedicated Inspector General to the CFPB.
- Prohibit funds from being used to implement Section 1071 of the Dodd Frank Act

There have been internal and external efforts over the last several years to shift the U.S. Post Office's focus away from its core mission to provide mail services and towards nonbank financial services.

- The Committee should resist efforts to provide funds to support postal nonbank financial services programs.

I look forward to working with you to ensure the Committee has all the information it needs to complete its work this coming appropriations season.

Sincerely,

Patrick McHenry
Chairman

Cc: The Honorable Maxine Waters, Ranking Member

---

[2] *Seila Law LLC v. Consumer Financial Protection Bureau*, 140 S. Ct. 2183, 207 L. Ed. 2d 494 (2020), https://www.supremecourt.gov/opinions/19pdf/19-7_new_bq7d.pdf.