**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | Civil Action No. 1:23-cv-01346-JSR |
| v. | Hon. Jed S. Rakoff |
| TERRAFORM LABS, PTE. LTD. and DO HYEONG KWON, | |
| Defendants. | |

## <u>REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT</u>

## <u>TABLE OF CONTENTS</u>

Page

ARGUMENT ........................................................................................................................ 1

I.      THE SEC FAILS TO ESTABLISH PERSONAL JURISDICTION ................................. 1

      A.     The Contracts Alleged Are Insufficient Grounds for Personal Jurisdiction .......... 2
      B.     Allegations of TFL's U.S.-Based Employees Are Insufficient ............................ 3
      C.     Allegations of Marketing and Travel Are Insufficient .......................................... 4

II.     THE SEC HAS NOT ESTABLISHED THAT ANY TOKENS ARE SECURITIES ....... 5
III.    THE DIGITAL ASSETS AT ISSUE ARE NOT SECURITIES ...................................... 9
IV.     THE REGISTRATION CLAIMS FAIL ........................................................................ 12
V.      THE SECURITIES FRAUD CLAIMS FAIL ................................................................ 15

      A.     The SEC Has Not Plead a Violation of '33 Act Section 17(a)(2) or (a)(3). ......... 15
      B.     The SEC Has Not Pled a Violation of '34 Act Section 10(b) or '33 Act
            Section 17(a)(1) ................................................................................................... 19

CONCLUSION .................................................................................................................. 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.*,
    141 S. Ct. 2485 (2021) ................................................................................................5, 6

*Balestra v. ATBCOIN LLC*,
    380 F. Supp. 3d 340 (S.D.N.Y. 2019) ...............................................................................4

*Bertolini-Mier v. Upper Valley Neurology, P.C.*,
    2017 WL 4081901 (D. Vt. Sept. 13, 2017) .......................................................................4

*Best Van Lines, Inc. v. Walker*,
    490 F.3d 239 (2d Cir. 2007) ..............................................................................................4

*Bissonnette v. Podlaski*,
    138 F. Supp. 3d 616 (S.D.N.Y. 2015) ...............................................................................3

*Bittner v. United States*,
    143 S. Ct. 713 (2023) .........................................................................................................9

*Brown v. U.S. Dep't of Educ.*,
    No. 4:22-cv-0908, 2022 WL 16858525 (N.D. Tex. Nov. 10, 2022) ...........................5, 6, 7

*BST Holdings, L.L.C. v. OSHA*,
    17 F. 4th 604 (5th Cir. 2021) .............................................................................................5

*Byron v. Bronx Parent Hous. Network*,
    No. 1:21-CV-02568 (MKV), 2023 WL 2585824 (S.D.N.Y. Mar. 20, 2023) ....................1

*Casio Computer Co. v. Sayo*,
    No. 1:98cv03772, 2000 WL 1877516 (S.D.N.Y. Sept. 20, 1999) .....................................3

*Chirag v. MT Marida Marguerite Schiffahrts*,
    604 F. App'x 16 (2d Cir. 2015) .......................................................................................1, 2

*Christopher v. SmithKline Beecham Corp.*,
    132 S. Ct. 2156 (2012) .......................................................................................................8

*Clarke v. Tango Networks, Inc.*,
    2021 WL 6095328 (S.D. W. Va. Dec. 23, 2021) ..............................................................4

*De Niz Robles v. Lynch*,
    803 F.3d 1165 (10th Cir. 2015) (Gorsuch, J.) ...................................................................8

*In re del Valle Ruiz*,
   939 F.3d 520 (2d Cir. 2019)............................................................................1

*Duncan v. Walker*,
   533 U.S. 167 (2001)......................................................................................9

*In re Elan Corp. Sec. Litig.*,
   543 F. Supp. 2d 187 (S.D.N.Y. 2008).........................................................17

*Fields v. Sickle Cell Disease Assoc. of Am., Inc.*,
   376 F. Supp. 3d 647 (E.D.N.C. 2018), *aff'd*, 770 F. App'x 77 (4th Cir. 2019)........................4

*Filetech S.A. v. France Telecom S.A.*,
   304 F.3d 180 (2d Cir. 2002)..........................................................................2

*Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*,
   529 U.S. 120 (2000)......................................................................................5

*Forties B LLC v. Am. W. Satellite, Inc.*,
   725 F. Supp. 2d 428 (S.D.N.Y. 2010) (Rakoff, J.) .....................................4

*Gary Plastic Packaging Corp. v. Merrill Lynch, Inc.*,
   756 F.2d 230 (2d Cir. 1985).........................................................................12

*Goldfarb v. Channel One Russia*,
   442 F. Supp. 3d 649 (S.D.N.Y. 2020)..........................................................3

*Gucci Am., Inc. v. Weixing Li*,
   135 F. Supp. 3d 87 (S.D.N.Y. 2015)............................................................2

*In re Hardinge, Inc. Sec. Litig.*,
   696 F. Supp. 2d 309 (W.D.N.Y. 2010) ......................................................17

*Hill v. HSBC Bank*
   *plc*, 207 F. Supp. 3d 333, 340 (S.D.N.Y. 2016).........................................3

*Hocking v. Dubois*,
   885 F.2d 1449 (9th Cir. 1989) .....................................................................9

*In re Initial Pub. Offering Sec. Litig.*,
   383 F. Supp. 2d 566, 583 (S.D.N.Y.), *opinion supplemented on
   reconsideration*, 399 F. Supp. 2d 261 (S.D.N.Y. 2005) ............................17

*Kentucky v. Biden*,
   23 F.4th 585 (6th Cir. 2022) ........................................................................6

*Miller v. Mercuria Energy Trading, Inc.*,
   291 F. Supp. 3d 509 (S.D.N.Y. 2018) (Rakoff, J.) ....................................3

*Miller v. Mercuria Energy Trading, Inc.*,
    774 F. App'x 714 (2d Cir. 2019) ..........................................................3

*Minholz v. Lockheed Martin Corp.*,
    227 F. Supp. 3d 249 (N.D.N.Y. 2016) ...............................................4

*Nat'l Treasury Employees Union v. Reagan*,
    685 F. Supp. 1346 (E.D. La. 1988)......................................................8

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000)...............................................................20

*Owen v. Elastos Foundation*,
    No. 1:19-cv-5462-GHW, 2021 WL 5868171 (S.D.N.Y. Dec. 9, 2021) ....................4

*Pehlivanian v. China Gerui Advanced Materials Grp., Ltd.*,
    153 F. Supp. 3d 628 (S.D.N.Y. 2015)..........................................15, 16

*Perry v. Nat'l Ass'n of Home Builders of the U.S.*,
    2020 WL 5759766 (D. Md. Sept. 28, 2020) ......................................4

*Pfaff v. U.S. Dept. of Housing and Urban Devel.*,
    88 F. 3d 739 (9th Cir. 1996) .................................................................9

*Philip Morris USA Inc. v. Veles Ltd.*,
    No. 1:06-cv-02988, 2007 WL 725412 (S.D.N.Y. Mar. 12, 2007).............................2

*R. A. Holman & Co. v. SEC*,
    366 F.2d 446 (2d Cir. 1966)...............................................................13

*Rapoport v. Asia Electronics Holding Co., Inc.*,
    88 F.Supp.2d 179 (S.D.N.Y.2000)......................................................1

*Red Fort Capital, Inc. v. Guardhouse Prods, LLC*,
    397 F. Supp. 3d 456 (S.D.N.Y. 2019)..........................................10, 16

*Revak v. SEC Realty Corp.*,
    18 F.3d 82 (2d *Cir.* 1994) ....................................................................11

*Roper Starch Worldwide, Inc. v. Reymer & Assocs., Inc.*,
    2 F. Supp. 2d 470 (S.D.N.Y. 1998)......................................................3

*Rothman v. Gregor*,
    220 F.3d 81 (2d Cir. 2000)....................................................................1

*S.E.C. v. Constantin*,
    939 F. Supp. 2d 288(S.D.N.Y. 2013).................................................20

*S.E.C. v. DiMaria*,
    207 F. Supp. 3d 343 (S.D.N.Y. 2016) ....................................................................18

*S.E.C. v. Espuelas*,
    698 F. Supp. 2d 415 (S.D.N.Y. 2010) ....................................................................19

*S.E.C. v. PlexCorps*,
    No. 1:17-CV-07007, 2018 WL 4299983 (E.D.N.Y. Aug. 9, 2018) ..........................5

*S.E.C. v. Rio Tinto*,
    41 F.4th 47 (2d Cir. 2022) ......................................................................................18

*S.E.C. v. Stoker*,
    865 F. Supp. 2d 457 (S.D.N.Y. 2012) ....................................................................18

*S.E.C. v. Syron*,
    934 F. Supp. 2d 609 (S.D.N.Y. 2013) ...............................................................18, 20

*S.E.C. v. Wey*,
    246 F. Supp. 3d 894 (S.D.N.Y. 2017) ....................................................................18

*SEC v. Aqua-Sonic Prods.*,
    524 F. Supp. 866 (S.D.N.Y. 1981), *aff'd*, 687 F.2d 577 (1982) ...............................9

*SEC v. Chenery*,
    332 U.S. 194 (1947) ..................................................................................................8

*SEC v. Glen-Arden Commodities, Inc.*,
    493 F.2d 1027 (2d Cir. 1974) ..................................................................................12

*SEC v. Kelly*,
    817 F. Supp. 2d 340 (S.D.N.Y. 2011) ....................................................................19

*SEC v. Kik Interactive Inc.*,
    492 F. Supp. 3d 169 (S.D.N.Y. 2020) ..........................................................10, 11, 12

*SEC v. MiMedx Grp., Inc.*,
    No. 1:19-CV-10927, 2022 WL 902784 (S.D.N.Y. Mar. 28, 2022) ..........................18

*SEC v. Sugarman*,
    No. 1:19cv5998, 2020 WL 5819848 (S.D.N.Y. Sept. 30, 2020) ..............................19

*SEC v. Terraform Labs Pte Ltd.*,
    No. 22-368, 2022 WL 2066414 (2d Cir. June 8, 2022) .............................................2

*SEC v. Universal Exp., Inc.*,
    475 F. Supp. 2d 412 (S.D.N.Y. 2007) ....................................................................12

*SEC v. W.J. Howey, Co.*,
  328 U.S. 293 (1946) ............................................................................... *passim*

*In re Sibanye Gold Ltd. Sec. Litig.*,
  No. 18-cv-3721, 2020 WL 6582326 (E.D.N.Y. Nov. 10, 2020) ...............................17

*Simuro v. Shedd*,
  2013 WL 3829627 (D. Vt. July 23, 2013) ........................................................15

*Sullivan v. Barclays PLC*,
  No. 1:13-CV-02811, 2017 WL 685570 (S.D.N.Y. Feb. 21, 2017)...............................3

*In re Time Warner Inc. Sec. Litig.*,
  9 F.3d 259 (2d Cir. 1993) .........................................................................17

*Tongue v. Sanofi*,
  816 F.3d 199 (2d Cir. 2016).......................................................................16

*U.S. v. Martoma*,
  2013 WL 6632676 (S.D.N.Y. Dec. 17, 2013) .......................................................11

*In re UBS AG Sec. Litig.*,
  No. 1:07-CV-11225, 2012 WL 4471265 (S.D.N.Y. Sept. 28, 2012) ...............................16

*United States v. Chiarella*,
  445 U.S. 222 (1980)................................................................................9

*In re Vivendi, S.A. Sec. Litig.*,
  838 F.3d 223 (2d Cir. 2016).......................................................................17

*W. Virginia v. Env't Prot. Agency*,
  142 S. Ct. 2587 (2022)..........................................................................5, 6

**Statutes**

5 United States Code § 551(4) .....................................................................8

Exchange Act of 1934...........................................................................*passim*

Responsible Financial Innovation Act, S.4356, 117th Cong. § 403 (2022) ...................6

Securities Act of 1933.........................................................................*passim*

Securities Clarity Act...........................................................................6

**Other Authorities**

17 Code of Federal Regulations § 230.903...........................................................13

31 Code of Federal Regulations § 1010.100 (2014) ....................................................11

80 Federal Register 48963 at 48976 (Aug. 14, 2015)...............................................14

*Compare Hearing: Understanding Stablecoins' Role in Payments and the Need for Legislation*, U.S. House Financial Services Committee (Apr. 19, 2023, 10:00 AM), https://bit.ly/3BHDhB9 ..............................................................6

*Framework for "Investment Contract" Analysis of Digital Assets*, at n.1 (Apr. 3, 2019), https://bit.ly/3Mn15z0 ....................................................................7

*Hearing: Oversight of the Securities and Exchange Commission*, U.S. House Financial Services Committee at 5:36:43 (Apr. 18, 2023), https://bit.ly/3Ml9uT......................................................................8

*Hearing: Putting the 'Stable' in 'Stablecoins:' How Legislation Will Help Stablecoins Achieve Their Promise*, U.S. House Financial Services Committee, at 1:29:55-1:30:33, (May 18, 2023, 9:00 AM), https://bit.ly/3BIpRFa ..................................................................2, 6, 13

*'Historic' Hearing Spotlights Deep Split On Crypto Regulation*, Law360 (May 10, 2023), https://www.law360.com/articles/1605889 ...................................6

*No-Action Letter: TurnKey Jet, Inc.* (Apr. 2, 2019), https://bit.ly/3WlUppn ................7

SEC Release No. 6863, *Offshore Offers and Sales* (Apr. 24, 1990.............................13

Securities Regulation Genesis Block Proposal, https://www.sec.gov/rules/petitions/2022/petn4-782.pdf ..........................7

Steven Ehrlich, Shining A Light On Crypto Market Capitalization, Forbes (Mar. 13, 2023), https://bit.ly/42S5P6Y ......................................................5

Defendants[1] respectfully submit this Reply in support of their Motion to Dismiss the AC. The SEC's Opposition fails to respond materially to Defendants' identification of deficiencies in the AC, instead mischaracterizing the law and relying on selective and out-of-context references. And the additional documents submitted by the SEC—just like the documents submitted by Defendants'—contradict the AC's allegations and demonstrate the AC's inadequacy.[2] The SEC's Opposition can be reduced to the core assertion that the SEC can regulate anything it unilaterally deems a security, which it justifies by claiming that *SEC v. W.J. Howey, Co.*, 328 U.S. 293 (1946), removed the word "contract" from the statutory term "investment contract" and offering an interpretation of *Howey* so broad that it would render the definition of a security subject to arbitrary and standard-less enforcement decisions by the SEC in violation of statutory text, congressional intent, the Due Process Clause, and the APA.

The SEC's arguments against dismissal are wrong. Because the SEC is not seeking to amend the AC,[3] the Court should dismiss the AC in its entirety with prejudice.

## ARGUMENT

## I.    THE SEC FAILS TO ESTABLISH PERSONAL JURISDICTION

As an initial matter, *SEC v. Terraform Labs Pte Ltd.*, No. 22-368, 2022 WL 2066414 (2d Cir. June 8, 2022), is not dispositive here. That court considered whether there was personal jurisdiction to enforce an investigative subpoena directed to a non-party, which examines if there is a connection between the recipient's contacts with the forum and the discovery order at issue. *In re del Valle Ruiz*, 939 F.3d 520, 529 (2d Cir. 2019). In the context of a plenary action, the Court examines the "fact-specific allegations or evidence," *Chirag v. MT Marida Marguerite Schiffahrts*,

---

[1] Capitalized terms not defined herein have the meanings set forth in Defendants' opening Memorandum of Law ("OB," ECF No. 29). References to the SEC's Memorandum of Law in Opposition of Defendants' Motion to Dismiss (ECF No. 32) are in the form "Opp. xx."

[2] "For purposes of a motion to dismiss, we have deemed a complaint to include ... documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit." *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000). If those documents contradict the allegations of the operative complaint, "the documents control and this Court need not accept as true the allegations in the [operative] complaint." *Rapoport v. Asia Electronics Holding Co., Inc.*, 88 F.Supp.2d 179, 184 (S.D.N.Y.2000). (Unless otherwise indicated, internal citations and quotation marks are omitted and emphasis is in the original.)

[3] *E.g., Byron v. Bronx Parent Hous. Network*, No. 1:21-CV-02568 (MKV), 2023 WL 2585824, at *4 (S.D.N.Y. Mar. 20, 2023).

604 F. App'x 16, 19 (2d Cir. 2015), to determine whether the claims alleged "arise out of or relate to" activities the defendant purposefully directed at the U.S., *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985). Where contacts are limited, "relatedness requires that 'the plaintiff's injury was proximately caused by those contacts.'" *Gucci Am., Inc. v. Weixing Li*, 135 F. Supp. 3d 87, 98 (S.D.N.Y. 2015). Where contacts with the forum are more substantial, "it is sufficient that those contacts be a but for cause." *Id.* The AC's allegations fail both standards.[4]

## A.   The Contracts Alleged Are Insufficient Grounds for Personal Jurisdiction

The SEC fails to make the necessary showing of jurisdiction in light of Defendants' challenge.[5] The AC's allegations are ambiguous as to whether the sales and contracts at issue were actually with U.S. firms or TFL.[6] But actually reviewing the contracts negates personal jurisdiction. *First*, some of the contracts do not involve relevant entities. The July 2018 contract cited by the SEC as involving token sales to a California firm actually involved a BVI entity, not TFL. Ex. PP. The contract by which the SEC alleges TFL loaned the "U.S. Trading Firm" 30 million LUNA in fact loaned those tokens to a Cayman Islands entity.[7] Ex. RR. *Second*, the SEC asserts that Mr. Kwon signed another contract with the "U.S. Trading Firm," AC ¶ 160, but omits any evidence regarding the actual counterparty or supporting documentation despite bearing the

---

[4] The Second Circuit also did not consider certain challenges that Defendants have raised here, such as whether the parties to the contracts on which the Second Circuit relied to establish jurisdiction were different entities from the parties at issue here. *See supra* Section I.B.

[5] "When defendant contests the plaintiff's factual allegations, then a hearing is required, at which the plaintiff must prove the existence of jurisdiction by a preponderance of the evidence." *Philip Morris USA Inc. v. Veles Ltd.*, No. 1:06-cv-02988, 2007 WL 725412, at *3 (S.D.N.Y. Mar. 12, 2007). Defendants submit that the documentary evidence provided is sufficient to make a jurisdictional determination without a hearing. *Filetech S.A. v. France Telecom S.A.*, 304 F.3d 180, 183 (2d Cir. 2002) (no abuse of discretion where court resolved jurisdictional issue without evidentiary hearing because factual disputes were "readily ascertainable" from the record).

[6] *See, e.g.*, AC ¶ 107 (token sales through "offshore entities"), ¶ 108 (loan "through an affiliate"), ¶ 112 (SAFT between investors and "wholly owned subsidiary of Terraform"), ¶ 151 (investor agreement "through a foreign entity"), ¶ 152 (purchases of tokens "through offshore entities" or "a wholly-controlled subsidiary" of TFL), ¶ 155 (agreements between U.S. Trading firm and Terraform "or its subsidiaries"), ¶ 160 (agreement was "signed by Kwon" but omitting the counter-party). Despite the SEC's attempt to impute the contacts of a "wholly owned subsidiary" to TFL (Opp. 9 n.6), it fails to allege that TFL exercised sufficient control over the subsidiary or disregarded corporate formalities.

[7] The "Chicago address" the SEC claims is the counterparty's address (Opp. 6) is the mailing address in the contract's notice provision (Ex. PP at 5), not the counterparty's address.

burden of proof.[8] *Third*, the allegation that TFL received a payment ***from*** a U.S. bank account of the U.S. Trading Firm, *id.*, does not constitute purposeful availment. *Casio Computer Co. v. Sayo*, No. 1:98cv03772, 2000 WL 1877516, at *26 (S.D.N.Y. Sept. 20, 1999) (wiring funds to, from, or through forum insufficient); *Roper Starch Worldwide, Inc. v. Reymer & Assocs., Inc.*, 2 F. Supp. 2d 470, 475 (S.D.N.Y. 1998) (sending payment to New York insufficient).

The remaining contracts have no relation to the SEC's claims. The contract that the SEC asserts was with a "California-based company to distribute LUNA tokens to investors" (Opp. 5) is a consulting contract with no relationship to the AC's claims. Ex. TT. The remaining contract did not sell or offer tokens, but was an agreement to allow tokens to be listed under which TFL received zero compensation.[9] Exs. UU § 3.1, VV. The SEC's reliance on the forum-selection clauses in some of these contracts is misplaced because these clauses are only enforceable where "the claims and parties involved in the suit are subject to the forum selection clause," *Miller v. Mercuria Energy Trading, Inc.*, 774 F. App'x 714, 716 (2d Cir. 2019), which is not the case here. The SEC's reliance on these contracts undercuts the jurisdictional allegations in the AC.

## B.   Allegations of TFL's U.S.-Based Employees Are Insufficient

The AC alleges that "Terraform had numerous employees located in the United States," AC ¶ 15, but fails to identify any actions these employees may have taken that relate to the AC. The lack of any allegation that a U.S.-based employee participated in suit-related conduct is fatal to specific jurisdiction, *Sullivan v. Barclays PLC*, No. 1:13-CV-02811, 2017 WL 685570, at *45 (S.D.N.Y. Feb. 21, 2017), and distinguishes this case from *Goldfarb v. Channel One Russia,* 442 F. Supp. 3d 649, 663 (S.D.N.Y. 2020), where the Court found a "substantial relationship" between

---

[8] At most the AC alleges communications with the "U.S. Trading Firm" that might relate to a negotiation of a contract with another entity. Such communications are insufficient to project TFL into the forum. *Hill v. HSBC Bank plc*, 207 F. Supp. 3d 333, 340 (S.D.N.Y. 2016); *Bissonnette v. Podlaski*, 138 F. Supp. 3d 616, 623 (S.D.N.Y. 2015) ("[E]ven substantial negotiations … often do not confer jurisdiction.").

[9] Even actively listing equity securities is insufficient to establish jurisdiction. *Miller v. Mercuria Energy Trading, Inc.*, 291 F. Supp. 3d 509, 523 n.5 (S.D.N.Y. 2018) (Rakoff, J.).

the defendant's forum contacts (a studio and employee based in New York) and the underlying claims (the defamatory statement at issue was distributed from the studio in New York).[10]

### C.    Allegations of Marketing and Travel Are Insufficient

Allegations regarding Defendants' posts on Twitter, blogs, YouTube, and Telegram, in addition to a CNBC *Africa* television broadcast (AC ¶¶ 42, 128, 131–33) are also insufficient for specific jurisdiction. Courts have found use of these "passive" platforms insufficient for specific jurisdiction, and the AC does not allege the requisite commercial interactivity.[11] The SEC also fails to establish that Defendants' travel is sufficiently related to the claims in the AC. The SEC's allegations are ambiguous and do not specifically identify tokens the Defendants purportedly marketed during travel to the U.S. or anywhere else. *See* AC ¶¶ 15, 16, 42, 43 (referencing "Terraform's crypto asset securities").[12] The SEC's allegation regarding a sponsorship agreement with the Washington Nationals likewise fails to identify any relationship between placing "Terra" on seats at a baseball stadium and any claims in the AC.

The cases on which the SEC relies are distinguishable. *Owen v. Elastos Foundation*, No. 1:19-cv-5462-GHW, 2021 WL 5868171, at *8 (S.D.N.Y. Dec. 9, 2021), involved two defendants that conceded jurisdiction, and one that lived in the U.S. who "repeatedly and continuously" promoted the specific token at issue at conferences in the United States. In *Balestra v. ATBCOIN LLC*, 380 F. Supp. 3d 340, 350–51 (S.D.N.Y. 2019), the Court relied on the company conducting the ICO having a New York principal place of business and "ample evidence" that the defendants

---

[10] Because courts have generally found that employing a remote worker within the forum does not amount to purposeful availment when the employee's location is his or her choice, *Clarke v. Tango Networks, Inc.*, 2021 WL 6095328, at *8 (S.D. W. Va. Dec. 23, 2021); *Perry v. Nat'l Ass'n of Home Builders of the U.S.*, 2020 WL 5759766, at *5 (D. Md. Sept. 28, 2020); *Fields v. Sickle Cell Disease Assoc. of Am., Inc.*, 376 F. Supp. 3d 647, 653 (E.D.N.C. 2018), *aff'd*, 770 F. App'x 77 (4th Cir. 2019); *Bertolini-Mier v. Upper Valley Neurology, P.C.*, 2017 WL 4081901, at *5 (D. Vt. Sept. 13, 2017), the SEC's allegations would not suffice even if they alleged suit-related conduct.

[11] *See Forties B LLC v. Am. W. Satellite, Inc.*, 725 F. Supp. 2d 428, 433 (S.D.N.Y. 2010) (Rakoff, J.) (advertisements globally broadcast on Pars TV, including New York, insufficient for specific jurisdiction); *see also Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 251 (2d Cir. 2007); *Minholz v. Lockheed Martin Corp.*, 227 F. Supp. 3d 249, 273 (N.D.N.Y. 2016).

[12] The SEC references a short speech in New York, Ex. WW at 46:05–52:15, and a YouTube video from a September 2021 speech at a cryptocurrency summit, in which Mr. Kwon made passing references to UST and Anchor during general discussions of the Terraform blockchain's capabilities, demonstrating the *de minimis* relationship between these trips and the AC.

"targeted the U.S. market in an effort to promote the sale of [the token]," including multiple press releases explicitly detailing the launch of the token and solicitation of token investors in the U.S. And *S.E.C. v. PlexCorps*, No. 1:17-CV-07007, 2018 WL 4299983, at *10, 13 (E.D.N.Y. Aug. 9, 2018), involved the "repeated use of United States–based payment servicers," "doing business while traveling in the" U.S., and extensive marketing through *interactive* websites.

The SEC has thus failed to meet its burden to establish personal jurisdiction.

## II.  THE SEC HAS NOT ESTABLISHED THAT ANY TOKENS ARE SECURITIES

The Major Questions Doctrine:  The SEC does not dispute the record described in the OB, instead trying to sidestep the major questions doctrine by claiming a difference between "regulation" and "enforcement." Opp. 10–11. But an agency that seeks to resolve a "major question" must point to "clear congressional authorization for the power it claims." W. Virginia v. Env't Prot. Agency, 142 S. Ct. 2587, 2609 (2022) (emphasis added). The Supreme Court did not distinguish between "regulation" and "enforcement" and instead recognized that "assertions of 'extravagant statutory *power* over the national economy' must be greeted 'with skepticism.'" *Id.* (emphasis added) The doctrine thus "applies if an agency claims the *power* to make *decisions* of vast 'economic and political significance.'" *Brown v. U.S. Dep't of Educ.*, No. 4:22-cv-0908, 2022 WL 16858525, at *11 (N.D. Tex. Nov. 10, 2022) (emphasis added). The digital assets industry is a trillion dollar industry[13] and is, without question, of vast economic significance, *see Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000), as further demonstrated by the participation of the U.S. Chamber of Commerce in a cryptocurrency-related mandamus proceeding in the Third Circuit.[14]

The digital assets industry is also of vast political significance. "An agency action is politically significant if Congress has been 'engaged in robust debate' over bills authorizing

---

[13] Steven Ehrlich, Shining A Light On Crypto Market Capitalization, Forbes (Mar. 13, 2023), https://bit.ly/42S5P6Y. That is sufficient to bring the doctrine into play. *See, e.g., Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 141 S. Ct. 2485, 2489 (2021) (economic impact of $50 billion sufficient); *BST Holdings, L.L.C. v. OSHA*, 17 F. 4th 604, 617 (5th Cir. 2021) ($3 billion in compliance costs sufficient).

[14] *See generally* Ex. HHH at 2 ("As it stands today, nobody knows for certain which digital assets, if any, are 'securities' under federal law. That is no small question.").

something like the agency's action." Brown, 2022 WL 16858525, at *12. Legislation proposed as recently as May 18, 2023 would exclude digital assets from the SEC's regulatory authority,[15] and Congress is currently engaging in robust debate about who should regulate cryptocurrencies (despite the SEC's resistance to Congress's requests for the information necessary to perform its legislative function).[16] Recent testimony to Congress described the regulatory landscape for digital assets as, *inter alia*, an "ongoing turf war" between regulators, a "regulatory game of thrones," and a "public policy disaster."[17]

This is a stronger record for application of the major questions doctrine, and thus invalidating the SEC's position, than presented in *West Virginia*.[18] The SEC's assertion of authority must be treated with "skepticism" and justified by "clear congressional authorization." *West Virginia*, 142 S. Ct. at 2614. However, the SEC makes no attempt to point to such authorization.[19] Instead, the SEC tries to sidestep the doctrine by taking refuge in its expansive

---

[15] Section 3 of the Securities Clarity Act, H.R. __, 118th Cong. (2023), would define "security" to exclude digital assets. *See* Ex. III. Section 403 of the Responsible Financial Innovation Act, S.4356, 117th Cong. § 403 (2022) would vest jurisdiction to regulate most digital assets in the CFTC. *See* https://bit.ly/3BHDPab.

[16] *Compare Hearing: Understanding Stablecoins' Role in Payments and the Need for Legislation*, U.S. House Financial Services Committee (Apr. 19, 2023, 10:00 AM), https://bit.ly/3BHDhB9 (legislators and witnesses stressing the importance of digital assets, including that "public blockchains offer a revolutionary solution to our current financial system" and stablecoins "reinforce the strength of the dollar in the world") *with* Ex. JJJ ("Under Chair Gensler's tenure, the SEC has failed to uphold this mission, threatening the vibrancy of our capital markets. … Moreover, it is critical that the Committee prevent the SEC from continuing its effort to regulate by enforcement.") *and* Ex. KKK ("The Committee … made clear at the start of the 118th Congress [before this case was filed] that robust oversight of the [SEC] was forthcoming. … Since February, the SEC has been less than forthcoming with respect to this Committee's requests for information.").

[17] *See Hearing*, *supra* note 17; *see also Hearing: Putting the 'Stable' in 'Stablecoins:' How Legislation Will Help Stablecoins Achieve Their Promise*, U.S. House Financial Services Committee, at 1:29:55-1:30:33, (May 18, 2023, 9:00 AM), https://bit.ly/3BIpRFa (in response to questioning from Rep. Steil, witness Matt Homer stated that for "a user of a stablecoin, it's hard to understand how they could have an expectation of profit" and agreed that "stablecoins are not securities").

[18] *See also* Aislinn Keely, *'Historic' Hearing Spotlights Deep Split On Crypto Regulation*, Law360 (May 10, 2023), https://www.law360.com/articles/1605889 (during joint hearing that focused on the "core question" on "how to settle the boundaries between the CFTC and the [SEC] and whether securities laws need to be amended to clearly define digital assets and address crypto activities," Representative Dusty Johnson stated "[t]he right policy solution involves both committees speaking with one voice to appropriately direct the CFTC and the SEC to each focus on what they do best.").

[19] *See, e.g.*, *Alabama Ass'n of Realtors*, 141 S. Ct. at 2485 (Public Health Service Act did not give CDC authority to promulgate and extend eviction moratorium); *Kentucky v. Biden*, 23 F.4th

interpretation of "investment contract" under *Howey*, while simultaneously conceding that Congress could not have contemplated cryptocurrencies in 1933 and 1934 (Opp. 12) and not disputing that Congress is currently debating how best to regulate digital assets (OB 9). But unless Congress provided clear authority to the SEC ***in the text of the '33 and '34 Acts*** to regulate the digital assets at issue in this matter (it certainly did not), whether the SEC thinks those assets satisfy a 1946 judicial interpretation of those statutes based on a distinguishable fact pattern is irrelevant.[20]

The Due Process Clause:  The Opposition encapsulates the SEC's due process problem by condensing its lack of consistency into a single paragraph. The SEC goes awry out of the gate by asserting that courts have held that "investment contract" is not unconstitutionally vague (Opp. 12–13), but Defendants have not argued otherwise. The SEC then further confuses the issue by asserting that it has never "taken the position that crypto assets are *not* securities" (Opp. 13), an assertion that perfectly demonstrates the SEC's due process problem.[21] *First*, it is disproven by the SEC's own citations in the same paragraph, which purport to set forth ways to analyze whether a digital asset should be deemed a security—necessarily implying that some might not be. *Second*, it is refuted by the SEC's own statements *in 2023* that digital assets "may or may not meet the definition of a 'security' under the Federal securities laws."[22] *Third*, the SEC *has* stated that specific cryptocurrencies are not securities.[23] *Fourth*, the "staff guidance" the SEC cites[24]

---

585, 606–08 (6th Cir. 2022) (Property Act did not authorize the President to require federal contractors and subcontractors to have their employees vaccinated against COVID-19); *Brown*, 2022 WL 16858525, at \*13 (HEROES Act did not authorize Secretary of Education to forgive student loans because it did not mention loan forgiveness).

[20] Indeed, a former member of the SEC Investor Advisory Committee has stated that "digital assets, by their very design, do not fit within the classic framework of regulations designed for equity investments in firms led by boards of directors." Securities Regulation Genesis Block Proposal, https://www.sec.gov/rules/petitions/2022/petn4-782.pdf. This is the same body that urged the SEC to fight congressional action to bring regulatory clarity on this issue, OB at 9.

[21] Defendants actually argue that the SEC has *never before* taken the position that *all* crypto assets other than Bitcoin are securities, OB at 10, and the Opposition proves that point.

[22] *E.g.,* Release No. IA-6240; File No. S7-04-23 at 16 n.25 (Feb. 15, 2023) (citing the same authority the SEC cites here).

[23] *See* SEC, Division of Corporation Finance, *No-Action Letter: TurnKey Jet, Inc.* (Apr. 2, 2019), https://bit.ly/3WlUppn (TurnKey Tokens not securities); Ex. II at 3, Hinman Speech (stating that neither Bitcoin nor Ether are securities and that offers and sales of these cryptocurrencies are not securities transactions).

[24] SEC, *Framework for "Investment Contract" Analysis of Digital Assets*, at n.1 (Apr. 3, 2019), https://bit.ly/3Mn15z0.

expressly stated that it "d[id] not replace or supersede" prior statements by staff, including the 2018 speech that declared a "token ... all by itself is not a security, just as the orange groves in *Howey* were not."[25] The assertion that this record constitutes "consistent guidance" (Opp. 13) is absurd and directly contradicted by the case law. Where "the government has repeatedly issued guidance to the public at odds with the interpretation it" asks the Court to adopt, it is "one more reason yet to question whether its current position represents the best view of the law." *Bittner v. United States*, 143 S. Ct. 713, 722 (2023).[26]

The APA: The Opposition concedes an APA violation because the SEC's sole answer to Defendants' APA argument is to assert that it did not announce a new rule in bringing this case (Opp. 14). But its failure to have promulgated an applicable rule *before* bringing this case is exactly the point.[27] The APA defines "rule" to include "the whole or part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy." 5 U.S.C. § 551(4). That definition includes virtually every statement an agency might make, *Nat'l Treasury Employees Union v. Reagan*, 685 F. Supp. 1346, 1356 (E.D. La. 1988), which makes the SEC's reliance on *SEC v. Chenery*, 332 U.S. 194 (1947) mystifying: *Chenery* held that "filling in the interstices of the [securities laws] should be performed, as much as possible, through th[e] quasi-legislative promulgation of rules," which forces the SEC to explain its regulatory plans in advance and provides for fixed, prospective effective dates that avoid surprise actions asserting violations of duties parties could not know existed. *See* 332 U.S. at 202; *see also De Niz Robles v. Lynch*, 803 F.3d 1165, 1173 (10th Cir. 2015) (Gorsuch, J.) ("rulemaking offers

---

[25] Ex. II at 3.

[26] *See also Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2168 (2012) ("It is one thing to expect regulated parties to conform their conduct to an agency's interpretations once the agency announces them; it is quite another to require regulated parties to divine the agency's interpretations in advance or else be held liable when the agency announces its interpretations for the first time in an enforcement proceeding and demands deference."). This assumes that Defendants are even "regulated parties." They are not.

[27] This action is the SEC's "statement" asserting its claim that it has regulatory jurisdiction over digital assets such as UST. *See Hearing: Oversight of the Securities and Exchange Commission*, U.S. House Financial Services Committee at 5:36:43 (Apr. 18, 2023), https://bit.ly/3Ml9uTR (responding to statement that the SEC cannot "go out willy-nilly and pass regulations without getting congressional approval," Chair Gensler stated "[w]e live within the authorities granted by Congress, they're not unlimited").

more notice (due process) and better protects against invidious discrimination (equal protection")).[28] The SEC's response thus proves Defendants' point.

III.     **THE DIGITAL ASSETS AT ISSUE ARE NOT SECURITIES**

        The Proper Understanding of Howey: The SEC argues that "*Howey* Does Not Require a Common Law Contract" because *Howey* set the standard for determining when an "unconventional scheme or contract' constitutes an investment contract." Opp. 15–16. Beyond the problems demonstrated in the preceding section (which independently preclude the SEC from asserting this argument), it fails for at least three reasons. *First*, it is contradicted by the plain language of *Howey* and *Telegram*, the two cases the SEC relies on. *Compare* Opp. 15–16 *with* OB 13–14.[29] *Second*, it reads the word "contract" out of "investment contract" in violation of the rule requiring courts to give effect to every word of a statute. *See Duncan v. Walker*, 533 U.S. 167, 174 (2001). In the SEC's view, "investment contract" means "investment," which is not what Congress wrote. To paraphrase the Supreme Court, if "investment contract" is a "catch-all phrase" (Opp. 16 n.14), then what it catches must be a "contract" as well as an "investment." *See United States v. Chiarella*, 445 U.S. 222, 234–35 (1980) ("Section 10(b) is aptly described as a catch-all provision, but what it catches must be fraud."); *Duncan*, 533 U.S. at 174. If Congress had meant to say "investment" it would not have written "investment contract." But it did not do so.[30] *Third*, the SEC's reliance on *Howey*'s discussion of "schemes" to obtain the use of money from public investors (Opp. 16) does not apply here; the SEC has not adequately pled such a scheme because

---

[28] The SEC's attempt to distinguish *Pfaff v. U.S. Dept. of Housing and Urban Devel.*, 88 F. 3d 739 (9th Cir. 1996), on the basis that *Pfaff* involved an agency adjudication rather than an enforcement action, Opp. at 14 n.12, fails. In *Pfaff*, as here, the agency sought to *enforce* an interpretation of law that "depart[ed] radically from the agency's previous interpretation" without engaging in proper rulemaking—the forum it chose for that enforcement is irrelevant.

[29] The SEC's other citations support Defendants: In *SEC v. Aqua-Sonic Prods.*, 524 F. Supp. 866, 877 (S.D.N.Y. 1981), *aff'd*, 687 F.2d 577 (1982) "[a]ll licensees signed the Ultrasonic sales agency agreement and all thus retained Ultrasonic to sell the Steri Products" and in *Hocking v. Dubois*, 885 F.2d 1449, 1453 (9th Cir. 1989), the buyer (a) purchased property and (b) "entered into several agreements" concerning rental and management of the property; both cases have the same structure as *Howey*, where the buyers contracted with the sellers to farm and sell the oranges.

[30] The SEC deliberately misstates Defendants' argument regarding the '33 and '34 Acts' enumerated lists. *Compare* OB 7 ("enumerating lists of instruments *such as* 'stocks' and 'bonds'" (emphasis added)) *with* Opp. 16 n.14 ("Defendants' passing suggestion that all securities … have to possess the characteristics of 'stocks' and 'bonds'").

it fails to allege that Defendants sold digital assets to the public. *Compare* OB 20–24 (SEC has pleaded only exempt private offerings) *with SEC v. Kik Interactive Inc*., 492 F. Supp. 3d 169, 177–78 (S.D.N.Y. 2020) (Kik conducted public ICO).

UST Are Not Securities: The SEC has abandoned its argument that UST, standing alone, is a security. It now argues that "Defendants offered and sold UST as part of an investment scheme *in connection with the Anchor Protocol*" and that "*in September 2020*, Defendants *began* marketing UST as a 'yield bearing' asset together with the Anchor Protocol." Opp. 16–21 (emphasis added). This new theory fails for four reasons. *First*, it is a stealth attempt to amend the AC through briefing, which would be impermissible even if the SEC had sought leave to amend (which it did not do). *See Red Fort Capital, Inc. v. Guardhouse Prods, LLC*, 397 F. Supp. 3d 456, 476 (S.D.N.Y. 2019).

*Second*, it is internally inconsistent: The SEC mixes and matches arguments about UST's stability (i.e., lack of profit component) with allegations about using the Anchor Protocol to generate interest. Opp. 17–21. But in doing so the SEC unmoors its own new argument from *Howey* by asserting that "UST purchasers were not just buying software code, but *an opportunity* to participate in the Anchor Protocol … ." Opp. 17 (emphasis added). *Howey* and its progeny, however, require contracts to have someone else do something for the purchasers, not the "opportunity" for the purchaser to do something (or not) for itself. The SEC's fixation on the fact that 85% of the land purchasers in *Howey* entered into the contracts the Supreme Court held satisfied the definition of "investment contract" (Opp. 18) is irrelevant, because the Supreme Court specifically held that the orange groves purchased by *everyone* were *not* securities. *See* OB 13.

*Third*, it is not and cannot be supported by factual allegations. The AC nowhere pleads specific sales of UST by Defendants "together with," "in connection with," or otherwise "with" the Anchor Protocol, which is the only way the SEC could plead anything remotely "similar to the *Howey* arrangement." Opp. 19.[31] This is not surprising, because UST was introduced before the

---

[31] All of the SEC's cases are distinguishable because all involved *contemporaneous* sales of the things that made up the "investment contract," not a later event being alleged to have turned an asset into a security because it offered a previously unavailable use for that asset. This means the SEC's argument has no natural boundary, as explained in the OB, because it would allow the SEC to assert that any asset "became" a security by virtue of later events. *See* OB 14. Indeed, the

Anchor Protocol existed. The only way for UST and Anchor to be "similar to" *Howey* would be if the orange groves were sold on their own and the sellers later offered the cultivation and sale contracts, but that is not the *Howey* fact pattern. The SEC's argument thus collapses.

*Fourth*, the SEC's attempt to evade the statutory exclusion of currencies from the securities laws based on *Treasury Department regulations* (Opp. 20–21) fails. As the SEC concedes (Opp. 20), the '33 and '34 Acts do not define "currency," which means that the term had its ordinary definition when those statutes were drafted. OB 13. That precludes the SEC from relying on definitions promulgated by a different agency, pursuant to a different statutory scheme, and for which the regulation states that "[w]hen used *in this chapter and in forms prescribed under this chapter* … terms shall have the meanings ascribed in this subpart. … *Terms may have different meanings in different parts or subparts*." 31 C.F.R. § 1010.100 (2014) (emphasis added).[32]

LUNA, wLUNA, and MIR Are Not Securities[33]: With respect to vertical commonality, the SEC asserts that it need not plead it but in any event has. Opp. 22–23. The SEC's reliance on *Revak v. SEC Realty Corp.*, 18 F.3d 82, 87-89 (2d *Cir.* 1994), is misplaced because (a) the Second Circuit held that the assets in that case were *not* securities (reversing the district court), (b) declined to address whether strict vertical commonality satisfies *Howey*, and (c) held that broad vertical commonality does not satisfy *Howey*.[34]

---

SEC offers no reasoned explanation for why a bank account would not be deemed a "security" by the development of things to buy that the SEC might one day consider "securities."

[32] The SEC's objection to the Defendants' arguments about the effect of the SEC's position about being able to use UST to purchase other digital assets (Opp. 21) gets the SEC nowhere for two reasons. *First*, the SEC does not deny that that is the logical extension of its argument; if it is going to try to regulate through enforcement rather than by promulgating rules, it must live with the consequences of the positions its takes in litigations. *Second*, its focus on the programmatic convertibility of UST into LUNA misses the point that that concept is not unique to UST and LUNA, because any digital assets can be programmatically converted to other assets through any number of decentralized liquidity pools that have no necessary connection to the creators of the tokens that are exchanged through those pools.

[33] The SEC's arguments about wLUNA (Opp. 25–26) fail because LUNA is not a security. *U.S. v. Martoma*, 2013 WL 6632676, at *3 (S.D.N.Y. Dec. 17, 2013), does not help the SEC because Martoma argued that the charges at issue should be dismissed as improperly extraterritorial, not that ADRs are not securities.

[34] *Kik* does not help the SEC because Kik (a) conceded that Kin tokens were securities in its private sale agreements, (492 F. Supp. 3d at 174), and (b) conducted a true public ICO of Kin tokens (*id.* at 175-76).

With respect to the existence of a common enterprise relating to LUNA, the SEC quibbles with Defendants' arguments about when LUNA purchasers could buy and sell LUNA. Opp. 24. *Kik* does not help the SEC because there actual public ICO proceeds were pooled to create the infrastructure (492 F. Supp. 3d at 179), whereas here the SEC pleads (at most) that proceeds from exempt private offerings were used for such purposes (OB 20–24). *SEC v. Glen-Arden Commodities, Inc*., 493 F.2d 1027 (2d Cir. 1974), also does not help the SEC because (a) the structure of the assets there at issue was completely different (with perhaps even more contractual obligations to purchasers than *Howey, id*. at 1032, and (b) companies related to the defendants and the sales of the assets were involved in offers to buy back the assets from purchasers, *id*. at 1031.

With respect to MIR, the SEC does not dispute that the only "sales" of MIR tokens by TFL were tokens that TFL farmed by participating in the Mirror Protocol itself (OB 18–19), which does away with the SEC's "funding" argument (Opp. 26–27). And *Gary Plastic Packaging Corp. v. Merrill Lynch, Inc*., 756 F.2d 230 (2d Cir. 1985), is inapposite because the SEC does not allege that TFL earned any fees from selling MIR tokens or created a secondary market for MIR tokens (the closest the SEC comes to this is the allegation that TFL allowed MIR to be listed on a U.S. platform, but that is not "creating" a secondary market).

**IV.     THE REGISTRATION CLAIMS FAIL**

The registration claims fail because the digital assets at issue are not securities. But even if the assets might be securities, the claims fail for other reasons, and the SEC's tortured attempt to force the tokens at issue in this case into its regulatory framework demonstrates why its attempt to exercise jurisdiction is ill-advised, illegal, and unconstitutional.

'33 Act Section 17(a)(2) or (a)(3): The SEC does not claim that Defendants violated '33 Act Sections 5(a) and (c) with respect to UST and wLUNA because it does not (and cannot) allege that TFL offered or sold UST or wLUNA. With respect to LUNA and MIR, Defendants have carried their burden in demonstrating "an entitlement to an exemption from registration" (Opp. 29–30) by using the AC's allegations to show that the challenged transactions were not "public offerings." OB 20–24. Instead of responding to that on the merits, the SEC mischaracterizes the challenged transactions as "distributions" to "intermediaries who could resell to the public without

restriction." Opp. 29–30. This is wrong. *First*, the SEC's allegation that Defendants "expected" LUNA and MIR to be resold on public markets "is not supported by well-pled facts and is contradicted by the documents the SEC relies on." OB 21.[35] The SEC offers no response other than conclusory assertions. Opp. 30 ("the sales were understood to be but a preliminary step in a broader public distribution scheme").[36] *Second*, the cases the SEC relies on (Opp. 29) are inapplicable. Those cases concern instances where a defendant directly made a sale or explicitly instructed others to do so. *SEC v. Universal Exp., Inc.*, 475 F. Supp. 2d 412, 437 (S.D.N.Y. 2007); *R. A. Holman & Co. v. SEC*, 366 F.2d 446, 449 (2d Cir. 1966). The SEC makes no similar allegations, and it is clear from the AC (which includes the documents the SEC used to prepare it) that Defendants did not engage in public offerings.

Contrary to the SEC's argument, the challenged transactions fit within the Regulation S safe harbor (17 C.F.R. § 230.903). The SEC cites SEC Release No. 6863, *Offshore Offers and Sales* (Apr. 24, 1990) to argue that Defendants were required to take "steps to ensure that [the digital assets] sold to non-U.S. persons do not 'flow back' into the U.S. for a period of time" (Opp. 31), but that argument fails. *First*, the time period to which the SEC alludes only applies to Category 2 and Category 3 offerings, but the AC does not plead that Defendants do not fit within Category 1 (*i.e.*, "no substantial U.S. market interest in the class of securities to be offered or sold").[37] *Second*, the SEC has explicitly pled facts consistent with Defendants' compliance with the time period the SEC claims was not observed. AC ¶¶ 108–09 (alleging that the U.S. Trading Firm did not begin reselling LUNA until *more than a year* after it was "loaned" to it by TFL). *Third*, contrary to the SEC's argument (Opp. 31), the AC's allegations (which include the

_____

[35] The SEC's argument that the Section 4(a)(1) exemption is inapplicable because Defendants were an underwriter (Opp. 31 n.21) fails for the same reasons.

[36] Notably, the SEC fails to plead that *resales* into the public market by non-Defendants would violate the law. Contrary to the SEC's argument (Opp. 29), the AC does not adequately allege that the challenged transactions were intended to "effectuate large public distributions of LUNA and MIR."

[37] As noted above, the AC does not establish that Defendants' alleged marketing efforts were related to the tokens at issue. *See supra* Section I.C. Further, the SEC's argument that "TFL sold ... through crypto asset trading platforms that were accessible to U.S. investors" is based on conclusory allegations. *Compare* Opp. 31 *with* AC ¶¶ 111 (failing to identify any specific platform), 114 (failing to identify a specific platform or whether it was accessible to U.S. investors).

documents on which they are based) show that TFL did not sell LUNA and MIR directly *to* the public.

'33 Act Section 5(e) or '34 Act Section 6(I): The SEC has not saved its claims under Sections 5(e) of the Securities Act and Section 6(l) of the Exchange Act. *First*, the SEC cannot establish that mAssets are securities-based swaps. The SEC concedes its own definition of a "swap" (OB 25). Yet it claims that "each transaction offering or selling an mAsset ... constituted a security-based swap" (Opp. 33) despite failing to explain how mAssets satisfy the requirement of swapping payments with a swap counterparty (OB 26).

*Second*, although a party "need not be involved in the final step of the distribution" (Opp. 34), the SEC omits that the distribution must involve a "public offering." But the SEC does not allege that mAssets were part of a "public offering." The SEC does not dispute that the Mirror Protocol mints mAssets programmatically, which means that Defendants do not issue, pass title to, or solicit sales of mAssets.

*Third*, Defendants do not "effect" mAsset transactions. The SEC's reliance on Exchange Act Release No. 75611 to assert a broad definition of "effected" (Opp. 34) is misplaced. The only potentially applicable definition provided in the release as examples of those that would "effect" a security-based swap transaction include "persons on a trading desk actively involved in effecting security-based swap transactions, persons pricing security-based swap positions and managing collateral for the [entity], and persons assuring that the [entity's] security-based swap business operates in compliance with applicable regulations." Exchange Act Release No. 75611 (Aug. 5, 2015), 80 FR 48963 at 48976 (Aug. 14, 2015). The active verbs in that definition ("actively involved in effecting," "pricing," "managing," and "assuring") make clear that this claim cannot encompass Defendants: Although Defendants were involved in the creation of the Mirror Protocol, the SEC does not dispute that the protocol operated autonomously under the governance of its community (for example, mAsset prices were set by automated oracles, not Defendants), which explains why the SEC cannot allege that Defendants effected any mAsset transaction.

*Fourth*, it cannot be inferred that Defendants made offers to persons who were not eligible contract participants without the SEC identifying such an individual—especially when the SEC

fails to allege that Defendants' alleged activities were directed at U.S.-based persons. *Simuro v. Shedd*, 2013 WL 3829627, at *2 (D. Vt. July 23, 2013) ("an assumption of truth is not afforded to legal conclusions"). Thus, the SEC's claims relating to securities-based swaps must be dismissed.

## V.   THE SECURITIES FRAUD CLAIMS FAIL

The securities fraud claims are non-starters because the digital assets at issue are not securities. But these claims fail for other reasons as well.

### A.   The SEC Has Not Plead a Violation of '33 Act Section 17(a)(2) or (a)(3).

#### 1.   No Material Misrepresentation or Omission

The Chai Payment Service: Without disputing that Chai payments recorded on the Terra blockchain represented transfers of KrT from one wallet to a another and thus effected a transfer of value (OB 28), the SEC asserts that these were "sham transactions" because Chai also used KrW. Opp. 35–36. But the AC contains no well-pled facts that Chai's use of KrT and KrW were mutually exclusive.[38] The relevant disclosures stated that Chai used KrT to effect transactions on the Terra blockchain while also using KrW in its onramp (for consumers) and offramp (for merchants). *See* OB 28–30. The SEC's continued assertion that all Chai wallets were "TFL wallets" (Opp. 36) ignores the clear disclosure that TFL intended to manage wallets on behalf of users precisely so that users did not have to interact with the blockchain themselves. OB 30.

In the face of this undisputed disclosure by TFL regarding how Chai used the Terra blockchain (OB 28–30), the SEC asserts that on a motion to dismiss the Court cannot consider these disclosures. Opp. 36. The SEC is wrong for two reasons: *First*, the Court can take judicial notice of publicly available documents attached to Defendants' motion to dismiss but not cited to or relied on in the AC to establish what information was in the public domain during the time period corresponding to the SEC's fraud claims. *See Pehlivanian v. China Gerui Advanced Materials Grp., Ltd.*, 153 F. Supp. 3d 628, 643 (S.D.N.Y. 2015). *Second*, the SEC does not deny the identity, authenticity, or content of the documents, it simply wants the Court to accept its

---

[38] A recent request by the SEC to Korean authorities for basic information about how Chai works, Ex. LLL, suggests that the SEC did not have the information requested therein prior to filing the AC.

*characterizations* of the documents used in preparing the AC rather than reviewing the plain text of the documents. But that is not the law: When a document a plaintiff had access to in drafting a complaint contradicts the plaintiff's allegations, the document controls. *See supra* note 2.

The May 2021 Depeg: The SEC concedes that (a) the May 23 tweet accurately reported that TFL held a nominal amount of the total UST in circulation at the time and (b) the May 24 tweet is an non-actionable expression of optimism or opinion (*Pehlivian*, 153 F. Supp. 3d at 648–49) by not responding to either point.[39] Instead, the SEC argues that the May 24 tweet was misleading because its "implication" was that "UST was stable and the algorithm worked." Opp. 36. But the tweet makes no such statement—it merely reiterates the opinion that algorithms are more effective than human decision-making. Putting to the side whether a fraud claim can be based on an alleged implication, to argue that a statement of opinion was actionable fraud requires pleading facts supporting the inference that the speaker did not actually believe the opinion at the time it was stated or failed to disclose a fact "in serious conflict" with that opinion. *See Tongue v. Sanofi*, 816 F.3d 199, 212 (2d Cir. 2016) (expression of optimism in FDA approval not misleading merely because firm did not disclose FDA's "concerns about methodology"). The AC does not even try to meet that requirement.

The SEC fares no better in arguing that the May 24 tweet's expression of optimism was misleading because it did not disclose that "when the peg began to fail, Kwon secretly arranged with U.S. Trading Firm to intervene." Opp. 36–37. *First*, the AC alleges a failure to disclose that the U.S. Trading Firm's alleged open market purchases of UST were "the real reason for the re-peg," AC ¶ 118, which, even if that were plausible (it is not), could not have been disclosed on May 24, *one week prior to the re-peg*. Recognizing that temporal problem, the SEC tries to get around it with another attempt to use the Opposition as a stealth amendment of the AC (again without saying word "amend") to allege non-disclosure of purported communications with the U.S. Trading Firm instead (Opp. 36). But that is impermissible. *See Red Fort Capital*, 397 F. Supp.

---

[39] A plaintiff who does not respond to a point raised by a defendant on a motion to dismiss "concedes" that point "through silence." *In re UBS AG Sec. Litig.*, No. 1:07-CV-11225, 2012 WL 4471265, at *11 (S.D.N.Y. Sept. 28, 2012).

3d at 476. *Second*, the SEC fails to explain why the disclosure of the U.S. Trading Firm's alleged purchases of UST would have rendered the statement that "algorithms work" not misleading, which is required of every fraud claim. That is especially problematic given that it was publicly known that the algorithm relied on users to purchase and burn UST to contract supply and drive the price back towards $1, and there had been public disclosure of open market trading to accomplish the same result. OB 31–33.

Similarly, the AC fails to plead that Mr. Kwon's March 2022 statement on a podcast about issues specific to the speed of the mint-burn algorithm was in any way inaccurate or misleading for not disclosing alleged open market purchases. *See* OB 32. The SEC offers no response: accurately speaking about one topic does not give rise to a duty to disclose all facts tangentially related to that topic, let alone facts related to a different topic. *In re Sibanye Gold Ltd. Sec. Litig.*, No. 18-cv-3721, 2020 WL 6582326, at *17 (E.D.N.Y. Nov. 10, 2020); *In re Hardinge, Inc. Sec. Litig.*, 696 F. Supp. 2d 309, 321 (W.D.N.Y. 2010).[40]

Finally, the SEC's contention that on a motion to dismiss the Court must accept that the U.S. Trading Firm restored the peg simply because the AC asserts it (Opp. 37) is wrong. The SEC's allegation is a *causal inference* that is unwarranted in view of publicly available market data of which the Court may take judicial notice. *See In re Initial Pub. Offering Sec. Litig.*, 383 F. Supp. 2d 566, 583 (S.D.N.Y.), *opinion supplemented on reconsideration*, 399 F. Supp. 2d 261 (S.D.N.Y. 2005) (dismissing 10(b) claim where allegations that alleged misrepresentations caused stock prices to inflate were "flatly contradicted by actual trading data"). *Iqbal* and *Twombly* only oblige district courts to accept reasonable inferences, and the simple fact is that the AC does not plausibly plead that the U.S. Trading Firm restored the peg. *In re Elan Corp. Sec. Litig.*, 543 F. Supp. 2d 187, 214 (S.D.N.Y. 2008).

---

[40] *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259 (2d Cir. 1993) and *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223 (2d Cir. 2016) are inapposite. *Time Warner* held that a firm that announced one corporate strategy may have had a duty to disclose an alternative strategy *that was simultaneously under consideration* because the two strategies would have had "directly opposite effects on the price of [the stock]." 9 F.3d at 267. But open market purchases of UST and open market purchases combined with burning UST using the algorithm are complementary and, even as alleged in the AC, aimed at the same effect. In *Vivendi*, the firm's statements directly addressing liquidity risk may have been misleading for not revealing the firm's "true liquidity risk." 838 F.3d at 250. The SEC has pled no similar statement here.

### 2.       No Use of a Statement to Obtain Money or Property

The SEC does not dispute that the AC contains no allegations that Defendants used the alleged omission about the U.S. Trading Firm to obtain money or property. And the SEC's assertion that the AC contains a "clear allegation that Terraform made false statements about Chai to solicit an investment in LUNA" in November 2021 (Opp. 37) is an overstatement. At most, the SEC alleges that a private LUNA token purchase was *correlated* with a statement about Chai— but that is not enough.

Nor has the SEC shown that Mr. Kwon personally "obtained money or property" from the alleged November 2021 meeting. The SEC's assertion that Mr. Kwon benefited "indirectly" from TFL's receipt of alleged sale proceeds as a shareholder (Opp. 38) sweeps too broadly, as that would render every stockholder of every company potentially liable under Section 17(a)(2) if the company obtained money or property through an alleged misstatement. *SEC v. MiMedx Grp., Inc.*, No. 1:19-CV-10927, 2022 WL 902784, at *11 (S.D.N.Y. Mar. 28, 2022) and *S.E.C. v. Stoker*, 865 F. Supp. 2d 457, 464 (S.D.N.Y. 2012) support Defendants' arguments because both of those defendants were paid additional cash or stock as a result of the alleged fraud, whereas the AC does not allege that TFL (or anyone else) paid Mr. Kwon additional compensation as a result of the alleged sale.[41] The SEC cannot establish that Mr. Kwon obtained money or property from the alleged misstatement about Chai at the November 2021 meeting by relying on a generalized allegation that Mr. Kwon still retains "proceeds from the Terraform ecosystem" (AC ¶ 173), because the AC does not claim that those alleged funds included any funds related to the sale that supposedly resulted from the November 2021 meeting.

### 3.       No Deceptive Act Under Section 17(a)(3)

The SEC's scheme liability claim fails because the AC does not allege a deceptive act in connection with the alleged misrepresentations and omissions. *See S.E.C. v. Rio Tinto*, 41 F.4th 47, 53 (2d Cir. 2022). The SEC does not contest that the AC alleges no deceptive act as to the

---

[41] Although *Stoker* held that an employee may also be liable if he obtains money or property for his employer, the majority view post-*Stoker* is that a defendant must gain personally from the alleged fraud if he is to "obtain money or property" under Section 17(a)(2). *See, e.g., S.E.C. v. Wey*, 246 F. Supp. 3d 894, 914 (S.D.N.Y. 2017); *S.E.C. v. DiMaria*, 207 F. Supp. 3d 343, 358–59 (S.D.N.Y. 2016); *S.E.C. v. Syron*, 934 F. Supp. 2d 609, 637–39 (S.D.N.Y. 2013).

alleged omission regarding the U.S. Trading Firm. And the SEC's attempt to characterize Chai's recording of transactions on the Terra blockchain as a deceptive act (Opp. 38-39) is meritless. There is nothing "inherently deceptive" about recording transactions on the Terra blockchain. *See SEC v. Kelly*, 817 F. Supp. 2d 340, 344, 346 (S.D.N.Y. 2011). Nor could any users have been deceived by this activity as the SEC alleges (Opp. 38–39), because TFL disclosed how Chai used the Terra blockchain. OB 30. The SEC's repeated assertion that these were "sham transactions" is not supported by any well-pled facts.

The SEC's reliance on *SEC v. Sugarman*, No. 1:19cv5998, 2020 WL 5819848, at *9 (S.D.N.Y. Sept. 30, 2020), is misplaced. There, the defendant created a sham company to divert funds for the purpose of hiding the source of a purchase through a series of fraudulent transactions. In contrast, TFL did not disguise its management of the Chai wallets or accounts, and its actions were completely in line with the public disclosures on Chai's design and operation. OB 29–30. The SEC has not alleged deceptive acts under Section 17(a).

### 4.    No Requisite State of Mind Under Section 17(a)(2) or (a)(3)

The SEC concedes that it must plead at least negligence to state a claim under Section 17(a)(2) or 17(a)(3) (Opp. 39), but fails to identify any allegations capable of establishing that state of mind. The Section 17(a)(2) and (a)(3) claims should be dismissed for this reason as well.

### B.    The SEC Has Not Pled a Violation of '34 Act Section 10(b) or '33 Act Section 17(a)(1)

The SEC's Section 10(b) and Section 17(a)(1) fraud claims fail for the same reasons as its Section 17(a)(2) and (a)(3) fraud claims—no misrepresentation, omission, or deceptive act. The Section 10(b) and 17(a)(1) fraud claims also fail because the AC does not scienter.

The SEC's attempt to ascribe knowledge of the supposed falsity of statements about Chai's use of the Terra blockchain to Mr. Kwon based on "motive" and "direct access" to information (Opp. 39–40) is meritless. The SEC's motive theory—that Mr. Kwon used Chai to solicit investors *for TFL*—fails because it "charge[s] a motive possessed by virtually all corporate insiders." *S.E.C. v. Espuelas*, 698 F. Supp. 2d 415, 427 (S.D.N.Y. 2010). The SEC's direct access theory fails because the SEC relies on the very same allegations regarding Mr. Kwon's titles and supervision

of engineers that Defendants showed in their opening brief were "near-miss allegations" incapable of supporting the "strong inference of fraudulent intent" needed for scienter. OB 35. *See Syron*, 934 F. Supp. 2d at 631. *Novak v. Kasaks*, 216 F.3d 300, 311-12 (2d Cir. 2000), is not to the contrary. There, the defendants personally approved manipulative accounting practices that rendered the company's financial statements materially misleading. But the AC pleads no similar direct access to information or involvement by Mr. Kwon in the inner workings of Chai, at most it pleads secondhand knowledge about *some* parts of Chai's payment process. *See* OB 35.

The SEC's argument that Mr. Kwon or TFL knew statements about the restoration of UST's peg in May 2021 were false because Mr. Kwon "personally negotiated the arrangement" with the U.S. Trading Firm to restore the peg (Opp. 40) mischaracterizes the AC.[42] The AC does not allege that Mr. Kwon negotiated anything with the U.S. Trading Firm during the May 2021 depeg. It broadly alleges communications between Mr. Kwon and the U.S. Trading Firm but does not allege that Mr. Kwon knew that the U.S. Trading Firm had purchased UST, when, or how much, or that Mr. Kwon ever knew or believed that the U.S. Trading Firm restored the peg. *See* OB 36. Accordingly, the SEC has failed to plead scienter.

## CONCLUSION

For the foregoing reasons and those set forth in the OB, the Court should dismiss the AC in its entirety with prejudice.[43]

---

[42] The SEC's citation of *S.E.C. v. Constantin*, 939 F. Supp. 2d 288, 308–09 (S.D.N.Y. 2013), does not save its argument. *First*, *Constantin* dealt with a motion for summary judgment. *Second*, in that case there was record evidence that defendants routinely lied to clients and prepared false account statements reflecting information they knew to be untrue. *Id*. at 309. There are no such allegations in the AC (OB 36–37), and the SEC does not dispute that TFL had no "clients."

[43] The Opposition adds nothing to the control-person claims asserted against Mr. Kwon, which fail for the reasons set forth in the OB. *See* OB 37–38.

Date: May 19, 2023                    Respectfully submitted,

*/s/Douglas W. Henkin*
**DENTONS US LLP**
Douglas W. Henkin
David L. Kornblau
1221 Avenue of the Americas
New York, New York 10020
Tel: (212) 768-6700
douglas.henkin@dentons.com
david.kornblau@dentons.com

Mark G. Califano
Matthew A. Lafferman (admission forthcoming)
Nicholas W. Petts
1900 K Street, NW
Washington, DC 20006-1102
Tel: (202) 496-7500
mark.califano@dentons.com
matthew.lafferman@dentons.com
nicholas.petts@dentons.com

Stephen J. Senderowitz (admitted pro hac vice)
233 S. Wacker Drive
Chicago, Illinois 60606
Tel: (312) 876-8141
stephen.senderowitz@dentons.com

*Counsel for Defendants Terraform Labs Pte. Ltd.
and Kwon Do Hyeong*