EXHIBIT 1

```
 1                    IN THE UNITED STATES DISTRICT COURT
                         FOR THE DISTRICT OF COLUMBIA
 2

 3      Securities Exchange              )
        Commission,                      )  Civil Action
 4                                       )  No. 23-cv-1599
                          Plaintiff,     )
 5                                       )  Hearing for Temporary
        vs.                              )  Restraining Order
 6                                       )
        Binance Holdings Limited,        )  Washington, DC
 7      et al.,                          )  June 13, 2023
                                         )  Time:  2:00 p.m.
 8                        Defendants.    )

 9      _____

10          TRANSCRIPT OF HEARING FOR TEMPORARY RESTRAINING ORDER
                                 HELD BEFORE
11             THE HONORABLE JUDGE AMY BERMAN JACKSON
                      UNITED STATES DISTRICT JUDGE
12      _____

                          A P P E A R A N C E S
13

14      For Plaintiff:     Matthew Scarlato
                           Jennifer Farer
15                         David Nasse
                           Securities and Exchange Commission
16                         100 F Street, NE
                           Washington, DC  20549
17
                           Jorge G. Tenreiro
18                         John Emmett Murphy
                           Securities and Exchange Commission
19                         100 Pearl Street
                           New York, NY  10004
20
        For Defendant:
21        Binance           Daniel Nelson
                           Jason Mendro
22                         Richard Grime
                           Kendall Day
23                         Stephanie Brooker
                           Gibson, Dunn & Crutcher, LLP
24                         1050 Connecticut Avenue, NW, Suite 300
                           Washington, DC  20036
25
```

```
1     For Defendant
        Binance          Mary Beth Maloney
2                        Gibson, Dunn & Crutcher, LLP
                         200 Park Avenue
3                        New York, NY  10166

4                        Michael Celio
                         Gibson, Dunn & Crutcher, LLP
5                        1881 Page Mill Road
                         Palo Alto, CA  94304
6
        BAM Entities     Matthew Martens
7                        Matthew Beville
                         Wilmer, Cutler, Pickering, Hale and Dorr
8                        2100 Pennsylvania Avenue, NW
                         Washington, DC  20037
9
                         Adam Fee
10                       Milbank, LLP
                         1850 K Street, NW, Suite 1100
11                       Washington, DC  20006

12      Changpeng Zhao   Abid R. Qureshi
                         Michael Bern
13                       William Baker, III
                         Douglas Yatter
14                       Melanie Blunschi
                         Latham & Watkins, LLP
15                       555 11th Street, NW, Suite 1000
                         Washington, DC  20004
16
     _____
17
     Court Reporter:          Janice E. Dickman, RMR, CRR, CRC
18                            Official Court Reporter
                              United States Courthouse, Room 6523
19                            333 Constitution Avenue, NW
                              Washington, DC  20001
20                            202-354-3267

21

22

23

24

25
```

```
1        *   *   *   *   *   *   *P R O C E E D I N G S*   *   *   *   *   *   *

2              THE COURTROOM DEPUTY:  Good afternoon, Your Honor.

3        This afternoon we have civil action No. 23-1599, the *SEC versus*

4        *Binance Holdings Limited, BAM Trading Services, Inc., BAM*

5        *Management U.S. Holdings, Inc., and Changpeng Zhao.*

6              Will one of the attorneys representing the SEC please

7        approach the lectern, identify himself and his colleagues for

8        the record.

9              MR. SCARLATO:  Good afternoon.  This is Matt Scarlato

10       on behalf of the SEC.  I have with me, on the right, Jen Farer,

11       Jorge Tenreiro, Emmett Murphy, and David Nasse on the left.

12             THE COURT:  All right.  Good afternoon.

13             THE COURTROOM DEPUTY:  Counsel for Binance.

14             MR. NELSON:  Good afternoon, Your Honor.  Dan Nelson

15       from Gibson, Dunn on behalf of Binance Holding, Limited.  With

16       me are my colleagues Michael Celio, Mary Beth Maloney, Jason

17       Mendro, Stephanie Brooker, Kendall Day, and Richard Grime.

18             THE COURT:  All right.  Good afternoon, everybody.

19             MR. NELSON:  Thank you, Your Honor.

20             THE COURTROOM DEPUTY:  Counsel for the BAM parties.

21             MR. MERTENS:  Good afternoon, Your Honor.  Matthew

22       Mertens for the BAM entities.  I'm joined by my colleague Matt

23       Beville.  And from the Milbank law firm, Adam Fee.

24             THE COURT:  All right.  Good afternoon.

25             THE COURTROOM DEPUTY:  Mr. Qureshi, representing the
```

1    individually named defendant Mr. Zhao.

2            MR. QURESHI:  Good afternoon, Your Honor.  Abid R.

3    Qureshi, of Latham & Watkins on behalf of the individual

4    defendant.  With me are Mr. Yatter, also of Latham & Watkins,

5    and Ms. Melanie Blunschi, also of Latham.

6            THE COURT:  All right.  Good afternoon, everyone.  Is

7    that everyone?  I take it there's lots more lawyers sitting in

8    the back representing all of these people.  And I hope you'll

9    all consider, before you leave the courthouse, filling out the

10   form agreeing to accept CJA assignments.  We need lawyers.

11   Apparently there are a lot of them who have a lot of time on

12   their hands here in the District of Columbia.  And please note

13   if any of you speak Spanish, because we need some people like

14   that to take on even just mediations on behalf of indigent

15   defendants, which apparently these defendants are not.

16           All right.  We're here on the government's motion for

17   a TRO.  The memorandum, I have to say, at some points was

18   written as if it was for opposing counsel, as opposed to a

19   neutral who has not been living with these entities and assets

20   on a day-to-day basis for the past few years.  There's a lot of

21   technical terminology that takes a lot of time to unpack, as

22   they say in the business space, along with parades of acronyms

23   which I've devoted considerable time to reviewing and

24   absorbing.

25           But I do have some basic questions that I want to

1    ask, just to make sure I know exactly what is and what is not

2    being alleged and exactly what the government's position is

3    with respect to these assets and these companies.

4            However, before I get into that -- I was planning to

5    do this later, but this seems like the appropriate time -- I do

6    want to note that you've given me, the government, 1,000 pages

7    of exhibits, and the defendants have filed more than 3,000,

8    some of them late.  Putting aside who is right about the merits

9    of the legal and factual allegations, I think everyone in the

10   room can agree that it's important to get this issue of first

11   impression right.  And even holding a hearing in 14 days isn't

12   going to give me enough time to get to the bottom of everything

13   that you've given me with the level of understanding that you

14   all deserve.

15           And it appeared to me last night, when I got the

16   defense submission, was largely about the fact that you thought

17   there was some sort of consent decree that could be entered,

18   that the parties weren't really that far apart in terms of how

19   to preserve the assets of the U.S. investors and the U.S.

20   entities pending the outcome of these proceedings, and if an

21   order could be entered with the parties' agreement, that would

22   actually give us time to give this complicated factual and

23   legal matter the attention it deserves.

24           So I ordered the government to give me a red line,

25   what exactly is missing from what they've proposed?  I wanted

```
 1     to kind of strip away the grand statements by each side about
 2     what was and wasn't a good proposal and I want to get into the
 3     nitty-gritty.  And while there was sort of a spray of red
 4     across the red line that initially was a little intimidating,
 5     the more I looked at it, the more I thought that, really,
 6     there's not that much difference between the parties anymore.
 7     The SEC seems to understand that BAM Trading needs to operate
 8     in the ordinary course of business pending the outcome of this
 9     proceeding, not only for itself, but shutting it down
10     completely would create significant consequences not only for
11     the company, but for the digital asset market in general.
12            What's left to negotiate is the kind of nitty-gritty
13     and the kind of details, the wallets, and the shards that are
14     of importance to and understood much better by those who are
15     knowledgeable and immersed in these matters.  And so it seems
16     to me, notwithstanding the fact that I think I'm a pretty smart
17     person, I do a pretty good job up here, that there's a lot of
18     reasons why it would be far better for people like you, as
19     opposed to a generalist like me, to get this consent decree
20     over the finish line and you have the opportunity to be
21     operating under an agreement that you all crafted, as opposed
22     to the one that I come up with, and which would ultimately then
23     be appealable by whichever side is disappointed, taking even
24     more time and attention away from getting to the merits.
25            So, in some cases, when you have this many lawyers
```

```
1    working on something, there's kind of a Department of State and
2    a Department of Defense and you've got the people that are
3    doing the diplomacy and the people that are getting ready for
4    battle.  And if that is the case here, and there would be some
5    benefit to excusing some of you, the Department of State, to
6    now discuss the red line that you have, that all of the
7    disputes have now been limited to, a couple pages, or whether
8    you still want the afternoon and the evening to think about it,
9    at which time I could, if you thought it was -- would be of
10   benefit, send you to Magistrate Judge Faruqui to try to finish
11   the process.
12            But does it make sense to just go ahead with all my
13   questions and answers with all of you present right now, or
14   would some of you like the opportunity to confer?
15            (Pause.)
16            MR. SCARLATO:  Your Honor?
17            THE COURT:  Yes.
18            MR. SCARLATO:  Matt Scarlato.  Good afternoon.  Your
19   points are well taken.  And so if you can give us a minute's
20   indulgence to speak with the other side, we'll have an answer
21   for you shortly.
22            THE COURT:  All right.
23            MR. SCARLATO:  Thank you, Your Honor.
24            THE COURT:  I'll be happy to give you all the time
25   you need to cross the middle of the courtroom and put your
```

1    heads together.  Would it be easier for you all if I left the

2    room?  No?  It looks like you're fine.

3              (Pause.)

4              MR. SCARLATO:  That was fast, Your Honor.  No, we

5    cannot come to an agreement right now.

6              THE COURT:  Shocker.  Okay.  All right.  What I'm

7    going to do then is go ahead with the questions that I have.

8    But, one of the questions I will be asking all of you is

9    whether you would agree to participate with Judge Faruqui as

10   early as he can see you to try to discuss the consent decree.

11   In the meantime, I'm going to have the TRO and everything you

12   tell me today under advisement.

13             But, there's a lot of reasons, in addition to the

14   ones I've listed, why the best agreement would be one that you

15   all draft.  So I'm not going to ask you that question now, but

16   you can be prepared for it.

17             All right.  Then are you the one answering the

18   questions with respect to the motion?

19             MR. SCARLATO:  Depends on the question, Your Honor,

20   but probably.

21             THE COURT:  Okay.  Well, that will be fun.  All

22   right.  The memorandum says, at multiple points, including on

23   pages 16 and 19, that the defendant, particularly the U.S.

24   entity BAM Trading offers the ability to buy and sell, quote,

25   crypto assets, including crypto asset securities.  That's your

1    formulation.  At various points in the memorandum you refer to

2    "crypto assets," but in others you use the term "crypto asset

3    securities."

4            I am aware of your legal argument about what made a

5    particular offer, the Binance coin -- which you also refer to

6    BNB -- a security for purposes of the act.  My first question

7    is, is that the same as the BUSD, or is it different?

8            MR. SCARLATO:  Different coin, Your Honor.

9            THE COURT:  Okay.  All right.  And we'll get to that

10   in a minute, but it would help me if, first, you would walk me

11   through what differentiates crypto assets from crypto asset

12   securities, and then I'm going to ask you to tell me which

13   assets in particular referred to in the memo and in the

14   complaint, other than the Binance coin, are the securities that

15   are the predicate for your complaint.

16           MR. SCARLATO:  For our complaint, Your Honor?

17           THE COURT:  Yes.  The only one mentioned, are we in

18   agreement, in the TRO is the Binance coin, is that correct.

19           MR. SCARLATO:  It's correct.  We also rely on other

20   cases where judges have found other coins in other cases to be

21   securities.

22           THE COURT:  All right.  And so the notion as to

23   whether these are securities or not, are you saying this has

24   been -- this is not a case of first impression here, that this

25   has been dealt with before?

```
1          MR. SCARLATO:  Other courts have dealt with the

2   question in other -- not as to, at least, the coins at issue in

3   the TRO, which is Binance's coins, but in other cases, yes,

4   there have been judicial opinions on whether they meet what's

5   called the Howey test, Your Honor.

6          THE COURT:  Okay.  I understand that.  But before we

7   get into -- so my point is, the only one you're arguing in

8   the -- in your TRO motion of the defendants' is the Binance

9   coin?  You're saying that is a security.

10         MR. SCARLATO:  That's correct.

11         THE COURT:  All right.  But when you talk generally

12  about the companies and their businesses, you say they deal

13  both in crypto assets and crypto asset securities.  Does the

14  complaint allege any other specific coins are securities,

15  besides the BNB or the Binance coin?

16         MR. SCARLATO:  Yes, it does, Your Honor.

17         THE COURT:  Which ones are they?

18         MR. SCARLATO:  That would be in our complaint, Your

19  Honor, starting on paragraphs -- in the 300s, page 85, section

20  8, we give an explanation of the different coins that were

21  trading on the defendants' platforms.  And, you know, while

22  it's our position we only need to prove one of these coins is a

23  security to prove our case, you know, we thought it proper to

24  allege that there were other coins that we see trading on these

25  platforms that should also be deemed securities.
```

```
1              THE COURT:  All right.  And --

2              MR. SCARLATO:  Go ahead.

3              THE COURT:  When you use the formulation crypto asset

4    versus crypto asset securities, can you tell me, what are the

5    differentiating factors?

6              MR. SCARLATO:  Whether they meet the Howey test.

7              THE COURT:  That's it?  The Howey test for each

8    one --

9              MR. SCARLATO:  Yes.

10             THE COURT:  -- in --

11             MR. SCARLATO:  I'm sorry, Your Honor.  Yes, that's

12   how a security is defined, and we give 14 specific

13   representatives.  We're not saying that's exclusive, Your

14   Honor.  Our complaint, we feel like, was long enough, so we

15   gave a bunch that we thought satisfied that test and reserve

16   our right in discovery to, you know, conform our complaint to

17   the pleadings or whatever is necessary before trial.

18             THE COURT:  All right.  Are the other crypto assets

19   that you're not labeling as securities, commodities?

20             MR. SCARLATO:  The other -- that aren't alleged in

21   our complaint, Your Honor?

22             THE COURT:  The others that you say they're trading

23   in that you're not saying are securities, because you're not

24   saying all of the ones they're trading in are securities,

25   correct?
```

```
1              MR. SCARLATO:  We -- at this time, Your Honor, we're

2       reserving our rights, just given we're at the pleading stage we

3       have to get into discovery where we can make a full assessment.

4       But our position, Your Honor, is that if one of these coins are

5       a security, we've won.

6              THE COURT:  I heard that.

7              MR. SCARLATO:  Okay.

8              THE COURT:  But you have said all over the complaint

9       crypto assets -- and you differentiate that specifically from

10      crypto asset securities, and you make it clear that one

11      category is larger than the other category and that both

12      categories are on the Binance.com platform and the Binance.US

13      platform, correct?

14             MR. SCARLATO:  Yes.

15             THE COURT:  So I'm asking you, the ones that you are

16      not putting in the securities category, what are they?  Are

17      they commodities?

18             MR. SCARLATO:  We are not -- thank you, Your Honor.

19      We are not taking a position at this time.  We're at the

20      pleading stage.  We are trying to get past, you know, any

21      potential motion to dismiss and satisfying our burden under the

22      rules.  So we have, we think, way more than is required under

23      Rule 8.  We gave the Court and the parties notice as to -- I

24      think the number is 14 total coins, including BNB, which is at

25      issue in the TRO.
```

```
1              THE COURT:  All right.  If the Binance coin is the

2     only security that you're relying on right now for purposes of

3     the TRO and the facts that you rely upon when you describe to

4     me why it meets the test are from the time of the initial

5     offering, how does that -- how does that make it a security

6     now, such that BAM Trading, which was created later, didn't

7     even exist at the time of the ICO, how does it make it a dealer

8     in these securities?

9              MR. SCARLATO:  And, Your Honor, I want to see if my

10    colleague wants to -- do you mind if I defer to my colleague,

11    Mr. Murphy, on this?

12             THE COURT:  No.  Go ahead.  I don't want two of you

13    answering the same question, but two of you can answer

14    different questions.

15             MR. MURPHY:  So, sorry, Your Honor, let me just

16    restate -- oh, Emmett Murphy, from the SEC.

17             So let me just restate, so I understand.  The

18    question is, why is -- why are facts back from 2017 relevant to

19    whether BNB is a security when BAM Trading as a platform hadn't

20    opened by 2017?

21             THE COURT:  Yes.  There's an argument made in their

22    opposition that when you describe it as a security, the facts

23    you're relying upon are the fact that it was offered at the

24    time when they were saying we're going to use these funds to

25    set up this platform, et cetera, et cetera, and you talk about
```

14

```
 1      the enterprises being created and you -- all your facts relate
 2      to the 2017 offering.  And they have pointed out that they
 3      didn't exist at the time of the offering and now these coins
 4      have been around since then.  So, how does it make it a
 5      security?  Why is it still a security now?
 6              MR. MURPHY:  Yeah, Your Honor, so I was reading that
 7      last night and I was confused because I thought at one point
 8      they were making an argument about statute of limitations for a
 9      Section 5 offering under the Securities Act, which they can
10      raise as a defense.  I don't think that undermines our prima
11      facie case.  But if the question is:  Why is it a security?
12      Howey looks at the economic substance of the instrument at
13      issue.
14              And here, those statements back in 2017 are
15      unfiltered statements about what the economic reality is of
16      these crypto assets.  They were absolutely candid that these
17      were investments where they were seeking money for investors to
18      grow the enterprise.  If their argument is that it somehow is
19      no longer an investment contract because -- and they have a
20      bunch of different things in their papers -- because it's
21      become adequately decentralized or somehow has changed its
22      nature --
23              THE COURT:  I guess the point is, when you did the
24      offering, people could buy them.  And since then they've been
25      on the platforms and people could trade them, sell them,
```

1       repurchase them.  At that point the people aren't responding to

2       the initial offering, they're responding to that asset.  I want

3       one of those, I don't want one of those.  So at that point, why

4       is it a security, as opposed to, like, another coin?

5               MR. MURPHY:  I guess I would just say that there are

6       secondary trading markets for all kinds of securities.  And if

7       the idea that once it goes into the secondary trading market it

8       doesn't become a security, that would destroy all kinds of

9       understandings of how the securities markets work.  The

10      statements that they made, again, go to the raw economic

11      reality of these people buy them so that their value will be

12      appreciated.

13              The Binance enterprise -- and you know in our papers

14      that we don't think there's such a clear distinction between

15      .com and BAM and the platforms.  Right?  Binance is running

16      both.  But they're clear in statement after statement that we

17      set out in our papers that this is an ongoing enterprise, there

18      are ties to the BNB, their prestige is tied to the BNB, they

19      will support the price; you will make money if you buy BNB.

20      And that is continuous from that ICO to the present day.

21              THE COURT:  Isn't that the flip side of what you say

22      a security is?  You're saying that they're saying it's tied to

23      them, as opposed to they're tied -- the success of the coin is

24      based on the success of the platform, and you just turned that

25      the other way, I think.

```
 1              MR. MURPHY:  I don't know, Your Honor.  I think
 2     they've tied their fate to BNB in many ways, which goes to the
 3     commonality element of Howey, where folks are looking at the
 4     efforts of others.  And the question might be, there's
 5     statements in their papers to the effect of Binance has nothing
 6     to do with BNB anymore, BNB is a baby that's been born and we
 7     have nothing to do with it and it will be fine without Binance.
 8     And I think the facts that we put into our papers are very
 9     clear that that's not the case, that they've -- on their web
10     page and their blog, they are constantly monitoring the price,
11     talking about how it's a valuable asset, giving you additional
12     uses for the asset, and making clear to the investing public
13     that they are invested in it, they are going to continue to
14     create ways to make money on BNB.
15              THE COURT:  All right.  What is your response to the
16     argument that the coin can't be a security contract for
17     purposes of the Howey case if there's no contract?
18              MR. MURPHY:  I would respond by pointing to the
19     language in Howey itself which says, essentially, that
20     investment contract was meant to be a catchall term for all the
21     different ways that people solicit capital to get other
22     people's money on the promise of profits.  And the language in
23     Howey -- if I could just look, so I don't -- Howey says that an
24     investment contract can cover schemes or contracts.  And I
25     think that language is clear.  And if you look at -- this is
```

1    on, sorry, 298 and -99 in *Howey*.

2         *Howey* defined the investment contract as a contract

3    transaction or scheme.  If you look at the *Telegram* case that

4    we cited in our papers, there you had initial purchasers who

5    had contracts and the later public where it was distributed

6    very quickly.  And the Court looked through the economic

7    substance of that, where there had clearly been an attempt made

8    to insulate themselves from the securities laws by saying we

9    had these initial sophisticated purchasers, they're exempt from

10   the securities laws, they're very sophisticated, and whatever

11   happens after that we have no control of.

12        The Court in *Telegram* looked through that and said,

13   no, it's all part of the same offering.  You are selling to a

14   broader public, that's the only reason it has its value.  There

15   was no contract with that broader public and yet the Court

16   still found a Section 5 offering there.

17        THE COURT:  Okay.  I want to talk about the

18   misrepresentations, which is section 6 of your statement of

19   facts.  I don't know if that's your issue.

20        MR. MURPHY:  We're going to tag team, if you'd allow.

21        THE COURT:  All right.

22        MR. MURPHY:  Sorry, I don't want to walk off with

23   Mr. Scarlato's papers here.

24        THE COURT:  All right.  That section alleges

25   misrepresentations by the U.S. BAM entities regarding trade

 1    surveillance and trade volume, and it expresses skepticism

 2    about whether these organizations are really truly monitoring

 3    for market manipulation or whether they have procedures to

 4    control it, and you point to the wash trades.  What exactly is

 5    the actionable misrepresentation?  Is it the statement in the

 6    pitch deck that they hired vendors and got the reporting

 7    software to provide trade surveillance and market manipulation

 8    monitoring?

 9             MR. SCARLATO:  Close.  It's basically -- it's not the

10    wash trading itself, Your Honor.  We don't charge that conduct,

11    we use it as evidence that -- of the misreps that you

12    identified.  And just to put them in boxes, you first have

13    misrepresentation in the pitch deck, which are to the equity

14    investors that we allege.  And you have two sets of

15    misrepresentations.  You have one, first, that they said they

16    had surveillance on the platform, which is, Your Honor, typical

17    of any registered platform.  This one was not registered, so it

18    didn't have any surveillance and wasn't required to.

19             THE COURT:  The sentence, I think you put it in your

20    statement of facts, you said the platform is engaged in

21    monitoring for manipulation.  Is that one of the false

22    statements?  Or you just said --

23             MR. SCARLATO:  Correct --

24             THE COURT:  -- that they represented that, but you

25    didn't say where they said it, so I wasn't --

1          MR. SCARLATO:  If that's the case, Your Honor, we

2   apologize.  But it's a citation to the pitch deck, which was

3   given to equity investors, Exhibit A-53.

4          THE COURT:  Right.  Is there anything else?  The

5   statement in the pitch deck was we hired vendors and got

6   third-party software to provide trade surveillance and

7   monitoring.

8          MR. SCARLATO:  That's right.

9          THE COURT:  Okay.  That's the false statement.  Is

10  there any other false statement?

11         MR. SCARLATO:  In the category of surveillance

12  there's another false statement where the former CEO, Catherine

13  Coley, made a public statement -- I don't have it in front of

14  me, but it's something about how we don't allow toxic behavior

15  on the exchange, which, again, this was in, I think, 2019, and

16  that statement was also false because at that time, in effect,

17  it wasn't until 2022 that BAM Trading put any trade

18  surveillance on the platform.

19         So that's one box.  And it has two subparts, equity

20  investors and then just the retail public who is listening to

21  the CEO talk about the platform.

22         The second box, if Your Honor is ready, has to do

23  with the volume reporting itself.  And here we -- you know,

24  this is a trading platform, the way that it solicits customers

25  is it says we have a lot of volume, come trade with us, right?

1    So throughout the relevant period BAM Trading made a bunch of

2    representations on Twitter, through data aggregators and

3    elsewhere that said our trading volume is X.  And what the

4    fraud was, is they did not explain that X meant we weren't even

5    checking for any wash trade.  And that's where the Sigma Chain

6    point comes in, where they were actually conducting wash

7    trading, which was inflating the volumes.

8            The final piece in that category, Your Honor, is

9    again back to the pitch deck, because the pitch deck itself

10   that was shared with investors who invested in BAM also made

11   representations about trading volumes.  And then there was some

12   other accompanying documents we did not include in the TRO

13   papers for simplicity sake, but there were other

14   representations made to these investors about the volume on the

15   platform.  And again, the fraud is these volumes were inflated

16   by wash trading and the lack of surveillance.

17           THE COURT:  All right.  What's your response to the

18   defense argument that the volume was minimal compared to the

19   overall volume and it couldn't have really been material or

20   affected anybody?

21           MR. SCARLATO:  Then I would refer defense counsel to

22   Mr. Zhao's own statement on Twitter that we cite, I think both

23   in our brief and the complaint, where he acknowledges that

24   investors want to know if they're trading on a platform that is

25   corrupted by wash trading or lacked surveillance.

1          And then in addition, Your Honor, as to the equity

2     investors --

3          THE COURT:  I think the statements you quoted were

4     much broader than that.  It was like credibility is important.

5     I don't remember -- he made a specific statement about wash

6     trades that you --

7          MR. SCARLATO:  I believe it does mention wash

8     trading.  I have to pull it up.  But while I'm doing that, Your

9     Honor, I'll just say that we also, in the Steele declaration,

10    give -- Mr. Steele attests to an interview we had with one of

11    the equity investors who told us that when he was investing in

12    BAM Trading -- or, BAM Management, excuse me, he wanted to know

13    if this volume was inflated and if they had trade surveillance.

14    And that was -- so that was the materiality point from a

15    different perspective.

16         THE COURT:  And so is he saying he relied on that

17    when he made his decision to buy?

18         MR. SCARLATO:  He said it would have been important

19    for him to know.  He didn't know it at the time, right?  He was

20    defrauded.  But when we interviewed post hoc and told him the

21    situation, he -- you know, I can refer you to the paragraph in

22    the Steele declaration, if you'd like.

23         But if I can first refer to Mr. Zhao's comment?

24         THE COURT:  Sure.

25         MR. SCARLATO:  He said, "Credibility is the most

1    important asset for any exchange.  If an exchange fakes their

2    volumes" -- and that's how you fake your volumes, through wash

3    trades.

4            THE COURT:  All right.  So let's go back to the

5    statement in the pitch deck that they hired vendors and got

6    third-party software to provide trade surveillance and market

7    monitoring.  Are you alleging that they did not do that, or

8    just that they -- those things weren't actually doing what they

9    were supposed to do?  Was the statement literally false or did

10   it just give rise to an impression of more oversight than there

11   was?  You don't actually say that.

12           MR. SCARLATO:  So the full facts are that they had

13   hired a trade surveillance monitor, but they had done nothing

14   with it at the time that these statements were made.  The facts

15   are that it wasn't until after the -- what was called the seed

16   funding ground was completed, they finally started ramping up

17   the actual surveillance of the platform.  But that was well

18   after these statements were made.  And so, again, it matters at

19   the time the statements were made and at that time they had

20   nothing, frankly.  They had a contract, but it wasn't

21   implemented in any way.

22           THE COURT:  Are there -- putting aside the ones

23   described in section 6, are there other alleged

24   misrepresentations that you maintain were in violation of the

25   Act?

```
1              MR. SCARLATO:  Those two categories with retail and
2      equity investors are it.
3              THE COURT:  All with respect to trade volume and
4      trade surveillance on the U.S. BAM platform.
5              MR. SCARLATO:  That's exactly right.
6              THE COURT:  Are there any other misrepresentations
7      that you're alleging?
8              MR. SCARLATO:  Oh, Your Honor, I forgot to mention
9      that the terms of use for BAM Trading and the terms of use,
10     which is what anyone who joined the platform has to sign up
11     for, they have a section on manipulative trading, and we allege
12     that, and I believe prove in our TRO papers, that when people
13     were signing up for the platform, they were defrauded by
14     believing that BAM prohibited manipulative trading, when in
15     fact its own control person, Mr. Zhao, was doing exactly that.
16             THE COURT:  All right.  But the answer -- but that's
17     sort of part of the same thing, right, the --
18             MR. SCARLATO:  Correct, yeah.  I just forgot a layer
19     to it.
20             THE COURT:  All right.  So I read that section.  Are
21     there any other misrepresentations that you're talking about
22     besides that set?
23             MR. SCARLATO:  Not at this time.
24             THE COURT:  So every other claim in the case then
25     relates to failure to register.  Am I correct about that?
```

```
 1                    MR. SCARLATO:  Failure to register, the exchange, the

 2        clearing agency, the broker-dealer, and then the section 5

 3        claims, which are the office --

 4                    THE COURT:  Control person.

 5                    MR. SCARLATO:  Excuse me?

 6                    THE COURT:  The control person.

 7                    MR. SCARLATO:  No.  I'm sorry.  The section 5

 8        Securities Act, which is registering the office in sales.  So

 9        that we allege they were selling BNB, BUSD, and then they're

10        providing a service or offering sales that needed to be

11        registered and were not.

12                    THE COURT:  All right.

13                    MR. SCARLATO:  Did I confuse you?

14                    THE COURT:  When you go through -- I'm going to go

15        through all the failure to register claims with you to make

16        sure I understand them.

17                    MR. SCARLATO:  Sure.

18                    THE COURT:  You're kind of swallowing your words and

19        I still don't know what you said at the end of the last

20        sentence, the sentence that you keep saying failure to

21        register.  Besides failure to register as a broker-dealer,

22        failure to register as an exchange, and failure to register --

23        what's the term?  As the trading --

24                    MR. SCARLATO:  Clearing agency.

25                    THE COURT:  Clearing agency.
```

1          MR. SCARLATO:  There you go.  Okay.

2          THE COURT:  Those were the three.  And different

3     entities are alleged to be one or the other, and fail to

4     register as one or the other.  I'm going to go through which

5     ones you're alleging are or aren't those things, and fail to

6     register.  But is there some other failure to register you're

7     talking about?

8          MR. SCARLATO:  Yes.  And I apologize if I wasn't

9     clear.  So there are the offers and sales of the securities

10    themselves.  For example, you talked earlier with my colleague

11    about the IPO -- ICO, excuse me, of BNB.  So that should have

12    been registered; it was not.  Subsequent sales of BNB, which

13    includes to the employees, and then we also allege BUSD -- it's

14    not in the TRO papers, Your Honor, but in the complaint we also

15    allege that the offer and sale of BUSD should have been

16    registered under Securities Act section 5.

17         THE COURT:  Okay.  I think that is more in the

18    complaint than in the --

19         MR. SCARLATO:  Correct.

20         THE COURT:  -- in the TRO memo, which is what I'm

21    really focused on at this point.

22         Is it an element of the claims, the failure to

23    register claims, that the individual or organization knew of

24    the registration obligation, failed to register, or is knowing

25    and willful not an element of that violation?

```
 1          MR. SCARLATO:  Not an element at all.

 2          THE COURT:  And a big theme of the submission, an

 3    important aspect of your concerns is the potential conflicts

 4    arising from the overlapping ownership and relationships

 5    between the various defendants and the multiple functions that

 6    they perform; in particular, the international company and then

 7    the U.S. companies.  But the memo in support of the TRO doesn't

 8    specifically allege that those conflicts or functions violate

 9    the Act.  And if the companies were registered, would there be

10    regulations that would be violated by these relationships?

11          MR. SCARLATO:  Your Honor is exactly on point.  We

12    point out those conflicts of interest to show you why they

13    should have been registered, because the failure to register

14    creates the conflicts of interests that things like wash

15    trading and commingling result in without supervision or

16    regulation.  But those themselves are not the laws that are

17    violated.

18          THE COURT:  You say the failure to register created

19    the conflicts of interest.  So --

20          MR. SCARLATO:  Permitted.

21          THE COURT:  Permitted.

22          MR. SCARLATO:  Permitted.

23          THE COURT:  So if they were registered, then these

24    would not be violations of the Act, but they would be

25    regulatory violations of a registered entity?
```

1          MR. SCARLATO:  Like, if the exchange were registered,

2     there would be safeguards in place to make sure there was trade

3     surveillance so that Mr. Zhao could not wash trade on the

4     platform.

5          THE COURT:  And disclosure obligations, I take it,

6     also?

7          MR. SCARLATO:  Many.  And including the custody of

8     assets, which is why we're here today, right, Your Honor.

9          THE COURT:  Now, the SEC has obviously been aware of

10    the nature of Binance's business and the business of the U.S.

11    affiliates for some time.  They got involved back in 2019 when

12    they told Binance they couldn't operate in the U.S., which is

13    what led to the creation of the U.S. entities.  So what

14    prompted the need to seek emergency relief?

15         MR. SCARLATO:  Right.  So, Your Honor, it is true we

16    have been investigating the entities for several years.  And

17    obviously they were -- we were aware that they were operating,

18    but as I'm sure Your Honor can understand, that, you know,

19    government investigations take time.  And, you know, we have

20    been engaged with the parties to ensure that, you know, just

21    that the investigation went as planned.  And so there is a

22    process, we followed it, and there came a time that we, as well

23    as the defendants, that was this year, there were settlement

24    discussions and when those settlement discussions broke down we

25    realized that we were going to have to file a case, and then at

1    that point we assessed the facts that we were learning, and we

2    were learning them real-time, Your Honor.  There were things we

3    learned leading up to filing, like some of the audit reports

4    that we cite in our briefs.  And when we put that all together

5    and then there was a failure to come to an agreement on a deal,

6    the SEC realized it needed to not only file the case, but

7    accompany it with a TRO.

8                 THE COURT:  All right.  Now, the defendants say,

9    well, this is a big broad area that is generally unregulated at

10   this point, you should be proceeding by rule making.  No one

11   seems to be saying let's see what congress gets around to

12   doing.  Why is it prudent, from the Commission's point of view,

13   to assign the determination that would have such far-reaching

14   affects in a billion dollar industry to a lone federal district

15   judge, especially when there's another lone federal district

16   judge in a parallel action who could rule the other way?  It

17   seems like an inefficient and cumbersome way to establish a

18   national, consistent, understandable policy for the regulation

19   of trading in crypto assets.

20                 Now, I'm not sure on what basis the defense says,

21   well, you should tell them that they should have exercised

22   their discretion to do a rule making, because I don't know that

23   I have the power to do that and I imagine you would tell me

24   that I don't.  But, still, the question is, why -- why does it

25   make sense to go this way?

1    MR. SCARLATO:  Because this is the law, Your Honor.

2    The *Howey* test has been around since the 1940s.  And, you know,

3    we tried to interact with these entities to, you know, figure

4    out a plan.  The technology was new.  The rules are

5    longstanding and anything but new, Your Honor, and defendants

6    knew the rules.  You know, Your Honor says this wasn't -- many

7    of our claims are not scienter based.  But, you know, as we

8    allege, there are many things that the defendants have said

9    that acknowledge they knew these were the rules and they just

10   chose not to follow them.

11   So at a given time the SEC can try to interact with

12   these entities to come to a resolution or try to do rule

13   making.  Yes, there's lots of things the SEC could do, but the

14   enforcement arm is here, too, and when we see the law is being

15   violated, we have to act on it.

16   THE COURT:  All right.  Now, most important for

17   purposes of the TRO and the asset freeze is section 7 of your

18   statement of facts where you're talking about the money that's

19   going out and where it's going.  And there are a lot of details

20   about amounts transferred and where they went, but it wasn't

21   always clear to me in the memorandum, even when I sat down and

22   looked at the accountant's declaration, where they come from

23   and your language kind of blurred the distinction.

24   For example, on page 26 you say:  Between 2019 and

25   2021, Merit Peak's account received over $22 billion.  And then

1   you say:  And Merit Peak, just to circle back, is a wholly

2   owned company of defendant Zhao, and you -- offshore.  And you

3   say these funds consisted in significant part of Binance

4   Platforms, plural, customer assets, including those of

5   Binance.US platform customers and other sources.

6          Can you clarify or walk me through the transfers you

7   allege were made specifically from the U.S. entities, as

8   opposed to the international Binance platform, to offshore

9   accounts held by Zhao and how you know that those were customer

10  assets?

11         MR. SCARLATO:  Sure, Your Honor.  It is a lot of

12  details.  So the Merit Peak account, Your Honor, was receiving

13  money primarily from three sources, one of which was an entity

14  called Key Vision.  And if you look at Mr. Verma's declaration

15  at 8-A, you believe -- let me grab it.  Yep, 8-A.  It gives

16  some detail, Mr. Verma gives some detail on the application

17  that Key Vision submitted, and it shows you that -- it talks

18  about how Key Vision was involved in accepting deposits for

19  converting to the stable coin BUSD that we talked about

20  earlier.  And it shows you that the email address is at

21  Binance.com.

22         So that shows that this is Binance customers --

23  Binance.com, the international entity, customers and investors

24  who were putting money into the platform and it's going through

25  Key Vision, and so you have that.  And then separately, Merit

1    Peak had billions of dollars coming in through other finance-

2    related entities, primarily BAM trade.  And it was over

3    a billion dollars, I believe.  I was just trying to get to it.

4    I believe that's paragraph 12.  Yep, 1.154 billion.

5          So you have what totals, in paragraph 12, $11 billion

6    coming in from Key Vision, which is customer funds, and then

7    you have $6 billion coming from Binance Holdings Limited, which

8    is the entity that operates the foreign exchange, .com.  And we

9    don't allege that's customer funds; we don't know at this time,

10   you know, discovery hasn't begun.  But coming -- that amount of

11   money coming from Binance Holdings.  There's probably an

12   inference of that, but we're not saying that at this time.  And

13   similar as to BAM Trading.  So you're taking --

14          THE COURT:  I'm still trying to get to the money

15   coming from the U.S. platform customers.  I think the thrust of

16   the TRO is the U.S. entities, making sure that their customers'

17   assets and their assets are not dissipated, are not sent

18   offshore, and are here in the event you determine that they

19   should be registered, or that there's a disgorgement or money

20   owed, due to the customers.  And they're the subject of the --

21   really, the focus of your proposed TRO, that they can't

22   transfer any money.  And you're asking for repatriation.  I

23   assume when you're talking about bringing money back to this

24   country, you're talking money back to the U.S. entities, not to

25   Binance.com.

1          So what I want to know is where specifically are the

2     allegations about transfers from BAM Trading -- BAM Trading --

3     out, offshore, as opposed to the examples you're giving me are

4     still Binance.com, not Binance.US.com.

5          MR. SCARLATO:  Fair enough, Your Honor.  Sorry if

6     that was not clear.  But the point is that BAM Trading is

7     operating in the U.S., that's correct.  The only thing that's

8     abroad are some of those so-called key shards, and that's part

9     of the repatriation order.  We want those back.

10         THE COURT:  Some of the what?  Key shards.

11         MR. SCARLATO:  Key shards.  Did you get that

12    terminology down?  I can explain it, if you'd like.

13         THE COURT:  Go right ahead.

14         MR. SCARLATO:  Okay.  So under the crypto currency

15    security protocols that Binance -- excuse me, this is BAM

16    Trading employs, you need keys, kind of like, you know, the

17    nuclear football needs several people to put a key and turn it.

18    This is the crypto version of that.  And so you need -- there

19    are seven keys, as far as we understand.

20         THE COURT:  And there's -- three of them are

21    offshore.

22         MR. SCARLATO:  That's right, and we want them back.

23         THE COURT:  Okay.

24         MR. SCARLATO:  But your question was as to the money,

25    so do you want me to continue there?

1          THE COURT:  Well, if you're saying we need to shut

2     down and impose this regime on the U.S. companies because we're

3     concerned about the dissipation of assets from the U.S.

4     companies, I want to know, where have you made a showing that

5     it is the money from the U.S. companies that is moving out?

6          MR. SCARLATO:  It hasn't happened yet, Your Honor.

7     But that's not the point.  The point is that we are concerned

8     about Mr. Zhao and Binance exerting their influence, based on

9     the motives that they've shown since the relevant period began,

10    for many years now, to exert that influence and to take those

11    funds offshore.

12         THE COURT:  Okay.  So you can say we don't want your

13    funds to go offshore, but why does what you just told me

14    justify saying you don't get to spend your money at all, it's

15    just frozen?  I mean, you've argued, on page 31 of your memo,

16    you describe the back and forth with counsel for the

17    defendants -- and we're talking about the U.S. -- and you said

18    the SEC has not obtained sufficient reassurance that Binance.US

19    customer assets, which total over 2.2 billion, are squarely in

20    the control of BAM Trading, rather than under the control or

21    influence of Binance or Zhao.

22         You're not alleging that they aren't, you're saying

23    you're not sufficiently reassured that they are.  And then you

24    say the SEC is concerned about the safety and security of those

25    assets.  Okay.  I understand that.

```
 1              But, I want to know, besides the interlocking

 2      relationships then, what have you seen of money going out that

 3      supports those concerns?  And are the concerns you talked about

 4      enough to support the kind of significant -- you're saying I

 5      want to preserve the status quo.  The status quo is anything

 6      you've got, that 2.2 billion, that stays right here in the

 7      U.S., thank you very much.  But you're saying more than that,

 8      you're saying you can't spend any of it, and we want an

 9      accounting.  But you're not alleging that it's gone anywhere.

10      You said it hasn't happened yet.  Isn't that a little bit

11      earlier in the TRO for asset freeze process than usual?

12              MR. SCARLATO:  Your Honor, I would say this is the

13      perfect time to freeze those assets.  But my colleague,

14      Ms. Farer, would like to comment on your question as well.

15              THE COURT:  All right.  Okay.

16              MS. FARER:  Good afternoon.

17              THE COURT:  And just to finish up, when you're

18      talking about repatriation, you're not talking about

19      repatriation of funds taken from the U.S. entities, because

20      you're not saying funds from the U.S. entities are gone; is

21      that correct?

22              MS. FARER:  We're saying funds from -- that relate to

23      the U.S. entities and the customers of the U.S. entities are

24      not based in the United States.

25              THE COURT:  Funds that relate to the U.S. customers
```

1    and the U.S. entities are not based in the United States.

2            MS. FARER:  Correct.

3            THE COURT:  That is a different statement than the

4    question I asked you.  So what does that mean and how does that

5    fit into what you're saying?  And what's the answer to the

6    question of whether customer assets that came into the U.S.,

7    whether they left?  Have they left?  He said no.  Do you

8    disagree with that?

9            MS. FARER:  Your Honor, there are a number of

10   transfers out of the United States bank accounts that have left

11   the country.  But I think in large part we're focussed on the

12   $2.2 billion in crypto assets.  And the way that crypto asset

13   securities and crypto assets generally are controlled, and

14   their movement is controlled, is through these functions called

15   private keys, and portions thereof are what defendants refer to

16   as key shards.

17           And so the private keys, which control the

18   $2.2 billion in customer assets just for the Binance.US

19   platform, all but one of those are based outside of the

20   United States.  And so our concern is with respect to those

21   private keys.  In addition --

22           THE COURT:  I thought the keys were -- four were in

23   the U.S. and three were out?  There were seven altogether, and

24   it was three and four.  So you always needed one U.S., was

25   their position.

```
1           MS. FARER:  So we can take a step back, Your Honor.

2      And I think that would be helpful to help us --

3           THE COURT:  But what bothers me is the keys and the

4      shards are not mentioned in the memorandum.  The memorandum

5      says they're transferring money out, out, out, they're

6      dissipating assets, assets are going, they're leaving, and see

7      the Verma declaration.  So I'm saying, okay, tell me about

8      money that left the United States that belonged to U.S.

9      investors, because you're saying we're really concerned that

10     it's going to disappear.  And now you're not saying that it has

11     disappeared.

12          MS. FARER:  So I think we're saying a couple of

13     things, Your Honor.  I think in our memo we did identify

14     significant transfers out of bank accounts in the

15     United States.

16          THE COURT:  Okay.  And I think you said that they

17     consisted of Binance platforms customer assets, including those

18     of Binance.US.  And so I said, okay, where was the money coming

19     from Binance.US?  And your colleague just said it hasn't

20     happened yet.  So has it happened?  What is the -- the money

21     coming out of the U.S., is it money in accounts that the

22     international company happened to have in the U.S. that it's

23     now moved out?  Or is it money that the U.S. company had in the

24     U.S. that has been moved out?

25          MS. FARER:  It's both, Your Honor.  So I think, to
```

1    take a step back, contrary to defendant's framing and

2    characterization of our papers, we are concerned about all U.S.

3    investors, both those on the domestic platform, Binance.US, and

4    the international platform, Binance.com.  And a large reason

5    for the violation set forth in our complaint does relate to, as

6    Your Honor identified, the interlocking of the entities and

7    trading platforms, the trading and money flow between the

8    platforms, between the entities.

9         And we have really tried to be reasonable, as set

10   forth in our papers and as represented by my colleague here, in

11   trying to have a narrowly tailored order to preserve assets

12   that are currently identifiable in the United States, and to

13   preserve assets, the crypto assets, the $2.2 billion in crypto

14   assets that we understand are under the control of individuals,

15   including those relating to Binance Holdings that are located

16   outside of the United States.

17        Really, what we're just trying to accomplish here,

18   Your Honor, is to preserve the status quo for all of the U.S.

19   investors on both platforms, and having a narrowly tailored

20   order to freeze this and understand the lay of the land.

21        And what I think is important for Your Honor to

22   understand is in addition to --

23        THE COURT:  Except it's not their characterization of

24   your memo.  I'm talking about your characterization of your

25   memo.  And what you said in your memo was we need this TRO

1    because we don't have sufficient reassurance that Binance.US

2    customer assets, which total over 2.2 billion, are in the

3    control of BAM Trading.  And you said you're concerned about

4    the safety and security of those assets.  And now you just told

5    me, well, no, actually, the TRO is about all the investors on

6    both platforms.  What is it?  Which is it?  What you just told

7    me or what you wrote in your pleading?  Put aside what the

8    defendants have to say.

9              MS. FARER:  So it's both, Your Honor.  The freeze --

10             THE COURT:  Where is that --

11             MS. FARER:  -- so the asset --

12             THE COURT:  -- in your memorandum, where you asked me

13   to do this?

14             MS. FARER:  So the asset freeze pertains to the

15   $2.2 billion.  Some of the discovery provisions that we've

16   asked for that relate to the Binance holdings and Binance.com

17   relate to the broader universe investors.  And it is for this

18   very reason that I explained, Your Honor, is that we've

19   identified this $2.2 billion that we want to preserve and we

20   need additional information about the assets that may still be

21   held by Binance Holding on the .com platform that relate to

22   U.S. investors.  As we said, we are trying to have this as

23   narrowly tailored as possible.

24             THE COURT:  Okay.  Well, why is it saying that the

25   trading company, U.S. trading company can't make any

1    withdrawals whatsoever, narrowly tailored, to accomplish this,

2    now that you've said that really a big part of the problem is

3    the investors on the international platform and not on their

4    platform?

5         MS. FARER:  We're saying the crux of the focus for

6    the freeze, Your Honor, relates to the 2.2 billion in U.S.

7    assets.  And if you'll allow me, Your Honor, I'll explain.  The

8    risks that we've identified here relates to the ever changing

9    story and the movement of key shards and crypto assets that

10   have occurred within the past six months.

11        If you'll indulge me, Your Honor, I can explain.

12   There's been a lot of talk in the papers about this wallet

13   custody agreement.  When the BAM Trading platform was

14   established, the domestic entities engaged in a number --

15   entered into a number of service agreements with Binance

16   holdings and Mr. Zhao, one of which was the wallet custody

17   agreement which specifically designated that Binance holdings

18   was the custodian of the wallets, meaning they had the -- they

19   set up the servers, they set up the software, they set up the

20   wallets, had control of all of the keys.  All evidence furthers

21   that view that that agreement was in effect.  All the employees

22   referred to the Binance Holdings and Binance.com as the

23   custodian.

24        It has been only recently, since the fall, that

25   defense counsel has now told us that the wallet custody

1     agreement was, quote, not operationalized.  This is in the face

2     of audited financial reports reflecting that the wallet

3     agreement was in effect and that auditors have in fact

4     identified that Binance Holdings is implementing those

5     custodial functions.  This is also in the face of BAM Trading

6     and BAM Management counsel representations to the SEC

7     specifically identifying that this wallet agreement that --

8     that wallet custody agreement was in effect and that Binance

9     served as the custodian.  To the point, so much so, that they

10    said we are trying to explain to you how our assets are

11    custodied and controlled, but we have limited information,

12    given that Binance.com is our wallet custodian and performs the

13    functions at issue here.

14            So this -- we started asking a number of questions

15    for the past few months and all of the information has changed.

16    The wallet agreement is not operationalized, the wallet

17    agreement that was not operationalized has now been terminated

18    with no explanation as to why an agreement that was not

19    operationalized needed to be terminated.

20            THE COURT:  Well, does it matter, for purposes of the

21    TRO, to get to the bottom of whether it was operationalized or

22    whether it wasn't, whether it was operationalized and then

23    terminated?  Isn't just the question, where are the assets and

24    who is controlling them?  We don't care what you call it.

25            MS. FARER:  This gives rise to some of the questions,

1      because then, subsequent to this engagement about the back and

2      forth of this agreement, because we would submit that it gets a

3      little bit too into the weeds, and we've said, we just want to

4      know who is in control and how they're in control and to make

5      sure that they -- the investor assets are safe and secure.  So

6      then we start hearing about all these movements of tech stocks

7      and servers and key shards.

8              The protocols that govern and secure the assets at

9      issue have changed multiple times since January.  It used to be

10     that there were -- it was a nine key shard protocol.  And, Your

11     Honor, if you would like to take it to a higher level to

12     explain.  But really, it's a password that's broken up into

13     pieces and there are a certain number of pieces -- from what

14     our understanding is, we've asked a number of questions about

15     how this protocol works -- but what they've represented to us,

16     the particular pieces need to have, like -- need to execute

17     transfers and withdrawal.

18             January it was nine key shards, Binance Holdings had

19     three of them.  It was -- three shards were only required to

20     transfer.  So as of that time, Binance.com could transfer

21     without BAM Trading key shards.

22             Again, at that time no key shards, except for maybe

23     one, was located in the United States.  Then at some point the

24     key shards changed to seven key shards.  You know, four

25     required, three of which are by Binance.com.  But notably, this

1  key shard protocol does not even govern all of the assets at

2  issue.  There were assets in Singapore and Tokyo that were not

3  governed by this protocol.  And we were told by counsel that

4  they were in the control of BAM Trading, but when pressed upon

5  that, it was a Binance employee who had recently been holding

6  the wallet at issue and now it was a BAM employee.

7       So there's been a lot of moving parts, including,

8  most recently, we've been engaged with counsel for weeks now

9  about a hardware leger wallet located in Singapore.  And in

10  their papers, as of last night, they've said that there are no

11  Binance.US wallet -- assets on that wallet.  And we've seen

12  significant transfers.

13       So our concern here about the risk, Your Honor, is

14  there are all these moving parts, there's no evidence as to who

15  is in control at what point and there's -- all the evidence

16  shows that there is not a sufficient control within the

17  United States, within the Court's jurisdiction to make sure the

18  significant amount of customer assets are protected.  And

19  contrary to defense counsel's explanation about the, quote,

20  unquote, fiat, the U.S. dollars in bank accounts, we have no

21  confidence that the company assets and the investor assets are

22  segregated because they are held in these -- what are called

23  omnibus wallets, they all go into these wallets.

24       So in addition to the significant movement of money,

25  dollars through these fiat accounts, numbers of accounts have

1     closed, even before we began this TRO process, the fiat has

2     changed --

3               THE COURT:  Well, that's what I keep asking about, is

4     the significant movement of money.  You've explained to me that

5     we've got the 2.2 billion, whether they're in wallets or

6     they're not, they have eight people governing them, they have

7     nine; they're here, they are there.  Some of it is from the BAM

8     trading Binance.US platform, some of it are assets that people

9     got on the international platform, but they belong to U.S.

10    customers, and it's 2.2 billion and it's somewhere, and you

11    want it frozen.  I understand that.  And is that a freeze or is

12    that also a repatriation because you don't think it's here?

13              MS. FARER:  Your Honor, the way that we -- because we

14    are not -- we were trying to have a very narrowly tailored

15    order.  And as Your Honor identified, we don't want the

16    investor assets frozen.  So we are allowing customer

17    redemptions out of those customer funds.  Our concern is we

18    just want whoever is controlling those assets to be within the

19    United States under the Court's jurisdiction.

20              THE COURT:  All right.  Now, that's the 2.2 billion

21    that you said you wanted to preserve.

22              MS. FARER:  Right.

23              THE COURT:  But the memo talks a lot about transfers,

24    not -- this went to Merit Peak, this went here, this went

25    there, it's going offshore.  And I thought the upshot was that

1    it was going offshore from -- I'm not taking about the 2.2

2    anymore -- from BAM Trading's customers' assets or BAM

3    trading's own assets.  U.S. assets are going offshore or are --

4    and what your colleague said is our concern is that they're at

5    risk of going offshore.  It hasn't happened yet.  And you just

6    said we're seeing significant movement of money.  So I want to

7    know, talking about Binance.US, U.S. customer assets, money

8    that should be in the control of BAM Trading here in the

9    United States, has it moved yet?  Is it moving?

10         MS. FARER:  The current account information that we

11   have, Your Honor, is that it is moving within banks within the

12   United States.  In the time that we have been engaging with

13   counsel, certain banking partners have not allowed them to --

14   are shutting down their accounts.  And this is even before we

15   raised any -- we raised the idea of a TRO.

16         So contrary to defense counsel's representation,

17   these banking issues have been public that BAM is having.  And

18   so they are having trouble securing the U.S. dollars in the

19   United States.

20         But to Your Honor's question about all of the

21   allegations --

22         THE COURT:  I want to know, are they going offshore?

23   That was a big theme of the memo.

24         MS. FARER:  Yes, Your Honor.

25         THE COURT:  And I just want to know, are you saying

1     it's happening or it's not?  And it's kind of stunning to me

2     that I've now asked this question to each of you five times.

3          MS. FARER:  So currently the assets are not going

4     offshore.  The references to the Merit Peak and Sigma Chain

5     relates to a lot of movement of funds from Merit Peak into the

6     United States, into accounts that include U.S. customer funds

7     and back out.  But the current funding is that we are -- the

8     current accounts, we're not seeing any flows of money outside

9     of the United States.

10          THE COURT:  So other than the 2.2 billion, are you

11    seeking an order to freeze or repatriate money transferred from

12    the international Binance platform at this time?

13          MS. FARER:  There is no freeze focused on the

14    Binance.com platform, Your Honor.

15          THE COURT:  Now, is the accounting a necessary

16    predicate for the repatriation order?

17          MS. FARER:  Before this morning, Your Honor, I would

18    have said no, but now we understand from defense counsel's

19    brief that the staking assets that were located on a ledger

20    wallet in Singapore have since moved.

21          So as we said, the risk is great, Your Honor.  Funds

22    and crypto -- either crypto and fiat, everything is moving,

23    that's why we need everything frozen and we need an accounting

24    to preserve the status quo and ensure that our investors are

25    protected.

1          THE COURT:  All right.  Now the argument that they

2     keep making -- and again, I'm not sure I hear anybody

3     address -- is that you said freeze this, freeze that.  But with

4     respect to BAM Trading in particular, you basically said freeze

5     it, period.  Not, you can use it in the ordinary course.

6     That's what you asked me to impose.  Now it seems like you've

7     backed off of that considerably in the red line that I asked

8     for and received in the middle of the day today.

9          So what are you saying now with respect to what needs

10    to be ordered with respect to the U.S. company BAM Trading and

11    their ability to do business while this case plays out?

12          MS. FARER:  So our proposal, Your Honor, is to

13    freeze -- have a freeze on the assets; it allows for customer

14    withdrawals.  That was our proposed order.  In engagement with

15    counsel, they have asked for exceptions relating to the

16    ordinary course of business.

17          And some additional context that we think is

18    important, Your Honor, since we've been engaging with them, as

19    we identified, we are very focused on protecting investors, but

20    reasonably understand the continued -- the issues associated

21    with the continued operations of the business.  However, Your

22    Honor, we have been told multiple times by defense counsel that

23    the business is shutting down.  And multiple defense counsel

24    have represented to my colleague that there is a fear of

25    dissipation of assess.

1          So, Your Honor, we have no choice.  We have a duty to

2     our investors, a duty under our authority to be before the

3     Court when defense counsel themselves are identifying a risk of

4     dissipation of assets, that there's a back and forth about

5     whether they're shutting down or not shutting down.  This is

6     why we're here, Your Honor.  But we are trying to get to a

7     point -- to an agreement on this issue.

8          And we have told defense counsel, we are not

9     categorically opposed to a very narrow exception for ordinary-

10    course expenses, given the context I just identified, that they

11    are telling us they're shutting down, we've had defense counsel

12    tell us that there is a serious risk of dissipation of

13    assets --

14               THE COURT:  Well, they're going to object to that --

15               MS. FARER:  Yes.

16               THE COURT:  -- and I really don't think I can base

17    this TRO on what everybody's representing about what you each

18    said to each other in the context of these settlement

19    discussions.  What I want to know is:  If they operate, there's

20    some need for ordinary-course expenses.  They have to pay

21    salaries.  I don't know if these entities even pay rent.  But

22    they at least probably pay salaries, and they may pay for

23    their -- some utilities or internet or WiFi or something.

24               MS. FARER:  We propose --

25               THE COURT:  So they have expenses to do what they're

1    doing; they have accountants, they have lawyers, they have a

2    number of expenses that they need to pay.  And I think the TRO

3    went further than it needs to go to preserve customer assets by

4    saying nothing, no exception.  And if they are shutting down,

5    then still there's a way to say whatever is in there, the

6    customers can get their own stuff out, but nothing else, the

7    bank accounts need to be preserved.

8              MS. FARER:  So what we've proposed on this issue,

9    Your Honor, is while we maintain the low threshold to preserve

10   the status quo of a freeze is appropriate here, we have

11   proposed -- we hear you on the ordinary expenses, but we want a

12   better sense of what is involved, particularly given the

13   interrelationship between these entities.

14             You know, Mr. Zhao spins up a new company --

15   there's almost 100 companies that we're aware of for which he's

16   the ultimate beneficial owner.  And we appreciate that they

17   expressly put a carve-out in, but we just want an understanding

18   to make sure that the expenses that they are paying will not

19   unduly dissipate the assets that should be preserved for

20   investors.

21             And so what we've proposed is a limited, ten-day

22   period in which -- provides some expedited discovery so we can

23   evaluate the experiences that they have incurred now and they

24   anticipate going forward, so we can see, evaluate what might be

25   appropriate ordinary-course expenses to allow for the

```
 1    exception.

 2              THE COURT:  All right.  So a lot of what you're

 3    talking about now has arisen since you even filed your memo?

 4              MS. FARER:  Correct, Your Honor.

 5              THE COURT:  So --

 6              MS. FARER:  Literally, the ordinary expense

 7    discussion occurred over the weekend.  We expressed to counsel

 8    our concerns on the issue, they came back with a proposal.  We

 9    don't think it's sufficient because of the -- you know, sort of

10    moving targets that we've received on information, what

11    payments are being made, et cetera, so we just said provide

12    some accounting information, provide some additional discovery

13    and hopefully we can work this out, but understanding that we

14    believe a narrowly tailored exception is the appropriate

15    carve-out in this instance, given the nature of the activity at

16    issue.

17              THE COURT:  All right.  I think the answer to the

18    questions that I was asking about the transfers -- and I still,

19    I guess, want to go back through -- I got off the track with my

20    allegations.  So I don't know if you're back up, but --

21              MS. FARER:  Depends on what the question is.

22              THE COURT:  Okay.  Well, I want to talk about which

23    of the three defendant entities you're alleging is performing

24    which role without registration, and just make sure I've got

25    this straight based on the memorandum.
```

1          MS. FARER:  Yes, I'm happy to turn it over to

2     Mr. Murphy.

3          THE COURT:  All right.  All right.  In the

4     memorandum, in section II.5, you assert that Binance is an

5     unregistered exchange.  I think that much is clear.  And in

6     II.6 you assert that Binance and BAM Trading as a group are an

7     unregistered exchange.  So you're not alleging that BAM Trading

8     alone is an unregistered exchange?

9          MR. MURPHY:  It is, as part of a group of persons

10     with Binance.  Because that really goes to the point that in

11     the early days Binance was really providing all the

12     functionality for the exchange.

13          THE COURT:  Well, that's my question.  You said it

14     is, as part of a group.  But there's some things, like when you

15     get to II.7, you say that Binance and BAM Trading each are

16     unregistered clearing agencies, but XI.6 you say Binance and

17     BAM Trading as a group are an unregistered exchange.  So

18     there's no allegation by BAM Trading by itself, while it is an

19     unregistered clearing agency, is an unregistered exchange.  Am

20     I correct about that?

21          MR. MURPHY:  No, it is.  It is on its own an

22     exchange.

23          THE COURT:  Okay.  That's not -- it may be in the

24     complaint, but it's not clear at all in the memo.  All right.

25     So, that's helpful.

1              You've also alleged that Binance and BAM Trading are

2      each unregistered broker-dealers.  Do the acts that make them

3      broker-dealers overlap with the acts that make them exchanges

4      or clearing agencies?  Or are all these separate types of

5      conduct?

6              MR. MURPHY:  There is overlap, Your Honor, and part

7      of that is because -- and the securities laws account for that.

8      There are exceptions, for example, that if you are acting as a

9      broker-dealer, there's an acknowledgment that you are matching

10     buyers and sellers, which is something that exchanges do, but

11     you don't have to register as a national exchange if you are

12     registered as a broker-dealer.  As it turns out here --

13             THE COURT:  So you can be a broker-dealer without

14     being an exchange, but you can't really be an exchange without

15     being a broker-dealer, or no?

16             MR. MURPHY:  Yeah.  I mean, exchanges don't typically

17     take custody of funds, for example, Your Honor, whereas brokers

18     do.  Brokers do carry some of the functions that exchanges do

19     in matching buyers and sellers.

20             THE COURT:  All right.  Well, and finally, in section

21     II.9 you allege that Zhao is a -- has control person liability

22     for all of it; the unregistered exchanges, clearing agencies

23     and broker-dealers, and the misrepresentations, the alleged

24     misrepresentations by BAM Trading and BAM Management.  So

25     that's your allegation as to him individually.

```
1              MR. MURPHY:  Yes, Your Honor.  And I think part of
2     this is that the services are so intertwined for the three
3     intermediary charges that it's kind of -- it goes to the core
4     of the business that he founded.
5              THE COURT:  Now, that's everything that's in the
6     memorandum in section II about the failures to register.  So
7     what was the outstanding failure to register that was being
8     described to me earlier?
9              MR. MURPHY:  I think that's a section 5 offering of
10    individual securities, which, frankly, I don't think you need
11    to reach for the purposes of the TRO, Your Honor.
12             THE COURT:  All right.  So that, I think, might have
13    been referenced when you get to the personal jurisdiction
14    section.  On page 56 you say:  Binance and Zhao have
15    purposefully availed themselves of a forum by their coordinated
16    operation of three essential securities market functions:
17    Exchange, broker-dealer, and clearing agency on the Binance
18    platforms in the U.S. without registering with the SEC.
19             And then you said:  In addition, Binance and BAM
20    Trading have engaged in the offers and sales of crypto asset
21    securities, including BNB, in the U.S.  So that's the other
22    function that you're talking about.  But that sentence didn't
23    have, "and failed to register."  So that's the other failure to
24    register that you're talking about?
25             MR. MURPHY:  Yes, Your Honor.
```

1          THE COURT:  Okay.

2          MR. MURPHY:  Unregistered offers and sales.

3          THE COURT:  Okay.  On page 57 you mention contracts

4    between Binance and BAM Trading governed by the law of New York

5    as a sign of availing themselves of the forum.  That does mean

6    New York or any U.S. forum?

7          MR. MURPHY:  Well, under the securities laws, I think

8    here we're talking about any forum because of the contacts with

9    the United States for personal jurisdiction.

10          THE COURT:  All right.  So now my question, before I

11   turn to the defendants and give the court reporter a break,

12   is -- maybe I can ask you this after the break -- is whether

13   you're going to continue to discuss this among yourselves or

14   whether you're going to accept my very strong suggestion to get

15   together with Magistrate Faruqui with respect to this consent

16   decree which, notwithstanding everything that's been said this

17   morning, the differences between the parties and their rhetoric

18   is much greater than the differences between the parties and

19   the proposal and the red line.

20          So if you can answer that question, that would be

21   helpful.  But if you want to answer it after the break, we can

22   do that as well.

23          MR. MURPHY:  I think it would be helpful to answer

24   after the break.

25          THE COURT:  All right.  So we're going to break for

1    ten minutes and then we'll be back.

2              (Recess.)

3              THE COURT:  All right.  Before I ask the question, I

4    just want to underscore that I am not urging the parties at

5    this point to get together, unless you choose to do so, to

6    hammer out a permanent consent decree.  What I'm looking to do

7    is to have an order that works for both parties in place so

8    that we can then proceed to deal with the merits at an

9    appropriate pace.  And it seems that there might be some

10   benefit, given some of the distrust going back and forth, to

11   have a neutral in the room.

12             But all I'm looking for is for some variation of what

13   we almost already have, which is something that permits BAM

14   Trading to operate, permits the government to be comfortable

15   that the 2.2 billion is secure, and that U.S. assets, U.S.

16   customer assets, don't leave the country and don't leave the

17   U.S. company's control, and that then we get the additional

18   information and documents that we're seeking.

19             So, you know, again, I think the nitty-gritty of it,

20   because it's very detailed, is better handled by all of you

21   than by me.  And if you don't work it out among yourselves,

22   then the government risks having an order that doesn't go as

23   far as it wants it to go, and the defense risks having an order

24   that it really finds it hard to live under.  So there's some

25   benefit to this.

1          So what's your point of view about whether it makes

2     sense to meet with Judge Faruqui with respect to the

3     refinement, potentially, of a consent decree, instead of a TRO?

4          MS. FARER:  Your Honor, the government is certainly

5     open to that.  We did want to clarify that the freeze that

6     we're seeking is a freeze of all of the assets.  Because,

7     importantly, the operating -- the company operating funds

8     should be preserved under the applicable precedent for --

9     ultimately if we get a judgment, for disgorgement to investors.

10    In addition to --

11         THE COURT:  Freeze of all of the assets of?

12         MS. FARER:  Of the BAM entities.  Our position is --

13         THE COURT:  With the exception that they're allowed

14    to give customers back their money when they ask for it and to

15    pay salaries and operate their business, if they're still

16    operating their business, or not?

17         MS. FARER:  Yes, Your Honor.  What we're proposing

18    here is that all assets are frozen, both the customer assets,

19    but subject to the exception that is already included for

20    withdrawals, and then the remainder of the company assets.

21    It's important to note that we're preserving the status quo for

22    the investors who have paid transaction fees and whatnot that

23    would be included in a disgorgement order, should we prevail at

24    the end.

25         And so what we're asking for is the freeze, and then

1    we are certainly open to mediation on the scope of the

2    ordinary-course expenses.  As discussed, Your Honor, we are

3    open to the business continuing to operate, we just want to get

4    additional information as to what the scope of the payments

5    will be.

6              THE COURT:  But the extent of your position is fully

7    set out in what you sent me at 1 o'clock today, or a little

8    before?

9              MS. FARER:  Yes, Your Honor.

10             THE COURT:  All right.  Okay.  Thank you.

11             All right let me hear from the BAM defendants.

12             I want to start with you by saying that obviously

13    your memorandum raises a lot of legitimate questions and

14    concerns about the merits and about whether litigation is the

15    best method to get at this highly disputed issue that affects

16    billions of dollars already invested on multiple platforms in

17    the U.S. and elsewhere.  But some of your claims claim to be

18    shocked that the SEC thinks you're dealing in securities and

19    took this step.  And some of the surprise expressed in the

20    pleadings rang a little hollow in light of defendant Zhao's

21    statements over the years, the fact that the SEC banned Binance

22    from doing business in the United States in 2019.  And this

23    appears to be an extension of that, given the overlapping

24    ownerships and relationships.

25             And so the BAM Trading was in direct response for the

1   fact that Binance couldn't trade here anymore.  Plus, the

2   defendants received a Wells Notice, which you don't get unless

3   the SEC is planning to bring a civil enforcement action.  So

4   I'm not necessarily interested in getting further into whether

5   it's surprising or shocking or not, as much as how to deal with

6   it and get to the merits of it in a logical and organized

7   fashion.

8            Similarly, you all repeat in the memo that there's no

9   evidence, absolutely no evidence of any dissipation of assets

10  whatsoever.  And the government at this point has said they

11  haven't seen the evidence of offshore transfers from BAM

12  Trading itself.  But we do have considerable evidence of

13  offshore transfers and we do have the problem of the individual

14  defendants' ownership of the entities that own BAM Management,

15  which is the parent of BAM Trading.  So there's a lot of layers

16  going on here and a lot of onion that needs to be peeled to

17  figure out who is doing what.

18           So while you can quibble with the strength of the

19  evidence, whether there's anything wrong with any of the

20  transfers, I probably don't need a lot of hyperbole about how

21  shocking this is, and I probably don't need to hear the word

22  "draconian" anymore.

23           So you gave me the terms of exactly what you would be

24  willing to agree to in a consent decree.  But your proposed

25  order to me within your opposition to the memo just said TRO

```
 1    denied.  So if you all can't come to an agreement, if I enter

 2    the terms that you proposed, would that be with your consent?

 3              MR. MERTENS:  Yes.

 4              THE COURT:  And then, would it then be appropriate to

 5    consolidate the PI with the merits and order that it remain in

 6    place pending a ruling on a dispositive motion?

 7              MR. MERTENS:  I believe it would, Your Honor.  We've

 8    said all along that we are not -- we are not interested in

 9    making transfers among the defendants.  The sticking point, and

10    the really only sticking point, and it is still a sticking

11    point, even with the SEC's most recent submission, is on page 6

12    of the filing, which is numbered 5 at the bottom of the red

13    line, which is a paragraph 3-A which prohibits any disposal

14    whatsoever of any funds in BAM's possession.  That is a

15    prohibition on ordinary course expenditures.  And that is the

16    sticking point.

17              We are not willing to accept the death penalty eight

18    days into the case, and that is, in effect, what that would be

19    for our business.  We are simply asking for ordinary course.

20    And because while we don't --

21              THE COURT:  When you say ordinary course and that is

22    the sticking point, and I know that's the sticking point --

23              MR. MERTENS:  Yes, yes.

24              THE COURT:  -- what is it exactly that you need to be

25    able to do?
```

1          MR. MERTENS:  So for example, last night on the call

2     we said things like rent, salaries, vendor costs, professional

3     fees; you know, normal operating business expenses.  Those are

4     the -- and we could make -- we offered last night to make a

5     list of those things.  We think we could sit down and make a

6     list of those things.  But the government's position, the SEC's

7     position has been until this point --

8          THE COURT:  All right.  I'm not asking you whether

9     they're being unreasonable or not --

10          MR. MERTENS:  Sure.  Understood.

11          THE COURT:  -- I want to know what you need.  I may

12     have to craft this myself.

13          MR. MERTENS:  Right.  We need ordinary-course

14     business expenses, which is how the language we belive normally

15     appears in an order.  If we need a laundry list of those, we're

16     happy to provide them.  But the things, the type of things we

17     are thinking about are like salaries, rent, vendors.  We

18     obviously have, to the extent that there are servers or

19     licensing of software, professional fees, you know, those are

20     the sorts of things -- office supplies, you know, to the extent

21     that those are relevant, those are the types of things that we

22     are asking for; normal, ordinary course.  That is, I believe,

23     the primary sticking point.

24          THE COURT:  All right.  So you're willing to agree on

25     a ban of transfers to any account in which the individual

1    defendant not only has an ownership interest -- or, whether he

2    has an ownership interest or signatory authority, nothing

3    that's got his name on it?

4          MR. MERTENS:  We are -- it is acceptable to us not to

5    transfer money to -- you know, directly or indirectly in

6    control of the co-defendants.  You know, affiliated with them,

7    whatever the appropriate language is.

8          THE COURT:  And you obviously don't need to transfer

9    money to any offshore account in the ordinary course, much less

10   one that he owns.

11         MR. MERTENS:  I assume that we could -- there are

12   enough U.S. accounts that we could deal with that.

13         THE COURT:  And they also seem to be interested, with

14   respect to the 2.2 billion, about the clearing team and who

15   holds the key shards and all that.  Is there any reason why

16   they all have to be -- why they can't all be independent from

17   Binance?

18         MR. MERTENS:  We are prepared to bring all the key

19   shards to the U.S., if the Court orders that.  We have no

20   problem with that.

21         THE COURT:  The Court will definitely order it if you

22   agree to it.

23         MR. MERTENS:  Well, the only reason I'm hesitating on

24   that is because to the extent that the key shards are in the

25   possession of Binance, I can't speak for Binance.  I can speak

1    to what we, BAM will do.

2              THE COURT:  I understand that.

3              MR. MERTENS:  And the order would have to direct or

4    not direct what another entity would do.  But we don't have an

5    objection to them all being in BAM's possession.

6              THE COURT:  All right.  And there was a point where

7    you told me earlier today that there is no daylight between any

8    of the defendants at this point.  But I don't know that that

9    particular language was in the existing order, so I will

10   actually ask that to Binance's counsel.

11             And if there is no consent order and I have to issue

12   my own order -- and I meant to ask the government this, and

13   I'll ask you this when you get back up, because I know you're

14   going to want to get back up at the end.  What's your position

15   about how long a TRO could remain in place?  It's not a TRO

16   without notice, which is what Rule 65 says only lasts 14 days.

17   The government seems to take the position that it could only

18   last 14 days or it might expire, unless it gets turned into a

19   PI.

20             I don't see how, given what I've been provided, that

21   I can do the kind of order that would rule on all of the legal

22   and factual issues underlying a preliminary injunction in two

23   weeks.  So if I have to put something in place, how long can it

24   stay in place?

25             MR. MARTENS:  Well, I don't have an answer to that

1    because our position is that a TRO is not warranted, so I'm not

2    in a position to say so we would agree to one for X number of

3    days.  Obviously, if the Court ordered one, we would have to

4    have a discussion, as you do in any case, about how long is

5    necessary for discovery to conduct a PI hearing.  But as of

6    today, we don't believe that the sale -- and I think this is an

7    important point, and the Court identified this, they're

8    alleging on crypto asset among more than 100, and arguing --

9    while they say that allows them to win the case, that doesn't

10   provide a justification for taking over an entire business.

11   And that, I think, is -- I think we're going a long way to

12   saying, listen, we don't think this is justified at all based

13   on their showing, but we are willing to do -- to take steps to

14   allay concerns because we don't think that there's any valid

15   concerns here.

16            And so we're fine with agreeing to the handling of

17   these funds appropriately because my client believes they are

18   handling the funds appropriately.  But what we're not willing

19   to do is accept something that goes so far as to shut down our

20   business.

21            THE COURT:  I understand that.

22            MR. MERTENS:  I can't really answer the Court's

23   question about how long we would be willing to tolerate a TRO.

24   A, because we don't believe it's appropriate, but, B, because

25   depending on what it does, it could end our business.

1          THE COURT:  I don't think that a TRO can completely

2     shut down your business; it has to preserve the assets.  They

3     talked about status quo, status quo, status quo; status quo,

4     this business exists.  So I think if they're talking about a

5     TRO, it can't really go much further than literally preserving

6     the assets that we're talking about.

7          MR. MERTENS:  But that's not the status quo, Your

8     Honor.  The status quo is that we're continuing to operate as a

9     business and pay ordinary business expenses, that's the status

10    quo.

11         THE COURT:  I understand that.  I understand your

12    position about that.  I think you've made that very clear and

13    that is why I was asking you what you need in the ordinary

14    course.  And if you want to put it in a piece of paper for me,

15    if it wasn't received over the phone last night, you can docket

16    that.  It would be helpful for you to be specific.

17         MR. MERTENS:  Sure.

18         THE COURT:  But I think that I don't need to be in

19    the room where it happens and that there is a better way to get

20    to what the nature of this is and should be.

21         MR. MERTENS:  We're happy to provide that list, Your

22    Honor.

23         THE COURT:  All right.  Now, you raised important

24    questions to be considered in terms of whether the Binance coin

25    is or is not a security and, therefore, whether the

64

1    registration obligations attach.  And that's, obviously, the

2    legal question at the heart of the case that I'm going to have

3    to resolve.  But I want to make sure I understand, though, that

4    while you disagree that the assets bought and sold were

5    securities, do you dispute whether BAM Trading was operating as

6    an exchange with Binance with respect to those assets, whatever

7    they are?

8              MR. MERTENS:  So the reason I hesitate is because I

9    don't know whether you're using an exchange in a technical

10   sense under the securities laws or whether you mean in a

11   colloquial sense.  Certainly it was a platform under which

12   people could buy and sell crypto assets.  I hesitate to use the

13   word "exchange" because that has technical legal meaning in the

14   securities laws that we're not prepared to concede.

15             THE COURT:  All right.  Well, I was going to ask the

16   same questions about acting as a broker-dealer and acting as a

17   clearing agency.  And I guess my question is:  Your memorandum

18   took issue with the "it's a security," as opposed to "I'm

19   making them available for sale, I'm providing credit or

20   dealing, clearing the transactions, I'm offering them on a

21   platform where people can pick and choose among, and buy and

22   sell."

23             The underlying facts that make something an exchange,

24   a broker-dealer or clearing agency, you took issue with

25   whatever -- our offering of these assets is not something

1    that's subject to the jurisdiction of the agency because the

2    assets aren't securities, that's what you were saying, as

3    opposed to, no, we're not engaged in those operations.

4         MR. MERTENS:  We didn't have to get to the issue of

5    the operations because the operations -- the statutes governing

6    the operations only govern the operations if it's a security.

7    And so if they -- and we do believe they do -- fail on the

8    question of whether it's a security, everything else falls,

9    too.

10        THE COURT:  I understand that.  I was just wondering

11   if there's some even-if argument, that even if it turned out to

12   be a security, you can't call me a broker-dealer because I

13   didn't do X, Y, or Z, or I'm not a clearing agency because I

14   didn't do X, Y, and Z.  It wasn't in the memo and I assume

15   you're not giving that up as an option, should it come down to

16   that?

17        MR. MERTENS:  Right.  It's just for the TRO purposes

18   we took a simpler approach.

19        THE COURT:  All right.  You argue in your memo that

20   the Binance coin, at least by the time it was available to be

21   purchased through BAM Trading on the Binance.US platform was

22   not a security.  So what was it?  Was it a commodity?

23        MR. MERTENS:  It was a crypto asset.

24        THE COURT:  What is a crypto asset that is different

25   from a crypto security?  No one wants to tell me.

1              MR. MERTENS:  Well, the crypto asset security, as I

2    understand it, is they're adding the world "security" to bring

3    it within the scope of the federal securities laws.  And

4    whether it's section -- I believe it's section 2 of the

5    Securities Act or section 3 of the Exchange Act, defines a

6    security as, among other things, an investment contract, as the

7    Court has heard, and that is what the government is relying on.

8              An investment contract requires a contract.  The

9    language about a scheme, as I understand, it was dicta.  There

10   was not a scheme at issue in *Howey*, it was a contract.  And as

11   I understand the case law, all of the cases under *Howey* and all

12   of the cases under the Blue Sky laws prior to *Howey* under which

13   was the origin of the securities laws, involved a contract.  We

14   are not aware of any case that's found a security without a

15   contract.  And that is --

16             THE COURT:  Even since *Howey*?  I mean, what about the

17   government's citing cases where actually crypto assets were

18   found to be securities?

19             MR. MERTENS:  So my understanding is that those other

20   cases did have a contract in place, and there is not a contract

21   here.  And that's our dispute.  You can't have an investment

22   contract without a contract.  You also can't have an investment

23   contract without some expectation of profit.  And here

24   there's -- no one has talked, explained at all what the

25   obligation -- what the contractual obligations or the

1      contractual benefits are from supposedly buying one of these

2      assets.

3              And, you know, there's lots of other language used by

4      the SEC when they were speaking about it that, you know, people

5      hoped to earn a return.  That's not -- that doesn't equal an

6      investment contract.  It's a long way from investing in an

7      orange grove in *Howey* and expecting to earn returns when the

8      oranges were picked from the trees and sold.  There's no

9      contract here --

10             THE COURT:  When you buy stock in a company that's a

11     security, yes, you'd hoped to earn a profit, but is there any

12     promise you're going to earn a profit?

13             MR. MERTENS:  So the difference there is the stock is

14     specifically identified in the definition of a security as

15     being a security.  So it begins stock and then it has a list of

16     other things.  Halfway down the definition is the word

17     "investment contract."

18             So investment contract is its own unique thing, and

19     in order to claim this is an investment contract, they need to

20     start with a contract.

21             THE COURT:  And I know you've said that.  So that

22     even at the ICO stage, you're saying it wasn't even a security

23     then because there was no contract.  But it seemed like you

24     were also arguing even if it was, it lost that character by the

25     time it was being sold on the U.S. platform with something else

1  at that point.  Is that something you're also arguing?  And

2  when and how does it transform itself?

3          MR. MERTENS:  I think what -- so we were focused on

4  the time when it was trading on our platform because that is

5  the time relevant to establishing, thus, whether we were an

6  exchange or a broker-dealer.  And I think our particular focus,

7  for purposes of the TRO, was at the time it was trading on our

8  platform there was not a contract and, thus, not an investment

9  contract.

10          THE COURT:  Okay.

11          MR. MERTENS:  Yet, I think it remains to be seen, if

12  this proceeds into litigation, whether there was ever a

13  contract, even at the time of the ICO.  I suspect the evidence

14  is that there is not a contract even at that point.  But our

15  particular focus was at the time it was trading on our

16  platform.

17          THE COURT:  Well, you've been very clear about the

18  need for the ordinary course exception to any freeze with

19  respect to BAM Trading's assets.  The government's spent a lot

20  of time today talking about the 2.2 billion of U.S. investor

21  assets that it wants to make sure that they're under your

22  control and nobody else's control.  Do you have any problems

23  with any of that?

24          MR. MERTENS:  We do not.

25          THE COURT:  Okay.  And then given the fact that it

1    seems like really the difference between the two parties is

2    rent and ordinary expenses, what's your position about whether

3    it makes sense for you to be in a room with Magistrate Judge

4    Faruqui and your colleagues on the other side of the courtroom

5    sooner rather than later?

6          MERTENS:  We are happy to have a discussion with or

7    without the magistrate judge.  We don't think that's required

8    to sort out what ordinary-course expenses are.  But we're happy

9    to reach an agreement on ordinary-course expenses.  Again, we

10   don't -- I think that that language is typical.  I don't think

11   it's really a novel term to be included.  I don't know that

12   there's always a list, but we're not against having a

13   discussion about a list.

14         THE COURT:  All right.  Well, they have added a lot

15   of language about the 2.2 billion and who is actually going to

16   be in charge of it, and it seems to be different, what they

17   wrote than what you had.  But that's not the area that's giving

18   you consternation at this point.

19         MR. MERTENS:  That is not the area that's giving us

20   consternation.  The area that's giving us consternation is an

21   asset freeze that will be misconstrued by our banks.  What we

22   have agreed -- what we want to be able to do is make clear we

23   are entitled to continue spending our money in the ordinary

24   course and so that the banks understand that and so that we can

25   continue to operate.

1          THE COURT:  All right.  Do you want to say anything

2    in response to the statement that you said something about

3    shutting down or not shutting down?

4          MR. MERTENS:  Your Honor, I think -- I know you don't

5    want rhetoric, so I'll be measured.  But I think it is

6    inappropriate for the government to come in and make

7    announcements about whether a business will continue or not

8    continue.  We have made no such decision as BAM Trading.  And I

9    don't believe it's appropriate to come into court and make

10   announcements about what we are or not going to do as a

11   business.

12         THE COURT:  Well, given the public nature of these

13   proceedings, I wanted to give you the opportunity to say

14   something with respect to that, so that was why I asked the

15   question.

16         I have fewer questions for you, not because I think

17   your position is any less important, but because I think I

18   understand your position and I think that the questions for

19   what I'm supposed to do in the short-term for interim relief

20   are different questions than, at the end of the day, the legal

21   rulings that lie at the heart of this case, which I don't think

22   I should be making at this pace.

23         What I'm trying to do is to make sure that we can

24   reach that decision in a thoughtful pace and not have the

25   chickens fly the coop in the meantime.

1          So I think you and I have discussed what I need to

2    ask you about that, unless there is anything you would like to

3    put on the record right now that I haven't asked you about.

4          MR. MERTENS:  I don't think there is, Your Honor.

5    Again, I agree with you that I don't think we need to sort out

6    the merits now.  Our position is we belive there's a way

7    forward here that allows us to keep operating and allows this

8    litigation to proceed in the normal case and to decide these

9    issues on the facts, with appropriate time to review them.

10         THE COURT:  All right.  Let me hear from counsel for

11   Binance then.

12         MR. NELSON:  Good afternoon, Your Honor.

13         THE COURT:  Good afternoon.  What was I supposed to

14   do with 3,000 pages of exhibits filed four and a half hours

15   after memorandum was due without a motion for leave to file it

16   at that time?

17         MR. NELSON:  Hopefully accept an apology.  And we

18   worked hard to coordinate with counsel for Mr. Zhao.  And,

19   candidly, underestimated the process of getting everything into

20   ECF.  But the process of trying to work to coordinate on a

21   brief and a single set of exhibits, we ended up with some

22   logistical issues yesterday afternoon that were wrong, so I

23   apologize.

24         THE COURT:  All right.  Well, you understand,

25   obviously, that by 9:30 last night I was really focused on the

1     dueling proposals and the larger issues, rather than the

2     exhibits.  I've not yet had the opportunity, the pleasure to

3     dig into them fully.  But, understanding that I need to, and

4     I'm not going to be able to decide this case without looking at

5     all of theirs and looking at all of yours.  And what we're

6     trying to do is figure out how to manage this case so that that

7     is done.

8          What's your position about sitting down with a

9     magistrate judge to try to finish the process of hammering out

10    something that will govern the conduct of the parties between

11    now and then?

12         MR. NELSON:  Your Honor, Binance Holding, Limited,

13    would be agreeable with that approach, and we think it has

14    wisdom.  If the parties can come to an agreement, that would be

15    better.  Mr. Mertens has addressed the main issue.  There are

16    other details about, you know, difference of wording that may

17    make a difference.  But I think the parties in the first

18    instance would be best positioned to address that.

19         THE COURT:  Well, putting aside wording, and I

20    understand the ordinary course issue is BAM Trading's issue,

21    but the 2.2 million and whether anyone other than BAM Trading

22    is going to hold the wallets or make the decisions on

23    withdrawals, do you have problems with what the government has

24    proposed with respect to the 2.2 billion, which they are

25    alleging are U.S. investor dollars that are at stake in this

1    litigation?

2              MR. NELSON:  We do not, Your Honor.  And while we

3    disagree that it's necessary to transfer the key shards in

4    order to preserve the security of the assets, as you've seen

5    from our proposed order, we're willing to voluntarily undertake

6    the steps necessary to do that.  It's in II.4, where we have

7    specifically agreed to do that to address what we understand is

8    the government's concern.

9              THE COURT:  All right.  Now one of the points you

10   made -- I'm just going back to the original point.  Even

11   without the apology, I've accepted the filing of the exhibits

12   and I'm not going to strike them or do anything horrible to you

13   because of the four hours; it was just frustrating to have them

14   arrive.

15             I don't understand your addressability point.  You're

16   not saying that the lawsuit itself can't provide relief or

17   redress if the defendants are indeed performing the functions

18   for which they need to be registered.  They could be enjoined,

19   they could have to pay penalties.  There might be money that

20   has to go back to customers.  Are you saying that a motion for

21   TRO, for interim relief, based on the facts in the complaint,

22   has to separately meet all of the *Lujan* requirements if there

23   is standing to bring the action?

24             MR. NELSON:  Your Honor, I'll hand off to my

25   colleague Mr. Celio.

```
 1              THE COURT:  All right.

 2              MR. CELIO:  Good afternoon, Your Honor.  Michael

 3      Celio for BHL.

 4              It's not the Lujan holding, it's that for an exercise

 5      of this Court's jurisdiction on the TRO, what the law requires

 6      is that the relief that is sought be tightly coupled to what it

 7      is we've actually done.  And --

 8              THE COURT:  But my jurisdiction is over the case.

 9      The TRO is a pleading in the case.  You're saying I don't have

10      jurisdiction to hear this case?

11              MR. CELIO:  It's that the relief sought can't be

12      granted by this Court on this record.  This is a registration

13      case against us.  We're not aware of any of the cases that the

14      other side cited where a registration case has resulted in a

15      TRO like this.  Now we're willing to do it, I want to be clear.

16      I'm not disagreeing with anything my colleague said.  We've

17      offered what we've offered and we stand by that.  But we think

18      on the law -- we just want to be clear -- we're going far

19      beyond what we're required to do here.  Because this kind of

20      case, where it's just a question of whether we should have

21      registered, an issue that's been out there for what?  Six

22      years?  That doesn't actually allow the Court, no, to enter

23      that kind of relief.  You absolutely have jurisdiction over the

24      case, we get that.

25              THE COURT:  The question is whether ultimately I'm
```

1       going to have -- there would be relief associated, if it was

2       found to be a security.  And if it was found that you had

3       failed to register and you were supposed to register and that

4       resulted in X billions of trades or profits, you're saying

5       you're not going to owe anything at the end of the day?  It

6       would just be I'm sorry, will you accept my apology, as we said

7       earlier?

8                    MR. CELIO:  No, ma'am.  That's not what I'm saying.

9                    THE COURT:  So there could be a penalty owed.  And

10      they're saying all we're saying is we want to make sure the

11      money is there when we're all left standing at the end of the

12      day.  How does standing fit into this?

13                   MR. CELIO:  Because redressability is a separate --

14      and we've said it in our papers, the redressability is a

15      separate element at the TRO stage and they have not met their

16      burden to establish that.

17                   THE COURT:  Tell me what happened in the NLRB, the

18      one case you cited for that.

19                   MR. CELIO:  So I can't give you chapter and verse on

20      that case, but I think -- it's really just a common sense

21      principle, Your Honor.

22                   THE COURT:  It isn't to me, actually.  I've never

23      heard of it before and that's why I want to know what the case

24      held and why you're relying on it.

25                   MR. CELIO:  So I'm not prepared to answer that

1    question, and I apologize Your Honor.  But what we're saying,

2    though, is really what this goes to is the emergency nature of

3    what's sought against us here.  We understand why we're in the

4    case, we understand that this is an important issue.  Look

5    around us, we get it; it's an issue of first impression and

6    it's important.  So we're not --

7              THE COURT:  Some of those are press, some of those

8    are your associates, I'm pretty sure.

9              MR. CELIO:  I only know which ones are associates of

10   Gibson, Dunn, Your Honor.  But there are a lot of people here,

11   it's obviously an important case.  The question is, at this

12   stage, just at this narrow first stage, the Court doesn't have

13   unlimited ability to fashion any relief.  It's got to fashion

14   relief that's related to what's actually in the complaint and

15   what's actually before you, that's the argument.

16             As to my client, who is simply a corporate cousin of

17   BAM, admittedly with some relationship, contractual

18   relationships and other things, but we don't really understand

19   why we're here at the TRO stage.  We understand why we're in

20   the case, to be clear.  We understand, at the end -- and our

21   position is that at the end, if jurisdiction is established in

22   all the ways, that it will be fought.  We're not making any of

23   the claims you suggested.

24             But it is the case that the Court's ability to issue

25   interim relief has to be tied to what's actually in the

1    complaint and it's just not here.

2         THE COURT:  What are the specific aspects that

3    they're asking for in their order that apply to you in

4    particular?  I mean, there's things like the not destroying any

5    documents in discovery and that sort of thing, but what are the

6    particular aspects of what they're asking for that you say are

7    deficient for this reason?

8         MR. CELIO:  Here's the good news, Your Honor:  We

9    don't have to get into it because we've offered to do it

10   voluntarily.  So, I mean, we've said -- I think that it's, you

11   know, I think that our proposal that we filed today, earlier,

12   really makes this an easy question for me.  We want to preserve

13   our record that we think, you know, we're doing more than we're

14   required to do.  But we really want to assure the Court how

15   reasonable --

16        THE COURT:  The record will so reflect, that it is

17   your position that you are doing more than you're required to

18   do.

19        MR. CELIO:  I appreciate that.

20        THE COURT:  You argue, and your argument has some

21   force, that these kinds of complex legal and financial issues

22   are better resolved through regulation or rule making than

23   through test case litigation, but I don't run the executive

24   branch.  So what would be the authority under which I could

25   say, as you suggested, no, I'm sorry, you've exceeded your

1    discretion, you must proceed by rule making here.  How is that

2    in my lane as a member of the judiciary?

3              MR. CELIO:  If we made that statement, that's not

4    what I'm arguing today.  I think that it is something -- it may

5    well be in the brief, but I think that that's -- we're not

6    asking you to deny it on that basis.  I think the issue is --

7    I've got to go to Chicago in a little bit and defend the same

8    case on the issue of whether it's a commodity, and we are put

9    in a difficult position.  And I hope that the Court appreciates

10   that the executive has its authority to do what it wishes, they

11   have the right to bring this case, I suppose.  It is a

12   difficult thing for my client to be told it's a security, it's

13   a commodity --

14             THE COURT:  Well, "it," is the "it" the same?

15             MR. CELIO:  I think it is, but I'm sure we're going

16   to argue about that.  But the BNB is what I'm talking about

17   here.  But I think that there's disagreement as on those facts.

18   But I think that the issue that we're trying to raise --

19             THE COURT:  In the CFTC case they say the BUSD was

20   the commodity, and the SEC just told me that that's not the

21   same as the BNB.  Are you saying it is?

22             MR. CELIO:  BUSD is not the same as BNB, but BUSD is

23   very much in the papers that they filed, it's right there.

24             THE COURT:  Yes.

25             MR. CELIO:  So those things -- I mean, the point more

1    broadly is, and I think it's relevant to the TRO, right, is

2    because the TRO is a terrible way to do this, right?  It is

3    putting unfair pressure on the Court, it's putting unfair

4    pressure on my client.  We accept that we have to have this

5    fight.  We understand that this is coming.  I think it's been

6    pretty clear that it was coming against someone -- maybe not

7    against us, but someone -- for years.  So let's have the fight.

8    The Court should be given the opportunity to hear from

9    different parties, from -- you know, from amicus briefs, from

10   sort of all the relevant parties that this Court usually has

11   access to.

12           You know, we should do this over -- in a normal,

13   orderly discovery process so that the facts aren't coming in

14   the night before the Court -- you know, I had my apologies that

15   it came in late -- that the Court should have a full record.

16           THE COURT:  I agree, completely.  And so the question

17   is:  What do I need to do to make sure that happens and to make

18   sure that the government's, I think, legitimate concerns, given

19   the offshore nature of some of the defendants and the ease of

20   moving money from place to place, given the overlapping

21   ownership, that something needs to be done.  But, it may not be

22   everything they originally asked for.  They're not asking for

23   everything they originally asked for anymore.  It may look a

24   lot like what you all have proposed.  There's nothing I would

25   like better than an orderly process to get at complicated

```
 1    issues, that's the way we do things.

 2              All right.  I don't think I have anything else to ask

 3    you.

 4              MR. CELIO:  Okay.

 5              THE COURT:  And, finally, counsel for the individual

 6    defendant, your brief and your proposals were linked, but if

 7    there's anything you want to add to the discussion I just had

 8    on behalf of the two defendants?

 9              MR. QURESHI:  Thank you, Your Honor.  No, I have

10    nothing to add.  I would agree with my colleague representing

11    Binance that there are some stray issues that we look forward

12    to discussing with the Commission and hopefully resolving in

13    the ways that you've outlined.

14              THE COURT:  But right now there's no reason that you

15    see -- is there any reason that BAM Trading needs to be sending

16    money offshore to your client's accounts to operate its

17    business?

18              MR. QURESHI:  No, Your Honor.  And I think in the

19    proposed stipulation that we offered at 1 o'clock today, I

20    think that's at docket 58-1, there is a restriction on anything

21    like that happening.

22              THE COURT:  All right.  And so if all of that is in

23    place with respect to the 2.2 billion of U.S. customer assets,

24    that's something preserving your objections, the jurisdictional

25    objections and your personal jurisdiction, that's something
```

1    you're willing to live with while we figure out all these other

2    objections?

3              MR. QURESHI:  That is correct, Your Honor.

4              THE COURT:  All right.  All right.  Thank you.

5              All right.  Is there anything the government wants to

6    add at this point?

7              MS. FARER:  Just briefly, Your Honor.  On the issue

8    of the case brought by the CFTC, we would just highlight that

9    courts across the country have identified that different crypto

10   assets can be a commodity in certain contexts, can be a

11   security in different contexts.  As Your Honor may very well be

12   aware, there's a very fulsome court opinion, the *CFTC versus*

13   *McDonnell*, an EDNY case that sets forth the framework.  And a

14   number of the regulatory agencies have issued joint statements

15   about how different assets can be treated differently in

16   different context.  So the BUSD product that is identified in

17   the CFTC's complaint is different than the one that we are

18   alleging here.

19             With respect to the open questions, as Your Honor

20   identified with respect to just wanting a list, that's really

21   all we're asking for.  We just want information about the

22   expenses at issue.  You know, a general category of, quote,

23   unquote, professional fees.  When I was in the private sector,

24   that could cover a lot of things.  And so we just want an

25   understanding of what may be anticipated.

1          THE COURT:  Notwithstanding the eye rolling on my

2     right, I'm going to just order that BAM Trading docket a list

3     of what it maintains are the ordinary-course expenses, even if

4     it's obvious and even if it's commonly ordered, just go ahead

5     and do it, put it in writing.  And then I'll see it, if I end

6     up having to issue a TRO, and the government can see it, and

7     maybe that will streamline the conversation that you're going

8     to have with Magistrate Faruqui.

9          Yes?

10         MS. FARER:  We would just ask, Your Honor, in

11    connection with that request, that there be some time

12    parameters imposed.  We want to -- it would be helpful to have

13    an understanding of, sort of, the time periods at which these

14    expenses are anticipated.

15         THE COURT:  All right.

16         MS. FARER:  We would just add a couple other things

17    for the record.

18         THE COURT:  Yes.

19         MS. FARER:  We understand that defendants may be

20    frustrated by our reference to communications that we've had

21    with them, and we certainly, as a regulator in this space,

22    appreciate the sensitivities.  We would just highlight that the

23    defendants made this public themselves by including

24    communications between us that reference the shutdown

25    communications, at docket 41-6.  And we thought it was

1    important for Your Honor to understand our position on certain

2    issues that was within that context, that we needed to take

3    certain positions on certain issues.

4            And the final point, Your Honor, is I think an open

5    question that was a sticking point with respect to the consent

6    is -- are the terms of discovery.  It's not clear to us exactly

7    why Mr. Zhao is -- and Binance are extending the time period by

8    which they would be subject to certain discovery obligations.

9    We think that it's very important, for all the reasons that

10   we've discussed, that we have expedited discovery of all the

11   parties for -- as set forth in the proposed order.  So I think

12   that's one of the open questions for us, as well.

13           THE COURT:  All right.  Well, if you get to the point

14   that you can agree to everything except things like that --

15           MS. FARER:  We agree, Your Honor.

16           THE COURT:  -- you can submit to me a consent decree

17   that has, you know, two brackets; what one party thinks and

18   what the other party thinks, and I can figure that out.  I do

19   that all the time with discovery disputes among parties.  So, I

20   think if that's -- if that's where this resides, then there's

21   absolutely no need for a TRO, we can figure that out.

22           And, you know, I don't think I've ever issued a

23   discovery order that sooner or later somebody didn't say, Your

24   Honor, can we have additional time?  So what difference does it

25   make at the end of the day if I say ten days?  Ten days from

1    now somebody is going to tell me they need more time.  Maybe.

2             MS. FARER:  Given the expedited issue, we completely

3    appreciate.

4             I think the last piece on the list of expenses, Your

5    Honor, we understand that certain processors that may be

6    involved with BAM's ongoing operation are not located in the

7    United States.  And so it would be helpful -- this is one of

8    the issues that we want to make sure that all payments or all

9    vendors that may control the investor assets at issue are

10   within the United States, so it would be helpful if there are

11   going to be payments going offshore.

12            THE COURT:  All right.  But, I mean, everything

13   you've said is really so much to the side of what you stood up

14   and said, oh, you know, we're really worried about the

15   2.2 billion and we're really worried about BAM trading and

16   their investor assets, and this is -- these are all, like, the

17   little details around the fringes.  And I'm not saying they're

18   not important and that you all shouldn't be caring deeply about

19   them as advocates for your side, but if they're telling you we

20   don't need to send money offshore, we'll send the keys and the

21   wallets and all that back, they're telling you they're willing

22   to do that by consent, that gets you a lot further and the

23   relief lasts a long longer than even if I issued a TRO that

24   said everything you asked me to say.

25            So that's really worth thinking about.  And that

1    leads me to the question I didn't ask initially, which is, if I

2    have to issue a TRO, your pleading assumed it would evaporate

3    in two weeks.  Is that true if it was issued with notice and

4    after a hearing?

5              MS. FARER:  Our position, Your Honor, is that it

6    should convert to a preliminary injunction and last for the

7    duration of litigation.

8              THE COURT:  If and when it converts, at that point I

9    need an opinion with more findings in it than a TRO would have,

10   isn't that true?

11             MS. FARER:  It's our position that if it's entered by

12   consent, which we are hopeful --

13             THE COURT:  Well, yes, if it's entered by consent, I

14   don't have to do anything.  But if that process doesn't work --

15   and it really should, given how close you are -- and I have to

16   do something, I think we have to think seriously about how long

17   it could last and when we would be having a hearing on a

18   preliminary injunction, which would be very similar to this

19   hearing except you would actually be talking about the

20   exhibits, and I don't see how I have a chance to read them in

21   two weeks.

22             Given the volume of what you've all given me, I don't

23   think it would be fair to the Court or fair to you to say this

24   thing needs to be decided in two weeks, particularly since

25   everything else I have on my schedule and had on my schedule

1    before the TRO came along, in the next two weeks.

2          So what I'm going to do then is refer just the

3    question of the language of the consent decree to mediation

4    with Magistrate Judge Faruqui starting as soon as he can see

5    you, and ask the parties for a status report with respect to

6    the -- if you haven't docketed anything within the day after

7    the order, then I guess I would ask for a status report on --

8    what is today?  Tuesday.  Maybe by close of business Thursday

9    as to whether the discussions are ongoing or whether they've

10   reached an impasse.

11         And if it's just an impasse with respect to things

12   that you can say we've agreed to all this, but we have this and

13   this and this, you can just let me know what's going on by

14   close of business Thursday.  And if it turns out that he can't

15   see you between now and then, you need more time, let me know.

16         If there is a consent decree, that will render the

17   request for a TRO, and I think preliminary injunction, moot.

18   And at that point, what we will need to do is set a schedule

19   for the disposition, dispositive motions, whether they're

20   motions to dismiss or they're motions for summary judgment, and

21   you'll be able to propose how long you think you need to do

22   that and do that right.

23         The way I would envision this happening is the

24   defense would file -- defendants would file their motions

25   first, the government would then have the opportunity to oppose

1    and file at that time any cross motion of its own, supported by

2    a single memorandum of law, and then the reply or cross

3    opposition, and then the cross reply.  I think, I've done this

4    in big finance cases, like the *A&E Trust* case, that shortly

5    after the pleading is due -- you'll get detailed instructions

6    about how to do this -- but you're going to file a hyperlinked

7    version so that I can read -- with all the technology in this

8    courtroom, I know you can do it -- so that I can read the

9    pleading and just click on the link and get to the exhibit that

10   you're citing.

11           I have a lot of difficulty toggling back and forth.

12   The government's memo, when it got to the legal section, it

13   cited the statement of facts, so then I had to go back to the

14   statement of facts and see what you cited in the statement of

15   facts.  With respect to that, the statement of facts, there

16   will be instructions, it's not going to look like this, where

17   it's full paragraphs and they're fairly argumentative.  It's

18   going to be one fact per numbered paragraph, with the citation

19   that supports it in that paragraph, so it's very, very clear to

20   me where every fact that either side is relying on is coming

21   from.

22           But I don't think we need to set the schedule for

23   that until -- if we know that we have a consent decree, then

24   you can propose a schedule for how to do this and we'll set a

25   hearing date and all that.  But, let's -- and if this is not

```
 1      going to work out and I have to issue on order, then I'll issue
 2      on order.
 3              All right.  Is there anything else I need to take up
 4      right now on behalf of the government?
 5              MS. FARER:  Nothing for the government, Your Honor.
 6              THE COURT:  Okay.  Anything further on behalf of any
 7      of the defenses?
 8              MR. CELIO:  No, Your Honor.
 9              MR. NELSON:  (Shakes head.)
10              THE COURT:  Okay.  Appreciate the time that everyone
11      has put into this this afternoon.  Thank you.  Including the
12      dog.
13                              *   *   *
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1              CERTIFICATE OF OFFICIAL COURT REPORTER

 2

 3        I, JANICE DICKMAN, do hereby certify that the above and

 4   foregoing constitutes a true and accurate transcript of my

 5   stenographic notes and is a full, true and complete transcript

 6   of the proceedings to the best of my ability.

 7                        Dated this 14th day of June, 2023

 8

 9

10                       _____

11                       Janice E. Dickman, CRR, CMR, CCR
                         Official Court Reporter
12                       Room 6523
                         333 Constitution Avenue, N.W.
13                       Washington, D.C.  20001

14

15

16

17

18

19

20

21

22

23

24

25
```