# EXHIBIT 5

# Exhibit 155

**To:** Fredrickson, David R. ▮▮▮▮.GOV]; Szczepanik, Valerie ▮▮▮▮.GOV]; Seaman, Michael P. ▮▮▮▮.GOV]
**Cc:** Redfearn, Brett ▮▮▮▮.GOV]; Seidel, Heather ▮▮▮▮.GOV]; Goldsholle, Gary ▮▮▮▮.GOV]; Maitra, Neelanjan ▮▮▮▮.GOV]; Bergoffen, Roni E[ ▮▮▮▮.GOV]; Orr, Andrea ▮▮▮▮.GOV]
**From:** Greiner, Natasha (Vij)
**Sent:** 2018-06-06T21:36:38-04:00
**Importance:** Normal
**Subject:** RE: Ether speech
**Received:** 2018-06-06T21:36:39-04:00
DRAFT Digital Assets Speech 2018-06-04 (TM comments .docx

All,

Attached are TM's comments on Bill's draft speech. Please let us know if you have any questions or would like to discuss further.

Thanks,
Natasha

**From:** Seidel, Heather
**Sent:** Monday, June 04, 2018 11:21 AM
**To:** Greiner, Natasha (Vij); Maitra, Neelanjan
**Subject:** Fwd: Ether speech


Sent from my iPhone
Begin forwarded message:

**From:** "Hinman, William" <▮▮▮▮.GOV>
**Date:** June 4, 2018 at 11:10:36 AM EDT
**To:** "Moskowitz, Lucas" <▮▮▮▮.GOV>, "Memon, Sean" <▮▮▮▮.GOV>, "Fox, Raquel" <▮▮▮▮.GOV>, "Redfearn, Brett" <▮▮▮▮.GOV>, "Blass, Dalia" <▮▮▮▮.GOV>, "Avakian, Stephanie" <▮▮▮▮.GOV>, "Peikin, Steven" <▮▮▮▮.GOV>, "Karp, David S." <▮▮▮▮.GOV>, "Stebbins, Robert" <▮▮▮▮.GOV>, "Jarsulic, Laura" <▮▮▮▮.GOV>, "Morris, Daniel (Bryant)" <▮▮▮▮.GOV>, "McHugh, Jennifer B." <▮▮▮▮.GOV>, "Bartels, David P." <▮▮▮▮.GOV>, "Goldsholle, Gary" <▮▮▮▮.GOV>, "Seidel, Heather" <▮▮▮▮.GOV>
**Cc:** "Fredrickson, David R." <▮▮▮▮.GOV>, "Szczepanik, Valerie" <▮▮▮▮.GOV>, "Seaman, Michael P." <▮▮▮▮.GOV>
**Subject: Ether speech**

Attached please find a draft of the speech I had mentioned, which suggests that we do not need to see a need to regulate Ether, as it is currently offered, as a security. That language is in brackets and would be used if we all are in agreement. We also have a call with Buterin later this week to confirm our understanding of how the Ethereum Foundation operates.
Please feel free to share any comments with me and the folks in the cc line.

CONFIDENTIAL

SEC-LIT-EMAILS-000471124

Thanks
Bill

_____

William Hinman
Director of the Division of Corporation Finance
U.S. Securities and Exchange Commission
[redacted].gov

CONFIDENTIAL

SEC-LIT-EMAILS-000471125

*Non-Public Draft*
*TM Comments on draft of June 4, 2018*

### Digital Asset Morphing

> **Commented [A1]:**
> As a general overall comment, this speech is what the general public/market participants have been asking for, so we **are very supportive of the speech and what it is communicating.**
>
> The general sentiment of the speech is focused **on the "what is a security" discussion.** Query whether we should **reframe the title/intro and initial questions within the introductory paragraph to focus on the "what is a security" discussion rather than the issue of morphing.**
>
> As written, **we would like to add a disclaimer that the remarks** primarily pertain to the Securities Act, as there are significant Exchange Act implications (especially to the extent that a digital asset is a security) that are not discussed. We will draft something **and send it along.**
>
> **Commented [A2]:** Consider adding a FN noting the following:
> Section 2(a)(1) of the 1933 Act [15 U.S.C. § 77b(a)(1)] and Section 3(a)(10) of the 1934 Act [15 U.S.C. § 78c(a)(10)] define "security." Section 2(a)(1) of the 1933 Act and Section 3(a)(10) of the 1934 Act contain "slightly different formulations" of the terms "security," but which the U.S. Supreme Court has "treated as essentially identical in meaning." Reves v. Ernst & Young, 494 U.S. 56 at 61, n. 1.

There has been considerable discussion recently in the press and at legal conferences regarding whether a digital asset offered as a security can over time become something other than a security. I think framing the question that way might miss an important point, which I hope to make with my remarks here today.

To start, I think a better line of inquiry is: "Can a digital asset or token that was originally offered in a securities offering ever be sold in a manner that does not constitute a securities offering?" In cases where the digital asset or token represents a set of rights that give the holder a financial interest in an enterprise the answer is likely no. In these cases, calling the transaction an initial coin offering, or "ICO," won't take it out of the purview of the U.S. securities laws.

But what of those cases where there is no central enterprise being invested in and where the digital asset or token is sold only to be used to purchase a good or service available through the network on which it was created? I believe in these cases the answer is a qualified "yes," and I'd like to share my thinking with you today about the circumstances under which that could occur.

First, I would like to start with a little background on the new world of digital assets. Most of you are no doubt quite familiar with Bitcoin and know of blockchain – or distributed ledger – technology. As I have come to learn, what may be most exciting about this technology is the ability to share information, transfer value, and record transactions in a decentralized digital environment. What does that mean? Payment systems, supply chain management, intellectual property rights licensing, stock ownership transfers and countless other potential

1

CONFIDENTIAL

SEC-LIT-EMAILS-000471126

Non-Public Draft
TM Comments on draft of June 4, 2018

applications can be conducted electronically, with a public, immutable record without the need for a trusted third party to verify transactions. Using these new networks, one can create digital information packets that can be transferred using encryption keys. These packets are sometimes called coins or tokens, and can be obtained through mining, distribution, sale or exchange by users in the network  Some people believe these new systems will forever transform e-commerce as we know it. There is excitement around this new technology. There is also a great deal of "irrational exuberance" and, unfortunately, many cases of fraud.

But that is not what I want to focus on today. I am here to talk about how these digital tokens and coins are being issued, distributed and sold. In order to raise money to develop these new systems, promoters[1] often sell the tokens themselves, rather than sell shares, issue notes or obtain bank financing. We have seen public distributions on the internet and private placements to sophisticated investors. But, in many cases, the economic substance is the same: funds are raised with the expectation that the promoters will build their system and investors can earn a return on the instrument – usually by selling their tokens in the secondary market as the value of the digital enterprise increases once the promoters create something of value with the proceeds.

When we see that kind of economic transaction, it is easy to apply the Supreme Court's "investment contract" test first announced in SEC v. Howey.[2] As you will remember, the test requires an investment of money in a common enterprise with an expectation of profit derived from the efforts of others. And it is important to reflect on the facts of Howey. A Florida hotel

**Commented [A3]:** Consider noting that while Howey is often used to determine whether a digital asset is a security, there are also other applicable tests/legal standards that could apply in this context (depending on the facts and circumstances).

---

[1] I am using the term "promoters" in a broad, generic sense. The important factor in the legal analysis is that there is a person or coordinated group that is working actively to develop the infrastructure of the network. This person or group may be, variously, founders, sponsors, developers, or "promoters" in the traditional sense. The presence of promoters in this context is important to distinguish from the circumstance where multiple, independent actors work on the network but no individual actor's or coordinated group of actors' efforts are essential.
[2] *SEC v. W.J. Howey Co*, 328 U.S. 293 (1946).

2

CONFIDENTIAL
SEC-LIT-EMAILS-000471127

operator sold interests in a citrus grove to its largely out-of-state guests. The transaction was recorded as a real estate sale, together with a service contract. In theory, purchasers could arrange to service the grove themselves, but few pursued that option. In fact, the purchasers were passive, relying largely on the Howey Service Company's efforts tending the assets for a return. And in articulating the test for an investment contract, the Supreme Court stressed: "Form [is] disregarded for substance and the emphasis [is] placed on economic realities."[3] So the purported real estate purchase was found to be an investment contract, and hence a security.

In the ICOs we have seen, overwhelmingly, promoters tout their ability to create some innovative application of blockchain technology. The investors are passive. Marketing efforts are rarely targeted to potential users of the application. And the viability of the application is still uncertain. At that stage, the purchase of a token looks a lot like a bet on the success of the enterprise and not the purchase of something that may someday be used to exchange for goods or services on the network.

As an aside, you might ask, given that these token sales often look like securities offerings, why are the promoters choosing to package the investment as an ICO or token offering? This is an especially good question if the network on which the token or coin will function is not yet operational. I think there can be a number of reasons. For a while, it was believed such labeling might, by itself, remove the transaction from the securities laws. I think people now realize labeling an investment opportunity as a coin or token, does not achieve that result. Second, this labelling might be hoped to bring some marketing "sizzle" to the enterprise. That might still work to some extent, but the track record of ICOs is still being sorted out and

---

[3] Id. at 298.

3

CONFIDENTIAL
SEC-LIT-EMAILS-000471128

*Non-Public Draft*
*TM Comments on draft of June 4, 2018*

some of the sizzle may now be more of a potential warning flare for investors. Some may be attracted to crowdfund through a blockchain mediated process. Digital assets can represent a relatively frictionless way to reach a global audience in order to seed a network where initial purchasers have a stake in the success of the network and become part of its early adopting participants who add value beyond their investment contributions. Related to this, some believe that once the token or coin is operational, it will cease to be a security and secondary liquidity may be easier to achieve. While I recognize that possibility, as I will discuss, the ability to transact in a coin or token on the secondary market requires a careful and fact-sensitive legal analysis.

I believe some industry participants are beginning to realize that, in some circumstances, it might be easier to start a blockchain-based enterprise in a more conventional way. In other words, do the initial funding through a conventional equity or debt offering and once the network is up and running, distribute or offer blockchain based tokens or coins to participants who need the functionality the network and the digital assets offer. This allows the tokens or coins to be structured and offered in a way where it is evident purchasers are not making an investment in the development of the enterprise.

Returning to the ICOs we are seeing, strictly speaking, the token – or coin or whatever the digital information packet is called – all by itself is not a security, just as the orange groves in Howey were not. Central to determining whether a security is being sold is how it is being sold. For example, when a certificate of deposit is sold by a federally regulated bank, the CD is not a security.[4] When a CD is sold as a part of a program organized by a broker who offers retail

---

[4] Marine Bank v. Weaver, 455 U.S. 551 (1982).

4

CONFIDENTIAL

SEC-LIT-EMAILS-000471129

*Non-Public Draft*
*TM Comments on draft of June 4, 2018*

investors promises of liquidity and ability to profit from changes in interest rates, the CD is part of an investment contract that is a security.[5] Similarly, when someone buys a housing unit to live in – even when represented by an instrument called "stock" – it is probably not a security.[6] When the housing unit is offered with a management contract or other services as an investment, it can be a security.[7]

And so with digital assets. The digital asset itself is simply code. But the way it is sold – as part of an investment; to non-users; by promoters to develop their idea – can be, and, in that context, most often is, a security – because it evidences an investment contract. And regulating these transactions as securities transactions makes sense. The impetus of the Securities Act is to remove the information asymmetry between promoters and investors. In a public distribution, the Securities Act prescribes the information investors need in order to make an informed decision, and the promoter is liable for material misstatements in the offering materials. These are important safeguards, and they are appropriate for most ICOs. The disclosure marries nicely with the Howey investment contract element about the efforts of others. As an investor, the success of the enterprise – and the ability to realize a profit on the investment – turns on the efforts of the third party. The investor is relying on the third party. So learning material information about the third party – its background, financing, plans, financial stake, and so forth – is a prerequisite to making an informed investment decision. Unless the third party is compelled by the securities law to disclose what it alone knows of these topics and the risks associated with the venture, investors will be uninformed and are at risk.

---

[5] Gary Plastics Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 756 F.2d 230 (2d Cir. 1985).
[6] United Housing Found., Inc. v. Forman, 421 U.S. 837 (1975).
[7] Guidelines as to the Applicability of the Federal Securities Laws to Offers and Sales of Condominiums or Units in a Real Estate Development, SEC Rel. No. 33-5347 (Jan. 4, 1973).

CONFIDENTIAL

SEC-LIT-EMAILS-000471130

*Non-Public Draft*
*TM Comments on draft of June 4, 2018*

But this also points the way to when a digital asset may no longer represent a security. When the efforts of the third party are no longer a key determining factor for the enterprise's success, material information asymmetries recede. Moreover, as a network becomes truly decentralized, the ability to identify an issuer to make the disclosure becomes difficult, and perhaps meaningless.

And so, when we look at Bitcoin, we do not see a third party whose efforts are a key determining factor in the enterprise. The value of Bitcoin turns on the efforts of decentralized miners and independent market participants' assessments of an open-source payment mechanism. Applying the disclosure provisions of the securities laws in this situation would seem to add little value. **[Note to Draft: We expect to use the following bracketed language subject to confirmation of our understanding of the Ethereum network in discussions with representatives of Ethereum Foundation.]** [Likewise, based on our understanding of the present state of Ether and the Ethereum network, regulating Ether as a security does not seem to be warranted.] [There may be other decentralized networks where regulating the tokens that function on them as a security may not be warranted.] And of course there continue to be systems that rely on central actors whose efforts are key to the success of the enterprise. In those cases, application of the securities laws can protect the investors who purchase the coins. There will be disclosure requirements and SEC-supervised trading mediated by regulated entities.

As I have tried to point out, the analysis is not static and the nature of a security does not inhere to the instrument.[8] Like CDs – which when issued by a federally regulated bank are not

---

[8] The Supreme Court's investment contract test "embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." Howey, at 299.

**Commented [A4]:** See comment below regarding "not warranted." Although we do not want to suggest that BTC is a security, taking too strong a position on the lack of any benefits from the disclosure provisions of the federal securities laws (presumably 33 Act) might be a wedge that could undermine SEC efforts towards other crypto-assets where the asset is a security and applying the 34 Act principles of fair and orderly markets would provide great value.

**Commented [A5]:** As we discussed, as written, we have concerns regarding the sentiment within this section of the speech. We think the relevant question, as discussed throughout the rest of the speech, is whether a digital asset meets the legal standards of a security, not whether it warrants regulation as a security, [redacted] concern due to the Exchange Act implication [redacted]

[redacted] n addition, we question whether a statement like this would provide less, not more, clarity to the industry on the question of whether ether is a security.

If Bill (and/or the Chairman's office) wants to make a blanket statement that Ether is not a security (barring any changes of thought based on the meeting later this week with Buterin (or his counsel)), we will need to discuss this further internally and with Brett.

**Commented [A6]:** Not sure what is meant by mediated. Also, "SEC-supervised" is probably too strong, as we don't usually refer to our oversight as "supervision." SEC-regulated would be better.

6

CONFIDENTIAL SEC-LIT-EMAILS-000471131

securities but when repackaged as part of an investment strategy can be securities – even digital assets with utility in an existing eco-system could be packaged and sold as an investment strategy that can be a security. A promoter could place Bitcoin in a fund or trust and sell interests, creating a new security. Similarly, investment contracts can be made out of virtually any asset (including virtual assets), provided the investor is reasonably expecting profits from the promoter's efforts.

Let me emphasize an earlier point: simply labeling a digital asset a "utility token" does not turn the asset into something that is not a security.[9] True, the Supreme Court has acknowledged that if someone is purchasing an asset for consumption only, it is likely not a security.[10] But the economic substance of the transaction determines the legal analysis, not the labels.[11] The oranges in Howey had utility. Or in my favorite example, the Commission warned in the late 1960s about investment contracts sold in the form of whisky warehouse receipts.[12] Promoters sold the receipts to US investors to finance the aging and blending processes of Scotch whisky. The whisky was real – and, for some, had exquisite utility. But Howey was not selling oranges and the warehouse receipts promoters were not selling whisky for consumption. They were selling investments, and the purchasers were expecting a return.

We expect issuers and market participants will want to understand whether transactions in a particular digital asset involve the sale of a security. We are not trying to play "regulatory gotcha." We are happy to help promoters and their counsel work through these issues. We stand

> **Commented [A7]:** Fix cite.

---

[9] "[T]he name given to an instrument is not dispositive." Forman, at 850.
[10] Forman, at 853.
[11] See above
[12] SEC Rel. No. 33-5018 (Nov. 4, 1969); Investment in Interests in Whisky, SEC Rel. No. 33-5451 (Jan 7, 1974).

7

CONFIDENTIAL

SEC-LIT-EMAILS-000471132

*Non-Public Draft*
*TM Comments on draft of June 4, 2018*

prepared to provide more formal interpretive or no action guidance to market participants about the proper characterization of a digital asset in a proposed use.

What are some of the factors we would look to? Whether a digital asset is offered as an investment contract and is thus a security will always depend on the particular facts and circumstances, and this list is illustrative, not exhaustive:

1. Is there a person or organized group that has sponsored or promoted the creation and sale of the digital assets, the efforts of which play a significant role in the development and maintenance of the asset and its potential increase in value?
2. Has this person or group retained a stake or other interest in the digital asset such that it would be motivated to expend efforts to cause an increase in value in the digital asset? Would purchasers reasonably believe such efforts will be undertaken and may result in a return on their investment in the digital asset? Does the promoter continue to expend funds from proceeds or operations to enhance the functionality and/or value of the system within which the token operate? Has the promoter raised an amount of funding that seems reasonably related to the costs of creating the network?
3. Is the instrument marketed and sold to potential users of the network for a price that reasonably correlates with the market value of the good or service in the network?
4. Does application of Securities Act protections make sense? Is there a person or entity others are relying on that plays a key role in the profit-making of the enterprise such that disclosure of their activities and plans would be helpful to investors? Do informational asymmetries exist between the promoters and potential purchaser/investors in the digital asset?

**Commented [A8]:** As a general comment, please consider tying these factors more closely and explicitly to the *Howey* analysis. It may also be worth reiterating here that standards and tests other than *Howey* may also be applicable.

**Commented [A9]:** Why is this factor relevant and how would it be applied?

**Commented [A10]:** This seems ambiguous. What about amounts raised and earmarked for marketing or reserves?

**Commented [A11]:** Why is this factor relevant and how would it be applied?

**Commented [A12]:** What would constitute "reasonable correlation" for the purposes of this test?

**Commented [A13]:** Although this statement highlights the required disclosure framework within the Securities Act, we have some concern that this ignores the existence of the Exchange Act and the protections therein. (Although the introductory disclaimer that the speech is primarily focused on the regulatory framework within the Securities Act may fix this issue.)

8

CONFIDENTIAL

SEC-LIT-EMAILS-000471133

In the meantime, are there contractual or technical ways to structure digital assets so they are less likely to act like a security? I believe so. Again, these are certainly not "get out of jail free" cards, and we would look to the economic substance of the transaction, but promoters and their counsels should consider these, and other, possible features. This list is not intended to be exhaustive and by no means do I believe each and every one of these factors needs to be present to establish a case that a token is not being offered as a security.

1. Is token creation commensurate with meeting the needs of users or, rather, with feeding speculation?

   > **Commented [A14]:** This is ambiguously worded and it is not clear why this is relevant.

2. Can tokens be hoarded or are they distributed in ways to meet users' needs? For example, does the token degrade in value over time or can it only be held or transferred in amounts that correspond to a purchaser expected use?

   > **Commented [A15]:** Unclear what this intends to cover? Can't any asset be hoarded?

3. Are the assets dispersed across a diverse user base or concentrated in the hands of a few that can exert influence over the application?

   > **Commented [A16]:** Does this go to the efforts of others part of Howey?

4. Have purchasers made representations as to their consumptive, as opposed to their investment, intent?

   > **Commented [A17]:** Does this go to the expectation of profits part of Howey? What if purchasers can have either a consumptive or an investment intent? And how does the purchasers intent tie into the issuer/seller's intent?

5. Is the promoter supporting the secondary market for the assets or are independent actors setting the price?

   > **Commented [A18]:** The concept of promoting the idea of secondary market has been a key factor in our analysis. We suggest moving this concept to the other list (to the extent you keep two separate lists).

6. Is the application in early stage development or fully functioning?

7. Is the asset marketed and distributed to potential users or the general public?

   > **Commented [A19]:** General comment – as written, it may not be apparent to the reader which characteristic or factor weigh against it being a security or not.

These are exciting legal times and I am pleased to be part of a process that can help promoters of this new technology and their counsel navigate and comply with the federal securities laws.

9

CONFIDENTIAL

SEC-LIT-EMAILS-000471134