# EXHIBIT 6

# Exhibit 211

| To: | Hinman, William[████████@SEC.GOV]; Seaman, Michael P.[████████@SEC.GOV] |
|---|---|
| Cc: | Goldsholle, Gary[████████@SEC.GOV]; Seidel, Heather[████████@SEC.GOV]; Bergoffen, Roni E[████████@SEC.GOV] |
| From: | Redfearn, Brett |
| Sent: | 2018-06-12T10:34:45-04:00 |
| Importance: | Normal |
| Subject: | FW: Digital Asset Speech |
| Received: | 2018-06-12T10:34:45-04:00 |

DRAFT Digital Assets Speech 2018-06-11 TM comments.docx

Hi Bill,

We have a three key comments (see also attached) for your Digital Assets Speech.   It's a great speech, but we think that a few points could help make it stronger, primarily:

- We think that, up front, it would help if you added a disclaimer that the remarks focus on the 1933 Act.
- As written, the language remains vague as to whether ETH is a security.   If you want to make an affirmative statement that it is not a security, the language could be stronger (i.e., just say it).  If you don't want to take an affirmative stance, we suggest using language similar to what you used for Bitcoin re. the disclosure regime to make it more consistent.   Otherwise, it is unclear why bitcoin references the disclosure regime and ETH primarily references "resale activity."
- On p. 8, when talking about "implications under the federal securities laws" when an asset is considered a security, we would appreciate it if you would add: "There are a host of issues being addressed by our divisions of Trading and Markets and Investment Management, including broker-dealer, exchange and fund registration, as well as matters of market manipulation, custody and valuation."  These are key issues for us that we want to continue to emphasize when possible.

Please let me know if you would like to discuss.
Thanks,
Brett

SEC-LIT-EMAILS-000471315

*Non-Public Draft*
*June 11, 2018*

## Digital Asset Transactions:

## When Howey Met Gary (Plastics)

There has been considerable discussion recently in the press and at legal conferences regarding whether a digital asset offered as a security[1] can over time become something other than a security. I think framing the question that way might miss an important point, which I hope to make with my remarks here today.

To start, I think a better line of inquiry is: "Can a digital asset or token that was originally offered in a securities offering ever be later sold in a manner that does not constitute an offering of a security?" In cases where the digital asset or token represents a set of rights that give the holder a financial interest in an enterprise the answer is likely "no." In these cases, calling the transaction an initial coin offering, or "ICO," or a sale of a "Token," won't take it out of the purview of the U.S. securities laws.

But what of those cases where there is no longer any central enterprise being invested in and where the digital asset or token is sold only to be used to purchase a good or service available through the network on which it was created? I believe in these cases the answer is a qualified "yes," and I'd like to share my thinking with you today about the circumstances under which that could occur.

First, I would like to start with a little background on the new world of digital assets. Most of you are no doubt quite familiar with Bitcoin and know of blockchain – or distributed

---

[1] Section 2(a)(1) of the 1933 Act [15 U.S.C. § 77b(a)(1)] and Section 3(a)(10) of the 1934 Act [15 U.S.C. § 78c(a)(10)] define "security." Section 2(a)(1) of the 1933 Act and Section 3(a)(10) of the 1934 Act contain "slightly different formulations" of the terms "security," but which the U.S. Supreme Court has "treated as essentially identical in meaning," Reves v. Ernst & Young, 494 U.S. 56 at 61, n. 1.

1

SEC-LIT-EMAILS-000471316

ledger – technology. As I have come to learn, what may be most exciting about this technology is the ability to share information, transfer value, and record transactions in a decentralized digital environment. What does that mean? Payment systems, supply chain management, intellectual property rights licensing, stock ownership transfers and countless other potential applications can be conducted electronically, with a public, immutable record without the need for a trusted third party to verify transactions. Using these new networks, one can create digital information packets that can be transferred using encryption keys. These packets are sometimes called coins or tokens, and can be obtained through mining, distribution, sale or exchange by users in the network. Some people believe these new systems will forever transform e-commerce as we know it. There is excitement around this new technology, and a great deal of speculative interest. Unfortunately, there also are many cases of fraud. In many regards, it is still "early days."

But that is not what I want to focus on today. I am here to talk about how these digital tokens and coins are being issued, distributed and sold. In order to raise money to develop these new systems, promoters[2] often sell the tokens themselves, rather than sell shares, issue notes or obtain bank financing. But, in many cases, the economic substance is the same: funds are raised with the expectation that the promoters will build their system and investors can earn a return on the instrument – usually by selling their tokens in the secondary market once the promoters create something of value with the proceeds and the value of the digital enterprise increases.

---

[2] I am using the term "promoters" in a broad, generic sense. The important factor in the legal analysis is that there is a person or coordinated group (including "any unincorporated organization" *see* 5 U.S.C. § 77n(a)(4)) that is working actively to develop the infrastructure of the network. This person or group may be, variously, founders, sponsors, developers, or "promoters" in the traditional sense. The presence of promoters in this context is important to distinguish from the circumstance where multiple, independent actors work on the network but no individual actor's or coordinated group of actors' efforts are essential efforts that affect the failure or success of the enterprise.

2

SEC-LIT-EMAILS-000471317

*Non-Public Draft*
*June 11, 2018*

When we see that kind of economic transaction, it is easy to apply the Supreme Court's "investment contract" test first announced in SEC v. Howey.[3] As you will remember, the test requires an investment of money in a common enterprise with an expectation of profit derived from the efforts of others. And it is important to reflect on the facts of Howey. A hotel operator sold interests in a citrus grove to its guests. The transaction was recorded as a real estate sale, together with a service contract. In theory, purchasers could arrange to service the grove themselves. In fact, the purchasers were passive, relying largely on the Howey Service Company's efforts tending the assets for a return. In articulating the test for an investment contract, the Supreme Court stressed: "Form [is] disregarded for substance and the emphasis [is] placed on economic realities."[4] So the purported real estate purchase was found to be an investment contract, and hence a security.

In the ICOs we have seen, overwhelmingly, promoters tout their ability to create some innovative application of blockchain technology. The investors are passive. Marketing efforts are not targeted narrowly and rarely just to potential users of the application. And typically at the outset, viability of the application is still uncertain. At that stage, the purchase of a token looks a lot like a bet on the success of the enterprise and not the purchase of something used to exchange for goods or services on the network.

As an aside, you might ask, given that these token sales often look like securities offerings, why are the promoters choosing to package the investment as an ICO or token offering? This is an especially good question if the network on which the token or coin will

---

[3] *SEC v. W.J. Howey Co*, 328 U.S. 293 (1946). Depending on the facts of any given instrument, it may also need to be evaluated as a possible security under the general definition of security – see footnote 1 – and the case law interpreting it.
[4] Id. at 298.

CONFIDENTIAL

SEC-LIT-EMAILS-000471318

*Non-Public Draft*
*June 11, 2018*

function is not yet operational. I think there can be a number of reasons. For a while, it was believed such labeling might, by itself, remove the transaction from the securities laws. I think people now realize labeling an investment opportunity as a coin or token does not achieve that result. Second, this labelling might be hoped to bring some marketing "sizzle" to the enterprise. That might still work to some extent, but the track record of ICOs is still being sorted out and some of the sizzle may now be more of a potential warning flare for investors. Some may be attracted to a blockchain-mediated crowdfunding process. Digital assets can represent an efficient way to reach a global audience where initial purchasers have a stake in the success of the network and become part of a network where their participation adds value beyond their investment contributions. Related to this, it is possible that once a network is sufficiently decentralized, or the token or coin is used predominantly to purchase goods or services, transactions after that point would not be securities offerings. While I recognize that possibility, as I will discuss, whether a transaction in a coin or token on the secondary market will amount to an offer or sale of a security, requires a careful and fact-sensitive legal analysis.

I believe some industry participants are beginning to realize that, in some circumstances, it might be easier to start a blockchain-based enterprise in a more conventional way. In other words, do the initial funding through a registered or exempt equity or debt offering and, once the network is up and running, distribute or offer blockchain based tokens or coins to participants who need the functionality the network and the digital assets offer. This allows the tokens or coins to be structured and offered in a way where it is evident that purchasers are not making an investment in the development of the enterprise.

Returning to the ICOs we are seeing, strictly speaking, the token – or coin or whatever the digital information packet is called – all by itself is not a security, just as the orange groves in

4

SEC-LIT-EMAILS-000471319

*Non-Public Draft*
*June 11, 2018*

Howey were not. Central to determining whether a security is being sold is how it is being sold and the reasonable expectations of purchasers. When someone buys a housing unit to live in – even when represented by an instrument called "stock" – it is probably not a security.[5] When the housing unit is offered with a management contract or other services as an investment, it can be a security.[6] Similarly, when a CD, exempt from being treated as a security under Section 3 of the Securities Act, is sold as a part of a program organized by a broker who offers retail investors promises of liquidity and ability to profit from changes in interest rates, the Gary Plastics case teaches us that the instrument can be part of an investment contract that is a security.[7]

And so with digital assets. The digital asset itself is simply code. But the way it is sold – as part of an investment; to non-users; by promoters to develop their idea – can be, and, in that context, most often is, a security – because it evidences an investment contract. And regulating these transactions as securities transactions makes sense. The impetus of the Securities Act is to remove the information asymmetry between promoters and investors. In a public distribution, the Securities Act prescribes the information investors need in order to make an informed decision, and the promoter is liable for material misstatements in the offering materials. These are important safeguards, and they are appropriate for most ICOs. The disclosure marries nicely with the Howey investment contract element about the efforts of others. As an investor, the success of the enterprise – and the ability to realize a profit on the investment – turns on the efforts of the third party. So learning material information about the third party – its background, financing, plans, financial stake, and so forth – is a prerequisite to making an informed

---

[5] United Housing Found., Inc. v. Forman, 421 U.S. 837 (1975).
[6] Guidelines as to the Applicability of the Federal Securities Laws to Offers and Sales of Condominiums or Units in a Real Estate Development, SEC Rel. No. 33-5347 (Jan. 4, 1973).
[7] Gary Plastics Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 756 F.2d 230 (2d Cir. 1985).

CONFIDENTIAL                                                                    SEC-LIT-EMAILS-000471320

*Non-Public Draft*
*June 11, 2018*

investment decision. Unless the third party is compelled by the securities law to disclose what it alone knows of these topics and the risks associated with the venture, investors will be uninformed and are at risk.

But this also points the way to when a digital asset transaction may no longer represent a security offering. When the efforts of the third party are no longer a key determining factor for the enterprise's success, material information asymmetries recede. Moreover, as a network becomes truly decentralized, the ability to identify an issuer or promoter to make the disclosure becomes difficult, and perhaps meaningless.

And so, when I look at Bitcoin, I do not see a central third party whose efforts are a key determining factor in the enterprise. The network on which Bitcoin functions was operational and appears to have been highly decentralized from its inception. Applying the disclosure regime of the federal securities laws in this situation would seem to add little value. And putting aside the fundraising that accompanied the creation of Ether, based on my understanding of the present state of Ether and the Ethereum network and how it operates, regulating the current resale activity we see in Ether as security transactions would not appear to further the policy objectives of the federal securities laws.[8] Over time, there may be other sufficiently decentralized networks where regulating the tokens that function on them as a security may not be required. And of course there will continue to be systems that rely on central actors whose efforts are a key to the success of the enterprise. In those cases, application of the securities laws protects the investors who purchase the coins.

---

[8] Secondary trading in digital assets by regulated entities may raise other policy issues under the federal securities laws as well as the Commodities Exchange Act.

CONFIDENTIAL                                                                                    SEC-LIT-EMAILS-000471321

*Non-Public Draft*
*June 11, 2018*

As I have tried to point out, the analysis is not static and the nature of a security does not inhere to the instrument.[9]  Even digital assets with utility in an existing eco-system could be packaged and sold as an investment strategy that can be a security.  If a promoter were to place Bitcoin in a fund or trust and sell interests, it would create a new security.  Similarly, investment contracts can be made out of virtually any asset (including virtual assets), provided the investor is reasonably expecting profits from the promoter's efforts.

Let me emphasize an earlier point:  simply labeling a digital asset a "utility token" does not turn the asset into something that is not a security.[10]  True, the Supreme Court has acknowledged that if someone is purchasing an asset for consumption only, it is likely not a security.[11]  But the economic substance of the transaction determines the legal analysis, not the labels.[12]  The oranges in Howey had utility.  Or in my favorite example, the Commission warned in the late 1960s about investment contracts sold in the form of whisky warehouse receipts.[13]  Promoters sold the receipts to US investors to finance the aging and blending processes of Scotch whisky.  The whisky was real – and, for some, had exquisite utility.  But Howey was not selling oranges and the warehouse receipts promoters were not selling whisky for consumption.  They were selling investments, and the purchasers were expecting a return.

We expect issuers and market participants will want to understand whether transactions in a particular digital asset involve the sale of a security.  We are not trying to play "regulatory gotcha."  We are happy to help promoters and their counsel work through these issues.  We stand

---

[9] The Supreme Court's investment contract test "embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits."  Howey, at 299.

[10] "[T]he name given to an instrument is not dispositive."  Forman, at 850.

[11] Forman, at 853.

[12] See footnotes 9 and 10.

[13] SEC Rel. No. 33-5018 (Nov. 4, 1969);  Investment in Interests in Whisky, SEC Rel. No. 33-5451 (Jan 7, 1974).

CONFIDENTIAL                                        SEC-LIT-EMAILS-000471322

*Non-Public Draft*
*June 11, 2018*

prepared to provide more formal interpretive or no action guidance to market participants about the proper characterization of a digital asset in a proposed use. In addition, we recognize that there are implications under the federal securities laws of a particular asset being considered a security. There are a host of issues being addressed by our divisions of Trading and Markets and Investment Management, including broker-dealer, exchange and fund registration, as well as matters of market manipulation, custody and valuation. We understand that industry participants are working to make their services compliant with the existing regulatory framework, and we are happy to continue our engagement in this process.

What are some of the factors we would look to in assessing whether a digital asset is offered as an investment contract and is thus a security? Primarily, we are looking to the role of a third party – whether a person, entity or coordinated group of actors – that drive the possibility of a return. That question will always depend on the particular facts and circumstances, and this list is illustrative, not exhaustive:

1. Is there a person or organized group that has sponsored or promoted the creation and sale of the digital assets, the efforts of whom play a significant role in the development and maintenance of the asset and its potential increase in value?

2. Has this person or group retained a stake or other interest in the digital asset such that it would be motivated to expend efforts to cause an increase in value in the digital asset? Would purchasers reasonably believe such efforts will be undertaken and may result in a return on their investment in the digital asset? Does the promoter continue to expend funds from proceeds or operations to enhance the functionality and/or value of the system within which the tokens operate?

CONFIDENTIAL

SEC-LIT-EMAILS-000471323

*Non-Public Draft*
*June 11, 2018*

3.  Are purchasers "investing," that is seeking a return?  In that regard, is the instrument marketed and sold to potential users of the network for a price that reasonably correlates with the market value of the good or service in the network?

4.  Does application of the Securities Act protections make sense?  Is there a person or entity others are relying on that plays a key role in the profit-making of the enterprise such that disclosure of their activities and plans would be helpful to investors?  Do informational asymmetries exist between the promoters and potential purchaser/investors in the digital asset?  Has the promoter raised an amount of funds in excess of what may be needed to establish a functional network, and, if so, has it indicated how those funds may be used to support the value of the tokens or to increase the value of the enterprise?

5.  Do the decentralized persons or entities exercise bona fide voting rights and meaningful control, or are they limited, including by another person or organized group's powers?

In the meantime, are there contractual or technical ways to structure digital assets so they function more like a consumer item and less like a security?  I believe so.  Again, these are certainly not "get out of jail free" cards, and we would look to the economic substance of the transaction, but promoters and their counsels should consider these, and other, possible features. This list is not intended to be exhaustive and by no means do I believe each and every one of these factors needs to be present to establish a case that a token is not being offered as a security. This list is meant to prompt thinking by promoters and their counsel, and start the dialogue with the staff – it is not meant to be a list of all necessary factors in a legal analysis.

1.  Is token creation commensurate with meeting the needs of users or, rather, with feeding speculation?

CONFIDENTIAL

SEC-LIT-EMAILS-000471324

*Non-Public Draft*
*June 11, 2018*

2.  Is it clear that the primary motivation for purchasing the digital asset is for personal use or consumption, as compared to investment?

3.  Can tokens be hoarded or are they distributed in ways to meet users' needs? For example, does the token degrade in value over time or can it only be held or transferred in amounts that correspond to a purchaser's expected use?

4.  Are the assets dispersed across a diverse user base or concentrated in the hands of a few that can exert influence over the application?

5.  Have purchasers made representations as to their consumptive, as opposed to their investment, intent?

6.  Is the promoter supporting the secondary market for the assets or are independent actors setting the price?

7.  Is the application in early stage development or fully functioning?

8.  Is the asset marketed and distributed to potential users or the general public?

9.  Are the tokens available in increments that correlate with a consumptive versus investment intent?

These are exciting legal times and I am pleased to be part of a process that can help promoters of this new technology and their counsel navigate and comply with the federal securities laws.

10

CONFIDENTIAL

SEC-LIT-EMAILS-000471325

*Non-Public Draft*
*June 11, 2018*

**Digital Asset Transactions:**

**When Howey Met Gary (Plastics)**

There has been considerable discussion recently in the press and at legal conferences regarding whether a digital asset offered as a security[1] can over time become something other than a security.  I think framing the question that way might miss an important point, which I hope to make with my remarks here today.

> **Commented [A1]:** Please add a disclaimer upfront that my remarks are limited to provisions and policies of the Securities Act of 1933.

To start, I think a better line of inquiry is: "Can a digital asset or token that was originally offered in a securities offering ever be later sold in a manner that does not constitute an offering of a security?"  In cases where the digital asset or token represents a set of rights that give the holder a financial interest in an enterprise the answer is likely "no."  In these cases, calling the transaction an initial coin offering, or "ICO," or a sale of a "Token," won't take it out of the purview of the U.S. securities laws.

But what of those cases where there is no longer any central enterprise being invested in and where the digital asset or token is sold only to be used to purchase a good or service available through the network on which it was created?  I believe in these cases the answer is a qualified "yes," and I'd like to share my thinking with you today about the circumstances under which that could occur.

First, I would like to start with a little background on the new world of digital assets. Most of you are no doubt quite familiar with Bitcoin and know of blockchain – or distributed

---

[1] Section 2(a)(1) of the 1933 Act [15 U.S.C. § 77b(a)(1)] and Section 3(a)(10) of the 1934 Act [15 U.S.C. § 78c(a)(10)] define "security."  Section 2(a)(1) of the 1933 Act and Section 3(a)(10) of the 1934 Act contain "slightly different formulations" of the terms "security," but which the U.S. Supreme Court has "treated as essentially identical in meaning,"  Reves v. Ernst & Young, 494 U.S. 56 at 61, n. 1.

1

*Non-Public Draft*
*June 11, 2018*

ledger – technology.  As I have come to learn, what may be most exciting about this technology

is the ability to share information, transfer value, and record transactions in a decentralized

digital environment.  What does that mean?  Payment systems, supply chain management,

intellectual property rights licensing, stock ownership transfers and countless other potential

applications can be conducted electronically, with a public, immutable record without the need

for a trusted third party to verify transactions.  Using these new networks, one can create digital

information packets that can be transferred using encryption keys.  These packets are sometimes

called coins or tokens, and can be obtained through mining, distribution, sale or exchange by

users in the network.  Some people believe these new systems will forever transform e-

commerce as we know it.  There is excitement around this new technology, and a great deal of

speculative interest.  Unfortunately, there also are many cases of fraud.  In many regards, it is

still "early days."

But that is not what I want to focus on today.  I am here to talk about how these digital

tokens and coins are being issued, distributed and sold.  In order to raise money to develop these

new systems, promoters[2] often sell the tokens themselves, rather than sell shares, issue notes or

obtain bank financing.  But, in many cases, the economic substance is the same: funds are raised

with the expectation that the promoters will build their system and investors can earn a return on

the instrument – usually by selling their tokens in the secondary market once the promoters

create something of value with the proceeds and the value of the digital enterprise increases.

---

[2] I am using the term "promoters" in a broad, generic sense.  The important factor in the legal analysis is that there is a person or coordinated group (including "any unincorporated organization" *see* 5 U.S.C. § 77n(a)(4)) that is working actively to develop the infrastructure of the network.  This person or group may be, variously, founders, sponsors, developers, or "promoters" in the traditional sense.  The presence of promoters in this context is important to distinguish from the circumstance where multiple, independent actors work on the network but no individual actor's or coordinated group of actors' efforts are essential efforts that affect the failure or success of the enterprise.

*Non-Public Draft*
*June 11, 2018*

When we see that kind of economic transaction, it is easy to apply the Supreme Court's "investment contract" test first announced in SEC v. Howey.[3]  As you will remember, the test requires an investment of money in a common enterprise with an expectation of profit derived from the efforts of others.  And it is important to reflect on the facts of Howey.  A hotel operator sold interests in a citrus grove to its guests.  The transaction was recorded as a real estate sale, together with a service contract.  In theory, purchasers could arrange to service the grove themselves.  In fact, the purchasers were passive, relying largely on the Howey Service Company's efforts tending the assets for a return.  In articulating the test for an investment contract, the Supreme Court stressed:  "Form [is] disregarded for substance and the emphasis [is] placed on economic realities."[4]  So the purported real estate purchase was found to be an investment contract, and hence a security.

In the ICOs we have seen, overwhelmingly, promoters tout their ability to create some innovative application of blockchain technology.  The investors are passive.  Marketing efforts are not targeted narrowly and rarely just to potential users of the application.  And typically at the outset, viability of the application is still uncertain.  At that stage, the purchase of a token looks a lot like a bet on the success of the enterprise and not the purchase of something used to exchange for goods or services on the network.

As an aside, you might ask, given that these token sales often look like securities offerings, why are the promoters choosing to package the investment as an ICO or token offering?  This is an especially good question if the network on which the token or coin will

---

[3] *SEC v. W.J. Howey Co*, 328 U.S. 293 (1946).  Depending on the facts of any given instrument, it may also need to be evaluated as a possible security under the general definition of security – see footnote 1 – and the case law interpreting it.

[4] Id. at 298.

3

*Non-Public Draft*
*June 11, 2018*

function is not yet operational. I think there can be a number of reasons. For a while, it was believed such labeling might, by itself, remove the transaction from the securities laws. I think people now realize labeling an investment opportunity as a coin or token does not achieve that result. Second, this labelling might be hoped to bring some marketing "sizzle" to the enterprise. That might still work to some extent, but the track record of ICOs is still being sorted out and some of the sizzle may now be more of a potential warning flare for investors. Some may be attracted to a blockchain-mediated crowdfunding process. Digital assets can represent an efficient way to reach a global audience where initial purchasers have a stake in the success of the network and become part of a network where their participation adds value beyond their investment contributions. Related to this, it is possible that once a network is sufficiently decentralized, or the token or coin is used predominantly to purchase goods or services, transactions after that point would not be securities offerings. While I recognize that possibility, as I will discuss, whether a transaction in a coin or token on the secondary market will amount to an offer or sale of a security, requires a careful and fact-sensitive legal analysis.

I believe some industry participants are beginning to realize that, in some circumstances, it might be easier to start a blockchain-based enterprise in a more conventional way. In other words, do the initial funding through a registered or exempt equity or debt offering and, once the network is up and running, distribute or offer blockchain based tokens or coins to participants who need the functionality the network and the digital assets offer. This allows the tokens or coins to be structured and offered in a way where it is evident that purchasers are not making an investment in the development of the enterprise.

Returning to the ICOs we are seeing, strictly speaking, the token – or coin or whatever the digital information packet is called – all by itself is not a security, just as the orange groves in

4

*Non-Public Draft*
*June 11, 2018*

Howey were not. Central to determining whether a security is being sold is how it is being sold and the reasonable expectations of purchasers. When someone buys a housing unit to live in – even when represented by an instrument called "stock" – it is probably not a security.[5] When the housing unit is offered with a management contract or other services as an investment, it can be a security.[6] Similarly, when a CD, exempt from being treated as a security under Section 3 of the Securities Act, is sold as a part of a program organized by a broker who offers retail investors promises of liquidity and ability to profit from changes in interest rates, the Gary Plastics case teaches us that the instrument can be part of an investment contract that is a security.[7]

And so with digital assets. The digital asset itself is simply code. But the way it is sold – as part of an investment; to non-users; by promoters to develop their idea – can be, and, in that context, most often is, a security – because it evidences an investment contract. And regulating these transactions as securities transactions makes sense. The impetus of the Securities Act is to remove the information asymmetry between promoters and investors. In a public distribution, the Securities Act prescribes the information investors need in order to make an informed decision, and the promoter is liable for material misstatements in the offering materials. These are important safeguards, and they are appropriate for most ICOs. The disclosure marries nicely with the Howey investment contract element about the efforts of others. As an investor, the success of the enterprise – and the ability to realize a profit on the investment – turns on the efforts of the third party. So learning material information about the third party – its background, financing, plans, financial stake, and so forth – is a prerequisite to making an informed

---

[5] United Housing Found., Inc. v. Forman, 421 U.S. 837 (1975).
[6] Guidelines as to the Applicability of the Federal Securities Laws to Offers and Sales of Condominiums or Units in a Real Estate Development, SEC Rel. No. 33-5347 (Jan. 4, 1973).
[7] Gary Plastics Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 756 F.2d 230 (2d Cir. 1985).

*Non-Public Draft*
*June 11, 2018*

investment decision.  Unless the third party is compelled by the securities law to disclose what it alone knows of these topics and the risks associated with the venture, investors will be uninformed and are at risk.

But this also points the way to when a digital asset transaction may no longer represent a security offering.  When the efforts of the third party are no longer a key determining factor for the enterprise's success, material information asymmetries recede.  Moreover, as a network becomes truly decentralized, the ability to identify an issuer or promoter to make the disclosure becomes difficult, and perhaps meaningless.

And so, when I look at Bitcoin, I do not see a central third party whose efforts are a key determining factor in the enterprise.  The network on which Bitcoin functions was operational and appears to have been highly decentralized from its inception.  Applying the disclosure regime of the federal securities laws in this situation would seem to add little value.  And putting aside the fundraising that accompanied the creation of Ether, based on my understanding of the present state of Ether and the Ethereum network and how it operates, regulating the current resale activity we see in Ether as security transactions would not appear to further the policy objectives of the federal securities laws [8]  Over time, there may be other sufficiently decentralized networks where regulating the tokens that function on them as a security may not be required.  And of course there will continue to be systems that rely on central actors whose efforts are a key to the success of the enterprise.  In those cases, application of the securities laws protects the investors who purchase the coins.

> **Commented [A2]:** We thought you were going to say that you don't believe ETH is a security.  We think that is a helpful message. This statement, on the other hand, appears likely to create more confusion about the status of ETH.  To the extent you don't say ETH is not a security, please consider conforming the policy rationale to the disclosure regime of the federal securities laws as you did with respect to Bitcoin earlier in the paragraph.

---

[8] Secondary trading in digital assets by regulated entities may raise other policy issues under the federal securities laws as well as  the Commodities Exchange Act.

*Non-Public Draft*
*June 11, 2018*

As I have tried to point out, the analysis is not static and the nature of a security does not inhere to the instrument.[9]  Even digital assets with utility in an existing eco-system could be packaged and sold as an investment strategy that can be a security.  If a promoter were to place Bitcoin in a fund or trust and sell interests, it would create a new security.  Similarly, investment contracts can be made out of virtually any asset (including virtual assets), provided the investor is reasonably expecting profits from the promoter's efforts.

Let me emphasize an earlier point: simply labeling a digital asset a "utility token" does not turn the asset into something that is not a security.[10]  True, the Supreme Court has acknowledged that if someone is purchasing an asset for consumption only, it is likely not a security.[11]  But the economic substance of the transaction determines the legal analysis, not the labels.[12]  The oranges in Howey had utility.  Or in my favorite example, the Commission warned in the late 1960s about investment contracts sold in the form of whisky warehouse receipts.[13]  Promoters sold the receipts to US investors to finance the aging and blending processes of Scotch whisky. The whisky was real – and, for some, had exquisite utility.  But Howey was not selling oranges and the warehouse receipts promoters were not selling whisky for consumption.  They were selling investments, and the purchasers were expecting a return.

We expect issuers and market participants will want to understand whether transactions in a particular digital asset involve the sale of a security.  We are not trying to play "regulatory gotcha."  We are happy to help promoters and their counsel work through these issues.  We stand

---

[9] The Supreme Court's investment contract test "embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." Howey, at 299.

[10] "[T]he name given to an instrument is not dispositive." Forman, at 850.

[11] Forman, at 853.

[12] See footnotes 9 and 10.

[13] SEC Rel. No. 33-5018 (Nov. 4, 1969); Investment in Interests in Whisky, SEC Rel. No. 33-5451 (Jan 7, 1974).

*Non-Public Draft*
*June 11, 2018*

prepared to provide more formal interpretive or no action guidance to market participants about the proper characterization of a digital asset in a proposed use.  In addition, we recognize that there are implications under the federal securities laws of a particular asset being considered a security.  There are a host of issues being addressed by our divisions of Trading and Markets and Investment Management, including broker-dealer, exchange and fund registration, as well as matters of market manipulation, custody and valuation.  We understand that industry participants are working to make their services compliant with the existing regulatory framework, and we are happy to continue our engagement in this process.

What are some of the factors we would look to in assessing whether a digital asset is offered as an investment contract and is thus a security? Primarily, we are looking to the role of a third party – whether a person, entity or coordinated group of actors – that drive the possibility of a return.  That question will always depend on the particular facts and circumstances, and this list is illustrative, not exhaustive:

> **Commented [A3]:** We appreciate your efforts to link these more closely to the factors in the Howey test.  However, because the list of factors is so extensive – and appears to include things that go beyond the typical Howey analysis (e.g., hoarding) – we have concerns this might lead to greater confusion on what is a security.

1. Is there a person or organized group that has sponsored or promoted the creation and sale of the digital assets, the efforts of whom play a significant role in the development and maintenance of the asset and its potential increase in value?

2. Has this person or group retained a stake or other interest in the digital asset such that it would be motivated to expend efforts to cause an increase in value in the digital asset? Would purchasers reasonably believe such efforts will be undertaken and may result in a return on their investment in the digital asset?  Does the promoter continue to expend funds from proceeds or operations to enhance the functionality and/or value of the system within which the tokens operate?

*Non-Public Draft*
*June 11, 2018*

3. Are purchasers "investing," that is seeking a return?  In that regard, is the instrument marketed and sold to potential users of the network for a price that reasonably correlates with the market value of the good or service in the network?

4. Does application of the Securities Act protections make sense?  Is there a person or entity others are relying on that plays a key role in the profit-making of the enterprise such that disclosure of their activities and plans would be helpful to investors?  Do informational asymmetries exist between the promoters and potential purchaser/investors in the digital asset?  Has the promoter raised an amount of funds in excess of what may be needed to establish a functional network, and, if so, has it indicated how those funds may be used to support the value of the tokens or to increase the value of the enterprise?

5. Do the decentralized persons or entities exercise bona fide voting rights and meaningful control, or are they limited, including by another person or organized group's powers?

In the meantime, are there contractual or technical ways to structure digital assets so they function more like a consumer item and less like a security?  I believe so.  Again, these are certainly not "get out of jail free" cards, and we would look to the economic substance of the transaction, but promoters and their counsels should consider these, and other, possible features. This list is not intended to be exhaustive and by no means do I believe each and every one of these factors needs to be present to establish a case that a token is not being offered as a security. This list is meant to prompt thinking by promoters and their counsel, and start the dialogue with the staff – it is not meant to be a list of all necessary factors in a legal analysis.

1. Is token creation commensurate with meeting the needs of users or, rather, with feeding speculation?

2.  Is it clear that the primary motivation for purchasing the digital asset is for personal use or consumption, as compared to investment?

3.  Can tokens be hoarded or are they distributed in ways to meet users' needs?  For example, does the token degrade in value over time or can it only be held or transferred in amounts that correspond to a purchaser's expected use?

4.  Are the assets dispersed across a diverse user base or concentrated in the hands of a few that can exert influence over the application?

5.  Have purchasers made representations as to their consumptive, as opposed to their investment, intent?

6.  Is the promoter supporting the secondary market for the assets or are independent actors setting the price?

7.  Is the application in early stage development or fully functioning?

8.  Is the asset marketed and distributed to potential users or the general public?

9.  Are the tokens available in increments that correlate with a consumptive versus investment intent?

These are exciting legal times and I am pleased to be part of a process that can help promoters of this new technology and their counsel navigate and comply with the federal securities laws.

10