EXHIBIT 9

# Exhibit 152

| **To:** | Seaman, Michael P. ████████████ .GOV]; Fredrickson, David R. ████████ [GOV]; Hinman, William ██████████ .GOV] |
|---|---|
| **From:** | Szczepanik, Valerie |
| **Sent:** | 2018-06-12T22:10:29-04:00 |
| **Importance:** | Normal |
| **Subject:** | Fwd: Speech |
| **Received:** | 2018-06-12T22:10:29-04:00 |

DRAFT Digital Assets Speech 2018-06-11.docx

ATT00001.htm

This just in- OGC comments. I have not reviewed yet.

Sent from my iPhone

Begin forwarded message:

> **From:** "Jarsulic, Laura" ██████████ GOV>
> **Date:** June 12, 2018 at 8:50:48 PM EDT
> **To:** "Szczepanik, Valerie" ██████████ GOV>
> **Subject: Fwd: Speech**
>
> Here are my thoughts - please keep in mind what I said in my email a minute ago - you can ignore much of the heavy editing if you'd like - the big issues are information asymmetry, the idea of deleting the line about ether as a way of generating more discussion, and some edits to the description of Howey.

I might have backed out the edits that aren't highlighted if I had the chance today - so you're seeing part of my process in all it's ugliness and I apologize! But I don't want to cause further delay.

SEC-LIT-EMAILS-000471395

CONFIDENTIAL

SEC-LIT-EMAILS-000471396

*Non-Public Draft*
*June 11, 2018*

## Digital Asset Transactions:

## When Howey Met Gary (Plastics)

Commented [A1]: Please insert the standard disclaimer in a footnote:

*The Securities and Exchange Commission disclaims responsibility for any private publication or statement of any SEC employee or Commissioner. This speech expresses the author's views and does not necessarily reflect those of the Commission, the Commissioners, or other members of the staff.*

Commented [A2]: This is a catchy title. But to the extent that the speech focuses more on Howey than Gary (and the fact that many outside the building may not understand the joke), you could change it to something like: "Digital Asset Transactions and Howey: When Is the Sale of an Orange Tree (or a Token) Just a Tree, and When Is It a Security?"

There has been considerable discussion recently in the press and at legal conferences regarding whether a digital asset offered as a security[1] can over time become something other than a security.  I think framing the question that way might miss an important point, which I hope to make with my remarks here today.

To start, I think a better line of inquiry is: "Can a digital asset or token that was originally offered in a securities offering ever be later sold in a manner that does not constitute an offering of a security?"  In cases where the digital asset or token represents a set of rights that give the holder a financial interest in an enterprise the answer is likely "no."  In these cases, calling the transaction an initial coin offering, or "ICO," or a sale of a "Token," won't take it out of the purview of the U.S. securities laws.

But what of those cases where there is no longer any central enterprise being invested in and where the digital asset or token is sold only to be used to purchase a good or service available through the network on which it was created?  I believe in these cases the answer is a qualified "yes," and I'd like to share my thinking with you today about the circumstances under which that could occur.

First, I would like to start with a little background on the new world of digital assets.  Most of you are no doubt quite familiar with Bitcoin and know of blockchain – or distributed

---

[1] Section 2(a)(1) of the 1933 Act [15 U.S.C. § 77b(a)(1)] and Section 3(a)(10) of the 1934 Act [15 U.S.C. § 78c(a)(10)] define "security."  Section 2(a)(1) of the 1933 Act and Section 3(a)(10) of the 1934 Act contain "slightly different formulations" of the terms "security," but which the U.S. Supreme Court has "treated as essentially identical in meaning," Reves v. Ernst & Young, 494 U.S. 56 at 61, n. 1.

1

SEC-LIT-EMAILS-000471397

*Non-Public Draft*
*June 11, 2018*

ledger   technology.  As I have come to learn, what may be most exciting about this technology is the ability to share information, transfer value, and record transactions in a decentralized digital environment.  What does that mean?  Payment systems, supply chain management, intellectual property rights licensing, stock ownership transfers and countless other potential applications can be conducted electronically, with a public, immutable record without the need for a trusted third party to verify transactions.  Using these new networks, one can create digital information packets that can be transferred using encryption keys.  These packets are sometimes called coins or tokens, and can be obtained through mining, distribution, sale or exchange by users in the network.  Some people believe these new systems will forever transform e-commerce as we know it.  There is excitement around this new technology, and a great deal of speculative interest.  Unfortunately, there also are many cases of fraud.  In many regards, it is still "early days."

But that is not what I want to focus on today.  I am here to talk about how these digital tokens and coins are being issued, distributed and sold.  In order to raise money to develop these new systems, promoters[2] often sell the tokens or ~~them selves,~~ rather than sell shares, issue notes or obtain bank financing.  But, in many cases, the economic substance is the same: funds are raised with the expectation that the promoters will build their system and investors can earn a return on the instrument – usually by selling their tokens in the secondary market once the

**Commented [A3]:** Tracks preceding sentence.

---

[2] I am using the term "promoters" in a broad, generic sense.  The important factor in the legal analysis is that there is a person or coordinated group (including "any unincorporated organization" *see* 5 U.S.C. § 77n(a)(4)) that is working actively to develop or guide the development of the infrastructure of the network.  This person or group may be, variously, founders, sponsors, developers, or "promoters" in the traditional sense.  The presence of promoters in this context is important to distinguish from the circumstance where multiple, independent actors work on the network but no individual actor's or coordinated group of actors' efforts are essential efforts that affect the failure or success of the enterprise.

2

*Non-Public Draft*
June 11, 2018

promoters create something of value with the proceeds and the value of the digital enterprise increases.

When we see that kind of economic transaction, it is ~~easy~~ straightforward to apply the Supreme Court's "investment contract" test first announced in SEC v. Howey.[3]  As you will remember, the test requires an investment of money in a common enterprise with an expectation of profit derived from the efforts of others.  And it is important to reflect on the facts of Howey.  A hotel operator sold interests in ~~an orange citrus~~ a grove to its guests, along with a service contract to cultivate and harvest the oranges.  The transaction was recorded as a real estate sale, together with a service contract.  ▓▓▓ urchasers could arrange to service the grove themselves ▓▓ ─ f ─ ─ most of the purchasers ▓▓▓▓ passive ▓▓▓▓ largely on the ▓ Howey-in-the-Hills Service, Inc ▓ ▓▓ rend ─ the assets for a return.  In articulating the test for an investment contract, the Supreme Court stressed:  "Form [is] disregarded for substance and the emphasis [is] placed on economic realities."[4]  So the purported combined purchase of real estate and a service contract ~~purchase~~ was found to be an investment contract, and hence a security.

Just as in the *Howey* case, tokens or coins are often touted as an asset tha ▓ s use in its own right -- like an orange tree - coupled with a promise that the asset will be cultivated in a way that will cause it to grow in value, to be sold later at a profit.  And, as in *Howey*, where the trees were sold to hotel guests, not farmers, the tokens typically are sold to a wide audience rather than persons who are likely to use the tokens on the network or in an application.  ~~In the~~

---

[3] *SEC v. W.J. Howey Co*, 328 U.S. 293 (1946).  Depending on the facts of any given instrument, it may also need to be evaluated as a possible security under the general definition of security  see footnote 1  and the case law interpreting it.
[4] Id. at 298.

3

CONFIDENTIAL

SEC-LIT-EMAILS-000471399

---

**Comments:**

**Commented [A4]:** The edit made because in *Howey*, the Court noted that some purchasers did not purchase the service contract. As to the purchasers who bought only the trees, the Court made it clear that although they had been offered a security, they had not actually bought a security (they bought only the trees).  In underlying papers, I believe the facts show that some of the purchasers did, in fact, arrange for a service contract from a different company (not Howey).  In light of all of these facts, the *Howey* test reflects a great amount of flexibility in its application.

**Commented [A5]:** Edit made to reflect the facts of *Howey*.

**Commented [A6]:** *Howey* enthusiasts (if there are any outside the SEC?) will know that the service company was Howey-in-the-Hills.

**Commented [A7]:** The Court found that only the purchase of land and service contract was the purchase of a security (those who bought land only had not purchased a security).

**Commented [A8]:** The edits in this paragraph are an attempt to weave *Howey* into the analysis a bit more and continue the thinking from the prior paragraph.

A direct comparison between the facts in Howey and the facts presented by most ICOs is helpful in that it makes it more clear why the prior paragraph states that it is easy to apply Howey to ICOs.

*Non-Public Draft*
*June 11, 2018*

ICOs we have seen, overwhelmingly, promoters tout their ability to create some innovative ~~application of blockchain technology.~~ In both situations – the sales of both the trees and tokens - ~~the~~The investors are pass**ive and.** M marketing efforts are not targeted narrowly ~~and rarely just to potential users of the application.~~ But the sale of tokens is, in some ways, even more clearly the sale of a security than the sale of the trees in *Howey*. In *Howey*, the orange trees already existed and the very concept of cultivating trees and harvesting oranges is a business model that is easy to understand. In f... et. the purchasers in *Howey* were not even required to purchase the service contract to cultivate the trees. By contrast, in the case of tokens or coins. the ~~And typically at the outset,~~ business model and very viability of the application is uncertain and typically is not easy to discern at the outset~~still uncertain~~, and the purchaser has no choice but to rely on the efforts of others to build the network and make the enterprise a success. At the outset~~at stage~~, the purchase of a token looks a lot like a bet on the success of the enterprise and not the purchase of something used to exchange for goods or services on the network.

As an aside, you might ask, given that these token sales often look like securities offerings, why are the promoters choosing to package the investment as an ICO or token offering? This is an especially good question if the network on which the token or coin will function is not yet operational. I think there can be a number of reasons. For a while, it was believed such labeling might, by itself, remove the transaction from the securities laws. I think people now realize labeling an investment opportunity as a coin or token does not achieve that result. Second, this labelling might be hoped to bring some marketing "sizzle" to the enterprise. That might still work to some extent, but the track record of ICOs is still being sorted out and some of the sizzle may now be more of a potential warning flare for investors. Some may be attracted to a blockchain-mediated crowdfunding process. Digital assets can represent an

4

*Non-Public Draft*
*June 11, 2018*

efficient way to reach a global audience where initial purchasers have a stake in the success of the network and become part of a network where their participation adds value beyond their investment contributions. Related

> Commented [A9]: We recommending deleting these sentences for two reasons – first, the main discussion of this concept is presented later in the speech. and including it here breaks the flow of the speech; and, second, t seems to introduce a factor or test for whether a token is a "utility" that doesn't appear in the list of factors at the end of the speech (whether it is used predominantly to purchase goods or services).

But I believe some industry participants are beginning to realize that, in some circumstances, it might be easier to start a blockchain-based enterprise in a more conventional way. In other words, do the initial funding through a registered or exempt equity or debt offering and, once the network is up and running, distribute or offer blockchain based tokens or coins to participants who need the functionality the network and the digital assets offer. These tokens or coins are for use on the network, not for the purpose of secondary market trading. This allows the tokens or coins to be structured and offered in a way where it is evident that purchasers are not making an investment in the development of the enterprise.

Returning to the ICOs we are seeing, strictly speaking, the token – or coin or whatever the digital information packet is called – all by itself is not a security, just as the orange groves in Howey were not. Instead, the token or coin (or orange tree) may or may not be offered and sold as a security depending on *how* Central to determining whether a security is being sold is how it is being sold and the reasonable expectations of purchasers. For example, When someone buys a housing unit to live in even when represented an instrument called

> Commented [A10]: We suggest this edit because there are things that we would say are securities all by themselves – i.e., things that are in the Securities or Exchange Act definition. Also – we could imagine a situation. in which a share in a company is instead issued as a token. That would be the exception to the rule that the bit of code itself is not the security.

5

SEC-LIT-EMAILS-000471401

*Non-Public Draft*
*June 11, 2018*

stock, it is probably not a security.[5] But a change in fac   circumstances can mean that the same asset can be offered and sold in a way that causes investors to have a reasonable expectation of profits based on the efforts of others. For example, ~~if~~When ~~that~~ ~~the~~ same housing unit is offered with a management contract or other servi~~ces as an investment~~, it can be a security.[6] ░░░░ ░░░░ ░░░░░░░░░░░░░░░ ░░░░░░░░░░░░░░░░

░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░

░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░

░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░

> **Commented [A11]:** We suggest moving this to a footnote or into a parenthetical attached to the case. It might be confusing here where a broader point is being made.

> **Commented [A12]:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

And so with digital assets. The digital asset itself is simply code. But the way it is sold – as part of an investment; to non-users; by promoters to develop their idea – can be, and, in that context, most often is, a security – because it evidences an investment contract. And regulating these transactions as securities transactions makes sense. The impetus of the Securities Act is to remove the information asymmetry between promoters and investors. In a public distribution, the Securities Act prescribes the information investors need in order to make an informed decision, and the promoter is liable for material misstatements in the offering materials. These are important safeguards, and they are appropriate for most ICOs. The disclosure marries nicely with the Howey investment contract element about the efforts of others. As an investor, the success of the enterprise – and the ability to realize a profit on the investment – turns on the efforts of the third party. So learning material information about the third party – its background, financing, plans, financial stake, and so forth – is a prerequisite to making an informed

---

[5] United Housing Found., Inc. v. Forman, 421 U.S. 837 (1975).
[6] Guidelines as to the Applicability of the Federal Securities Laws to Offers and Sales of Condominiums or Units in a Real Estate Development, SEC Rel. No. 33-5347 (Jan. 4, 1973).
[8] ~~Gary Plastics Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 756 F.2d 230 (2d Cir. 1985).~~ [If you keep this cite in, please note that the party name is "Gary Plastic" (no "s").]

6

SEC-LIT-EMAILS-000471402

*Non-Public Draft*
*June 11, 2018*

investment decision.  Unless the third party is compelled by the securities law to disclose what it alone knows of these topics and the risks associated with the venture, investors will be uninformed and are at risk.

But what happens if there is no third party or promoter to make this disclosure?  In other words, what if the token or coin's related network is sufficiently decentralized to the point that there is no person or group on which purchasers would reasonably expected to carry out essential managerial or entrepreneurial efforts?  Where there is no person ~~and there~~ which investors reasonably expect to provide those efforts, then ~~it also points the way to when~~ the offer or sale of that~~e~~ digital asset ~~transaction~~ may no longer represent a security offering. ~~When~~ ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮  ~~Moreover~~ This is demonstrated by the possibility that, as a network becomes ~~truly~~ decentralized, the ability to identify an issuer or promoter to make the disclosure becomes difficult—and perhaps meaningless.  Purchasers of tokens in such a decentralized network are more likely to have bought an asset that was *not* offered as part of an investment contract because there is no longer a third party which an investor can reasonably expect to provide the essential managerial or entrepreneurial efforts.

As I referred to earlier, it is a longstanding principle of federal securities law that whether an asset is offered or sold as a security turns on the particular facts and circumstances surrounding the offer and sale.[8]  It follows that an asset that is sold as an investment contract at one point in time may at some later point in time be sold in in a way that does not meet the test for an investment contract, due to a change in facts and circumstances.

---

[8] Even in *Howey*, the Supreme Court acknowledged that the persons who purchased the trees but not the service contract did not purchase an investment contract.

7

> **Commented [A13]:** While we agree that a central purpose of the Securities Act is to address an information asymmetry, I think we worry that it does not follow that there is no longer an asymmetry once a network becomes decentralized.  There likely are still people who have far more information (i.e., Buterin likely has far more information that retail purchasers of Ethers).  In fact, disclosure is likely to still be important to purchasers (and disclosure could help address the information asymmetry that is likely to continue to persist for some time after decentralization).  But the bigger point is that it's no longer an investment contract once there are no "efforts of others" to point to – plus, without a group in control, there's no one to hold responsible for providing the disclosure.
>
> The fact that tokens on a sufficiently decentralized network are no longer securities—and no longer are required to register, with all the benefits to investors of registration—seems to point out what might be considered the "regulatory gap" that exists in this space.
>
> In other words, this speech acknowledges that there is an "other" category—it's not a security because there's no "controlling" group (at least in the *Howey* sense), yet, like many other things (medication, credit cards) there may be a need for regulation to protect purchasers.

> **Commented [A14]:** Just an editorial suggestion to provide a transition to the next paragraph.

SEC-LIT-EMAILS-000471403

*Non-Public Draft*
*June 11, 2018*

And so, when I look at Bitcoin today, I do not see a central third party that ▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ~~rts are a key determining factor~~ ▓ the

enterprise. The network on which Bitcoin functions **was** operational and appears to have been

highly decentralized from its inception. In other words, it does not appear that investors can

reasonably expect that a person or group of people would provide the essential managerial or

entrepreneurial efforts. ~~Apply:~~ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ —————————— ▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

Over time, there may be other sufficiently decentralized networks where regulating the tokens

that function on them as a security may not be required. And of course there will continue to be

systems where investors reasonable ~~that rely expect~~ on central actors to provide ~~whose key~~ efforts

~~are a key to the success of the enterprise.~~ In those cases, application of the securities laws

protects the investors who purchase the coins.

As I have tried to point out, the analysis is not static and the nature of a security does not

inhere to the instrument.[10] Rather, the analysis turns on the facts and circumstances surrounding

the offer and sale. We apply the *Howey* test at the *time* of that offer and sale, and can reach a

different conclusion at various points in time, depending on changes in the facts and

circumstances. Even digital assets with utility in an existing eco-system could be packaged and

---

~~▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓ regulated entities may raise other policy issues under the federal securities~~
~~▓▓▓▓▓▓▓▓▓▓ ▓▓ the ▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓ ▓▓~~

[10] The Supreme Court's investment contract test "embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." Howey, at 299.

8

**Commented [A15]:** We suggest making this change because it seems that in the future, there may be groups or persons that do appear to be key determining factors (but those are not persons who have control in the *Howey* sense – rather, they are persons that essentially are followed by the crowd or "allowed" to be a determining factor).

**Commented [A16]:** As above, we suggest deleting this sentence because of our concern that informational asymmetries likely do still exist in some form, even where an enterprise is decentralized. The application of the securities laws may have value; but, as a practical matter, there's not a way to implement them.

**Commented [A17]:** We still have reservations about including a statement directly about Ether in the speech. Even with the caveats in the sentence, it seems that it would be difficult for the agency to take a different position on Ether in the future.

Further, the rest of the paragraph strongly implies that the thinking applies to Ether. Without the sentence about Ether, those implications might generate a useful reaction about Ether (from purchasers of those in the FinTech space). With the sentence, the reaction seems less likely to focus on the analysis, and more likely to focus on the potential fallout of making a direct statement about Ether's status as a security.

**Commented [A18]:** Suggested just to explain this a bit more

SEC-LIT-EMAILS-000471404

*Non-Public Draft*
*June 11, 2018*

sold as an investment strategy contract that can be a security.  If a promoter were to place Bitcoin in a fund or trust and sell interests, it would create a new security.  Similarly, investment contracts can be made out of virtually any asset (including virtual assets), provided the investor is reasonably expecting profits from the promoter's efforts.

Let me emphasize an earlier point: simply labeling a digital asset a "utility token" does not turn the asset into something that is not a security.[11]  True, the Supreme Court has acknowledged that if someone is purchasing an asset for consumption only, it is likely not a security.[12]  But the economic substance of the transaction determines the legal analysis, not the labels.[13]  The oranges in Howey had utility.  Or in my favorite example, the Commission warned in the late 1960s about investment contracts sold in the form of whisky warehouse receipts.[14]  Promoters sold the receipts to US investors to finance the aging and blending processes of Scotch whisky. The whisky was real – and, for some, had exquisite utility.  But Howey was not selling oranges and the warehouse receipts promoters were not selling whisky for consumption.  They were selling investments, and the purchasers were expecting a return.

We expect issuers and market participants will want to understand whether transactions in a particular digital asset involve the sale of a security.  We are not trying to play "regulatory gotcha."  We are happy to help promoters and their counsel work through these issues.  We stand prepared to provide more formal interpretive or no action guidance to market participants about the proper characterization of a digital asset in a proposed use.  In addition, we recognize that there are implications under the federal securities laws of a particular asset being considered a

---

[11] "[T]he name given to an instrument is not dispositive." Forman, at 850.
[12] Forman, at 853.
[13] See footnotes 9 and 10.
[14] SEC Rel. No. 33-5018 (Nov. 4, 1969); Investment in Interests in Whisky, SEC Rel. No. 33-5451 (Jan 7, 1974).

9

SEC-LIT-EMAILS-000471405

*Non-Public Draft*
*June 11, 2018*

security. We understand that industry participants are working to make their services compliant
with the existing regulatory framework, and we are happy to continue our engagement in this
process.

What are some of the factors we would look to in assessing whether a digital asset is
offered as an investment contract and is thus a security? Primarily, we are looking to the role of a
third party – whether a person, entity or coordinated group of actors – █████████████
██████████ █ that drive the possibility of a return. That question will
always depend on the particular facts and circumstances, and this list is illustrative, not
exhaustive:

1. Is there a person or ~~organized group~~ that has sponsored or promoted the creation and sale
   of the digital assets, the efforts of whom play a significant role in the development and
   maintenance of the asset and its potential increase in value?

2. ~~███~~
   ████████████████████████████████████████
   Would purchasers reasonably believe such efforts will be undertaken and may result in a
   return on their investment in the digital asset? Does the promoter continue to expend
   funds from proceeds or operations to enhance the functionality and/or value of the system
   within which the tokens operate?

3. Are purchasers "investing," that is seeking a return? In that regard, is the instrument
   marketed and sold the general public instead of marketed to potential users of the
   network for a price that reasonably correlates with the market value of the good or
   service in the network?

10

> **Commented [A19]:** This edit is intended to capture the fact that there is likely to be some group that **is driving the success of the enterprise** – that group may shift throughout time, and it may only have influence because its ideas are sound and attractive to others. So the central issue is **whether investors can reasonably expect a person or group to take control and provide the essential efforts.**

> **Commented [A20]:** Although we understand the reason for using the word "organized" here, it might appear to a reader to **connote that a level of formality is required to meet the** *Howey* **test.**

> **Commented [A21]:** We suggest deleting this. Although having a stake might show *control* (which could be useful for **the** *Howey* analysis), we worry that linking the stake to the person's *motivation* might appear to endorse the idea that there needs to be strict vertical *commonality* (i.e., that the interests of the promoter and the investor need to be aligned – that they'll both profit from the success of the enterprise). The SEC has rejected that view.

SEC-LIT-EMAILS-000471406

Case 1:23-cv-11323-JSR   Document 80-4   Filed 06/15/23   Page 15 of 16

*Non-Public Draft*
*June 11, 2018*



Is there a person or entity

5.  Do the decentralized persons or entities exercise ~~in fide voting rights a u~~ meaningful control, or are they limited, **including** by another person or organized ~~group's~~ powers?

In the meantime, are there contractual or technical ways to structure digital assets so they function more like a consumer item and less like a security?  I believe so.  Again, these are certainly not "get out of jail free" cards, and we would look to the economic substance of the transaction, but promoters and their counsels should consider these, and other, possible features. This list is not intended to be exhaustive and by no means do I believe each and every one of these factors needs to be present to establish a case that a token is not being offered as a security. This list is meant to prompt thinking by promoters and their counsel, and start the dialogue with the staff – it is not meant to be a list of all necessary factors in a legal analysis.

1.  Is token creation commensurate with meeting the needs of users ~~or~~ rather ~~than~~ raising capital for the purpose of building a network, ~~with feeding speculation~~?

2.  Is it clear that the primary motivation for purchasing the digital asset is for personal use or consumption, as compared to investment?

11

Commented [A22]: We suggest these edits to address our concerns with pointing to informational asymmetries and whether they continue to exist after decentralization has occurred.

In the context of a factor, we also are concerned that pointing to whether the application of the securities laws makes sense, and whether there are information asymmetries, will encourage would-be violators to claim that there have made fulsome disclosure outside the context of registration such that there no longer is a purpose in applying the securities laws or requiring registration (in other words, they've cured any potential information asymmetry).

Commented [A23]: It seems that the decentralized entity could continue to have some voting rights so long as they don't have meaningful control.

Commented [A24]: Would this other person or entity exercise meaningful control such that the entity is not really decentralized? And should the word "decentralized" be used here? We are asking because we aren't sure how this factor is intended to come out.

In other words, in order for this to be a "yes, it's a security" factor, should it read:
"Do persons or entities exercise meaningful control over the entity, including through another person or organized group?"

Commented [A25]: The edits in this section are suggested to make clear that a "yes" answer to the question supports the potential finding of a non-security.

SEC-LIT-EMAILS-000471407

*Non-Public Draft*
*June 11, 2018*

3. Can tokens be hoarded or a~~Are tokens~~they distributed in ways to meet users' needs rather than hoarded? For example, does the token degrade in value over time or can it only be held or transferred in amounts that correspond to a purchaser's expected use?

4. Are the assets dispersed across a diverse user base ~~or~~ instead of concentrated in the hands of a few that can exert influence over the application?

5. Have purchasers made representations as to their consumptive, as opposed to their investment, intent?

6. ~~Is the promoter supporting the secondary market for the assets or a~~Are independent actors setting the price in the secondary market as opposed to a promoter (for example, by supporting the price in the secondary market)?

7. Is the applicati~~on in early stage developme~~nt ~~or~~ fully functioning at the time the tokens are sold, as opposed to being in an earlier stage of development?

8. Is the asset marketed and distributed to potential users as opposed to ~~or~~ the general public?

9. Are the tokens available in increments that correlate with a consumptive versus investment intent?

These are exciting legal times and I am pleased to be part of a process that can help promoters of this new technology and their counsel navigate and comply with the federal securities laws.

12

SEC-LIT-EMAILS-000471408