## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>TERRAFORM LABS, PTE. LTD. and DO HYEONG KWON,<br><br>Defendants. | Civil Action No. 1:23-cv-01346-JSR<br><br><br><br>Hon. Jed S. Rakoff |

## MEMORANDUM REGARDING SUPPLEMENTAL AUTHORITY
## IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

Defendants[1] respectfully bring to the Court's attention a decision issued by the Honorable Analisa Torres last week in *SEC v. Ripple Labs, Inc., et al.*, No. 20 Civ. 10832 (AT) (S.D.N.Y. Jul. 13, 2023) (Ex. A), which directly bears on Defendants' pending motion to dismiss. The SEC's concession at oral argument in this case that UST, LUNA, wLUNA, MIR, or mAssets are not themselves securities significantly clarified the nature of the inquiry on the pending motion. *Compare* AC ¶ 1 n.1 ("'crypto asset security' refers to an asset …'") *with* Arg. Tr. 55:19-20 ("these crypto assets alone are not investment contracts"). *Ripple* confirms the legal insufficiency of the SEC's argument that UST, LUNA, wLUNA, MIR, and mAssets were securities because of the way they were allegedly sold.

Programmatic Sales: Ripple held that "programmatic sales" of the digital asset at issue in that case (XRP) *by the defendants* on exchanges were not "investment contracts" and that *Howey* would not be satisfied even if secondary market purchasers had speculative intent. Ex. A at 22-25. The same reasoning applies to UST, LUNA, wLUNA, MIR, and mAssets: The SEC does not allege that Defendants sold UST to anyone, directly or on a secondary market: All UST was created by operation of the Terra blockchain. AC ¶¶ 31-38, 69-84. Although the SEC tries to

---

[1] Capitalized terms not defined herein have the meanings set forth in Defendants' Motion (ECF. No. 29).

allege that TFL sold LUNA and MIR on secondary markets (AC ¶¶ 105-114), *Ripple*'s reasoning would make those transactions not investment contracts (likewise for wLUNA, which is simply a programmatic use of LUNA by someone who already owns it). And as the SEC does not dispute, mAssets were minted by the Mirror Protocol at the request of users of the protocol and were traded *peer-to-peer*: Transacting in mAssets was not transacting with Defendants at all.

<u>Purchases By Institutional Investors</u>: Ripple sold $728 million of XRP to institutional investors through written contracts. Ex. A at 15. Judge Torres held that those sales met the *Howey* test. But in *Ripple*, many of the institutional buyers specifically stated in their purchase contracts that they were buying XRP to re-sell it rather than consume it, some unlock periods were based on the volume of XRP trading, and the purchasers indemnified Ripple for claims arising out of the sale or distribution of XRP. Ex. A at 21-22. Here, the SEC alleges institutional sales only of LUNA and MIR, not wLUNA, UST, or mAssets (AC ¶¶ 105-110, 112-114), and the institutional purchase contracts did not state that the tokens were purchased for resale, the unlock provisions were temporal as opposed to based on trading volume, and the only indemnification by the purchasers was for specific statements by the purchasers (e.g., Ex. K at page 1, §§ 5-6, page 17 ). Moreover, as Defendants demonstrated in their prior briefing, all the institutional sales of LUNA and MIR were exempt from registration, an argument that was not made in *Ripple*.

In addition, the LUNA and MIR sales were nothing like the institutional sales in *Ripple*: The LUNA and MIR sales were smaller, and the Terra ecosystem messaging was about participation by ecosystem participants and not just bringing value to one ecosystem (e.g., Ex. DDD ("Our mission is to bring decentralized monies to as many blockchains as possible"); AC ¶ 51 ("As a holder of [LUNA], you then have three choices: Sit back and watch me kick ass, Take profits and buy un-valuable assets, Or you can roll up your sleeves and build cool s[**]t")[2]).

---

[2] During argument, the SEC referred to a single line in a single sub-part of this tweet thread, and the AC quotes two tweets from the thread. But the entirety of the thread was about the growth of the Terra ecosystem based on contributions from entities other than TFL, the opposite of the messaging relied on in *Ripple*. *Compare* Ex. A at 20-21 *with* https://twitter.com/stablekwon/status/1379728830307258374 (last visited July 17, 2023).

These critical facts distinguish Judge Torres's holding that institutional sales of XRP were securities.[3]

      *Ripple* is thus fatal to the SEC's arguments that UST, LUNA, wLUNA, MIR, and mAssets were sold as investment contracts. This conclusion requires dismissal of the SEC's fraud claims as well as its registration claims.

Dated: July 18, 2023

*/s/ Douglas W. Henkin*
**DENTONS US LLP**
Douglas W. Henkin
David L. Kornblau
1221 Avenue of the Americas
New York, New York 10020
Tel: (212) 768-6700
douglas.henkin@dentons.com
david.kornblau@dentons.com

Mark G. Califano
1900 K Street, NW
Washington, DC 20006-1102
Tel: (202) 496-7500
mark.califano@dentons.com

Stephen J. Senderowitz (*pro hac vice*)
233 S. Wacker Drive
Chicago, Illinois 60606
Tel: (312) 876-8141
stephen.senderowitz@dentons.com

*Counsel for Defendants*

---

[3] *Ripple* also held that Ripple's use of XRP to pay employees, fund project grants, and for other uses did not constitute the sale of a security. Ex. A at 26-27. To the extent the SEC makes similar arguments about UST and LUNA, they fail for the same reasons.

# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE
COMMISSION,

                Plaintiff,

   -against-

RIPPLE LABS, INC., BRADLEY
GARLINGHOUSE, and CHRISTIAN A.
LARSEN,

                Defendants.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __7/13/2023__

20 Civ. 10832 (AT)

**<u>ORDER</u>**

ANALISA TORRES, District Judge:

Plaintiff, the Securities and Exchange Commission (the "SEC"), brings this action against

Defendants Ripple Labs, Inc. ("Ripple") and two of its senior leaders, Bradley Garlinghouse and

Christian A. Larsen, alleging that Defendants engaged in the unlawful offer and sale of securities

in violation of Section 5 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77e(a)

and (c).  Am. Compl. ¶¶ 9, 430–35, ECF No. 46.  The SEC also alleges that Garlinghouse and

Larsen aided and abetted Ripple's Section 5 violations.  *Id.* ¶¶ 9, 436–40.

Before the Court are the parties' cross-motions for summary judgment.  ECF Nos. 824,

836; *see also* ECF Nos. 621, 625, 639, 642.[1]  For the reasons stated below, the SEC's motion is

GRANTED in part and DENIED in part, and Defendants' motion is GRANTED in part and

DENIED in part.

---

[1] Portions of the briefs, Rule 56.1 statements, and other documents discussed in this order were filed under seal or redacted.  *See* ECF No. 819 (granting in part and denying in part the parties' and third parties' motions to seal). These materials are "judicial documents" because they are "relevant to the performance of the judicial function and useful in the judicial process."  *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119 (2d Cir. 2006); *see also Bernstein v. Bernstein Litowitz Berger & Grossmann LLP*, 814 F.3d 132, 139 (2d Cir. 2016).  To the extent that information in these documents is disclosed in this order, the privacy and business interests that justified their sealing or redaction are outweighed by "the public's right of access to [information] necessary to understand the basis for court rulings."  *Spinelli v. Nat'l Football League*, 903 F.3d 185, 193 n.2 (2d Cir. 2018); *see also Dodona I, LLC v. Goldman, Sachs & Co.*, 119 F. Supp. 3d 152, 155 (S.D.N.Y. 2015).

# BACKGROUND[2]

## I.  Factual Background

### A.  Development of the XRP Ledger and the Founding of Ripple

In 2011 and early 2012, Arthur Britto, Jed McCaleb, and David Schwartz developed the source code for a cryptographically secured ledger, or a "blockchain,"[3] which is now known as the XRP Ledger.  SEC 56.1 Resp. ¶ 11, ECF No. 842; *see also* ECF No. 668.  They aimed to create a faster, cheaper, and more energy-efficient alternative to the bitcoin blockchain, the first blockchain ledger which was introduced in 2009.  *Id.* ¶¶ 4, 12.  When the XRP Ledger launched in 2012, its source code generated a fixed supply of 100 billion XRP.  *Id.* ¶¶ 17–18.  XRP is the native digital token of the XRP Ledger, and the XRP Ledger requires XRP to operate.  *Id.* ¶¶ 13–14.  Each unit of XRP is divisible into one million "drops," and each unit or drop of XRP is fungible with any other unit or drop.  Defs. 56.1 Resp. ¶¶ 17–18, ECF No. 835; *see also* ECF No. 663.

In 2012, Britto, Defendant Larsen, and McCaleb founded Ripple.[4]  *Id.* ¶ 41; SEC 56.1 Resp. ¶ 32.  Larsen became Ripple's CEO, a position he held until December 2016.  Defs. 56.1 Resp. ¶ 41.  Of the 100 billion XRP generated by the XRP Ledger's code, the three founders

---

[2] The facts in this section are taken from the parties' Rule 56.1 statements, counterstatements, and responses, unless otherwise noted.  Disputed facts are so noted.  Citations to a paragraph in a Rule 56.1 statement also include the opposing party's response.  "[W]here there are no citations[,] or where the cited materials do not support the factual assertions in the [s]tatements, the Court is free to disregard the assertion."  *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) (alteration omitted).

[3] A blockchain is an electronically distributed database or ledger "shared among a computer network's nodes."  *See* Adam Hayes, *Blockchain Facts: What Is It, How It Works, and How It Can Be Used*, Investopedia (updated Apr. 23, 2023), https://www.investopedia.com/terms/b/blockchain.asp/.  A blockchain is a system for recording information.  Each transaction is recorded as a "block" of data on the digital ledger, which is connected to the blocks before and after it.  SEC 56.1 Resp. ¶ 1, ECF No. 842.  Blockchains are typically recorded across a distributed network of computers.  *Id.* ¶ 2.

[4] Ripple was originally named NewCoin, Inc. and incorporated under California law.  SEC 56.1 Resp. ¶ 33.  It was then renamed OpenCoin, Inc. in October 2012.  *Id.*  In 2013, the company was renamed Ripple Labs, Inc., and in 2014, it was incorporated under Delaware law.  *Id.*  In this order, the Court shall refer to the company as Ripple, even when referring to its forerunners, NewCoin and OpenCoin.

retained 20 billion for themselves (including 9 billion for Larsen) and provided 80 billion XRP to Ripple. *Id.* ¶ 15; SEC 56.1 Resp. ¶ 21. The founders did not sell any XRP before the launch of the XRP Ledger, and Ripple never owned the 20 billion XRP retained by the three founders. SEC 56.1 Resp. ¶¶ 20, 22.

Since its founding, Ripple's mission has been to realize an "Internet of Value" by using technology to facilitate the transfer of value across the internet. *Id.* ¶ 35. Specifically, Ripple "seeks to modernize international payments by developing a global payments network for international currency transfers." *Id.* For instance, Ripple developed a software product called RippleNet, which allows customers to clear and settle cross-border financial transactions on mutually agreed upon terms. *Id.* ¶ 41. One feature of RippleNet is known as "on demand liquidity" ("ODL"). *Id.* ¶ 45. ODL facilitates cross-border transactions by allowing customers to exchange fiat currency (for example, U.S. dollars) for XRP and then the XRP for another fiat currency (for example, Mexican pesos). *Id.* ¶ 46; Defs. 56.1 Resp. ¶ 740.

Like ODL, some, but not all, of Ripple's products and services rely on the XRP Ledger and XRP. SEC 56.1 Resp. ¶ 44. The XRP Ledger is based on open-source software; anyone can use the ledger, submit transactions, host a node to contribute to the validation of transactions, propose changes to the source code, or develop applications that run on the ledger. *Id.* ¶¶ 52, 54. Other developers have built software products that use the XRP Ledger, such as payment-processing applications. *Id.* ¶ 59. Ripple has also funded companies as part of its "Xpring" initiative to incentivize the development of other use "cases" on the XRP Ledger. *Id.* ¶¶ 58–59.

3

B.  Defendants' Sales and Distributions of XRP

At all times before the end of 2020, Ripple owned between 50 and 80 billion XRP.  *See* Defs. 56.1 Resp. ¶¶ 15, 35; *see also id.* ¶ 256.  Although the parties dispute the specific dollar amounts and details, they agree that from 2013 through the end of 2020, Ripple engaged in various sales and distributions of XRP.  *See id.* ¶¶ 647, 716; *see generally* SEC 56.1 Resp. ¶¶ 92–123.

First, Ripple, through wholly owned subsidiaries, sold XRP directly to certain counterparties (primarily institutional buyers, hedge funds, and ODL customers) pursuant to written contracts (the "Institutional Sales").  SEC 56.1 Resp. ¶ 105; Defs. 56.1 Resp. ¶¶ 5–6, 619–20, 716.  The SEC alleges that Ripple sold approximately $728.9 million of XRP in these Institutional Sales.  Defs. 56.1 Resp. ¶ 716.

Second, Ripple sold XRP on digital asset exchanges "programmatically," or through the use of trading algorithms (the "Programmatic Sales").  SEC 56.1 Resp. ¶ 95; Defs. 56.1 Resp. ¶ 647.  Ripple's XRP sales on these digital asset exchanges were blind bid/ask transactions: Ripple did not know who was buying the XRP, and the purchasers did not know who was selling it.  SEC 56.1 Resp. ¶ 96; Defs. 56.1 Resp. ¶¶ 652–54.  The SEC alleges that Ripple sold approximately $757.6 million of XRP in Programmatic Sales.  Defs. 56.1 Resp. ¶ 647.  Ripple used the proceeds from the Institutional and Programmatic Sales to fund its operations.  Defs. 56.1 Resp. ¶¶ 156–70.[5]

Ripple also distributed XRP as a form of payment for services ("Other Distributions").  Defs. 56.1 Resp. ¶¶ 827–30.  For instance, Ripple distributed XRP to its employees as a form of

---

[5] Since 2012, Ripple has also raised investment capital through multiple funding rounds in which it sold stock to investors.  SEC 56.1 Resp. ¶ 34.  Ripple has issued millions of shares of common stock, as well as convertible notes, preferred stock, and a stock warrant.  SEC Add. 56.1 Resp. ¶¶ 1607, 1609, ECF No. 844.

employee compensation.  SEC 56.1 Resp. ¶ 110; Defs. 56.1 Resp. ¶¶ 217–18.  Ripple also

distributed XRP in conjunction with its Xpring initiative to fund third parties that would develop

new applications for XRP and the XRP Ledger.  Defs. 56.1 Resp. ¶¶ 831–32.  In sum, the SEC

alleges that Ripple recognized revenue of $609 million from its distributions of XRP to

individuals and entities in exchange for services.  *Id.* ¶¶ 829–30.[6]

In addition to Ripple's sales and distributions, Larsen and Garlinghouse offered and sold

XRP in their individual capacities.  After stepping down as CEO of Ripple in December 2016,

Larsen became the Executive Chairman of Ripple's Board of Directors, a position he currently

holds.  SEC 56.1 Resp. ¶¶ 128–29.  From at least 2013 through 2020, Larsen sold XRP on digital

asset exchanges programmatically and made at least $450 million from his sales.  Defs. 56.1

Resp. ¶ 868.

Garlinghouse was hired as Ripple's COO in April 2015.  SEC 56.1 Resp. ¶ 140.  After

Larsen stepped down as CEO, Garlinghouse became CEO effective January 1, 2017, a position

he currently holds.  *Id.* ¶ 143.  From April 2017 through 2020, Garlinghouse sold XRP on digital

asset exchanges, *id.* ¶¶ 303, 310; the SEC alleges that Garlinghouse sold approximately $150

million in XRP during this period, Defs. 56.1 Resp. ¶ 870.  Garlinghouse has also received XRP

as part of his overall compensation from Ripple.  SEC 56.1 Resp. ¶ 145.

Defendants did not file a registration statement as to any offers or sales of XRP.  Defs.

56.1 Resp. ¶ 928.  Ripple did not publicly file any financial statements or other periodic reports,

---

[6] Ripple also distributed XRP for free to "early adopters and developers" and to charities and grant recipients.  SEC 56.1 Resp. ¶¶ 92–94.  The SEC does not include these transactions in its complaint.  *See* SEC Opp. at 26 n.15, ECF No. 841.

nor did it make any EDGAR filings[7] with the SEC for Ripple or XRP, such as a Form 10-Q, Form 10-K, or Form 8-K relating to XRP.  *Id.* ¶¶ 930–32.

### C.  Defendants' XRP Marketing Campaign

The SEC alleges that "in 2013 Defendants began extensive, years-long marketing efforts representing they would search for purported 'use' and 'value' for XRP—and casting XRP as an opportunity to invest in those efforts."  SEC Opp. at 4, ECF No. 841.  The SEC points to a wide range of statements, including informational brochures, internal talking points, public blog posts, statements on social media, videos, interviews with various Ripple employees, and more. Defendants dispute the SEC's factual narrative and argue that the SEC "cherry-picks excerpts from documents with many authors and from public statements of many speakers, made at many points across an eight-year period of time to many audiences."  Defs. Opp. at 10, ECF No. 828.[8]

Since at least 2013, Ripple has prepared and distributed documents that describe the company's operations, the XRP trading market, and the XRP Ledger.  For example, in 2013 and 2014, Ripple created three brochures: a "Ripple for Gateways" brochure, a "Ripple Primer," and a "Deep Dive for Finance Professionals."  Defs. 56.1 Resp. ¶¶ 59–60, 171.  These documents were distributed publicly to prospective and existing XRP investors and outline, among other things, the relationship between XRP and Ripple's business model.  *Id.*  Ripple circulated versions of the "Gateways" brochure to more than one hundred third parties, *id.* ¶ 172; the "Primer" had "widespread distribution," *id.* ¶ 178; and the "Deep Dive" was posted on Ripple's website and sent to over one hundred people, *id.* ¶¶ 185–86.  Later, starting at the end of 2016,

---

[7] EDGAR, or "Electronic Data Gathering, Analysis, and Retrieval," is an electronic filing system developed by the SEC "to increase the efficiency and accessibility of corporate filings."  James Chen, *Electronic Data Gathering Analysis and Retrieval: Overview, FAQ*, Investopedia (updated Feb. 13, 2022), https://www.investopedia.com/terms/e/edgar.asp/.

[8] The SEC's Rule 56.1 statement contains over 1,600 purported facts—many of which are disputed by Defendants—and cites over 900 exhibits.  *See generally* Defs. 56.1 Resp.  The Court highlights below only those documents and statements directly relevant to this order.

Ripple began to publish on its website quarterly "XRP Market Reports," which were intended to provide "clarity and visibility" about Ripple's market activities. *Id.* ¶¶ 500–01.

Ripple and its senior leaders used a variety of social media platforms—including Twitter, Facebook, Reddit, and XRP Chat, an online forum described as "The Largest XRP Crypto Community Forum"—to communicate about XRP and Ripple. Defs. 56.1 Resp. ¶¶ 77, 192; *see, e.g.*, *id.* ¶¶ 391–96, 401–08, 425, 437–40. Ripple officials also spoke in interviews about the company and its relationship to XRP. For instance, Larsen gave interviews in which he discussed XRP, *e.g.*, *id.* ¶¶ 371, 377, and Garlinghouse was interviewed by media outlets such as the Financial Times, Bloomberg, and CNBC, spoke with organizations like the Economic Club of New York, and participated at conferences such as DC Fintech, in which he described Ripple's operations and the XRP market, *e.g.*, *id.* ¶¶ 252, 263, 269, 387, 444, 446.

### D. Defendants' Receipt of Legal Advice About XRP Offers and Sales

In February 2012, before the XRP Ledger was publicly launched, Ripple's founders, including Larsen, received from the Perkins Coie LLP law firm a memorandum, which sought to "review the proposed product and business structure, analyze the legal risks associated with [Ripple], and recommend steps to mitigate these risks." Defs. 56.1 Resp. ¶ 986; *see* ECF No. 846-29 at 4. The memorandum analyzes, among other things, the legal risks associated with selling XRP. Defs. 56.1 Resp. ¶ 986. Specifically, it states that "[i]f sold to [i]nvestors, [XRP tokens] are likely to be securities," and "[t]o the extent that [the founders'] issuance of [XRP] does not involve an investment of money, there is a low risk that [XRP] will be considered an investment contract." *Id.* ¶¶ 986, 989; *see* ECF No. 846-29 at 5, 12.

In October 2012, Ripple, Larsen, and others received another memorandum from Perkins Coie which sought to "review the proposed features of the Ripple [n]etwork and [XRP] and to

provide recommendations for mitigating relevant legal risks." Defs. 56.1 Resp. ¶ 987; *see* ECF No. 846-30 at 3. That memorandum states that "[a]lthough we believe that a compelling argument can be made that [XRP tokens] do not constitute 'securities' under federal securities laws, given the lack of applicable case law, we believe that there is some risk, albeit small, that the [SEC] disagrees with our analysis." Defs. 56.1 Resp. ¶ 993; *see* ECF No. 846-30 at 6. The memorandum further states that, "[t]he more that [the founders and Ripple] promote [XRP] as an investment opportunity, the more likely it is that the SEC will take action and argue that [XRP tokens] are 'investment contracts.'" Defs. 56.1 Resp. ¶ 993; *see* ECF No. 846-30 at 6.

Larsen reviewed both the February and the October 2012 memoranda and discussed them with Perkins Coie attorneys. Defs. 56.1 Resp. ¶ 998. Both memoranda analyze XRP under the Supreme Court's holding in *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946), which outlines the standard for an investment contract. *Id.* ¶ 988.

II.    Procedural Background

On December 22, 2020, the SEC commenced this action. ECF No. 1. An amended complaint was filed on February 18, 2021. Am. Compl. Fact discovery closed on August 31, 2021, *see* ECF No. 313, and expert discovery concluded on February 28, 2022, *see* ECF No. 411. On March 11, 2022, the Court denied the SEC's motion to strike Ripple's affirmative defense that it "lacked . . . 'notice that its conduct was in violation of law, in contravention of Ripple's due process rights,'" ECF No. 128. ECF No. 440. That same day, the Court also denied Garlinghouse's and Larsen's separate motions to dismiss, ECF Nos. 105, 110. MTD Order, ECF No. 441. On March 6, 2023, the Court granted in part and denied in part the parties' motions to preclude expert testimony. ECF No. 814.

Before the Court are the parties' cross-motions for summary judgment filed on September 13, 2022. ECF Nos. 621, 625; *see also* ECF Nos. 639, 642, 824, 836. The Court has also reviewed amicus briefs from Accredify, Inc. d/b/a/ InvestReady, ECF No. 698[9]; the Blockchain Association, ECF No. 706; the Chamber of Digital Commerce, ECF No. 649; Coinbase, Inc., ECF No. 705; Cryptillian Payment Systems, LLC, ECF No. 716; the Crypto Council for Innovation, ECF No. 711; I-Remit, Inc., ECF No. 660; the New Sports Economy Institute, ECF No. 717; Paradigm Operations LP, ECF No. 707; Phillip Goldstein and the Investor Choice Advocates Network, ECF No. 683; Reaper Financial, LLC, ECF No. 710; SpendTheBits, Inc., ECF No. 684; TapJets, Inc., ECF No. 661; Valhil Capital, LLC, ECF No. 722; Veri DAO, LLC, ECF No. 709; and XRP holders Jordan Deaton, James LaMonte, Mya LaMonte, Tyler LaMonte, Mitchell McKenna, and Kristiana Warner, ECF No. 708.[10]

## DISCUSSION

I.     <u>Legal Standard</u>

       A.  Summary Judgment

Summary judgment is appropriate where the record shows that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–26 (1986). A genuine dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

---

[9] Accredify, Inc. did not formally file an amicus brief after the Court granted leave to do so, *see* ECF No. 704, but included its brief as an attachment to its original request, *see* ECF No. 698.
[10] On November 4, 2022, the Court directed that any requests to file amicus briefs be filed by November 11, 2022. ECF No. 695. William M. Cunningham and Anoop Bungay, both *pro se* litigants, each separately requested leave to file an amicus brief on November 16, 2022, and January 20, 2023, respectively. ECF Nos. 712, 807. Cunningham's and Bungay's requests are DENIED as untimely.

The moving party initially bears the burden of demonstrating the absence of a genuine dispute of material fact by citing evidence in the record. *See Celotex*, 477 U.S. at 323–24; *Koch v. Town of Brattleboro, Vt.*, 287 F.3d 162, 165 (2d Cir. 2002). If the moving party meets its initial burden, the burden then shifts to the opposing party to establish a genuine dispute of material fact. Fed. R. Civ. P. 56(c)(1); *Beard v. Banks*, 548 U.S. 521, 529 (2006); *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (per curiam). In doing so, the non-moving party "may not rely on conclusory allegations or unsubstantiated speculation," *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998), as "unsupported allegations do not create a material issue of fact," *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000).

   B. Section 5 Liability and the *Howey* Test

Under Section 5 of the Securities Act, it is "unlawful for any person, directly or indirectly, . . . to offer to sell, offer to buy or purchase[,] or sell" a "security" unless a registration statement is in effect or has been filed with the SEC as to the offer and sale of such security to the public. 15 U.S.C. §§ 77e(a), (c), (e). To prove a violation of Section 5, the SEC must show: (1) that no registration statement was filed or in effect as to the transaction, and (2) that the defendant directly or indirectly offered to sell or sold the securities (3) through interstate commerce. *See SEC v. Cavanagh*, 445 F.3d 105, 111 n.13 (2d Cir. 2006).

Defendants do not dispute that they offered to sell and sold XRP through interstate commerce. *See, e.g.*, Defs 56.1 Resp. ¶¶ 647, 716, 868, 870. They also do not dispute that they did not file a registration statement with the SEC for any offer or sale of XRP. *Id.* ¶ 928. The question before the Court is whether Defendants offered to sell or sold XRP as a security. Specifically, the SEC alleges that Defendants sold XRP as an "investment contract," which is a type of security as defined by the Securities Act, 15 U.S.C. § 77b(a)(1). *See, e.g.*, SEC Mem. at

10

2, 5, 49, ECF No. 837; Am. Compl. ¶¶ 3, 9, 60.  Defendants argue that they did not sell XRP as an investment contract, and, therefore, no registration statement was required.  *See, e.g.*, Defs. Mem. at 3, 36, ECF No. 825; Defs. 56.1 Resp. ¶ 928.

In *SEC v. W.J. Howey Co.*, the Supreme Court held that under the Securities Act, an investment contract is "a contract, transaction[,] or scheme whereby a person [(1)] invests his money [(2)] in a common enterprise and [(3)] is led to expect profits solely from the efforts of the promoter or a third party."  328 U.S. at 298–99; *see also SEC v. Edwards*, 540 U.S. 389, 393 (2004).  In analyzing whether a contract, transaction, or scheme is an investment contract, "form should be disregarded for substance and the emphasis should be on economic reality" and the "totality of circumstances."  *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967); *Glen-Arden Commodities, Inc. v. Constantino*, 493 F.2d 1027, 1034 (2d Cir. 1974).

C.  Defendants' "Essential Ingredients" Test

In their summary judgment briefing, Defendants advance a novel "essential ingredients" test, arguing that, in addition to the *Howey* test, all investment contracts must contain three "essential ingredients": (1) "a contract between a promoter and an investor that establishe[s] the investor's rights as to an investment," which contract (2) "impose[s] post-sale obligations on the promoter to take specific actions for the investor's benefit" and (3) "grant[s] the investor a right to share in profits from the promoter's efforts to generate a return on the use of investor funds."  Defs. Mem. at 2; *see id.* at 13–28.

The Court declines to adopt Defendants' "essential ingredients" test, which would call for the Court to read beyond the plain words of *Howey* and impose additional requirements not mandated by the Supreme Court.  The Court sees no reason to do so.  Neither *Howey*, nor its progeny, hold that an investment contract requires the existence of Defendants' "essential

11

ingredients."  To the contrary, these cases make clear that the relevant test reflects a focus on an investor's expectation of "profits . . . from the efforts of others," rather than the formal imposition of post-sale obligations on the promoter or the grant to an investor of a right to share in profits.  *Howey*, 328 U.S. at 301.  The Supreme Court's use of the word "profits" in *Howey* was intended to refer to "income or return," *Edwards*, 540 U.S. at 394, and financial returns on investments are not equivalent to post-sale obligations or profit sharing.  Thus, the Court is not persuaded that precedent supports the consideration of these "ingredients" in determining whether a contract, transaction, or scheme constitutes an investment contract under *Howey*.

Defendants do not cite a single case that has applied their test.  *See generally* Defs. Mem. at 13–28.  Rather, Defendants contend that the Court should look to the pre-1933 state "blue sky" law cases on which the *Howey* Court relied.  *Id.* at 16–17.  According to Defendants, every pre-1933 blue sky investment contract case involved a contract, post-sale obligations on the promoter, and the investor's right to receive a profit.  *Id.* at 18–21.  That may be so, but the *Howey* Court relied on the state courts' definition of an investment contract as "a contract or scheme for the placing of capital or laying out of money in a way intended to secure income or profit from its employment" when fashioning the relevant test.  328 U.S. at 298 (quotation marks and citation omitted).  Had the Supreme Court intended to incorporate these ingredients as essential requirements, it would have done so.  In any event, even accepting Defendants' survey and analysis of the caselaw as accurate, the fact that pre-1933 investment contract cases shared some common features does not convert those common features into requirements necessary for finding an investment contract under *Howey*.  Rather, the Supreme Court was guided by the "fundamental purpose undergirding the Securities Acts," in which Congress "painted with a

12

broad brush" in recognition of the "virtually limitless scope of human ingenuity." *Reves v. Ernst & Young*, 494 U.S. 56, 60–61 (1990). So, too, must this Court be guided.

Indeed, in the more than seventy-five years of securities law jurisprudence after *Howey*, courts have found the existence of an investment contract even in the absence of Defendants' "essential ingredients," including in recent digital asset cases in this District. *See, e.g.*, *SEC v. Kik Interactive Inc.*, 492 F. Supp. 3d 169, 175–80 (S.D.N.Y. 2020); *Balestra v. ATBCOIN LLC*, 380 F. Supp. 3d 340, 354 (S.D.N.Y. 2019) ("ATB Coins did not entitle purchasers to a pro rata share of the profits derived from any ATB-managed transaction . . . . However, such a formalized profit-sharing mechanism is not required."). And this makes sense, given that the *Howey* test was intended to "embod[y] a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." 328 U.S. at 299. Put differently, the *Howey* test was intended to effectuate "[t]he statutory policy of affording broad protection to investors," protection that is "not to be thwarted by unrealistic and irrelevant formulae." *Id.* at 301. Accordingly, the Court rejects Defendants' argument that all investment contracts must include post-sale obligations on the promoter and grant the investor a right to share in profits from the promoter's efforts.

The Court does not reach Defendants' first "essential ingredient": that a contract must exist for an investment contract to exist.[11] As discussed in greater detail below, in each instance where Defendants offered or sold XRP as an investment contract, a contract existed.

---

[11] The SEC's opposition papers misconstrue Defendants' "essential ingredients" test. The SEC dedicates several pages to refuting the argument that a *written* contract must exist, *see* SEC Opp. at 19–24, but Defendants' proposed test does not turn on the need for a written contract as opposed to an oral or implied contract, *see* Defs. Mem. at 2, 18–19; Defs. Reply at 9, ECF No. 832. Therefore, the Court does not address the SEC's arguments that *Howey* does not require the existence of a written contract. *See* SEC Opp. at 19–24.

II.    Analysis

A.  The XRP Token

The plain words of *Howey* make clear that "an investment contract for purposes of the Securities Act means a *contract, transaction*[*,*] *or scheme*." 328 U.S. at 298–99 (emphasis added). But the subject of a contract, transaction, or scheme is not necessarily a security on its face. Under *Howey*, the Court analyzes the economic reality and totality of circumstances surrounding the offers and sales of the underlying asset. *See Tcherepnin*, 389 U.S. at 336; *Glen-Arden*, 493 F.2d at 1034.

*Howey* and its progeny have held that a variety of tangible and intangible assets can serve as the subject of an investment contract. *See, e.g.*, *Howey*, 328 U.S. 293 (orange groves); *Glen-Arden*, 493 F.2d 1027 (whiskey casks); *Edwards*, 540 U.S. 389 (payphones); *Hocking v. Dubois*, 885 F.2d 1449 (9th Cir. 1989) (condominiums), *cert. denied*, 494 U.S. 1078 (1990); *Cont'l Mktg. Corp. v. SEC*, 387 F.2d 466 (10th Cir. 1967) (beavers); *SEC v. Telegram Grp. Inc.*, 448 F. Supp. 3d 352 (S.D.N.Y. 2020) (digital tokens). In each of these cases, the subject of the investment contract was a standalone commodity, which was not itself inherently an investment contract. For instance, if the original citrus groves in *Howey* were later resold, those resales may or may not constitute investment contracts, depending on the totality of circumstances surrounding the later transaction.

Here, Defendants argue that XRP does not have the "character in commerce" of a security and is akin to other "ordinary assets" like gold, silver, and sugar. *See* Defs. Mem. at 3–4, 42–44 (citation omitted). This argument misses the point because ordinary assets—like gold, silver, and sugar—may be sold as investment contracts, depending on the circumstances of those sales. *See Glen-Arden*, 493 F.2d at 1033, 1035; *Fedance v. Harris*, 1 F.4th 1278, 1288–89

14

(11th Cir. 2021) ("Plenty of items that can be consumed or used . . . have been the subject of transactions determined to be securities because they had the attributes of an investment." (citation omitted)).  Even if XRP exhibits certain characteristics of a commodity or a currency, it may nonetheless be offered or sold as an investment contract.

As another court in this District recently held:

> While helpful as a shorthand reference, the security in this case is not simply the [digital token, the] Gram, which is little more than alphanumeric cryptographic sequence . . . . This case presents a "scheme" to be evaluated under *Howey* that consists of the full set of contracts, expectations, and understandings centered on the sales and distribution of the Gram.  *Howey* requires an examination of the entirety of the parties' understandings and expectations.

*Telegram*, 448 F. Supp. 3d at 379.  XRP, as a digital token, is not in and of itself a "contract, transaction[,] or scheme" that embodies the *Howey* requirements of an investment contract.  Rather, the Court examines the totality of circumstances surrounding Defendants' different transactions and schemes involving the sale and distribution of XRP.  *See Marine Bank v. Weaver*, 455 U.S. 551, 560 n.11 (1982) ("Each transaction must be analyzed and evaluated on the basis of the content of the instruments in question, the purposes intended to be served, and the factual setting as a whole.").

### B.  Defendants' Offers and Sales of XRP

The parties cross-move for summary judgment on the SEC's claim under Section 5 of the Securities Act.  Whether Defendants offered or sold "investment contracts" is a legal question that the Court resolves based on the undisputed record.  *See SEC v. Thompson*, 732 F.3d 1151, 1160–61 (10th Cir. 2013) (collecting cases).  The SEC alleges that Ripple engaged in three categories of unregistered XRP offers and sales:

> (1) Institutional Sales under written contracts for which it received $728 million;
> (2) Programmatic Sales on digital asset exchanges for which it received $757 million; and

(3) Other Distributions under written contracts for which it recorded $609 million in "consideration other than cash."

*See* SEC Reply at 4–5, ECF No. 843.  The SEC also alleges that Larsen and Garlinghouse engaged in unregistered individual XRP sales, from which they received at least $450 million and $150 million, respectively.  *See id.* at 5.  The Court shall separately analyze and evaluate each category of transaction.  *See Marine Bank*, 455 U.S. at 560 n.11.

### 1. Institutional Sales

The Court first addresses Ripple's Institutional Sales of XRP to sophisticated individuals and entities (the "Institutional Buyers") pursuant to written contracts.  *See* SEC Mem. at 28–31; Defs. Mem. at 11.  The SEC alleges that these Institutional Sales were distributions of XRP into public markets through conduits, and that "some Institutional [Buyers] were buying XRP as brokers, while others simply resold it as part of their trading strategies."  SEC Mem. at 28–29.

The first prong of *Howey* examines whether an "investment of money" was part of the relevant transaction.  328 U.S. at 301.  Here, the Institutional Buyers invested money by providing fiat or other currency in exchange for XRP.  Defs. 56.1 Resp. ¶ 607.  Defendants do not dispute that Ripple received money for XRP through its Institutional Sales.  *See* Defs. Mem. at 11; Defs. Opp. at 17 n.7.  However, Defendants argue that an "investment of money" is different from "merely payment of money"—that is, *Howey* requires not just payment of money but an intent to invest that money.  *See* Defs. Opp. at 18–19.

Not so.  Defendants' purported distinction is not supported by caselaw.  The proper inquiry is whether the Institutional Buyers "provide[d] the capital," *Howey*, 328 U.S. at 300, "put up their money," *Glen-Arden*, 493 F.2d at 1034, or "provide[d]" cash, *Telegram*, 448 F. Supp. 3d at 368–69.  Defendants do not dispute that there was a payment of money; the Court finds, therefore, that this element has been established.

16

The second prong of *Howey*, the existence of a "common enterprise," 328 U.S. at 301, may be demonstrated through a showing of "horizontal commonality," *Revak v. SEC Realty Corp.*, 18 F.3d 81, 87 (2d Cir. 1994). Horizontal commonality exists where the investors' assets are pooled and the fortunes of each investor are tied to the fortunes of other investors, as well as to the success of the overall enterprise. *See id.* at 88; *see also SEC v. SG Ltd.*, 265 F.3d 42, 49 (1st Cir. 2001) ("[H]orizontal commonality [is] a type of commonality that involves the pooling of assets from multiple investors so that all share in the profits and risks of the enterprise."); *ATBCOIN LLC*, 380 F. Supp. 3d at 353.[12]

Here, the undisputed record shows the existence of horizontal commonality. Ripple pooled the proceeds of its Institutional Sales into a network of bank accounts under the names of its various subsidiaries. *See, e.g.*, ECF No. 831-29 ¶¶ 3–4; Defs. 56.1 Resp. ¶¶ 795–98; *see also id.* ¶ 1004. Although Ripple maintained separate bank accounts for each subsidiary, Ripple controlled all of the accounts and used the funds raised from the Institutional Sales to finance its operations. *See* Defs. 56.1 Resp. ¶¶ 255–56; SEC Reply at 8; *cf.* Defs. Opp. at 22–23; Defs. Reply at 19–20, ECF No. 832. Defendants do not dispute that Ripple did not "segregate[] and separately manage[]" investor funds or "allow[] for profits to remain independent." *Kik*, 492 F. Supp. 3d at 179; *see* SEC Reply at 8. And, Ripple's accountants recorded all of its XRP-related proceeds together. *See* Defs. 56.1 Resp. ¶¶ 147–48.

Further, each Institutional Buyer's ability to profit was tied to Ripple's fortunes and the fortunes of other Institutional Buyers because all Institutional Buyers received the same fungible

---

[12] The SEC also argues that the record establishes strict vertical commonality. *See* SEC Mem. at 51–53. The Second Circuit has not addressed whether the strict vertical commonality theory can give rise to a common enterprise. *See Revak*, 18 F.3d at 88. In this case, because horizontal commonality establishes the existence of a common enterprise, the Court does not reach the issue of strict vertical commonality or its viability as a theory.

XRP.[13]  *See id.* ¶¶ 206–07.  Ripple used the funds it received from its Institutional Sales to

promote and increase the value of XRP by developing uses for XRP and protecting the XRP

trading market.  *See id.* ¶¶ 156–57, 161–68, 255–56.  When the value of XRP rose, all

Institutional Buyers profited in proportion to their XRP holdings.  *See Kik*, 492 F. Supp. 3d at

178 ("The success of the ecosystem drove demand for [the digital token] Kin and thus dictated

investors' profits."); *Telegram*, 448 F. Supp. 3d at 369–70 (finding horizontal commonality

where the digital token purchasers "possess an identical instrument, the value of which is entirely

dependent on the success or failure of the TON Blockchain" and "[t]he investors' fortunes are

directly tied to the success of the TON Blockchain as a whole").  The Court finds the existence

of a common enterprise because the record demonstrates that there was a pooling of assets and

that the fortunes of the Institutional Buyers were tied to the success of the enterprise as well as to

the success of other Institutional Buyers.

      The third prong of *Howey* examines whether the economic reality surrounding Ripple's

Institutional Sales led the Institutional Buyers to have "a reasonable expectation of profits to be

derived from the entrepreneurial or managerial efforts of others."  *See United Hous. Found.,*

*Inc. v. Forman*, 421 U.S. 837, 852 (1975).[14]  In this context, profit means an "income or return,

to include, for example, dividends, other periodic payments, or *the increased value of the*

*investment*."  *Edwards*, 540 U.S. at 394 (emphasis added).  The reasonable expectation of profits

from the efforts of others need not be the sole reason a purchaser buys an investment; an asset

---

[13] The Court holds only that a common enterprise existed between Ripple and the Institutional Buyers.  The Court does not reach the question of whether the common enterprise extends to encompass "other XRP holders," Defendants Garlinghouse and Larsen, the "XRP ecosystem," or any other entities.  *Cf.* Defs. Opp. at 20–21.

[14] *Howey* contemplates that an investor is "led to expect profits solely from the efforts of the promoter or a third party." 328 U.S. at 298–99.  However, the Second Circuit "ha[s] held that the word 'solely' should not be construed as a literal limitation; rather, [courts] 'consider whether, under all the circumstances, the scheme was being promoted primarily as an investment or as a means whereby participants could pool their own activities, their money and the promoter's contribution in a meaningful way.'"  *United States v. Leonard*, 529 F.3d 83, 88 (2d Cir. 2008) (quoting *SEC v. Aqua-Sonic Prods. Corp.*, 687 F.2d 577, 582 (2d Cir. 1982)).

may be sold for both consumptive and speculative uses. *See SEC v. LBRY, Inc.*, No. 21 Civ. 260, 2022 WL 16744741, at *7 (D.N.H. Nov. 7, 2022). Moreover, "[t]he inquiry is an objective one focusing on the promises and offers made to investors; it is not a search for the precise motivation of each individual participant." *Telegram*, 448 F. Supp. 3d at 371 (citing *Warfield v. Alaniz*, 569 F.3d 1015, 1021 (9th Cir. 2009)).

Based on the totality of circumstances, the Court finds that reasonable investors, situated in the position of the Institutional Buyers, would have purchased XRP with the expectation that they would derive profits from Ripple's efforts. From Ripple's communications, marketing campaign, and the nature of the Institutional Sales, reasonable investors would understand that Ripple would use the capital received from its Institutional Sales to improve the market for XRP and develop uses for the XRP Ledger, thereby increasing the value of XRP. *Cf. Kik*, 492 F. Supp. 3d at 179–80; *Telegram*, 448 F. Supp. 3d at 371–78.

Starting in 2013, Ripple marketed XRP to potential investors, including the Institutional Buyers, by distributing promotional brochures that touted XRP as an investment tied to the company's success. For instance, in the "Deep Dive" brochure, which was circulated to prospective investors, Ripple explains that its "business model is predicated on a belief that demand for XRP will increase . . . if the Ripple protocol becomes widely adopted," and "[i]f the Ripple protocol becomes the backbone of global value transfer, Ripple . . . expects the demand for XRP to be considerable." Defs. 56.1 Resp. ¶ 187; ECF No. 855-14 at 23, 29, 31. Similarly, the "Ripple Primer" states that Ripple "hopes to make money from XRP if the world finds the Ripple network useful." Defs. 56.1 Resp. ¶ 180; ECF No. 861-26 at 20. The "Gateways" brochure also explains that "Ripple's business model is based on the success of [XRP,]" and includes a graphical representation of bitcoin's price change below the text: "Can a virtual

19

currency really create and hold value?  *Bitcoin proves it can*."  Defs. 56.1 Resp. ¶¶ 173, 175;
ECF No. 861-25 at 21.

Later, through its XRP Market Reports, Ripple continued to connect XRP's price and
trading to its own efforts.  Ripple's Q1 2017 XRP Markets Report states that the company's
efforts—including its "vocal . . . commitment to XRP," the announcement of a new business
relationship, and "continu[ing] to sign up banks to commercially deploy its enterprise blockchain
solution and join its global payments network"—may have had an impact on XRP's price
increase and "impressive" trading volume.  Defs. 56.1 Resp. ¶ 421; ECF No. 839-4 at 9.  The Q2
2017 XRP Markets Report highlights XRP's "dramatic" and "stunning" price increase and notes
that "[t]he market responded favorably to [Ripple's] escrow and decentralization
announcements."  Defs. 56.1 Resp. ¶ 422; ECF No. 839-4 at 16.  Similarly, Ripple's Q1 2020
XRP Markets Report states that XRP's liquidity was "bolstered through new use cases for XRP
outside of cross-border payments."  Defs. 56.1 Resp. ¶ 366; ECF No. 839-4 at 98.

During this time, Ripple's senior leaders echoed similar statements on various public
channels.  In a February 2014 interview, Larsen said, "for Ripple . . . to do well, we have to do a
very good job in protecting the value of XRP and the value of the network," and asked potential
investors to "[g]ive [Ripple] time" to "add[] the most value to the protocol."  Defs. 56.1 Resp.
¶ 461.  In July 2017, David Schwartz, who was then chief cryptographer at Ripple, *see id.* ¶ 40,
wrote on Reddit that "Ripple's interest[s] closely (but, yes, not perfectly) align with those of
other XRP holders," *id.* ¶ 462.  In February 2018, Schwartz posted on Reddit that what "really
set[s] XRP apart from any other digital asset" is the "amazing team of dedicated professionals
that Ripple has managed to amass to develop an ecosystem around XRP."  *Id.* ¶¶ 345, 349, 360.
In a December 2017 interview, Garlinghouse stated that XRP gave Ripple "a huge strategic asset

to go invest in and accelerate the vision [it] see[s] for an internet of value." *Id.* ¶ 468.  And, in March 2018, Garlinghouse said at a press conference that "Ripple is very, very interested in the success and the health of the ecosystem and will continue to invest in the ecosystem." *Id.* ¶ 469.

Ripple and its senior leaders publicly emphasized the complexity of creating an "internet of value" and the need for extensive capital to solve this "trillion dollar" problem.  Defs. 56.1 Resp. ¶ 101.  For instance, in October 2017, Garlinghouse declared in a YouTube video:  "I have no qualms saying definitively if we continue to drive the success we're driving, we're going to drive a massive amount of demand for XRP because we're solving a multitrillion dollar problem." *Id.* ¶ 98; *see also id.* ¶¶ 99–101.  In July 2017, Schwartz wrote on Reddit that, "Ripple can justify spending $100 million on a project if it could reasonably be expected to increase the price of XRP by one penny over the long term." *Id.* ¶ 462.  In November 2017, Schwartz posted on XRP Chat that Ripple would use its "war chest" to put upward pressure on XRP's price. *Id.* ¶ 445.

These statements, and many more, are representative of Ripple's overall messaging to the Institutional Buyers about the investment potential of XRP and its relationship to Defendants' efforts.  Clearly, the Institutional Buyers would have understood that Ripple was pitching a speculative value proposition for XRP with potential profits to be derived from Ripple's entrepreneurial and managerial efforts. *See LBRY*, 2022 WL 16744741, at *5–6.

Further, the nature of the Institutional Sales also supports the conclusion that Ripple sold XRP as an investment rather than for consumptive use.  In their sales contracts, some Institutional Buyers agreed to lockup provisions or resale restrictions based on XRP's trading volume. *See, e.g.*, Defs. 56.1 Resp. ¶¶ 575, 800–01.  These restrictions are inconsistent with the notion that XRP was used as a currency or for some other consumptive use.  "Simply put, a

rational economic actor would not agree to freeze millions of dollars . . . if the purchaser's intent was to obtain a substitute for fiat currency."  *Telegram*, 448 F. Supp. 3d at 373.  Certain Institutional Sales contracts required the Institutional Buyer to indemnify Ripple for claims arising out of the sale or distribution of XRP, *see* Defs. 56.1 Resp. ¶ 792, and other contracts expressly stated that the Institutional Buyer was purchasing XRP "solely to resell or otherwise distribute . . . and not to use [XRP] as an [e]nd [u]ser or for any other purpose."  *Id.* ¶ 793.  These various provisions in the Institutional Sales contracts support the conclusion that the parties did not view the XRP sale as a sale of a commodity or a currency—they understood the sale of XRP to be an investment in Ripple's efforts.

Therefore, having considered the economic reality and totality of circumstances surrounding the Institutional Sales, the Court concludes that Ripple's Institutional Sales of XRP constituted the unregistered offer and sale of investment contracts in violation of Section 5 of the Securities Act.[15]

2.  Programmatic Sales

The Court next addresses Ripple's Programmatic Sales, which occurred under different circumstances from the Institutional Sales.  *See* SEC Mem. at 28; Defs. Mem. at 10–11.  The SEC alleges that in the Programmatic Sales to public buyers ("Programmatic Buyers") on digital asset exchanges, "Ripple understood that people were speculating on XRP as an investment," "explicitly targeted speculators[,] and made increased speculative volume a 'target goal.'"  SEC Mem. at 28.

---

[15] The Court holds only that Ripple's sales of XRP to the Institutional Buyers were offers and sales of investment contracts.  To the extent the SEC instead argues that Ripple actually sold investment contracts to the public and used the Institutional Buyers as underwriters, the Court rejects that argument.  *Cf.* SEC Mem. at 63–65.

Having considered the economic reality of the Programmatic Sales, the Court concludes that the undisputed record does not establish the third *Howey* prong.  Whereas the Institutional Buyers reasonably expected that Ripple would use the capital it received from its sales to improve the XRP ecosystem and thereby increase the price of XRP, *see Kik*, 492 F. Supp. 3d at 180; *cf. supra* § II.B.1, Programmatic Buyers could not reasonably expect the same.  Indeed, Ripple's Programmatic Sales were blind bid/ask transactions, and Programmatic Buyers could not have known if their payments of money went to Ripple, or any other seller of XRP.  SEC 56.1 Resp. ¶ 96; Defs. 56.1 Resp. ¶¶ 652–54.  Since 2017, Ripple's Programmatic Sales represented less than 1% of the global XRP trading volume.  SEC 56.1 Resp. ¶¶ 77, 82.  Therefore, the vast majority of individuals who purchased XRP from digital asset exchanges did not invest their money in Ripple at all.  An Institutional Buyer knowingly purchased XRP directly from Ripple pursuant to a contract, but the economic reality is that a Programmatic Buyer stood in the same shoes as a secondary market purchaser who did not know to whom or what it was paying its money.[16]

Further, it is not enough for the SEC to argue that Ripple "explicitly targeted speculators" or that "Ripple understood that people were speculating on XRP as an investment," SEC Mem. at 28, because a speculative motive "on the part of the purchaser or seller does not evidence the existence of an 'investment contract' within the meaning of the [Securities Act]," *Sinva, Inc. v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 253 F. Supp. 359, 367 (S.D.N.Y. 1966).  "[A]nyone who buys or sells[, for example,] a horse or an automobile hopes to realize a

---

[16] The Court does not address whether secondary market sales of XRP constitute offers and sales of investment contracts because that question is not properly before the Court.  Whether a secondary market sale constitutes an offer or sale of an investment contract would depend on the totality of circumstances and the economic reality of that specific contract, transaction, or scheme.  *See Marine Bank*, 455 U.S. at 560 n.11; *Telegram*, 448 F. Supp. 3d at 379; *see also* ECF No. 105 at 34:14-16, *LBRY*, No. 21 Civ. 260 (D.N.H. Jan. 30, 2023) (declining to extend holding to include secondary sales).

profitable 'investment.'  But the expected return is not contingent upon the continuing efforts of another."  *Id.* (citing *SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344, 348 (1943)).  The relevant inquiry is whether this speculative motive "derived from the entrepreneurial or managerial efforts of others."  *Forman*, 421 U.S. at 852.  It may certainly be the case that many Programmatic Buyers purchased XRP with an expectation of profit, but they did not derive that expectation from Ripple's efforts (as opposed to other factors, such as general cryptocurrency market trends)—particularly because none of the Programmatic Buyers were aware that they were buying XRP from Ripple.

Of course, some Programmatic Buyers may have purchased XRP with the expectation of profits to be derived from Ripple's efforts.  However, "[t]he inquiry is an objective one focusing on the promises and offers made to investors; it is not a search for the precise motivation of each individual participant."  *Telegram*, 448 F. Supp. 3d at 371 (citation omitted).  Here, the record establishes that with respect to Programmatic Sales, Ripple did not make any promises or offers because Ripple did not know who was buying the XRP, and the purchasers did not know who was selling it.  SEC 56.1 Resp. ¶ 96; Defs. 56.1 Resp. ¶¶ 652–54.  In fact, many Programmatic Buyers were entirely unaware of Ripple's existence.  SEC Add. 56.1 Resp. ¶ 1606, ECF No. 844; ECF Nos. 831-1–831-26.

The Programmatic Sales also lacked other factors present in the economic reality of the Institutional Sales which cut in favor of finding "a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others."  *Forman*, 421 U.S. at 852; *cf. supra* § II.B.1.  For instance, the Programmatic Sales were not made pursuant to contracts that contained lockup provisions, resale restrictions, indemnification clauses, or statements of purpose.  *Cf. Telegram*, 448 F. Supp. 3d at 373.  Similarly, Ripple's promotional materials, such

as the "Ripple Primer" and the "Gateways" brochure, were widely circulated amongst potential investors like the Institutional Buyers.  But, there is no evidence that these documents were distributed more broadly to the general public, such as XRP purchasers on digital asset exchanges.  Nor is there evidence that Programmatic Buyers understood that statements made by Larsen, Schwartz, Garlinghouse, and others were representations of Ripple and its efforts.

Lastly, the Institutional Buyers were sophisticated entities, including institutional investors and hedge funds.  SEC 56.1 Resp. ¶ 105.  An "examination of the entirety of the parties' understandings and expectations," including the "full set of contracts, expectations, and understandings centered on the sales and distribution of" XRP supports the conclusion that a reasonable investor, situated in the position of the Institutional Buyers, would have been aware of Ripple's marketing campaign and public statements connecting XRP's price to its own efforts. *Telegram*, 448 F. Supp. 3d at 379.  There is no evidence that a reasonable Programmatic Buyer, who was generally less sophisticated as an investor, shared similar "understandings and expectations" and could parse through the multiple documents and statements that the SEC highlights, which include statements (sometimes inconsistent) across many social media platforms and news sites from a variety of Ripple speakers (with different levels of authority) over an extended eight-year period.

Therefore, having considered the economic reality and totality of circumstances, the Court concludes that Ripple's Programmatic Sales of XRP did not constitute the offer and sale of investment contracts.[17]

---

[17] Because the Court finds that the record does not establish the third *Howey* prong as to the Programmatic Sales, the Court does not reach whether the first or second *Howey* prongs have been satisfied.

   3.  Other Distributions

The SEC's last category of XRP offers and sales are "Other Distributions under written contracts for which [Ripple] recorded $609 million in 'consideration other than cash' in its audited financial statements."  SEC Reply at 5.  These Other Distributions include distributions to employees as compensation and to third parties as part of Ripple's Xpring initiative to develop new applications for XRP and the XRP Ledger.  SEC Mem. at 31–32.  The SEC alleges that "Ripple funded its projects by transferring XRP to third parties and then having them sell the XRP into public markets."  *Id.* at 31.

The Other Distributions do not satisfy *Howey*'s first prong that there be an "investment of money" as part of the transaction or scheme.  328 U.S. at 301.  *Howey* requires a showing that the investors "provide[d] the capital," *id.* at 300, "put up their money," *Glen-Arden*, 493 F.2d at 1034, or "provide[d]" cash, *Telegram*, 448 F. Supp. 3d at 368–69.  "In every case [finding an investment contract] the purchaser gave up some tangible and definable consideration in return for an interest that had substantially the characteristics of a security."  *Int'l Bhd. of Teamsters v. Daniel*, 439 U.S. 551, 560 (1979).  Here, the record shows that recipients of the Other Distributions did not pay money or "some tangible and definable consideration" to Ripple.  To the contrary, Ripple paid XRP to these employees and companies.  And, as a factual matter, there is no evidence that "Ripple funded its projects by transferring XRP to third parties and then having them sell the XRP," SEC Mem. at 31, because Ripple never received the payments from these XRP distributions.

In its opposition papers, the SEC pivots and argues instead that the Other Distributions were an indirect public offering because "the parties that received XRP from Ripple, such as an '[Xpring] recipient,' could 'transfer their XRP (in exchange for units of another currency, goods,

26

or services) to another holder.'"  SEC Opp. at 26 (citation omitted).  But the SEC does not

elsewhere allege that the recipients of these Other Distributions, like Ripple employees and

Xpring third-party companies, were Ripple's underwriters.  In any event, the SEC does not

develop the argument that these secondary market sales were offers or sales of investment

contracts, particularly where the payment of money for these XRP sales never traced back to

Ripple, and the Court cannot make such a finding.

Therefore, having considered the economic reality and totality of circumstances, the

Court concludes that Ripple's Other Distributions did not constitute the offer and sale of

investment contracts.[18]

### 4.  Larsen's and Garlinghouse's Offers and Sales

Lastly, the Court addresses Larsen's and Garlinghouse's offers and sales of XRP.

Section 4(a)(1) of the Securities Act exempts "transactions by any person other than an issuer,

underwriter, or dealer."  15 U.S.C. § 77d(a)(1).  The SEC argues that this exemption does not

apply to Larsen and Garlinghouse because they are "affiliates" of Ripple and "an affiliate of the

issuer—such as an officer, director, or controlling shareholder—ordinarily may not rely upon the

Section 4(1) exemption."  *Cavanagh*, 445 F.3d at 111 (cleaned up).

The Court need not reach this issue.  Like Ripple's Programmatic Sales, Larsen's and

Garlinghouse's XRP sales were programmatic sales on various digital asset exchanges through

blind bid/ask transactions.  *See* SEC 56.1 Resp. ¶¶ 280–84, 306–09.  Larsen and Garlinghouse

did not know to whom they sold XRP, and the buyers did not know the identity of the seller.

Thus, as a matter of law, the record cannot establish the third *Howey* prong as to these

transactions.  For substantially the same reasons discussed above, *supra* § II.B.2, Larsen's and

---

[18] Because the Court determines that the record does not establish the first *Howey* prong as to the Other Distributions, the Court does not reach whether the second or third *Howey* prongs have been satisfied.

Garlinghouse's offer and sale of XRP on digital asset exchanges did not amount to offers and sales of investment contracts.[19]

### 5. Defendants' Due Process Defenses

Defendants each assert a "fair notice" defense, claiming that the SEC violated their due process rights; Larsen and Garlinghouse also assert an as-applied vagueness defense based on the same due process principles. *See* Defs. Opp. at 43 & n.28; *see also* ECF No. 51 at 97–99; ECF No. 462 at 97–99; ECF No. 463 at 103–05.

"A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). This clarity requirement is "essential to the protections provided by the Due Process Clause of the Fifth Amendment," and "requires the invalidation of laws that are impermissibly vague." *Id.* Laws fail to comport with due process when they (1) "fail[] to provide a person of ordinary intelligence fair notice of what is prohibited," or (2) are so standardless that they authorize or encourage "seriously discriminatory enforcement." *Id.* (citation omitted).

This "assessment cannot be conducted in the abstract; rather . . . the party claiming a lack of notice [must] show[] 'that the statute in question provided insufficient notice that his or her behavior at issue was prohibited.'" ECF No. 440 at 8 (quoting *Copeland v. Vance*, 893 F.3d 101, 110 (2d Cir. 2018)). "[T]he evaluation of any fair notice defense is objective—it does not require inquiry into 'whether a particular [party] actually received a warning that alerted him or her to the danger of being held to account for the behavior in question.'" *Id.* at 10 n.5 (quoting

---

[19] For the reasons stated, the Court need not address Defendants' argument that Larsen and Garlinghouse are entitled to summary judgment on offers and sales on "foreign exchanges." *See* Defs. Mem. at 58–74.

*United States v. Smith*, 985 F. Supp. 2d 547, 587 (S.D.N.Y. 2014), *aff'd sub nom. United States v. Halloran*, 664 F. App'x 23 (2d Cir. 2016)).

The Court rejects Defendants' fair notice and vagueness defenses as to the Institutional Sales. First, the caselaw that defines an investment contract provides a person of ordinary intelligence a reasonable opportunity to understand what conduct it covers. *See Copeland*, 893 F.3d at 114. *Howey* sets forth a clear test for determining what constitutes an investment contract, and *Howey*'s progeny provides guidance on how to apply that test to a variety of factual scenarios. *See Smith*, 985 F. Supp. 2d at 588 ("[I]t is not only the language of a statute that can provide the requisite fair notice; judicial decisions interpreting that statute can do so as well."). That is constitutionally sufficient to satisfy due process. *See United States v. Zaslavskiy*, No. 17 Cr. 647, 2018 WL 4346339, at *9 (E.D.N.Y. Sept. 11, 2018) ("[T]he abundance of caselaw interpreting and applying *Howey* at all levels of the judiciary, as well as related guidance issued by the SEC as to the scope of its regulatory authority and enforcement power, provide all the notice that is constitutionally required.").

Second, the caselaw articulates sufficiently clear standards to eliminate the risk of arbitrary enforcement. *Howey* is an objective test that provides the flexibility necessary for the assessment of a wide range of contracts, transactions, and schemes. Defendants focus on the SEC's failure to issue guidance on digital assets and its inconsistent statements and approaches to regulating the sale of digital assets as investment contracts. *See* Defs. Opp. at 45–52. But the SEC's approach to enforcement, at least as to the Institutional Sales,[20] is consistent with the

---

[20] Because the Court finds that only the Institutional Sales constituted the offer and sale of investment contracts, the Court does not address Defendants' asserted fair notice defense as to the other transactions and schemes. The Court's holding is limited to the Institutional Sales because the SEC's theories as to the other sales in this case are potentially inconsistent with its enforcement in prior digital asset cases. *See Upton v. SEC*, 75 F.3d 92, 98 (2d Cir. 1996).

29

enforcement actions that the agency has brought relating to the sale of other digital assets to buyers pursuant to written contracts and for the purpose of fundraising. *See, e.g.*, *Telegram*, 448 F. Supp. 3d 352; *Kik*, 492 F. Supp. 3d 169. Moreover, the law does not require the SEC to warn all potential violators on an individual or industry level. *See Dickerson v. Napolitano*, 604 F.3d 732, 745–46 (2d Cir. 2010) ("Courts ask whether the law presents an ordinary person with sufficient notice of or the opportunity to understand what conduct is prohibited or proscribed, not whether a particular [party] actually received a warning that alerted him or her to the danger of being held to account for the behavior in question." (cleaned up)).

Accordingly, the SEC's motion for summary judgment is GRANTED as to the Institutional Sales and otherwise DENIED, and Defendants' motion for summary judgment is GRANTED as to the Programmatic Sales, the Other Distributions, and Larsen's and Garlinghouse's sales, and DENIED as to the Institutional Sales.

### C. Larsen's and Garlinghouse's Aiding and Abetting of Ripple's Violations

The SEC also moves for summary judgment on its aiding and abetting claim against Larsen and Garlinghouse. *See* SEC Mem. at 66. To establish liability for aiding and abetting a securities violation, the SEC must show:

> (1) the existence of a securities law violation by the primary (as opposed to the aiding and abetting) party;
> (2) knowledge of this violation on the part of the aider and abettor; and
> (3) substantial assistance by the aider and abettor in the achievement of the primary violation.

*SEC v. Apuzzo*, 689 F.3d 204, 206 (2d Cir. 2012) (cleaned up). Courts cannot consider the three requirements in isolation from one another because "[s]atisfaction of the knowledge requirement will depend on the theory of primary liability, and there may be a nexus between the degree of knowledge and the requirement that the alleged aider and abettor render substantial assistance."

30

*SEC v. Espuelas*, 905 F. Supp. 2d 507, 517 (S.D.N.Y. 2012) (quoting *SEC v. DiBella*, 587 F.3d 553, 566 (2d Cir. 2009)).  Indeed, courts have found that "'[a] high degree of substantial assistance may lessen the SEC's burden in proving scienter' and vice versa." *SEC v. Wey*, 246 F. Supp. 3d 894, 928 (S.D.N.Y. 2017) (quoting *Apuzzo*, 689 F.3d at 215).

      As to the first requirement, the Court has already held that Ripple's Institutional Sales constituted the unregistered offer and sale of investment contracts in violation of Section 5 of the Securities Act.  *See supra* § II.B.1.

      With respect to the second requirement, to show knowledge of Ripple's violations, the SEC must demonstrate Larsen's and Garlinghouse's "general awareness of their overall role in Ripple's illegal scheme."  MTD Order at 15; *see SEC v. Yorkville Advisors, LLC*, 305 F. Supp. 3d 486, 511 (S.D.N.Y. 2018); Dodd-Frank Wall St. Reform & Consumer Protection Act, Pub. L. 111-203, 124 Stat. 1376, § 929O (2010) (codified at 15 U.S.C. § 78t(e)).  The SEC need not demonstrate that Larsen and Garlinghouse were aware that Ripple's transactions and schemes were illegal.  *See SEC v. Mattessich*, 407 F. Supp. 3d 264, 272–73 (S.D.N.Y. 2019).  Rather, the SEC must show that Larsen and Garlinghouse knew, or recklessly disregarded, the facts that made Ripple's transactions and schemes illegal under statutory and caselaw.  *See id.*

      Based on the record, Defendants have raised a genuine dispute of material fact as to whether Larsen and Garlinghouse knew or recklessly disregarded the facts that made Ripple's scheme illegal.  *See* MTD Order at 15.  It is not clear whether Larsen and Garlinghouse knew or recklessly disregarded that securities laws, rather than laws under other regulatory regimes, applied to XRP.  For instance, Larsen and Garlinghouse testified that they did not believe XRP was a security because multiple foreign regulators, including regulators in Japan, Singapore, Switzerland, the United Arab Emirates, and the United Kingdom, had determined that XRP was

not a security.  SEC Add. 56.1 Resp. ¶¶ 1744, 1782.  Larsen and Garlinghouse also stated that

when the U.S. Department of Justice and the U.S. Treasury Department's Financial Crimes

Enforcement Network labeled XRP a "virtual currency" in 2015, they understood this as an

"official United States government declaration that XRP [was] a currency" and "exempt from

[U.S.] securities laws."  *Id.* ¶¶ 1734, 1759–60.  Larsen further testified that he understood the

2018 speech by the then-Director of the SEC Division of Corporate Finance, Bill Hinman—in

which he stated that neither bitcoin nor ether (another digital asset) were securities—to further

reinforce the SEC's position that XRP was not a security.  *See id.* ¶¶ 1742–43.

The October 2012 Perkins Coie memorandum, which Larsen reviewed, advises,

"[a]lthough we believe that a compelling argument can be made that [XRP tokens] do not

constitute 'securities' under the federal securities laws, given the lack of applicable [caselaw],

we believe that there is some risk, albeit small, that the [SEC] disagrees with our analysis."

Defs. 56.1 Resp. ¶ 993; *see* ECF No. 846-30 at 6.  Larsen testified that after receiving the

memorandum, Ripple took specific steps to ensure compliance with the advice contained within

the memorandum.  Defs. 56.1 Resp. ¶ 1730.

Likewise, Defendants have raised a genuine issue of material fact as to whether Larsen

and Garlinghouse knew or recklessly disregarded facts about each of the *Howey* elements.  For

example, Defendants have adduced evidence that Larsen and Garlinghouse did not know that

Ripple's Institutional Sales of XRP satisfied the *Howey* "common enterprise" element because

they did not believe that the proceeds from the sales were pooled and understood that Ripple did

not manage, operate, or control the XRP Ledger or the broader "XRP ecosystem."  *See id.*

¶¶ 1748–50.  Based on the disputed facts in the record, therefore, a reasonable juror could find

that Larsen and Garlinghouse did not know or recklessly disregard Ripple's Section 5 violations. *See Apuzzo*, 689 F.3d at 206.

As to the third requirement, Defendants concede that Larsen, as Ripple's CEO prior to 2017, provided substantial assistance, and Garlinghouse, after becoming Ripple's CEO in January 2017, provided substantial assistance. *See* Defs. Opp. at 71. However, Larsen claims that he did not provide substantial assistance during his time as Executive Chairman of Ripple's Board, starting in 2017. *See id.*

To satisfy the substantial assistance component of aiding and abetting, the "SEC must show that the defendant in some sort associated himself with the venture, that he participated in it as in something that he wished to bring about, and that he sought by his action to make it succeed." *Apuzzo*, 689 F.3d at 206 (cleaned up). In other words, the defendant must "consciously assist the commission of the specific crime in some active way." *SEC v. Mudd*, 885 F. Supp. 2d 654, 670–71 (S.D.N.Y. 2012) (cleaned up).

Here, Larsen has raised a triable issue of material fact as to whether he provided "substantial assistance" beginning in 2017. *See Anderson*, 477 U.S. at 248. The record establishes that, starting in 2017, Larsen moved away from a day-to-day operational role at Ripple. *See* SEC Add. 56.1 Resp. ¶¶ 1722–29. But after he stepped down as CEO, Larsen also continued his role on the XRP Sales Committee, which approved Ripple's sales of XRP. *See* Defs. 56.1 Resp. Part 2 ¶ 1099, ECF No. 835-1. The Court concludes, therefore, that a reasonable jury could find that, starting in 2017, Larsen did not "consciously assist [Ripple's Section 5 violations] in some active way." *Mudd*, 885 F. Supp. 2d at 670–71 (cleaned up).

Accordingly, the SEC's motion for summary judgment on the aiding and abetting claim against Larsen and Garlinghouse is DENIED.

33

## CONCLUSION

For the foregoing reasons, the SEC's motion for summary judgment is GRANTED as to the Institutional Sales, and otherwise DENIED.  Defendants' motion for summary judgment is GRANTED as to the Programmatic Sales, the Other Distributions, and Larsen's and Garlinghouse's sales, and DENIED as to the Institutional Sales.

The Court shall issue a separate order setting a trial date and related pre-trial deadlines in due course.

The Clerk of Court is directed to terminate the motions at ECF Nos. 621, 625, 639, 642, 807, 824, and 836.

SO ORDERED.

Dated: July 13, 2023
New York, New York

_____
ANALISA TORRES
United States District Judge