**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>     Plaintiff,<br><br>  v.<br><br>TERRAFORM LABS, PTE. LTD. and DO HYEONG KWON,<br><br>      Defendants. | Civil Action No. 1:23-cv-01346-JSR<br><br>Hon. Jed S. Rakoff |

**DEFENDANTS' MEMORANDUM OF LAW**
**IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................. 1

STATEMENT OF UNDISPUTED FACTS ................................................ 2

SUMMARY JUDGMENT STANDARD ................................................... 7

ARGUMENT ............................................................................................ 8

I.    THE SEC CANNOT PROVE THAT DEFENDANTS OFFERED OR SOLD
      "INVESTMENT CONTRACTS" ..................................................................... 8

      A.    The SEC's Definition of "Investment Contract" Is Not Supported By
            Existing Law .......................................................................................... 8

      B.    Defendants Did Not Offer and Sell Investment Contracts Under *Howey* ........... 13

      C.    UST, LUNA, wLUNA and MIR Are Not Investment Contracts ......................... 16

II.   THERE IS NO GENUINE ISSUE OF MATERIAL FACT THAT, EVEN IF
      LUNA OR MIR WERE SECURITIES, THEY WERE EXEMPT FROM
      REGISTRATION ............................................................................................ 25

      A.    LUNA Tokens ........................................................................................ 25

      B.    MIR Tokens ........................................................................................... 26

III.  DEFENDANTS DID NOT OFFER OR SELL UNREGISTERED SECURITY-
      BASED SWAPS ............................................................................................. 27

IV.   DEFENDANTS DID NOT KNOWINGLY OR NEGLIGENTLY MAKE ANY
      FALSE OR MISLEADING STATEMENT ..................................................... 29

      A.    There is No Admissible Evidence That Defendants' Statements About
            Chai and the May 2021 Depeg were Materially False or Misleading ................. 29

      B.    There is No Admissible Evidence Supporting Scienter ..................................... 39

V.    THERE IS NO EVIDENCE OF DECEPTIVE ACTS ..................................... 42

VI.   THERE IS NO EVIDENCE SUPPORTING A FINDING THAT THE
      ALLEGED STATEMENTS WERE USED TO OBTAIN MONEY OR
      PROPERTY .................................................................................................... 42

VII.   THE COURT SHOULD STRIKE AMENDED COMPLAINT PARAGRAPH
173 IN ITS ENTIRETY BECAUSE THE SEC KNEW IT WAS FALSE WHEN
ALLEGED ................................................................................................................. 43

VIII.   THERE IS NO GENUINE ISSUE OF MATERIAL FACT THAT THE SEC IS
PRECLUDED FROM BRINGING ITS CLAIMS ............................................................ 44

CONCLUSION ...................................................................................................................... 45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aaron v. SEC*,
    446 U.S. 680 (1980)..................................................................................................39

*Al-Bihani v. Obama*,
    619 F.3d 1 (D.C. Cir. 2010) (Kavanaugh, J.).........................................................12

*In re Axis Capital Holdings Ltd. Secs. Litig.*,
    456 F. Supp. 2d 576 (S.D.N.Y. 2006).....................................................................4

*Bailey v. J.W.K. Prop., Inc.*,
    904 F.2d 918 (4th Cir. 1990) ...................................................................................5

*Bartenwerfer v. Buckley*,
    598 U.S. 69 (2023) (Barrett, J.) .............................................................................12

*Beard v. Banks*,
    548 U.S. 521 (2006)..............................................................................................6, 7

*Blanchard v. Bergeron*,
    489 U.S. 87 (1989) (Scalia, J.)...............................................................................12

*Bostock v. Clayton Cnty., Georgia*,
    140 S. Ct. 1731 (2020) (Gorsuch, J., joined by Roberts, C.J.) ...............................12

*Bouboulis v. Transp. Workers Union of Am.*,
    442 F.3d 55 (2d Cir. 2006)........................................................................................6

*Brizzi v.Utica Mut. Ins. Co.*,
    529 F. Supp. 3d 44 (E.D.N.Y. 2021) ........................................................................7

*Brnovich v. Democratic Nat'l Comm.*,
    141 S. Ct. 2321 (2021) (Alito, J.) ..........................................................................12

*Carcieri v. Salazar*,
    555 U.S. 379 (2009) (Thomas, J.)...........................................................................12

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)...................................................................................................6

*CFTC v. Wilson*,
    No. 13 Civ. 7884 (RJS), 2018 WL 6322024 (S.D.N.Y. Nov. 30, 2018) ................27

*Chill v. Gen. Elec. Co.*,
   101 F.3d 263 (2d Cir. 1996)..........................................................................41

*CMEG Nymex Holding Inc. v. Optionable, Inc.*,
   2012 WL 3683560 (S.D.N.Y. Aug. 24, 2012) ...........................................44

*Cohens v. Virginia*,
   6 Wheat. 264, 5 L.Ed. 257 (1821) (Marshall, C.J.) ........................... 10-11

*Conroy v. Aniskoff*,
   507 U.S. 511 (1993) (Scalia, J., concurring) ...........................................12

*Cont' Mktg. Corp. v. SEC*,
   387 F.2d 466 (10th Cir. 1967) .....................................................................5

*Cordiano v. Metacon Gun Club, Inc.*,
   575 F.3d 199 (2d Cir. 2009)..................................................................7, 38

*Dalberth v. Xerox Corp.*,
   766 F.3d 172 (2d Cir. 2014)......................................................................38

*Diaz v. Local No. 241 Transport Workers Union of America*,
   No. 17cv8898, 2021 WL 1063184 (S.D.N.Y. Mar. 19, 2021) ...................6

*Donovan v. Red Star Marine Servs., Inc.*,
   739 F.2d 774 (2d Cir. 1984).......................................................................11

*Ernst & Ernst v. Hochfelder*,
   425 U.S. 185 (1976).....................................................................................41

*Fuld v. Palestine Liberation Org.*,
   No. 22-496-CV, 2023 WL 5808926 (2d Cir. Sept. 8, 2023) ................11, 2

*Gary Plastic Packaging Corp. v. Merrill Lynch, Inc.*,
   756 F.2d 230 (2d Cir. 1985)..................................................5, 22, 24, 26

*Goenaga v. March of Dimes Birth Defects Found.*,
   51 F.3d 14 (2d Cir.1995).............................................................................6

*Grenader v. Spitz*,
   537 F.2d 612 (2d Cir. 1976)........................................................................2

*Hocking v. Dubois*,
   885 F.2d 1449 (9th Cir. 1989) (*en banc*) ..............................................5, 7

*In re J.P. Jeanneret Assocs., Inc.*,
   769 F. Supp. 2d 340 (S.D.N.Y. 2011)......................................................19

*Klatt v. Guaranteed Bond Co.*,
    213 Wis. 12, 250 N.W. 825 (Wis. 1933) .................................................................10

*Knight v. Conn. Dep't of Pub. Health*,
    275 F.3d 156 (2d Cir. 2001)...............................................................................11

*Lasker v. N.Y. State Elec. & Gas Corp.*,
    85 F.3d 55 (2d Cir.1996)....................................................................................3

*Maraschiello v. City of Buffalo Police Dep't*,
    709 F.3d 87 (2d Cir. 2013)................................................................................7

*Marini v. Adamo*,
    812 F. Supp. 2d 243 (E.D.N.Y. 2011) ........................................................17, 18

*Matsushita Elc. Indus. Co., Ltd. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)..........................................................................................7

*Mayer v. Oil Field Sys. Corp.*,
    803 F.2d 749 (2d Cir. 1986).............................................................................41

*McAnaney v. Astoria Fin. Corp.*,
    665 F. Supp. 2d 132 (E.D.N.Y. 2009) ............................................................7

*Milner v. Dep't of Navy*,
    562 U.S. 562 (2011) (Kagan, J.) .....................................................................2

*Moore v. Stella*,
    52 Cal. App. 2d 766, 127 P.2d 300 (Cal. Ct. App., 2nd Dist. 1942) ......................41

*In re N. Telecom Ltd. Sec. Litig.*,
    116 F. Supp. 2d 446 (S.D.N.Y. 2000) (Cedarbaum, J.)........................................41

*Newdow v. Peterson*,
    753 F.3d 105 (2d Cir. 2014)...........................................................................11, 2

*Noa v. Key Futures, Inc.*,
    638 F.2d 77 (9th Cir. 1980) .............................................................................3

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000)................................................................... 33-34, 39

*In re Omnicom Group, Inc. Sec. Litig.*,
    597 F.3d 501 (2d Cir. 2010).............................................................................36

*Oncale v. Sundowner Offshore Servs., Inc.*,
    523 U.S. 75 (1998) (Scalia, J.).........................................................................12

*Pehlivanian v. China Gerui Advanced Materials Grp., Ltd.*,
    153 F. Supp. 3d 628 (S.D.N.Y. 2015).......................................................................3

*People v. White*,
    124 Cal. App. 548, 12 P.2d 1078 (Cal. Ct. App., 2nd Dist. 1932) ..........................10

*Phillips v. Kidder, Peabody & Co.*,
    933 F. Supp. 303 (S.D.N.Y. 1996) (Francis, J.), *aff'd mem.*, 108 F.3d 1370 (2d
    Cir. 1997) .................................................................................................................41

*Prohaska v. Hemmer-Miller Development Co.*,
    256 Ill. App. 331 (Ill. Ct. App., 1st Dist. 1930).....................................................10

*Revak v. SEC Realty Corp.*,
    18 F.3d 81 (2d Cir. 1994)......................................................................... 6-17, 19, 20

*Rice v. Branigar Org., Inc.*,
    922 F.2d 788 (11th Cir. 1991) ................................................................................22

*Robbins v. Moore Med. Corp.*,
    894 F. Supp. 661 (S.D.N.Y. 1995) (Scheindlin, J.) ...............................................40

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004)......................................................................................3

*Rothman v. Gregor*,
    220 F.3d 81 (2d Cir. 2000)......................................................................................39

*RSL Commc'ns, PLC v. Bildirci*,
    No. 04 Civ. 5217 (JRS), 2009 WL 454136 (S.D.N.Y. Feb. 23, 2009) .....................7

*San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*,
    75 F.3d 801 (2d Cir.1996).......................................................................................29

*Scotto v. Almenas*,
    143 F.3d 105 (2d Cir. 1998).......................................................................................7

*SEC v. Aqua-Sonic Prods. Corp.*,
    687 F.2d 577 (2d Cir. 1982), *cert. denied,* 459 U.S. 1086 (1982).........................5, 2

*SEC v. Belmont Reid & Co.*,
    794 F.2d 1388 (9th Cir. 1986) ...........................................................................20, 23

*SEC v. Blech*,
    No. 99 Civ. 4770(RWS), 2000 WL 288263 (S.D.N.Y. March 20, 2000) ...............39

*SEC v. Genovese*,
    No. 17 Civ. 5821 (LGS), 2021 WL 1164654 (S.D.N.Y. Mar. 26, 2021) ................28

*SEC v. Glen-Arden Commodities, Inc.*,
    493 F.2d 1027 (2d Cir. 1974)............................................................5, 2

*SEC v. Kelly*,
    817 F. Supp. 2d 340 (S.D.N.Y. 2011)......................................................42

*SEC v. Life Partners, Inc.*,
    87 F.3d 536 (D.C. Cir. 1996) ........................................................... *passim*

*SEC v. MiMedx Group, Inc.*,
    No. 19 CIV. 10927 (NRB), 2022 WL 902784 (S.D.N.Y. Mar. 28, 2022) ............................42

*SEC v. Mut. Benefits Corp.*,
    408 F.3d 737 (11th Cir. 2005) ........................................................2

*SEC v. Parnes*,
    No. 01 CIV 0763 LLS THK, 2001 WL 1658275 (S.D.N.Y. Dec. 26, 2001) ........................39

*SEC v. Ralston Purina Co.*,
    346 U.S. 119 (1953)....................................................................6

*SEC v. Stoker*,
    No. 11 Civ. 7388 (JSR), 865 F. Supp. 2d 457 (S.D.N.Y. 2012) (Rakoff, J.) ..................42

*SEC v. Telegram Grp. Inc.*,
    No. 19-cv-9439 (PKC), 2020 WL 1547383 (S.D.N.Y. Apr. 1, 2020)................................15

*SEC v. Terraform Labs Pte. Ltd., et al.*,
    23-cv-1346(JSR), 2023 WL 4858299 (S.D.N.Y July 31, 2023)...............................6

*SEC v. Thompson*,
    238 F. Supp. 3d 575 (S.D.N.Y. 2017)......................................................42

*SEC v. United Benefit Life Ins. Co.*,
    387 U.S. 202 (1967)....................................................................5

*SEC v. Variable Annuity Life Ins. Co.*,
    359 U.S. 65 (1959).....................................................................16

*SEC v. W.J. Howey Co.*
    328 U.S. 293 (1946)............................................................. *passim*
    No. 843, 1946 WL 50582 (U.S. Apr. 17, 1946) ...........................................8

*SEC v. Wey*,
    246 F. Supp. 3d 894 (S.D.N.Y. 2017).....................................................42

*SEC v.*

*Advisors, LLC*,
    305 F. Supp. 3d 486 (S.D.N.Y. 2018)...........................................................41, 43

*State v. Evans*,
    154 Minn. 95, 191 N.W. 425 (Minn. 1922) ...........................................................10

*State v. Heath*,
    199 N.C. 135, 153 S.E. 855 (N.C. 1930) ...............................................................10

*Steed Fin. LDC v. Nomura Sec. Int'l, Inc.*,
    148 F. App'x 66 (2d Cir. 2005) (Summary order) ...........................................40, 41

*Stevens v. Liberty Packing Corp.*,
    111 N.J. Eq. 61 161 A. 193 (N.J. Chancery Ct. 1932)...........................................10

*Strougo v. Barclays PLC*,
    334 F. Supp. 3d 591 (S.D.N.Y. 2018).....................................................................39

*Tardif v. City of New York*,
    991 F.3d 394, 403 (2d Cir. 2021)...............................................................................7

*Tcherepnin v. Knight*,
    389 U.S. 332 (1967) ...................................................................................................5

*In re Time Warner Inc. Sec. Litig.*,
    9 F.3d 259 (2d Cir.1993)............................................................................................5

*U.S Secs. & Exch. Comm. v. Universal Exp., Inc.*,
    475 F. Supp. 2d 412 (S.D.N.Y. 2007).....................................................................28

*Underwood v. Coinbase Glob., Inc.*,
    No. 21 CIV. 8353 (PAE), 2023 WL 1431965 (S.D.N.Y. Feb. 1, 2023)................27

*United States Forest Serv. v. Cowpasture River Pres. Ass'n*,
    140 S. Ct. 1837 (2020) (Sotomayor, J., dissenting)...............................................12

*United States v. Am. Trucking Ass'ns*,
    310 U.S. 534 (1940).................................................................................................11

*United States v. Leonard*,
    529 F.3d 83 (2d Cir. 2008).....................................................................................5, 2

*In re Vivendi, S.A. Sec. Litig.*,
    838 F.3d 223 (2d Cir. 2016)....................................................................................29

*Wis. Cent. Ltd. v. United States*,
    138 S. Ct. 2067 (2018)...............................................................................................8

**Statutes**

7 U.S.C. § 1a(47) .................................................................................................................30

15 U.S.C.
    § 77b(a)(1) ....................................................................................................8, 13, 19, 20
    § 77d(a)(1) ..................................................................................................................6
    § 77d(a)(2) ..............................................................................................................5, 29
    § 77e ..........................................................................................................7, 27, 30, 31
    § 77q(a)(1) ..............................................................................................................2, 48
    § 77q(a)(3) ..............................................................................................................13
    § 78c(a)(10) ..............................................................................................................2, 19

**Rules and Regulations**

17 C.F.R.
    § 230.506(b) ............................................................................................................5, 6
    § 230.901 ..................................................................................................................5

Fed. R. Civ. P. 9(b) ..........................................................................................................39

Fed. R. Civ. P. 11(b)(3) ....................................................................................................30

Fed. R. Civ. P. 56(a) ........................................................................................................6

Fed. R. Civ. P. 56(c)(1) ....................................................................................................6

**Other Authorities**

Do Kwon, Agora Governance Proposal "*TIP 36: Further improvements to
    liquidity parameters*" (Feb. 10, 2021).........................................................................36

Justice Elena Kagan, *The Scalia Lecture: A Dialogue with Justice Kagan on the
    Reading of Statutes*, (Nov. 17, 2015), http://today.law.harvard.edu/in-scalia-
    lecture-kagan-discusses-statutory-interpretation ....................................................12

## GLOSSARY

| | |
|---|---|
| '33 Act | Securities Act of 1933 |
| '34 Act | Securities Exchange Act of 1934 |
| AC | Amended Complaint (ECF No. 24) |

| | |
|---|---|
| APA | Administrative Procedure Act |
| BTC | Bitcoin |
| Defendants | Terraform Labs Pte. Ltd. and Kwon Do Hyeong |
| ETH | Ether |
| Ex. __. | Exhibit __ to the Declaration of Douglas W. Henkin dated October 27, 2023 |
| ICO | Initial Coin Offering |
| KrT | TerraKR (stablecoin pegged to KrW) |
| KrW | Korean Won |
| LFG | Luna Foundation Guard |
| Mirror | Mirror Protocol |
| MTD Order | *SEC v. Terraform Labs Pte. Ltd., et al.*, 23-cv-1346(JSR) (Dkt. 51), 2023 WL 4858299 (S.D.N.Y July 31, 2023 |
| QIB | Qualified Institutional Buyer |
| SEC | Securities and Exchange Commission |
| SEC Howey Br. | Brief for Respondent at 18, *SEC v. W. J. Howey Co.*, 328 U.S. 293 (1946) (No. 843), 1946 WL 50582, at 18. |
| TFL | Terraform Labs Pte. LTD |
| UST | TerraUSD (stablecoin pegged to U.S. dollar) |
| wLUNA | Wrapped LUNA |
| 56.1 Stmt. | Statement of Undisputed Material Facts in Support of Defendants' Motion for Summary Judgment dated October 27, 2023 |

Defendants Terraform Labs Pte. LTD. and Kwon Do Hyeong respectfully submit this memorandum of law in support of their Motion for Summary Judgment.

<u>**PRELIMINARY STATEMENT**</u>

Defendants bring this motion because there is no genuine dispute as to any material facts and they are entitled to summary judgment as a matter of law.

In the MTD Order, this Court denied Defendants' motion to dismiss, holding among other things, that the "SEC has, through its factual allegations, asserted a plausible claim that the defendants' crypto-assets qualify as securities," MTD Order at 29, and that other claims asserted in the Amended Complaint, *if taken as true*, would state a claim for relief.

But after two years of investigation, the completion of a discovery period that resulted in the taking of more than 20 depositions, and the exchange of over two million pages of documents and data, the SEC is evidentiarily no closer to proving that the Defendants did anything wrong. Indeed, with the close of fact and expert discovery, the deficiencies in the SEC's case have gotten worse, as it is now apparent that admissible evidence does not exist to support many of the SEC's claims and that the SEC knew some of its allegations were false when it filed the Amended Complaint. It is evident that the SEC's preferred witnesses have trafficked in rumor and innuendo about the Defendants, but few, if any, have any firsthand knowledge about anything relevant to this case. Not surprisingly, given these severe deficiencies, the SEC tries to rely on proposed experts to paper over the myriad factual and evidentiary gaps in its case. But the SEC's proposed experts have proffered opinions that utterly lack relevance, rigor, or reliability (and in some cases are not even opinions at all). Indeed, as the Defendants' experts demonstrate, some of the SEC's analytical modeling, particularly with respect to Professor Mizrach's opinions, yield such absurd results that they are the kind of "junk science" that has been repeatedly condemned by the Supreme Court and the Second Circuit. Accordingly, the Defendants also move to exclude the opinions of both of the SEC's proposed experts.

The SEC launched this very public action—which, unusually, included a comment by its Chairman in the press release that the SEC later erased from its web site—with little to no

1

investigation into many of the claims it made, scant knowledge of whether or not some facts it asserts are true, and actual knowledge that some are false.  For example, a centerpiece of the SEC's claims is that Defendants made false statements about the function of the blockchain in relation to the South Korean payment system known as Chai.  However, the SEC admitted to the Defendants that it never had access to Chai's code before bringing this case and to this day *still* has not reviewed Chai's code.  In fact, *no one* in this case has been able to gain access to Chai's code, and without that code the SEC cannot carry its burden of proving the misstatements it alleged.

In a more outrageous example, in a transparent attempt to make this case seem like FTX, Celsius, and other cases involving thefts of customer funds, the SEC alleges that Defendants secretly moved millions of dollars into Swiss bank accounts for personal gain.  *See* AC ¶ 173.  The SEC knew this allegation was false when it filed this case.  But to this day, the SEC has preferred to advance the narrative that Defendants sought to profit from their market misfortunes—which they did not—rather than publicly correct the record, as they should.  This is made even worse by the undisputed fact that TFL had no customers, and thus no customer funds, compelling the conclusion that AC ¶ 173 was ginned up from whole cloth.

The SEC has no admissible evidence to prove that UST, LUNA, MIR, or mAssets are securities.  It has no admissible evidence that Defendants made misstatements about Chai.  And it has no admissible evidence Defendants misrepresented the self-healing functions of the Terra peg mechanism.  For the reasons which follow, the SEC cannot carry its burden of proof in this case, and the Court should grant summary judgment in its entirety, with prejudice.

## STATEMENT OF UNDISPUTED FACTS

Mr. Kwon co-founded TFL, a Singaporean open-source software development firm, to address cryptocurrency price volatility which interfered with the ability to use cryptocurrency as a medium of exchange or store of value. *See* 56.1 Stmt. ¶¶ 1-3. In 2018, TFL developed a novel approach to dealing with that volatility by creating the Terra Protocol, a decentralized and open-source application for algorithmic stablecoins, and the Terra Blockchain on which the Terra Protocol would operate. *See id.* ¶¶ 9-13. The broader "Terra ecosystem," which is not under

Defendants' control, refers to the open-source Terra Ledger, independent developers, exchanges, and myriad holders and users of the various Terra tokens. *See id.* ¶ 14-15. Terra token holders are not entitled, by virtue of owning Terra tokens, to receive profits, dividends, or anything else from TFL, or any other common pool. *See id.* ¶ 18; *see also id.* at 17.

**A. UST**: In September 2020, TFL launched the UST stablecoin, which was designed to maintain its stability though the operation of an algorithm. *See id.* ¶¶ 19-21. It targeted a 1:1 exchange rate to the U.S. dollar through smart contracts operating on the blockchain, with the open-source code for those contracts adjusting money supply in response to changes in demand. *See id.* ¶ 22. UST could be and was used for a variety of purposes, including as a means of payment, in protocols developed by TFL as well as other developers, or simply as a store of value for later uses. *See id.* ¶ 24.

**B. LUNA**: Because the Terra Blockchain is a "proof-of-stake" blockchain where transactions are recorded and verified by the consensus of validators, in April 2019, TFL launched LUNA tokens to function as the staking and governance token of the Terra Blockchain and serve as the stabilization token for the UST peg algorithm. *See id.* ¶¶ 26-28. The Terra Protocol was designed to stabilize the price of UST through an "elastic money supply," which would adjust the supply of UST and LUNA in response to changes in demand through a "mint-burn" mechanism. *See id.* ¶¶ 34-38. Thus, when UST fell below $1, UST holders could burn UST and receive $1 of minted LUNA, and when UST rose above $1, LUNA holders could mint UST by burning $1 worth of LUNA. *See id.* ¶ 36. This arbitrage opportunity incentivized users to interact with the Terra Protocol to decrease and increase the supplies of UST and LUNA to normalize the price of UST relative to $1. *See id.* ¶ 37. Although additional uses for LUNA were later developed in connection with other Terra Protocols, UST users did not acquire UST primarily to convert it to LUNA as opposed to using it in other UST use cases. *See id.* ¶¶ 39-40.[1]

**C. Mirror Protocol**:  In December 2020, TFL launched the Mirror Protocol, which allowed users to choose any real-world asset with a live price feed to create a digital asset that

---

[1] wLUNA is a digital asset that facilitates the use of LUNA on the Ethereum blockchain. Defs.56.1 Stmt. at ¶ 51. Defendants did not develop the concept of "wrapping" tokens. *Id.* ¶ 52.

mirrored its price movements. *See id.* ¶ 53. Users created mirrored assets, or "mAssets," referencing a range of financial assets, including U.S. equities, indices, and cryptocurrencies. *See id.* mAssets could be traded in peer-to-peer transactions and on trading platforms. *See id.* Users minted mAssets by depositing collateral with the Mirror Protocol, which locked the collateral and delivered the mAsset to the user who minted it. *See id.* ¶ 55. The Mirror Protocol granted MIR tokens, the Mirror Protocol's governance token, to users for activities such as providing liquidity for mAssets, trading, and voting on governance proposals. *See id.*

**D. Anchor Protocol**:  In March 2021, TFL launched the "Anchor Protocol," which accepted deposits of UST and lent out UST deposits to users who wished to borrow UST. UST borrowers pledged specific types of digital assets as collateral for the loans. The yield earned by the Anchor Protocol from its programmatic use of that collateral as a source of staking rewards was paid to the "depositors" as "interest." Defendants did not market UST "together with," "in connection with," or otherwise "with" the Anchor Protocol, nor did Defendants earn fees or commissions from Anchor Protocol user activity or maintain custody or control over digital assets staked in the Anchor Protocol. *See id.* ¶¶ 63-71. From the time Anchor was launched in March of 2021 until February of 2022, significantly less than 50% of outstanding UST was deposited in Anchor. *See id.* ¶ 72; *see also id.* ¶ 73.

Holders of Terra Tokens were not entitled to receive any future profits or income from TFL (or any other entity); indeed, private purchasers of LUNA and MIR expressly disclaimed any ownership interests or claims on assets. *See id.* ¶ 46. If a private purchaser resold LUNA or MIR, its counterparty received those tokens subject to the same disclaimers. Nor did TFL earn fees or commissions from user activity on the Terra Protocol. *See id.* ¶ 43. Although UST, LUNA, and MIR were later traded on global markets by third parties unrelated to TFL, TFL never operated a market for such trading or earned remuneration from such trading. *See id.* ¶ 44.

**E. Chai**:  The Chai payment system was formally launched in June 2019 in South Korea by Chai Corporation as a new payment processing platform for consumers and merchants in South Korea.  *See id.* ¶ 119. Upon its launch it was described as providing a payment infrastructure familiar to merchants and consumers while, through partnering with Terra, offering benefits

coming from its use of blockchain technology. *See id.* In order to operate, Chai had extensive technology and software components including: mobile and/or web applications that customers interact with; high-throughput systems for real-time transaction processing; an API for its business customers; and systems for processing and securely managing customer data, among many others. *See id.* ¶ 120. Chai was integrated with Korean banks and employed the Terra blockchain on the backend to run, record, and manage account balances without the need for users to manage crypto wallets[2] for payments. *See id.* ¶¶ 119-121.  Chai was only one of the payment processing systems Terra was supporting in Asia. *See id.* ¶ 121.

The SEC contends that Chai did not use the Terra blockchain to process or settle transactions, but the SEC (i) has not provided any industry-recognized definition or framework to determine what these terms mean in the Chai payment system, (ii) lacks any evidence to explain how the Chai payment system worked or the role played by its blockchain-facing systems (such as the LP Server) in the Chai payment system, and (iii) lacks any other admissible evidence to prove that Chai did not use the blockchain. *See id.* ¶¶ 116-117. The SEC's expert witness on this topic, Dr. Matthew Edman, failed to submit admissible opinions on any of these issues. *See id.* ¶ 118. He admits that the LP Server cannot act on its own and must receive input from another system or source to do so; that he does not know how the Chai payment system worked; he did not know the source of the inputs; and that the source could be an "organic" person, which would include Chai users. *See id.* ¶¶ 123-124, 131-135.

**F.  The Depeg Events and the Trading Firm**:  Like other cryptocurrency projects, TFL had an ongoing business relationship with the Trading Firm, both as a liquidity provider and general business partner, which was known in the Terra community and crypto industry. *See id.* ¶ 90. This relationship began in 2019, but was not ironed out until 2020 when TFL and the Trading Firm agreed that the purpose of the relationship was to support the Terra ecosystem through

---

[2] A crypto (cryptocurrency) wallet is a device or program that stores a person's cryptocurrency keys and allows them access to and control over the cryptocurrency or assets stored in the wallet. Wallets can be non-custodial (controlled by the person who owns the cryptocurrency or assets in the wallet) or custodial (controlled by a third party on behalf of the person(s) who own the cryptocurrency or assets the wallet holds). 56.1 Stmt. ¶ 3.

efforts that would help grow the adoption of Terra stablecoins. *See id.* ¶¶ 90-97.

TFL and the Trading Firm formalized their relationship by entering into an OTC Trading Agreement expressing the "general desire to consider entering spot cryptocurrency purchase and sale transactions." *See id.* ¶ 95, Ex. 50. TFL agreed to loan the Trading Firm "[u]p to 65 million LUNA, subject to the conditions," pursuant to a delivery schedule, with the right to delivery vesting upon the Trading Firm meeting specified threshold amounts of market activity. *See id.* ¶ 97. After the Trading Firm had met those conditions, the agreement was amended to provide the Trading Firm with the full amount of the 65 million LUNA loan *on a longer vesting schedule*. *See id.* ¶ 97, Ex. 55.

Defendants did not secretly seek the assistance of the Trading Firm to restore the UST peg on May 23, 2021. Beginning on May 19, 2021, UST and the broader crypto market faced extreme volatility. This ultimately caused the price of UST to drop below $1.00 on May 23, 2021 ("May 2021 Depeg"). *See id.* ¶ 89. UST's price dropped to a low of $0.854 on May 23, then generally increased until it re-stabilized during the morning of May 25, 2021 and the peg recovered. *See id.* at ¶ 103.

Almost immediately after the May 2021 Depeg, there was public discussion of the risk of UST losing its price peg as a result of market activity and public calls for external support of the UST price peg. *See id.* Contrary to the Amended Complaint, Defendants never sought the assistance of the Trading Firm to restore the peg. *See id.* ¶¶ 98-100. The only communications between Defendants and the Trading Firm on May 23, 2021 were five Signal calls between the President of the Trading Firm's Crypto-specific entity (the "President") and Mr. Kwon. *See id.* ¶¶ 101-102. The SEC has presented no evidence of what was discussed on these calls. *Id.* The timing of these calls show that the Trading Firm's UST trades were not at the direction of Defendants. *See id.* ¶¶ 98-102. Further, the Trading Firm's alleged purchases of UST between May 23 and May 27 were not the cause of the restoration of the peg, which was stabilized by May 25, 2021. *See id.* ¶ 103. The price of UST recovered and stabilized during the time when the Trading Firm's UST trading volume accounted for only 2% of trading activity on centralized exchanges and was insufficient to restore the peg. *See id.* ¶ 99.

6

On January 19, 2022, LFG, a non-profit organization, was formed to help address the publicly-discussed risk that UST might lose its peg again and require additional support. *See id.* ¶ 105. In May 2022, however, the publicly-known risk of another depeg materialized (the "May 2022 Depeg"). *See id.* ¶ 107. UST lost its peg despite LFG expending approximately $2.8 billion and TFL spending hundreds of millions of dollars of its own resources trying to defend the peg, vastly more than the amount the SEC alleges the Trading Firm traded in May 2021. *See id.* ¶ 108.

**G. Procedural History**:  Defendants moved to dismiss the Amended Complaint, and in an Opinion and Order dated July 31, 2023, this Court denied that motion. *See SEC v. Terraform Labs Pte. Ltd., et al.*, 23-cv-1346(JSR) (Dkt. No. 51), 2023 WL 4858299 (S.D.N.Y July 31, 2023).  A final pre-trial conference is set for November 30, 2023 and trial of any claims not resolved by summary judgment is set to commence on January 29, 2024. *See* 10/18/2023 Minute Entry, 23 Civ. 1346 (JSR).

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "The substantive law governing the case will identify those facts that are material, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir. 2006). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by ... showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). In seeking summary judgment against a party who bears the ultimate burden of proof at trial, "the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995); *see also Tardif v. City of New York*, 991 F.3d 394, 403 (2d Cir. 2021) ("the movant's initial burden at summary judgment can be met by pointing to a lack of evidence supporting the non-movant's claim").

The moving party has the initial burden of demonstrating the absence of a disputed issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Diaz v. Local No. 241 Transport Workers of America*, 2021 WL 1063184, at *6 (S.D.N.Y. Mar. 19, 2021). Once that showing is made, the nonmoving party must present "specific facts showing that there is a genuine issue for trial," *Beard v. Banks*, 548 U.S. 521, 529 (2006), and "may not rely on conclusory allegations or unsubstantiated speculation," *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998); *see also Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d 199, 204 (2d Cir. 2009).

A court is not precluded from granting summary judgment based on examination of the evidentiary record after denying a motion to dismiss based only on a plaintiff's allegations. *See Maraschiello v. City of Buffalo Police Dep't*, 709 F.3d 87, 97 (2d Cir. 2013) (revisiting a "conclusion based on factual allegations taken as true at the motion to dismiss stage" and reaching the opposite decision on summary judgment where evidence reflected a situation that "was a good deal more complicated"); *see also RSL Commc'ns, PLC v. Bildirci*, No. 04 Civ. 5217 (JRS), 2009 WL 454136, at *2 (S.D.N.Y. Feb. 23, 2009) (court is not obligated to follow previous ruling when evaluating summary judgment motion, "as a ruling in favor of a plaintiff on a motion to dismiss does not address the merits of a case").[3]

## ARGUMENT

**I.   THE SEC CANNOT PROVE THAT DEFENDANTS OFFERED OR SOLD "INVESTMENT CONTRACTS"**

    **A.   The SEC's Definition of "Investment Contract" Is Not Supported By Existing Law**

The SEC claims that every offer and sale of UST, LUNA, wLUNA, and MIR tokens was an offer or sale of a "security" that required registration with the SEC under 15 U.S.C. § 77e. The definition of "security" under the Securities Act is based on an enumerated list of specific instruments, including "any note, stock, treasury stock," or "investment contract," among others. 15 U.S.C. § 77b(a)(1). The only part of the Securities Act's definition the SEC seeks to apply

---

[3]   The SEC repeatedly refused to answer Defendants' RFAs by asserting that certain issues had been "established" by the Court in the MTD Order.  That legal position is, of course, wrong because of the "divergent standard of review applicable to motions to dismiss and motions for summary judgment." *McAnaney v. Astoria Fin. Corp.*, 665 F. Supp. 2d 132, 142 (E.D.N.Y. 2009).

here is "investment contract." The SEC therefore claims that every offer and sale of UST, LUNA, wLUNA, and MIR tokens is the offer and sale of an "investment contract" even if there was no "contract," the seller or purchaser has no connection with TFL, and the digital assets in question were not issued (directly or indirectly) by TFL. The SEC is wrong on the law, and over-reaching in a calculated effort to regulate an entity and assets that are outside its statutory purview. Because UST, LUNA, wLUNA, and MIR are not "securities," registration was not required.

The Securities Act does not define "investment contract." But it is "a 'fundamental canon of statutory construction' that words generally should be 'interpreted as taking their ordinary, contemporary, common meaning ... at the time Congress enacted the statute.'" *Wis. Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2074 (2018). In *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946), the Supreme Court applied these principles of statutory construction to the term "investment contract." It found "the term was common in many state 'blue sky' laws in existence prior to the adoption of the federal statute." *Id.* at 298. The SEC itself argued in *Howey* that because "[t]he term 'investment contract' is not defined by state or federal statutes" "in adopting the definition of a security from the 'blue sky' laws, Congress must be deemed to have intended also to adopt that construction of the term which was uniformly followed by the state courts." 56.1 Stmt. ¶ 115 (SEC *Howey* Br. at 18). Accordingly, the Supreme Court gave the term "investment contract" the "meaning" that was "crystallized by ... prior judicial interpretation[s]" of state blue sky laws. *Howey*, 328 U.S. at 298.

The meaning of "investment contract" the SEC asks this Court to apply here bears no connection to the statutory language which "crystallized" judicial interpretations of states' blue sky laws. *Howey*, 328 U.S. at 298. The SEC concedes that tokens themselves are not securities or investment contracts. 56.1 Stmt. ¶ 142, Ex. 96, at 34- 38. Nonetheless, the SEC contends that every transfer of (or offer to transfer) UST, LUNA, wLUNA, or MIR from April 2018 through May 2022 (by TFL or anyone else) was the offer and sale of an "investment contract," even if TFL never owned the asset in question, the transaction took place without any contract between TFL and the asset recipient, and even if, where a token sale contract was present, the purchaser

had no post-sale rights against TFL and TFL had no post-sale obligations to the purchaser. This expansion of SEC authority goes beyond anything that Congress contemplated or that *Howey* or its progeny ever considered or authorized.

To the extent that purchasers acquired these assets programmatically, through trading on exchanges, or in peer-to-peer transactions, Defendants did not offer or sell "investment contracts" because they did not have any contractual relationship with these buyers at all. *See* 56.1 Stmt. ¶ 114. Nor did Defendants offer or sell investment contracts to the third parties that entered into Luna Token Sale Agreements and Simple Agreements for Farmed Tokens ("SAFT") with Terraform Labs Limited ("TLL"), a TFL subsidiary. *See, e.g.,* 56.1 Stmt. ¶ 114.[4]

The transactions here are nothing like the purely contractual relationships at issue in *Howey*, which involved two contracts that the parties *stipulated* were presented to every person interested in orange groves as a package deal:  A "Land Sale Contract" from the Howey Company for the purchase of an orange grove and a "Servicing Contract" which assigned that land back to Howey Company's sister corporation, to which purchasers of the land paid a servicing fee for the cultivation of the orange groves and from which the purchasers received payments based on that cultivation. *Howey*, 328 U.S. at 296.; *see also* 56.1 Stmt. ¶ 115 Exhibit A, 11-15; Exhibit B, 11-15.

The SEC relies on *Howey*'s statement that "investment contracts" may encompass "schemes" separate and apart from "contracts." 328 U.S. at 298-99. But that statement was *dicta* that is not binding on and should not be followed by this Court. On the *stipulated* facts of *Howey*, which included the text of the sales pitch delivered to prospective purchasers, the Supreme Court held that the "investment contracts … t[ook] the form of land sales contracts, warranty deeds, and service contracts which respondents offer[ed] to prospective investors." 328 U.S. at 300; *see* 56.1 Stmt. ¶ 115 (copies of *Howey* contracts, stipulation, and sales pitch text). The *Howey* Court

---

[4] As further discussed below, even if TLL's sales were attributable to TFL, these asset sale agreements are not "investment contracts" because, among other reasons, they do *not* entitle the purchaser or borrower to receive any future profits or income from TFL or any other entity, contain *no* promise of any future efforts by anyone to generate such profits or income, and expressly disclaim the creation of any ownership interest or claim on assets by the purchaser. *See Howey*, 328 U.S. at 301 (requiring that an "investment contract" provide for "an investment of money in a common enterprise with profits to come solely from the efforts of others").

observed that those contracts "serve[d] as a convenient method of determining the investors' allocable shares of the profits." *Id.* The Court had no need to—and did not—rest its holding on the existence of any non-contractual "scheme." The reference to a "scheme" was wholly extraneous to its holding on the facts of the case before it—the very definition of *dicta*. And every case relied on by the SEC—for whiskey casks, dental equipment, or live beavers— followed the same contractual structure as *Howey*.

*Howey*'s "scheme" *dicta* is not good law for two reasons. *First*, it was ill-founded even in 1946. The Court based its interpretation of the words "investment contract" on what it called a "crystalized" meaning derived from state court decisions of that era interpreting the same language in state blue sky laws. *See Howey*, 328 U.S. at 298. But every one of the state court decisions cited in *Howey* that interpreted "investment contract" involved *actual contracts*—not one even mentioned the word "scheme."[5]

The lack of support for *Howey*'s *dicta* is a paradigmatic example why superfluous language in judicial opinions ought not to control in a subsequent suit when the very point not previously decided is presented for decision. *See Cohens v. Virginia*, 6 Wheat. 264, 399–400 (1821) (Marshall, C.J.).[6] As Chief Justice Marshall explained, the "question actually before the Court is investigated with care, and considered in its full extent. Other principles which may serve to illustrate it, are considered in their relation to the case decided, but their possible bearing

---

[5] *See Howey*, 328 U.S. at 298 n.4, *citing State v. Heath*, 153 S.E. 855, 857 (N.C. 1930) ("The term ['investment contract'] … implies the apprehension of an investment as well as of a contract."); *State v. Evans*, 191 N.W. 425, 526-27 (Minn. 1922) ("We think the contract before us in this case is an investment contract."); *Klatt v. Guaranteed Bond Co.,* 13 250 N.W. 825, 829 (Wis. 1933) ("contract by which [plaintiff] agreed to purchase and the [defendant] agreed to sell a certain number of … bonds"); *State v. Heath,* 199 N.C. 135, 140, 153 S.E. 855, 858 (N.C. 1930) ("[T]he contract included in the special verdict is not an 'investment contract'…."); *Prohaska v. Hemmer-Miller Develop. Co.,* 256 Ill. App. 331, 338 (Ill. Ct. App., 1st Dist. 1930) ("[T]he contract in question should be considered as an 'investment contract'… ."); *People v. White,* 12 P.2d 1078, 1081 (Cal. Ct. App., 2d Dist. 1932) ("That the contract before us is an investment contract is hardly open to question."); *Stevens v. Liberty Packing Corp.,* 161 A. 193, 195 (N.J. Chancery Ct. 1932) (holding that "[t]he home treatment lease and the 'buy back' contract are securities," without discussing whether they are "investment contracts"); *Moore v. Stella,* 52 Cal. App. 2d 766, 127 P.2d 300 (Cal. Ct. App., 2d Dist. 1942) (holding that "mineral deeds were 'certificates of interest' in an oil, gas or mining title," without discussing whether they were "investment contracts").

[6] *See also Knight v. Conn. Dep't of Pub. Health*, 275 F.3d 156, 167 (2d Cir. 2001) ("Appellants' reliance on [a Supreme Court decision] is misplaced, as the language … is dicta and not binding on this court."); *Donovan v. Red Star Marine Servs., Inc.*, 739 F.2d 774, 781-82 (2d Cir. 1984) ("comments by the Supreme Court ... were non-binding dicta").

on all other cases is seldom completely investigated," *id.,* which is precisely what happened in *Howey*.

The *Howey* "scheme" dicta should also be disregarded because its conceptual underpinnings have been eroded by wholesale changes in the "legal landscape" in the 77 years since the case was decided. *Fuld v. Palestine Liberation Org.*, No. 22-496-CV, 2023 WL 5808926, at *15 (2d Cir. Sept. 8, 2023) (according deference to Supreme Court *dicta* only "where … no change has occurred in the legal landscape"); *Newdow v. Peterson*, 753 F.3d 105, 108 (2d Cir. 2014) (same). As was typical of courts at the time, the *Howey* Court interpreted the statutory provision before it by invoking considerations of legislative intent untethered to the actual text enacted by Congress. *See, e.g., United States v. Am. Trucking Ass'ns*, 310 U.S. 534, 543 (1940) (emphasizing the Court's willingness to ignore statutory text when it produced an "unreasonable" result "plainly at variance with the policy of the legislature as a whole") (citation omitted). Thus, the *Howey* Court relied on prior state-court rulings "broadly constru[ing]" the phrase "investment contract" in state blue sky statutes based on a policy judgment "to afford the investing public a full measure of protection." *Howey,* 328 U. S. at 298. The *Howey* Court also cited a Congressional report to divine a "statutory purpose of compelling full and fair disclosure relative to the issuance of 'the many types of instruments that, in our commercial world, fall within the ordinary concept of a security.'" *Id.* at 299. The *Howey* Court relied on these policy pronouncements to depart from Congress's clear statutory text to state in *dicta* that "investment contracts" may include "countless and variable schemes devised by those who seek the use of the money of others on the promise of profits," *id.,* even though no "schemes" were before it.

But the Supreme Court now expressly rejects the approach to statutory construction that produced the *Howey dicta*. Supreme Court Justices "are all textualists now,"[7] and the Court no longer relies on general inferences about legislative intent unmoored to statutory text: "[I]t is ultimately the provisions of our laws rather than the principal concerns of our legislators by

_____

[7] Justice Elena Kagan, *The Scalia Lecture: A Dialogue with Justice Kagan on the Reading of Statutes*, at 8:09 (Nov. 17, 2015), http://today.law.harvard.edu/in-scalia-lecture-kagan-discusses-statutory-interpretation (Justice Scalia "taught everybody how to do statutory interpretation differently").

which we are governed*." Oncale v. Sundowner Offshore Servs. Inc.*, 523 U.S. 75, 79 (1998) (Scalia, J.); *see also Conroy v. Aniskoff*, 507 U.S. 511, 519 (1993) (Scalia, J., concurring); *Blanchard v. Bergeron*, 489 U.S. 87, 99 (1989) (Scalia, J., concurring in part).[8] Although some Justices still rely on legislative history to illuminate ambiguous text, the Court "will not take the opposite tack of allowing ambiguous legislative history to muddy clear statutory language." *Milner v. Dep't of Navy*, 562 U.S. 562, 572 (2011) (Kagan, J.). Under this line of Supreme Court decisions, lower courts have no duty to follow or defer to *Howey*'s "scheme" *dicta*. *See, e.g., Fuld*, 2023 WL 5808926, at *15; *Newdow*, 753 F.3d at 108.

Under the controlling Supreme Court case law on statutory construction, "investment contracts" must be limited to the text Congress enacted. Congress was fully familiar with the word "scheme," which it used in, among many other statutes, the anti-fraud provision of the Securities Act, 15 U.S.C. § 77q(a)(1). But when Congress defined "security" in the same bill with a lengthy list of investment types, it included "investment contracts" and excluded "schemes." 15 U.S.C. §§ 77b(a)(1), 78c(a)(10). That is the beginning and end of the analysis. No divination of legislative intent or citation to committee reports is necessary or appropriate. *See, e.g., Milner*, 562 U.S. at 572. There is simply no valid basis for any court to expand the definition of "investment" using an ill-defined word that (a) Congress did not include in the statute, (b) was not implicated by the *Howey* facts, and (c) was not even mentioned in the sources *Howey* relied on. This Court thus should not rely on the *Howey* Court's unfounded and outmoded "scheme" *dicta*, and should dismiss the SEC's claims for failure to prove that Defendants offered or sold any "investment contracts" within the meaning of the federal securities laws.

**B.    Defendants Did Not Offer and Sell Investment Contracts Under *Howey***

Even accepting the SEC's erroneous position that an "investment contract" can exist without a contract, the SEC still lacks evidence from which a reasonable factfinder could

---

[8] *See generally Bostock v. Clayton Cnty., Georgia*, 140 S. Ct. 1731, 1749 (2020) (Gorsuch, J., joined by Roberts, C.J.) ("[W]hen the meaning of the statute's terms is plain, our job is at an end."); *Carcieri v. Salazar*, 555 U.S. 379, 387 (2009) (Thomas, J.) (similar); *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2325 (2021) (Alito, J.) (similar); *Bartenwerfer v. Buckley*, 598 U.S. 69, 74 (2023) (Barrett, J.) (similar); *United States Forest Serv. v. Cowpasture River Pres. Ass'n*, 140 S. Ct. 1837, 1856-57 n.9 (2020) (Sotomayor, J., dissenting) (similar); *Al-Bihani v. Obama*, 619 F.3d 1, 24 (D.C. Cir. 2010) (Kavanaugh, J., concurring in denial of rehearing *en banc*) (similar).

conclude that a purchaser of the tokens at issue "(i) invest[ed] [] money (ii) in a common enterprise (iii) with profits to be derived solely from the efforts of others." *Howey*, 328 U.S. at 298–99. All three elements of the *Howey* test must be met for the sale of an asset to constitute an investment contract. *Id*. After extensive discovery, and further investigation into the factual record underpinning *Howey*, it is clear that Defendants are entitled to summary judgement on the grounds that the assets at issue here are not securities.

This case is factually distinct from *Howey* and every post-*Howey* case finding the existence of an investment contract. The W.J. Howey Company ("Howey Company") owned and maintained the Floridian Country Club, a resort hotel and golf course. *See* 56.1 Stmt. ¶ 115 at 8, ¶ 12. Guests of the resort who toured the property were offered a "package deal" which included both a "Land Sale Contract" to purchase orange groves and a "Servicing Contract" under which a sister servicing company promised to grow and market the oranges and distribute the profits. *See id.* at 10, ¶ 17 and Exhibit A 11-15, Exhibit B 15-20; *Howey*, 328 U.S. at 295. The Land Sale Contract and the Servicing Contract, which were "offered at the same time," were marketed to potential purchasers as providing for the *pro rata* distribution of profits to investors based on the cultivation and sale of oranges pooled from the Howey companies' endeavors. *See id.* at Exhibit B, at 17-18. Although a potential investor could forgo the Servicing Contract, all potential investors were "encouraged" to enter into the Servicing Contract because the investors (largely out-of-state vacationers) needed to outsource this critical function (without which the land itself was worthless). *Id.* at 10, ¶ 17; *see also id.* at 9, ¶ 14; *Howey*, 328 U.S. at 295. As a result of the Howey companies' marketing and sale efforts linking the Land Sales Contract to the Servicing Contract, the record reflects that "[g]enerally ... the [Land Sale Contract and the Servicing Contract] are executed simultaneously." *See* 56.1 Stmt. ¶ 115 at 9, ¶ 13.

The Servicing Contracts, which were "generally of a 10-year duration without option of cancellation" also gave the Servicing Company a leasehold interest and "full and complete" possession of the acreage. 328 U.S. at 296; *see also* 56.1 Stmt. ¶ 115 at Exhibit B at 16. The Purchasers had no right of entry to market the crop without the consent of the Service Company. 328 U.S. at 296; *see also* 56.1 Stmt. ¶ 115 at Exhibit B.  Rather, for a specified fee plus the cost

of labor and materials, the Servicing Company was given "full discretion and authority over the cultivation of the groves and the harvest and marketing of the crops" *Id*. In the event of a payment default by a purchaser, the Servicing Company had the option to immediately "foreclose the lien hereby granted upon the premises and crops above described for the amounts then due under this indenture." *Id.* at Exhibit B at 19; *see also id.* at 20.

 The Supreme Court held that the purchasers were offered "an opportunity to contribute money and to share in the profits of a large citrus fruit enterprise." *Howey*, 328 U.S. at 299.  The Supreme Court stated:

> [w]ithout the consent of the company, the land owner or purchaser has no right of entry to market the crop thus there is ordinarily no right to specific fruit. The company is accountable only for an allocation of the net profits … at the time of picking. All the produce is pooled by the respondent companies, which do business under their own names.

*Id.* at 296. On those facts, the transaction constituted an "investment contract," and thus a security, because it involved a "bundle" of contractual rights for the sale of land in an orange grove *in addition* to the seller's contractual promise to cultivate that land and give a share of profits created by that cultivation to each purchaser. *See* 328 U.S. at 295-96. As a matter of economic substance, the Supreme Court concluded that the bundle of contractual rights at issue in *Howey* was indistinguishable from an equity investment in an orange-growing enterprise. The Supreme Court further clarified that, had the orange groves in *Howey* been resold on their own, without the associated rights to have the groves cultivated and profits therefrom distributed to the purchasers, they would not have been securities. *See id.* at 295-96, 299; *see also SEC v. Telegram Grp. Inc.*, 2020 WL 1547383, at *1 (S.D.N.Y. Apr. 1, 2020) (the "security" was neither the token purchase agreement nor the token). Thus, *Howey*'s holding is that a land sales contract *coupled* with the simultaneous provision of a service contract formed an investment contract, even if neither document standing alone would have sufficed. *See* 328 U.S. at 297-98. To constitute an investment contract under *Howey*, therefore, a purchaser must have a contractually-grounded expectation of delivery of future value and the investment must be directed to the business itself rather than a purchase of the business's products. *Every* post-*Howey* Supreme Court and Second Circuit case considering an "investment contract" involved

(a) a contract between the promoter and the investor that (b) imposed post-sale obligations on the promoter and (c) gave the investor a share of profits from the promoter's activities.[9]

### C.    UST, LUNA, wLUNA and MIR Are Not Investment Contracts

Unlike the "package deals" offered in *Howey* and its progeny, here, there is no dispute that UST, LUNA,[10] and MIR were not marketed as "package deals." 56.1 Stmt. ¶ 58. Not only was there a separate Servicing Contract in *Howey*, it was bilateral and gave possession of the land to the Servicing Company, provided for bi-directional payments, and gave the Servicing Company the right to foreclose on the land if purchaser defaulted. *See supra*, Section I.B. The cases after *Howey* do not deviate from this fundamental factual blueprint. *See id.* at 16 n.9. Each involved a contractual "package deal" where the "investors" were precluded from taking possession of or choosing how to use the underlying assets at issue, because the "package deal" sellers never gave up control or possession of those assets. What the investors were buying in each case was assets and the promise by the seller to guarantee their sale or re-sale in some asset-specific fashion.

---

[9] *See Tcherepnin v. Knight*, 389 U.S. 332, 337 (1967) ("withdrawable capital shares" giving right to "dividends … based on [an] association's profits"); *SEC v. United Benefit Life Ins. Co.*, 387 U.S. 202, 205 (1967) (variable annuity contracts giving a right to a pro rata share of returns from a portfolio of equity interests); *SEC v. Variable Annuity Life Ins. Co.*, 359 U.S. 65, 71 (1959) (same); *see also United States v. Leonard*, 529 F.3d 83, 86 (2d Cir. 2008) (involving written subscription agreements); *Gary Plastic Packaging Corp. v. Merrill Lynch*, 756 F.2d 230, 233-35 (2d Cir. 1985) (sale of CDs accompanied by written contractual representations according to which the issuers would "maintain a secondary market for its customers," would continue to monitor[], on a regular basis, th[e] issuers," and Merrill would be the buyer of last resort of the CDs); *SEC v. Aqua-Sonic Prods. Corp.*, 687 F.2d 577, 578 (2d Cir.) ("license and security agreement and notes payable," a written "Offer to Act as Sales Agent," and other written agreements" for dentist office products), *cert. denied,* 459 U.S. 1086 (1982); *SEC v. Glen-Arden Commodities, Inc.*, 493 F.2d 1027, 1032 (2d Cir. 1974) ("Scotch whisky warehouse receipts" combined with agreements to "provid[e] … cooperage and insurance and … assistance in the liquidation of [the whiskey] investments"). Other circuits have also focused on the offering of a "package deal" when finding investment contracts under *Howey*. *See Bailey v. J.W.K. Props., Inc.*, 904 F.2d 918, 919 (4th Cir. 1990) (investors were simultaneously offered separate purchase and management agreements for bull embryos and the care of the resulting herds by defendants); *Hocking*, 885 F.2d at 1457 (9th Cir. 1989) (en banc) (condominium sale agreement and a rental pool agreement were presented as a package); *Cont'l Mktg. Corp. v. SEC*, 387 F.2d 466, 469-70 (10th Cir. 1967) (purchasers of live beavers were encouraged to and did enter into separate purchase and maintenance contracts for the animals).

[10] Defendants generally omit separate discussion of wLUNA because there is no evidence that it was marketed as a separate product. Wrapping tokens is a generic blockchain concept. *See* 56.1 Stmt. at ¶¶ 51-52.

That fact pattern is entirely absent here. As the evidentiary record makes plain, no marketing or sales of UST, LUNA, or MIR involved any similar "bundling" of contractual rights, let alone the imposition of post-sale obligations on TFL or the receipt of a share of "profits" from TFL. Indeed, unlike *Howey* and its progeny, all purchasers of UST, LUNA, and MIR took individual possession of those tokens and self-determined how and when to use them, which is the opposite of *Howey* and its progeny. *See, e.g.*, 56.1 Stmt. ¶ 24, 58, 65. The SEC also cannot establish that purchasers of UST, LUNA, or MIR obtained a participatory interest in the future economic performance of TFL, nor is there evidence in the record to support that purchasers of UST, LUNA, or MIR were led to expect profits solely by virtue of efforts by Defendants. 56.1 Stmt. ¶¶ 17, 18, 48, 49, 56, 70, 71, 79. Because the SEC has not and cannot demonstrate that UST, LUNA, or MIR tokens are investment contracts under *Howey*, summary judgment on all claims is warranted.

1.     **The SEC Cannot Establish A Common Enterprise Under** *Howey*

The SEC must prove that Defendants offered recipients of UST, LUNA, or MIR the economic equivalent of stock in a business enterprise such that such recipients obtained a participatory interest in the future economic performance of a business enterprise. *Howey*, 328 U.S. at 300. In *Howey*, "all the elements of a profit seeking-business venture we[re] present"— "[t]he investors provide the capital and share in the earnings and profits; the promoters manage, control and operate the enterprise." *Id.* Importantly, no oranges were sold to the purchasers, but rather, only an interest in a large citrus-growing enterprise; oranges were sold *for* the purchasers and what the purchasers got was profits from those orange sales.

A common enterprise can potentially be demonstrated in one of two ways. The first is "horizontal commonality," or the pooling of investor assets into an investment such that investors share in profits and losses *pro rata*. *Revak v. SEC Realty Corp.*, 18 F.3d 81, 87 (2d Cir. 1994)*; Marini v. Adamo*, 812 F. Supp. 2d 243, 256 (E.D.N.Y. 2011); *see also Hocking v. Dubois*, 885 F.2d 1449, 1459 (9th Cir. 1989) (en banc) (investors "give up any claim to profits or losses attributable to their particular investments in return for a *pro rata* share of the profits of the

enterprise"). The second is through "strict vertical commonality" or the tying of the promoter's financial compensation to the fortunes of the investors. *See Revak*, 18 F.3d at 87.[11]

But neither type of commonality exists here. A universal characteristic of a "common enterprise" is that the "investor" invests in a "profit-seeking business venture" that the promoter can "manage, control and operate." *Howey*, 328 U.S. at 300. The "Terra ecosystem" is no such venture. It includes the fully open-source Terra blockchain, some protocol use cases developed by TFL, some use cases developed by independent developers, exchanges, and myriad holders and users of the Terra tokens. *See* 56.1 Stmt. ¶¶ 13-17. That is not a profit-seeking business that earns "profits" in the way *Howey* uses that word, let alone one in whose profits a token holder holds any participatory interest, and it is certainly not under Defendants' control. Unlike in *Howey*, it is undisputed that the holders of UST, LUNA, and MIR had no participatory interest in any common pool of assets; they were entitled to only proceeds that might be generated by the uses they made of their specific tokens (such as by the choices to stake them with a validator) or proceeds they might receive if they chose to sell their own tokens. Furthermore, proceeds of UST, LUNA, and MIR sales—to the extent there were any not on secondary markets—were not deposited in a single pool. Nor were holders of UST, LUNA, or MIR entitled, by virtue of owning those tokens, to receive profits, dividends, or anything else from TFL. *See* 56.1 Stmt. ¶¶ 17, 18, 46- 48, 79. Accordingly, the SEC has no evidence to show any genuine issue of disputed fact as to the existence of a common enterprise functioning as a business under TFL's management and control. Owners of UST, LUNA, and MIR owned just those assets.

### a.   The SEC's Attempt To Link UST And The Anchor Protocol Does Not Satisfy *Howey*

Because the SEC concedes that UST (standing alone) is not a security and stablecoins are currencies which are thus exempt from the federal securities laws (15 U.S.C §§ 78c(a)(10), 77b(a)(1); 56.1 Stmt. at ¶¶ 20, 25, 50 (former Trading Firm employee testified that UST was not

---

[11] It is unclear whether vertical commonality satisfies *Howey*. The Second Circuit concluded that the focus on "the efforts of the promoter" improperly collapses two separate questions under *Howey* – "whether a common enterprise exists and whether the investors' profits are to be derived solely from the efforts of others" – into a single inquiry: "whether the fortuity of the investments collectively is essentially dependent upon promoter expertise." *Revak*, 18 F.3d at 88. It went on to say it does not "interpret the *Howey* test to be so easily satisfied." *Id.*

an investment)), the SEC tries to tie UST to the Anchor Protocol to suggest that the combination of the two products is a security. The first problem with this theory is timing: Anchor did not even *launch* until more than half a year *after* UST launched. *See* 56.1 Stmt. ¶¶ 26, 63. And even when Anchor was introduced, the evidence adduced in discovery showed no connection between UST and Anchor like the connections that existed in *Howey* and its progeny. There is no evidence that even one person was "offered" UST plus Anchor as a single product, as was the situation in *Howey* and every case that follows it, let alone the uniform offerings that took place in those cases. Indeed, the evidence contradicts the SEC's "one offering" theory, because it shows that the amount of UST deposited into Anchor rose slowly. *See id.* ¶¶ 72-73.

There is also no evidence in the record that UST was marketed by Defendants "together with," "in connection with," or otherwise "with" the Anchor Protocol as called for by *Howey*. *See id.* ¶¶ 68, 71, 111. This is not surprising. As set forth above, UST was introduced before the Anchor Protocol existed. *See id.* ¶¶ 19, 66-67.

Nor is there factual evidence that UST was *required* to be deposited in Anchor. *See id.* at ¶¶ 111. To the contrary, large amounts of UST were used for other purposes. *See id.* ¶¶ 23-24, 68. Anyone who deposited UST into Anchor (i) made that decision on their own and (ii) acquired their UST in a separate transaction or purchased it on a secondary market—which can never satisfy the *Howey* test because there were no contracts involved in the purchase of these products. *See* Section I.C, *infra.* An Anchor depositor had relationships with the Anchor Protocol itself and perhaps the Anchor community, not with the Defendants. *See id.* ¶¶ 69, 74-76. There is no evidentiary support that the deposits of any one UST depositor were dependent on the deposits of any other UST depositor such that they were joined in a pooled investment as required under *Howey*.[12]

---

[12] Defendants' deposits of UST into Anchor cannot establish vertical commonality either. *See* 56.1 Stmt. ¶¶ 74-79 (AC ¶ 72). Vertical commonality typically requires that a defendant earn a performance fee equal to a percentage of the profits of an investor's account. *See In re J.P. Jeanneret Assocs., Inc.*, 769 F. Supp. 2d 340, 360 (S.D.N.Y. 2011). The SEC does not allege, nor is there any evidence demonstrating that Defendants earned fees or commissions from user activity on the Anchor Protocol.

Finally, unlike *Howey*, there were no bilateral contracts involved with UST purchases. There were no bi-directional obligations by which UST purchasers gave up possession of tokens and gave a servicing company the right to foreclose on the tokens if a purchaser defaulted.

The only way for UST and the Anchor Protocol to be "similar to" the arrangement in *Howey* would be if orange groves were sold on their own and then the sellers *later* offered a new optional service for cultivating the groves, while the purchasers retained individual possession of those orange groves and self-determined how and when to use them. But that is not the *Howey* fact pattern.

### b. Purchasers Of LUNA Were Not Involved In A Common Enterprise With Defendants

Even if TLL's contractual sales of LUNA could be attributable to TFL (*see* Section I.A, *supra*), these agreements are not "investment contracts" under *Howey*. Among other things, the sales did *not* entitle the purchaser or borrower to receive any future profits or income from TFL—or any other entity—and they expressly disclaimed the creation of any ownership interest or claim on assets by the purchaser. *Compare Howey*, 328 U.S. at 301 *with* 56.1 Stmt. ¶¶ 46-47. *Howey* made clear that the real estate sale agreements were not investment contracts in the absence of the seller's *additional* contractual promise to cultivate the land and give the purchaser a share of profits created thereby. *See id.* at 299. Here, the record is devoid of any evidence to suggest that anyone made comparable promises to LUNA token purchasers. *See* 56.1 Stmt. ¶¶ 46-49. Furthermore, the SEC cannot satisfy horizontal commonality even if some early LUNA sale proceeds were "pooled" by TFL and used to "fund operations" and develop new projects. AC ¶¶ 46-47. Horizontal commonality requires more than just the aggregation or "commingling" of sale proceeds or the use of proceeds to fund operations. *See SEC v. Life Partners, Inc.*, 87 F.3d 536, 544 (D.C. Cir. 1996); *SEC v. Belmont Reid & Co.*, 794 F.2d 1388, 1389 (9th Cir. 1986). There must be an "interdependency among investors" such that profits depend upon "completion of the larger deal" between other investors and the promoter. *Life Partners*, 87 F.3d at 544. The SEC developed no evidence identifying such interdependency among LUNA purchasers. *See* 56.1 Stmt. ¶¶ 48-49.

The SEC also cannot establish either horizontal or strict vertical commonality between LUNA purchasers and Defendants on the basis that they all held LUNA at some point. *See* 56.1 Stmt. ¶¶ 43-45, 48-49. Although their separate holdings may have "paralleled" one another in valuation, they were not "intertwined such that [their] fortunes had to rise and fall together," because the parties were free to hold, use, or sell their LUNA at their discretion. *Marini*, 812 F. Supp. 2d at 257-58.

### c. Purchasers Of MIR Were Not Involved In A Common Enterprise With Defendants

Nor can the SEC establish horizontal commonality among MIR token holders by alleging that the proceeds from the sale of farmed MIR tokens were "pooled together to develop and fund … the Mirror Protocol," the success of which would determine their profits. *See* 56.1 Stmt. ¶¶ 56 (AC ¶ 87). The SEC can point to no facts in the record indicating that the Mirror Protocol required further development at the time of the small sale of MIR tokens or required funding. Indeed, the SEC knows from its investigation that TFL used the sale proceeds solely to acquire MIR tokens through farming to satisfy the purchase agreements.[13] *See* 56.1 Stmt. ¶¶ 59-60.

### 2. The SEC Cannot Establish That Holders of UST, LUNA, or MIR Reasonably Expected Profits From Defendants' Efforts

The SEC also cannot establish that depositors in the Anchor Protocol had a reasonable expectation of profits derived primarily from TFL's managerial efforts. *First*, the SEC must prove that users acquired UST primarily with an investment intent specific to the Anchor Protocol—rather than for its other consumptive uses. *See Rice v. Branigar Org., Inc.*, 922 F.2d 788, 790 (11th Cir. 1991) ("Where those who purchase something with the primary desire to use or consume it, the securities laws do not apply."). UST had a variety of practical applications: it could be used as a means of payment, to mint mAssets on the Mirror protocol, in other protocols developed by other developers, or simply as a store of value for later uses. 56.1 Stmt. ¶¶ 23-24. As the SEC's own whistleblower stated, UST was "not an investment." *See id.* ¶ 50. The SEC's allegation that "[j]ust prior to the collapse of [UST] in May 2022," more UST was deposited in Anchor than used for other purposes (*see id.* ¶¶ 23-24, 72-73 (AC ¶ 75)) does not establish that

---

[13] Here, there is no evidence that TFL earned any fees from selling MIR tokens or created a secondary market for MIR tokens. *Gary Plastic*, 756 F.2d at 233-35.

UST was used primarily for deposit in the Anchor Protocol from the time of UST's launch in September 2020, particularly because the Anchor Protocol did not even become available until March 2021. *See id.* ¶¶ 19, 63. And the SEC's anecdotal evidence that *five* people claim to have acquired UST "for the sole purpose of earning a return on the Anchor Protocol" (*see id.* ¶¶ 24, 68-69 (AC ¶ 81)), does nothing to establish that anyone else acquired UST for that purpose. As the publicly available deposit data shows, Anchor adoption was much slower than the SEC suggests. 56.1 Stmt. ¶¶ 72-73.

Even if those five users acquired UST just to deposit it into Anchor, the SEC has not plausibly alleged that they expected to earn a return from the managerial efforts of Defendants. There is not an investment contract unless the defendant's managerial efforts are the primary, if not only, driver of investor profits. *See Life Partners*, 87 F.3d at 546. TFL's efforts in initially "building out its front-end user access and back-end features" or "facilitating user access to the protocol" did no more than facilitate global users' choice to interact with the protocol or not, they did not drive profits and in any event were embedded in the system at the time of release. *See id.* ¶¶ 63-65 (AC ¶ 76); *see also Life Partners*, 87 F.3d at 547. Nor were one-time subsidies by TFL or a third party drivers of interest payments on the Anchor Protocol. *See id.* ¶ 77 (AC ¶¶ 75, 78).[14]

Nor can the SEC prove that holders of UST, LUNA, or MIR were "led to expect profits solely from the efforts of" Defendants. *Howey*, 328 U.S. 298-99. Where the Second Circuit has found an investment contract, the alleged promoters promised profit-generating efforts either within or accompanying a contract.[15] Here, there is no dispute that Defendants have no

---

[14] Despite all the focus on the Anchor Protocol, at no point has any litigant, in any jurisdiction, alleged that the Anchor Protocol failed to pay any scheduled interest on any deposits. *See id.* ¶ 78.

[15] *See Glen-Arden*, 493 F.2d at 1032-35 (defendants used their "expertise" to select "the type and quality of Scotch whisky" for purchase and "represented that they would handle all the necessary arrangements for warehousing the Scotch and insuring it" and "would find buyers for the Scotch or buy it back themselves"); *Aqua-Sonic*, 687 F.2d at 578-79 (promoter was "responsible for all sales ... for the benefit of th[e] licensee" and for "all significant marketing functions, such as finding customers, taking orders, collecting proceeds, and paying expenses and taxes"); *Gary Plastic*, 756 F.2d at 232, 233 (Merrill Lynch represented it would repurchase its "negotiable, insured, and liquid" CDs "at prevailing market rates" and committed to "monitoring" certificate "issuers" and providing "a written credit analysis on each"); *Leonard*, 529 F.3d at 85-86 (sales of

contractual obligation to make efforts that would return a profit to Terra token owners. *See* Section I.A & C, *supra.* There is no investment contract where, like here, the relevant documents are "barren of any representation or intimation of anticipated profits," *Grenader v. Spitz*, 537 F.2d 612, 618 (2d Cir. 1976)  And, as discussed below, even if extra-contractual statements could be part of alleged investment contracts—they cannot, because each token sale agreement has non-reliance and integration clauses—the SEC has not and cannot identify any public statements sufficient to establish a reasonable expectation of profits.

To the extent that LUNA or MIR experienced changes in price by virtue of market forces, that does not satisfy the "efforts of others" prong of *Howey* as a matter of law. *See, e.g., SEC v. Mut. Benefits Corp.*, 408 F.3d 737, 744 n.5 (11th Cir. 2005) (if the "realization of profits depends significantly on the post-investment operation of market forces," this does "not satisfy *Howey's* third prong"); *Grenader*, 537 F.2d at 619 (if "returns are driven mostly by market forces, the plaintiff cannot satisfy the 'efforts of others prong'"); *see also* 56.1 Stmt. ¶¶ 34, 49, 53.

### a. UST

Purchasers of UST did not expect to make a profit on it, because it was a stablecoin. Indeed, even the SEC's whistleblower agreed when he testified that UST is not an investment for precisely this reason. 56.1 Stmt. ¶ 50.

### b. LUNA

The LUNA sales agreements do not contain a promise of any future efforts by anyone to generate profits or income. *See Howey*, 328 U.S. at 301, *see also* 56.1 Stmt. ¶ 47. In fact, they contain disclaimers of such promises. *See* 56.1 Stmt. ¶ 46. Colloquially mentioning the words "investment" or "investors" in a few circumstances cannot change the fact that purchasers who bought LUNA subject to these agreements disclaimed an expectation of profits for *Howey* purposes. *See* 56.1 Stmt. ¶¶ 46-47 (AC ¶ 53). This is consistent with *Forman*, in which the Supreme Court held that an instrument labeled "stock" was nevertheless not a security. 421 U.S. at 851-52. LUNA was created to stabilize UST, validate transactions on the Terra blockchain, and enable voting for governance proposals.  *See* 56.1 Stmt. ¶ 27. But even if some LUNA

_____

"units" in companies to finance the production and distribution of motion pictures that would generate profits for unit holders).

purchasers acquired it because they considered it an investment, that would not matter. *See* 56.1 Stmt. ¶¶ 46-47. Where purchasers acquire an asset to speculate on fluctuations in global market prices (or markets generally), courts hold that profits are not driven primarily by the managerial efforts of others. *See Belmont Reid & Co.*, 794 F.2d at 1389-91; *Noa v. Key Futures, Inc.*, 638 F.2d 77, 79-80 (9th Cir. 1980).

### c.  MIR

The SEC also cannot demonstrate that anyone acquired MIR with the expectation of profits, let alone profits from TFL's efforts. *See* 56.1 Stmt. ¶ 79. Nowhere in the record is there any evidence that anyone acquired MIR primarily as an investment rather than for their use as the governance token for the Mirror Protocol. *See* 56.1 Stmt. at ¶ 57.

Even with the small set of purchasers that purchased farmed MIR tokens from TFL for "investment purposes," the SEC has developed no factual support that they reasonably expected to reap profits primarily from the efforts of TFL. *See* 56.1 Stmt. at ¶¶ 60 (sample SAFTs agreements), 79-82. At best, the SEC's unsupported allegations that TFL "engineered, launched, and upgraded versions of the Mirror Protocol" and posted relevant information online (*see* 56.1 Stmt. at ¶¶ 53-61 (AC ¶¶ 94-95)) are pre-sale activities that are baked in at point of sale and "ministerial" post-sale activities, neither of which has the "predominant influence" on the investment's future value necessary for an investment contract. *Life Partners*, 87 F.3d at 546-48. The SEC does not allege that the Mirror Protocol was still in development at the time of the alleged purchases.

The allegation that TFL represented that it "would heavily promote the Mirror Protocol, which would increase the price of the MIR tokens" and increase profits for the token purchasers is misleading. *See* 56.1 Stmt. at ¶ 62 (AC ¶ 91). One document this allegation is based on includes a single bullet point that read "Heavily marketed to users in Asia with low accessibility to US equities," and a *separate* document discussed how the value of MIR tokens might grow with greater usage of the Mirror Protocol.  *See* 56.1 Stmt. ¶ 62. In neither document did TFL say that it would expend efforts to drive the value of MIR tokens up as the SEC has alleged. Isolated tweets about "being active contributors in the community to help mirror protocol succeed" or

"working hard to improve Mirror and rely[ing] on our brilliant community for feedback and ideas" are far too vague and refer to no specific projects that could be connected to purchaser expectation of profits. *See* 56.1 Stmt. ¶ 62 (AC ¶¶ 96-97). Finally, the SEC does not dispute that the only "sales" of MIR tokens by TFL were tokens that TFL farmed by participating in the Mirror Protocol itself, which does away with any "funding" argument.

## II.   THERE IS NO GENUINE ISSUE OF MATERIAL FACT THAT, EVEN IF LUNA OR MIR WERE SECURITIES, THEY WERE EXEMPT FROM REGISTRATION

The SEC cannot establish that, even if LUNA or MIR were securities—which they are not—Defendants violated Sections 5(a) and (c) of the Securities Act. Summary judgment should therefore be awarded on the SEC's Section 5(a) and (c) claims because (i) the SEC cannot establish a requisite public offering of securities in violation of Section 5 and/or (ii) Defendants have satisfied their burden of demonstrating that the offer or sale of LUNA Tokens and MIR Tokens are exempt from registration.

### A.   LUNA Tokens

Exempt private offerings of LUNA tokens are not Section 5 violations. At issue are private agreements to sell LUNA tokens that Defendants entered into in 2018 and between 2019 and 2022, and two agreements with the Trading Firm to facilitate secondary trading of LUNA on foreign markets. These transactions did not involve public offerings.

*First*, the 2018 transactions involving LUNA tokens are exempt from registration under Section 4(a)(2) because those sales did "not involve[e] any public offering." 15 U.S.C. § 77d(a)(2).  The transactions were also exempt under Rule 506(b) of Regulation D, because they were offerings to accredited investors—as the SEC admits (AC ¶ 107)—and there is no evidence of any general solicitation. 17 C.F.R. § 230.506(b). Knowing this, the SEC pled that Defendants "expect[ed] that most, if not all, of these purchasers would sell their LUNA into public markets." AC ¶ 107. But that allegation is contradicted by the text of the agreements. For example, the vesting period precluded immediate resale, as did the fact that LUNA was not listed on any trading platform at the time of the purchases. OB Ex. K at 23. Moreover, if a purchaser intended to resell its LUNA, it could have done so without violating Section 5 by selling on any of several

foreign platforms under Regulation S's exemption. 17 C.F.R. § 230.901.[16] This was all the more likely since it was not until August 2021—*three years after these sales*—that LUNA was listed (and then not by TFL) on a "U.S.-based" trading platform. *See* AC ¶109.

*Second*, the two agreements Terra entered into with the Trading Firm are also exempt under Regulation S. The SEC claims that these agreements were "in essence, public distributions of LUNA" into the U.S. AC ¶110. But the SEC wholly lacks evidence to support this claim. *See* 56.1 Stmt. ¶¶ 28-32. There is no admissible evidence that TFL hired the Trading Firm to access *U.S.* markets or solicit purchases of LUNA in the U.S. The evidence shows that the purpose of the LUNA transfers to the Trading Firm were to improve liquidity in the aftermarket. *See* 56.1 Stmt. ¶¶ 90, 92. And when these agreements were entered into, LUNA was only traded on non-U.S. platforms. *See* AC ¶¶ 108-109. The SEC has admitted that the Trading Firm did not begin reselling LUNA for more than a year after the tokens were loaned to it by TFL. *Id.* Any trading within the contemplation of Defendants and the Trading Firm were thus foreign transactions, exempt under Regulation S, and outside the SEC's authority.

    **B.**    **MIR Tokens**

The Mirror Protocol does not sell MIR tokens. *See* 56.1 Stmt. ¶ 54. Consequently, there is no issue of material fact that providing access to the Mirror Protocol is not an offer or sale of anything. The farmed MIR tokens sold to a small group of international purchasers (AC ¶112) are exempt under Section 4(a)(1) as "transactions by any person other than an issuer, underwriter, or dealer." 15 U.S.C. § 77d(a)(1). The SEC acknowledges that TFL had to farm the tokens from Mirror Protocol just as any other user could have. AC ¶ 89. And TFL is not (i) an issuer because it did not own MIR tokens when the protocol launched, (ii) not an underwriter because it could not purchase MIR tokens from the Mirror Protocol, and (iii) not a dealer of MIR

---

[16] Rule 901 also disposes of the SEC's allegations regarding sales of LUNA between August 2019 and February 2022. Although the SEC claims that sales were made "directly into secondary markets through transactions on crypto asset trading platforms, including those available to U.S. investors" (AC ¶111), this contention lacks any supporting evidence. *See* 56.1 Stmt. ¶ 32. And a foreign platform that is available to U.S. investors is still a foreign platform for Rule 901 purposes. For example, U.S. residents can purchase stock on the London Stock Exchange, but that does not bring such transactions within SEC jurisdiction.

tokens because, as the SEC concedes, it sold only the MIR tokens it acquired in connection with satisfying its SAFT agreements. 56.1 Stmt. ¶¶ 59-60 (AC ¶ 89). There exists no evidence in the record to the contrary.

Moreover, these sales were an exempt private offering under Rule 506(b), which exempts sales to accredited investors and up to 35 non-accredited investors where there is no general solicitation. 17 C.F.R. § 230.506(b). The SEC concedes that "there is no indication of general solicitation" (AC ¶ 113) and that there were fewer than 35 purchasers in total.[17]  In addition, these sales are exempt under Section 4(a)(2), because they are private offerings to persons with economic sophistication who have available to them the kind of information that a registration statement would disclose. *SEC v. Ralston Purina Co.,* 346 U.S. 119, 125-27 (1953). Each purchaser at issue represented that it understood digital assets and their risks, the agreements disclosed risks specific to the Mirror Protocol, and TFL provided additional financial information. *See* 56.1 Stmt. ¶ 61.[18]

## III.   DEFENDANTS DID NOT OFFER OR SELL UNREGISTERED SECURITY-BASED SWAPS

The SEC cannot show, through admissible evidence, that mAssets are security-based swaps, were sold by Defendants, or were sold to non-eligible contract participants.

*First,* mAssets and transactions therein are not security-based "swaps" because there is no counterparty. There is no evidentiary support for the assertion that mAssets involve a payment from one party to a counterparty based on a change of value in an underlying asset (whether that asset is a security or something else). *CFTC v. Wilson*, No. 13 Civ. 7884 (RJS), 2018 WL 6322024, at *2 (S.D.N.Y. Nov. 30, 2018). When an mAsset is programmatically generated by the Mirror Protocol, the Protocol receives the collateral deposited by the minter of the mAsset and issues the mAsset, but it does not make cash payments unless (a) the liquidation function is triggered and collateral that remains is left to be returned to the minter or (b) the

---

[17] Summary judgment should therefore be granted on these grounds alone.
[18] The SEC's allegation that TFL "entered into a listing agreement with at least one U.S. crypto asset trading platform for the listing of MIR tokens on the platform" (AC ¶114) changes nothing. At a minimum the SEC would have come forward with admissible evidence that a Defendant actually bought or sold MIR tokens on that platform, which it has not done. Nor has it produced evidence that Defendants received any fees generated by any MIR token sales on that platform.

minter burns the mAsset and gets back his or her collateral. On the other hand, a "purchase" of an mAsset occurs only *after* a third party has minted an mAsset and proffered it for sale—*for the first time*—to another party on a peer-to-peer basis. *See* 56.1 Stmt. ¶¶ 82-87.[19]

    *Second,* Defendants did not "offer," "sell," or "effect" mAsset transactions. Defendants helped create the Mirror Protocol, but after it was launched the Protocol operated autonomously under community governance and through its decentralized ecosystem. *See* 56.1 Stmt. ¶ 80. Development of the protocol, publishing accurate information about it, or providing an interface to it (AC ¶ 115) is not issuing, passing title to, or soliciting sales of mAssets. *See Underwood v. Coinbase Glob., Inc.*, No. 21 CIV. 8353 (PAE), 2023 WL 1431965, at *9 (S.D.N.Y. Feb. 1, 2023). Finally, the nature of programmatically generating mAssets when minting users interface with the protocol means that Defendants do not issue, pass title to, or solicit sales of mAssets. *See* 56.1 Stmt. ¶¶ 82-83, 85-87. The SEC would need to provide admissible evidence that a Defendant has some role in a transaction that takes place in a completely automated manner and for which no Defendant receives a payment. It has not done so.

    *Third,* even *if* mAssets were unregistered securities, Defendants are not "necessary participants" in mAsset distributions. Lacking evidence of offers or sales *by* Defendants, the SEC claims that mAsset sales "would not have taken place ... but for the defendants['] participation." Order at *44. Although it is true that liability "for violations of Section 5 extends to those who have 'engaged in steps necessary to the distribution of [unregistered] security[ies]," *U.S Secs. & Exch. Comm. v. Univer. Exp., Inc.*, 475 F. Supp. 2d 412, 422 (S.D.N.Y. 2007), such a distribution *must* involve a "public offering." *Id.* This is where the SEC's misunderstanding of the Mirror Protocol's operation comes into sharp focus:  The SEC fails to submit any admissible evidence that mAssets were part of a "public offering." In addition, the SEC cannot sufficiently connect Defendants to actual sales of mAssets.  This is because courts only find individuals

---

[19] It is important to understand that there is no "swap" counterparty even in the hypothetical in which the minter has sold the mAsset to a third party.  If the mAsset is liquidated or burned while owned by a third party, the collateral from the minting process is returned to the original minter, not the holder of the mAsset. So even when mAssets were traded, there were no swap counterparties in the sense of the SEC's definition.

"necessary" or "substantial participants" in sales of unregistered stock when their activity is directed at the actual unregistered sales, because not everyone in the chain between a seller of securities and the ultimate buyer is sufficiently involved in the process to make him responsible for an unlawful distribution. *SEC v. Genovese,* No. 17 Civ. 5821 (LGS), 2021 WL 1164654, at *5 (S.D.N.Y. Mar. 26, 2021). But the Mirror Protocol mints mAssets programmatically when users interface with it directly and mAsset users exchange them on a peer-to-peer basis, and all of that happens without Defendants' involvement. *See* 56.1 Stmt. ¶ 82.[20] That means the SEC cannot satisfy the legal requirements to hold Defendants liable for mAsset transactions.

     *Fourth,* Defendants did not make offers to non-eligible contract participants. The SEC has not identified any such individuals, and there exists no admissible evidence that Defendants' alleged activities were directed at U.S.-based persons. *See* 56.1 Stmt. ¶ 88. The SEC also has proffered only speculation that Defendants "promoted mAsssets to the general public, including institutional investors and retail investors alike." *See e.g.*, AC ¶ 107. Discovery has not changed this. Defendants' creation of the Mirror Protocol—which generates assets for users to exchange across trading platforms in foreign venues and was explicitly directed at people who could not trade on U.S. markets—simply cannot be interpreted as an offering into the U.S. market or toward U.S. investors. *See* 56.1 Stmt. ¶¶ 80-88.

## IV.    DEFENDANTS DID NOT KNOWINGLY OR NEGLIGENTLY MAKE ANY FALSE OR MISLEADING STATEMENT

### A.    There is No Admissible Evidence That Defendants' Statements About Chai and the May 2021 Depeg were Materially False or Misleading

     The SEC challenges various statements by Defendants about the May 2021 depeg (AC ¶¶163-65) and Chai (AC ¶¶ 128-33, 137-40). Its two year investigation has yielded no admissible evidence that those statements were false or misleading. "[T]o support a finding of liability, Rule 10b–5 expressly requires an actual statement, one that is either 'untrue' outright or 'misleading' by virtue of what it omits to state." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 239 (2d Cir.

---

[20] This is the same reason the SEC's assertion that Defendants "pocketed" fees generated by the Mirror Protocol makes no sense and cannot be supported by evidence. *See* 56.1 Stmt. ¶ 83. Every user generating, offering, selling, purchasing, or burning an mAsset acts independently of Defendants, *see id.*, and that means this theory has no legs to stand on.

2016). To be actionable, a misstatement must have been false when it was made. *See San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 812–13 (2d Cir.1996). A statement that was believed to be true when made, but was later shown to be false, does not suffice. *See id.* Here, there is no need to address materiality, because the factual record simply does not support the basic premise that there were false statements.

### 1.   Chai

The crux of the SEC's allegations is that Defendants' statements that Chai used the Terra blockchain to process and settle Chai transactions were materially false and misleading because Chai did not use the blockchain, and the LP Server merely "recorded completed Chai transactions" in the blockchain to make it seem these were originally processed and settled on the Terra blockchain. AC ¶¶ 5, 118, 121, 122, 135. But the SEC has no admissible evidence to support these allegations, and the claims are actually contradicted by evidence produced in this case demonstrating that Chai's use of the Terra blockchain was accurately described and communicated by Defendants.

### a.   Alleged Statements at Issue

The SEC claims that Chai did not process or settle transactions on the Terra blockchain, and that therefore all of the statements it identifies in the AC (AC ¶¶ 118, 128-33) were false. That this was going to be a failure of proof case became apparent when counsel for the SEC admitted, early in discovery, that they had not looked at any Chai or TFL source code before filing this case.[21] Henkin Decl. ¶ 3. And the SEC *still* has not done so. The SEC has not pointed to or provided any recognized definition of, or framework to evaluate, the meaning of "processing" or "settlement" in the Chai payment system. Chai, which is not part of TFL, has not produced any source code for any component of the Chai system (the best evidence of how such

---

[21] "By presenting to the court a pleading, … an attorney … certifies that to the best of the person's knowledge, information, and belief, *formed after an inquiry reasonable under the circumstances* … the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery … ." Fed. R. Civ. P. 11(b)(3) (emphasis added).  Defendants will leave for a later date whether the SEC satisfied its Rule 11 obligations with respect to the Chai allegations and, perhaps worse, the allegations in AC ¶ 173.

a data processing system actually works); the Chai or LP Server systems themselves; or logs, data, or records from operation of the Chai System, including the LP Server. But this is what the SEC would need to prove Chai did not use the Terra blockchain in its operations, and it is now clear that the SEC filed this case without examining any of that evidence.

The only evidence the SEC has provided is the Report of its proposed expert Dr. Matthew Edman, who in forming his opinions analyzed *only* the source code he connects to the LP Server and LP Watcher, as well as what he describes as purported Terra Chai blockchain transaction data, but also did not analyze any of the evidence discussed in the preceding paragraph. 56.1 Stmt. ¶ 131.[22] Despite having reviewed no direct evidence regarding the operations of Chai, Dr. Edman opines that the "transactions on the Terra blockchain were created by Terraform Labs' LP Server rather than by 'organic' users" and do not represent "the processing and settlement of Chai transactions between Chai users and merchants of the Terra blockchain." *Id.* But for the reasons outlined below and in Defendants' Motion to Exclude Dr. Edman's testimony and reports, neither Dr. Edman's facts, analysis or methodology meet the criteria required to admit his opinions as evidence, meaning the SEC's Chai claims fail. *See id.* ¶ 118.

The Defendants clearly articulated to the public how Chai used Terra on "the backend" in a Terra Community Update just 10 days after Chai's launch:

> We've been getting a lot of questions regarding how Chai uses Terra's blockchain. Quite simply, Chai runs, records transactions, and manages account balances on Terra's Columbus mainnet. Unique for blockchain services, it is integrated with most major banks in Korea such that the user can checkout with just a few clicks instead of having to manage wallet addresses, QR codes or private keys.
>
> Chai batches all the user purchase actions in a 10–15 second time window, and submits the batched tx to the Columbus blockchain. Each of these transactions pay a % stability fee, which gets rewarded each block to network stakeholders. Over the last 2 days, around 26k batch transactions have been made over Chai.

 56.1 Stmt. ¶119, Ex. 74.

As demonstrated below, the SEC has no admissible evidence contradicting these statements, which means the Chai-related fraud claims must be dismissed.

> **b.**     **No Admissible Evidence Supports The SEC's Chai Allegations**

---

[22] Dr. Edman makes a fleeting, conclusory reference to a chat between developers at the end of his Report, but does not incorporate this into his analysis of the LP Server or Chai payment system—nor could he given the lack of context regarding the conversation. *See* 56.1 Stmt. ¶ 131.

The SEC's attempt to prove that Defendants made false statements that Chai used the Terra blockchain to process and settle transactions rests on Dr. Edman's opinions. 56.1 Stmt. ¶ 117, Ex.71 ¶ 11. Dr. Edman, however, lacks the expertise and foundation in financial services and payment systems[23] to formulate his opinions.  56.1 Stmt. ¶ 123. He does not have expertise or experience in building or evaluating financial services and payment systems, and the gaps in his evidence, analysis, and logic supporting his opinions show this. *See id.*

Other than the LP Server and LP Watcher source code, Dr. Edman failed to examine any source code for any component of the Chai system (the best evidence of how such a data processing system actually works); the Chai or LP Server systems themselves; or logs, data, or records from operation of the Chai System, including the LP Server. *See id.* ¶ 118. He did not examine and could not determine who, or what systems, provided inputs to the LP Server. *See id*. He rests his opinion on his assessment that the LP Server operated a closed system of crypto wallets to execute transactions, but he omitted from his Corrected Report information that refutes his assessment, and he changed the methodology he used to conduct this assessment between his original and his most recent Rebuttal Report. *See id.* ¶¶ 137-139.[24]

Dr. Edman, like the SEC, fails to provide *any* definition or framework for the meaning of processing and settlement in the Chai payment system—let alone any recognized in the payment industry—in formulating his opinions. *See id*. ¶¶ 118, 128-129.[25] In the financial services and payments industry, the actual meaning of these terms varies depending on the context and structure of a particular payment system. *See id.* ¶¶ 125-127. **And as Dr. Edman testified, he does not know how Chai processed payments at all**, which means he constructed his proposed methodology entirely in the dark about what he was purporting to analyze. *See id.* ¶¶ 130-132.

---

[23] In this document the term "financial payment systems" includes commercial payments systems as referenced by Dr. Edman and the Plaintiffs.

[24] These arguments are addressed in further detail in Defendants' Memorandum in Support of Motion to Exclude Edman Testimony, filed contemporaneously herewith. *See id.* ¶¶ 118, 123.

[25] Dr. Edman belatedly offered his interpretation of what it means to "process and settle" a transaction after being pressed to do so in his deposition, and then tried to rehabilitate this testimony by claiming it is "consistent" with other ways in which "processing and settlement" can occur. *See id.* ¶ 129.

Put differently, if you know nothing about how the system you have been asked to analyze is supposed to work, how can you opine about what it does?

The *only* basis Dr. Edman provides for his opinions in his Corrected Report is his examination of the LP Server source code, LP Watcher source code, and blockchain transactions he describes as connected to the LP Server, plus a smattering of uncontextualized documents. *See id.* ¶ 131. Dr. Edman acknowledges that the LP Server cannot act on its own and must receive inputs from a separate source in order to execute transactions on the Terra blockchain. *See id.* ¶¶ 134-135. He also admitted that, because he had not analyzed source code for any Chai system components, any part of the Chai system, or related logs or data for the Chai system or the LP Server, he did not know who or what provided inputs to the LP Server and could "only speculate" as to who was using the LP Server, or what it was being used for. *See id.* ¶ 135. Indeed, he admitted that input to the LP Server could be provided by an "organic" person, and that would include actual Chai users. *See id.*

As a result, Dr. Edman's opinions are not supported by evidence. His review of source code only describes what he says the LP Server "could" do, not what it actually did. *See id.* ¶¶ 134-135. He cannot determine who or what provided inputs to the LP Server. *See id.* ¶ 135. His assessment that the LP Server operated a closed system of wallets is contradicted by the data he reviewed to formulate that observation (and omitted in his Corrected Report) and the methodology he used. *See id.* at ¶¶ 136-137. His defense in his Rebuttal Report of his observation is based upon changes in the methodology he used in his original report. *See id.* ¶¶ 137-139.

### 2.   May 2021 Depeg

The SEC alleges that Defendants misled supposed "investors" about the May 2021 de-pegging incident. The thrust of the SEC's allegations is that Defendants "falsely reported that the peg was restored due to the success of UST's algorithm" and "misleadingly omitted the real reason for the re-peg—the deliberate intervention by a third party … to buy large amounts of UST to restore its value." AC ¶ 118. More specifically, the SEC alleges several misstatements, but *none* of them concern human intervention to recover the peg in May 2021. *See* ¶¶ 163-65.

### a.   The Alleged Misstatements

TFL tweeted on May 23, 2021 that TFL held a nominal amount of the total UST in circulation at the time ($59 million of over $2 billion). AC ¶ 163. This statement is innocuous, factual, and its veracity is undisputed. Mr. Kwon tweeted on the same day that "[b]uilding pure, unbiased and decentralized money is the long game." *Id*. This is the expressly stated business goal of the Terraform ecosystem. *See* 56.1 Stmt. ¶ 23, Ex. 5, p. 5 – 6. The SEC does not challenge this statement, likely because it is precisely the sort of statement that the Second Circuit and other Circuits have consistently held to be non-actionable. *See Lasker v. N.Y. State Elec. & Gas Corp.*, 85 F.3d 55, 59 (2d Cir.1996) (statements that company's "business strategies [would] lead to continued prosperity ... consist of precisely the type of 'puffery' that this and other circuits have consistently held to be inactionable"). Put differently, expressions of opinions, expectations, or declarations of intentions are non-actionable. *See Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000); *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004); *Pehlivanian v. China Gerui Advanced Materials Grp., Ltd.*, 153 F. Supp. 3d 628, 647 (S.D.N.Y. 2015).

TFL tweeted on May 24, 2021, that because of the "cumbersome nature of stress-induced decision-making of human agents in time of market volatility," "central banks are exploring [central bank digital currencies]," and that "[a]lgorithmic, calibrated adjustments of economic parameters are more effective than faxes and suits in meetings." AC ¶ 164. This statement is beyond dispute, and the SEC discovered no evidence to the contrary. This general statement about the success of the cryptocurrency industry is not specific to any TFL product, and is completely untied to the claims alleged in this case. *See Pehlivanian*, 153 F. Supp. 3d at 648-49 ("general statements of corporate optimism" that "strategies would be successful" are non-actionable).

Nearly a year later, during a March 1, 2022 Twitter talk show, Mr. Kwon discussed the May 2021 depeg. *See* 56.1 Stmt. ¶ 104, Ex.61. In the AC, the SEC selectively focused on a snippet wherein Mr. Kwon stated that "when the exchange rate has deviated from the peg, the protocol automatically self-heals the exchange rate back to whatever the spot price is being

quoted by the oracle." AC ¶165. But the statement must be reviewed in context and as a whole. *See In re Axis Capital Holdings Ltd. Sec.. Litig.*, 456 F. Supp. 2d 576, 588 (S.D.N.Y. 2006). In context, it is clear that Mr. Kwon was discussing the speed at which the mint-burn mechanism— which itself depends on human intervention by those who use the mechanism—"heals" the exchange rate in times of high slippage cost (*i.e.*, common financial feature that is the difference between the expected price of a transaction and the price actually received upon execution). *See* 56.1 Stmt. ¶ 104. This is confirmed by the statement's preceding sentence: "And it took a few days for the *slippage cost to naturally heal back to spot*." *Id.* ¶ 104, Ex. 61[26]

None of these statements were false. They also did not give rise to any required disclosures because (1) Defendants are not obligated to "disclose a fact merely because a reasonable investor would very much like to know that fact," *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993), and (2) there is nothing that could have been disclosed that would have painted a fuller picture. Yet the SEC claims that disclosure to make these statements not misleading was required, including disclosure of the purported involvement of Defendants and the Trading Firm in restoring UST's peg. But the SEC has no admissible evidence to support this claim, which alone warrants summary judgment in favor of Defendants.  *See In re Omnicom Group, Inc. Sec. Litig.*, 597 F.3d 501, 512 (2d Cir. 2010) ("if the admissible evidence is insufficient to permit a rational juror to find in favor of the plaintiff, the court remains free to … grant summary judgment for defendant.").

### b.    The Appropriate and Known Relationship Between Terraform and the Trading Firm

It was well-known within the Terra community and the crypto industry that TFL had an ongoing business relationship with the Trading Firm, both as a liquidity provider and general business partner. There was an "institutional understanding" amongst community members that

---

[26] In the MTD Order, the Court indicated that the SEC sufficiently pled only that the "self-healing" statement gave rise to a duty to disclose: "Here, the SEC has plausibly alleged both that the defendants ascribed the "re-peg" to the "self-healing" effects of the UST/LUNA algorithm and that the defendants knew that it was, in reality, a third-party investor that had stabilized the UST tokens value." MTD Order at 49. For the avoidance of doubt, Defendants move for summary judgment on all alleged misstatements and assert that there was no duty to disclose the *alleged* intervention, which Defendants deny occurred and which the SEC has no admissible evidence to support.

the Trading Firm "provided market-making services for [TFL]." *See* 56.1 Stmt. ¶ 90-91. In public chat forums specifically geared to TFL's Network and Protocols, community members discussed the Trading Firm's involvement in the Terra ecosystem and that its involvement involved "more than just peg maintenance." *See, e.g. See* 56.1 Stmt. ¶ 90-91, Ex. 40 (a user writes that [the Trading Firm's] involvement is "more than just peg maintenance."); *see also* ¶ 90-91, Ex. 41.

Further, it was and is general knowledge in the crypto community, specifically concerning stablecoins, that liquidity providers are essential to make economic adjustments for stability mechanisms to continue functioning properly. *See, e.g,. See* 56.1 Stmt. ¶ 91, Ex. 46 ("Market makers provide liquidity for Terra tokens."). Both the Trading Firm and Defendants published several Agora governance proposals making clear that the algorithm was continuously being updated via adjustments to the liquidity parameters, and that the Trading Firm was directly involved in making these adjustments. *See* 56.1 Stmt. ¶ 91, Exs. 43 & 44.[27] Even after the May 2021 Depeg, the Trading Firm revised Prop 90 to explain that its governance proposal "is just as necessary for contractions in the other direction to help maintain the peg." *See* 56.1 Stmt. ¶ 89, Ex. 44.

Although their partnership was well-known, the Trading Firm sought to keep its relationship with TFL confidential before the terms of the Loan Confirmation Agreements were finalized later in 2020. *See* 56.1 Stmt. ¶ 93, Ex. 49 ("at [the Trading Firm]'s request, we are keeping this arrangement strictly confidential and the size of notified parties small (5 firms), so would appreciate it if all of you could do the same."). That was the Trading Firm's decision, not TFL's. Nonetheless, Defendants still made it known to early token purchasers that the Trading Firm "will deploy its own resources to improve liquidity of Terra and Luna. [Trading Firm] will deploy a validator and participate in on-chain governance. [Trading Firm] is rewarded with call

---

[27] Defendants made it clear to community members that these governance proposals to adjust liquidity parameters were critical to Terra's "journey towards creating the first scalable & decentralized algorithmic stablecoin." *See* 56.1 Stmt. ¶ 91, Ex. 97 (@Stablekwon tweet, Feb. 4, 2021, STABLEKWONTIWTTER0001270); *see also id.* ¶ 91, Ex. 43 (Do Kwon, Agora Governance Proposal "TIP 36: Further improvements to liquidity parameters" (February 10, 2021) (Trading Firm's Prop 27 "has been instrumental in helping accelerate the throughput of minting Terra stablecoins to meet the demand fueled by new apps in the ecosystem.")).

options for Luna at above current market prices (30, 40, 50 cents) over the next three years to align incentives to improve markets." *Id.*

The core of the SEC's allegations is that TFL and the Trading Firm conspired to have the Trading Firm restore the peg and make it look like it self-healed, and that there was some undocumented agreement to repay the Trading Firm for that assistance that resulted in monetary benefits for the Trading Firm. But there is no admissible evidence to support either part of that theory.  On the one hand, the loan amendment did not materially modify TFL's or the Trading Firm's rights and obligations under the existing Loan Confirmation Agreements; it memorialized in writing the modified LUNA delivery schedule, which cancelled the remaining deliveries and set a new, *more extended*,[28] delivery schedule for the remaining 61.5 million LUNA the Trading Firm was entitled to since meeting its obligations under the Loan Confirmation Agreements. *See* 56.1 Stmt. ¶ 96, Ex. 57.

### c.     There Is No Admissible Evidence That the Trading Firm Restored the Peg

Discovery has yielded no admissible evidence to establish that Defendants secretly sought the assistance of the Trading Firm to restore the peg or that the Trading Firm did restore the peg. The *only* admissible evidence the SEC refers to is a call log (that includes no further information) on Signal between Mr. Kwon and President of the Trading Firm Crypto entity ("President"). *See* 56.1 Stmt. ¶ 101.[29] President first called Mr. Kwon at 9:10 AM CDT. *Id.* Per the Trading Firm's trading records, the Trading Firm began actively trading at approximately 9:30 AM CDT, President again called Mr. Kwon at 9:58 AM CDT. *Id.* At approximately 10:00 AM CDT, the Trading Firm effectively stops active trading.[30] *Id.* Per the Call Log, at 3:22 PM

---

[28] One would think that if the Trading Firm had been so important to the repeg, it would have sought a *faster* delivery schedule. But the result was the opposite.

[29] President has no Signal messages between him and Mr. Kwon on May 23, 2021, either because (a) there were no messages between the two or (b) they were deleted by the disappearing messages function in the President's Signal app, which the record demonstrates that he, not Mr. Kwon, turned on for their chat. *See* 56.1 Stmt. ¶ 101. The record also demonstrates that it was the Trading Firm that requested that communications be done through Signal, not Mr. Kwon. *See* 56.1 Stmt. ¶ 93, Ex. 48; *see also id.* ¶ 101, Ex. 42.

[30] The Trading Firm's "active" trading was categorized in bookstacker_UST. The Trading Firm's records from May 23 show UST being accumulated from "9:25 CDT to 10:01 [AM] CDT, after which time [the Trading Firm] pauses trading until [2]:30 CDT [PM]. From [2]:30 CDT to [10]:40 CDT [PM], bookstacker_UST accumulates another 6.7 million in UST. By the start of

CDT, Mr. Kwon called President, and called him again at 4:25 PM CDT and 4:55 PM CDT. *Id.* ¶ 102. And per the Trading Firm's trading records, with the exception of limited trading at around 2:30 PM CDT, the Trading Firm began trading again at approximately 5:35 PM CDT. *Id.*

But the most important reason that the SEC's depeg-related claims fail is that it has no admissible evidence that the Trading Firm's activities actually caused the repeg. The only evidence the SEC submits that seeks to prove that the "actual" cause of the May 2021 repeg was the Trading Firm is the Mizrach Report. But that report is so conceptually and methodologically flawed that it is inadmissible under Fed. R. Evid. 702, as demonstrated in the contemporaneously filed motion to strike Prof. Mizrach's opinions and the submissions by Defendants' expert Terrence Hendershott. Without Prof. Mizrach's opinions, the SEC has no evidence at all to support its claims regarding the May 2021 depeg, and those claims must be dismissed. *See City of Providence, Rhode Island v. Bats Glob. Markets, Inc.,* No. 14-CV-2811, 2022 WL902402, *14 (S.D.N.Y. Mar. 28, 2022) (discussing the necessity of applying *Daubert's* "gatekeeping requirement" to exclude an expert witness's testimony in its entirety, even where such exclusion "will have a significant impact on [] pending motions").

But even if the Court did not strike Prof. Mizrach's opinions, summary judgment would still be required on these claims because even with Prof. Mizrach's opinions the SEC cannot establish that the Trading Firm caused the repeg.[31] Defendants' expert (Prof. Terrence Hendershott, one of the most prominent market microstructure experts in the country and who has served as an expert witness for the SEC, the CFTC, and the DOJ) demonstrated that the Trading Firm's alleged purchases of UST did not restore the peg.  Among other things, Prof. Hendershott demonstrated that:

---

the day on May 24, bookstacker_UST held 19.5 million UST. From May 24 to May 25 6:03 CDT, the time that UST reached $0.99, bookstacker_UST purchased another 4.4 million UST, ending its position with a total of 24.0 million UST." *See* 56.1 Stmt. ¶ 99, Ex. 58, Ex. 1 ¶ 88).

[31] Professor Hendershott shows that the price of UST recovered and stabilized during the time period when the Trading Firm was ***not actively trading*** to move the price of UST, and the Court can grant summary judgment in these circumstances even if it does not strike Prof. Mizrach's opinions. *See Dalberth v. Xerox Corp.*, 766 F.3d 172, 189 (2d Cir. 2014). ("[S]ummary judgment is not per se precluded because there are conflicting expert[]" reports).

- Prof. Mizrach's methodology cannot estimate how other market participants would have traded, or how UST prices would have moved in the absence of the Trading Firm's trading. Even taking Dr. Mizrach's price impact estimates at face value, he did not establish that UST's re-peg would not have happened absent the Trading Firm's trading.

- Prof. Mizrach's analyses fail to account for the extent to which other market participants' trading contributed to UST's re-pegging. He ignores the fact that the majority of the Trading Firm's directional UST purchases (i) occurred at times *after* large price movements had already occurred, (ii) were made through passive orders, and (iii) constituted a small (just 2%) overall share of the active buy volume on KuCoin.

- Prof. Mizrach's price impact analysis is premised on a number of unstated, untested, speculative, and unsupported assumptions. Using his own model, Prof. Hendershott empirically tested the validity of these assumptions and found that none of them are sound. Correcting for these flawed assumptions substantially lowers Prof. Mizrach's price impact estimates, rendering his price impact findings unreliable. Indeed, correcting just one of them lowers his price impact by at least a factor of ten, and his errors are so interrelated that it is impossible to disentangle them to calculate the cumulative effect of the errors.

- Prof. Mizrach's analysis yields economically nonsensical results, which he did not even bother to test against the actual data to evaluate the reliability of his model.[32]

Where, as here, the SEC has no admissible evidence proving the existence of misstatements or omissions, summary judgment must be awarded to Defendants. *See Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d 199, 204 (2d Cir. 2009).

### B.    There is No Admissible Evidence Supporting Scienter

"On a motion for summary judgment ... the issue is whether the evidence, taken as a whole, could support a finding by a reasonable juror that defendants acted with the intent to deceive, manipulate, or defraud investors." *Strougo v. Barclays PLC*, 334 F. Supp. 3d 591, 596 (S.D.N.Y. 2018). There is no evidence supporting such a finding here. To the contrary, the admissible evidence reflects a lack of knowledge on part of Defendants as to (a) any involvement by the Trading Firm, (b) the "real reason" for the repeg beyond market and algorithmic forces, and (c) whether Chai "process[ed] or settle[d] transactions on the Terraform blockchain" (*see* AC), which as described herein, Defendants maintain was indeed the case.

Liability under Section 10(b) and Rule 10b-5 requires scienter—a conscious intent to defraud or a high degree of recklessness. *See Aaron v. SEC*, 446 U.S. 680, 686, 701-02 (1980); *Rothman v. Gregor*, 220 F.3d 81, 90 (2d Cir. 2000). The "Second Circuit sets a higher standard for securities fraud [than for fraud under Rule 9(b)] and requires the SEC to 'allege facts giving

---

[32] *See* 56.1 Stmt. ¶ 99, Ex. 58, Ex. 1 ¶¶ 10-13.

rise to a strong inference of fraudulent intent.'" *SEC. v. Parnes*, No. 01 CIV 0763 LLS THK, 2001 WL 1658275, at *5 (S.D.N.Y. Dec. 26, 2001) (quoting *SEC v. Blech*, 99 Civ. 4770(RWS), 2000 WL 288263, at *3 (S.D.N.Y. March 20, 2000)). Establishing recklessness is no easy burden—a defendant must have engaged in deceptive conduct "representing an *extreme departure* from the standards of ordinary care to the extent that the danger was either *known* to the defendant or *so obvious that the defendant must have been aware of it.*" *Gregor*, 220 F.3d at 90 (emphasis added) (internal citation and quotation marks omitted). As courts have repeatedly emphasized, "recklessness" is "not merely a heightened form of negligence" but rather "a state of mind approximating actual intent." *Novak v. Kasaks*, 216 F.3d 300, 312 (2d Cir. 2000) (internal citation and quotation marks omitted); *see Chill v. Gen. Elec. Co.*, 101 F.3d 263, 269 (2d Cir. 1996) (same).  Section 17(a)(1) also requires scienter, while liability under subsections (2) and (3) requires proof of negligence, that is, a showing that a defendant failed to exercise the standard of care that a reasonably prudent person would have exercised. *See SEC v. Yorkville Advisors, LLC*, 305 F. Supp. 3d 486, 510 (S.D.N.Y. 2018).

There is no genuine issue of material fact that Defendants did not act with scienter, which itself is sufficient to support summary judgment in this case. *See Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976); *see also In re N. Telecom Ltd. Sec. Litig.*, 116 F. Supp. 2d 446, 455 (S.D.N.Y. 2000) ("A failure of proof on any one of [the elements of a § 10(b) claim] 'necessarily renders all other facts immaterial' and requires summary judgment in favor of defendants."); *Robbins v. Moore Med. Corp.*, 894 F. Supp. 661, 669 (S.D.N.Y. 1995) ("The failure to offer any evidence of scienter is proper grounds for granting summary judgment."); *Mayer v. Oil Field Sys. Corp.*, 803 F.2d 749, 756 (2d Cir. 1986) (similar). Where a plaintiff "does not supply any specific facts that would suggest that [the defendant] acted egregiously," summary judgment on lack of scienter is appropriate. *Phillips v. Kidder, Peabody & Co.*, 933 F. Supp. 303, 319 (S.D.N.Y. 1996), *aff'd mem.*, 108 F.3d 1370 (2d Cir. 1997); *see also Steed Fin. LDC v. Nomura Sec. Int'l, Inc.*, 148 F. App'x 66, 69 (2d Cir. 2005) (affirming summary judgment for defendants because of a lack of "evidence sufficient to create a material issue of fact as to the required element of scienter").

### 1. Chai

The SEC asserts that Defendants knew that Chai did not process or settle transactions on the Terra blockchain (AC ⁋ 146) and that such knowledge stemmed principally from Mr. Kwon's role as "former director of Chai," his "senior technical position" held at TFL, and participation in technical discussions of how Chai worked. AC ⁋⁋ 146-47. The SEC may not continue to rely on those allegations, but must now present admissible evidence of scienter. *See Yorkville Advisors, LLC*, 305 F. Supp. 3d at 513. The SEC has not met this burden.

The SEC's allegation that Mr. Kwon's knowledge of any purported fraud is drawn from his personal involvement in writing TFL blockchain code or supervision of specific employees who programmed the LP Server (AC ⁋ 147) is contradicted by the evidence and testimony in this case; even the SEC's proposed expert opined that Mr. Kwon did not develop or maintain the LP Server software. *See, e.g.*, 56.1 Stmt. ¶ 134, Ex. 71 ¶¶ 35-36).

### 2. May 2021 Depeg

The SEC asserts that Defendants "knew that the Trading Firm had intervened to buy up UST" (AC ¶167) and that they knew "it was the deliberate actions of "human agents," that ultimately led to the restoration of the peg" (AC ¶166). But as demonstrated above, the SEC cannot even establish that the Trading Firm did cause the repeg. *Ipso facto*, it cannot demonstrate that either Defendant knew the thing the SEC cannot prove happened. The scienter inquiry thus ends there.

The SEC also tries to establish scienter for Mr. Kwon by arguing that he personally negotiated the arrangement with the Trading Firm to buy UST for the express purpose of restoring the peg. Again, the record contains no admissible evidence of this. In any event, on *summary judgment*, "mere involvement in the drafting of [documents], without an identification of specific, contrary information which [Defendants] had access to or knowledge of is insufficient for purposes of establishing an intent to defraud." *Yorkville Advisors, LLC*, 305 F. Supp. 3d 486 at 521. So even if there was admissible evidence that Mr. Kwon was involved in drafting or revising loan agreements (there is not), that would not suffice to carry the SEC's burden of proof and would require summary judgment against the SEC. *Id.* at 519.

("Accordingly, based on the lack of material evidence demonstrating scienter or negligence, the SEC is unable to proceed."); *Steed Fin. LDC v. Nomura Sec. Int'l, Inc.*, 148 F. App'x 66, 69 (2d Cir. 2005) (affirming summary judgment for defendants due to a lack of "evidence sufficient to create a material issue of fact as to the required element of scienter").[33]

## V.    THERE IS NO EVIDENCE OF DECEPTIVE ACTS

The SEC also lacks admissible evidence to support its *one* allegation of "deceptive act" relating to how Chai transactions were "reflected" on the blockchain (AC ¶134).[34] There is nothing "inherently deceptive" about recording transactions on the Terra blockchain. *See SEC v. Kelly*, 817 F. Supp. 2d 340, 344, 346 (S.D.N.Y. 2011). Nor could any users have been deceived by this activity as the SEC alleges, because TFL disclosed how Chai used the Terra blockchain and the SEC has not presented admissible evidence that anything about that disclosure was false. *Supra* Section IV.A.1. Thus, there is no genuine issue of material fact that Defendants did not engage in deceptive acts.

## VI.    THERE IS NO EVIDENCE SUPPORTING A FINDING THAT THE ALLEGED STATEMENTS WERE USED TO OBTAIN MONEY OR PROPERTY

The SEC cannot establish that Defendants obtained money "by means of" the alleged false statement upon which the SEC bases its Section 17(a)(2) claim. *SEC v. Wey*, 246 F. Supp. 3d 894, 915 (S.D.N.Y. 2017). When a direct benefit cannot be shown—such as here—this Court requires a showing that defendants were paid some kind of additional compensation, *e.g.*, "salary, bonus cash payments, [or] equity compensation" as a result of the alleged false statement. *See SEC v. MiMedx Group, Inc.,* No. 19 CIV. 10927 (NRB), 2022 WL 902784, at *10 (S.D.N.Y. Mar. 28, 2022) (defendant "obtained salary, bonus cash payments, and equity compensation … that was influenced by [defendant]s' misstated financial performance); *SEC. v.*

---

[33] That the SEC does not have access to Mr. Kwon and other individuals located abroad does not relieve the SEC of its burden on summary judgment. The SEC chose to bring this case when it did and chose to proceed with the record it has. It thus bears the risk of failing to meet its burden of proof.
[34] The AC does not allege a deceptive act in connection with the alleged misrepresentations and omissions, and because of this, the SEC's claims under Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder, and Securities Act Section 17(a)(1) and (3) fail for a lack of a deceptive act made with scienter. *See SEC v. Thompson*, 238 F. Supp. 3d 575, 591 (S.D.N.Y. 2017).

*Stoker,* No. 11 Civ. 7388 (JSR), 865 F. Supp. 2d 457, 463 (S.D.N.Y. 2012) (Rakoff, J.)
(defendant was paid double his yearly bonus as a result of the alleged misstatements). Here, there
is no admissible evidence to show a connection between any alleged false statement and money
obtained by Defendants.

The SEC points to a single instance where Defendants mentioned Chai in a meeting with
an institutional purchaser that entered into a token purchase agreement for LUNA tokens (AC ¶
151), but that does not support the inference that those LUNA tokens were purchased *by means
of* the alleged false statement for two reasons. *First*, the SEC bases its claim on the Defendants'
statement that "the Terraform blockchain was being used to process Chai transactions" and that
the purchaser pointed to an internal memo in which the purchaser cited "Chai's purported
transaction on the Terra[] blockchain." *Id.* But as demonstrated above, the SEC has not proven
any misstatements about Chai. *Second*, even putting aside that fatal problem, this allegation is
not supported by admissible evidence that any Defendant personally obtained money as a result
of this statement.[35] Thus, the SEC falls far short of the standard to survive summary judgment on
its Section 17(a)(2) claim, which requires "drawing all inferences in [Defendants'] favor,"
*CMEG Nymex Holding Inc. v. Optionable, Inc.*, 2012 WL 3683560, at *5 (S.D.N.Y. Aug. 24,
2012).

## VII.   THE COURT SHOULD STRIKE AMENDED COMPLAINT PARAGRAPH 173 IN ITS ENTIRETY BECAUSE THE SEC KNEW IT WAS FALSE WHEN ALLEGED

In a transparent attempt to create a false narrative that Defendants profited from the May
2022 depeg event, the SEC alleged in the final paragraph of its AC that Defendants "retained
valuable proceeds from the Terraform ecosystem" by transferring bitcoin to an un-hosted "cold"
wallet, and then, on a periodic basis since May 2022, transferring and continuing to transfer
Bitcoin from this wallet to a Swiss financial institution. AC ¶ 173. Thereafter, the SEC alleges,
the Defendants withdrew over $100 million in fiat currency from that Swiss bank. *Id.*

---

[35] For the avoidance of doubt, there is no allegation that Defendants *used* the alleged omission
about the Trading Firm to obtain money, and the SEC fails to dispute this. *See* Amended Reply,
ECF No. 38, at 18.

Because it had received full account statements for the Defendants from the Swiss financial institution before filing this case, the SEC knew that the allegations in paragraph 173 of the AC were false when it filed this case. *See* 56.1 Stmt. ¶ 140. In fact, when pressed to admit that the allegations in paragraph 173 are false, the SEC asserted that it could not admit or deny whether paragraph 173 was false after reasonable inquiry because Defendants did not produce information relating to their accounts with the Swiss financial institution. *Id*. ¶ 141. But paragraph 173 contains very specific allegations, and the SEC's own document production shows that it received Defendants' full account information from the Swiss financial institution in late 2022, before it filed this case. The SEC's responses to Defendants' RFAs are thus themselves false statements, as well as admissions that the SEC lacked any basis to allege paragraph 173 when this case was filed. *Id*. In any event, because the information provided to the SEC by the Swiss financial institution (56.1 Stmt. ¶ 140) refutes paragraph 173, there is no factual basis for the allegation and it should be stricken. *Scotto,* 143 F.3d at 114.

## VIII.   THERE IS NO GENUINE ISSUE OF MATERIAL FACT THAT THE SEC IS PRECLUDED FROM BRINGING ITS CLAIMS

For the purposes of preserving them for appeal, the Defendants hereby incorporate and reiterate legal arguments that the Court rejected in the MTD Order. *First*, Defendants assert that the SEC cannot establish personal jurisdiction over Defendants. *See* MTD at 5-7; Reply at 1-5. *Second*, the Major Questions Doctrine Bars the SEC's claims because Congress has not provided clear authority to the SEC to regulate and assert enforcement jurisdiction over the digital assets at issue here, including the stablecoin UST. *See* MTD at 7-9; Reply at 5-7. *Third*, the Due Process Clause bars the SEC's claims because Defendants did not receive "fair notice" that the digital assets here at issue would be treated as securities. *See* MTD at 10-11; Reply at 7-8. *Fourth*, the APA bars the SEC's Claims because the SEC has not engaged in the necessary notice-and-comment rulemaking in enforcing a rule that distinct digital assets are securities. *See* MTD at 11-12; Reply at 8-9. Although they are not pressing these arguments for the purposes of this motion, the Defendants incorporate them and do not waive them.

**<u>CONCLUSION</u>**

For all the foregoing reasons, the Court should grant summary judgment in its entirety with prejudice.

Dated:  October 27, 2023                    Respectfully submitted,

                                                          */s/ Douglas W. Henkin*
                                                          **DENTONS US LLP**
                                                          Douglas W. Henkin
                                                          David L. Kornblau
                                                          Louis A. Pellegrino
                                                          1221 Avenue of the Americas
                                                          New York, New York 10020
                                                          Tel: (212) 768-6700
                                                          douglas.henkin@dentons.com
                                                          david.kornblau@dentons.com

                                                          Mark G. Califano
                                                          1900 K Street, NW
                                                          Washington, DC 20006-1102
                                                          Tel: (202) 496-7500
                                                          mark.califano@dentons.com

                                                          *Counsel for Defendants Terraform Labs Pte. Ltd.*
                                                          *and Kwon Do Hyeong*