UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SECURITIES AND EXCHANGE COMMISSION,

                      Plaintiff,

      v.

TERRAFORM LABS PTE LTD. and
DO HYEONG KWON,

                    Defendants.

No. 1:23-cv-1346 (JSR)

---

**SECURITIES AND EXCHANGE COMMISSION'S MEMORANDUM OF
LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ...................................................................1

PROCEDURAL HISTORY ......................................................................2

THE UNDISPUTED RECORD EVIDENCE.....................................................3

I.    Terraform and Kwon Created the Terra Blockchain, Crypto Asset Securities, and Related Protocols ................................................................3

II.    Defendants Marketed Their Crypto Assets as Securities.........................5

    A.    Defendants Marketed LUNA and wLUNA as Investments ......................6

        1.    LUNA and wLUNA Purchasers Invested Money in a Common Enterprise ................................................................6

        2.    Defendants Represented to LUNA and wLUNA Investors that Defendants Would Undertake Efforts to Generate Profits .............7

    B.    Defendants Marketed UST in Combination with the Anchor Protocol as an Investment........................................................................9

        1.    Investors in UST and Anchor Protocol Invested Money in a Common Enterprise ................................................................9

        2.    Defendants Represented to UST and Anchor Protocol Investors that Defendants Would Undertake Efforts to Generate Profits .......9

    C.    Defendants Marketed MIR as an Investment...........................................11

        1.    MIR Purchasers Invested Money in a Common Enterprise...........11

        2.    Defendants Represented to MIR Investors that Defendants Would Undertake Efforts to Generate Profits...............................11

    D.    Defendants Engaged in Public Offerings of LUNA ................................13

        1.    Terraform's 2018 Luna Sales .....................................................13

        2.    Terraform's Public Distribution of LUNA through ▮▮▮▮ .............14

    E.    Defendants Engaged in Public Offerings of MIR.....................................16

        1.    MIR Sales Pursuant to SAFTs and on its Website ........................16

i

2.     MIR "Loans" to ▮ ........................................................16

F.     Defendants Directly Sold LUNA and MIR into Public Trading Markets ................................................................................16

G.     Defendants Offered and Sold and Effected mAsset Transactions Through Its Website.................................................................17

H.     Defendants Misled and Deceived Investors about Chai ...........................18

1.     Chai Processed Payment in Fiat Currency ....................................18

2.     Defendants Falsely Told Investors that Chai Processed Transactions on the Terra Blockchain .............................................20

3.     Defendants Copied Chai Transactions to the Terra Blockchain to Make It Appear as if They Had Actually Been Executed There .............................................................................................21

4.     Defendants' Chai Misrepresentations Were Made in Connection with Transactions in Defendants' Crypto Asset Securities............23

I.     Defendants Misled and Deceived Investors About the May 2021 Depeg .........................................................................................24

1.     Kwon Made a Secret Deal with ▮ in May 2021 ......................24

2.     Defendants Falsely Represented that the Terra Algorithm Alone Restabilized UST in May 2021.......................................................26

3.     Defendant's Misrepresentations About the May 2021 Depeg Were Material to Investors............................................................27

ARGUMENT ................................................................................................................29

I.     Defendants Offered and Sold Securities ................................................29

A.     Investors Tendered Money For Terraform's Securities.............................30

B.     Purchasers of Terraform's Securities Invested in a Common Enterprise ..................................................................................30

1.     UST Investors Invested in a Common Enterprise.........................31

2.      LUNA Investors Invested in a Common Enterprise .....................32

3.      MIR Investors Invested in a Common Enterprise.........................33

C.      Reasonable Expectation of Profits from the Efforts of Others .................34

1.      UST and Anchor Investors Had a Reasonable Expectation of Profits from Defendants' Efforts ....................................................34

2.      LUNA and wLUNA Investors Had a Reasonable Expectation of Profits from Defendants' Efforts .................................................35

3.      MIR Investors Had a Reasonable Expectation of Profits from Defendants' Efforts .......................................................................36

II.     Defendants Violated the Section 5 by Offering and Selling LUNA and MIR in Unregistered Transactions ......................................................................36

III.    Defendants Engaged in Transactions Involving mAssets.....................................39

A.      Transactions Involving mAssets Were Security-Based Swaps .................39

B.      Defendants Offered, Sold, and Effected Transactions Involving mAssets to Persons that Were Not "Eligible Contract Participants".........40

IV.     Defendants Committed Fraud ...............................................................................41

A.      Terraform and Kwon Engaged in Deceptive, Manipulative, and Fraudulent conduct...................................................................................41

B.      Terraform and Kwon Made Materially False and Misleading Statements ...............................................................................................44

C.      Terraform and Kwon Knew or Were Reckless in Not Knowing that Their Conduct Was Deceptive and that Their Statements Were False and Misleading ........................................................................................47

D.      Defendants' Misconduct Was in Connection with the Purchase or Sale of Securities...................................................................................48

E.      Defendants Used the Means and Instrumentalities of Interstate Commerce .................................................................................................48

F.      Terraform and Kwon Obtained Money or Property ...................................49

G. Kwon Is Liable for Terraform's Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder as a Control Person Under Exchange Act Section 20(a)...........................................................49

**CONCLUSION** .................................................................................................................50

# TABLE OF AUTHORTIES

**Cases**

*Audet v. Fraser*,

    605 F.Supp.3d 372 (D. Conn. 2022) ..................................................................... 32, 34

*Basic, Inc. v. Levinson*,

    485 U.S. 224 (1988) .............................................................................................. 44

*Case v. City of New York*,

    408 F.Supp.3d 313 (S.D.N.Y 2019) ..................................................................... 29

*Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,

    756 F.2d 230 (2d Cir. 1985) ................................................................................. 36

*In re Lehman Bros. Mortg.Backed Secur. Litig.*,

    650 F.3d 167 (2d Cir. 2011) ................................................................................. 49

*In re Smith Barney Transfer Agent Litig.*,

    884 F.Supp.2d 152 (S.D.N.Y. 2012) .................................................................... 43

*In re Vivendi, S.A. Secs. Litig.*,

    838 F.3d 223 (2d Cir. 2016) ................................................................................. 45

*In re Wonsover,*

    Exchange Act Release No. 41123, 1999 WL 100935 (Mar. 1, 1999) ................... 37

*Karimi v. Deutsche Bank Aktiengesellschaft,*

    607 F.Supp.3d 381, 393 (S.D.N.Y. 2022) ............................................................ 46

*Revak v. SEC Realty Corp.*,

    18 F.3d 81 (2d Cir. 1994) ........................................................................... 30, 31, 33

*SEC v. Aly*,

    2018 WL 1581986 (S.D.N.Y. March 27, 2018) ........................................................... 44

*SEC v. Airborne Wireless Network*,

    2023 WL 5938527 (S.D.N.Y. Sept 12, 2023) ...................................................... 47, 48

*SEC v. Carrillo Huettel LLP*,

    2017 WL 213067 (S.D.N.Y. Jan. 17, 2017) ............................................................. 46

*SEC v. Carrillo Huettel LLP*,

    2017 WL 1162199 (S.D.N.Y. Mar. 28, 2017) ......................................................... 46

*SEC v. Cavanagh*,

    445 F.3d 105 (2d Cir. 2006) ..................................................................................... 37

*SEC v. China Northeast Petroleum Holdings Ltd.*,

    27 F.Supp.3d 379 (S.D.N.Y. 2014) ......................................................................... 48

*SEC v. Chinese Consol. Benev. Ass'n, Inc.*,

    120 F.2d 738 (2d Cir. 1941) ..................................................................................... 37

*SEC v. Collector's Coffee, Inc.*,

    2023 WL 6453709 (S.D.N.Y. Oct. 4, 2023) ............................................................ 42

*SEC v. Constantin*,

    939 F.Supp.2d 288 (S.D.N.Y. 2013) ................................................................. 47, 48

*SEC v. Edwards*,

    540 U.S. 389 (2004) ................................................................................................. 34

*SEC v. Farmer*,

    2015 WL 5838867 (S.D. Tex. Oct. 7 2015) ................................................. 44, 45, 47

*SEC v. Genovese*,

    553 F.Supp. 3d 24 (S.D.N.Y. 2021) ............................................................. 41

*SEC v. GPL Ventures, LLC*,

    2022 WL 158885 (S.D.N.Y. Jan. 18, 2022) .................................................. 41

*SEC v. Greenstone Holdings, Inc.*,

    954 F.Supp.2d 211 (S.D.N.Y. 2013) ........................................................... 37

*SEC v. Hurgin*,

    2022 WL 4448561 (S.D.N.Y. Sept. 23, 2022)............................................. 49

*SEC v. Infinity Grp. Co.*,

    212 F.3d 180 (3d Cir. 2000) ....................................................................... 31

*SEC v. Kern*,

    425 F.3d 143 (2d Cir. 2005) ....................................................................... 36

*SEC v. Kik Interactive Inc.*,

    492 F.Supp.3d 169 (S.D.N.Y. 2020) ........................................... 30, 32, 34, 36

*SEC v. Laura*,

    2023 WL 4238153 (E.D.N.Y. June 28, 2023) ............................................. 46

*SEC v. LBRY*,

    639 F.Supp.3d 211 (D.N.H. 2022)............................................................... 30

*SEC v. Lek Secur. Corp.*,

    276 F.Supp.3d 49 (S.D.N.Y. 2017) ...................................................... 49, 50

*SEC v. Milan Cap. Grp., Inc.*,

    2000 WL 1682761 (S.D.N.Y. Nov. 9, 2000)............................................... 47

*SEC v. Ripple Labs, Inc.*,

    2023 WL 4507900 (S.D.N.Y. July 13, 2023) ............................................................. 29

*SEC v. Rio Tinto plc*,

    41 F.4th 47 (2d Cir. 2022) ........................................................................................... 42

*SEC v. Rio Tinto plc*,

    2019 WL 1244933 (S.D.N.Y. March 18, 2019) .......................................................... 48

*SEC v. Sason*,

    433 F.Supp.3d 496 (S.D.N.Y. 2020) .................................................................... 41, 49

*SEC v. SG Ltd.*,

    265 F.3d 42 (1st Cir. 2001) ................................................................................. 30, 31

*SEC v. Stoker*,

    865 F.Supp.2d 457 (S.D.N.Y. 2012) .......................................................................... 49

*SEC v. StratoComm Corp.*,

    652 F. App'x 35 (2d Cir. 2016) ........................................................... 45, 46, 47, 48

*SEC v. Stubos*,

    634 F.Supp.3d 174 (S.D.N.Y. 2022) .......................................................................... 42

*SEC v. Sugarman*,

    2020 WL 5819848 (S.D.N.Y. Sept. 30, 2020) ........................................................... 42

*SEC v. Syron*,

    934 F.Supp.2d 609 (S.D.N.Y. 2013) .......................................................................... 49

*SEC v. Telegram Grp. Inc.*,

    448 F.Supp.3d 352 (S.D.N.Y. 2020) ................................................................ 30, 36, 38

*SEC v. Terraform Labs Pte. Ltd.*,

    2023 WL 4858299 (S.D.N.Y. July 31, 2023) .......................................................... passim

*SEC v. Thompson*,

    238 F.Supp.3d 575 (S.D.N.Y. 2017) ................................................................ 44, 46

*SEC v. Thompson*,

    732 F.3d 1151 (10th Cir. 2013) ............................................................................ 29

*SEC v. Tourre*,

    2013 WL 2407172 (S.D.N.Y. June 4, 2013) ........................................................ 48

*SEC v. Universal Express., Inc.*,

    475 F.Supp.2d 412 (S.D.N.Y. 2007) ............................................................. 37, 40

*SEC v. Wey*,

    246 F.Supp.3d 894 (S.D.N.Y. 2017) .................................................................... 41

*SEC v. W.J. Howey Co.*,

    328 U.S. 293 (1943) ................................................................................... 29, 32

*UCAR Intern., Inc. v. Union Carbide Corp.*,

    2004 WL 137073 (S.D.N.Y. Jan. 26, 2004) ................................................... 43, 44

*United States v. Martoma*,

    2013 WL 6632676 (S.D.N.Y. Dec. 17, 2013) ...................................................... 33

*Wonsover v. SEC*,

    205 F.3d 408 (D.C. Cir. 2000) ........................................................................... 38

**Statutes**

7 U.S.C. § 1a ............................................................................................................. 39, 40

15 U.S.C. § 77b ................................................................................................... 29, 31, 33

15 U.S.C. § 77e ............................................................................................. 40

15 U.S.C. § 78c ................................................................................... 29, 39, 40

15 U.S.C. § 78f ............................................................................................. 40

 **Rules**

17 C.F.R. § 230.502 ...................................................................................... 38

Fed. R. Civ. P. 56 ........................................................................................... 29

*Registration Process for Security-Based Swap Dealers and Major Security-Based Swap*

   *Participants,*

   Exchange Act Release No. 75611 (Aug. 5, 2015), 80 FR 48963 (Aug. 14, 2015)) ..... 41

Pursuant to Federal Rule of Civil Procedure 56, Plaintiff Securities and Exchange Commission ("SEC") respectfully submits this memorandum of law in support of its motion for summary judgment on all the SEC's claims against Defendants Terraform Labs Pte Ltd. ("Terraform") and Do Hyeong Kwon ("Kwon") (collectively, "Defendants").

## PRELIMINARY STATEMENT

Terraform and Kwon orchestrated a fraudulent scheme that ultimately led to $45 billion in market loss, including devastating losses for U.S. investors. Defendants fabricated Terra blockchain activity to create the appearance of real world transactions on the blockchain that did not exist. And they lied to investors about the stability of Terraform's so-called stablecoin, while concealing the secret deal Defendants had entered into with a third party to save the asset from collapse. When this scheme unraveled, investors in Terraform's crypto asset securities lost nearly everything. Defendants, meanwhile, cashed out more than ███████ in fiat currency.

Starting in 2018, Defendants offered and sold an array of crypto asset securities, aggressively marketing them to the public as profitable investments. Defendants created and touted a purportedly "principal protected" and "yield-bearing" protocol, dubbed the Anchor Protocol, which promised to pay 19-20% interest on Terraform' s so-called stablecoin TerraUSD ("UST"). UST was purportedly pegged at $1 based on an algorithm tying UST to another one of Defendants' crypto asset securities, the LUNA token, which Defendants called the "equity" of the Terra ecosystem. Defendants promised investors that LUNA's value would appreciate the more the Terra blockchain was used, and repeatedly touted the managerial and entrepreneurial efforts they would and did undertake to accomplish that goal.

Kwon and Terraform then engaged in a scheme to defraud the public about use and stability of these crypto asset securities. First, Defendants told investors that a popular Korean

online payment platform called Chai, was using the Terra blockchain to process merchant transactions, when it was not.  To further deceive investors, Defendants replicated the Chai payments on the Terra blockchain in millions of what Kwon internally referred to as "fake transactions" using wallets and stablecoins that Defendants owned and controlled.

Second, Defendants also represented to the public that each UST token was safely and automatically pegged to the U.S. Dollar via a blockchain algorithm linking it with LUNA.  In May 2021, when UST slipped below and then returned to its $1 peg, Kwon told investors that UST had "automatically self-healed" due to the ingenuity of Defendants' algorithm, which had, according to Terraform, prevailed over the "decision-making of human agents."  In reality, there was no automatic self-healing.  Defendants had struck a secret side-deal with a third party to push UST back up to $1, in exchange for selling that party LUNA at dramatically reduced prices.

In addition to defrauding investors, Defendants engaged in unregistered public offerings of certain of their crypto asset securities.  Defendants distributed LUNA and MIR to intermediaries that were expected to, and did, resell those securities into public trading markets accessible to investors in the U.S.  Defendants also directly offered and sold LUNA and MIR to investors through public trading public markets accessible to U.S. investors.  Defendants did not register any of these offers or sales of their crypto asset securities with the SEC.

As set forth below and in the SEC's Statement of Undisputed Material Facts Pursuant to Local Civil Rule 56.1 ("SEC 56.1"), the evidence that establishes Defendants' violations is clear, undisputed, and overwhelming.  The Court should grant summary judgment in the SEC's favor.

## PROCEDURAL HISTORY

On February 16, 2023, the SEC filed a complaint against Defendants and amended that complaint on April 3, 2023.  ECF Nos. 1, 25.  On July 30, 2023, the Court denied Defendants'

motion to dismiss.  ECF No. 51.  Kwon is incarcerated in Montenegro and did not appear at his

October 9, 2023 deposition.  *See* ECF No. 61.  Discovery closed on October 13, 2023.

**THE UNDISPUTED RECORD EVIDENCE**

**I.     Terraform and Kwon Created the Terra Blockchain, Crypto Asset Securities, and Related Protocols**

From April 2018 through May 2022 (the "relevant period"), Terraform[1] and Kwon

developed, managed, and marketed an "ecosystem," which included the Terra blockchain and

related blockchain protocols[2], together with several crypto assets that came to include UST,

LUNA, wLUNA, MIR, and mAssets ("crypto asset securities").  56.1 ¶¶ 19-116. Defendants'

stated goal for this ecosystem was to achieve "mass adoption" of Terraform's so-called

stablecoins, including UST (purportedly tied to the U.S. dollar), which Defendants claimed were

tied to the price of LUNA – the "equity" of the Terra blockchain.  *Id*. ¶¶ 20-24, 59, 61-64.

Defendants launched the Terra blockchain around April 23, 2019, with the name

"Columbus."  *Id*. ¶¶ 25, 189.  Kwon wrote most of the code for this blockchain version and then

maintained and updated it, with Terraform employees, in over 100 code repositories used to

perform key updates.  *Id*. ¶¶ 19, 27-28.  Over time, Terraform developed and launched four

upgraded versions of the Terra blockchain.  *Id*. ¶ 28.

---

[1] Terraform operated directly, and through subsidiaries, including Terraform Labs Limited, a British Virgin Islands entity ("Terraform BVI"), which had no employees of its own and was controlled entirely by Terraform. 56.1 ¶¶ 3-9.  Kwon – as co-founder of Terraform, and Chief Executive Officer ("CEO"), ███████████████████████ – was the ultimate decision-maker for both Terraform and Terraform BVI.  56.1 ¶ 17.

[2]  A blockchain or distributed ledger is a peer-to-peer database spread across a network of computers that records all transactions in theoretically unchangeable, digitally recorded data packages.  A blockchain "protocol" is a type of code, software, or algorithm that governs how a feature of a blockchain operates.

A.     <u>LUNA and wLUNA</u>:  Terraform coded 1 billion LUNA tokens into the Terra blockchain at launch, all of which Terraform controlled.  *Id*. ¶ 25.  Defendants then sold ██████████████ of LUNA from 2018 to late 2021, touting that investors would receive fees from transactions on the blockchain and that the LUNA token would appreciate in value with increased use of the Terra blockchain.  *Id*. ¶¶ 51, 57, 62-63, 67, 117, 180, 204.

In December 2020, Defendants developed and launched a blockchain "bridge" called "Shuttle," which allowed LUNA holders to create "wrapped" versions of LUNA ("wLUNA").  *Id*. ¶¶ 40, 42.  The wLUNA tokens were identical to LUNA, except that they could be traded on the Ethereum blockchain, as opposed to the Terra blockchain.  *Id*. ¶ 42.  Investors accessed Shuttle through Terraform's publicly available website.  *Id*. ¶ 40.

B.     <u>UST and the Anchor Protocol</u>:  Defendants also created the so-called algorithmic stablecoin, UST, which was first "minted," or created, in December 2019.  *Id*. ¶¶ 22, 26.  Defendants represented publicly that UST's value was "pegged" at $1 through an algorithm.  *Id*. ¶ 23.  Under this algorithm, UST was purportedly created and destroyed (or "burned") in parallel with LUNA, such that holders of UST could swap 1 UST for $1 worth of LUNA, and vice versa.  *Id*.  Defendants claimed the algorithm functioned to keep UST's price pegged at $1 by creating an arbitrage opportunity, such that if UST slipped in price, traders could profit by buying UST at the lower price and exchanging it for $1 worth of LUNA.  *Id*. ¶ 24.  In theory, this process incentivized traders to reduce UST's supply and increase its price until it reached a dollar.  *Id*.  And vice versa, as more UST was created, the supply of LUNA would decrease and, therefore, increase LUNA's price.  *Id*. ¶¶ 23-24.

In June 2020, Defendants began marketing UST as a "yield bearing" stablecoin together with the Anchor Protocol, a savings protocol Terraform described as the "gold standard for

passive income on the blockchain." *Id*. ¶¶ 20, 30, 82; Ex. 44 at 1.  In March 2021, Terraform

launched the Anchor Protocol, and marketed its yield to retail investors as a "[s]table 20% APY

… high-yield safe-haven in uncertain market conditions."  *Id*. ¶¶ 30, 32, 82; Ex. 133.  With

promised returns of 20%, the Anchor Protocol drove the increase of UST from just under 300

million in January 2021, to approximately 18.5 billion UST by May 2022, with 14 billion of that

UST (nearly 74%) deposited in the Anchor Protocol.  SEC 56.1 ¶¶ 31-36.

> C.  <u>MIR tokens and mAssets</u>:  In December 2020, Defendants launched the "Mirror

Protocol," which included the MIR token, whose value would be based upon, among other

things, usage of the Mirror Protocol.  *Id*. ¶ 38.  Using the Mirror Protocol, investors could engage

in transactions involving "mirrored assets" or "mAssets" that would "mirror" the price of mostly

U.S. equities. *Id*. ¶ 39

## II.     **Defendants Marketed Their Crypto Assets as Securities**

> Throughout the relevant period, Defendants—through nearly 100 employees worldwide,

including at least 42 in the United States—publicized a continuous drumbeat of statements aimed

at marketing and promoting the Terra ecosystem, its crypto asset securities, and Defendants'

efforts to grow and expand the Terra ecosystem.  *Id*. ¶¶ 10, 18, 21-22, 29-30, 43-47, 59-60, 62-

70, 77, 81-88, 100-110.[3]  In these statements, Defendants marketed to investors, potential

investors, and the public, Kwon's and Terraform's experience and "deep relevant expertise"

which would be deployed with the goal of increasing usage of the Terra blockchain, thereby,

driving up the price of LUNA.  *Id*. ¶ 65, 59-60, 62-70; Ex. 109 at 3.

---

[3] U.S. employees included Terraform's general counsel, head of operations (now current CEO), head of business development, general manager for the Anchor Protocol, head of ecosystems, head of communications, director of special projects.  *Id*. ¶ 10.  The engineering team consisted of a number of software developers and engineers led by ████████████, who was known as Terraform's chief technology officer ("CTO").  *Id*. ¶ 11.

Defendants made these statements publicly through press releases, interviews, and public messaging platforms on Telegram, Discord, and Twitter, and via posts and monthly "Community Updates" to an open-writing platform on Medium.com, all available to U.S. investors.  SEC 56.1 ¶¶ 43-44.  Defendants also directly communicated with investors and potential investors, including U.S. individuals, to promote, market, offer, and sell Terraform's crypto asset securities in person, through email, and private messages on these platforms.[4]  *Id.* ¶ 45.

Defendants also directly targeted U.S investors by, among other things, soliciting investments from, and negotiating and executing agreements with U.S. individuals and entities. *Id.* ¶¶ 14, 46, 51, 135.  Defendants sent Terraform employees, including Kwon, to meet with existing and potential investors in the U.S. and to market, offer, and sell Terraform's crypto asset securities.  *Id.* ¶ 46.  In February 2022, Defendants partnered with the Washington Nationals to have the word "Terra" placed on every seat behind home plate and elsewhere around the stadium in Washington, D.C.  *Id.* ¶ 47.

## A.      Defendants Marketed LUNA and wLUNA as Investments

### 1.      LUNA and wLUNA Purchasers Invested Money in a Common Enterprise

Investors tendered fiat currency and/or crypto assets to obtain LUNA and wLUNA.  *Id.* ¶ 51. Each unit of LUNA or wLUNA is fungible with and indistinguishable from any other unit. *Id.* ¶ 52. LUNA and wLUNA prices were the same, and they were exchangeable with each other on a one-to-one basis. *Id.* ¶¶ 42, 52.  Thus, investors in LUNA and wLUNA shared equally in

---

[4] Defendants also developed and operated multiple websites accessible in the U.S., which they also used to post promotional materials and information and to facilitate transactions involving its crypto asset securities.  SEC 56.1 ¶¶ 29, 37, 147.  Investors used these websites to, for instance, access Terraform systems and create Terra wallets to hold and transact in Terraform's crypto asset securities, and track their Terra blockchain transactions.  *Id.* ¶¶ 29, 37, 147-148.

price increases and decreases, such that if one investor profited, all investors did so as well. *Id.* ¶ 52.

In addition, Defendants told LUNA investors that "funds raised during both private and public rounds will be used for a temporary fiat reserve and other ongoing expenses." *Id.* ¶ 55; Ex. 51 at 5. Specifically, Defendants represented that LUNA investment proceeds would be fed back into the system "in furtherance of the establishment and operation of the systems," which included building and expanding the Terra ecosystem. SEC 56.1 ¶ 55; Ex. 26 at 2. And, in fact, Defendants received LUNA sales proceeds into bank accounts and wallet addresses that were used to fund Terraform's business operations. SEC 56.1 ¶¶ 56-57; Declaration of Donald S. Hong ("Hong Decl.") ¶¶ 21, 22, 25.

Finally, Defendants also held and retained large amounts of LUNA – Terraform approximately ████████ and Kwon ████████, of which he still held ████████ as of August 2022. SEC 56.1 ¶¶ 25, 58.

### 2. Defendants Represented to LUNA and wLUNA Investors that Defendants Would Undertake Efforts to Generate Profits

Defendants pitched LUNA as an investment that would increase in value based upon Defendants' efforts to increase usage of the Terra blockchain. *Id.* ¶ 59. As Kwon explained in an April 7, 2021 tweet: "A bet on the moon [LUNA] is very simple: it goes up in value (inc. scarcity) the more Terra money [i.e., UST] is used; it goes down in value (inc. dilution) the less Terra money [i.e., UST] is used. The moon's fate in the long run is tied to how widely the money gets used and transacted." *Id.* ¶ 62; Ex. 105. In a later tweet that same day, Kwon claimed that "in the long run, $Luna value is actionable – it grows as the ecosystem grows" and offered LUNA holders the option to "sit back and watch me kick ass." SEC 56.1 ¶ 64; Ex. 108. Other Terraform employees made similar statements, referring to LUNA as Terraform's "equity"

and claiming that "[a] bet on LUNA is a bet on the success of the Terra economy."  SEC 56.1 ¶¶ 45-46, 59, 63, 68; Ex. 93 at 11; Ex. 106B beginning at 4:20; Ex. 107 at 4.

Almost daily, Defendants and their employees made similar representations, including through regular investor updates, about a wide range of efforts they were undertaking to increase usage of the Terra blockchain, and, therefore, LUNA's (and wLUNA's) value. SEC 56.1 ¶¶ 45, 59-68.  For instance, Defendants represented that they would and did: a) develop and launch protocols to encourage use of the Terra blockchain and its crypto assets, including the Mirror Protocol and the Anchor Protocol, both of which required the use of UST; b) collaborate with and fund third parties to build applications on the Terra blockchain; and c) maintain and upgrade the Terra blockchain.  *Id*. ¶ 66-68.

Defendants also publicized their efforts to create and maintain public trading markets for LUNA (and wLUNA), creating profit opportunities for investors.  *Id*. ¶¶ 69, 121, 142-146.  Specifically, Defendants told investors that they would and did undertake efforts to get Terraform's crypto asset securities, including LUNA and MIR, listed on crypto asset trading platforms, such Binance and KuCoin, which were available to U.S. investors, and Coinbase, which is headquartered in the U.S.  *Id*.

As Defendants engaged in and advertised these efforts, the market price of LUNA, and wLUNA, increased from under a dollar in January 2021 to a high of around $119.18 in April 2022, before it crashed to under a penny in May 2022.  *Id*. ¶ 76; Ex. 125.  Even as the Terra ecosystem was crashing, Defendants continued to represent that they were undertaking efforts to protect the Terra ecosystem, including that Kwon was "[d]eploying more capital" and "[c]lose to announcing a recovery plan for $UST," and asking investors to "hang tight."  SEC 56.1 ¶ 77; Exs. 126, 127.  These statements were important to investors, including U.S. investors, who

viewed Kwon and Terraform exactly as they had represented themselves – managers of the Terra ecosystem with the expertise necessary to ensure its expansion and growth for the benefit of investors.  SEC 56.1 ¶¶ 72-75, 77.

### B. Defendants Marketed UST in Combination with the Anchor Protocol as an Investment

#### 1. Investors in UST and Anchor Protocol Invested Money in a Common Enterprise

Investors tendered fiat currency and/or crypto assets to obtain UST and then deposited their UST into the Anchor Protocol, through Terraform-operated websites.  *Id*. ¶¶ 37,78. Terraform used the resulting pool of UST to lend to Anchor Protocol borrowers.  *Id*. ¶ 79.  Those borrowers paid lending fees and staked collateral that was used to generate the returns paid to the Anchor Protocol investors.  *Id*.  Returns generated by the Anchor Protocol were paid out to investors on a pro rata basis in direct proportion to the amount of UST they had deposited into the Anchor Protocol.  *Id*. ¶¶ 79-80.

#### 2. Defendants Represented to UST and Anchor Protocol Investors that Defendants Would Undertake Efforts to Generate Profits

Terraform began marketing UST in combination with the Anchor Protocol even before the protocol was officially launched in March 2021.  *Id*. ¶ 30.  These materials made clear that the Anchor Protocol was intended for investment by retail investors.  *Id.*  For instance, in a June 2020 whitepaper, the Anchor Protocol was described as "an attempt to give *the main street investor* a single, reliable, rate of return across all blockchains" *Id*.; Ex. 44 at 2 (emphasis added).

As it had with LUNA and wLUNA, Terraform continued its stream of promotional and marketing statements, including on websites, and Twitter and Medium accounts they controlled. SEC. 56.1 ¶¶ 20, 30, 81-84, 86-88.  These statements repeatedly emphasized the 20% returns, which they described as a "principal-protected stablecoin savings product . . .that pays a stable

interest rate" and "a better way to save." *Id.* ¶¶ 30, 90-92; Ex. 63 at 2; Declaration of Matthew

Hyde ("Hyde Decl.") ¶ 17.  Kwon tweeted that it would be "commercial suicide" not to take

advantage of the returns promised by the Anchor Protocol.  SEC 56.1 ¶ 81; Ex. 131.

In these statements, Defendants also represented that they would and did undertake

efforts to engineer, develop, and manage the Anchor Protocol, including facilitating and

broadening user access to the protocol (which would presumably increase the reliability of the

promised returns).  SEC 56.1 ¶¶ 82-84.  For instance, in May 2021, Terraform tweeted that it had

released a new product that would allow "third parties to seamlessly integrate 20% yield on

$UST to expand stable savings opportunities to a greater audience." *Id.* ¶ 84; Ex. 135.  Later that

month, Terraform tweeted that it had hired a new general manager to oversee and manage the

Anchor Protocol.  SEC 56.1 ¶ 83.  And in October 2021, Terraform announced that it had

engineered an option for users to make deposits into the Anchor Protocol directly from

Terraform's primary website. *Id.* ¶ 84; Ex. 136.

Defendants also publicly promised to undertake efforts to manage and fund the Anchor

Protocol "yield reserve," which was used to pay the 20% returns to investors.  SEC 56.1 ¶¶ 86-

87.  On at least two occasions in 2021 and 2022, when revenue from the Anchor Protocol was

insufficient to cover the 20% returns, Defendants told investors they would and did fund the

Anchor Protocol's yield reserve so that so that the promised interest would be paid. *Id.*; Ex. 137;

Ex. 138.

These representations were important in the investment decisions of investors, including

U.S. retail investors, who considered UST in combination with the Anchor Protocol to be a safe

investment.  SEC 56.1 ¶¶ 90-92.

### C.     Defendants Marketed MIR as an Investment

#### 1.     MIR Purchasers Invested Money in a Common Enterprise

To obtain MIR tokens, investors paid fiat currency and/or crypto assets.  SEC 56.1 ¶ 93. MIR tokens were fungible, all had the same price, and were exchangeable with each other on a one-to-one basis.  *Id*. ¶ 98.  Thus, MIR investors shared equally in MIR price increases and decreases.  *Id*.

Defendants represented to MIR investors that their investment would be used to develop and fund Terraform's operations, specifically, the Mirror Protocol.  *Id*. ¶¶ 94, 97.  Prior to launch, Defendants sold MIR tokens to investors pursuant to "Simple Agreements for Farmed Token" or "SAFTs," in a "Mirror Protocol strategic fundraise."  *Id*. ¶¶ 94, 96, 135; Exs. 143-144. Consistent with these representations, MIR sales proceeds were received into Terraform bank accounts and crypto asset wallet addresses that were used by Terraform to fund its operations, including the Mirror Protocol.  SEC 56.1 ¶ 95; Hong Decl. ¶¶ 22-23, 29-32, 35.  In fact, Defendants represented that all the MIR SAFT proceeds were spent by Defendants on developing the Mirror Protocol.  SEC 56.1 ¶ 97.

#### 2.     Defendants Represented to MIR Investors that Defendants Would Undertake Efforts to Generate Profits

Just as with LUNA, wLUNA, and UST in combination with Anchor, Terraform began to issue a stream of promotional and marketing statements specifically promoting the Mirror Protocol and the MIR token leading up to its launch in December 2020.  *Id*. ¶¶ 101-106. Defendants set up accounts in the name of the Mirror Protocol on Twitter and Medium and developed new websites to promote the Mirror Protocol and instruct on its use, through which investors, including U.S. retail investors, could access the Mirror Protocol.  *Id*. ¶¶ 43-44

And as with LUNA, Defendants represented that MIR token holders would receive fees from transactions involving the Mirror Protocol and that the price of MIR would increase as use of the protocol increased. *Id.* ¶¶ 100-101. For instance, Kwon provided to investors slides that explained that the "Mirror token will accrue value from network fees and governance" and described the "trading fee revenues" that MIR token holders could receive. *Id.* ¶ 101; Ex 148 at 11, 20. Kwon also provided investors with a revenue projections table that estimated the price of MIR based on how much the Mirror Protocol was used. SEC 56.1 ¶ 101; Ex. 148 at 7.

Defendants also promised to and did undertake efforts to develop, promote, and manage the Mirror Protocol to increase its usage, and, thus, the value of MIR. SEC 56.1 ¶¶ 102-111. For instance, in the months prior to the December 2020 launch, Kwon emailed investors that "the team has been hard at work bringing product to market" and described Terraform's efforts to build the Mirror Protocol website, including hiring a firm to audit the code, and a "new MIR token distribution scheme" intended to "encourage wide participation" in the Mirror Protocol. *Id.* ¶ 103; Ex. 150A at 1. In a later email to investors, Kwon highlighted Defendants planned efforts to publicize the Mirror Protocol, including a marketing campaign to accompany the launch. SEC 56.1 ¶ 104; Ex. 151.

Defendants also touted their efforts to expand the Mirror Protocol by publishing new listings of MIR on crypto asset trading platforms and "dashboards" purporting to show the growth of the Mirror Protocol. SEC 56.1 ¶ 107. In a January 2021 "Ask Me Anything" session focusing on the Mirror Protocol, two U.S.-based Terraform employees claimed that "TFL is doing [its] best with its global suite of talent and organizing stuff like trading competitions and referral campaign to increase visibility for Mirror." *Id.* ¶ 108; Ex. 155 at 7. In June 2021, Terraform's New York-based director of special projects presented to an online "Defi Summit"

audience touting Terraform's success in developing and launching the Mirror Protocol, noting

that "we've grown [the Mirror Protocol] to two billion [dollars] in total value locked and a

billion [dollars] in liquidity."  SEC 56.1 ¶ 110; Exs. 106A at 5:2-7, 106B beginning at 4:20.

Consistent with these representations, Defendants engaged in numerous entrepreneurial

and managerial efforts to encourage the success of the Mirror Protocol, including actively

marketing the Mirror Protocol, employing a "product manager" to oversee the Mirror Protocol,

acting as a liquidity provider in mAsset markets, and developing, coding, and launching

improvements to the protocol including a Version 2 of the Mirror Protocol.  SEC 56.1 ¶ 111.

### D.      Defendants Engaged in Public Offerings of LUNA

#### 1.      Terraform's 2018 LUNA Sales

From approximately April 2018 through December 2018, as part of one continuous

offering, Terraform sold at least ▮▮▮▮▮▮▮ LUNA to institutional buyers, including at least one

U.S. entity and other offshore entities controlled by U.S. entities.  *Id*. ¶ 117.  These agreements

were all signed Kwon or Terraform's CFO, CJ Han.  *Id*.  Defendants communicated directly

with U.S. individuals regarding these agreements. *Id*.  These agreements did not restrict

purchasers' ability to resell the assets to U.S. investors or into public trading markets.  *Id*. ¶ 119.

These sales were a first step in a public offering in which it was expected that purchasers

would distribute their LUNA into public trading markets.  *Id.* ¶¶ 118-122.  Specifically, these

purchasers acquired LUNA at discounts of 40% or more to expected market prices, thus

incentivizing them to resell their LUNA into public trading markets at a profit. *Id*. ¶ 119;

Declaration of Karthik Raju ¶ 10.  And Defendants took steps to protect LUNA's expected

market price by implementing a graduated schedule for delivery of the LUNA.  SEC 56.1 ¶ 120.

Defendants later modified that schedule to implement a "vesting rule change that will drastically

reduce price uncertainty" after purchasers expressed concerns about "market volatility" of LUNA's price. *Id.* ¶ 122; Ex. 43 at 3.

Terraform further promised these purchasers that Defendants would undertake efforts to establish the public trading markets into which they could sell their LUNA. SEC 56.1 ¶¶ 69, 121. For instance, the purchase agreements contemplate an "Initial Token Launch," which the agreements defined as "the online sale and/or distribution of Tokens by the Vendor to the general public in a campaign to be initiated and conducted by the Vendor." *Id.* ¶ 118; *see e.g.*, Ex. 28 at 3. And Defendants undertook efforts to get LUNA listed on a number of trading platforms, including platforms accessible to U.S. investors. SEC 56.1 ¶ 145.

Ultimately, many of these initial LUNA purchasers, did sell their LUNA into public trading markets, often within a year of receiving the LUNA. *Id.* ¶ 123. For example, in a July 11, 2018 agreement, an institutional buyer, ████████████████████, agreed to pay ████████████ to purchase LUNA tokens from Terraform. *Id.* ¶ 51. ████████ LUNA tokens were subject to the described vesting and distribution schedule designed to protect the public trading market price of LUNA. *Id.* ¶¶ 120, 122. Defendants began distributing the tokens shortly after Terra's launch. *Id.* ¶¶ 122-123. After receiving them, ████████ immediately began selling the LUNA tokens and less than a year from the date its LUNA Token Sale Agreement was executed. *Id.* ¶ 123.

### 2.    Terraform's Public Distribution of LUNA through ████

In November 2019 and September 2020, Terraform entered into two agreements to "loan" ████████ and ████████ LUNA tokens, respectively, to a subsidiary of a U.S. crypto asset trading firm, ██████████████, which is part of the ██████████████ ████. *Id.* ¶¶ 124, 130; Exs. 166, 172; ██████████████████████. Kwon

negotiated and signed both agreements.  SEC 56.1 ¶¶ 124-134.  Both agreements included

options to purchase the LUNA tokens, which ▆▆▆ did by wiring ▆▆▆▆▆ from a U.S. bank

account to Terraform's bank account. *Id*. ¶¶ 124-134. Neither agreement contained any

restriction on ▆▆▆ reselling its LUNA into public trading markets or to U.S. investors. *Id*. ¶¶

124, 130

These "loans" also represented a step toward a public offering in which ▆▆▆ was

expected to sell its LUNA into public trading markets.  *Id*. ¶¶ 124-134.  Kwon confirmed this in

a January 2020 email, announcing that "we've agreed to enter a partnership with ▆▆▆▆▆▆

in which ▆▆▆ will "deploy its own resources to improve liquidity of Terra and Luna," which

Kwon described as "rather lackluster" up to that point.  Kwon added that "[t]o provide initial

Luna liquidity Terraform Labs has loaned ▆▆▆▆▆▆▆Luna." *Id*. ¶ 126; Ex. 168.

▆▆▆ then agreed to continue to "thicken up LUNA markets further" in connection with

the September 2020 agreement for ▆▆▆▆ LUNA.  SEC 56.1 ¶ 129; Ex. 170.  To receive this

LUNA, ▆▆▆ had to meet certain vesting benchmarks that required ▆▆▆ to transact in

Terraform crypto assets.  SEC 56.1 ¶ 130. From January to April 2021, ▆▆▆ achieved its

vesting benchmarks and received each tranche of LUNA as it vested. *Id*.¶131-133.  This deal

was renegotiated in May 2021, and beginning on or about September 2021, ▆▆▆ began to

receive LUNA monthly without vesting conditions. *Id*. ¶¶ 131, 211-214.

Terraform ultimately delivered a total of approximately ▆▆▆▆▆ LUNA tokens to

▆▆▆ under the two agreements before the May 2022 crash. *Id*. ¶¶ 127, 133.  As expected, ▆▆▆

began trading the LUNA on public trading markets within six months. *Id*. ¶¶ 127-128.

### E.   Defendants Engaged in Public Offerings of MIR

#### 1.   MIR Sales Pursuant to SAFTs and on its Website

In the fall of 2020, Defendants, through Terraform BVI, sold MIR tokens directly to purchasers, including U.S. persons, pursuant to SAFT agreements. *Id*. ¶ 135. These sales also represented a first step in a public offering in which it was contemplated that purchasers could sell their MIR into public trading markets, which Terraform undertook efforts to establish. *Id*. ¶¶ 135-137. There were no restrictions on resales in public trading markets or to U.S. investors. *Id*. ¶ 136. Terraform also offered and sold MIR tokens through its Mirror Protocol website ending in mirror.finance, which was accessible to U.S. *Id*. ¶ 147.

#### 2.   MIR "Loans" to ▮▮▮

In agreements dated December 10, 2020 and May 7, 2021, Defendants "loaned" at least ▮▮▮▮ MIR tokens to ▮▮▮ for approximately ▮▮▮▮▮. *Id*. ¶ 138. These "loans" also represented a first step in a public offering in which it was expected that ▮▮▮ would sell its MIR into public trading markets in "[p]retty much the same agreement [the parties] had for [the] initial LUNA agreement." *Id*. ¶¶ 138-140; Ex. 196. Neither MIR agreement contained any restriction on ▮▮▮ ability to resell the MIR tokens into public trading markets or to U.S. investors. SEC 56.1 ¶ 138. In fact, ▮▮▮ was expressly required to trade MIR tokens into public trading markets and provide Defendants with reports of its trading, which ▮▮ did. *Id*.; Ex. 140. Defendants delivered at least ▮▮▮▮ of these MIR tokens to ▮▮▮ pursuant to these agreements, which ▮▮ then sold into public trading markets. SEC 56.1 ¶ 140.

### F.   Defendants Directly Sold LUNA and MIR into Public Trading Markets

During the relevant period, Terraform also sold billions of dollars of LUNA and MIR tokens directly and continuously into public trading markets through transactions on crypto asset

trading platforms.  *Id*. ¶ 141.  Specifically, Defendant sold LUNA and MIR almost continuously

from their account on Binance, which is accessible to U.S. investors.  *Id*.  From August 2020 to

May 2022, Defendants sold a total of 593.48 million LUNA tokens directly to purchasers almost

daily. *Id*.; Hong Decl. ¶¶ 38-39, 41.  From April 2021 to April 2022, Defendants also sold 45.43

million MIR tokens almost daily directly to purchasers.  *Id*.

Defendants enabled these public trading market sales by negotiating and executing

agreements with crypto asset trading platforms, including Coinbase, which is based in the U.S.,

to "list" LUNA and MIR.  *Id*. ¶¶ 145-146.

### G. Defendants Offered and Sold and Effected mAsset Transactions Through Its Website

Through the Mirror Protocol, an investor could mint an mAsset by depositing collateral,

such as UST, equal to 150% or more of the value of the reference asset of the mAsset.  *Id*. ¶ 113.

The investor then received an mAsset intended to be equal in price to the reference asset.  *Id*.

Terraform facilitated the creation and liquidation of mAssets by controlling the pricing

mechanism by which mAssets were priced.  *Id*. ¶ 116.  If the reference asset price increased or

decreased, the price of mAsset did so as well.  *Id*. ¶ 114.  If the reference asset price increased by

a certain amount such that the collateral requirement was no longer satisfied, the investor was

required to deposit additional collateral to meet those requirements.  *Id*.  If the investor did not

deposit the requisite additional collateral, that investor could lose some or all of the mAsset

and/or collateral to liquidation.  *Id*.  An investor could terminate the transaction by making a

final payment in the form of the mAsset, at which point, the investor was entitled to receive

payment back in the form of the entire collateral.  *Id*. ¶ 115.

Investors could access the Mirror Protocol through Terraform's website, which was

available in the U.S. and to retail investors, where the investor could choose to mint, trade, or

buy mAssets.  *Id.* ¶¶ 148-149.  As Terraform explained on its website, "mAssets mimic the price behavior of real-world assets and give traders anywhere in the world open access to price exposure without the burdens of owning or transacting real assets."  *Id.* ¶ 112; Ex. 159A at 1.  In fact, Defendants deliberately marketed mAssets as a way to "vastly expand access" to U.S. equities to "anyone with access to the blockchain."  SEC 56.1 ¶ 101; Ex. 148 at 14.  Despite this, Defendants admit that they did not collect information about investors that acquired mAssets through the mirror.finance website. SEC 56.1 ¶ 149.  Thus, Defendants made no efforts to obtain financial, identifying, or other information from investors acquiring mAssets through its website. *Id.*  And Defendants made no other effort to determine whether potential or actual investors met any financial or other qualifications.  *Id.*

### H.      Defendants Misled and Deceived Investors about Chai

From mid-2019 through at least March 2022, Defendants engaged in a scheme to defraud investors by artificially increasing Terra blockchain activity with "fake transactions" that Defendants falsely represented as a real-world use of Terraform's stablecoins.  *Id.* ¶¶ 150-207. Specifically, Defendants falsely claimed that a Korean company, Chai Corporation ("Chai"), was using the Terra blockchain to process and settle commercial transactions for Korean consumers at retail establishments using KRT, a stablecoin purportedly tied to the Korean Won.  *Id.* ¶¶ 168-182.  In fact, Chai was processing and settling transactions in fiat currency and Defendants were replicating or "mirroring" the Chai transactions on the Terra blockchain.  *Id.* ¶¶ 188-201.

### 1.      Chai Processed Payments in Fiat Currency

Chai was a Korean payment processing company, similar to PayPal, launched around June 2019.  *Id.* ¶¶ 150-151.  Chai began as part of Terraform, developed by Kwon and Terraform's co-founder, Daniel Shin.  Until early 2020, Chai and Terraform were closely

associated with each other, sharing office space and overlapping personnel.  *Id.* ¶¶ 150, 153.

During that time, Kwon led the development of Chai's technology and he sat on Chai's board of

directors until May 2022.  *Id.* ¶¶ 152-153.

According to Chai's ███████████████, "[e]ach of [Chai's] three main

business lines (Chai e-wallet, Chai card, and I'mport) involved traditional payment processes of

bank accounts, credit cards, and debit cards – all using fiat currency."  *Id.* ¶ 155; ██████

███████████████.  In Chai's e-wallet business, customers linked a bank

account to their Chai wallet and transferred Korean Won into that wallet to make payments.

SEC 56.1 ¶¶ 154-155.  Chai paid participating merchants by transferring fiat currency to the

merchant's bank account.  *Id.* ¶¶ 154-156; Exs. 211B at 5, 212A, 212B.

As Chai's ████ put it, with one extremely limited exception, "Chai did not use the

blockchain at all." SEC 56.1 ¶ 159; ███████████.  As Kwon knew, Korean regulations

restricted Chai's ability to use blockchain technology and was the reason that Kwon and Shin

separate Terraform from Chai.  SEC 56.1 ¶¶ 161-165.  In a March 2, 2020 email to Terraform

employees, Kwon explained "[p]ost split, Chai will double down on growing as a successful

payments company within the bounds of regulatory tolerance," adding that "[m]uch of that will

have nothing to do with Terra."  *Id.* ¶ 163; Ex. 224 at 1.  Thereafter, Kwon took control of

Terraform and moved its offices, while Shin took control of Chai.  SEC 56.1 ¶ 164.

At first, Defendants were careful to describe Chai and Terraform as "work[ing] together

to *find ways to utilize Terra's blockchain* technology" [emphasis added].  *Id.* ¶ 166; Ex. 229 at 2.

When Kwon learned on June 13, 2019 that Chai's marketing director had told a reporter that

"Chai is currently testing with Terra's blockchain technology," Kwon responded "that's factually

incorrect.  We are not using any terra blockchain technology."  SEC 56.1 ¶ 167; Exs. 230A, 230B at 3.

### 2.  Defendants Falsely Told Investors that Chai Processed Transactions on the Terra Blockchain

Yet, less than two months later, Defendants began to falsely represent that Chai transactions were being processed and settled on the Terra blockchain.  SEC 56.1 ¶ 168.  For instance, in a July 26, 2019 Community Update, Kwon wrote "[i]t's been 40 days since Chai launched using the Terra Protocol, and it already it is one of the most heavily used blockchain applications in existence."  *Id.*; Ex. 117 at 1.  Forty days prior to July 26, 2019 was June 16, 2019 – merely 3 days after Kwon internally said Chai was "not using any terra blockchain technology."  SEC 56.1 ¶¶ 167-168.  In an October 2019 Medium post, Terraform again touted the growth of Chai, falsely representing that "we replace the complicated value chain with a single blockchain layer," as if Chai customers and merchants were transacting directly on the Terra blockchain.  *Id.* ¶ 169; Ex. 231 at 5-6.

Thereafter, Defendants repeatedly referenced Chai's millions of users and thousands of daily transactions, misleadingly using Chai's success as a proxy for the success of the Terra ecosystem. SEC 56.1 ¶¶ 170-172.  For instance, in February 2020 email to investors, including U.S.-based institutional investors, Kwon claimed that "Chai sits at 1.18 million active accounts today, and we passed the 1M mark on Jan 14th."  *Id.* ¶ 172; Ex. 234 at 1. To further highlight Chai's purported use of the blockchain, Kwon commissioned the development of a dashboard called "Chaiscan," for which a link was included on the homepage of Terraform's website. SEC 56.1 ¶¶ 178-179.

In an April 2020 Medium post, Terraform wrote that Chai had "partnered with 15+ major local banks to facilitate convenient fiat on/off ramps" to "facilitate[] efficient settlement with

20

merchants," falsely suggesting that Korean banks were facilitating the conversion of Korean

Won to KRT. *Id.* ¶ 175; ECF No. 30-13.  Kwon knew this was false, because as of September

21, 2020, he was still trying to negotiate a deal with a third party to "launch crypto onramps onto

CHAI." SEC 56.1 ¶ 175; Ex. 238 at 2.

Kwon also falsely claimed that Chai merchants were directly accepting KRT as payment.

SEC 56.1 ¶¶ 173-174, 181-182.  For instance, in a February 2020 public Discord chat, Kwon

claimed that "[r]ight now Chai has 12 merchants, all of whom get settled in KRT on the

Terraform blockchain."  *Id.* ¶ 173; Ex. 237.  In April 2021, Kwon again falsely claimed that by

"settl[ing with] merchants directly in stablecoin, we're able to cut down settlement times."  SEC

56.1 ¶ 181; Ex. 242A at 11.  In March, 2022, Kwon again claimed that Chai provided "a large

network of *merchants and users that are willing to transact using Terra*" (emphasis added).

SEC 56.1 ¶ 182; Exs. 243A, 243B at 7, 243C.

> ### 3. Defendants Copied Chai transactions to the Terra Blockchain to Make It Appear as if They Had Actually Been Executed There

Defendants furthered their deception by replicating or "mirroring" Chai transactions on

the Terra blockchain to make it appear as if they had "settled" on the Terra blockchain. SEC 56.1

¶¶ 185-201.  At certain times, these fake Chai transactions represented the majority of Terra

blockchain activity.  *Id.* ¶ 206; Declaration of Jonathan Kol ("Kol Decl.") ¶ 18.  As described by

a Chai employee, Chai "process[ed] transaction[s] outside the blockchain" and then "wr[o]te a

record on the Terra blockchain in parallel."  SEC 56.1 ¶ 185; Ex. 244 at 1.

The concept of "fake transactions" first appears in a May 9, 2019 Slack communication

in which Kwon suggests to Shin that he will "do fake transactions on the mainnet to generate

staking returns of SDT."[5]  SEC 56.1 ¶ 187; Ex. 245 at 6, 10.  Shin responded "right, but we probably need a story then as to … where the transactions are coming from."  *Id.*  Kwon later responds "[I] can just create fake transactions that look real which will generate fees and we can wind down as chai grows," adding "[a]ll power to those that can prove its fake because I will try my best to make it indiscernible."  *Id.*  Shortly thereafter, Kwon directed Paul Kim, Terraform's head of infrastructure, and Yun Yeo, a Terraform developer, to develop a server, dubbed the "LP Server," to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  SEC 56.1 ¶¶ 188-201.

Communications within Terraform and Chai confirm that the LP Server functioned ▮ ▮▮▮▮▮▮▮▮▮▮ just as Kwon intended.  *Id.* ¶¶ 189-194.  In October 2020, Paul Kim told Terraform developer that the LP Server "▮▮▮▮▮▮▮▮▮▮▮▮▮▮."  *Id.* ¶ 200; Ex. 259 at 2.  The engineer responds "ahhh yes ok, this is mirroring chai traffic on chain kinda" and Paul Kim responded "yes."  *Id.*  Similarly, Chai's lead engineer confirmed to Chai's ▮ that "there's no crypto going on within Chai," but that Chai sent transactions to Terraform to be "mirrored."  SEC 56.1 ¶ 186; ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

Defendants carried out the scheme by directing the movement of KRT among more than 1.2 million wallets that Terraform created and controlled.  SEC 56.1 ¶¶ 195-197; Ex. 252 at 2.  Terraform's control over both the wallets and the KRT is apparent from the fact that Terraform was able to move KRT to *and from* these wallets. SEC 56.1 ¶¶ 196-197, 199.  For instance, in a December 2019 communication, Kwon directs the wallets be funded with Terraform's KRT and then asks for confirmation that "[a]fter 14 days, the coins automatically return to the lp server, right?"  *Id.* ¶ 196; Exs. 254A, 254B at 2-3.

---

[5]      SDT was another Terraform purported stablecoin.

When directly asked about Chai's use of the Terra blockchain, Kwon has tried to disclaim personal knowledge.  SEC 56.1 ¶¶ 202-203.  For instance, in a June 22, 2022 chat, a Terraform employee asked Kwon whether he knew when "KRT started being used in Chai" and Kwon responded, "I don't know man I haven't used the thing much."  SEC 56.1 ¶ 203; Ex. 262 at 2.  When asked about Chai during the investigation, Kwon claimed that he did not "have access to, you know, Chai's payment servers or its technical stack…"  SEC 56.1 ¶ 202; Ex. 2 at 274:3-21.  When asked whether the Chai payments could be happening through traditional payment methods and merely "copied" onto the blockchain, Kwon responded "I mean, it's possible that that was happening on test net." *Id.* at 275:23-276:5.

In fact, Kwon knew Chai payments were not processed and settled on the Terra blockchain.  SEC 56.1 ¶¶ 161, 175, 183-184, 187-194.  When Chai's ███ confronted him in September 2021 about the fact the Chai did not use the blockchain, Kwon did not deny it or express surprise, but rather responded that he didn't "give a f[***] about Chai." SEC 56.1 ¶ 183; ████████████████ .

### 4. Defendants' Chai Misrepresentations Were Made in Connection with Transactions in Defendants' Crypto Asset Securities

Defendants used these misrepresentations about Chai to solicit millions of dollars from investors, including U.S. investors, by linking the Chai transactions to the value of LUNA and wLUNA.  SEC 56.1 ¶¶ 204-207.  For instance, in a June 2020 Medium post Terraform noted that "[t]he fundamental driver of transactions fees in the Terra network is the broad adoption of CHAI by consumers and merchants," adding that "[t]his capture of transaction value ultimately accrues to the Luna holders."  *Id*. ¶ 205; Ex. 264 at 2.  Defendants also provided a slide deck to at least one U.S.-based institutional investor, claiming that ████████ in transaction fees from the fake Chai transactions had accrued to LUNA holders.  SEC 56.1 ¶ 204; Ex. 263 at 12.

In addition, Kwon and other Terraform employees directly misled U.S. investment firms about Chai's use of the Terra blockchain, to convince them to invest in LUNA.  SEC 56.1 ¶¶ 206-207.  For instance, in soliciting ███████, a New York-based firm, Kwon represented that "the driver of growth on the Terra blockchain [was] Chai," whose transactions were "settled on the Terra blockchain."  *Id.* ¶ 206; Kol Decl. ¶ 15.  Ultimately, ██████ invested █ to purchase LUNA from Terraform, which might not have occurred if they had known that "settlement of Chai transactions did not occur through the blockchain," SEC 56.1 ¶ 206; Kol Decl. ¶ 23, 26. Defendants gave a similar pitch to ████, a California-based firm which eventually decided to purchase ███████ in LUNA tokens. SEC 56.1 ¶ 207; Declaration of Arjun Sethi ("Sethi Decl.") ¶¶ 12-14; Sethi Exs. 3, 8.

I.     **Defendants Misled and Deceived Investors about the May 2021 Depeg**

From approximately May 23, 2021 through at least March 2022, Defendants falsely represented that the algorithm linking UST and LUNA had successfully repegged UST to the $1 following a temporary depeg in May 2021, when, in fact, Kwon made a secret deal with a third party, ████, to restore the peg by buying up large amounts of UST.  SEC 56.1 ¶¶ 208-226. Investors, including U.S. investors, found these representations material to their decisions to buy and hold UST (including as offered and sold with Anchor Protocol).  *Id.* ¶¶ 227-231.

1.     **Kwon Made a Secret Deal with ████ in May 2021**

From 2019, when UST was first coded onto the Terra blockchain, until mid-May 2021, there were no significant market disruptions to UST.  *Id.* ¶ 208.  On May 19, 2021, UST's price began to fall below $1. *Id.* ¶ 209.  By May 23, 2021, UST's price dropped significantly. *Id.*  That morning and throughout the day, Kwon communicated repeatedly with a ██████████████ ██████, about the depeg and efforts to restore UST's peg to the dollar.  *Id.* ¶ 210.  In these

communications, Defendants reached a deal in which ▮▮ agreed to take action to restore UST's peg and Defendants agreed to modify the September 2020 LUNA agreement such that ▮▮ would no longer be required to achieve any vesting conditions to receive its LUNA.  *Id.* ¶¶ 211, 216.  The deal allowed ▮▮ to obtain LUNA at ▮▮ each, during a time when it was trading at more than ▮ times that price.  *Id.* ¶¶ 212-213.  When asked about this May 23, 2021 deal, both ▮▮ and ▮▮ co-founder, ▮▮▮▮▮ invoked their rights under the Fifth Amendment of the United States Constitution. *Id.* ¶ 211.

In a Zoom call on May 23, 2021, while discussing the UST depeg, ▮▮ told a group of ▮▮ employees that "I spoke to Do and he's going to vest us." *Id.* ¶ 214; ▮▮▮▮▮▮▮▮▮▮. Thereafter, ▮▮ carried out ▮▮ side of the bargain by directing employees to modify ▮▮ existing trading strategy of entering automated trades and, instead, to place manual buy orders for large amounts of UST, which were then executed by ▮▮ traders.  SEC 56.1 ¶ 214; ▮▮▮▮▮. UST's price began to restabilize and after several days was restored to near $1.  SEC 56.1 ¶ 215.

As Kwon was negotiating the deal with ▮▮, he discussed the negotiations with other Terraform employees. *Id.* ¶ 217.  For example, on May 23, Kwon called Terraform's head of business development and told him that Terraform was "speaking to ▮▮ about a solution." *Id.*; Exs. 273 at 4.  Shortly thereafter, Kwon told Terraform's head of communications of plans to deploy capital through ▮▮. SEC 56.1 ¶ 217; Ex. 7 at 73:15-76:12.  That same day, Kwon announced to Terraform employees that the "[p]eg had to be defended" and that "▮▮ was deploying ▮▮ to buyback UST" to defend the peg.  SEC 56.1 ¶ 218; Ex. 7 at 80:12-82:22; Ex. 274 at 1.  Later that year, Kwon told Terraform employees that if ▮▮ hadn't stepped

in, Terraform "actually might've been f[****]ed and that ▮▮▮ "saved our ass" during the May

2021 depeg.  SEC 56.1 ¶ 219; Ex. 275 at 2; Ex. 7 at 100:8-102:2; Ex. 11 at 67:24- 69:25.

### 2.      Defendants Falsely Represented that the Terra Algorithm Alone Restabilized UST in May 2021

Despite deliberately bringing ▮▮▮ in to help restore the peg in May 2021, Terraform and

Kwon repeatedly made public statements falsely suggesting that Terraform's algorithm, had

successfully restored UST's peg to the $1, while – at the same time – failing to disclose the side

deal with ▮▮▮ .  SEC 56.1 ¶¶ 220-224.

Beginning on May 23, 2021, Kwon posted a series of 18 tweets, to "help [] understand

what's been going on *& how the protocol(s) have responded recently*" (emphasis added) –

falsely suggesting that it was "the protocols" that responded to the depeg rather than Terraform

and ▮▮▮ .  *Id.* ¶ 220; Ex. 42 at 1/, 5/, 16/, 17/, 18/.  The next day, on May 24, 2021, Terraform

and Kwon issued self-congratulatory tweets about the recovery that "Terra's not going

anywhere, frens. $1 parity on UST already recovered" and "I see.  Back to work" accompanied

by a screenshot reflecting UST's price as a $1.00.  SEC 56.1 ¶ 221; Exs. 276, 277.  Later that

same day, Terraform issued a series of 29 tweets touting the triumph of "algorithmic, calibrated

adjustments of economic parameters" over the "stress-induced decision-making of human agents

in time of market volatility."  SEC 56.1 ¶ 222; Ex. 47 at 3/, 14/, 16/, 24/.  In these tweets,

Terraform described the reliability of the UST $1 peg as the "lynchpin for the entire [Terra]

ecosystem" and boasted that it has purportedly proven its reliability in a "black swan" event that

was "as intense of a stress test in live conditions as can ever be expected."  SEC 56.1 ¶ 222; Ex.

47 at 16/, 24/.

Defendants continued to make similar materially misleading statements over the course

of the next year, suggesting the May 2021 depeg was a "test" for UST and an indicator of the

reliability of UST's peg, having survived the test.  SEC 56.1 ¶ 223.  For instance, in a June 2021 Community Update on Medium, Terraform claimed that "the **UST Peg has healed** after a **period of high volatility** for the market across the board.  Industry-wide volatility stress-tested the **stability mechanism** of the Terra protocol and posed **unprecedented challenges to Anchor Protocol**, but has also been incredible test of the protocol's ability to continue providing stable yields (18-20%) under extreme conditions" (emphasis in original).  *Id.*; Ex. 116 at 1.  In a March 2022 Twitter talk show, in which he discussed the May 2021 depeg, Kwon noted "it took a few days for the slippage cost to *naturally heal* back to spot" and explained that "the *protocol automatically self-heals* the exchange rate" (emphasis added). SEC 56.1 ¶ 224; Ex. 278 at 26-27.

Not only did Defendants never disclose to the public the May 23, 2021 deal with ▮▮▮, Kwon explicitly instructed Terraform employees not to disclose ▮▮▮'s involvement in public communications.  SEC 56.1 ¶ 225; Ex. 7 at 102:3-108:2.  In mid-2021, Kwon also pressured his head of communications to publish material that Kwon knew was false to cover up ▮▮▮'s role in the May 2021.  *Id.*  Specifically, Kwon requested Terraform's head of communications issue an announcement for a "Project Dawn," which Kwon admitted was a cover story to justify the monthly delivery of LUNA tokens to ▮▮▮ under the terms of its May 2021 deal with Defendants.  *Id.*  When Mr. Curran refused to publish the announcement, Kwon published it on Medium under his own name. *Id.*; Ex. 279.

### 3.  Defendant's Misrepresentations About the May 2021 Depeg Were Material to Investors

Defendants' misrepresentations about the May 2021 depeg were material to U.S. investors, including retail investors, who unaware that any third party had intervened, continued to buy and hold LUNA and UST on the belief that the algorithm alone had worked to restore the peg.  SEC 56.1 ¶¶ 227-231; Sethi Decl. ¶¶ 15; Declaration of Boris Revsin ¶¶ 15-16.  For

27

instance, a retail investor from Vermont invested nearly $85,000, including part of his child's college fund, in UST and the Anchor Protocol, which he viewed as a high yield savings account offered by Defendants.  SEC 56.1 ¶¶ 91, 228; Hyde Decl. ¶¶ 1, 7-25.  Although he was aware of the May 2021 depeg, he "understood that the mint/burn algorithm was automated," and because there were no statements to the contrary, he assumed that UST had repegged due to this algorithm.  *Id*.  He viewed the stability of the peg as significant to the security of his investment in UST and the Anchor Protocol.  *Id*.

Similarly, a retail investor from California understood that UST in the Anchor Protocol was "a safe and reliable stablecoin that you could use to earn returns" – so reliable that he took out the largest home equity loan he could and put all $400,000 into UST and the Anchor Protocol.  SEC 56.1 ¶¶ 90, 227; Declaration of Nader George ("George Decl.") at ¶ 1, 6-25.  He also was aware of the May 2021 events, and he interpreted the quick repeg as "confirmation that UST's peg to the $1 was reliable."  *Id.*  And an investor from New York put nearly $188,000 of his life savings in what he understood was a "stable, low-risk" investment, trusting that UST would "remain pegged to the $1 through its relationship with LUNA, and that this peg was stable and reliable."  SEC 56.1 ¶ 92; Declaration of Arash Vakil ("Vakil Decl.") ¶¶ 1, 5-11, 19-20.

After the UST peg was restored in May 2021, investors poured additional billions of dollars into the Terra ecosystem.  SEC 56.1 ¶ 231.  However, in May 2022, UST depegged permanently from $1 and its price fell to near zero, as did the prices of Terraform's other crypto assets in the Terra ecosystem, including LUNA, wLUNA, and MIR – wiping out more than $45 billion of total market value. *Id.* ¶ 49; Defendants' Answer (ECF No. 53) at ¶¶ 170, 171.  The May 2022 crash also wiped out the investments of many U.S. and retail investors, such as the Vermont investor who lost part of his child's college fund, the New York investor who lost his

life savings, and the California investor who will likely lose his house.  SEC 56.1 ¶¶ 90-92; Hyde

Decl. ¶¶ 24-25; Vakil Decl. ¶ 20; George Decl. ¶¶ 24-25.  Yet, Defendants have managed to cash

out more than ███████.  SEC 56.1 ¶ 50; Hong Decl. ¶ 42-48.

## ARGUMENT

"Summary judgment is appropriate when the record shows that there is no genuine

dispute as to any material fact and that the moving party is entitled to judgment as a matter of

law."  *Case v. City of New York*, 408 F.Supp.3d 313, 319 (S.D.N.Y 2019) (applying Fed. R. Civ.

P. 56(a)).  "If the moving party meets its initial burden, the burden then shifts to the opposing

party to establish a genuine dispute of material fact."  *Id.* at 320 (citations omitted).

## I.    Defendants Offered and Sold Securities

A "security" includes "an investment contract."  15 U.S.C. §§ 77b(a)(1), 78c(a)(10).  The

Supreme Court defined an "investment contract" in *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946)

as a "contract, transaction, or scheme" involving an investment of money in a common enterprise

with a reasonable expectation of profits to be derived from the efforts of a promotor or third

party.  *Id.* at 298-99, 301.  In deciding whether a given transaction or scheme amounts to an

"investment contract" under Howey, courts must analyze the "substance" – and not merely the

"form" – of the parties' economic arrangement by looking at the "totality of the circumstances"

surrounding that arrangement.  *SEC v. Terraform*, 2023 WL 4858299, at *11 (S.D.N.Y. July 31,

2023) (citation omitted).

Whether Defendants offered or sold "investment contracts" is a legal question that can

and should be resolved based on facts that cannot reasonably be disputed.  *SEC v. Ripple Labs,*

*Inc.*, 2023 WL 4507900, at *8 (S.D.N.Y. July 13, 2023) (citing *SEC v. Thompson*, 732 F.3d

1151, 1160-61 (10th Cir. 2013) (collecting cases)).  Courts in this district and elsewhere applying

*Howey* have consistently recognized that offers and sales of crypto assets can constitute offerings of investment contracts (or would so constitute if the allegations are proved) if all of *Howey*'s elements are satisfied.  *See e.g.*, *Terraform*, 2023 WL 4858299, at *18 (denying motion to dismiss); *SEC v. Kik Interactive Inc.*, 492 F.Supp.3d 169, 177 (S.D.N.Y. 2020) (granting SEC summary judgment); *SEC v. Telegram Grp. Inc.*, 448 F.Supp.3d 352, 365 (S.D.N.Y. 2020) (granting preliminary injunction); *SEC v. LBRY, Inc.*, 639 F.Supp.3d 211, 222 (D.N.H. 2022) (granting SEC summary judgment).

The undisputed evidence shows that each of the Defendants' crypto assets "and the means by which they were offered and sold … amounted to a transaction or scheme that exhibited [*Howey*'s] three qualities."  *Terraform*, 2023 WL 4858299, at *11.

### A.      Investors Tendered Money for Terraform's Securities

There is no dispute that purchasers made an investment of money, either through fiat currency or crypto assets, for each crypto asset – LUNA, wLUNA, MIR, and UST, thereby satisfying the first prong of *Howey*.  SEC 56.1 ¶¶ 51,78, 93.  *See Telegram*, 448 F.Supp.3d at 368-69 ("providing dollars or euros in exchange for the future delivery of" a digital asset "establishe[s]" an "investment of money" under *Howey*).  "The determining factor is whether an investor chose to give up a specific consideration in return for the separable financial interest with the characteristics of a security."  *SEC v. SG Ltd.*, 265 F.3d 42, 48 (1st Cir. 2001) (citation omitted).  The exchange of crypto assets also constitutes an investment of money.  *See, e.g., Kik*, 492 F.Supp.3d at 177-78.

### B      Purchasers of Terraform's Securities Invested in a Common Enterprise

The Second Circuit has held that a common enterprise can be established by showing "horizontal commonality" *Revak v. SEC Realty Corp.*, 18 F.3d 81, 87 (2d Cir. 1994), and district courts in this Circuit also recognize "strict vertical commonality."  *Telegram*, 448 F.Supp.3d at

369.  Horizontal commonality exists if each investor's fortunes are "tie[ed]…to the fortunes of the other investors," by the pooling of investor assets or a "pro-rata distribution of profits." *Revak*, 18 F.3d 81 at 88.  Horizontal commonality thus exists where "each investor was entitled to receive returns directly proportionate to his or her investment stake" as an "increase in the value of the investment." *SG Ltd.*, 265 F.3d at 46-47, 51.  Vertical commonality similarly exists where the financial fortunes of the investor are tied to the financial fortunes of the promoter. *Revak*, 18 F.3d at 88 ("Strict vertical commonality requires that the fortunes of investors be tied to the fortunes of the promoter.") (emphasis and citation omitted).  The undisputed facts here demonstrate a common enterprise for the Terraform crypto asset securities.

### 1.    UST Purchasers Invested in a Common Enterprise

The undisputed facts establish that, as alleged in the complaint, Defendants marketed, offered, and sold UST together with the Anchor Protocol, which, with promised returns of up to 20%, was the primary use for UST.[6]  SEC 56.1 ¶¶ 20, 30-36. These undisputed facts also establish the SEC's allegations that UST deposits were pooled together in the Anchor Protocol, where they were lent to borrowers to generate returns, which were paid to investors in direct proportion to the amount of UST they had deposited. *Id.* ¶¶ 31-36, 79-80.  *See Revak*, 18 F.3d at 87; *see also SEC v. Infinity Grp. Co.*, 212 F.3d 180, 188 (3d Cir. 2000) (finding horizontal commonality where the "return on investment was … directly proportional to the amount of that investment").

---

[6]      In addition to being offered as part of an investment contract, UST conferred a "right to subscribe to or purchase another security," namely LUNA.  Specifically, as marketed by Terraform, investors could freely exchange LUNA for UST and vice versa through the UST/LUNA algorithm coded into the Terra blockchain.  UST accordingly meets a second, independent statutory definition of "security" under the Securities Act.  *See* 15 U.S.C. § 77b(a)(1).

As the Court noted in denying Defendants' motion to dismiss, "if the SEC's allegations are credited – which, at this stage, they must be – there was thus plainly horizontal commonality between the defendants and at least those large majority of UST investors who deposited their coins in the Anchor Protocol." *Terraform*, 2023 WL 4858299, at *13. Now that those allegations have been borne out by undisputed evidence, summary judgment in the SEC's favor is warranted. Moreover, as to the UST purchasers who chose not to deposit their coins into the Anchor Protocol, they were nevertheless *offered* an investment contract by Defendants. *See Howey*, 328 U.S. at 301 ("it is enough that the respondents merely offer the essential ingredients of an investment contract").

### 2. LUNA Purchasers Invested in a Common Enterprise

The undisputed evidence also demonstrates that LUNA and wLUNA purchasers invested "in a common enterprise" because, as promised to investors, Defendants pooled the funds received from LUNA investors to develop and grow the Terra ecosystem. SEC 56.1 ¶ 56. Defendants told investors that Terraform would use LUNA sales proceeds to establish and operate Terraform ecosystem, and in fact did so "in an effort . . . to boost the value of the investment." *Id.* ¶¶ 42, 54-57. *Kik*, 492 F.Supp.3d at 179. "This is the nature of a common enterprise." *Id.* In addition, the price of LUNA and wLUNA was the same, so all investors shared in the rise or fall of that price. SEC 56.1 ¶¶ 42, 51-58. *Audet v. Fraser*, 605 F.Supp.3d 372, 394 (D. Conn. 2022) (horizontal commonality established as a matter of law where the price of the coin "rose and fell across the board").

The Court previously held with respect to LUNA that "the SEC has demonstrated horizontal commonality by alleging that the defendants' used proceeds from LUNA coin sales to develop the Terraform blockchain and represented that these improvements would increase the

value of the LUNA tokens themselves." *Terraform*, 2023 WL 4858299, at *13. "In other words, by alleging that the defendants 'pooled' the proceeds of LUNA purchases together and promised that further investment through these purchases would benefit all LUNA holders, the SEC has adequately pled that the defendants and the investors were joined in a common, profit-seeking enterprise." *Id.* The Court also recognized that "the wLUNA investors were just a variation on this theme since wLUNA tokens could be exchanged for LUNA tokens." *Id.* Now that the SEC's allegations regarding LUNA and wLUNA[7] have been established by undisputed evidence, summary judgment is warranted.

The undisputed evidence also establishes strict vertical commonality as to LUNA, of which Defendants held ███████████ during the relevant period. SEC 56.1 ¶ 58. Thus, as a matter of economic reality, the success of LUNA affected the fortunes of Kwon, Terraform, LUNA, and wLUNA purchasers, such that all would both profit from the rise in trading value of LUNA. *Id.* ¶ 58. *Revak*, 18 F.3d at 88 ("Strict vertical commonality requires that the fortunes of investors be tied to the fortunes of the promoter.") (emphasis and citation omitted).

### 3. MIR Purchasers Invested in a Common Enterprise

Horizontal commonality also exists with respect to MIR. Defendants represented that the proceeds of MIR SAFT investments would be used for developing the Mirror Protocol, describing those agreements as part of "the Mirror Protocol strategic fundraise." The economic reality was that Terraform, as it said it would, pooled these proceeds to develop and fund growth

---

[7]     Separately, because a holder of wLUNA had the right and ability at any time to exchange the wLUNA for LUNA (which was a security), wLUNA was also a "receipt" for LUNA, and therefore, itself, a security. 15 U.S.C. § 77b(a)(1). *Cf. United States v. Martoma*, 2013 WL 6632676, at *3 (S.D.N.Y. Dec. 17, 2013) (concluding that there could be "no dispute" that American Depository Receipts that allow American investors to invest in instruments that represent a certain number or fraction of shares of foreign stock are themselves securities).

of its operations, including the Mirror Protocol.  In acquiring MIR, purchasers invested in a common enterprise because they obtained a pooled interest in, and shared in the profits and risks of, the success of the Mirror Protocol, through the increase or decrease in price of MIR tokens.  SEC 56.1 ¶¶ 94-98.  *See, e.g., Audet v. Fraser*, 605 F.Supp.3d at 394.  "This is not a scenario where the funds of each investor were segregated and separately managed, allowing for profits to remain independent."  *Kik*, 492 F.Supp.3d at 179.

### C.      Reasonable Expectation of Profits from the Efforts of Others

The undisputed evidence also establishes that investors in Terraform's crypto asset securities had a "reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others."  *SEC v. Edwards*, 540 U.S. 389, 393 (2004).  "Profits" under *Howey* include "capital appreciation . . . from the development of the initial investment," and profit distributions are not required.  *Id*. at 395-96.  The inquiry as to investors' reasonable expectation of profits is an objective one.  It is not required that "each and every investor was personally led to think that profits would follow from their investment in the defendants' products.  If an objective investor would have perceived the defendants' statements and actions as promising the possibility of such returns, "the third prong of *Howey* is satisfied."  *Terraform*, 2023 WL 4858299, at *14.

### 1.      UST and Anchor Investors Had a Reasonable Expectation of Profits from Defendants' Efforts

Defendants cannot dispute that UST investors were led to expect profits from Defendants' efforts.  Defendants marketed UST as a "yield bearing" stablecoin when deposited into the Anchor Protocol, promising up to 20% returns.  SEC 56.1 ¶¶ 32, 55, 81-90.  Specifically, the facts establish that Defendants issued a nearly constant stream of communications through social media, websites Defendants controlled, meetings, email, touting the myriad efforts

Defendants would and did undertake to engineer, develop, and manage the Anchor Protocol to ensure investors received the promise returns.  *Id.* ¶¶ 81-92. The Court previously recognized that, if shown to be true, such facts would establish an expectation of profits in UST that satisfies *Howey*.  *Terraform*, 2023 WL 4858299, at *14.  As the undisputed evidence now establishes these facts, summary judgment is warranted.

## 2. LUNA and wLUNA Investors Had a Reasonable Expectation of Profits from Defendants' Efforts

The undisputed evidence also establishes that LUNA and wLUNA investors had a reasonable expectation of profits from Defendants' efforts.  Defendants pitched LUNA (and, therefore, wLUNA) as "equity" that would increase in value from increased usage of the Terra blockchain, which Defendants promised and did to undertake efforts to achieve.  SEC 56.1 ¶¶ 59-69.  Here, through a continuous stream of marketing via multiple channels, Defendants repeatedly touted their efforts and successes in developing the Terra ecosystem, improving the Terra blockchain, expanding its user base, and facilitating the creation of a public trading market on which LUNA and wLUNA could be traded.  *Id.*  Defendants premised their case for LUNA's profitability based on Defendants' actions, efforts, and technical acumen. *Id.* ¶¶ 59-77. Defendants also broadly publicized their efforts establishing a fund meant to expand the reach of Terra and soliciting investments in LUNA for the purpose of "defending" the UST peg, further demonstrating their continued support for the Terra ecosystem.  *Id.* ¶¶ 57, 70-71.  The Court previously recognized that such facts, if proven, would satisfy *Howey*.  *Terraform*, 2023 WL 4858299, at *14.  The undisputed evidence, in the form of Defendants' own statements, now establishes these facts for purposes of summary judgment.

### 3.      MIR Investors Had a Reasonable Expectation of Profits from Defendants' Efforts

Likewise, based on Defendants' statements and actions as to the Mirror Protocol, the undisputed facts demonstrate that MIR investors reasonably expected to profit from Defendants' efforts.  Defendants promised that MIR would increase in value with increased usage of the Mirror Protocol.  SEC 56.1 ¶¶ 100-111.  And Defendants publicized their efforts to support and grow the Mirror Protocol, by among other things, facilitating the use of the Mirror Protocol by the public and providing technical and engineering support "following the launch."  *See Telegram*, 448 F.Supp.3d at 375.  Defendants' constant stream of representations touting their efforts to support the Mirror Protocol and facilitate its use created a reasonable expectation that investors could profit from their purchase of MIR.  SEC 56.1 ¶¶ 100-111.

As the Court has already recognized that such facts, if established, show reasonable expectation of profits from the efforts of another, summary judgment is warranted.  *Terraform*, 2023 WL 4858299, at *14.  Defendants also emphasized that MIR would be (and was) tradable on secondary crypto trading platforms.  "[R]esale in the secondary market" is "crucial to the investor" for "realizing profits from capital appreciation." *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 756 F.2d 230, 240 (2d Cir. 1985); *Kik*, 492 F.Supp.3d at 179-80 (promoter "explained how [the token] would be tradable on the secondary market through cryptocurrency exchanges").

## II.    Defendants Violated the Section 5 by Offering and Selling LUNA and MIR in Unregistered Transactions

"Section 5 of the [Securities] Act provides that securities must be registered with the Commission before any person may sell or offer to sell such securities."  *SEC v. Kern*, 425 F.3d 143, 147 (2d Cir. 2005).  To prove a violation, the SEC must show that: (1) no registration

statement was filed or was in effect as to the securities in question; (2) the defendant, directly or indirectly, sold or offered to sell the securities; and (3) in connection with the offer or sale, there was a use of interstate transportation, or communication in interstate commerce, or of the mails. *SEC v. Cavanagh*, 445 F.3d 105, 111 n.13 (2d Cir. 2006) (quotation and citation omitted). Once the SEC meets this *prima facie* burden, the burden shifts to the defendant to show that an exemption from registration applies. *Id.* No scienter is required. *SEC v. Greenstone Holdings, Inc.,* 954 F.Supp.2d 211, 214 (S.D.N.Y. 2013) (citation omitted).

Defendants repeatedly violated Section 5 in connection with public offerings of LUNA and MIR. It is undisputed that no registration statement was filed or in effect with respect to any of Defendants' offers or sales of LUNA or MIR, which were offered and sold using interstate commerce. And, as set forth above, it cannot be reasonably disputed that these constitutes the offer and sales of securities.

Specifically, Defendants "'engaged in steps necessary to the distribution of [unregistered] security issues'" by executing agreements for sales and "loans" of LUNA and MIR to institutional buyers,[8] who were expected to, and did, further distribute LUNA and MIR into public trading markets that Terraform helped to establish. SEC 56.1 ¶¶ 117-140. *Terraform*, 2023 WL 4858299, at 15 (quoting *SEC v. Universal Express., Inc.*, 475 F.Supp.2d 412, 422 (S.D.N.Y. 2007). *See also SEC v. Chinese Consol. Benev. Ass'n, Inc*., 120 F.2d 738, 741 (2d Cir. 1941)). Distribution "refers to the entire process in a public offering through which a block of securities is dispersed and ultimately comes to rest in the hand of the investing public." *In re*

---

[8]    That some of the agreements may have involved Terraform BVI rather that Terraform directly does not change the analysis. Kwon signed the agreements on behalf of Terraform BVI, which was merely a sham entity controlled by Kwon and Terraform that was set up solely to conduct the business of Terraform.

*Wonsover*, Exchange Act Release No. 41123, 1999 WL 100935, at \*6 n. 25 (Mar. 1, 1999), *aff'd*, *Wonsover v. SEC*, 205 F.3d 408 (D.C. Cir. 2000).

Defendants structured the sales to institutional purchasers to be a preliminary step in a broader public distribution scheme.  Defendants took no steps to prohibit the resale of tokens sold in the 2018 LUNA sales, 2020 MIR SAFTs, or purported "loans" of LUNA and MIR to ██.  SEC 56.1 ¶¶ 118-119, 124, 136, 138.  On the contrary, ██ was expected to sell the tokens into public trading markets expressly to "improve liquidity" and "thicken up" those markets.  "Improve liquidity" is "a term that in this context could signify little else than the defendants' desire that the institutional investor redistribute the coins on the secondary market." *Terraform*, 2023 WL 4858299, at \*16.  Similarly, Defendants provided economic incentives to 2018 LUNA purchasers to resell their LUNA into public trading markets for a profit by setting the purchase price at a discount to expected trading prices.  SEC 56.1 ¶¶ 117-123.  Defendants then undertook efforts to protect trading prices first by graduating and later modifying the graduated token delivery schedule. *Id. See Telegram*, 448 F.Supp.3d at 380 ("Telegram built economic incentives into the 2018 Sales, including large discounts and differential lockups, to ensure that the Initial Purchasers resold Grams soon after launch").

Thus, Defendants cannot demonstrate that the LUNA or MIR at issue "came to rest" in the hands of those purchasers or that any care was taken to ensure that the purchasers would not immediately resell to the public upon delivery.  *See* 17 C.F.R. § 230.502(d); *R.A. Holman v. SEC*, 366 F.2d 446, 449 (2d Cir. 1966).  Defendants' scheme is "the very disguised public distribution that Section 5 seeks to prohibit." *Terraform*, 2023 WL 4858299, at \*16.

Defendants also offered and sold LUNA and MIR in violation of Section 5 by directly selling LUNA and MIR continuously into public trading markets, which were accessible to U.S.

investors.  SEC 56.1 ¶¶ 141-147.  To enable this trading, Defendants negotiated and executed agreements with crypto asset trading platforms to "list" LUNA and MIR, which became available for public sale on those platforms.  *Id.*  Defendants also offered and sold MIR tokens from Terraform's Mirror Protocol website, which was available to the public, including retail investors in the U.S.  *Id.*

## III.    Defendants Engaged in Transactions Involving mAssets

### A.      Transactions Involving mAssets Were Security-Based Swaps

A security-based swap includes an agreement, contract, or transaction that meets the definition of "swap" under Section 1a of the Commodity Exchange Act ("CEA") and is based on the value of a single security.  *See* 15 U.S.C. § 78c(a)(68).  CEA Section 1a(47) defines "swap" to include "any agreement, contract, or transaction" that "provides on an executory basis for the exchange ... of 1 or more payments based on the value or level of 1 or more ... securities … and that transfers, as between the parties to the transaction, in whole or in part, the financial risk associated with a future change in any such value or level without also conveying a current or future direct or indirect ownership interest in [the] asset."  7 U.S.C. § 1a(47).

The transactions creating mAssets meet this definition because each transaction transferred, between the investor and the Mirror Protocol, the financial risk associated with a future change in the value of a security without also conveying a current or future direct or indirect ownership interest in the security.  First, each involved an exchange of payments on "an executory basis" because the investor had an ongoing obligation to make payments to increase collateral if the price of the reference security increased.  SEC 56.1 ¶¶ 112-116.  Second, each transaction was based on the value of one security, such as U.S. equity.  *Id.*.  Third, the ongoing obligation to make payments if the price of the reference security went up meant that financial

risk associated with that security was transferred to the investor (if the price rose by a certain amount, the investor had to add collateral or the existing collateral was liquidated).  *Id.*  Fourth, no actual interest in the underlying security was conveyed to the investor. *Id.*

> **B.**     **Defendants Offered, Sold, and Effected Transactions Involving mAssets to Persons that Were Not "Eligible Contract Participants"**

Securities Act Section 5(e) makes it "unlawful for any person, directly or indirectly to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell, offer to buy, or purchase or sell a security-based swap to any person who is not an eligible contract participant" without an effective registration statement.  15 U.S.C. § 77e(e).  Exchange Act Section 6(*l*) prohibits "effecting" transactions in security-based swaps to any person who is not an "eligible contract participant" unless the transaction is effected on a registered national securities exchange. *Id.* § 78f(l).  "Eligible contract participants" are defined to include high-net-worth individuals and certain types of sophisticated and regulated entities. 7 U.S.C. § 1a(18); 15 U.S.C. § 78c(a)(65).

In violation of these provisions, Defendants offered, sold, and effected transactions involving mAssets to persons that were not "eligible contract participants" without an effective registration statement and not on a registered national securities exchange. Instead, Defendants offered and sold these transactions through the Mirror Protocol, which was engineered, launched, and maintained by Terraform, and which could be accessed via Terraform's Mirror Protocol website.  SEC 56.1 ¶¶ 148-149.  Defendants made no effort to determine whether potential or actual investors were "eligible contract participants."  In offering these mAsset transaction through its website, Terraform made use of interstate commerce.  *Id.*

Defendants are liable under Section 5 because they "engaged in steps necessary to the distribution of [unregistered] security issues."  *Universal Express, Inc.*, 475 F.Supp.2d at 422

(internal quotations omitted).  Without Defendants' development and management of the Mirror Protocol and the website through which investors accessed the mAssets, these transactions could not occur.  The definition of "effecting" a security-based swap transaction is even broader and not limited to being a party to the transaction.  *See, e.g.*, *Registration Process for Security-Based Swap Dealers and Major Security-Based Swap Participants* ("SBS Entity Registration Adopting Release"), Exchange Act Release No. 75611 (Aug. 5, 2015), 80 FR 48963 at 48976 (Aug. 14, 2015).  Within this broad definition, Defendant's actions in developing and managing the Mirror Protocol and the website through which investors accessed the mAssets also constitute actions "effecting" transactions in mAssets for purposes of Exchange Act Section 6.

## IV.    Defendants Committed Fraud

### A.    Terraform and Kwon Engaged in Deceptive, Manipulative, and Fraudulent Conduct

"Section 17(a)(1) and (3) of the Securities Act and Section 10(b) of the . . . Exchange Act and Rules 10b-5(a) and (c) thereunder create what courts have called 'scheme liability' for those who, with scienter, engage in deceitful conduct."  *SEC v. Wey*, 246 F.Supp.3d 894, 915 (S.D.N.Y. 2017).  To establish a violation of these provisions, the SEC must show that, in connection with the offer or sale of a security (as described above) and through interstate commerce, a defendant "(1) committed a deceptive or manipulative act (2) in furtherance of the alleged scheme to defraud, (3) with scienter."  *SEC v. Sason*, 433 F.Supp.3d 496, 508-09 (S.D.N.Y. 2020). The same elements that establish a violation of Section 10(b) also establish a violation of Section 17(a).  *SEC v. Genovese*, 553 F.Supp.3d 24, 40-41 (S.D.N.Y. 2021).

"A manipulative or deceptive act is some act that gives the victim a false impression." *SEC v. GPL Ventures, LLC*, 2022 WL 158885, at *8 (S.D.N.Y. Jan. 18, 2022). Even if the deceptive conduct is not "inherently unlawful," it may still form the basis of a scheme to defraud.

41

*See SEC v. Sugarman*, 2020 WL 5819848, at *7 (S.D.N.Y. Sept. 30, 2020). So-called scheme

liability cannot rest solely or entirely on misrepresentations; the defendant must engage in

deceptive or manipulative conduct, which includes, but is not limited to, the dissemination of

false information. *SEC v. Stubos*, 634 F.Supp.3d 174, 201 (S.D.N.Y. 2022) (discussing *SEC v.

Rio Tinto plc*, 41 F.4th 47 (2d Cir. 2022)).  Defendants cannot dispute that they engaged in

numerous deceptive, manipulative, and fraudulent acts, which individually and taken together

establish liability as a matter of law.

   The undisputed evidence demonstrates that Kwon was the primary architect of the

scheme to mislead investors into believing that Chai was processing and settling transactions on

the Terra blockchain, when it was not.  Kwon conceived of the plan to "fake transactions" on the

Terra blockchain in the first instance.  SEC 56.1 ¶ 187.  Kwon then implemented his plan by

directing the design and development of the LP Server by Terraform's head of infrastructure and

other Terraform engineers.  *Id.* ¶ 188.  Using the LP Server, Kwon and Terraform replicated Chai

transactions on the Terra blockchain ████████████████████████████████████████████.

*Id.* ¶¶ 188-196.  After the LP Server became operational, Kwon remained involved in

engineering discussions, to ensure that LP Server operated as he intended.  In doing so, Kwon

followed through on his plan for the "fake transactions" to be "indiscernible" from real

blockchain transactions.  *Id*. These were nothing more than sham transactions, inherently

deceptive and designed to artificially inflate Terra blockchain activity.  *See Sugarman*, 2020 WL

5819848, at *9 (discussing authority explaining that sham transactions are "inherently

deceptive"); *see also SEC v. Collector's Coffee, Inc.*, 2023 WL 6453709, at *20 (S.D.N.Y. Oct.

4, 2023) ("Reliance on fabricated documents, too, constitutes deceptive conduct.").

Kwon and Terraform used these sham Chai transactions to deceive investors into believing that people in the "real world" were using the Terra blockchain.  Defendants made and disseminated countless misrepresentations to investors, potential investors, and the public that Chai was processing and settling transactions on the Terra blockchain.  SEC 56.1 ¶¶ 168-182.  And Kwon led efforts to highlight Chai transaction data in Terraform's marketing materials, to further the false impression that those users and merchants were transacting using Terra stablecoins.  *Id.* ¶¶ 199.  In truth, as Defendants knew, Chai users and merchants were transacting in fiat currency and "did not use the blockchain at all."

With respect to the May 2021 depeg, the undisputed evidence shows that Kwon, on behalf of Terraform, engaged in deceptive conduct when he secretly made a deal with ███ to step in and restore the $1 peg in exchange for modifying the terms of an agreement for LUNA tokens.  *Id.* ¶¶ 208-231.  Kwon and Terraform then made and disseminated numerous false and misleading statements to investors, potential investors, and the public suggesting that the algorithm alone had caused UST's repeg.  *Id.* ¶¶ 220-227.  Kwon specifically directed Terraform's head of communications not to disclose ███ role in the repeg in statements to the public.  *Id.* ¶ 226.  Kwon also pressured that employee to publish a cover story that would justify the monthly delivery of LUNA to ███ under the May 2021 deal.  *Id.*  When that employee refused, Kwon published it on Medium under his own name. *Id.*  *See In re Smith Barney Transfer Agent Litig.*, 884 F.Supp.2d 152, 161 (S.D.N.Y. 2012) (concealment of financial relationship with third party to deceive investors constitutes "inherently deceptive" conduct).

Terraform is liable for its own deceptive and manipulative conduct, as well as Kwon's conduct in his role as officer for Terraform, because "[k]nowledge and actions of a corporation's employees and agents are generally imputed to the corporation where the acts are performed on

behalf of the corporation and are within the scope of their authority." *UCAR Intern., Inc. v. Union Carbide Corp.*, 2004 WL 137073, at *13 (S.D.N.Y. Jan. 26, 2004).

### B.    Terraform and Kwon Made Materially False and Misleading Statements

To establish a violation for materially false and misleading statements, "the SEC must prove that the defendants (1) made one or more misstatements of material fact, or omitted to state one or more material facts that the defendants had a duty to disclose; (2) with scienter; (3) in connection with the purchase or sale of securities." *SEC v. Thompson*, 238 F.Supp.3d 575, 591 (S.D.N.Y. 2017). "Misstatements or omissions are material if there is a 'substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available.'" *SEC v. Aly*, 2018 WL 1581986, at *20 (S.D.N.Y. March 27, 2018) (quoting *Basic, Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988)).

The undisputed evidence reflects that Defendants repeatedly made materially false statements that Chai was processing and settling millions of transactions on the Terra blockchain involving millions of accounts, when it was not. SEC 56.1 ¶¶ 168-182. Defendants made these representations publicly on Medium, Discord, Twitter, in public interviews, and in marketing materials and statements made directly to investors and potential investors. *Id.*

Defendants' false and misleading statements about Chai were material to investors and material as a matter of law because they created the false impression there was substantial "real-world" use of the Terra blockchain, purportedly generating transaction fees for LUNA holders, that simply did not exist. *See SEC v. Farmer*, 2015 WL 5838867, at *8 (S.D. Tex. Oct. 7, 2015) (the "omission was material because it helped provide the impression that there was substantial genuine interest in Chimera stock when in fact Mr. Farmer was on both sides of forty percent of

44

the IPO purchases").  No reasonable jury could find that the truth here – that Terraform was

faking millions of Chai transactions on the Terra blockchain using millions of ████████

████████████████████ – would not have significantly altered the total mix of

information available.  Yet Kwon and Terraform put these fake transactions on the Terra

blockchain and represented them as real-world uses of Terra stablecoins.  The sheer number and

frequency of Chai references by Defendants in their statements to the public further demonstrates

the materiality of these statements.

The undisputed evidence reflects that Kwon and Terraform also misled the investing

public about the stability of UST by falsely representing that the algorithm alone successfully

caused the repeg of UST in May 2021.  Kwon falsely suggested that it was "the protocols" that

responded to the depeg rather than Terraform and ████.  SEC 56.1 ¶ 220.  Terraform posted a

series of tweets touting the "[a]lgorithmic, calibrated adjustments of economic parameters" over

the "cumbersome nature of stress-induced decision-making of human agents."  SEC 56.1 ¶ 222.

In a 2022 Twitter talk show, Kwon again suggested that "the protocol automatically self-

heal[ed]" UST's price.  SEC 56.1 ¶ 224.

These statements clearly suggest that the algorithm alone successfully repegged UST's

price in May 2021.  Yet, Defendants failed to disclose that, when the peg began to fail, Kwon

secretly made a deal with ████ to intervene.  This critical omission rendered the statement about

the supposed efficiency of "algorithmic calibrated adjustments" highly misleading.  *See In re

Vivendi, S.A. Secs. Litig.*, 838 F.3d 223, 258 (2d Cir. 2016) ("once a company speaks on an issue

or topic, there is a duty to tell the whole truth").  As the Second Circuit has explained,

"ambiguous statements, and half-truths can render a statement misleading."  *SEC v. StratoComm

Corp.*, 652 F. App'x 35, 37 (2d Cir. 2016) (affirming summary judgment on a Section 10(b)

claim). Courts have repeatedly found such misstatements material. *See, e.g., Thompson*, 238 F.Supp.3d at 597-98.

Kwon's and Terraform's false and misleading statements about the stability of UST during the May 2021 depeg are also material as a matter of law. *See Karimi v. Deutsche Bank Aktiengesellschaft*, 607 F.Supp. 3d 381, 393 (S.D.N.Y. 2022) (Rakoff, J.) (holding bank's misrepresentations about specific measures taken to mitigate risk are material); *see also SEC v. Laura*, 2023 WL 4238153, at *11 (E.D.N.Y. June 28, 2023) (companies' misrepresentations regarding the state of its technology were "so obviously important to an investor that they are material misrepresentations as a matter of law.") (cleaned up). No reasonable jury could find that the truth here – that UST repegged only after Defendants brought in a third party to intervene – would not have significantly altered the total mix of information available.

Here, Terraform's communications staff was explicitly instructed to omit the fact of ███████ intervention from public statements and then Defendants touted the purported success of the algorithm in restabilizing the UST $1 peg in May 2021, which they described as the "lynchpin for the entire [Terra] ecosystem." SEC 56.1 ¶ 222. Yet, Kwon told Terraform employees internally that Terraform "actually might've been f[****]d" if ██████ hadn't stepped in to restore the peg. SEC 56.1 ¶ 219. The May 2022 market losses of more than $45 billion when Defendants were unable to reverse UST's depeg, provided stark evidence of the significance of Defendants' false and misleading statements regarding UST's May 2021 repeg. *See SEC v. Carrillo Huettel LLP,* 2017 WL 213067, at *4 (S.D.N.Y. Jan. 17, 2017), report and recommendation adopted, 2017 WL 1162199 (S.D.N.Y. Mar. 28, 2017) (finding materiality as a matter of law when the stock price fell 40% after truth was disclosed).

**C.      Terraform and Kwon Knew or Were Reckless in Not Knowing that Their Conduct Was Deceptive and that Their Statements Were False and Misleading**

"Scienter, as used in connection with the securities fraud statutes, means intent to deceive, manipulate, or defraud." *StratoComm Corp.*, 652 F. App'x at 38.  The SEC may also establish scienter "through a showing of reckless disregard for the truth, that is, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care." *Id.*  To establish liability for under Securities Act Sections 17(a)(2) and (3), the SEC must show only that the defendants were negligent.  *SEC v. Airborne Wireless Network*, 2023 WL 5938527, at *25 (S.D.N.Y. Sept. 12, 2023).  The undisputed facts demonstrate that Terraform and Kwon acted with scienter.

With respect to Chai, Kwon was the architect and director of the fraud.  Each deceptive act he undertook to put "fake transactions" on the Terra blockchain was intended to create a misleading impression of blockchain activity that did not exist.  SEC 56.1 ¶ 287.  Defendants then used these transactions to promote, solicit investment in, and drive up the price of LUNA, from which Defendants as holders of ███████ of LUNA, benefited. SEC 56.1 ¶¶ 204-207.  Courts have consistently held that defendants who conceive of, orchestrate, and benefit from a fraudulent scheme have scienter as a matter of law and routinely grant SEC motions for summary judgment. *See, e.g., Airborne*, 2023 WL 5938527, at *23; *SEC v. Milan Cap. Grp., Inc.*, 2000 WL 1682761, at *7 (S.D.N.Y. Nov. 9, 2000); *Farmer*, 2015 WL 5838867, at *11.

The evidence also shows that Kwon knew that his statements that Chai processed and settled transactions on blockchain were false when he made them.  As Kwon explained in describing his planned fraud, his intent was to "create fake transactions that look real."  SEC 56.1 ¶ 187.  In the Second Circuit, "[r]epresenting information as true while knowing it is not . . .

[is] sufficient to support a conclusion of scienter."  *SEC v. Constantin*, 939 F.Supp.2d 288, 308

(S.D.N.Y. 2013); *see also StratoComm*, 652 F. App'x at 38.

Kwon's own admissions demonstrate, at the very least, recklessness as a matter of law.

When Kwon was asked in the investigation to explain his statements that Chai transactions were

processed and settled on the Terra blockchain, Kwon claimed he did not have access to "Chai's

payment servers or its technical stack" and he acknowledged that it was possible that Chai

transactions were merely "copied" onto the blockchain.  SEC 56.1 ¶ 202.  Even accepting

Kwon's dubious claim that he did not know his Chai statements were false, he acted recklessly in

failing to verify the accuracy of the information.  *See Constantin*, 939 F.Supp.2d at 309.

Kwon's scienter is imputed to Terraform; Kwon was Terraform's CEO, ███████████

███████████████████.  *See SEC v. Rio Tinto plc*, 2019 WL 1244933, at *14 (S.D.N.Y.

March 18, 2019); *SEC v. China Northeast Petroleum Holdings Ltd*., 27 F.Supp.3d 379, 390

(S.D.N.Y. 2014).  As such, Terraform also acted with scienter in connection with its deceptive,

manipulative, and fraudulent conduct and its materially false and misleading statements.

### D.    Defendants' Misconduct Was in Connection with the Purchase or Sale of Securities

Courts broadly construe the "in connection with" factor. *See, e.g., Airborne*, 2023 WL

5938527, at *27.  "Any statement that is reasonably calculated to influence the average investor

satisfie[s] the 'in connection with' requirement."  *Id*.  Here, the undisputed evidence establishes

that Defendants' misconduct with respect to Chai and the May 2021 depeg were "in connection

with" efforts to promote Terraform's crypto asset securities, including LUNA and UST.

### E.    Defendants Used the Means and Instrumentalities of Interstate Commerce

The interstate commerce elements are satisfied "where the defendant uses the telephone,

internet, or e-mail to accomplish the alleged fraud."  *SEC v. Tourre*, 2013 WL 2407172, at *11

(S.D.N.Y. June 4, 2013).  Here, the undisputed evidence as shown above demonstrates that

Defendants communicated and interacted with investors through email, internet-based chat

applications, and websites, among other things.

> **F.      Terraform and Kwon Obtained Money or Property**

Securities Act Section 17(a)(2) requires that a defendant "obtain money or property" by

means of a material misrepresentation or omission. *SEC v. Hurgin*, 2022 WL 4448561, at *8

(S.D.N.Y. Sept. 23, 2022).  The undisputed evidence demonstrates that Terraform and Kwon use

misrepresentations about Chai to solicit funds from investors, including a ███████ investment

in LUNA by a U.S. institutional investor.  SEC 56.1 ¶207.  *See SEC v. Stoker*, 865 F.Supp.2d

457, 462-63 (S.D.N.Y. 2012).  Kwon, as the founder, CEO, and majority shareholder of 92% of

Terraform, at least indirectly, benefitted from all funds received by Terraform, including those

obtained from investors that he misled.  *See, e.g., SEC v. Syron*, 934 F.Supp.2d 609, 639

(S.D.N.Y. 2013) (recognizing that "the statute clearly creates liability where a defendant

'indirectly' obtains money or property").

> **G.      Kwon Is Liable for Terraform's Violations of Section 10(b) of the Exchange
> Act and Rule 10b-5 Thereunder as a Control Person Under Exchange Act
> Section 20(a)**

To prevail on a claim for control person liability, the SEC must establish: "(1) a primary

violation by the controlled person, (2) control of the primary violator by the defendant, and (3)

that the defendant was, in some meaningful sense, a culpable participant in the controlled

person's fraud." *Sason*, 433 F.Supp.3d at 514 (citations and quotation omitted). "Control over a

primary violator may be established by showing that the defendant possessed 'the power to direct

or cause the direction of the management and policies of the primary violators, whether through

the ownership of voting securities, by contract, or otherwise.'" *SEC v. Lek Secs. Corp*., 276

F.Supp.3d 49, 63 (S.D.N.Y. 2017) (quoting *In re Lehman Bros. Mortg.Backed Secur. Litig*., 650

F.3d 167, 185 (2d Cir. 2011)). There is no genuine dispute that Kwon controlled and directed Terraform, which, at his direction, repeatedly violated the securities laws.

First, as set forth above, Terraform repeatedly violated Exchange Act Section 10(b) and Rule 10b-5 thereunder. It made numerous material misrepresentations in statements to investors and potential investors about Chai and the May 2021 depeg and engaged in other deceptive conduct, including causing "fake transactions" to be put on the Terra blockchain.

Second, the undisputed record shows that Kwon – as the founder, CEO, and majority shareholder of 92% of Terraform – had the "power to direct or cause the direction of the management and policies of" Terraform. *Lek*, 276 F.Supp.3d at 63. Kwon admitted in that he had ultimate authority for decisions at Terraform. SEC 56.1 ¶ 17.

Third, Kwon was a culpable participant in Terraform's deceptive conduct and misrepresentations. In fact, he was the genesis of that conduct and he repeatedly used Terraform to advance his schemes. Kwon conceived and directed the plan to "fake transactions" on Terraform's blockchain and then falsely represented them as real. SEC 56.1 ¶¶ 168-187. Kwon personally negotiated the deal with ███ in May 2021 to restore the peg, and then misrepresented to the public that the algorithm had "automatically self-heal[ed]" the peg. SEC 56.1 ¶ 211, 220-225. At the same time, Kwon directed Terraform employees to omit that information from public statements.

No rational jury could conclude that Kwon was not liable for Terraform's violations of Exchange Act Section 10(b) and Rule 10b-5 thereunder pursuant to Exchange Act Section 20(a).

## V.     Conclusion

For the foregoing reasons, summary judgment is warranted against Defendants Terraform and Kwon on all of the SEC's claims.

Dated:  October 27, 2023                    Respectfully submitted,

                                            /s/   *Devon Staren*
                                            Devon L. Staren, admitted *pro hac vice*
                                            Christopher J. Carney
                                            James P. Connor, admitted *pro hac vice*
                                            Laura E. Meehan
                                            Carina Cuellar, admitted *pro hac vice*
                                            Michael Welsh, admitted *pro hac vice*
                                            Roger J Landsman, admitted *pro hac vice*
                                            Attorneys for Plaintiff
                                            U.S. SECURITIES AND EXCHANGE
                                            COMMISSION
                                            100 F Street NE
                                            Washington, DC 20549
                                            Tel: (202) 551-5346
                                            Email: StarenD@sec.gov