NBHJSECH – REDACTED

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   SECURITIES AND EXCHANGE
     COMMISION,
 4
                  Plaintiff,
 5
                  v.                        23 Civ. 1346 (JSR)
 6
     TERRAFORM LABS PTE LTD., ET
 7   AL.,
                                            Hearing
 8
                  Defendants.
 9
     ------------------------------x
10                                          New York, N.Y.
                                            November 17, 2023
11                                          2:00 p.m.

12   Before:

13                   HON. JED S. RAKOFF,

14                                    District Judge

15                        APPEARANCES

16   U.S. SECURITIES AND EXCHANGE COMMISSION
          Attorneys for Plaintiff
17   BY:  CHRISTOPHER J. CARNEY
          JAMES P. CONNOR
18        LAURA E. MEEHAN

19   DENTONS US LLP
          Attorneys for Defendants Do Hyeong Kwon and Terraform Labs
20   BY:  DOUGLAS W. HENKIN
          LOUIS A. PELLEGRINO, III
21        MARK CALIFANO
          MATTHEW A. LAFFERMAN
22        DAVID L. KORNBLAU

23   Also Present:

24   Elliott Bacon, Katten Muchin Rosenman
     Sarah Gonzalez, Paralegal
25
```

NBHJSECH – REDACTED

```
1              (Case called)

2              THE DEPUTY CLERK:  Will the parties please identify

3    themselves for the record.

4              MR. CARNEY:  Good afternoon, your Honor.

5              Christopher Carney for the SEC.

6              MR. CONNOR:  Good afternoon, your Honor.

7              James Connor for the SEC.

8              MS. MEEHAN:  Good afternoon.

9              Laura Meehan for the SEC.

10             MR. HENKIN:  Good afternoon, your Honor.

11             Douglas Henkin for the defendants.

12             MR. PELLEGRINO:  Good afternoon, your Honor.

13             Lewis Pellegrino for the defendants.

14             MR. CALIFANO:  Good afternoon, your Honor.

15             Mark Califano for the defendants.

16             MR. LAFFERMAN:  Good afternoon.

17             Matthew Lafferman for the defendants.

18             THE COURT:  So there is someone there who didn't

19   introducer herself.

20             MR. KORNBLAU:  David Kornblau for the defendants.

21             MS. GONZALEZ:  Sarah Gonzalez, paralegal.

22             THE COURT:  You're the most important person here.

23             Welcome, everyone.  As you can see, this is a jury

24   hearing.  We have a very distinguished group of jurors whose

25   part-time job is that they are students in my seminar at
```

NBHJSECH — REDACTED

```
 1   Columbia Law School, and they heard the lawyers here were so
 2   terrific, it's worth coming to see, so put on a good show.
 3           I know that the SEC had asked to postpone this hearing
 4   because one of their attorneys was sick, and please extend to
 5   him my great sympathy.  And I don't know how the SEC can manage
 6   to survive with only three attorneys here to argue, but I guess
 7   they'll do as best they can.  But the reason I denied that
 8   request, among other things, was because defense counsel had
 9   said their experts were only available today.  So I think we
10   ought to start with the defense experts and make sure we at
11   least finish with them today.
12           MR. CARNEY:  Your Honor, I'm Chris Carney.
13           THE COURT:  Oh, you are the --
14           MR. CARNEY:  I was the recovering sick person.
15           THE COURT:  Well, congratulations on your miraculous
16   recovery.
17           MR. CARNEY:  36 hours of sleep has markedly improved
18   my well-being.
19           THE COURT:  Just don't get too close to the bench.
20           MR. CARNEY:  I will not.  Thank you, your Honor.
21           THE COURT:  Okay.  So sort of what I'd like to do is,
22   as we get to each expert, because all five experts have been
23   objected to on Daubert grounds, first, hear from counsel and
24   then, if necessary, we'll hear from the expert themselves.
25           So let's start with Dr. Christine Parlour.  So should
```

NBHJSECH – REDACTED

1    note that Dr. Parlour teaches at University of California

2    Berkeley, and I should note for the record that I teach a

3    one-week course at Berkeley Law School every spring, but I have

4    not had the pleasure of meeting Dr. Parlour.  And I don't see

5    any reason to recuse myself, even under the much more demanding

6    standards that apply to federal district judges, as opposed to

7    the Supreme Court of the United States.

8              MR. HENKIN:  Agreed, your Honor.

9              THE COURT:  So in any event, my questions for defense

10   counsel are that she was asked by you to opine on two things:

11   First — and this is at page 3 of her report — to provide an

12   overview of the characteristics and underlying economics of

13   certain tokens on the Terra blockchain; and, second, to discuss

14   "whether risks such as the risk of a depeg with respect to the

15   Terra USD stable coin have been discussed by TFL regulators and

16   other market participants."

17             And I'm just wondering what is the expertise that

18   she's bringing to bear with respect to those?  The second one,

19   as near as I can tell, consists of her noting that some people

20   had already written articles or made statements about how this

21   kind of market in cryptocurrency was inherently risky and so

22   forth.  What she says at the very end of her discussion on the

23   second point on page 32 "as demonstrated above, many in

24   academia had expounded on the inherent possibility of a run

25   based on the structural design of an algorithmic stable coin,

NBHJSECH – REDACTED

leaving it perennially subject to runs, notwithstanding reserve

funds that may delay or lessen the risk.  The 2022 depeg was,

therefore, not a wholly unanticipated event."

          Well, putting aside the joke that I would never make

about reading stuff from academics, why is the subject of any

expert testimony let alone hers?

          MR. HENKIN:  Your Honor, just would you like me to go

from the podium?

          THE COURT:  No.  You can stay where you are.

          MR. HENKIN:  The answer --

          THE COURT:  You can be seated if you prefer.

          MR. HENKIN:  Thank you, your Honor.

          The answer to those questions is, I think, you look at

this almost like some academic survey articles, and so the

sorts of things that Professor Parlour discusses in her report

are not significantly different, except for the specific

platforms and protocoling, of course, than what she teaches in

her MBA-level class at Berkeley.

          So what she's doing is she's providing context for a

trier of fact to understand how DeFi platforms and technologies

operate and explain how they're alike but also unlike

traditional finance systems and products.  So that's really the

first part of the reports, so that's the answer to your first

question.

          And in that context, she worked the same --

NBHJSECH – REDACTED

1      THE COURT:  Just pausing on the first part, I thought

2  she said in her deposition that what she was opining on was

3  what your client was designed to do, and she had no opinion as

4  to what it actually did, so who cares?

5      MR. HENKIN:  Well, the issue with what it was designed

6  to do has to do with where the burden of proof lies.  And in

7  that context, what Professor Parlour is doing is explaining

8  what the SEC needs to prove did or didn't happen.  So the

9  context of that is relevant to understand on the one hand how

10 these fit into what we'll eventually get to at another time in

11 terms of how to characterize the instruments, but it will also

12 help a trier of fact understand, to the extent necessary, where

13 everything fits into all of the things on which the SEC bears

14 the burden of proof including are these securities?  Was there

15 fraud?  Did the operation deviate from the design?  And

16 remember, the defendants don't bear the burden of proof on

17 that; the SEC does.

18      THE COURT:  On the issue whether or not these are

19 securities, is an issue that no one has any strong feelings

20 about, I'm sure.  While the jury may have to find the facts

21 relevant to that, isn't the ultimate determination of that a

22 legal determination?

23      MR. HENKIN:  I think that depends on who you ask, your

24 Honor.  Certainly, the way we have argued it, you can decide it

25 as a matter of law.  And if you decide it as a matter of law,

NBHJSECH — REDACTED

1    then that is something that you would never need to hear from

2    Professor Parlour on.  But the SEC's views, I think, are — and

3    I don't want to speak for them, but I think the SEC's views are

4    that that is an issue of fact, and under those circumstances,

5    then, Professor Parlour's views would definitely be valuable.

6          THE COURT:  Well, what I'm trying to distinguish — and

7    I want to hear from the SEC in a minute — is if there are

8    disputed facts, that that's for the jury to determine, but what

9    follows from that in terms of the law is not.  Sometimes it's

10   for the jury, but often it's for the judge.

11          Do you disagree with that?

12          MR. HENKIN:  There's only been one case where that has

13   happened where that has been an issue.  That was in the *LBRY*

14   case in the District of Connecticut that I'm aware of.  And in

15   that circumstance, the jury actually made the decision.

16          THE COURT:  Well, they're so smart up there in

17   Connecticut.  All right.

18          What about the second part of Dr. Parlour's report?

19          MR. HENKIN:  So the second part is, again, that's

20   where we come to what academics — I, like you, will not make

21   the joke — that academics refer to as survey articles.  And so

22   long as the same rigor was applied to surveying the literature

23   under the circumstances, I think it's permissible for a witness

24   to give that sort of a summary of what's available.  And I will

25   note that there really hasn't been any challenge by the SEC to

NBHJSECH – REDACTED

what Professor Parlour described in that portion of her report.

Now, they disagree with what the implications of it should be

or what inferences should be drawn from it, but that's not the

same as disagreeing that it is not an appropriate subject for

an exposition in this way.

          THE COURT:  Okay.  Let me hear from the SEC.

          MR. CONNOR:  Your Honor, I think your Honor hit on the

point correctly.  Professor Parlour's opinions here in this

case are not opinions at all.  They're merely factual

narratives that should be presented through percipient fact

witnesses.

          Second, and relatedly, Professor Parlour offers no

methodology whatsoever in her report.  It's just simply based

on her experience.  And third, she failed to consider

sufficient facts or data to form her opinions.  She did not

review a single deposition transcript.  She did not talk to a

single Terraform employee.  She did not review a single

internal Terraform document.  She merely accepted as true all

of Terraform's marketing materials and parrots them in the

guise of expert testimony.  That is completely improper under

all the cases we've cited in our briefs, none of which

defendants attempted to distinguish in their opposition brief.

I think it's going to be very confusing --

          THE COURT:  Let me ask you this.  This doesn't relate

to her report, but just while I'm thinking about it, do we not

NBHJSECH – REDACTED

1    want to have someone explain to the jury what a token is?  What

2    a blockchain is, all these terms?

3          Now, normally, in these situations, that's done by

4    stipulation among the parties, and then I can just read the

5    stipulation to the jury at the outset so they know a little bit

6    about what the case is about, and I encourage the parties to do

7    that here.  But otherwise, assuming for whatever reason the

8    parties are unwilling to do that — and I don't think it's a

9    question of law what is a token, what is a blockchain and so

10   forth — don't we need someone to tell the jury what that's all

11   about just so they have a sort of basic grounding?

12         MR. CONNOR:  Your Honor, I think the appropriate way

13   to do that is through the fact witnesses, through the witnesses

14   who actually work with this technology.  In this case, this is

15   about the Terra blockchain.  And we anticipate calling

16   witnesses from Terra to explain what the blockchain actually

17   did, not how it was designed to do.

18         And I think what's problematic about her opinions is,

19   if I could just use one example with UST, she opines in her

20   opinion that "primary use case," that's the word she uses — of

21   UST is as a "medium of change like fiat currency, like the U.S.

22   dollar."  When asked in her deposition if she could recount a

23   single instance of UST ever being used as a medium of change,

24   she said no.

25         Then the real primary use case of UST, as we've

NBHJSECH - REDACTED

established in our summary judgment papers, was to deposit in

the Anchor Protocol, to earn interest and as an investment that

they marketed to retail investors.  That was the primary use

case of UST.  And so I think it's going to be very confusing to

a jury to have a professor come up and say, "Well, the primary

use as designed was this," when the facts completely do not

bear that out.

          And the second, I think, misleading part of Professor

Parlour's report is her talking about decentralization.  She

goes on and on in her report about how Terra blockchain was

decentralized, how the Mirror Protocol was decentralized.  But

when pressed at her deposition, she admitted that she actually

doesn't know if it was decentralized.  All she knows is how it

was designed, how Terraform marketed it to investors.  And when

I put the question to her in her deposition very directly, the

quote is "Do you know whether the Mirror Protocol is

decentralized?"  Her answer was "I don't know."  And then

followed up with similar questions on Anchor Protocol, "I don't

know."  On the Terra blockchain generally, "I don't know."

          She really is not offering any opinions that are at

all relevant to this case.  And on top of that, she didn't

consider sufficient facts or data.  She didn't talk to any

Terraform witnesses.  She didn't look at any internal Terraform

documents.  She didn't even talk to counsel for defendants till

after she issued her expert report, so she couldn't even obtain

NBHJSECH - REDACTED

```
1    documents, even if she had wanted to.  So I think there are

2    just fundamental problems with her opinion.

3         THE COURT:  Let me hear some rebuttal from defense

4    counsel.

5         MR. HENKIN:  Thank you, your Honor.

6         Let me address the last part first.  There was a

7    memory error during the deposition.  In fact, there were

8    discussions prior to the issuance of Professor Parlour's

9    report.  She just didn't remember in the midst of the

10   deposition.  That's something that can be cleared up fairly

11   easily, so this is not a situation where there was either a

12   request for documents that went unheeded or a request for

13   documents that was not able to be made.

14        But I want to follow up on the internal documents

15   concept and talking to people concept.  And this is a situation

16   where the new nature of DeFi protocols is important and where

17   Professor Parlour can provide very important context exactly as

18   your Honor was saying.  Who's going to explain these issues to

19   a trier of fact?  Remember that TFL is a software company, and

20   it's an open source software company, which means that

21   "internal documents," the way you would think about a company —

22   I'm just going to pick on IBM for no reason, it popped into my

23   head — where they have internal documents that are

24   confidential --

25        THE COURT:  This is a function of age.  When I was a
```

NBHJSECH - REDACTED

young lawyer, the hypo would always be about General Motors.

Then they sort of lost it.  Then it was, at your age, IBM.  We

won't comment as to where they are now in the hierarchy.  Today

would have to be Google.  But anyway, go ahead.

MR. HENKIN:  That's exactly the point.

But the larger issue is that when you're dealing with

an open source software company that publishes all of its

design specifications as whitepapers and whose code is

available in public GitHub repositories, the concept of an

internal document is not the same as it is with whichever

company we might pick on under those circumstances.  And so

that's the sort of thing that in and of itself is useful to

explain to a trier of fact as to why a lot of the things — and

I won't get into some of the detail because I don't think this

is the right time and I'm mindful of timing — but a lot of the

things that were being discussed are things that are

cross-examination questions.  Did you consider this?  Did you

consider that?  Would your opinion be different if you saw — I

don't know — an email, for example, that the SEC would think

contradicts something that's in a GitHub repository?  Those are

all cross-examination questions, but what they don't do is

address the fundamental question that your Honor raised is

wouldn't it be nice if there was somebody who could kind of set

the stage.

THE COURT:  All right.  Mindful, as you point out, of

1    our time constraints, I only have a few questions for

2    Dr. Parlour.  But if she's here, let's get her up on the stand.

3           MR. HENKIN:  She is, your Honor.

4    CHRISTINE PARLOUR,

5         called as a witness by the Defendants,

6         having been duly sworn, testified as follows:

7    DIRECT EXAMINATION

8    BY THE COURT:

9           THE COURT:  Dr. Parlour, thank you for being here and

10   thank you for bringing a touch of California weather to

11   New York.

12          I was a little concerned, if I understood what you

13   said at your deposition, about your description of the

14   methodology you had used for the two parts of your report.  For

15   example, as to the second part about this information being out

16   there and so forth, your counsel, which are defense counsel,

17   was just saying, well, typically there are academic surveys,

18   yes, they are, but they are usually followed by fairly precise

19   survey criteria.  And I was not clear what methodology you used

20   for either part of your report, so if you wanted to elaborate

21   on that.

22          THE WITNESS:  Sure.  So you know we have this long

23   history of literature that basically talks about

24   microeconomics, incentives, how markets works, understanding

25   the relationship between markets.  And so what I did was I

1  basically took that long literature, and then I put the facts

2  that we know about this new type of business model into that

3  literature just so that it sort of makes sense from an

4  economics and finance point of view.  And I did the same in

5  both sections of my report.

6           THE COURT:  So this was basically you put in search

7  terms?

8           THE WITNESS:  No.

9           So I have a conceptual framework that comes from

10  training, and then I put what we know about how these systems

11  were designed into that conceptual framework.  So it's the same

12  thing we do in an academic model, though if I was writing an

13  academic paper, I'd have a lot of math.  But in this case, what

14  I did --

15           THE COURT:  Always like to have a lot of math.  That's

16  absolutely *sine qua non*.

17           THE WITNESS:  I described in words what basically the

18  math would have elaborated.

19           THE COURT:  Okay.  And am I right that, again, in the

20  second part of your report, you did not consider statements

21  made by Terraform that the risk that might otherwise be present

22  in a cryptocurrency context would not be present here?  Am I

23  right you did not address what they had said on the subject?

24           THE WITNESS:  I don't have my report right in front of

25  me, but I think I did mention some of the comments that they

1   had made.  And basically, what I did is I just put into context

2   the idea that if you have a pegged asset — I think you're

3   talking about UST — if you have a pegged asset, it's

4   potentially subject to depegging.

5           THE COURT:  Well, you're right.  What I have from your

6   deposition is that you knew about the statements that Terraform

7   had made but did not mention in particular a "whitepaper" in

8   which Terraform downplayed the risk because you didn't think it

9   was relevant.  And according to my notes, that's your

10  deposition at page 201, line 22, to 202, line 10.

11          Why is it not relevant?

12          THE WITNESS:  So the point that I'm making is that

13  pegged assets, be they banks, be they currencies in the sort of

14  traditional sense, all of these have the capacity to be

15  depegged.  So at the time, I was just pointing out that there

16  is a huge amount of literature, if you think about banking and

17  currencies, one.  Two, I knew that there was a discussion about

18  the possibility of stable coins being depegged.  And the paper

19  that you're referring to by Di Maggio and colleagues basically

20  was in that same thing, it was people talking about the

21  possibility of depeg.  And in that particular paper, what they

22  did is they just did simulations.

23          THE COURT:  Maybe I'm missing your point, but this is

24  ultimately a case alleging fraud.  And so if, in general,

25  people are told, you know, automobile tires may go flat, and so

1    everyone buying an automobile knows that there's a risk that

2    the tires may go flat.  But the makers of tire X says not ours,

3    we're using a new design and there's no way our tire will go

4    flat.  And assume for my hypothetical that that's a lie, and lo

5    and behold, lots of tires go flat and the market for those

6    tires goes south.

7            What is the relevance of the fact, then, that people

8    were told about other tires, that they have the risk of flats

9    when the specifics, the relevant statement here was that the

10   statement of the hypothetical tire manufacturer that our tires

11   never go flat?  It's the best analogy I can come up on two

12   seconds.  I thought of IBM, but couldn't come up with them.

13           THE WITNESS:  GM, yes.

14           THE COURT:  But isn't it highly relevant to you, the

15   point you're making that Terraform was denying the risk that

16   otherwise were being complained about in academic literature?

17           THE WITNESS:  So the specific paper that we were

18   talking about, the Di Maggio paper, basically this was an

19   abstruse academic paper, I would say, that did simulations

20   under certain sorts of stress tests, so it wasn't a general

21   statement.  It just said -- it makes conditional statements,

22   conditional on this set of environments.  We think that there

23   won't be a depeg, which is different than an advertiser making

24   statements, if I understood your analogy correctly.  I don't

25   drive, so --

1          THE COURT:  Well, you're definitely in the right city

2     now.

3          Okay.  Those were all the questions I have, so you may

4     step down.  Thank you very much.

5          THE WITNESS:  Thank you.

6          (Witness excused)

7          THE COURT:  I should mention that I'm not going to

8     make any rulings from the bench, but I will get you, as to all

9     these witnesses and the challenges, a bottom line decision by

10    Thanksgiving.  The reason I want to do it by then is because

11    you have your argument for summary judgment coming up on the

12    30th, if I recall correctly, so you'll need to know that before

13    that argument.

14         Okay.  Again, I'm just artificially going first with

15    the defense experts, only because of their travel issues.  So

16    Mr. Raj Unny, I hope I'm pronouncing that right, who is really

17    a rebuttal expert, as I understand it, to Dr. Edman, but we'll

18    get to him in a short while.  But obviously, if I agree with

19    the defense that Dr. Edman's testimony should go out, then this

20    would become irrelevant, but let's assume that that's not the

21    case.

22         Some of Mr. Unny's statements, not all, but many of

23    them have to do with opining on Dr. Edman's conclusions about

24    blockchains.  But for example, Mr. Unny concludes, "Dr. Edman

25    provides insufficient evidence to substantiate his claims and

NBHJSECH

1    opinions that the purported Chai transactions on the Terra

2    blockchain do not represent the actual processing and

3    settlement of real world Chai transactions."  And my question

4    with respect to Mr. Unny is what is his expertise that allows

5    him to be an expert on blockchains?

6              MR. CALIFANO:  Thank you, your Honor.

7              Mr. Unny has been working for the last ten years on

8    blockchain applications.  That is part of what his business

9    does.  Included in the types of things he works on are some of

10   the very functionality that we're examining here in Dr. Edman's

11   opinion, which is the use of blockchain technology and

12   blockchain transactions with traditional payment systems.

13             And Mr. Unny has been working on a number of different

14   types of blockchain applications, including a

15   blockchain-operated payment system that operated in

16   Switzerland.  He also helped build and test and put into

17   operation for a brief time a tokenized system that also used

18   blockchain transactions.  He also created for a bank, a

19   traditional financial services institution, the ability for the

20   bank to allow its customers to accept cryptocurrencies and

21   onboard them into their controlled accounts.

22             THE COURT:  Well, again, my understanding from the

23   deposition is that he did not personally analyze the Terra

24   blockchain data in this case, that that analysis was performed

25   by employees of a firm called Cornerstone Research whose his

NBHJSECH

qualifications he did not know.  And at least at his deposition

he could not even recall which computer program the Cornerstone

analyst used.  So where is he exercising his expertise and how

can I possibly determine whether it's reliable under Rule 702

when it was done by someone else?

MR. CALIFANO:  Mr. Unny instructed and directed each

of those staff members on how they were to process the

blockchain data, what they were to do with the data, and he

personally reviewed both their work and the output.  So it is

not accurate to say that Mr. Unny did not oversee every aspect

of that operation and every aspect of their work, as often

doctors and professors do when they're overseeing lab testing,

chemical testing, even lab tests for a diagnosis for a patient

as an expert.

THE COURT:  Well, if what you're suggesting was a

hands-on supervision, how come he didn't even know what

computer program they used?

MR. CALIFANO:  I think, your Honor, he would be able

and comfortable with describing to you exactly what was done

and how they did it, including a little more about the types of

computer language and programming that were done.  I understand

that in that particular section of the deposition, he didn't

provide that specific program, but I am confident that if your

Honor wishes to query Mr. Unny about this, he is in a position

to answer your questions.

NBHJSECH

1          THE COURT:  All right.  Well, we'll certainly want to

2     get him on the stand in a minute.  Let me hear first from the

3     SEC.

4          MR. CARNEY:  Thank you, your Honor.

5          Your Honor, as you pointed out, the SEC's expert,

6     Dr. Edman, relied on sophisticated blockchain analysis to offer

7     the opinions that he did in this case.  And his ability to do

8     that derives from his training both as a Ph.D. computer

9     scientist and the fact that's what his company does.  His

10    company, NAXO, specializes in that type of work.

11         Mr. Unny, on the other hand, at his deposition

12    candidly admitted that he did not hold himself out as an expert

13    on blockchain analysis, and that is not in fact what his

14    company does.  Mr. Unny has no professional certifications

15    related to blockchain analysis.  When asked what kinds of tools

16    he uses to perform blockchain analysis, he made reference to

17    the publically available ones that the Ethereum Foundation

18    makes available, which is a reference to Etherscan, which is a

19    public website that even I can use, and I will admit I am no

20    blockchain expert.

21         In terms of even at parts disclaimed that he had done

22    any kind of blockchain analysis, even though his report

23    identifies an important set of transfers that were shown on the

24    Terra blockchain and even though that was a large part of what

25    Dr. Edman did, he was analyzing these blockchain transfers and

NBHJSECH

identifying where they came from.  And that's what allowed

Dr. Edman to come up with the opinion that this was all one big

circular operation where transfers were just going in and out

in this closed loop to make it look like a lot of activity was

happening on the blockchain, but it all started and began with

Terraform.

As your Honor mentioned, he didn't really know the

background or qualifications of the folks at Cornerstone, even

the person that did most of the blockchain analysis, he

couldn't recall his last name.  And one thing, in terms of what

counsel just told us now, that Mr. Unny oversaw and supervised

the work of Cornerstone, it's not clear to us how that could

have been possible.  Maybe that's something that Mr. Unny could

clear up when he speaks with your Honor, because our

understanding is that the actual data, the blockchain data that

Cornerstone was analyzing was not in Switzerland where Mr. Unny

is, was not available to him in Switzerland.  So what Mr. Unny

would have been reviewing in that case are just the reports

that Cornerstone themselves generated, and he wouldn't have had

a way to go into the blockchain data or in the SQL database

that Cornerstone created and query that data himself.

THE COURT:  All right.  I think maybe we should get

Mr. Unny on the stand since both of the speakers in effect

suggested that.  So Mr. Unny, come on up.

RAJ UNNY,

1       called as a witness by the Defendants,

2       having been duly sworn, testified as follows:

3   DIRECT EXAMINATION

4   BY THE COURT:

5           THE COURT:  So again, thank you for being here.

6           I'm sure it's somewhere in your report — it was in all

7   the other reports, but I may have missed it somehow.  How much

8   are you being compensated for your expert work here?

9           THE WITNESS:  Yes, your Honor.

10          As stated, in my first report, it's -- the

11  compensation is $950.

12          THE COURT:  Oh, there it is.  I now see it, $950 an

13  hour.  Okay.  Are you aware that some of the experts are

14  getting even more and do you want a raise?  You don't have to

15  answer that.

16          So you heard the colloquy, and I guess one of the

17  questions is, since you weren't personally doing the underlying

18  processing of the data, what kind of supervision did you

19  exercise and how did you exercise it?

20          THE WITNESS:  Yes, your Honor.

21          So Cornerstone research is a data analytics company,

22  and the data was provided to us with Mr. Edman's report and it

23  was in a format called JSON.  And so I had Cornerstone extract

24  the data from the JSON data set and put it into a standardized

25  SQL database.  And then --

1          THE COURT:  What kind of data are we talking about?

2          THE WITNESS:  There is the data that Mr. Edman was

3     given by some consultant.  He's not named, the consultant, but

4     it was the data that was extracted, as I understand it, from

5     Terra blockchain.

6          THE COURT:  But that's part of my question.  I

7     understand what you just said, whether this was all the data,

8     partial data, whether it was extracted through proper

9     methodology or from skewed methodology, you just took it as

10    given to you, yes?

11         THE WITNESS:  I did verify the scripts that Dr. Edman

12    provided in terms of how they extracted it.  And there is a

13    service called Terra Finder where you can query the Terra

14    blockchain directly, and I did run a few queries to make sure

15    the data was matching after we extracted it to the SQL

16    database.

17         THE COURT:  Now, did you limit yourself to Dr. Edman's

18    data?

19         THE WITNESS:  I tried to, your Honor, because that's

20    the data that he uses to make his opinions.

21         THE COURT:  And you concluded that it wasn't

22    sufficient to substantiate his opinions; do I have that right?

23         THE WITNESS:  Correct.

24         THE COURT:  And so you're not saying his opinions are

25    necessarily wrong, you're saying that you can't tell whether

1   they're right or wrong based on the evidence he examined?  Do I

2   have that right?

3          THE WITNESS:  No, your Honor.

4          I would say that I think the conclusions that he draws

5   are wrong, given that this is more than just blockchain data,

6   given that you also need to examine the code across the Terra

7   Chai payment system.  And in the absence of the Chai data and

8   the Chai logs and the Chai code, he could not draw the

9   conclusions that he draws.

10          THE COURT:  And what is the area of your expertise

11   that allows you to say that?

12          THE WITNESS:  The fact that I can read the code and I

13   have looked at the same body of code and data that Dr. Edman

14   has provided, and I see all of the missing pieces that would

15   not let me make the same conclusions.

16          THE COURT:  Okay.  I have no further questions for

17   Mr. Unny, so thank you very much.  You may step down.

18          (Witness excused)

19          THE COURT:  Let's turn next to Dr. Hendershott.  And

20   by the way, there was in this part of the briefing, one of the

21   issues was whether or not a company that was allegedly involved

22   in restoring UST's peg in May 2021, that the name of this

23   company should be kept confidential.  Why?

24          MR. HENKIN:  Your Honor, I was actually going to raise

25   that as a housekeeping question.  My understanding is that that

NBHJSECH

1    company has made the confidentiality designation.  That was my

2    understanding when we took Professor Mizrach's deposition.

3    It's not a designation that's been made by the defendants or I

4    think — and I'll let the SEC speak for itself — or by the SEC.

5    And so we've been going on the basis of that --

6           THE COURT:  So the company is not applying to this

7    Court, directed you folks to keep their name out of it?  Do I

8    have that right?

9           MR. CARNEY:  If I could explain.

10           So in response to the SEC's subpoena, the company

11    provided terabytes of their trading data to the SEC, which we

12    then in turn produced to defendant.  So a lot of Professor

13    Mizrach's opinions and, by virtue of that, Professor

14    Hendershott's opinions are inextricably linked to that data, so

15    it's more than just their name.  It's just all the references

16    to the numbers and to profits and things like that that are

17    tied to the name itself.

18           THE COURT:  So I'll come back.  So there's a

19    protective order in this case signed by me.

20           MR. CARNEY:  Yes.

21           THE COURT:  Signed by both of you.

22           MR. CARNEY:  Yes.

23           THE COURT:  It says nothing about a third party

24    designating confidentiality, but, of course, they could have

25    applied to this Court for such a ruling, but they chose not to.

NBHJSECH

1          In addition, the protective order says that this Court

2    reserves unfettered discretion to not impose confidentiality as

3    to anything that's relevant to any motion before this Court.

4    So I'm about 30 seconds away from using their name, but if you

5    have some major reason for saying I shouldn't, I will consider

6    it.

7          MR. CARNEY:  We --

8          MR. CONNOR:  No objection.

9          MR. CARNEY:  We don't have a major reason.  I believe

10   their counsel might be in court.

11         THE COURT:  Is their counsel here?  Give your name and

12   identify your company as X.

13         MR. BACON:  Yes, your Honor.

14         Elliott Bacon, Katten Muchin, on behalf of X.

15         THE COURT:  So am I right you never applied to me for

16   confidentiality?

17         MR. BACON:  That's correct, your Honor.

18         THE COURT:  And you know that the confidentiality

19   order in place gives me unfettered discretion not to abide by

20   what the parties think should be confidential?

21         MR. BACON:  Yes, your Honor.

22         THE COURT:  So why the heck should I keep this name

23   out?

24         MR. BACON:  Your Honor, I think that there's

25   significant amounts of materials that — aside from the name —

NBHJSECH

1    that are highly confidential materials.

2              THE COURT:  Well, that might or might not come up, but

3    for today's argument purposes, all I propose to use is the name

4    of the company.

5              MR. BACON:  Yes, your Honor.

6              THE COURT:  Any problem with that?

7              MR. BACON:  Your Honor, I'll submit that we believe

8    that the materials themselves are highly confidential, but I

9    understand that your Honor has unfettered access.

10             THE COURT:  Well, that doesn't mean that you couldn't

11   convince me about the materials, but I don't have to reach that

12   right now.  So what I propose is the following:  That we will

13   in this argument reveal to the entire universe the name of this

14   company, but that if you want to ask that particular data such

15   as profit data remain under confidentiality protection, you may

16   do so by a brief submitted no later — what do you want?  I was

17   going to say a week, but I think you probably are celebrating

18   Thanksgiving.

19             MR. BACON:  I was hoping to, your Honor.

20             THE COURT:  Me too.  So how about on the Monday after

21   Thanksgiving?

22             MR. BACON:  That would be great, your Honor.

23             THE COURT:  Okay.  And if either of the parties want

24   to be heard, you don't have to submit anything, but if you want

25   to, you can submit a brief three business days later and then

NBHJSECH

I'll resolve it.  Okay?

MR. BACON:  Thank you, your Honor.

THE COURT:  All right.  So jumping right into it, the name of the company is Jump.  Okay.

My question, though, is the first 15 paragraphs of Dr. Hendershott's report seems to be nothing to do with his expertise.  It's really only maybe as late as paragraph 33 that we get into what I understand is his area of expertise, market microstructure.  So my question is whether I should at least strike the first part of the report.

MR. HENKIN:  The answer to that is no, your Honor.  I think what you will hear from Professor Hendershott -- and I assume that you will be hearing from him?

THE COURT:  Yes.

MR. HENKIN:  Is that this is the way he generally writes papers when he is addressing anything that is of the type that he generally writes papers on, including some of the ones that are cited in his report where there's an introduction.  And I think the SEC says there are 17 paragraphs that are about blockchain technology and it thinks he's not qualified on that.

And there are two responses to that.  One is we don't think it's that many, we think there are really only seven or eight, but that really what that is is it's background to put into context all of what comes later.  And when you also hear

NBHJSECH

1    from Professor Hendershott about what his specific background

2    is, for example, his Ph.D. is in -- I believe it's in

3    operations and information management, and he has had quite a

4    bit of experience that directly relates to the blockchain.  We

5    have even some demonstratives that we can put that will show

6    that.  He has more than enough experience to address those

7    aspects of his report.  But at the end of the day, they are in

8    the nature of background for what follows, and his opinions

9    wouldn't change one way or the other.

10            THE COURT:  Well, are you saying that you don't really

11   care whether they're included or not?

12            MR. HENKIN:  No, I'm not saying I don't care.

13            What I'm saying is that the objection to those

14   paragraphs is really not appropriate, given that they are in

15   the nature of background for the report.  I think what you can

16   look at is -- probably the best example that I can think of is

17   what Judge Furman in the *City of Providence* case with respect

18   to Mr. Lauer's declaration, this is a case that we cite in our

19   Daubert motion for Professor Mizrach where there was some

20   background information that was challenged.  There was some

21   background sections of the report and Judge Furman struck all

22   of the substantive opinions, but then dropped a footnote in the

23   decision that said, "I'm not striking the background, but it

24   doesn't matter that I'm not striking the background."  We're in

25   kind of the reverse situation here.

NBHJSECH

1          THE COURT:  All right.  Let me hear from the SEC.

2          MR. CARNEY:  Thank you, your Honor.

3          So I think we highlighted one of the key exchanges in

4     our brief, and that's where I asked Dr. Hendershott at his

5     deposition, I said, generally speaking, how many key components

6     are there in the blockchain?  And he responded, "Key components

7     to the blockchain?  What do you mean 'key components?'"  And

8     then I handed him his expert report that had paragraphs

9     explaining the five key components of the blockchain.

10          And that to us highlights why a professional witness,

11    someone -- Daubert talks about it and other cases, the *Nimely*

12    case from the Second Circuit, talk about the influence that an

13    expert witness can have on a jury.  And so if you have a

14    professional expert witness, someone with a lot of experience

15    testifying in front of a jury, he might not know the subject

16    matter, might not be his expertise, but he gets up there and

17    starts saying things about how the Terra ecosystem worked, how

18    Anchor was a decentralized system, these aren't, as Mr. Henkin

19    said, background facts in the litigation.  This is the

20    litigation, whether Anchor was decentralized or not, the SEC

21    says it most certainly was not decentralized.  So to have an

22    expert get up who doesn't have the expertise and say Anchor was

23    a decentralized system, that creates serious risks.

24          THE COURT:  Although a different view, though not

25    universally held, but there have been at least a lot of studies

NBHJSECH

1    of mock juries that suggest that when parties call competing

2    experts, the jury says screw the experts, we'll decide it on

3    the facts.

4              MR. CARNEY:  That's true.

5              THE COURT:  But we don't know that.

6              MR. CARNEY:  I believe there's a district court judge

7    in New Mexico that cites that in every footnote in his cases.

8              THE COURT:  Sounds like a brilliant judge to me.

9              Okay.  So let's assume hypothetically that I strike

10   that part of the report.  What about the rest?

11             MR. CARNEY:  So the rest of our objection relates to

12   the fact that Professor Hendershott in his 97-page response to

13   Dr. Mizrach's 30-page report never addresses and never even

14   looked at the agreements that Jump had with Terraform.  And

15   these were agreements that they had to acquire tens of millions

16   of LUNA.  And it's important because it creates and shows an

17   incentive on Jump's part to support the peg.  As I'm sure your

18   Honor is aware, UST and LUNA were closely tied together.  And

19   so if UST's peg personally dropped and it collapsed, which is

20   what ultimately happened, LUNA was going with it.

21             THE COURT:  Yes.  So I understand that that created

22   all sorts of motivations which may be highly relevant to the

23   assessment of their roles before a jury, but as I understand

24   his report, he was just saying that he was assessing whether

25   Jump's trading played a role in pushing UST's price back up to

NBHJSECH

1    $1 in May, 2021.  And it's not clear to me how the

2    consideration of Jump's motives for those trades would

3    disqualify or so materially affect his conclusions as to make

4    them inadmissible.

5         MR. CARNEY:  The reason why is Professor Hendershott

6    did not do his own model in this case.  He purported to

7    critique Dr. Mizrach's model.  And one of the main criticisms

8    that he offers of that model is that Dr. Mizrach failed to

9    account for the fact that other traders, had Jump not been

10   there, other traders might have been incentivized to step in

11   and engage in the exact same kind of trading that Jump did.

12   And why do I know they have an incentive?  Because Jump earned

13   a ████████ profit from acquiring these ████████ of UST on

14   May 23, 2021.  So he sees the ██████ profit and says Jump had

15   an incentive.  So therefore, all these other traders would have

16   had an incentive, too, and they might have stepped in.

17        And that ignores the unique situation that Jump had

18   agreements that allowed them to acquire ████████ worth of

19   LUNA.  Besides that, at the time, May 23, 2021, Jump also

20   already held ████████████ worth of LUNA.  And

21   while UST was falling on May 23, 2021, so was LUNA, and Jump

22   was losing ████████████ with its held LUNA

23   precipitously dropping.  And those are the incentives, those

24   are the ones that matter.  And you can't point to a ██████

25   profit that they earned from acquiring a ████████ in UST

1   to support the peg and say that any other trader in the world

2   would have risked ███████ to earn ██████ on a token that

3   was rapidly declining.  And so it's a failure to consider the

4   entire context of what was going on with Jump that we point to

5   as a criticism.

6           THE COURT:  Let's get the witness up on the stand.

7   TERRENCE HENDERSHOTT,

8       called as a witness by the Defendants,

9       having been duly sworn, testified as follows:

10  DIRECT EXAMINATION

11  BY THE COURT:

12          THE COURT:  And if I'm not mistaken, you're also from

13  Berkeley?

14          THE WITNESS:  I am.

15          THE COURT:  So what about the point just made by the

16  SEC counsel?

17          THE WITNESS:  I don't believe I would characterize my

18  opinions the way the SEC did.  So what I looked –– so the first

19  thing is that, indeed, as your Honor pointed out, the

20  motivations don't enter into the statistical model.  So in

21  terms of evaluating Dr. Mizrach's statistical model, motivation

22  or agreements aren't part of that.

23          Now, the SEC was referring to a particular opinion

24  which was I examined whether or not Jump –– so in a case where

25  you might think someone is doing something for reasons other

1    than a profit motive, you would examine what their profits are.

2    And so I calculated what their profits were on what they did.

3    I made no statement about that -- well, that means that lots of

4    other people would have, but they potentially could have.  And

5    whether or not █████████ would have been enough incentive for

6    other people to do it is a question that's sort of separate

7    from whether or not Jump had other motivations to do it.

8            I wanted to focus on what Jump's revenues were from

9    that trading and whether or not someone else, therefore, might

10   have had an incentive to do it.  Whether or not Jump had other

11   incentive is a separate question.  I was merely trying to say,

12   well, might someone else have done the same thing?  And if they

13   had, would they have made money?

14           THE COURT:  By the way, I notice that you were paid

15   $1,400 an hour, and if I remember correctly, your colleague,

16   Dr. Parlour, was paid considerably less.  Does that mean you're

17   a lot better than she is?

18           THE WITNESS:  Christine is wonderful colleague, and I

19   certainly would never say that.  I might have more experience

20   than she does, although I'm not sure I would refer to myself as

21   a professional witness.  I try and be professional, but I've

22   only testified in front of a jury once.

23           THE COURT:  Okay.  Well, you may have that opportunity

24   again.  Okay.

25           What about the part about blockchain?  Why shouldn't I

1      just get rid of that?  It's not central to your opinions.

2                  THE WITNESS:  Well, it's not central to my opinion,

3      but, as Mr. Henkin pointed out that -- you know, so at the

4      latter part of my report, I talk about what happened in 2022

5      and the Anchor withdrawals and things like that.  So explaining

6      what Anchor is is relevant for understanding that later, and so

7      I wrote those initial parts.  They're heavily footnoted.  I've

8      published a paper that was a survey article on financial

9      technology that talked about the blockchain and made a number

10     of those same points.  So I have a publication that does a

11     similar thing, and I was characterizing them the way an

12     economist would in -- at a high level.  I'm not offering any

13     technical opinions about how it works.

14                  And I'm also -- you know, those characterizations are

15     similar to the academic literature that's looked at the Terra

16     blockchain.  The paper that Dr. Mizrach cites by Liu, Makarov,

17     and Schoar, you know, talks about Terra being decentralized and

18     Anchor.  And so I wasn't saying anything that I was intended to

19     be controversial.

20                  THE COURT:  But that's not the test.  The test under

21     rule -- you're not a lawyer, but I can congratulate you on

22     that.  But the test that I have to apply is whether the

23     opinions you're offering are within your area of expertise,

24     whether you derive them through an appropriate methodology,

25     whether you applied that methodology consistently, etc., etc.

1    So the fact that you once did a paper that had the similar

2    situation, that's neither here nor there.

3              THE WITNESS:  Well --

4              THE COURT:  The question is whether you have the

5    expertise in that area.  I could write a paper about the

6    considerable defects of the Yankees management, but I would not

7    claim that my expertise is in that area.

8              THE WITNESS:  So my expertise has been studying

9    technology and financial markets for the last 30 years.  And

10   the blockchain is a new kind of financial market, right?  My

11   first job was in a department called Computers and Information

12   Systems when Berkeley hired me.  I'm in the Operations and

13   Information Technology Management Group.  I'm basically the

14   information technology management person; the other people are

15   more operations.

16             I oversaw a research center.  I was a codirector of it

17   for ten years on technology and management.  We started up a

18   research center on innovative financial technology that I was

19   the director of.  I've been the chair of the group I mentioned

20   for almost the last decade, so I have a -- my entire career is

21   about studying technology and understanding how it works in

22   markets.  And when I write papers that have technology and then

23   talk about the market microstructure of it, I provide the sort

24   of backgrounds, and I use the same methodology in my expert

25   report that I do in my academic work to provide that

NBHJSECH                    Hendershott – Cross

1    background.

2              THE COURT:  All right.  Unlike the other two experts,

3    I think because of the potential greater materiality, if you

4    will, of the dispute between Dr. Edman and Dr. Hendershott, I

5    will allow the SEC to put some questions and then allow defense

6    counsel to put some questions, just a few.  I don't want to

7    take a lot of time with this, but if you want to put a few

8    questions, you may.  Or if you want to play Perry Mason, you

9    can go right up to him.

10   CROSS-EXAMINATION

11   BY MR. CARNEY:

12   Q    Good afternoon, Dr. Hendershott.

13            Now, you calculated that the Jump's profits on their

14   long position UST on May 23, 2021, were approximately ▮▮▮▮▮▮,

15   right?

16   A    I believe so.

17   Q    Okay.  And you believe that the profitable trading

18   undertaken by Jump indicates that other traders might have done

19   the same, right?

20   A    It indicates that someone who traded like this made money,

21   so other people might have done so.

22   Q    Okay.  And you don't know whether other traders or firms

23   have the same incentives as Jump, though, right?

24   A    I mean, everyone has a profit incentive.  If you're asking

25   about did they have the other incentives or other agreements?

NBHJSECH                    Hendershott - Cross

1   No, I haven't seen an analysis by Dr. Mizrach that analyzed

2   everyone else's incentives, so I don't know.

3   Q   You didn't do such an analysis yourself, right?

4   A   No.

5   Q   Okay.  And Jump's trading and in ██████████, which is the

6   algorithm they used, right?  It would not have been profitable

7   if the UST peg was not restored to $1, right?

8   A   I didn't calculate that.  But if you bought UST and the

9   price went down to a lower price, then indeed, you would lose

10  money.  But there were lots of other people who were buying UST

11  that day as well.

12  Q   Okay.  And you'd agree that when Jump took their long

13  position, they didn't know that their trades would be

14  profitable, right?

15  A   A trader -- it's a rare trade where you know you'd be

16  profitable when you make it, so no, they wouldn't know.

17  Q   And in fact, any trader on May 23, 2021, who took a long

18  position in UST at a price of ████████ wouldn't know for sure

19  whether the trade was going to be profitable, right?

20  A   I think it's very difficult to predict future price

21  changes, so you can't be certain.

22  Q   Are you aware of any other traders that also took a

23  ████████████████████████ on UST on May 23, 2021?

24  A   So non-Jump traders bought 125 million UST that day.

25  Whether or not any of them were individual traders, I don't

1  know, because, I mean, I was really critiquing Dr. Mizrach's

2  report, and he didn't do that analysis.

3  Q   Okay.  So were any of those traders within the 120 million

4  you mentioned individually acquiring ████████ worth?

5  A   As I said, I don't know.

6  Q   Okay.  And in your report, you didn't consider whether

7  other traders took large long positions when UST was below $1

8  on May 23, 2021, right?

9  A   No.  Dr. Mizrach did not, and I did not.

10 Q   And in your report, you didn't consider whether other

11 traders made a profit taking a long position on UST on May 23,

12 2021, right?

13 A   People who bought at the same time Jump would have or did

14 would have made a profit.  People who bought it at other times,

15 I'm not sure.

16 Q   Okay.  And so when you stated, as we just mentioned

17 earlier, that Jump's ████████ profits, that because of that,

18 other market participants would have had an intentive to trade

19 in a similar matter, you were basing that on the ████████

20 profits that you calculated, right?

21 A   Yes.  This was a trade that turned out to be profitable, so

22 other people had an incentive.  How strong that incentive is is

23 another question.

24 Q   So incentives were relevant to your opinions, right?

25 A   So I was looking at the -- you know, whether or not some

1   trading was profitable to see whether or not someone else would

2   have done it.  That's what I was looking at.

3   Q   All right.  And you did not review Jump's agreement with

4   Terra in forming your opinions, right?

5   A   It depends upon what you mean by "review."  So in terms

6   of -- Dr. Mizrach had long sections that talk about the flows

7   in of LUNA that occurred well after May 23.  And I read those,

8   and I did not dispute them.  But I was aware of them, so I

9   certainly considered them.

10  Q   You read the sections of his report?

11  A   Yes.

12  Q   But you never looked at the agreements themselves, did you?

13  A   There's -- I believe his report summarizes what he

14  characterizes as the agreements, but no, I didn't look beyond

15  that.

16  Q   And you know the agreements were entered into before

17  May 23, 2021, right?

18  A   It depends upon which agreements you're -- so I -- it's my

19  understanding, but -- and this is from counsel, is that there

20  were various agreements over time.  Some of them may have

21  preceded May 23.

22  Q   And then there was the one that was amended in July of

23  2021, right?

24  A   That's what I was making reference to.

25  Q   And you didn't review that agreement either, right?

NBHJSECH                    Hendershott - Cross

A    Well, I -- Dr. Mizrach talks about that -- those transfers
that occurred and did calculations of where the LUNA went, and
I read his report and considered that.

THE COURT:  Let me ask you a different question.
Since your testimony and report are being offered in rebuttal
of Dr. Mizrach's report, the SEC says that you used two papers,
you relied on two papers by Dr. Mizrach.  You used a similar
model to the one he used here in your declaration in the case
of *CFTC v. Nav Sarao Futures Limited*; is that correct?

THE WITNESS:  Yes, that's correct.  Although the
question is how similar they were, but I can talk about that at
length if you want.

THE COURT:  Well, I might put that off to another
time, but my question is -- so you're not disputing his
expertise?  You're only disputing what, how he applied his
model in this case?

THE WITNESS:  I can make very -- if you'd like me to
talk about the *Sarao* case and how this case is different from
it and how my -- what my criticisms of Dr. Mizrach, how those
relate to *Sarao*, I've got a demonstrative that would summarize
it very shortly.

THE COURT:  No.  I thank you, and not because I
wouldn't be interested to hear, but we unfortunately have a lot
to cover.  All right.  Questions from defense counsel?  I know
you wanted to ask more questions, but just as I cut off the

1    witness, I'm cutting off you as well.  Defense counsel?

2    REDIRECT EXAMINATION

3    BY MR. HENKIN:

4    Q    Professor Hendershott, where in the model that Dr. Mizrach

5    used are what the SEC has called incentives taken into account?

6    A    Not anywhere that I'm aware of.

7    Q    And the SEC has questioned your use of the word

8    "decentralization."  Are you offering an opinion about whether

9    anything in this case was decentralized or not?  Or are you

10   just discussing it as a generic term?

11   A    I was discussing it as a generic term.

12   Q    I would like you to talk about the *Sarao* case and, in

13   particular, what opinion you were asked to render by the CFTC

14   in that case and what you did render in that case.

15   A    So in particular in the *Sarao* case, this was about the

16   flash crash, when a trader in London was allege -- he pleaded

17   guilty to spoofing eventually.  And so in that case, there --

18   it was again -- I used a model that related to Dr. Mizrach's

19   model that -- and to assess the price impact of *Sarao*'s

20   trading.  And the question is what can you do with such a model

21   conceptually?  And so conceptually, it basically looks at the

22   ordering of events or how, you know, trading precedes price

23   changes.

24          And you can only -- you can calculate something that's

25   called a price impact.  But then, to say what would happen in

NBHJSECH                    Hendershott - Redirect

1    the absence of that trading requires a lot more.  You have to

2    do -- you have to have some way of determining how you think

3    other buyers and sellers would've behaved, and that's what

4    Dr. Mizrach doesn't do this that case.  That's what I told the

5    CFTC was very hard to do, so I declined to assert to make any

6    opinion about what the price would have been in the absence of

7    *Sarao's* trading, unlike Dr. Mizrach in that case, who opines

8    about what the price would have been but for Jump's trading.

9          And the second thing is there were large events,

10   right, there was the flash crash that was -- Dr. Sarao, the

11   CFTC was saying he played a role in, and they asked me do I

12   think that my model could support claiming that he caused the

13   flash crash?  And I said no, you need to do a lot more than

14   just calculate a price impact to be able to say someone caused

15   something.

16         And the analogous thing in this case is did Jump cause

17   the repeg?  And this was exactly what I was talking to

18   Mr. Carney about is that you have to understand how other

19   people might have traded if prices -- if Jump hadn't bought,

20   would other people have bought?  Were there other buyers?

21   There were a lot of other buyers that day, and Mr. Mizrach is

22   making very sort of extreme assumptions that no new buyers

23   would have come up, even after price falls all the way to zero

24   and people had bought UST before Jump did its alleged

25   intervention --

1            THE COURT:  Well, forgive me for interrupting.  All

2       the questions I have — and this is really more a question for

3       counsel, but I'll raise it now.  Given what you were just

4       discussing, one of the central allegations in this case is that

5       Terraform falsely represented that its pegging of the $1 price

6       for its tokens was the result of an automatic

7       self-stabilization and not through the intervention of some

8       third party such as Jump.

9            And my understanding is that the SEC's going to

10      present evidence from whistleblowers that Jump or other places

11      that will say when there was this huge crisis that ultimately

12      destroyed hundreds of millions, if not billions of dollars,

13      they attempted to pretend that their automatic algorithm was

14      stabilizing the price at $1 when, in fact, what was happening

15      was that there was a huge infusion of cash, secret infusion of

16      cash that propped up the price for a while.

17           I'm not clear why either your opinion or the SEC's

18      expert's opinion really bears on any of that more than

19      tangentally.  It's a simple factual question.  If they said to

20      the public we're maintaining the price automatically through

21      this very clever algorithm that keeps it at $1 dollar and, in

22      fact, they knew that was a lie and that they were dependent on

23      Jump, the fact that, theoretically, some other people might

24      have entered the market seems to me to be not irrelevant

25      perhaps, but very tangential.

1          THE WITNESS:  So my understanding of the SEC or

2     Dr. Mizrach's opinion is that he claims that his model shows

3     that Jump was responsible for that repegging.

4          THE COURT:  I understand.  And you're saying that you

5     disagree with that.  But if the question is that I say to the

6     public it's going to happen through our algorithm and I know at

7     the time I make that statement that that's baloney, it doesn't

8     matter what might have happened theoretically.

9          THE WITNESS:  Well, I'm a rebuttal witness and --

10          THE COURT:  No.  I'm not saying that what Dr. Mizrach

11     or you say is irrelevant.  It would be perhaps corroboration if

12     you took his position of what the SEC is saying, and it would

13     be not corroboration if the jury agrees with you.  I'm just

14     having a little difficulty seeing why it's a central matter in

15     this case, but that's really a question for counsel.

16          THE WITNESS:  Well, I mean it's -- I'm happy to

17     respond a little bit if you'd like me to.

18          THE COURT:  Sure.

19          THE WITNESS:  So I mean, there is this question of --

20     and I don't know what evidence the SEC is going to offer about

21     what the Terraform state of mind was, but the SEC attributed

22     the recovery to the trading of the -- of Jump.  And there's

23     just -- the price impact model that Dr. Mizrach uses by itself

24     does not allow you to --

25          THE COURT:  Well, I know that's your opinion.

1              THE WITNESS:  That's fine.

2              THE COURT:  And that's why I say this is really not a

3     question for you.

4              Okay.  We'll let you sit down.  Thank you very much.

5              MR. CARNEY:  Did your Honor want us to address that

6     briefly or --

7              THE COURT:  Yes.

8              (Witness excused)

9              MR. CARNEY:  So your Honor, I think the SEC shares

10    your assessment — and we've laid that out in our summary

11    judgment briefing — that the relevant fact is that Terraform

12    had secretly entered into this agreement with Jump to help

13    restore the peg outside of the algorithm.  And I think it's

14    important that the algorithm is something that's happening on

15    the Terra blockchain where people are going on and they're

16    burning UST in exchange for LUNA and vice versa, where the sort

17    of support and propping up of UST that we're talking about here

18    is all happening off the Terra blockchain on these centralized

19    exchanges where people are buying UST or Jump is buying UST in

20    exchange for non-Terraform cryptocurrencies, which is driving

21    the price of UST up.

22             And so our allegation is that they were going out in

23    the public and saying it was our algorithm that's on chain that

24    is allowing this equillibrium to be kept in place and to keep

25    UST at $1 when, in actuality, they had reached an agreement on

NBHJSECH

the morning of May 23, 2021 with Jump, when they saw the USD

depegging to go in and go onto these centralized exchanges and

buy up UST to get that price up.  Now, we hired an expert in

order to assess, well, what was the -- we know about this

agreement, we know that they were buying UST.  Let's get their

trading records.  You tell us.  You're the expert; we're not

experts.  What was the effect of that trading?  And so he

reached --

THE COURT:  My point — and I do want to thank you and

I'll give you an opportunity to be heard on this.  I'm a little

sorry, given the shortness of time, that I raised this

digression.  My point is if you've entered into a secret

agreement and you are representing to the public, oh, the

reason it's at $1 is that the combination of your brilliant

algorithm and natural forces, but really you're relying on a

secret agreement to do it, the fact that maybe theoretically

the natural forces may have achieved this is neither here nor

there.  It would still be a lie.

But let me hear from defense counsel.

MR. HENKIN:  So your Honor, I think what we're dealing

with here is you have to start with what's the SEC's

allegation.  And the SEC's allegation here that relates to the

reports that we're talking about from Professor Hendershott and

Professor Mizrach is that Jump was the cause of the repeg in

May of 2021.  And to the extent that that is the issue before

1    the Court, the Court needs to address whether Dr. Mizrach --

2    whether the SEC --

3         THE COURT:  I agree, I have to address it.  That's why

4    I say it's my fault for raising an unfortunate digression.

5         MR. HENKIN:  And I think the rest of this goes to

6    whatever other evidence the SEC intends to offer.  And your

7    Honor's going to have to address that in connection with

8    summary judgment because it's not in any of the reports here.

9    And so the idea that there might be whistleblowers and whether

10   any of that evidence is admissible is a separate issue.  It's

11   got nothing to do about whether Professor Mizrach's model is

12   admissible under Daubert and Rule 702.

13        THE COURT:  I agree with that.  So let's get

14   Mr. Mizrach up here, and then I'll also want to put some

15   questions to counsel with regard to him.

16   BRUCE MIZRACH,

17        called as a witness by the Plaintiff,

18        having been duly sworn, testified as follows:

19   DIRECT EXAMINATION

20   BY THE COURT:

21        THE COURT:  So Mr. Mizrach, thank you for being here,

22   although I think you only had to come from New Jersey, but, you

23   know, that can be a burden.

24        THE WITNESS:  New Jersey Transit is quite the

25   experience.

1              THE COURT:  Always a questionable trip.

2              So as I understand, the defense objections to your

3     report is that your methodology might be appropriate for

4     determining what price changes Jump's trading might have been

5     predicted to cause, but that's different from saying that they

6     actually caused it.  So what about that?

7              THE WITNESS:  Well, so two things:  The model has two

8     parts.  There first part is what's known as a vector

9     autoregression.  This involves, in this particular case,

10    returns, in this case, of UST/Tether.  But I want to make sure

11    the Court's aware, also, that we've analyzed another pair.  But

12    most of the attention of Dr. Hendershott has been focused on

13    the USDT/UST pair.  But I've also analyzed the Bitcoin/UST pair

14    as well.

15             So the VAR part tells us something about how did the

16    events of that day or this trading period were influenced with

17    one another.  And one thing that comes out of the lengthy

18    research on microstructure is that order flow is very

19    important.  We need to know the direction and sign of order

20    flow.  And then we see how it influences returns.

21             But then causal statements come, actually, from the

22    inversion of that model, too, something called the impulse

23    response.  This might not be forum, but once you invert it, you

24    then represent the history in a series of orthogonal shocks.

25    And orthogonal is a fancy statistical way of saying that these

NBHJSECH                    Mizrach - Direct

1   are causal.  So we can actually look at causal factors once we

2   invert the VAR for the impulse response, then we can draw

3   causal conclusions about the behavior of market participants.

4              THE COURT:  So the defendants say that you, "Did not

5   conduct a sanity check."  We'll get back to that in a minute

6   against the real world data because, under your model, if there

7   was a sufficient panic in the UST market, under your model, the

8   trading price would have been less than zero, which is clearly

9   impossible.  So what about that?

10             THE WITNESS:  Well, there's a statistical explanation,

11  and then there's the logical expansion.  The statistical

12  explanation is that at certain points in the day — and the

13  really key point of the day begins with 1430 to 15 GMT, where

14  other evidence in the case talks about what was going on

15  between Jump and TFL.  But associated with that, Jump typically

16  traded only ███████ UST, and that's a statement with respect

17  top May 1 to May 18.

18             And then, in this one half hour, they traded

19  ███████ UST, so ███████ in a half an hour than they

20  typically traded in a day.  So when you confront data like

21  this, unfortunately, the standard errors tend to be bigger, and

22  the standard errors here included zero.  I could've put in

23  fancier techniques that would have actually truncated the

24  standard errors from going to zero, but in fact, I thought it

25  was better to use the standard methodology, even with this

1    potential implication.

2              Now the second part, if I may, is to go to the logical

3    part.  Yes, this is a panic, and so we really have no idea how

4    much buying is necessary to stem the panic in that moment.  And

5    they didn't have the stem the panic once; they had to stem the

6    panic twice.  There's also an hour at the end the day on May 23

7    when they have to intervene again in large scale in manual

8    trading.

9              So the logical test is, of course, if the selling

10   pressure had not been alleviated, one of two things would have

11   happened.  And you'll have to speculate about what Jump might

12   have done, and that would have been to intervene even more,

13   so -- in the timeframe.  But we know it was sufficient in that

14   timeframe, and both of those timeframes, Jump simply provided

15   sufficient capital to support the pay.  And logically, we know

16   that selling would have stopped at zero.

17             THE COURT:  All right.  I'm going to give defense

18   counsel and SEC counsel the same opportunity I gave with

19   Dr. Hendershott to put questions.  But before I do it — and

20   this falls under the category of a strange exercise of judicial

21   discretion — I was struck by the use of the term "sanity check"

22   in the papers.

23             And it reminded me of something that none of our

24   guests ever heard of, which is the Marx Brothers film, "A Night

25   At The Opera."  And in that very great movie, Groucho is

NBHJSECH                    Mizrach - Cross

1    negotiating a contract with Chico, and they keep agreeing to

2    remove this clause and that clause.  And finally, they get down

3    to the final clause, the sanity clause.  Do you want to play

4    that, please.

5                (Video played)

6                THE COURT:  So I'm sure you wanted me to share that

7    with you.  Okay.  Let's get serious again.

8                Some questions from defense counsel for the witness.

9    CROSS-EXAMINATION

10   BY MR. HENKIN:

11   Q   Professor, would you agree with me that the price of UST

12   was increasing prior to the 1430 UTC period during which Jump

13   started what you've termed the active trading?

14   A   The price of UST moves up and down.  I don't have the

15   figure burned into my cortex, but you can look at my report and

16   you'll see it's moving up and down before 1430.

17   Q   Would you agree that it had moved from approximately ██

18   ██████ to approximately ████████ before Jump started what you

19   call the active trading?

20   A   I'd have to look back at the graph before I'd say yes or

21   no.  Since I don't have it in front of me, I'm going to just

22   say maybe.

23   Q   And would you agree that you use the same methodology in

24   analyzing both currency pairs that you talked about?  So the

25   Bitcoin/UST and the Tether/UST pairs?

A    Correct.  And part of that was the decision to model all of

Jump's buying, regardless of what form it took, whether passive

or active, as Professor Hendershott would like to consider it,

and that definitely, in fact, took into account exactly the

agreements that took place between Terraform and Jump.  So the

question came up in Dr. Hendershott's testimony where he's

saying that the incentives don't matter in the model.  No, the

incentives very much matter in the model.  And that is the

reason why I made the decision to model Jump's buying, whether

passive or active, as being indicative of the trade direction.

Q    And would you agree that, separate from Jump's purchases on

May 23, there were net purchases of 125 million UST by other

market participants on May 23?

A    You'd have to show me in which pairs and break that down.

So far the discussion in my report is confined to the

Tether/UST pair and the BTC/UST pair and also the aggregate, in

this case the net amount, of purchases by Jump across ten

different trading pairs.

Q    And your model depends on the notion that all non-Jump

trading is impounded into what you call the midquote, right?

A    Well, I don't create the midquote.  The midquote is created

by the market.  And so that's why I make the statement that I

do.

Q    No.  No.  No.  But your model depends on the notion that

trading by anybody else, information about trading by anybody

other than Jump is impounded into the midquote at any point in

time, right?

A    It's impounded, but both in the midquote and also the fact

that Jump is not doing any self-trading on this particular day.

Q    And so that means that if Jump trades at time T, and then

Jump trades again, let's say, 10 seconds later, your model

depends on the assumption that information about everyone else

who traded in between in that 10 second gap is impounded into

the midquote at the 10 second later time?

A    So the causal claims would require someone to demonstrate

that there was another party, another entity that was trading

in the same size, same timeframe, and also same direction as

Jump.  And I don't see such a party in the data, particularly

in the most crucial times of the day.  Jump is the only one

buying.

Q    Where in your report do you discuss any analysis that you

did of trading between the midquotes?

A    It came up in the rebuttal because there was a large debate

between Professor Hendershott and I about trade direction.

Q    And did you, in your rebuttal report, dispute the results

that Professor Hendershott came up with that your midquotes

didn't, in fact, include information about non-Jump trades?

A    So the primary things that I addressed in the rebuttal

report, because I'm limited in scope, I'm not going to provide

new arguments; they're simply responding to points raised by

1    Professor Hendershott.  And so there are a number of criticisms

2    of his alternative specifications, but I think the real bottom

3    line on that is from what Professor Hendershott said in his

4    deposition, that he didn't take any of these models seriously.

5    Q   But that's not the question I ask.  Professor Hendershott

6    looked at the assumption that you made, which is that all

7    non-Jump trading was in implied into the midquote or was

8    impounded into the midquote.  And he used your data and he

9    concluded that, in fact, that was incorrect.  Do you dispute

10   his result?

11   A   Yes.  Because this is precisely what the impulse response

12   is doing.  It's putting those forces into the background and

13   isolating the effect of Jump's trading.

14   Q   And where in your rebuttal report is the data that disputes

15   that result?

16   A   It's the same data that I used in my initial report.  It's

17   a VAR specifying sine trade direction influenced by the

18   information that I had about Jump's agreements with TFL and

19   corresponding quotes from the midquote that came from the best

20   bidder offer from the KuCoin exchange.  And again, we're just

21   talking about the one pair, so the data is the same.  I haven't

22   changed anything about the data or analysis.  I'm just

23   responding to specific points from Professor Hendershott's

24   report.

25           THE COURT:  I need to get cut you off, but questions

NBHJSECH                    Mizrach - Redirect

1   from the SEC?

2            MR. CARNEY:  Sure.  I'll keep it brief, your Honor.

3   REDIRECT EXAMINATION

4   BY MR. CARNEY:

5   Q    So Professor Mizrach, does your price impact analysis

6   generate a negative price?

7   A    No.  It predicts that there was a -- at the median, roughly

8   an 8 cents per million price impact.  But it is true, then,

9   that the tails of that extend into negative prices.

10  Q    And you talked about this in response to his Honor's

11  questions, but why was the period from 1430 to 1500 GMT on

12  May 23 critical to the Tether/UST pair?

13  A    Well, so generally, I don't have access to the kind of data

14  that I have in this particular class, certainly not in my

15  academic work, and even sometimes not in my regulatory work.

16  And so the -- I think the most important exhibit, the one that

17  I think that this tribunal should definitely be talking most

18  about, is that massive trading position that differs from all

19  of Jump's trading activity prior to that point.

20            And so you would be negligent, in my view, to not then

21  go into the textual record, as I talk about it, to try to

22  understand why all of a sudden after basically trading like --

23  in small positions as a market maker in UST does Jump again

24  begin this large-scale directional trading.

25  Q    And Dr. Hendershott claims that during a 30-minute period

1    where Jump makes ████████████████████████, the

2    price of UST ████████████.  Whereas your model predicts

3    the price impact to be ███████.  What is your interpretation

4    of what occurred in that 30-minute period?

5    A    So the period between 1430 and 15 appears to be a period of

6    panic in UST.  So selling accelerates.  I don't fully know the

7    reasons.  I'm sure the Jump witnesses can probably tell us

8    about that.  But what I'm actually showing is -- and that's

9    what the price impact model is telling you, is saying where

10   would the price have been had it not been for these large

11   directional purchases by Jump.

12              MR. CARNEY:  Thank you.

13              THE COURT:  You may step down.  Thank you very much.

14              (Witness excused)

15              THE COURT:  We have one more witness.

16         I should tell counsel that at 4:00 I have to take a

17   15-minute call in my chambers on another matter.  But if we're

18   not finished, we'll come back at 4:15, finish off then.

19         Let's get the other witness, Dr. Edman on the stand.

20   Is he here?  Yes, he is.

21   MATTHEW EDMAN,

22        called as a witness by the Plaintiff,

23        having been duly sworn, testified as follows:

24   DIRECT EXAMINATION

25   BY THE COURT:

1           THE COURT:  And how tall are you?

2           THE WITNESS:  Approximately 6'3", but I feel like I'm

3     shrinking.

4           THE COURT:  I was worried that might be the case.

5     Okay.

6           All right.  So I wasn't totally clear what expertise

7     you would bring to bear here.  Defendants argue that your

8     testimony should be excluded because you lack "sufficient

9     expertise in financial payment systems or payment processes,"

10    but as I understood it, what you were opining on is about the

11    Terra blockchain source code and its programming, but do I have

12    that right?

13          THE WITNESS:  Yes, to an extent, sir.

14          THE COURT:  Why don't you elaborate.

15          THE WITNESS:  So my expertise in this case really

16    falls into two categories.  The first one is source code

17    analysis where I was reviewing certain source code associated

18    with an application -- a number of applications, actually, that

19    Terraform implemented.  The second category of expertise is in

20    blockchain analysis where I collected and analyzed blockchain

21    transactions created using that software.

22          THE COURT:  So to put this in context, the overall

23    issue is the SEC's allegation that the representation by

24    Terraform that a company called Chai used the Terra blockchain

25    to process transactions was a lie, and really to disguise that

 1     lie, they were just copying what had independently been done by

 2     Chai.  It wasn't that Chai was using them — and this presumably

 3     would be of importance to anyone who wanted to invest in

 4     Terraform because if a big company is using Terraform for its

 5     transactions, that would be material.  So what I wasn't totally

 6     clear on is what you are saying about that issue.

 7              THE WITNESS:  So my opinions related to that issue are

 8     specific to whether or not these Chai transactions were

 9     processed and settled on the Terraform blockchain.  My opinions

10     aren't related to how Chai, for example, accepted credit cards.

11              THE COURT:  You're just saying here's what we know

12     about how Terraform dealt with this?

13              THE WITNESS:  Correct.  Here's what we know about

14     these transactions on the Terra blockchain.

15              THE COURT:  Okay.  And how did you determine that?

16              THE WITNESS:  I determined that by analyzing data from

17     a variety of sources.  One of those sources is the source code

18     for a piece of the software called the LP server, which was

19     responsible in my opinion for generating transactions on the

20     Terra blockchain.  I analyzed that software, determined the

21     nature of the transactions that the software created in the

22     Terra blockchain, collected and analyzed those transactions,

23     and looked at the interactions between addresses involved in

24     those transactions.

25              THE COURT:  Okay.  So rather than put further

NBHJSECH                          Edman - Cross

1    questions myself, again, I'll give defense counsel the first

2    shot and then SEC counsel.  Though we may have to interrupt for

3    a few minutes at 4:00 o'clock.

4    CROSS-EXAMINATION

5    BY MR. CALIFANO:

6    Q    Good afternoon, Dr. Edman?

7    A    Good afternoon.

8    Q    So as part of your examination and analysis, one thing that

9    you agreed upon and determined was that the LP server uses

10   what's known as a RESTful API; is that correct?

11   A    That's one component of it, yes.

12   Q    But it was also the case, do you agree, that unless inputs

13   are made into that RESTful API, that LP server will not execute

14   any transactions on the blockchain; is that right?

15   A    The LP server source code that I reviewed did require

16   inputs, whether via the RESTful API or via certain databases

17   that the LP server relied on.

18   Q    But because you did not examine any of that input or could

19   not determine what system was providing that input, you could

20   not determine who or what was exercising control over those

21   transactions that the LP server was performing; is that right?

22   A    Well, first, the inputs to the server were not available

23   for review.

24         THE COURT:  Yes.  I'm going to interrupt you on that

25   because that's something that I was unclear of from the papers.

NBHJSECH                          Edman - Cross

1   As I understand it, there was some data that was requested, I

2   guess, by the SEC that was never produced, what?  By Chai?

3            MR. CARNEY:  Never produced by defendants.  We had

4   discussions with, in particular Mr. Califano, who said he was

5   making his best efforts to obtain the data from a company

6   called Naver that was apparently hosting the data on behalf of

7   Gaza Labs, which was a Terra-affiliated company.  And by virtue

8   of that, they were asking Naver to provide them the data, but

9   were unable to get Naver to turn the data over to them.

10            THE COURT:  So what about that?

11            MR. CALIFANO:  Well, your Honor, there's a little more

12   information, I think, that the Court needs to consider about

13   that.  First of all, according to evidence that the SEC has

14   included in its own motion for summary judgment, the head of

15   engineering for e-wallets at Chai had explained that the LP

16   server actually sits with the Chai server on the Chai system.

17   What we do know from the information that was provided that was

18   available to TFL and was provided to the SEC was that control

19   of that Naver cloud was not in the hands of TFL.

20            TFL has produced every document and every relevant

21   piece of code or other data that it had in its possession.  TFL

22   also made efforts to try to get access to any of that server

23   information through Gaza Labs and even through Naver cloud,

24   which is sort of like the Amazon web services for Korea.  But

25   more importantly, your Honor, both the SEC and the defendants

NBHJSECH                          Edman - Cross

1   have made requests, which your Honor approved directly, to Chai

2   for all of this information and we are still waiting for it.

3   We want it, the SEC wants it, but we don't have it.

4          MR. CARNEY:  Your Honor, if I --

5          THE COURT:  Yes.  But then we are going to have to

6   stop and then we'll resume it because this is not unimportant.

7   So I want to get everyone's view, but I guess my narrow

8   question at the moment is if the data is produced by Chai, then

9   doesn't it make sense then to give it to the experts for both

10  sides to allow a supplemental report from each side if it

11  changes anything in a material way, yes?

12         MR. CALIFANO:  Yes, your Honor.

13         MR. CARNEY:  Yes, your Honor.

14         THE COURT:  You would agree with that?  Okay.

15         And secondly, where is Chai located?

16         MR. CARNEY:  In Korea.

17         THE COURT:  Okay.  All right.  To be continued.

18         We will take a 15-minute break.

19         (Recess)

20         THE COURT:  So just to finish up on that little

21  question, are there efforts that the SEC can apply for that

22  they haven't yet applied for to try to compel production of

23  those documents from Chai?

24         MR. CARNEY:  Well, your Honor, first, I think it's

25  important to make clear that there's two separate sets of data

1     that we're talking about.  And so when I was talking about the

2     efforts of defense counsel to obtain data, I was specifically

3     talking about their efforts to obtain Terraform data.  There's

4     this device called the LP server, and the evidence shows that

5     it was Terraform employees, there was an employee by the name

6     of Paul Kim, and I think in some of the briefing you would've

7     seen the chat message.  He's the fellow that says the LP server

8     is just replicating Chai transactions.  So the LP server was

9     something that was controlled by Terraform, and we asked

10    Terraform for that.  And that's what started this dialogue

11    which we attached to our briefing about their efforts to go to

12    Naver and get that information.  So that's one category of

13    data.

14         THE COURT:  Let's stop on that just for a minute so we

15    don't get two things confused.  So what about that?

16         MR. CALIFANO:  Your Honor, Paul Kim, according to the

17    evidence, was one of the people would wrote the code for the LP

18    server and wrote the code for another piece of operation that

19    Dr. Edman examined in his opinion.  The operation of the LP

20    server was something that was conducted in Chai systems.  That

21    information and that evidence is sitting in the government's

22    own filings in their motion for summary judgment.

23         What we have tried to do, nevertheless, because

24    Mr. Kim is a TFL employee and that kind of work that software

25    companies often perform by writing code for the operation of a

system that they may or may not fully control the operation of,
we have done everything we can to gather all the information in
our possession or in the possession of TFL and have produced it
to the SEC.

We are also interested in all of the data that was put
into the LP server and all of the structure of that Chai
payment system ourselves, which is why we have sought
independently to try to get that information.  But we have had
to do what we have to do by going to third parties to get it
because we do not have possession of it and nor do we have
control over it.  That is why we both made our independent
efforts to make those requests from Gaza Labs, which at one
point did initially open the version of Amazon web services
where all the Chai systems were operated.  We have gone to the
actual web hosting company to try to get them to respond to us,
and we have joined the SEC in making those requests to Chai
because we would also like to see that data.

THE COURT:  So to the extent that the data has not
been produced that was requested, is any of that data in or
controlled by companies in the U.S.?

MR. CALIFANO:  Not that we're at all aware of, your
Honor.  It's all in Korea.

THE COURT:  Okay.  So then I want to come back to the
SEC.  So I know you made and I approved your applications.  I'm
just wondering whether there are other things that could be

1   done to try to have those applications complied with.  So any

2   thoughts on that?

3          MR. CARNEY:  I mean, we could certainly give it some

4   thought.  I know that a request from your Honor carries a lot

5   more weight than a request from us, so I'm not sure --

6          THE COURT:  That's why I'm raising it.  I'm happy to

7   make requests, but I need to see what's -- there are two

8   possibilities.  There are things that I can compel.  That would

9   be true of, for example, anything in the United States, but

10  that's not the issue here.  There are things that I can

11  formally request like in Hague Convention applications and

12  stuff like that.  And then there are things that I can less

13  formally request such as letters to relevant judges in foreign

14  countries and so forth.

15         All those seem to me to be at least worth thinking

16  about, but we'd need to act fairly quickly because the trial

17  date, by the way, is, as I'm sure I've said before, firm,

18  fixed, final, and unmoveable.

19         So okay, let's go back to the witness.  Counsel was

20  putting some questions.

21         MR. CALIFANO:  Thank you, your Honor.

22  BY MR. CALIFANO:

23  Q   Dr. Edman, I think the last question I may have asked you —

24  and I just want to make sure that I've gotten this correctly —

25  is that, because you did not examine any of the input data that

NBHJSECH                         Edman - Cross

1   was put into the LP server to execute those transactions, you

2   were unable to determine who or what actually provided that

3   data; is that correct?

4   A   Yes.  Based on reviewing the LP server source code itself,

5   I can't say, you know, whether -- I can't say exactly what

6   application may have provided or called that REST API.

7   Q   And I believe you stated in your deposition that to do so

8   would be speculation; is that right?

9   A   I'm sorry.  Could you be more specific?  I don't remember

10  that context.

11  Q   In your deposition, when you explained that you were unable

12  to determine who or what was providing information to the LP

13  server, you said that any venture to guess on that would be

14  speculation; is that right?

15  A   You'd have to show me the transcript, but that's possible.

16  But the opinions in my report really relate to the -- whatever

17  actions the LP server source code takes on those inputs, what

18  it expects those inputs to be and the nature of the blockchain

19  transactions that that source code created on the Terra

20  blockchain.

21          MR. CALIFANO:  I think in order to speed that up, I

22  can submit to the Court, your Honor, that citation if we need

23  to.  I think we actually have --

24          THE COURT:  No.  I already have it.

25          MR. CALIFANO:  Thank you.

1          THE COURT:  But it seems to me there were two

2     questions.  One is a legal question, which is if an expert

3     would ideally have relied on certain information that, despite

4     the best efforts of everyone, is not available, does the fact

5     that it might be helpful mean that, nevertheless, his opinion

6     should be stricken?  Or simply does it mean that his opinions

7     have to be taken in a more narrow context?  And the second

8     question is whether really it matters as to the force of his

9     major opinion.

10          So those seem to me to be the questions raised by this

11    unfortunate lack of data.  I don't know if you wanted to

12    comment on any of that, but if not, let's put another question.

13    Q   Dr. Edman, you have no experience building, testing, or

14    operating financial payment systems; is that correct?

15    A   If you're talking about, you know, like credit card payment

16    systems, things like that, no.  Some of my professional work

17    was intersected with those sorts of systems before, in the

18    context of incident response, investigative analysis, source

19    code review.  But, again, my opinions in this case relate to

20    analysis of source code that Terraform developed and Terra

21    blockchain transactions.

22    Q   But you have never analyzed any payment systems to

23    determine where in those payment systems and at which point in

24    those payment systems a settlement is achieved, have you?

25    A   In the context of blockchain-based payment systems, yes.

NBHJSECH                        Edman - Cross

1   Q   Where did you offer an opinion about the settlement of

2   blockchain payment systems outside of this case?

3   A   Well, I think the example that I gave during my deposition

4   was a case here in Southern District of New York involving a

5   platform called OpenSea, which is a marketplace where users can

6   buy and sell NFTs in exchange for crypto assets, and I examined

7   certain transactions and smart contract source code related to

8   processing the settlement of those transactions on that

9   decentralized marketplace.

10  Q   But that doesn't relate to fiat payments, and it's not a

11  system like Chai that involves fiat payments; is that correct?

12  A   Correct.  That did not involve fiat payments, at least my

13  analysis in that case did not involve fiat payments.

14  Q   And your opinion, Dr. Edman, is that in this case, the

15  transactions that are executed by the LP server on the

16  blockchain do not represent the processing and settlement of

17  Chai payment system transactions; is that correct?

18  A   Correct.  Because based on my analysis of the blockchain

19  transactions, there was no indication that there was actually a

20  transfer of value between users and merchants that occurred on

21  the Terra blockchain.

22  Q   But you have not looked at a single element of the Chai

23  payment system, have you, in doing this analysis?

24  A   I mean, if you consider the LP server to be part of the

25  Chai payment system, then I would say that I have.  But again,

1    I haven't analyzed, you know, for example, how Chai accepted

2    credit card payments or interacted with fiat currency systems.

3    Q    In fact, you testified that you did not know how Chai

4    operated; is that correct?

5    A    Correct.  Again, my analysis in this case and my opinions

6    relate to an analysis of source court in Terra blockchain

7    transactions.

8    Q    So you have not analyzed any commercial payment systems

9    that use fiat, and in this case, you were unable to examine any

10   part of the Chai payment system other than the single component

11   that is identified as the LP server; is that correct?

12   A    No, I don't believe that's correct.  I gave on example

13   before of analysis that involved a traditional payment

14   provider, and my analysis in this case involved analysis of

15   more than just the LP server.

16            MR. CALIFANO:  Your Honor, I think I can stop there.

17            THE COURT:  Okay.

18   REDIRECT EXAMINATION

19   BY MR. CARNEY:

20   Q    Dr. Edman, what did you review in connection with forming

21   your opinions in this case?

22   A    I reviewed data from a variety of sources.  This included

23   source code repositories for components developed by Terraform

24   Labs, including the LP server, an LP watcher application.  I

25   reviewed internal communications, emails, chats involving the

NBHJSECH                        Edman – Redirect

1   developers of these systems.  I reviewed information related to

2   a website called Chai Scan, which purported to track Chai

3   payment transactions, deposition transcripts, really a variety

4   of sources.

5   Q   And is it normal in your line of work for someone to

6   review, for instance, communications between developers?

7   A   Yes.  In I would say pretty much every single

8   investigation, including blockchain-related investigations,

9   that involves, you know, not just analyzing and collecting

10  blockchain data, but also adding context to that data by

11  examining other sources.

12  Q   And how is it that you can determine what the LP server did

13  in this case without the inputs that defense counsel referred

14  to?

15  A   Well, the LP server is just source code and a fairly small

16  application at that.  So I could analyze that source code.  I

17  could look at what it expected the inputs to be, and I could

18  analyze what it would do with those inputs.  It's a

19  deterministic system.  So given certain inputs, you can analyze

20  the software and determine what the outputs are.  In this case,

21  the outputs from the LP server are blockchain transactions

22  which are public, and so I was able to identify the properties

23  of those blockchain transactions based on reviewing the source

24  code associated with the LP server and then identifying those

25  transactions on the public Terra blockchain.

1   Q   So just to be clear, did you need the inputs to identify LP

2   server blockchain transactions?

3   A   No.

4   Q   And did you do anything to verify your identification of LP

5   server blockchain transactions?

6   A   I did.  I reviewed some public posts that were made by Do

7   Kwon where he identified and pointed to screenshots of certain

8   transactions on the Terra blockchain and identified them as,

9   you know, purported Chai transactions.  I compared those

10  transactions and the properties of those transactions to the

11  properties that I used in my methodology for identifying Chai

12  transactions on the Terra blockchain and confirmed that they

13  were consistent.

14  Q   Okay.  And based on your analysis, did the properties of LP

15  transactions on the Terra blockchain change over time?

16  A   They did.  At a high level, there were kind of two

17  different properties or different characteristics of blockchain

18  transactions generated by the LP server.  Prior to

19  December 2019, the LP server source code, it appeared to ignore

20  a merchant ID that was one of the inputs, and it would just

21  create transactions from an address called the LP wallet.  It's

22  two purported user wallets controlled by the LP server, and

23  then a matching transaction sending funds back to the LP

24  wallet.  Post December 2019, it started to incorporate merchant

25  IDs into those transactions.

1   Q    Okay.  And just so we understand, if the inputs to the LP

2   server were not necessary for your analysis, do you have an

3   understanding as to why the SEC would have requested a copy of

4   the LP server?

5   A    So the copy of the LP server is interesting, aside from

6   just the inputs, because it can provide a source of forensic

7   analysis.  You can analyze this computer system and determine,

8   for example, who accessed this system, what they did while they

9   were on that system, commands that they had run.  I identified

10  certain scripts that were developed alongside the LP server.  I

11  don't provide an opinion in my report whether those were run,

12  but given access to the LP server itself, based on a forensic

13  analysis of that, you could determine whether and when and by

14  whom those scripts are run.

15  Q    And did you analyze the source code associates with

16  additional scripts or programs in the LP server repository?

17  A    I did.

18  Q    And then, finally, in your report do you offer any opinions

19  regarding the state of mind or the intent of the developer or

20  the LP server?

21  A    No.  I quote in my report statements made by the developer,

22  but the opinions in my report are really based on analysis of

23  blockchain transactions, other data produced in this case, as

24  well as my analysis of what the LP server source code did.

25          MR. CARNEY:  Thank you.

NBHJSECH

1              THE COURT:  All right.  Thank you very much.  You may

2      step down.

3              MR. CARNEY:  Thank you, your Honor.

4              (Witness excused)

5              THE COURT:  So while I know both sides would like to

6      make additional points and offer additional arguments, running

7      at least till midnight, I think I will forego that benefit.

8      But I will get you, as I say, a bottom line order.  There will

9      be a full opinion, but that I'm sure will not be ready by

10     Thanksgiving, but a bottom line will be, so you'll have the

11     bottom line.

12             And I do want to go back to a small issue, but I think

13     it's one we maybe should get a little briefing on, which is

14     should it be left to the jury to determine, on an appropriate

15     charge, whether these are or are not securities?  Or should it

16     be left to the jury to make factual determinations of each of

17     the elements that would be part, for example, of a Howey test,

18     but still then based on the jury's determination of those

19     factual elements, leave it to the Court to determine whether

20     they meet the requirements of Howey or not?

21             So there was mention made of one case that went the

22     first way, and that may be the right way.  I don't have a

23     preconception on this issue, but I think we need to resolve it.

24     Because, of course, the case may get resolved on summary

25     judgment, but barring that, this is an issue obviously we'll

NBHJSECH

1    have to confront before we get to the jury because we're not

2    going to have time during the course of the jury trial to deal

3    with it.

4            So I'll ask both sides.  I don't think we need a back

5    and forth in all this.  This is just to give me a head start,

6    so give me your views on that issue in letter briefs to be

7    submitted no later than December 2.  I would imagine would be

8    maybe no more than about five single-spaced pages.

9            All right.  Anything else we need to take up today?

10           MR. CARNEY:  Your Honor, I would just note for the

11   record that today was the date that your Honor had set as the,

12   trial-ready date and I don't know if --

13           THE COURT:  Oh, no.  No.  That has been superseded

14   by the fixed, final, unalterable trial date of January 29, I

15   think it is.

16           MR. CONNOR:  Your Honor, the one other issue we wanted

17   to raise is, just in terms of planning for trial, we have not

18   heard yet from the defendants whether they expect the defendant

19   Do Kwon to appear in trial.  And we've asked defendants whether

20   they intend to waive his right to appear at trial, and we

21   haven't heard an answer on that.  And we were hoping for an

22   answer by today, which previously was the trial-ready date.  So

23   we would just request that defendants inform us of their

24   position on that.

25           THE COURT:  Okay.  Dense counsel, want to comment on

NBHJSECH

1    that?

2            MR. HENKIN:  Your Honor, at this point, we're unable

3    to address that for the reasons that we've discussed with the

4    SEC previously.  When we are able to, when we have information,

5    we will, of course, provide it, but we just don't know yet.

6            THE COURT:  Okay.  Well, I think that's got to be

7    resolved certainly by end of December.  I don't think we can

8    leave it until right before the start of trial.

9            MR. HENKIN:  Agreed, your Honor.

10           By the way, one thing I just wanted to note, one of my

11   colleagues informed me that December 2 is a Saturday.  I don't

12   know if that's what your Honor intended.

13           THE COURT:  No.  Well, that's an added advantage, of

14   course, but yes, I was looking at a 2022 calendar.  So you are

15   absolutely right.  So in taking merciful advantage of that,

16   I'll give you till December 4.

17           Okay.  Anything else we need to take up today?

18           MR. HENKIN:  No.  Thank you, your Honor.

19           I would just say that we believe that the issues

20   raised by the expert reports, particularly of Doctors Mizrach

21   and Edman are critical to two of the very specific fraud

22   claims, and so we would urge your Honor to very strictly apply

23   *Amorgianos* and the 702 factors.

24           THE COURT:  Yes.  By the way, I should mention I was

25   invited — I think the fair term is coerced — into participating

NBHJSECH

1    at a conference on issues in securities law at Columbia Law

2    School in December.  Professor Jack Coffey, with whom I've been

3    teaching a course in white collar crime for 34 years, basically

4    let it be known that if I didn't say yes, he would never speak

5    to me again, which was, of course, made it a close call.  But

6    in any event, I accepted on the strict condition that obviously

7    I would say nothing about this case, even indirectly.

8            So what they have me doing in that is sort of giving

9    the history of *Howey* and with sort of the basic law that you

10   both have all agreed on in your papers and all like that.  But

11   I just wanted to let you know because if anybody has any

12   objections to my doing that, I might be tempted to take you up

13   on it.  Anyway, so that will be sometime in December.

14           Okay.  Very good.  Thanks so much.

15           (Adjourned)

16

17

18

19

20

21

22

23

24

25

1                          INDEX OF EXAMINATION

2      Examination  of:                              Page

3      CHRISTINE PARLOUR

4      Direct By The Court  . . . . . . . . . . . . .13

5      RAJ UNNY

6      Direct By The Court  . . . . . . . . . . . . .22

7      TERRENCE HENDERSHOTT

8      Direct By The Court  . . . . . . . . . . . . .33

9      Cross By Mr. Carney  . . . . . . . . . . . . .37

10     Redirect By Mr. Henkin . . . . . . . . . . . .42

11     BRUCE MIZRACH

12     Direct By The Court  . . . . . . . . . . . . .48

13     Cross By Mr. Henkin  . . . . . . . . . . . . .52

14     Redirect By Mr. Carney . . . . . . . . . . . .56

15     MATTHEW EDMAN

16     Direct By The Court  . . . . . . . . . . . . .57

17     Cross By Mr. Califano  . . . . . . . . . . . .60

18     Redirect By Mr. Carney . . . . . . . . . . . .69

19

20

21

22

23

24

25