NBURSEC

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   Securities and Exchange
    Commission,
4
                        Plaintiff,
5
                v.                          23 Civ. 1346 (JSR)
6
    TERRAFORM LABS PTE LTD., *et*
7   *al.*,
                                            Oral Argument
8
                        Defendants.
9
    ------------------------------x
10                                          New York, N.Y.
                                            November 30, 2023
11                                          3:30 p.m.

12  Before:

13                      HON. JED S. RAKOFF,

14                                          District Judge

15                          APPEARANCES

16  SECURITIES AND EXCHANGE COMMISSION
        Attorneys for Plaintiff
17  BY:  DEVON STAREN
         JAMES CONNOR
18       LAURA E. MEEHAN
         CARINA CUELLAR
19       CHRISTOPHER CARNEY
         ROGER LANDSMAN
20
    DENTONS US LLP
21      Attorneys for Defendants
    BY:  DOUGLAS W. HENKIN
22       LOUIS PELLEGRINO
         MARK CALIFANO
23

24

25

NBURSEC

1          (Case called)

2          MS. STAREN:  Devon Staren for the Securities and

3    Exchange Commission.

4          MR. CONNOR:  Good afternoon, your Honor.  James Connor

5    for the S.E.C.

6          MS. MEEHAN:  Good afternoon, your Honor.  Laura Meehan

7    for the S.E.C.

8          MS. CUELLAR:  Good afternoon, your Honor.  Carina

9    Cuellar for the S.E.C.

10          MR. CARNEY:  Good afternoon, your Honor.  Christopher

11    Carney for the S.E.C.

12          MR. LANDSMAN:  Good afternoon, your Honor.  Roger

13    Landsman for the S.E.C.

14          THE COURT:  So who is minding the store back at the

15    office?

16          Go ahead, counsel.

17          MR. HENKIN:  Good afternoon, your Honor.  Douglas

18    Henkin for the defendants.

19          MR. PELLEGRINO:  Good afternoon, your Honor.  Louis

20    Pellegrino for the defendants, and I believe we'll be joined by

21    paralegal Sarah Gonzalez in a moment.

22          THE COURT:  That's fine.

23          MR. CALIFANO:  Mark Califano for the defendants, your

24    Honor.

25          THE COURT:  Good afternoon.  So we're here for an

NBURSEC

1   argument on summary judgment.  This was originally supposed to

2   occur at 4:00, but the Senate of the United States confirmed a

3   new judge for the Southern District of New York a day or two

4   ago and a bunch of judges, including myself, have been asked to

5   meet with her at 4:30 today to help train her in our ways, from

6   which she will never recover.  So we have an hour.  So I'm

7   going to ask counsel not to reiterate what is already in their

8   excellent papers, but just to pick one or two points that they

9   particularly want to emphasize on the cross-motions for summary

10  judgment.

11          Before we get to that, though, there's a matter that

12  regretfully I have to raise just to make it a matter of record.

13  So in the motion papers that were submitted by the defense in

14  support of their motion for summary judgment, there was

15  included a declaration of Mr. Raj Unny.  It was a 26-page

16  declaration with a modest 185 pages of exhibits attached

17  thereto.  And the S.E.C., on October 31, called and said this

18  was really an unauthorized surrebuttal report that should not

19  be allowed because not only had expert discovery and

20  depositions been concluded but all discovery had been

21  concluded, and no application had ever been made to file a

22  surrebuttal report.  The defendant said, no, this is not a

23  surrebuttal report.  It's not an expert report.  It's simply a

24  declaration that is being submitted in support of their motion

25  for summary judgment.  So I said, well, what I would do is read

NBURSEC

1    it and then determine whether I should consider it on summary

2    judgment.

3              Subsequently, we had a Daubert hearing, and although I

4    have not issued the full opinion, I have issued the bottom-line

5    which included striking the testimony of Mr. Unny as an expert.

6    And although by that time I had read his declaration submitted

7    in support of summary judgment, I think based on what defense

8    counsel had represented to me over the phone, it should have

9    played and really should not play any role in the Court's

10   Daubert decision.  Nevertheless, for what it's worth, that

11   decision would have been the same so far as Mr. Unny is

12   concerned either way.

13             When I was reading the papers on summary judgment, I

14   returned to Mr. Unny's declaration, and it appears to the Court

15   unequivocally to be a surrebuttal expert opinion that, of

16   course, could never have been inquired into on deposition by

17   the plaintiffs because it was issued without permission after

18   all the discovery had been completed.  And it says, for

19   example, in paragraph two, "Dr. Edman has subsequently filed

20   the rebuttal report of Dr. Edman on October 13, 2023."  Let me

21   pause there to say that was with the full permission of the

22   Court after hearing from both sides.  But continuing the quote,

23   "I have been asked by counsel for Terraform Labs, or TFL, and

24   Dr. Do Hyeong Kwon to review and assess the opinions put

25   forward by Dr. Edman in this rebuttal report."  That certainly

NBURSEC

1   sounds like an unauthorized surrebuttal expert report, which

2   the S.E.C. had no ability to take a deposition about because it

3   was submitted without authorization and after discovery had

4   closed.

5           Nevertheless, troubled though I am very much by the

6   representations that defense counsel made to me on the phone, I

7   have decided to consider this report for purposes of summary

8   judgment, but I'm not considering it for purposes of Daubert

9   based on defense counsel's representation to me that it wasn't

10  part of Daubert.  Anything defense counsel wants to say about

11  any of that?

12          MR. HENKIN:  No, your Honor.  I think what you've done

13  in characterizing it is something that defense understands.

14          THE COURT:  All right.  Very good.  So we have

15  cross-motions.  Let me hear first from the S.E.C.

16          MS. STAREN:  Would your Honor like me to stay here or

17  go to --

18          THE COURT:  Go there.  I think everyone can hear you

19  better from there.

20          MS. STAREN:  This time I did not drop my papers.

21          Good afternoon, your Honor, and May it Please the

22  Court, we're here today because defendants Do Kwon and his

23  company Terraform Labs orchestrated a multibillion-dollar

24  fraud.  Defendant's fraud is not novel, and it is not

25  complicated.  Quite simply, they created a security, LUNA.

NBURSEC

1    They represented it to investors as the equity of the Terra

2    blockchain, and they linked its value to the successful Terra

3    economy.  Defendants then embarked on a campaign to increase

4    LUNA's price on a number of fronts, including by artificially

5    inflating Terra blockchain activity with fake transactions that

6    they falsely represented were real-world blockchain payments

7    through a company called Chai.  At the time, defendants

8    launched a near continuous stream of promotional statements

9    highlighting the various efforts they would and did undertake

10   to promote and grow the Terra economy.  When UST and LUNA

11   nearly crashed in May of 2021, defendants secretly brought in a

12   third party to help restore UST's peg, and then falsely

13   reassured the public that the algorithm had "self-healed."

14   Throughout this time, of course, defendants held on to hundreds

15   of millions of LUNA tokens that they created --

16            THE COURT:  Forgive me for interrupting.  Let me ask

17   you a few questions.

18            MS. STAREN:  Sure.

19            THE COURT:  First, are you contending that the mAssets

20   are themselves securities?

21            MS. STAREN:  No, your Honor.

22            THE COURT:  Okay.  That was my understanding of your

23   papers.  I just wanted to be sure.

24            Second, with respect to the fraud claims where intent

25   is an essential element, how can that be a matter of summary

1    judgment?

2          MS. STAREN:  So, your Honor, in this case, starting

3    with the Chai fraud, the undisputed evidence here comes in the

4    form of defendant's own internal and external communications,

5    and those communications make clear that defendants were very

6    much aware that Chai did not use the blockchain for purposes of

7    processing its payments.

8          First, we have Do Kwon's own statements.  In June of

9    2019, as defendants do not dispute, he told Terraform's

10    marketing director while Chai was start part of Terraform, and

11    he said, We are not using any Terra blockchain technology.  And

12    he instructed her to not tell the press that Chai was using the

13    Terra blockchain technology.  He knew Chai wasn't using the

14    Terra blockchain.  Again, in March of 2020, we have an

15    undisputed statement that Do Kwon made in an email -- internal

16    email to Terraform employees where he explained that Chai and

17    Terraform were going to split.  And the reason for the split is

18    so that Chai could operate its payment processing business as a

19    licensed payment platform within Korea and consistent with

20    Korean regulation, but that going forward, "Its business will

21    have nothing to do with Terra."  He recognized that Chai was

22    not going to be using the Terra blockchain because it couldn't.

23          Similarly, we have internal communications that

24    demonstrate Do Kwon himself directed that Terraform put

25    millions of sham transactions on the Terra blockchain by

NBURSEC

1   following Terraform's own KRT to and from their own accounts in

2   order to replicate Chai transactions that were happening in the

3   real world in fiat currency.

4          THE COURT:  What about the other claim?

5          MS. STAREN:  With respect to the May 2021 depeg, once

6   again, we have defendant Do Kwon's own internal communications

7   which, again, are undisputed.  On May 23, the day of the

8   significant drop of UST's price, Kwon told a Terraform employee

9   that he was "speaking to Jump about a solution."  He also told

10  a Terraform employee that the peg had to be defended, and he

11  held a meeting where he told a group of Terraform employees

12  that Jump was deploying $100 million to buy back UST.

13         Defendants already admit that Do Kwon had

14  communications with a Jump executive on that day, and

15  defendants already admit that Do Kwon and that Jump executive

16  discussed "efforts to restore the dollar UST peg."  And then,

17  of course, we have the declarations by the Jump employees who

18  tell the other side of the story.  And they are able to testify

19  that that Jump executive told Jump employees, I spoke to Do and

20  he is going to vest us.  The undisputed evidence here

21  establishes that Do Kwon and Jump established an agreement on

22  May 23 so that Jump would step in and buy up UST.  And then

23  defendants turned around and told the public that the algorithm

24  had self-healed when they knew that they had brought in a third

25  party to buy UST in an attempt to restore the peg.  Those

NBURSEC

1    statements were false, and they were misleading and they were

2    material as a matter of law.

3          THE COURT:  All right.  I interrupted you.  Go ahead

4    with whatever else you wanted to cover.

5          MS. STAREN:  Sure.  I think here the issue, obviously,

6    is going to be evidence, and the S.E.C.'s position is that

7    while the S.E.C. has, of course, presented overwhelming and

8    admissible evidence in support of its motion for summary

9    judgment, the defendants have proffered virtually nothing.  And

10   as mentioned, the vast majority of the S.E.C.'s evidence is in

11   the form of communications and statements that defendants do

12   not even attempt to dispute the contents of.  This includes, of

13   course, defendant's own internal and external communications.

14   It includes deposition testimony from Terraform employees,

15   investigative testimony from Do Kwon, and purchase and loan

16   agreements and communications between defendants and buyers of

17   LUNA and MIR.

18         And the S.E.C. has also submitted sworn declarations

19   and associated documents from summary and fact witnesses,

20   including whistleblowers at Chai and Jump, representatives of

21   intermediary firms that purchased tokens from defendants and

22   then resold them into public trading markets, and, of course,

23   U.S. retail and institutional investors that were defrauded by

24   defendants.  And although defendants purport to dispute some of

25   this evidence, they utterly fail to create a genuine dispute

NBURSEC

under Second Circuit law and the rules of this district because the defendants do not offer admissible evidence to contradict it.

Bluster, hyperbole, assertions of critical context that are provided by defense counsel is not evidence.  And if you look at the actual documents defendants rely on, they are either not admissible, they are not material, or they do not support defendants' assertions.  By way of example, one document, Opposition Exhibit 18, defendants claim that this demonstrates that Chai used the blockchain to process and settle transactions.  In fact, it is a marketing agreement between a Chai merchant, Chai and Terraform, and it provides for discounts, payable in fiat currency, Korean won.  And the agreement does not mention blockchain technology at all.

Even worse, defendants' point to a Chai merchant agreement, Opposition Exhibit 19, as evidence, again, that Chai processed and settled transaction on the blockchain.  In fact, this merchant agreement provides that the merchant would be "settled by payment to a bank account."  Defendants point to language in the agreement providing for reduced fees.  "If Terraform Labs PTE. Ltd. integrates the Terra service and open banking API."  "If", if Terra's service is integrated.  This means that Terra's service was not integrated as of the time they signed that agreement, which, if you look at it, was dated August 23, 2019.  All defendants have done by placing this

NBURSEC

1    document into evidence is prove that Do Kwon was, in fact,

2    lying in June 2019 when he told the world in his Medium post

3    that Chai "runs" on Terra's blockchain, which is in Defense

4    Exhibit 74b.

5          Now, because defendants have no evidence to support

6    their case, they resort to arguing to exclude the S.E.C.'s

7    evidence.  Defendant's arguments should be disregarded for the

8    reasons described in our reply brief.  The S.E.C.'s

9    fact-witness declarations are admissible, they are probative,

10   and they are damning, and the defendants offer no admissible

11   evidence to controvert them.  Thus, there is no genuine dispute

12   of material fact, and the S.E.C. is entitled to summary

13   judgment on all its claims.

14         With respect to *Howey* in particular, because

15   defendants do not dispute the contents of their statements,

16   there is no dispute about what defendants told investors.

17   Defendants only real argument there is a legal one that has

18   already been rejected by this Court.

19         THE COURT:  Let me interrupt again.  So I want to

20   focus on mAssets again and on your fifth and sixth claims for

21   relief, which are that defendants offered unregistered

22   security-based swaps to non-eligible contract participants in

23   violation of Section 5(e) of the Securities Act, and affected

24   transactions and security-based swaps with non-eligible

25   contract participants in violation of Section 6 -- I think it's

NBURSEC

6(l) of the Exchange Act.  The Commodity Exchange Act defines a
swap as "Any agreement, contract or transaction that provides
on an executory basis for the exchange of one or more payments
based on the value or level of one or more securities, and that
transfers, as between the parties, to the transaction in whole
or in part, the financial risk associated with a future change
at any such value or level, without also conveying a current or
future direct or indirect ownership interest in an asset."

Since, as you've already agreed mAssets themselves are
not securities, how do you fit them under these provisions?

MS. STAREN:  Sure.  So the S.E.C.'s position with
respect to the mAssets are that the transaction creating the
mAsset is the security-based swap.  And the way that this
security-based swap functioned is that the user could go to the
defendant's website at mirror.finance and could choose to
create or mint an mAsset.  And when they did so, they would
have to or were required to deposit collateral in the form of
UST equal to 150 percent or more of the value of that
referenced underlying asset.  Let's say it's a U.S. security,
Apple, for instance, and because of the way that the
transaction --

THE COURT:  Yes.  Again, I apologize for interrupting,
but it's not clear to me how the holder of an mAsset passes on
any financial risk associated with the future change in the
value of the security to a counter-party since the holder bears

NBURSEC

1    all the risk himself.

2            MS. STAREN:  So I think the S.E.C.'s interpretation is

3    that the financial risk is actually being transferred to the

4    investor, to the one minting the asset.  They are the ones that

5    have the financial risk such that if you --

6            THE COURT:  How is that?  Because, as I understand it,

7    if there's a change in the value of the underlying portfolio,

8    the holder has to increase their amount of their contribution.

9            MS. STAREN:  That's correct.

10           THE COURT:  So what is the risk that is being passed

11   on?

12           MS. STAREN:  So the risk that is being passed on is

13   that if they do not increase the collateral -- maintain the

14   150 percent ratio, they risk losing their entire collateral.

15   It would get liquidated through the protocol.

16           THE COURT:  Okay.  All right.  With apologies, I know

17   you were in full flight, but since we have such limited time,

18   let me hear from your adversary.  We'll come back to you

19   shortly.

20           MS. STAREN:  Sure.  Thank you, your Honor.

21           MR. HENKIN:  Good afternoon, your Honor, May it Please

22   the Court, Douglas Henkin for the defendants.  What Ms. Staren

23   said is correct.  This is about evidence but it's also about

24   legal issues.  And the motions before your Honor are

25   asymmetric.  The defendant's motion for summary judgment has to

NBURSEC

1   be evaluated on whether there's a lack of admissible evidence

2   that the S.E.C. has submitted, on issues on which they bear the

3   burden of proof, which are all but one.  The one that the

4   S.E.C. doesn't bear the burden of proof on are exemptions from

5   registration; whereas, the S.E.C.'s motion has to be evaluated

6   on whether it has offered admissible evidence proving every

7   element that it has the burden of.  Even if the Court thinks

8   the S.E.C. has offered admissible evidence on an element that

9   it bears the burden of proof on, which it shouldn't for reasons

10  such as the ones your Honor was describing, with regard to

11  mAssets.  And I think your Honor got it right, by the way, with

12  respect to that last part of the conversation.

13          That doesn't mean the S.E.C. gets summary judgment

14  because the defendants have demonstrated that there would still

15  be factual questions to be resolved in these circumstances.

16  And that can be done by, for example, demonstrating that a

17  witness has bias or has lack of personal knowledge or has -- or

18  that testimony is hearsay.  So this is a case --

19          THE COURT:  Of course, I understand you don't agree

20  with my interpretation of *Howey* and so forth, but that's

21  neither here nor there.  I've decided that on a motion to

22  dismiss.  So assuming that the facts that make certain of these

23  instrument securities is itself undisputed and all that is in

24  dispute is the legal interpretation I previously made, why is

25  your adversary not entitled to, at a minimum, summary judgment

NBURSEC

1   on the failure to register securities?

2           MR. HENKIN:  So for several reasons, your Honor.

3   First of all, I respectfully disagree that the interpretation

4   of *Howey* in this case was set or could have been set by the

5   motion to dismiss for two reasons.  One, it was just a motion

6   to dismiss; and, two, there are different arguments that have

7   been presented here with respect to how to interpret *Howey* and

8   how to decide if *Howey* is even good law with respect to the

9   interpretation of the S.E.C.

10          THE COURT:  All right.  So let's assume that those new

11  arguments are unsuccessful.  Let's assume hypothetically I

12  haven't made any decision, that I'm still not persuaded that

13  most of these instruments were not securities, but rather

14  believe that they were securities under the law.  What then is

15  left, assuming my hypothetical, with respect to summary

16  judgment on the lack of registration?

17          MR. HENKIN:  So what is left is whether, in fact, the

18  instruments do satisfy the *Howey* test.

19          THE COURT:  Okay.  I think we're on the same

20  wavelength.  So you agree that if contrary to your arguments,

21  old and new, that I find that on the undisputed facts, these

22  were securities that then the S.E.C. is entitled to summary

23  judgment on the failure to register?

24          MR. HENKIN:  No.  Then we go to the exemption

25  questions, your Honor.

NBURSEC

1          THE COURT:  Okay.  Again those -- well, all right.

2     Fair enough.  Those are largely legal issues.  They are not

3     perhaps entirely --

4          MR. HENKIN:  No, I don't think so, your Honor, and let

5     me give you an example of why not.  With respect to the -- and

6     this really ties together with the interpretation of *Howey*.

7     And the S.E.C.'s view of how Howey work is that these

8     instruments, with the exception of mAssets which we've now

9     dealt with separately, are investment contracts.

10         THE COURT:  I like, by the way, the turn of phrase of

11    "how *Howey* works."  I'll remember that for future use.

12         MR. HENKIN:  Maybe on December 8, your Honor?

13         THE COURT:  Yes.

14         MR. HENKIN:  That's their view of how *Howey* works, and

15    you have to go back and look what was at issue, what the record

16    was before the Supreme Court.  We submitted the entirety of it.

17    It's actually not big.  It's part of the record, and I would

18    urge your Honor to look at it.  And I'm going to get to that.

19    But before I get to that, there are two parts of this and they

20    are really two sides of the same coin.

21              (Continued on the next page)

22

23

24

25

NBU8SEC2

1            MR. HENKIN:  On the one hand, the SEC says, We want

2      you to infer the existence of a contract between TFL, for

3      example, and purchasers of UST or LUNA on the other hand, from

4      the way things were marketed, things that were said on YouTube

5      interviews or in press interviews or in other things, but they

6      want you to infer the existence of a contract and the terms of

7      a contract.  Because the requirement is –– again, on their

8      view, with which I do not agree –– that investment contracts

9      can be used under these circumstances.  They want you to infer

10     that there was a contract and what its terms were, where there

11     is nothing in writing, as there was in *Howey* and every other

12     case that has followed *Howey*, and we cite all of them in our

13     papers.

14            On the other hand, what you have is a situation, with

15     respect to the exemptions, in which you have token purchase

16     agreements or token sale agreements that are written contracts,

17     that have these specified terms that relate directly to, for

18     example, Regulation D exemptions, Regulation S exemptions,

19     Section 4(a)(2) exemptions.  And those are things that the

20     Court would have to look at.  But the SEC says, Those are just

21     things in pieces of paper; they shouldn't count.

22            They can't have it both ways.  If they want your Honor

23     to infer contracts on the side of whether something was a

24     security, then your Honor also has to consider what the effect

25     of contractual terms in contracts that were actually reduced to

NBU8SEC2

```
1    writing, and exist, and are before the Court, and are not
2    disputed.  In fact, the SEC has offered those as affirmative
3    evidence.  But they can't have it both ways.
4              THE COURT:  That's an interesting point.
5              I do want to -- again, with apologies, but because of
6    the time limitations -- hear what you have to say on the
7    fraudulent intent issues on the fraud claims.
8              MR. HENKIN:  Okay.  With regard to -- and my colleague
9    is going to address Chai.  I will address the depeg.  This case
10   is actually the opposite of a normal 10b-5 case.  And it's
11   interesting that Ms. Staren actually confirmed that the SEC's
12   allegations about the May 2021 depeg are about what first
13   happened in May and what was said about it later.
14             The normal 10(b) case is an allegation that on day
15   one, for example, somebody said something that was false then,
16   and then the truth was discovered sometime later.  Your Honor
17   has had, I don't even know how many cases like that.  This is
18   the reverse.  What the SEC's allegation here is, is that
19   something happened in May, that in fact the true cause of the
20   repeg was actions by Jump -- and that's the subject of disputed
21   expert testimony, significantly disputed expert testimony --
22   and that statements made after that were false because the SEC
23   says, we are right, in fact, it was really the Jump actions
24   that caused the repeg.
25             So if, in fact, that turns out to be wrong, then those
```

NBU8SEC2

1    post hoc statements are irrelevant.  They can't be true or

2    false, because the predicate for them being true or false, that

3    Jump caused the repeg, is false.

4         The fact of the matter is your Honor has allowed both

5    Professor Mizrach and Professor Hendershott to stay in.  And

6    that means that there is, at the very least, an issue of

7    material fact.  There is a substantial dispute, as discussed by

8    Professor Hendershott, in his report.  We disagree with your

9    Honor's decision not to exclude Professor Mizrach.  I'm not

10   going to relitigate that now.  But with him in the case, even

11   his testimony at the *Daubert* hearing creates issues of fact.

12   And I will give you an example.  This is just one.

13        THE COURT:  I need to interrupt you because you said

14   daw-bert.  And although lots of people say daw-bert, in fact,

15   Mr. Daubert is on record saying he pronounces his name

16   dow-bert.

17        MR. HENKIN:  Dow-bear.  I'm sorry.

18        THE COURT:  Not dow-bear.  Only French people say

19   dow-bear.  He says dow-bert.  I think it's the Brooklyn

20   pronunciation.

21        Go ahead.

22        MR. HENKIN:  Just Professor Mizrach's statements about

23   what he called -- when your Honor asked him about the negative

24   prices that his model produced, a couple of things happened.

25        First of all, he offered opinions that were not in

NBU8SEC2

1    either of his reports.

2           Second of all, he said that negative prices only

3    occurred in what he referred to as the tails, implying that

4    negative prices occur only with a small probability, which is

5    what being in the tail of a distribution means.  And that this

6    was due to the standard errors of his estimates being large.

7    That was on page 55, lines 8 and 9 of the *Daubert* transcript.

8    That's wrong.  Standard errors determine the width of a

9    confidence interval.  Larger standard errors cause the

10   confidence interval around the midpoint of an estimate to be

11   larger, not smaller.

12          So, if we were to go to trial, what Professor

13   Hendershott would testify is that, because the midpoint of the

14   confidence interval for the price impact from Professor

15   Mizrach's model was 1.303, that means that there would be 96.6

16   percent chance that his model was predicting a negative value.

17   And if he cut that down, the probability would only go up.  So

18   if he reduced the standard error, it would only go up.

19          That means that there is going to be a significant

20   fight in terms of the experts on the causation question that's

21   at the core of that part of the SEC's fraud theory.

22          I would like to let Mr. Califano address Chai.

23          THE COURT:  That is a good idea.

24          MR. CALIFANO:  Thank you, your Honor.  I am going to

25   break this down into a couple of quick pieces because I know

NBU8SEC2

1     the Court has time constraints.

2              One of the first things I want to address is the SEC's

3     attention to specific factual statements.  I think one of the

4     examples they gave was in paragraph 167 of their 56.1

5     statement, and we have a counter to that which I think the

6     Court should read.  But this is a great example because the

7     only thing they cite in that particular discussion is one

8     discussion about how one communications person was going to

9     make a comment with respect to what Chai has tested as opposed

10    to what Terraform Labs was doing, which was using a blockchain

11    for Chai and its transactions.  And later down in that

12    conversation there is explicit discussion about it.  So any

13    suggestion that this was a concealment is very misleading and

14    mischaracterizes the statements.

15             I can go through the 20 or so statements that the SEC

16    has done that with, but what we find is this.  On their face,

17    they are not false, and it is the defendants' position that

18    they are not false.  In many cases, and especially when we have

19    the entire statement, not just a piece of it, and that happens

20    at least six to ten times that we can count, and we have

21    identified those in our counterstatement, it is very clear that

22    that is not what they say.  When they say that statements that

23    Do Kwon makes say that merchants accept KRT in payment, that is

24    not what those statements say, not on their face and not in any

25    way.  They talk about settlement with respect to the

NBU8SEC2

blockchain.

Now, your Honor, I am going to leave those statements because our position on them is very clear.  We think they have been misrepresented.  We think on their face they are very clear and not false.  But more importantly, the basis of the fraud that the SEC, and the basis of their evidence, is from two sources.  The first source is their whistleblower witness, the Chai witness, who I understand, your Honor, until you give us instruction otherwise, we are not to name, so I will not.

That particular person has no personal knowledge about the functionality of Chai's payment system, nor does he have any personal knowledge about the LP server.  These are from his own statements, many of which he surreptitiously recorded, one of which we only received because the Court compelled him to produce it.  And, of course, later, in his deposition, we discovered that he had additional recordings that he had not produced pursuant to that subpoena.

However, a couple of things he did admit.  He did not develop the Chai payment code.  He wasn't around when that happened.  He only managed the software developers.  He did not work on any code.  He did not produce Chai payment system code or any operational data at all.  We have none of that.  And the SEC has never gotten it, in fact.  He never examined the LP server codes, and he had never heard of a top-up source code, and he did not know about the LP server code until shortly

NBU8SEC2

1    before he left.  And how he learned about it was by asking the

2    head of engineering --

3            THE COURT:  I don't think it's the SEC's position,

4    that we will hear in a minute or two from them, that I could

5    award them summary judgment on the issue of scienter, or for

6    that matter, the issue of fraud, based solely, or even

7    substantially, on the whistleblower testimony, because it's

8    clear that you have disputed that testimony in enumerable

9    respects.  So what I just heard from them, however, was

10   reference instead to things that have come out of the mouths of

11   your clients, in effect.

12           MR. CALIFANO:  Yes, your Honor.  And in our

13   counterstatement, we have disputed each and every one of those

14   interpretations by the SEC, and in many cases we have actually

15   provided the Court with the full discussion.  In many cases,

16   when Do Kwon or TFL is discussing a vision or a plan, they have

17   mischaracterized it as the actual representation of

18   functioning, which it most certainly is not on the face of it.

19   And it's clear by the words that it's not.

20           In other cases, they have taken one, and this is an

21   interesting case where they have suggested, for example, that

22   in a discussion between Mr. Kwon and Mr. Shin, where there is a

23   discussion of generating fake transactions, they have said that

24   this is evidence of exactly what they did with Chai.  But in

25   reading that conversation, the very plain language of that

NBU8SEC2

1    conversation, it has nothing to do with Chai.  Those

2    transactions and that discussion concern SDT, which is a

3    different type of stablecoin, which is used by validators in

4    conducting transactions on the main net, not with Chai, never

5    with Chai.  It never involved Chai.  And, in fact, it was a

6    public project.  It was called Project Santa, which was

7    publicly announced, in which the validators participated in

8    generating those transactions.

9         There was a purpose for that.  And the purpose was

10   this.  Because of the mechanism, whereby the stablecoins were

11   managed through the algorithm with LUNA and the variable price

12   of LUNA, there was no way for those validators to actually get

13   benefit from the normal inflationary value of tokens on a

14   blockchain as the blockchain begins to grow.  They can't do

15   that.  So they had to find an alternative way.  And actually,

16   in this discussion, they do discuss this.  They discuss the

17   fact that they have to give that incentive to the validators in

18   order to continue to operate the blockchain, until, hopefully,

19   other protocols take off and make the blockchain more active.

20        The very big concern that the defense has with that is

21   that that is a primary example of something that has absolutely

22   no probative value, it's highly prejudicial, and is exactly the

23   kind of thing that courts prohibit from admitting.  Because the

24   suggestion and the supposed stink of that had nothing to do

25   with what they have alleged as a fraud.  And that's one of the

NBU8SEC2

1   most important examples I can give you.

2             THE COURT:  All right.

3             MR. CALIFANO:  I want to just continue with one or two

4   other things.

5             THE COURT:  Quickly, though, but I will be glad to

6   hear you.

7             MR. CALIFANO:  Very, very important.  In the

8   discussion in which the SEC's whistleblower witness is trying

9   to learn how the LP server works, there is some very important

10  statements made by the Chai engineer that is important for the

11  Court to understand.  The first one is that the LP server

12  resides in the Chai server, it's part of the Chai system.  The

13  second one -- I am going to make it three.  The second one is

14  that the LP server transactions were part and parcel of what

15  Chai did.  When a consumer made a transaction with a merchant,

16  it executed two pathways.  And the engineer references both

17  pathways.  But even more important, what the engineer tells

18  this witness is, from Terra's perspective, the transactions has

19  a mirror so I think they are settling.  Not paying.  In the

20  eyes of that engineer, settling was occurring through the LP

21  server.

22             That's important, because the only thing that this

23  witness has to talk about with respect to that activity is what

24  he has been told by others.  He has no independent knowledge

25  and no personal knowledge whatsoever.  And as proof of that,

NBU8SEC2

1    twice this witness, once in a deposition and later in an actual

2    declaration in support of this motion for summary judgment,

3    tries to explain why he asserts that Chai doesn't use the

4    blockchain.  The first time he does it he says, Chai doesn't

5    use the blockchain because the transactions that the LP server

6    actually executes have already been settled with the merchants.

7    But that's false.  It's provably false.  Those transactions

8    that the LP server executes are executed within seconds of a

9    consumer buying or transacting with a merchant.  Merchants buy

10   the exact agreements that were just cited by the SEC and get

11   paid 14 days later.  That's not the way this system works.  It

12   was demonstrably not that way when he said it, and it is still

13   that way today.

14          Secondly, in his own declaration, in which he begins

15   to describe things that he never described in his deposition or

16   in any other statements whatsoever that we have, he insists

17   that one of the reasons that he knows that Chai does not use

18   the blockchain is because of the way that Chai actually settles

19   with merchants on a, quote, monthly basis.  But that's false.

20   He was told, again, by that same engineer, that Chai settles

21   every day, like every other payment system, your Honor, that

22   has ever used that kind of a process.  There is a 14-day

23   settlement period, and that's the period of settlement that was

24   used.

25          In both cases, he was given two slow highballs to

NBU8SEC2

1    swing at, to try to explain why he has personal information,

2    and in both cases he failed.  He failed because he really

3    doesn't know.  Not only did he fail, either he ignored what he

4    was told or he deliberately didn't tell the truth.  And given

5    his history and given his practices, we obviously feel it was

6    the latter.  He has incredible bias.  He has been caught lying

7    several times, both in his deposition and several other

8    instances.

9            Finally, your Honor, we know that Dr. Edman will

10   testify.  And Dr. Edman, even as a testifying expert, has a

11   massive problem.  Dr. Edman has opined about settlement and

12   processing in a payment system.  He has no expertise and

13   experience in it.  He has never looked at the system.  He has

14   never looked at any data from the system.  He has admitted that

15   he has no idea how the one process he looked at in that system

16   runs, and he admitted that it could very well be directed by a

17   human being, just like a customer.

18           THE COURT:  All right.  Thank you very much.

19           Let me hear finally from the SEC in rebuttal.

20           MR. HENKIN:  Your Honor, may I make a request just

21   briefly.  Not to intervene, but because there are competing

22   summary judgment motions, may I have one minute at the end for

23   rebuttal on ours?

24           THE COURT:  No, you will have two minutes.

25           MS. STAREN:  Thank you, your Honor.

NBU8SEC2

1          So, there were a number of points that were addressed
2     by defense counsel, and I would like to start with Chai just
3     because it was the most recent topic of discussion.  Once
4     again, the issue is evidence.  And while defense counsel can
5     stand up here and talk at length about Project Santa, and
6     whatever other fake transactions Do Kwon may have been talking
7     about that were separate and apart from the fake Chai
8     transactions that he put on the blockchain, none of that is
9     evidence.  If they have a witness -- they have 100 employees,
10    over 42 in the United States alone.  They don't have a single
11    fact witness to come forward and say that Chai was using the
12    blockchain, that Chai and Terraform collaborated to put these
13    transactions on the blockchain.  There is no factual evidence
14    to support what they are saying.  And again, very creative, but
15    it's not evidence, and it cannot be used to create a genuine
16    dispute of material fact before this Court.

17         I would also like to point out something interesting,
18    two things that defense counsel said.  First, he came up and he
19    said, Terraform was using the blockchain for Chai.  And I
20    actually don't necessarily disagree with that.  I think that's
21    the whole point here.  Is that Do Kwon and Terraform were
22    telling the world that Chai was processing transactions.  Chai,
23    a real world payment processing company, was executing real
24    world transactions between real world Chai users and real world
25    Chai merchants.  And they represented to the world that those

NBU8SEC2

1    were happening on the blockchain.  In fact, Do Kwon said, in a

2    February 2020 discourse post, right now we have 12 merchants

3    that are accepting payments on the Terra blockchain.  And that

4    is simply false.  Because, as I mentioned before, the

5    agreements that defendants even put into the record

6    demonstrate, and as counsel reiterated just now, it was a

7    14-day settlement process.  Merchants got settled in fiat

8    currency by a transfer to their bank accounts.

9           So, again, the story is about Project Santa and

10   whatever other alternative hypothetical scenarios defense

11   counsel can come up with.  It's not evidence.  It doesn't

12   create a genuine dispute.  What you have here is you have the

13   Chai CPO attesting to the fact that, in his role as chief

14   product officer, he saw all of Chai's products lines.  They all

15   involved traditional payment processes, of bank accounts,

16   credit cards, debit cards.  It is corroborated by the

17   undisputed record that Chai users used Chai by connecting the

18   bank account and transferring the fiat currency to the Chai

19   platform, and Chai transferred fiat currency to settle those

20   transactions with merchants by transferring that currency to

21   the merchant bank accounts.  That is not in dispute.

22          And again, with respect to the LP server, whether or

23   not it sits on Terraform servers or Chai servers, they were the

24   same company for a long time.  And what matters is that, as

25   defendants have already admitted, Terraform employees were the

NBU8SEC2

ones that coded, developed, controlled, operated the LP server, which they also admit is the server that was used to put those transactions on the blockchain.

And let me reinforce that it is, in fact, Terraform's own employees. Defendants admit there were two Terraform engineers that had primary roles with respect to developing the LP server. One was Paul Kim, the head engineer for Terraform. And he directly said, in an undisputed communication, that the LP server basically replicates Chai transactions. Similarly, Yun Yow, the other Terraform employee that defendants admit coded, developed, and operated the LP server, he is on record saying, we currently mirror all actual transactions between user Chai and merchant accounts. The clear implication here is that the actual transactions are not happening on the blockchain; they are happening in fiat currency off the blockchain.

Now, I would like to go back and correct something with respect to the May 2021 depeg fraud. Which is that it is not the SEC's position that we have to prove that Jump's trading was a but-for cause of the May 2021 repeg. Of course, you have our expert reports, and we obviously believe that it was, but we don't believe we have to prove that. That is not an element. All that the SEC needs to prove here is that the statements relating to that depeg were false and misleading. And the SEC's view is, because defendants brought in Jump to

NBU8SEC2

1   intervene and buy up UST, it was false and misleading for them

2   to represent publicly that the algorithm operated alone to

3   restore UST's peg without the involvement of human agents.

4          That's it.

5          THE COURT:  Let me hear finally from Mr. Henkin.

6          MS. STAREN:  Thank you, your Honor.

7          THE COURT:  Thank you.

8          MR. HENKIN:  Thank you, your Honor.

9          What I want to start with is that what you have just

10  heard from the SEC is an attempt to completely reverse the

11  burden of proof in a case like this.  The argument is

12  essentially that, because the defendants, in the SEC's view,

13  have not presented affirmative evidence disproving the SEC's

14  claims, the SEC is entitled to summary judgment.  Your Honor

15  knows that's not the way summary judgment works.  That's not

16  the way the burden of proof works.  And that is a fundamental

17  issue in this case.

18         You just heard a flip-flop, I guess I would call it,

19  with regard to what the SEC thinks it needs to prove with

20  regard to Jump.  That in and of itself is a demonstration that

21  the SEC's motion for summary judgment can't be granted with

22  respect to the May 2021 depeg, because now what you have heard

23  the SEC say is, never mind what our expert thinks, we can prove

24  that the statements were false and misleading independent of --

25  and that's exactly what was said -- independent of what caused

NBU8SEC2

1    the May 2021 depeg.

2            THE COURT:  Isn't the SEC right about what the law

3    requires in that regard?  Their expert may have gone further,

4    and they may have a much broader theory, but what they have to

5    show is that there was a material false statement or

6    misrepresentation made with intent, and the other classic

7    elements of fraud.

8            MR. HENKIN:  That's right, your Honor.  But that

9    raises the question of how they are going to prove that the

10   statements were false if the expert is not at issue.  And the

11   only thing that they have submitted with regard to that are

12   statements by Jump employees who have admitted that they have

13   no personal knowledge of anything that they have testified to.

14           One, for example, who we are going to call the Jump

15   whistleblower, is somebody -- and I won't say the other names

16   just so that we keep all that --

17           THE COURT:  By the way, forgive me for interrupting.

18   In a different connection recently, in one of my orders and one

19   of the lesser issues raised, I reminded counsel, but I want to

20   remind them again, to the extent this case goes to trial,

21   nothing is going to be kept confidential.

22           MR. HENKIN:  Your Honor, I fully remember that.  If

23   your Honor decided that today, it would be fine with me.  I am

24   not asking you to.

25           But the important part about that whistleblower is

NBU8SEC2

1    that that whistleblower admitted during his deposition that he

2    had no personal knowledge of anything he had informed the SEC

3    about.  He heard it all from other people.  And he admitted it

4    to somebody else in direct messages on Twitter that your Honor

5    has in the record as well.

6         So, even if they are not relying on their experts,

7    which is a very interesting and curious position for a

8    plaintiff alleging fraud to take, they still don't have any

9    admissible evidence that the statements were false or

10   misleading.

11        And I want to leave your Honor with the *Howey* issue.

12   Because what I think your Honor needs to do is look at what

13   really was going on in *Howey*.  It was stipulated in *Howey* that

14   everyone was offered the same deal.  And the same thing is true

15   in every case that has followed *Howey*.  And your Honor has the

16   *Howey* record.  It has the stipulation of facts; it has the two

17   contracts that were offered to every single person who was

18   given a tour of the Howey-in-the-Hills facility and a hotel;

19   and it has a copy of the sales pitch.  And the sales pitch is

20   really interesting.  Because the sales pitch includes the

21   statement:  Don't buy one of these groves unless you can take

22   care of it and do all the things that were promised as part of

23   the companion second written contract.  And you're not going to

24   find anything like that here.  And the real issue here is, in

25   none of those cases was it the case that a purchaser of an

NBU8SEC2

1   asset took possession of it and decided what to do with it

2   later.  You don't have in the *Beaver* case, for example,

3   discussions of somebody took home a live beaver and said, Oh,

4   this isn't working out, I better go back to those people who

5   sold me the beavers and enter into a contract.  That's not the

6   fact pattern of these cases.  The fact pattern is a uniform

7   offer of multiple contracts with bilateral obligations going

8   forward.

9            And in this case, the SEC has presented no evidence of

10   that.  The best example is their reliance on the idea that LUNA

11   purchasers could get staking rewards.  But again, LUNA

12   purchasers could only get staking rewards after they had

13   purchased LUNA and by making a specific decision to stake, or

14   leave, or unstake that LUNA with validators and get those

15   rewards.  Just holding LUNA didn't entitle that holder to any

16   staking reward.

17            And what I would say is, even if your Honor sticks to

18   the interpretation of *Howey* that was discussed in the motion to

19   dismiss decision, and has been argued by the SEC, that is an

20   individualized determination that needs to be made for each

21   instrument based on the admissible evidence.  And when you look

22   at what the issue was in *Howey*, you will not find evidence

23   proving each of those elements in the record.

24            Thank you.

25            THE COURT:  Thank you very much.  And I thank all

NBU8SEC2

1    counsel for their excellent presentations.

2              I am going to go tell my new colleague that all the

3    lawyers who appear in the Southern District are brilliant, but

4    really it's just the three of you, and who knows about the

5    rest.

6              Thank you very much.

7              That concludes this proceeding.

8              (Adjourned)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25