# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>       Plaintiff,<br><br>  v.<br><br>TERRAFORM LABS PTE. LTD. and DO HYEONG KWON,<br><br><br>       Defendants. | Civil Action No. 23-cv-1346 (JSR)<br><br><br><br>Hon. Jed S. Rakoff |

## DECLARATION OF ARRASH CHRIS AMANI

I hereby declare pursuant to 28 U.S.C. § 1746:

1.  I am the Chief Executive Officer of Defendant Terraform Labs Pte. Ltd. ("TFL"). I make this Declaration in opposition to the SEC's Motion for Final Judgment Against Defendants. This declaration is based on my personal knowledge and review of TFL business records and public information.

<u>LUNA Foundation Guard</u>

2.  The Luna Foundation Guard, or LFG, is an independent Singaporean nonprofit organization. It was created to hold a reserve of cryptocurrencies (such as Bitcoin) to defend the UST peg against volatility. Exhibit A hereto is a true and correct copy of a post on  Medium on Jan. 19, 2022, entitled "Formation of the Luna Foundation Guard (LFG)."

3.  On January 10, 2022, TFL and LFG entered into a Master Services Agreement. Exhibit B hereto is a true and correct copy of the agreement.

4.  TFL is not and was never a director or owner of LFG.

5.      The bulk of LFG's assets were distributed to UST holders through (1) interest payments to Anchor depositors (by means of a contribution from LFG to the Anchor reserve fund) and (2) open-market UST purchases made to defend the UST peg during the May 2022 depeg.

Terra 2.0

6.      On May 17, 2022, a community governance proposal, Proposal 1623, proposed the launch of a new blockchain, Terra 2.0 mainnet (Phoenix-1), with a new governance token, LUNA 2.0. This proposal was live for voting between May 18, 2022 and May 25, 2022.

7.      Proposal 1623 passed the community vote with over 65% of the votes cast in favor of the proposal.

8.      TFL did not vote for or against Proposal 1623. Do Kwon's votes for Proposal 1623 represented only 0.06% of the total votes in favor, and 0.04% of the total votes overall.

9.      Proposal 1623 would have passed without Do Kwon's votes in favor of the proposal.

10.     On May 28, 2022, Terra 2.0 went live.

11.     Pursuant to Proposal 1623, LUNA 2.0 was distributed to the community pool, LUNA classic holders, and UST holders.

Restrictions by Non-U.S. Exchanges

12.     Exhibit C hereto is a true and correct copy of a June 14, 2019 update by Binance to its Terms of Use, which provides in part, "Binance is unable to provide services to any U.S. person."

13.     Exhibit D is a true and correct copy of a August 12, 2017 service changes announcement by Bitfinex, in which it stated that, "effective immediately, [it] will no longer be

DocuSign Envelope ID: 67D3B38E-6D4D-40E6-B663-1ED76D7F4140

accepting verification requests for U.S. individuals" and that, "over the next 90 days, [it] will be discontinuing services to [its] existing U.S. individual customers."

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed within the United States, this 26th of April, 2024

Arrash Chris Amani

# EXHIBIT A

1/3/24, 9:46 PM
Formation of the Luna Foundation Guard (LFG) | by The Intern | Medium

Open in app ↗                          Sign up    Sign in



🔍 Search                          ✎ Write    👤

# Formation of the Luna Foundation Guard (LFG)



The Intern · Follow
Published in Terra · 6 min read · Jan 19, 2022

👏 268     💬 2                    🔖  ▶  ⬆



The first step towards {REDACTED} is complete.

We're pleased to announce the formation of the Luna Foundation Guard (LFG) — a non-profit organization established in the Republic of Singapore dedicated to supporting the advancement of open-source technology, facilitating the growth of the Terra ecosystem, and improving the sustainability and stability of Terra's algorithmic stablecoins.

https://medium.com/terra-money/formation-of-the-luna-foundation-guard-lfg-6b8dcb5e127b

<u>https://lfg.org/</u>

**The Strive for Decentralized Money**

If a decentralized economy needs decentralized money, then DeFi requires a scalable, robust, and censorship-resistant form of money at the base layer of its technology stack.

Enter stablecoins.

Where price-volatile assets predominating the industry have failed to fulfill the currency mandate of cryptocurrencies, stablecoins have established themselves as the preferred medium of interacting with DeFi — with network effects bolstered by pre-existing preferences for units of account in fiat currencies.

Stablecoin adoption is exploding. With a ballooning market cap north of <u>$170 billion</u>, the product-market fit of stablecoins as viable Internet-native mediums of value exchange between public blockchains is evident. Stablecoins are significantly more composable, portable, accessible, and cost-effective for counterparties to engage with on the Internet than fiat currencies.

However, the rise of stablecoins is handcuffed by the centralization of incumbent issuers whose models are at odds with the underlying ethos of decentralization permeating the industry. Centralized control of stablecoins underpinning a decentralized financial stack induces risks of holding the upper layers of the DeFi stack hostage to the actions of third-party issuers. Liquidity throughout DeFi is tethered to the prevalence of centralized

stablecoins, with alternative recourses to the risk at hand with major stablecoins only materializing recently.

Terra emerged as a decentralized protocol issuing a suite of fiat-pegged stablecoins that are both scalable and censorship-resistant — removing many of the capital inefficiency constraints of decentralized stablecoin alternatives with its unique _algorithmic design_.

By providing a decentralized issuance mechanism at the base layer of the DeFi stack, Terra's stablecoins, particularly TerraUSD (UST), have surged into prominence alongside an entourage of other decentralized stablecoins in a thriving cross-chain environment. With a current outstanding market cap of nearly 11 billion, UST is now the leading decentralized stablecoin in the market and 4th overall behind Tether, USDC, and BUSD. For now…



_Image Credit — https://messari.io/asset/terrausd_

1/3/24, 9:46 PM
Case 1:23-cv-01346-JSR Document 239 Filed 04/26/24 Page 8 of 40
Formation of the Luna Foundation Guard | by Terra Money | Medium

The rise of decentralized stablecoins has not come without criticism, however. As they begin to absorb increasingly larger shares of the stablecoin market from centralized issuers such as Tether and Circle, algorithmic stablecoins have come under fire for the robustness of their peg stability, as they are not over-collateralized or backed 1:1 by cash equivalents in a bank account.

Tilting at the misconception that algo stablecoin designs are unsustainable has been a core focus of Terraform Labs and the broader Terra ecosystem and LUNAtic community. By concentrating almost explicitly on bootstrapping the demand-side of algorithmic stablecoins, UST weathered a massive, reflexive drawdown in the LUNA price in May — learning important lessons and improving upon its design and adoption strategy. Still, questions persist about the sustainability of algorithmic stablecoin pegs, which is something our community doesn't hide from and tackles head-on.

Manifesting the vision of a decentralized economy based on truly decentralized money is an exacting task. Incremental improvements in mechanism design, education, awareness, and incubating applications that wield algorithmic stablecoins like UST in a meaningful way have proven success in unleashing a new form of money free from the risks of centralized stablecoins.

But, it's a continual process. Terra is not in its end state — it's only just beginning.

In order to succeed, we need to continue supplementing the Terra economy with effective resources across multiple dimensions. These include everything from technical developer tooling to capital backing projects, educational materials helping onboard new users and builders, and

innovative mechanisms to support algorithmic stablecoin models amid volatility.

Achieving the outcome for Terra that our community evangelizes means penetrating the mainstream — onboarding a global user set and giving them the resources to wield the power of a new, more inclusive financial system. Getting to that point means continually refining, developing, and building an ecosystem around Terra stablecoins that confer credibility in their sustainability and widespread demand.

It means building a cross-chain ecosystem of demand for Terra stablecoins that absorbs the short-term volatility of speculative market cycles and creates a new stablecoin era — one where the underlying decentralized ethos of the industry we all share remains steadfast.

By focusing on bootstrapping demand via a variety of avenues beyond ephemeral liquidity mining incentives, Terra's ecosystem has exploded into a vibrant economy of cutting-edge financial applications, payments and savings primitives, NFTs, and much more.

1/3/24, 9:46 PM
Case 1:23-cv-01346-JSR Document 239 Filed 04/26/24 Page 10 of 40
Formation of the Luna Foundation Guard (LFG) | by Terra | Medium



*Image Credit — https://terra.smartstake.io/eco*

A deluge of organizations and projects have formed out of our community's enterprise to eventually realize the ambitious goals laid forth for Terra. Together, they have propelled Terra to the <u>2nd largest smart contracts chain by TVL</u> — only behind Ethereum.

Now, they have a powerful new ally — the LFG.

The formation of the LFG is a culmination of the lessons learned from the previous years in the market. It's a center of excellence focused on cultivating the tendrils of demand pivotal to the success of Terra stablecoins and solidifying the position of decentralized stablecoins in the market as the superior alternative to incumbents.

**Defining the LFG Mandate & Structure**

1/3/24, 9:46 PM
Case 1:23-cv-01346-JSR Document 239 Filed 04/26/24 Page 11 of 40
Formation of the Luna Foundation Guard (LFG) | by Terra | Medium

LFG's core mandate is to buttress the stability of the UST peg and foster the growth of the Terra ecosystem. Building reserves that backstop the peg of algorithmic stablecoins amid volatility and funneling resources into research that further advances what's possible with stablecoins are only just the beginning.

The LFG will also allocate grants for builders, researchers, community members, and anyone else pursuing bold ideas in the interest of the Terra economy categorized into 3 primary groups:

1. Open-Source Technology Development

2. Research & Education

3. Community Growth

Establishing a non-profit organization unlocks a new pathway for the future development of a decentralized economy built on truly decentralized money.

The LFG will be overseen and operated by an independent Governing Council, initially comprised of the following leaders and experts in the industry, which will expand to include leading builders in the Terra ecosystem:

- Do Kwon (Co-Founder and CEO of Terraform Labs)

- Nicholas Platias (Founding member of Terraform Labs)

- Kanav Kariya (President of Jump Crypto)

- Remi Tetot (Co-Founder of RealVision)

- Jonathan Caras (Project Lead at Levana Protocol)

1/3/24, 9:46 PM
Formation of the Luna Foundation Guard (LFG) | by Terra Money | Medium
Case 1:23-cv-01346-JSR  Document 230  Filed 04/26/24  Page 12 of 40

- Jose Maria Delgado (Co-Founder of Delphi Digital)



The LFG will initially be funded with a 50 million LUNA gift from TFL to help bootstrap its stabilizing reserves and grants framework. The planned execution from the TFL wallet is scheduled for 01/22 at 10 AM SGT (2 AM UTC) and the transaction hash will be shared publicly once complete for transparency.

Moving forward, proposals to the LFG for funding will be evaluated on their relevance to LFG's mission, the technical design of the project, and the overall quality of the team and its members. If you have a great idea for improving or building a decentralized application on Terra, a DeFi project that utilizes algorithmic stablecoins, or if you are otherwise inspired to build something completely different that helps advance the goal of growing a truly decentralized economy, the LFG would love to hear about it!

The LFG is currently putting the final touches on its grants framework, which will be released publicly in the coming weeks. For now, if you have any questions or are interested in learning more, please feel free to contact the LFG at the email address below:

contact@lfg.org

Are you interested in pushing the boundaries of stablecoin innovation? The LFG is currently seeking to hire highly motivated individuals with deep experience in the industry as it ramps up its grants framework this year.

Let's build decentralized money, together.

jobs@lfg.org

Finally, the formation of LFG sets the stage for {REDACTED}, which will be announced shortly now that the LFG is ready to kickstart its mission.

Stay tuned frens, more to come.



Crypto    Defi    Money    Blockchain    Finance

1/3/24, 9:46 PM
Formation of the Luna Foundation Guard (LFG) | by The Intern | Terra | Medium
Case 1:23-cv-01346-JSR Document 239 Filed 04/26/24 Page 15 of 40



# Written by The Intern

999 Followers · Editor for Terra

 

# EXHIBIT B

DocuSign Envelope ID: C3093E78-701B-456A-81CF-35DBE1692BF1



# MASTER SERVICES AGREEMENT

THIS MASTER SERVICES AGREEMENT ("Agreement") is made and entered into as of ___1/10/2022___, 2022 (the "Effective Date"), by and between Terraform Labs PTE Ltd ("Company"), a Singapore company with registration number 201813807M and Luna Foundation Guard Ltd. ("Customer"), a company limited by guarantee established under the laws of the Republic of Singapore with registration number 202144909Z.

1.      **Services.**

        1.1      General. The parties may from time to time execute and attach to this Agreement statements of work (each, a "Statement of Work"). Company shall perform the services for Customer that are described in Statements of Work (the "Services") and deliver to Customer the deliverables set forth in Statements of Work (the "Deliverables") in accordance with the terms and conditions of this Agreement, and on the price, delivery dates and specifications described in the applicable Statement of Work for the Services. A form of Statement of Work is attached hereto as Exhibit A. In the case of any ambiguity or conflict between the terms and conditions of this Agreement and the terms and conditions of a Statement of Work, this Agreement shall control, except to the extent that any particular provision of a Statement of Work expressly states that it is intended to supersede any terms and conditions of this Agreement, in which case such provision of such Statement of Work shall control for the purposes of such Statement of Work only.

        1.2      Changes. Each party acknowledges that changes to the Services may be necessary or desirable. Accordingly, if either party believes that a non-de minimis change to the Services is necessary or desirable, the parties shall discuss in good faith changes to the applicable Statement of Work, taking into consideration: (a) the estimated impact on the Services, if any, and the modifications to the Services that will be required as a result of such changes; and (b) an estimate of the cost to implement such changes. For the avoidance of doubt, no changes to the Services or any Statement of Work shall be effective unless a change order, amendment or modification is issued in writing and signed by an officer of each party.

        1.3      Subcontracting. Company may subcontract any part or all of the Services to any third party (each, a "Subcontractor") as Company determines in its sole discretion; provided that Company shall remain liable for all of its obligations hereunder.

        1.4      Cooperation. Customer acknowledges that Company's timely provision of, and Company's access to, Customer's facilities, equipment, assistance, cooperation, and complete and accurate information and data from Customer's officers, employees and agents ("Cooperation") is essential to the performance of the Services. Cooperation includes designating a project manager to coordinate with Company during the performance of the Services, and allocating and engaging additional resources as may reasonably be required to assist Company in performing the Services. If Customer fails to provide Cooperation to Company, Company shall not be liable for any deficiency or delay in performing the Services arising from such failure to provide Cooperation, and Customer shall reimburse Company for any obligation to pay overtime to Company's employees or other expenses in order to perform the Services in accordance with

-1-

the schedule to the extent such overtime or other expenses were incurred as a result of Customer's failure to provide Cooperation.

**2.      Delivery Schedule.** Company shall complete and deliver the Services to Customer according to the delivery schedule and in conformance with the specifications described in the applicable Statement of Work. Customer shall evaluate the Services to determine whether they conform to the applicable specifications and shall submit a written or verbal notice of acceptance or rejection to Company within thirty (30) days after Customer's receipt of the Services, or such other time as reasonable under the circumstances. If Customer does not notify Company in writing of Customer's acceptance or rejection of the Services within such thirty (30) day period, the Services will be deemed accepted. If rejected by Customer in good faith, Company shall promptly correct the Services within a commercially reasonable period given the circumstances.

**3.      Payment.**

        3.1      Service Fees. In consideration for Company's performance of the Services, Customer shall pay Company for the Services as described in the applicable Statement of Work (the "Service Fees") in accordance with the terms set forth therein. If the applicable Statement of Work does not specify the fees to be paid by Customer thereunder, Customer shall pay Company on a time-and-materials basis at Company's then-current rates for the Services performed under such Statement of Work.

        3.2      Expenses. Customer shall reimburse Company for all reasonable travel, lodging, communications, shipping charges and other out-of-pocket expenses incurred by Company in connection with performing the Services.

        3.3      Taxes. Customer shall, in addition to the other amounts payable under this Agreement, pay all applicable customs, duties, sales, use, value added or other taxes, federal, state or otherwise, however designated, which are levied or imposed by reason of the transactions contemplated by this Agreement, excluding only taxes based on Company's net income. Customer agrees to indemnify, defend, and hold Company, its officers, directors, consultants, employees, successors and assigns harmless from all claims and liability arising from Customer's failure to report or pay any such taxes, duties or assessments.

        3.4      Payment Terms. All amounts payable to Company under this Agreement will be due within thirty (30) days from the date of an invoice. Overdue payments will be subject to interest at the rate of one and one-half percent (1.5%) per month, or the highest interest rate permitted by applicable law, whichever is less.

        3.5      Invoices. Company's invoices shall set forth all amounts due from Customer to Company, and shall contain sufficient detail to allow Customer to determine the accuracy of the amount(s) billed. All invoices shall be expressed and payable in U.S. dollars or the TerraUSD stablecoin cryptocurrency.

**4.      Confidentiality.**

        4.1      Nondisclosure. Each party shall retain in confidence the non-public information and know-how disclosed or made available by the other party pursuant to this Agreement which

-2-

DocuSign Envelope ID: C3093E78-701B-456A-81CF-35DBE1692BF1

is either designated in writing as proprietary and/or confidential, if disclosed in writing, or if disclosed orally, is designated in writing (which may be via email) as confidential within thirty (30) days of the oral disclosure or should reasonably be understood to be confidential by the recipient (the "Confidential Information"). Notwithstanding any failure to so designate them, the Licensed Materials and the terms and conditions of this Agreement shall be Company's Confidential Information. Each party agrees to: (a) preserve and protect the confidentiality of the other party's Confidential Information; (b) refrain from using the other party's Confidential Information except as contemplated herein; and (c) not disclose such Confidential Information to any third party except to employees and subcontractors as is reasonably required in connection with the exercise of its rights and obligations under this Agreement (and only subject to binding use and disclosure restrictions at least as protective as those set forth herein). Each party agrees to immediately notify the other party of any unauthorized disclosure or use of any Confidential Information and to assist the other party in remedying such unauthorized use or disclosure by taking such steps as are reasonably requested. Notwithstanding the foregoing, either party may disclose Confidential Information of the other party which is: (i) already publicly known without breach of this Agreement; (ii) discovered or created by the receiving party without use of, or reference to, the Confidential Information of the disclosing party, as shown in records of the receiving party; (iii) otherwise known to the receiving party through no wrongful conduct of the receiving party, or (iv) required to be disclosed by law or court order; provided that the receiving party shall provide prompt notice thereof and reasonable assistance to the disclosing party to enable the disclosing party to seek a protective order or otherwise prevent or restrict such disclosure. Moreover, either party hereto may disclose any Confidential Information hereunder to such party's agents, attorneys and other representatives (and only subject to confidentiality obligations at least as protective as those set forth herein) or any court of competent jurisdiction as reasonably required to resolve any dispute between the parties hereto.

4.2    Remedies. Each party agrees and acknowledges that any breach or threatened breach of this Section 4 may cause irreparable injury to the disclosing party and that, in addition to any other remedies that may be available, in law, in equity or otherwise, the disclosing party shall be entitled to seek injunctive relief against the threatened breach of this Agreement or the continuation of any such breach by the receiving party, without the necessity of proving actual damages or posting any bond, in addition to any other rights or remedies provided by law.

5.    **Proprietary Rights.**

5.1    Intellectual Property. As used in this Agreement, "Intellectual Property" means (a) patents, patent applications, patent disclosures and inventions (whether patentable or not), (b) trademarks, service marks, and registrations and applications for the registration thereof, together with all goodwill associated therewith, (c) copyrights and copyrightable works (including computer programs), and registrations and applications for the registration thereof, (d) trade secrets, know-how and other confidential and proprietary information, and (e) all other forms of intellectual property or industrial property.

5.2    Deliverables. Subject to Company's right, title and interest in and to the Company Background Materials (as defined below), including all Intellectual Property therein, the parties acknowledge and agree that the Deliverables have been specially ordered and commissioned by Customer as "works made for hire." Customer shall accordingly own all right, title and interest

-3-

DocuSign Envelope ID: C3093E78-701B-456A-81CF-35DBE1692BF1

in and to the Deliverables (including any Intellectual Property therein), other than any Company Background Materials incorporated therein. To the extent that ownership of any Deliverable (other than any Company Background Materials) does not automatically vest in Customer by virtue of this Agreement or otherwise, Company hereby irrevocably assigns to Customer, its successors and assigns, all rights, title and interest in and to such Deliverable, including, without limitation, all Intellectual Property therein.

5.3   <u>Further Assurances</u>. At Customer's sole expense, Company shall execute and deliver such instruments and take such other action as may be reasonably requested by Customer to perfect or protect Customer's rights in the Deliverables and to carry out the assignments contemplated in <u>Section 5.1</u>. Company shall use commercially reasonable efforts to cooperate with Customer in the filing and prosecution of any copyright or patent applications that Customer may elect to file on the Deliverables or inventions and designs relating to the Deliverables.

5.4   <u>Customer Materials</u>. The parties acknowledge that Customer may provide to Company pursuant to this Agreement certain proprietary technology of Customer and other materials and information (as it determines in its discretion) (collectively, "<u>Customer Materials</u>"). Subject to the terms hereof and solely to the extent necessary to perform the Services for Customer in accordance with this Agreement, Customer hereby grants to Company a non-exclusive, non-transferable license to use, during the Term hereof, the Customer Materials. Customer expressly retains all right, title and interest in and to the Customer Materials and any and all derivative works thereof based on any of the Customer Confidential Information created by Customer or Company, including all Intellectual Property therein.

5.5   <u>Company Background Materials</u>. "<u>Company Background Materials</u>" shall mean any general skills, know-how, expertise, ideas, concepts, methods, techniques, technology, processes, software, materials or other Intellectual Property or information made, conceived, or developed by or on behalf of, or licensed to, Company prior to performance or independent of the Services and contained in, comprising, or otherwise necessary to use and/or maintain the Services or Deliverables. Company hereby grants to Customer a non-exclusive, perpetual, royalty free, worldwide license to use, reproduce and modify the Company Background Materials incorporated into the Deliverables for use in connection with Customer's business.

5.6   <u>Reservation of Rights</u>. Except as otherwise expressly provided herein, nothing in this Agreement shall be deemed to grant, directly or by implication, estoppel or otherwise, any right or license with respect to any Intellectual Property, and each party retains all right, title and interest in and to its respective Intellectual Property.

**6.   Representations and Warranties.**

6.1   <u>Authority</u>. Each party represents and warrants that it has full corporate power and authority to execute and deliver this Agreement and to consummate the transactions contemplated herein.

6.2   <u>Access Authority</u>. If the Services include Company's access to, or analysis of, any data, information, computer, computer network or communications network, or other system or

-4-

DocuSign Envelope ID: C3093E78-701B-456A-81CF-35DBE1692BF1

equipment, Customer represents and warrants to Company that Customer has, or will obtain prior to commencement of such Services, all rights, licenses or consents required to authorize Company to perform such Services, including any required licenses or consents from third-party owners of licensed or shared resources.

6.3 <u>Limited Warranty</u>. Company shall perform the Services in a professional and workmanlike manner consistent with generally accepted industry standards. In the event of a breach of the limited warranty set forth in this <u>Section 6.3</u>, Customer shall notify Company or such breach within ninety (90) days after performance of the Services or delivery of the Deliverables with respect to which Company breached such limited warranty, and Company shall, as Company's sole and exclusive obligation and Customer's sole and exclusive remedy, use commercially reasonable efforts to re-perform such Services or re-deliver such Deliverables in compliance with such limited warranty.

6.4 <u>Disclaimer of Any Other Warranties</u>. EXCEPT AS SPECIFICALLY PROVIDED IN THIS <u>SECTION 6</u>, COMPANY MAKES NO WARRANTIES, EXPRESS, IMPLIED, STATUTORY, OR OTHERWISE, WITH RESPECT TO THE SERVICES, DELIVERABLES OR ANY OTHER ACCOMPANYING MATERIAL PROVIDED HEREUNDER. COMPANY SPECIFICALLY DISCLAIMS ALL OTHER WARRANTIES, EXPRESS AND IMPLIED, INCLUDING WITHOUT LIMITATION THE IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE AND NONINFRINGEMENT AND THOSE ARISING FROM A COURSE OF DEALING OR USAGE OR TRADE, AND ALL SUCH WARRANTIES ARE HEREBY EXCLUDED TO THE FULLEST EXTENT PERMITTED BY LAW. EXCEPT AS EXPRESSLY PROVIDED HEREIN, THE SERVICES AND DELIVERABLES ARE PROVIDED ON AN "AS IS" AND "AS AVAILABLE" BASIS.

**7. Indemnity.**

7.1 <u>Indemnification by Company</u>. Company shall defend or settle, at its own expense, any third-party action against Customer or its officers, directors, employees, subcontractors, agents, successors and assigns to the extent based upon a claim that the Services or Deliverables infringe any copyright or trademark or misappropriates any trade secret, and will pay such damages or costs as are finally awarded against Customer attributable to such claim; provided that Customer: (a) notifies Company promptly in writing of any such action, provided that Customer's failure to timely provide such notice shall not relieve Company of its indemnification obligations except to the extent Company can demonstrate actual prejudice as a result of such failure; (b) gives Company sole control of the defense and/or settlement of such action, provided that Company shall not settle any claim without Customer's prior written consent, which consent shall not be unreasonably withheld; and (c) gives Company all reasonable information and assistance. Should any Service or Deliverable become, or in the opinion of Company be likely to become, the subject of such an infringement claim, Company may, at its option: (i) procure for Customer the right to use such Service or Deliverable at no cost to Customer; (ii) replace or modify, in whole or in part, such Service or Deliverable to make it non-infringing; or (iii) terminate this Agreement and refund a pro rata portion of the Service Fees paid for such Service or Deliverable. Company assumes no liability hereunder (x) to the extent such liability arises from, or is based upon, Customer's breach of its warranty set forth in <u>Section</u>

-5-

TFL_SEC_00244698

DocuSign Envelope ID: C3093E78-701B-456A-81CF-35DBE1692BF1

<u>6.2</u> or (y) for any combination, operation or use of the Services or Deliverables with non-Company programs or data other than those intended or recommended by Company, and Customer shall indemnify and hold harmless Company and its officers, directors, employees, agents, successors and assigns against any damages, losses, and expenses (including reasonable attorneys' fees) arising from any third-party action to the extent based upon a claim that the Services or Deliverables infringe any copyright or trademark or misappropriates any trade secret due to any of the foregoing factors, and shall give Company all reasonable information and assistance regarding such claim. THIS <u>SECTION 7.1</u> SETS FORTH COMPANY'S ENTIRE LIABILITY AND OBLIGATION AND CUSTOMER'S SOLE REMEDY FOR ANY CLAIM OF INFRINGEMENT OF ANY INTELLECTUAL PROPERTY RIGHTS.

7.2     <u>Indemnification by Customer</u>. Customer shall defend or settle, at its own expense, any third-party action against Company or its officers, directors, employees, subcontractors, agents, successors and assigns to the extent based upon a claim that arises out of Customer's breach of its warranty set forth in <u>Section 6.2</u>; provided that Company: (a) notifies Customer promptly in writing of any such action, provided that Company's failure to timely provide such notice shall not relieve Customer of its indemnification obligations except to the extent Customer can demonstrate actual prejudice as a result of such failure; (b) gives Customer sole control of the defense and/or settlement of such action, provided that Customer shall not settle any claim without Company's prior written consent, which consent shall not be unreasonably withheld; and (c) gives Customer all reasonable information and assistance.

**8.     Limitation of Liability.** EXCEPT FOR BREACH OF <u>SECTION 4</u>, AND INDEMNIFICATION OBLIGATIONS UNDER <u>SECTION 7</u>, IN NO EVENT SHALL EITHER PARTY'S LIABILITY ARISING UNDER THIS AGREEMENT EXCEED THE AMOUNT PAID BY CUSTOMER TO COMPANY HEREUNDER DURING THE TWELVE (12) MONTHS IMMEDIATELY PRIOR TO THE EVENT GIVING RISE TO SUCH LIABILITY. EXCEPT FOR BREACH OF <u>SECTION 4</u>, AND INDEMNIFICATION OBLIGATIONS UNDER <u>SECTION 7</u>, NEITHER PARTY WILL BE LIABLE TO THE OTHER FOR ANY CONSEQUENTIAL, INCIDENTAL, SPECIAL, INDIRECT, PUNITIVE OR EXEMPLARY DAMAGES, INCLUDING WITHOUT LIMITATION LOST PROFITS, BUSINESS, CONTRACTS, REVENUE, GOODWILL, PRODUCTION, ANTICIPATED SAVINGS, LOSS OF DATA, OR COSTS OF PROCUREMENT OF SUBSTITUTE GOODS OR SERVICES, OR, EXCEPT AS PROVIDED IN <u>SECTION 7</u>, FOR ANY CLAIM OR DEMAND BY ANY OTHER PARTY, HOWEVER CAUSED AND (TO THE FULLEST EXTENT PERMITTED BY LAW) UNDER ANY THEORY OF LIABILITY (INCLUDING NEGLIGENCE) EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. CUSTOMER ACKNOWLEDGES THAT THE AMOUNTS PAYABLE HEREUNDER ARE BASED IN PART ON THESE LIMITATIONS, AND FURTHER AGREES THAT THESE LIMITATIONS SHALL APPLY NOTWITHSTANDING ANY FAILURE OF ESSENTIAL PURPOSE OF ANY LIMITED REMEDY.

**9.     Term and Termination.**

9.1     <u>Term</u>. Unless earlier terminated as provided in this <u>Section 8</u>, this Agreement shall be effective as of the Effective Date and shall continue thereafter until Company's completion of all Services described in effective Statements of Work ("<u>Term</u>").

FOIA CONFIDENTIAL TREATMENT REQUESTED BY TFL                                     TFL_SEC_00244699

9.2    <u>Termination</u>. Either party shall have the right to terminate this Agreement and the license granted herein upon written notice in the event the other party fails to perform or observe any material term or condition of this Agreement and such default has not been cured within thirty (30) days after written notice of such default to the other party. Company may also terminate this Agreement immediately if the Customer: (a) terminates or suspends its business; (b) becomes subject to any bankruptcy or insolvency proceeding under the jurisdiction or laws of any country or state; (c) becomes insolvent or subject to direct control by a trustee, receiver or similar authority; or (d) has wound up or liquidated, voluntarily or otherwise.

9.3    <u>Effect of Termination</u>. The rights and obligations of Company and Customer in <u>Sections 3</u> (to the extent payments accrued prior to termination or are otherwise due), <u>4</u>, <u>5</u>, <u>6</u>, <u>7</u>, <u>8</u>, <u>9.3</u>, <u>10</u> and <u>11</u> shall survive termination of this Agreement. Except in the event of termination by Customer for Company's material breach, all unpaid Service Fees for the then-current Term shall become immediately due and payable upon termination of this Agreement. If any Statement of Work is terminated prior to the completion of the Deliverables, Company shall deliver to Customer within thirty (30) days of the effective date of termination all Deliverables (whether complete or incomplete) to be delivered to Customer under such Statement of Work. Within thirty (30) days after termination of this Agreement, each party (as the receiving party) shall return to the other party (as the disclosing party) or, upon the disclosing party's request, destroy, at the receiving party's sole expense, all Confidential Information of the disclosing party and materials containing any Confidential Information of the disclosing party, including all copies thereof, and deliver to the disclosing party a certification, in writing signed by an officer of the receiving party, that such Confidential Information, and all copies thereof have been returned or destroyed, and their use discontinued. Nothing contained herein shall limit any other remedies that Company may have for the default of Customer under this Agreement nor relieve Customer of any of its obligations incurred prior to such termination.

**10.    Non-Solicitation.**

10.1    <u>Non-Solicitation</u>. Without the prior written consent of the Company during the Term of this Agreement and for one (1) year thereafter, Customer shall not to hire, solicit or retain the services of, or attempt to hire, solicit or retain the services of, any person who is an employee or subcontractor of Company, or who was an employee or subcontractor of Company at any time during the three (3) months prior to such hiring, solicitation or retention, or attempted hiring, solicitation or retention, in each case who provided Services to Customer hereunder; provided that individuals hired as a result of the use of an independent employment agency (so long as the agency was not directed to solicit a particular individual) or as a result of the use of a general solicitation (such as a newspaper advertisement or on radio or television) not specifically directed to employees or subcontractors of Company shall not violate this <u>Section 10.1</u>.

10.2    <u>Liquidated Damages</u>. Customer acknowledges that Company and its employees and subcontractors have developed a special expertise in the subject matter of the Services. If Customer breaches <u>Section 10.1</u> with respect to a particular employee or subcontractor, Customer shall pay Company liquidated damages in an amount equal to: (a) in the case of an employee, such employee's then-current annual salary (or, if a former employee, such employee's final annual salary), or (b) in the case of a subcontractor, the greater of (i) the fees paid to such subcontractor during the preceding twelve (12) month period or (ii) fifty thousand

-7-

DocuSign Envelope ID: C3093E78-701B-456A-81CF-35DBE1692BF1

dollars ($50,000). The parties acknowledge and agree that (x) given the nature of the Services provided and the expertise of Company's employees and subcontractors, the amount of the damages that would be sustained by Company if Customer breaches Section 10.1 is incapable of estimation, or very difficult to estimate, as of the Effective Date, (y) the amount of such liquidated damages is a fair estimate as of the Effective Date of the potential damages that would be sustained by Company if Customer breaches Section 10.1, and (z) such amount is intended to be liquidated damages and not a penalty.

## 11. Miscellaneous.

11.1 Assignment. Customer shall not assign or otherwise transfer this Agreement or any rights or obligations hereunder, in whole or in part, whether by operation of law or otherwise, to any third party without Company's prior written consent. Any purported transfer, assignment or delegation without such prior written consent will be null and void and of no force or effect. Notwithstanding the foregoing, Customer shall have the right to assign this Agreement to any successor to its business or assets to which this Agreement relates, whether by merger, sale of assets, sale of stock, reorganization or otherwise, conditioned upon (a) the parties' mutual written agreement on any additional fees payable as a result of such assignment and (b) the payment of such fees. Company shall have the right to assign this Agreement to any successor to its business or assets to which this Agreement relates, whether by merger, sale of assets, sale of stock, reorganization or otherwise. Subject to this Section 10.1, this Agreement shall be binding upon and inure to the benefit of the parties hereto, and their respective successors and permitted assigns.

11.2 Entire Agreement; Modification; Waiver. This Agreement, together with its exhibits, represents the entire agreement between the parties, and supersedes all prior agreements and understandings, written or oral, with respect to the matters covered by this Agreement, and is not intended to confer upon any third party any rights or remedies hereunder. Customer acknowledges that it has not entered in this Agreement based on any representations other than those contained herein. No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, shall be effective unless in writing and signed by both parties. If there is any conflict between the terms and conditions of this Agreement and the terms and conditions of any Customer purchase order or other document, the terms and conditions of this Agreement shall prevail. The waiver of one breach or default or any delay in exercising any rights shall not constitute a waiver of any subsequent breach or default.

11.3 Delays. In the event that either party is prevented from performing or is unable to perform any of its obligations under this Agreement (other than any payment obligation) due to any Act of God, fire, casualty, flood, earthquake, war, strike, lockout, epidemic, destruction of production facilities, riot, insurrection, material unavailability, or any other cause beyond the reasonable control of the party invoking this Section, and if such party shall have used its commercially reasonable efforts to mitigate its effects, such party shall give prompt written notice to the other party, and the time for the performance shall be extended for the period of delay or inability to perform due to such occurrences.

11.4 Governing Law. This Agreement shall in all respects be governed by the laws of the Republic of Singapore without reference to its principles of conflicts of laws. The parties

FOIA CONFIDENTIAL TREATMENT REQUESTED BY TFL

TFL_SEC_00244701

DocuSign Envelope ID: C3093E78-701B-456A-81CF-35DBE1692BF1

hereby agree that all disputes arising out of this Agreement shall be subject to the exclusive jurisdiction of and venue in the courts within the Republic of Singapore. Customer hereby consents to the personal and exclusive jurisdiction and venue of these courts.

       11.5    <u>Severability</u>. If any provision of this Agreement is held invalid or unenforceable under applicable law by a court of competent jurisdiction, it shall be replaced with the valid provision that most closely reflects the intent of the parties and the remaining provisions of the Agreement will remain in full force and effect.

       11.6    <u>Relationship of the Parties</u>. Nothing in this Agreement is to be construed as creating an agency, partnership, or joint venture relationship between the parties hereto. Neither party shall have any right or authority to assume or create any obligations or to make any representations or warranties on behalf of any other party, whether express or implied, or to bind the other party in any respect whatsoever. Each party may identify the other as a customer or supplier, as applicable.

       11.7    <u>Notices</u>. All notices permitted or required under this Agreement shall be in writing and shall be deemed to have been given when delivered in person (including by overnight courier), or three (3) business days after being mailed by first class, registered or certified mail, postage prepaid, to the address of the party specified in this Agreement or such other address as either party may specify in writing.

       11.8    <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which shall be deemed an original and all of which together shall constitute one instrument.

       11.9    <u>Costs</u>. If any action at law or in equity (including arbitration) is necessary to enforce or interpret the terms of this Agreement, the prevailing party shall be entitled to reasonable attorney's fees, costs and necessary disbursements in addition to any other relief to which such party may be entitled.

[Signature Page Follows]

-9-

DocuSign Envelope ID: C3093E78-701B-456A-81CF-35DBE1692BF1

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their duly authorized representatives.

**TERRAFORM LABS PTE LTD.**

Signature: _CJ Han_

Name: _CJ Han_

Title: _CFO_

Date: _1/11/2022_

**LUNAR FOUNDATION GUARD LTD.**

Signature: _Do Kwon_

Name: _Do Kwon_

Title: _Personal_

Date: _1/10/2022_

-10-

CONFIDENTIAL TREATMENT REQUESTED BY TERRAFORM LABS PTE LTD

DocuSign Envelope ID: C3093E78-701B-456A-81CF-35DBE1692BF1

## EXHIBIT A

## STATEMENT OF WORK
## TO
## THE MASTER SERVICES AGREEMENT

THIS STATEMENT OF WORK ("Statement of Work") is to the Master Services Agreement (the "Agreement"), dated ___1/10/2022___, 2022, by and between Terraform Labs PTE Ltd ("Company"), a Singapore company with registration number 201813807M and Luna Foundation Guard Ltd. ("Customer"), a company limited by guarantee established under the laws of the Republic of Singapore with registration number 202144909Z, and is made and entered into as of ___1/10/2022___, 2022 ("SOW Effective Date").

*A.*     *Description of Services:*

- Management and execution of all accounting, finance, and tax-related operations and responsibilities of the Customer; and

- Such other administrative and operational functions or support as the Customer reasonably requests.

*B.*     *Deliverables:*

- Any such reports, documentation or filings as may reasonably been needed or desirable with respect to the Services.

*C.*     *Payment:*

(i)     As complete and final payment for the Services, Customer shall pay Company a flat fee of ___10,000___ U.S. Dollars ($ _10,000_ ) or its equivalent in the TerraUSD stablecoin cryptocurrency, which shall be payable upon execution of this Statement of Work. Company shall complete perform the Services in their entirety, notwithstanding the foregoing limit.

(ii)     *Expenses.* Customer shall reimburse Company for all reasonable travel, lodging, communications, shipping charges and other out-of-pocket expenses incurred by Company in connection with performing the Services pursuant to Section 3 of the Agreement.

(iii)     *Invoicing/Payment Method.* Company shall invoice Customer for the above amounts, and Customer shall pay Company, pursuant to Section 3 of the Agreement.

**D.**     *Term/Delivery Schedule:*

-11-

DocuSign Envelope ID: C3093E78-701B-456A-81CF-35DBE1692BF1

Company shall commence the Services on _____1/10/2022_____, 2022, and complete and deliver the Services until such time as the Company or Customer provides written notice of termination of this Statement Work to the other party.

This Statement of Work shall be attached to and incorporated into the Agreement, and is subject to all of the terms and conditions of the Agreement.

**TERRAFORM LABS PTE LTD.**

Signature: _CJ Han_

Name: CJ Han

Title: CFO

Date: 1/11/2022

**LUNAR FOUNDATION GUARD LTD.**

Signature: _Do Kwon_

Name: Do Kwon

Title: Personal

Date: 1/10/2022

-12-

# EXHIBIT C

The Wayback Machine - https://web.archive.org/web/20190615011432/https://www.binance.com/agreement.html

     Exchange                                    Join Us    Support    News    Log In  or  Re:

# Binance Terms of Use

**[Last revised: 14 June 2019]**

This agreement is between you (referenced herein as "you" or with "your") and Binance. By accessing, using or clicking "I agree" to any of the services made available by Binance or one of its affiliates through the website (https://www.binance.com), the API (https://api.binance.com), our mobile applications, or any other related services provided by Binance or its affiliates as further described in Section 4 below (collectively, the "Services") you agree that you have read, understood and accepted all of the terms and conditions contained in this Terms of Use agreement (the or these "Terms"), as well as our Privacy Policy found at https://www.binance.com/statement.html. Additionally, when using certain features of the Services, you may be subject to additional terms and conditions applicable to such features.

PLEASE READ THESE TERMS CAREFULLY AS THEY GOVERN YOUR USE OF THE SERVICES. THESE TERMS CONTAINS IMPORTANT PROVISIONS INCLUDING AN ARBITRATION PROVISION THAT REQUIRES ALL CLAIMS TO BE RESOLVED BY WAY OF BINDING ARBITRATION. THE TERMS OF THE ARBITRATION PROVISION ARE SET FORTH IN SECTION 14 BELOW ENTITLED "RESOLVING DISPUTES: FORUM, ARBITRATION, CLASS ACTION WAIVER, GOVERNING LAW." AS WITH ANY ASSET, THE VALUE OF DIGITAL CURRENCIES CAN GO UP OR DOWN AND THERE CAN BE A SUBSTANTIAL RISK THAT YOU WILL LOSE MONEY BUYING, SELLING, HOLDING, OR INVESTING IN DIGITAL CURRENCIES. BY USING THE SERVICES YOU ACKNOWLEDGE AND AGREE THAT (1) YOU ARE AWARE OF THE RISKS ASSOCIATED WITH TRANSACTING IN DIGITAL CURRENCIES (2) THAT YOU ASSUME ALL RISKS WITH RESPECT TO YOUR USE OF THE SERVICES AND TRADING IN DIGITAL CURRENCIES AND (3) BINANCE IS NOT RESPONSIBLE OR LIABLE FOR ANY SUCH RISKS OR ADVERSE OUTCOMES.

BY ACCESSING, USING OR ATTEMPTING TO USE THE SERVICES IN ANY CAPACITY, YOU ACKNOWLEDGE THAT YOU ACCEPT AND AGREE TO BE BOUND BY THESE TERMS. IF YOU DO NOT AGREE, DO NOT ACCESS OR USE THE SERVICES.

**1. Agreement Conditions**

Binance reserves the right to modify or change the Terms at any time and at its sole discretion. Binance will provide notice of these changes by updating the revised Terms on the webpage (https://support.binance.com/hc/en-us/articles/115000421672-Terms-of-Use) and changing the "[Last revised: ]" date on this page. Any and all modifications or changes to these Terms will be effective immediately upon being announced on the website or released to users. As such, your continued use of Binance's services acts as acceptance of the amended agreement and rules. If you do not agree to any modification to these Terms, you must stop using the Services. Binance encourages you to frequently review the Terms to ensure you understand the terms and conditions that apply to your access to, and use of, the Services.

**2. Eligibility**

By registering to use a Binance Account (as defined in Section 5 below), you represent and warrant that you (a) are at least 18 years old or of legal age to form a binding contract under applicable law, (b) are an individual, legal person or other organization with full legal capacity and authority to enter into these Terms, (c) have not previously been suspended or removed from using our Services and (d) you do not currently have an existing Binance Account. If you are entering into these Terms on behalf of a legal entity of which you are an employee or agent, you represent and warrant that you have all necessary rights and authority to bind such legal entity.

**3. Prohibition of use**

By accessing and using the Services, you represent and warrant that you are not on any trade or economic sanctions lists, such as the UN Security Council Sanctions list, designated as a "Specially Designated National" by OFAC (Office of Foreign Assets Control of the U.S. Treasury Department) or placed on the U.S. Commerce Department's "Denied Persons List". Binance is unable to provide services to any U.S. person. Binance maintains the right to select its markets and jurisdictions to operate and may restrict or deny the Services in certain countries at its discretion.

**4. Description of services**

Binance provides an online digital asset trading platform (crypto to crypto) for products commonly known as cryptographic tokens, digital tokens or cryptographic currency (collectively, "Digital Currency"). Binance does not provide fiat trading capabilities on as part of the Services. Binance functions as a trading platform provider and not as a buyer or seller in trades between traders. Binance is also not a market maker. Users must register and open an account with Binance as further set forth in Section 5 below and deposit digital assets prior to commencement of trading. Traders may request the withdrawal of their digital asset subject to the limitations as stated in these Terms.

Binance strives to maintain the accuracy of information posted on the Services however it cannot and does not guarantee the accuracy, suitability, reliability, completeness, performance or fitness for any purpose of the content made available through the Services, and will not be liable for any loss or damage that may arise directly or indirectly from your use of such content. Information on the Services can be subjected to change without notice and is provided for the primary purpose of facilitating users to arrive at independent decisions. Binance does not provide investment or advisory advice and will have no liability for the use or interpretation of information as stated on the Services or other communication mediums. All users of the Services must understand that there are risks involved in trading in Digital Currencies. Binance encourages all users to exercise prudence and trade responsibly within their own means.

**5. Binance Account Registration & Requirements**

**a. Registration**

All users of the Services (each, a "User") must register at (https://www.binance.com/register.html) for a Binance account (an "Account") before using the Services. To register for an Account, you must provide your real name, email address and password, as well as accept the Terms of Use, Privacy Policy and Consent Form. Binance may, in its sole discretion, refuse to open an account for you. You agree to provide complete and accurate information when opening an Account and agree to promptly update any information you provide to Binance so that such information is complete and accurate at all times. Each registration is for a single user only and each User (including with respect to any User that is a business or legal entity) may only maintain one active Account with Binance.

**b. User Identity Verification**

With registration of an account on Binance, you agree to share personal information requested for the purposes of identity verification. This information is used specifically for the detection of money laundering, terrorist financing, fraud and other financial crimes on the Binance platform. We will collect, use and share this information in accordance with our posted Privacy Policy. In addition to providing this information, to facilitate compliance with global industry standards for data retention, you agree to permit us to keep a record of such information for the lifetime of your account plus 5 years beyond account closing. You also authorise us to make inquiries, either directly or through third parties, that are deemed necessary to verify your identity or to protect you and/or us against financial crimes such as fraud.

The identity verification information we request may include, but is not limited to, your: Name, Email Address, Contact Information, Telephone Number, Username, Government Issued ID, Date of Birth and other information collected at the time of account registration. In providing this required information, you confirm that it is accurate and authentic. Post-registration, you must guarantee that the information is truthful, complete and updated in a timely manner with any changes. If there is any reasonable doubt that any information provided by you is wrong, untruthful, outdated or incomplete, Binance shall have the right to send you a notice to demand corrections, remove relevant information directly and, as the case may be, terminate all or part of the Services to you. You shall be solely and fully responsible for any loss or expenses incurred during the use of Binance Service if you cannot be reached through the contact information provided. You hereby acknowledge and agree that you have the obligation to keep all information provided up to date if there are any changes.

BY SIGNING UP FOR ACCOUNT YOU HEREBY AUTHORIZE BINANCE TO MAKE INQUIRIES, WHETHER DIRECTLY OR THROUGH THIRD PARTIES, THAT BINANCE CONSIDERS NECESSARY TO VERIFY YOUR IDENTITY OR PROTECT YOU AND/OR BINANCE AGAINST FRAUD OR OTHER FINANCIAL CRIMES, AND TO TAKE ACTION BINANCE REASONABLY DEEMS NECESSARY BASED ON THE RESULTS OF SUCH INQUIRIES. YOU ALSO ACKNOWLEDGE AND AGREE THAT YOUR PERSONAL INFORMATION MAY BE DISCLOSED TO CREDIT REFERENCE AND FRAUD PREVENTION OR FINANCIAL CRIME AGENCIES AND THAT THESE AGENCIES MAY RESPOND TO OUR INQUIRIES IN FULL.

**c. Account Usage Requirements**

Accounts can only be used by the person whose name they are registered under. Binance reserves the right to suspend, freeze or cancel accounts that are used by persons other than the persons whose names they are registered under. You shall immediately notify Binance if you suspect or become aware of unauthorized use of your user name and password. Binance will not be liable for any loss or damage arising from any use of your Account by you or by any third party (whether or not authorized by you).

**d. Account Security**

Binance strives to maintain the safety of those user funds entrusted to us and has implemented industry standard protections for the Services. However, there are risks that are created by individual User actions. You agree to consider your access credentials such as user name and password as confidential information and not to disclose such information to any third party. You also agree that you alone are responsible for taking necessary safety precautions to protect your own account and personal information.

You shall be solely responsible for the safekeeping of your Binance account and password on your own, and you shall be responsible for all activities under Account and Binance will not be responsible for any loss or consequences of authorized or unauthorized use of your Account credentials including but not limited to information disclosure, information posting, consent to or submission of various rules and agreements by clicking on the website, online renewal of agreement, etc.

By creating an Account, you hereby agree that:

(i) you will notify Binance immediately if you are aware of any unauthorized use of your Binance account and password by any person or any other violation to

the security rules;

(ii) you will strictly observe the security, authentication, dealing, charging, withdrawal mechanism or procedures of the website/service; and

(iii) you will log out from the website by taking proper steps at the end of every visit.

**6. Guidelines for Usage of the Services**

**a. License**

Subject to your continued compliance with the express terms and conditions of these Terms, Binance provides to you a revocable, limited, royalty-free, non-exclusive, non-transferable, and non-sublicensable license to access and use the Services on your computer or other internet compatible device for your personal, internal use only. You are not permitted to use the Services for any resale or commercial use including to place trades on behalf of another person or entity. All such use is expressly prohibited and shall constitute a material violation of these Terms. The content layout, formatting, and features of these access privileges for the Services shall be as specified by Binance in its sole discretion. All rights not expressly granted under these Terms are hereby reserved. Accordingly, you are hereby prohibited from using the Services in any manner that is not expressly and unambiguously authorized by these Terms.

These Terms provide only a limited license to access and use the Services. Accordingly, you hereby agree that Binance transfers no ownership or intellectual property interest or title in and to the Services or any Binance intellectual property to you or anyone else in connection with your use of the Services. All text, graphics, user interfaces, visual interfaces, photographs, sounds, artwork, computer code (including html code), programs, software, products, information, and documentation as well as the design, structure, selection, coordination, expression, "look and feel," and arrangement of any content contained on or available through the Services are exclusively owned, controlled, and/or licensed by Binance or its members, parent(s), licensors, or affiliates.

Binance will own any feedback, suggestions, ideas, or other information or materials regarding Binance or the Services that you provide, whether by email, through the Services or otherwise ("Feedback"). You hereby assign to Binance all right, title and interest to Feedback together with all associated intellectual property rights. You will not be entitled to, and hereby waive any claim for, acknowledgment or compensation based on any Feedback or any modifications made based on any Feedback.

**b. Restrictions**

When you use the Services you agree and covenant to observe the following:

    i. All the activities that you carry out during the use of the Services will be in compliance with the requirements of applicable laws, regulations, as well as the various guidelines of Binance;

    ii. Your use of the Services will not be in violation of public interests, public ethics or other's legitimate interests including taking any action that would interfere with, disrupt, negatively affect, or inhibit other Users from using the Services;

    iii. You agree not to use the services for engaging in market manipulation (such as pump and dump schemes, wash trading, self-trading, front running, quote stuffing, and spoofing or layering regardless of whether prohibited by law);

    iv. The following commercial uses of Binance data is prohibited unless written consent from Binance is granted:

      1) Exchange services that use quotes or order book information from Binance.

      2) Data feed or data stream services that make use of any market data from Binance.

      3) Any other websites/apps/services that charge for, or otherwise commercially monetize (including through advertising or referral fees), market data obtained from Binance.

    v. You may not modify, reproduce, duplicate, copy, download, store, further transmit, disseminate, transfer, disassemble, broadcast, publish, remove or alter any proprietary notices or labels, license, sublicense, sell, mirror, frame, rent, lease, private label, grant a security interest in, create derivative works of, or otherwise exploit the Properties, or any portion of the Properties without Binance's prior written consent.

    vi. You may not (i) use any "deep link," "page scrape," "robot," "spider," or other automatic device, program, script, algorithm, or methodology, or any similar or equivalent manual process, to access, acquire, copy, or monitor any portion of the Properties or in any way reproduce or circumvent the navigational structure or presentation of the Services to obtain or attempt to obtain any materials, documents, or information through any means not purposely made available through the Services, (ii) attempt to gain unauthorized access to any portion or feature of the Properties or any other systems or networks connected to the Services or to any Binance server or to any of the services offered on or through the Services, by hacking, password "mining," or any other illegitimate or prohibited means, (iii) probe, scan, or test the vulnerability of the Services or any network connected to the Properties, nor breach the security or authentication measures on the Services or any network connected to the Services, (iv) reverse look-up, trace, or seek to trace any information on any other user of or visitor to the Services, (v) take any action that imposes an unreasonable or disproportionately large load on the infrastructure of the Services or Binance's systems or networks or any systems or networks connected to the Services, (v) use any device, software, or routine to interfere with the proper working of the Services or any transaction conducted on the Services, or with any other person's use of the Services, (vi) forge headers, impersonate a person, or otherwise manipulate identifiers in order to disguise your identity or the origin of any message or transmittal you send to the Services, or (vii) use the Services in an unlawful manner.

By accessing the Service, you agree that Binance shall have the right to investigate any violation of these Terms, unilaterally determine whether you have violated these Terms, and take actions to apply relevant rules without receiving your consent or giving prior notice to you. Examples of such actions include, but are not limited to:

- block and close order requests
- freezing your account
- reporting the incident to authorities
- publishing the alleged violations and actions that have been taken
- deleting any information you published that is in violation

**7. Orders and Service Fees**

**a. Orders**

Upon placing an instruction to effect a trade using the Services (an "Order"), your Account will be updated to reflect the open Order and your Order will be included in Binance's order book for matching with Orders from other Users. If all or a portion of your Order is matched with another User, the Services will execute an exchange (a "Trade"). Upon execution of a Trade, your Account will be updated to reflect that the Order has either been closed due to having been fully executed, or updated to reflect any partial fulfillment of the Order. Orders will remain open until fully executed or cancelled in accordance with subsection (b) below. For purposes of effectuating a Trade, you authorize Binance to take temporary control of the Digital Currency that you are disposing of in the Trade.

**b. Cancellations**

You may only cancel an order initiated via the Services if such cancellation occurs before your Order has been matched with an Order from another user. Once your Order has been matched with an Order from another user, you may not change, withdraw, or cancel your authorization for Binance to complete such Order. If any order has been partially matched, you may cancel the unmatched portion of the Order unless and until the unmatched portion has been matched. Binance reserves the right to refuse any cancellation request associated with an Order after you have submitted such Order. If you have an insufficient amount of Digital Currency in your Account to fulfill an Order, Binance may cancel the entire Order or may fulfill a partial Order that can be covered by the Digital Currency in your Account (in each case after deducting any fees payable to Binance in connection with the Trade as described in subsection (c) below).

**c. Fees**

You agree to pay Binance the fees set forth at https://www.binance.com/en/fee/schedule which may be updated from time to time in Binance's sole discretion. Any such updated fees will apply prospectively to any trades or other transactions that take place following the effective date of such updated fees. You authorize Binance to remove any amounts from your Account for any applicable fees owed by you under these Terms.

**8. Liability**

**a. Disclaimer of Warranties**

TO THE MAXIMUM EXTENT PERMITTED UNDER APPLICABLE LAW, THE SERVICES, THE BINANCE MATERIALS AND ANY PRODUCT, SERVICE OR OTHER ITEM PROVIDED BY OR ON BEHALF OF BINANCE ARE PROVIDED ON AN "AS IS" AND "AS AVAILABLE" BASIS AND BINANCE EXPRESSLY DISCLAIMS, AND YOU WAIVE, ANY AND ALL OTHER WARRANTIES OF ANY KIND, WHETHER EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE OR NON-INFRINGEMENT OR WARRANTIES ARISING FROM COURSE OF PERFORMANCE, COURSE OF DEALING OR USAGE IN TRADE. WITHOUT LIMITING THE FOREGOING, BINANCE DOES NOT REPRESENT OR WARRANT THAT THE SITE, THE SERVICES OR BINANCE MATERIALS ARE ACCURATE, COMPLETE, RELIABLE, CURRENT, ERROR-FREE, OR FREE OF VIRUSES OR OTHER HARMFUL COMPONENTS. BINANCE DOES NOT GUARANTEE THAT ANY ORDER WILL BE EXECUTED, ACCEPTED, RECORDED OR REMAIN OPEN. EXCEPT FOR THE EXPRESS STATEMENTS SET FORTH IN THIS AGREEMENT, YOU HEREBY ACKNOWLEDGE AND AGREE THAT YOU HAVE NOT RELIED UPON ANY OTHER STATEMENT OR UNDERSTANDING, WHETHER WRITTEN OR ORAL, WITH RESPECT TO YOUR USE AND ACCESS OF THE SERVICES. WITHOUT LIMITING THE FOREGOING, YOU HEREBY UNDERSTAND AND AGREE THAT BINANCE WILL NOT BE LIABLE FOR ANY LOSSES OR DAMAGES ARISING OUT OF OR RELATING TO: (A) ANY INACCURACY, DEFECT OR OMISSION OF DIGITAL CURRENCY PRICE DATA, (B) ANY ERROR OR DELAY IN THE TRANSMISSION OF SUCH DATA, (C) INTERRUPTION IN ANY SUCH DATA AND (D) ANY DAMAGES INCURRED BY ANOTHER USER'S ACTIONS, OMISSIONS OR VIOLATION OF THIS AGREEMENT.

THE DISCLAIMER OF IMPLIED WARRANTIES CONTAINED HEREIN MAY NOT APPLY IF AND TO THE EXTENT IT IS PROHIBITED BY APPLICABLE LAW OF THE JURISDICTION IN WHICH YOU RESIDE.

**b. Disclaimer of Damages and Limitation of Liability**

TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, IN NO EVENT WILL BINANCE, ITS AFFILIATES AND THEIR RESPECTIVE SHAREHOLDERS, MEMBERS, DIRECTORS, OFFICERS, EMPLOYEES, ATTORNEYS, AGENTS, REPRESENTATIVES, SUPPLIERS OR CONTRACTORS BE LIABLE FOR ANY INCIDENTAL, INDIRECT, SPECIAL, PUNITIVE, CONSEQUENTIAL OR SIMILAR DAMAGES OR LIABILITIES WHATSOEVER (INCLUDING,

WITHOUT LIMITATION, DAMAGES FOR LOSS OF DATA, INFORMATION, REVENUE, PROFITS OR OTHER BUSINESS OR FINANCIAL BENEFIT) ARISING OUT OF OR IN CONNECTION WITH THE SERVICES, ANY PERFORMANCE OR NON-PERFORMANCE OF THE SERVICES, OR ANY OTHER PRODUCT, SERVICE OR OTHER ITEM PROVIDED BY OR ON BEHALF OF BINANCE AND ITS AFFILIATES, WHETHER UNDER CONTRACT, STATUTE, STRICT LIABILITY OR OTHER THEORY EVEN IF BINANCE HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES EXCEPT TO THE EXTENT OF A FINAL JUDICIAL DETERMINATION THAT SUCH DAMAGES WERE A RESULT OF BINANCE'S GROSS NEGLIGENCE, FRAUD, WILLFUL MISCONDUCT OR INTENTIONAL VIOLATION OF LAW. SOME JURISDICTIONS DO NOT ALLOW THE EXCLUSION OR LIMITATION OF INCIDENTAL OR CONSEQUENTIAL DAMAGES, SO THE ABOVE LIMITATION MAY NOT APPLY TO YOU.

NOTWITHSTANDING THE FOREGOING, IN NO EVENT WILL THE LIABILITY OF BINANCE, ITS AFFILIATES AND THEIR RESPECTIVE SHAREHOLDERS, MEMBERS, DIRECTORS, OFFICERS, EMPLOYEES, ATTORNEYS, AGENTS, REPRESENTATIVES, SUPPLIERS OR CONTRACTORS ARISING OUT OF OR IN CONNECTION THE SERVICES, ANY PERFORMANCE OR NON-PERFORMANCE OF THE SERVICES, OR ANY OTHER PRODUCT, SERVICE OR OTHER ITEM PROVIDED BY OR ON BEHALF OF BINANCE OR ITS AFFILIATES WHETHER UNDER CONTRACT, STATUTE, STRICT LIABILITY OR OTHER THEORY, EXCEED THE AMOUNT OF THE FEES PAID BY YOU TO BINANCE UNDER THIS AGREEMENT IN THE TWELVE-MONTH PERIOD IMMEDIATELY PRECEDING THE EVENT GIVING RISE TO THE CLAIM FOR LIABILITY.

**c. Indemnification**

You agree to indemnify and hold harmless Binance, its affiliates, contractors, licensors, and their respective directors, officers, employees and agents from and against any claims, actions, proceedings, investigations, demands, suits, costs, expenses and damages (including attorneys' fees, fines or penalties imposed by any regulatory authority) arising out of or related to (i) your use of, or conduct in connection with, the Services, (ii) your breach or our enforcement of these Terms, or (iii) your violation of any applicable law, regulation, or rights of any third party during your use of the Service. If you are obligated to indemnify Binance, its affiliates, contractors, licensors, and their respective directors, officers, employees or agents pursuant to this clause, Binance will have the right, in its sole discretion, to control any action or proceeding and to determine whether Binance wishes to settle, and if so, on what terms.

**9. Announcements**

Please be aware that all official announcements, news, promotions, competitions and airdrops will be listed on https://support.binance.com/hc/en-us/categories/115000056351-Announcements where we urge all users to refer to regularly. Binance will not be held liable or responsible in any manner of compensation should users incur personal losses arising from ignorance or negligence of the announcements.

**10. Termination of Agreement**

You agree that Binance shall have the right to immediately suspend your account (and any accounts beneficially owned by related entities or affiliates), freeze or lock the funds in all such accounts, and suspend your access to Binance for any reason including if it suspects any such accounts to be in violation of these Terms, our Privacy Policy, or any applicable laws and regulations. You agree that Binance shall not be liable to you for any permanent or temporary modification, suspension or termination of your Account or access to all or any portion of the Services. Binance shall have the right to keep and use the transaction data or other information related to such accounts. The above account controls may also be applied in the following cases:

- The account is subject to a governmental proceeding, criminal investigation or other pending litigation;
- We detect unusual activity in the account;
- We detect unauthorized access to the account;
- We are required to do so by a court order or command by a regulatory/government authority

In case of any of the following events, Binance shall have the right to directly terminate this agreement by cancelling your Account, and shall have the right to permanently freeze (cancel) the authorizations of your account on Binance and withdraw the corresponding Binance Account thereof:

- after Binance terminates services to you;
- you allegedly register or register in any other person's name as Binance user again, directly or indirectly;
- the information that you have provided is untruthful, inaccurate, outdated or incomplete;
- when these Terms are amended, you expressly state and notify Binance of your unwillingness to accept the amended Terms;
- you request that the Services be terminated; and
- any other circumstances where Binance deems it should terminate the services.

Should your Account be terminated, the Account and transactional information required for meeting data retention standards will be securely stored for 5 years. In addition, if a transaction is unfinished during the Account termination process, Binance shall have the right to notify your counterparty of the situation at that time. You acknowledge that a user initiated account exit (right to erasure under GDPR or other equivalent regulations) will also be subjected to the termination protocol stated above.

If Binance receives notice that any funds held in your Account are alleged to have been stolen or otherwise are not lawfully possessed by you, Binance may, but has no obligation to, place an administrative hold on the affected funds and your Account. If Binance does place an administrative hold on some or all of your funds or Account, Binance may continue such hold until such time as the dispute has been resolved and evidence of the resolution acceptable to Binance has been provided to Binance in a form acceptable to Binance. Binance will not involve itself in any such dispute or the resolution of the dispute. You agree that Binance will have no liability or responsibility for any such hold, or for your inability to withdraw funds or execute trades during the period of any such hold.

**a. Remaining funds after Account termination**

Except as set forth in subsection (b) below, once the Account is closed/withdrawn, all remaining balance (which includes charges and liabilities owed to Binance) on the account will be payable immediately to Binance. Upon payment of all outstanding charges to Binance (if any), the User will have 5 business days to withdraw all funds from the Account.

**b. Remaining funds after Account termination due to fraud, violation of law, or violation of these terms)**

Binance maintains full custody of the funds and User data/information which may be turned over to governmental authorities in the event of Account suspension/closure arising from fraud investigations, violation of law investigations or violation of these Terms.

**11. No Financial Advice**

Binance is not your broker, intermediary, agent, or advisor and has no fiduciary relationship or obligation to you in connection with any trades or other decisions or activities effected by you using the Services. No communication or information provided to you by Binance is intended as, or shall be considered or construed as, investment advice, financial advice, trading advice, or any other sort of advice. All trades are executed automatically, based on the parameters of your order instructions and in accordance with posted trade execution procedures, and you are solely responsible for determining whether any investment, investment strategy or related transaction is appropriate for you based on your personal investment objectives, financial circumstances and risk tolerance. You should consult your legal or tax professional regarding your specific situation. Binance does not recommend that any Digital Currency should be bought, earned, sold, or held by you. Before making the decision to buy, sell or hold any Digital Currency, you should conduct your own due diligence and consult your financial advisors before making any investment decision. Binance will not be held responsible for the decisions you make to buy, sell, or hold Digital Currency based on the information provided by Binance.

**12. Compliance with Local Laws**

It is the responsibility of the User to abide by local laws in relation to the legal usage of Binance in their local jurisdiction. Users must also factor, to the extent of their local law all aspects of taxation, the withholding, collection, reporting and remittance to their appropriate tax authorities. All Users of Binance and any of its services acknowledge and declare that the source of their funds come from a legitimate manner and are not derived from illegal activities. Binance maintains a stance of cooperation with law enforcement authorities globally and will not hesitate to seize, freeze, terminate the account and funds of Users which are flagged out or investigated by legal mandate.

**13. Privacy Policy**

Access to the Services will require the submission of certain personally identifiable information. Please review Binance's Privacy Policy found at https://www.binance.com/statement.html for a summary of Binance's practices related to the collection and use of personally identifiable information.

**14. RESOLVING DISPUTES: FORUM, ARBITRATION, CLASS ACTION WAIVER, GOVERNING LAW**

PLEASE READ THIS SECTION CAREFULLY, AS IT INVOLVES A WAIVER OF CERTAIN RIGHTS TO BRING LEGAL PROCEEDINGS, INCLUDING AS A CLASS ACTION FOR RESIDENTS OF THE U.S.

**a. Notification of Dispute.** Please contact Binance first! Binance wants to address your concerns without resorting to formal legal proceedings. Before filing a claim, you agree to try to resolve the dispute informally by contacting Binance first through https://support.binance.com/hc/en-us/requests/new.

**b. Agreement to Arbitrate.** You and Binance agree to resolve any claims relating to this Agreement (including any question regarding its existence, validity, termination, or any services or products provided and any representations made by us) through final and binding arbitration, except as set forth under Exceptions to Agreement to Arbitrate below. You agree to first give us an opportunity to resolve any claims by contacting us as set forth in subsection (a) above. If we are not able to resolve your claims within 60 days of receiving the notice, you may seek relief through arbitration or in the Small Claims Tribunals of Singapore ("SCT"), as set forth below.

**c. Arbitration Procedure.** Either you or Binance may submit a dispute (after having made good faith efforts to resolve such dispute in accordance with subsections (a) and (b) above) for final, binding resolution by arbitration under the arbitration rules of the Singapore International Arbitration Centre ("SIAC"), which are deemed to be incorporated by reference. The arbitration tribunal shall consist of a sole arbitrator to be appointed by the President of SIAC. The language of the arbitration hearings shall be English and the seat, or legal place, of arbitration shall be Singapore. **Judgment on any arbitral award may be entered in any court having jurisdiction over the party (or the assets of the party) due and owing such award.**

**d. Exceptions.** Either party may instead choose to assert the claims in the SCT if the claims fall within the jurisdiction of the SCT, and either party may seek injunctive relief or other urgent equitable relief in a court of competent jurisdiction. However, for the avoidance of doubt, where the claims fall outside of the jurisdiction of the SCT, the claims will be referred to and finally resolved by SIAC arbitration.

**e. Notice.** To begin an arbitration proceeding, you must send a letter requesting arbitration and describing your claims to Binance Europe Services Limited, Melita Court, Level 3, Triq Giuseppe Cali, Ta'Xbiex XBX 1420, Malta. If we request arbitration against you, we will give you notice at the email address or street address you have provided. SIAC Rules and filing instructions are available at http://www.siac.org.sg/our-rules or by calling +65 6713 9777.

**f. Controlling Law.** This Agreement is governed by the law of Singapore except for its conflicts of laws principles, unless otherwise required by a mandatory law of any other jurisdiction.

**15. Miscellaneous**

**a. Independent Parties.** Binance is an independent contractor and not an agent of you in the performance of these Terms. These Terms not to be interpreted as evidence of an association, joint venture, partnership, or franchise between the parties.

**b. Entire Agreement.** These Terms constitute the entire agreement between the parties regarding use of the Services and will supersede all prior agreements between the parties whether, written or oral. No usage of trade or other regular practice or method of dealing between the parties will be used to modify, interpret, supplement, or alter the terms of these Terms.

**c. Force Majeure.** Binance will not be liable for any delay or failure to perform as required by these Terms because of any cause or condition beyond Binance's reasonable control.

**d. Severability.** If any portion of these Terms are held invalid or unenforceable, such invalidity or enforceability will not affect the other provisions of these Terms, which will remain in full force and effect, and the invalid or unenforceable portion will be given effect to the greatest extent possible.

**e. Assignment.** You may not assign or transfer any right to use the Services or any of your rights or obligations under these Terms without prior written consent from us, including by operation of law or in connection with any change of control. Binance may assign or transfer any or all of its rights or obligations under these Terms, in whole or in part, without notice or obtaining your consent or approval.

**f. Waiver.** The failure of a party to require performance of any provision will not affect that party's right to require performance at any time thereafter, nor will a waiver of any breach or default of these Terms or any provision of these Terms constitute a waiver of any subsequent breach or default or a waiver of the provision itself.

**g. Third-Party Website Disclaimer.** Any links to third-party websites from the Services does not imply endorsement by Binance of any products, services or information presented therein, nor does Binance guarantee the accuracy of the information contained on them. In addition, since Binance has no control over the terms of use or privacy practices of third-party websites, you should read and understand those policies carefully.

**h. Contact Information.** For more information on Binance, you can refer to the company and license information found on the website. If you have questions regarding this agreement, please feel free to contact Binance for clarification via our Customer Support team at https://support.binance.com/hc/en-us/requests/new.

© 2017 - 2020 Binance.com. All rights reserved



# EXHIBIT D



Traders ⌄    Lenders ⌄    About ⌄    UNUS Sed Leo    Securities

# Service Changes for U.S. Customers (Amended as of August 12, 2017)

**FRIDAY, AUGUST 11, 2017**

Bitfinex is making changes to the services we provide to U.S. individuals. These changes impact the verification process and trading of certain digital tokens for U.S. customers. Some changes are effective immediately, and others will be gradually implemented in the coming weeks.

**Suspension of U.S. Individual Verification Requests**

We regret to announce that, effective immediately, we will no longer be accepting verification requests for U.S. individuals.

We have for some time considered pulling away from the retail marketplace in the U.S., and now with a current backlog of verification requests and ongoing difficulties in providing USD deposit and withdrawals for U.S. individuals, we feel that the time has come to begin disengaging from U.S. retail customers.

Several factors have gone into this decision:

- While we have been able to normalize banking for some corporate customers and individuals in certain jurisdictions, compliant banking solutions for U.S. individuals remain elusive. We have been slowly and selectively inviting users in particular jurisdictions who meet set criteria to start using banking channels that have come online. This process is ongoing.
- A surprisingly small percentage of our revenues come from verified U.S. individual accounts while a dramatically outsized portion of our resources goes into servicing the needs of U.S. individuals, including support, legal and regulatory.
- We anticipate the regulatory landscape to become even more challenging in the future.
- Bitfinex is not based in the United States. Exchanges based in the U.S. are better positioned to properly service retail U.S. customers.

We are thankful to all of our loyal U.S. customers that have consistently traded with us but, unfortunately, we have an obligation to our whole customer base and to our shareholders to make rational resource allocation decisions.

Furthermore, over the next 90 days, we will be discontinuing services to our existing U.S. individual customers. We will be communicating further with affected users on timing and specifics. Our intention is to reduce disruption as much as possible for our U.S. customers.



Traders ⌄    Lenders ⌄    About ⌄    UNUS Sed Leo    Securities

ban will go into effect at noon UTC on Wednesday, August 16, 2017. No trading of these tokens will be allowed for U.S. customers as of that date and time. Please note that nothing in this announcement should be taken as fact or opinion that any such ERC20 tokens are a security pursuant to U.S. law or require regulation under U.S. law.

Once again, we regret any inconvenience this change in policy might create.

Back to announcements

## Start trading today

One of the world's longest running exchanges, trusted by professionals, enabling financial freedom for everyone

Try demo          Sign up



**Services**

**Products**

**Company**

**Support**

**Learn**

**Legal & privacy**

