EXHIBIT 1

Judge Richard A. Jones

```
_____ FILED    _____ ENTERED
_____ LODGED   _____ RECEIVED

NOV 21 2023

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY                        DEPUTY
```

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>BINANCE HOLDINGS LIMITED, d/b/a BINANCE.COM,<br><br>Defendant. | NO. 23-178RAJ<br><br>**PLEA AGREEMENT** |

Pursuant to Federal Rule of Criminal Procedure Rule 11(c)(1)(C), the United States of America, by and through the Department of Justice, Criminal Division, Money Laundering and Asset Recovery Section ("MLARS"); the Department of Justice, National Security Division, Counterintelligence and Export Control Section ("CES"); and the United States Attorney's Office for the Western District of Washington ("the USAO-WDWA") (collectively the "Offices"), and the Defendant, BINANCE HOLDINGS LIMITED ("BINANCE," the "Defendant" or the "Company"), by and through its undersigned counsel, and through its authorized representative, pursuant to authority granted by Defendant's Controlling Shareholder(s), hereby submit and enter into this plea

Plea Agreement - 1
*United States v. Binance Holdings, Limited, CR23-178RAJ*

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

agreement (the "Agreement"). The terms and conditions of this Agreement are as follows.

1. **Waiver of Indictment.** Defendant, having been advised of the right to be charged by Indictment, agrees to waive that right and enter a plea of guilty to the charges brought by the United States Attorney in an Information. Defendant further agrees to persist in that plea through sentencing and, as set forth below, to cooperate fully with the Offices in their investigation into the conduct described in this Agreement and Attachment A to this Agreement ("Statement of Facts"), as further set forth in Paragraphs 7 and 25.

2. **The Charges.** Defendant, having been advised of the right to have this matter tried before a jury, agrees to waive that right and enters a plea of guilty to each of the following charges contained in the Information:

    a.    Conspiracy to conduct an unlicensed money transmitting business ("MTB"), in violation of Title 18, United States Code, Sections 1960(a), 1960(b)(1)(B), and to fail to maintain an effective anti-money laundering ("AML") program, in violation of Title 31, United States Code, Sections 5318(h), 5322, as charged in Count 1, in violation of Title 18, United States Code, Section 371;

    b.    Conducting an unlicensed MTB, as charged in Count 2, in violation of Title 18, United States Code, Sections 1960(a), 1960(b)(1)(B), and 2; and

    c.    Violation of the International Emergency Economic Powers Act ("IEEPA"), as charged in Count 3, in violation of Title 50, United States Code, Section 1705, and Title 31, Code of Federal Regulations, Part 560 *et seq.*

By entering these pleas of guilty, Defendant hereby waives all objections to the form of the charging document. Defendant further understands that before entering any guilty plea, Defendant, through its representative, will be placed under oath. Any statement given by Defendant under oath may be used by the Offices in a prosecution for perjury or false statement.

Plea Agreement - 2
*United States v. Binance Holdings, Limited,* CR23-178RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

3. **Elements of the Offenses.** The elements of the offenses to which Defendant is pleading guilty are as follows:

      a.    The elements of conspiracy to conduct an unlicensed MTB and to fail to maintain an effective AML program, as charged in Count 1, are as follows:

          i.    First, there was an agreement between two or more persons to commit the crimes of conducting an unlicensed MTB and failing to maintain an effective AML program;

          ii.    Second, Defendant became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it; and

          iii.    Third, at least one member of the conspiracy performed an overt act for the purpose of carrying out the conspiracy.

      The elements of conducting an unlicensed MTB, which was an object of the conspiracy, are set forth in (b), below.

      The elements of failure to maintain an effective AML program, which was an object of the conspiracy, are:

          i.    First, Defendant, a covered financial institution, to wit, a money services business, failed to develop, implement, and maintain an effective AML program; and

          ii.    Second, Defendant acted willfully.

      b.    The elements of conducting an unlicensed MTB, as charged in Count 2, are as follows:

          i.    First, Defendant conducted, managed, supervised, directed or owned all or part of an MTB;

          ii.    Second, the business was unlicensed, that is, it failed to comply with the MTB registration requirements under Title 31, United States Code Section 5330 and the regulations prescribed thereunder; and

          iii.    Third, Defendant acted knowingly.

Plea Agreement - 3
*United States v. Binance Holdings, Limited*, CR23-178RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

c. The elements of a violation of IEEPA, as charged in Count 3, are as follows:

    i. First, Defendant caused a violation of any license, order, regulation, or prohibition issued pursuant to IEEPA;

    ii. Second, Defendant acted willfully; and

    iii. Third, Defendant did not have a license issued by the Department of the Treasury, Office of Foreign Assets Control ("OFAC"), to engage in the charged conduct.

4. **The Penalties.** Defendant understands that the statutory penalties applicable to the offenses to which Defendant is pleading guilty are as follows:

a. For the offense of conspiracy to conduct an unlicensed MTB and to fail to maintain an effective AML program, as charged in Count 1: a fine of up to $500,000, or twice the gross gain or loss resulting from the unlawful conduct, whichever is greater, pursuant to Title 18, United States Code, Section 3571(d); a period of probation of up to five (5) years; and a mandatory special assessment of $400;

b. For the offense of conducting an unlicensed MTB, as charged in Count 2: a fine of up to $500,000, or twice the gross gain or loss resulting from the unlawful conduct, whichever is greater, pursuant to Title 18, United States Code, Section 3571(d); a period of probation of up to five (5) years; and a mandatory special assessment of $400; and

c. For the offense of willfully violating IEEPA, as charged in Count 3: a fine of up to $1,000,000, or twice the gross gain or loss resulting from the unlawful conduct, whichever is greater, pursuant to Title 18, United States Code, Section 3571(d); a period of probation of up to five (5) years; and a mandatory special assessment of $400.

Defendant agrees that all special assessments are to be paid at or before the time of sentencing.

Plea Agreement - 4
*United States v. Binance Holdings, Limited*, CR23-178RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Defendant further understands and agrees that the consequences of pleading guilty includes the forfeiture of certain property, either as a part of the sentence imposed by the Court, or as a result of civil judicial or administrative process, as agreed to below.

Defendant agrees that any monetary penalty the Court imposes, including the fine, costs, or restitution, is due and payable as agreed to below.

5. **Rights Waived by Pleading Guilty.** Defendant is satisfied that Defendant's attorneys have rendered effective assistance. Defendant understands that by pleading guilty, Defendant knowingly and voluntarily waives the following rights:

    a.    The right to plead not guilty and to persist in a plea of not guilty;

    b.    The right to a speedy and public trial before a jury of Defendant's peers;

    c.    The right to the effective assistance of counsel at trial, including, if Defendant could not afford an attorney, the right to have the Court appoint one for Defendant;

    d.    The right to be presumed innocent until guilt has been established beyond a reasonable doubt at trial;

    e.    The right to confront and cross-examine witnesses against Defendant at trial;

    f.    The right to compel or subpoena witnesses to appear on Defendant's behalf at trial;

    g.    The right to testify or to remain silent at trial, at which trial such silence could not be used against Defendant; and

    h.    The right to appeal a finding of guilt or any pretrial rulings.

6. **Corporate Authorization.** Defendant agrees that it has the full legal right, power, and authority to enter into and perform all of the obligations under this Agreement.

Defendant further agrees that this Agreement will be executed by a corporate representative authorized to enter into this agreement and to plead guilty on behalf of

Plea Agreement - 5
*United States v. Binance Holdings, Limited*, CR23-178RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Defendant. The authorized person shall hold a position of significant responsibility within the corporation and have sufficient authority to bind the corporation in all matters. On or before the date of entry and filing of this Agreement, Defendant shall provide the U.S. Attorney's Office and the Court with a signed written statement, attached hereto as Attachment B, evidencing the fact that Defendant is authorized to enter into and comply with all the provisions of this Agreement; that a representative of Defendant has been authorized to enter a guilty plea and attend the sentencing hearing on behalf of Defendant; and that Defendant and its authorized representative have observed all required corporate formalities for such authorizations. On or before the date of entry and filing of this Agreement, Defendant shall also provide a supplemental authorization to the Offices, signed by the ultimate beneficial owner, that provides assurances that such assignees, parent corporations, subsidiaries, affiliates involved in the operation of the Binance.com exchange, successors-in-interest, and transferees of Defendant are bound by this Agreement.

7.      **Term of Defendant's Obligations Under the Agreement.** Except as otherwise provided in Paragraph 25 in connection with Defendant's cooperation obligations, Defendant's obligations under the Agreement shall last and be effective for a period beginning on the date on which the Plea is accepted by the Court and ending three years from the date on which the independent compliance monitor (the "Monitor") identified in Attachment D is selected (the "Term"). Defendant agrees, however, that in the event the Offices determine, in their sole discretion, that Defendant has knowingly violated any provision of this Agreement or failed to completely perform or fulfill each of Defendant's obligations under this Agreement, the Offices, in their sole discretion, may impose an extension or extensions of the Term for up to a total additional time period of one year, without prejudice to the Offices' right to proceed as provided in Paragraphs 35 through 37. Any extension of the Term extends all terms of this Agreement, including any

Plea Agreement - 6
*United States v. Binance Holdings, Limited*, CR23-178RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  compliance, Monitor, or reporting requirements described in Attachments C and D, for an

2  equivalent period.

3  8.    **Considerations.** The Offices enter into this Agreement based on the individual

4  facts and circumstances presented by this case, including:

5           a.    The nature, seriousness, and pervasiveness of the offense conduct, as

6  described in the Statement of Facts, including that at least as early as August 2017 and

7  continuing until at least October 2022, Defendant operated as an MTB and a money

8  services business that did business wholly or in substantial part in the United States,

9  served a substantial number of U.S. customers, and processed billions of dollars' worth of

10  cryptocurrency transactions for U.S. persons, most of which were on-platform trades.

11  Defendant prioritized growth and profit over compliance with U.S. law. During the

12  relevant period, Defendant disregarded U.S. law and failed to register with the

13  Department of the Treasury, Financial Crimes Enforcement Network ("FinCEN"), failed

14  to implement an effective AML program pursuant to the Bank Secrecy Act ("BSA"), and

15  caused U.S. users to engage in transactions with users in sanctioned jurisdictions in

16  violation of U.S. sanctions;

17           b.    Defendant did not receive voluntary disclosure credit pursuant to the

18  United States Sentencing Guidelines ("U.S.S.G.") because it did not voluntarily and

19  timely disclose to the Offices the conduct described in the Statement of Facts;

20           c.    Defendant received partial credit for cooperation under U.S.S.G.

21  § 8C2.5(g)(2), because, after becoming aware of the Offices' investigation, it provided

22  partial cooperation with the investigation and demonstrated recognition and affirmative

23  acceptance of responsibility for its criminal conduct by, among other things, investigating

24  facts and obtaining information as requested by the Offices, which allowed the Offices to

25  preserve and obtain evidence as part of their own independent investigation; making

26  regular and detailed factual presentations to the Offices; voluntarily producing a

27  significant amount of documents located outside the United States to the Offices in ways

Plea Agreement - 7
*United States v. Binance Holdings, Limited*, CR23-178RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

that did not implicate foreign data privacy laws; collecting and producing voluminous evidence and information to the Offices; providing detailed analysis of complex, on-platform cryptocurrency transactions;

      d.     Defendant did not receive full credit for its cooperation because Defendant was delayed in producing relevant evidence, including recordings of meetings in which senior executives discussed U.S. legal requirements related to the conduct set forth in the Statement of Facts;

      e.     Ultimately, Defendant also provided to the Offices relevant facts known to it, including information about the individuals involved in the conduct described in the Statement of Facts;

      f.     Defendant engaged in remedial measures, including:

          i.     Began implementing geofencing measures in late 2019, and continued to improve its controls by using a variety of location-detection tools, including IP address, phone number, and mobile carrier;

          ii.     Began restricting accounts for a number of known U.S. users prior to notice of the Offices' investigation;

          iii.     Changed its terms of service to require all new users to submit to full know your customer ("KYC") procedures in August 2021;

          iv.     Implemented full KYC requirements for all direct account holders by May 2022, including the use of recognized third-party vendors to verify identity and assess customer risk;

          v.     Began restricting accounts for users subject to U.S. sanctions;

          vi.     Invested significant financial resources in improvements to Defendant's AML and countering the financing of terrorism ("CFT") programs, including by replacing ineffective compliance staff with experienced employees and significantly increasing compliance head count;

Plea Agreement - 8
*United States v. Binance Holdings, Limited*, CR23-178RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

vii.    Implemented enterprise-wide AML/CFT and sanctions risk assessments beginning in November 2022;

viii.    Implemented Financial Action Task Force standards for AML and KYC;

ix.    Improved Defendant's enhanced due diligence ("EDD") program in November 2022 to cover, among other things, politically exposed persons ("PEPs"), high-risk users, applicants for limit increases, unusual corporate structures, and unusual transaction activity;

x.    Improved employee AML/CFT training;

xi.    Increased investment in real-time and post transaction monitoring including by increasing head count, enhancing internal tools, and employing recognized third-party vendors—such as blockchain analytics vendors—to scan user transactions and profiles;

xii.    Updated Defendant's sanctions policy in November 2022, improving customer due diligence ("CDD"), screening, offboarding, account blocking, risk assessments, and sanctions reporting;

xiii.    Accepted the resignation of the Chief Executive Officer, Changpeng Zhao, and prohibited him from any present or future involvement in operating or managing Defendant's business;

xiv.    Developed and implemented a comprehensive framework designed to determine the nationality of enterprise users;

xv.    Initiated an extensive historical review to identify and offboard U.S. enterprise users from the platform; and

xvi.    As part of its resolution of parallel investigations by U.S. regulatory agencies, committed to additional remediation.

g.    Although Defendant had inadequate compliance programs, policies, procedures, and controls, including an ineffective AML and sanctions compliance

Plea Agreement - 9
*United States v. Binance Holdings, Limited*, CR23-178RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  program, as shown above, Defendant has taken significant steps to remediate its AML

2  and sanctions compliance programs and has committed to continuing to enhance those

3  programs, including ensuring that its AML and sanctions compliance program satisfies

4  the minimum elements set forth in Attachment C to this Agreement;

5          h.      Defendant has agreed to retain a Monitor to oversee implementation

6  of Defendant's compliance remediation and enhancement, as further described in

7  Attachment D to this Agreement;

8          i.      Defendant has no prior criminal history;

9          j.      Defendant is entering into parallel resolutions with the Commodities

10  Futures Trading Commission ("CFTC"), FinCEN, and OFAC; and

11          k.      Defendant has agreed to continue to cooperate with the Offices as

12  described in Paragraph 25 below.

13          l.      Accordingly, after considering (a) through (k) above, the Offices

14  believe that the appropriate resolution in this case is for Defendant to plead guilty to the

15  counts described in Paragraph 2.

16  9.    **The Offices' Agreement.** In exchange for the guilty plea of Defendant and the

17  complete fulfillment of all of its obligations under this Agreement, the Offices agree that

18  they will not file additional criminal charges against Defendant, or any of its current or

19  former direct or indirect affiliates and subsidiaries involved in the operation of the

20  Binance.com exchange or with access to the Binance.com orderbook, relating to or

21  arising from the conduct in the Statement of Facts or the Information filed pursuant to

22  this Agreement. This Agreement does not provide any protection against, and the Offices

23  may also use any information related to the conduct described in the Statement of Facts

24  against Defendant in, any prosecution or other proceeding relating to (a) obstruction of

25  justice; (b) perjury or making a false statement; (c) any crime of violence; (d) a violation

26  of any provision set forth in Chapter 113B of Title 18 of the United States Code; or (e) a

27  violation of any provision of Title 26 of the United States Code.

Plea Agreement - 10
*United States v. Binance Holdings, Limited,* CR23-178RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1         This Agreement does not provide any protection against prosecution for any

2    conduct not described in the Statement of Facts or the Information and its charges by

3    Defendant or any of its direct or indirect affiliates, subsidiaries, officers, directors,

4    employees, agents, or consultants, whether or not disclosed by Defendant pursuant to the

5    terms of this Agreement. This Agreement does not provide any protection against

6    prosecution of any individuals, regardless of their affiliation with Defendant. Defendant

7    agrees that nothing in this Agreement is intended to release Defendant from any and all

8    of Defendant's tax liabilities and reporting obligations for any and all income not

9    properly reported and/or legally or illegally obtained or derived.

10   10.    **Defendant's Agreement.** Defendant agrees to abide by all terms and obligations

11   of this Agreement as described herein, including, but not limited to, the following:

12        a.    to plead guilty as set forth in this Agreement;

13        b.    to abide by all sentencing stipulations contained in this Agreement;

14        c.    to appear, through its duly appointed representatives, as ordered for

15   all court appearances, and obey any other ongoing court order in this matter, consistent

16   with all applicable U.S. and foreign laws, procedures, and regulations;

17        d.    to commit no further crimes;

18        e.    to be truthful at all times with the Court;

19        f.    to pay the applicable special assessment;

20        g.    to consent to and to pay the applicable sentence of a fine;

21        h.    to consent to and to pay the applicable forfeiture amount;

22        i.    to cooperate fully with the Offices as described in Paragraph 25;

23        j.    to continue to implement compliance programs as described in

24   Paragraphs 27 and 28 and Attachment C; and

25        k.    to retain a Monitor as set forth in Attachment D.

26   11.    **Statement of Facts.** Defendant is pleading guilty because it is guilty of the

27   charges contained in the Information. Defendant admits, agrees, and stipulates that the

Plea Agreement - 11
*United States v. Binance Holdings, Limited*, CR23-178RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   factual allegations set forth in the Information and the Statement of Facts are true and
2   correct, that it is responsible for the acts of its officers, directors, employees, and agents
3   described in the Information and Statement of Facts, and that the Information and
4   Statement of Facts accurately reflect Defendant's criminal conduct. Defendant stipulates
5   to the admissibility of the Statement of Facts in any proceeding by the Offices, including
6   any trial, guilty plea, or sentencing proceeding, and will not contradict anything in the
7   attached Statement of Facts at any such proceeding.

8   12.   **Sentencing Factors.** The parties agree that the following Sentencing Guidelines
9   provisions apply to this case, with respect to Count One, Conspiracy, and Count Two,
10   Conducting an Unlicensed MTB: U.S.S.G. § 8C2.4(a)(2) (pecuniary gain of
11   $1,612,031,763 to organization from the offense).

12       With respect to Count Three, because the Sentencing Guidelines provision
13   applicable to a willful violation of the IEEPA is U.S.S.G. § 2M5.1, which is not one of
14   the enumerated offense Guidelines to which the organizational fine Guidelines apply
15   under U.S.S.G. § 8C2.1, the parties agree that the provisions of 18 U.S.C. §§ 3553 and
16   3572 control the imposition of an appropriate sentence for Count Three, pursuant to
17   U.S.S.G. § 8C2.10.

18   13.   **Criminal Fine.** The parties agree, based on the application of the U.S.S.G. and 18
19   U.S.C. § 3571(d), that the following provisions with respect to sentence of a fine apply to
20   this case:

21       -   A base fine of $1,612,031,763 pursuant to U.S.S.G. § 8C2.4(a)(2) (the
22          pecuniary gain to Defendant from the offense).
23       -   Culpability score of seven (7) points based on U.S.S.G. § 8C2.5,
24          calculated as follows:
25            o   Base culpability score of five (5) points pursuant to U.S.S.G. §
26              8C2.5(a).

27

Plea Agreement - 12
*United States v. Binance Holdings, Limited*, CR23-178RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1      ○  A four-point (4) addition because the organization had more than

2          1,000 employees and an individual within high-level personnel

3          participated in, condoned, or was willfully ignorant of the offense

4          pursuant to U.S.S.G. § 8C2.5(b)(2)(A)(i).

5      ○  A two-point (2) reduction for cooperation and acceptance of

6          responsibility.

7    -  Calculation of fine range pursuant to U.S.S.G. § 8C2.6:

8      ○  Base Fine: $1,612,031,763

9      ○  Multiplier: 1.4 (min) / 2.8 (max)

10      ○  Fine Range: $2,256,844,468 to $4,513,688,936

11  **14.**     **Agreed Sentence Pursuant to Rule 11(c)(1)(C).** Pursuant to Rule 11(c)(1)(C) of

12  the Federal Rules of Criminal Procedure, the parties acknowledge and agree that the

13  appropriate sentence to be imposed by the Court at the time of sentencing is outlined

14  below. If the sentencing Court rejects the agreement of the parties regarding the

15  appropriate sentence, both Defendant and the Offices reserve the right to withdraw from

16  this Agreement pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure

17  and proceed to trial. No other agreement has been made regarding the imposition of a

18  sentence in this matter and the parties understand that the Court retains full discretion

19  regarding the imposition of a term of probation, the conditions of probation, and other

20  aspects of the sentence as may be applicable. Except as specified above, Defendant

21  understands that Defendant cannot withdraw a guilty plea simply because of the sentence

22  imposed by the Court.

23      a.    <u>Criminal Fine</u>. The parties agree the appropriate sentence of a fine is

24  a fine of $1,805,475,575 ("Criminal Fine"). This reflects a twenty (20) percent discount

25  off the bottom of the applicable Sentencing Guidelines fine range for Defendant's partial

26  cooperation and remediation. Defendant agrees to pay the Criminal Fine on the schedule

27  set forth below in Paragraph 24. The Offices will credit $950,000,000 of the penalty that

Plea Agreement - 13
*United States v. Binance Holdings, Limited*, CR23-178RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   Defendant and/or Defendant's Chief Executive Officer Changpeng Zhao pay to the
2   CFTC in connection with a parallel resolution entered into between the CFTC and the
3   Defendant or Zhao by the end of fifteen months from the sentencing of the Defendant
4   against the Criminal Fine (the "CFTC Credit"). The Offices will credit $850,000,000 of
5   the penalty that Defendant pays to FinCEN or OFAC in connection with parallel
6   resolutions entered into between the Defendant and FinCEN or OFAC by the end of
7   fifteen months from the sentencing of the Defendant against the Criminal Fine (the
8   "Treasury Credit"). Should Defendant not pay any portion of the CFTC Credit or the
9   Treasury Credit to the CFTC, FinCEN, or OFAC within fifteen months from the
10  sentencing of the Defendant for any reason, Defendant will pay the remaining portion of
11  the Criminal Fine to the U.S. Treasury within ten business days.

12          b.      Forfeiture. Defendant consents to the entry of an Order of Forfeiture
13  requiring Defendant to pay a money judgment, representing property forfeitable to the
14  United States, in the amount of $2,510,650,588 (the "Total Money Judgment"), as set
15  forth in Paragraphs 15 through 23 below and payable pursuant to the schedule set forth at
16  Paragraph 24 below.

17          c.      Mandatory Special Assessment. Defendant shall pay to the Clerk of
18  the Court for the United States District Court for the Western District of Washington the
19  total mandatory special assessment of $1200.

20          d.      Probation. Pursuant to 18 U.S.C. § 3561(c)(1), the parties agree to
21  request that the Court impose on Defendant a term of probation ending three (3) years
22  from the date on which the Monitor is selected.

23          e.      Waiver of Pre-Sentence Investigation Report. The parties waive the
24  preparation of a Pre-Sentence Investigation Report ("PSR"). Defendant understands that
25  whether to proceed with the sentencing proceeding without a PSR is exclusively the
26  decision of the Court. Pursuant to Federal Rule of Criminal Procedure 32(c)(1)(A)(ii), the
27  parties submit that the information contained in the record of this case is sufficient to

Plea Agreement - 14
*United States v. Binance Holdings, Limited*, CR23-178RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  enable this Court to meaningfully exercise its sentencing authority under 18 U.S.C. §

2  3553 without preparing a PSR. In the event the Court directs the preparation of a PSR,

3  the Offices will fully inform the preparer of the PSR and the Court of the facts and law

4  related to Defendant's case.

5  15.    **Forfeiture of Assets.** Defendant understands that the forfeiture of property is part

6  of the sentence that must be imposed in this case. Defendant agrees to forfeit to the

7  United States pursuant to this Agreement its right, title, and interest in any property, real

8  or personal, constituting, or derived from, proceeds traceable to its commission of

9  Conspiracy to conduct an unlicensed MTB and to fail to maintain an effective AML

10  program, as charged in Count 1 of the Information. All such property is forfeitable

11  pursuant to Title 18, United States Code, Section 981(a)(1)(C), by way of Title 28,

12  United States Code, Section 2461.

13  16.    Defendant further agrees to forfeit to the United States its right, title, and interest

14  in any property, real or personal, involved in its commission of conducting an unlicensed

15  MTB, as charged in Count 2 of the Information. All such property is forfeitable pursuant

16  to Title 18, United States Code, Section 982(a)(1), and includes, but is not limited to, a

17  money judgment of least $1,612,031,763, which Defendant admits it collected in fees for

18  transactions involving its United States users and includes, but is not limited to, a sum of

19  money reflecting the proceeds Defendant obtained from this offense (the "1960 Money

20  Judgment").

21  17.    Defendant further agrees to forfeit to the United States its right, title, and interest

22  in any property, real or personal, constituting, or derived from, proceeds traceable to its

23  commission of violation of IEEPA, as charged in Count 3 of the Information. All such

24  property is forfeitable pursuant to Title 18, United States Code, Section 981(a)(1)(C), by

25  way of Title 28, United States Code, Section 2461(c), and includes, but is not limited to,

26  a money judgment in the amount of $898,618,825, which Defendant admits is the amount

27  of transactions it caused between users who were U.S. persons and persons who resided

Plea Agreement - 15
*United States v. Binance Holdings, Limited*, CR23-178RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

in Iran and includes, but is not limited to, a sum of money reflecting the proceeds Defendant obtained from this offense (the "IEEPA Money Judgment").

18.    Defendant acknowledges that the forfeitable sums for Count 2 and Count 3 total at least $2,510,650,588 and accordingly agrees to forfeit to the United States this sum of money as the Total Money Judgment.

19.    Defendant further agrees that it will pay the entirety of this Total Money Judgment, in U.S. currency (*i.e.*, U.S. fiat currency), pursuant to the terms of the Agreement. Payment shall be made as directed, in writing, by the Offices. Defendant understands and acknowledges that its failure to pay the entirety of the Total Money Judgment pursuant to the Agreement will constitute a breach of this Plea Agreement, and the Offices, at the Offices' sole discretion, may withdraw from this Plea Agreement.

20.    Defendant consents to the filing of the Proposed Order of Forfeiture, attached hereto as Attachment G, and agrees that the Proposed Order of Forfeiture shall be final as to Defendant at the time it is entered by the Court. Defendant acknowledges that the Order of Forfeiture will be incorporated into the Judgment at sentencing.

21.    Defendant agrees to fully assist the United States in the forfeiture of any forfeitable property and to take whatever steps are necessary to pass clear title to the United States, including but not limited to: surrendering title and executing any documents necessary to effect forfeiture; assisting in bringing any property located outside the United States within the jurisdiction of the United States; and taking whatever steps are necessary to ensure that property subject to forfeiture is not sold, disbursed, wasted, hidden, or otherwise made unavailable for forfeiture. Defendant agrees not to file a claim to any of this property in any federal forfeiture proceeding, administrative or judicial, that may be or has been initiated. Defendant also agrees it will not assist any party who may file a claim to this property in any federal forfeiture proceeding.

22.    Defendant agrees and acknowledges that any forfeiture of Defendant's assets and the payment of the Total Money Judgment shall not be treated as satisfaction of any fine,

Plea Agreement - 16
*United States v. Binance Holdings, Limited*, CR23-178RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  restitution, cost of imprisonment, or any other penalty the Court may impose upon
2  Defendant in addition to forfeiture.

3  23.     In the event of a breach of this Agreement as specified in Paragraph 35, the United
4  States reserves its right to proceed against any remaining property not identified in this
5  Agreement, in which Defendant has any interest, if that property constitutes or derives
6  from proceeds traceable to its commission of Conspiracy to Conduct an Unlicensed MTB
7  and to Fail to Maintain an Effective AML Program (Count 1); was involved in its
8  commission of Conducting an Unlicensed MTB (Count 2); or constitutes or derives from
9  proceeds traceable to its commission of a Willful Violation of IEEPA (Count 3).

10 24.     **Payment Terms.** The Defendant agrees to pay the Total Money Judgment and
11 Criminal Fine as follows:

12   - No later than 30 days after the Defendant's sentencing, payment of $898,618,825,
13     the IEEPA Money Judgment;
14   - No later than 6 months after the Defendant's sentencing, payment of
15     $1,612,031,763, the 1960 Money Judgment; and
16   - No later than 15 months after the Defendant's sentencing, payment of
17     $1,805,475,575, the Criminal Fine, subject to the crediting set forth in Paragraph
18     14(a).

19 25.     **Cooperation.** Defendant shall cooperate fully with the Offices in any and all
20 matters relating to the conduct described in this Agreement and the Statement of Facts
21 and any individual or entity referred to therein, as well as any other conduct under
22 investigation by the Offices at any time during the Term, until the later of the date upon
23 which all investigations and prosecutions arising out of such conduct are concluded, or
24 the end of the Term. At the Offices' request, Defendant shall also cooperate fully with
25 other domestic or foreign law enforcement and regulatory authorities and agencies in any
26 other investigation at any time during the Term. Defendant's cooperation pursuant to this
27 Paragraph is subject to applicable law and regulations, as well as valid claims of attorney-

Plea Agreement - 17
*United States v. Binance Holdings, Limited,* CR23-178RAJ

1  client privilege or attorney work product doctrine; however, Defendant must provide to

2  the Offices a log of any information or cooperation that is not provided based on an

3  assertion of law, regulation, or privilege, and Defendant bears the burden of establishing

4  the validity of any such assertion. Defendant agrees that its cooperation pursuant to this

5  Paragraph shall include, but not be limited to, the following, subject to local law and

6  regulations:

7        a.     Defendant represents that it has truthfully disclosed all factual

8  information with respect to its activities, those of its subsidiaries and affiliates, and those

9  of its present and former directors, officers, employees, agents, and consultants relating to

10  the conduct described in this Agreement, as well as any other conduct under investigation

11  by the Offices at any time about which Defendant has any knowledge. Defendant further

12  agrees that it shall timely and truthfully disclose all information with respect to its

13  activities, those of its subsidiaries and affiliates involved in the operation of the

14  Binance.com exchange or with access to the Binance.com orderbook, and those of its

15  present and former directors, officers, employees, agents, and consultants, including any

16  evidence or allegations and internal or external investigations, about which the Offices

17  may inquire. This obligation of truthful disclosure includes, but is not limited to, the

18  obligation of Defendant to provide to the Offices, upon request, any document, record, or

19  other tangible evidence about which the Offices may inquire of Defendant, including

20  evidence that is responsive to any requests made prior to the execution of this Agreement.

21        b.     Upon the Offices' request, Defendant shall designate knowledgeable

22  employees, directors, officers, agents, consultants, or attorneys to provide to the Offices

23  the information and materials described above on behalf of Defendant. It is further

24  understood that Defendant must at all times provide complete, truthful, and accurate

25  information.

26        c.     Defendant shall use its best efforts to make available for interviews

27  or testimony, as requested by the Offices, present or former officers, directors,

Plea Agreement - 18
*United States v. Binance Holdings, Limited,* CR23-178RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1 employees, agents, and consultants of Defendant. This obligation includes, but is not
2 limited to, sworn testimony before a federal grand jury or in federal trials, as well as
3 interviews with domestic or foreign law enforcement and regulatory authorities.
4 Cooperation under this Paragraph shall include identification of witnesses who, to the
5 knowledge of Defendant, may have material information regarding the matters under
6 investigation.

7          d.          With respect to any information, testimony, documents, records, or
8 other tangible evidence provided to the Offices pursuant to this Agreement, Defendant
9 consents to any and all disclosures, subject to applicable law and regulations, to other
10 governmental authorities including United States authorities and those of a foreign
11 government of such materials as the Offices, in their sole discretion, shall deem
12 appropriate.

13 26.     **Disclosures.**  During the Term, should Defendant learn of any evidence or
14 allegation of conduct that may constitute a violation of federal laws prohibiting money
15 laundering, the federal laws governing MTBs, the BSA or other laws requiring AML
16 programs, or laws prohibiting violations of U.S. sanctions, had the conduct occurred
17 within the jurisdiction of the United States, or any evidence or allegation of a criminal
18 violation of U.S. federal law, Defendant shall promptly report such evidence or allegation
19 to the Offices in a manner and form consistent with local law. Thirty (30) days prior to
20 the end of the Term, Defendant, by the Chief Executive Officer of Defendant and the
21 Chief Compliance Officer of Defendant, or an executive officer substantively responsible
22 for Defendant's operations, will certify to the Offices, in the form of executing the
23 document attached as Attachment E to this Agreement, that Defendant has met its
24 disclosure obligations pursuant to this Paragraph. Each certification will be deemed a
25 material statement and representation by Defendant to the executive branch of the United
26 States for purposes of 18 U.S.C. §§ 1001 and 1519, and it will be deemed to have been
27 made in the judicial district in which this Agreement is filed.

Plea Agreement - 19
*United States v. Binance Holdings, Limited*, CR23-178RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

27.     **Compliance Program, Monitoring, and Reporting.** The parties have agreed to the compliance, monitoring, and reporting requirements set forth in Attachments C and D. Defendant represents that it has implemented and will continue to implement AML and sanctions compliance programs that meet, at a minimum, the elements set forth in Attachment C. Such programs shall be designed to detect and prevent violations of laws prohibiting money laundering, laws requiring AML programs, laws governing MTBs, and laws prohibiting violations of U.S. sanctions through Defendant's operations, including those of its subsidiaries and affiliates involved in the operation of the Binance.com exchange or with access to the Binance.com orderbook, and its agents and business partners, as defined in Attachment C. Thirty (30) days prior to the expiration of the Term, Defendant, by the Chief Executive Officer and Chief Compliance Officer, will certify to the Offices, in the form of executing the document attached as Attachment F to this Agreement, that Defendant has met its compliance obligations pursuant to this Agreement.

28.     In order to address any deficiencies in its AML and U.S. sanctions compliance programs, Defendant represents that it has undertaken, and will continue to undertake in the future, in a manner consistent with all of its obligations under this Agreement, a review of its existing compliance and ethics programs, policies, procedures, systems, and internal controls regarding compliance with federal laws prohibiting money laundering, the federal laws governing MTBs, the BSA or other laws requiring AML programs, or laws prohibiting violations of U.S. sanctions. Where necessary and appropriate, Defendant agrees to adopt new or modify its AML and sanctions compliance programs in order to ensure that it develops and maintains rigorous compliance programs, including an effective and risk-based AML program, that incorporate relevant policies, procedures, and internal systems and controls designed to effectively detect and deter violations of federal laws prohibiting money laundering, the federal laws governing MTBs, the BSA or other laws requiring AML programs, or laws prohibiting violations of U.S. sanctions. The

Plea Agreement - 20
*United States v. Binance Holdings, Limited,* CR23-178RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  compliance programs will include, but not be limited to, the minimum elements set forth

2  in Attachment C.

3  29.   **Monitor.** Defendant agrees to retain a Monitor for the term specified in Paragraph

4  7. The Monitor's duties and authority, and the obligations of Defendant with respect to

5  the Monitor and the Offices are set forth in Attachments C and D, which are incorporated

6  by reference into this Agreement. No later than 30 days after the execution of this

7  Agreement, Defendant shall submit a written proposal identifying the Monitor

8  candidates, and, at a minimum, providing the following:

9         a.    A description of each candidate's qualifications and credentials in

10  support of the evaluative considerations and factors listed below;

11         b.    A written certification by Defendant that Defendant and its

12  subsidiaries will not employ or be affiliated with the Monitor for a period of not less than

13  two years from the date of the termination of the monitorship;

14         c.    A written certification by each of the candidates that he/she is not a

15  current or recent (*i.e.*, within the prior two years) employee, agent, or representative of

16  Defendant and holds no interest in, and has no relationship with, Defendant, its

17  subsidiaries, affiliates, or related entities, or its employees, officers, or directors;

18         d.    A written certification by each of the candidates that he/she has

19  notified any clients that the candidate represents in a matter involving the Offices (or any

20  other Department component) handling the Monitor selection process, and that the

21  candidate has either obtained a waiver from those clients or has withdrawn as counsel in

22  the other matter(s); and

23         e.    A statement identifying the Monitor candidate that is Defendant's

24  first, second, and third choice to serve as the Monitor.

25  30.   The Monitor candidates or their team members shall have, at a minimum, the

26  following qualifications:

27

Plea Agreement - 21
*United States v. Binance Holdings, Limited,* CR23-178RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

a.      Demonstrated expertise with respect to the BSA and other applicable laws requiring AML programs, including experience counseling or advising on effective AML programs at financial institutions;

b.      Demonstrated expertise with respect to U.S. sanctions laws, including experience counseling or advising financial institutions on sanctions compliance;

c.      Experience designing and/or reviewing corporate compliance programs, policies, procedures, and controls, including AML compliance programs and sanctions compliance programs, and compliance programs implemented at financial institutions;

d.      The ability to access and deploy resources as necessary to discharge the Monitor's duties as described in the Agreement; and

e.      Sufficient independence from Defendant and its subsidiaries to ensure effective and impartial performance of the Monitor's duties as described in the Agreement.

31.      The Offices retain the right, in their sole discretion, to choose the Monitor from among the proposed candidates, though Defendant may express its preference(s) among the candidates. The Offices understand that FinCEN shall also impose an independent consultant. The Department agrees that the Monitor and the independent consultant may be fulfilled by the Offices' and FinCEN's selection of the same individual subject to the provisions in Attachment D. Monitor selections shall be made in keeping with the Department's commitment to diversity and inclusion. If the Offices determine, in their sole discretion, that any of the candidates are not, in fact, qualified to serve as the Monitor, or if the Offices, in their sole discretion, are not satisfied with the candidates proposed, the Offices reserve the right to request that Defendant nominate additional candidates. In the event the Offices reject any proposed Monitors, Defendant shall propose additional candidates within twenty (20) business days after receiving notice of

Plea Agreement - 22
*United States v. Binance Holdings, Limited,* CR23-178RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

the rejection so that three qualified candidates are proposed. This process shall continue until a Monitor acceptable to both parties is chosen. The Offices and Defendant will use their best efforts to complete the selection process within sixty (60) business days of the execution of this Agreement. The Offices retain the right to determine that the Monitor should be removed, if in the Offices sole discretion, the Monitor fails to conduct the monitorship effectively, fails to comply with this Agreement, or no longer meets the qualifications outlined in Paragraph 30 above. If the Monitor resigns, is removed, or is otherwise unable to fulfill his or her obligations as set out herein and in Attachments C and D, Defendant shall within twenty (20) business days recommend a pool of three qualified Monitor candidates from which the offices will choose a replacement, following the process outlined above.

32.    The Monitor's term shall be three years from the date on which the Monitor is retained, subject to Paragraph 7.

33.    The Monitor's powers, duties, and responsibilities, as well as additional circumstances that may support an extension of the Monitor's term, are set forth in Attachments C and D. Defendant agrees that Defendant and its subsidiaries, branches, and affiliates will not employ or be affiliated with the Monitor or the Monitor's firm for a period of not less than two years from the date on which the Monitor's term expires, nor will Defendant and its subsidiaries, branches, and affiliates discuss with the Monitor or the Monitor's firm the possibility of further employment or affiliation during the Monitor's term. Upon agreement by the parties, this prohibition will not apply to other monitorship responsibilities that the Monitor or the Monitor's firm may undertake in connection with related resolutions with foreign or other domestic authorities, including FinCEN.

34.    **Ongoing Corporate Obligation.** Except as may otherwise be agreed by the parties in connection with a particular transaction, Defendant agrees that in the event that, during the Term, Defendant undertakes any change in corporate form or control,

Plea Agreement - 23
*United States v. Binance Holdings, Limited,* CR23-178RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  including if it sells, merges, or transfers business operations that are material to

2  Defendant's consolidated operations, or to the operations of any subsidiaries, branches, or

3  affiliates involved in the conduct described in the Statement of Facts, as they exist as of

4  the date of this Agreement, whether such sale is structured as a sale, asset sale, merger,

5  transfer, or other change in corporate form or control, it shall include in any contract for

6  sale, merger, transfer, or other change in corporate form a provision binding the

7  purchaser, or any successor in interest thereto, to the obligations described in this

8  Agreement. The purchaser or successor in interest must also agree in writing that the

9  Offices' ability to breach under this Agreement is applicable in full force to that entity.

10  Defendant agrees that the failure to include these provisions in the transaction will make

11  any such transaction null and void. Defendant shall provide notice to the Offices at least

12  thirty (30) days prior to undertaking any such sale, merger, transfer, or other change in

13  corporate form or control. The Offices shall notify Defendant prior to such transaction (or

14  series of transactions) if they determine that the transaction(s) will have the effect of

15  circumventing or frustrating the purposes of this Agreement, as determined in the sole

16  discretion of the Offices; Defendant agrees that such transaction(s) will not be

17  consummated. In addition, if at any time during the Term, the Offices determine in their

18  sole discretion that Defendant has engaged in a transaction(s) that has the effect of

19  circumventing or frustrating the purposes of this Agreement, the Offices may deem it a

20  breach of this Agreement pursuant to Paragraphs 35 through 37. Nothing herein shall

21  restrict Defendant from indemnifying (or otherwise holding harmless) the purchaser or

22  successor in interest for penalties or other costs arising from any conduct that may have

23  occurred prior to the date of the transaction, so long as such indemnification does not

24  have the effect of circumventing or frustrating the purposes of this Agreement, as

25  determined by the Offices.

26  35.  **Breach and Post-Plea Conduct.** If Defendant (a) commits any felony under U.S.

27  federal law; (b) provides in connection with this Agreement deliberately false,

Plea Agreement - 24
*United States v. Binance Holdings, Limited*, CR23-178RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

incomplete, or misleading information; (c) fails to cooperate as set forth in Paragraph 25 of this Agreement; (d) fails to implement a compliance program as set forth in Paragraphs 27 and 28 of this Agreement and Attachment C; (e) commits any acts that had they occurred within the jurisdictional reach of the United States would be a violation of the BSA, the federal laws governing MTBs, or laws prohibiting violations of U.S. sanctions; or (f) otherwise fails specifically to perform or to fulfill completely each of Defendant's obligations under the Agreement, including payment of the Total Money Judgment in its entirety pursuant to the Agreement, regardless of whether the Offices become aware of such a breach after the Term, Defendant shall thereafter be subject to prosecution for any federal criminal violation of which the Offices have knowledge, including, but not limited to, the charges in the Information described in Paragraph 2, which may be pursued by the Offices in the U.S. District Court for the Western District of Washington or any other appropriate venue. Determination of whether Defendant has breached the Agreement and whether to pursue prosecution of Defendant shall be in the Offices' sole discretion. Any such prosecution may be premised on information provided by Defendant or its personnel. Any such prosecution relating to the conduct described in the Information and the attached Statement of Facts or relating to conduct known to the Offices prior to the date on which this Agreement was signed that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against Defendant, notwithstanding the expiration of the statute of limitations, between the signing of this Agreement and the expiration of the Term plus one year. Thus, by signing this Agreement, Defendant agrees that the statute of limitations with respect to any such prosecution that is not time-barred on the date of the signing of this Agreement shall be tolled for the Term plus one year. Defendant gives up all defenses based on the statute of limitations, any claim of pre-indictment delay, or any speedy trial claim with respect to any such prosecution or action, except to the extent that such defenses existed as of the date of the signing of this Agreement. In addition,

Plea Agreement - 25
*United States v. Binance Holdings, Limited*, CR23-178RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Defendant agrees that the statute of limitations as to any violation of federal law that occurs during the term of the cooperation obligations provided for in Paragraph 25 of the Agreement will be tolled from the date upon which the violation occurs until the earlier of the date upon which the Offices are made aware of the violation or the duration of the Term plus five years, and that this period shall be excluded from any calculation of time for purposes of the application of the statute of limitations.

36.     In the event the Offices determine that Defendant has breached this Agreement, the Offices agree to provide Defendant with written notice of such breach prior to instituting any prosecution resulting from such breach. Within thirty (30) days of receipt of such notice, Defendant shall have the opportunity to respond to the Offices in writing to explain the nature and circumstances of such breach, as well as the actions Defendant has taken to address and remediate the situation, which explanation the Offices shall consider in determining whether to pursue prosecution of Defendant.

37.     In the event that the Offices determine that Defendant has breached this Agreement: (a) the Offices will be free from all of their obligations under the Agreement; (b) Defendant will not have the right to withdraw the guilty plea; (c) all statements made by or on behalf of Defendant to the Offices or to the Court, including the Information and the Statement of Facts, and any testimony given by Defendant before a grand jury, a court, or any tribunal, or at any legislative hearings, whether prior or subsequent to this Agreement, and any leads derived from such statements or testimony, shall be admissible in evidence in any and all criminal proceedings brought by the Offices against Defendant as set forth in Paragraph 2; and (b) Defendant shall not assert any claim under the United States Constitution, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule that any such statements or testimony made by or on behalf of Defendant prior or subsequent to this Agreement, or any leads derived therefrom, should be suppressed or are otherwise inadmissible. The decision whether conduct or statements of any current director, officer, employee, or any

Plea Agreement - 26
*United States v. Binance Holdings, Limited*, CR23-178RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    person acting on behalf of, or at the direction of, Defendant, will be imputed to Defendant

2    for the purpose of determining whether Defendant has violated any provision of this

3    Agreement shall be in the sole discretion of the Offices.

4    38.    Defendant acknowledges that the Offices have made no representations,

5    assurances, or promises concerning what sentence may be imposed by the Court if

6    Defendant breaches this Agreement and this matter proceeds to judgment. Defendant

7    further acknowledges that any such sentence is solely within the discretion of the Court

8    and that nothing in this Agreement binds or restricts the Court in the exercise of such

9    discretion.

10    39.    **Waivers including Waiver of Appellate Rights and Rights to Collateral**

11    **Attacks.** Defendant acknowledges that, by entering the guilty plea required by this plea

12    agreement, Defendant waives all rights to appeal from Defendant's conviction, and any

13    pretrial rulings of the Court, and any rulings of the Court made prior to entry of the

14    judgment of conviction. Defendant further agrees that Defendant waives to the full extent

15    of the law:

16        a.    Any right conferred by Title 18, United States Code, Section 3742,

17    to challenge, on direct appeal, the sentence imposed by the Court, provided it is within

18    the statutory maximum, including any fine, restitution order, probation or supervised

19    release conditions, or forfeiture order (if applicable); and

20        b.    Any right to bring a collateral attack against the conviction and

21    sentence, including any restitution order imposed, except as it may relate to the

22    effectiveness of legal representation.

23        This does not affect the rights or obligations of the Offices set forth in Title 18,

24    United States Code, Section 3742(b).

25    40.    If Defendant breaches this Plea·Agreement at any time by appealing or collaterally

26    attacking (except as to effectiveness of legal representation) the conviction or sentence in

27

Plea Agreement - 27
*United States v. Binance Holdings, Limited*, CR23-178RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  any way, the Offices may prosecute Defendant for any counts that were not charged

2  pursuant to this Plea Agreement.

3  41.    Federal Rule of Criminal Procedure 11(f) and Federal Rule of Evidence 410 limit

4  the admissibility of statements made in the course of plea proceedings or plea discussions

5  in both civil and criminal proceedings, if the guilty plea is later withdrawn. Defendant

6  expressly warrants that it has discussed these rules with its counsel and understands them.

7  Solely to the extent set forth below, Defendant voluntarily waives and gives up the rights

8  enumerated in Federal Rule of Criminal Procedure 11(f) and Federal Rule of Evidence

9  410. Defendant agrees that, effective as of the date Defendant signs this Agreement, it

10 will not dispute the Statement of Facts set forth in this Agreement, and that the Statement

11 of Facts shall be admissible against Defendant in any criminal case involving the Offices

12 and Defendant, as: (a) substantive evidence offered by the government in its case-in-chief

13 and rebuttal case; (b) impeachment evidence offered by the government on cross-

14 examination; and (c) evidence at any sentencing hearing or other hearing. In addition,

15 Defendant also agrees not to assert any claim under the Federal Rules of Evidence

16 (including Rule 410 of the Federal Rules of Evidence), the Federal Rules of Criminal

17 Procedure (including Rule 11 of the Federal Rules of Criminal Procedure), or the United

18 States Sentencing Guidelines (including U.S.S.G. § 1B1.1(a)) that the Statement of Facts

19 should be suppressed or is otherwise inadmissible as evidence (in any form). Specifically,

20 Defendant understands and agrees that any statements that it makes in the course of its

21 guilty plea or in connection with the Agreement, or any leads derived therefrom, are

22 admissible against it for any purpose in any U.S. federal criminal proceeding if, even

23 though the Offices have fulfilled all of their obligations under this Agreement and the

24 Court has imposed the agreed-upon sentence, Defendant nevertheless withdraws its guilty

25 plea.

26 42.    Defendant hereby waives all rights, whether asserted directly or by a

27 representative, to request or receive from any department or agency of the United States

Plea Agreement - 28
*United States v. Binance Holdings, Limited,* CR23-178RAJ

1  any records pertaining to the investigation or prosecution of this criminal case, including

2  without limitation any records that may be sought under the Freedom of Information Act,

3  Title 5, United States Code, Section 552, or the Privacy Act, Title 5, United States Code,

4  Section 552a.

5  43.     The Offices are free to take any position on appeal or any other post-judgment

6  matter. The parties agree that any challenge to Defendant's sentence that is not foreclosed

7  by this Paragraph will be limited to that portion of the sentencing calculation that is

8  inconsistent with (or not addressed by) this waiver. Nothing in the foregoing waiver of

9  appellate and collateral review rights shall preclude Defendant from challenging a

10  sentence exceeding the statutory maximum punishment or raising a claim of ineffective

11  assistance of counsel in an appropriate forum.

12  44.     **Voluntariness of Plea.** Defendant agrees that Defendant has entered into this Plea

13  Agreement freely and voluntarily, and that no threats or promises were made to induce

14  Defendant to enter a plea of guilty other than the promises contained in this Plea

15  Agreement or set forth on the record at the change of plea hearing in this matter.

16  45.     **Statute of Limitations.** Defendant waives all defenses based on the statute of

17  limitations and venue with respect to any prosecution related to the conduct described in

18  the Statement of Facts or the Information, including any prosecution that is not time-

19  barred on the date that this Agreement is signed in the event that: (a) the conviction is

20  later vacated for any reason; (b) Defendant violates this Agreement; or (c) the plea is later

21  withdrawn, provided such prosecution is brought within one year of any such vacatur of

22  conviction, violation of the Agreement, or withdrawal of plea, plus the remaining time

23  period of the statute of limitations as of the date that this Agreement is signed.

24  46.     **Public Statements by Defendant.** Defendant expressly agrees that it shall not,

25  through present or future attorneys, officers, directors, employees, agents, or any other

26  person authorized to speak for Defendant make any public statement, in litigation or

27  otherwise, contradicting the acceptance of responsibility by Defendant set forth above or

Plea Agreement - 29
*United States v. Binance Holdings, Limited,* CR23-178RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

the facts described in the Information and Statement of Facts. Any such contradictory statement shall, subject to cure rights of Defendant described below, constitute a breach of this Agreement, and Defendant thereafter shall be subject to prosecution as set forth in Paragraphs 35 through 37 of this Agreement. The decision whether any public statement by any such person contradicting a fact contained in the Information or Statement of Facts will be imputed to Defendant for the purpose of determining whether it has breached this Agreement shall be at the sole discretion of the Offices. If the Offices determine that a public statement by any such person contradicts in whole or in part a statement contained in the Information or Statement of Facts, the Offices shall so notify Defendant, and Defendant may avoid a breach of this Agreement by publicly repudiating such statement(s) within five business days after notification. Defendant shall be permitted to raise defenses and to assert affirmative claims in other proceedings relating to the matters set forth in the Information and Statement of Facts provided that such defenses and claims do not contradict, in whole or in part, a statement contained in the Information or Statement of Facts. This paragraph applies to any statement made by Changpeng Zhao in connection with any criminal, regulatory, or civil case initiated against him. This paragraph, however, does not apply to any statement made by any other present or former officer, director, employee, or agent of Defendant in the course of any criminal, regulatory, or civil case initiated against such individual, unless such individual is speaking on behalf of Defendant. Defendant agrees that if it or any of its direct or indirect subsidiaries or affiliates issues a press release or holds any press conference in connection with this Agreement, Defendant shall first consult the Offices to determine (a) whether the text of the release or proposed statements at the press conference are true and accurate with respect to matters between the Offices and Defendant; and (b) whether the Offices have any objection to the release or statement.

47.    **Completeness of Plea Agreement.** The Offices and Defendant acknowledge that these terms constitute the entire Agreement between the parties, except as may be set

Plea Agreement - 30
*United States v. Binance Holdings, Limited,* CR23-178RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  forth on the record at the change of plea hearing in this matter. There are no other

2  promises or agreements, express or implied. This Agreement binds only the Criminal

3  Division, U.S. Department of Justice; Counterintelligence & Export Control Section,

4  National Security Division, U.S. Department of Justice; and U.S. Attorney's Office for

5  the Western District of Washington. It does not bind any other United States Attorney's

6  Office or any other division or section of the Department of Justice or any other federal,

7  state, local, or foreign prosecuting, administrative, or regulatory authority. Nevertheless,

8  the Offices will bring this Agreement and the nature and quality of the conduct,

9  cooperation, and remediation of Defendant, its direct or indirect affiliates, subsidiaries,

Plea Agreement - 31
*United States v. Binance Holdings, Limited*, CR23-178RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1 branches, and joint ventures, to the attention of other law enforcement, regulatory, and

2 debarment authorities, if requested by Defendant.

3     Dated this 21st day of November, 2023.

5 _____

6 BINANCE HOLDINGS LIMITED
   Defendant

7 _____

8 STEPHANIE BROOKER
   M. KENDALL DAY

9 POONAM G. KUMAR
   Counsel for Defendant

11 **FOR THE DEPARTMENT OF JUSTICE:**

12 MARGARET A. MOESER          TESSA M. GORMAN
   Acting Chief                        Acting United States Attorney

13 Money Laundering and Asset Recovery      Western District of Washington
   Section, Criminal Division              U.S. Department of Justice

14 U.S. Department of Justice

16 _____        _____
   Kevin G. Mosley

17 Elizabeth R. Carr                    Andrew Friedman
   Trial Attorneys                     Assistant United States Attorney

19 JENNIFER KENNEDY GELLIE
   Acting Chief

20 Counterintelligence and Export Control

21 Section, National Security Division
   U.S. Department of Justice

23 _____

24 Alex Wharton
   Beau D. Barnes

25 Trial Attorneys

Plea Agreement - 32
*United States v. Binance Holdings, Limited*, CR23-178RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

# DEFENDANT'S ACCEPTANCE OF TERMS.

Binance Holdings Limited (BINANCE), through its authorized representatives, affirms that this document contains all of the agreements made between BINANCE—with the assistance of counsel—and the Offices regarding these pleas. There are no other promises, assurances, or agreements the Offices have made or entered into with BINANCE that have affected the decision to enter any plea of guilty or to enter into this agreement. If there are any additional promises, assurances, or agreements, BINANCE and the Offices will jointly inform the Court in writing before BINANCE enters the guilty plea.

BINANCE understands that no one, including counsel for BINANCE, can guarantee the outcome of this case or what sentence the Court may impose if BINANCE pleads guilty. If anyone, including BINANCE's counsel, has done or said anything other than what is contained in this agreement, BINANCE will inform the Court when it stands before the Court to enter its plea.

As Binance's authorized representative, I understand the Court will ask me under an oath to answer questions about the offenses to which BINANCE is pleading guilty and BINANCE's understanding of this plea agreement. I understand that I may be prosecuted if I make knowingly false statements or give false answers and may suffer other consequences set forth in this agreement.

On behalf of BINANCE, I have read this plea agreement carefully and understand it thoroughly. I know of no reason why the Court should find me incompetent to enter into this agreement on behalf of BINANCE or to enter the pleas on behalf of BINANCE. I enter into this agreement knowingly and voluntarily. I understand that anything that I discuss with BINANCE's counsel is privileged and confidential and cannot be revealed without BINANCE's permission. Knowing this, I agree that this document will be filed with the Court.

BINANCE is fully satisfied with the representation given BINANCE by the counsel for BINANCE and I am prepared to repeat this statement at the time I stand

before the Court and enter BINANCE's guilty pleas. BINANCE's counsel and BINANCE have discussed all possible defenses to the charges to which BINANCE is pleading guilty. BINANCE's counsel has investigated BINANCE's case and followed up on any information and issues BINANCE has raised to BINANCE's satisfaction. BINANCE's counsel have taken the time to fully explain the legal and factual issues involved in this case to BINANCE's satisfaction. BINANCE's counsel and BINANCE have discussed the statutes applicable to BINANCE's offense and sentence as well as the possible effect the U.S.S.G. may have on BINANCE's sentence.

Based on BINANCE's complete understanding of this plea agreement, BINANCE therefore wishes to enter a plea of guilty to Counts 1, 2, and 3 of the Information filed in this case.

DATED: 11/21/23

BINANCE HOLDINGS, LTD, Defendant
Joshua Eaton
Authorized Representative of Defendant

Plea Agreement - 34
*United States v. Binance Holdings, Limited*, CR23-178RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

## STATEMENT OF COUNSEL

As counsel for the Defendant, I have discussed all plea offers and the terms of this plea agreement with the Defendant, have fully explained the charges to which the Defendant is pleading guilty and the necessary elements, all possible defenses, and the consequences of a guilty plea to a felony. Based on these discussions, I have no reason to doubt that the Defendant is knowingly and voluntarily entering into this agreement and entering a plea of guilty. I know of no reason to question the Defendant's competency to make these decisions. If, prior to the imposition of sentence, I become aware of any reason to question the Defendant's competency to enter into this plea agreement or to enter a plea of guilty, I will immediately inform the Court.

DATED: 11/21/23

STEPHANIE BROOKER
M. KENDALL DAY
POONAM KUMAR
Counsel for Defendant

Plea Agreement - 35
*United States v. Binance Holdings, Limited*, CR23-178RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

# ATTACHMENT A

## STATEMENT OF FACTS

The following Statement of Facts is incorporated by reference as part of the Plea Agreement between the Department of Justice, Criminal Division, Money Laundering and Asset Recovery Section ("MLARS"), the Department of Justice, National Security Division, Counterintelligence and Export Control Section ("CES"), and the United States Attorney's Office for the Western District of Washington ("the USAO-WDWA") (collectively, the "Offices"), and Defendant, BINANCE HOLDINGS LIMITED ("Defendant," "Binance," or "the Company"). Defendant hereby agrees and stipulates that the following facts are true and accurate. Certain of the facts herein are based on information obtained from third parties by the United States through its investigation and described to the Defendant.

Defendant admits, accepts, and acknowledges that it is responsible for the acts of its officers, directors, employees, and agents as set forth below. Had this matter proceeded to trial, Defendant acknowledges that the United States would have proven beyond a reasonable doubt, by admissible evidence, the facts alleged below and set forth in the Criminal Information.

### Overview

1.      Starting at least as early as August 2017 and continuing until at least October 2022 (the "relevant period"), Defendant, led by its founder, owner, and chief executive officer ("CEO"), Changpeng Zhao, and certain of its officers, directors, employees, and agents knowingly failed to register as a money services business ("MSB"), willfully violated the Bank Secrecy Act ("BSA") by failing to implement and maintain an effective anti-money laundering ("AML") program, and willfully caused violations of U.S. economic sanctions issued pursuant to the International Emergency Economic Powers Act ("IEEPA"), in a deliberate and calculated effort to profit from the U.S. market without implementing controls required by U.S. law. During the relevant period, Defendant

operated a cryptocurrency exchange wholly or in substantial part in the United States by serving a substantial number of U.S. users. And by failing to register with the U.S. Department of the Treasury Financial Crimes Enforcement Network ("FinCEN") as an MSB, Defendant operated an unlicensed money transmitting business in violation of U.S. law. Defendant operated as an unlicensed money transmitting business in part to prevent U.S. regulators from discovering that Defendant facilitated billions of dollars of cryptocurrency transactions on behalf of its customers, including U.S. customers, without implementing appropriate "know your customer" ("KYC") procedures, conducting adequate transaction monitoring, or establishing sufficient controls that would have prevented its U.S. customers from engaging in transactions in violation of U.S. sanctions and other criminal laws. As a result, Defendant willfully caused millions of dollars of cryptocurrency transactions between U.S. persons and persons in jurisdictions that are subject to comprehensive U.S. sanctions in violation of IEEPA. Due to its willful failure to implement an effective AML program, Defendant processed transactions by users who operated illicit mixing services and laundered proceeds of darknet market transactions, hacks, ransomware, and scams. In part because of this scheme, and because Defendant prioritized growth, market share, and profits over compliance with U.S. law, Binance became the largest cryptocurrency exchange in the world.

### Relevant Entities and Individuals

2.      Binance was an entity registered in the Cayman Islands and held, *inter alia*, the employment contracts for certain employees operating Binance.com.

3.      Changpeng Zhao, also known as "CZ," was Binance's primary founder, majority owner, and CEO. Zhao founded Binance in or around 2017. Together with a core senior management group composed of individuals known to the Defendant and to the Offices, Zhao, as Binance's CEO, made the strategic decisions for Binance and exercised day-to-day control over its operations and finances.

4.      Binance.com was launched in or around July 2017, and became a virtual currency exchange through which millions of users in more than 180 countries bought and sold hundreds of types of virtual assets, in volumes equivalent to trillions of U.S. dollars.

5.      Binance.US was launched in or around September 2019 and was a virtual currency exchange wholly owned by Zhao, through the legal entity BAM Trading Services, Inc. Binance.US registered as an MSB with FinCEN in or around June 2019.

6.      Individual 1, whose identity is known to the Offices and the Company, was Defendant's chief compliance officer during much of the relevant period. Individual 1 was hired by Binance in April 2018. Binance placed him on administrative leave beginning in or around June 2022. Individual 1's responsibilities included building and directing the compliance protocols and functions for Binance and certain affiliated exchanges offering, among other things, conversion between virtual and fiat currencies.

7.      Individual 2, whose identity is known to the Offices and the Company, worked for Defendant from in or around 2018, until in or around 2021. During that period, Individual 2 held the title of chief financial officer.

8.      Individual 3, whose identity is known to the Offices and the Company, co-founded Binance and was one of Zhao's close advisors as part of Binance's senior management group.

9.      Individual 4, whose identity is known to the Offices and the Company, co-founded Binance, was part of Binance's senior management group, and was Binance's operations director.

10.     A cloud computing platform and application programming interface ("API") service owned by a technology service provider based in the Western District of Washington hosted Binance's website, https://www.binance.com, stored Binance's data, and operated Binance's exchange platform on servers in Japan.

<u>Relevant Legal Background</u>

*Registration and Anti-Money Laundering Statutes*

11.     During the relevant period, Defendant was a foreign-located cryptocurrency exchange that did business wholly or in substantial part within the United States, including by providing services to a substantial number of U.S. customers. As a result, in the United States, Defendant qualified as a money transmitter, which is a type of MSB. 31 C.F.R. §

1010.100(ff). As a cryptocurrency exchange, Defendant was a money transmitter because it was "[a] person that provides money transmission services," meaning "the acceptance of currency, funds, or other value that substitutes for currency from one person and the transmission of currency, funds, or other value that substitutes for currency to another location or person by any means," including through "an electronic funds transfer network" or "an informal value transfer system." *Id.*

12.     Money transmitters were required to register with FinCEN pursuant to 31 U.S.C. § 5330 and 31 C.F.R. § 1022.380 within 180 days of establishment or risk criminal penalties pursuant to 18 U.S.C. § 1960. Money transmitters were also required to comply with the BSA, 31 U.S.C. § 5311 *et seq.*, for example by filing reports of suspicious transactions that occurred in the U.S., 31 U.S.C. § 5318(g), 31 C.F.R. § 1022.320(a), and implementing an effective AML program "that [was] reasonably designed to prevent the money services business from being used to facilitate money laundering and the financing of terrorist activities," 31 C.F.R. § 1022.210. An AML program was required, at a minimum and within 90 days of the business's establishment, to "[i]ncorporate policies, procedures, and internal controls reasonably designed to assure compliance" with requirements that an MSB file reports, create and retain records, respond to law enforcement requests, and verify customer identification—commonly called a "know your customer" or "KYC" requirement. 31 C.F.R. §§ 1022.210(d)(1), (e).

***U.S. Sanctions Statutes and Authorities***

13.     IEEPA, 50 U.S.C. § 1701 *et seq.*, authorized the President of the United States to impose economic sanctions on countries, groups, entities, and individuals in response to any unusual and extraordinary threat to the national security, foreign policy, or economy of the United States when the President declared a national emergency with respect to that threat. Section 1705 provided, in part, that "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued [pursuant to IEEPA]." 50 U.S.C. § 1705(a).

14.     The U.S. Department of the Treasury Office of Foreign Assets Control ("OFAC") administered and enforced economic sanctions programs established by executive orders issued by the President pursuant to IEEPA. In particular, OFAC administered and enforced comprehensive sanctions programs that, with limited exception, prohibited U.S. persons from engaging in transactions with a designated country or region, including Iran, the Democratic People's Republic of Korea ("DPRK" or "North Korea"), Syria, and the Crimea, Donetsk, and Luhansk regions of Ukraine, among others.

### Binance's Business

15.     Binance users could store and trade value in the form of virtual assets, including cryptocurrency, in accounts maintained by Binance. When a user opened an account, Binance assigned them a custodial virtual currency wallet—*i.e.*, a wallet in Binance's custody that allowed the user to conduct transactions on the platform, including transferring funds to other Binance users or accounts or to external virtual currency wallets.

16.     Binance charged its users fees on transactions, which varied based on a user's trading volume such that higher-volume traders generally paid lower fees. Higher-volume traders helped provide liquidity on Binance's platform, which is critical to a large cryptocurrency exchange. For any cryptocurrency asset traded on its platform, Binance needed individuals or entities willing to "make markets" in that asset by buying or selling at a relatively predictable price and able to trade in high volumes and variable amounts. These high-volume traders were often referred to as "market makers." For most on-platform transactions by individual retail users—*i.e.*, users who are not market makers, corporate entities, or otherwise high-volume traders—Binance's base fee was 0.1% of the amount transacted. To attract market makers, Binance rewarded them with "VIP" status, which conferred certain benefits including discounted transaction fees.

17.     Binance rewarded its VIPs with perks to generate volume and improve liquidity on Binance's platform. Binance assessed a user's VIP status each month based on the user's prior 30-day trading volume and the user's holdings in Binance's proprietary token, BNB. If a user's trading volume and BNB balance met its preset thresholds, Binance

rewarded that user with discounted trading fees and, on occasion, rebates on fees paid. These rewards would increase as a VIP user's BNB balance and trading volume increased.

18.     VIP users were an important part of Defendant's business model, and a significant number were U.S. users. VIP users, including those within and outside the United States, accounted for an outsized percentage of Binance's revenue and of the trading volume on Binance's platform. Accordingly, Defendant and its co-conspirators paid close attention to Binance's VIP user base.

### The Scheme

19.     Beginning no later than August 2017 and continuing until October 2022, Defendant and its co-conspirators, including Zhao and Individuals 1 and 2, knowingly and willfully conspired (i) to operate as an unlicensed money transmitter that failed to comply with registration requirements under U.S. law and (ii) to violate the BSA by failing to establish, implement, and maintain an effective AML program at Binance.

20.     MSBs, including money transmitters with effective AML programs, collect KYC information that allows them to, among other things, identify users who are subject to U.S. sanctions programs and prevent U.S. persons from conducting prohibited transactions with persons subject to U.S. sanctions. During the relevant time period, many MSBs, particularly those doing business wholly or in substantial part in the United States, had AML programs that used KYC and other information to identify users subject to U.S. sanctions programs and prevent U.S. persons from conducting prohibited transactions with persons subject to U.S. sanctions.

21.     The purpose of the conspiracy was to allow Binance to operate as a virtual currency exchange and gain market share and profit as quickly as possible. Defendant and its co-conspirators accomplished this goal by attracting a substantial number of U.S. users to Binance.com—particularly U.S. VIP users, who accounted for a significant percentage of the overall trading volume on Binance's platform. Defendant chose not to comply with U.S. legal and regulatory requirements because it determined that doing so would limit its ability to attract and maintain U.S. users. Defendant and its co-conspirators concealed Binance's avoidance and noncompliance with U.S. law.

22.     Defendant's decision to prioritize its growth over compliance with U.S. legal requirements meant that it facilitated billions of dollars of cryptocurrency transactions on behalf of its customers, including users in comprehensively sanctioned jurisdictions such as Iran, without implementing appropriate KYC procedures or conducting adequate transaction monitoring. During the relevant period, Defendant knew that U.S. law prohibited U.S. persons from conducting certain financial transactions with countries, groups, entities, or persons sanctioned by the U.S. government. Defendant knew that it serviced users from comprehensively sanctioned jurisdictions and that these users were prohibited from conducting transactions with U.S. persons. Defendant further knew that its matching engine, *i.e.*, Binance's tool that matched customer bids and offers to execute cryptocurrency trades, had been designed to execute cryptocurrency trades based on price and time without regard to whether the matched customers were prohibited by law from transacting with one another. Defendant also knew that it did not block transactions between users subject to sanctions and U.S. users and that its matching engine would necessarily cause such transactions, in violation of U.S. law. During the relevant period, Defendant nonetheless did not implement the necessary controls that would have prevented Binance from causing U.S. users to conduct cryptocurrency transactions with users in comprehensively sanctioned jurisdictions.

23.     As a result of Defendant's decision not to implement comprehensive controls blocking illegal transactions between sanctioned users and U.S. users, Defendant willfully caused transactions between U.S. users and users in comprehensively sanctioned jurisdictions in violation of U.S. law. Specifically, between in or about January 2018 through May 2022, Defendant caused at least 1.1 million transactions in violation of IEEPA between users it had reason to believe were U.S. persons and persons it had reason to believe resided in Iran, with an aggregate transaction value of at least $898,618,825.

24.     Some of these transactions were conducted with Binance users located in the Western District of Washington. For example, a user in Auburn, Washington conducted about 14 transactions with users in Iran on Binance.com, totaling about $9,419.99 in value, around and between January 6, 2018 and October 4, 2020; and a user in Redmond,

Washington conducted about two transactions with one or more users in Iran on Binance.com, totaling about $1,396 in value, on or around June 9, 2020.

***Defendant and Its Co-Conspirators Sought and Maintained a Significant U.S. User Base***

25.     During the relevant period, Defendant operated as a foreign-located money transmitter that chose to do business wholly or in substantial part in the United States. As described above, money transmitters are a subset of MSBs that were required under federal regulations to register with FinCEN.

26.     In part to make Binance more difficult to regulate, Defendant was intentionally vague about the Company's principal place of business. At the time of Binance's founding, Binance's senior management group was based in Shanghai, People's Republic of China. Beginning in or around 2018 until in or around 2021, Binance's management was based in various places. Since 2021, Binance's senior management group primarily operated Binance from the United Arab Emirates and other countries in Asia.

27.     During the relevant period, Defendant intentionally sought and served millions of customers located in the United States, including in the Western District of Washington. Defendant intentionally maintained substantial connections to the United States, from which it generated, among other things, web traffic, user base, transaction volume, and profit.

28.     Defendant focused on attracting and retaining its VIP market makers, including U.S. based VIPs that provided much-needed liquidity on the platform. These VIP users helped Binance become the largest cryptocurrency exchange in the world by allowing individual retail users to trade a broad range of virtual assets, in virtually any quantity, at competitive rates.

29.     From the beginning, Defendant tracked and monitored the status and growth of both its U.S.-registered users and its U.S.-based website visitors. In or around August 2017, Defendant created a graphic touting the exchange's "[r]apid user growth" in its first forty-five days of operation, showing that more than 23% of Binance's 122,729 users were from the United States, a greater share than from any other country.



30.   In or around March 2018, an employee confirmed Zhao's estimate that Defendant had approximately three million U.S. users—more than a third of Binance's eight million total users at the time. In or around June 2019, Zhao stated on a call among senior management that "at a high level . . . 20 to 30% of [Defendant's website] traffic comes from the U.S." and that the U.S. market represented "20 to 30% of [Binance's] potential revenue." Zhao responded "we do need to block by IP and also by KYC." Zhao stated that "blocking U.S. overall is probably one of the largest business decisions we have to make . . . but it's better than losing everything." Nonetheless, despite knowing that Binance had a large number of U.S. users, acknowledging that it was important to block those users based on both KYC and IP addresses, and knowing that that the failure to do so could cause Binance to violate U.S. laws —and indeed announcing publicly that Binance was blocking U.S. users—Zhao authorized strategies whereby Binance maintained a subset of valuable U.S. users, as detailed below.

31.   Zhao was aware that U.S. users transacted on Binance.com, writing in a September 2019 chat: "If we blocked US users from day 1, Binance will be not [sic] as big as we are today. We would also not have had any US revenue we had for the last 2 years.

And further, we would not have had additional revenue resulted from the network effect . . . better to ask for forgiveness than permission" in what Zhao described as a "grey zone."

***Binance Launched a Separate U.S. Exchange but Intentionally Maintained a Substantial U.S. User Base on Binance.com***

32.     Defendant and certain members of its senior management group, including Zhao, knew that Defendant's substantial U.S. user base required it to register with FinCEN and comply with the BSA. Nevertheless, rather than registering with FinCEN and complying with the BSA, Defendant and its co-conspirators agreed to a plan to further evade U.S. legal and regulatory requirements and reduce regulatory pressure on Binance. In 2019, Defendant and its co-conspirators launched Binance.US, a U.S.-based exchange that would register with FinCEN and conduct KYC. In turn, Binance blocked some U.S. users on Binance.com and redirected them to the U.S. exchange but continued to allow some of the largest U.S. users to remain on the Binance.com platform.

33.     Around this time, in late 2018, Defendant engaged a consultant, who gave Binance guidance regarding managing its risk related to U.S. law enforcement, including through a presentation to Binance leaders including Individual 1 and Individual 2. The consultant outlined various aspects of Binance's exposure to U.S. laws, including federal MSB registration, BSA compliance, AML policies and procedures, sanctions laws, and state money transmitting licensing, among other legal and regulatory requirements. The consultant proposed various avenues through which Defendant could mitigate its regulatory exposure, ranging from the "low-risk" option of fully complying with U.S. laws, the "moderate-risk" option of establishing a formal U.S. presence subject to U.S. laws that would absorb U.S. regulatory scrutiny, and the "high-risk" option of maintaining the status quo, whereby Binance would continue to operate in the U.S. without taking steps to comply with U.S. laws. The consultant further provided guidance for Defendant to pursue the "moderate-risk" option: establishing a U.S. entity, indirectly controlled by Binance, which would become the focus of U.S. law enforcement and regulatory authorities and allow Binance to continue to profit from the U.S. market.

34.     Although Defendant did not adopt the consultant's recommendations as offered, Defendant's senior leaders decided to create and launch a U.S.-based exchange that would register with FinCEN and conduct KYC on all users. Defendant's "retail" users would, gradually, be directed to move from Binance.com to the new U.S.-based exchange. But Defendant would develop and execute various strategies to allow some high-volume, VIP U.S. users to continue to access Binance.com. For example, in February 2019, Zhao established "U.S. Exchange and Main Exchange - Compliance [P]arameters" within which Binance would allow U.S. users from U.S.-located internet protocol ("IP") addresses with non-U.S. KYC information to continue to access Binance.com through an API. A senior manager advised Zhao that "U.S. legal" had identified a strategy "to allow the US big traders to be able to be able to trade via API on the main site, but not everyone." Zhao proposed that these U.S. users could "remain on main exchange [Binance] or move over to US exchange. However if they want to move over to US exchange, they have to perform US KYC."

35.     A contemporaneous chat from February 2019 between Individual 1 and certain compliance employees shows Defendant's knowledge that its connections to the United States required it to comply with U.S. registration requirements and the BSA. As Individual 1 explained: "it is the activities performed that cause a person to be categorized as an MSB subject to anti-money laundering rules," and "an entity qualifies as an MSB based on its activity within the United States, not the physical presence of one or more of its agents, agencies, branches, or offices in the United States." Individual 1 also noted that "the Internet and other technological advances make it increasingly possible for persons to offer MSB services in the United States from foreign locations" and "FinCEN seeks to ensure that the BSA rules apply to all persons engaging in covered activities within the United States, regardless of physical location."

36.     Consistent with the scheme developed by Defendant and its co-conspirators, in or around June 2019, Binance publicly announced that it would block U.S. users from Binance.com and launch a separate U.S. exchange. Defendant, Zhao, and Individuals 1 and 2, helped launch the new U.S. exchange, including registering it as an MSB with FinCEN

and obtaining state money transmitting licenses ("MTLs"). Individual 2 reported to Binance's other senior leaders regarding the status of the entity's MSB registration and MTLs, which they understood the new entity would need in order to operate lawfully in the United States. BAM Trading Services, Ltd., an entity formed under the law of the State of Delaware and wholly owned by Zhao, launched Binance.US in September 2019.

37.     As described above, although Binance announced it would block U.S. users and establish a separate exchange would serve the U.S. market, Binance retained a substantial portion of its U.S. user base on Binance.com, with a particular focus on the largest U.S.-based VIPs, including the trading firms that made markets on Binance.com. On or about June 3, 2019, Zhao sought and requested information regarding the number of U.S. VIPs on Binance.com as identified by KYC, and his assistant informed him that Binance had more than 1,100 U.S. KYC VIP users. On a June 9, 2019 recorded call among senior Binance leaders, including Zhao, Individual 3 stated that Binance had more than 3,500 VIPs from the United States, based on KYC and IP address information Defendant possessed, and the total number of U.S. and non-U.S. VIP and enterprise users accounted for more than 70% of Binance's revenue. On a June 25, 2019 call among senior leaders, Individual 3 further noted that Binance's approximately 11,000 VIPs accounted for more than 70% of its trading revenue. Of that 70% of trading revenue, U.S. VIPs accounted for about one-third.

38.     Rather than lose high-volume U.S. VIP users, Defendant's employees, acting on instruction by Defendant's senior leaders, including Zhao and Individuals 1, 3, and 4 encouraged such users to conceal and obfuscate their U.S. connections, including by creating new accounts and submitting non-U.S. KYC information in connection with those accounts. Senior Binance leaders discussed this strategy on internet-based calls in or around June 2019.

39.     For example, during a June 25, 2019 call, including, among others, Zhao and Individuals 1, 3, and 4, the participants discussed and agreed to strategies to keep U.S. VIPs on Binance.com and, as Zhao noted to, "achieve a reduction in our own losses and, at the same time, to be able to have U.S. supervision agencies not cause us any troubles" and to

achieve the "goal" of having "US users slowly turn into to [*sic*] other users." Zhao acknowledged that Binance "cannot say this publicly, of course."

40.     During the same call on or around June 25, 2019, Binance employees and executives, including Individuals 3 and 4, told Zhao that they were implementing the plan by contacting U.S. VIP users "offline," through direct phone calls, "leav[ing] no trace." If a U.S. VIP user owned or controlled an offshore entity, *i.e.*, located outside of the United States, Binance's VIP team would help the VIP user register a new, separate account for the offshore entity and transfer the user's VIP benefits to that account, while the user transferred their holdings to the new account. As Defendant's VIP manager acknowledged, however, some of these offshore entities were owned by U.S. persons. On the same call on or around June 25, 2019, Individual 3 described a script that Binance employees could use in communications with U.S. VIPs to encourage them to provide non-U.S. KYC information to Defendant by falsely suggesting that the user was "misidentified" in Binance's records as a U.S. customer. Zhao authorized and directed this strategy, explaining on the call, "[W]e cannot say they are U.S. users and we want to help them. We say we mis-categorized them as U.S. users, but actually they are not."

41.     Also during the call on or around June 25, 2019, Individual 1 provided guidance on what Binance should not do: "We cannot advise our users to change their KYC. That's, that's of course against the law." Individual 1 provided an alternative route to the same end: "But what we can tell them is through our internal monitoring, we realize that your account exhibits qualities which makes us believe it is a US account . . . if you think we made a wrong judgment, please do the following, you know, and we have a dedicated customer service VIP service officer." Individual 1 described Defendant's plan as "international circumvention of KYC."

42.     Defendant and its co-conspirators agreed to and implemented this strategy to keep U.S. VIP users on Binance.com as documented in an internal document titled "VIP handling." Document metadata reflects that the "VIP handling" document was last modified by Individual 1 on June 27, 2019.

43.     The "VIP handling" document provided templates for messages that employees would send to U.S. users—"in batches . . . as recommended by CZ"—describing the impending and purported block of U.S. users from Binance.com and launch of Binance.US. The document also provided scripts for Binance representatives to use in follow-up communications by phone or through an encrypted internet-based messaging service to help U.S. users continue to access Binance.com despite the purported block.

44.     For VIP users that had submitted U.S. KYC documents, the "VIP handling" document instructed Binance representatives to, among other things, "[m]ake sure the user has completed his/her new account creation with no US documents allowed," and to "[m]ake sure to inform user to keep this confidential." The document further instructed representatives: "We cannot tell users in any way we are changing their KYC, this is not compliant. We are basically correcting previously inaccurate records in light of new evidence."

45.     For VIP users that had not submitted KYC information and were blocked due to accessing Binance via a U.S. IP address, the "VIP handling" document instructed Binance representatives to surreptitiously counsel the user to hide their U.S. location by, among other things, "[i]nform the user that the reason why he/she cant [sic] use our [binance.com url] is because his/her IP is detected as US IP [sic]," and "[i]f the user doesn't get the hint, indicate that IP is the **sole** reason why he/she can't use .com" (emphasis in original). The document further instructed representatives not to "[e]xplicitly instruct user to use different IP. We cannot teach users how to circumvent controls. If they figure it out on their own, its [sic] fine."

46.     Through these strategies, including after Binance.US went live in September 2019, Binance maintained a substantial number of U.S. users on Binance.com, including U.S.-based VIP users that at times conducted virtual currency transactions equivalent to billions of U.S. dollars per day, helping provide liquidity necessary for Binance.

47.     By September 2020, Binance attributed approximately 16% of its total registered user base to the United States, more than any other country on Binance.com, according to an internal monthly report that listed the approximate number and percentage

14

of registered users by country. The following month, Binance removed the United States label from this report and recategorized U.S. users with the label "UNKWN." In October 2020, according to the internal monthly report, "UNKWN" users represented approximately 17% of Binance's registered user base.



Registered user count as of by country 9.30.2020          Registered user count as of by country 10.31.2020

48.     According to Binance's own transaction data, U.S. users conducted trillions of dollars in transactions on the platform between August 2017 and October 2022—transactions that generated approximately $1,612,031,763 in profit for Binance.

***Binance was Subject to Registration and AML Requirements Under U.S. Law; Binance Intentionally Defied Registration Requirements and Willfully Maintained an Ineffective AML Program***

49.     Beginning at least in or around August 2017, Binance conspired to operate and operated as a foreign-located MSB required to register with FinCEN pursuant to 31 U.S.C. § 5330 and 31 C.F.R. § 1022.380 or risk criminal penalties pursuant to 18 U.S.C. § 1960. Binance never registered as an MSB with FinCEN.

50.     Binance, as an operator of an MSB, was required to comply with the BSA, for example by filing suspicious activity reports ("SARs") on activity within the United States, 31 U.S.C. § 5318(g), 31 C.F.R. § 1022.320(a), and implementing an effective AML program "that is reasonably designed to prevent the money services business from being

used to facilitate money laundering and the financing of terrorist activities," 31 C.F.R. § 1022.210.

51.     Binance and its co-conspirators did not implement an effective AML program while it operated in substantial part in the United States as required by the BSA. Despite facilitating a significant number of suspicious transactions, Binance has never filed a SAR with FinCEN. Binance did not collect full KYC information from a large share of its users until May 2022.

52.     For much of the relevant period, Binance.com had two "levels" or "tiers" of user accounts. Until in or around August 2021, Binance and its co-conspirators allowed users to open a "Level 1" or "Tier 1" accounts without submitting any KYC information. Instead, users could open Level 1 accounts simply by providing an email address and a password. Binance required no other information, including the user's name, citizenship, or location. A Level 1 account holder could deposit virtual currency into their account, and then transact in, an unlimited amount of virtual currency. While Level 1 accounts had certain limitations, including a crypto withdrawal limit of up to the value of two Bitcoins ("BTC") per day, Binance allowed users to open multiple Level 1 accounts by providing a new email address for each account, which effectively circumvented the withdrawal limit. Even if a user adhered to the daily two BTC withdrawal limit on a single account, for most of Binance's existence, the user could still withdraw thousands—and sometimes many tens of thousands—of U.S. dollars due to the rising value of a single Bitcoin, which increased from approximately $3,000 to $63,000 in value between December 2018 and April 2021. To access greater withdrawal limits within a single account, users could open a "Level 2" or "Tier 2" account by submitting KYC information, including the user's name, citizenship, residential address, or government issued identification document or number. During the relevant period, Level 1 accounts comprised the vast majority of the user accounts on Binance.com.

53.     In or about August 2021, Binance announced that it would require all new users to submit full KYC information. But Binance allowed existing users who had not submitted KYC information—including for all Level 1 accounts, which was most of the

user accounts—to trade on the platform without providing full KYC information until in or about May 2022.

54.     During the relevant period, Defendant and its co-conspirators did not systematically monitor transactions on Binance's platform, as required by the BSA and its implementing regulations.

55.     In a September 2018 chat conversation, Individual 1 learned that Binance had "[n]othing . . . in place" to review high-volume accounts for suspicious activity. In the same chat, Individual 1 listed types of transactions that, "in [the] aml world," would be flagged for money laundering risks, while noting that "as of now[,] there is no regulation for .com to play by." Binance did not have protocols to flag or report such transactions. Individual 1 further noted: "its [sic] challenging to use the aml standards to impose on [Binance].com especially when Cz doesn't see a need to." Binance compliance personnel, including Individual 1, recognized that Binance's AML controls were inadequate and would attract criminals to the platform. For example, in a February 2019 chat conversation, one compliance employee wrote, "we need a banner 'is washing drug money too hard these days - come to binance we got cake for you.'"

56.     Due in part to Binance's failure to implement an effective AML program, illicit actors used Binance's exchange in various ways, including: operating mixing services that obfuscated the source and ownership of cryptocurrency; transacting illicit proceeds from ransomware variants; and moving proceeds of darknet market transactions, exchange hacks, and various internet-related scams.

57.     For example, between August 2017 and April 2022, there were direct transfers of approximately $106 million in bitcoin to Binance.com wallets from Hydra, a popular Russian darknet marketplace frequently utilized by criminals that facilitated the sale of illegal goods and services. These transfers occurred over time to a relatively small number of unique addresses, which indicates "cash out" activity by a repeat Hydra user, such as a vendor selling illicit goods or services.

58.     Similarly, from February 2018 to May 2019, Binance processed more than $275 million in deposits and more than $273 million in withdrawals from BestMixer—one

of the largest cryptocurrency mixers in the world until it was shut down by Dutch authorities in May 2019.

59.     In some instances, when illicit actors or high-risk users were identified, Defendant and some of its co-conspirators allowed those individuals to continue to access the platform—particularly if they were VIP users. For example, in July 2020, Individual 1 and others discussed a VIP user who was offboarded after being publicly identified as among the "top contributors to illicit activity." Individual 1 wrote that, as a general matter, Binance's compliance and investigation teams should check a user's VIP level before offboarding them, and then Binance could "give them a new account (if they are important/VIP)" with the instructions "not to go through XXX channel again." In another conversation, Individual 1 referenced Hydra. With respect to the same specific VIP user, Individual 1 wrote, "[c]an let him know to be careful with his flow of funds, especially from darknet like hydra . . . [h]e can come back with a new account . . . [b]ut this current one has to go, its tainted."

***Binance Violated IEEPA by Causing U.S. Users to Transact with Users in Comprehensively Sanctioned Jurisdictions***

60.     As discussed above, with limited exception, comprehensive U.S. sanctions broadly prohibited U.S. persons from transacting with persons in certain specified countries and regions, including Iran, among others. From its inception, Defendant's platform had a significant customer base from some of these comprehensively sanctioned jurisdictions, with Iran representing the majority of such customers. Defendant was aware of this fact.

61.     Defendant knew both that (i) there was a significant number of users from certain countries and regions subject to comprehensive U.S. sanctions who were trading on its platform and (ii) a substantial number of the users trading on its platform were U.S. users. Defendant understood that Binance's matching engine would necessarily cause U.S. users to transact with users in comprehensively sanctioned jurisdictions. Defendant further knew that by causing and facilitating such unlawful transactions it would be acting in violation of U.S. law.

62.     Specifically, Binance's matching engine paired users on opposite sides of trades on its platform—for example, pairing User A, seeking to sell BTC for Ether ("ETH"), and User B, seeking to buy BTC with ETH—and matched U.S. users with users located anywhere, including in comprehensively sanctioned countries and regions. Binance developed the code for the matching engine and routinely performed maintenance on it. Binance designed the matching engine without regard for the risk of matching U.S. users with those in comprehensively sanctioned countries and regions. Binance allowed the matching engine to facilitate trades purely based on price and time, without automated controls or human intervention to prevent matches in which U.S. users would and did trade with users in sanctioned jurisdictions.

63.     Through Zhao and others, Defendant understood that the Company would violate U.S. laws by matching U.S. users with users in comprehensively sanctioned jurisdictions, but it did not implement sufficiently effective controls to prevent such sanctions violations from occurring. For example, Defendant could have removed from Binance's platform all accounts associated with either (i) U.S. users or (ii) users in comprehensively sanctioned jurisdictions. Or Defendant could have implemented controls in its matching engine to prevent U.S. users from violating sanctions by preventing them from transacting with users in comprehensively sanctioned jurisdictions. But either measure would have required full KYC for all users, which Defendant did not fully implement until May 2022.

64.     Individual 1 was aware of developments in the U.S. sanctions laws through regular email updates regarding U.S. sanctions from OFAC and other third parties. Individual 1 disseminated some of this information about U.S. sanctions to colleagues and senior leaders, including Zhao.

65.     In an October 2018 chat, Individual 1 sent a message to Zhao about the sanctions risk to Binance's business and the need to develop a sanctions strategy: "Cz I know it's a pain in the ass but its [sic] my duty to constantly remind you . . . [a]re we going to proceed to block sanctioned countries ip addresses ([as] we currently have users from sanction countries on [Binance].com)[.]" Individual 1 continued to note, "[d]ownside risk

is if fincen or ofac has concrete evidence we have sanction [sic] users, they might try to investigate or blow it up big on worldstage." While Zhao responded "yes, let's do it," Zhao and Binance senior management knew that IP address blocks could be circumvented by users accessing Binance through a virtual private network ("VPN"). Binance did not, in any event, in fact block IP addresses of sanctioned countries at that time.

66.     In a meeting in or around December 2018, Individual 1 briefed Zhao and other Binance senior leaders, including Individuals 3 and 4, regarding Binance's sanctions risk—specifically because Binance served U.S. persons and persons in comprehensively sanctioned countries—and the importance of addressing that risk. In or around January 2, 2019, Individual 1 explained to senior Binance leaders that it was imperative to block trades by users who were logged in using an IP address located in a comprehensively sanctioned jurisdiction, even if those users had become Binance customers by providing KYC documents from a non-sanctioned country. This was because the IP address indicated that the user was physically located in a comprehensively sanctioned jurisdiction, which would prohibit that user from transacting with U.S. persons. He noted that both "IP + KYC" are factors for sanctions. Later in the chat, Individual 1 noted that "Iran, North Korea, Syria, Cuba and Crimea . . . . ***They present the highest risk in OFAC***."

67.     Senior leaders understood that Binance risked violating sanctions laws. For example, on or about June 9, 2019, after a meeting among senior leaders about Binance's U.S. strategy, Zhao explained Binance's sanctions risk to another senior leader: "The United States has a bunch of laws to prevent you and Americans from any transaction with any terrorist," adding, "you only need to serve Americans or service U.S. sanctioned country"—and then Binance would need to "give all data" to the U.S. government.

68.     Knowing the risk of violating U.S. sanctions, Zhao authorized a remediation of Binance's sanctions risk between late 2018 and early 2019 whereby Binance's compliance team would identify users from comprehensively sanctioned jurisdictions and work with Binance's operations team to implement controls to prevent those users from accessing the platform.

69.     However, Defendant refused to devote sufficient resources to the remediation effort. As Individual 1 noted in a December 2018 chat conversation: "10/10 cleanup will shake up [Binance].com, take more than 3 months and 7 digits in cost and almost never get buy in from SH." By "SH," Individual 1 was referring to Binance's inner circle of leaders based in Shanghai at the time, including Individual 4, who, as operations director, would oversee implementation of any controls restricting or removing users—though his performance was evaluated based on his ability to achieve user growth.

70.     Individual 1 explained the goal of the remediation was to "ensure OFAC compliance" and "ensure we have documented records and steps taken should we be approached by various regulators." However, senior Binance leaders including Zhao and Individual 4 knew that the remedial measures Defendant purported to implement, such as limited KYC and IP blocking, would be ineffective, since most users at that time provided Defendant with limited KYC information, and users could easily access Binance's platform by using VPNs to change their IP address to an address associated with a country that was not comprehensively sanctioned.

71.     Despite Binance's purported remediation in 2018 and 2019, users in the United States and from comprehensively sanctioned countries continued to access Binance.com, and Binance's matching engine continued to cause transactions between U.S. persons and users in comprehensively sanctioned jurisdictions, in violation of U.S. law.

72.     As described above, Binance took steps to retain U.S. users on its platform. But Binance offboarded some users from sanctioned jurisdictions. For example, in March 2019, Individual 1 described the status of Binance's remediation, which included the "[s]creening of approximately 500,000 names for sanctions" and "[s]creening approximately 1 million transactions for negative/illicit addresses." Further, Individual 4 ultimately allowed for the implementation of a limited block of users who had completed KYC from a country on Binance's list of sanctioned countries. In May 2019, a Binance employee stated that they would give Individual 4 a "heads up" that they were locking accounts for affiliations with sanctioned jurisdictions or entities, and Individual 1 stated

that Binance senior management, including Zhao and Individual 4 "are all aware of what we are doing for US compliance and are agreeable." As Defendant knew, these efforts were not successful, as Binance did not always close such user accounts and blocked users could contact customer support and ask Binance to reactivate their account.

73.     Further, Binance did not block users who did not fully complete KYC but otherwise submitted identification documents or phone numbers indicating they resided in a comprehensively sanctioned country such as Iran. For example, if a user submitted an Iranian passport as part of Binance's optional "Level 2" KYC process but did not complete KYC verification, Binance would allow that user to remain on the platform and continue to trade.

74.     As Individual 1 and other Binance employees and contractors discussed, Binance continued to risk causing U.S. sanctions violations so long as the Company did not demand full KYC information from users. In a May 2019 conversation with Individual 1, a Binance contractor noted that Binance "should take a hardline policy when it comes to Iran/DPRK" but "non-KYC accounts really, really complicate this [sic]." For much of the relevant time, the vast majority of user accounts on Binance's platform were non-KYC accounts—*i.e.*, Level or Tier 1 accounts that could be opened with merely an email address.

75.     In or around May 2019, at Zhao's request, Individual 1 reported to Zhao regarding the conclusion of the purported remediation. As Individual 1 knew at the time, the purported remediation was ineffective as users from comprehensively sanctioned countries remained on the platform. Zhao knew that without collecting KYC information on all customers any remediation of this type would be ineffective. Nonetheless, Zhao considered remediation operationally complete and did not pursue effective remediation. At this time, as Binance employees knew and discussed, Binance continued to serve thousands of users that employees had identified as being from comprehensively sanctioned countries—including, for example, more than 7,000 accounts that had submitted KYC documents from a comprehensively sanctioned country and more than 12,500 users who had provided Iranian phone numbers.

76.     Binance employees continued to raise concerns about users from comprehensively sanctioned countries on the platform, while also removing some of those users from the platform. Binance employees detected these significant gaps in Binance's sanctions controls and informed Individual 4 about them. For example, in a July 2019 chat identifying several such gaps, Individual 4 noted that the product team was already working on addressing of the gaps, and that he would "try to resolve [another gap] ASAP." While noting that the issues the specific users identified were "not very critical" because the accounts were already frozen and thus the users were unable to trade, Individual 4 indicated he would "raise the priority to fix this bug" but said the employees should not "[o]verreact the sanctions country risk [sic]." He wrote that while there was "[n]o easy solution" to deal with some of these bugs at the moment, the "US sanction risk [was] now under control by the effort for [sic] the compliance team[.]" He continued that Binance "should pay more attention is [sic] to give user better service and user experience, not further ban some users."

77.     Individual 1 and other Binance employees continued to raise concerns about U.S. sanctions, including when law enforcement contacted Binance about particular users from comprehensively sanctioned jurisdictions. For example, in May 2019, Binance received a request related to a user "from Iran" that "lives in Turkey," and Individual 1 discussed Binance's options with a Binance investigations specialist, writing: "if he submitted an Iranian ID and we are asking him to give an alternate now, we totally SHOULDN'T be doing that . . . lol," then adding, "please have him submit his ID . . . and then we can decide from there . . . do not need to give any advice such as submit a non-iran id . . . let the user submit on his own through his own will." As another example, also in May 2019, Binance received a law enforcement request from Turkish law enforcement targeting a "suspected . . . Iranian" user's account. Individual 1 was told that Binance "may not have proof he's actually Iranian, though, maybe just born there." Individual 1 told an investigations specialist: "Iran is very tricky[.] We definitely do not want to acknowledge we have them onboard[,] [a]s our official stance is we gotten rid of all of them(sanctions) and blocked." Additionally, in October 2019, following a request from the FBI, Individual

1 expressed concern to a colleague that Binance's U.S. sanctions compliance program was insufficient. Specifically, Individual 1's colleague noted that Binance would "need to inquire into the accounts by asking for KYC docs" in order to confirm the nationality of the users, "but by doing that, [Binance would be] in breach of FBI comment not to do anything." In response, Individual 1 stated that "[Binance] obviously failed [its] sanctions programme [sic] in FBI's US regs eyes" and that "FBI pass on to OFAC that, btw, we are certain binance has deficiencies in sanctions controls."

78.     In November 2019, about a year after Binance claimed it had begun to block persons in comprehensively sanctioned jurisdictions, an FBI inquiry caused Binance to discover approximately 600 "verified level 2" users from Iran.

79.     In or around and between January 2018 and through May 2022, Binance violated U.S. law by willfully causing at least 1.1 million trades, totaling at least $898,618,825, between Defendant's U.S. customers and its customers ordinarily resident in Iran. Among these transactions, Binance caused users in the Western District of Washington to trade with users in Iran.

80.     According to Defendant's own data, in or around and between August 2017 and October 2022, Binance also caused millions of dollars of transactions between U.S. users and users in other comprehensively sanctioned jurisdictions, including Cuba, Syria, and the Ukrainian regions of Crimea, Donetsk, and Luhansk. Defendant profited from the transactions that it caused in violation of IEEPA and various U.S. sanctions regimes. Those transactions, and Defendant's profit, were a direct and foreseeable result of Defendant's decision to prioritize profits and growth over its implementation of KYC procedures that would have identified U.S. users and users in comprehensively sanctioned jurisdictions. Likewise, had Defendant implemented sufficient controls to prevent U.S. users from transacting with users in comprehensively sanctioned jurisdictions, it could have prevented Binance's matching engine from causing those users to transact on Binance's platform.

Binance Holdings Limited

(the "Company")

Written resolutions by the sole director of the Company

The sole director of the Company passes the resolutions set out below.

1      Appointment of Authorised Agent

Background

1.1    Article 25.2 of the Company's articles of association provides as follows:

*"The Directors may establish any committees, local boards or agencies for managing any of the businesses and affairs of the Company, and may appoint any persons to be members of such committees, local boards, managers or agents for the Company and may fix their remuneration and may delegate to any committees, local board, manager or agent any of the powers, authorities and discretions vested in the Directors, with the power to sub-delegate, and may authorise the members of any committees, local boards or agencies, or any of them, to fill any vacancies therein and to act notwithstanding vacancies, and any such appointment and delegation may be made upon such terms and subject to such conditions as the Directors may think fit, and the Directors may remove any person so appointed and may annul or vary any such delegation, but no person dealing in good faith and without notice of any such annulment or variation shall be affected thereby."*

1.2    The Company has been engaged in discussions with the United States Department of Justice, Criminal Division, Money Laundering and Asset Recovery Section; the Department of Justice, National Security Division, Counterintelligence and Export Control Section; and the United States Attorney's Office for the Western District of Washington (collectively the "Offices"), regarding issues arising in relation to the Offices' investigation of potential violations of U.S. law.

1.3    To resolve such discussions, it is proposed that the Company (a) enter into a Plea Agreement with the Department of Justice to plead guilty to the charges described in 1.5(b) herein (the "Agreement"); (b) waive indictment on such charges and accede to the filing of an Information charging the Company; (c) agree to pay a total combined amount of $4,316,126,163, representing a Criminal Fine and

Money Judgment; and (d) admit the Court's jurisdiction over the Company and the subject matter of such action and consent to the judgment therein.

1.4 The Company's Deputy General Counsel together with external counsel for the Company have advised the sole director of the Company, Changpeng Zhao (the "Director"), of the Company's rights, possible defenses, the Sentencing Guidelines' provisions, and the consequences of entering into such agreement with the Offices.

1.5 It is proposed that the Deputy General Counsel be appointed pursuant to Article 25.2 of the Company's articles of association as an authorised agent of the Company (the "**Agent**") for the purposes of executing and delivering from time to time for and on behalf of the Company the following materials and/or classes of materials:

(a) The Agreement;

(b) The Information charging the Company with (1) conspiracy to conduct an unlicensed money transmitting business and to fail to maintain an effective anti-money laundering program, as charged in Count 1, in violation of Title 18, United States Code, Section 371; (2) conducting an unlicensed money transmitting business, as charged in Count 2, in violation of Title 18, United States Code, Sections 1960(a), 1960(b)(1)(B), and 2; and (3) violation of the International Emergency Economic Powers Act ("IEEPA"), as charged in Count 3, in violation of Title 50, United States Code, Section 1705, and Title 31, Code of Federal Regulations, Part 560; and

(c) any ancillary materials in connection with these materials,

(collectively, the "**Relevant Materials**").

1.6 By signing these written resolutions, the Director acknowledges that, after due consideration, they are of the opinion that it would be in the Company's best interests to appoint the Agent as an authorised agent of the Company for the purposes of executing and delivering the Relevant Materials.

**Resolution**

1.7 It is resolved that:

(a)     the Agent be appointed as an authorised agent of the Company;

(b)     the Agent be and is hereby authorised and instructed to execute and deliver the Relevant Materials as necessary or convenient for and on behalf of the Company, specifically to accept the terms and conditions of the Agreement, including but not limited to, (a) a knowing waiver of the Company's rights to a speedy trial pursuant to the Sixth Amendment of the United States Constitution, Title 18, United States Code, Section 3161, and Federal Rule of Criminal Procedure 48(b); (b) a knowing waiver for the purposes of the Agreement and any charges by the United States against the Company arising out of the conduct described in the Statement of Facts attached to the Agreement of any objection with respect to venue and consent to the filing of the Information, as provided under the terms of the Agreement, in the United States District Court for the Western District of Washington; and (c) a knowing waiver of any defences by the Company based on the statute of limitations for any prosecution relating to the conduct described in the Statement of Facts attached to the Agreement and in the Information that is not time-barred by the applicable statute of limitations on the date of the signing of the Agreement; and

(c)     The Agent be and is hereby authorised and instructed to further (1) appear in the United States District Court for the Western District of Washington on behalf of the Company and enter the requisite plea of guilty on behalf of the Company; (2) appear at the Company's sentencing; and (3) as its corporate representative take such actions as may be necessary, appropriate, or desirable to negotiate, execute and complete the resolution and the Agreement substantially with the terms presented to the Director in accordance with these resolutions, and further, any and all actions taken by the Agent in connection with the foregoing, are hereby adopted, ratified, confirmed and approved in all respects as fully as if any such action had been presented for approval and approved prior to such action being taken, subject to such changes as the Agent shall approve.

By: _____     Dated: _Nov 20, 2023_

CHANGPENG ZHAO, in his
capacity as director of the Company

## ATTACHMENT C

## COMPLIANCE COMMITMENTS

In order to address any deficiencies in its compliance programs, policies, procedures, codes of conduct, systems, and internal controls regarding compliance with money laundering, anti-money laundering, and U.S. sanctions laws, Binance Holdings Limited (the "Company") on behalf of itself and its subsidiaries and affiliates involved in the operation of the Binance.com exchange or with access to the Binance.com orderbook, agrees to continue to conduct, in a manner consistent with all of its obligations under this Agreement, appropriate reviews of its existing compliance programs, policies, procedures, codes of conduct, systems, and internal controls, including its anti-money laundering and U.S. sanctions compliance programs (the "Compliance Programs").

Where necessary and appropriate, the Company agrees to adopt new, or to enhance existing Compliance Programs in order to ensure their effectiveness in detecting and deterring violations of laws prohibiting money laundering, laws requiring anti-money laundering programs, and laws prohibiting violations of U.S. sanctions. At a minimum, this will include, but not be limited to, the following elements to the extent they are not already part of the Company's existing Compliance Programs:

*High-Level Commitment to Compliance*

1.      The Company will select a new chief executive officer and ensure that management and the new chief executive officer have a strong commitment to and experience in compliance.

2.      The Company will ensure that its directors and senior management provide strong, explicit, and visible support and commitment to its Compliance Programs and any other corporate policy against violations of laws prohibiting money laundering and violations of U.S. sanctions and demonstrate rigorous adherence by example. The Company will also ensure that all levels of

C-1

management, in turn, reinforce those standards and encourage and incentivize employees to abide by them. The Company will create and foster a culture of ethics and compliance with the law in its day-to-day operations at all levels of the Company.

*Policies, Procedures, and Internal Controls*

3.      The Company will develop, enhance, and promulgate a clearly articulated and visible corporate policy against violations of laws prohibiting money laundering, requiring anti-money laundering programs, and laws prohibiting violations of U.S. sanctions, which policy shall be memorialized in writing in the Compliance Programs.

4.      The Company will develop, enhance, promulgate, implement, and maintain Compliance Programs designed to reduce the prospect of violations of the Company's Compliance Programs and any other corporate policy against violations of laws prohibiting money laundering and violations of U.S. sanctions, and the Company will take appropriate measures to encourage and support the observance of ethics and the requirements of the Compliance Programs by personnel at all levels of the Company. The Compliance Programs shall apply to all directors, officers, and employees and, where necessary and appropriate, outside parties acting on behalf of the Company, including but not limited to, agents and intermediaries, consultants, representatives, distributors, licensees, contractors and suppliers, and joint venture partners (collectively, "agents and business partners"). The Company shall notify all employees that compliance with the Compliance Programs is the duty of individuals at all levels of the Company. Such Compliance Programs shall address, among others, the following minimum requirements:

      a.      customer onboarding;

      b.      know your customer and due diligence procedures, including for customers' customers;

C-2

      c.       periodic customer reviews for illicit activity, money laundering and sanctions risk;

      d.       designation of high-risk customers;

      e.       reviews of high-risk customers;

      f.       closure of customer accounts;

      g.       maintenance of customer files, including records of and about each customer's access to and use of the customer's accounts;

      h.       prohibition of business with designated persons, entities, groups, industries, regions, and countries targeted by U.S. sanctions laws;

      i.       real-time transaction monitoring for suspicious or unlawful activity;

      j.       timely response to law enforcement requests and legal process;

      k.       filing of suspicious activity reports;

      l.       blocking of transactions that violate U.S. sanctions and other laws, the Compliance Programs, or terms of use where appropriate;

      m.       independent audit of anti-money laundering policies, procedures, and systems;

      n.       conflicts of interest;

      o.       provision of information to regulators and supervisors;

      p.       provision of information to financial institutions;

      q.       whistleblowing; and

      r.       technological controls to prevent circumvention of the Compliance Programs.

*Customer and Third-Party Relationships*

5.      As part of the Compliance Programs, the Company will institute and/or enhance appropriate, risk-based know your customer, due diligence, and compliance requirements pertaining to the acceptance, retention, and oversight of all customers and agents and business partners, including, among others, the following minimum requirements:

a.      properly documented know your customer and due diligence reviews for all new customers, including customer identity, citizenship, permanent residency status, location verification, and, for customers that are legal persons, formation, structure, jurisdictional presence, nature of business, control and beneficial ownership verification;

b.      properly documented ongoing know your customer and due diligence reviews of existing customers, and for customers who are legal persons and offer services to their own customers via the Company, the customer's customer;

c.      properly documented procedures for closing customer accounts;

d.      procedures for retaining and sharing information regarding customers and transactions within the Company and with third parties to the extent permissible under applicable law;

e.      properly documented due diligence pertaining to the hiring and appropriate and regular oversight of agents and business partners;

f.      informing customers of the Company's commitment to abiding by laws prohibiting money laundering and laws prohibiting violations of U.S. sanctions;

g.      informing employees and, where necessary, agents and business partners, of the Company's commitment to abiding by the Compliance Programs and any other corporate

policy against violations of laws prohibiting money laundering and laws prohibiting violations of U.S. sanctions; and

      h.     seeking a reciprocal commitment from agents and business partners.

6.     Where necessary and appropriate, and in accordance with applicable law, the Company will include standard provisions in agreements, contracts, and renewals thereof with all customers and agents and business partners that are reasonably calculated to prevent violations of laws prohibiting money laundering and violations of laws prohibiting violations of U.S. sanctions, which may, depending upon the circumstances, include: (a) representations and undertakings relating to compliance with applicable laws prohibiting money laundering and laws prohibiting violations of U.S. sanctions; (b) rights to conduct audits of the books and records of the agent or business partner to ensure compliance with the foregoing; and (c) rights to seek termination of a customer or agent or business partner as a result of any breach of the Compliance Programs or any applicable laws prohibiting money laundering or laws prohibiting violations of U.S. sanctions, or the representations and undertakings related to such matters.

*Anti-Circumvention Controls*

7.     The Company will implement and/or enhance effective technological controls to prevent the Compliance Programs from being circumvented. These anti-circumvention controls will achieve, among others, the following minimum requirements:

      a.     prevent customers from accessing or using the Company's services in an unauthorized or illicit manner, including by misleading the Company regarding the true location from which the customer uses or accesses the Company's services;

      b.     prevent individuals from accessing or using customer accounts who are not the customer registered with the Company as the account owner or an authorized trader; and

       c.      prevent customers from conducting transactions in a manner designed to circumvent transaction monitoring and know-your-customer policies, procedures, and controls.

*Periodic Risk-Based Review*

8.      The Company will develop, maintain, and enhance the Compliance Programs on the basis of regular, periodic risk assessments addressing the individual circumstances of the Company, in particular, the money laundering and U.S. sanctions risks facing the Company, including, but not limited to, its Internet-based operations in and exposure to multiple jurisdictions, geographical decentralization, involvement in joint venture and licensing arrangements, and degree of governmental oversight and inspection.

9.      The Company shall review its Compliance Programs no less than annually and update them as appropriate to ensure their continued effectiveness and risk-tailored resource allocation, taking into account lessons learned, relevant developments in the field, and evolving industry standards.

*Proper Oversight and Independence*

10.      The Company will assign responsibility to one or more senior corporate executives of the Company for the implementation and oversight of the Company's Compliance Programs. Such corporate official(s) shall have the authority to report directly to independent monitoring bodies, including internal audit, or any appropriate management committee, or executives, and shall have an adequate level of autonomy from management as well as sufficient resources and authority to maintain such autonomy. The executives responsible for the implementation and

oversight of the Company's Compliance Programs, including, e.g., those with approval authority or certification responsibilities, will be highly qualified and experienced within the field.

*Training and Guidance*

11.     The Company will implement and/or enhance mechanisms designed to ensure that its Compliance Programs are effectively communicated to all directors, officers, employees, and, where necessary and appropriate, agents and business partners. These mechanisms shall include: (a) periodic training for all directors and officers, all employees in positions of leadership or trust, positions that require such training (e.g., internal audit, sales, legal, compliance, finance, customer service, product engineering and development), and, where necessary and appropriate, agents and business partners; and (b) corresponding certifications by all such directors, officers, employees and agents and business partners, certifying compliance with the training requirements.

12.     The Company will establish an effective system for providing guidance and advice to directors, officers, employees, and, where necessary and appropriate, agents and business partners, on complying with the Company's Compliance Programs, including when they need advice on an urgent basis.

*Internal Reporting and Investigation*

13.     The Company will maintain, or where necessary establish, an effective system for internal and, where possible, confidential reporting by, and protection of, directors, officers, employees, and, where appropriate, agents and business partners concerning violations of laws prohibiting money laundering and laws prohibiting violations of U.S. sanctions or the Compliance Programs.

14.     The Company will implement mechanisms designed to ensure that the system for internal and, where possible, confidential reporting is effectively communicated to all directors, officers, employees, and, where necessary and appropriate, agents and business partners.

15.     The Company will maintain, or where necessary establish, an effective and reliable process with sufficient resources for responding to, investigating, and documenting allegations of violations of laws prohibiting money laundering and violations of U.S. sanctions or the Compliance Programs.

*Enforcement and Discipline*

16.     The Company will implement and/or enhance mechanisms designed to effectively enforce the Compliance Programs. Such mechanisms shall appropriately incentivize compliance and discipline violations.

17.     The Company will institute appropriate disciplinary procedures to address, among other things, violations of laws prohibiting money laundering and violations of U.S. sanctions and the Compliance Programs by the Company's directors, officers, and employees. Such procedures should be applied consistently and fairly, regardless of the position held by, or perceived importance of, the director, officer, or employee. The Company shall implement procedures to ensure that where misconduct is discovered, reasonable steps are taken to remedy the harm resulting from such misconduct, and to ensure that appropriate steps are taken to prevent further similar misconduct, including assessing the Compliance Programs and making modifications necessary to ensure the Compliance Programs are effective.

18.     The Company will ensure that its compensation and bonus system, including any compensation provision in any employment or consulting contract, is designed to incentivize adherence to the Company's Compliance Programs and any other corporate policy against

C-8

violations of laws prohibiting money laundering and violations of U.S. sanctions, including the following minimum requirements:

      a.     prohibitions on bonuses for employees who do not satisfy compliance performance requirements;

      b.     compensation clawback provisions permitting the Company to recoup compensation paid to employees who (i) violate applicable law, and (ii) had supervisory authority over the employee(s) or business area engaged in the misconduct and knew of, or were willfully blind to, the misconduct; and

      c.     compensation incentives for employees who demonstrate full commitment to compliance processes.

19.    The Company will not permit any person to participate, directly or indirectly, formally or informally, in managing or operating the business of the Company who has been convicted of a crime related to the conduct set forth in the Statement of Facts.

20.    The Company will continue its internal review of the involvement of the Company's directors, officers, employees and agents in the conduct described in the Statement of Facts. Once the internal review is complete and based on its findings, the Company shall take such disciplinary action against any of the Company's directors, officers, employees and agents found to have engaged in misconduct as may be appropriate under the circumstances.

*Mergers and Acquisitions*

21.    The Company will develop and implement policies and procedures for mergers and acquisitions requiring that the Company conduct appropriate risk-based due diligence on potential new business entities by legal, accounting, and compliance personnel.

22.     The Company will ensure that the Compliance Programs apply as quickly as is practicable to newly acquired businesses or entities merged with the Company that will be involved in the operation of the Binance.com exchange or with access to the Binance.com orderbook, and will promptly:

      a.     train the directors, officers, employees and agents and business partners consistent with Paragraph 11 above on laws prohibiting money laundering and violations of U.S. sanctions and the Compliance Programs;

      b.     ensure that any newly acquired businesses or entities are properly integrated into the Company's existing information technology systems and subject to appropriate oversight by the Company, including but not limited to any Compliance Programs-related systems and any electronic communication systems or oversight; and

      c.     where warranted, conduct an audit specific to laws prohibiting money laundering and violations of U.S. sanctions of all newly acquired or merged businesses as quickly as practicable.

*Monitoring, Testing, and Audit*

23.     The Company will conduct periodic reviews and testing of the Compliance Programs designed to evaluate and improve their effectiveness in preventing and detecting violations of laws prohibiting money laundering and violations of U.S. sanctions, taking into account relevant developments in the field, evolving industry standards, and technological developments.

24.     The Company will ensure that the testing or audit function is accountable to senior management, is independent of the audited activities and functions, and has sufficient authority, skills, expertise, resources, and authority within the organization.

25.     The Company will ensure that it employs testing or audit procedures appropriate to the level and sophistication of the Compliance Programs and that this function, whether deployed internally or by an external party, reflects a comprehensive and objective assessment of the Company's anti-money laundering, and U.S. sanctions-related risks and internal controls.

26.     The Company will ensure that, upon learning of an adverse testing result or audit finding pertaining to its Compliance Programs, it will take immediate and effective action, to the extent possible, to identify and implement compensating controls until the root cause of the weakness can be determined and remediated.

**ATTACHMENT D**

**INDEPENDENT COMPLIANCE MONITOR**

As set forth in the Plea Agreement (the "Agreement"), Binance Holdings Limited (the "Company"), on behalf of itself and its subsidiaries and affiliates involved in the operation of the Binance.com exchange or with access to the Binance.com orderbook, has agreed to retain an independent compliance monitor (the "Monitor"). The duties and authority of the Monitor and the obligation of the Company with respect to the Monitor and the United States Department of Justice, Criminal Division, Money Laundering and Asset Recovery Section ("MLARS"); National Security Division, Counterintelligence and Export Control Section ("CES"); and the United States Attorney's Office for the Western District of Washington ("the USAO-WDWA") (collectively the "Offices") are as described below.

1. The Company will retain the Monitor for a period of three years (the "Term of the Monitorship" or the "Term"), unless the provision for extension described in Paragraph 7 of the Company's Plea Agreement (the "Agreement") is triggered.

*Monitor's Mandate*

2. The Monitor's primary responsibility is to assess and monitor the Company's compliance with the terms of the Agreement, including the Company's compliance programs, policies, procedures, codes of conduct, systems, and internal controls, including its anti-money laundering and U.S. sanctions compliance programs (the "Compliance Programs") in Attachment C, to specifically address and reduce the risk of any recurrence of the Company's misconduct. During the Term of the Monitorship, the Monitor will evaluate, in the manner set forth below, the effectiveness of the Company's Compliance Programs as they relate to its current and ongoing compliance with laws prohibiting money laundering, laws requiring anti-money laundering programs, and laws prohibiting violations of U.S. sanctions. In so doing, the

Monitor will take such reasonable steps as, in his or her view, may be necessary to fulfill the foregoing mandate (the "Mandate"). This Mandate shall include an assessment of the Company governing authority's and senior management's commitment to, and effective implementation of, the compliance commitments described in Attachment C of the Agreement.

*Company's Obligations*

3.      The Company shall cooperate fully with the Monitor, and the Monitor shall have the authority to take such reasonable steps as, in his or her view, may be necessary to be fully informed about the Company's Compliance Programs in accordance with the principles set forth herein and subject to applicable law, including applicable data protection and labor laws and regulations. To that end, the Company shall: facilitate the Monitor's access to the Company's documents and resources; not limit such access, except as provided in Paragraphs 5 and 6 below; and provide guidance on applicable local law. The Company shall provide the Monitor with access to all information, documents, records, facilities, and employees, as reasonably requested by the Monitor, that fall within the scope of the Mandate of the Monitor under the Agreement. The Company shall use its best efforts to provide the Monitor with access to the Company's former employees, agents, intermediaries, consultants, representatives, distributors, licensees, contractors, suppliers, and joint venture partners (collectively, "agents and business partners"), as reasonably requested by the Monitor, that fall within the scope of the Mandate of the Monitor under the Agreement. The Company shall inform agents and business partners of this obligation.

4.      Any disclosure by the Company to the Monitor concerning violations of laws prohibiting money laundering, laws requiring anti-money laundering programs, or laws prohibiting violations of U.S. sanctions shall not relieve the Company of any otherwise

applicable obligation to truthfully disclose such matters to the Offices pursuant to the Agreement.

*Withholding Access*

5.     The parties agree that no attorney-client relationship shall be formed between the Company and the Monitor. In the event that the Company seeks to withhold from the Monitor access to information, documents, records, facilities, or current or former employees of the Company that may be subject to a claim of attorney-client privilege or to the attorney work-product doctrine, or where the Company reasonably believes production would otherwise be inconsistent with applicable law, the Company shall work cooperatively with the Monitor to resolve the matter to the satisfaction of the Monitor.

6.     If the matter cannot be resolved, at the request of the Monitor, the Company shall promptly provide written notice to the Monitor and the Offices. Such notice shall include a general description of the nature of the information, documents, records, facilities, or employees that are being withheld, as well as the legal basis for withholding access. The Offices may then consider whether to make a further request for access to such information, documents, records, facilities, or employees. Any such request would be made pursuant to the cooperation provisions set forth in Paragraph 25 of the Agreement.

*Monitor's Coordination with the Company and Review Methodology*

7.     In carrying out the Mandate, to the extent appropriate under the circumstances, the Monitor should coordinate with Company personnel, including in-house counsel, compliance personnel, and internal auditors, on an ongoing basis. The Monitor may rely on the product of the Company's processes, such as the results of studies, reviews, sampling and testing methodologies, audits, and analyses conducted by or on behalf of the Company, as well as the Company's internal resources (*e.g.*, legal, compliance, and internal audit), which can assist the

Monitor in carrying out the Mandate through increased efficiency and Company-specific expertise, provided that the Monitor has confidence in the quality of those resources.

8.      The Monitor's reviews should use a risk-based approach, and thus, the Monitor is not expected to conduct a comprehensive review of all business lines, all business activities, or all markets. In carrying out the Mandate, the Monitor should consider, for instance, risks presented by:

   a.      The countries and business areas in which the Company operates or in which its customers are located;

   b.      The size of the Company and its business;

   c.      The nature and volume of the financial services provided the Company;

   d.      The nature of the Company's customers and transaction counterparties, including whether those customers and counterparties are natural persons, financial institutions, or financial intermediaries including mixing and tumbling services;

   e.      The jurisdictions in which the Company is licensed;

   f.      Current and potential agents and business partners, and the business rationale for such relationships;

   g.      The failure of the Company, a global money transmitting business, to have effective Compliance Programs; and

   h.      The extent to which the Company interacts with customers only over the Internet and not in person.

9.      In undertaking the reviews to carry out the Mandate, the Monitor shall formulate conclusions based on, among other things:

a.      Inspection of relevant documents, including the Company's current compliance policies and procedures;

b.      Direct observation of selected systems and procedures of the Company, including those related to know-your-customer, customer due diligence, U.S. sanctions screening, real-time transaction monitoring, law enforcement notifications, internal accounting controls, record-keeping, and internal audit procedures;

c.      Meetings with, and interviews of, relevant current and, where appropriate, former shareholders, officers, employees, agents and business partners, and other persons at mutually convenient times and places; and

d.      Analyses, studies, and testing of the Compliance Programs.

*Monitor's Written Work Plans*

10.     To carry out the Mandate, during the Term of the Monitorship, the Monitor shall conduct an initial ("first") review and prepare a first report, followed by at least two follow-up reviews and reports as described in Paragraphs 16 through 20 below. With respect to the first report, after consultation with the Company and the Offices, the Monitor shall prepare the first written work plan within sixty (60) calendar days of being retained, and the Company and the Offices shall provide comments within thirty (30) calendar days after receipt of the written work plan. With respect to each follow-up report, after consultation with the Company and the Offices, the Monitor shall prepare a written work plan at least thirty (30) calendar days prior to commencing a review, and the Company and the Offices shall provide comments within twenty (20) calendar days after receipt of the written work plan. Any disputes between the Company and the Monitor with respect to any written work plan shall be decided by the Offices in their sole discretion.

11.     All written work plans shall identify with reasonable specificity the activities the Monitor plans to undertake in execution of the Mandate, including a written request for documents. The Monitor's work plan for the first review shall include such steps as are reasonably necessary to conduct an effective first review in accordance with the Mandate, including by developing an understanding, to the extent the Monitor deems appropriate, of the facts and circumstances surrounding any violations that may have occurred before the date of the Agreement. In developing such understanding, the Monitor is to rely, to the extent possible, on available information and documents provided by the Company. It is not intended that the Monitor will conduct his or her own inquiry into the historical events that gave rise to the Agreement.

*First Review*

12.     The first review shall commence no later than one hundred twenty (120) calendar days from the date of the engagement of the Monitor (unless otherwise agreed by the Company, the Monitor, and the Offices). The Monitor shall issue a written report within one hundred fifty calendar (150) days of commencing the first review, setting forth the Monitor's assessment and, if necessary, making recommendations reasonably designed to improve the effectiveness of the Company's Compliance Programs as set forth in Attachment C. The Monitor should consult with the Company concerning his or her findings and recommendations on an ongoing basis and should consider the Company's comments and input to the extent the Monitor deems appropriate. The Monitor may also choose to share a draft of his or her reports with the Company prior to finalizing them. The Monitor's reports need not recite or describe comprehensively the Company's history or compliance policies, procedures, and practices. Rather, the reports should focus on areas the Monitor has identified as requiring recommendations for improvement or which the Monitor otherwise concludes merit particular

attention. The Monitor shall provide the report to the Company's governing authority and contemporaneously transmit copies to the following representatives of the Offices or their designees:

> Chief and Deputy Chief, Bank Integrity Unit
> Money Laundering and Asset Recovery Section, Criminal Division
> U.S. Department of Justice
> Bond Building, Tenth Floor
> 1400 New York Avenue, N.W.
> Washington, D.C. 20005

> Chief and Deputy Chief Counsel for Corporate Enforcement
> Counterintelligence & Export Control Section, National Security Division
> U.S. Department of Justice
> 950 Pennsylvania Avenue, N.W.
> Suite 7700
> Washington, D.C. 20530

> United States Attorney
> Western District of Washington
> 700 Stewart Street, Suite 5220
> Seattle, WA 98101

After consultation with the Company, the Monitor may extend the time period for issuance of the first report for a brief period of time with prior written approval of the Offices.

13.     Within one hundred fifty (150) calendar days after receiving the Monitor's first report, the Company shall adopt and implement all recommendations in the report. If the Company considers any recommendations unduly burdensome, inconsistent with applicable law or regulation, impractical, excessively expensive, or otherwise inadvisable, it must notify the Monitor and the Offices of any such recommendations in writing within sixty (60) calendar days of receiving the report. The Company need not adopt those recommendations within the one hundred fifty (150) calendar days of receiving the report but shall propose in writing to the Monitor and the Offices an alternative policy, procedure, or system designed to achieve the same objective or purpose. As to any recommendation on which the Company and the Monitor do not

agree, such parties shall attempt in good faith to reach an agreement within forty-five (45) calendar days after the Company serves the written notice.

14.     In the event the Company and the Monitor are unable to agree on an acceptable alternative proposal, the Company shall promptly consult with the Offices. The Offices may consider the Monitor's recommendation and the Company's reasons for not adopting the recommendation in determining whether the Company has fully complied with its obligations under the Agreement. Pending such determination by the Offices, the Company shall not be required to implement any contested recommendation(s).

15.     With respect to any recommendation that the Monitor determines cannot reasonably be implemented within one hundred fifty (150) calendar days after receiving the report, the Monitor may extend the time period for implementation with prior written approval of the Offices.

*Follow-Up Reviews*

16.     A follow-up ("second") review shall commence no later than one hundred and eighty (180) calendar days after the issuance of the first report (unless otherwise agreed by the Company, the Monitor, and the Offices). The Monitor shall issue a written follow-up ("second") report within one hundred twenty (120) calendar days of commencing the second review, setting forth the Monitor's assessment and, if necessary, making recommendations in the same fashion as set forth in Paragraph 12 above with respect to the first review. After consultation with the Company, the Monitor may extend the time period for issuance of the second report for a brief period of time with prior written approval of the Offices.

17.     Within one hundred twenty (120) calendar days after receiving the Monitor's second report, the Company shall adopt and implement all recommendations in the report, unless, within thirty (30) calendar days after receiving the report, the Company notifies in

writing the Monitor, and the Offices concerning any recommendations that the Company considers unduly burdensome, inconsistent with applicable law or regulation, impractical, excessively expensive, or otherwise inadvisable. With respect to any such recommendation, the Company need not adopt that recommendation within the one hundred twenty (120) calendar days of receiving the report but shall propose in writing to the Monitor, and the Offices an alternative policy, procedure, or system designed to achieve the same objective or purpose. As to any recommendation on which the Company and the Monitor do not agree, such parties shall attempt in good faith to reach an agreement within thirty (30) calendar days after the Company serves the written notice.

18.     In the event the Company and the Monitor are unable to agree on an acceptable alternative proposal, the Company shall promptly consult with the Offices. The Offices may consider the Monitor's recommendation and the Company's reasons for not adopting the recommendation in determining whether the Company has fully complied with its obligations under the Agreement. Pending such determination by the Offices, the Company shall not be required to implement any contested recommendation(s). With respect to any recommendation that the Monitor determines cannot reasonably be implemented within one hundred twenty (120) calendar days after receiving the report, the Monitor may extend the time period for implementation with prior written approval of the Offices.

19.     The Monitor shall undertake a second follow-up ("third") review not later than one hundred fifty (150) days after the issuance of the second report. The Monitor shall issue a third report within one hundred and twenty (120) days of commencing the review, and recommendations shall follow the same procedures described in Paragraphs 16 through 18 above. Following the third review, the Monitor shall certify whether the Defendant's

Compliance Programs, including its policies and procedures, are reasonably designed and implemented to prevent and detect violations of laws prohibiting money laundering, laws requiring anti-money laundering programs, and laws prohibiting violations of U.S. sanctions. The final review and report shall be completed and delivered to the Offices no later than thirty (30) days before the end of the Term. If, by the third review, the Monitor assesses that the Company's Compliance Programs are not reasonably designed and implemented to prevent and detect violations of laws prohibiting money laundering, laws requiring anti-money laundering programs, and laws prohibiting violations of U.S. sanctions, the Offices may, in their sole discretion, declare a breach or extension of the Agreement or the Monitorship

*Monitor's Discovery of Potential or Actual Misconduct*

20.     Except as set forth below in sub-paragraphs (b), (c) and (d),

     a.     Should the Monitor discover "Potential Misconduct" during the course of his or her engagement, which means a high likelihood that:

       i.   An individual who has been convicted of a crime related to the conduct set forth in the Statement of Facts in Attachment A to the Agreement has participated, directly or indirectly, formally or informally, in managing or operating the business of the Company;

       ii.  The Company or its personnel have selectively enforced know-your-customer and customer due diligence policies and procedures;

       iii. The Company or its personnel have willfully failed to implement an effective anti-money laundering program;

       iv.  Specific violations of money laundering, anti-money laundering, and U.S. sanctions laws—post-dating or not disclosed in the Agreement—may have occurred or may be ongoing;

D-10

v. The Company is doing business with or permits customers to conduct transactions with designated persons, entities, groups, industries, regions, and countries targeted by U.S. sanctions laws;

vi. The Company is knowingly permitting customer accounts to conduct unlawful activity including to transact with proceeds of unlawful activity or hold property blocked under U.S. sanctions laws.;

vii. The Company's technological controls to prevent circumvention of the Compliance Programs, described in Paragraph 7 of Attachment C, may be ineffective;

viii. Real-time transaction and account monitoring may be ineffective;

ix. The Company may have maintained false books, records or accounts; or

x. The Company has intentionally withheld relevant information from law enforcement or regulators,

the Monitor shall immediately report the Potential Misconduct to the Binance Chief Compliance Officer for further action, unless the Potential Misconduct was already so disclosed. The Monitor also may report Potential Misconduct to the Offices at any time and shall report Potential Misconduct to the Offices when the Offices requests the information.

b. In some instances, the Monitor should immediately report Potential Misconduct directly to the Offices and not to the Company. The presence of any of the following factors militates in favor of reporting Potential Misconduct directly to the Offices and not to the Company, namely, where—in the Monitor's good faith assessment—the Potential Misconduct: (1) poses a risk to U.S. national security, public health or safety, or the environment; (2) involves

senior management of the Company; (3) involves obstruction of justice; or (4) otherwise poses a substantial risk of harm.

      c.    If the Monitor believes that any Potential Misconduct or other misconduct has occurred that may constitute a criminal or regulatory violation ("Actual Misconduct"), the Monitor shall immediately report the Actual Misconduct to the Offices. When the Monitor discovers Actual Misconduct, the Monitor shall disclose the Actual Misconduct solely to the Offices, and, in such cases, disclosure of the Actual Misconduct to the Binance Chief Compliance Officer should occur as the Offices and the Monitor deem appropriate under the circumstances.

      d.    The Monitor shall address in his or her reports the appropriateness of the Company's response to disclosed Potential Misconduct or Actual Misconduct, whether previously disclosed to the Offices or not. Further, if the Company or any entity or person working directly or indirectly for or on behalf of the Company withholds information necessary for the performance of the Monitor's responsibilities and the Monitor believes that such withholding is without just cause, the Monitor shall also immediately disclose that fact to the Offices and address the Company's failure to disclose the necessary information in his or her reports.

21.    Neither the Company, nor anyone acting on its behalf, shall take any action to retaliate against the Monitor for any such disclosures or for any other reason.

*Meetings During Pendency of Monitorship*

22.    The Monitor shall meet with the Offices within thirty (30) calendar days after providing each report to the Offices to discuss the report, to be followed by a meeting among the Offices, the Monitor, and the Company.

23.    At least annually, and more frequently if the Offices deem it appropriate, representatives from the Company and the Offices will meet to discuss the Monitor and any

suggestions, comments, or improvements the Company may wish to discuss with or propose to the Offices, including with respect to the scope or costs of the Monitor.

*Contemplated Confidentiality of Monitor's Reports*

24.     The reports will likely include proprietary, financial, confidential, and competitive business information. Moreover, public disclosure of the reports could discourage cooperation, or impede pending or potential government investigations and thus undermine the objectives of the Monitorship. For these reasons, among others, the reports and the contents thereof are intended to remain and shall remain non-public, except as otherwise agreed to by the parties in writing, or except to the extent the Offices determine in their sole discretion that disclosure would be in furtherance of the Offices' discharge of their respective duties and responsibilities or is otherwise required by law.

**ATTACHMENT E**
**<u>CERTIFICATION</u>**

To:     United States Department of Justice
        Criminal Division, Money Laundering and Asset Recovery Section
        Attention:  Chief, Bank Integrity Unit

        United States Department of Justice
        National Security Division, Counterintelligence & Export Control Section
        Attention:  Chief Counsel and Deputy Chief Counsel for Corporate Enforcement

        United States Attorney's Office
        Western District of Washington
        Attention:  Chief, Cybercrimes Unit

Re:     Plea Agreement Disclosure Certification

The undersigned certify, pursuant to Paragraph 26 of the Plea Agreement ("Agreement")

filed on November 20, 2023 in the United States District Court for the Western District of

Washington, by and between the United States Department of Justice, Criminal Division, Money

Laundering and Asset Recovery Section ("MLARS"); National Security Division,

Counterintelligence and Export Control Section ("CES"); and the United States Attorney's Office

for the Western District of Washington ("the USAO-WDWA") (collectively the "Offices") and

Binance Holdings Limited (the "Company"), that undersigned are aware of the Company's

disclosure obligations under Paragraph 26 of the Agreement and that, to the best of the

undersigneds' knowledge and belief (including belief based on representations from others), the

Company has complied with its disclosure obligations, as described in Paragraph 26 of the

Agreement, which includes disclosure of evidence or allegations that may constitute a violation of

federal money laundering laws, federal laws governing money transmitting businesses, the Bank

Secrecy Act or other anti-money laundering laws, or U.S. sanctions laws ("Disclosable

Information"). This obligation to disclose information extends to any and all Disclosable

Information that has been identified through the Company's anti-money laundering compliance program, sanctions compliance program, whistleblower channel, internal audit reports, due diligence procedures, investigation process, or other processes. The undersigned further acknowledge and agree that the reporting requirement contained in Paragraph 26 and the representations contained in this Certification constitute a significant and important component of the Agreement and the Offices' determination of whether the Company has satisfied its obligations under the Agreement.

The undersigned hereby certify that they are respectively the Chief Executive Officer of the Company and Chief Compliance Officer of the Company or otherwise an executive officer substantively responsible for the Company's operations and that each has been duly authorized by the Company to sign this Certification on behalf of the Company.

This Certification shall constitute a material statement and representation by the undersigned and by, on behalf of, and for the benefit of, the Company to the executive branch of the United States for purposes of 18 U.S.C. § 1001, and such material statement and representation shall be deemed to have been made in the Western District of Washington. This Certification shall also constitute a record, document, or tangible object in connection with a matter within the jurisdiction of a department and agency of the United States for purposes of 18 U.S.C. § 1519, and such record, document, or tangible object shall be deemed to have been made in the Western District of Washington.

By: _____       Dated: _____
       Chief Executive Officer
       Binance Holdings Limited


       _____
       Signature


By: _____       Dated: _____
       Chief Compliance Officer
       Binance Holdings Limited


       _____
       Signature

**ATTACHMENT F**
<u>**CERTIFICATION**</u>

To:     United States Department of Justice
        Criminal Division, Money Laundering and Asset Recovery Section
        Attention:  Chief, Bank Integrity Unit

        United States Department of Justice
        National Security Division, Counterintelligence & Export Control Section
        Attention:  Chief Counsel and Deputy Chief Counsel for Corporate Enforcement

        United States Attorney's Office
        Western District of Washington
        Attention:  Chief, Cybercrimes Unit

Re:     Plea Agreement Compliance Certification

        The undersigned certify, pursuant to Paragraphs 27 and 28 of the Plea Agreement

("Agreement") filed on November 20, 2023 in the United States District Court for the Western

District of Washington, by and between the United States Department of Justice, Criminal

Division, Money Laundering and Asset Recovery Section ("MLARS"); National Security

Division, Counterintelligence and Export Control Section ("CES"); and the United States

Attorney's Office for the Western District of Washington ("the USAO-WDWA") (collectively the

"Offices") and Binance Holdings Limited (the "Company"), that the undersigned are aware of the

Company's compliance obligations under Paragraphs 27 and 28 and Attachment C of the

Agreement and that, based on the undersigned's review and understanding of the Company's

compliance programs, including its anti-money laundering compliance program and sanctions

compliance program, the Company has implemented compliance programs that meet the

requirements set forth in Attachment C to the Agreement. The undersigned certify that the

Company's compliance programs are reasonably and effectively designed to detect and prevent

violations of money laundering, anti-money laundering, and U.S. sanctions laws throughout the Company's operations.

The undersigned hereby certify, if applicable, that, based on a review of the Company's reports submitted to the Offices, the reports were true, accurate, and complete as of the day they were submitted.

The undersigned hereby certify that they are respectively the Chief Executive Officer of the Company and Chief Compliance Officer of the Company and each has been duly authorized by the Company to sign this Certification on behalf of the Company.

This Certification shall constitute a material statement and representation by the undersigned and by, on behalf of, and for the benefit of, the Company to the executive branch of the United States for purposes of 18 U.S.C. § 1001, and such material statement and representation shall be deemed to have been made in the Western District of Washington. This Certification shall also constitute a record, document, or tangible object in connection with a matter within the jurisdiction of a department and agency of the United States for purposes of 18 U.S.C. § 1519, and such record, document, or tangible object shall be deemed to have been made in the Western District of Washington.

By: _____     Dated: _____
    Chief Executive Officer
    Binance Holdings Limited


_____
Signature

By: _____    Dated: _____
     Chief Compliance Officer
     Binance Holdings Limited


    _____
    Signature

1                                             The Honorable Richard A. Jones

2

3

4

5

6

7                UNITED STATES DISTRICT COURT FOR THE

8                   WESTERN DISTRICT OF WASHINGTON

9                         AT SEATTLE

10  UNITED STATES OF AMERICA,       NO. CR23-178RAJ

11              Plaintiff,

12                 v.          [PROPOSED]

13  BINANCE HOLDINGS LIMITED, d/b/a   **ORDER OF FORFEITURE**
      BINANCE.COM,

14

15              Defendant.

16

17      THIS MATTER comes before the Court on the United States' and Defendant

18  Binance Holdings Limited's Stipulated Motion for Order of Forfeiture (the "Stipulated

19  Motion"), in which the parties jointly moved for an Order of Forfeiture forfeiting, to the

20  United States, the Defendant's interest in a sum of money (also referred to as the "Money

21  Judgment") in an amount totaling $2,510,650,558.

22      The Court, having reviewed the Stipulated Motion, as well as the other papers and

23  pleadings filed in this matter, hereby FINDS entry of an Order of Forfeiture is

24  appropriate because:

25        •   The Defendant has pleaded guilty to Conspiracy to Conduct an Unlicensed

26            Money Transmitting Business ("MTB") and to Fail to Maintain an

27            Effective Anti-Money Laundering ("AML") Program, in violation of

Order of Forfeiture - 1
*United States v. Binance Holdings Limited,* CR23-178RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Title 18, United States Code, Section 371 (Count 1); Conducting an Unlicensed MTB, in violation of Title 18, United States Code, Sections 1960(a), 1960(b)(1)(B), and 2 (Count 2); and Violation of the International Emergency Economic Powers Act ("IEEPA"), in violation of Title 50, United States Code, Section 1705, and Title 31, Code of Federal Regulations, Part 560 *et seq.* (Count 3).

- Pursuant to Title 18, United States Code, Section 981(a)(1)(C), by way of Title 28, United States Code, Section 2461(c), any property, real or personal, constituting, or derived from, proceeds traceable to the offense of Conspiracy to Conduct an Unlicensed MTB and to Fail to Maintain an Effective AML Program, in violation of Title 18, United States Code, Section 371, is forfeitable to the United States.

- Pursuant to Title 18, United States Code, Section 982(a)(1), any property, real or personal, involved in the offense of Conducting an Unlicensed MTB, in violation of Title 18, United States Code, Sections 1960(a), 1960(b)(1)(B), and 2, is forfeitable to the United States.

- Pursuant to Title 18, United States Code, Section 981(a)(1)(C), by way of Title 28, United States Code, Section 2461(c), any property, real or personal, constituting, or derived from, proceeds traceable to the offense of Violation of IEEPA, in violation of Title 50, United States Code, Section 1705, and Title 31, Code of Federal Regulations, Part 560 *et seq.*, is forfeitable to the United States.

- The Information and the stipulated Statement of Facts recite the factual basis for forfeiting the property involved in the offense of Conducting an Unlicensed MTB. *See* Information; Statement of Facts.

Order of Forfeiture - 2
*United States v. Binance Holdings Limited,* CR23-178RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

- The Information and the stipulated Statement of Facts recite the factual basis for forfeiting the proceeds traceable to the offense of Violation of IEEPA. *See* Information; Statement of Facts.

- In the Plea Agreement it entered on November 21, 2023, the Defendant admitted, agreed, and stipulated that all the facts set forth in the Information and in the stipulated Statement of Facts were true and correct. *See* Plea Agreement ¶11.

- The sum of money in the amount of $1,612,031,763 is forfeitable pursuant to Title 18, United States Code, Section 982(a)(1), as it reflects the profits the Defendant obtained from its commission of Conducting an Unlicensed MTB (Count 2), to which it entered a guilty plea.

- The sum of money in the amount of $898,618,825 is forfeitable pursuant to Title 18, United States Code, Section 981(a)(1)(C), by way of Title 28, United States Code, Section 2461(c), as it reflects the proceeds the Defendant obtained from its commission of Violation of IEEPA (Count 3), to which it entered a guilty plea.

- The total of the sums of money forfeitable on Counts 2 and 3 is $2,510,650,558, and as such that is the total amount of the Money Judgment.

- Pursuant to Federal Rule of Criminal Procedure ("Fed. R. Crim. P.") 32.2(c)(1), no third-party ancillary process is required before entering it.

NOW, THEREFORE, THE COURT ORDERS:

1) Pursuant to 18 U.S.C. § 982(a)(1) (as to Count 2), 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c) (as to Count 3), and the Plea Agreement, the Court enters a money judgment in the amount of $2,510,650,558 against the Defendant;

Order of Forfeiture - 3
*United States v. Binance Holdings Limited,* CR23-178RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

2)      Pursuant to the above-referenced authority and the Defendant's Plea Agreement, the Defendant shall pay the Money Judgment in full pursuant to the payment terms, and the Defendant's failure to do so would constitute a breach of the Plea Agreement, notwithstanding entry of the instant Order, *See* Plea Agreement ¶ 19;

3)      Pursuant to Fed. R. Crim. P. 32.2(b)(4), this Order will become final as to the Defendant at the time of its entry by the Court; it will be made part of the sentence; and it will be included in the judgment;

4)      Pursuant to Fed. R. Crim. P. 32.2(e), in order to satisfy this Order forfeiting the sum of money, in whole or in part, the United States may move to amend this Order at any time, to include substitute property having a value not to exceed $2,510,650,558;

5)      Forfeiture of the sum of money is separate and distinct from the satisfaction of any fine, restitution, cost of imprisonment, or any other penalty the Court may impose upon the Defendant in addition to forfeiture; and

6)      The Court will retain jurisdiction in this case for the purpose of enforcing this Order, as necessary.

IT IS SO ORDERED.

DATED this _____ day of _____, 2023.


_____
THE HON. RICHARD A. JONES
UNITED STATES DISTRICT JUDGE

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   Presented by:

2

3   MARGARET A. MOESER                TESSA M. GORMAN
    Acting Chief                      Acting United States Attorney
4   Money Laundering and Asset Recovery   Western District of Washington
    Section, Criminal Division        U.S. Department of Justice
5   U.S. Department of Justice

6

7   /s Kevin G. Mosley                /s Michael Dion
    Kevin G. Mosley                   Michael Dion
8   Elizabeth R. Carr                 Assistant United States Attorney
    Trial Attorneys

9

10  JENNIFER K. GELLIE
    Acting Chief
11  Counterintelligence and Export Control
    Section, National Security Division
12  U.S. Department of Justice

13

14  /s Alex Wharton
    Alex Wharton
15  Beau D. Barnes
    Trial Attorneys

16

17

18

19

20

21

22

23

24

25

26

27

Order of Forfeiture - 5
*United States v. Binance Holdings Limited*, CR23-178RAJ