O3PHSec1

```
1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   SECURITIES AND EXCHANGE
    COMMISSION
4
                    Plaintiff,
5
                 v.                        23 Civ. 1346 (JSR)
6
    TERRAFORM LABS PTE LTD., et
7   al.

8                   Defendants            Trial

9   ------------------------------x

10

11                                         New York, N.Y.
                                           March 25, 2024
12                                         9:10 a.m.

13  Before:

14                      HON. JED S. RAKOFF

15                                         District Judge
                                           -and a Jury-
16

17                      APPEARANCES

18  UNITED STATES SECURITIES AND EXCHANGE COMMISSION
            Attorneys for Plaintiff
19  By:   JAMES P. CONNOR
          DEVON STAREN
20        CARINA CUELLAR
          LAURA E. MEEHAN
21        CHRISTOPHER J. CARNEY
          ROGER LANDSMAN
22

23

24

25
```

O3PHSec1

1                          APPEARANCES (Cont'd)

2

3    DENTONS US LLP
          Attorneys for Defendant Terraform
4    BY:  LOUIS A. PELLEGRINO III
          DAVID KORNBLAU
5         MARK CALIFANO
          DOUGLAS W. HENKIN
6         MATTHEW A. LAFFERMAN

7    KAPLAN HECKER & FINK LLP
          Attorney for Defendant Kwon
8    BY:  MICHAEL FERRARA
          CHRISTOPHER MOREL
9         DAVID E. PATTON
          ANDREW CHESLEY
10        SEAN HECKER

11   Also Present:

12   Shadow Haywood, SEC Trial Assistant

13

14

15

16

17

18

19

20

21

22

23

24

25

O3PHSec1

```
 1              (Case called)
 2              MR. CONNOR:  Yes.  Good morning, your Honor.  James
 3    Connor for the Securities and Exchange Commission.
 4              THE COURT:  Good morning.
 5              MS. STAREN:  Good morning, your Honor.  Devon Staren
 6    for the Securities and Exchange Commission.
 7              THE COURT:  Good morning.
 8              MS. MEEHAN:  Laura Meehan for the Securities and
 9    Exchange Commission.
10              THE COURT:  Good morning.
11              MS. CUELLAR:  Good morning, your Honor.  Carina
12    Cuellar on behalf of the Securities and Exchange Commission.
13              THE COURT:  Good morning.
14              MR. CARNEY:  Good morning, your Honor.  Christopher
15    Carney for the SEC.
16              THE COURT:  Good morning.
17              MR. LANDSMAN:  Good morning.  Roger Landsman on behalf
18    of the Securities and Exchange Commission.
19              THE COURT:  Good morning.
20              And who is the other gentleman?
21              MR. MOREL:  Good morning, your Honor.  Christopher
22    Morel from Kaplan ──
23              THE COURT:  No, no, I'm sorry, the gentleman right
24    here.
25              MR. HAYWOOD:  Shadow Haywood on behalf of the SEC.
```

O3PHSec1

1          THE COURT:  OK.  Go ahead.

2          MR. MOREL:  Good morning, your Honor.  Christopher

3   Morel from Kaplan Hecker & Fink for defendant Do Kwon.

4          THE COURT:  Good morning.

5          MR. PATTON:  Good morning, your Honor.  David Patton

6   for Mr. Kwon from Kaplan Hecker.

7          THE COURT:  Good morning.

8          MR. FERRARA:  Michael Ferrara from Kaplan Hecker for

9   Do Kwon.  Good morning.

10         THE COURT:  Good morning.

11         MR. KORNBLAU:  David Kornblau from Dentons for

12   Terraform Labs.

13         THE COURT:  Good morning.

14         MR. CALIFANO:  Mark Califano from Dentons for

15   Terraform Labs.

16         THE COURT:  Good morning.

17         MR. PELLEGRINO:  Louis Pellegrino from Dentons.  We're

18   for joined by Terraform Labs' CEO Mr. Chris Amani.

19         THE COURT:  Good morning.

20         MR. HENKIN:  Good morning, your Honor.  Douglas Henkin

21   from Dentons for TFL.

22         THE COURT:  Good morning.

23         MR. HECKER:  Good morning, your honor.  Sean Hecker

24   for Do Kwon.

25         THE COURT:  Good morning.

O3PHSec1

1          MR. CHESLEY:  Good morning, your honor.  Andrew

2     Chesley for Do Kwon.

3          THE COURT:  Good morning.

4          All right.  So I take it no one's left at the home

5     base of the SEC or Kaplan Hecker.  Dentons, of course, has got

6     people all over the world.

7          So as soon as the jury is ready, we will select our

8     jury, but in the meantime, we'll start with other business we

9     have.  Just in terms of the jury selection, we will pick a jury

10     of nine.  Each side will have three challenges, in other words,

11     three for the SEC and three collectively for the two

12     defendants.

13          I will first question the jury for cause, and then we

14     will show ⸺ my courtroom deputy will show you the little chart

15     with the cards, and we'll do this in three rounds.  On the

16     first round, each side will turn over a card of the first

17     challenge they're making, and so forth, through the three

18     rounds.  If you waive your challenge in any round, you don't

19     lose the other two challenges unless both sides waive in a

20     round, in which case we have our jury.

21          Any question about any of that?

22          Very good.  Now, I thank you for your two volumes of

23     deposition transcripts because my internist says I should do a

24     lot of weightlifting, and this was very helpful.  But it really

25     wasn't in the form I had requested, but I will deal with it as

O3PHSec1

1    presented.

2            What you gave me, and let's take, for example, what I

3    understand is the first deposition that will be presented,

4    which is the deposition of the 30(b)(6) witness,

5    Mr. Mathialagan, now, what you gave me, tab 10 is the

6    deposition testimony that you each want.  Then you gave me the

7    errata sheet — we'll talk about that in a minute — tab 11,

8    and then you gave me tab 12, the objections.

9            So what that means is, instead of what I wanted, which

10   was the objections in the margins right next to the testimony

11   you're objecting to so that I didn't have to go back and forth,

12   I now have the added problem of having to look at each

13   objection, go back to the testimony, see what the objection is

14   to, and come back again, which took me a lot of time yesterday

15   just on that one deposition, but I will deal with what you gave

16   me, problematic though it was.

17           Because of that, the only deposition I was able to

18   deal with yesterday is this 30(b)(6) witness, but I'll get to

19   the others in the next day or two.  If someone is planning on

20   offering deposition testimony in a different order than you've

21   indicated in your pretrial consent order, let me know the

22   evening before.

23           Now, there are two broad questions presented by the

24   deposition of Mr. Mathialagan, and the first — let me turn to

25   tab 12.

O3PHSec1

1          Let me ask my courtroom deputy, any word yet as to

2   when the jury panel will be available?

3          THE LAW CLERK:  I haven't called them yet.

4          THE COURT:  Give them a call.

5          So with respect to the offers from the defense, the

6   first overall objection and response is that this is hearsay.

7   The defense points out that the witness is not available

8   because he resides in another country, and therefore, the

9   testimony is admissible under Federal Rule of Evidence

10  804(b)(1)(A) and Federal Rule of Civil Procedure 32(a)(4)(B).

11  However, no one addressed, but I'll hear from you now, the

12  question of how those rules apply, if at all, to a 30(b)(6)

13  witness.  A 30(b)(6) witness is not giving personal testimony

14  based on personal knowledge.  A 30(b)(6) witness is giving

15  testimony as to certain topics designated by the moving party,

16  in this case, the SEC.  So, for example, anything offered by

17  the defense on cross-examination of a 30(b)(6) witness arguably

18  would not be admissible despite unavailability since the

19  witness was not designated by the defense as a 30(b)(6)

20  witness, nor indeed could they.

21          However, and, again, because of the way you presented

22  this, it took me a lot longer than it should have, it looks

23  like most of what the defense is offering is in response to

24  questions put by the SEC, and therefore, it seems to me it

25  still would qualify for the hearsay exception for

O3PHSec1

1    unavailability.  You're welcome to look at the case law.  I

2    couldn't find any over the weekend while you were out sunning

3    yourself on Jones Beach.  But anyone want to be heard on that?

4              MR. CONNOR:  Your Honor, this is James Connor for the

5    SEC.  I would like to be heard on that if your Honor permits.

6              THE COURT:  OK.

7              MR. CONNOR:  The reason why the Rule 30(b)(6)

8    testimony comes in is —— it's under Rule 32(a)(3), which says

9    an adverse party may use for any purpose the deposition of a

10   corporate designee.  So the SEC is permitted to United States

11   other the deposition transcript of the 30(b)(6).

12             THE COURT:  That's right.  And, as I said, if then

13   they were offering 30(b)(6) testimony from this witness that

14   you had designated that they had put the questions on cross, I

15   agree, that would not be admissible.  But most, if not perhaps

16   all, at least a large part of what they're offering was in

17   response, answers given in response to questions that the SEC

18   put.

19             MR. CONNOR:  I think what would be fair, your Honor,

20   if they're offering anything that's for rule of completeness

21   under Rule 106, but anything that's outside of that, because

22   the only way that it comes in is if used by an adverse party.

23   They're, of course, not an adverse party.  It's their own

24   corporate designee.  As far as the unavailability, the idea

25   that a corporate designee is unavailable is a difficult concept

O3PHSec1

1    to ——

2              THE COURT:  Yes, that's another —— because presumably,

3    in theory, they can designate the janitor.  So if there's

4    anyone, clearly, on their list of witnesses, there's at least

5    one or two people who are available, so they could have

6    designated someone else.

7              MR. CONNOR:  And there's also no probative value from

8    the testimony as offered by the defendants because the witness

9    had no personal knowledge under Rule 602.

10             THE COURT:  That's why —— it's really that that is the

11   heart of why I'm raising this.  It seems to me it's the

12   functional equivalent in some ways of interrogatory answers,

13   and therefore, the unavailability seems to me to be a different

14   issue in this kind of —— in a 30(b)(6) witness.

15             MR. CONNOR:  I think the answer, your Honor, if they

16   want to put what we view to be the self-serving testimony of

17   the 30(b)(6) witness in, they can do it through percipient fact

18   witnesses.  But it's simply not appropriate and not allowed for

19   under the rules for a party to put their own 30(b)(6) testimony

20   in at trial.

21             THE COURT:  Of course, you didn't raise this, but

22   maybe you didn't have the opportunity because in the chart you

23   gave me, there were your objections and their responses, and

24   you didn't ask for rebuttal, so to speak, in that context, so I

25   don't think it's waived.

O3PHSec1

1              All right.  Let me hear from the other side.

2              MR. KORNBLAU:  Thank you, your Honor.

3              With the 30(b)(6) testimony, as your Honor pointed

4    out, we on the defense —— and I was the one who was there —— we

5    didn't ask any questions.  That's not ——

6              THE COURT:  Right, so we can exclude that.

7              MR. KORNBLAU:  There are two issues.  One is the

8    admissibility of the —— the validity of the questions, whether

9    any were objectionable on their face, that's one question, and

10   we ——

11             THE COURT:  No, no, I'm not dealing now with the more

12   technical issues about whether there were objections that

13   they've preserved to specific questions or form of questions or

14   there is also raised by you the question of completeness and

15   all like that.  Those are separate questions, but that's not

16   the narrow question I want to be addressing now.

17             MR. KORNBLAU:  So, your Honor, thank you.  I think the

18   narrow question is do the corrections come in?  And I think

19   that's what a ——

20             THE COURT:  The errata —— no, no, that's a separate

21   question.  That's the second issue I want to address in a

22   minute, which is do the corrections in your errata sheet come

23   in?

24             MR. KORNBLAU:  Exactly.

25             THE COURT:  But you designated from the actual

O3PHSec1

1    testimony.

2           MR. KORNBLAU:  No, no, we did not.

3           THE COURT:  Well, let me go back, then.  Maybe I

4    misread, then.

5           MR. KORNBLAU:  Oh, for completeness maybe we did.

6           THE COURT:  Yes.

7           MR. KORNBLAU:  You're right.  Rule of completeness,

8    you're right, your Honor, we did.  There were some rule of

9    completeness designations, and that trumps hearsay, your Honor.

10   It's just if the SEC is going to put in a statement, you need

11   to put in the whole context so the jury is not misled.

12          THE COURT:  So on the first page of Exhibit 10, there

13   it's indicated that plaintiffs have designated, what I would

14   call mango orange, various parts of the testimony, and it's

15   stated there is "no objection" to those.  Then what I've been

16   dealing with now is where there is an objection, it's

17   plaintiffs in pink and ——

18          MR. CONNOR:  Your Honor, if I could clarify, I believe

19   that the pink is the defendants' objections to our

20   designations, so yellow is no objection.

21          THE COURT:  I see.  OK.

22          MR. CONNOR:  And their chart designations are at the

23   bottom.

24          THE COURT:  All right.  So I am sorry.  I

25   misunderstood.

1          So what we have, for example —— so there was nothing

2   designated by the defense other than from the errata sheet?

3          MR. CONNOR:  The errata sheet, that's correct.

4          MR. KORNBLAU:  I think that's correct, your Honor.

5          THE COURT:  My misunderstanding.  Thank you for

6   clarifying.

7          But now let's look at that, because it's still the

8   same issue.  So, for example, on page —— beginning on the

9   bottom of page 141 of the transcript of the testimony:

10  "Q.  Is it your testimony that merchants accepted payments on

11  the term 'blockchain'?

12  "A.  I would need to review the terms and conditions that was

13  presented to the merchant in terms of what was returning there.

14  "Q.  So sitting here today, you cannot tell me whether

15  merchants accepted payments on the Terra blockchain?

16  "A.  Without looking at terms and conditions, I'm not able to

17  give you a clear answer whether that specific language was

18  included or not, whether the merchant accepted payment on the

19  Terra blockchain."

20          And then an Exhibit 10 was marked for identification.

21  "Q.  You were being handed what is marked Exhibit 10."

22          I don't think, by the way, I was furnished with

23  Exhibit 10, but I may be wrong.

24  "Do you recognize Exhibit 10?

25  "A.  Yes.

O3PHSec1

1    "Q.  OK.  What is it?

2    "A.  It's a Medium blog post.

3    "Q.  OK.  Who posted this Medium blog?

4    "A.  Based on three out of five, it says here return here by

5    Terra," etc., etc.

6              This goes on through page 161.

7              So then tab 12, there are various objections, such as

8    inadequate notice of topic, completeness.  The completeness is

9    "failure to include correction on errata sheet, inadequate

10   notice of topic," etc.  Then we get to what here is designated

11   on page 5 of your submission as defendants'

12   counter-designation, and numerous pages are listed, although I

13   now see that they all are "as corrected on errata sheet."  So,

14   really, I was misled when you said defendants'

15   counter-designation and gave me pages.  They really are all

16   relating to the errata sheet.

17             And part of the plaintiff's objection is hearsay, not

18   offered for completeness, and errata sheet should be stricken.

19   Response is witness is not available to appear live for

20   testimony at trial, as he resides in another country.

21   Therefore, testimony is admissible per the two rules I

22   mentioned previously.  Then "there is no basis for the

23   assertion that this testimony is not offered for completeness

24   under Federal Rule of Evidence 106," and they go on to say why

25   they think that's fair.  And there is similar objections made

O3PHSec1

1    to the other "defendants' counter-designations."

2            So now that we've clarified the otherwise absurdly

3    confusing presentation that I received from the parties on this

4    score, I think we're down to the two questions that I mentioned

5    earlier:  (1) putting aside unavailability for a moment, does

6    an errata sheet come in, and (2) does the unavailability

7    exception apply to a 30(b)(6) witness?

8            And I think that, since an errata sheet is the

9    functional equivalent of the defendants putting the question to

10   the witness, "You want to clarify your answer, sir?  Answer:

11   Yes," but it's done in a written form, there also still remains

12   the question of whether defendants' designation is admissible

13   for a 30(b)(6) witness.  So taking those issues again, if it

14   were not for the 30(b)(6) issues, I think the *Podell* case does

15   indicate that errata sheet corrections otherwise come in.

16           Does the SEC disagree with that?

17           MR. CONNOR:  No, your Honor, that's correct.

18           THE COURT:  OK.  So we're really back to the 30(b)(6)

19   issue.  So now that we've clarified what the exact situation is

20   with respect to the deposition, anything either counsel wanted

21   to say further on that?

22           MR. CONNOR:  Yes, your Honor.  For the SEC, the reason

23   why the errata sheet should be stricken is, under Rule 30,

24   before a deposition closes, you're required to request the

25   ability to review and sign.  We cited the case law in our

O3PHSec1

1    motion *in limine* that when parties don't do that, they waive

2    the ability to submit an errata, and that's what happened here.

3    Counsel for Terraform Labs did not request the opportunity to

4    review and sign.  Therefore, under the two cases we cited in

5    our briefing, they waive that right, and therefore, the errata

6    sheet should be stricken.

7         MR. KORNBLAU:  Your Honor, under Rule 30(e), the

8    witness and the defense can request errata at any time until

9    the deposition is completed.  At the end of the deposition, the

10   SEC explicitly said we're holding this open.  So it was about

11   maybe two days later where we said we want to put in the

12   corrections.  So the deposition was still open.  So Rule 30(e)

13   was complied with.

14        I think this question about the errata sheet, frankly,

15   is a straightforward question under Rule 30(e).  It's a

16   deposition.  Corrections were submitted within the appropriate

17   time.  They were signed.  I think that ——

18        THE COURT:  So an adverse party designates someone as

19   a 30(b)(6) witness, and in my hypo —— this is not the facts

20   here, but just to illustrate the issue —— the witness says

21   that, in his deposition testimony, when we reported in our

22   financial disclosure to the SEC that we made a billion dollars

23   last year, as the 30(b)(6) witness, I have carefully reviewed

24   the records, and there is no basis whatsoever in the records of

25   the company to justify that statement.  Then, in the errata

O3PHSec1

1    sheet, the witness says:  On further checking, I now find that

2    there is ample evidence to support that billion-dollar figure.

3    I have done a more thorough search.

4          And then, assuming for the sake of argument, that that

5    testimony would come in under — that errata would come in

6    under *Podell*, but the SEC could then call the witness at trial

7    and cross-examine him about that correction, which they had no

8    opportunity to inquire about at the time of the deposition

9    because it was offered afterwards, but now you're saying that

10   the — that statement purportedly made on behalf of the company

11   by a 30(b)(6) witness comes in anyway, even though the witness

12   is unavailable and therefore not subject to any

13   cross-examination on that 180-degree change.  Is that your

14   position?

15         MR. KORNBLAU:  Well, your Honor, the SEC could have

16   sought to continue the deposition upon receipt of the

17   correction.  So I think there was an opportunity to

18   cross-examine.  They did not make that request.  But I think

19   the answer is yes, the answers come in, and then the jury gets

20   to decide.

21         And what's also important here, and the reason why

22   your hypothetical — it is a hypothetical, it's not this case

23   — what this is really about, your Honor, here is the SEC for

24   this 30(b)(6) notice served the list of topics as required by

25   the rule.  It was 29 topics covering the entire case for over

O3PHSec1

1    ── for about six years.

2            THE COURT:  Did you object to that?

3            MR. KORNBLAU:  Well, we asked them if they would

4    narrow it.  They said no.

5            THE COURT:  You could have come to me, of course.

6            MR. KORNBLAU:  I beg your pardon?

7            THE COURT:  You could have come to the Court.

8            MR. KORNBLAU:  We could have, you're correct, but we

9    tried to work through it.  Then before the deposition they gave

10   us two or maybe three exhibits.  They said we may ask about

11   these.  And then at the deposition, they asked him about very

12   specific communications on a certain day within this six-year

13   period, and he was surprised by them, even though he spent

14   hours and hours preparing on all these 29 topics.

15           So he's taken by surprise.  He did the best he could,

16   and then he went back and checked it out and had to make

17   corrections.  So that's what you're seeing in that errata sheet

18   correction process.  It all flows from this notice issue, which

19   we briefed in the motion *in limine*.  The whole thing was really

20   unfair to this witness, but he did the best he could, and then

21   he had to make some corrections after the fact and complied

22   with Rule 30(e).

23           THE COURT:  Let me ask the SEC counsel, if you thought

24   any of these changes were material and needed to be

25   cross-examined, why didn't you ask to renew the deposition

O3PHSec1

1    when, in fact, you had stated that it was still open?

2         MR. CONNOR:  Yes, your Honor.  The reason why we said

3    it was open was because of the unpreparedness of the witness.

4    But the reason we did not is because defense counsel delayed in

5    submitting the errata sheet until after discovery was already

6    closed, and so at that point ——

7         THE COURT:  No, the parties in this case asked for

8    various discovery after discovery had closed, and by and large,

9    I granted that.

10        MR. CONNOR:  Yes, your Honor.  And we did not seek

11   another discovery extension request.  We believed that the

12   testimony from the witness was very clear in the 30(b)(6).  And

13   I think, even if the errata would come in, it's not as if the

14   testimony goes away.  The testimony is still there, and that

15   should still absolutely be presented to the jury.

16        The reason why the errata sheet should be stricken ——

17   it's allowed for, as your Honor noted, but the reason why it

18   should be stricken in this case is just the untimely nature of

19   it, and that's what we point out in our motion *in limine*.  But,

20   at a minimum, the actual testimony comes in.  It's just the

21   jury can see —— if the errata comes in, they can also see the

22   errata, but the video testimony of that 30(b)(6) is played.

23        THE COURT:  All right.  Well, I want to think about

24   the 30(b)(6) issue that was raised, but putting that ——

25   assuming I'm not persuaded that that is a reason to keep out

O3PHSec1

1    the errata sheet, I agree that, subject to the other

2    objections, which I'll have to go through in more minute

3    detail, the testimony objected to would come in with the errata

4    sheet also coming into evidence.

5         Now, assuming we wind up in that situation, how do you

6    propose to present that to the jury?  Are we just going to play

7    the testimony and then offer the corrections or errata?  That

8    will be, I think, very confusing to the jury.

9         MR. CONNOR:  I think the way we would propose to do it

10   is we have cued up the clips from the 30(b)(6) that we would

11   offer, and that's the appropriate testimony that we believe

12   should be presented to the jury.  And then if defense counsel

13   can read in —— if the Court finds that the errata sheet is

14   admissible, the defense counsel can read in those portions of

15   the revised testimony, and then the jury can assess which is ——

16   which should be given credibility.

17        THE COURT:  The problem I'm foreseeing —— let me take

18   a look again at the errata sheet.  I thought it was here in

19   these tabs.  I know I've seen it somewhere.

20        My recollection, correct me if I'm wrong, is it's

21   geared to line number and page and line, yes?

22        MR. KORNBLAU:  Yes, your Honor.  We think it would be

23   much more efficient for the —— and understandable for the jury

24   if the SEC played the portion that they want to play, we stop,

25   we read the correction, they move on to the next part, and we

O3PHSec1

1    just get it done.

2              THE COURT:  Yes, I think that is right.  The jury, of

3    course, will have to be told that the correction is being

4    offered by the defense so they don't think it's the SEC who's

5    offering it, but I think otherwise it would be almost

6    impossible for them to follow the errata sheet.

7              Any problem with that?

8              MR. CONNOR:  No, your Honor.

9              THE COURT:  All right.  But I will still rule on the

10   more specific objections that have been made.  Probably get

11   that to you tomorrow.

12             Now, on the motions *in limine*, there are many of them,

13   we'll get to that in a minute.  We probably won't finish all of

14   them before we select the jury, but we'll do the rest after we

15   select the jury but before we start the testimony, so you'll

16   know the results before you start the testimony.

17             But just going ahead to opening statements, a

18   half-hour per side.  Who's giving the opening statement for the

19   SEC?

20             MS. STAREN:  That would be me, your Honor, Devon

21   Staren.

22             THE COURT:  Who's giving the opening statement for the

23   defendants, or how are you splitting if you are splitting it?

24             MR. PATTON:  Your Honor, I'll be giving the opening

25   statement for Mr. Kwon.

O3PHSec1

1          MR. PELLEGRINO:  And I'll be giving it for Terraform,

2     your Honor.

3          THE COURT:  How much of the half-hour do you want and

4     how much does he want?

5          MR. PELLEGRINO:  I think we are going to do about 15

6     and 15, roughly.

7          THE COURT:  That makes sense.

8          The reason I in this and every other trial put a limit

9     of 30 minutes on opening statements is I know, from talking to

10    jurors after trials, there's only so much they can absorb from

11    opening statements.  There are complexities in this case that

12    you will, of course, deal with through various testimony, and

13    I'm going to give a preliminary statement to the jury, which

14    we'll talk about in one minute, even before the beginning of

15    opening statements to help give them some context.  But, again,

16    they're not going to be able to remember any great amount of

17    detail from opening statements, and that's why, by restricting

18    you to a half-hour, it forces you to focus on what is the

19    critical items that you want to convey on an opening statement.

20         Let's take a look at preliminary statement.  While

21    we're getting my copy, in terms of objections during trial, I

22    am, of course, the soul of good humor.  The only way you can

23    possibly get me mad is by making a speaking objection in front

24    of the jury.  So if you have an objection, you say, at most,

25    three words.  The first word is "objection."  Second word is

O3PHSec1

1    either like "hearsay" or "Rule 403."  I guess I'll expand it to

2    three words.  You can say "lack of foundation," and that's it.

3    If, for some reason, you have an objection that you think is

4    particularly complicated or somehow has not been obvious to the

5    Court, you can request a sidebar.  And I will initially grant

6    sidebars when requested, but if I find you're abusing that

7    privilege, I'll stop allowing that.  So that's the story on

8    objections.

9         OK.  Here we go.  So I sent you this morning the

10   revised preliminary instruction.  Any objections to that from

11   the SEC?

12        MR. PELLEGRINO:  Your Honor, if I may, if we could

13   just return to the objection point.  Because we have two people

14   at the back, two parties at the back table, may we stipulate

15   that one objection by either defense party would count for both

16   so that we're not all objecting?

17        THE COURT:  That's fine.

18        MR. PELLEGRINO:  Thank you, your Honor.

19        THE COURT:  And there will be situations where, let's

20   say, I admit testimony on the grounds that it's a coconspirator

21   statement made in furtherance of the conspiracy, and there's

22   then ten minutes of testimony.  You can say, May we have a

23   continuing objection? and that will be granted.

24        MR. PELLEGRINO:  Thank you, your Honor.

25        THE COURT:  Any objections from the SEC to the

O3PHSec1

1  preliminary instructions?

2            MS. CUELLAR:  No, your Honor.

3            THE COURT:  From the defense?

4            MR. PATTON:  No, your Honor.

5            THE COURT:  And the codefendant?

6            MR. PELLEGRINO:  No, your Honor.

7            THE COURT:  OK.  Very good.

8            MR. CALIFANO:  Excuse me, your Honor.

9            MR. PELLEGRINO:  I'm sorry.

10            MR. CALIFANO:  My apologies.  There is one small

11  correction.  If Mr. Connor would just take a look.  In the

12  first, second, third — fourth paragraph, your Honor, the

13  preliminary instruction has a statement that just says that in

14  the second scheme, the SEC alleges that defendants falsely

15  represented to Terraform investors that one of Terraform's

16  products call UST was designed in such a way that its market

17  value would never fall below a dollar when it is, in fact, not

18  true.

19            The actual allegation that the SEC has is that it

20  actually, by the function of the algorithm, does fall above and

21  below by design, but the SEC's — and I want to respect the

22  SEC's position on this — is that it naturally corrected, and

23  that was the false statement.

24            THE COURT:  So you want that to say it was designed in

25  such a way that its market value would always naturally correct

O3PHSec1

1    to $1.  Is that what you want to say?

2            MR. CALIFANO:  If the SEC is satisfied with that, we'd

3    be satisfied with that.

4            THE COURT:  All right.  Hold on.

5            MR. CALIFANO:  I would just say "designed," your

6    Honor, instead of "always."

7            THE COURT:  Well, I think the allegation is always.

8            So it would read "It was designed in such a way that

9    its market value would always automatically correct to $1."

10            MR. CALIFANO:  I think if the SEC's OK with that, we'd

11    rather not have "always," but, your Honor, that's your

12    discretion.

13            MR. CONNOR:  And yes, your Honor, we are OK with that.

14            THE COURT:  All right.  I'll make that correction.

15    Let me hand it to my law clerk.

16            All right.  Now, I will tell the jury early on that

17    the individual defendant — how does he want his name

18    pronounced?

19            MR. FERRARA:  It's, I believe, Do Kwon, your Honor.

20            THE COURT:  There's that other name.

21            MR. FERRARA:  I think Do Kwon is sufficient.

22            THE COURT:  Do Kwon is sufficient.  Great.

23            And I will tell the jury that he's abroad and

24    unavailable, period.  I will, if the defense wants, tell them

25    "and you should not draw any adverse inference from him not

O3PHSec1

```
1    being here," but do you really want that?  I think it just

2    invites the jury to speculate about why he's not here, but I'll

3    do it if you want me to.

4            MR. PATTON:  Your Honor, we would ask that the

5    Court ——

6            THE COURT:  Pardon me?

7            MR. PATTON:  We would ask that the Court give that

8    instruction.

9            THE COURT:  All right.

10           MR. CONNOR:  Your Honor, if we could be heard on that.

11   That is the subject of one of the motions in limine.

12           THE COURT:  Oh, that's right.  OK.  Let me hold off on

13   that until I get to the motions.  I forgot that.  But anyway,

14   at a minimum, I'm going to tell them that he's abroad and

15   unavailable.  We'll get to what else in a second.

16           Let's turn to the motions in limine.  So we'll start

17   with the defendants' motion in limine No. 1.

18           Now, let me say at the outset of our discussion of

19   motions in limine, motions in limine are a judicial invention

20   for the benefit of the Court and the parties.  You will not

21   find anywhere in the Federal Rules of Civil Procedure any

22   reference to motions in limine.  And, of course, it's helpful

23   if I can decide matters in advance of their being offered in

24   evidence to avoid delay and possible prejudice.  But many,

25   many, many times I've found that motions in limine in many
```

O3PHSec1

1    cases cannot be decided until I hear the actual proffer, and

2    I'll indicate that as we go through some of these.

3            In addition, if I exclude certain testimony or

4    evidence and the door is then opened by the other side, nothing

5    in my ruling on the motion *in limine* prevents the evidence from

6    then being reoffered.  So, for example, the first motion is to

7    exclude evidence of the May 2022 "depeg."

8            I want to remind counsel, for purposes of opening

9    statements and everything else, that the terms that you're now

10   so familiar with are completely unfamiliar to the jury.

11   They've never heard the term "depeg," and it won't do you much

12   good to define it once and then just use it all the time.

13   You've got to, at least initially, say what is meant by various

14   terms.  Most of them will have never heard the term

15   "blockchain."  Probably many of them will never have heard the

16   term "cryptocurrency."  You keep using those terms without

17   telling the jury, reminding the jury what those terms mean,

18   it's going to lead to confusion.  Now, eventually, they'll

19   become familiar with it, and then you can stop doing that, but

20   otherwise it's not helpful.  I mention that because if you fail

21   to follow my instruction, I will interrupt you and say:  Ladies

22   and gentlemen, you will remember that what is meant by depeg is

23   such and such.

24           So, anyway, the motion to exclude evidence of the

25   May 2022 depeg is granted, looks to me, largely on consent with

O3PHSec1

1    one caveat that I'll get to in a second.  But this is a good

2    example of, for example, if there's a victim on the stand and

3    the defense —— I'm sure they won't say this —— says:  And you

4    didn't lose any money, did you?  Then, of course, the door is

5    open for if they lost money at any time.  So all my motion *in*

6    *limine* rulings are predicated on the door not being opened.

7            Now, as I ——

8            MS. MEEHAN:  Your Honor, may the SEC be heard on that

9    motion *in limine*?

10           THE COURT:  Well, my understanding is, forgive me if

11   I'm wrong, your motion *in limine* No. 3 moved to exclude

12   evidence of the cause of the 2022 depeg.  And the one issue I

13   was going to get to was the one place you wanted to get in was

14   you say that you want to present testimony from investors

15   regarding the materiality of defendants' false and misleading

16   statements —— that is fine —— and "the effect that those

17   misstatements and omissions had on investors' decisions to make

18   their investment."  That's fine.

19           But you then go on to say:  "The fact of the May 2022

20   crash and the resulting loss of nearly $40 billion is relevant

21   because 'if the investing public had known that Terraform's

22   algorithm could not withstand the May 2021 events, they would

23   not have trusted it with their funds in the amounts they did

24   leading to an increase in Luna's price.'"  But I don't see why

25   that opens the door to the actual May 2022 depeg which you

O3PHSec1

concede had many causes.

MS. MEEHAN:  Your Honor, if I could just address a couple things.  So the first issue is that with respect to the fact of the May 2022 depeg, we do have one investor who will testify that he made purchases and sales during these events, and it was directly tied to his understanding that the algorithm worked and was stable.  So we do intend to elicit that testimony from that investor that he was panic buying and selling during the course of these events when Luna and UST were crashing in May 2022 because it was tied directly to his belief, which was — it was not ever disclosed to him that the algorithm didn't work and it was not stable and required third-party intervention.  So that's one issue that we wanted to make sure that your Honor was aware.

Then with respect to our motion *in limine*, the SEC's motion *in limine* No. 3, which asked the Court to preclude evidence relating to the cause of the May 2022 depeg, the defendants have put forth voluminous, voluminous exhibits, and they're intending to offer voluminous testimony discussing in depth the market factors that led to this crash.  So, in other words, they have their expert, Professor Hendershott, who has almost 20 pages in his report discussing the types of selling pressure that was going on and different curve pools, which parties were contributing to the selling pressure, what they were trading, how they were trading, and that's the specific

O3PHSec1

evidence that we're seeking to preclude because it's just not
relevant.  In fact, the SEC has conceded that there were other
contributing factors that caused the crash apart from —— there
were other contributing factors, including that these
sophisticated players came in and were putting sell pressure on
the peg.

So it's just not something that's at issue in the
case, this testimony relating to the cause of how it happened.
But the fact that it did happen is highly relevant, your Honor,
because it is a testament to the fact of the instability of the
algorithm.  And to exclude any reference to the May 2022 crash,
which I believe we actually have ——

THE COURT:  The jury's here, but I want to continue
this.  So your witness will say:  I had such faith in the
algorithm, it was so important, i.e., material, that I invested
lots of money.  So that's fine.  Then you want him to say ——
this was investing before the earlier depeg?

MS. MEEHAN:  He invested at numerous points in time.
He invested before —— he invested after the earlier depeg, and
it was precisely because of his understanding that when in
May 2021 the peg had restored itself, that he believed it was
stable.

THE COURT:  I see.  He was deluded into thinking that
the algorithm had worked.

MS. MEEHAN:  Exactly.

O3PHSec1

1          THE COURT:  And how do you propose to show that the

2     algorithm didn't work?

3          MS. MEEHAN:  Well, we'll show that through other

4     evidence.

5          THE COURT:  Yes, exactly.  But you want to go a

6     further step and say because the algorithm worked, in part

7     because the algorithm worked, the whole thing crashed, but then

8     you move in your motion *in limine* to exclude testimony about

9     why the May 2022 depeg occurred.

10          MS. MEEHAN:  Your Honor, just to clarify, the point

11     about this particular investor is that he made purchases during

12     that crash, and so we intended to elicit testimony about his

13     purchases and sales while that crash was occurring.

14          THE COURT:  OK.  So this is a good example.  Now I've

15     heard all this ⸺ I'll hear from the defense in a second, but

16     now that I've heard all this, it's a good example why it's

17     important not to rule on this perhaps.  And this is going to be

18     true of many of the motions *in limine*.  I thought this one was

19     more consented to than it turns out to be.  But when we get to

20     that witness, I'm going to want a short voir dire, out of the

21     presence of the jury, to see exactly whether this comes in or

22     not rather than having to decide it in the abstract before we

23     even know what he's going to say.  Yes.

24          MR. KORNBLAU:  Your Honor, David Kornblau.

25          That's fair, but for purposes of opening statements ⸺

O3PHSec1

1          THE COURT:  Yes, I agree, they should not.

2          MR. KORNBLAU:  I think May 2022 should probably just

3    be out of the discussion.

4          THE COURT:  I think that's fair.  It should not be

5    referenced in the opening statement.

6          MS. MEEHAN:  Your Honor, if I may, I think the SEC's

7    position would be that we would allow the defendant —— we would

8    allow the defendants to introduce some rebuttal evidence about

9    May 2022 in order to be able to complete the story and

10   introduce this evidence.

11         THE COURT:  So you're withdrawing your ——

12         MS. MEEHAN:  So we would withdraw or objection.

13         THE COURT:  —— your motion *in limine* No. 3 as long as

14   I deny their motion *in limine* No. 1?

15         MS. MEEHAN:  Correct.  And, your Honor, we would just

16   ask that they be curtailed and not ——

17         THE COURT:  All right.  We'll continue this discussion

18   after we pick the jury.

19         MR. KORNBLAU:  Understood, your Honor, but we will

20   need clarity on the opening statements.

21         THE COURT:  I agree.  So the people in the audience,

22   you all now have to either go, those who are not seated in the

23   back row, to the back row or you can stand on the side, but we

24   need the nearer rows for the jury, prospective jurors.

25         (Jury selection ensued)

O3PASEC2

1          (Jury not present)

2          THE COURT:  Please be seated.  All right.  As to the

3     members of the jury panel who were not called, congratulations

4     on dodging the bullet.  Nevertheless, you're not off the hook

5     yet because you may be selected for another jury.  So you need

6     to go down to the jury room that you first came up from on the

7     ground floor.  And we'll ask one of you, which one?

8          THE DEPUTY CLERK:  Peter Tascio.

9          THE COURT:  Will you come forward and give you the

10     tickets for everyone, and all of you now can leave and

11     Mr. Tascio, give that to the jury clerk when you get down.  And

12     I want to thank you very much for being available for jury

13     service.  And any of the people that were standing can now take

14     seats.

15          So I think now we need to deal first with any of the

16     motions *in limine* that present an issue for opening statements,

17     and then we'll deal with the rest.  I should have the record

18     reflect that we were going to deal with all this on Friday and

19     I was supposed to take a plane back from Zurich on Thursday and

20     it was first delayed five hours, and then finally canceled.

21     And remind me not to fly Swiss Air in the future.  But in any

22     event, so we have to deal with it today.  We will deal with it

23     today.  But so we can move things along, are there any of the

24     motions *in limine* that relate to opening statements?

25          I think the one that's obvious is about the May 2022

O3PASEC2

1    depeg, so no one should make any mention of that on opening

2    statement.  That's without prejudice to whatever will come out.

3            MS. MEEHAN:  Well, your Honor, we had withdrawn our

4    motion *in limine* on that.

5            THE COURT:  Yeah.  But the problem is it's just one

6    witness, right, who's going to refer to it?

7            MS. MEEHAN:  No, your Honor.  We actually have like

8    fact stipulations about the fact that the value dropped in

9    May 2022.  So to not mention this --

10           THE COURT:  Well, what's it relevant to?  If you drop

11   your motion *in limine* number three, and you want to argue that

12   it was one of the causes of the depeg.

13           MS. MEEHAN:  Absolutely, your Honor.

14           THE COURT:  And what's your evidence of that?

15           MS. MEEHAN:  That the algorithm didn't work because it

16   could not restore the peg.

17           THE COURT:  So you're saying the very fact that there

18   was this crash shows on its face that the algorithm did not

19   work?

20           MS. MEEHAN:  Yes.

21           THE COURT:  Okay.  And you think that was, of course,

22   intentionally fraudulent, so forth.  Let me hear from defense

23   counsel on that.

24           MR. CALIFANO:  Your Honor, I think I want to make sure

25   that some of these aren't an issue.  There is the motion with

O3PASEC2

1    respect to the invocation of the Fifth Amendment.

2            THE COURT:  We'll get to that in a minute but, I just

3    want to deal with -- so the proposal is that the SEC will drop

4    its motion number three, and will limit its arguments about the

5    2022 depeg to the fact that the crash showed that the algorithm

6    assertion was false.

7            So I'm inclined to grant that, but let me hear

8    anything you want to say about it.

9            MR. CALIFANO:  The problem with that, your Honor, is

10   that once they make that assertion, it's going to be incumbent

11   upon us to explain what we believe is the actual cause of that.

12           THE COURT:  Oh, yes.  That opens the door totally.

13   And they are no longer opposing that.

14           MS. MEEHAN:  That's correct.

15           MR. CALIFANO:  We understand, your Honor.

16           THE COURT:  Okay.  Very good.

17           Now, you were reminding me that the question of the

18   Fifth might come up in opening statements.  Let me ask, is the

19   SEC planning to refer to that in their opening statements?

20           MS. STAREN:  No, your Honor.

21           THE COURT:  No.  So that's not a question.  We'll get

22   to that on the motions *in limine*, but not a question in the

23   opening statements.  Anything else in the motions *in limine* or

24   anything else period relating to opening statements that

25   someone thinks may come up?

O3PASEC2

1          MS. STAREN:  Yes, your Honor.  The defendants have

2     motions *in limine* relating to Mr. Myung's ability to testify,

3     and we do intend to talk about that with respect to --

4          THE COURT:  Which of your motions is that, by number?

5          MS. STAREN:  Defendants' motion *in limine* number four.

6          THE COURT:  Okay.  So the defendants' motion number

7     four is to exclude the testimony of four witnesses who they

8     claim lack personal knowledge.  They are Aaron Myung, James

9     Hunsaker, Keone Hon, and Brandon Ackley.  Which will you refer

10    to?

11         MS. STAREN:  We will refer to the testimony of Aaron

12    Myung and James Hunsaker.

13         THE COURT:  So two of them.  So with respect to Aaron

14    Myung, for our court reporter, that's M-Y-U-N-G.  As I

15    understand, the defense contention is that he "had only a

16    managerial role at Chai and concedes that he did not write or

17    work on any code for the Chai payment system, has not reviewed

18    the Chai payment system code or operational data, and did not

19    have access to any code after Chai fired him two years ago."

20    The SEC in response says that as chief product officer, he

21    closely observed the Chai's payment processing business was

22    almost entirely conducted in Fiat currency, and he knew that

23    because he directly oversaw all of Chai's business lines and

24    supervised the engineers and design teams and implemented and

25    maintained and upgraded Chai's payment systems.

O3PASEC2

1          So what is it you want to say on opening statement

2    about that testimony?

3          MS. STAREN:  Well, essentially this, we're going to be

4    talking about the evidence that we intend to present to prove

5    our allegations.  So I do want to talk about the fact that we

6    will present testimony by Mr. Myung and he will talk about the

7    fact that he was the chief product officer, and that in that

8    role he oversaw all of Chai's business lines, and he will

9    testify that he did in fact see that Chai customers and

10   merchants were transacting using Korean won and not crypto.

11   And our belief of course is that he has personal knowledge of

12   that because he was the chief product officer.

13         THE COURT:  Yeah.  So, well, this example is something

14   I might have left to later.  I don't see the harm in what the

15   SEC says is going to be presenting.  I'm going to tell the jury

16   of course that nothing that counsel says is evidence.  And if

17   either counsel says anything in their opening statements that

18   turns out not to be the subject of evidence in the case, then

19   of course on your summation, you can dwell on that and say,

20   remember they promised you that you would hear such and such,

21   well, you never heard one word about that.  They haven't.

22         So each party takes its chances in that regard.  So

23   I'm going to allow that.

24         MS. STAREN:  Thank you.

25         THE COURT:  Which is the other witness?

O3PASEC2

1          MS. STAREN:  So, just to be clear, I will also be

2    mentioning the testimony of James Hunsaker as well as on I

3    guess under the same premise that we expect to be able to

4    present his testimony.

5          THE COURT:  I see.  But nothing more than that?

6          MS. STAREN:  Well, we'll talk in the opening.  I'll

7    present the summary of the fact that he intends to testify to

8    what he observed as an employee --

9          THE COURT:  Yeah, I think the objection here was

10   hearsay.  I already, in the summary judgment order, was said

11   that those statements were both statements against interest.

12   And but even if they're not, in the case of Mr. Hunsaker, they

13   go to the defendants' state of mind, which of course is a major

14   issue in this and every other fraud case.

15         Moreover, as I understand it, Mr. Hunsaker is able to

16   testify that he personally observed Jump's sudden shift in

17   trading of UST through a computer interface that he had access

18   to as a Jump employee.  So that would be -- certainly sounds

19   like admissible testimony.  But let me hear if there's anything

20   the defense wants to say further about Mr. Hunsaker.

21         MR. CALIFANO:  Your Honor, I just want to clarify with

22   Ms. Staren, that as I understand it, part of what she's going

23   to talk about in the opening, at least one of her slides, is a

24   recording or Aaron Myung's testimony that JiHoon Kim told Aaron

25   Myung -- JiHoon Kim is an engineer at Chai.  And Aaron Myung is

O3PASEC2

1    going to testify to a statement that JiHoon Kim makes and that

2    statement is being introduced for the truth.  That, your

3    Honor --

4              THE COURT:  As a co-conspirator statement?

5              MR. CALIFANO:  No, he's not talking about the

6    conspiracy.  He's talking about a description how Chai works

7    because Aaron Myung asked him how Chai worked, engaged him in

8    almost an interview.

9              THE COURT:  I see.  Let me ask.  What about that?  It

10   does not sound like it's a co-conspirator statement, so what

11   about that?

12             MR. CALIFANO:  It's also Chai, your Honor.  I

13   apologize.  I want to be sure I'm clear with the Court.

14   Mr. JiHoon Kim is a Chai employee.

15             THE COURT:  I understand.  But my understanding of the

16   allegation is that with respect to one of the fraudulent

17   schemes, that Chai was acting as a co-conspirator.  But maybe

18   that's not the SEC's position.  They'll tell me that now if

19   that's not the case.

20             MS. STAREN:  Yes, your Honor.  Our view is that the

21   statements made by JiHoon Kim -- and just to clarify we don't

22   intend to introduce a recording in the opening.  We are only

23   intending to introduce a slide that reflects a Slack chat,

24   which is a messaging communication, between Aaron Myung and

25   JiHoon Kim.  And in that message, JiHoon Kim talks about the

O3PASEC2

1    fact that Chai transactions were being mirrored on the Terra

2    blockchain, and we believe --

3         THE COURT:  So maybe the more I think about it, maybe

4    I was too quick to assume that the SEC was saying that was

5    being done with Chai's consent and therefore that they were

6    co-conspirator.  Is that your position?

7         MS. STAREN:  It is the SEC's position that they were

8    co-conspirators.  Our view is that Chai and Terraform conspired

9    to create the illusion that Chai was actually using the

10   blockchain --

11        THE COURT:  All right.  But still, this statement

12   would not be in furtherance of conspiracies is the backup of

13   defense counsel.  What about that?

14        MS. STAREN:  So our view is this particular statement

15   comes in as a statement against interest because JiHoon Kim

16   essentially admitting, yeah, we don't actually use the

17   blockchain, we just help Terra mirror those transactions.

18        THE COURT:  I see.  Again, this is all going to be

19   reconsidered at the time these people testify, so I'm not

20   making any final ruling.  I will allow that for opening

21   statement purposes in the slide form mentioned.  But, of

22   course, again, both sides take their chances if they fail to

23   prove something that's mentioned in opening statement, then

24   that can be referred to on summation.

25        MS. STAREN:  Thank you.

O3PASEC2

1              MR. HENKIN:  Oh, I'm sorry.

2              MS. STAREN:  Do you want to talk about the other

3    slide?

4              MR. HENKIN:  Yes.  Your Honor, with respect to

5    Mr. Hunsaker -- actually, not the other slide.  The objections

6    with respect to Mr. Hunsaker that your Honor talked about

7    addressing in the summary judgment motion under the hearsay

8    rule, there are multiple objections to Mr. Hunsaker.  One is

9    foundation and one is 602.  And just to be clear about our

10   view, the way your Honor described it was that he was able to

11   personally observe changes in Chai's trading strategy.

12             THE COURT:  I think that was a direct quote from the

13   SEC's papers.

14             MR. HENKIN:  Yeah, that's what the SEC asserts.  Our

15   view is that what the evidence will show is that he just heard

16   some things from people --

17             THE COURT:  But based on their representations, I'm

18   going to allow them to assert it in opening, but it's without

19   prejudice to your reraising at the time he actually -- or right

20   before he takes the stand and then we'll, if necessary, have a

21   voir dire outside the presence of the jury.

22             MR. KORNBLAU:  Okay.

23             THE COURT:  Okay.  Anything else on the opening

24   statement?

25             MS. STAREN:  Yes, there is one other exhibit that the

O3PASEC2

1    parties have not agreed on that we do intend to present in our

2    opening slides.  And that is Plaintiff's Exhibit 703, which is

3    a statement or a chat communication between Brian Curran and

4    Jeff Kuan, two employees of Terraform, during their time at

5    Terraform when they're talking about the fact of the May 2021

6    depeg, and Brian Curran says in the chat to Jeff Kuan:  Do Kwon

7    said if Jump hasn't stepped in, we actually might have been

8    F'ed, LOL.

9            And we intend to use this in a slide in our opening as

10   well as presented during Mr. Curran's testimony.

11           THE COURT:  Let me hear from defense.

12           MR. PELLEGRINO:  Your Honor, if we could do this, I

13   think it would be helpful to actually look at it.  We have a

14   comment about the overall context.  I have a paper copy or SEC

15   could put up slide 42.

16           THE COURT:  If you want to put it up on the screen,

17   I'll take a look at it.

18           MS. STAREN:  It's slide 42 of our opening slides.

19           THE COURT:  Okay.  What's the objection?

20           MR. PELLEGRINO:  First of all, your Honor, the part

21   that says "Do says if Jump hasn't stepped in," yes, that's a

22   party admission, but Mr. Curran will be present and can testify

23   to that.  Our objection is the second layer of hearsay.  And I

24   want to describe what you're looking at, your Honor.

25           First of all, this is an off-channel communication.

O3PASEC2

```
1    It's not a business record.  If you look at the top, Jeff said,

2    "sold out instantly."  He's talking about tickets.  Then

3    there's LOLs and LMFAOs.  This is not a communication they're

4    having in furtherance of business.  And then Mr. Curran says

5    "LOL apparently during the May crash," that portion is hearsay.

6    And it's not a party admission either, your Honor because

7    Mr. Curran is not acting in the scope of his employment.

8           And this is why I wanted your Honor to see the entire

9    slide because they're joking and LOLing and they're not

10   communicating about the company and they're not doing so on a

11   corporate --

12          THE COURT:  Yeah, but how do you understand the second

13   sentence, which you agree is admissible, without having the

14   first sentence, which gives the context for what the second

15   sentence means?  So when he testifies or when this comes into

16   evidence, if it does, you might need an instruction to the jury

17   that the first sentence is being offered not for its truth, but

18   to give the context of the second sentence, but the second

19   sentence doesn't make any sense without the first sentence.

20          MR. PELLEGRINO:  Your Honor, he'll be here.  So they

21   don't need to show this document to the jury.  They can just

22   ask him did you have --

23          THE COURT:  No, no, but that doesn't mean -- since

24   it's independently admissible, the second sentence, and the

25   first sentence gives the context, that objection is overruled.
```

O3PASEC2

1          Anything else?

2          MS. STAREN:  Yes, your Honor.  There's just one other

3     topic area that I intend to cover in the opening statement,

4     which is the fact of the defendants' knowledge or belief that

5     Korean regulations did not permit Chai to operate on the

6     blockchain.  The defendants had a motion *in limine* to keep out

7     any reference to --

8          THE COURT:  What are you planning to say about that?

9          MS. STAREN:  I just intend to say that the defendants

10    did in fact know or believed that Chai was not permitted under

11    Korean regulations to operate on the blockchain, and that as a

12    result, Chai and Terraform split.  And just to be clear, there

13    is a stipulation, the parties have agreed that Chai and

14    Terraform did split at least in part as a result of their

15    belief that Korean regulations impacted Chai's ability to use

16    the blockchain.

17         THE COURT:  Well, given the stipulation, I don't see

18    the objection.  Except on the motion *in limine*, my preliminary

19    view, subject to hearing from both sides, had been that the SEC

20    could offer evidence that the defendants believed they were not

21    in compliance with Korean law or were violating Korean law.

22    But they could not, the SEC could not assert that in fact they

23    were violating Korean law.  Which would create -- because now

24    we'd have to have a whole sort of mini-trial on that probably

25    before me.  And despite my unquestioned expertise in Korean

O3PASEC2

1    law, I thought that we should avoid that little side show.  So

2    if you limit it to belief, I will allow that.

3            MS. STAREN:  Yes, your Honor.

4            THE COURT:  Very good.  All right.  Anything else

5    about opening statements?

6            Okay.  I'm taking a wild guess that you may want a

7    quick break before we have opening statements.  So we will take

8    a five-minute break.  And then we'll call in the jury and have

9    opening statements.  We will deal with all the motions *in*

10   *limine* later today, but not right now.  So we'll see you in

11   five minutes.

12           (Recess)

13           THE COURT:  Okay.  Are we waiting for any of the

14   lawyers?

15           MR. CALIFANO:  I think we may be, your Honor.  For one

16   or two.

17           THE COURT:  Please be seated.

18           MR. CALIFANO:  Your Honor, defense had one suggestion,

19   and it's obviously up to your Honor if you decide to do it.

20   But would it be also helpful to instruct the jury not to look

21   at social media during this trial --

22           THE COURT:  Yes.

23           MR. CALIFANO:  -- about this.  I wasn't sure if you

24   wanted to do it.

25           THE COURT:  I thought that was implicit what I told

O3PASEC2

```
 1    them, but let me make it implicit.

 2                MR. CALIFANO:  Thank you, your Honor.

 3                THE COURT:  Okay.  Let's bring in the jury.

 4                (Continued on next page)

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

O3PASEC2

1          (Jury present)

2          THE COURT:  I do have to mention to juror number six,

3   when I saw the back and it was a Giants, that I also am a

4   Giants fan, and that's why I'm wearing black because I'm in

5   mourning.

6          Ladies and gentlemen, before we have opening

7   statements, we're going to read together a preliminary

8   instruction that you all have copies of but you can also take

9   it back with you to the jury room to assist you in following

10  the testimony that will start very shortly.  But let's read it

11  together.

12         To the jury, before you begin to hear the evidence, I

13  want to give you a brief overview of some of the main issues in

14  this case.  After you have heard all of the evidence and the

15  parties have made their closing arguments, I will give you more

16  detailed instructions of law that will replace this preliminary

17  instruction and will govern your deliberations.

18         This is a civil case brought by the federal government

19  agency known as the Securities and Exchange Commission, or SEC,

20  against defendants Terraform Labs Pte. Ltd. or Terraform, and

21  Do Hyeong Kwon, Terraform's cofounder.  The SEC claims that

22  defendants violated the federal securities laws by

23  intentionally engaging in two fraudulent schemes in connection

24  with the purchase or sale of Terraform securities.

25         The first scheme, the SEC alleges, is that defendants

O3PASEC2

1    falsely represented to Terraform investors that a well-known

2    Korean company called Chai used Terraform's technology to carry

3    out its business, when in fact it did not.

4         The second scheme, the SEC alleges, is that defendants

5    falsely represented to Terraform investors that one of

6    Terraform's products called UST, was designed in such a way

7    that its market value would always automatically correct $1.00,

8    when in fact this was not true.

9         Defendants deny the SEC's allegations and argue that

10   they did not make any false or misleading statements, or at

11   least none that were important to Terraform investors.

12        Please remember that this preliminary instruction is

13   simply a very brief overview of some of the main issues in this

14   case.  Before you start your deliberations, I will give you

15   more detailed, final instructions that will replace this

16   overview.

17        Okay.  So you can put that down, but you can keep it

18   with you when you go to the jury room.

19        Two other things.  First, I told you be careful, to

20   disregard anything you see in the media, and that of course

21   includes social media.  If you see any reference in social

22   media to anything about this case, just turn away and have

23   nothing to do with it.

24        We're now going to hear opening statements of the

25   lawyers.  Now, as I told you before, the evidence comes from

O3PASEC2                          Opening - Ms. Staren

1    the witnesses and the exhibits and nothing that the lawyers say

2    is itself evidence.  So you may ask, why do we even have

3    opening statements?  Well, the answer to that is the evidence

4    is going to come in a little bit at a time, and so it may be

5    useful to you to hear what each side believes that the evidence

6    will show or fail to show as the case may be, their best take

7    on what they predict the evidence will show or fail to show.

8            Each side is allotted 30 minutes for opening

9    statements.  The two defendants will divide their time when we

10   come to the defendants, but we'll start with the SEC.  The

11   reason we'll start with the SEC is they have what's called the

12   burden of proof, that is, to prevail this case, they have to

13   show that it's more likely than not that what they're alleging

14   is true.  So let's hear first from the SEC.

15           MS. STAREN:  Thank you, your Honor.

16           Good morning, ladies and gentlemen.  This is a case

17   about fraud, a fraud committed by defendant Do Kwon and his

18   company Terraform Labs, a fraud where these defendants lied to

19   investors.  They knew the things that they were saying were not

20   true, and they used these lies to obtain millions of dollars in

21   profits.

22           As you will learn, Terraform is a Singapore based

23   company that was controlled by Do Kwon, a citizen of Korea, who

24   was a founder and chief executive officer or CEO of Terraform

25   and who owned 92 percent of Terraform's shares.  Together, Do

O3PASEC2                     Opening - Ms. Staren

1    Kwon and Terraform developed an online financial empire that

2    they called Terra.  To grow their empire, defendants

3    represented that it was successful and that it was stable.  And

4    they recruited investors, including U.S. investors, to go

5    online and buy securities in the form of Terra crypto assets

6    I'll describe that in a little more detail later on.

7            You will learn that from 2019 to 2022, investors

8    poured billions of dollars into Terra.  But as the evidence

9    will show, Terra was a fraud.  A house of cards.  And when it

10   collapsed, investors lost nearly everything.

11           During this trial, you will hear about two separate

12   schemes that defendants used to defraud investors.  In scheme

13   one, you will hear evidence that defendants misled investors

14   into believing that Terra was much more successful than it

15   actually was, that defendants told investors that Terra was

16   being used by a Korean company called Chai for real-world

17   transactions between millions of Korean consumers and

18   merchants.  And you will learn that defendants backed up these

19   lies by fabricating millions of scam transactions within Terra.

20   But as we will prove, Chai was not using Terra for its

21   transactions.

22           Scheme two, you will hear evidence that defendants

23   misled investors into believing that Terra was more stable than

24   it actually was.  Specifically, you will hear that defendants

25   told investors that Terra crypto assets would hold their value

through a computer program or an algorithm that they called the
Terra protocol.  In fact, you will learn that defendants told
investors that the Terra protocol had already worked to
restabilize Terra when Terra assets temporarily lost value.

         As we will prove, this was also false.  The evidence
will show that, in fact, defendants brought in a third party,
Jump Trading, to inject tens of millions of dollars to
restabilize Terra.  But you will hear that defendants concealed
Jump's role from investors.

         Defendants let investors believe that Terra had
restabilized itself, self-healed, as defendants put it.  And
they let investors pour billions more into Terra.

         Now, why does this matter?  Well, it's because things
like the success and the stability of an investment, well,
they're important.  Right?  Before we invest our money in
something, we want to know the truth about how successful that
venture really is.  And stability matters.  When we invest our
money in something, we want to know the truth about how safe or
how risky that investment really is.  Because money that we set
aside for our savings, we expect that to be safe.

         My name is Devon Staren, and I represent the United
States Securities and Exchange Commission, or SEC, along with
my colleagues, Jim Connor, Laura Meehan, Carina Cuellar, Chris
Carney and Roger Landsman.

         As you heard, the SEC is a federal government agency

1  and our job is to protect investors, make sure that they are

2  not lied to when they're asked to part with their hard-earned

3  money.  Because lying to investors is against the law.  It's

4  called securities fraud.  Now, the SEC doesn't have criminal

5  authority.  We cannot send people to jail for securities fraud.

6  But we can bring civil lawsuits, like this one, against

7  defendants that break the law.  And that is why we're here

8  today, to hold Do Kwon and Terraform accountable for their

9  actions, and to ensure that they do not continue to profit at

10  the expense of the investors that they defrauded.

11          Now, I want to provide you with some details about how

12  we will be proving our case.  First, I'm going to go over some

13  terminology that you'll hear during the trial that might be

14  unfamiliar to some of you.

15          Second, I'm going to describe the investments that the

16  defendants offered.

17          Third, I'm going to explain how the defendants

18  profited.

19          And, fourth, I'm going to walk you through some of the

20  SEC's evidence regarding the two schemes.

21          Now, you may remember that when I first described

22  Terra, I said it was an online financial empire.  And that the

23  securities that defendants were offering were something called

24  crypto assets.  And you may hear this also being referred to

25  during the trial as cryptocurrency, sometimes it's called

O3PASEC2                       Opening – Ms. Staren

1    tokens, sometimes they're called coins.  One example of a

2    crypto asset you may have heard of is Bitcoin.  And you'll

3    learn more about what crypto assets are during the trial, but

4    for now you can think of them as just an asset that exists on

5    the internet.

6            Another term you'll hear during this trial is

7    blockchain.  And again, you'll learn more about it later but

8    for now you can think of it as a list or a ledger of

9    transactions involving crypto assets.  When someone buys or

10   sells a crypto asset, a block of information about that

11   transaction is created and you can see that block of

12   information on the internet.  And the block will contain

13   information like the type of crypto asset, the amount of crypto

14   asset, and the accounts, which are sometimes called wallets or

15   wallet addresses.  Those are the accounts that are sending and

16   receiving crypto assets.  And as new transactions happen, new

17   blocks are created and they are connected in a chain of

18   transactions that they just call a blockchain.

19           So when you hear people talking about a Terra

20   blockchain during this trial, you just need to know that

21   they're talking about transactions involving Terra crypto

22   assets.  Now, let's talk about the specific crypto assets that

23   the defendants were offering.

24           First, there was UST.  UST was a type of crypto asset

25   that's called a stablecoin, and all that means is that UST was

O3PASEC2                        Opening - Ms. Staren

1    supposed to hold a stable value, kind of like money.  And here,

2    each UST was supposed to be worth — and you'll sometimes hear

3    that called pegged — to one U.S. dollar.  And defendants

4    promised that this $1 peg would be maintained by the computer

5    program I mentioned earlier, the Terra protocol.

6           Defendants offered UST to investors and they promised

7    them interest returns if they deposited their UST into a

8    savings account within Terra.  Now, during the trial you'll

9    learn more about how the Terra protocol was supposed to work.

10   But for now, you just need to know that the Terra protocol

11   linked UST to a second crypto asset called Luna.  And

12   defendants offered and sold Luna like an investment, kind of

13   like a stock.  And just as a stock of a company increases in

14   price as that company grows more successful, defendants

15   promised that LUNA's price would increase as the Terra

16   financial empire grew.  And the Terra protocol was supposed to

17   provide stability to that Terra empire by guaranteeing that one

18   UST would always be worth or could be exchanged for 1 dollar's

19   worth of Luna.  And that was supposed to keep UST's peg to the

20   dollar.

21          Now let's talk about how the defendants profited from

22   this.  As I mentioned earlier, we will prove that defendants

23   lied to investors about Chai and about the Terra protocol in

24   order to make UST and Luna seem more valuable than they really

25   are.  Defendants knew the things that they were saying were not

O3PASEC2                        Opening - Ms. Staren

true.  Yet, they used these lies to obtain millions of dollars
directly from investors that purchased Terra crypto assets.

You will also learn that defendants themselves owned
hundreds of millions of Luna tokens.  And as the defendants
lied about the success and the stability of the Terra financial
empire, LUNA's price rose from just a few dollars in 2019 to a
high of nearly $120 per token by April 2022.  But in May 2022,
the jig was up.  Terra crashed.  $40 billion was wiped out.
And many investors lost their life savings.

Now, let's talk in some more detail about the
defendants' two schemes.  In scheme one, as I mentioned
earlier, defendants lied to investors about how successful
Terra really was.  This scheme began in June 2019, soon after
Terra was launched.  Defendants told investors that the Terra
blockchain was being used for real-world transactions through a
company called Chai Corporation.

Now, Chai was essentially a Korean version of PayPal
or Venmo.  Chai users could download the Chai application to
the phone, link their bank account, and then use that
application to make payments at stores that accepted Chai.  The
evidence will show that to kickstart Terra's growth, defendants
told investors that Chai customers and merchants were making
and accepting payments using a Terra crypto asset called KRT.

And you'll hear more about KRT, but for now it's a
stablecoin, just like UST, only KRT was supposed to be pegged

O3PASEC2                          Opening - Ms. Staren

1    to the Korean won, the official currency of Korea.  The

2    evidence will show of course that defendants lied, that

3    defendants knew the things they were saying were not true,

4    because Do Kwon created Chai as part of Terraform, together

5    with a cofounder named Daniel Shin.

6              The evidence will show that Do Kwon led the

7    development of the Chai payment system, that Do Kwon knew that

8    Chai customers and merchants were using Korean won and not

9    crypto, and that Do Kwon knew that Chai transactions were not

10   happening on the blockchain.

11             Despite this, in June 2019, Do Kwon posted an article

12   online that said, "we've been getting a lot of questions

13   regarding how Chai uses Terra's blockchain.  Quite simply, Chai

14   runs, records transactions, and manages account balances on

15   Terra's Columbus mainnet."  That's the Terra blockchain.

16             In February 2020, Do Kwon posted a public message,

17   "right now Chai has 12 merchants, all of whom get settled in

18   KRT on the Terra blockchain."

19             KRT, if you recall, is the so-called stablecoin that's

20   tied to the Korean won.  And, again, in a March 2021 interview,

21   Do Kwon said "last year, Chai processed more than $2 billion in

22   transaction volume with more than 2.5 million users, making it

23   one of the most successful and widely adopted applications that

24   uses blockchain technology and is not purely speculative in

25   nature."

O3PASEC2                         Opening - Ms. Staren

1          None of this was true and the defendants knew it.  The

2     evidence will show that defendants discovered that Korean

3     regulations did not permit Chai to use crypto for its payment

4     systems.  And you will learn that because of these Korean

5     regulations, Chai split from Terraform.

6          You will see that in June 2019 when Chai was still

7     part of Terraform Do Kwon told another Terraform employee, "we

8     are not using any Terra blockchain technology."

9          And in March 2020, Do Kwon sent an e-mail explaining

10    the split of Chai from Terraform saying, "post split, Chai will

11    double down on growing as a successful payments company within

12    the bounds of regulatory tolerance.  Much of that will have

13    nothing to do with Terra."

14         In addition to Do Kwon's own statements, you will hear

15    testimony from Chai's former chief product officer, Aaron

16    Myung.  And Mr. Myung will testify that he managed all of

17    Chai's business lines and that Chai customers made payments

18    just like PayPal users by linking a bank account and sending

19    Korean won to their Chai accounts, and that Chai merchants were

20    paid or settled when Chai transferred Korean won to their bank

21    accounts.  Mr. Myung will tell you that Chai did not use crypto

22    for its payment transactions.

23         Now, Mr. Myung's testimony is really important.  And

24    you might see defense counsel try to attack him, try to argue

25    that he should not be believed.  But you will see that

everything Mr. Myung says about Chai's payment systems is

corroborated, confirmed by other evidence.  For instance, Chai

agreements with merchants explicitly provide that payment of

settlement amounts are to be made to the merchants' designated

bank accounts.  These agreements contain no mention of crypto

assets or the Terra blockchain.  You will also learn that there

was a so-called gentleman's agreement between Do Kwon and

Daniel Shin, who if you remember was Terraform and Chai's

cofounder.  And under this agreement, Do Kwon was allowed to

lie about Chai's use of the Terra blockchain while Chai agreed

to remain silent.  As Mr. Shin described it, in a chat with

Mr. Myung, "yeah as I said we have a look the other way

handshake (confidential) for two years."

        Mr. Myung will also tell you that he directly

confronted Do Kwon about the fact that Chai did not use the

blockchain.  And he will tell you that Do Kwon was not

surprised, that Do Kwon did not deny the truth.  In fact

Mr. Myung will tell you that Do Kwon said I don't give an F

about Chai.  Because of course Do Kwon already knew that Chai

was not using the blockchain.

        And the evidence will show that to back up their lies,

defendants faked transactions on the blockchain, that

defendants did this by taking information about real-world

transactions between Chai customers, Chai, and Chai merchants.

Transactions that used Korean won, not crypto assets, and then

O3PASEC2                        Opening - Ms. Staren

1    defendants duplicated those transactions on the Terra

2    blockchain, but told investors that those blockchain

3    transactions were real Chai transactions.  They were fake.

4    Defendants took their own KRT, moved it to and from their own

5    Terra accounts, or wallet addresses, to make it appear as if

6    there were millions of participants using the Terra blockchain,

7    but it was all controlled by one party, Terraform.

8            And how do we know that this is what defendants were

9    doing?  Well, we have an expert in computer forensics and

10   blockchain technology.  Dr. Matthew Edman will testify that he

11   analyzed the Terra blockchain and he reviewed the computer code

12   or source code for a computer program that you will hear a lot

13   about during this trial called the LP server.  And you will

14   learn that the LP server was controlled by Terraform and you

15   will learn that Terraform used the LP server to receive

16   transaction information from Chai and then replicate those

17   transactions onto the Terra blockchain.  In fact, Dr. Edman

18   will tell you that between June 2019 and May 2022, these fake

19   transactions constituted more than 45 percent of the total

20   number of transactions on the Terra blockchain.  But you don't

21   have to rely on just our expert.  Paul Kim, Terraform's own

22   engineer, the engineer that created the LP server, confirmed in

23   a chat with another Terraform employee, saying "LP server

24   creates multi-send transactions by receiving transaction

25   information from Chai.  In short:  It basically replicates Chai

O3PASEC2                          Opening - Ms. Staren

1    transactions."

2            Or you could choose to rely on Chai's head of

3    engineering, Mr. JiHoon Kim, who explained in a chat that,

4    "only Chai transaction history is mirrored to Terra network so

5    there is no wallet or token concept in Chai."

6            In short, defendants faked it all.  The evidence will

7    show that they lied to investors to make Terra appear more

8    successful than it actually was.  And they knew the things that

9    they were saying about Chai were not true.  And they used these

10   lies to obtain millions of dollars from investors.

11           Let's talk about scheme two.  Here, defendants misled

12   investors into believing that Terra was more stable than it

13   was.  Scheme two centered on defendants so-called stablecoin,

14   UST, which if you recall was supposed to remain pegged or worth

15   one U.S. dollar, and defendants' failure to disclose the role

16   of Jump Trading in helping to maintain UST's value.  The

17   evidence will show that defendants marketed UST as an

18   investment that could earn interest when deposited into a

19   savings account within Terra called the anchor protocol.

20   Defendants told investors that "anchor offers a

21   principal-protected stablecoin savings product that accepts

22   Terra deposits and pays a stable interest rate."

23   Principal-protected, that means risk free.  Right?  This was a

24   promise that UST would not lose its value.  And what was the

25   stable interest rate that was offered?  20 percent, 20 percent

O3PASEC2                    Opening – Ms. Staren

1    risk-free investments flooded in.  And the evidence will show

2    that by May 2022, there was more than $14 billion of UST that

3    had been invested in the anchor protocol, all based on

4    defendants' representations that the Terra protocol worked,

5    that one UST would always be worth $1, and that you could earn

6    20 percent on that.

7            But around May 23rd, 2021, UST's price fell briefly,

8    and the evidence will show that during this time defendants cut

9    a side deal with Jump Trading to buy up more than 60 million

10   UST to restabilize UST's value.

11           But as UST was recovering, defendants told investors

12   that it was the Terra protocol that was working.  On May 24th,

13   Terraform issued a stream of tweets aimed at describing what

14   they called the levers of the Terra protocol, explaining that,

15   "it just needs time to recalibrate and confidence restored,

16   something that will take more than a weekend."

17           The next month Terraform issued a medium post

18   celebrating the May 2021 depeg as, "an incredible test of the

19   protocol's ability to continue providing stable yields, 18 to

20   20 percent under extreme conditions."  The following year, Do

21   Kwon claimed that, "it took a few days for the slippage cost to

22   naturally heal back to spot."  Adding that, "when the exchange

23   rate has deviated from the peg, the protocol automatically

24   self-heals the exchange rate back."

25           Defendants told investors that the Terra protocol

O3PASEC2                          Opening – Ms. Staren

1    automatically self-healed UST's peg to the dollar.  But they

2    did not tell investors that they brought in Jump Trading to

3    intervene.  The evidence will show that defendants lied again

4    to make investors think that UST was stable and self-healing.

5    Defendants knew this was not true because they knew Jump had

6    intervened.  Terraform's former head of communications, Brian

7    Curran will testify that Do Kwon told him that Jump agreed to

8    buy up to $100 million of UST if necessary to restore the peg.

9    Mr. Curran will testify that Do Kwon also told him in exchange

10   for that help, they had cut a deal with Jump.  And you will

11   hear evidence that Do Kwon knew Jump's help was significant

12   because Do Kwon explicitly instructed Mr. Curran not to tell

13   the public that Jump stepped in.  In fact, Mr. Curran will

14   testify that Do Kwon told him if Jump had not stepped in, that

15   Terraform "actually might have been F'ed."

16         On the Jump side of the deal, former Jump employee,

17   James Hunsaker will testify that on May 23rd, he heard Jump

18   executive, Kanav Kariya, announce a deal with Terraform.

19   Mr. Hunsaker will testify that after that announcement, Jump's

20   cofounder, William DiSomma, began to issue instructions to Jump

21   traders to buy up UST.

22         And you will hear from the SEC's expert, Dr. Bruce

23   Mizrach, a professor of economics at Rutgers University.

24   Dr. Mizrach will testify that he analyzed Jump's trading during

25   May 2021, that Jump did step in, and that Jump did buy more

O3PASEC2                    Opening - Ms. Staren

1  than 60 million UST.  And Dr. Mizrach will tell that after Jump

2  stepped in, UST repegged to the dollar.

3          And you will hear from victims that will testify that

4  they believed the defendants when they said the Terra protocol

5  worked.  They believed that Terra was stable.  And they will

6  tell you what they lost when that house of cards finally

7  collapsed in May 2022.

8          Now, over the next couple of weeks, you're going to

9  see and hear a lot of evidence in the form of documents,

10  recorded conversations, and testimony from different witnesses.

11  Nearly all of this evidence will include discussions of crypto

12  assets and blockchain technology.  And while some of these

13  terms may be new or seem complicated, I'm going to ask you to

14  remember that this trial is not about the technology.  This

15  trial is about Do Kwon's and Terraform's efforts to defraud

16  investors and profit at their expense.  And, unfortunately,

17  fraud is neither new nor complicated.  The evidence will show

18  that defendants lied to investors, that defendants knew the

19  things they were saying were not true, and that defendants used

20  those lies to gain millions while some investors lost

21  everything.

22          And at the end, you will hear from my colleague, Laura

23  Meehan, and she will walk you through the evidence that is

24  presented and you will be asked to return the only verdict that

25  is consistent with that evidence, and that is to find the

O3PASEC2                          Opening – Ms. Staren

1    defendants Do Kwon and Terraform Labs committed securities

2    fraud and are liable for each of the SEC's claims against them.

3    We thank you very much for your service.

4            THE COURT:  Thank you very much.  And now we'll hear

5    from defense counsel.

6            MR. PATTON:  Do Kwon didn't defraud anyone.  He

7    believed in the company he founded and everything he said about

8    it.  That company, Terraform Labs, was more than just a

9    business to Do, it was a cherished invention that he spent

10   years of painstaking and hard work developing.  He wanted to

11   bring new financial tools, far better than our current banking

12   system with its expensive fees and lack of access and all sorts

13   of other problems.

14           The SEC has it wrong here.  Do Kwon did not lie about

15   what Terraform did or could do.  Those statements, very

16   selected statements out of thousands that he made about

17   Terraform Labs, about Chai, about the 2021 depeg that they

18   claim are false, are true statements.

19           (Continued on next page)

20

21

22

23

24

25

O3PHSec3                         Opening – Mr. Patton

1           MR. PATTON:  (Continued) They were not misleading.

2     Every single one of them, Chai did use Terraform's blockchain.

3     The protocol did work during the '21 depeg, and as we go

4     through this trial, I think you're going to see that for

5     yourselves.

6           I'm going to give you a little bit of an overview

7     about what I expect you'll learn about Do Kwon and about

8     Terraform Labs and how it worked, and when I sit down, one of

9     the attorneys for the company, Terraform Labs, Tony Pellegrino,

10    is going to talk to you in more detail about those Chai and

11    2021 depeg statements.

12          Let me reintroduce myself.  My name is David Patton.

13    Together with my colleagues Christopher Morel, Andrew Chesley,

14    Mike Ferrara, and Sean Hecker, we are proud to represent Do

15    Kwon.  Do came to the United States from his home country of

16    South Korea to attend Stanford University in California where

17    he studied and got a degree in computer science, and he went on

18    to get one of the most-coveted jobs in tech, a programmer at

19    Microsoft.  But he wanted more.  He had lots of ideas about how

20    this new technology of the blockchain could be used, and he

21    wanted to start something from scratch.  And so in 2018, he

22    formed Terraform Labs in his home country, in South Korea.

23          And until 2022, in the spring of 2022, when nearly the

24    whole cryptocurrency market crashed, the company thrived.

25    Thousands of developers used Terra's blockchain to develop

O3PHSec3                        Opening - Mr. Patton

1    applications and tools, and millions of people used those tools

2    and applications.  And not only did they use them, they

3    participated in the governance of Terraform's blockchain

4    itself.

5            This is one of kind of the remarkable things that you

6    learn about this technology.  If you own one of Terraform's

7    cryptocurrencies, you could vote on proposals to change the

8    very computer code, to change the very way the blockchain

9    worked.  It was meant to be a participatory process.  And over

10   the years, it grew spectacularly.  And a lot of very

11   sophisticated, very smart people with a lot of money took a

12   hard look at Terraform and what it was doing —— and they could

13   see the computer code themselves.  It's out there for everyone

14   to see —— and they saw what Do was building, and they thought

15   he was on to something.  They thought it had real promise.

16           These people were not being tricked.  They were not

17   being fooled.  They took a hard look and they thought it had

18   real promise.  But just because something has promise doesn't

19   mean it's guaranteed.  I don't need to tell you that there are

20   no guarantees in life, certainly not in business, certainly not

21   in a new emerging technology.

22           And so in 2022 when the market was crashing,

23   Terraform's cryptocurrencies lost nearly all their value.  But

24   while that was happening, no one poured more money and

25   resources in trying to salvage the value of those

O3PHSec3                         Opening – Mr. Patton

1    cryptocurrencies than Do Kwon.  He authorized Terraform —— he

2    owned most of it —— to spend billions of dollars worth of

3    resources to try to protect the value of those

4    cryptocurrencies, to the result that he and the company lost

5    billions.  He wasn't doing that because he didn't believe in

6    the company and the good things he was saying about it.  He did

7    that because he did believe.

8            Now, just because, ultimately, it wasn't successful

9    doesn't mean he committed fraud.  Failure doesn't equal fraud.

10   He built a real company with real products and a real desire to

11   succeed.

12           So I want to talk now a little bit about what that

13   company was, what Terraform Labs was, what the idea behind it

14   was.  And to do that, it requires a little bit of an overview

15   of the blockchain.  I promise this will not get too detailed,

16   and we'll start with just how the current financial system

17   works to understand what he was trying to develop with the

18   blockchain.

19           As you all probably know, when you deposit your

20   paycheck or if it's direct deposited, there's not actual

21   physical cash going into some safe in your bank just for you,

22   right?  When you use an ATM card and the money comes out of the

23   machine, that money is not coming out of some locker just for

24   you, and when you use a credit card, your bank isn't physically

25   taking money and then taking it to the merchant's bank.  I

O3PHSec3                    Opening - Mr. Patton

think we all know that in modern financial transactions, that's
not how it works.

What's happening is that the banks are just changing
notations on a ledger.  And back in the old days, it was an
actual paper ledger.  They're just changing who owes whom what
and how much is still in someone's account and debiting and
crediting accounts.  Of course, now that's taking place in very
large computers, computer servers typically owned and operated
by an individual private bank for their own information or big
institutions like the Federal Reserve.  But it's all
centralized, and the money that we imagine we have in a bank is
really just a series of electronic IOUs on a ledger.

So for all the modern convenience that that brings,
there are some downsides to that system.  One, there can be
very expensive fees and penalties that banks can charge.  Two,
there are security issues because it's centralized.  Because
that information is held in a private bank's centralized
server, they can be compromised; they can be hacked.  And,
third, there's an issue of speed.  It can take a long time for
these transactions to finally be recorded.

So the idea in the blockchain community was to try to
solve for some or all of those problems.  So how would it do
that?  First and foremost, the thing to understand about the
blockchain is that instead of a centralized computer server
that's controlled by a private entity, the blockchain works in

O3PHSec3                        Opening – Mr. Patton

a decentralized way.  Millions of individual users are
basically running the system.  Anybody with a laptop or a ——
anybody with access to the Internet can participate.  It is
open source software.  It's peer-to-peer networking.  People
are connecting directly with each other rather than going
through a centralized server.

        And the reason it's called the blockchain, you heard a
little bit about this, is that every time a new transaction
occurs, if enough people verify that it's a valid transaction,
that creates a new block of information for the computer code
and that becomes unalterable, and that —— so this chain of
blocks is where we get the term "blockchain."

        So you might be thinking, well, if it's all open
source, if everybody can see exactly what the computer code
says, how is this possibly sure?  Well, that's where the term
"crypto" comes in, and it's based on the term "cryptography."
Cryptography is basically a series of very complex math
problems that equate to an unbreakable password, and that's
where we get the term "cryptocurrency" because, at root, it's
based on cryptography.  And any single token, any piece of
cryptocurrency, any single unit is basically just a series of
numbers.  It's an encrypted digital asset that people can't
access, so it's very secure.

        One thing, though, that is a downside of
cryptocurrency, that I'm guessing most of you have heard about,

O3PHSec3                          Opening - Mr. Patton

1   is that the price can fluctuate wildly in terms of value.  So

2   take Bitcoin.  You might hear in the news one day Bitcoin's

3   price is up here and then the next day it's here and then a

4   week later it's three times as much.  It's a rollercoaster, and

5   that creates real problems for practically using

6   cryptocurrency.

7         And so imagine, just a very simple example, you want

8   to buy a car and you want to use cryptocurrency.  Well, you and

9   the car dealer agree on a price, a certain number of X

10  cryptocurrency, but then by the time you go to pay for it, the

11  cryptocurrency has doubled in value.  Well, now you're paying

12  twice as much for the car, and you're not very happy about

13  that.  And the reverse could be true.  It could crash in half,

14  and now the car dealer's not very happy, right?  So that makes

15  people hesitant to use it in real-world practical scenarios.

16        So people in the cryptocurrency world wanted to

17  develop something to solve for that, and what they wanted to do

18  was create stablecoins.  You heard a little about that.  The

19  idea was to tie the value —— to create a cryptocurrency that

20  would tie the value to a traditional currency like the dollar.

21  This is not a new thing to cryptocurrency.  This happens among

22  traditional currencies as well.  You may have heard that some

23  countries, smaller countries, maybe more developing economies,

24  will peg their currency to the dollar or some other more larger

25  more stable currency, and they're doing it for the exact same

O3PHSec3                     Opening – Mr. Patton

1   reason.  Because in a small developing country, the value of

2   their currency might fluctuate wildly, and it makes it

3   difficult to run an economy that way.  So they're solving for

4   the same issue.

5         But in the crypto space, what Do Kwon wanted to do was

6   develop a stablecoin because he wasn't interested in wildly

7   fluctuating prices of cryptocurrency.  He wanted to come up

8   with something that would actually have practical uses that you

9   might actually purchase something with because it was more

10  stable.  So that was the idea behind it, and the one you'll

11  hear a lot about in this trial is UST, for U.S. Terra, and that

12  was meant to be tied to the U.S. dollar, to be roughly

13  equivalent at all times to a dollar.  That was the idea behind

14  it.

15        The other ⸺ the SEC mentioned this ⸺ there was

16  another one tied to the Korean currency.  That stablecoin was

17  called KRT.  Meant to be tied to the Korean won.  There was

18  another cryptocurrency that Terraform had that was a governance

19  token.  I mentioned before one of the incredible things about

20  Terraform's blockchain was that people could not only use it,

21  but they could participate, they could propose, hey, I think we

22  should change the way the code works in this, that, or the

23  other way.  And then anyone with a Luna token, which was the

24  governance token, could vote.  The entire community could vote

25  on whether to make that change.

O3PHSec3                        Opening – Mr. Patton

1           So Luna was the governance token, but Luna is a little

2   bit more like Bitcoin in that its price can fluctuate wildly.

3   It's not a stablecoin.

4           So how does this all relate together?  Well, Luna

5   played an important role in Do Kwon's idea for a stablecoin,

6   and the idea was this:  That you could always exchange one UST,

7   the stablecoin that was meant to be pegged to a dollar.  You

8   could always exchange one UST for 1 dollar's worth of Luna.  It

9   didn't matter how much Luna was worth.  You could exchange one

10  UST for a dollar's worth of Luna and vice versa.  You could

11  spend whatever amount of Luna was equivalent to a dollar to get

12  one UST.

13          So let's take a simple example.  If Luna is worth 50

14  cents, then for two Luna you can get one UST and vice versa.

15  If Luna was worth $5, then you could get five UST for one Luna.

16  So that was the idea behind keeping UST roughly worth a dollar.

17  How would it actually work in practice?  Again, I'm not going

18  to get into great details, but I'll give you a very simple

19  example.

20          Say UST, the value dropped to, say, 95 cents, right?

21  You want to keep it around a dollar, but say its value is

22  dropping to 95 cents because of the way people are exchanging

23  it.  Well, now, you, anyone, who wants to can exchange that

24  95-cent thing, UST, for a dollar's worth of Luna and profit 5

25  cents.  And as people do that and take advantage of that, the

O3PHSec3                        Opening - Mr. Patton

1    price will move back up closer to a dollar.  And 5 cents

2    doesn't sound like a lot, but if you're exchanging enough of

3    these, you could make a lot of money, 5 cents per exchange.

4    And the reverse is true.  If it got up to, say, being worth a

5    $1.05, well, now you can take one dollar's worth of Luna and

6    change it for a $1.05, in essence, worth of UST, and that would

7    bring the price back down closer to the dollar.

8            So that was the idea.  That was the program.  That was

9    Do Kwon's idea.  It's a little more complicated than that, but

10   that's the basics of it to keep UST close to a dollar.

11           But here's the really important thing to understand,

12   and this, I think, is where you're going to see that we really

13   disagree with the SEC.  They said, oh, this is risk-free.  This

14   is a guarantee.  I think you're going to find nobody thought

15   this was a guarantee.  This was an incentive.  The computer

16   program incentivized people to exchange in the way that I just

17   talked to you about, a $1.05, 95.  There was an incentive to

18   engage in that.  But that wasn't a guarantee.  Just like any

19   currency, if people lose confidence in something, it craters.

20   It doesn't matter what incentives you provide.  This can happen

21   to regular currencies, not just cryptocurrency.  If people

22   don't think it's actually going to be worth a dollar tomorrow

23   and everybody stops buying it, then it becomes worthless.

24   That's one way.

25           Another way is if big traders with lots of money

O3PHSec3                    Opening – Mr. Patton

1    intentionally attack a currency, because they can make money by

2    cratering a currency.  That can happen too.  Everybody knew

3    this.  Do Kwon didn't hide that.  Terraform didn't hide that.

4    In fact, in the white paper explaining how UST worked, they

5    used the term "death spiral" as a possible risk.  They never

6    said it was risk-free.  People within the Terraform community

7    who were talking about all of this used that term, talked about

8    it, and Do Kwon talked about the various ways that Terraform

9    was creating reserves to try to defend the peg.  Again, I'm not

10   going to go into a great deal of detail on that, but he was

11   open about the fact that it might need defending; that there

12   might need to be reserves put in place to help keep UST at a

13   dollar.

14          Like I said, I'm going to sit down in just a moment,

15   and Mr. Pellegrino is going to talk to you in more detail about

16   these Chai and 2021 depeg statements.  I just want to say a

17   little something before I sit down about the tone of discussion

18   in social media and Twitter, because the SEC has very

19   selectively cherry-picked a small handful of statements that Do

20   and Terra made out of the thousands that were made about this.

21   And I think it's important to understand how discussion works

22   in social media and Twitter, other places, to put this in

23   context.

24          I don't think I need to tell you that the tone of

25   discussion in those places can be rough.  People lob insults,

O3PHSec3                    Opening - Mr. Patton

1    people troll, right?  And Do and Terraform were on the

2    receiving end of a lot of that.  I mean, anybody who's in the

3    news, any group is —— people are lobbing insults, and Do

4    sometimes responded in kind.  OK?  He could be blunt.  He could

5    be sarcastic.  I'm guessing you will look at some of the

6    statements he made and not appreciate the tone.  I get that.

7    But I hope you will focus on what we're here to decide, which

8    is did he make false or misleading statements?  And to that I'm

9    very confident, when you see the evidence, you'll decide no.

10          You know, it's very easy to Monday morning quarterback

11   a business that takes heavy losses like Terraform did in '22,

12   to look back in retrospect and point out the flaws and the

13   mistakes, and surely Do Kwon made mistakes.  But to swing big,

14   to swing for the fences and come up a little bit short, to try

15   to do something truly new and inventive and not succeed is not

16   against the law.  Failure doesn't equal fraud, thank goodness.

17          Was Terraform Labs, as a brand-new company using a

18   brand-new technology, a risky proposition?  You bet.  Do Kwon

19   never hid that.  And anybody paying any attention at all to the

20   cryptocurrency world knew that, or they certainly should have

21   known that.  Terraform suffered heavy losses in 2022 despite Do

22   Kwon's best efforts and those of the people who worked at

23   Terraform Labs.  He believed in his company.  He believed

24   everything he said about that, and I think you'll see that for

25   yourselves as we go through these next two weeks.

O3PHSec3                              Opening – Mr. Pellegrino

1            Thank you very much.

2            THE COURT:  Counsel, just to make sure you understand,

3  you have ten minutes.

4            MR. PELLEGRINO:  Thank you, your Honor.

5            The SEC told you this case was about fraud, where the

6  defendants allegedly lied to investors and used these lies to

7  obtain millions of dollars in profits.  They called Terra a

8  house of cards, but the SEC is wrong.  Terra is a real company

9  with real products.  Its CEO is sitting right here behind me.

10 You met Mr. Amani this morning.

11           In this trial, the evidence will show that Terraform

12 told the truth about Chai.  Terraform told the truth about the

13 2021 depeg.  And when all the evidence is in, you will see that

14 Terraform did not lie and Terraform did not profit from any

15 statements.  As Mr. Patton told you, the government doesn't

16 always get it right, and in this case the SEC got it all wrong.

17           Now I want to talk directly about the SEC's claims,

18 about what the evidence will show and what it will not show.

19 Let's start with Chai.

20           Recall that in 2019, a product called Chai was

21 launched.  It was an application like the kind of application

22 that runs on your phone.  Chai was a payment system in Korea

23 that used the Terra blockchain.  If you wanted a cup of coffee

24 from the corner store, you could use that Chai app on your

25 phone and pay for it right from your phone.

O3PHSec3                        Opening - Mr. Pellegrino

1          Now, the SEC showed you a number of social media posts

2     made by Do Kwon and Terraform in which they talked about Chai

3     using Terra's blockchain, and the SEC claims that those were

4     false.  But they are not; they are true.  And in this trial we

5     will show you why.

6          The pieces of the statements that the SEC will show

7     you in this trial are taken out of context, all of them, even

8     the ones they just showed you, like the one where they showed

9     you Do Kwon saying we are not using any Terra blockchain

10    technology.  If you recall, they did not show the full context

11    of that statement.  You saw just a one-line excerpt at the

12    bottom of that slide.  And when you are shown the full context

13    of that statement at trial, you will see in the same

14    conversation Do Kwon explained exactly what he meant.  He was

15    being specific about a very small aspect of Chai, not the

16    overall system.  And everything that he said about that small

17    aspect of Chai was correct.  So the evidence will show that

18    every statement Terraform made was true.  The only one

19    misleading here is the SEC by cherry-picking statements that

20    are taken out of context.

21         Even more importantly regarding Chai, you will hear

22    testimony at this trial from the only person who has firsthand

23    knowledge about how Chai worked, a programmer called Paul Kim.

24    The SEC already spoke about him, and contrary to what they just

25    told you, Paul Kim's testimony does not support their case.

O3PHSec3                    Opening - Mr. Pellegrino

1      Paul Kim designed and built Chai to use the Terra

2   blockchain.  You can think of Paul Kim as like the architect.

3   He is the only one who knows the blueprints to the Chai system

4   because he's the one who wrote the computer code, and the

5   computer code is the instructions that Chai ran on.  Now, Paul

6   Kim designed and built it just like an architect that builds a

7   house.  Paul Kim knows exactly where everything inside that

8   house is laid out.

9      You will see that Paul Kim testified under oath that

10  Chai was designed to use and did use the Terra blockchain in

11  exactly the ways that Terraform and Do Kwon said it did.  Paul

12  Kim completely refutes the SEC's claims.

13      Now, they offer two main responses:  First, the SEC

14  hired a professional witness.  They told you about Dr. Matthew

15  Edman.  Now, Edman will admit to you that he didn't know how

16  the Chai system worked.  Edman did not examine the Chai code.

17  He's never seen the code, and he has no knowledge of the

18  system.  Edman is no architect.  He's more like a person

19  looking at your house from across the street and taking a wild

20  guess at where the plumbing goes.

21      Second, the SEC will rely on a disgruntled former

22  employee.  You heard about him as well, Aaron Myung.  He was

23  fired by Chai.  They said his testimony is "really important,"

24  but unlike Paul Kim, this former employee had nothing to do

25  with building the Chai system and has no actual knowledge about

O3PHSec3                    Opening – Mr. Pellegrino

1    how it works.

2            And what the SEC did not tell you, Aaron Myung is a

3    "whistleblower."  He's trying to use this case to make a lot of

4    money if only he can convince you of his story.  You will learn

5    at this trial that whistleblowers can be paid money by the

6    government, sometimes a lot of money.  So watch Aaron Myung

7    carefully when he testifies, and when he does, ask yourself:

8    Does he seem honest?  Does he have something to gain from his

9    testimony?  Why was he going around secretly recording people

10   at the exact time that he was begging the SEC to promise to

11   make him a whistleblower?  Holding out the possibility of a

12   huge financial payday is a dangerous recipe for dishonest and

13   unreliable testimony, and you'll see more about what we mean

14   when you meet Aaron Myung later this week.

15           Now, the SEC's second claim is that Do Kwon and

16   Terraform lied about the May 2021 depeg.  First, there are at

17   least three reasons the SEC's depeg claims are wrong.  First,

18   you will learn that the potential risks of purchasing UST and

19   Lunas were disclosed and known.  None of the statements

20   regarding the depeg were false because everyone in the crypto

21   community had access to this information.  Everyone in the

22   crypto community could learn how this worked, and these risks

23   were widely discussed within the community.

24           You heard Mr. Patton speak about this earlier.  He

25   talked about the death spiral.  We will show you right in black

O3PHSec3                        Opening – Mr. Pellegrino

1    and white where this warning appeared in Terraform documents,

2    death spiral.  That's pretty serious.  When you see that in

3    writing, ask yourself if that's not a warning of a risk, what

4    is?  To be clear, there was no promise that these products

5    could not fail.  Everyone knew that.

6            Second, I want to talk about the "secret agreement"

7    that Ms. Staren alleged.  That agreement is alleged to be

8    between Jump and Terraform, but there are no records regarding

9    this secret deal supposedly worth millions of dollars.  There

10   are no documents, and that's because there was no secret

11   agreement.

12           Now, the SEC told you that it intends to call at least

13   two witnesses about this alleged agreement, but you will see

14   one critical fact.  None of the witnesses they call have any

15   firsthand knowledge of any secret deal.  You will see also that

16   one of these witnesses is another one of those SEC

17   "whistleblowers."  Again, he's looking to get a big payday if

18   the SEC wins his case —— wins this case.

19           The third point is that the expert that the defendants

20   will present to you in this case is someone that the SEC itself

21   routinely uses as an expert witness.  He is a professor at

22   Berkeley in California, and he will definitively show you that

23   Jump's trading was not the cause of the re-peg.  What you will

24   see with this witness is that the data doesn't lie.  Jump's

25   trading did not cause the depeg.

O3PHSec3                          Opening – Mr. Pellegrino

1           Now, you will also recall that Ms. Staren told you

2     that the defendants profited while everyday people lost money.

3     She told you that they used lies to obtain millions of dollars

4     directly from investors.  But, again, that is misleading

5     because here is the critical fact that the SEC did not tell

6     you.  Terraform had no individual customers.  It did not hold

7     any accounts, and it did not manage any customers' money

8     because Terraform was not a bank or an exchange.  It was a

9     software company.  In fact, you will see that, while the

10    purchasers the SEC mentioned allegedly lost money, Do Kwon and

11    Terraform owned these products, too, and they lost millions of

12    dollars.  So, members of the jury, if they engaged in a fraud,

13    they were defrauding themselves as well.

14          Finally, I want to say a word about how to approach

15    this case.  The SEC is claiming that Do Kwon and Terraform made

16    false statements.  To prove this, they are going to have to

17    show you these statements and prove that they are misleading.

18    When you see these statements, I'm going to ask you to do two

19    things:  First, read the statements carefully.  Ask yourself:

20    What is the context of the statement?  When is it dated?  Has

21    the SEC shown me the full statement or just bits and pieces

22    that leave out information, exactly like the example I told you

23    about earlier where Do Kwon was talking about Chai and the

24    blockchain but just a small part of how it operated?

25          Second, after you understand all that, then decide, is

O3PHSec3                    Opening - Mr. Pellegrino

1    this a true statement or is this a statement in which the

2    speaker did not intend to be truthful?  Only then should you

3    make your decision.  And if you do those two things, at the

4    conclusion of this case, you will see that the defendants'

5    statements were not false.  You will see that the defendants

6    took care to tell the truth and did not intend to mislead

7    anyone, and you will see that Terraform and Do Kwon are not

8    liable.

9              THE COURT:  All right.  Thank you very much.

10             SEC will call their first witness.

11             MS. STAREN:  Your Honor, could we have a five-minute

12   break?  I am missing some materials.

13             THE COURT:  Well, I'm trying to move these things

14   along so we can be faithful to our pledge to the jury to keep

15   within the two weeks we've talked about, but all right.  You

16   want a five-minute break?

17             MS. STAREN:  Yes.

18             THE COURT:  I tell you what, why don't we take our

19   lunch break early.  That was not the plan, but let's do that.

20             So, ladies and gentlemen, we'll give you an hour for

21   lunch right now.  We're going to go to 4:30, but we'll take

22   another break in midafternoon.

23             So we'll see you —— it's 12:35 now, so we'll see you

24   at 1:35.  Have a good lunch.

25             (Jury excused)

```
 1              (Jury not present)

 2              THE COURT:  Please be seated.

 3              So let me give counsel the option.  We can either

 4    continue our discussion now of the motions in limine and go

 5    without lunch, which I'm sure your doctors would approve of, or

 6    you can take time to have lunch now, and then we'll take up the

 7    remaining motions in limine at 4:30.

 8              I have to tell you that I have to leave at 5:30 to

 9    teach at NYU Law School, but we will have a full block of an

10    hour then.  So I'm happy to do either, but what's your choice?

11              MR. FERRARA:  We would like to eat something.

12              MR. CONNOR:  We do as well.

13              THE COURT:  I don't know.  Looking at some of you, I

14    wonder whether that's a good idea.

15              MR. FERRARA:  For the record, your Honor is not

16    looking at me when you say that.

17              THE COURT:  All right.  Unless there's any objection,

18    we'll reconvene at 1:35 promptly, no delays.  Let's start with

19    the witness then, and then do the motions in limine at 4:30.

20              MR. FERRARA:  Your Honor, there's one motion in limine

21    that does go to this next witness, I think.  So it maybe ——

22    reconvene maybe 10 or 15 minutes sooner just so we can ——

23              THE COURT:  We'll reconvene at 20 after.

24              MR. FERRARA:  Thank you, your Honor.

25              THE COURT:  All right.  Very good.  (Lunch recess)
```

O3PHSec3

                        AFTERNOON SESSION

                            1:25 p.m.

 3          (In open court; jury not present)

 4          THE COURT:  Please be seated.

 5          What was the matter that the defense wanted to do?  I

 6  thought it was the defense who wanted to take up a matter

 7  relating to the witness who's coming up.  Maybe it was the

 8  plaintiffs.

 9          MR. CARNEY:  I think they did, your Honor.  I just

10  wanted to address one issue.

11          THE COURT:  Who's the first witness again?

12          MS. STAREN:  It is Arash Vakil.

13          THE COURT:  Well, I thought defense counsel — yes.

14          MR. FERRARA:  Yes, your Honor.  I think what the SEC

15  was going to say is just — was going to talk about excluding

16  witnesses from the courtroom.

17          THE COURT:  Oh, I'm sorry.  That's a very good point.

18  We should have handled that earlier.

19          Yes, all witnesses are hereby excluded from the

20  courtroom throughout the trial and can only be here when

21  they're testifying.

22          MR. CARNEY:  And, your Honor, the parties have

23  discussed that we would ask that Rule 615 not apply to expert

24  witnesses as the —

25          THE COURT:  No.  Expert witness is limited to

O3PHSec3

1    testifying about what was in their report, not what they heard

2    in the courtroom.  That is an old-fashioned idea still applied

3    in New York State Court.  This, in case you haven't checked, is

4    a federal court.

5            MR. CARNEY:  Experts would be excluded?

6            THE COURT:  The experts are excluded.

7            MR. CARNEY:  Thank you.

8            MR. PELLEGRINO:  Your Honor, there is one exception to

9    Rule 615 for corporate ——

10           THE COURT:  Yes, I assume that's the CEO who's seated

11   there.

12           MR. PELLEGRINO:  That would be Mr. Amani, your Honor,

13   yes.

14           THE COURT:  That's fine.

15           MR. LAFFERMAN:  Matthew Lafferman of Dentons for

16   Terraform Labs.

17           Your Honor, we believe the last witness is going to be

18   —— we have to get a resolution on motion *in limine* —— TFL

19   motion *in limine* 14 —— or SEC motion *in limine* 14, which

20   concerns the admissibility of ——

21           THE COURT:  Hang on.

22           MR. LAFFERMAN:  Sorry.

23           THE COURT:  By the way, I've marked the preliminary

24   instruction as Court Exhibit 1.  I'll give it right now to my

25   courtroom deputy to docket.

1          SEC motion *in limine* 14?

2          MR. LAFFERMAN:  Yes, your Honor.  It's to exclude ——

3          THE COURT:  The evidence that defendants' false and

4    misleading statements were immaterial based on disclaimers.

5          MR. LAFFERMAN:  Yes, your Honor.

6          THE COURT:  I deny that motion.

7          MR. LAFFERMAN:  Thank you, your Honor.

8          MR. KORNBLAU:  Also, your Honor, there's the issue of

9    investor losses, which will come up with this witness, and it's

10   our position that investor losses are irrelevant to this case,

11   and it should not be in evidence at all.  The SEC argues that

12   it's relevant to materiality.  Materiality relates to the

13   reasons why purchasers made their purchases.  It has nothing to

14   do with what happened to the tokens or investments after they

15   were purchased.  So that entire discussion —— all evidence on

16   losses should be excluded.

17         THE COURT:  Well, we talked earlier, and I ruled in

18   the SEC's favor, about this victim who purchased after the

19   depeg in reliance on what they thought was the automatically

20   adjusting mechanism, and the argument of the SEC was that the

21   proof that that mechanism did not work was then the eventual

22   de-pegging in 2022.  I've already ruled in the SEC's favor of

23   that, but you want to —— you're addressing a different point?

24         MR. KORNBLAU:  No, your Honor.  It's just that the

25   SEC's fraud theory on the depeg is not —— oh, did it work or

1  not work?  The representations that they are relying on had to

2  do for the reasons why in May 2021 the peg was restored.  So if

3  an investor wants to say that that was part of their decision,

4  that would be relevant to materiality.  But, again, what

5  happened to the value of that token, whether it was sold ——

6        THE COURT:  No, the proof —— this is really revisiting

7  what I thought we spent a long time on, and if I had realized

8  that the only reason you were calling me back 10 minutes —— 15

9  minutes early was for the point that your colleague just

10  raised, which he won in two seconds without even having to make

11  an argument because I agreed with him, we could have resumed

12  much later.

13        But the question of whether one proof that the

14  automatic adjustment did not work is the fact that it later

15  went way down and what caused that, which is the subject of

16  dispute, will be the subject of testimony.  But the fact that

17  it went way down is, seems to me, relevant to showing that it

18  was a phony in the ——

19        MR. KORNBLAU:  That's not the allegation, your Honor.

20  The allegations have to do with the reasons why, in 2021, the

21  peg was restored.  And, again, if an investor says, well, I

22  relied on those reasons to make a purchase, fine, we can have

23  evidence on that, but again ——

24        THE COURT:  If you're told that you have good reason

25  to trust our representation that every time you purchase this

O3PHSec3

1    security, you will —— be a guarantee that it will never go

2    below a certain level or it will immediately readjust because

3    it's tied to another security, Luna, and then, in fact, it goes

4    way down below that, why isn't that circumstantial evidence

5    that the representation was false?

6         MR. KORNBLAU:  Right, but that's not the case, your

7    Honor, that there was a guarantee.  The disclosure was clear

8    that there was risk in this.

9         THE COURT:  This is all rearguing what we spent many

10   minutes arguing this morning, and I've already ruled.

11        MR. KORNBLAU:  OK.  Thank you, your Honor.

12        THE COURT:  So let's see if the jury's back.

13        They're all hereinafter deemed superstars, and I'm

14   very grateful to have such good attorneys here in my court, but

15   that doesn't mean I won't say nasty things to you on occasion.

16        We're still missing two, so let's make use of this

17   time and go back to the motions *in limine*.

18        So the defendants' second motion *in limine* is to

19   exclude reference to Kwon's incarceration, arrest, or legal

20   proceedings in Montenegro.  Unless the SEC wants to be heard,

21   I'm inclined to grant that motion.

22        MR. CONNOR:  Yes, your Honor, the SEC would like to be

23   heard on that motion.  We agree not to bring up things related

24   to indictments, for example, in the Southern District of New

25   York, but as far as reference to his Montenegrin conviction for

O3PHSec3

1    passport forgery, that is admissible under Rule 6 O nine(a).

2              THE COURT:  That's, I think, a different motion, but

3    since you brought it up, let's deal with it.

4              So it's admissible for impeachment.  Now, how can I

5    rule on that until I've ruled on what statements, if any, from

6    Mr. Kwon that you're offering come in or don't come in?

7              MR. CONNOR:  Well, we have designated ——

8              THE COURT:  Some of the things you're offering, I

9    think you're offering for their truth, right?

10             MR. CONNOR:  That's correct.

11             THE COURT:  So there's no need for impeachment as to

12   those.  To the extent there's something that's being offered

13   that you dispute, don't I need to tell the jury, if I admit

14   this conviction, that it's being admitted with respect to items

15   X, Y and Z, not items A, B and C, otherwise they won't know

16   what to do with it, right?

17             MR. CONNOR:  Yes, I think to clarify that it's for the

18   purposes of impeachment would make sense to us, but I think

19   under the rules it is clear that it should come in for

20   impeachment, not only to the testimony that we plan to offer

21   but also to the representations that Mr. Kwon made to the

22   public.  This is evidence of, you know, a prior dishonest act

23   that must be admissible.

24             THE COURT:  I understand it qualifies.  I want to hear

25   from defense counsel, but I understand it qualifies under the

O3PHSec3

1    rules for impeachment.  My point is, and the reason I thought

2    it might have to be modified, I don't know what the jury will

3    make of that if you don't tell them which of the statements

4    you're offering from him you're offering as ones you endorse

5    and which you think are lies.

6              MR. CONNOR:  Yes.  We have one particular response in

7    mind from Mr. Kwon's testimony where he's talking about Chai.

8              THE COURT:  OK.  With that massaging, I think it will

9    come in, but let me hear from defense counsel if they want to

10   be heard on this.

11             MR. MOREL:  Mr. Morel from Kaplan Hecker for defendant

12   Do Kwon.

13             I think your Honor's exactly right.  It's one of the

14   requests we made in opposition, which is let's wait and see

15   what from Mr. Kwon's prior testimony comes in, and then the

16   Court can decide then on impeachment.

17             The second point is under the Second Circuit ruling in

18   *U.S. v. Estrada*, we should limit the scope of the impeachment

19   evidence that comes in to the essential facts of the

20   conviction, and that's namely just the name of the offense, the

21   date, and the sentence that was imposed.  Anything beyond that,

22   your Honor, just ——

23             THE COURT:  I'm not sure they were offering more than

24   that.

25             MR. MOREL:  It's not clear from their papers, but just

O3PHSec3

1    for the defense to be clear, that's what we would request be

2    the scope of the impeachment evidence.

3            THE COURT:  What are you offering in this regard?

4            MR. CONNOR:  Yes, your Honor, we ——

5            THE COURT:  Usually comes in certified copy of the

6    impeachment, and that's been allowed by the Second Circuit for

7    the last thousand years.

8            MR. CONNOR:  Yes, and that's what we would request.

9    That's what we have on our exhibit list is the Montenegrin

10   original and then a certified translation of the conviction.

11   So that's what we would be offering into evidence.

12           THE COURT:  Again, after I parse through all the Kwon

13   offerings, I think offered in that form sounds perfectly fine.

14           MR. MOREL:  Thank you, your Honor.

15           THE COURT:  Thank you.

16           All right.  I'm a little disturbed the jury's still

17   not here.

18           I haven't forgotten that at some point I need to tell

19   the jury, as defense requested, that Kwon's absence —— that

20   they should draw no inference from Kwon's absence since that

21   was a specific request made.

22           MR. CONNOR:  Your Honor, that was another subject of

23   whatever motion *in limine*.  We do seek an adverse inference ——

24           THE COURT:  From his absence?

25           MR. CONNOR:  Yes, from his absence.

O3PHSec3

1          THE COURT:  On what basis?

2          MR. CONNOR:  The basis is, your Honor, as your Honor

3    recalls, Mr. Kwon sought an adjournment of the trial date.

4          THE COURT:  I haven't forgotten that.  I have, of

5    course, with time forgiven defense counsel, or their Montenegro

6    colleagues, for seemingly misleading the Court, which I'm sure

7    was unintentional but very real, nevertheless.  But I don't see

8    why that creates a basis for an adverse inference.

9          MR. CONNOR:  The reason why we think it creates it,

10   your Honor, is that this is not just a witness, this is the

11   party.  This is the architect of what we allege is the fraud

12   scheme.

13         THE COURT:  He couldn't be here if he wanted to.

14         MR. CONNOR:  I think that's a point we might ——

15         THE COURT:  Or I should say he couldn't be here

16   without asserting the various legal rights that he has,

17   contrary to my original understanding of what he would do,

18   continued to assert.

19         MR. CONNOR:  He appealed a —— this is all in the

20   declaration from the Montenegrin's order.  That's what I'm

21   basing this on.  He was ordered by a Montenegrin court

22   extradited to the United States.  Instead of accepting that and

23   being here for the trial, he appealed that, and as a result of

24   that, he procured his own absence from the trial.

25         Under the Second Circuit, the nonappearance of a

O3PHSec3

litigant at trial or his failure to testify as to facts

material to his case and to which he has especially full

knowledge creates an inference that he refrained from appearing

or testifying because the truth, if made to appear, would not

aid his contention.

We'll further note that Judge Marrero gave a missing

witness instruction in the Coffee Collectors case fairly

recently on somewhat similar facts.  There, the defendant was

detained in Germany, and he was fighting extradition to the

United States.  And there, the court gave the precise missing

witness instruction that we assert that the Court should give

here.

THE COURT:  All right.  I will take a look at the

Marrero decision.  I have tremendous respect for Judge Marrero.

But I'm a little troubled by the notion that if someone is not

able to appear because they are asserting their legal rights,

that somehow that should be held as a voluntary nonappearance.

That seems to me to chill his exercise of his Montenegro

rights.  So I'm not totally convinced of your position.

I don't want to dwell endlessly on the fact that I

have been led to believe that he would not be asserting those

rights, but that's water over the bridge —— or, no, under the

bridge, over the dam.

So the jury's here.  Let's bring them in.  Let's get

the witness on the stand.

O3PHSec3

1              MR. CONNOR:  Thank you.

2              (Continued on next page)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury present)

2    ARASH VAKIL,

3         called as a witness by the Plaintiff,

4         having been duly sworn, testified as follows:

5              THE COURT:  Counsel.

6              MS. STAREN:  Your Honor, may I approach the witness,

7    please, and provide him with a binder?

8              THE COURT:  Yes.

9    DIRECT EXAMINATION

10   BY MS. STAREN:

11   Q.  Good afternoon, Mr. Vakil.

12            Could you please tell us where you currently reside.

13   A.  I reside in Elizaville, New York.

14   Q.  Do you have any other residences?

15   A.  I do.  I have a few multifamily residences in ——

16   multifamily properties in Astoria, Queens.

17   Q.  OK.  Did you grow up in New York?

18   A.  I did.  I grew up in Harlem in the '80s.

19   Q.  OK.  Are you currently employed?

20   A.  Yes.  I run —— I'm CEO of Vakil Ventures.  That is an

21   active development and investment firm.  I'm a professor at

22   CUNY, and I manage my rental properties.

23   Q.  And did you attend college?

24   A.  I did, yes.

25   Q.  Where was that?

O3PHSec3                        Vakil - Direct

1    A.   Queens College.

2    Q.   And that's CUNY?

3    A.   That's right.

4    Q.   Did you obtain a degree?

5    A.   Yes.  I got a Bachelor of Arts.

6    Q.   And what was your focus of study?

7    A.   Media studies.

8    Q.   Did you obtain any further education?

9    A.   I did, yes.

10   Q.   Where was that?

11   A.   CUNY, Baruch.

12   Q.   And did you obtain a degree from Baruch?

13   A.   Yes, I got my master's in business administration from

14   Baruch.

15   Q.   Do you have any experience in investing?

16   A.   I do, yes.

17   Q.   What kinds of investments do you have experience in?

18   A.   When I was around 18, I started investing in stocks.

19   Eventually, I started investing in real estate and, most

20   recently, crypto.

21   Q.   And how did you become interested in investing?

22   A.   Mainly my mom.  She got me interested in real estate, and,

23   you know, we thought it was a great way to build wealth and

24   save for retirement and all that.

25   Q.   You mentioned that you recently became involved in

O3PHSec3                         Vakil – Direct

1    investing in crypto.  What is that?

2    A.  Cryptocurrency, these are digital tokens that exist on

3    blockchains.

4            THE COURT:  So although the jury's heard a little bit

5    about this, why don't you tell them what you mean by tokens and

6    by blockchain.

7            THE WITNESS:  Blockchain is a decentralized ledger

8    where everyone can see everything that goes on on that specific

9    blockchain.  And a crypto token, such as Bitcoin, would operate

10   on a blockchain.  And there are multiple blockchains, multiple

11   crypto assets that run on different blockchains.

12           THE COURT:  So if you're making a purchase here,

13   you're purchasing a token, but it's recorded on a blockchain.

14   Do I have that right?

15           THE WITNESS:  That's correct.

16           THE COURT:  All right.  Go ahead.

17   BY MS. STAREN:

18   Q.  And is the blockchain something that you can see on the

19   Internet?

20   A.  That's right.

21   Q.  I think you mentioned that —— or maybe you didn't.  Did you

22   ever personally invest in any crypto assets?

23   A.  Yes, I did.

24   Q.  What crypto assets have you invested in?

25   A.  I've invested in Bitcoin, Ethereum, Ripple, and a number of

O3PHSec3                          Vakil – Direct

1  other crypto assets.

2  Q.  What led you to become interested in investing in crypto

3  assets?

4  A.  To me, I first started getting interested in Bitcoin.  I

5  started hearing about it in 2013.  I purchased in 2016, and I

6  was very interested in it because to me it seemed like digital

7  gold.  So that — that's what kind of led me to that purchase.

8         THE COURT:  What do you mean by that?

9         THE WITNESS:  It is an asset where there's a finite

10  amount of them that will ever be produced, 21 million, and so

11  that's it.  So there's — that's something that I thought was

12  interesting about Bitcoin itself.

13  Q.  At some point did there come a time when you learned of a

14  company called Terraform Labs?

15  A.  Yes.

16  Q.  And is it OK if I refer to that as Terraform?

17  A.  Sure.

18  Q.  Approximately when did you first learn of Terraform?

19  A.  I learned about Terraform Labs around, I think, middle

20  2022, middle towards the end.

21  Q.  I'm sorry?

22  A.  No, sorry, no.  It was towards the end of 2021 and, yeah,

23  beginning of 2022.

24  Q.  OK.  Thank you.

25         How did you hear about Terraform?

1   A.  I saw — I saw that there was a lot of discussions about it

2   on Twitter and other online publications.

3   Q.  Based on those online publications, what did you understand

4   that Terraform's business was?

5   A.  Terraform Labs operated a blockchain with two core assets.

6   One was the Luna token; the other was the algorithmic

7   stablecoin called U.S. Terra, or UST.

8   Q.  And are you familiar with an individual named Do Kwon?

9   A.  Yes, I am.

10  Q.  Who is Do Kwon?

11  A.  He is the founder/CEO of Terraform Labs.

12  Q.  And how did you come to that understanding?

13  A.  Online publications, Twitter.

14  Q.  Were these statements made by Do Kwon?

15  A.  Yes.  I mean, yeah, and they were on their website, yeah.

16  Q.  You mentioned two crypto assets offered by Terraform, Luna

17  and UST, is that right?

18  A.  That's right.

19  Q.  You described UST as an algorithmic stablecoin.  Can you

20  tell us, first, what is your understanding of what a stablecoin

21  is?

22  A.  A stablecoin is something that, by definition, is always

23  stable, and in this case, it was pegged to be $1 at all times.

24  Q.  And when you say pegged to be $1, was it your understanding

25  that that meant it would be worth $1?

O3PHSec3                          Vakil - Direct

1    A.  That's right.

2    Q.  And what does it mean for a stablecoin to be algorithmic?

3    A.  The term "algorithmic" implies that there's some

4    mathematical properties, underlying mathematical properties,

5    that ensure that it always stays at $1.

6    Q.  And was it your understanding that those mathematical

7    properties were carried out through a computer program?

8    A.  That's right, yes.

9    Q.  Do you know the name of the computer program that was

10   supposed to provide that algorithm?

11   A.  It would be the Terra blockchain.

12   Q.  And how did you get your understanding that UST was

13   supposed to be pegged to a dollar?

14   A.  Through multiple publications by Do Kwon, by Terraform

15   Labs, through their white paper.  There were a number of

16   resources.

17   Q.  And did you personally buy UST?

18   A.  I did, yes.

19   Q.  Why did you buy UST?

20   A.  Primarily due to their claim of 20 percent APY, so annual

21   percentage on yield.

22   Q.  What does that mean, annual percentage on yield?

23   A.  So over the course of a year, if I invested $100,000, I

24   would expect to have 120,000 by the end of the year,

25   approximately.

O3PHSec3                              Vakil - Direct

1   Q.  And how was it that you understood you could get those

2   20 percent —— can I call them returns?

3   A.  Yes.

4   Q.  And how was it you understood you could get those

5   20 percent returns?

6   A.  By purchasing UST tokens and then depositing them into the

7   Anchor protocol.

8   Q.  What is the Anchor protocol?

9   A.  The Anchor protocol was a buying and lending platform

10  operated by Terraform Labs.

11  Q.  And who represented that you would be able to get

12  20 percent returns through the Anchor protocol?

13  A.  Do Kwon, Terraform Labs.

14  Q.  Did you have an understanding as to where the 20 percent

15  returns were supposed to be coming from?

16  A.  Yes.

17  Q.  What was your understanding?

18  A.  There was a buying and —— sorry, there was a borrowing and

19  lending platform within the Anchor protocol where you could ——

20  you would be charged fees.  Also transaction fees on the

21  blockchain would be used to, you know, contribute towards that

22  20 percent.

23  Q.  And when you said you would have to pay fees, who was it

24  that would have to pay those fees on the Anchor protocol?

25  A.  The borrowers ——

O3PHSec3                          Vakil - Direct

1    Q.  OK.

2    A.  —— primarily.

3    Q.  And when you deposited UST into the Anchor protocol, were

4    you on the borrowing side or the lending side?

5    A.  I was on the lending side, yeah.

6    Q.  OK.  And did you, in fact, purchase UST and then invest it

7    in the Anchor protocol?

8    A.  I did, yes.

9    Q.  Did you maintain records of your investments?

10   A.  I did, yes.

11          MS. STAREN:  Shadow, could we please pull up, just for

12   the witness, Plaintiff's Exhibit 34.

13   Q.  Mr. Vakil, do you recognize this document?

14   A.  I do, yes.

15   Q.  You can take a look at the binder I gave you.  There should

16   be a hard copy there.

17   A.  Yes.

18   Q.  What is that document?

19   A.  This is a spreadsheet of transactions of —— that I made

20   relating to UST.

21   Q.  Who created this spreadsheet?

22   A.  I did.

23          MS. STAREN:  Your Honor, at this time we would move to

24   admit Plaintiff's Exhibit 34 into evidence.

25          THE COURT:  Any objection?

O3PHSec3                              Vakil – Direct

1              MR. KORNBLAU:  Hearsay and relevance.

2              THE COURT:  Overruled and overruled.  Received.

3              (Plaintiff's Exhibit 34 received in evidence)

4              MS. STAREN:  Thank you, your Honor.

5              Shadow, you can go ahead and publish to the jury.

6    BY MS. STAREN:

7    Q.  So, Mr. Vakil, if we take a look, there are multiple tabs

8    across the bottom.  Do you see that?

9    A.  I do, yes.

10   Q.  And if you take a look at that first tab, can you read the

11   title of that tab, please?

12   A.  The title of the tab is "Compiled."

13   Q.  Can you describe generally what is in that first tab.

14   A.  This first tab has my purchases, purchase transactions, as

15   well as the sales.

16   Q.  And does this tab contain your total investments in UST?

17   A.  It does, yes.

18   Q.  How did you go about compiling this data?

19   A.  These transactions are —— were available on the blockchain.

20   So I could look at my wallet and pull these transactions out

21   and know exactly what happened.

22   Q.  And so you viewed those transactions from the blockchain,

23   and then did you put it in the spreadsheet?

24   A.  I did, yes.

25   Q.  Over what time period did you make your purchases of UST?

O3PHSec3                        Vakil - Direct

1    A.  My first purchase was February 10, 2022, and I believe the

2    last purchase was March 10, yes, March 10.

3    Q.  Approximately how much UST did you purchase in total?

4    A.  Approximately $188,000.

5    Q.  How much of that UST did you invest in the Anchor Protocol?

6    A.  All of it.

7         MS. STAREN:  Shadow, you can take that down.

8    Q.  Let's talk about the mechanics of how you invested.

9         First, how did you obtain your UST?

10   A.  I purchased the UST from various exchanges.

11   Q.  And when you say "exchanges," what are you referring to?

12   A.  Exchanges like Gemini or KuCoin.  These exchanges are like

13   the stock market where you can trade various assets.

14   Q.  Were these exchanges specialized or designed or used

15   primarily for crypto assets?

16   A.  100 percent, yes.

17   Q.  Are these sometimes referred to as cryptocurrency

18   exchanges?

19   A.  That's right, yes.

20   Q.  Where were you located when you made these purchases?

21   A.  I was in the state of New York.

22   Q.  After you purchased your UST, what did you do with it

23   first?

24   A.  I went to the Anchor Protocol, and I connected my wallet to

25   the Anchor Protocol.

O3PHSec3                         Vakil – Direct

1    Q.   What wallet did you connect to the Anchor Protocol?

2    A.   This was the Terra Station wallet.

3    Q.   What is a Terra Station wallet?

4    A.   It was the specific account that you would use to interact

5    with the Terra blockchain.

6    Q.   So when you first purchased your UST, did you first put it

7    in your Terra Station wallet?

8    A.   Yes, I did.

9    Q.   And then I think you testified you connected it to the

10   Anchor Protocol?

11   A.   That's right.

12   Q.   And how did you access the Anchor Protocol?

13   A.   Through Anchorprotocol.com, also within the wallet itself,

14   Terra.station —— Terra.money.

15   Q.   OK.

16           THE COURT:  So just so I'm clear and the jury's clear,

17   so you would initially purchase USTs?

18           THE WITNESS:  Correct, yes, that's how the process

19   started, yes.

20           THE COURT:  And you did that using money, what, from

21   your own bank account?

22           THE WITNESS:  Correct.

23           THE COURT:  And then you took —— those investments

24   were summarized in an electronic wallet?

25           THE WITNESS:  I withdrew them from the exchanges into

O3PHSec3                          Vakil - Direct

1    the Terra Station wallet.

2            THE COURT:  So that was a place to, in effect,

3    digitally store your investment in USTs?

4            THE WITNESS:  Yes, sir.

5            THE COURT:  Then you took some of that and invested

6    it, ultimately all of it, invested in Anchor?

7            THE WITNESS:  Yes, sir.

8            THE COURT:  Is that right?  OK.

9    BY MS. STAREN:

10   Q.  And when you invested your UST into the Anchor Protocol,

11   were you able to see your returns?

12   A.  I was able to, yes.

13   Q.  And did you, in fact, check to see your returns?

14   A.  Indeed, I did.

15   Q.  And how were you able to see your returns?

16   A.  On the Anchorprotocol.com website, on every refresh I could

17   see my total go up.

18   Q.  When you refreshed each time, were you seeing that you were

19   getting the interest that you expected?

20   A.  Yes.

21   Q.  Now, this investment that you put in the Anchor protocol,

22   what did you intend that investment to be for?

23   A.  This was my savings.  This was nonspeculative assets.

24   Q.  Did you have an understanding about how safe your

25   investment in the Anchor Protocol would be?

O3PHSec3                          Vakil - Direct

1    A.  Yes, I believed so.

2    Q.  And what was your understanding at the time of your

3    investments?

4    A.  That the stable —— I invested in a stablecoin that would

5    remain stable, and it would be protected.  It would be safe.

6    Q.  How did you ——

7            THE COURT:  What about the further investment into the

8    Anchor Protocol?  What guarantees, if you had —— there were no

9    guarantees that that would necessarily bring you 20 percent, or

10   were there?

11           THE WITNESS:  There were many publications made by

12   Terraform Labs, Do Kwon that represented that I would be

13   earning 20 percent on that deposit into the Anchor Protocol.

14           THE COURT:  If I understand what you're saying, this

15   is a little bit like putting money into an interest-bearing

16   savings account?

17           THE WITNESS:  Absolutely.

18           THE COURT:  All right.

19   BY MS. STAREN:

20   Q.  How did you get that understanding that your investment

21   would be safe?

22   A.  Through many statements made by Do Kwon and Terraform Labs.

23   Q.  Was it important to you that your $188,000 was in a safe

24   investment?

25   A.  Absolutely.

O3PHSec3                      Vakil - Direct

1  Q.  And why is that?

2  A.  Again, this was my savings account.  These were

3  nonspeculative assets.  I wasn't looking to do anything risky

4  with it.  This was supposed to be safe.

5  Q.  Let's talk about some of the specific things you looked at

6  in connection with your investment.

7          First, I think you mentioned earlier that you

8  generally got your information from online sources, is that

9  right?

10  A.  That's right.

11  Q.  And what sorts of online sources were you looking at?

12  A.  I was looking at Twitter, Terraform Labs, Medium, their

13  white papers.  There were a number of sources.

14  Q.  When you say "their white papers," whose white papers are

15  you referring to?

16  A.  Terraform Labs'.

17  Q.  And when you say "Twitter," whose Twitter accounts were you

18  looking at?

19  A.  Do Kwon, the Luna Foundation Guard, Anchor Protocol.

20  Q.  Did you also look at Terraform Labs' Twitter account?

21  A.  Yes, I did.

22  Q.  In connection with researching your investment, did you

23  also visit Terraform's websites?

24  A.  I did, yes.

25  Q.  Did you mention earlier what that website web address was?

O3PHSec3                          Vakil - Direct

1  A.  Terra.money.

2  Q.  And did Terraform's website contain information about how

3  UST was supposed to be pegged or maintain its worth to the U.S.

4  dollars?

5  A.  Yes, it did.

6          MR. KORNBLAU:  Objection.  Leading.

7          THE COURT:  Well, it is leading.  I think it's

8  implicit, though, in his previous answers, but I'll allow it

9  for now, but no further leading.

10 Q.  OK.  Did Terraform's website contain information about how

11 UST would remain pegged to the dollar?

12 A.  Yes, it did.

13         MS. STAREN:  At this time, Shadow, could you please

14 show the witness Plaintiff's Exhibit 653.

15 Q.  And, again, it's also in your binder if you want to flip

16 through it.

17         Do you recognize this document?

18 A.  Yes, I do.

19 Q.  What is it?

20 A.  This is documentation, their white paper, about the Terra

21 protocol.

22 Q.  Was this information on Terraform's website?

23 A.  Yes, it was.

24 Q.  And did you review this information in connection with your

25 investment?

O3PHSec3                        Vakil - Direct

1    A.  I did, yes.

2            MS. STAREN:  We would move to admit Plaintiff's

3    Exhibit 653 into evidence.

4            THE COURT:  Any objection?

5            MR. KORNBLAU:  No, your Honor.

6            THE COURT:  Received.

7            (Plaintiff's Exhibit 653 received in evidence)

8            MS. STAREN:  Thank you.

9            Shadow, you can publish to the jury, please.

10   BY MS. STAREN:

11   Q.  Mr. Vakil, could you please read the title of this

12   document.

13   A.  The title is "About the Terra Protocol."

14   Q.  Did you have an understanding of what the Terra protocol

15   was?

16   A.  Yes.

17   Q.  What was your understanding?

18   A.  Terra protocol was made up of two core assets: the Luna

19   token and the Terra token.

20   Q.  And did the Terra protocol have a role in holding UST's

21   price to the dollar?

22   A.  Yes, it did.  The Terra protocol was the algorithmic

23   stablecoin.

24   Q.  Let's go to the section called Terra and Luna.

25           Can you please read the first sentence highlighted

O3PHSec3                          Vakil - Direct

1    there.

2    A.   "The protocol consists of two main tokens, Terra and Luna."

3    Q.   And here, what did you understand Terra was referring to?

4    A.   Terra was referring to the algorithmic stablecoin, UST.

5    Q.   And what did you understand Luna was referring to here?

6    A.   Luna was the —— the Luna token.  Sorry, go ahead.

7    Q.   And what did you understand that this section here was

8    describing?

9    A.   This was describing the relationship between Terra and Luna

10   and how it was going to —— how Terra was going to maintain its

11   stability on the platform.

12   Q.   Again, when you say "Terra," just to clarify again, are you

13   referring to the stablecoin UST?

14   A.   That's right, yes, I am.

15   Q.   And what did you understand the relationship between UST

16   and Luna was?

17   A.   The core relationship was that one UST —— there was ——

18   there was a mint-burn mechanism between the two, so they would

19   fluctuate with supply and demand, but you were always able ——

20   you're always supposed to get $1 of Luna.

21   Q.   One dollar of Luna for what?

22   A.   For a UST.

23   Q.   So each UST was —— you were supposed to be able to get $1

24   worth of Luna, is that right?

25   A.   That's right, yes.

O3PHSec3                         Vakil - Direct

1    Q.  And you mentioned a mint-burn mechanism.  Can you tell me,

2    what does it mean when you say "mint"?

3    A.  "Mint" means that you're creating new tokens in the

4    ecosystem.

5    Q.  And what does it mean to burn?

6    A.  "Burn" means you are removing these tokens from the

7    ecosystem, so you're fluctuating the supply and demand

8    mechanisms.

9    Q.  And what is the relationship between minting and burning

10   tokens and the ── what you described as getting one dollar's

11   worth of Luna for every UST?

12   A.  So the relationship between them sometimes, you would ── as

13   you would ── sorry.

14          You would create more supply when it was necessary,

15   and you would take away supply when ── when it wasn't

16   necessary.  So they were able to maintain the fluct ── maintain

17   the supply through the mint-burn algorithm.

18   Q.  So are you saying that you could control the supply by

19   sometimes minting new tokens, on the one hand?

20   A.  Yes.

21          MR. FERRARA:  Objection, your Honor.  This is leading.

22          THE COURT:  Well, just going forward, with respect to

23   any given witness, only one attorney can be handling that

24   witness for each side.  So I've just heard in the last few

25   minutes objections or statements with respect to this witness

1    from two —— I'm sorry.  You're saying you're just objecting on

2    behalf of Mr. Kwon?

3              MR. FERRARA:  Correct, your Honor, for my client.

4              THE COURT:  I'm sorry.  My apologies.

5              MR. FERRARA:  No worries.

6              THE COURT:  And your objection is?

7              MR. FERRARA:  It's leading, your Honor.

8              THE COURT:  So sustained.

9              MR. KORNBLAU:  Your Honor, we would also —— on behalf

10   of TFL, Mr. Kornblau, we would also request that the exhibit be

11   taken down because it doesn't seem to be —— the questions

12   aren't asking him about the exhibit anymore.

13             MS. STAREN:  I'm actually not done with this exhibit.

14   I was just trying to clarify for the jury.  When he described

15   the mint-burn function, I thought it was a little confusing.  I

16   can move on, but I do want to move on to another section.

17             THE COURT:  Let's see if —— because I think the jury

18   needs to be clarified.

19             So you would purchase UST, and it was said to be

20   stable in that it would maintain a value of at least $1 per $1

21   token?

22             THE WITNESS:  Yes, that's right.

23             THE COURT:  And the way you understood that would

24   happen was that it would be algorithmically related to Luna,

25   and therefore, if it was in danger of going below a dollar or

O3PHSec3                         Vakil - Direct

1   had gone slightly below a dollar, it would automatically,

2   through this algorithm, be replaced by Luna tokens worth a

3   dollar.  Do I understand that correctly?

4                THE WITNESS:  Yes.

5                THE COURT:  OK.

6                MS. STAREN:  Thank you, your Honor.  We'll move on now

7   to the stablecoin section.

8   BY MS. STAREN:

9   Q.  Could you please read, in the second paragraph, read the

10  first sentence of that second paragraph.

11  A.  "Stable coins are only valuable to users if they maintain

12  their price peg."

13  Q.  Did you agree with that statement?

14  A.  Absolutely.

15  Q.  And why is that?

16  A.  Stablecoins, by definition, needs to be stable if they have

17  any use at all.

18  Q.  Could you please read the rest of that paragraph.

19  A.  Sure.  "The Terra protocol uses the basic market forces of

20  supply and demand to maintain the price of Terra.  When the

21  demand for Terra is high and supply is limited, the price of

22  Terra increases.  When the demand for Terra is low and the

23  supply is too large, the price of Terra decreases.  The

24  protocol ensures the supply and demand of Terra is always

25  balanced, leading to a stable price."

O3PHSec3                         Vakil - Direct

1    Q.  And when you saw that it says here "the supply and demand

2    of Terra is always balanced, leading to a stable price," what

3    did you understand that to mean?

4    A.  That was referring to the mint-burn mechanism, and the

5    stable price was the —— the fact that it would always remain at

6    $1.

7    Q.  Did you review other materials in connection with your

8    decision to invest?

9    A.  Yes, I did.

10           MS. STAREN:  Shadow, could you please show the witness

11   Plaintiff's Exhibit 231.

12   Q.  Mr. Vakil, do you recognize this document?

13   A.  Yes, I do.

14   Q.  What is it?

15   A.  This is the Terra.money white paper.

16   Q.  And who are the authors listed on this document?

17   A.  Evan Kereiakes, Do Kwon, Marco DiMaggio, and Nicholas

18   Platias.

19   Q.  Is this a document that you reviewed in connection with

20   your investment?

21   A.  Yes, I did.

22           MS. STAREN:  Actually, your Honor, my understanding is

23   this document is stipulated to, so we would request that we are

24   able to move this into evidence at this time.

25           MR. FERRARA:  No objection.

1          THE COURT:  Received.

2          (Plaintiff's Exhibit 231 received in evidence)

3          MS. STAREN:  Shadow, you can go ahead and publish this

4   to the jury.

5   BY MS. STAREN:

6   Q.  Mr. Vakil, how did you come across this document?

7   A.  Through the Terra website.

8   Q.  And can you please read the title of this document.

9   A.  "Terra Money:  Stability and Adoption."

10  Q.  And if you take a look at the section titled "Abstract,"

11  I'd like you to read the third sentence in the abstract.

12  A.  "We propose a currency, Terra, which is both price-stable

13  and growth-driven."

14  Q.  And just for accuracy, does it say, "We propose a

15  cryptocurrency, Terra"?

16  A.  Yes, "We propose a cryptocurrency, Terra."

17  Q.  And did you have an understanding as to what the

18  cryptocurrency Terra here was referring to?

19  A.  Yes.

20  Q.  What was your understanding?

21  A.  It was referring to the UST token.

22  Q.  What did you understand was meant by "price stable"?

23  A.  Once again, I expected no fluctuation in the price of that

24  token.

25  Q.  When you say "that token," what are you referring to?

O3PHSec3                          Vakil - Direct

1    A.  The UST stablecoin.

2    Q.  OK.  And how did this representation impact your decision

3    to invest in UST and the Anchor Protocol?

4    A.  It gave me confidence in my investment.

5    Q.  Did you also review materials related to the Anchor

6    Protocol?

7    A.  I did, yes.

8            MS. STAREN:  Shadow, can you please put up Plaintiff's

9    Exhibit 78 just for the witness.

10           And I know it's a few pages.  If you want to flip

11   through in your binder and then let me know.

12   Q.  Do you recognize this?

13   A.  I do, yes.

14   Q.  What is this?

15   A.  This was a Medium post made by Terraform Labs.

16   Q.  And what is Medium?

17   A.  Medium is an online blogging platform.

18   Q.  OK.  Did you review this Medium post in connection with

19   your investment?

20   A.  I did, yes.

21   Q.  Can you please read the author of this article.

22   A.  The author is Nicholas Platias.

23   Q.  Can you read whose Medium account it was published in?

24   A.  It was published by Terra.

25   Q.  And did you understand that to be Terraform Labs?

O3PHSec3                        Vakil - Direct

1    A.  Yes.

2              MS. STAREN:  We would move to admit Plaintiff's

3    Exhibit 78 into evidence.

4              MR. FERRARA:  No objection.

5              THE COURT:  Received.

6              (Plaintiff's Exhibit 78 received in evidence)

7              MS. STAREN:  You can publish it to the jury, please,

8    Shadow.

9    BY MS. STAREN:

10   Q.  Mr. Vakil, how did you come across this document?

11   A.  Online sources.  Their Anchor Protocol website.

12   Q.  OK.

13   A.  Twitter.  Sorry, I also mentioned Twitter.

14   Q.  Can you please read the title of this document.

15   A.  The title is "Introducing Anchor."

16   Q.  And what is the date of this post?

17   A.  July 6, 2020.

18   Q.  And if you'd go to the second page, can you please read the

19   highlighted text in the bottom paragraph.

20   A.  Sure.

21             "To address this pressing need, we introduce Anchor, a

22   savings protocol on the Terra blockchain.  Anchor offers a

23   principal-protected stablecoin savings product that accepts

24   Terra deposits and pays a stable interest rate."

25   Q.  What did you understand was meant by "principal-protected

O3PHSec3                          Vakil - Direct

1    stablecoin savings product"?

2    A.  That meant that I had no risk of losing my principal, which

3    was my investment.

4    Q.  And what did you understand was meant by "accepts Terra

5    deposits"?

6    A.  That it accepts Terra blockchain tokens, such as UST.

7    Q.  And what about that it "pays depositors a stable interest

8    rate"?  What did you understand that to mean?

9    A.  It meant to me that it was a consistent interest rate that

10   they were talking about.

11   Q.  If you turn to the last sentence on page 3, which actually

12   continues on to page 4, could you please read that for us,

13   please.

14          Shadow, it's on the bottom of page 3.  It starts with

15   that very last sentence on the bottom of page 3, starting with

16   "beyond."

17   A.  I see.  "Beyond offering low-volatility yield, Anchor is an

18   attempt to give the main street investor a single reliable rate

19   of return across all blockchains."

20   Q.  OK.  And here, what did you understand was meant by

21   low-volatility yield?

22   A.  Low-volatility yield to me meant that it was a consistent

23   return that wouldn't fluctuate.

24   Q.  And what was that return again?

25   A.  It was the 20 percent APY.

O3PHSec3                              Vakil - Direct

1    Q.  And it says here that it's an attempt to give the main

2    street investor a reliable rate of return.  What did you

3    understand was meant here by "main street investor"?

4    A.  I thought that it was talking to me as an investor.

5    Q.  And what did you mean there by like someone like you?

6    A.  Just the normal guy who's looking for a place to —— to park

7    money and get a return on —— a higher APY than they would

8    normally from a traditional savings bank.

9    Q.  Could you please —— going back to page 3 again, the —— at

10   the top of the page, there is —— could you please read that

11   language.

12   A.  "In this post, we cover the core concepts behind the Anchor

13   Protocol.  For the full treatment, read through the Anchor

14   white paper."

15   Q.  Are you familiar with the Anchor white paper?

16   A.  Yes, I am.

17   Q.  Did you review the Anchor white paper in connection with

18   your investment?

19   A.  Yes, I did.

20           MS. STAREN:  Shadow, could you please show Plaintiff's

21   Exhibit 417 just to the witness, please.

22   Q.  Could you review that, Mr. Vakil, and then let us know, do

23   you recognize this document?

24   A.  Yes, I do.

25   Q.  What is this?

O3PHSec3                          Vakil - Direct

1   A.   This is the Anchor Protocol white paper.

2   Q.   And who are the authors of this document?

3   A.   Nicholas Platias, Eui Joon Lee, Marco DiMaggio.

4   Q.   Did you review this document in connection with your

5   investment?

6   A.   I did, yes.

7          MS. STAREN:  We move to admit Plaintiff's Exhibit 417

8   into evidence at this time.

9          MR. KORNBLAU:  No objection.

10          THE COURT:  Received.

11          (Plaintiff's Exhibit 417 received in evidence)

12          MS. STAREN:  Thank you.

13          Shadow, could you please publish it to the jury.

14   BY MS. STAREN:

15   Q.  Mr. Vakil, how did you come across this document?

16   A.  This was from the Anchorprotocol.com website.

17   Q.  Could you please read the title of this document.

18   A.  The title is "Anchor:  Gold Standard for Passive Income on

19   the Blockchain."

20   Q.  And what did you understand that to mean, "gold standard

21   for passive income"?

22   A.  It was aiming to be the premier destination for you to park

23   money, and for very little effort, you would be receiving a

24   return.

25   Q.  OK.  Could you please take a look at the abstract section

O3PHSec3                          Vakil - Direct

1    and read the highlighted text there.

2    A.  "Anchor offers a principal-protected stablecoin savings

3    product that pays depositors a stable interest rate."

4    Q.  Was this reference the same as what was just made in the

5    Medium post we just looked at?

6    A.  Yes, it was.

7    Q.  What did you understand the difference was between this

8    white paper and the Medium post that we just looked at?

9    A.  This went into significantly more detail about the Anchor

10   Protocol, how it was generating the —— the fees as well as the

11   algorithm behind it.

12   Q.  Did this more detailed description of the Anchor Protocol

13   impact you in any way?

14   A.  Yes, it did.

15   Q.  How was that?

16   A.  It gave me more confidence in the product.

17   Q.  When you say "the product," what are you referring to?

18   A.  I'm referring to UST.

19          THE COURT:  When you say it gave you more confidence,

20   are you saying that it was important to you in making —— in

21   your decision whether or not to invest?

22          THE WITNESS:  That's right, yes.

23          THE COURT:  Go ahead.

24          (Continued on next page)

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O3PASEC4                          Vakil - Direct

1    BY MS. STAREN:

2    Q.  Did you come across any other materials about the Anchor

3    Protocol in your online research?

4    A.  Yes, I did.

5    Q.  Shadow, could you please show the witness Plaintiff's

6    Exhibit 79.

7           Mr. Vakil, do you recognize this document?

8    A.  Yes, I do.

9    Q.  And what is it?

10   A.  This is a tweet from Do Kwon.

11   Q.  Okay.  And did you review this document in connection with

12   your investment?

13   A.  Yes, I did.

14          MS. STAREN:  We would move to admit Exhibit 79 into

15   evidence at this time.

16          MR. KORNBLAU:  No objection.

17          THE COURT:  Received.

18          (Plaintiff's Exhibit 79 received in evidence)

19          MS. STAREN:  Thank you, Shadow.  You can publish to

20   the jury.

21   BY MS. STAREN:

22   Q.  Mr. Vakil, can you please read the name and the Twitter

23   handle on this tweet?

24   A.  The name is Do Kwon.  The Twitter handle is Stable Kwon.

25   Q.  And can you please tell me the date of this tweet?

O3PASEC4                         Vakil – Direct

1    A.  The date is March 15, 2021.

2    Q.  And how did you come across this tweet?

3    A.  I was -- through research of the Anchor Protocol and Do

4    Kwon, so through Twitter.

5    Q.  And can you please read this tweet?

6    A.  Anchor public announcement number two.  Anchor will target

7    20 percent fixed APR.  This is by far the highest stablecoin

8    yield in the market.

9    Q.  And what was significant to you about this tweet?

10   A.  The declaration of the 20 percent fixed APR as well as

11   stablecoin yield.

12   Q.  And was it significant to you that it was Do Kwon tweeting

13   this?

14   A.  Yes, it was.

15   Q.  After you invested, did you continue to research

16   information about your investment in the Anchor Protocol?

17   A.  Yes, I did.

18   Q.  And why is that?

19   A.  I wanted to keep tabs on things and make sure that things

20   were going okay.

21   Q.  And did you come across information related to the growth

22   or the success of the Anchor Protocol?

23   A.  I did, yes.

24   Q.  Shadow, could you please show the witness Plaintiff's

25   Exhibit 81.

1          Mr. Vakil, do you recognize this document?

2    A.   I do, yes.

3    Q.   And what is it?

4    A.   This is primarily a screen shot from the Anchor Protocol.

5    Q.   Okay.  Could you please tell us, though, what the document

6    itself is?

7    A.   This is a tweet from the Anchor Protocol handle.

8    Q.   Okay.  And did you -- sorry.

9          MS. STAREN:  We would move at this time to admit

10   Plaintiff's Exhibit 81.

11         MR. KORNBLAU:  No objection.

12         MR. FERRARA:  Your Honor, we just might want to admit

13   it without some of the -- there's some other comments that we

14   just might want to talk to the SEC about not bringing in as

15   well, but generally we have no objection, but we may ask it be

16   subject to redaction later.

17         THE COURT:  Well, I don't think they're pursuing that

18   now.  We can talk at the next break about any redactions.

19         MR. FERRARA:  Thank you, your Honor.

20         (Plaintiff's Exhibit 81 received in evidence)

21   BY MS. STAREN:

22   Q.   Mr. Vakil, could you please read the Twitter handle for

23   this tweet?

24   A.   The Twitter handle is Anchor Protocol.

25   Q.   And can you tell me the date of this tweet?

O3PASEC4                        Vakil - Direct

1    A.  The date is May 4, 2022.

2    Q.  And how did you come across this tweet?

3    A.  I was following them on Twitter.

4    Q.  Okay.  And can you please read this tweet?

5    A.  Here's to the next 20 billion, with a champagne emoji.

6    Q.  And what did you understand that to mean, "here's to the

7    next 20 billion?"

8    A.  They were celebrating that they had $20 billion on the

9    platform.

10   Q.  Okay.  And this tweet is forwarding a chart, or a screen

11   shot I think you described it, titled to total value locked.

12           Do you recognize this screen shot?

13   A.  Yes, I do.

14   Q.  And what is this?

15   A.  This is a screen shot from the Anchor Protocol dashboard.

16   Q.  Okay.  And when you say "this is a screen shot from the

17   Anchor Protocol dashboard," what do you mean?

18   A.  This is something that I would view regularly on the

19   platform and it showed how much was on the platform.

20   Q.  Was this on the Anchor Protocol website?

21   A.  Yes.

22   Q.  Okay.  And what did that mean to you, "total value locked?"

23   A.  This meant the aggregate value of money on the platform.

24   Q.  Okay.  Now, you see there are references here to a total

25   deposit and a total collateral.  Do you have an understanding

O3PASEC4                          Vakil - Direct

1   as to what those refer to?

2   A.  Yes.  These are the amounts in dollars, the value of the

3   tokens that have been deposited on the platform, on the Anchor

4   Protocol.

5   Q.  Okay.  So when it says "total collateral," what did that

6   mean to you?

7   A.  Just meant that these are addition -- these are tokens that

8   were, you know, backed.  These are additional value that was

9   placed in there as -- to back whatever the supply and demand

10  platform, the borrowing and the lending platform.

11  Q.  Okay.  So you mentioned borrowing and lending.  Did the

12  total collateral number relate to the amount of UST that was

13  deposited -- well, did it relate to the amount of UST that was

14  deposited?

15          MR. KORNBLAU:  Objection.  Leading.

16          THE COURT:  Well, she was certainly going down that

17  road, but I think she caught herself.  I will allow it.  You

18  may answer the question.

19  A.  Yes.

20  Q.  Okay.

21          THE COURT:  In what way?

22  Q.  What about --

23          THE COURT:  Whoa.

24          THE WITNESS:  I'm sorry.  Can you repeat.

25          THE COURT:  Yeah.  The question was, let's go back.

O3PASEC4                          Vakil - Direct

1    So you mentioned borrowing and lending.  Did the total

2    collateral number relate to the amount of UST that was

3    deposited -- well, did it relate to the amount of UST that was

4    deposited?

5            MR. KORNBLAU:  Also lack of foundation, your Honor.

6            THE COURT:  Too late.

7            So you answered yes, and my question is, in what way

8    did it relate, as you understood?

9            THE WITNESS:  This was the total amount backed on the

10   platform, on the Anchor Protocol in terms of overall value that

11   was stored.

12           THE COURT:  Okay.

13   BY MS. STAREN:

14   Q.  So when you take a look at the total deposit number, can

15   you read that number, please?

16   A.  $14 billion.

17   Q.  And what did that refer to?

18           MR. KORNBLAU:  Objection.  Lack of foundation.

19           THE COURT:  Without saying yet what you understood

20   that referred to, what was your basis of forming an opinion on

21   that subject?

22           THE WITNESS:  For the total deposit, the total deposit

23   was the total amount of UST that was on the platform, or at

24   least --

25           THE COURT:  And how did you reach that understanding

O3PASEC4                          Vakil - Direct

1   is my question?  Is that based on your reading of this document

2   against the background of your prior experience in this kind of

3   investment?

4              THE WITNESS:  That's right.  Yes.

5              THE COURT:  All right.  Overruled.  So now you can put

6   again your question.

7   BY MS. STAREN:

8   Q.  The reference here to total deposits, what did that refer

9   to?

10  A.  The amount of people that -- the amount of dollars that

11  were earning the 20 percent.

12  Q.  Okay.  Shadow, you can take the exhibit down.

13             Mr. Vakil, were you sent a subpoena for documents by

14  the defendants in this case?

15  A.  I was, yes.

16             MR. KORNBLAU:  Objection.  Relevance.

17             THE COURT:  Well, I'll let the jury know that both

18  sides are free to send subpoenas for documents to anyone

19  involved in the matter, including witnesses for the other side.

20  So if a subpoena was sent, it was perfectly proper.  Go ahead.

21  BY MS. STAREN:

22  Q.  And did you respond to that subpoena to the best of your

23  ability?

24  A.  I did, yes.

25  Q.  And did that subpoena ask you to produce everything you

O3PASEC4                          Vakil - Direct

1    looked at in connection with your investment?

2    A.  It did ask me that, yes.

3    Q.  And did you in fact produce everything you looked at in

4    response?

5    A.  I tried my best.  There was a lot of stuff.  I'm just one

6    person.

7    Q.  Okay.  Did there come a time before you invested when you

8    learned of something called the LUNA Foundation Guard?

9    A.  Yes, I did.

10   Q.  And was that also sometimes called the LFG?

11   A.  That's right, yes.

12   Q.  And approximately when did you first hear of the LFG?

13   A.  Probably around the same time that I started learning about

14   the platform itself.  So mid -- late 2021.

15   Q.  Okay.  And what did you understand the LFG was?

16   A.  This was a foundation, a group of individuals who was

17   tasked to oversee the success of the Terra protocol and

18   blockchain.

19   Q.  And did you have an understanding as to how the LFG was

20   tasked to oversee the success of the Terra protocol?

21   A.  Yes.

22   Q.  What was your understanding?

23   A.  I think they were supposed to monitor the health of

24   business, ensure that everything was going to plan.

25   Q.  And did that add to your comfort about the stability of

O3PASEC4                        Vakil - Direct

1    UST?

2              MR. KORNBLAU:  Objection.  Leading.

3              THE COURT:  Yep.  Sustained.

4    BY MS. STAREN:

5    Q.  How did the activities that the LFG impact your decision to

6    invest?

7    A.  It gave me more confidence in my investment.

8    Q.  And why is that?

9    A.  Because of the public statements that the LFG was making.

10   Q.  Did you have -- let me back up.

11             What public statements are you referring to?

12   A.  There was one that I remember saying that they bought

13   $1.5 billion of Bitcoin.

14   Q.  And how did that impact your comfort in your investment?

15             MR. FERRARA:  Objection.  Leading.

16             THE COURT:  Well, it's getting close to the line of --

17   I think the proper question is, did that have any impact on

18   you?  And, if so, what?

19             THE WITNESS:  Yes, it did.  And what was the impact,

20   well, it gave me confidence that these guys knew what they were

21   doing.

22   BY MS. STAREN:

23   Q.  And when you say these guys, who are you referring to?

24   A.  Do Kwon, Terraform Labs, the LFG.

25   Q.  Did you have an understanding of who controlled the LFG?

O3PASEC4                    Vakil - Direct

1    A.  Yes.

2    Q.  And who did you understand controlled the LFG?

3    A.  Primarily Do Kwon.

4    Q.  And how did you get that understanding?

5    A.  Through public statements, Twitter, online sources.

6    Q.  In researching your investment, did you learn of any time

7    when UST had depegged from the dollar?

8    A.  I did, yes.

9    Q.  And do you recall approximately when that was?

10   A.  That was around May 2021.

11   Q.  And how did you learn of this event?

12   A.  I looked at a price chart of the UST token over a long

13   period of time, and typically you would see a flat, stable

14   chart at $1, and I saw a little blip in May 21.

15   Q.  And when you say "blip" what was it that you saw?

16   A.  I saw that it deviated from being a stablecoin.  It went

17   south.  It went lower than a dollar.

18   Q.  Okay.  And when you refer to the blip, did it recover?

19   A.  It did, yes.

20   Q.  And you said you reviewed price charts.  Where did you find

21   these price charts?

22   A.  Price charts are accessible through sites like

23   Coingecko.com or Coinmarketcap.com.

24   Q.  And what are Coingecko and Coinmarketcap.com?

25   A.  These sites list the prices of every crypto asset or --

O3PASEC4                        Vakil - Direct

1  basically every crypto asset that's available for purchase.

2  Q.  Okay.  And when you reviewed the price charts, what did you

3  see?

4  A.  In May 2021, I saw that little blip that -- where it

5  depegged from the dollar and then it restored.

6  Q.  Did you have any understanding as to how UST's price was

7  restored in that May 2021 timeframe?

8  A.  I assumed that it was the algorithm that enabled it to

9  restore itself back to $1.

10 Q.  And why did you make that assumption?

11 A.  Because of the statements that were made in the light paper

12 and all of the online media sources that talked about the UST

13 algorithmic stable going token.

14 Q.  Before you invested, did you see any public information

15 about a third party being brought in to restore UST's peg

16 during that time?

17          MR. KORNBLAU:  Objection.  Leading.

18          THE COURT:  No, I think that's an appropriate

19 foundational question.  Overruled.

20 A.  Sorry.  Can you repeat the question?

21 Q.  Sure.  Before you invested, did you see any public

22 information about a third party being brought in to restore

23 UST's peg at that time?

24 A.  No, I did not.

25 Q.  If you had known that a third party had been brought in to

O3PASEC4                              Vakil - Direct

1    help restabilize UST, would that fact have been important to

2    you?

3              MR. FERRARA:  Objection.

4              MR. KORNBLAU:  Objection.  Leading.

5              THE COURT:  No, no, no, this is when -- this is a

6    different kind of situation.  This goes to a hypothetical

7    bearing on materiality, and a hypothetical requires necessarily

8    that kind of question.  Overruled.  You may answer the

9    question.

10   A.  Sorry.  Can you repeat that?

11   Q.  Of course.

12             THE COURT:  If you had known that a third party had

13   been brought in to help restabilize UST, would that fact have

14   been important to you?

15             THE WITNESS:  Absolutely.

16             THE COURT:  Why?

17             THE WITNESS:  Because I wouldn't know if they were --

18   I wouldn't know if they were available again in the future or I

19   would have -- I would not have invested as much as I did had I

20   known that there was a third party involved.

21             THE COURT:  So just so the jury is clear, the Court is

22   clear on that, as I understand your prior representation, your

23   prior testimony, was that it was being represented to you by

24   Terraform that this algorithm created by Terraform would assure

25   the stability of the price, yes?

O3PASEC4                    Vakil - Direct

1          THE WITNESS:  That's right, yes.

2          THE COURT:  And if, hypothetically, you had learned

3    that the correction back to the $1 price was being obtained,

4    not by some algorithm, but by a third party investing, that you

5    say would have been important to you in questioning the earlier

6    representations?  Do I have that?

7          THE WITNESS:  Yes, sir.  That's correct.

8          THE COURT:  Okay.  Go ahead.

9          MS. STAREN:  Thank you, your Honor.

10   BY MS. STAREN:

11   Q.  Did there come a time, Mr. Vakil, that you learned that

12   UST's price was falling again after you had invested?

13   A.  Yes.

14   Q.  Approximately when was that?

15   A.  It was early May 2022.

16   Q.  And how did you learn that UST's price was falling?

17   A.  Primarily Do Kwon's Twitter account.

18   Q.  And what was your initial view when you first learned that

19   UST's price was falling?

20   A.  I thought that the Twitter community was overly dramatic

21   and these guys had it under control.

22   Q.  And when you say these guys, who are you referring to?

23   A.  Do Kwon, LFG, Terraform Labs.

24   Q.  Did Do Kwon make any statements during this time?

25   A.  Yes, he did.

O3PASEC4                          Vakil - Cross

1   Q.   And what did Do Kwon say during this time?

2   A.   Generally, he said I -- everyone don't freak out, I'm a new

3   father, everything is fine.  That was the general consensus of

4   the statement.

5   Q.   Did those statements have any impact on you?

6   A.   It did, yes.

7   Q.   What was that impact?

8   A.   As I saw the price dropping, I decided to hold onto the

9   token.

10  Q.   Did there come a time when you decided to sell your UST?

11  A.   Yes, there was.

12  Q.   And why did you decide to sell your investment?

13  A.   I lost all hope for the restoration of the token back to

14  the $1 peg.  Sorry.

15  Q.   And from your original $188,000 investment, how much did

16  you end up getting back?

17  A.   Approximately $13,000.

18          MS. STAREN:  I have no further questions.

19          THE COURT:  Cross-examination.

20          MR. FERRARA:  Thank you, your Honor.

21  CROSS-EXAMINATION

22  BY MR. FERRARA:

23  Q.   Good afternoon, sir.

24  A.   Good afternoon.

25  Q.   So you're a professor at -- was it CUNY?

O3PASEC4                          Vakil - Cross

1    A.  Sure.  Yes, yes.

2    Q.  I'll refer to you as professor.

3            We've never met before, right?

4    A.  No.

5    Q.  But you've met with the SEC counsel several times; is that

6    fair to say?

7    A.  That's correct.

8    Q.  About how many times would you say you met with this?

9    A.  Seven, around seven times.

10   Q.  You discussed your sort of testimony with them before

11   today?

12   A.  That's correct, my experience, yes.

13   Q.  So I want to start by just going over -- I have a few

14   questions about your background and experience; is that okay?

15   A.  Sure.

16   Q.  And I guess at a high level, is it fair to say that you are

17   an experienced investor; is that right?

18   A.  Sure.

19   Q.  An experienced businessman; is that fair?

20   A.  Yes.

21   Q.  You have an MBA, right, which is a Master's Degree in

22   business, right?

23   A.  That's correct.

24   Q.  You've been the chief product officer at multiple

25   companies; is that right?

1    A.   That's correct.

2    Q.   I think one of them is called Paltalk, Inc.; is that right?

3    A.   That's correct.

4    Q.   And another called Disrupt With Us?

5    A.   Correct.

6    Q.   Why did you leave Paltalk?

7    A.   Well, I saw other opportunities.

8    Q.   That was your decision to leave?

9    A.   Well, we had mutual parting of ways.  I had been there for

10   basically 12 years.

11   Q.   What about Disrupt With Us?

12   A.   That's -- DBA is Vakil Ventures, so that's me.

13   Q.   So at Disrupt With Us, that's where you actually worked in

14   cryptocurrencies; is that right?

15   A.   I wouldn't necessarily say that I worked in cryptocurrency,

16   but I have, you know, discussed crypto, and, you know, advised

17   and, you know, that kind of stuff, within my consulting engage,

18   my consulting entity.

19   Q.   I think the way you described it on your LinkedIn is that,

20   as an experienced interim CPO/CMO/COO you drive sustainable

21   growth and digital transformation; is that right?

22   A.   Correct, yes.

23   Q.   And I think you said that your consultancy merges

24   investment insight and leadership to innovate in live

25   streaming, social media, dating, E-commerce, SAAS, FinTech,

O3PASEC4                         Vakil - Cross

1   cryptocurrency, and DeFi; do I have that right?

2   A.  Sure.

3   Q.  What is SAAS?

4   A.  Software as a service.

5   Q.  Would that be, for instance, Microsoft Outlook?  Is that

6   SAAS?

7   A.  Sure.  Yeah, subscription based currency -- subscription

8   based product, yeah.

9   Q.  What about DeFi, what is that?

10  A.  Decentralized finance.

11  Q.  Does a blockchain count as a kind of decentralized finance?

12  A.  It certainly could.

13  Q.  Based on your education and experience, you have an

14  expertise in digital products that use blockchain, such as

15  cryptocurrencies; is that fair to say?

16  A.  Expertise is kind of a bigger word, but, you know, it's

17  close enough.  I mean, I'm not top one percent person on it,

18  but I know more than the average person I think.

19  Q.  Well, you mentor executives on crypto ecosystems, right?

20  A.  Sure.  I've had discussions around that with various

21  executives.

22  Q.  That's also part of your résumé?

23  A.  Sure.

24  Q.  You focus on -- I think the way you put it leveraging

25  blockchain technologies to revolutionize industries; do I have

O3PASEC4                        Vakil - Cross

1   that right?

2   A.  Sure.

3   Q.  And you're saying sure, I just want to -- is that how you

4   put it on your LinkedIn page?  I just want to make sure I have

5   it right?

6   A.  I'm not up to date on how I represented myself on LinkedIn.

7   Right.  That's not a social platform that I'm in love with.

8   But yeah, it's -- I'm sure it's there and I'm sure that's

9   accurate.  Yeah.

10  Q.  I take it in just in terms of your work and your teaching

11  class, is it fair to say that it's your practice to keep up

12  with the financial press?

13  A.  Yeah, I try to.

14  Q.  Like the *Wall Street Journal* let's say?

15  A.  Sure.

16  Q.  How about others?  Do you read *The Financial Times*?

17  A.  Maybe not necessarily *Financial Times*.

18  Q.  What about the *New York Times* business section, how about

19  that?

20  A.  Sure.

21  Q.  Is it fair to say in your business experience that these

22  publications often cover key developments in crypto ecosystems

23  and the crypto industry generally?

24  A.  Yes.

25  Q.  So since 2016, when you started I think investing in

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O3PASEC4                          Vakil - Cross

1   cryptocurrencies, you regularly kept up with stories let's say

2   in the *Wall Street Journal* about crypto; is that fair to say?

3   A.  Maybe not specifically *Wall Street Journal*, but I would say

4   I keep myself abreast of what's going on.

5   Q.  Any particular reporters you follow in the financial press?

6   A.  I think Matt Levine.

7   Q.  Do you have a Bloomberg account?

8   A.  No.

9   Q.  Have you ever used a Bloomberg account for trading?

10  A.  Not that I'm aware of.

11  Q.  I think your course, am I right, your course at CUNY -- is

12  it CUNY or SUNY?

13  A.  CUNY.

14  Q.  Pardon me.

15  A.  It's all good.

16  Q.  Thanks for correcting me.  Your course is called virtual

17  enterprise?

18  A.  Yeah.  That's one of the courses, yeah.

19  Q.  What are the others?

20  A.  Global business.

21  Q.  Just to focus on virtual enterprise for a second, does that

22  course focus on navigating the challenges and opportunities of

23  taking virtual products and services to market in the global

24  economy; is that right?

25  A.  That's fair, yeah.

O3PASEC4                        Vakil - Cross

1    Q.  It's designed to equip students with the tools necessary to

2    thrive in the digital age; did I get that right?

3    A.  Sure.  Yes.

4    Q.  And then for the global business course, I think as part of

5    that course, do you explore critical aspects of researching and

6    entering foreign markets, identifying and evaluating risks and

7    opportunities; is that right?

8    A.  That's right.

9    Q.  I think you've described yourself, and sorry to put you on

10   the spot, but I think you've described yourself as a visionary

11   leader with over 15 years of expertise at the intersection of

12   product management, marketing, and technology; do I have that

13   right?

14   A.  I like to think so, yes.

15   Q.  Okay.  And you own your own app development and investment

16   firm; is that right?

17   A.  That is true.

18   Q.  That's Vakil Ventures?

19   A.  That's right.

20   Q.  Am I saying your name right, professor, is it Vakil?

21   A.  Yes, sir.

22   Q.  You used Vakil Ventures to invest in a number of assets; is

23   that fair?

24   A.  I would say that's correct.

25   Q.  You talked about some of them on direct --

O3PASEC4                    Vakil - Cross

1    A.  Sure.  Yeah.

2    Q.  How many employees does Vakil Ventures have?

3    A.  Contractors, I mean, on and off, but I would say it's just

4    me primarily.

5    Q.  I ask because I think the web page says:  We are investors,

6    advisors, and builders of sustainable growth.  So I want to

7    know who the "we" refers to?

8    A.  Me.

9    Q.  Is it fair to say that you personally design and execute

10   trades and investments in crypto assets?

11   A.  Yes.

12   Q.  So you have firsthand knowledge of how to obtain and manage

13   crypto assets; is that fair to say?

14   A.  That's fair to say, yes.

15   Q.  So I think just -- I think I have it, but about eight years

16   that you've been investing in crypto products?

17   A.  I would say that's correct, yeah.

18   Q.  I won't hold you to it.  Give or take.

19   A.  Give or take, yeah.

20   Q.  You've held a number of different crypto assets.  We

21   covered a few of them, but just to be sure, I think Bitcoin,

22   right?

23   A.  Yes.

24   Q.  Did you mention Ether or Etherum?

25   A.  Yes.

O3PASEC4                          Vakil – Cross

1    Q.  How about Ripple's token, XRP?

2    A.  That's right, yeah.

3    Q.  And then, of course, as relevant here, UST?

4    A.  Absolutely, yes.

5    Q.  And, sorry, what is -- just for the jury's sake and maybe

6    mine, what is XRP?

7    A.  XRP is the Ripple token.

8    Q.  Is that a stablecoin or does it fluctuate?

9    A.  It fluctuates.

10   Q.  You also invest in more traditional securities; is that

11   fair to say?

12   A.  That's fair to say, yes.

13   Q.  Stocks and bonds and the like?

14   A.  Correct.

15   Q.  Let me just change topics.  I want to talk a little more

16   about UST.

17          THE COURT:  Counsel, just so you know, that at 3:00

18   we'll give the jury their mid-afternoon break.  So you may want

19   to find an appropriate spot to break around.

20          MR. FERRARA:  Thank you, your Honor.  We can whenever

21   your Honor wants to.

22          THE COURT:  Go ahead.  Until 3:00.

23   Q.  Is it fair to say you hope the government wins this trial?

24   A.  Yes.

25   Q.  Is part of the reason that if they win they could

O3PASEC4                          Vakil - Cross

1    potentially recover money for investors like you?

2    A.  Not the sole reason, but sure.

3    Q.  You stand to get some money back depending on the outcome

4    'is that fair to say?

5    A.  I have no idea if that's remotely true.  But I'm here just

6    to give my story about what happened.  I was asked to do that

7    and that's what I'm doing.

8    Q.  So let's --

9               THE COURT:  To clarify that to the jury, all you're

10   being asked to determine is whether or not the defendants are

11   liable for fraud.  Any penalties or other relief is solely for

12   the Court to determine.  That won't be your determination.  And

13   of course until I know your verdict, I've not even thought

14   about what penalties, if any, I would impose.  But that's an

15   issue for the Court, not for you.  Go ahead, counsel.

16              MR. FERRARA:  Thank you, your Honor.

17              So let's talk about UST for a few minutes.

18              Your Honor, any time we take a break here is totally,

19   totally fine.

20   BY MR. FERRARA:

21   Q.  So we talked about UST being a stablecoin, right?

22   A.  That's correct, yes.

23   Q.  The idea was that its value would be tied to the U.S.

24   dollar, right?

25   A.  That's right.

O3PASEC4                       Vakil - Cross

1   Q.  And if we call that a peg sometimes, you understand that
2   that's what that refers to?  Peg, meaning UST, the idea it
3   would be around a dollar; is that fair?
4   A.  Yes.
5   Q.  Now, you testified a little about how that works.  I think
6   you talked about the mint burn mechanism; do you recall that?
7   A.  Yes.
8   Q.  Now, I want to flag it because on the one hand I believe
9   you testified that you expected no fluctuation in the price of
10  UST; did I recall that correctly?
11  A.  Generally speaking, correct, yes.
12  Q.  Well, that's what I think I want to talk about a little
13  bit.
14  A.  Sure.
15  Q.  Because the idea of the mint burn mechanism, doesn't that
16  sort of incorporate the idea that there will be some
17  fluctuation to incentivize people to buy on either side; is
18  that fair to say?
19  A.  Some fluctuation to a degree, yes.
20  Q.  Let's talk a little bit about that idea of the incentive.
21          Am I right that the algorithm that you sort of
22  mentioned, the algorithm, the idea of it is to incentivize
23  people to purchase or sell LUNA or UST; is that fair to say?
24  A.  Sure.
25  Q.  If no one buys it, it has no value; is that fair?

O3PASEC4                           Vakil - Cross

1    A.  That's correct of anything.

2    Q.  Right.

3    A.  Yeah.

4    Q.  Anything that no one wants has no value; is that fair?

5    A.  Yes.

6    Q.  Okay.  Understood.

7              THE COURT:  All right.  I will take time to pause.

8    So, ladies and gentlemen, we will take a 15-minute break at

9    this time and then we'll resume.

10              (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O3PASEC4                         Vakil - Cross

1              (Jury not present)

2              THE COURT:  Please be seated.  Anything counsel needs

3     to raise?  Otherwise, we'll take the 15-minute break.

4              Very good.  We'll see you in 15 minutes.

5              (Recess)

6              THE COURT:  Let's bring in the jury.

7              MR. FERRARA:  Do you want me seated, your Honor, or

8     may I stand?

9              THE COURT:  No, you should stand.

10             MR. FERRARA:  But here is okay?

11             THE COURT:  Yeah.

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

O3PASEC4                          Vakil - Cross

1          (Jury present)

2          THE COURT:  Please be seated.  So although I commented

3     on juror number six's sweater, I don't want to juror number

4     three, four, and seven to feel that I haven't noticed the

5     writing on their T-shirts as well.

6          Juror number three in particular, maybe you want to

7     show the back to everyone.  Stand up.  Turn around.

8          All right.  Let's continue.  Go ahead, counsel.

9          MR. FERRARA:  May I inquire, your Honor.

10         THE COURT:  Please.

11    BY MR. FERRARA:

12    Q.  So I think when we took a break we were talking about UST;

13    do you recall that?

14    A.  Yes.

15    Q.  So before we talk about why you purchase UST, I want to ask

16    you a little bit more about how you purchased it, which you

17    also got into a little bit on direct.

18    A.  Sure.

19    Q.  Now, fair to say you did not buy UST directly from like Do

20    Kwon or Terraform Labs; is that right?

21    A.  I did not.

22    Q.  It took some -- sounds, listening to your testimony, that

23    it took some technical expertise to actually purchase this

24    stuff; is that fair?

25         THE COURT:  Sustained.

O3PASEC4                          Vakil - Cross

1              THE WITNESS:  There were --

2              THE COURT:  No, no.  When I sustain an objection,

3     which was quietly made by plaintiff's counsel, then you don't

4     answer.

5              THE WITNESS:  Sorry.

6     BY MR. FERRARA:

7     Q.  So let's walk through the steps.  So I think you testified

8     or have said that you started buying UST on February 10, 2022;

9     is that right?

10    A.  That is correct, yes.

11    Q.  You bought UST over the course of a month until around

12    March 10, 2022; do I have it right?

13    A.  That's correct, yes.

14    Q.  And so you had in total about $188,000 worth?

15    A.  Correct, yes.

16    Q.  And I think you said that you bought UST in a couple

17    different ways and I want to sort of cover each of those.  Did

18    you use a perform called Gemini to buy UST?

19    A.  I did, yes.

20    Q.  Gemini is a crypto exchange, right?

21    A.  Yes.

22    Q.  To use Gemini you have to create an account there, right?

23    A.  That's correct.

24    Q.  Did you already have a Gemini account before you began

25    buying UST in February, 2022?

O3PASEC4                       Vakil - Cross

1   A.  Yes.

2   Q.  So you didn't open your account just for the purpose of

3   purchasing UST; is that fair?

4   A.  I did not open the Gemini account specifically for the

5   purchase of UST.

6   Q.  Then you had to put funds into your Gemini account in order

7   to buy the UST; is that right?

8   A.  That's correct.

9   Q.  How did you get, how did you get your sort of -- your cash

10  or -- well, money in the bank.  How did you get that into the

11  Gemini account?

12  A.  It was an electronic transfer, an ACH transfer.

13  Q.  You also bought -- am I right that you also bought a

14  different stablecoin on Gemini, something called USDC?

15  A.  That's correct.

16  Q.  What is USDC?

17  A.  USDC is the stablecoin that is backed by a company Circle.

18  Q.  That's not related to Terra; that fair?

19  A.  It is not.

20  Q.  And am I right that you used the USDC that you had

21  purchased on Gemini to buy the UST?

22  A.  That's correct, yes.

23  Q.  So are the steps so far that you opened the account, you

24  put in currency, like you put in your sort of US dollars, you

25  buy USDC, and then you buy UST; do I have it right so far?

O3PASEC4                         Vakil - Cross

1   A.  That's one of the ways.

2   Q.  Fair enough.  And I think we'll come to --

3   A.  Okay.

4   Q.  -- another way.  But do I have that right?

5   A.  Yes, that was a way that I had purchased it.

6   Q.  So you mentioned this other way.  Is that the other

7   cryptocurrency exchange called KuCoin?

8   A.  Sure.  But that wasn't the way I was referring to.

9   Q.  What was the other way you were referring to?

10  A.  You could buy UST directly from Gemini.

11  Q.  Did you do that?

12  A.  I believe so.

13  Q.  Now, what about -- so KuCoin for the benefit of the court

14  reporter K-u-C-o-i-n.

15          Are you familiar with that?

16  A.  I am, yes.

17  Q.  Is that also a cryptocurrency exchange?

18  A.  That is correct, yes.

19  Q.  Now, just to sort of ask some of the similar questions, you

20  also needed an account on KuCoin to purchase assets on that

21  exchange; is that right?

22  A.  That's correct.

23  Q.  Again, did you have a KuCoin account, or did you set it up

24  for the purchase of buying UST?

25  A.  I already had a KuCoin account.

O3PASEC4                        Vakil - Cross

1    Q.  Did you trade on KuCoin from the United States?

2    A.  I did, yes.

3    Q.  Am I right USDC wasn't the only cryptocurrency product that

4    you used -- well, did you also do the same thing where you

5    bought the USDC and then purchased the UST on KuCoin?  Is that

6    the same?

7    A.  I did not purchase USDC directly on KuCoin.  No, I did not.

8    Q.  Did you use Bitcoin to purchase USD --

9    A.  Some of that was Bitcoin, very small amount was Bitcoin.  I

10   did transfer USDC into KuCoin and exchange that for UST.

11   Q.  So did you transfer USDC from Gemini to KuCoin?

12   A.  Correct.

13   Q.  Did you also hold another stablecoin called USDT?

14   A.  That's correct, yes.  I likely had that.  Yeah.

15   Q.  Again, that's another stablecoin that's the idea is it's

16   pegged to the U.S. dollar; is that right?

17   A.  That's right, yes.

18   Q.  As far as you know, it has no relationship to Terraform

19   Labs or Do Kwon?

20   A.  No relation that I am aware of.

21   Q.  So, again, you had both sort of figured out how to get your

22   cash onto these exchanges, and then also how to swap the sort

23   of different cryptocurrencies themselves; is that fair to say?

24   A.  Sure.  Yes.

25   Q.  Are you familiar, professor, with what a VPN is?

O3PASEC4                          Vakil - Cross

1    A.  Yes, I am.

2    Q.  What is a VPN?

3    A.  It's a virtual private network.

4    Q.  Is it fair to say that a VPN can be used to make your

5    computer appear to be online in a different geographical place

6    than it actually is?

7    A.  That's correct, it can be used for that.

8    Q.  That's one use.  You could be on a computer in the United

9    States but could appear to be, for instance, in Europe; is that

10   fair to say?

11   A.  That is very possible, yes, you can do that, yeah.

12   Q.  Am I right that KuCoin is not available in the United

13   States without a use of the VPN; is that right?

14   A.  That is incorrect.

15   Q.  It's incorrect.  So if I showed you -- why don't I just

16   show the witness -- I want to show you what's been marked for

17   identification as Defense Exhibit 1935, just for the witness.

18   Mr. Aquino, can we blow up for the witness that middle.

19             Have you taken a look at this?

20   A.  I see this, yes.

21   Q.  So we can bring that down.  Thank you so much.

22             So it's your testimony that you can access KuCoin from

23   the United States without a VPN?

24   A.  When I did it, yes, years ago.

25   Q.  And KuCoin, is it your testimony that the terms of service

O3PASEC4                         Vakil - Cross

1    don't say that it is not available to U.S. investors?

2              MS. STAREN:  Objection, your Honor.

3              THE COURT:  Yeah.  Is the question what did it say

4    then is I think the objection.

5              MR. FERRARA:  Fair enough.

6    Q.  At the time when you logged onto KuCoin to do this, did the

7    terms of service not prohibit U.S. users from using the site?

8    A.  I'm unaware of what the terms of service stated there.

9    Q.  Did you review the terms of service?

10   A.  I don't recall.

11   Q.  We can come back to that.

12             Let's turn to the Anchor Protocol.  I believe you

13   testified that you purchased UST for the purpose of putting it

14   in the Anchor Protocol; is that right?

15   A.  That's correct.

16   Q.  So just so we're all totally clear, UST is one product, and

17   the Anchor Protocol is sort of a different maybe related

18   product; is that fair to say?

19   A.  Certainly, yeah, related, yes.

20   Q.  Sorry.  I didn't mean to cut you off.  Did I?

21   A.  No, that's fine.

22   Q.  Meaning you can own UST, but not put it in Anchor; is that

23   fair?

24   A.  Correct, yes.

25   Q.  The Anchor Protocol allows people to, I'll use the word

O3PASEC4                          Vakil - Cross

1    stake UST; is that fair?

2    A.  Yes.

3    Q.  Do you know what I mean by the word "stake" there, like to

4    sort of -- how do you understand the word "stake?"

5    A.  You deposit the funds and you earn a yield, that is a

6    typical way of -- that's typically what happens in the staking

7    process.

8    Q.  Now, you talked about the idea that you were hoping to

9    receive or you saw these -- the 20 percent returns.  Do you

10   remember your testimony about that?

11   A.  Yes.

12   Q.  You wanted to earn 20 percent on your -- by staking your

13   UST in Anchor; is that fair to say?

14   A.  Yes, that was my hope.

15   Q.  And I want to ask a few questions about this idea of

16   something you said on direct, which is the idea that there

17   was -- I think you said no risk to the stablecoin; is that how

18   you put it?

19   A.  If it was a stablecoin, then true proper stablecoin, there

20   should not be any risk.

21   Q.  So let's break that down a little bit.  And just going to

22   sort of ask you to put on your professor hat.

23           Around this time, let's look at 2022, do you recall --

24   I mean, do you recall --

25           THE COURT:  I need to interrupt because this witness

O3PASEC4                    Vakil – Cross

1    has not been called as an expert.

2              MR. FERRARA:  I'm not using him as one, your Honor.

3              THE COURT:  So I don't know what you mean by putting

4    on his professor hat.

5              MR. FERRARA:  I withdraw.

6              THE COURT: He's a lay witness.

7              MR. FERRARA:  Fair enough.  I withdraw.

8    Q.  In 2022, fair to say interest rates were very low?

9    A.  It's very possible, yes.  I don't recall off the top of my

10   head.

11   Q.  So I think you had testified that you thought of

12   potentially UST and Anchor as a savings account.  Do you

13   remember saying that on direct?

14   A.  That's correct, yes.

15   Q.  Now, savings account, fair to say at that time 2022 were

16   paying maybe 1 percent interest; is that right?

17   A.  If that's an accurate number, I'll trust your word, yeah.

18   Q.  Well, the idea, right, usually in finance is that risk

19   matches reward; is that fair to say?

20   A.  To an extent, yes.

21   Q.  So if you're getting 1 percent on, for instance, a savings

22   account with a bank, you're willing to accept a very low

23   interest rate, a very low return on your investment because

24   it's so safe; is that fair?

25   A.  That's fair.

O3PASEC4                    Vakil - Cross

Q.  So a 20 percent return is quite a bit higher, right?

A.  It is higher.

Q.  And with that comes a risk, wouldn't you say?

A.  I disagree with that.

Q.  So in order to pay investors 20 percent on an investment, isn't it true that Terra would have had to use those Terra to invest in other things, right?

A.  Sure.  They needed to come up with the 20 percent somehow.

Q.  Right.  So if UST has -- the idea is it's pegged to $1, Anchor, which pays the 20 percent, those, the UST that's put in Anchor, has to be I'll use the word deployed or used in order to earn something to pay an investor; is that fair to say?

A.  Yes.

         MS. STAREN:  Objection, your Honor.  Speculation, lacks foundation.

         THE COURT:  I will sustain that objection.  On a slightly different ground, which is, to repeat what I said two minutes ago, this is a percipient witness, so he can be asked on cross as on direct about what he saw, observed, or heard.

         Now, it is true that plaintiff's counsel, without objection from the defense, asked his understanding and that opened the door then to asking this witness about his understanding of particular representations or statements that were made.  But it doesn't open the door to more general forays into competing economic theories.

O3PASEC4                      Vakil – Cross

1              MR. FERRARA:  Your Honor, I am reluctant to talk too

2    much in front of the jury, but I have some questions on this.

3    I would be happy to discuss with your Honor.

4              THE COURT:  All right.  Come to the side.

5              (Continued on next page)

O3PASEC4                           Vakil - Cross

1           (At sidebar)

2           MR. FERRARA:  Does your Honor use the shusher?

3           THE COURT:  Do you know how to turn it up?

4           MR. FERRARA:  That's okay.  My voice is sometimes too

5    loud.

6           THE COURT:  But your beard is great and that's what

7    counts.

8           MR. FERRARA:  Coming from a guy with a great beard.

9    So, your Honor, we think this witness has been used to discuss

10   certain financial concepts.  We have no problem with it.  It

11   was his understanding that this was a risk -- he essentially

12   used the word phrase, not quoting, but riskless.  That this was

13   a risk free type of --

14          THE COURT:  Yeah, that's why it was called a

15   stablecoin rather than a fluctuating.

16          MR. FERRARA:  Right.  I think we're entitled to get

17   into the idea that that is objectively unreasonable.  It's an

18   objectively unreasonable position to take to look at something

19   that says we will pay you --

20          THE COURT:  No, no.  The question, I thought the

21   question was whether it was represented as stable.  And if your

22   position is that no one would believe that, so that even if it

23   was a lie, it's immaterial, I'll hear you on that.  But it

24   wasn't that he was asked is it stable or is it not stable.  It

25   was what is your understanding of the representation that was

O3PASEC4                            Vakil - Cross

1    made that it was stable.

2              MR. FERRARA:  I accept your Honor's memory of the

3    record.  And you anticipated my other point, which is that in

4    the context of what he's hearing, an objective listener would

5    not think to themselves this is risk free, this must be risk --

6    there's no way you could interpret.  If someone is deploying

7    your capital and paying you 20 percent, they must be doing

8    something away from you.  And that carries risk.  And the idea

9    that the jury is being left with the idea that UST and Anchor

10   were somehow the same, they're not.  One deployed capital.

11   These are concepts that it was asked about, what he learned,

12   what he heard, what he was told.  And I think we're entitled to

13   say -- intelligent investor --

14             THE COURT:  So, again, just to make sure I understand

15   what you're saying.  So let's take a more abstract, just to

16   understand your point.  So if you, if a company, a bank company

17   or a lending company or investment company says, hypothetical,

18   we guarantee you 20 percent return.  And the argument is that

19   you would know that's a lie because of your sophistication in

20   the business, that in the economics of 2012, or whatever, 2022,

21   excuse me, no one could make that promise, why would that be

22   relevant?

23             MR. FERRARA:  He's taken it one step further.  The SEC

24   did not show this witness anything that says risk free.

25             MS. STAREN:  Yes, we did.

O3PASEC4                      Vakil - Cross

                 THE COURT:  Well, I think they did, but anyway, we're

assuming they didn't.

                 MR. FERRARA:  Principal-protected is different than

risk free 20 percent rewards.  So all I'm saying is the witness

put his glass on.  I have no problem to put his glass on.  This

witness, put aside the reason, I agree with your Honor's point.

Reasonable investor, I don't think a reasonable investor -- but

this witness, and I'm not trying to make him an expert.  But I

think I am entitled to impeach him with his background and

experience for him to say that I'm a professor, I teach

business courses, etc., I've got my own companies, etc., and

I've come here and I'll tell you I thought it was risk free.  I

think I'm allowed to impeach him for saying that because I

don't believe it.

                 THE COURT:  I think that's just a disguised version of

making him an expert.  The objection is sustained.

                 (Continued on next page)

O3PASEC4                        Vakil - Cross

1              (In open court)

2              MR. FERRARA:  One moment, your Honor.

3              THE COURT:  I will allow the following question, or

4      I'll put the question to the witness.

5              You've indicated that it was your understanding from

6      the representations being made that the 20 percent was being

7      guaranteed in effect, yes?

8              THE WITNESS:  I don't think I ever said it was

9      guaranteed.

10             THE COURT:  Okay.  So tell me what was your specific

11     understanding if you read things like principal-protected and

12     things like that, what was your understanding about the

13     investment in Anchor?

14             THE WITNESS:  By principal-protected, I thought that

15     the principal that I put into the platform was safe, and it

16     would not lose value.

17             THE COURT:  So were you surprised that such a

18     representation could be made with respect to such a high,

19     relatively high, percentage of return?

20             THE WITNESS:  I think looking at what else and how it

21     was -- the additional properties of the platform, such as the

22     borrowing rates were very high at the time as well.  So it

23     seemed reasonable to me that 20 percent was accurate.

24             THE COURT:  Okay.  Go ahead, counsel.  Within that

25     framework, you can put the question.

O3PASEC4                          Vakil - Cross

1           MR. FERRARA:  Thank you, your Honor.

2     BY MR. FERRARA:

3     Q.  To go back to this idea you understood that the 20 percent

4     was not guaranteed; is that fair to say?

5     A.  I understood that the rates can fluctuate, just like they

6     would at a bank.

7     Q.  Okay.  And that applies to both the 20 percent Anchor and

8     the UST pegged at $1; is that fair?

9     A.  No.  That's specific to the 20 percent AP -- while I

10    figured, yes, okay, if they wanted to lower it, they could do

11    that.

12    Q.  But we also, and again, I appreciate that, we want to make

13    sure we're just talking about which product.  I believe you

14    testified you also understood that UST, the price of UST could

15    fluctuate; is that fair?

16    A.  That's true, but in a very, very minor, minuscule way.

17          THE COURT:  And was that the difference between what

18    you've described at stable and fluctuating, stable meaning that

19    it basically stayed the same, there might be minor

20    fluctuations.  Whereas, fluctuation it could be up and down to

21    materially, yes?

22          THE WITNESS:  That's correct.  I accepted a band of

23    maybe 1 cent.  Ninety-nine-cents, a dollar one, okay, that's

24    where it should have stayed.

25    Q.  But in fact at the time you had purchased UST, it had

O3PASEC4                          Vakil - Cross

1    depegged, right?

2    A.   The definition of peg here is important.  During my

3    purchases of UST, I considered that to be a pegged stablecoin.

4    Q.   Sorry.  I think my question was at the time you purchased

5    your UST.

6    A.   Yes.

7    Q.   It had already depegged in the past; isn't that right?

8    A.   That's correct.  Based on the chart that I had seen, yes,

9    it had.

10   Q.   It went down to what about?  Do you recall, 80, 90, 80

11   cents?

12   A.   I believe it was around 80 cents.

13   Q.   I also want to show you I think it's Plaintiff's Exhibit

14   79, which I believe is in evidence.  Yes, it is in evidence.

15   So I think we can show the jury if the Court is okay with it.

16              THE COURT:  Yeah.

17              MR. FERRARA:  So there is Plaintiff's 79.

18   Q.   Do you recall this exhibit?

19   A.   I do, yes.

20   Q.   And if you look, it says Anchor will target 20 percent

21   fixed APR; do you see that?

22   A.   Yes, I do.

23   Q.   So target, right, means that's what we're trying to get to;

24   is that fair?

25   A.   Yes, that's fair.

O3PASEC4                        Vakil - Cross

1    Q.  It does not say guarantee, right?

2    A.  That's accurate, yes.

3    Q.  We can take that down.  Thank you.

4           Am I right you put all -- you put all of your UST into

5    the Anchor Protocol; is that right?

6    A.  Yes.

7    Q.  Was that a complicated process to put your UST into the

8    Anchor Protocol?

9    A.  No, not really.

10   Q.  So how does it work, you went to the Terraform website, is

11   that -- and you create a wallet; is that the first step?

12   A.  Yes.

13   Q.  And then you would deposit your UST into that wallet; is

14   that right?

15   A.  That's right, yes.

16   Q.  So how does that work?  Is that a transfer from the

17   exchange, like KuCoin to the Terraform wallet?  Is that how it

18   works?

19   A.  Yes, that's correct.

20   Q.  Then am I right that after that, you then need to link the

21   Terra wallet to the Anchor website?

22   A.  Link or log in with it, yeah.

23   Q.  Then you go to the Anchor Protocol website; is that right?

24   A.  Yeah.

25   Q.  And am I right that the Anchor Protocol website is a

O3PASEC4                          Vakil - Cross

1    different website than the Terraform website; is that right?

2    A.   That's correct.

3    Q.   When you went to the Anchor Protocol website you had to

4    open up an account, right?

5    A.   No.

6    Q.   How does that work?

7    A.   You just connect your wallet that I created through the

8    Terra website.  And I connected that wallet to the Anchor

9    Protocol.  So I went to the Anchor Protocol dot com website,

10   connected my wallet.

11   Q.   So and then I think you would have had to accept the Anchor

12   terms of service, right?

13   A.   There were no terms of service at the time.

14   Q.   So let's take a look at defense exhibit -- let me show you

15   what's been marked Defense Exhibit 347.

16   A.   Sorry.  Can I clarify?  There's no terms of service that I

17   was forced to accept.  Maybe it was there, but I don't recall.

18   Q.   So is your testimony just -- I just want to be clear.  Is

19   your testimony that there was no -- there were no terms of

20   service or that you do not recall?

21   A.   I do not recall the terms of service.  I did not have to

22   check any box, or, you know, I didn't have to do anything in

23   order to -- that was not a precondition or a requirement to me

24   connecting and accessing the Anchor Protocol.

25   Q.   So just to be clear, you affirmatively remember today that

O3PASEC4                          Vakil – Cross

1    you did not have to accept terms of service; is that your

2    testimony?

3    A.   Not explicitly, yeah, I did not have to check a box to my

4    knowledge.

5    Q.   So let's take a look at what's been marked for

6    identification as Defense Exhibit 347.

7              Sir, do you recognize this as the terms of service

8    dated October 12, 2021?

9    A.   Sure, yes.

10   Q.   Do you see Terra on the upper right-hand corner?

11   A.   Yes, I do.

12             MR. FERRARA:  Your Honor, defense offers 347.

13             MS. STAREN:  Objection, your Honor.  Authentication.

14             THE COURT:  Sustained.

15             MR. FERRARA:  Let's leave this up for one more second.

16   Q.   Sir, just looking at this now, does this refresh your

17   memory that you had to accept these terms of service when you

18   signed up?

19             THE COURT:  He didn't indicate any ambiguity.

20             MR. FERRARA:  Fair enough.

21   Q.   Is it still your testimony, sir, that there were no terms

22   of service on the Terra website at the time you signed up?

23             THE COURT:  No.  His testimony, just so we're clear,

24   is whether or not there was, he remembers not having to check

25   any box agreeing to terms of service.  Do I have that right?

O3PASEC4                          Vakil - Cross

1                THE WITNESS:  That is correct.

2                MR. FERRARA:  And actually, your Honor, I also

3      misspoke.  Because what my question should have been was, were

4      there terms of service -- I think I was asking about Anchor.

5      Q.  And, sir, is it still your testimony regarding Anchor?

6      A.  It's possible it was there.  But, again, I did not -- I was

7      never explicitly forced to read it or check any box confirming

8      or indicating that I had to read it in order to proceed to

9      access the Anchor Protocol.

10     Q.  So sitting here today, you have no recollection of these

11     terms of service; is that your testimony?

12     A.  I would say yes.

13     Q.  You created -- we can take this down, Mr. Aquino.  Thank

14     you so much.

15                You created a spreadsheet, which we looked at, and I

16     think you just mentioned it, of sort of your purchases of UST;

17     do I have it right?

18     A.  That's correct, yes.

19     Q.  You created that.  That's not something you made sort of as

20     you were -- you tell me.  Is that something you made as you

21     were buying or is that something you went back and created?

22     A.  As I was buying, I think I was maintaining it as I was

23     going, just to see how much I was really putting in it and all

24     that.

25     Q.  You could create the same chart today, right?

O3PASEC4                         Vakil - Cross

1    A.  You can, yeah.

2    Q.  Because you can go back and look at everything, every one

3    of your transactions on the blockchain, right?

4    A.  It's all on the blockchain, yep.

5    Q.  In fact, I could make the chart that you created?

6    A.  You can.

7    Q.  That is plaintiff's I think 34; is that fair?

8    A.  Yes, that's fair.

9    Q.  It's all sitting there and anyone can go look and see what

10   every single transaction that's ever been made; is that right?

11   A.  Probably true, yes.

12   Q.  And it can't be changed?

13   A.  Correct.

14   Q.  So I want to talk a little bit about like the research that

15   you did on these products, okay?

16        Would you agree with me that a person should research

17   an investment before they spend money on it; is that fair?

18   A.  That is a fair statement, yes.

19   Q.  And you described some research that you did into Terra

20   before you purchased UST, right?

21   A.  Yeah.

22   Q.  I think you testified that you read a post that Terraform

23   released announcing called the LUNA Foundation Guard; is that

24   right?

25   A.  That's right.

O3PASEC4                        Vakil – Cross

1    Q.  That was part of your research?

2    A.  Yeah.

3    Q.  Let me show you what's been marked as Defense Exhibit 43.

4            Sir, I think you said that one of the places you found

5    your information was on Terra's Medium; is that what you had

6    testified to?

7    A.  That's correct, yes.

8    Q.  And, sir, so do you recognize this as a January 19, 2022,

9    Medium article about the formation of the LUNA Foundation

10   Guard?

11   A.  Yes.

12           MR. FERRARA:  Defense offers 43, your Honor.

13           MS. STAREN:  Objection, your Honor.  Foundation.

14           THE COURT:  You remember reading this at the time?

15           THE WITNESS:  Yeah, I'm sure I came across it.

16           THE COURT:  Okay.  Overruled.  Received.

17           (Defendant's Exhibit 43 received in evidence)

18           MR. FERRARA:  Thank you, your Honor.  If we could

19   publish this for the jury.

20   Q.  So, again, this is dated January 19, 2022, which is before

21   you would have invested, right?

22   A.  Yeah.  Based on my transactions, yeah.

23   Q.  So let's if we could, Mr. Aquino, jump to page three for

24   context, and I think we want to look at this, the second full

25   paragraph.  So it says, "by providing a decentralized issuance

O3PASEC4                     Vakil - Cross

1   mechanism at the base layer of the DeFi stack, Terra's

2   stablecoins, particularly Terra USD, which is called UST, have

3   surged into prominence alongside an entourage of other

4   decentralized stablecoins in a thriving cross chain

5   environment."

6           Do you see that?

7   A.  I do see that, yes.

8           (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O3PHSec5                              Vakil - Cross

1    BY MR. FERRARA:

2    Q.  And then let's go to the top of page 4.  Right here at the

3    top, it says:  "The rise of decentralized stablecoins has not

4    come without criticism, however, as they begin to absorb

5    increasingly larger shares of the stablecoin market from" ——

6              MS. STAREN:  Objection, your Honor.

7              THE COURT:  Ground?

8              MS. STAREN:  Need to ask questions.  He needs to ask a

9    question.  It's hearsay if he's just reading it into the

10   record.

11             THE COURT:  Well, so I think he was going to put a

12   question after reading that.

13             So, ladies and gentlemen, you should understand that

14   this exhibit is not being received for the truth of what it

15   says, but for what his —— how it may have affected his

16   understanding before he made some of the purchases that he

17   made.

18             So with that understanding, go ahead, you can complete

19   your reading, but I think you need to not read the whole

20   article, so to speak.

21             MR. FERRARA:  No, understood.  I promise I would not

22   do that to everyone here.

23             But if I could just finish this sentence, it

24   continues:  "Algorithmic stablecoins have come under fire for

25   the robustness of their peg stability, as they are not

O3PHSec5                              Vakil - Cross

1    over-collateralized or backed 1:1 by cash equivalent in a bank
2    account."
3    Q.  Do you remember reading that, sir?
4    A.  I'm sure I came across this.  I mean, this was over two
5    years ago at this point.  I'm sure I've read about the pluses
6    and minuses of UST itself.
7    Q.  If we could jump a little further down, it talks about
8    events in May 2021.
9            THE COURT:  No, no, I don't understand.  I allowed,
10   over objection, you to read that because of its bearing on his
11   understanding, but you haven't put any question on his
12   understanding.  You just asked if he read it.
13           MR. FERRARA:  I was going to do it together with
14   another piece of it, your Honor.  I just want to find it.
15           Maybe we could just briefly zoom out, Mr. Aquino, and
16   I can take a look.  Yes, it's — sorry, it's right there at the
17   end of the next paragraph.  If we could just leave it like
18   this.
19   Q.  The next sentence of the last paragraph, professor, says:
20   "Still, questions persist about the sustainability of
21   algorithmic stablecoin pegs, which is something our community
22   doesn't hide from and tackles head on."
23           Do you see that?
24   A.  I do see that.
25   Q.  Sir, isn't it fair that what this is saying is that there

O3PHSec5                        Vakil - Cross

1    were concerns about stablecoin pegs at the time that you

2    invested, isn't that right?

3    A.   I think there are concerns about anything that anyone

4    invests in ever.

5    Q.   Fair to say including the pegs of stablecoin, right?

6    A.   Sure, just like anything else, yes.

7    Q.   Like every investment has risk, right?

8    A.   Anything based on ── OK.  Go ahead.

9    Q.   And the reference to the reflexive drawdown in the Luna

10   price in May, if you see just above the highlighting, that

11   refers to the depeg that we discussed in May of 2021, right?

12   A.   Yes, I believe so.

13           MR. FERRARA:  We can take that down.  Thank you so

14   much, Mr. Aquino.

15           I sorry, your Honor, I'm taking this time to cut.

16           THE COURT:  That's fine.

17           MR. FERRARA:  May I have a moment, your Honor?

18           THE COURT:  Yes.

19   BY MR. FERRARA:

20   Q.   Sir, when you signed up for your Gemini account, do you

21   recall terms of service for the Gemini on the Gemini website?

22   A.   I'm sure it existed, and I'm sure I had to check a box as

23   part of the account-creation process.

24   Q.   Let's ──

25           MS. STAREN:  Objection.  Relevance.

O3PHSec5                         Vakil - Cross

1              THE COURT:  I haven't heard the question yet.

2     Q.  So let me show you what's been marked for identification as

3     Defense Exhibit 1938.

4              MS. STAREN:  Objection.  Relevance.

5              THE COURT:  Well, he hasn't put the question yet, but

6     if he's going to put a question about this document, the

7     objection is sustained.

8              MR. FERRARA:  OK.  Then I think I won't waste our

9     time.

10             THE COURT:  Seems like a reasonable approach.

11    Q.  All right.  I don't want to —— I don't remember exactly how

12    you put it.  I don't want to put words in your mouth.  I think

13    you described UST and Anchor —— I'll use a risk-free

14    investment.  Is that —— how would you put it?

15    A.  Well, I would put it the way the Terraform Labs put it,

16    right, principal protected, stable.  That's how I would put it.

17    Q.  I think you understand —— testified that from that, your

18    understanding was it had no risk.  Do I remember that right?

19    A.  If I specifically said no risk, it should have been a

20    relatively risk free.  I mean, I would modify my statement,

21    right?  Relatively risk free.

22    Q.  Would you say it was a lower risk than, for instance, like

23    a bond, a government bond, for instance?

24    A.  A government bond is probably the most risk-free asset on

25    earth.

1   Q.  What about IBM stock?

2   A.  That's not without risk.

3   Q.  Which is riskier, UST or IBM stock?

4   A.  Clearly UST.

5   Q.  So we took —— I think you've seen some examples.  You've

6   looked at some examples of different statements that are out

7   there, and I just want to see if you recognize any other ones.

8           So why don't we look at Defense Exhibit 4.  Do you

9   recognize this?

10  A.  Not off the top of my head.

11  Q.  Do you recall seeing this white paper from the Terra

12  website dated March 19, 2018?

13  A.  2018, this is years before my other —— my investment.  I

14  don't recall this one.

15  Q.  But you did recall two other white papers from the same

16  website, correct?

17  A.  Yes.

18  Q.  But this one you do not recall?

19  A.  I don't recall this one.  I apologize.

20  Q.  You don't have to apologize.

21          How about —— sorry, just so I have it right, do you

22  not remember —— like, is it your memory that you did not read

23  this or is it your memory you just don't remember one way or

24  the other?

25  A.  I don't remember one way or the other.  I'm sorry.

O3PHSec5                          Vakil - Cross

1    Q.  How about —— let's take this one down.  Let's look at

2    Defense 352, what's been marked for identification as Defense

3    352.

4            Do you recognize this as a Delphi Digital research

5    report dated December 2021 about Terra?

6    A.  That's what it says.  That's what the document says, yes.

7    Q.  Do you recall reviewing this as part of your research into

8    UST or Anchor?

9    A.  No, I've never seen this, definitively, at this time.

10   Q.  How about —— I think you said you followed *The Wall Street*

11   *Journal*, is that right?

12   A.  I will come across articles from the *Wall Street Journal* in

13   my news feed, yes, that's very possible.

14   Q.  So do you recall reading —— do you recall reading press

15   coverage about UST in the *Wall Street Journal* around that time?

16   A.  Around which time?

17   Q.  Sorry, around the time of your investment.  Pardon me.

18   A.  I don't recall.

19   Q.  So let's take a look at Defense Exhibit 46.  Do you

20   recognize this as an April 2022 *Wall Street Journal* article

21   about crypto?

22   A.  Yes, I see that here.

23            THE COURT:  Did you read it at the time?

24            THE WITNESS:  It's possible I came across it, yes.

25            MR. FERRARA:  Defense offers 46, your Honor.

1          MS. STAREN:  Objection.  Hearsay and lack of

2     foundation.

3          THE COURT:  Well, you're not challenging the

4     authenticity of this, are you?

5          MS. STAREN:  No, your Honor, not the authenticity.

6          THE COURT:  So, here again, this will be received,

7     ladies and gentlemen, not for its truth.  We don't know,

8     because the author is not here, what he based it on or anything

9     like that.  But since the witness believes he read it, then it

10    goes to his understanding at the time.  So it's received for

11    that limited purpose.

12         Go ahead, counsel.

13         (Defendants' Exhibit 46 received in evidence)

14         MR. FERRARA:  Thank you, your Honor.

15    BY MR. FERRARA:

16    Q.  So if we take a look here, the title —— and we don't have

17    to zoom in right now, Mr. Aquino —— but you see it says:

18    "Cutting-edge crypto coins tout stability.  Critics call them

19    dangerous."

20         Do you see that?

21    A.  Yes.

22    Q.  And then on page 3, we go to page 3, do you see the second

23    full paragraph there's a reference here, it says —— this law

24    professor is quoted —— or not —— then it says:  "Ryan Clements,

25    a law professor," skipping a little, "says Terra USD is

O3PHSec5                          Vakil - Cross

1    susceptible to what crypto traders call a death spiral."

2            Do you see that?

3    A.  I do see that in this article.

4    Q.  Do you understand what a death spiral is?

5    A.  I guess it can be defined as many ways, but I'm not sure in

6    this context what it's referring to.

7    Q.  What do you understand a death spiral to be?

8    A.  Basically, things that are within —— things that you are

9    doing that are just going to enable the —— what you're doing to

10   collapse, right, a long, slow death.

11   Q.  Is it fair to say that this article is warning about the

12   idea that if ——

13           MS. STAREN:  Objection, your Honor.  Foundation.

14           THE COURT:  Well, first of all, all these questions

15   have to be phrased in terms of his understanding at the time,

16   not what any person might otherwise assume.  I am concerned, in

17   light of the reference to death spiral, that we're getting

18   close to the end of today's time, and I was hoping to finish

19   this witness.  How much more do you have?

20           MR. FERRARA:  I probably have ten minutes, your Honor.

21           THE COURT:  All right.  Go ahead.  Rephrase the

22   question.

23           MR. FERRARA:  OK.

24   Q.  If we look at the next paragraph, I think it describes a

25   death spiral.  So if you look, it says:  "In such a scenario,

O3PHSec5                        Vakil – Cross

1  an algorithmic stablecoin drops below one dollar, and nervous

2  traders step back from the arbitrage mechanism that keeps it

3  pegged to the dollar.  If there aren't enough traders willing

4  to buy the coin and push it back to one dollar, the market's

5  faith in the peg could erode.  That could prompt even more

6  traders to flee, accelerating the coin's decline."

7         Do you agree with that definition, or that

8  explanation ——

9         MS. STAREN:  Objection, your Honor.  He hasn't

10 testified he's read that.

11        THE COURT:  Well, there's that, and also I guess I

12 must be very poor in communicating because I indicated the

13 questions I wanted and the only questions I would allow with

14 reference to this was what was his understanding of any given

15 passage at the time, and that's not the question you've been

16 putting.

17        MR. FERRARA:  I will try again, your Honor.

18        THE COURT:  Very good.

19 Q.  Was your understanding at the time, based on this and other

20 research that you had done, that UST was susceptible to a death

21 spiral?

22 A.  I think by death spiral —— defining death spiral is

23 important, and I would say failure or not doing what it could

24 do —— not doing what it's supposed to.  But I think that's

25 correct of anything that you invest in.

O3PHSec5                          Vakil - Cross

1    Q.  So ——

2              THE COURT:  Are you saying —— I'm not sure I

3    understood that.  Are you saying that if its representations

4    were true, then the chance of a death spiral was exceedingly

5    remote?

6              THE WITNESS:  Correct.

7              THE COURT:  OK.

8    Q.  Was it your understanding that —— do you know what a short

9    position is?

10   A.  Yes.

11   Q.  What's a short position?

12   A.  Short position is when you're betting for a stock to go

13   down and you profit on that difference.

14   Q.  We talked about the mint-burn mechanism earlier, right?

15   A.  Yeah.

16   Q.  I don't want to go back over it.

17             Was it your understanding at the time that if enough

18   investors or people with money were putting pressure on one

19   side of the peg, that UST could destabilize?  Wasn't that your

20   understanding?

21   A.  I believe they had mechanisms to counteract that within the

22   —— within the protocol.  That was the whole part of the

23   mint-burn process there.

24   Q.  But, again, mint-burn is an incentive process, isn't that

25   what we discussed earlier?

O3PHSec5                          Vakil - Cross

1    A.   It was incentivized, sure.

2    Q.   If no one wants to take the incentive, it's worthless,

3    right?

4    A.   Just like anything else, yes.

5    Q.   And again, fair to say we've covered some — we've talked

6    about some of these different things that you researched, but

7    at the end of the day, professor, I mean, it's fair to say you

8    didn't need these warnings to understand at that time that

9    crypto was risky, right?

10   A.   No, I didn't need these specific warnings.

11   Q.   Again, you knew at the time you invested in February '22,

12   you understood UST was a new technology, right?

13   A.   I understood that it was — I understood that it was a

14   newish blockchain.

15   Q.   It had been around for about a year and a half, right?

16   A.   That sounds accurate.

17   Q.   You didn't need anyone to tell you that a crypto — a new

18   crypto technology that had been around for a year and a half

19   carried potential risks, right?

20   A.   Right.   But this was also, you know, promised to be a

21   principal-protected stablecoin.

22   Q.   Everything has risks, right?

23              THE COURT:   Sustained.

24              MR. FERRARA:   May I have one moment, your Honor?

25              THE COURT:   Yes.

1           MR. FERRARA:  Just a couple more questions, your

2      Honor, then I'm done.

3      Q.  You testified about some white papers that you reviewed

4      that Terra had published on their website.  Do you remember

5      that?

6      A.  Yes.

7      Q.  Do you recall one of the white papers also discussing the

8      chances of a death spiral with UST and Anchor?  Do you recall

9      that?

10     A.  It's possible.  Again, this information was reviewed a

11     couple years ago.

12     Q.  But it's possible you read that?

13     A.  It's very possible, sure.

14          MR. FERRARA:  Nothing further, your Honor.

15          THE COURT:  All right.  Redirect.

16     REDIRECT EXAMINATION

17     BY MS. STAREN:

18     Q.  Mr. Vakil, you were asked on cross whether you wanted the

19     SEC to win this case.  Do you remember that?

20     A.  I do recall the question, yes.

21     Q.  And do you recall your answer?

22     A.  I don't recall.

23     Q.  I believe you said yes, is that right?

24     A.  Sure, yeah.  Yes.

25     Q.  What is the reason that you want the SEC to win?

O3PHSec5                        Vakil - Redirect

1   A.  I think that if people do wrong things, you know, or if

2   they misrepresent things, they should be, you know, punished or

3   — and if this action brings that, OK.

4   Q.  Were you promised anything by the SEC to be a witness in

5   this case?

6   A.  Nothing at all.

7   Q.  Now, Mr. Vakil, you were just asked a number of questions

8   regarding the risks of investing in crypto.  Do you recall

9   that?

10  A.  I do, yes.

11  Q.  You testified that you generally understood that crypto

12  could be risky.  Do you remember that?

13  A.  Sure, yes.

14  Q.  Did you understand that your investment in UST and Anchor

15  was risky?

16  A.  I did not, no.

17  Q.  And why is that?

18  A.  Because of the public statements that Terraform Labs made,

19  Do Kwon made that continued to reiterate and reinforce the fact

20  that this was a stablecoin.

21         MS. STAREN:  Shadow, are you able to bring up Defense

22  Exhibit 43, which I believe was introduced on cross?  Could you

23  please turn to page 4 of 11.  Could you please highlight that

24  second.

25  Q.  And could you please read, Mr. Vakil, starting with

O3PHSec5                          Vakil - Redirect

1    "tilting at," that first sentence.

2    A.   Sure.  "Tilting at the misconception that algo stablecoin

3    designs are unsustainable has been a core focus of Terraform

4    Labs and the broader Terra ecosystem and LUNA-tic community."

5    Q.   Mr. Vakil, do you have any understanding or an

6    understanding as to what this term "tilting at the

7    misconception that algo stablecoin are unsustainable," do you

8    have any understanding of what that refers to?

9              MR. FERRARA:  Objection.  Foundation.

10             THE COURT:  Well, this was something you read at the

11   time, yes?

12             THE WITNESS:  I believe so, yes.

13             THE COURT:  And what was —— if you can recall, what

14   was your understanding of what that meant at the time?

15             THE WITNESS:  It looks like they were refuting the

16   negative remarks around algorithmic stablecoins.

17   BY MS. STAREN:

18   Q.   And by "they," who are you referring to?

19   A.   The authors of the white paper, Terraform Labs.

20   Q.   Could you please read the next sentence, please.

21   A.   "By concentrating almost explicitly on bootstrapping the

22   demand side of algorithmic stablecoin, UST weathered a massive

23   reflexive drawdown in the Luna price in May, learning important

24   lessons and improving upon its design and adoption strategy."

25   Q.   Do you have any understanding as to what the massive

O3PHSec5                          Vakil - Redirect

1    reflective drawdown that is being referred to there?

2    A.  That is discussing the May 2021 depeg event, I believe.

3    Q.  And do you have an understanding as to what is meant by UST

4    weathered that massive reflective drawdown?

5    A.  That it recovered.  Sorry.  Go ahead.

6    Q.  And when you say "that it recovered," what is it that

7    you're referring to?

8    A.  UST token recovered.

9    Q.  OK.  You mentioned earlier that you understood that UST was

10   safe based on the representations you heard, is that correct?

11   A.  That's right, yes.

12   Q.  Would you have invested if you knew that the

13   representations about the algorithm were not true?

14   A.  I would not have invested if I —— if I knew that to be the

15   case.

16              MS. STAREN:  Thank you, your Honor.

17              THE COURT:  Anything else?

18              MR. FERRARA:  Nothing.

19              THE COURT:  Thank you so much.  You may step down.

20              THE WITNESS:  Thank you very much.

21              (Witness excused)

22              THE COURT:  So, ladies and gentlemen, I'm presented

23   with a terrible dilemma here.  There is a full eight minutes

24   left to go, and part of me says:  Let's call the next witness.

25   Let's get it moving.  The other part of me says:  No, we should

O3PHSec5                           Vakil – Redirect

1    be mindful of consideration for our excellent jurors, even the

2    ones who are Giants fans, and therefore, we should let you go.

3    So having weighed this important decision, I've decided to let

4    you go.

5              So in all seriousness, though, to keep on track, it's

6    very important that you all be here a few minutes before

7    10 o'clock tomorrow.  Remember, tomorrow's a short day, and

8    we're starting at 10:00, and we're going to end earlier also.

9    So it's really very important that everyone be here.

10             So have a great evening, and we will see you at

11   10 o'clock tomorrow.

12             (Jury excused)

13             (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

O3PHSec5

1          (Jury not present)

2          THE COURT:  Please be seated.

3          All right.  So we were working through the motions *in*

4   *limine*, and I think we were up to the question of whether the

5   defense should be entitled to consider Mr. Kwon's absence as

6   sufficiently voluntary as to warrant either a negative

7   inference or other related relief.

8          So where we left off was I'm sort of troubled by the

9   notion that someone is resisting extradition and wants to raise

10  some legal points on appeal, someone who is otherwise being

11  detained in a foreign country, that that should be viewed as a

12  voluntary absence from the proceeding here and whether that

13  would have a chilling effect on people asserting their rights

14  in a foreign court.  The only thing that gives me pause is this

15  decision, which I'm not familiar with but what was described by

16  SEC counsel, by Judge Marrero.

17         So are defense counsel aware of that decision?

18         MR. PATTON:  Yes, your Honor.

19         THE COURT:  All right.  Well, I think the Court is the

20  only one in ignorance, but let me hear from defense counsel

21  about that.  How would you distinguish that?

22         MR. PATTON:  Your Honor, primarily, I would suggest

23  that your Honor shouldn't follow Judge Marrero.

24         THE COURT:  You find my observations wholly

25  persuasive?

O3PHSec5

1           MR. PATTON:  Correct.  I would say there are a number

2      of respects in which —— I don't know all of the details of the

3      case before Judge Marrero  that are not contained in the case,

4      but the extradition proceedings in this case, in Montenegro,

5      are quite, to put it charitably, convoluted.

6           THE COURT:  Yes.  I will say for the last time —— and

7      then I'm going to forget it forever —— I never would have

8      granted the adjournment of this trial that I granted had I not

9      been led to believe that Mr. Kwon was doing everything he could

10     to consent to extradition here, and that clearly was not the

11     case.  But that's water over the bridge or under the bridge.

12          MR. PATTON:  Understood.  But on that point, I think

13     part of the convoluted nature of what is going on over there is

14     that there is meant to be an expedited extradition proceeding

15     which Mr. Kwon was attempting to avail himself of.  He has

16     these competing extradition requests from Korea, from the U.S.

17     He consented to both of them, expecting that sometime last fall

18     there would have been some sort of rational decision on that.

19          I won't go through all of the things that are in his

20     Montenegrin counsel's declaration on that, but needless to say,

21     the court was making some just very obviously factual incorrect

22     determinations, like who requested it first.  It was very clear

23     that it was South Korea that did.  Our client is from South

24     Korea, has family there.  So I think, as between the two, he

25     was hoping that it would be resolved, that it would be resolved

O3PHSec5

1  quickly, and that he could, in fact, participate in this trial,

2  either be present here ——

3        THE COURT:  Well, anyway, as I say, I'm going to

4  forget about this.  Prior to this, my only knowledge of

5  Montenegro, which I'm sure is a fine country, was seeing the

6  movie, the James Bond movie, "Casino Royale," which features

7  some beautiful pictures of Montenegro and perhaps some dubious

8  goings on there but not attributable to the courts.

9        So, anyway, go ahead.

10       MR. PATTON:  But the point is that I think that your

11  Honor's point about him simply exercising those rights in the

12  Montenegrin courts is important that he not be punished for

13  that, particularly when he, in fact, would like to participate

14  in this trial.  So it would just be an incorrect assertion that

15  that is not the case.

16       THE COURT:  Anything further from the SEC?

17       MR. CONNOR:  Yes, your Honor.  One of the reasons why

18  we feel so strongly about this is that Mr. Kwon's a defendant

19  in this case.

20       THE COURT:  Whenever a lawyer tells me he feels

21  strongly, that predisposes me to rule against them, but don't

22  let that stop you.

23       MR. CONNOR:  I withdraw.  I withdraw.  Mr. Kwon was

24  arrested with three laptops, three iPhones.  The SEC hasn't

25  received any of that evidence.  He's the architect of the fraud

O3PHSec5

1    scheme here that we allege.  We haven't gotten a deposition.

2    We haven't gotten any of this.  Mr. Kwon could have been here

3    for trial, and he chose not to be.  And that was his decision,

4    but he can't have it both ways.  We wanted Mr. Kwon here.  We

5    —— several people moved their vacations to move the trial date

6    so that he could be here.  And now he has the opportunity to be

7    here, and the jury is going to be left with the impression that

8    the SEC didn't want to call him as a witness when we, in fact,

9    did want to call him as a witness.

10        THE COURT:  I don't see how they can draw that

11    inference.  They've already been told that he's abroad and

12    unavailable.

13        MR. CONNOR:  Yes, your Honor.  But, again, he is a

14    very important fact witness in this case and he's a party.  I

15    think it's not ——

16        THE COURT:  You took his deposition, and you're

17    offering portions of his deposition.  I mean, I'm not sure I

18    see the force of that.  If he were, God forbid, in the hospital

19    abroad and you wouldn't be able to call him, but you could

20    still offer his deposition, and that's what you're doing.

21        MR. CONNOR:  I think it's a little bit different.  He

22    wasn't deposed in the case.  We took investigative testimony

23    from him very early on, when we didn't have all the facts, well

24    before we filed our complaint.  This was not a deposition

25    conducted under Federal Rules of Civil Procedure but was,

O3PHSec5

```
 1   rather, investigative testimony that was remote.  He was in
 2   Singapore.  It was 3 a.m. here.  We were taking the testimony.
 3   It wasn't akin to a regular deposition under Rule 30.  So it's
 4   just not the same thing.
 5           I think the Coffee Collectors case is on point, and I
 6   think in there the facts could have been a little bit more
 7   egregious.  I think the defendant there fled the country,
 8   whereas Mr. Kwon was already out of the country.  But I think
 9   the important thing here is we are being very judicious in how
10   we are seeking to use Mr. Kwon's unavailability.  We could have
11   sought a consciousness of guilt, put on evidence of
12   consciousness of guilt.  He was arrested fleeing to Dubai with
13   a Costa Rican passport and Belgian false passport.  We could
14   have attempted to have a consciousness of guilt finding.
15           THE COURT:  That was your decision.  I don't see why
16   the fact that you passed on that particular application, which
17   might have been quite interesting, has any bearing on the point
18   that I'm focusing on, which is if the reason for someone's
19   unavailability is that they are raising in a foreign court,
20   where they're in a foreign country where they're being
21   detained, they're raising legal grounds, to make that a basis
22   for an inference against them is to chill their assertion of
23   their legal defenses in another court.
24           In a very rough way, it's analogous to that I never
25   apply the guideline penalty for testifying falsely in a
```

O3PHSec5

1    criminal case because, as I've held several times, it chills

2    the decision of the defendant, before he testifies, whether or

3    not to testify.  If he's being told if you testify and the

4    judge concludes you're lying, you go to jail for longer, that

5    always seemed to me to have an unfair chilling effect.  I don't

6    think that's the position of other judges, but that's my

7    position, and I think this is roughly akin to that.

8             MR. CONNOR:  We understand all those points, your

9    Honor.  I think our final point is just that —— I mean, the

10   *Collector's Coffee* case is a case where someone was fighting

11   extradition.  That's exactly what we have here.  Mr. Kwon is

12   fighting extradition to the United States.

13            THE COURT:  So subject to —— was that a written

14   decision by Judge Marrero?

15            MR. CONNOR:  That was not.  There was a decision on

16   the motion *in limine*, but it was reserved for trial, and then

17   ultimately trial ——

18            THE COURT:  Then he gave the —— well, I do have very,

19   very great respect for Judge Marrero, but every case is

20   different.  And in any event, my purely objective view is that

21   my reasoning is better, so I will not give the instruction you

22   asked for.

23            MR. CONNOR:  Thank you, your Honor.

24            THE COURT:  I think the more I hear about this, I'm

25   also not going to give the instruction about you should draw no

O3PHSec5

1    inference.  That's for the reason I mentioned earlier.  Even

2    though the defense still wanted that, I think that just from

3    the — I know all counsel here have had many trials, but I've

4    had over 300 jury trials and I talk to the jurors afterwards.

5    It's one thing to just tell them, as I already have, he's

6    abroad, he's unavailable, period.  If you give the further

7    instruction, oh, and do not, whatever you do, draw any adverse

8    inference from that fact, it just invites speculation.  That's

9    the reality of it.

10         I don't see — particularly given all I've just heard,

11   I don't see that it would be helpful to anyone to invite

12   speculation.  So I think that further instruction would be

13   counterproductive.  Should they raise some question about it,

14   then I will give that instruction, but other than that, I

15   won't.

16         OK.  Let's move on.  The next motion from the defense,

17   No. 3, was invocation of the Fifth Amendment privilege by

18   nonparty witnesses should be excluded.  My tentative belief is

19   that the SEC is very likely to satisfy the four-part test set

20   forth in *LiButti v. United States*, 107 F.3d 110 at page 124,

21   1997 decision of the Second Circuit.  But I don't think I can

22   make that ruling dispositively until we have those witnesses

23   here, and if necessary, have a discussion outside the jury with

24   them.  But I flag so that everyone knows this, so that they can

25   prepare, that I am very likely to deny the defendants' motion

O3PHSec5

1    and allow the SEC to put in the taking of the Fifth.

2            Yes.

3            MS. CUELLAR:  Your Honor, Carina Cuellar on behalf of

4    the SEC.

5            Not to snatch victory —— or defeat from the jaws of

6    victory, but we had worked out with the three —— well, with two

7    of them, anyway, and we're working on it with Mr. Kwon, that

8    they would not actually have to come here.  They would agree to

9    a stipulation that, if called, they would invoke, and then we

10   would just seek to introduce the testimony that we had

11   designated via video.

12           So if you, your Honor, need the witnesses to come,

13   then, obviously, we will contact the witnesses and tell them

14   they must appear.

15           THE COURT:  Well, the test under *LiButti* is —— and by

16   the way, this is not the definitive test because these are four

17   "nonexclusive factors" —— first, the nature of the relationship

18   between the nonparty and the defendants; second, the degree of

19   control which the party has vested in a nonparty witness in

20   regard to key facts and general subject matter of the

21   litigation; third, whether the nonparty witness' pragmatically

22   a non-captioned party in interest and whether the assertion of

23   the privilege advances the interest of both the nonparty with

24   and the affected party in the outcome of the litigation; and,

25   fourth, whether the nonparty witness was a key figure in the

O3PHSec5

litigation and played a controlling role in respect to any of

its underlying aspects.  And it seemed to me that maybe we

needed the witnesses to evaluate that four-part test.

But if the defense prefers to simply go with the

stipulation so that, on the one hand, they don't win the motion

that I'm now addressing, the motion to prevent this, but on the

other hand, we don't have the witnesses here live, I can

certainly live with that.  But if the defense is not so

agreeing, then I think we do have to have the witnesses here.

MR. CALIFANO:  Your Honor, Mark Califano.

I just wanted to bring one additional factor with

respect to the two Jump witnesses that are the subject of this

motion.

A number of weeks ago when the SEC notified us of a

document, a Jump document, that they had found in another

investigation, we learned that there is a separate

investigation of Jump.  The problem that that raises here is

the one which *LiButti* raises, which is the overriding concern

about whether that adverse inference is trustworthy under all

circumstances and contributes to the search for the truth.

The problem we have here is we do not know what

Mr. Kariya and Mr. DiSomma were actually taking the Fifth

about.  They took the Fifth very broadly, across all questions

from both parties, and we don't know if this has to do with the

investigation that resulted in this case or the second

O3PHSec5

investigation that's ongoing.  And for that reason ——

            THE COURT:  Well, so ——

            MR. CALIFANO:  —— we think there's a risk here.

            THE COURT:  If they were here, and I assume they have

counsel who would also be here —— do they have counsel?

            MS. CUELLAR:  Yes, your Honor, they do.

            THE COURT:  Then we could inquire.  It might have to

be done, because of the privilege, just by the Court in a

sealed proceeding, but I could inquire into that and find out

whether they're taking the Fifth for one reason or the other

reason or both.  However, going back to my days as a criminal

defense lawyer, I'm willing to wager that their lawyers are

going to say both.  But I'm happy to have —— if you want, we'll

have them here.  We'll make the inquiry.  It may be an *in*

*camera* inquiry, but we'll see.

            MR. CALIFANO:  I think, your Honor, given the

circumstances, if we're allowed to consult probably with the

SEC tonight and a little bit tomorrow and see how we want to

proceed.

            THE COURT:  Yes, that makes sense.  Hopefully, you can

work it out.  OK.

            MR. CALIFANO:  Excuse me one second, your Honor.  I

apologize.

            MR. PELLEGRINO:  One more point, your Honor.  Louis

Pellegrino.

O3PHSec5

1          Because you gave us your tentative as a means of

2   looking ahead and the SEC raised an issue about a stipulation,

3   one point we wanted to raise is that under *650 5th Avenue*, it

4   would be our view that if your Honor was inclined to grant any

5   relief on this motion, that it should be limited to a

6   stipulation.  The jury can be given an instruction.  What that

7   case references is that —— the case that I just referenced,

8   what it says is that you should not be allowed to play a video

9   or have them take the stand and repeatedly answer questions by

10  invoking the Fifth Amendment.

11          THE COURT:  Well, without getting into that, if you

12  and the SEC are happy with a stipulation, I'm happy with a

13  stipulation.  So why don't you discuss that tonight, and we'll

14  see where we stand tomorrow morning.

15          MR. PELLEGRINO:  OK, your Honor.  Thank you.

16          THE COURT:  The next motion is to exclude four SEC

17  witnesses who purportedly lack personal knowledge.  As I think

18  I've already indicated, I don't see how I can rule on that till

19  they are on the stand and I hear the actual questions.  So

20  that's a good example of a motion *in limine* that cannot be

21  decided in advance.

22          The defendants' fifth motion is to exclude reference

23  to other fraud cases or scandals.

24          Is anyone planning to reference any other fraud cases

25  or scandals?

O3PHSec5

1          MR. CONNOR:  No, your Honor.

2          THE COURT:  No.  OK.  So that motion is granted on

3     consent.

4          With respect to the defendants' motion *in limine*

5     No. 6, to exclude certain audio recordings as hearsay, I think

6     this is conversations with Mr. Myung that he had with others at

7     Chai, and they are now being offered at least as statements

8     against interest and possibly also as statements in furtherance

9     of a conspiracy, though there was some suggestion that they

10    were not in furtherance of the conspiracy.

11         Again, I don't see how I can possibly rule on that

12    until I see exactly what is being offered and what has already

13    come into evidence at the trial.  Just to flag it, I'm leaning

14    towards denying that motion and allowing the audio recordings,

15    but that ── I can't say that definitively until I have a much

16    more precise view of exactly what's going to be offered.  So

17    I'm going to reserve on that.

18         Yes.  Next, we have the motion to exclude reference to

19    the beliefs of the defendants and others about the legality of

20    Chai's use of blockchain under Korean law.  As I've already

21    indicated, I think the SEC can put in evidence that the

22    defendants and those related to them believed that they

23    couldn't have certain arrangements without violating Korean

24    law, to the extent those arrangements then explain what

25    happened in this case, but I don't think we will get into what,

O3PHSec5

1   in fact, Korean law prohibited or did not prohibit.  So it will

2   be admitted only with respect to belief, but let me hear from

3   defense counsel.

4           MR. CALIFANO:  Your Honor, I do understand the Court's

5   ruling on that particular issue.  There were two very specific

6   emails or releases that were done by Chai after the May 2020

7   depeg when there was a broad investigation in Korea.  They were

8   statements that were made by a nonparty.  They, I expect, would

9   be something the SEC would intend to enter into evidence for

10  the truth, and they're clearly hearsay.  They're also very

11  self-serving, your Honor, because, obviously, Chai at that

12  point in time was trying to retreat from what it had done

13  before.

14          Those two particular releases, I think, are of

15  separate concerns for the defense because of their suspect

16  nature, because of their lack of trustworthiness, and because I

17  think they are different than some of the other evidence that

18  the SEC seeks to get admitted into court, into evidence.  Those

19  we want to make sure I focus the Court on because we don't

20  think those have the same basis for admission that the other

21  evidence does.

22          THE COURT:  Let me hear from the SEC.

23          MS. STAREN:  So, your Honor, the SEC does not intend

24  to introduce those particular documents for the truth on its

25  case-in-chief.  However, I do want to flag that, to the extent

O3PHSec5

1    that defendants intend to get into certain topics on cross

2    related to Mr. Myung's subjective beliefs and understandings as

3    to certain events that may have happened after he left Chai,

4    those materials may become relevant.

5         THE COURT:  Well, that goes to my more general point,

6    which I flagged for everyone at the very beginning, which is

7    that if the door is opened, the door is opened, and then we

8    have to reconsider.  But since you're not planning to offer

9    those statements, as I understood it, on your direct, then with

10   the caveat about door-opening, the question is resolved, as I

11   previously said that the beliefs are admissible but not the

12   underlying question of whether Korean law did, in fact,

13   prohibit this or not.

14        Defendants' next motion, No. 8, is to exclude

15   references to defendants' unregistered sale of securities.  By

16   the way, I might add that everything I've heard, and we've only

17   had one witness so far, reinforces strongly the Court's belief

18   that it correctly ruled that UST and Luna, and so forth, were

19   securities.  They have, just from what I heard today, all the

20   earmarks of investment contracts.

21        But putting that aside, the question is whether the

22   SEC is entitled to the inference that the defendants' failure

23   to register their securities was part of a plan to commit

24   securities fraud.  As I understand the defense, it is we didn't

25   think they were securities.  We, in fact, are going to appeal

O3PHSec5

1    the Court's ruling that they are.  But in the meantime, it

2    wasn't a question — every bit of evidence, says the defense,

3    suggests that we had a good faith belief that these were not

4    securities, and therefore no inference that it was really part

5    of covering up a fraud or helping conceal a fraud should be

6    allowed.

7          So those are the positions of the parties, as I

8    currently understand it, but let me hear anything further that

9    either side wants to say.

10          MR. KORNBLAU:  It's defense motion, your Honor, so

11    I'll go ahead and kick it off for the defense, David Kornblau.

12          I think the Court knows that the SEC brings many

13    registration — cases with registration claims.  They bring

14    many fraud claim cases.  Sometimes they bring both.  Sometimes

15    they bring a registration case without a fraud claim, including

16    in the crypto space, and sometimes they bring fraud claims

17    without registration claims.  The two — one does not follow

18    from the other.  And as your Honor pointed out in this case,

19    there's no basis to say that, well, the defendants didn't file

20    a registration statement, so therefore they must have lied.

21    The two are just completely separate.

22          And as your Honor pointed out, there was a strong

23    belief that they weren't securities.  And it's not for a

24    further debate for this Court, but Mr. Vakil didn't testify

25    about any contract that they had with TFL or Mr. Kwon.  So I

O3PHSec5

1    would say that it would be highly prejudicial and, frankly,

2    illogical and unfair for the jury to hear about a registration

3    violation.  Certainly, the Court is going to instruct the jury

4    about whether the Court's ruling about the tokens are

5    securities, but that's a wholly separate question.

6            THE COURT:  Yeah, I agree that's a separate question.

7            So let me hear from the SEC.

8            MR. CARNEY:  Thank you, your Honor.

9            As the Court noted, you've already found that

10   defendants violated Section 5 and they sold unregistered

11   securities and ——

12           THE COURT:  As I recall correctly, the SEC has taken

13   the position at various times that not every cryptocurrency is

14   automatically a security.  That there were things that made

15   this —— these tokens securities, as the Court agrees, but that

16   there was —— the SEC itself was not saying that everything in

17   this market was a security, and therefore, why doesn't it

18   follow that the defendants had a good faith belief that what

19   they were offering were not securities?  And if they were

20   wrong, they were wrong, but that's as a matter of law, not a

21   matter of their purposely using that as a device to commit a

22   fraud.

23           MR. CARNEY:  Well, your Honor, I think, obviously,

24   we're here today at trial where Section 5 has already been

25   resolved, but we could equally be here at a trial where the

O3PHSec5

1    jury in this same case, where those Section 5 violations were

2    part of that same complaint, was asked to decide that.  But the

3    Court is ——

4           THE COURT:  So you want me to withdraw my

5    determination that you won on Section 5?

6           MR. CARNEY:  No, absolutely not, your Honor, but it is

7    to say it was part of the same scheme.  As we pointed out in

8    our opposition to the motion *in limine* ——

9           THE COURT:  Is there any independent evidence, like an

10    email from someone, saying, Aha, we don't need to register and

11    that will help us commit fraud, or anything remotely like that?

12           MR. CARNEY:  I'm not aware of specific evidence like

13    that, your Honor, but I think the jury could infer that the

14    securities laws, as the Supreme Court has said, were designed

15    for disclosure purposes, and one of the disclosure purposes was

16    to preclude fraud.  And if a company decides —— and there's

17    certainly evidence that the defendants were aware of the SEC

18    and aware of the securities laws.  And I think the jury could

19    infer from the fact that they were selling unregistered

20    securities that that would allow them to escape scrutiny more.

21           THE COURT:  Is there any evidence from any of your

22    victim witnesses or any witness that, oh, I trusted what they

23    had to say because I knew they would have to register it with

24    the SEC?

25           MR. CARNEY:  I'm not aware of such evidence, your

O3PHSec5

1    Honor.

2          THE COURT:  No, I think it involves too much

3    speculation on the jury's part.  I'm going to grant the motion

4    to exclude reference to the unregistered sale of securities.

5          No. 9, is —— and because we're running a little slow

6    on this, I'll be a little more conclusory —— No. 9 is to

7    exclude SEC witnesses William Connolly and Sonny Kim on grounds

8    that they were not part of the SEC's Rule 26(a) disclosure, but

9    William Connolly is only going to be called to authenticate a

10   public message that Kwon posted.  And Sonny Kim is, as I

11   understand it, only to be called, if at all, as a rebuttal

12   witness.

13         So I'm going to deny that motion.  I will say this,

14   just to flag for the SEC, I don't usually allow rebuttal

15   witnesses.  I have occasionally, but you're going to have to

16   make a —— if you offer rebuttal, you're going to have to make a

17   strong showing why this was not something that was reasonably

18   offered on your direct case.  But having said that, the motion

19   is denied.

20         The tenth motion is to exclude "speculation," of

21   former Terraform employee William Chen expressed through

22   messages, Terraform messages, about various things he said

23   about Terraform's products and business.

24         I'm inclined to deny that motion without prejudice to

25   whatever rulings I'm called upon to make about the exhibits

O3PHSec5

1  when they're offered.  Or to put it another way, I'm leaning

2  towards denying that motion, but I'm not going to make a final

3  ruling till we get to when those emails are offered and the

4  matter is more ripe for determination.

5          With respect to defendants' motion *in limine* No. 11 to

6  exclude reference to government agencies other than the SEC,

7  was the SEC planning on offering reference to any other

8  agencies?

9          MR. CONNOR:  No, your Honor.

10          THE COURT:  All right.  So that motion is granted on

11  consent.

12          With respect to ——

13          MS. STAREN:  Your Honor, sorry.

14          THE COURT:  Yes.

15          MS. STAREN:  Sorry to interrupt.  This is Devon

16  Staren.

17          I just wanted to point out we do not intend to

18  introduce any such evidence in our case-in-chief.  However, to

19  the extent, once again, that the defendants intend to cross

20  Aaron on events related to his settlement agreements with Chai

21  after he left Chai's employment, that will absolutely implicate

22  Aaron Myung's role in talking to Korean prosecutors and their

23  investigation into ——

24          THE COURT:  You're talking about opening the door.

25  The reason I'm distinguishing rebuttal, opening the door is

O3PHSec5

1  normally handled through redirect or recross, depending which

2  side you're on.  So that's the time, then, if the door has been

3  opened, to make that offer.  And of course, you would want to

4  flag that for me first at a break or at the sidebar so I can

5  rule on it.

6  　　　　MS. STAREN:  Yes, your Honor.  I think, in this

7  instance, because —— and I will happily discuss this with

8  defense counsel, and we can see if we can figure out what is

9  intended —— but if they do intend to do that on cross, I think

10  that some of our —— it would be to our benefit to be able to

11  get some of that information out on direct, and so I'd like to

12  know ahead of time so that I know how to craft my direct.

13  　　　　THE COURT:  I assume that's why you were asking the

14  witness we just heard from about receiving a subpoena from the

15  defense, at least that's what I guessed, because you

16  anticipated some cross on that and you wanted to get it out

17  front.  So why don't you discuss what you just said with the

18  defense, and then I can hear further on that.

19  　　　　MS. STAREN:  Yes, your Honor.

20  　　　　THE COURT:  So with respect to defendants' motion *in*

21  *limine* No. 12, which seeks to limit testimony of the SEC

22  summary witness to authentication, I don't think a summary

23  witness is limited to authentication, but I think a summary

24  witness is limited to summarizing voluminous documents without

25  making further inferences or speculations.

O3PHSec5

1          So this we'll see — this is a classic case of where

2     I'll have to hear the questions put at the time, but my

3     tentative feeling is that — well, for sure he's not limited

4     just to authentication, but that doesn't open the door to his

5     giving a mini summation, in effect.  So the rule on summary

6     witnesses is set forth very clearly in the Federal Rules of

7     Evidence, and that's what I'll follow.

8          With respect to motion *in limine* No. 13 to exclude

9     Kwon's May 23, 2021, Twitter messages, that motion is denied.

10          With respect to defendants' motion *in limine* No. 14,

11    to exclude reference to defendants' failure to produce the LP

12    server, I'm inclined to grant that motion, but I'll hear

13    anything further from the SEC if they want to be heard on that.

14          MR. CARNEY:  Yes, your Honor.  Thank you.

15          As your Honor might recall, during the *Daubert* hearing

16    back in November, the issue of this LP server came up.  There

17    were questions to our expert —

18          THE COURT:  Forgive me for interrupting.  Just before

19    I forget it, there was a motion for really, I think it was, the

20    third bite at the apple —

21          MR. CARNEY:  Yes, your Honor.

22          THE COURT:  — to reconsider my rulings with respect

23    to one of the experts, and that motion is denied.

24          MR. CARNEY:  Thank you, your Honor.

25          THE COURT:  Yes, go ahead.

O3PHSec5

1          MR. CARNEY:  So, your Honor, this came to a head at

2     the *Daubert* hearing.  Dr. Edman ——

3          THE COURT:  Except it's Daubert.

4          MR. CARNEY:  Daubert, yes.

5          THE COURT:  Mr. Daubert pronounces it Daubert, and

6     he's the ultimate authority on the pronunciation.

7          MR. CARNEY:  In your court I shall pronounce it

8     Daubert from now on.

9          Your Honor, it came to head at the hearing where

10    Dr. Edman was questioned about the fact that he had not looked

11    at these inputs, the LP server inputs, which were not provided

12    by the defendants in discovery.  The Court held in its ruling

13    that not only did defendants not produce these inputs, but that

14    as Dr. Edman opined he did not need them to offer his opinions.

15         Defendants sort of want to have it both ways.  They

16    have challenged our motion *in limine* regarding the LP server

17    where we have said they should not be able to question

18    Dr. Edman about failing to look at these LP server inputs that

19    were not provided to him.  Defendants have characterized their

20    connection to the LP server as limited.  They talked about how

21    they went to this company Gaza Labs, that's now Kernel Labs,

22    and said we don't really have a connection with them.  The only

23    connection that the SEC has found is this one offhand remark by

24    an employee, Natalie Luu, who said Do Kwon told us that Kernel

25    Labs is, in fact, the Korea office of Terraform.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O3PHSec5

1          In our response to the motion *in limine*, we put in

2     document after document after document that showed the

3     connections between Do Kwon, the defendant, Terraform, the

4     defendant, and Kernel Labs, including the fact that they had a

5     —— Kernel Labs issued a patent where Do Kwon was the inventor

6     on the patent.  Do Kwon signed employment agreements on behalf

7     of Kernel Labs.  And we had a long list of documents in

8     response.  Their corporate records showed they had the same

9     offices.

10          THE COURT:  Did you subpoena Kernel Labs?

11          MR. CARNEY:  We requested those documents through

12    defendants.

13          THE COURT:  Why didn't you just, you know, cut through

14    the debate and just get it directly from Kernel Labs?

15          MR. CARNEY:  Well, it was our —— so in discovery we

16    asked where it was.  We didn't know about the Kernel Labs

17    connection until late in discovery.  Defense counsel came to us

18    and said that we have some recent information that there's

19    something called a Naver cloud account where Gaza Labs/Kernel

20    Labs is hosting this.  We've reached out to them to try to get

21    this, and then, ultimately, said they couldn't get it.  And in

22    the declaration they supported —— they submitted in support of

23    the motion, they said we reached out to the law firm, Korean

24    law firm, of Bae, Kim & Lee, and they said, sorry, guys, can't

25    have the LP server data.

O3PHSec5

1          As we looked through the document production, we saw

2     Bae, Kim & Lee was the law firm representing Terraform in

3     connection with the Chai project.  They were listed as

4     Terraform's primary licensure and regulatory counsel in Korea

5     regarding the Chai project.  So we thought that there was

6     enough of a connection there that, at the very least,

7     defendants should be precluded from saying to our expert:  You

8     failed to look at this material, and therefore your opinions

9     are unreliable.

10         THE COURT:  I'm not sure.  I haven't gone to your

11    motions in limine yet, but all they're asking for is to exclude

12    reference that it's their fault.  And assuming for the sake of

13    argument that they're agreeable, they won't ask any of your

14    witnesses, including your expert, why didn't you look at the

15    server, then are you agreeable that no one should make any

16    reference to it?

17         MR. CARNEY:  Yes, your Honor, we would be agreeable.

18    We just thought they shouldn't have it both ways.

19         THE COURT:  Yes, I thought that cliche might enter

20    your mind.  So let me hear from defense counsel.

21         MR. CALIFANO:  Your Honor, I'm fine —— if you can hear

22    me here, I'll try to answer this.

23         THE COURT:  I can hear.

24         MR. CALIFANO:  Can the court reporter hear me?  Thank

25    you.

O3PHSec5

1          I want to make sure I understand what the agreement

2     would be with Mr. Carney, which is that ——

3          THE COURT:  That you can't say to their witness, why

4     didn't you look at the server?

5          MR. CALIFANO:  It's hard for me to not repeat what

6     your Honor just explained, which is this is not our company

7     that had possession of this server, and it wasn't in our

8     possession.  I think the answer ——

9          THE COURT:  I can't force you into that agreement,

10    but ——

11         MR. CALIFANO:  I understand.

12         THE COURT:  Then if that's not agreeable, that's fine.

13    But then I have to determine whether, then, in response on

14    either on direct or redirect, they can bring out the evidence

15    that they think a jury could find shows that it really was in

16    your control.

17         MR. CALIFANO:  I think, your Honor —— and I want to

18    make sure that I understand the distinction here —— there is

19    the "why didn't you," and then there is just the plain "you

20    didn't."  I think ——

21         THE COURT:  Well, they have represented that they

22    asked for this through you, and they have represented that they

23    believe a reasonable jury could find that you could have forced

24    Kernel or Gaza, or whatever, to produce it and instead chose

25    not to.  You can produce contrary evidence.  I think it would

O3PHSec5

1    be better for both sides to just forget about this, and I think

2    that can only be if you don't cross-examine the witness about

3    why didn't you look at the server.

4         MR. CALIFANO:  Your Honor, again — and I apologize

5    for doing this — I'm going to talk with Mr. Carney this

6    evening and see if we can't come to an agreement.

7         THE COURT:  That's fine.  I'm all for that.

8         So we've finished with the modest 14 motions *in limine*

9    from the defense, but now we have the measly 14 from the SEC.

10   God, this is such fun.

11        So the first SEC is to allow adverse inferences from

12   the Fifth Amendment invocations of Jeff Kuan, Kanav Kariya, and

13   William DiSomma.  This is really the inverse of the motion *in*

14   *limine* No. 3 from the defense, and my understanding is you're

15   going to try to work this out tonight, so we'll just see what

16   occurs.

17        The next motion is the motion No. 2 to admit Jump's

18   statements in PX 68.  This is a number of internal messages

19   between Jump employees.  On the representations I've seen so

20   far, I think at least a lot of this is going to come in, but I

21   don't think I can make that determination yet till I hear the

22   evidence of the alleged coconspiracy.  So I'll reserve on that

23   till trial.

24        The SEC also says it contains statements against

25   interest and expressions of state of mind, and in the summary

O3PHSec5

1    judgment motion I adopted some of those approaches.  So again

2    to flag this, if I had to rule now, I would probably admit most

3    of these statements, if not all, but I'm not making that

4    determination till they are actually offered in evidence so we

5    hear what the situation then is, taking advantage of the other

6    proof that will have been admitted.

7            The SEC's motion *in limine* No. 3 is to exclude

8    evidence of the cause of the May 2022 depeg.  That has been

9    withdrawn by the SEC and pursuant to the rulings that I made

10   earlier.

11           The SEC's motion No. 4 is to admit portions of Kwon's

12   investigative testimony.  I have to go through those to see if

13   there are any other more narrow objections that may have been

14   raised, but on the general question, I'm quite sure that a lot

15   of that will come into evidence.  So that motion is granted

16   with that qualification.

17           With respect to SEC motion *in limine* No. 5 to allow

18   the SEC to impeach Kwon's testimony with his forgery

19   conviction, I think I've already ruled on that.  I will allow

20   that if it's made clear what portions of his testimony, which I

21   will then determine in the next couple of days, is being

22   attacked as false.  So it's not across-the-board impeachment

23   because some of what's being offered is being offered as truth.

24           With respect to No. 6, the motion —— SEC motion No. 6

25   is to preclude defendants from introducing evidence regarding

O3PHSec5

1    the location or custody of the LP server.  This is similar to

2    the motions I've already discussed, and you'll discuss it

3    tonight and see what you can resolve.

4         With respect to motion *in limine* No. 7 to preclude

5    defendants from introducing deposition designations from

6    available witnesses, I mean, that, of course, is the right

7    result.  If the witness is going to be called or if he's

8    available to be called, then we don't need his deposition.

9    But, as I understand it, defendants say that all but one of

10   these witnesses that this motion relates to are more than

11   100 miles, so they're unavailable, in which case the

12   deposition, if otherwise proper, would come in.

13        The one who is available is William Chen, and I think

14   there the objection is really to the counter-designations of

15   the defendants ── or I should say designation of the defendants

16   that are based on the rule of completeness.  And I'm going to

17   be ruling tonight on the rule of completeness with some of the

18   other stuff you've given me.  But let me state my understanding

19   of the rule of completeness, which I think is frequently

20   misunderstood.

21        If as a party offers like half of a sentence, then the

22   other half comes in.  If the party offers a sentence that

23   refers back to an earlier sentence, then the other sentence may

24   come in.  But the fact that a party at a deposition says X and

25   then gives, on cross, a long-winded explanation of why he said

O3PHSec5

1    X, that does not come in under the rule of completeness.  That

2    is a complete misreading of the rule of completeness.  So to

3    put it a different way, in my view, it is narrowly — it's a

4    narrow exception, not a broad exception, and that goes for both

5    sides.

6             MR. CONNOR:  Your Honor, may I be heard on the

7    deposition designations issue?

8             THE COURT:  Yes.

9             MR. CONNOR:  So, ordinarily, were the SEC not a party,

10   that 100-mile rule would apply, but in SEC enforcement actions

11   under Dodd-Frank, the SEC and the defendants have nationwide

12   subpoena power, so no one ——

13            THE COURT:  I totally forgot about that.

14            MR. CONNOR:  And in fact, the defendants subpoenaed

15   their retail investors and they, at least a couple of them,

16   lived over 100 miles away.  So they've afforded themselves of

17   that.

18            THE COURT:  What about —— let me hear from defense

19   counsel.  What about Dodd-Frank.

20            MR. KORNBLAU:  Yes, your Honor.  That issue's been

21   addressed, and the nationwide service of process does not trump

22   the 100-mile rule in Rule 32(a)(4)(B), and that goes way back.

23   That was decided with another agency that had nationwide

24   service of process in U.S. v. IBM, 90 F.R.D. 377, jump cite

25   380, (S.D.N.Y. 1981).  The rules are ——

O3PHSec5

1          THE COURT:  That was in the part of the *IBM* antitrust

2     case?

3          MR. KORNBLAU:  I think so, your Honor.  It's going ——

4          THE COURT:  The late Judge Edelstein.

5          MR. KORNBLAU:  But the Rule 32(a)(4) limitation, it's

6     not abrogated by the nationwide service of process.

7          THE COURT:  Do you have any other authority?

8          MR. KORNBLAU:  Well, the other authority is that the

9     SEC itself took that same position in a different case that the

10    100-mile rule does not apply.

11         THE COURT:  Does apply?

12         MR. KORNBLAU:  Does apply, excuse me, in an SEC

13    enforcement action, and we cited that in our brief.

14         THE COURT:  I need to go back and look at that.

15         MR. KORNBLAU:  Yeah.

16         THE COURT:  What was Judge Edelstein's reasoning

17    there?

18         MR. KORNBLAU:  Just because the rule —— it doesn't ——

19    there's nothing in the statute that overrules Rule 32(a)(4)(B),

20    and ——

21         THE COURT:  I'm amazed this has not come up to a

22    higher authority, or maybe it has.

23         MR. CONNOR:  Your Honor, we don't have any higher

24    authority, but we do have several —— I know at least one

25    district court decision out of Texas just a couple months ago

O3PHSec5

1   where the court held that because the parties had nationwide

2   subpoena power ——

3            THE COURT:  I thought they only had state courts in

4   Texas.  Go ahead.

5            MR. CONNOR:  The court held that because of the

6   nationwide subpoena power, that the witnesses were not

7   unavailable.  Therefore, they had to appear at trial and could

8   not testify by deposition.

9            THE COURT:  This is interesting.  I must admit, I have

10  to go back your briefs on this point.  I will look at it

11  overnight and discuss it more tomorrow.

12           The next one is motion No. 8 from the SEC to preclude

13  defendants from calling a witness named Kevin Zhou because he

14  was not listed on the defendants' Rule 26(a) disclosure.  But

15  the defendants represent that they first learned of him as a

16  relevant witness ——

17           MR. CALIFANO:  Your Honor.

18           THE COURT:  Yes.

19           MR. CALIFANO:  I think I'll help you by saying that

20  the defense does not intend to call Mr. Zhou.

21           THE COURT:  Great.  So that motion is moot.

22           Then there's motion *in limine* No. 9 to preclude

23  defendants from calling witnesses to testify about topics not

24  disclosed in discovery because they have disavowed knowledge,

25  and specifically, that the defendants assert that they're only

O3PHSec5

1    call to call these witnesses about matters on which they have

2    personal knowledge.  So I think the answer to that is that's a

3    classic case where I'll rule at the time when the motion is ——

4    when the questions are put.

5                    (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O3PASEC6

1        THE COURT:  With respect to motion *in limine* number

2    ten, to permit the SEC to designate the testimony of

3    Terraform's (30)(b)(6) witness and to strike defendants'

4    corrections.  We had extensive discussion of this earlier today

5    and against that I'm going to -- this is the first deposition I

6    think you're putting into evidence.  When do you think you'll

7    reach that?

8        MR. CONNOR:  Yeah, I believe we planned for

9    Mr. Mathialagan to be the fourth witness, so I think two more

10   witnesses, so probably tomorrow.

11       THE COURT:  Probably tomorrow.  Okay.  So I need to

12   get that done tonight.  Lucky me.  Okay.  And then number 11,

13   to preclude defendants from questioning Mr. Myung about

14   irrelevant topics, specifically about whether he threatened his

15   ex-girlfriend in June 2019 after she broke up with him and the

16   police told him to leave her alone.  And if that question were

17   allowed and he answered no, and then they would seek to put in

18   the threatening messages.  I think this is classic 403 and the

19   motion to preclude is granted.

20       The next one is motion *in limine* number 12 --

21       MR. KORNBLAU:  Your Honor, I hate to interrupt you.

22   There was a second part to that.

23       THE COURT:  I'm sorry.

24       MR. KORNBLAU:  The motion, but I don't want to speak

25   for the SEC, but there's also the question of Mr. Myung's

O3PASEC6

1     criminal conviction in Korea.

2             THE COURT:  Oh.  Well, I already have ruled that it

3     will come in for impeachment, but they have to specify what

4     they claim is being impeached.

5             MR. KORNBLAU:  That's for Mr. Kwon.  This is for

6     Mr. Myung.

7             THE COURT:  Oh, I'm sorry.  I misunderstood.

8             MR. KORNBLAU:  Yeah, the whistleblower has some --

9             THE COURT:  Mr. Myung, I see.  Criminal conviction.

10    Thank you for reminding me.  I had to turn the page.  Criminal

11    conviction in South Korea from employing workers without proper

12    vias.  And how are you planning to put this in?  Do you have a

13    certified copy of the conviction?

14            MR. KORNBLAU:  Yes, your Honor.  It's agreed upon.

15            THE COURT:  So any objection to that?

16            MS. STAREN:  Yes, your Honor, our objection is that

17    this particular conviction is an immigration violation.  It

18    involves no falsity or allegation that anyone --

19            THE COURT:  Well, no, no.  The drafters of the Federal

20    Rules of Evidence made the decision, which I personally

21    disagree with, but it was that any criminal conviction in the

22    last ten years is admissible for impeachment, regardless of

23    whether it bears on credibility or not.  If it's more than ten

24    years, then it only comes in if it does bear on credibility.

25            When I say bears on credibility, I mean the conviction

O3PASEC6

1  itself shows lying or something like perjury or fraud or

2  whatever.  But they made the determination that if it's less

3  than ten years, it comes in.

4       Now the only thing I don't remember is whether -- I

5  think it's a felony at least in American terms because it's

6  more than one year, punishable by more than one year.

7       MS. STAREN:  Yes, your Honor, that is our

8  understanding.  I think our position is that even though the

9  rule does contemplate, as you said correctly, that any

10 conviction that carries a sentence of more than a year may come

11 in, I think that that is always weighed against the 403

12 standard of whether it has -- it is unduly prejudicial.  I

13 think in this instance, because of what it is, it really has

14 only -- the only value it has is in painting Mr. Myung as a

15 criminal or a bad guy.  It just doesn't have any bearing at all

16 and can only be --

17      THE COURT:  No.  The theory is, and again, I stress I

18 totally disagree with this theory, but I'm bound by the rules

19 like everyone else.  The theory is in a felony conviction is

20 inherently evidence that the guy is dishonest and, therefore,

21 not to be believed.

22      Now, I don't agree with that series of inferences, but

23 that's what the federal rule says.  And then they said, well,

24 okay, if it's more than ten years, it's too remote.  So we'll

25 keep it out unless it expressly deals with making false

O3PASEC6

1    statements and the like.  So the other side of that decision

2    was if it's less than ten years, it comes in.  Do you have any

3    authority to the contrary?

4            MS. STAREN:  Your Honor, I'm looking at the Federal

5    Rule of Evidence 609(a)(1)(A).

6            THE COURT:  Hold on a minute.  Let me pull that out.

7    609.

8            MS. STAREN:  And as you correctly note --

9            THE COURT:  The following rules apply to attacking

10   witnesses' character for truthfulness by evidence of a criminal

11   conviction.  One, for a crime that in the convicting

12   jurisdiction was punishable by death or by imprisonment for

13   more than one year, the evidence, (a) must be admitted subject

14   to Rule 403 in a civil case or in a criminal case in which the

15   witness is not a defendant.  But the exception to 403 refers to

16   something that is so prejudicial on its face, he was convicted

17   of assaulting a baby.  That's not this kind of thing.  So and I

18   see I'm running out of time.  So I hear your argument, but I

19   will allow that cross-examination of Mr. Myung regarding his

20   criminal conviction.

21           Because I've run out of time, just quickly, the motion

22   *in limine* number 12, emit statements by Chai into evidence.

23   I'm leaning on granting that, but, again, I want to make a

24   final decision after I hear the specific offering and exhibits.

25           Number 13, the missing witness jury instruction, I've

O3PASEC6

1    already said I'm not going to grant that.

2              And number 14, to exclude evidence that defendants'

3    false and misleading statements were immaterial based on

4    disclaimers.  I'm leaning towards denying that motion but I

5    will hear argument on it.  Since we've run out of time, I'll

6    hear argument on it tomorrow morning.

7              MR. FERRARA:  Your Honor, one housekeeping matter.

8              THE COURT:  Yeah.

9              MR. FERRARA:  So, your Honor, the defense has

10   endeavored to make sure we are not repeating each other back

11   here as you saw.

12             THE COURT:  Yes, I've been very grateful for that.

13             MR. FERRARA:  And there will be some witnesses where

14   we both have some cross, but we coordinated that.

15             THE COURT:  That's fine.

16             MR. FERRARA:  Your Honor, is there a place we could

17   bring a white board for a witness that your Honor would allow

18   us to set up.

19             THE COURT:  Yeah, I think we have one somewhere.  If

20   you want to bring it, and you can get it by security, it's fine

21   with me.

22             MR. FERRARA:  But that's generally okay with the Court

23   to bring it in.

24             THE COURT:  Yes.

25             MR. FERRARA:  Thank you, your Honor.

O3PASEC6

1              THE COURT:  We'll see you all tomorrow.

2              (Adjourned to March 26, 2024, at 10:00 a.m.)

3                              *  *  *

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    INDEX OF EXAMINATION

2    Examination  of:                              Page

3    ARASH VAKIL

4    Direct By Ms. Staren . . . . . . . . . . . . . .94

5    Cross By Mr. Ferrara . . . . . . . . . . . . . 135

6    Redirect By Ms. Staren . . . . . . . . . . . 183

7                    PLAINTIFF EXHIBITS

8    Exhibit No.                              Received

9     34   . . . . . . . . . . . . . . . . . . . 102

10    653  . . . . . . . . . . . . . . . . . . . 109

11    231  . . . . . . . . . . . . . . . . . . . 115

12    78   . . . . . . . . . . . . . . . . . . . 117

13    417  . . . . . . . . . . . . . . . . . . . 120

14    79   . . . . . . . . . . . . . . . . . . . 122

15    81   . . . . . . . . . . . . . . . . . . . 124

16                    DEFENDANT EXHIBITS

17    Exhibit No.                              Received

18    43   . . . . . . . . . . . . . . . . . . . 170

19    46   . . . . . . . . . . . . . . . . . . . 178

20

21

22

23

24

25