O3QASEC1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    SECURITIES AND EXCHANGE
     COMMISSION
4
              Plaintiff,
5
              v.                          23 Civ. 1346 (JSR)
6
     TERRAFORM LABS PTE LTD. , et
7    al.

8              Defendants

9    ------------------------------x
                                        New York, N.Y.
10                                      March 26, 2024
                                        10:00 a.m.
11
     Before:
12
                        HON. JED S. RAKOFF
13
                                        District Judge
14                                      –and a Jury–

15
                            APPEARANCES
16
     UNITED STATES SECURITIES AND EXCHANGE COMMISSION
17        Attorneys for Plaintiff
     By:  JAMES P. CONNOR
18        DEVON STAREN
          CARINA CUELLAR
19        LAURA E. MEEHAN
          CHRISTOPHER J. CARNEY
20        ROGER LANDSMAN

21

22

23

24

25

O3QASEC1

1                          APPEARANCES (Cont'd)

2   DENTONS US LLP
            Attorneys for Defendant Terraform
3   BY:   LOUIS A. PELLEGRINO III
            DAVID KORNBLAU
4           MARK CALIFANO
            DOUGLAS W. HENKIN
5           MATTHEW A. LAFFERMAN

6   KAPLAN HECKER & FINK LLP
            Attorney for Defendant Kwon
7   BY:   MICHAEL FERRARA
            CHRISTOPHER MOREL
8           DAVID E. PATTON
            ANDREW CHESLEY
9           SEAN HECKER

10  Also Present:

11  Shadow Haywood, SEC Trial Assistant

12  Armando Aquino, Terraform Trial Assistant

13

14

15

16

17

18

19

20

21

22

23

24

25

O3QASEC1

1           (Trial resumed; in open court)

2            (Case called)

3           THE COURT:  Please be seated.  So my law clerk will

4    hand to each of the parties my rulings on the 30(b)(6)

5    deposition so you can conform the video.

6           I understand the parties have something they wanted to

7    raise.

8           MR. FERRARA:  Thank you, your Honor.  Michael Ferrara

9    for Do Kwon.

10          Your Honor, we just wanted to raise with the Court how

11   your Honor -- if we have objections to your Honor's questions,

12   what is the best way to raise those.

13          THE COURT:  You can object.

14          MR. FERRARA:  I think your Honor can understand that

15   we don't want to suggest that we're sort of sideways with the

16   Court necessarily in front of the jury.  If you're saying

17   object, we'll object, but there would be -- maybe could we ask,

18   for instance, for a side bar so we could explain the situation

19   and I'm happy to sort of --

20          THE COURT:  If you want a side bar, I will initially

21   allow that.  We'll see if it's a waste of time.  My questions

22   are basically for clarification.  So several times I ask a

23   question to make sure that the jury understood exactly what the

24   witness was saying, and for that purpose, I will often lead.

25   But the leading is permissible because it's a summary of what

O3QASEC1

1    he said before.  But if you've got a problem with it, you want

2    a side bar, I'll hear you at that time.

3            MR. FERRARA:  To be totally clear, your Honor, we

4    think that 95 percent or everything your Honor asks is totally

5    unobjectionable.  At times -- and also not complaining about

6    leading, except at times it felt -- or it seems having reviewed

7    the record, at times the Court perhaps recast what the witness

8    had said in a way that was a little more favorable let's say

9    for the witness, and it would be in those instances where we

10   might object.

11           THE COURT:  Well, I'm shocked that you thought this

12   witness was such a dumbbell that if I misstated something, he

13   wouldn't correct it.  But I hear your point.

14           MR. FERRARA:  Thank you, your Honor.

15           THE COURT:  Yes.

16           MR. KORNBLAU:  Your Honor, we appreciate the rulings

17   on the deposition testimony for later today.  I was handed a

18   copy and it's just cutoff at the bottom.  I see O for

19   overruled.

20           THE COURT:  Yes.  I'm sorry.  Does someone have the

21   original?  Because I have a cutoff copy as well.  Let's get the

22   original and give them the copy.  Great.  So what it says is O

23   equals objection overruled.  S equals objection sustained, but

24   there were no such sustainings.  And E equals errata statement

25   received along with original testimony to which it corresponds.

O3QASEC1

1    So this follows up with what I mentioned yesterday.  It's silly

2    to have the errata come in piecemeal after the testimony.  So

3    where I'm accepting the errata, I'm not accepting all the

4    errata, but I'm accepting some of it where the errata is

5    accepted.  Then at that point the video has to be interrupted

6    and someone either has to state or put on the screen or

7    something whatever the errata is to that particular portion.

8    Okay?

9              MR. KORNBLAU:  Thank you.  May I just ask for the

10   record what would be the basis for excluding some of the

11   errata?

12             THE COURT:  Yes.  The exclusions were because they

13   were hopelessly vague and meaningless.  So, for example, and of

14   course just like deposition testimony, your adversary -- all

15   objections are preserved except to form.  So, for example, let

16   me see the errata sheet.  Wait a minute.  I think I have it

17   here.  Hold on.  Yeah.  I've got it.

18             So where the errata was, for example, something that I

19   permitted:  Chai transactions were integrated with the Terra

20   blockchain as of September 2019.  I received that, and that

21   will be put to the jury.  But where you had things like:  Chai

22   the company did not itself directly interface with a Terra

23   blockchain at this time, but did rely on its partnership with

24   TFL to integrate the functionality of its payment product into

25   the Terra blockchain to rebuild the payment stack as described

O3QASEC1

1    in the article.  Meaningless.

2              MR. KORNBLAU:  So, your Honor is objecting to the

3    answer but not the question?

4              THE COURT:  I'm sorry?

5              MR. KORNBLAU:  You're objecting --

6              THE COURT:  I thought you're asking why I objected to

7    certain of the errata.

8              MR. KORNBLAU:  Right.  Errata are the answers, not the

9    questions.

10              THE COURT:  I don't understand what you're saying.

11              MR. KORNBLAU:  Well, you're just striking the

12    witness's answer to questions.  I just want to be clear so I

13    understand.

14              THE COURT:  No.  If you mean the errata answers, yes.

15              MR. KORNBLAU:  Correct, yes.

16              THE COURT:  So the basic point you wanted to make in

17    your answers in your errata that I allowed in, and you can

18    expand on it in your case, obviously is the allegation, the

19    testimony of the (30)(b)(6) witness, which he was contrary to

20    what he said in his testimony, which is also coming into

21    evidence, but it was part of his errata that the Chai

22    transactions were integrated with the Terra blockchain as of

23    September 2019.  That's in, in several places, that errata.

24              What is not in is that meaningless statement that I

25    just read, which the jury would be unable to comprehend in any

1  way, shape, or form.

2          Now, you may be able to introduce it as part of your

3  case.  But, for example, when you say that Chai the company did

4  not itself directly interface with the Terra blockchain at this

5  time, but did rely on its partnership with TFL to integrate the

6  functionality of its payment product into the Terra blockchain

7  to rebuild the payment stack as described in the article.  And

8  of course, because this was an errata, it was not subject to

9  cross-examination.  It is meaningless.  It is vague.  If you

10  had asked that, if the witness had given that statement in

11  court and an objection had been raised on vagueness, impossible

12  to comprehend, I would have sustained that objection.  Got it?

13          MR. KORNBLAU:  Yes, sir.  Thank you.

14          THE COURT:  Very good.

15          MR. CONNOR:  Your Honor, the SEC just has three

16  quick --

17          THE COURT:  Is the jury here?

18          THE DEPUTY CLERK:  Yes.

19          THE COURT:  I'm giving you two minutes.

20          MR. CONNOR:  I will hold off.  One quick thing is on

21  the stipulations, we have certain stipulations that we would

22  like read into the record before each witness testifies.  Our

23  proposal is that your Honor would read the stipulations, but we

24  are also happy to do so.

25          THE COURT:  No.  The party offering the stipulation,

O3QASEC1

1    which is you presuming, will read the stipulation and I'll tell

2    them what a stipulation is.

3         MR. CONNOR:  The second quick issue is there's a video

4    of a conversation between Kanav Kariya and Do Kwon that we

5    intend to introduce into evidence, and I have copies right

6    here.  It's the records of the phone calls between the two.  We

7    are agreeing to use the defense exhibits, which are in the

8    pretrial order as already admissible.  We understand,

9    notwithstanding that fact the defense still has some objection,

10   we think that objection will be unfounded on multiple grounds.

11        THE COURT:  If they listed as their exhibit, I don't

12   see how they can possibly object, but we'll hear.

13        MR. CONNOR:  Thank you, your Honor.

14        MR. PELLEGRINO:  Your Honor, we think you should

15   review the entire video, which that sub exhibit is a portion

16   of, and this discussion might be better handled after we have a

17   break because we'd like you to see the video itself.

18        THE COURT:  Fair.  Bring the witness.  And bring in

19   the jury, please.

20        MS. CUELLAR:  Your Honor, good morning.  Carina

21   Cuellar.  We were going to start with reading fact

22   stipulations.

23        THE COURT:  So exciting.  Why not.

24        MR. FERRARA:  Your Honor, we would ask if starting

25   with factual stipulation, if the witness could not be in the

O3QASEC1

1    courtroom for the reading of the fact stipulations.

2              THE COURT:  Why?

3              MR. FERRARA:  If a witness would testify about the

4    stipulations, that would violate the rule against witnesses --

5              THE DEPUTY CLERK:  Jury entering.

6              MR. FERRARA:  I don't know which are being read.

7              THE COURT:  All right.  The witness can step out for a

8    minute.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O3QASEC1

1          (Jury present)

2          THE COURT:  Good morning, ladies and gentlemen.  Thank

3    you for your promptness.  I'm sorry counsel had some matters

4    they needed to raise with the Court, which is why we're

5    starting a few minutes late.  By the way, we'll be sitting only

6    until 3:30 because of other matters I have.

7          Before the next witness is called, counsel is going to

8    read what's called a stipulation.  And a stipulation is

9    something that both sides agree to, so you can consider it as

10   fully proven, both sides agree to it.  And I want to remind

11   you, there are three sources of evidence in this case.  One is

12   the testimony of the witnesses.  One is the exhibits that have

13   been received in evidence.  And the third is a stipulation.

14   And the difference only is that the stipulation is accepted by

15   both sides.  So you don't have to worry about whether it's

16   disputed or not.

17         So this is so exciting.  We're going to read a

18   stipulation.

19         MS. CUELLAR:  Yes, your Honor.  Good morning.

20         Stipulation one, defendant Do Kwon, along with an

21   individual named Daniel Shin, founded Terraform Labs, PTE, Ltd.

22   in April 2018.

23         Terraform is a Singaporean software development firm.

24         Stipulation four, in April 2019 Terraform launched the

25   Terraform blockchain.

O3QASEC1

1          Stipulation five, since the inception of Luna,

2   Terraform owned hundreds of millions of Luna tokens.

3          Stipulation six, the UST Luna mint-burn algorithm was

4   intended to provide an arbitrage opportunity for traders in UST

5   and Luna to help keep the price of UST pegged at $1.

6          Stipulation seven, by May 1, 2022, Luna had a market

7   value of more than $27 billion.

8          Stipulation eight, on May 4, 2022, UST had a market

9   value of approximately $18.5 billion, of which approximately

10  14 billion was on deposit in the Anchor protocol.

11         Stipulation nine, by mid May 2022, the sum of the

12  market capitalization of Luna in UST was more than $40 billion.

13         Stipulation ten, by late May 2022, the price of Luna

14  fell to under 1 cent.

15         Stipulation eleven, defendants directed the movement

16  of funds and/or assets from Luna Foundation Guard wallet

17  addresses and accounts that held Luna Foundation Guard funds

18  and/or assets.

19         Thank you, your Honor.

20         THE COURT:  Thank you.  Please call your next witness.

21         MS. CUELLAR:  At this time, we call Boris Revsin.

22         THE DEPUTY CLERK:  Please take the witness stand.

23  BORIS REVSIN,

24       called as a witness by the Plaintiff,

25       having been duly sworn, testified as follows:

1           THE COURT:  Counsel.

2    DIRECT EXAMINATION

3    BY MS. CUELLAR:

4    Q.  Good morning, sir.  What is your state of residence?

5    A.  Massachusetts.

6    Q.  What is your highest level of education?

7    A.  Some college.

8    Q.  Where did you attend college?

9    A.  University of Massachusetts Amherst.

10   Q.  And what year did you leave college?

11   A.  Approximately 2008.

12   Q.  And why did you leave college?

13   A.  To start a company.

14   Q.  And what was the name of the company you started?

15   A.  It's now called Breaktime Media.

16   Q.  And what was it called at the time?

17   A.  Campus Live.

18   Q.  What did that company do?

19   A.  We created advertising technology for major brands, among

20   other things.

21   Q.  And why did you leave that company?

22   A.  It was acquired.

23   Q.  And what year did you leave?

24   A.  I left in 2015.

25   Q.  And what did you do after?

O3QASEC1                          Revsin - Direct

1    A.  I started another company.

2    Q.  And how long did you stay there?

3    A.  Approximately two, two and a half years.

4    Q.  And what did you do next?

5    A.  I began investing personally out of another company that I

6    started.

7    Q.  And what was the name of that company?

8    A.  It was called Game Theory Group.

9    Q.  And what did the Game Theory Group invest in?

10   A.  We invested in cryptocurrencies and FinTech companies.

11   Q.  And what made you interested in cryptocurrency?

12   A.  My background in computer science, economics, and game

13   theory.

14   Q.  And what in particular did the Game Theory Group do?

15   A.  We occasionally wrote research reports for clients and

16   partners and then sourced investment opportunities in the

17   space.

18   Q.  And did you become familiar with something called the

19   blockchain?

20   A.  Yes.

21   Q.  And in simple terms, what is a blockchain?

22   A.  A blockchain is essentially a set of transactions that are

23   fully transparent, censorship resistant, and available usually

24   for all to see online.  And that makes the transactions that

25   occur immutable, meaning they can't be reversed or changed.

O3QASEC1                          Revsin – Direct

```
 1   Q.  Now, how long did you stay --
 2            THE COURT:  Just so we're clear, the blockchain is a
 3   ledger of these, right?
 4            THE WITNESS:  Correct.
 5            THE COURT:  Okay.
 6            MS. CUELLAR:  Thank you, your Honor.
 7   Q.  And how long did you stay at the blockchain group?
 8   A.  Game Theory Group.
 9   Q.  Sorry.  The Game Theory Group.
10   A.  Approximately two years.
11   Q.  And what did you do next?
12   A.  I joined a company called Republic.
13   Q.  And what is Republic?
14   A.  Republic is a set of products -- or it's a company that
15   creates a set of products, one of which was a crowdfunding
16   platform, one of which was my group, The Venture Group.
17   Q.  And what is a crowdfunding platform?
18   A.  A crowdfunding platform is website that is regulated and
19   allows retail investors to deploy smaller amounts of capital
20   into early stage startups.
21   Q.  And what did your group, The Venture Group, focus on?
22   A.  We worked with accredited and qualified investors to make
23   more traditional venture capital investments.
24   Q.  And how long did you stay at Republic?
25   A.  Almost four years.
```

O3QASEC1                          Revsin – Direct

1   Q.  And where did you go after that?

2   A.  I went to a firm called Tribe Capital.

3   Q.  And are you still at Tribe Capital?

4   A.  Yes.

5   Q.  What does Tribe Capital do?

6   A.  Tribe Capital is a traditional venture capital firm.

7   Q.  Now, going back to your time at Republic, what was your

8   role?

9   A.  I was the cofounder of the group and then the head of the

10  group for the majority of my time there.

11  Q.  And so what were your duties and responsibilities?

12  A.  Managing the teams, sourcing investments, leading

13  investments, among other things.

14  Q.  And what did Republic mainly invest in?

15  A.  My group primarily invested in FinTech, cryptocurrency

16  companies, marketplace, SAAS companies.  So a lot of

17  traditional venture, but quite a bit of cryptocurrency

18  investing.

19  Q.  And just if you could briefly explain, you used a term

20  called FinTech.  What is FinTech?

21  A.  Financial technology or financial services technology.

22  Q.  While at Republic, did you research prospective

23  investments?

24  A.  Yes.  I was part of a group that would do that.

25  Q.  And how would you and Republic go about doing that?

1    A.  We would review material that was provided to us both

2    privately.  We would also review public material.  We would

3    look at on-chain data, which is essentially the blockchain

4    available online among other things.

5    Q.  And why would you look at on-chain data?

6    A.  Because the -- most of the blockchains are transparent and

7    online, and it's a public ledger.  You can see activity in real

8    time.

9    Q.  And who mainly invested in Republic?

10   A.  Invested in Republic?  Our clients?

11   Q.  Yes.

12   A.  We would have family offices, institutions, ultrahigh

13   networks.  That was my group.  The crowdfund was very

14   different.

15   Q.  Now, at some point did you hear of Terraform Labs?

16   A.  Yes.

17   Q.  And did you hear of a person named Do Kwon?

18   A.  Yes.

19   Q.  And around when was this?

20   A.  Approximately some point in 2020.

21   Q.  And who did you understand Do Kwon to be?

22   A.  The cofounder of Terra Luna and its associated products.

23   Q.  So in this time period around 2020, what did you hear about

24   Terraform?

25   A.  That it was an emerging stablecoin platform and protocol

O3QASEC1                          Revsin - Direct

1     that was getting a lot of attention in the press and among

2     retail investors.

3     Q.  You used a term stablecoin.  What is a stablecoin?

4     A.  A stablecoin typically is meant to mimic the U.S. dollar in

5     the sense that it stays worth a dollar.  However, it's on-chain

6     meaning, it acts similar to other cryptocurrencies when it's

7     being transferred.

8     Q.  Now, when you first heard of Terraform Labs, did Republic

9     invest in Terraform?

10    A.  No.

11    Q.  Now, did you and Republic Capital become interested in

12    Terraform sometime later?

13    A.  Yes.

14    Q.  And around when was this?

15    A.  2021.

16    Q.  And why?

17    A.  As the protocol grew and the amount of interest grew.  We

18    thought it could be an interesting investment opportunity for

19    our clients.

20    Q.  Now, at some point did you learn of an opportunity to

21    invest in Terraform?

22    A.  We did.

23    Q.  And around when was this?

24    A.  I believe it was at some point late in 2021.

25    Q.  And how did you learn about this opportunity?

1   A.  I heard about it I think the first time from one of our

2   partner funds.

3            MS. CUELLAR:  And Mr. Haywood, if we could please

4   display for the witness Plaintiff's Exhibit 24a.

5   Q.  And do you recognize this exhibit, sir?

6   A.  I do.

7   Q.  And what is it?

8   A.  It is an e-mail from Arjun Sethy at Tribe Capital letting

9   me know about the opportunity to invest in Terra.

10  Q.  And is there an attachment to the e-mail?

11  A.  I believe so.

12           MS. CUELLAR:  And if we could please display it for

13  the witness, Plaintiff's Exhibit 24b.

14  Q.  Do you recognize this exhibit?

15  A.  I do.

16  Q.  And what is it?

17  A.  It's the marketing deck that the Terra team used to promote

18  the investment.

19           MS. CUELLAR:  And, your Honor, at this time, we move

20  to admit Plaintiff's Exhibit 24a and 24b into evidence.

21           MR. FERRARA:  Without objection.

22           THE COURT:  Received.

23           (Plaintiff's Exhibits 24a, 24b received in evidence)

24           MS. CUELLAR:  If we could please display for the

25  courtroom Plaintiff's Exhibit 24a.  If we could focus on the

1   bottom half.

2   Q.  And, sir, who is the sender of this e-mail?

3   A.  The e-mail that went to Paul is Do Kwon.

4   Q.  And who was Paul?

5   A.  Paul was an associate, an analyst at Tribe Capital.

6   Q.  And is Tribe Capital where you work now?

7   A.  Yes.

8   Q.  And what date was this sent?

9   A.  November 15, 2021.

10  Q.  And can you please read the subject.

11  A.  Confidential Terra Forex Reserve Raise.

12  Q.  What does Forex mean?

13  A.  In this subject line, it's meant for foreign exchange.

14  Q.  Now, focusing on the actual text of the e-mail, after "hi

15  Paul, Do from Terra here."

16          Can you please read that first paragraph?

17  A.  "TLDR, we are looking to raise approximately 1 billion USD

18  worth of wBTC to put into a decentralized reserve smart

19  contract to buttress UST's stability mechanism (users can

20  redeem UST against Bitcoin).  We believe this will assuage

21  lingering worries about the stability of UST's core stability

22  mechanism and position UST to capture market share against

23  Tether and USDC as regulatory pressures mount up against them."

24  Q.  Now, in the first line it says approximately $1 billion

25  worth of wBTC.  What is wBTC?

O3QASEC1                     Revsin - Direct

1   A.  wBTC is Wrapped Bitcoin, typically on the Etherum protocol.

2   So if you wanted to trade Bitcoin outside the Bitcoin protocol,

3   you could use the wBTC.

4   Q.  And at the bottom it says "and position UST to capture

5   market share against Tether and USDC."  What was Tether?

6   A.  Tether was another stablecoin.

7   Q.  And what was USDC?

8   A.  Also another stablecoin.

9   Q.  So based on this paragraph, what did you understand the

10  fundraise was for?

11  A.  Based on this paragraph, Do Kwon was trying to raise money

12  to add additional support to the stablecoin through Wrapped

13  Bitcoin.

14  Q.  And if you could now please read the second paragraph

15  beginning with "terms of the round?"

16  A.  "Terms of the round are:  Selling Luna tokens for

17  40 percent discount from one month TWAP/four-year lock

18  up/annual 25 percent vest.  Jump capital is leading with a

19  300 million-dollar commitment."

20  Q.  So first of all, what is TWAP?

21  A.  It just basically means the average of the trading price

22  over a certain period of time.

23  Q.  And if you can, can you explain these terms in layman's

24  terms?

25  A.  Sure.  The idea is that over a certain period of time, in

1    this case four years, the availability for the investor to

2    potentially sell these tokens would unlock.  And so, again, the

3    idea is for it to take a certain amount of time.  What it's

4    saying here is every year, 25 percent would become available to

5    the investor.

6    Q.  And what does it mean to unlock?

7    A.  Because Luna was sitting in a smart contract for the

8    investor, basically would programmatically make itself

9    available to be sold, so you could then sell it on an exchange.

10   As opposed to when it's locked, you couldn't do that.

11   Q.  And did you review the attachment to the e-mail?

12   A.  Yes.

13         MS. CUELLAR:  If we could please display Plaintiff's

14   Exhibit 24b.  And if we could please move to page four.

15   Q.  Could you please read the title?

16   A.  "Terra is the market leader in decentralized stablecoins."

17   Q.  And if you could please read the line underneath?

18   A.  "Terra's largest stablecoin, UST, has a market cap of

19   2.7 billion and is the fifth largest stablecoin by market

20   capitalization."

21   Q.  So what does that mean, market capitalization?

22         MR. KORNBLAU:  Objection.  Lack of foundation.

23         THE COURT:  Did you have an understanding of what that

24   meant?

25         THE WITNESS:  I did, yes.

O3QASEC1                          Revsin – Direct

1            THE COURT:  What was that understanding?

2            THE WITNESS:  Market capitalization, meant the

3    aggregate amount of total float for the stablecoin.

4    BY MS. CUELLAR:

5    Q.  And when it says market cap of 2.7 billion, what is market

6    cap short for?

7            MR. KORNBLAU:  Objection.  Lack of foundation.

8            MR. FERRARA:  I'll add 702 and 703, your Honor.

9            THE COURT:  Overruled.

10   A.  Market cap means market capitalization.

11   Q.  So did this influence you in any way, what's represented

12   here?

13   A.  Yes.

14   Q.  How so?

15   A.  2.7 billion is a substantial amount of market

16   capitalization for any product in the crypto space and

17   certainly for a stablecoin.

18           MS. CUELLAR:  And if we could please move to page

19   five.

20   Q.  If you could please read the title here.

21   A.  Terra is the fourth largest network by TVL.

22   Q.  Now, in your job at an investor, did you become familiar

23   with the acronym TVL?

24   A.  Yes.

25   Q.  What is TVL?

1    A.  Total value locked.

2    Q.  And what does that mean in layman's terms?

3    A.  Typically that means that if you're the holder of the

4    cryptocurrency, you can lock it on-chain in various ways to

5    earn rewards or yield or something else.

6    Q.  And going down to line four, what was the -- what was

7    represented as the total value locked?

8    A.  9.74 billion.

9    Q.  Why is that higher than UST's market capitalization of

10   approximately 2.7 billion?

11   A.  This seems to represent all associated chains within the

12   Terra ecosystem.

13           MS. CUELLAR:  And if we could please move to slide

14   eight.  Or backing up a little.

15   Q.  Did that influence you in any way, the amount of total

16   value locked?

17   A.  Yes.

18   Q.  How so?

19   A.  It was a signal of a successful ecosystem in the space.

20   Q.  And how so?

21   A.  9.74 billion is significant amount of total value locked.

22           MS. CUELLAR:  And if we could please move to page

23   eight.

24   Q.  If you could please read the title.

25   A.  "Terra is poised to capitalize on the multichain future."

O3QASEC1                          Revsin - Direct

```
1   Q.  And if you could please read the line underneath.

2   A.  "Terra will be the most connected blockchain, and UST is

3   the asset that paves highways that connects all blockchains."

4   Q.  What did you understand this to mean, sir?

5   A.  That there was an undergoing initiative to connect the Luna

6   ecosystem with other major blockchains.

7   Q.  And did that influence you?

8   A.  Somewhat.

9   Q.  And why is that?

10  A.  By providing access to the Luna ecosystem from other major

11  chains, you could ostensibly increase activity on the Luna

12  blockchain itself, thus driving up TVL in value.

13  Q.  And what was TVL again?

14  A.  Total value locked.

15          MS. CUELLAR:  And if we could please move to slide

16  ten.

17  Q.  And, sir, if you could please read the title here.

18  A.  "A bet on Luna is a bet on the success of the Terra

19  economy."

20  Q.  And underneath, could you read that line?

21  A.  "Luna captures value through."

22  Q.  And then if you could please read the highlighted text

23  there.

24  A.  "Given that the supply of Luna is noninflationary, this

25  arbitrage mechanism keeps UST on peg and causes Luna to become
```

O3QASEC1                          Revsin – Direct

1   more scarce as the demand for UST increases."

2   Q.  What did you understand this to mean?

3   A.  At a high level, there is an arbitrage system set up

4   between UST, the stablecoin, and Luna, the call it governance

5   token.

6            Basically the idea is you could burn Luna to receive

7   stablecoin or you could burn stablecoin to receive Luna.  And

8   through that mechanism, you could keep it stable.

9   Q.  What does it mean to burn?

10  A.  Burn means remove from circulation.

11  Q.  Did this influence you?

12  A.  Yes.

13  Q.  And why is that?

14  A.  We believe this is the core product set for the Luna

15  ecosystem.

16  Q.  And why did you believe that?

17  A.  Not only did it have the majority of usage and TVL, but it

18  was also where most retail and institutional investors started

19  from to then use for other products in the Luna ecosystem.

20  Q.  And here it says "this arbitrage mechanism keeps UST on

21  peg."

22           Was it important to you that the UST peg be

23  maintained?

24  A.  Yes.

25  Q.  Can you explain why?

O3QASEC1                          Revsin - Direct

1   A.  If the -- most holders of UST expected it to be worth

2   roughly $1, and if it was worth significantly less, people

3   would lose trust in the protocol and, therefore, not use it.

4   Alongside obviously losing money if they purchased it at a

5   dollar.

6           MS. CUELLAR:  And if we could please move to the next

7   page.

8   Q.  And if you could please read the "why" here.

9   A.  "This reserve will buttress the faith in the peg of UST,

10  and allows for more participants to get involved in the Terra

11  ecosystem."

12  Q.  Now, how did you understand this would work?

13  A.  My understanding from this slide was that the capital

14  raised would then be marked to other potential users and

15  investors as further proof that the stability mechanism was

16  strong and backed by further capital.

17  Q.  Now, did this fundraise undercut your belief that the UST

18  peg was stable?

19  A.  No.

20  Q.  Why not?

21  A.  We believe that any additional capital was a benefit and

22  would potentially allow investors globally to feel even more

23  faith in the ecosystem.

24  Q.  Thank you.

25          MS. CUELLAR:  We can take down this slide,

1    Mr. Haywood.

2    Q.   Now, after receiving this e-mail and reviewing the

3    attachment, what did you do next?

4    A.   We began to research and due diligence on the investment

5    opportunity.

6    Q.   What does it mean to due diligence?

7    A.   Research private and public material to decide if we wanted

8    to make an investment.

9    Q.   So ultimately what material did you analyze in determining

10   whether to make an investment?

11   A.   From a material perspective, it would have been the deck

12   that they sent, the marketing deck that we discussed, along

13   with public information published by Terra and by others.

14   Q.   And did you talk to any people?

15   A.   Yes.

16   Q.   Who did you speak with?

17   A.   We spoke with Jeff Kuan.

18   Q.   And who is Jeff Kuan?

19   A.   We understood him to lead business corporate development

20   for Terra.

21   Q.   And what are the things you spoke about with Mr. Jeff Kuan?

22   A.   We spoke about the need for the fundraise, how it would be

23   used, and also the structure of the investment round and

24   potential investment allocation, which is how much there might

25   be available to invest.

O3QASEC1                    Revsin - Direct

1  Q.  What are, if you recall, what are some of the public

2  information you reviewed?

3  A.  We would look at blog posts, social media, and other

4  research reports written online.

5  Q.  And did you ever go to the Terraform website?

6  A.  Yes.

7  Q.  And what do you recall reviewing there?

8  A.  I recall reviewing posts by various team members along with

9  the website itself.

10  Q.  And do you recall what was on the website?

11  A.  Not in extreme detail.

12  Q.  Now, during this process did you speak to Mr. Do Kwon?

13  A.  No.

14  Q.  Now, during your due diligence process, did you discover

15  whether the UST peg to the dollar ever came under stress?

16  A.  Yes.

17  Q.  And how did you learn of this?

18  A.  By reviewing on-chain activity, we saw that the value of

19  UST had dropped significantly below a dollar.

20  Q.  And did you research that event?

21  A.  Yes.

22  Q.  And what did you review in your research?

23  A.  I don't remember the exact specifics, but primarily we

24  would look at how quickly and how efficiently the peg regained

25  its dollar footing.

O3QASEC1                        Revsin – Direct

1   Q.  Now, what did you ultimately determine about how the peg --

2   how UST was restored to $1?

3   A.  Our team --

4          MR. FERRARA:  Objection, your Honor.

5          THE COURT:  And the objection is?

6          MR. FERRARA:  It's a foundational objection.  To the

7   extent it's about his understanding, that's one thing.  To the

8   extent this is sort of posed as a determination, that is a

9   different question.

10         THE COURT:  All right.  Rephrase.

11         MS. CUELLAR:  Yes, your Honor.

12  BY MS. CUELLAR:

13  Q.  In your research, were you able to form your own opinion on

14  why you thought the UST returned to $1 in value?

15  A.  Yes.

16  Q.  And can you please share what you determined?

17  A.  Our belief was that the peg returned to a dollar because of

18  the arbitrage mechanism that had been widely marketed.

19  Q.  Now, during this research process, did you ever convey your

20  opinions in a written document?

21  A.  Our opinions on this specific return to the peg?

22  Q.  No, excuse me.  I'll rephrase.

23         Did you ever convey your opinion about the investment

24  opportunity in a written document?

25  A.  Yes, we wrote a memo.

O3QASEC1                          Revsin – Direct

1    Q.   And why did you do that?

2    A.   Both for internal documentation reasons and for future

3    marketing to our own clients.

4    Q.   And did this document reflect yours and Republic's

5    understanding of the investment opportunity?

6    A.   Yes.

7    Q.   And what was the memo based on?

8    A.   The memo based was on my research and my team's research in

9    the investment opportunity.

10   Q.   And specifically what research?

11   A.   The marketing deck, the conversation with Jeff Kuan, and

12   on-chain activity review, and publicly created information.

13             MS. CUELLAR:   And if we could please display,

14   Mr. Haywood, for the witness Plaintiff's Exhibit 27b.

15             Do you recognize this exhibit?

16   A.   I do.

17   Q.   And what is it?

18   A.   This is our investment memo.

19   Q.   And was it Republic's standard practice to prepare an

20   investment memo in a situation like this?

21   A.   Yes.

22   Q.   And was this particular investment memo prepared at the

23   time of the Luna Foundation Guard offering?

24   A.   Yes.

25   Q.   And was it maintained in the course of Republic's standard

O3QASEC1                          Revsin - Direct

1    business?

2    A.  Yes.

3    Q.  And is this a complete and accurate copy of Plaintiff's

4    Exhibit 27b?

5    A.  Yes.

6           MS. CUELLAR:  Your Honor, at this time we move to

7    admit Plaintiff's Exhibit 27b.

8           MR. FERRARA:  Without objection.

9           THE COURT:  Received.

10          MS. CUELLAR:  And if we could please display it.

11          (Plaintiff's Exhibit 27b received in evidence)

12   Q.  Now, again, Mr. Revsin, who did you share this investment

13   memo with?

14   A.  This would have been shared internally and also with our

15   clients that we thought might have an interest in investing in

16   Terra alongside us.

17   Q.  And if you can, can you please read the first two sentences

18   of this overview paragraph?

19   A.  "Terra is the leader in decentralized stablecoins.  Terra's

20   largest stablecoin, UST, has a market cap of 2.7 billion and is

21   the fifth largest stablecoin by market capitalization.

22   Currently, Terra is the fourth largest network by total value

23   locked, TVL.  Terra, the Luna token specifically, first entered

24   the market in January 2018."

25   Q.  Where did you get this information from?

1   A.   This looks like it was primarily sourced from the marketing

2   materials provided to us.

3   Q.   Provided to you by who?

4   A.   By Do Kwon through the e-mail from Arjun.

5        MS. CUELLAR:  And if we could please move to the final

6   paragraph on this page.

7   Q.   Can you please read this?

8   A.   "Since it is not collateralized, its tokenomics are highly

9   reflexive, whereby broad adoption of Terra's DApps translates

10  to demand for UST, which leads to supply reduction of Luna,

11  which ultimately drives up the price of LUNA."

12  Q.   What is DApps?

13  A.   Decentralized applications.

14  Q.   And what are those?

15  A.   Those are typically applications that are built on top of a

16  protocol like Terra.

17  Q.   And can you explain in layman's terms what this paragraph

18  means?

19  A.   Essentially it's describing the mechanism by which our

20  investment in Luna would be successful, meaning the price of

21  Luna would go up because of the way the arbitrage system works.

22  The more stablecoin there is, the less Luna there is.  And if

23  there is less supply of something, typically the price will

24  move up as demand moves up.

25  Q.   And was this important to your investment decision?

O3QASEC1                        Revsin - Direct

1    A.  Yes.

2            MS. CUELLAR:  And if we could please go to page two.

3    And focusing on raise details.

4    Q.  Can you please read "notable lead and coinvestors?"

5    A.  "Jump capital, 300 million, Binance, 300 million, 3AC."

6    Q.  How did this influence you?

7    A.  These were notable investors in the space at the time.

8    Q.  Does that have any impact on you?

9    A.  Yes.

10   Q.  How so?

11   A.  In a number of ways, but primarily the expectation would be

12   that these investors also conducted due diligence and decided

13   to invest, and there were a number of smart people working at

14   these companies.

15   Q.  Now, if you could please read "reason for funding."

16   A.  "To raise capital for the formation of a

17   protocol-controlled reserve in order to ensure faith in the peg

18   of UST and have liquidity for the peg."

19   Q.  Now, this reason for funding, did this cause you to

20   question UST's stability?

21   A.  No.

22   Q.  And why not?

23   A.  We believed that any additional liquidity would only act to

24   bring more investors into the protocol because there would be

25   more faith in the ecosystem.

O3QASEC1                        Revsin - Direct

1              MS. CUELLAR:  If we could please move to page three.

2      Q.  There are a number of categories listed here.  What do

3      these categories represent?

4      A.  Various things that we would review as part of our due

5      diligence.

6      Q.  And focusing on partnerships under paragraph two -- well,

7      first of all, why did you focus on partnerships?

8      A.   In the space, especially fairly early on, partnerships with

9      other organizations or protocols or applications would drive

10     usage for the underlying protocol.

11     Q.  Is usage important?

12     A.  Yes.

13     Q.  How so?

14     A.  A protocol like UST or Luna that has usage typically

15     generates more activity on-chain, more fees, more TVL.  Which,

16     again, through the various mechanisms could drive up the value

17     of an investment in the underlying token.

18     Q.  And again, what is TVL?

19     A.  Total value locked.

20     Q.  And if you can, can you please read this paragraph?

21     A.  "Terra launched with and has the support of the Terra

22     alliance, which consists of 15 large E-commerce companies in

23     Asia that collectively process 25 billion USD in annual

24     transaction volume and has 45 million users."

25     Q.  And if you could please continue reading.

1    A.   "It already has robust integrations with many big players

2    in DeFi, NFTs, E-commerce and a myriad of other protocols.

3    Anchor, Mirror, Cosmos, Tendermint, SDK, Pylon, Chai, Nebula."

4    Q.   I see here Chai is listed.  What did you understand Chai to

5    be?

6    A.   We understood it to be a payments platform that Do Kwon had

7    founded in South Korea and had leveraged the Luna ecosystem.

8    Q.   And were you aware of whether Chai had a connection to

9    Terraform?

10   A.   We believed that it did.

11   Q.   How so?

12   A.   Our understanding was that it was one of the first major

13   applications that was built leveraging the Luna ecosystem.

14   Q.   And how did Chai leverage the Luna ecosystem?

15   A.   Our understanding is that Luna would facilitate

16   settlement -- I'm sorry.  Terra would facilitate settlement of

17   the payments platform on-chain.

18   Q.   And where did you learn this information?

19   A.   I believe that this particular piece may have been on the

20   deck or the Terra website.  But it was also widely discussed

21   online.

22   Q.   And if Chai did not in fact use the Terra blockchain to

23   settle transactions, is that something you would have wanted to

24   know?

25   A.   Yes.

O3QASEC1                    Revsin – Direct

1    Q.   Why?

2    A.   For two reasons.  One, it would have felt like a

3    misrepresentation from public comments that had been made.

4    And, two, it would have potentially driven less activity onto

5    the Luna blockchain.

6    Q.   And what is the impact of less activity?

7    A.   Less activity means less interest in the protocol.  And,

8    ultimately for an investor, less interest in buying the token

9    and increasing the price.

10            MS. CUELLAR:  Now, if we could go to page four, down

11   to paragraph seven and token use and structure.  And if we

12   could broaden that to cover the whole paragraph.

13   Q.   What are you analyzing here?

14   A.   It looks like we are analyzing the stablecoin and the

15   arbitrage ecosystem.

16   Q.   And why were you analyzing it?

17   A.   We wanted to understand how it worked.

18   Q.   Was it important to you to understand how it worked?

19   A.   Yes.

20   Q.   Why?

21   A.   It would give us confidence in the stability of the

22   mechanism and other people's view of the stability of the

23   mechanism.

24   Q.   And did you believe in the stability of the mechanism?

25   A.   Yes.

O3QASEC1                        Revsin - Direct

1    Q.  Why?

2    A.  Among other reasons, that it had maintained its peg.  And

3    when it had seemed to lose some of the peg, the ecosystem and

4    the arbitrage mechanism had seemed to regain the peg pretty

5    quickly.  So we saw it as a stress test.

6    Q.  And you can take down the exhibit, Mr. Haywood.

7            Now, ultimately, after conducting the due diligence

8    and writing this memo, did Republic decide to invest?

9    A.  Yes.

10   Q.  And why did Republic decide to invest?

11   A.  We believed it was a good investment opportunity for

12   ourselves and our clients.

13   Q.  Why did you believe that?

14   A.  We believed that the investment would appreciate in value.

15   Q.  And why did you believe it would appreciate in value?

16   A.  We saw the ecosystem as an emerging player in the space and

17   we believed that there was further opportunity for it to grow.

18   Q.  Now, were you involved in the process to finalize the deal?

19   A.  Yes.

20   Q.  And who did -- or did you and Republic employees interact

21   with anyone to finalize the deal?

22   A.  Yes.  I think we interacted with the legal team.

23   Q.  Whose legal team?

24   A.  Terraform Labs and associated companies.

25           MS. CUELLAR:  And if we could please display Exhibit

1   29 for the witness.

2   Q.  Do you recognize this exhibit?

3   A.  Yes.

4   Q.  And what is it?

5   A.  This seems to be an e-mail generated by DocuSign, which is

6   a tool used for signing contracts and it also has a note from

7   Marc Goldich.

8   Q.  And who did you understand Marc Goldich to be?

9   A.  One of the senior counsel or the general counsel for

10  Terraform.

11          MS. CUELLAR:  Your Honor, the parties have stipulated

12  to the admission of this exhibit.  So at this time, we move to

13  admit Plaintiff's Exhibit 29.

14          THE COURT:  Received.

15          MS. CUELLAR:  And if we could please display it.

16          (Plaintiff's Exhibit 29 received in evidence)

17  Q.  And, sir, what date was this sent?

18  A.  January 25, 2022.

19  Q.  And who was it sent to?

20  A.  Me.

21  Q.  And what was the subject here beginning with "the Luna

22  Foundation Guard?"

23  A.  "The Luna Foundation Guard, OTC token sale agreement,

24  confidential."

25  Q.  What does OTC stand for?

1    A.  Over the counter.

2    Q.  And was there an attachment to this e-mail?

3    A.  Yes.

4    Q.  And what was the attachment?

5    A.  The OTC token sale agreement.

6    Q.  Looking now at towards the bottom of the exhibit, whose

7    name is listed there and whose e-mail?

8    A.  Marc Goldich, Marc's e-mail.

9    Q.  And is his e-mail Marc@Terra.money?

10   A.  Yes.

11   Q.  And if you could please read the paragraph after "good

12   afternoon?"

13   A.  "As you are aware, today is the day we move forward with

14   the Luna Foundation Guard token sale.  We are very pleased to

15   have you participate in this momentous event for the Terra

16   ecosystem.  Attached you will find the final token sale

17   agreement, the TSA.  Please finalize your purchase amount and

18   execute the document by Monday, January 24."

19   Q.  And what is a token sale agreement?

20   A.  It's an agreement to purchase tokens or sell tokens.

21          MS. CUELLAR:  And if we could please move to page two.

22   And if we could focus on the paragraph beginning with "the

23   final token price."

24   Q.  If you could please read that paragraph, sir.

25   A.  "The final token price is USD $30.95, which represents a

O3QASEC1                          Revsin – Direct

1    40 percent discount of the relevant price, as defined by the

2    TSA.  Please execute the TSA at your earliest convenience

3    today."

4    Q.  What does that mean, a 40 percent discount of the relevant

5    price?

6    A.  It means that this would have been the calculated

7    40 percent discount based on the structure, the TWAP that we

8    discussed earlier, which is typically I believe for this was 30

9    days average trading price.

10   Q.  Does that mean that Republic was not paying -- or not

11   paying market prices?

12   A.  Correct.

13            MS. CUELLAR:  And if we could please display for the

14   witness Plaintiff's Exhibit 32.

15   Q.  Do you recognize this exhibit, sir?

16   A.  Yes.

17   Q.  And what is it?

18   A.  This is the token sale agreement used for the sale of Luna

19   tokens.

20            MS. CUELLAR:  And, your Honor, the parties have

21   stipulated to the admissibility of this document.  So at this

22   time, we move to admit Plaintiff's Exhibit 32.

23            THE COURT:  Received.

24            (Plaintiff's Exhibit 32 received in evidence)

25            MS. CUELLAR:  And if we could please display, and

1    moving to page two.

2    Q.  In focusing towards the top of the document here, what was

3    the date of this agreement?

4    A.  Twenty-first of January, 2022.

5    Q.  And who was the vendor?

6    A.  Luna Foundation Guard, LTD.

7    Q.  And who did you understand the Luna Foundation Guard to be?

8    A.  An affiliate or subsidiary of Terraform.

9            MS. CUELLAR:  And if we can now move to the two

10   paragraphs underneath.  Beginning with "in connection with, the

11   intended distribution." And also the paragraph underneath,

12   please.

13   Q.  If you could please read the second paragraph there, the

14   establishment of UST reserve?

15   A.  "The establishment of UST reserve, UST reserve

16   establishment, is a nonprofit initiative of the vendor to

17   provide a further layer support to maintain the UST's peg to

18   USD, USD peg.  It is contemplated that in an event where the

19   market price of UST deviates from the USD peg, holders of UST

20   in the community will be able to close the arbitrage and bring

21   the market price of UST back to the USD peg."

22   Q.  And, again, did this -- the fact that this was the intended

23   use, did this undermine your belief in the UST stability

24   mechanism?

25   A.  No.

O3QASEC1                         Revsin - Direct

1   Q.  And why not?

2   A.  We believed that the establishment of a further reserve

3   would add more faith and confidence in the protocol among those

4   that didn't understand or have interest in algorithmic

5   stablecoins.

6           MS. CUELLAR:  And if we could please move to page 20

7   in the document.  And focusing on the top two boxes there.

8   Q.  Who is the buyer?

9   A.  RCapital Terranova.

10  Q.  What was RCapital Terranova?

11  A.  It was an investment vehicle that we structured at Republic

12  Capital to make this investment.

13  Q.  And under buyer tokens, what is represented here?

14  A.  It's basically writing the formula for how many tokens we

15  would be purchasing.

16  Q.  And in the next box, what is that purchase consideration?

17  What is the number there?

18  A.  That's the quantum of capital that we would pay to purchase

19  those tokens.

20  Q.  And if you could please read how much Republic invested.

21  A.  35.9 million.

22  Q.  And under settlement digital asset, right underneath, it

23  lists BTC.  What is BTC?

24  A.  Bitcoin.

25  Q.  What is USDT?

O3QASEC1                         Revsin – Direct

A.   The Tether stablecoin.

Q.   What is USDC?

A.   The Circle created stablecoin.

Q.   And what is BNB?

A.   BNB is a Binance token.

Q.   What does it mean to be a settlement digital asset?

A.   They're basically saying you could purchase their token
with any of these four digital assets.

Q.   And if we could go down to settlement date.  What was the
settlement date, sir?

A.   January 26th, 2022.

Q.   Now, if we could focus on seven, buyer tokens unlock date,
which also goes to the next page.  If you could please read
that.

A.   "Buyer tokens unlock date, subject to wallet setup, as
defined herein, the vendor shall deliver the buyer tokens to
the buyer tokens' receiving address in accordance with clause
2.1, which shall remain locked and cannot be transferred by the
buyer to another address unless otherwise unlocked based on the
following token unlock schedule, buyer tokens unlock schedule."

Q.   What does it mean they had to remain locked?

A.   It means that they were nontransferable so you couldn't
sell them.

          MS. CUELLAR:  And if we could please go down now to
the buyer tokens unlock schedule.

O3QASEC1                        Revsin - Direct

1   Q.  So under these, when was Republic to take delivery --

2   excuse me.  Let me rephrase.

3        When was the first tranche of tokens to be unlocked?

4   A.  On the first anniversary of January 26, 2022.  So it looks

5   like one year.

6   Q.  And once it was unlocked, what could Republic do?

7   A.  We could move the tokens to another wallet, we could use

8   them within the ecosystem, or we could sell them.

9   Q.  And for tranches two, three, and four, would it follow then

10  every year, one-fourth of the amount would become unlocked?

11  A.  That's right.

12        MS. CUELLAR:  And we can take down the exhibit.

13        Excuse me.  If we could go back.  Apologies.  And

14  display page 28.

15  Q.  And focusing on buyer, who signed for the buyer, sir?

16  A.  Boris Revsin, myself.

17  Q.  And who signed for the vendor?

18  A.  Do Kwon.

19  Q.  And what date did Do Kwon sign?

20  A.  January 25th, 2022.

21        MS. CUELLAR:  And we can now take that down.

22  Q.  Now, based on your interactions with Terraform, including

23  Jeff Kuan and the general counsels, who did you understand ran

24  the Luna Foundation Guard?

25  A.  Do Kwon and his team.

O3QASEC1                        Revsin - Direct

1   Q.   Now, did Republic Capital ultimately transfer the

2   approximate $35.9 million?

3   A.   Yes.

4   Q.   And who did Republic work with to transfer the funds?

5   A.   The legal team that we just discussed.

6           MS. CUELLAR:   And if we could please display

7   Plaintiff's Exhibit 31 for the witness.

8   Q.   Do you recognize this exhibit, sir?

9   A.   Yes.

10  Q.   And what is it?

11  A.   It looks like it is a set of e-mails confirming, prepping,

12  and then confirming the transactions that came from one of my

13  team members.

14          MS. CUELLAR:   Your Honor, at this time we move to

15  admit Plaintiff's Exhibit 31.

16          MR. FERRARA:   May I have one moment, your Honor.   I

17  apologize.   May I consult briefly with SEC counsel, your Honor?

18          THE COURT:   Yeah.

19          MR. FERRARA:   Thank you, your Honor.   Subject to my

20  conversation with counsel, we have no objection.

21          THE COURT:   Received.

22          (Plaintiff's Exhibit 31 received in evidence)

23          MS. CUELLAR:   Thank you, your Honor.

24          If we could please display the exhibit and move to

25  page three.   It is quite small so if we could please zoom in.

O3QASEC1                      Revsin – Direct

1    Q.  Now, sir, could you please read your first e-mail?

2    A.  "Terra team:  Republic Capital is prepared to fund the

3    25 million portion of our 35.9 million commitment in USDC.

4    What would be the appropriate next step?  Thank you."

5    Q.  And then a Leo Batali next e-mails.  Who is he?

6    A.  He was on the operations and investor relations team at

7    Republic Capital.

8    Q.  And what is he asking for here?

9    A.  He's confirming the wallet address for Republic Capital to

10   send the USDC.

11   Q.  And just what is a wallet address?

12   A.  Similar to a bank account.  It's a unique ID that would be

13   used for us to send capital, or in this case, USDC.

14   Q.  Thank you.  And if we could now focus on the response just

15   above.  Who responds to Mr. Batali?

16   A.  Marc Goldich.

17   Q.  And who is Marc Goldich?

18   A.  He was the general counsel for Terraform Labs.

19   Q.  And for the record, is that actually in his signature

20   block?

21   A.  Yes.

22   Q.  And what does Marc Goldich provide?

23   A.  He provides the address for us to send the stablecoin USDC.

24   Q.  And if we could now turn to page two.  And focusing on the

25   bottom, what is Mr. Batali asking Marc Goldich for here?

O3QASEC1                        Revsin - Direct

1    A.  He's looking for a confirmation that the test transaction

2    we sent was received.

3    Q.  Why is he doing that?

4    A.  To ensure that the stablecoin went to the right wallet

5    address.

6    Q.  And if we can now focus on the next two responses above.

7            And how does Marc Goldich respond there at the bottom?

8    A.  Would you mind zooming in to the piece that you would like

9    me to read?

10           MS. CUELLAR:  Mr. Haywood, it's at the very bottom.

11   No.

12   A.  I do see "receipt confirmed, thanks," if that's the piece.

13   Q.  Yes.  And was that sent January 26th at 2010?

14   A.  Yes.

15   Q.  Then above, Leo Batali responds again, and what does he

16   say?

17           MS. CUELLAR:  No, Mr. Haywood, it's further down the

18   page.

19   A.  I think it starts with Marc --

20   Q.  4:00 p.m.

21   A.  Yep.  A bit hard to read but is says, "Marc, amazing, I'm

22   glad to hear.  We have sent the remaining 24,999,990 to the

23   same wallet address, for which I've included the corresponding

24   ether scan link below."

25   Q.  And how does Marc Goldich respond?

O3QASEC1                        Revsin - Direct

1    A.  "Receipt confirmed."

2         MS. CUELLAR:  Thank you.  We can take down the

3    exhibit.

4    Q.  Now, in your testimony you previously mentioned that you

5    and your team analyzed the circumstances around UST's brief

6    depeg; is that correct?

7    A.  Yes.

8    Q.  And what did you understand happened during that brief

9    depeg?

10         MR. FERRARA:  Objection.  Asked and answered.

11         THE COURT:  I'll allow it.  You may answer.

12    A.  What we understood to happen is that the arbitrage

13    mechanism between UST and Luna allowed the community to restore

14    the peg.

15    Q.  And how did you obtain this understanding?

16    A.  From monitoring on-chain data and from what was said about

17    the events online and in social media.

18    Q.  Were you aware whether a third party had stepped in and

19    purchased significant amounts of UST to stabilize the price?

20         MR. KORNBLAU:  Objection.  Leading.

21         THE COURT:  We've been through this before.  When

22    you're putting a question to establish a negative, leading is

23    permissible.  Overruled.  Overruled.

24         MR. FERRARA:  I have a different objection, your

25    Honor.

1          THE COURT:  I'm sorry.

2          MR. FERRARA:  I think we'll agree third parties were

3    involved in this, so I just wanted to flag.  I'm happy to

4    discuss it at side bar.

5          THE COURT:  No, I don't think we need a side bar.

6          Go ahead.  You may answer the question.

7          Do you want to put the question again.

8          MS. CUELLAR:  Yes, please your Honor.

9    Q.  Were you aware whether a third party had stepped in and

10   purchased significant amounts of UST to stabilize its price?

11   A.  No.

12   Q.  Would you have wanted to know this information prior to

13   investing?

14   A.  Yes.

15   Q.  Can you please explain why.

16   A.  The typical way that the arbitrage mechanism should work is

17   that many people or institutions would come in and restabilize

18   the peg.  It is not supposed to be -- or our understanding was

19   that it was not supposed to be one major institution that would

20   come in and backstop the peg.

21   Q.  And would this information have called into question the

22   stability of UST for you?

23   A.  To some degree, yes.

24   Q.  And why is that?

25   A.  Because our understanding was that there was a community

O3QASEC1                    Revsin - Cross

1   and -- a community of users around the ecosystem that would

2   restabilize the peg and that it did not rely on any one large

3   institution.

4   Q.  And, ultimately, what happened to the price of UST in May

5   of 2022?

6   A.  The price of UST depegged massively from the dollar target.

7   Q.  And what happened to the price of Luna?

8   A.  Luna also dropped precipitously in price.

9   Q.  And what happened to Republic Capital's $35.9 million?

10  A.  The majority of the investment was lost.

11          MS. CUELLAR:  Thank you.  No further questions, your

12  Honor.

13          THE COURT:  All right.  Cross-examination.

14          MR. FERRARA:  Thank you, your Honor.

15  CROSS-EXAMINATION

16  BY MR. FERRARA:

17  Q.  Good morning, sir.

18  A.  Good morning.

19  Q.  We've never met before, right?

20  A.  We shook hands yesterday.

21  Q.  That's true, yes, we did.  Thank you for reminding me.  We

22  shook hands yesterday.

23          Did we talk about the case at all?

24  A.  We did not.

25  Q.  You've met with the SEC's counsel several times to talk

O3QASEC1                          Revsin - Cross

1    about the case; is that right?

2    A.  Over Zoom.

3    Q.  Good.  About how many times?

4    A.  Several.

5    Q.  You discussed the substance of your testimony with them,

6    right?

7    A.  Yes.

8    Q.  I want to start a little by going over a little bit of your

9    background and experience.  Okay?

10           So you began college at UMass Amherst, right?

11           I think you have to say yes or no for the court

12    reporter.

13   A.  Yes.

14   Q.  Thank you.  And you left college early to found your first

15   company, right?

16   A.  Yes.

17   Q.  And then you founded a second company after that, which is

18   Game Theory Group, right?

19   A.  No.

20   Q.  Oh, I'm sorry.  Please correct me.

21           What was the order of the founding?

22   A.  The first company was Campus Live.  The second company was

23   a company now known as HQO.  The third company was Game Theory

24   Group.

25   Q.  Thank you.  And was that in June 2017 that you founded Game

O3QASEC1                          Revsin - Cross

1    Theory?

2    A.   About that time.

3    Q.   Fair enough.  So you were, what, around 19 years old when

4    you started that company?

5    A.   I'm 37.  So I was a bit older.  I know I look young.

6    Q.   Game Theory was focused on researching blockchain

7    technology; is that right?

8    A.   And investing, yes.

9              MR. FERRARA:  I'm sorry.

10             THE COURT:  I'm sorry, yes.  What's going on here?

11             MR. FERRARA:  I think a juror --

12             THE COURT:  Yes.  Ms. Juror, what's going on?

13             JUROR:  Can I get some water?

14             MR. FERRARA:  Asking for water.

15             THE COURT:  That's fine, but you cannot just leave the

16   jury box without permission.

17             JUROR:  Sorry.

18             THE COURT:  I'll tell you what, we were going to take

19   in 15 minutes our mid-morning break, why don't we take it now.

20   Mid-morning break.

21             MR. FERRARA:  Fair enough, your Honor.

22             THE COURT:  You may step down.  We'll see you in 15

23   minutes.

24             (Continued on next page)

25

O3QASEC1                          Revsin - Cross

1           (Jury not present)

2           THE COURT:  Please be seated.  My law clerk will hand

3    to you my rulings on the objections to portions of the

4    deposition of Paul Kim.

5           Now, there was something that counsel wanted to raise

6    about video.

7           MR. PELLEGRINO:  Yes, your Honor.  Louis Pellegrino.

8    This pertains to an Exhibit 258a and b.

9           When Mr. Connor raised it a moment ago, he tried to

10   move in an exhibit known as D1509, which is the defendants'

11   exhibit.  I think what he should have done is explain that they

12   have the same exhibit on their exhibit sheet.  Now, I want to

13   show the Court --

14          THE COURT:  So the pretrial consent order, if I

15   understand what you're saying, represented that both parties

16   were going to offer this exhibit?

17          MR. PELLEGRINO:  No, your Honor.

18          THE COURT:  No?

19          MR. PELLEGRINO:  No.  We listed this exhibit on our

20   exhibit list for a specific purpose.  It's a Kanav related

21   exhibit.  If Mr. Kanav were to be here at some point during the

22   trial, we would offer it to cross-examine him on it, and that's

23   the reason we put it on our list.  However, they listed it on

24   their list and we did object to it for multiple reasons.

25          So if they're introducing it in their case in chief,

O3QASEC1                          Revsin – Cross

1    they should be introducing exhibit --

2              THE COURT:  Let me just look at the pretrial consent

3    order.

4              MR. PELLEGRINO:  Sure.

5              THE COURT:  Their number is what?

6              MR. PELLEGRINO:  It's 258a and b, your Honor.

7              THE COURT:  Okay.  So you're objecting first on 403,

8    meaning that you think the prejudice substantially outweighs

9    the probative value.  Then, as you so often do, you object on

10   the rule of completeness without indicating what needs to be

11   included to make it complete.  This, by the way, is a perennial

12   problem with the objections you have made in the depositions

13   that I've been slogging through.  There is no point to object

14   on incompleteness if you're not prepared to state what has to

15   be added to make it complete.

16             MR. PELLEGRINO:  I am prepared to state that.

17             THE COURT:  Well, fine.  That should be stated in the

18   pretrial order and it should be stated in your deposition

19   objection so that I don't have to waste, as I've had to,

20   immense amount of my time.

21             MR. PELLEGRINO:  Understood, your Honor.  I was in

22   court yesterday when I heard your Honor's explanation of Rule

23   106.  And in this instance, we believe it's a clear of 106, and

24   I can explain that, your Honor.

25             THE COURT:  Go ahead.

1          MR. PELLEGRINO:  And then also 901, which is where I

2     would start with our analysis, actually.

3          THE COURT:  Okay.  Authentication.

4          MR. PELLEGRINO:  Correct, your Honor.  Authentication.

5          THE COURT:  So and then just where you have it on your

6     list?

7          MR. PELLEGRINO:  It's D1509, your Honor.

8          THE COURT:  So, which is labeled screen shot of the

9     video taken of a conversation between Do Kwon and Kanav Kariya

10    to which the SEC has no objection.

11         So where do you indicate -- aside from the fact that

12    cross exhibits for cross-examination don't have to be listed,

13    period.  So what needs to be listed is the exhibits you're

14    introducing on your direct case, and now you're telling me

15    you're not introducing it on your direct case, you're

16    introducing solely for cross-examination.

17         MR. PELLEGRINO:  Your Honor, it's really going to

18    depend what your Honor's ruling is with regard to Mr. Kanav.

19    So it was conditionally listed, which we think is all right.

20    We don't have to offer it.  As the Court knows, the exhibit

21    list is often times much larger than what's admitted into the

22    Court.

23         THE COURT:  No, but that's overstating it.  Because if

24    a party lists an exhibit, it is attesting in effect that it's

25    authentic.  Therefore, I don't really see how a party can say

O3QASEC1                              Revsin - Cross

1    that they have preserved their objection to the very same

2    exhibit on grounds of authenticity, when they have represented

3    to the Court that they're prepared to offer it.

4          MR. PELLEGRINO:  Well, your Honor, the particular

5    witness would still have to weigh a foundation.  I don't think

6    that makes it automatically authentic.  It would depend on

7    whether Mr. Kanav was going be here or not.

8          THE COURT:  I very much disagree with your view of the

9    pretrial consent order.  But in any event, since you apparently

10   were operating under a misimpression, I will not treat it as a

11   waiver.

12         So, now, talking about the objections you raised to

13   their exhibit.  What is it you wanted me to look at?

14         MR. PELLEGRINO:  Your Honor, this is part of a larger

15   video that we can just put up on the screen as 258b.  Your

16   Honor could observe it, and then I could explain what this is.

17   Because it's a subset of a video.

18         THE COURT:  Okay.

19         MR. PELLEGRINO:  Can someone play that, please.

20         (Video played)

21         MR. PELLEGRINO:  I think that's sufficient.

22         THE COURT:  This looks like a message, a text message.

23         MR. PELLEGRINO:  Okay.  So what's happening here, your

24   Honor, we cut the sound because this is apparently, apparently,

25   Mr. Kanav scrolling through his own phone and looking at signal

1   conversations between himself and Do Kwon.  We believe from

2   what we understand he's doing that at the request of his

3   attorney, which is why we cut the sound.  We can listen to that

4   later if we need to.  And it's a long string.  It goes on for

5   three minutes.

6          Now, the exhibit you looked at that is an excerpt of

7   this larger exhibit, is a series of conversations -- what it

8   shows is five phone calls between Mr. Kwon and Mr. Kanav on

9   May 23rd.

10          THE COURT:  May 23rd?

11          MR. PELLEGRINO:  2021, your Honor.  That would be the

12   day of the depeg.  Now, the 106 objection is well-founded here,

13   your Honor, because if you were to scroll through this

14   conversation, you would see they talk to each other all the

15   time.  All the time.  They talked about dogs, automobiles, all

16   sorts of things.  And there's also a reflection --

17          THE COURT:  I'm not sure why that gives you 106

18   objection.

19          MR. PELLEGRINO:  Because the --

20          THE COURT:  So let's say, in my hypothetical we sort

21   of went through this yesterday.  I'm scrolling with you, and I

22   say, you know, how's the weather, what's new, how's your

23   mother, oh, by the way, did you trade on that inside

24   information that I gave you yesterday; the rule of completeness

25   would not mean that we have to get into or add all the stuff

O3QASEC1                        Revsin - Cross

about your mother and so forth.

          MR. PELLEGRINO:  Okay.  Let's take your Honor's

hypothetical and suppose that we had a secret agreement, and

the allegation was on a particular day we discussed that secret

agreement, and the phone records reflected that we spoke five

times.  The rule of completeness suggests that there were phone

calls that happened the day before or two days before, and the

jury should be told that there were many phone calls between

the parties, and you should not assume that because there was

five calls on May 23rd, that's the only time that they spoke.

They were in frequent communication with each other --

          THE COURT:  That sounds like cross-examination, but

not completeness.

          MR. PELLEGRINO:  Well, but the problem is, your Honor,

is there Mr. Kanav is taking the 5th and that goes to our

authenticity and our 403 objections.  There is no person to

authenticate or introduce this document.  They want to

introduce it on a free-standing basis.

          With regard to the 403, your Honor, we're not sure how

that's going to turn out in terms of your Honor's ruling, but

if you give the jury an adverse inference or any -- if there's

a stipulation and they hear that Mr. Kanav is taking the 5th,

they're not going to understand why they did that but they are

going to see somebody scrolling through the phone or holding

the phone in this one still image, and they're not going to

1    appreciate where that image came from.  They're not going to

2    know is Mr. Kanav in custody, or police officers recording his

3    Signal chats on his phone, because there's no context for who

4    is taking the video.  And there's nobody in this case who can

5    explain that.

6             Now, the SEC, because we've had some discussions

7    about --

8             THE COURT:  Where is the prejudice?

9             MR. PELLEGRINO:  The prejudice is --

10            THE COURT:  So, I mean, the parties may want to

11   stipulate it was an attorney who was directing him to do this.

12   But assuming, even assuming they don't, if the message was sent

13   and it was received and it's there for everyone to see, I don't

14   see the prejudice.

15            MR. PELLEGRINO:  Well, first of all, your Honor, the

16   parties did attempt to stipulate.  Without getting into detail,

17   the stipulation would have allowed us to show that there were

18   other phone calls in addition to the phone calls on this day,

19   for balance, and we think that's a fair 106 application.

20            But with regard to the 403 argument, again, because

21   Mr. Kanav is taking the 5th, the jury is not going to

22   understand.  They may think he's in custody and that the police

23   are actually recording his Signal conversation.

24            THE COURT:  Well, is he available?

25            MR. PELLEGRINO:  No, because he's taking the 5th.

O3QASEC1                        Revsin – Cross

1           THE COURT:  No, no.  That's not my question.  Is he

2      physically available?

3           MR. PELLEGRINO:  I mean, yes, he's –- people can reach

4      him.

5           THE COURT:  All right.  So instead of stipulation, why

6      don't you call him, and then you can put all the questions you

7      want.  And if he takes the 5th you're entitled to argue for an

8      adverse inference.

9           (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

1              MR. PELLEGRINO:  Well, I mean, I think the issue with

2      that, your Honor, goes to *650 Fifth Avenue*, which is that then

3      we would have a witness taking the Fifth repeatedly in response

4      to all of the questions that they have designated they want to

5      ask him and then all of the questions that we would ask him.

6              THE COURT:  Yes.  And that has frequently occurred in

7      my court, and it's usually been, frankly, helpful to the

8      defense.  So I don't think it's ruled out by any of the case

9      law.

10             MR. PELLEGRINO:  We may have to do it that way, your

11     Honor.  So I guess what I would ask is that the Court reserve

12     ruling on it so that we can either talk to them about a

13     potential stip or come back to you and say that that's how we

14     would want to approach it.

15             THE COURT:  Yes.  I mean, a stipulation is totally

16     within the prerogative of the parties and not for the Court.

17     If I understand what you're saying, you would like to bring

18     out, through stipulation, that he was in regular telephonic

19     contact and that, on this particular occasion, he was scrolling

20     through at the request of his counsel, something like that.

21     I'm surprised the SEC wouldn't want to stipulate to that, but

22     that's what you wanted, right?

23             MR. PELLEGRINO:  That's correct.  There were two other

24     pieces of it that we wanted.  That Mr. Kanav had set his Signal

25     settings to disappearing, and Mr. Kanav had suggested that,

O3QHSec2                        Revsin - Cross

1    from his side of things, he was the one who wanted to use

2    Signal to communicate, not Mr. Kuan.  Those are what we would

3    want.

4            THE COURT:  I don't know if that's necessary for the

5    objections you're raising.  But I don't think it's a

6    completeness objection at all, but I would encourage, in the

7    interest of fairness, the SEC to stipulate at least to the two

8    things I suggested a minute ago.

9            MR. PELLEGRINO:  OK.  We may have to call him.  I

10   think we'll have to discuss, and we'll your Honor know from ——

11           THE COURT:  That's fine.  Well, that's fine.  I assume

12   you'll let me know fairly soon.

13           MR. PELLEGRINO:  We will, your Honor.

14           MR. CONNOR:  Your Honor, if I could just be heard on

15   that for just two quick points.

16           We were under the assumption, given it was in the

17   pretrial consent order, that defendants represented this

18   document was admissible in the pretrial consent order, that we

19   could use it, but we're now hearing a different understanding.

20           THE COURT:  I think the fair thing to say is that

21   their notations in the pretrial consent order were ambiguous

22   because, on the one hand, they did raise all sorts of

23   objections, not that I'm necessarily convinced that they're

24   good objections, but they did raise all sorts of objections to

25   your version of it.  And then, as I understand it, you raised

O3QHSec2                         Revsin - Cross

no objection to their version of it.

         So I think, in fairness to them, even though I think
they should have been more careful about that, I don't think
there was any waiver of their objections.

         MR. CONNOR:  And the other point on the authenticity
objection is that, given that Mr. Kariya is taking the Fifth
and that he produced his records to Jump's counsel, that act of
production authenticates the documents, and we have a case to
support that, *Mitchell v. Quality King Distributors*.  So we
don't think there's any grounds for the authentication
objection, and furthermore, we think it's appropriate for the
Court or counsel to instruct the jury that this is Mr. Kariya's
phone.  They represented that on their exhibit list, that it
was Mr. Kariya's phone.

         THE COURT:  Now, that part, I don't see how they could
have put it on their list if they didn't think it was an
authentic document.  Counsel is misleading the Court if it
suggests they want to introduce a document that they believe is
inauthentic.  I can't believe that professionals of the sort
I'm dealing with here would engage in such gamesmanship.

         MR. CONNOR:  And the only other point, your Honor, is
not only is it on their list, but it's also in the amended
pretrial consent order where the parties agreed and represented
what the exhibits are.  And both parties said none of these
documents are objectionable, and it should come into evidence.

O3QHSec2                          Revsin - Cross

1          THE COURT:  What about that?

2          MR. CONNOR:  It's in the pretrial order.

3          THE COURT:  Let me ask defense counsel about that.

4          MR. PELLEGRINO:  I'm sorry, I didn't hear the point.

5    Could you just restate it, Mr. Connor?

6          MR. CONNOR:  The exhibit, which I have a copy of right

7    here, is in the pretrial consent order, and both parties

8    stipulated that it's admissible into evidence without any

9    objection.

10         MR. PELLEGRINO:  I wasn't aware of that, your Honor.

11   I'd have to look at it.  Let me see.

12         THE COURT:  What page of the pretrial consent order is

13   this?

14         MR. CONNOR:  It is page 14 of the pretrial consent

15   order, D-1509 and D-1510.

16         THE COURT:  Yeah, there it is.

17         MR. PELLEGRINO:  Well, again, your Honor, I think I

18   just need to look at it.  One moment.  I see that.

19         So, your Honor, it may be a misunderstanding.  First

20   of all, there's no attempt to mislead or to introduce to the

21   Court inauthentic documents.  We may have done this wrong, but

22   I think our intent was that we want to put notification in to

23   the parties and to the Court that if Mr. Kanav is going to be

24   here, it would be part of the information we would cross him

25   on.  So that would be our mistake.

1          THE COURT:  Let me just make sure I understand what's

2     left.  If you work out a stipulation, great.  If not, your

3     objections are, first, completeness.  I'm not going to make any

4     final ruling now, but I'm very skeptical about that objection.

5          Authenticity, which they say could be satisfied

6     through an act of production —— they may have to call someone

7     for that purpose, but if they can call someone for that

8     purpose, do you disagree that that would satisfy authenticity?

9          MR. PELLEGRINO:  Well, I haven't had a chance to look

10    at that case because they just cited it to me this morning, but

11    my reaction, from not having looked at it, would be I would

12    question whether it deals with this scenario in which someone

13    else, or perhaps Mr. Kanav, is using another phone or device to

14    record the first device.  So I don't know how his attorney ——

15         THE COURT:  I'm sorry.  Is that the situation?  I

16    thought this was his phone.

17         MR. PELLEGRINO:  People say that —— I have ——

18         THE COURT:  So if I hand you a phone and the messages

19    on the phone are all messages between me and my wife, isn't

20    that enough to satisfy authenticity?

21         MR. PELLEGRINO:  Maybe.  But in your scenario, your

22    Honor, your law clerk has to take his phone or you have to

23    borrow someone else's phone or perhaps you have two phones and

24    you have to take one phone and record the second phone.  That's

25    what you saw on your screen.  Then you're transmitting that to

O3QHSec2                    Revsin - Cross

1    your lawyer at his direction, and now SEC is suggesting the

2    lawyer can come in and perhaps waive privilege because, as you

3    saw, the video has ——

4            THE COURT:  I don't think there's any —— I think he's

5    waived privilege as to anything he has produced.

6            MR. PELLEGRINO:  OK.  Even so, they have to offer a

7    modicum of proof that this is what they say it is, and the

8    lawyer cannot explain this two-video scenario that we're

9    talking about because he wasn't in the room, as far as I know.

10   So he doesn't know how that happened.

11           THE COURT:  I thought you told me that was his voice.

12           MR. PELLEGRINO:  I believe he was talking —— I believe

13   Mr. Kariya was talking to someone else who was working at the

14   lawyer's direction.  Honestly, we don't have the details, and

15   that's part of our authenticity objection, because we don't

16   really know the full story.  He's talking to somebody called

17   Max.  I don't know who that is.  I understand it's not the

18   lawyer, but he was doing this elaborate recording thing at the

19   direction of his lawyer.

20           THE COURT:  All right.  Well, I remain skeptical that

21   your objections can't be overcome, but I'm not making any

22   ruling now.

23           So let's bring the jury in and continue with the

24   witness.

25           (Continued on next page)

1           (Jury present)

2           THE COURT:  Please be seated.

3           We need to get the witness back on the stand, please.

4    We need to get the witness back on the stand, please.

5           You can, by the way, ladies and gentlemen, if at any

6    time a juror has some reason they need to leave, just raise

7    your hand, and we'll deal with it.

8           Go ahead, counsel.

9           MR. FERRARA:  Thank you, your Honor.

10   BY MR. FERRARA:

11   Q.  So I think where we had left off, we were talking about

12   your company Game Theory?

13   A.  Yes.

14   Q.  So Game Theory was focused on researching blockchain

15   technology, right?

16   A.  And investing.

17   Q.  Right, investing in that technology, too, correct?

18   A.  Yes.

19   Q.  So when you were at Game Theory, you were well versed in

20   those technologies, correct?

21   A.  I was still educating myself.

22   Q.  Part of your job was researching the different technologies

23   to see which ones had promise and which ones didn't, right?

24   A.  Part of it, yes.

25   Q.  Because you wanted to invest in the promising ones and

O3QHSec2                        Revsin - Cross

1    avoid the ones that you didn't think would make money, right?

2    A.   Sometimes.

3    Q.   Then Game Theory, I'll call it, merged with Republic

4    Capital.  Is that what you would say, or how would you put it?

5    A.   I would say the principals behind Game Theory Group joined

6    Republic.

7    Q.   Republic is a venture capital fund, right?

8    A.   No.

9    Q.   What is it?

10   A.   Republic is a company that has several products, one of

11   which is the cloud fund platform, one of which is a consulting

12   business, and then the business that I created within Republic

13   was a set of venture capital funds.

14   Q.   As of 2022, Republic had, what, something like a billion

15   dollars under management, is that right?

16   A.   Roughly.

17   Q.   To be clear, "under management" means that Republic had

18   about $1 billion that belonged to investors who invested in the

19   fund.  Is that fair to say?

20   A.   That's right.

21   Q.   In other words, I guess, to be totally clear, it wasn't

22   your $1 billion, correct?

23   A.   Correct.

24   Q.   Were there rules about who could invest in the venture

25   capital portions of Republic?

1   A.  Yes.

2   Q.  They have to be institutions, for example, right?

3   A.  No.

4   Q.  They could be institutions.  They could be, what I'll call,

5   high-net-worth individuals, is that correct?

6   A.  Correct.

7   Q.  A high-net-worth individual —— again, I'm going to grossly

8   oversimplify —— but sort of is someone who is wealthy and meets

9   certain criteria for their wealth, is that fair to say?

10  A.  Correct.

11  Q.  So you're investing the money of those institutions and

12  those wealthy people, is that fair?

13  A.  Correct.

14  Q.  You make your money by investing their money, right?

15  A.  Correct.

16  Q.  So you don't want to lose their money to a bad investment,

17  right?

18  A.  Correct.

19  Q.  Am I right that between 2019 and 2022, Republic invested in

20  over 30 different crypto opportunities?

21  A.  That number sounds about right.

22  Q.  You think that one of your advantages as an investor is

23  that you're good at spotting potential upsides of startup

24  companies, is that right?

25  A.  Yes.

O3QHSec2                              Revsin - Cross

1   Q.  You're also good at spotting potential downsides of startup

2   companies, fair to say?

3   A.  Sometimes.

4   Q.  That's one of the things you might sort of tell your

5   clients in terms of why they should give you their money to

6   invest, right?

7   A.  Sure.

8   Q.  So let's turn to a few sort of questions about what you

9   described as due diligence into crypto investments.  OK.

10          Due diligence involves you and other people at

11  Republic Capital —— or involved, I should say, when you were

12  there, you and other people at Republic Capital reviewing

13  materials sent by the crypto venture or about the crypto

14  venture, is that fair?

15  A.  Yes.

16  Q.  Sometimes you would speak with employees at the crypto

17  company, right?

18  A.  Yes.

19  Q.  Fair to say you don't just take their word for it, though,

20  right?  You do other research, right?

21  A.  At times.

22  Q.  You might review blockchain data, right?

23  A.  Yes.

24  Q.  Blockchain data is publicly available, correct?

25  A.  Yes.

O3QHSec2                         Revsin – Cross

1    Q.   It's unalterable, right?

2    A.   Typically.

3    Q.   And that's one of the benefits of investing in the crypto

4    company, right, that you can see this public blockchain, right?

5    A.   Yes.

6    Q.   The more robust the due diligence, the better your

7    evaluation of the company will be, right?

8    A.   Sometimes.

9    Q.   And you want to make sure you're sort of honoring the trust

10   that your clients put in you by conducting thorough due

11   diligence, right?

12   A.   We want to make the best investments possible.

13   Q.   And that involves at times —— well, that involves making

14   sure that you're doing robust research, right?

15   A.   Yes.

16   Q.   You understood you were obligated to do what you could on

17   behalf of your investors to identify both potential risks and

18   potential rewards associated with any particular venture or

19   investment, right?

20   A.   Yes.

21   Q.   Today you've now left, of course, Republic.  You're at

22   Tribe, which is an even bigger venture capital fund, is that

23   right?

24   A.   Yes.

25   Q.   I think Tribe has over about, what, 1.7 billion assets

O3QHSec2                        Revsin – Cross

1    under management, give or take?

2    A.  Yes.

3    Q.  So just turning to, say, 2021, 2022, I take it it was your

4    practice and the practice of others at Republic to keep up with

5    the financial press?

6    A.  To some degree.  That was not our main job.

7    Q.  For instance, you might keep up with what was happening in

8    *The Wall Street Journal*, is that fair?

9    A.  That was not the primary thing we read, but sometimes.

10   Q.  How about Bloomberg?

11   A.  Sometimes.

12   Q.  *New York Times* business section?

13   A.  More —— more infrequently.

14   Q.  I think you also said that you at times conduct due

15   diligence by using —— by looking at social media, is that

16   right?

17   A.  Sometimes.

18   Q.  Including Twitter, right?

19   A.  Yes.

20   Q.  I think you said you first learned of Terraform in 2020, is

21   that right?

22   A.  Yes.

23   Q.  Then I think it was November 2021 where you learned about

24   an opportunity to purchase Luna tokens, yes?

25   A.  Yes.

O3QHSec2                          Revsin - Cross

1    Q.  The opportunity involved purchasing Luna tokens from an

2    entity called the Luna Foundation Guard, right?

3    A.  Ultimately, yes.

4    Q.  You said that you learned this from this gentleman Arjun

5    Sethy who was then the CEO of Tribe Capital?

6    A.  Yes.

7    Q.  Just to be totally clear, at that time you were not at

8    Tribe Capital; you were at Republic?

9    A.  Correct.

10   Q.  But you were sort of communicating with this gentleman from

11   Tribe, right?

12   A.  Correct.

13   Q.  You consider Mr. -- am I pronouncing it right, Sethy?

14   A.  Close enough.

15   Q.  Please correct me.  I don't want to ——

16   A.  It's close enough.

17   Q.  You consider him a mentor?

18   A.  Yes.

19   Q.  The fact that Mr. Sethy and Tribe were sending you this

20   opportunity made you feel like it was potentially worthwhile,

21   right?

22   A.  Yes.

23   Q.  So I think it was November 2021 where Mr. Sethy forwarded

24   you the email we looked at.  He forwarded you an email from Do

25   Kwon, right?

O3QHSec2                        Revsin - Cross

1   A.  Yes.

2   Q.  So let me show you this.  This is Plaintiff's 24A, which is

3   in evidence, which we looked at earlier.

4           And if he could publish this for the jury.  It's in

5   evidence, your Honor.

6           This is the forwarded email, right, from Do Kwon,

7   correct?

8   A.  Yes.

9   Q.  And in the email from Do Kwon, do you see he says:  "We are

10  looking to raise approximately 1 billion USD worth of wrapped

11  Bitcoin to put into a decentralized reserve smart contract to

12  buttress UST's stability mechanism"?

13          Do you see that?

14  A.  I do.

15  Q.  I think there, we don't have to look at it, but there was

16  similar language in the attached slides.  Do you remember that?

17  A.  Yes.

18  Q.  Do Kwon also said that he believed this would assuage

19  lingering worries about the stability of UST's core stability

20  mechanism.  Do you see that?

21  A.  I do.

22  Q.  So from the initial introduction, your initial introduction

23  to this Terra opportunity, you saw that Mr. Kwon was

24  referencing stability concerns, right?

25  A.  I saw that he was referencing lingering worries.

O3QHSec2                            Revsin – Cross

1    Q.  I'm sorry.  I didn't hear.

2    A.  Roughly.

3    Q.  I just didn't hear.  I'm sorry.  I just didn't hear the end

4    of your ——

5    A.  I was just clarifying, yes.

6    Q.  You saw that he wanted to add support to the stablecoin,

7    correct?

8    A.  Yes.

9    Q.  That's why Terra was raising capital; in part, was to

10   address these concerns, correct?

11   A.  Yes.

12   Q.  You understood that —— if we look one sort of paragraph

13   down, Jump Capital was leading that effort, is that fair?

14   A.  Yes.

15   Q.  You felt good about the fact that Jump Capital was

16   involved, correct?

17   A.  Yes.

18   Q.  You knew of Jump Capital at the time that you received this

19   email, right?

20   A.  Yes.

21   Q.  They're a relatively big player in this space, is that

22   fair?

23   A.  Yes.

24   Q.  They're a market maker in crypto, is that right?

25   A.  They also do that, yes.

1    Q.  What is a market maker?

2    A.  A market maker is someone who puts forth maker and taker

3    orders on an exchange in order to generate revenue and create

4    price discovery.

5    Q.  Is it fair to say they provide liquidity?

6    A.  Yeah.

7    Q.  Just to make sure we all understand that, providing

8    liquidity means there's an opportunity for people to buy and

9    sell crypto tokens, is that right?

10   A.  That is what a market maker does, yes.

11   Q.  Now, if we actually ⸺ let's just take a look quickly at

12   24B, which is the slides.  I just want to show you one other

13   thing.

14           If we go to slide 11, Mr. Aquino.  Thank you so much.

15           I think you saw this earlier, but you see where it

16   says "Why" and it says, "This reserve will buttress the faith

17   in the peg of UST"?  Do you see that?

18   A.  I do.

19   Q.  If we flip back one slide, I want to ask you one other

20   question.

21           Do you see this discussion here?  This is a discussion

22   of the arbitrage mechanism.  Do you see that?

23   A.  I do.

24   Q.  And this is, I think, where you were talking about minting

25   and burning, right?

1   A.  Yes.

2   Q.  You understood at the time that minting and burning had to

3   be done by institutions and people, right?

4   A.  Yes.

5   Q.  In other words, if no one wanted to mint or burn, there

6   would be no value to these tokens, right?

7   A.  I'm not sure what you mean by that.

8   Q.  Fair enough.

9          If no one wants to buy a thing, it has no value,

10  right?

11  A.  At that point in time, sure.

12  Q.  If no one was prepared to buy Luna or Terra, if no one

13  wanted to own it, it would have no value, right?

14  A.  Fair.

15  Q.  The algorithm —— when we talk about mint and burn, the

16  algorithm doesn't do it itself magically, right?

17  A.  Correct.

18  Q.  You need people or institutions to come in and do the

19  actual buying and selling, right?

20  A.  Yes.

21  Q.  Including an institution like Jump, right?

22  A.  Yes.

23          MR. FERRARA:  We could take this down.  Thank you.

24  Q.  Now, at the time you were considering this, you were

25  considering buying —— and when I say "you," I'll try to do my

O3QHSec2                              Revsin - Cross

1    best to say "Republic."  I understand you personally did not

2    buy $35 million worth of Luna, right?

3    A.  I understand what you're asking.

4    Q.  At the time that Republic was considering buying Luna,

5    let's call it, 2021, 2022, you understood that UST, the

6    stablecoin, could go through something people in the

7    cryptocurrency community called a death spiral, right?

8    A.  I may have been familiar with the term, but I don't recall.

9    Q.  Are you saying you don't recall whether you were familiar

10   with that risk at the time, or you don't recall what that term

11   means today?

12   A.  I know what the term means today.

13   Q.  What does the term mean?

14   A.  Essentially, it means if both UST and Luna were to

15   depreciate in price, there would be less opportunity for it to

16   regain the peg.  I believe that's the definition of a death

17   spiral.

18   Q.  To break it down a little bit, if UST started to go down

19   too much, people might get scared, start taking their money

20   out, which creates a cycle where more and more people take

21   their money out until it's worth nothing.  Is that fair to say?

22   A.  That would be the death spiral scenario.

23   Q.  You had read about that in the press at the time?

24   A.  I don't remember.

25   Q.  In the context of your due diligence, do you recall

O3QHSec2                        Revsin - Cross

1    publicly available materials discussing a death spiral?

2    A.  No, but I do recall doing research in a depeg.

3    Q.  Well, we can come back to that.

4            Do you recall in your research on Twitter a

5    November 2021 tweet from a user that ——

6            MS. CUELLAR:  Your Honor, objection.

7            THE COURT:  Yes, I think you can't get into details of

8    that.  If you want to show him something to frame his

9    recollection, that's OK, but you can't, by a question, put into

10   evidence or put before the jury something that's otherwise not

11   in evidence.  So sustained.

12   Q.  Well, sir, you said that Twitter was one of the places you

13   might go for purposes of due diligence, right?

14   A.  Yes.

15   Q.  So let's take a look at what's been marked for

16   identification as Defense 1707.

17           Sir, do you recognize this as a November 25, 2021,

18   tweet?

19   A.  Do you mean is that the date of the tweet?

20   Q.  Yes.

21   A.  It seems so, yes.

22   Q.  Is this the sort of publicly available information that you

23   or someone at Republic would look at when conducting due

24   diligence?

25   A.  Not really.

1   Q.  So you would look at Twitter, but you don't think you ever

2   looked at this particular tweet?

3   A.  At random tweets, no.  We would typically look at what the

4   founders or official affiliates of the protocol would say.  We

5   may have seen other tweets, of course, but I don't recognize

6   this one.

7               MR. FERRARA:  We can take that down.  Thank you.

8               Let's go back to Plaintiff's 24B for one moment, that

9   tenth slide.

10              And we just —— I apologize, your Honor, just one

11  moment.

12              It's actually a little further, Mr. Aquino.  I misled

13  you.  It's maybe the third to last —— I'm sorry, this is

14  actually the right one.  I'm so sorry.

15  Q.  I'm looking at the header, sir.  Do you see the header, "A

16  Bet on Luna is a Bet on the Success of the Terra Economy?"

17  A.  Yes.

18  Q.  All right.  I don't have to tell you that bets are risky,

19  right?

20  A.  Typically, yes.

21              MR. FERRARA:  And we can take this down.  Thank you,

22  Mr. Aquino.

23  Q.  Is it fair to say that sometimes entrepreneurs make risky

24  bets in exchange for the possibility of high rewards?

25  A.  Yes.

O3QHSec2                          Revsin – Cross

1  Q.  You recommended to Republic Capital that it participate in

2  the Terraform opportunity, right?

3  A.  Yes.

4  Q.  In fact, you told Mr. Sethy that you had been looking to

5  get into Terra for a while, right?

6  A.  Yes.

7  Q.  So you connect with Jeff Kuan, who's a Terraform employee,

8  right?

9  A.  Yes.

10 Q.  I think you told Mr. Kuan that Republic Capital tends to

11 move quickly.  Do I have that right?

12 A.  I don't recall.

13        MR. FERRARA:  Let's just put up ⸺ let's just show

14 what's been marked for identification as Defense Exhibit 1910

15 just for the witness, and I believe it's the second page.

16 Q.  Just, sir, for the witness, I'll just calling your

17 attention to your 6:27 a.m. email.

18 A.  Yes, I see it.

19 Q.  If you could review that just quickly to yourself.  Just

20 let me know when you've had enough time for that.

21 A.  Yep.  Thanks.

22        MR. FERRARA:  We can take that down, Mr. Aquino.

23 Thank you.

24 Q.  Sir, does that refresh your memory that you told Jeff Kuan

25 that Republic tends to move quickly?

O3QHSec2                          Revsin – Cross

```
 1  A.  Yes.
 2  Q.  Then I think it was just two days later, after a call with
 3  Jeff Kuan, you said Republic was interested in moving forward
 4  with the purchase, right?
 5  A.  Again, I don't recall if that was in that email, but yes.
 6  Q.  And by moving forward with the purchase, you meant that
 7  Republic Capital would be purchasing Luna, right?
 8  A.  It may have meant that.  It may have been confirmatory
 9  diligence.  I'm not sure unless you show me the email.
10  Q.  Sure.  Let's take a look again at 1910, Defendant's 1910,
11  what's been marked.
12  A.  Got it.  Thank you.
13          MR. FERRARA:  If we could take that down, Mr. Aquino.
14  Thank you so much.
15  Q.  Sir, does that refresh your memory?
16  A.  Yes.
17  Q.  Which was it?
18  A.  I'm sorry?
19  Q.  Sorry.  Was it you were saying you were interested in
20  moving forward with the purchase, was that right?
21  A.  Correct.  It looks like we were ready to move forward with
22  a portion of the investment.
23  Q.  You were purchasing Luna, of course, in the hopes it would
24  increase in value, fair to say?
25  A.  Yes.
```

1   Q.  But you understood that it could also decrease in value,

2   right?

3   A.  Yes.

4   Q.  You actually, I think, wanted to invest more in Terraform

5   than actually was initially being offered, is that right?

6   A.  I believe so.

7   Q.  You were prepared to purchase 10 million, but you, I think,

8   wanted to purchase 25 million.  You wanted your investment to

9   be up to 25 million, right?

10  A.  That's what that email says, yes.

11  Q.  Ultimately, you purchased 35.9 million —— or Republic

12  purchased 35.9 million, right?

13  A.  Correct.

14  Q.  So, specifically, I think you testified that your due

15  diligence into Terraform included public information published

16  by Terraform and others.  Do I have that right?

17  A.  Yes.

18  Q.  Blog posts?

19  A.  I would count that under public information, yes.

20  Q.  We covered social media.  Research reports, you said,

21  right?

22  A.  Again, that would be covered by publicly available

23  information.

24  Q.  Well, some of those research reports could be paid.  You

25  might have to pay for them.  You tell me.

O3QHSec2                        Revsin – Cross

1    A.  As far as I understand, we didn't do that for this

2    particular investment.

3    Q.  And I think you said Terraform website and posts by his

4    team members, right?

5    A.  Yes.

6    Q.  You did not speak to Do Kwon, right?

7    A.  I did not.

8    Q.  You also, I think, said you examined —— on direct you were

9    talking about what we've been calling the May 2021 depeg.  Do

10   you remember that?

11   A.  Yes.

12   Q.  That was when the price of UST went down to around

13   80 cents, right?

14   A.  That sounds right.

15   Q.  You testified that you examined May 2021 trading data,

16   right?

17   A.  Our team would have, yes.

18   Q.  In your team's review of the on-chain activity, it would

19   show the volume of particular traders, right?

20   A.  That sounds likely.

21   Q.  So if a trader had an outsized role in restabilizing the

22   peg, you'd see that, right, or you team would?

23   A.  Not necessarily.

24   Q.  They could examine the blockchain, right?

25   A.  Correct.  But the trader could leverage multiple

O3QHSec2                          Revsin – Cross

1    transactions should they want to.

2    Q.  Now, part of your due diligence included Terraform's white

3    papers, right?

4    A.  Our teams did, yes.

5    Q.  Fair enough.  Thank you.

6           So I want to show you one of those white papers.

7           And if we could take a look at Defense 4 for

8    identification.  If we could just pull back out just for a

9    second.

10          Sir, do you recognize this as a Terraform white paper?

11   A.  I recognize it as Terraform white paper if that's what you

12   tell me it is.

13   Q.  Is this sort of thing — well, it is called Terra, a price

14   stable — well, I won't read it.

15          Do you see that the author is @terramoney?

16   A.  Yes.

17   Q.  The date is March 19, 2018, is that right?

18   A.  Yes.

19   Q.  Are these the sorts of materials from Terraform's website

20   that your team would review as part of its due diligence?

21   A.  It's likely.

22          MR. FERRARA:  Your Honor, defense offers 4.

23          MS. CUELLAR:  Objection, your Honor.  The witness —

24          THE COURT:  You've seen this before?

25          THE WITNESS:  I do not think I've read this before.

O3QHSec2                         Revsin – Cross

1              THE COURT:  The objection is sustained.

2              MR. FERRARA:  Your Honor, may we briefly have a

3     sidebar?

4              THE COURT:  Sure.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At sidebar)

2          MR. FERRARA:  Your Honor, we think this is admissible

3     as part of the mix of information that investors would have had

4     when researching, when thinking about investing.

5          THE COURT:  You can call a witness on your case, and

6     maybe you'll be able to put it in, but it doesn't come in

7     through this witness who's never seen it before.

8          MR. FERRARA:  Your Honor, waiting on this leaves the

9     impression that there are certain things that he looked at

10    which did not disclose certain risks, and that was what was out

11    there.  That idea is going to be cemented in the jury's idea,

12    in his response.  In fact, there was quite a lot of information

13    which he said was the sort of information Republic looked at ——

14         THE COURT:  He said unequivocally —— there was no

15    hesitation and there was no ambiguity —— that he's never seen

16    it before.  That means it doesn't come in through this witness.

17    Sustained.

18         (Continued on next page)

19

20

21

22

23

24

25

O3QHSec2                          Revsin – Cross

1              (In open court; jurors present)

2    BY MR. FERRARA:

3    Q.  Thank you, sir, and I apologize for the brief delay there.

4              My colleague correctly pointed out ⸺ I think I

5    misspoke and said the depeg went down to around 80 cents.  I

6    think it was actually in the low 90 cents, so I didn't want to

7    mislead you.  Does that sound right to you?

8    A.  I don't remember the exact number, but it depegged.

9    Q.  I certainly didn't mean to get that number wrong, and I

10   apologize for misspeaking.

11   A.  Sure.

12             MR. FERRARA:  So we can take that exhibit down,

13   Mr. Aquino.  Thank you.

14   Q.  You understood at the time, sir, that crypto companies

15   often issued white papers explaining their products, right?

16   A.  Yes.

17   Q.  Generally speaking, in those white papers, the crypto

18   company would talk about the idea behind the token, right?

19   A.  Yes.

20   Q.  They talk about how the coin would work, right?

21   A.  Often, yes.

22   Q.  They sometimes talked about the computer code, yes?

23   A.  Sometimes.

24   Q.  And I just want to be clear.  Your testimony is that you

25   recommended that Republic invest in this token without reading

O3QHSec2                        Revsin – Cross

1    these white papers, is that right?

2    A.  I didn't read the white paper.  Also, generally, we believe

3    that white papers written four years after a protocol is

4    launched were not of extreme use.  Typically, the formulas

5    would change, the code would change, the team would change.

6    Q.  Would the risk change?

7    A.  Possibly.

8    Q.  As part of your due diligence, is it not helpful to

9    understand what risks the founders themselves saw in their

10   token?

11   A.  Of course it is.

12   Q.  Sir, just so I understand your testimony, sitting here

13   today, do you know whether a member of your team reviewed the

14   white paper that I just showed you, Defense 4?

15   A.  It's possible.

16   Q.  Do you know, sir?

17   A.  I don't know.

18   Q.  Now, during the diligence process, you drafted a memo that

19   we saw regarding the purchase of Luna, right?

20   A.  Yes, our team drafted a memo.

21   Q.  And this is Plaintiff's Exhibit 27A.

22            Oh, no, that's the cover email.  Let's go to 27B,

23   Mr. Aquino.  Thank you.

24            So if we take a look at —— sorry, and this is the memo

25   that your team prepared, right?

1  A.  Yes.

2  Q.  If we take a look at page 2, it says, notable lead and

3  co-investors, and one of them is Jump Capital at 300 million,

4  right?

5  A.  Yes.

6  Q.  And, again, you had more confidence in recommending

7  Republic purchase a token because Jump was involved, right?

8  A.  Yes.

9  Q.  In that way, it was good for Terraform to publicize Jump's

10  involvement, right?

11  A.  Yes.

12  Q.  If we go to the end of this, I think, or maybe it's page 4

13  — and I guess, actually, we should show the page right before

14  this just so the witness has — thank you so much, Mr. Aquino.

15          So at the bottom of this page, sir, you see it says

16  No. 2 is partnerships?

17  A.  Yes.

18  Q.  And then in the next page, we see one of the — it says if

19  we highlight the very top — talks about DeFi, NFTs,

20  e-commerce, and a myriad of other products, and it mentions

21  Chai there, right?

22  A.  Yes.

23  Q.  Is Chai mentioned anywhere else in this document?

24  A.  I'm not sure.

25  Q.  Let's go to page 1, under highlights.

1          Chai's involvement is not mentioned in the highlights,

2     is that right?

3     A.  No.

4     Q.  Now, ordinarily —— we can take this down, Mr. Aquino ——

5     ordinarily, you would consider whether a service was growing

6     when deciding to invest in it, right?

7     A.  You mean a protocol or a product?

8     Q.  Right.

9     A.  Yes.

10    Q.  If it was slowing and people weren't using it as

11    frequently, if its rate of use was slowing down, that might be

12    one factor or one reason not to invest, is that fair?

13    A.  That's fair.

14    Q.  Did you assess Chai's rate of growth?

15    A.  As far as I remember, we did not.

16    Q.  I think another thing that was important to you in terms of

17    purchasing these Luna tokens was that Mr. Kwon, Do Kwon, had

18    successfully founded other projects, is that right?

19    A.  That would have been a factor.

20    Q.  It would have been?

21    A.  It would have been, yes.

22    Q.  You thought Mr. Kwon's background was impressive, correct?

23    A.  Yes.

24    Q.  As were the backgrounds of other TFL employees, right?

25    A.  Yes.

O3QHSec2                        Revsin - Cross

1    Q.   You believed that Do Kwon and the Terra team were committed

2    to growing Terra, right?

3    A.   We did.

4    Q.   That was important to your purchase decision, right?

5    A.   Yes.

6    Q.   Now, I mentioned briefly the Luna Foundation Guard.  I just

7    want to make sure we're clear here.  LFG was not an affiliate

8    of Terra, right?

9    A.   Are you asking me?

10   Q.   I am.

11   A.   I understood it to be an affiliate.

12   Q.   Let's take a look at —— so in fact —— well, let's take a

13   look at Defense Exhibit 1407, just for the witness, what's been

14   marked for identification as Defense Exhibit 1407.

15        Sir, this is a Medium —— do you see this is a Medium

16   article, and it says published in Terra, January 19, 2022?

17   A.   Yes.

18   Q.   Do you recall reviewing this as part of your due diligence

19   into your purchase of Luna tokens?

20   A.   I don't.

21   Q.   Sir, in fact, Luna Foundation Guard was a nonprofit

22   organization, was it not?

23   A.   That's how it was described to us, yes.

24   Q.   And, in fact, it had its independent —— had independent

25   counsel, right?

O3QHSec2                        Revsin - Cross

1   A.  I don't know about that.

2   Q.  It had people on the board who were not employees of

3   Terraform, right?

4   A.  I don't think we were exposed to all the members of the

5   board of Luna Foundation Guard.

6   Q.  I think, just to be clear, I think we used the term

7   "affiliate."  What do you understand an affiliate to be?

8   A.  In this case, I mean that it had similar or same

9   leadership, but there's other definitions.

10  Q.  So Republic Capital's purchase of Luna tokens was conducted

11  through the fundraise for the Luna Foundation Guard.  Do I have

12  it right?

13  A.  That sounds correct.

14  Q.  I want to show you Plaintiff's Exhibit 32.

15          And I just apologize?  Is this one in?  32 is in?

16          MS. CUELLAR:  Yes.

17          MR. FERRARA:  If we could publish this for the jury as

18  well.

19  Q.  If we flip to the ── this is the token sale agreement

20  between Republic or Republic sort of other entity and

21  Terraform, right?  Or, sorry ──

22  A.  Yes.

23  Q.  ── and Luna Foundation Guard?

24          How did it work?  We can flip to the next page.

25  A.  You'd have to show me the signature line.

1    Q.  Yeah, sure.

2    A.  Yes, that says Luna Foundation Guard.

3    Q.  And it's dated January 21, 2022, right?

4    A.  Yes.

5    Q.  And when it says "buyer," that is essentially Republic,

6    right?

7    A.  The investment vehicle we would have established, yes.

8    Q.  Right.  If we just look at —— if we scroll down a little

9    bit, so if we look at under subparagraph 2, we see that

10   language in the sort of first full paragraph:  "The

11   establishment of UST reserve is a nonprofit initiative of the

12   vendor to provide a further layer support to maintain the UST's

13   peg to the USD."

14          Do you see that?

15   A.  I do.

16   Q.  "It is contemplated that in an event where the market price

17   of UST deviates from the USD peg, holders of UST in the

18   community will be able to close the arbitrage and bring the

19   market price of UST back to the USD peg."

20          Do you see that?

21   A.  I do.

22   Q.  So you understood at the time you purchased these tokens

23   that there might be an event that would require holders of UST

24   to bring the market price of UST back to the peg, right?

25   A.  That is how the arbitrage mechanism worked, yes.

O3QHSec2                          Revsin - Cross

1  Q.  One of the holders of UST in the community was Jump, right?

2  A.  It seemed so.

3  Q.  You weren't deterred from your purchase by this language

4  that the peg might need the help of the —— of market

5  participants to repeg, right?

6  A.  Correct.

7  Q.  And in fact, right, like, Republic's $35.9 million, part of

8  the purpose of that from Luna Foundation Guard's perspective

9  was to help maintain the peg, right?

10  A.  In part.

11       MR. FERRARA:  We can take this down, Mr. Aquino.

12  Thank you, sir.

13  Q.  LFG publicly announced its fundraise in February of 2022,

14  right?

15  A.  Probably.  I don't see it in front of me.  I don't know

16  when they did their PR announcement.

17  Q.  Let's looked at what's been marked for identification as

18  Defense Exhibit 1711.

19       Do you recognize this as a Twitter post from Terra

20  dated February 22, 2022?  There's a series of Terra posts.

21  A.  Yes.

22  Q.  Did you see these at the time?

23  A.  I don't remember.

24  Q.  You knew that Terra was going to publicize the fundraise,

25  right?

1   A.  We assumed so.

2   Q.  You understood that part of the public announcement would

3   be the idea that Terra would be telling the community that

4   there was this stability for the peg, is that right?

5   A.  As far as I remember, they didn't share their PR plans with

6   us, but that seems reasonable.

7           MR. FERRARA:  We can take this down, Mr. Aquino.

8   Thank you.

9   Q.  So let's bring back up, real quick, Plaintiff's 32 again.

10  This is the token sale agreement we were just talking about.

11          If we take a look at page 12, and I think it's

12  Section 4.12, it says:  "Significant Risks.  The buyer

13  acknowledges and understands that participating in the token

14  sale and the ownership and distribution of buyer tokens involve

15  significant risks, including but not limited to the risks set

16  out in Schedule 4."

17          Did I read that right?

18  A.  Yes.

19  Q.  And then if we look at Schedule 4, which I think is page 26

20  —— I think it's like the sort of PDF 26th page, Mr. Aquino ——

21  these are all —— I won't read them all, but these are all the

22  risk factors, right?

23  A.  These are all the risk factors that they put in the

24  document, yes.

25          MR. FERRARA:  And we can actually zoom out just so the

1    jury has a sense.  And of course, the jury will have this to

2    review, so I won't go through all of it.  But I just highlight

3    maybe one or two.

4            If we just look at (b), Mr. Aquino, if we just

5    highlight (b) for the witness and the jurors.

6    Q.  So it says:  "Volatility Risks.  The value of digital

7    assets are highly speculative and is typically associated with

8    high price volatility.  Digital assets, including the tokens,

9    can completely lose all market value."

10           Do you see that?

11   A.  Yes.

12   Q.  So you understood at the time Republic made its purchase

13   that Luna tokens could completely lose their value, correct?

14   A.  Yes.

15           MR. FERRARA:  Now, we can bring this down.  Thank you

16   so much.

17   Q.  We talked about the sort of, again, May 2021 depeg, right?

18   A.  Uh-huh.

19   Q.  Then you also testified about the May 2022 depeg in which I

20   think you testified that —— and that's where I think the

21   losses, your losses, occurred, correct?

22   A.  The next year, yes.

23   Q.  Right.

24   A.  That sounds right.

25   Q.  Now, you understood that the LFG capital, that capital

1   raise, you understood that was actually deployed to fight the

2   May 2022 depeg, right?

3   A.   I understood that after the fact of our investment, yes.

4   Q.   But, in other words, at the time or shortly after the

5   May 2022 depeg, you understood that the money raised by LFG

6   was, in fact, used to try to keep the price of UST at $1,

7   right?

8   A.   If I remember correctly, that is what Do Kwon said in his

9   posts.

10  Q.   That was publicly disclosed, right?

11  A.   I think so.

12  Q.   Well, the posts were public.  Do Kwon's posts were public?

13  A.   I believe so.

14  Q.   Now, you also understood at the time that you invested ——

15  you also understood at the time that you purchased the Luna

16  tokens that algorithmic stablecoins like UST were operating

17  under the stress of extreme market volatility, right?

18  A.   I wouldn't specifically point out just algorithmic

19  stablecoin.  Crypto in general has volatility.

20  Q.   Fair enough.

21       You understood —— I guess another way to say it is the

22  forces of supply and demand operate on stablecoins like they

23  would on any other thing, fair to say?

24  A.   Sure.

25  Q.   I want to show you what's been marked as Defense

O3QHSec2                         Revsin - Cross

1    Exhibit 33, what's been marked for identification as Defense

2    33.

3    A.  Can I amend my last answer a little bit?

4            THE COURT:  Go ahead.

5    A.  One thing I would say is that although typical

6    cryptocurrencies like Luna will have high volatility,

7    stablecoins are not expected to have high volatility.

8    Q.  They are expected to remain pegged, correct?

9    A.  Yes, by definition.

10   Q.  But, again, as we discussed earlier, if no one wants to buy

11   it, it cannot maintain the peg, right?

12   A.  Probably.

13   Q.  Large institutional investors, for example, could put

14   downward price pressure on the peg, right?

15   A.  By offering to sell large amounts of it at a price lower

16   than a dollar, yes.

17   Q.  Right.  That could have the effect of destabilizing the

18   peg, right?

19   A.  Yes.

20           MR. FERRARA:  I think D-33 is admitted.

21           MS. CUELLAR:  No, I don't believe so, your Honor.

22           MR. FERRARA:  Am I wrong?  I apologize.  I am wrong.

23   Q.  So let's take a look at just for —— as marked for

24   identification here.

25           So do you recognize this as a Medium —— do you know,

O3QHSec2                          Revsin - Cross

1   what is Medium?

2   A.  I understand Medium is a place where companies and

3   individuals can make blog posts.

4   Q.  Do you recognize this as a Terra Medium post from June 9 of

5   2021?

6   A.  Yes, I believe so.

7   Q.  Did you review this at the time as part of your due

8   diligence?

9   A.  No.

10  Q.  Let's try another one.  I only have a couple more.  Let's

11  take a look at what's been marked for identification as Defense

12  Exhibit 352.

13       Sir, you testified that you and your colleagues looked

14  at research reports, correct?

15  A.  Probably, yes.  That was what we would typically do.

16  Q.  Do you recognize this as a Delphi Digital research report

17  about Terra dated December 22, 2021?

18  A.  Yes.

19  Q.  Did you review this as part of your due diligence?

20  A.  I don't know if the team did.  I did not.

21  Q.  But you knew —— we can take this down, Mr. Aquino —— but

22  you knew, sir, just from your experience, that stablecoins were

23  susceptible to death spirals, right?

24  A.  I don't know if I would agree with that statement.  I would

25  say I understood a depeg, but I wouldn't say that I knew they

O3QHSec2                          Revsin - Cross

1    were susceptible to death spirals.

2    Q.  Well, again, as an investor with your experience in the

3    crypto market, is it surprising to you that if the —— if the

4    price of UST started to come down, people could get scared and

5    abandon the product entirely?

6    A.  It was a possibility.

7    Q.  You understand that, as we discussed, there are analysts

8    who put out these research papers on crypto tokens and crypto

9    projects, right?

10   A.  Yes.

11            THE COURT:  Counsel, how much more do you have?

12            MR. FERRARA:  Probably have ten minutes.  Maybe not

13   even, your Honor.  About ten minutes.

14            THE COURT:  Go ahead.

15            MR. FERRARA:  Thank you, your Honor.

16   Q.  The idea of a death spiral was also publicized by *The Wall*

17   *Street Journal* in 2022, right?

18   A.  I don't know.

19   Q.  So let's take a look at what's in evidence as Defense 46.

20            I'm happy to briefly consult.

21            (Counsel confer)

22            MR. FERRARA:  I think we all agree that this one's in

23   evidence.  I'm happy to discuss it further with SEC counsel,

24   but I think we agree.

25            MS. CUELLAR:  Yes, we agree.  Objection, though, on

1   foundation for this witness, your Honor.

2             THE COURT:  Well, I haven't heard the question yet, so

3   I don't know how I can rule.  I don't think —— there's not a

4   pending question, I don't believe.

5             MR. FERRARA:  I don't think there is.  We'd put it up

6   for the jury.  It's in evidence.

7             THE COURT:  You can show the document.  It's in

8   evidence.  But now I want to hear the question.

9             MR. FERRARA:  OK.

10  Q.  So do you recognize this as a *Wall Street Journal* article

11  dated April 18, 2022?

12  A.  By the URL on the top, yes.

13  Q.  Would your team —— would you or your team review —— did you

14  and your team in 2022 review the financial press as part of

15  your due diligence into Terra?

16  A.  Honestly, I don't remember, but it would not have been a

17  primary source of due diligence, random articles.

18  Q.  Let me show you ——

19            THE COURT:  Do you recollect whether you saw this

20  particular article?

21            THE WITNESS:  I did not see this one.  I can't speak

22  to others within Republic.

23  Q.  Here's my question.  If we look at page 3, there's the

24  second full paragraph down, it says:  Ryan Clements, a law

25  professor at the University of Calgary who has studied

1  algorithmic stablecoins, says TerraUSD is susceptible to what

2  crypto traders call a death spiral.  Do you see that?

3  A.  That's what it says.

4  Q.  So I want to understand your testimony.  Is it your

5  testimony that these ideas were published in mainstream media,

6  but you did not understand at the time ——

7          THE COURT:  Sustained.

8          MR. FERRARA:  We can take this down, Mr. Aquino.

9  Thank you.

10 Q.  Let's turn away from the reports and let's talk about

11 blockchain governance just for a couple of minutes, and then

12 I'm done.

13          You're aware of the concept of governance tokens.  I

14 think you mentioned it on direct?

15 A.  Yes.

16 Q.  The tokens give the holders of the token the ability to

17 vote their tokens to support or oppose particular changes to

18 the sort of rules on the blockchain?

19 A.  Yes.

20 Q.  Luna was a governance token for the Terra blockchain,

21 right?

22 A.  That is how we understood it.

23 Q.  So the blockchain was governed by community members, fair

24 to say?

25 A.  That was the end goal.  I'm not sure it ever fully achieved

O3QHSec2                          Revsin - Cross

1    that, or, rather, I would say there were significantly large

2    holders that could sway the opinion of a particular vote.

3    Q.  Which is not different than, for instance, like — well,

4    withdrawn.

5            And community members could vote with their — they

6    could stake their Luna, right?

7    A.  Yes.

8    Q.  What does that mean, to stake Luna?

9    A.  It means to essentially lock up your Luna within a

10   validator or a node to receive yield and potentially be able to

11   also support the vote of one of those validators.  I believe

12   I'm explaining it correctly, but. . .

13   Q.  So you knew in 2022, at the time you made your purchase —

14   that Republic made its purchase, that Jump Trading had made

15   governance proposals for the Terra blockchain, right?

16   A.  I don't remember.

17   Q.  The governance proposals — well, let's take a look at

18   Defense 26, what's been marked for identification as Defense

19   26.

20           Do you recognize this as a post on Terra's research

21   forum?

22   A.  Yes.

23   Q.  Do you recall seeing this as part of your due diligence

24   into Terra?

25   A.  Not this particular one.

O3QHSec2                          Revsin - Cross

1   Q.  Sir, take a minute to look at this, and I'm going to ask if

2   it refreshes your memory about Jump Trading making governance

3   proposals.  Please don't read from it.  Just read it to

4   yourself.

5           MS. CUELLAR:  Objection, your Honor.

6           THE COURT:  Ground?

7           MS. CUELLAR:  He did not say his memory needed to be

8   refreshed.

9           MR. FERRARA:  Your Honor, apologies.  He said, "I

10  don't remember."  I'm looking at it.

11          THE COURT:  Well, what it says, according to what I'm

12  looking at is:

13  "Q.  Do you recall seeing this as part of your due diligence

14  into Terra?

15  "A.  Not this particular one."

16          MR. FERRARA:  Above that, your Honor, I was asking the

17  witness if he remembers whether Jump made governance proposals.

18          THE COURT:  All right.  To move this along, I'll let

19  him look at it.  Just read it to yourself.

20  A.  I've read it.  I did not see this particular governance

21  proposal.

22  Q.  Understood.  We can take this down, Mr. Aquino.

23          My question, sir, is does this refresh your memory

24  that Jump did make governance proposals?

25  A.  That seems reasonable.

O3QHSec2                         Revsin - Cross

1    Q.   Those are public, the proposals are public, right, on the

2    blockchain?

3    A.   I'm not sure.

4    Q.   Well, isn't that part of the ——

5    A.   They're public on the forums.  I'm not sure if they're

6    public on the blockchain.

7    Q.   Fair enough.

8            As part of Republic's due diligence, did anyone at

9    Republic research governance proposals involving UST?

10   A.   It's likely.

11           MR. FERRARA:  Your Honor, could I just have one

12   moment?

13           (Counsel confer)

14           MR. FERRARA:  Your Honor, if I could just confer with

15   SEC counsel for a second.

16           (Counsel confer)

17           MR. FERRARA:  Sorry, your Honor.  I just have one or

18   two questions.

19   Q.   Sir, we talked about the vehicle that Republic created to

20   publish the tokens, right?

21   A.   Yes.

22   Q.   That was a vehicle that —— I believe Republic set up an

23   offshore entity to purchase those tokens, is that right?

24   A.   That sounds right.

25   Q.   And you were asked to do that by someone at Terra, correct?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O3QHSec2                          Revsin – Redirect

1    A.  The general counsel of Terraform.

2    Q.  Not Do Kwon, right?

3    A.  Correct.

4    Q.  And you did it in order to buy these tokens, correct?

5    A.  Correct.

6    Q.  Do you remember where?  Was that one of the Cayman Islands,

7    sir?

8    A.  Yes.  Our legal team would have handled the majority of

9    this work.

10              MR. FERRARA:  No further questions, your Honor.

11              THE COURT:  Redirect.

12              MS. CUELLAR:  Yes, your Honor.

13              I will try to be brief, your Honor.

14              If we could please display Plaintiff's Exhibit 24A.

15   REDIRECT EXAMINATION

16   BY MS. CUELLAR:

17   Q.  I'm focusing on the lower part of the page where it begins

18   with "terms of the round."

19   A.  Uh-huh.

20   Q.  Does here it say "Jump Capital's leading with an

21   approximate .3B commitment"?

22   A.  Yes.

23   Q.  What was .3B?

24   A.  I understood it to mean $300 million.

25   Q.  And how did it influence you to know that Jump Capital was

1    investing approximately $300 million?

2    A.  I felt it to be they had a lot of conviction in the

3    protocol.

4    Q.  Now, did you and your team conduct due diligence before

5    recommending this investment?

6    A.  Yes.

7    Q.  And what did you look at?

8    A.  We looked at the marketing deck that was supplied through

9    this email, we referenced the discussion that we had with Jeff

10   Kuan, and we looked at publicly available material and on-chain

11   data.

12   Q.  Now, you used the term "on-chain," and I think defense

13   counsel did as well.  What does "on-chain" mean?

14   A.  Essentially, we used an explorer website that would explain

15   what was happening on the blockchain, meaning all of the

16   transactions, when they settled, for what size, and so forth.

17   Q.  Now, were you able to research off-chain activity?

18   A.  No.

19   Q.  Can you see into trading at centralized exchanges?

20   A.  You cannot.

21   Q.  Now, at any point in your due diligence process, did anyone

22   tell you that Jump had intervened and purchased tens of

23   millions of UST to help restore the UST to $1 in May of 2021?

24   A.  No.

25   Q.  Is that something you would have wanted to know?

1    A.  Yes.

2            MS. CUELLAR:  If we could please display Plaintiff's

3    Exhibit 32 and go to page 12.

4    Q.  I believe defense counsel referred to paragraph 4.12,

5    significant risks.  Is that correct?

6    A.  Yes.

7            MS. CUELLAR:  If we could go to Schedule 4, please,

8    which is on page 26.

9    Q.  For the sake of expediency, what is listed here?

10   A.  Risk factors.

11   Q.  And are the risk factors in bold?

12   A.  The first portion, yes.

13   Q.  I will read it just for expediency.

14           Is the first one the tokens are nonrefundable?

15   A.  Yes.

16   Q.  Is the second one volatility risk?

17   A.  Yes.

18   Q.  Is the third one market liquidity risk?

19   A.  Yes.

20   Q.  Is the fourth one regulatory risk?

21   A.  Yes.

22   Q.  Is the fifth one risk associated with taxation?

23   A.  Yes.

24   Q.  Is the sixth one risk associated with negative publicity?

25   A.  Yes.

O3QHSec2                          Revsin – Redirect

1    Q.  Is the seventh one operational and legal risks?

2    A.  Yes.

3    Q.  Is the eighth one technology risks?

4    A.  Yes.

5    Q.  Is the ninth one risks associated with consensus mechanisms

6    of blockchains and distributed networks?

7    A.  Yes.

8    Q.  Is the next one risks associated with hardware and software

9    weaknesses?

10   A.  Yes.

11   Q.  Is the next one risks associated with service providers?

12   A.  Yes.

13           MS. CUELLAR:  Can we go to the next page.

14   Q.  Is the next one risks associated with participating in

15   decentralized finance, if applicable?

16   A.  Yes.

17   Q.  Is the next one risks of force majeure?

18   A.  Yes.

19   Q.  Is the next one unanticipated risk?

20   A.  Yes.

21   Q.  Is anywhere there a risk that says the Terra team withholds

22   information from you?

23           MR. FERRARA:  Objection.  Argumentative.

24           THE COURT:  Overruled.

25   A.  No.

O3QHSec2                    Kol - Direct

1           MS. CUELLAR:  No further questions, your Honor.

2           THE COURT:  Anything else?

3           MR. FERRARA:  No, your Honor.

4           THE COURT:  Thank you very much.  You may step down.

5           (Witness excused)

6           THE COURT:  Please call your next witness.

7           MS. MEEHAN:  The SEC calls Jonathan Kol.

8           THE DEPUTY CLERK:  Please take the witness stand.

9           Please remain standing and raise your right hand.

10  JONATHAN MOSHE KOL,

11      called as a witness by the Plaintiff,

12      having been duly sworn, testified as follows:

13          THE COURT:  Counsel.

14  DIRECT EXAMINATION

15  BY MS. MEEHAN:

16  Q.  Good afternoon, Mr. Kol.  Where are you from?

17  A.  I'm from Greenwich, Connecticut.

18  Q.  What is your current state of residence?

19  A.  Connecticut.

20  Q.  What is the highest level of education that you've

21  received?

22  A.  A bachelor's degree.

23  Q.  Where did you get your bachelor's degree?

24  A.  The University of California at Berkeley.

25  Q.  And what year was that?

1    A.  2016.

2    Q.  What did you obtain your bachelor's degree in?

3    A.  Economics.

4    Q.  After you graduated from Berkeley, what did you do?

5    A.  I joined Morgan Stanley in their fixed income division.

6    Q.  And what types of work did you do in Morgan Stanley's fixed

7    income division?

8    A.  Initially, I worked on the sales desk where I was assisting

9    in the sales of bonds and eventually was promoted to a trader

10    role where I was trading similar bonds.

11    Q.  For how long a period of time did you work at Morgan

12    Stanley?

13    A.  Roughly two years.

14    Q.  What year did you leave that job?

15    A.  2018.

16    Q.  When you left Morgan Stanley in 2018, where did you go?

17    A.  I had joined a firm called Passport Capital that was

18    getting started with a crypto-specific team, and I joined that

19    team specifically.

20    Q.  Sorry, Mr. Kol, if you could just keep your voice up

21    because I'm having a little trouble hearing your answers.

22    A.  Oh.

23    Q.  Could you just tell me again, what type of firm is Passport

24    Capital?

25    A.  Passport Capital was a hedge fund that had just entered the

1    crypto industry and started a crypto-specific fund which I

2    joined to work on that crypto fund.

3    Q.  And what type of work did you do at Passport Capital for

4    this crypto specific fund that you've described?

5    A.  At Passport I had an investor role, which meant that I was

6    doing analysis to stay abreast of general market trends.  I was

7    meeting other market researchers.  I was speaking directly with

8    people who were looking to start their own crypto venture and

9    were seeking funding, and I was diligencing and eventually

10   leading investments into some of those opportunities.

11   Q.  What was your position?

12   A.  I was called an investment analyst.

13   Q.  For how long a period of time did you do this work at

14   Passport Capital?

15   A.  Roughly two years.

16   Q.  Where is Passport Capital located?

17   A.  San Francisco, California.

18   Q.  Did there come a time when you left Passport Capital?

19   A.  Yes, at the end of 2019.

20   Q.  Where did you go?

21   A.  At that point I joined Galaxy Digital.

22   Q.  What type of firm is Galaxy Digital?

23   A.  Galaxy Digital is a firm that's active in the crypto

24   sector, and it conducts all sorts of business, from trading and

25   selling assets on behalf of clients.  They also engage in

O3QHSec2                        Kol - Direct

1    lending on behalf of clients.  They had a mining operation, not

2    physical mining but cryptocurrency mining.  And of course, they

3    had an investment business, which I was a part of.

4    Q.  Can you tell us a little bit more about this investment

5    business that you were part of at Galaxy Capital.

6    A.  It was a fairly — it was a venture capital business, but

7    instead of having external investors, it used the firm's

8    balance sheet.  In this capacity, we would often meet with

9    founders who are starting crypto businesses or already had

10   something operating.  We were learning more about their

11   opportunities, and in some cases we would choose to make an

12   investment into their operation.  Beyond that, we also

13   conducted broad market research to stay abreast of everything

14   happening within the industry and any new trends that were

15   arising.

16   Q.  When you say "the industry," you're referring to crypto

17   asset industry or — industry?

18   A.  Yes, that's correct.

19   Q.  Where is Galaxy Digital based?

20   A.  I don't know where it's formally headquartered, but I was

21   — initially, I was the only person working for them in

22   San Francisco, and eventually, I was working in an office in

23   New York.

24   Q.  When you say "eventually," when was that?

25   A.  That happened during COVID, so the latter half of 2020.

O3QHSec2                        Kol - Direct

Q.   You talked about some research that you would do into

crypto investments in your position at Galaxy Digital.  Can you

tell me about how you would go about doing that research?

A.   A number of ways, anywhere from talking to experts on the

specific sector of the market, conducting research online,

reading what other researchers put out, learning more about

distinct areas.  Many times also speaking to people who are

practitioners within that area.  That could take the form of

people who work at companies that perform a specific task or

are about to start a company focused on a specific area.

Beyond that, we would also consult.  Galaxy on its own had an

internal research organization which we would consult with

often.

Q.   During your tenure at Galaxy Digital, did there come a time

when you learned of a company called Terraform Labs?

A.   Yes.

Q.   When was that?

A.   It was the beginning of my tenure there, but I was already

familiar with Terraform Labs from my time at Passport Capital.

Q.   How did you become familiar with Terraform Labs?

A.   Initially was during my tenure at passport where my

superior there had mentioned one of the opportunities we'll be

reviewing is Terra and that the founders were coming to

San Francisco, and there's a prospect of us meeting them in

person.

O3QHSec2                          Kol - Direct

1    Q.  Who were the founders?

2    A.  Daniel Shin and Do Kwon.

3    Q.  You said that they were coming to San Francisco and there

4    was an opportunity of meeting them in person.  Did you, in

5    fact, meet with Daniel Shin and Do Kwon in person?

6    A.  Don't recall if Daniel Shin was there, but Do Kwon was

7    definitely there.  And they came by the Passport Capital

8    office, so we met in person.

9    Q.  And that was in San Francisco?

10   A.  Correct.

11   Q.  And you talked about an opportunity.  Can you just give a

12   little more detail about what that opportunity was.

13   A.  Absolutely.  At the time, the Terra blockchain had not

14   existed yet.  These gentlemen were coming to tell us about this

15   thing that they were going to start that eventually will become

16   the Terra blockchain.  They had shared more about their

17   experience in e-commerce and payments.  They had said we are

18   going to build this blockchain, this is the design for it, and

19   gave us a broad overview.  And that was —— the opportunity at

20   hand was to purchase what would eventually become tokens in

21   this blockchain.

22   Q.  Did Passport Capital ultimately invest in that opportunity?

23   A.  Yes.

24   Q.  Can you tell us about that investment.

25   A.  Yes.  It was to purchase what would later be known as Luna

1    tokens, which were a part of the Terra blockchain.

2    Q.  Apart from this meeting in San Francisco while you were

3    working at Passport Capital, did you meet with Do Kwon on any

4    other occasions?

5    A.  Yes.  Met with Do Kwon in person in New York in

6    September 2021.  Galaxy had held a small gathering around the

7    May .Net conference, and Mr. Kwon happened to be in town, so we

8    invited him to join us.

9    Q.  While you were employed at Galaxy —— was that while you

10   were employed at Galaxy?

11   A.  Yes.

12   Q.  While you were employed at Galaxy, did you interact with Do

13   Kwon by other methods?

14   A.  Routinely, by combination of phone and video call, as well

15   as through chat.

16   Q.  How frequently would you interact with Do Kwon?

17   A.  There was a variance in frequency, but oftentimes it would

18   be no more than a few months would go by, but usually we spoke

19   at least once a month.

20   Q.  While you were employed at Galaxy, did there come a time

21   when you learned of another opportunity to invest in Luna

22   tokens?

23   A.  Yes.

24   Q.  When was that?

25   A.  I don't recall the exact date, but it was in the early

1  portion of 2021 — sorry, 2020.

2  Q.  How did you come to learn of this opportunity?

3  A.  In one of my conversations with Do when we were just

4  checking in with each other, he had mentioned that he would be

5  interested in Galaxy exploring this prospect.

6  Q.  Sorry.  Can you just repeat the last part of your answer.

7  A.  He had mentioned being interested in Galaxy looking into

8  something like this.

9  Q.  Were you interested in this opportunity to invest in Luna?

10 A.  After speaking with Do and learning about the most recent

11 updates, yes.

12 Q.  And what was it that attracted you to the investment?

13 A.  The thing that was most attractive to me personally, and I

14 think certainly — sorry, I should not speak on behalf of

15 others.

16      The thing that was attractive to me was that Terra

17 seemed like the first blockchain that had a genuine prospect of

18 having some utility outside of just the crypto space, and in

19 this case specifically, that is because of its ability to be

20 used in e-commerce and payments.

21      THE COURT:  What do you mean by that?

22      THE WITNESS:  The Terra blockchain was meant to

23 facilitate what was called a stablecoin.  And in the realm of

24 payments, those stablecoins could be used as opposed to more

25 traditional means of payments through other payment systems,

1  like SWIFT, or what have you, and that there are purported

2  benefits to using something like a blockchain, such as perhaps

3  reduced payment processing costs or reduced time for payment

4  processing.

5  Q.  Did you have any understanding of how this was being

6  accomplished?

7  A.  Yes.

8  Q.  How did you come to that understanding?

9  A.  Primarily from Do Kwon directly.

10  Q.  What was that understanding?

11  A.  That the Terra blockchain would be used as a sort of back

12  end for the settlement of transactions that are happening

13  through other payment apps.

14  Q.  What were some of these —— what were these other payment

15  apps that you're referring to?

16  A.  The most prominent one was called Chai, which was started

17  by a lot of the same people who started Terraform.

18  Q.  What was Chai?

19  A.  To the best of my understanding, Chai was a payments app

20  that was primarily active in South Korea.  You could think of

21  it as a South Korean equivalent to something like Venmo.

22  Q.  When you say it was started by other people who started

23  Terraform, did that include Do Kwon?

24  A.  Yes.

25          THE COURT:  Counsel, we're going to need to break in

O3QHSec2                        Kol – Direct

1    the next few minutes for lunch, so pick a point where you want

2    to break.

3              MS. MEEHAN:  Now, is fine, your Honor.

4              THE COURT:  All right.  Ladies and gentlemen, so we'll

5    take an hour for lunch now, and we'll resume promptly at 2:00

6    and go to 3:30.

7              (Jury excused)

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury not present)

2          THE COURT:  Please be seated.

3          When was Mr. Do Kwon's conviction for forgery?

4          MR. CONNOR:  I believe it was March of 2023.

5          THE COURT:  March of 2023?

6          MR. CONNOR:  2023, after we filed our complaint.

7          THE COURT:  OK.  The reason I raise it is ——

8          MR. CONNOR:  I'm sorry, June.  He was arrested in

9   March; the conviction was in June.  My apologies.

10          THE COURT:  I want to remind everyone to be careful

11  about opening the door.  So the question was put to Mr. Revsin

12  on cross:  Mr. Do Kwon's —— you knew that Mr. Do Kwon's

13  background was impressive, and that was a factor in your

14  decision.  I don't think that opened any door given that we're

15  talking, in the case of Mr. Revsin, about 2022.  But had the

16  conviction been earlier, of course, it would clearly have

17  opened the door to redirect:  Did you know when you read about

18  his impressive background that he had been convicted for

19  forgery?  So all the discussion we've had about that would have

20  been mooted.  But since it was 2023, that was not a problem.

21  But I just want to caution everyone about being careful not to

22  open doors.

23          All right.  We'll see you all.

24          MR. CONNOR:  Your Honor, could I raise one other issue

25  that's actually on this topic?

O3QHSec2

```
1              THE COURT:  Yes.

2              MR. CONNOR:  Our understanding is Do Kwon was released

3    from prison yesterday, and so we've conferred with defense

4    counsel about the opportunity of doing a remote deposition or

5    testimony.  We, of course, would need to comply with the

6    Montenegrin procedures, but we wanted to flag that for your

7    Honor.  That is a development since yesterday.  I wanted to

8    make your Honor aware of that.

9              MR. PATTON:  Your Honor, perhaps the SEC has better

10   information than we do.  As far as we know, he's still in

11   custody, but we're happy to look into it.

12             THE COURT:  Yes, that's between you guys.  The one

13   thing I'm sure I do not need to emphasize is we are not going

14   to pause this trial for any reason whatsoever.

15             So very good.

16             (Lunch recess)

17

18

19

20

21

22

23

24

25
```

O3QHSec2

```
1
1                        AFTERNOON SESSION

2                          2:00 p.m.

3            THE COURT:  Let's get the witness back on the stand

4    and let's bring in the jury.

5            THE DEPUTY CLERK:  Jury entering.

6            (Jury present)

7            THE COURT:  Please be seated.  I was kind of

8    disappointed there were no interesting T-shirts today.

9    Although, juror no. 5 has a nice dog pattern that you're now

10   concealing with your scarf, but I can see.  There it is.

11           JUROR:  I'm into dogs.  I have a lot of dogs.

12           THE COURT:  All right.  Let's continue.

13   Jonathan Kol, resumed.

14   DIRECT EXAMINATION CONTINUED

15   BY MS. MEEHAN:

16   Q.  Good afternoon, Mr. Kol.

17           Before the break we were discussing Galaxy's potential

18   investment in Luna and I believe you mentioned that you

19   understood that the Chai payment application was using the

20   Terraform blockchain on the back end.

21           Can you tell us what you meant by the term "back end?"

22   A.  That the Terra blockchain was used as a sort of engine to

23   facilitate the transactions.  If you think of -- let's say I

24   mentioned before of the Chai app resembling Venmo, which many

25   of us are probably familiar with.  How many of us then know
```

O3QASEC3                        Kol - Direct

what happens when I send you let's say money on Venmo, what
actually happens in the background?  So in this case if it were
on the Chai app, that transaction from say my Venmo account to
yours, or my Chai account to yours, or paying a merchant with
the Chai app, that that transaction is actually reflected on
the Terra blockchain, meaning that while transactions happen
within the app, the actual exchange of funds happens and is
facilitated on the Terra blockchain.

Q.  And how did you come to that understanding?

A.  Primarily from conversations with Do Kwon.

Q.  You also mentioned earlier that this facilitation resulted
in certain benefits.  What were some of those benefits?

A.  The purported benefits were centered around two primary
issues.  One is the cost of payment processing.  When you
process a transaction through a credit card, the credit card
network charges, even today, upwards of two and a half percent,
sometimes 3 percent.

        By using Chai and by Chai's usage of the Terra
blockchain, that cost was supposed to be reduced by as much as
half.

        And another major benefit is the amount of time for
that payment to be processed.  Such that, in the end of the day
the merchants can receive their payment in a much quicker time
instead of what might be several days or even weeks that it
could be in a much shorter time span.  And those were the two

O3QASEC3                          Kol - Direct

1    primary benefits that we understood came from the usage of the

2    Terra blockchain.

3    Q.  And how did you come to the understanding as to those two

4    specific benefits?

5    A.  Primarily from conversation with Do who mentioned that many

6    times, both in private conversations with us, as well as in his

7    more public speaking.

8    Q.  So in addition to your conversations with Do Kwon in this

9    regard, did you conduct any additional research on this?

10   A.  Yes.

11   Q.  What did you do?

12   A.  We consumed materials that were outward facing.  There were

13   many public presentations, whether they were a conferences or

14   live streams where Do or someone from Terraform would speak

15   about the connection between Chai and Terra.

16   Q.  And did you consult any additional materials in your

17   research?

18   A.  On this specific matter, no.

19   Q.  Are you familiar with what's known as the Terra Station

20   dashboard?

21   A.  Yes.

22   Q.  Can you tell me what that is?

23   A.  The Terra Station dashboard was a website that had a

24   visualization of everything happening on the Terra blockchain,

25   from the transactions that were committed on any period of

O3QASEC3                          Kol - Direct

1    time, the total dollar value that the transactions involved,

2    the number of accounts that were transacting, and the total

3    number of accounts that were open.  All of which are very

4    useful statistics if you were trying to understand what was

5    happening on the Terra blockchain.

6    Q.  Why are those very useful statistics?

7    A.  They are the best indication as to the amount of traction

8    that this thing has.  If those numbers are going up, if the

9    transaction volume is increasing, if the amount of each

10   transaction is increasing, if the number of accounts is

11   increasing, all of those are very useful indicators, telling

12   you that Terra is being used more and more and more often.

13   Q.  When you say Terra, are you referring to the Terraform

14   blockchain?

15   A.  Yes, that is correct.

16   Q.  And why was that information that you've just explained --

17   why was that significant?

18   A.  Insofar as us being interested and making an investment, it

19   was extremely relevant as all of this information indicates

20   whether this thing is being used or not.  And as an investor,

21   you want to see is it being used.  Is the premise of this thing

22   making a difference in the world?  It being used more and more

23   is an indication of, yes, it is making a difference.  And that

24   is very supportive of the notion of investment thesis or an

25   eventual investment recommendation.

O3QASEC3                    Kol - Direct

1    Q.  You just used the term "it" a lot in your answer.  What

2    specifically were you referring to when you said "it?"

3    A.  My apologies.  I was specifically referring to the

4    increased usage as indicated by something like the Terra

5    Station dashboard which reported the statistics of what's

6    occurring on the Terra blockchain.

7    Q.  And how did you learn about the Terra Station dashboard?

8    A.  I don't remember specifically, but most likely it was from

9    Do, but it was in the public domain you could say.

10              MR. FERRARA:  Objection, your Honor.  Speculation.

11   Move to strike.

12              THE COURT:  Sustained.

13   BY MS. MEEHAN:

14   Q.  Where did you find the information that you were referring

15   to from the Terra Station dashboard?

16   A.  I'm sorry.  Could you repeat that?

17   Q.  Where did you go to look at the Terra Station dashboard?

18   A.  It was a website.  I think it was TerraStation.com or

19   something akin to that.

20   Q.  And did you have any understanding as to -- withdrawn.

21              Did there come a time when you raised the possibility

22   of this investment at Luna to other individuals at Galaxy?

23   A.  Yes.

24   Q.  When was that?

25   A.  Don't remember the exact date, but it had to be in the

1    early part of 2021 -- or sorry, 2020.

2             MS. MEEHAN:  At this time, Mr. Haywood, could you

3    please pull up for the witness Plaintiff's Exhibit 2.

4    Q.  Mr. Kol, do you recognize this document?

5    A.  Yes.

6    Q.  What is it?

7    A.  It is an e-mail sent from me to my colleagues.

8             MR. KORNBLAU:  Your Honor, this isn't in evidence yet.

9    Oh, we don't have the feed yet.

10             MS. MEEHAN:  Can you pull it up for counsel too,

11    Mr. Haywood.  They don't have it on their screen.

12             MR. PELLEGRINO:  We have an error.

13             (Pause)

14             MR. KORNBLAU:  Got it.  Thank you.

15             THE COURT:  Go ahead.

16    BY MS. MEEHAN:

17    Q.  Mr. Kol, what is this document?

18    A.  It is an e-mail sent from me to my colleagues at Galaxy.

19    Q.  Did you send this e-mail from your e-mail address at Galaxy

20    Digital?

21    A.  Yes.

22             MS. MEEHAN:  At this time, the SEC offers Plaintiff's

23    Exhibit 2 into evidence.

24             MR. KORNBLAU:  Objection.  Hearsay.

25             MR. FERRARA:  Objection.

O3QASEC3                          Kol - Direct

 1                THE COURT:  Can someone blow it up for me.

 2                Without describing what's on this document, what was

 3       the reason you sent this document?

 4                THE WITNESS:  Your Honor, I sent this document because

 5       I wanted to -- as I would with any other prospective

 6       investment, inform my colleagues that there is something

 7       interesting that is worth spending more time on.

 8                THE COURT:  So this was a document you created in the

 9       course of the regular course of your business?

10                THE WITNESS:  Correct.

11                THE COURT:  And it was reflecting matters that had

12       occurred contemporaneously or soon after -- soon before the

13       preparation of the document?

14                THE WITNESS:  Correct.

15                THE COURT:  And it was maintained in your records as

16       part of the regular course of business?

17                THE WITNESS:  Correct.

18                THE COURT:  Overruled.  Received.

19                (Plaintiff's Exhibit 2 received in evidence)

20       BY MS. MEEHAN:

21       Q.  Mr. Kol, what is the date of this e-mail?

22       A.  It looks like January 21, 2020.

23       Q.  Who did you send this e-mail to?

24       A.  I sent to my colleagues, Michael Jordan, Josh Lim, Luca

25       Jankovic and William Nuelle.  And I also copied our superiors,

O3QASEC3                          Kol - Direct

1   in this case Peter Wisniewski and Greg Wassermann.

2   Q.  And can you please read the subject line in the email?

3   A.  "Call with Terra cofounder Do Kwon."

4   Q.  And if I can direct you to the third paragraph -- excuse

5   me.  To the first paragraph.  Can you please read the first

6   sentence of that paragraph there?

7   A.  Of course.  "Just got off the phone with Terra cofounder Do

8   Kwon."

9   Q.  And moving now down to the third paragraph.  Can you please

10  read the first sentence of the third paragraph there?

11  A.  "What's attracted me to Terra is the strong user growth

12  metrics they are posting, which if are to be believed make

13  Terra one of the most active networks behind Bitcoin and

14  Ethereum, coupled with the current price of Luna (down to a

15  current market cap of 56 million) which has been in free fall

16  as a number of large investors have become forced sellers as

17  they're liquidating their funds (allegedly FBG) the largest

18  investor has been doing this."

19  Q.  Mr. Kol, what were you referring to when you used the term

20  "strong user growth metrics" in that sentence?

21  A.  Specifically referring to statistics emerging from the

22  Terra blockchain, which were available to be viewed on the

23  Terra Station dashboard, such as the growth in total accounts,

24  the growth in transaction volume, and total transaction volume.

25  Q.  And did those growth metrics relate to Chai?

O3QASEC3                        Kol - Direct

```
 1   A.  As we understood it, in that same conversation, I learned
 2   from Do that Chai is a major driver in those transactions.
 3   Q.  And from a financial perspective, what was attractive about
 4   those strong user growth metrics that you're discussing here?
 5   A.  From a financial perspective, transactions in Terra
 6   stablecoins, which is what is being reflected here, carried
 7   with them a small transaction fee.  And that small transaction
 8   fee accrues to the holders of the Luna assets and that what is
 9   the investment prospect was in.
10   Q.  And if you can turn to the next page of the e-mail, you see
11   there are two charts reflected there?
12   A.  Yes.
13   Q.  And the first chart is titled "total accounts?"
14   A.  Correct.
15   Q.  What does that -- what information is contained there?
16   A.  What's being reflected here is the total number of accounts
17   since inception on the Terra blockchain.  And at the time, it
18   was at a million and almost fifty thousand.
19   Q.  And just beneath that chart there's another one that refers
20   to transaction volume?
21   A.  Yes.
22   Q.  And what information is contained in that chart?
23   A.  That chart shows the last 30 days of transactions in the
24   Korean won stablecoin on the Terra blockchain, and reflecting
25   an amount of about 190 billion Korean won transacted in total.
```

O3QASEC3                        Kol - Direct

1    Q.  And did you have any understanding as to what this

2    information was -- what this -- withdrawn.

3            Why did you include this information in this e-mail?

4    A.  It is a reflection of the strong user growth metrics that I

5    was citing earlier.

6            MS. MEEHAN:  You can take that exhibit down.

7    Q.  Mr. Kol, did there come a point in time later when you made

8    a recommendation to your colleagues at Galaxy regarding this

9    investment in Luna tokens?

10   A.  Yes.

11   Q.  When was that?

12   A.  Sometime in the fourth quarter.  I believe it was in maybe

13   the end of summer, early fall of 2020.

14           MS. MEEHAN:  And if, Mr. Haywood, if you could please

15   display for the witness only Plaintiff's Exhibit 3.

16   Q.  Mr. Kol, do you recognize this document?

17   A.  Yes.

18   Q.  What is it?

19   A.  It is an e-mail from me to my superior at Galaxy and

20   several colleagues to denote my interest in pursuing an

21   investment in Terra and justifying further work on it.

22   Q.  And was it your standard practice to send an e-mail like

23   this in connection with making an investment recommendation?

24   A.  Yes.

25   Q.  And did you write this e-mail contemporaneous at the time

1    of the events that we've been discussing?

2    A.  Yes.

3    Q.  And is this e-mail maintained in the regular course of

4    Galaxy Digital's business?

5    A.  Yes.

6              MS. MEEHAN:  At this time, the SEC offers Plaintiff's

7    Exhibit 3 into evidence.

8              MR. KORNBLAU:  Objection.  Hearsay.

9              MR. FERRARA:  Objection, your Honor.

10             THE COURT:  Can you please blow it up.

11             MS. MEEHAN:  Your Honor, it's also being offered for

12   effect on a listener.

13             THE COURT:  So, I'm sorry, tell me again who this is

14   between, who and whom?

15             THE WITNESS:  This is me sending an e-mail directly to

16   Mike Novagratz, who was the founder and I believe at the time

17   CEO or president of Galaxy, but effectively the key figure in

18   the organization and copying several of my other colleagues.

19             THE COURT:  So I don't understand the additional

20   ground that plaintiff's counsel mentioned, but I think it is a

21   business record.  So the objection is overruled.  Received.

22             (Plaintiff's Exhibit 3 received in evidence)

23             MS. MEEHAN:  You can display the exhibit, Mr. Haywood,

24   for the jury.

25

O3QASEC3                          Kol - Direct

1    BY MS. MEEHAN:

2    Q.  Mr. Kol, what is the date of this e-mail?

3    A.  August 24, 2020.

4    Q.  Who did you send the e-mail to?

5    A.  Mike Novagratz, and I am copying several of my colleagues.

6    They are Michael Jordan, William Nuelle, Brett Harner and

7    Richard Kim.

8    Q.  Who is Michael Novagratz?

9    A.  Michael Novagratz is the founder of Galaxy Digital and is

10   the key figure there, effectively the CEO.

11   Q.  And can you please read the subject line of the e-mail?

12   A.  "Regarding potential position in Terra/Luna."

13   Q.  Mr. Kol, why did you send Mr. Novagratz this e-mail?

14   A.  To give him an update on the latest information that I had

15   learned from Do Kwon regarding the most recent updates

16   regarding Terra, and to say that I think we should proceed

17   towards making an investment and doing all the requisite work

18   for that.

19   Q.  And if I can direct you to the third paragraph of the

20   e-mail, could you please read that into the record for me.

21   A.  Yes.  "Received the most recent update on traction from the

22   founder over the weekend.  The payment app is the fastest

23   growing e-wallet in South Korea, with annual transaction volume

24   over $1.2 billion and over 2 million users.  Fees are on an

25   annual run rate of $13 million.  Financial applications are

1    being built on top of Terra, most notably is Mirror Protocol, a

2    synthetic asset protocol that will give South Korean users

3    exposure to synthetics."

4    Q.  And when you refer to the founder, who were you referring

5    to?

6    A.  Do Kwon.

7    Q.  And when you referred to the payment app in that sentence,

8    what were you referring to?

9    A.  The Chai app.

10   Q.  Why did you include this information in your e-mail to

11   Mr. Novagratz?

12   A.  As I mentioned before, primary interest in Terra was driven

13   by its impact outside of just the crypto industry, meaning that

14   it is effecting things that are not solely industry specific.

15   And we viewed Terra as having a prospect to penetrate

16   e-commerce and payment systems.  And as our understanding was,

17   Chai is a major driver of that penetration into payments.

18   Q.  And was that information significant to you in connection

19   with making this investment recommendation?

20   A.  Absolutely.

21   Q.  Why is that?

22   A.  It represented the best evidence that Terra is having a

23   real -- or sorry.  That Terra, through the Chai app, is having

24   a meaningful impact outside of the realms of cryptocurrency.

25               And as I mentioned before, these statistics are an

O3QASEC3                        Kol - Direct

1    indication of this happening in the world, and their growth

2    over time is an indication of this actually growing, not being

3    a static thing.  So it's moving in the right direction.

4    Q.  You mentioned in your answer that it was an indication that

5    it was having a meaningful impact outside the realm of

6    cryptocurrency.  Can you explain a little bit more about what

7    you meant by that?

8    A.  As I mentioned before, we understood that the key reason

9    why merchants are interested in accepting payments through Chai

10   is those business benefits to them.  The reduction in payment

11   processing costs, the reduction in processing times.  And

12   presumably the growth in these are an indication of more

13   merchants seeing these benefits and wanting to transact with

14   Chai more, and more merchants wanting to transact.

15   Q.  Why would that have a meaningful impact outside of the

16   cryptocurrency industry?

17   A.  I would say the holy grail of crypto is always having an

18   impact outside of the industry.  And here were people who had

19   nothing to do with the industry, who for as much as they knew,

20   perhaps didn't even understand that on the back end this

21   payments app is actually running on a blockchain.  And these

22   statistics are an indication that more and more of them want to

23   use it.  And so it's a fairly clear incidence of that impact

24   happening.

25           MS. MEEHAN:  Mr. Haywood, you can take that exhibit

O3QASEC3                          Kol - Direct

1    down.  Thank you.

2    Q.  In connection with your investment recommendation, did you

3    prepare a memorandum?

4    A.  Yes.

5    Q.  When did you do that?

6    A.  Again, I don't remember the exact date, but most likely it

7    was in the fall of 2020.

8           MS. MEEHAN:  Mr. Haywood, if you could please pull up

9    for the witness Plaintiff's Exhibit 8.

10   Q.  Mr. Kol, do you recognize this document?

11   A.  Yes.

12   Q.  What is it?

13   A.  It is the investment memorandum regarding establishing an

14   investment in Terra.

15   Q.  And was it Galaxy Digital standard practice to prepare an

16   investment memorandum in a situation like this?

17   A.  Yes.

18   Q.  And was this investment memorandum prepared at the time or

19   near the time that Galaxy was making an investment in Luna?

20   A.  Yes.

21   Q.  And was this document maintained in the course of Galaxy

22   Digital's business?

23   A.  Yes.

24          MS. MEEHAN:  At this time, the SEC offers Plaintiff's

25   Exhibit 8 into evidence.

1              MR. KORNBLAU:  No objection.

2              THE COURT:  Received.

3              (Plaintiff's Exhibit 8 received in evidence)

4    BY MS. MEEHAN:

5    Q.  Mr. Kol, did you prepare this memorandum?

6    A.  Primarily.  I may have used several of my younger

7    colleagues in assisting with it, but it's primarily my work.

8    Q.  And looking at the first page here, do you see the section

9    where it says "Terra and Luna mechanics?"

10   A.  Yes.

11   Q.  And underneath that it says "how does the peg work?"

12   A.  Yes.

13   Q.  Can you tell me what information is being discussed here?

14   A.  The information discussed in this section provides an

15   explanation for how the algorithmic mechanism to maintain the

16   value of the stablecoins relative to the asset that they're

17   pegged to, that might be a U.S. dollar, it might be a Korean

18   won.

19   Q.  How did it do that?

20   A.  In simple terms, the way the system did that is it had to

21   reserve assets, which was Luna, this would be the thing in this

22   case that Galaxy would be purchasing.  This asset acted as

23   what's known as the collateral reserve.  And in instances where

24   the stablecoin goes below the value of a peg, say if it was

25   meant to be a dollar and now it's trading at 95 cents, the

O3QASEC3                          Kol - Direct

1    system would automatically use the reserve asset to purchase

2    the stablecoin and bring its price back up to the pegged value

3    of $1.  In instances where the -- sorry.  Where the stablecoin

4    is above that amount, anyone could deposit into the system

5    units of the reserve asset and then redeem back the stablecoin,

6    sell it in the marketplace, and then bring the value back to

7    its pegged value.  In this case, $1.

8    Q.  And this peg mechanism that you're describing, was it

9    automated?

10   A.  Yes.

11   Q.  Why did you include this section in your report?

12   A.  I would consider it absolutely required information for

13   someone who was going to make such an investment.  It is

14   pertinent for an investor to understand this.

15   Q.  Why is that?

16   A.  In the simplest terms, it basically describes how the

17   stablecoin is meant to remain stable.

18   Q.  Directing you to the page of the report that's ending in

19   6630.

20          Do you see there in the middle of the page there's a

21   paragraph starting with the word "overall?"

22   A.  Yes.

23   Q.  Can you just read that for me?

24   A.  "Overall, Chai has 2.03 million users, as defined by unique

25   users who have downloaded the app and created a wallet.  Chai

currently has roughly 65,000 daily active users, (a three-month

range of 60 to 80,000), 290,000 weekly active users (three --

month range of 202 to 300,000 users) and 573 monthly active

users (three-month range of 550 to 613,000.)"

Q.  Why did you include this information in your memorandum

recommending Galaxy make an investment in Luna?

A.  As I had mentioned, from our understanding, Chai was a

major driver in activity on the Terra blockchain.  And, again,

our primary interest in Terra in the first place was guided by

its penetration outside of the industry.  And an app like Chai

and its traction statistics, the user metrics that are posted

here are a good indication of that penetration.

Q.  If you turn to the next page, there's a section titled

"thesis."

        And if you look at the second paragraph that starts

with "Terra has an investor awareness problem," can you please

read the next sentence there?

A.  Yes.  "It is one of a small number of crypto assets that

has real economic activity behind it, yet it is generally

dismissed by most western crypto investors due to its early

go-to-market strategy which emphasized subsidies by the

protocol."

Q.  What did you mean when you said it had "real economic

activity behind it?"

A.  I meant exactly that penetration in markets outside of

crypto.  To us, real economic activity translated to being

involved in the providing of goods and services, either through

the payments mechanism or something of the sort.  In this case,

we had reason to believe that Terra has economic activity

behind it because of the activity of the Chai app, which was

running on the Terra blockchain.

Q.  And if I can just direct you to the page of the report

ending in 6635.  There's a section there that's titled "risks."

Mr. Kol, where did you include this section in your

memorandum?

A.  It was a standard course of business with any type of

memorandum that we would write.  As an investor, you're in the

business of understanding the risks that you would be taking

with any investment in trying to weigh them against the

potential upside or reward.  And in this case, we felt that the

risks listed here are the most pertinent ones that an investor,

such as ourselves, would need to understand as they weigh a

decision around an investment.

Q.  And what are the specific risks that you're discussing

here?

A.  We discuss the market risk.  This one is fairly generic.

There's always that risk that the market might not be appealing

for it.

The two most pertinent and most specific risks, as to

Luna specifically, were around what I called the supply

1    expansion risk and the liquidity risk.  The supply expansion

2    was specifically about the notion where any sustained deviation

3    from the peg would lead to additional issuance of that reserve

4    asset, as we discussed earlier, with respect to keeping the

5    peg.  And so that meant if the deviations persisted for long

6    enough, the mechanism would create so many new Luna tokens that

7    it might dilute -- or not might, it will dilute the value of

8    Luna tokens that already are in circulation.

9            And the other risk is that if there was no liquidity

10   in the Luna asset, then the mechanism would also be faced with

11   troubles as it does depend on the market's ability to transact

12   in Luna tokens, and there being sufficient liquidity for the

13   mechanism to maintain the peg on an ongoing basis.

14   Q.  And do these risks that you just described relate to the

15   peg mechanism that we were just previously discussing?

16   A.  Correct.

17   Q.  And was it important to the investment recommendation that

18   that peg mechanism function properly?

19   A.  Yes.

20   Q.  And would you have encouraged an investment in Luna if you

21   believed that the peg did not function properly?

22   A.  I would not have recommended one, and we understood that

23   these would be the primary risks that might still manifest even

24   if the peg was working as intended.

25   Q.  Did Galaxy ultimately invest in Luna?

O3QASEC3                          Kol - Direct

1    A.  Yes.

2    Q.  When was that?

3    A.  It I believe was in either late October or early November

4    of 2020.

5    Q.  How much did Galaxy invest in the Luna token?

6    A.  Roughly $4 million.

7    Q.  Were you involved in the process to finalize that deal?

8    A.  Yes.

9    Q.  Who did you interact with to do that?

10   A.  Primarily Mike Novagratz, with respect to him being the

11   final decision maker, alongside several others.  And there were

12   a few individuals who were involved in the actual facilitation

13   of the deal, such as Joe McGrady, who was the head of

14   operations, who was the one actually funding the deal, meaning

15   sending from us to Terraform Labs.

16   Q.  With respect to individuals at Terraform, who did you

17   interact with to finalize the deal?

18   A.  Do Kwon and the Terra I believe CFO at the time who was CJ

19   Han.

20       MS. MEEHAN:  Mr. Haywood, if you could please pull up

21   Plaintiff's Exhibit 11.

22   Q.  Mr. Kol, do you recognize this document?

23   A.  Yes.

24   Q.  What is it?

25   A.  It looks to be an e-mail chain regarding the investment in

O3QASEC3                          Kol – Direct

1    Luna tokens.

2    Q.  Did you send this e-mail?

3    A.  Yes.

4    Q.  And is this your e-mail address at GalaxyDigital.io that's

5    reflected here?

6    A.  Yes.

7              MS. MEEHAN:  Your Honor, at this time the SEC offers

8    Plaintiff's Exhibit 11 into evidence.

9              MR. KORNBLAU:  Objection.  Hearsay.

10             MS. MEEHAN:  Your Honor.  May we approach?

11             THE COURT:  Yes.

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

O3QASEC3                        Kol - Direct

1           (At sidebar)

2           MS. MEEHAN:  I'm going to be questioning him about the

3   portions of this e-mail, specifically e-mail from CJ Han, CFO

4   of Terraform Labs, just reflecting the settlement of payments,

5   and then a statement by a party opponent.  It's not hearsay.

6   So I'll be questioning him about that and then the other

7   e-mails are --

8           THE COURT:  Let me see.

9           MR. KORNBLAU:  There's no dispute about payment.  You

10  can just ask him did they pay.  Was it received.  You just

11  don't need all of this.  It's a lot of hearsay.

12          THE COURT:  Let me see the document.

13          What's the relevance?

14          MS. MEEHAN:  Just to show that they actually made the

15  payment and they made it through an internet.

16          THE COURT:  So are you challenging that?

17          MR. KORNBLAU:  No.  Just ask, he'll say yes, and we're

18  done.

19          THE COURT:  So why?  We don't need the document.

20          MS. MEEHAN:  That's fine.

21          (Continued on next page)

22

23

24

25

1              (In open court)

2    Q.  Mr. Kol, I believe you are mentioned that Galaxy invested

3    $4 million in Luna?

4    A.  Yes.

5    Q.  How did they make that payment?

6    A.  I believe we had sent cash directly to Terraform Labs.

7    Q.  Who at Terraform Labs did you send the cash to?

8    A.  CJ Han, the CFO there.  He was the primary contact on the

9    other side for receive of funds.

10   Q.  And do you know by what method Galaxy sent the funds?

11   A.  I'm afraid I'm not sure exactly.  Either would have been

12   cash through a bank wire or a stablecoin transfer.  Those were

13   the two ways that we did it on a recurring course of business.

14   Q.  Did Galaxy ultimately receive the Luna that they paid for

15   from Terraform Labs?

16   A.  Yes.

17   Q.  How did Galaxy receive that Luna?

18   A.  They would send it to us, to a prespecified wallet address.

19   Q.  What do you mean by wallet address?

20   A.  In the crypto sector, you would have for each blockchain an

21   account or several accounts, as we saw with the chart earlier,

22   that shows the total number of those accounts.  The way that

23   that account is identified, the way people can interact with it

24   and send funds into it is through what we call a public address

25   or colloquially we call it a wallet.

1  Q.  Mr. Kol, we talked earlier about the information that was

2  provided to you by Do Kwon relating to Chai metrics and that --

3  why that was important to your investment recommendation in

4  Luna.

5          If you had been told that these Chai metrics and

6  transaction volumes that we've been discussing were being

7  copied onto Terraform's blockchain, would that have impacted

8  your investment recommendation?

9  A.  Yes.

10  Q.  How so?

11  A.  If nothing else, it would prompt a line of questioning to

12  Do Kwon as, what does it mean for them to be copied?  Are they

13  actually effected on the blockchain?  Because if that was not

14  the case, then it's unclear how merchants are getting those

15  benefits of reduced payment processing costs or reduced payment

16  processing times.

17  Q.  And if you had understood that they were -- these

18  transactions were in fact being copied, would that information

19  have changed anything about your recommendation?

20  A.  It's entirely possible.  Again, if nothing else, it would

21  absolutely change the line of questioning where we would have

22  wanted to understand, exactly what does that mean?  How are

23  they interacting with the blockchain?

24  Q.  And why would you have asked those questions?

25  A.  As I've stated before, our primary motivation here was, we

O3QASEC3                          Kol - Cross

1  saw this thing that, our understanding was, is having an impact

2  on real world commerce, on real economic activity.  That was

3  happening through the Chai app.  People were using this to pay

4  for things.  Merchants were using it to accept payment.  The

5  reason that they are doing that is because allegedly this gives

6  them reduced cost on payment processing.  That's a huge

7  difference if you're saving 50 percent on the cost to accept

8  payment.  It's a huge difference if you're getting -- if you're

9  getting money faster as a merchant.  And so if that wasn't the

10  case, we would absolutely want to know that, and that would

11  absolutely effect our investment decision.

12          MS. MEEHAN:  I have no further questions.

13          THE COURT:  Cross-examination.

14  CROSS-EXAMINATION

15  BY MR. KORNBLAU:

16  Q.  Good afternoon, Mr. Kol.  I am David Kornblau, one of the

17  lawyers for Terraform Labs in this case.

18          We've never met before; is that correct?

19  A.  Correct.

20  Q.  You would agree, Mr. Kol, that you're a sophisticated

21  finance professional?

22  A.  Yes.

23  Q.  And you discussed your impressive education.  I won't go

24  over that again.  You mentioned that you worked at Morgan

25  Stanley?

O3QASEC3                        Kol - Cross

1    A.  Correct.

2    Q.  I don't know if everyone knows what Morgan Stanley is, so

3    would you agree it's one of the most prestigious investment

4    banks in the world?

5    A.  Yes.

6    Q.  And you got that job right out of college, correct?

7    A.  That is correct.

8    Q.  And, again, you mentioned that you sold bonds and then were

9    promoted to be a trader of bonds at Morgan Stanley; is that

10   correct?

11   A.  Yes.

12   Q.  Now, in order to have those jobs at Morgan Stanley you

13   needed to become a registered securities professional; is that

14   correct?

15   A.  Yes, had to pass several licensing exams.

16   Q.  And there were four different tests that you had to take or

17   that you did take to become registered; is that right?

18   A.  I believe that's correct.  At least three that I can

19   remember.

20   Q.  Did you take a course to help prepare for those tests?

21   A.  Yes.  Morgan Stanley facilitated a course for all incoming

22   folks.

23   Q.  How long did you study?

24   A.  I want to say it was about a month long.

25   Q.  And those tests that you took, were they given by the

O3QASEC3                    Kol – Cross

1    Financial Industry Regulatory Authority, or FINRA?

2    A.   Yes.

3    Q.   And FINRA is a securities regulator, correct?

4    A.   I believe it's a self-regulatory organization.

5    Q.   And overseen by the SEC?

6    A.   I think so.

7    Q.   So you took one test to be a -- to be registered as a

8    General Securities Representative Series 7; is that right?

9    A.   Yes.

10   Q.   And that one covered a bunch of topics, including corporate

11   stocks, corporate bonds, municipal securities, variable

12   annuities, options, and government securities; does that sound

13   right?

14   A.   Yes.

15   Q.   And you took a separate test just on municipal securities,

16   right, that was Series 52, correct?

17   A.   Correct.

18   Q.   One on state securities regulation, correct?

19   A.   Correct.

20   Q.   And then there was a fourth, let me see if you remember,

21   called the Securities Industry Essentials a couple years later;

22   do you remember that?

23   A.   Vaguely.

24   Q.   Okay.  Did any of those -- and you aced all the tests,

25   right?  Passed the first time, correct?

O3QASEC3                     Kol - Cross

1    A.  Yes.

2    Q.  Did any of those tests or preparations cover

3    cryptocurrencies?

4    A.  No.

5    Q.  So FINRA didn't include crypto as something you needed to

6    know to become a registered securities representative; is that

7    correct?

8              MS. MEEHAN:  Objection, your Honor.  Relevance.

9              THE COURT:  Sustained.

10   Q.  Mr. Kol, you had to learn about crypto on your own; is that

11   fair?

12   A.  Yes.

13   Q.  And I think you mentioned earlier one of the many things

14   you learned in your studies to be a registered securities

15   professional was the importance of doing research or due

16   diligence on investments; you would agree with that?

17   A.  Yes.

18   Q.  And now, at Morgan Stanley, you mentioned that you sold

19   bonds, traded bonds; do I have that right?

20   A.  Correct.

21   Q.  And that was with Morgan Stanley clients, correct?

22   A.  Yes.

23   Q.  And am I right that these were institutional clients?

24   A.  Among others.

25   Q.  So big companies, funds, that sort of customer?

1    A.  Yes.

2    Q.  You would agree that those were sophisticated customers?

3    A.  Yes.

4    Q.  Okay.  So you mentioned in 2018 you got a different job at

5    Passport Capital, correct?

6    A.  Yes, sir.

7    Q.  That was a hedge fund?

8    A.  Yes.

9    Q.  And you joined their new crypto fund, correct?

10   A.  Yes.

11   Q.  And you mentioned that part of your role was -- I did not

12   get it all down, but to analysis, stay abreast of market trends

13   and diligence; you did all those things?

14   A.  Yes, sir.

15   Q.  At Passport, right?

16   A.  Correct.

17   Q.  And did you help Passport Capital develop Passport

18   Capital's framework for evaluating crypto assets in particular?

19   A.   In conjunction with the other members of the team.

20   Q.  And so part of that would have been to research companies

21   involved in blockchain and crypto, correct?

22   A.  Correct.

23   Q.  And in that job at Passport Capital, you started looking at

24   stablecoins; is that correct?

25   A.  Correct.

O3QASEC3                        Kol - Cross

1    Q.  And Terra stablecoins in particular?

2    A.  Yes.

3    Q.  And would it be fair to say that Terra stablecoin was the

4    only stablecoin you were interested in when you were looking at

5    that Passport Capital?

6    A.  Correct.

7    Q.  And you mentioned a little bit before when the SEC

8    questioned you about how the Terra stablecoin worked; do you

9    remember that general topic?

10   A.  Yes.

11   Q.  And you mentioned that there was an algorithm.  It required

12   people to mint or burn UST and Luna, correct, to maintain the

13   peg; is that right?

14   A.  That's about right.

15   Q.  And so the algorithm depended on actions of people or

16   companies buying and selling UST and Luna or minting and

17   burning; is that fair?

18   A.  Yeah.  Absolutely.  The algorithm was there, but market

19   participants still had to take advantage of it.  So think of it

20   like there's a computer program, but someone still has to use

21   the computer program to effect sort of action.

22   Q.  And I think you used the word "automatic," but you didn't

23   mean automatic to exclude the actions of people, correct?

24   A.  That is correct.  People still have to use the program.

25              THE COURT:  So there are crypto assets that are

O3QASEC3                    Kol - Cross

1    labeled stable and those that are labeled as fluctuating.

2    What's the difference?

3          THE WITNESS:  In the case of the stable assets, there

4    is something in place that is designed to ensure that this

5    thing will have a relatively fixed value.  There's a few ways

6    to go about it.  One is to simply say be a company and take in

7    deposits into a bank account, and then mint a blockchain or

8    presentation of the dollars in that bank account.  We call

9    those collateral backed.

10         A large example is USDC, which is created by Circle

11   and Coinbase.  Then there are some that try to use a

12   programmatic or algorithmic mechanism, where there is some

13   programmatic mechanism in place, meant to help facilitate that

14   pegged value, such that there is something that will happen if

15   it is above the value, there's something that will happen if it

16   is below the value.

17         THE COURT:  And which of those models, was it your

18   understanding, was Terraform?

19         THE WITNESS:  It was a stablecoin with that

20   algorithmic design.

21         THE COURT:  Go ahead, counsel.

22   BY MR. KORNBLAU:

23   Q.  You mentioned, Mr. Kol, that Passport, while you were

24   there, bought $100,000 of Luna or future Luna in 2018; do I

25   have that correct?

1    A.  It sounds about right.

2    Q.  And what was your involvement in that purchase?

3    A.  I was one of the people who diligenced the opportunity.

4    Q.  And did Passport make money on that one?

5    A.  I don't know exactly.  Not too sure at this point in time.

6    I think so, but I couldn't tell you with high certainty.

7    Q.  We'll come back to that a bit, but let's just get through

8    your background here.

9            So you left Passport in 2019, correct?

10   A.  Yes, sir.

11   Q.  Then you joined Galaxy Digital, correct?

12   A.  Yes, sir.

13   Q.  Now, Galaxy Digital, for those who may not be familiar with

14   it, would you agree is one of the leading cryptocurrency and

15   blockchain companies in the entire world?

16   A.  Yes.

17   Q.  How much do they buy and sell?  Just in the most general

18   terms.

19   A.  On a given day, the amount is in the millions, perhaps even

20   the tens of millions.

21   Q.  So in a year, billions?

22   A.  Likely.

23   Q.  And you mentioned Michael Novagratz, he was the founder,

24   CEO, and chairman of Galaxy, correct?

25   A.  I believe so.  I'm not 100 percent sure about chairman, but

O3QASEC3                    Kol - Cross

1    everything else sounds accurate.

2    Q.  And you would agree that Mr. Novagratz was a sophisticated

3    finance professional, correct?

4    A.  Undoubtedly, yes.

5    Q.  And he had previously been a partner at Goldman Sachs and

6    at Fortress; is that correct?

7    A.  Yes.

8    Q.  And, again, if there are people who don't know those firms,

9    Goldman Sachs you would agree is a highly prestigious

10   investment bank based on Wall Street?

11   A.  One of the best alongside Morgan Stanley and a few others.

12   Q.  And Fortress is one of the biggest hedge funds around,

13   correct?

14   A.  No doubt.

15   Q.  And, now, Galaxy wasn't as big as those companies, correct?

16   A.  Correct.

17   Q.  But it did have employees all around the world, didn't it?

18   A.  Yes.

19   Q.  And when you joined in 2019, Galaxy made you a vice

20   president on your first day; isn't that right?

21   A.  Yes.

22   Q.  And then you ended up getting two promotions, right?  You

23   became a director, and then in 2022, managing director,

24   correct?

25   A.  Yes, sir.

O3QASEC3                        Kol - Cross

Q.  And managing director, that's pretty senior, right?

A.  As senior as it gets.

Q.  All right.  So now let's get into a little bit more of the detail about the processes and decision making that you talked about earlier.  So let's start with Passport Capital.

So that one, as you just mentioned, that was a $100,000 purchase in 2018, correct?

A.  Yes, I'm not sure about the exact date, but would have had to have been close to the end of 2018.

Q.  Yeah.  And you mentioned you were a part of the research team at digital for its -- excuse me, at Passport for its crypto fund?

A.  Yeah.  The fund at Passport was quite small, so all of us conducted many responsibilities, but that was absolutely a part of the team that conducted the research.

Q.  And I think you mentioned on direct that at that time back in 2018, the Terra blockchain was not even yet up and running; is that right?

A.  That's right.

Q.  And the Chai payment application also had not yet been released, right?

A.  Correct.

Q.  So this would be like an early stage, pre-early stage purchase; was that fair?

A.  Very fair.

O3QASEC3                    Kol - Cross

1    Q.  And so you mentioned a bunch of different research that you

2    and your colleagues did.  Did that include looking at the Terra

3    white paper?

4    A.  Yes.

5            MR. KORNBLAU:  All right.  Can we pull up Exhibit D4

6    for identification, please.

7    Q.  Now, it's not in evidence, Mr. Kol, so just, you know, keep

8    your answers brief.

9            If you take a look, was this a white paper that you

10   reviewed in connection with your research at Passport Capital?

11   A.  Yes.

12           MR. KORNBLAU:  Your Honor, we offer Exhibit D4 into

13   evidence.

14           MS. MEEHAN:  No objection.

15           THE COURT:  Received.

16           (Defendant's Exhibit 4 received in evidence).

17   Q.  And just to help everybody orient, what is a white paper

18   with crypto?

19   A.  In the crypto space, think of a white paper as the thing

20   that describes the basics about how a certain blockchain or a

21   certain protocol work.  I think the simplest way to understand

22   it is this is the thing that lays out what this thing, what

23   this protocol, what this blockchain is, any problems in the

24   world that it means to tackle, and then a description of how it

25   would do that.

O3QASEC3                         Kol - Cross

1          And these read almost as academic papers.  You notice

2     they have an abstract.  They have, you know, a very informative

3     body that oftentimes takes an academic tone.  And they then go

4     into some conclusion, which is usually -- and this is why we

5     the authors are trying to bring this mechanism, this protocol,

6     this blockchain, into the world.

7     Q.  Okay.  If we can publish it to the jury, I don't know if

8     it's already been shown.  Okay.  Great.  You can see it.

9          So the date was March 19, 2018, correct?

10    A.  Correct.

11    Q.  And one of the authors is Do, that would be Do Kwon; is

12    that correct?

13    A.  Yes.

14    Q.  Okay.  If we could take a look at page seven.  And we don't

15    need to go in detail here because I think you covered this

16    before.  But this discussed how Luna and the stablecoin were

17    linked to each other and how that algorithm worked; is that

18    correct?

19    A.  Correct.

20    Q.  It goes into some detail about how that really works,

21    right?

22    A.  Correct.

23    Q.  And this white paper also discussed the risks involved in

24    buying Terra stablecoins; isn't that right?

25    A.  Yes, it explained the mechanism through and through.

O3QASEC3                          Kol - Cross

Q.  And it gives you the -- excuse me.  It gives you the

upsides and it gives you the risks, right?

A.  Yeah, I would say even it describes in kind of high level

terms what are the worldly or societal benefits that could come

from this, and then it explains how would the thing work, and

how it would not work.

Q.  And I should have asked you this, these white papers, how

do you find them?

A.  Generally speaking, pretty much in every case that I've

seen they are published online openly.

Q.  And would it be fair to say that if you're looking at

potentially buying any kind of crypto coin or token, there

should be a white paper for it?

A.  Most cases.  If there isn't one, then there is something

that acts as a functional equivalent for it.  Where it would be

perhaps not as academic, but a similar explainer.

Q.  So would it be fair to say that if you're doing your due

diligence, that would be a natural thing to look for?

A.  Foundational, yes.  Absolutely natural.

          MR. KORNBLAU:  Can we turn to page 15 of this exhibit,

please.

Q.  So you see there's a section there called "price shocks?"

A.  Yes.

Q.  And let me just read this.  Well, I don't want to read the

whole thing.  I'll read the first sentence.  The first sentence

1    says "arguably the most lethal risk to the survival of a

2    stablecoin is a sudden price shock."

3            Do you see that sentence?

4    A.  Yes.

5    Q.  Did you read that at the time?

6    A.  Of course.

7    Q.  Did you understand it?

8    A.  Of course.

9    Q.  And what's your understanding?  What's this about?

10   A.  The biggest risk of the survival of any stable asset, any

11   pegged asset, and there have been many, many attempts at

12   pegging currencies throughout the years.  It's always the risk

13   of a sudden price shock, because what a price shock means is

14   just like a big, big change in one direction of the price.

15   Once that happens, it can then distort how people perceive this

16   thing, and perhaps impact their confidence that the peg would

17   ever be restored, this thing that is meant to keep a certain

18   value, would ever go back to it.  And that is why I think it is

19   kind of widely understood this is the biggest risk.

20   Q.  So if you go down towards the bottom there's a sentence

21   that begins "in the case of a shorting attack."  Do you see

22   that?  "A well-resourced attacker can eat through fat reserves

23   if they do not offer full collateralization."  Did you read

24   that sentence at the time?

25   A.  Yes.

O3QASEC3                      Kol - Cross

Q.  Did you understand those concepts at the time you were

doing your due diligence on Terra stablecoin?

A.  Yes.

Q.  What was your understanding at that time of a shorting

attack?

A.  A shorting attack is a case where someone is aware -- they

have an estimate of what is the reserve base that a pegged

asset would have.  Say if you have $100 in reserve, if you

recall earlier we talked about how the way to bring the value

back up is by using the reserve asset to purchase the

stablecoin to bring it back up to the market.  A shorting

attack would be trying to short it in such an amount that your

reserves would not be sufficient to cover that difference.

          And there's the concept of short selling, which means

borrowing an asset from someone, selling it in the market in

hopes that its price would decrease.  And then you could return

the same asset you borrowed to the lender, but now it's worth a

lot less, and so you can kind of keep the difference.  And so

in that case, a shorting attack, if you have the means for it

and are sophisticate enough, can be profitable.

Q.  And the sentence contains the expression "a well-resourced

attacker."  Did you have an understanding of what that meant?

A.  Yes.

Q.  What is that?

A.  Again, it basically means someone who has sufficient

O3QASEC3                      Kol - Cross

1  resources to overwhelm the systems reserve.  Perhaps the most

2  famous shorting attack in history was the one on the British

3  pound in the early '90s.  George Soros and Stanley

4  Druckenmiller are famous for having broken the bank of England.

5              MS. MEEHAN:  Objection, your Honor.  Relevance.

6              THE COURT:  Well, I think the witness had already

7  answered the question and then he added an anecdote and we will

8  strike the anecdote.

9  Q.  Well, was it your understanding, Mr. Kol, that a shorting

10 attack could lead to a decrease in value of a crypto coin,

11 stablecoin, or a Fiat or regular type of currency?

12 A.  Yes.

13             MS. MEEHAN:  Objection.

14             THE COURT:  Ground?

15             MS. MEEHAN:  Compound.

16             THE COURT:  Well, it is.  But I'll accept it for now.

17 And the answer is yes.  Put another question.

18             Let me ask you this, though, in the list of risks in

19 this white paper or in any white paper that you've ever seen,

20 have you seen one of the risks is that the offerers of this

21 product will lie to you?

22             THE WITNESS:  Never have I seen such a thing.

23             MR. FERRARA:  Your Honor.

24             THE COURT:  Excuse me.

25             And if you had seen that, would you ever have invested

O3QASEC3                          Kol - Cross

1    in such a product?

2             THE WITNESS:  Most definitely not.

3             MR. FERRARA:  Objection, your Honor.

4             THE COURT:  Overruled.

5    BY MR. KORNBLAU:

6    Q.  And when you read about this risk of a shorting attack,

7    Mr. Kol, was that a new idea to you?

8    A.  No.

9    Q.  And let's just read the last sentence on this page.

10   "Stablecoins that appear to be perfectly healthy can get wiped

11   out like this."

12            Did you read that at the time and understand it?

13   A.  Yes.

14   Q.  And how can that be to be perfectly healthy and get wiped

15   out?

16   A.  As I mentioned before, if a, again, well-resourced

17   attacker, can amass in an amount greater than the reserves, you

18   might say that something is perfectly healthy because it has

19   ample reserves.  Well, if someone has more resources to throw

20   at it than the reserves can handle, then a situation like what

21   is described in that sentence can happen.

22   Q.  Now, the crash that occurred with US Terra in 2022, do you

23   know if that resulted from a short attack?

24            MS. MEEHAN:  Objection.  Foundation.

25            MR. KORNBLAU:  That's why I asked if he knew.

O3QASEC3                          Kol - Cross

1                    THE COURT:  Sustained.

2     Q.  What, if any, knowledge, Mr. Kol, do you have of the reason

3     for the crash of Terra in 2022?

4     A.  I don't have any specific knowledge to it, but it was my

5     understanding that the --

6                    MS. MEEHAN:  Objection, your Honor.

7                    THE COURT:  Sustained.

8                    MR. KORNBLAU:  All right.  We can take this exhibit

9     down.

10    Q.  Just to wrap up on the Passport purchase, Mr. Kol.  When

11    Passport Capital went ahead with that $100,000 purchase, would

12    it be fair to say that it understood and accepted these risks?

13    A.  Yes.

14    Q.  And would it be fair to say that Passport -- you and your

15    colleagues believed that the potential upside outweighed the

16    risks?

17    A.  Yes.

18    Q.  Okay.  So now let's turn to the purchase when you worked at

19    Galaxy.

20                    Now, Galaxy, is that all crypto?  Is that what they do

21    100 percent?

22    A.  Basically 100 percent.

23    Q.  And, you know, in a year, how many different crypto

24    investments or purchases would Galaxy do typically?

25    A.  Across the firm, dozens.

O3QASEC3                      Kol - Cross

1   Q.  And would it be fair to say that some of them make money

2   and some of them lose money?

3   A.  Yes.

4   Q.  Now, we talked about Mr. Novagratz.  Just to clarify, he

5   was the boss, right?

6   A.  Indeed he was.

7   Q.  Is the boss, correct?

8   A.  Is the boss.

9   Q.  So it was his decision to whether or not to buy Luna,

10  correct?

11  A.  Correct.

12  Q.  And you didn't have that authority, right?

13  A.  Not for that investment.

14  Q.  You were making the recommendation to Mr. Novagratz?

15  A.  Exactly correct.

16  Q.  So you had done research on Luna back in 2018, correct?

17  A.  Correct.

18  Q.  And did you do more research on Luna when you worked at

19  Galaxy for the second -- for that purchase by Galaxy?

20  A.  Correct.

21  Q.  So you did more due diligence; is that fair?

22  A.  That is fair.

23  Q.  And you mentioned you did lots of different kinds of due

24  diligence, talking to folks, reading things, you went through a

25  whole list.  Would you say that it was thorough and

O3QASEC3                          Kol - Cross

1    comprehensive due diligence?

2    A.  Yes.

3    Q.  One piece of that due diligence, did you ask Do Kwon to

4    connect you to Chai merchants for reference calls?

5    A.  We did.

6    Q.  And Mr. Kwon agreed; isn't that right?

7    A.  Yes, he said he would.

8    Q.  And he was willing to introduce you so you could talk

9    directly to Chai merchants; isn't that right?

10   A.  That is what he said at first.

11   Q.  And he didn't try to stop you?

12   A.  No.

13   Q.  And a Chai merchant would know how that merchant receives

14   payment, whether it's Fiat currency, cryptocurrency, whatever

15   it is, correct?

16   A.  Not necessarily.

17            MS. MEEHAN:  Objection.  Speculation.

18            THE COURT:  Sustained.

19            MR. KORNBLAU:  All right.

20   BY MR. KORNBLAU:

21   Q.  As part of your due diligence did you --

22            THE COURT:  Counsel, forgive me for interrupting, but

23   how much more do you have?

24            MR. KORNBLAU:  Five, ten minutes.

25            THE COURT:  Well, I'm just wondering if we can -- and

O3QASEC3                          Kol - Cross

1    you're not required to, but I would like to finish this witness

2    today if we can, and we have to stop promptly at 3:30 because

3    of other matters I have.  But take whatever time you want.

4              MR. KORNBLAU:  Thank you, your Honor.  I don't know

5    about redirect, so I can't say.  But I'll try to move through

6    it.

7    BY MR. KORNBLAU:

8    Q.  So as part of the due diligence that you were just

9    describing, did you review announcements concerning Terra and

10   Chai?

11   A.  Yes.

12   Q.  If we can put up for identification only Defendants'

13   Exhibit 9.

14             Did you look at announcements on Medium?

15   A.  Among other things, yes.

16   Q.  What is Medium?

17   A.  Medium is an open blogging platform where anyone can write

18   a publication.

19   Q.  Did you see this announcement here in Exhibit D9?

20   A.  I can't recall specifically if I saw that specific one, but

21   I saw several that resembled this premise.

22   Q.  Okay.  Well, then let's take that down.

23             And let me ask you, do you remember seeing any

24   announcement stating that Chai merchants were made in Fiat

25   currency?

O3QASEC3                        Kol - Cross

1  A.  Specific one regarding Fiat currency, no.  I recall several

2  that basically said that Chai merchants are receiving --

3  receiving payments through Chai and that is happening on the

4  Terra blockchain without anyones needing to be aware of the

5  blockchain in any direct sense.

6  Q.  Yeah.  Aside from what's going on on the back end as you

7  mentioned, did you see any announcements that said that what

8  the merchants actually receive is Fiat currency, Korean won?

9  A.  I don't recall any such announcement with that level of

10  specificity.

11 Q.  And I guess let's just put D9 back up just to see if it

12 refreshes that memory.  If we can look at page two.

13         MS. MEEHAN:  Objection, your Honor.

14         MR. KORNBLAU:  Just to refresh, that's all.

15         MS. MEEHAN:  It's not proper --

16         THE COURT:  He can show anything to the witness to

17 refresh him as long as --

18         MS. MEEHAN:  He never saw it, your Honor.

19         THE COURT:  Excuse me?  You can show a witness any

20 document in the world if you think it will refresh his

21 recollection but you cannot -- the person showing it cannot

22 identify the document other than by number.

23         MS. MEEHAN:  Understand, your Honor.

24         THE COURT:  That's the law of the United States for

25 the last 500 years.  Well, maybe only 200 years.

O3QASEC3                           Kol - Cross

1          MS. MEEHAN:  I understand, your Honor, but the witness

2    didn't say he didn't remember.

3          MR. KORNBLAU:  So, sorry.

4          THE COURT:  Ah.  I can't see on my screen.  I have to

5    go back.  What is the question that you're putting that you

6    think needs to be rephrased?

7          MR. KORNBLAU:  Let me try the question.  If you don't

8    like it, your Honor, you'll tell me.

9    Q.  So all I'm going to ask you to do is again read to

10   yourself, nothing out loud.  There's a paragraph -- there's a

11   sentence, let me just make sure I direct you to the right one.

12   Can you highlight it, Mr. Aquino.

13         So there's a sentence in the fourth paragraph.  Why

14   don't you just read the fourth paragraph quietly to yourself

15   and we'll see if it refreshes your recollection on the question

16   that I asked you.

17   A.  Yes.

18         THE COURT:  No.  I don't remember -- and this was the

19   objection, I don't remember that he said he did not have a

20   recollection with respect to a question you put.  But why don't

21   you put the underlying question again and we'll see.

22         MR. KORNBLAU:  Yes, your Honor, I think he did, but

23   I'm happy --

24         THE COURT:  Yes, he may have.  I couldn't see it on my

25   screen because it was already too far down.

O3QASEC3                    Kol - Cross

1          MR. KORNBLAU:  Correct.  I understand.

2     Q.  The question, just to go back, Mr. Kol, aside from this

3     document was just, do you remember reading any announcements as

4     part of your due diligence at Galaxy that stated that Chai

5     merchants received payment in Fiat currency?

6     A.  Yes.  At some point they're meant to receive Fiat currency

7     from a transaction.  Many transactions might occur in

8     stablecoin, but at some point at the end of it they're meant to

9     receive Fiat so they can continue to pay their bills and

10    conduct their operations.

11         MR. KORNBLAU:  We can take down the exhibit.  That's

12    fine.

13    Q.  And on --

14         THE COURT:  You know what, counsel, in fairness, I

15    don't think you're going to be able to finish today and we do

16    have redirect.  So I'm going to interrupt now and excuse the

17    jury and we'll continue with this witness first thing tomorrow.

18         So, ladies and gentlemen, we will start at

19    9:30 tomorrow.  Today was special.  But tomorrow we'll start at

20    9:30.  You've been very prompt up until now so keep up the good

21    work and we'll see you tomorrow at 9:30 with appropriate

22    T-shirts I'm sure.  See you tomorrow.

23         And you can step down.

24         THE WITNESS:  Thank you.

25         (Continued on next page)

1            (Jury not present)

2            THE COURT:  Please be seated.  Although the SEC has

3     been sparing in its objections, and this is an adversary

4     system, I have an obligation to keep this case moving and to

5     not let the jury be confused.  And I think the

6     cross-examination of all three of the witnesses so far has

7     dealt substantially in irrelevance.  This is a fraud case.  The

8     question that the jury has to decide and that the SEC has the

9     burden of proving is that lies were told to the investors in

10    order to induce their investments or to effect their decision

11    not to sell as the case may be.

12            The cross-examination has dealt with such things as

13    economics 101.  I am so thrilled to hear about supply and

14    demand and the laws relating to it, and of course, I was

15    completely ignorant of that previously, as was every juror in

16    the world.  And I'm also thrilled to learn about cataclysms

17    that may occur, so that even something that's being represented

18    as stable could be potentially unstable.  But I don't see the

19    relevance more than tangentially of 90 percent of that.

20            And in my 28 years on the bench, I've never yet before

21    had to set time limits on direct and cross-examination,

22    although my colleagues do it regularly.  But I'm getting very

23    close to doing that in this case.  So I want to see a much more

24    pinpointed examination by both sides starting tomorrow morning.

25    That concludes today's proceeding.

O3QASEC3                          Kol - Cross

1          MR. PATTON:  Your Honor, could we just be heard on

2     that point because I think it's important moving forward.

3          THE COURT:  Yes.

4          MR. PATTON:  We obviously want to be on track

5     relevance wise with what the Court views is relevant, but I

6     want to explain why I think those things are relevant because

7     it is going to be important moving forward.

8          The SEC has listed specific statements both by Terra

9     and to Do that it claims are false.

10          THE COURT:  Yes.  And indeed, in response to your

11     request, I required them to list the definitive amount in the

12     amended.  And it's been remarkable to me how virtually none of

13     the cross-examination has ever referred to those.

14          MR. PATTON:  Well, I think it is referring to those,

15     your Honor.

16          THE COURT:  By way of JPIP --

17          MR. PATTON:  No, your Honor.  A lot of the statements

18     that the SEC -- I believe the SEC in its opening talked about

19     how these things were marketed as guarantees, as having no

20     risks.  The first witness they called talked about how it was

21     risk free.  It was akin to putting something in a savings

22     account.  They're clearly relying heavily on a broad notion

23     that statements that Terra and Do made were either misleading

24     or false.  Misleading because they didn't provide the full

25     context.  And so this all goes directly to those points.

O3QASEC3                    Kol - Cross

1        THE COURT:  I don't see how.  I come back to the fact
2    that this is a fraud case where they have to show that the
3    statements were intentionally false.  Yes, they also have to
4    show materiality.  But materiality is -- I can't imagine or
5    recollect a case or even remember reading a case where they're,
6    in a context of investment, if you knew that someone was
7    intentionally lying to you about anything other than a really
8    peripheral matter, it wasn't material.
9        So I don't see how any of this bears on materiality
10    and it certainly doesn't bear on whether an individual's
11    statement was or was not a lie.  That's the issue.
12        MR. PATTON:  I don't disagree.  And maybe we can --
13    maybe the SEC's claims need to be narrowed in that respect as
14    well, because it strikes me that their claims are broader than
15    that and we are --
16        THE COURT:  Well, they were originally and that's why,
17    at your request, I narrowed it to specific statements that they
18    had to specify.  And if you're saying that in some of their
19    direct they have been similarly overbroad, that may well be.
20    That's why I'm addressing this point to both sides.
21        MR. PATTON:  It's not just that.  It's also the
22    specific statements they've identified are broad.  And the
23    theories that they've been arguing and asking the questions of
24    the witnesses go to that broader theory.
25        THE COURT:  If, for example, I'll just do this as a

1    hypothetical because I don't have the joint pretrial order

2    right in front of me.

3            But if a statement alleged to be false is, in my

4    hypothetical, that there is no ordinary risk to this

5    instrument.  And then your cross is all about how unusual

6    extraordinary risk may still exist, that's an irrelevancy.

7    Because in my hypothetical, the statement was in the ordinary

8    course, there will be little or no risk.  So the fact that you

9    and everyone else in the world knew that if a tornado followed

10   by a hurricane followed by a COVID outbreak occurred, that

11   might be an undisclosed risk is neither here nor there.

12           MR. PATTON:  I agree.  I don't think that's what we're

13   dealing with though.

14           THE COURT:  Well, I've heard some things about, oh,

15   and if there's no person who's willing to purchase, then the

16   whole thing is going to collapse.  That's right.  But that's

17   not the representation or the context of the representation

18   that's being made.  It wasn't that the statements that are

19   being attacked are not of the form, oh, but if the world should

20   end tomorrow, all bets are off.

21           So it's neither here nor there.

22           MR. PATTON:  But to use some of what the SEC has

23   been -- they have been saying this was marketed as an

24   algorithmic stablecoin, in that it would automatically come

25   back to peg.  Right?

O3QASEC3                    Kol - Cross

1           THE COURT:  Yeah.  And if that's not what -- there are

2      two responses to that.  One is to your -- the cross that I

3      thought has been relevant is to say, well, that's not exactly

4      what they said.  That's fair enough.  That's pinpointed to what

5      they're alleging is the false statement.  But it's gone well

6      beyond that.

7           MR. PATTON:  Well, if they're also saying that some

8      of -- I mean, there are clearly statements that I think

9      everybody would agree with that the SEC has identified that are

10     true statements.  But so clearly they must be arguing that they

11     were in some way misleading.  Because additional information

12     wasn't given that should have been given.  And so it is

13     important to --

14          THE COURT:  Well, if you and they want to take some

15     time tomorrow morning, we can convene at 9:00 and go through

16     those statements and see if there are any that they're no

17     longer pursuing.  But I continue to think that a great deal of

18     the testimony has not been focused, by either side perhaps, but

19     certainly in the cross on the issues in the case.  And that's

20     my problem.

21          MR. PATTON:  Your Honor, if I could just raise a

22     related but --

23          THE COURT:  Well, you can't because I've got to leave

24     for teaching at Columbia, among other things, but we'll see you

25     at 9:00 tomorrow.

O3QASEC3                          Kol – Cross

1            MR. PATTON:  Fair enough.  Thank you, your Honor.

2            THE COURT:  Thank you.

3            (Adjourned to March 27, 2024, at   9:00 a.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<pre>
 1                      INDEX OF EXAMINATION

 2   Examination  of:                            Page

 3   BORIS REVSIN

 4   Direct By Ms. Cuellar . . . . . . . . . . . 238

 5   Cross By Mr. Ferrara . . . . . . . . . . . . 276

 6   Redirect By Ms. Cuellar . . . . . . . . . . 333

 7   JONATHAN MOSHE KOL

 8   Direct By Ms. Meehan . . . . . . . . . . . . 337

 9   Direct By Ms. Meehan . . . . . . . . . . . . 349

10   Cross By Mr. Kornblau . . . . . . . . . . . 374

11                     PLAINTIFF EXHIBITS

12   Exhibit No.                              Received

13    24a, 24b . . . . . . . . . . . . . . . . . 244

14    27b  . . . . . . . . . . . . . . . . . . . 257

15    29   . . . . . . . . . . . . . . . . . . . 264

16    32   . . . . . . . . . . . . . . . . . . . 266

17    31   . . . . . . . . . . . . . . . . . . . 271

18    2  . . . . . . . . . . . . . . . . . . . . 355

19    3  . . . . . . . . . . . . . . . . . . . . 359

20    8  . . . . . . . . . . . . . . . . . . . . 364

21                     DEFENDANT EXHIBITS

22   Exhibit No.                              Received

23    4  . . . . . . . . . . . . . . . . . . . . 384

24

25
</pre>

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300