O3RHSec1

```
1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   SECURITIES AND EXCHANGE
    COMMISSION
4
                Plaintiff,
5
            v.                      23 Civ. 1346 (JSR)
6
    TERRAFORM LABS PTE LTD. , et
7   al.

8               Defendants

9   ------------------------------x
                                    New York, N.Y.
10                                  March 27, 2024
                                    9:05 a.m.
11
    Before:
12
                        HON. JED S. RAKOFF
13
                                    District Judge
14                                  –and a Jury–

15
                            APPEARANCES
16
    UNITED STATES SECURITIES AND EXCHANGE COMMISSION
17       Attorneys for Plaintiff
    By:  JAMES P. CONNOR
18       DEVON STAREN
         CARINA CUELLAR
19       LAURA E. MEEHAN
         CHRISTOPHER J. CARNEY
20       ROGER LANDSMAN

21

22

23

24

25
```

O3RHSec1

1                          APPEARANCES (Cont'd)

2    DENTONS US LLP
          Attorneys for Defendant Terraform
3    BY:  LOUIS A. PELLEGRINO III
          DAVID KORNBLAU
4         MARK CALIFANO
          DOUGLAS W. HENKIN
5         MATTHEW A. LAFFERMAN

6    KAPLAN HECKER & FINK LLP
          Attorney for Defendant Kwon
7    BY:  MICHAEL FERRARA
          CHRISTOPHER MOREL
8         DAVID E. PATTON
          ANDREW CHESLEY
9         SEAN HECKER

10   Also Present:

11   Shadow Haywood, SEC Trial Assistant
     Armando Aquino, Defense Trial Assistant
12

13

14

15

16

17

18

19

20

21

22

23

24

25

O3RHSec1

|     |                                                                    |
| --- | ------------------------------------------------------------------ |
| 1   | (Trial resumed; jury not present)                                  |
| 2   | THE COURT:  I understand the defense has a motion.                 |
| 3   | MR. PATTON:  Yes, your Honor.  David Patton for                    |
| 4   | Mr. Kwon.  Yesterday during Mr. Kornblau's examination of          |
| 5   | Mr. Kol, Mr. Ferrara objected to some of the Court's               |
| 6   | questioning, and ——                                                |
| 7   | THE COURT:  I think there were only two questions.                 |
| 8   | MR. PATTON:  That's correct.  And it's those questions             |
| 9   | that we think —— your Honor overruled the objection.  We think     |
| 10  | that the Court's questioning was highly problematic, and as        |
| 11  | such, we have a motion for a mistrial.                             |
| 12  | And I'll explain.  I don't know if the Court would                 |
| 13  | like me to —— the questioning is at page 389.  It sounds like      |
| 14  | the Court is familiar with what I'm discussing.                    |
| 15  | THE COURT:  Yes.                                                   |
| 16  | MR. PATTON:  The Court's question was:                             |
| 17  | "Let me ask you this, though, in the list of risks in              |
| 18  | this white paper or in any white paper that you've ever seen,      |
| 19  | have you seen one of the risks is that the offerers of this        |
| 20  | product will lie to you?"                                          |
| 21  | The witness answered:  "Never have I seen such a                   |
| 22  | thing."                                                            |
| 23  | Mr. Ferrara interjected:  "Your Honor."                            |
| 24  | The Court continued:  "Excuse me.                                  |
| 25  | "And if you had seen that, would you ever have                     |

1    invested in such a product?"

2              And the witness answered:  "Most definitely not."

3              Mr. Ferrara objected and the Court overruled it.

4              So our objection, the pieces of this that we found

5    objectionable, obviously, the Court may ask witnesses

6    questions, may do so to clarify points that may be confusing.

7    And there are certainly issues in this case that can use

8    clarifying, but we don't believe this question was clarifying.

9    I don't think it could be perceived by the jurors as a genuine

10   search for information.  I don't think anybody thinks any

11   agreement has a clause in it that says beware of the risk that

12   I may lie to you.

13             So we think instead it was surely perceived as the

14   Court injecting what is, in essence, the SEC's view of the

15   case.  I think we would have objected to the question even if

16   the SEC were asking it, but it's even more problematic when it

17   comes from the bench.  And it, in front of the jury, appears to

18   pit us against the Court.

19             I'll take the first piece of that first, which is

20   just, regardless of who might have asked that question, that it

21   would be problematic.  And here I'm referring to a case Saint

22   Lawrence.  This is United States v. — sorry, Lawrence, *United*

23   *States v. Lawrence*, 767 F.App'x 77 (2019).  This is a Second

24   Circuit case reviewing Judge Seibel's instruction to a jury —

25   well, let me back up.

1          Throughout the trial, the questioning had proceeded in

2     a fraud case along the lines of hypotheticals that if you

3     learned that there was an intentional lie or if you learned

4     that somebody had intentionally lied to you, would you have

5     done this, similar to some of the questioning we've had here.

6     And Judge Seibel had allowed that initially but then changed

7     course.

8          On the ninth day of testimony, the district court

9     raised the issue of whether such testimony could have the

10    effect of suggesting that any false statement made

11    intentionally would automatically be material.  After overnight

12    briefing from the parties, the district court struck the

13    testimony and instructed the jury not to consider questions

14    along the lines of if you learned that . . . there was an

15    intentional lie or if you learned that somebody had

16    intentionally lied to you, and the Second Circuit found that

17    that curative instruction was sufficient.

18          But as problematic as that line of questioning is,

19    when it's coming from a place the jury surely expects it to

20    come from, which is opposing counsel, here, having it come from

21    the bench, really does suggest that the Court is adopting that

22    viewpoint.  And here I would refer to the Second Circuit

23    opinion in *Rivas v. Brattesani*, and this is 94 F.3d 802 (1996).

24    And there the Court reversed in a civil case, an excessive use

25    of force case, based on judicial questioning.  And in doing

1    so — so one of the questions was the Court questioning a

2    police officer, where there was some credibility issues, and

3    the Court asked:  "So that your memo book becomes a fraud that

4    you make up at the end of the day?"

5                "Objection, objection to the characterization."

6                The Court clarified:  "Is the memo book made up at the

7    end of the day?"

8                And the witness denied it:  "No, your Honor, it's made

9    up right after I get back into the car."

10                And in reversing, the court held:  "Our view in this

11    regard is particularly influenced by the fact that in this

12    case, due to the sharply conflicting testimony of plaintiffs

13    and defendants, the court's use of the word 'fraud' in his

14    questioning of Brattesani was potentially fatal to defendants'

15    case."

16                And likewise here, the Court using the word "lie," I

17    think that's, obviously, one of the ultimate questions here is

18    whether, in fact, Mr. Kwon or the company lied.  And so to use

19    what is, in part, anyway, leaving aside the materiality

20    question that I raised in the case involving Judge Seibel, but

21    certainly whether or not there were false statements and

22    whether or not there was a lie is a big part of the case.

23                And lastly, I would just say on that score, the Second

24    Circuit has long talked about how much influence judges'

25    comments can have on a jury as compared to the parties.  And so

O3RHSec1

now I'm talking about *U.S. v. Grunberger*, which is a 1970

Second Circuit case but has been cited over the years.  That's

at 431 F.2d 1062, and here I'm reading at 1067:

"As a result of the court's varying style of

interrogating the prosecution's prime witness and the

defendant, the jury might have received the impression that the

judge believed Berger's version of the facts to be the most

plausible of the two versions.  As has often been said, the

influence of the trial judge on the jury is necessarily and

properly of great weight, and his lightest word or intimation

is received with deference and may prove controlling."

And it goes on to say:  "Moreover, instructions given

in the charge to the jury that they are the sole judges of the

credibility of the witnesses cannot remove the impression so

created."

So that's why we feel compelled to move for a

mistrial, your Honor.

THE COURT:  All right.  Thank you.

The motion is denied.  In the Court's view, it borders

on the frivolous, and let me tell you why.

First, it is important for any judge to make sure that

issues are clarified for the jury and that the matter and the

case moves with expedition and focus.  In this case, the Court

has been very distressed that the three witnesses who have so

far testified, three investors, whose testimony, if properly

O3RHSec1

1    focused, in the Court's view, would have taken no more than a

2    half-hour apiece, probably less, has taken many hours from each

3    side.  And just to illustrate the point, this is a case about

4    lying, and the defense from the very outset said that, although

5    materiality was involved, its main defense was that there were

6    no lies.  So that's the issue for the jury.

7            The SEC, in its direct of these witnesses, in the

8    Court's view, should have therefore more or less limited itself

9    to saying:  Did you invest in Terraform?  Did you receive

10   information from Terraform?  What was it?  And then focus on

11   the specific items that the SEC says were the lies.  If they

12   were affirmative lies, just said, Was that important to you?

13   If they were lies that are alleged to be misleading in nature,

14   then the question would have been, What was your understanding

15   of what was being said in that representation?  And that would

16   have been it.

17           Then defense counsel should have pointed out that the

18   witnesses had no personal knowledge of whether these were lies

19   or not.  That would have been something quite relevant for the

20   jury to know.  That question was never put.  And then to the

21   extent that materiality was involved, could have explored why

22   or why not the particular representations were or were not

23   important.

24           Instead what we saw from both sides —— but, frankly,

25   particularly from the defense —— was a series of irrelevancies

1    and smoke screens.  There was all this stuff that went on for

2    hours about how every investment involves some risk.  So what?

3    How does that relate to any issue in the case?  The specific

4    representation, one of the two that the SEC is focusing on, is

5    that a representation was made that investment in Terraform

6    would be at reduced risk through the algorithm and its

7    implementation.  But instead we had all sorts of stuff about

8    supply and demand.  We had all sorts of stuff that —— about

9    other risks that were disclosed.  This was, at best, very

10   tangentially relevant.  And the Court, therefore, felt an

11   obligation and will continue to feel an obligation to make sure

12   that the jury is focused on the real issues in the case, which

13   is why I put the questions I did.

14           Excuse me.  Sit down, counsel.  I'm not through.

15           Now, the Court by its questions —— which actually I

16   think were similar to questions that the SEC had put to

17   Mr. Revsin on rebuttal —— but, in any event, the Court, in its

18   questions, was simply trying to refocus the jury on the issue

19   in the case, and I think that's all that was implicit or

20   explicit.  I always give a charge as part of my final charge to

21   the jury that the Court has no opinion of the merits of the

22   case, that's their job, and that my questions were only

23   intended to clarify matters or to expedite the proceedings, in

24   this particular instance, both.

25           But I'm happy, if the defense wants, to give that

O3RHSec1

instruction right now to the jury so the jury is under no

misimpression, but I don't think they could be.  I think what

we did see was a long series of total irrelevancies or

marginally relevant inquiries from the defense.  And if I

weren't such fans of the defense lawyers, I would say that the

inference could be drawn that it was an attempt to mislead the

jury and refocus them from the actual issues in the case to

issues that are not in the case.

Now, I've tried very hard over the last two days to,

if anything, err on the side of being receptive to defense

assertions.  So, for example, I precluded the SEC from making

the argument that the failure to register was itself part of

the fraud, even though the SEC had meaningful arguments to that

effect.  I precluded the SEC from arguing that Mr. Do Kwon was

responsible for his absence from this trial, even though I

think there are substantial arguments to that effect.  I've

allowed the defense to include in the deposition of the

30(b)(6) witness material changes disguised as errata, even

though I think there were strong arguments for keeping them out

in the case of a 30(b)(6) witness, and so forth.

So I'm quite taken aback when a simple couple of

questions from the Court designed just to focus the jury on the

issue that involves these particular witnesses should be met

with this motion.  But I respect the right of defense counsel

to make any motion they want, however frivolous it may be, and

1       this one is denied.

2               There's some other business —— yes.

3               MR. PELLEGRINO:  Your Honor, if I may, Louis

4       Pellegrino for Terraform.  It wasn't made clear at the outset.

5       We didn't have a chance to rise.  I just need to make clear for

6       the record that Terraform defendants join in Mr. Patton's

7       motion.

8               THE COURT:  I understand that.

9               MR. PATTON:  Just two things.

10              THE COURT:  By the way, in the future I'm not going to

11      allow a lot of that with questioning that occurred with these

12      witnesses.  Now, it may not come up with other witnesses, but

13      the SEC did not object, and that's why I did not intervene

14      sooner, but it was getting just totally out of hand.  One

15      irrelevant question after another.

16              MR. PATTON:  Just on the broader point, your Honor, I

17      think that that line of questioning is really vital to

18      defending against very specific claims that the SEC has made

19      and included in the pretrial order.  So, I mean, there are a

20      lot of statements, so I'm not going to go through all of the

21      ones it's relevant to.  But some that really stand out, these

22      are quotes that the SEC is claiming are false.

23              THE COURT:  No, that's what we're —— my recollection

24      is that's what we're going to do this morning is go through

25      each of them and see exactly which ones they're pursuing.  I

O3RHSec1

1    thought that's what we had arranged.

2            MR. PATTON:  That would be terrific, your Honor.  We

3    asked the SEC last night if there were any that they were

4    withdrawing or to ask them for further explanation about why

5    they thought some of these were false.

6            THE COURT:  I don't want to limit my criticism, since

7    I'm on a roll, to the defense.  I'm amazed that the SEC with

8    these investor witnesses hasn't said to them specifically:  OK.

9    You've told us now what you saw that Terraform had said to you

10    or written to you or published, or whatever.  Now, focusing on

11    X, was that important to you?  But instead we just had a sort

12    of catchall of things.

13            And the SEC stated in its opening statement, as stated

14    throughout this case, that it's essentially making two

15    assertions of fraud.  One is that the investor in Terraform was

16    being assured that while no investment is risk-free, of course,

17    in this case the risk had been reduced through an algorithm

18    operating in a particular way, which the SEC alleges was false.

19    And the second was that the investor was told that the

20    investment —— excuse me, that the Terraform platform was

21    already being so successful that another important company,

22    Chai, was utilizing it, and that was false.

23            I don't think they have changed from that, but,

24    certainly, I want more focus from the SEC on that.  And in my

25    wild dreams, I would like to think that defense counsel might

1    want to focus on the issues in the case as well.

2              MR. PATTON:  Your Honor, could I just, as a broader

3    point in terms of what the SEC's position was on opening, their

4    headline-grabbing quote was "this was a house of cards," and

5    they actually used the term "risk free," not reduced risk, and

6    they did that through their first witness, too, who said I

7    thought this was risk free.  So they have gone well beyond

8    saying that the problem had to do with reduced risk.  They've

9    gone well beyond that.  They've described Terraform Labs as a

10   house of cards, and a lot of ——

11             THE COURT:  Nothing that counsel says in openings is

12   evidence.  I've already told the jury that.

13             MR. PATTON:  Sure.  But it goes to what their position

14   is, and it's aligned with a whole lot of statements that I

15   understand we're going to go through, but that do go well

16   beyond ——

17             THE COURT:  The point is there's a huge difference

18   under any —— if the defense justification for spending hours,

19   literally hours, on questions about various risks was that

20   there's always some risk to every investment.  That could have

21   been done with one question:  Isn't it true, Mr. Investor ——

22   and that could have been a question put to each of the three

23   investors.  I don't believe it was —— that no investment is

24   risk free?  But that wasn't where you went.  You went through,

25   you and your colleagues, through all sorts of stuff about how

O3RHSec1

supply and demand operate, how in this situation such and such

could occur, in that situation such and such could occur,

whereas the issue, so far as risk is concerned, is was it

falsely represented that risk was materially reduced or was it

not; or as you said in your opening, was that not the

representation, or if it was, was it a truthful representation?

MR. PATTON:  If I may, your Honor, just one very

simple example of this among the many quotes.  One of the

quotes that the SEC claims is false is "the protocol will keep

arb opportunities open.  Even if the incentives to do so are

dislocated during ephemeral market turmoil, the incentives

realigns and the system heals."  They're claiming that's a

false statement, and I think that does require —— I don't think

we've belabored this beyond what is necessary, but I do think

that does require some exploration of what Terraform said and

what Do Kwon said.

THE COURT:  Again, I find this really remarkable

because at your request I required them very shortly before

trial, because the request was only made very shortly before

trial, to spend several days of time that I'm sure was very

valuable to them for other reasons to amend the pretrial

consent order to specify exactly what they were claiming was

false.

I expected, indeed, I think it was almost incumbent on

you to say we see no basis for number three, number seven,

O3RHSec1

number nine being assertions, and so what we're about to do
would have done before the trial began or during the
discussions of motions *in limine*.  And now you are saying,
well, we chose not to do that then.  We only asked for it last
night, so now we're asking for it.

MR. PATTON:  So I guess I would respond in two ways:
One, in the fairly voluminous briefings, summary judgment and
otherwise, I think we did join issue on a lot of these issue,
but ——

THE COURT:  All the more reason, if they included
something in their pretrial consent order that you believe is
contrary to what the Court held on summary judgment —— I don't
think that necessarily is true —— but if it is true, then that
would have been an easy motion to make:  Judge, strike that one
because it was already disposed of in summary judgment.

MR. PATTON:  I don't know that this specific issue was
disposed of, but it's certainly the SEC making the factual
assertion this claim was false, and I think we're permitted to
join on that issue and to say, no, it wasn't false.  Here's
exactly what Terraform and Do were saying about the incentives
created by the algorithm.  And to do that, I think there has to
be some very basic understanding of how those incentives work.
That was my only point, your Honor.

THE COURT:  Anything the SEC wanted to say?

MR. CONNOR:  Yes, your Honor.  We join with the

1    Court's.  We think this —— we join with the Court and think

2    that mistrial motion is entirely meritless.

3              I would like to address some of the statements in the

4    pretrial order.  Our pretrial order was very specific and was

5    tied to the statements that we put forward in our summary

6    judgment papers.  On the Jump fraud scheme, we have five

7    statements made on five specific days, and we have identified

8    exactly what we say is false and misleading.  None of those

9    have to do with that there is absolutely no risk whatsoever

10   with any investment.  None of those have to do with the depeg

11   of the British pound, which was the subject of a bunch of

12   questions in the cross-examination.  So we think the pretrial

13   consent order in which we laid out exactly what was false,

14   which was backed up by our summary judgment briefing, has given

15   the defense counsel all the notice they need to challenge these

16   false and misleading statements.  The questions to the

17   witnesses, though, were just not related to any of these false

18   and misleading statements.

19             I think the other point that I think bears repeating

20   is the SEC's fraud claim in the context of these statements are

21   that Terraform Labs did not disclose to the public the secret

22   deal that they struck with Jump.  So on the next day when

23   they're saying that the algorithm healed and they're not

24   mentioning the fact that it healed because of a deal with Jump,

25   that's what's misleading, and none of their questions have been

1       about that which is actually the essence of the fraud.

2                THE COURT:  I think it's quite correct, and, again,

3       was part of my motivation in interrupting, that they never

4       joined with the major assertions being made by the SEC.  Even

5       if I accepted, which I don't think I do, the claims, as being

6       made by defense counsel, that this was responsive to one

7       particular representation mentioned in the pretrial order, to

8       spend hours on stuff related to that where the jury's already

9       been told from not only counsel but from the Court in its

10      preliminary instruction, here are the basic issues, and just

11      ignore that, I think the nicest thing I can say about it is

12      that it's a royal waste of time.  It might also be construed as

13      a smoke screen.  It might also be construed as an attempt to

14      confuse the jury.  And the Court is not going to allow any of

15      that to occur.

16               MR. CONNOR:  The other point I'll make, your Honor, is

17      this notion of an automatic self-healing, that is not something

18      the SEC has said.  That is what Mr. Kwon said.  This is a

19      specific misstatement that we have in there.  So that's why the

20      notion that they're saying that this was not automatic

21      self-healing is contrary to what Mr. Kwon actually said.

22               As far as Tribe's misreps, I don't think we need to go

23      into those.  Those are very specific.  On specific days here is

24      what he said.  He said that Chai settled on the Terra

25      blockchain.  Our is that is absolutely not true, so that's the

1    basis of our fraud claims with respect to Chai.

2        MR. PATTON:  Your Honor, can I just address ——

3        THE COURT:  I thought your colleague also had risen.

4    I don't know whether he had something to say.

5        MR. PELLEGRINO:  I have a housekeeping later, measured

6    later, your Honor, but let's resolve this.

7        MR. PATTON:  I want to be clear.  The one statement I

8    gave that the SEC claims is false is one of many.  Can I give

9    one other example that I think really goes to the heart of this

10   as well?

11       The SEC again, in its list of statements they claim

12   are false or misleading, they screenshotted a tweet from

13   someone else that Do Kwon then responded to, and what he's ——

14   the screenshot they give is a critic tweeting:  "The TerraUST

15   stablecoin could collapse in a bank run effect.  UST is backed

16   by an endogenous collateral Luna.  Current Luna market cap has

17   fallen to arguably less than outstanding UST.  We are now in a

18   dangerous spiral.  As users panic out of UST, this reinforces

19   the Luna crash further."

20       And Do's response that they're claiming is false is:

21   "The death spiral of a bank run applied to Terra's seigniorage

22   shares-style money policy is also not an apples-to-apples

23   comparison."

24       So they're claiming that's false.  So we need to —— we

25   need to be able to counter that.  That requires explaining what

O3RHSec1

1      a death spiral is, that it was being publicly discussed, and

2      that he was explaining it's not quite the same as a bank death

3      spiral.

4              THE COURT:  Again, I'm mystified by what you're

5      saying.  The term "death spiral" is a term that has many

6      meanings, even in the financial world, and so to ask a witness

7      what it means is neither here nor there when the representation

8      is that when Mr. Kwon and the person he was messaging or

9      interfacing with referred to it.  So the relevant inquiry would

10     be either to put that exhibit into evidence and make arguments

11     about that, regardless of any witness, or if there's a witness

12     who can testify about it, such as some of the witnesses we may

13     hear from in the next few days, put that before it.  But to ask

14     an investor what is meant by a death spiral and isn't —— would

15     you describe if X, Y, and Z happened that that's a death spiral

16     is a total irrelevance.

17             MR. PATTON:  But, your Honor, if the SEC is

18     claiming ——

19             THE COURT:  And at the age of 80, of course, I'm very

20     much focused on words like "death spiral."

21             MR. PATTON:  To the extent that the SEC, though, is

22     claiming that Do's use of that term is false or misleading and

23     his very public statements ——

24             THE COURT:  In context.

25             MR. PATTON:  Absolutely.

O3RHSec1

1          THE COURT:  But that was not — these investors were

2     not privy to that exchange.

3          MR. PATTON:  But they're under — but investors'

4     understanding of what Do is saying when he's talking about the

5     possibility of a death spiral goes to the heart of whether or

6     not these were material, whether they were false or misleading

7     in context of all the things that Do and Terra were talking

8     about in this space.  It just strikes me —

9          THE COURT:  I'm not sure that that was — that

10    particular exchange was showed to any investor who testified

11    here.

12         MR. PATTON:  We don't know what's going to be shown

13    tomorrow, which statements there — they have —

14         THE COURT:  No, no, no.  So this is another problem

15    I've had with a lot of questions from the defense:

16         Have you ever seen this article?

17         Well, I don't think I did.

18         Well, how could you not know that the mainstream media

19    — that was the term used by your colleague when he was

20    referring, in fact, to a quote from a Canadian professor that

21    was hidden deep in a *Wall Street Journal* article.  Now it was

22    the mainstream media has revealed this risk.  Both those

23    questions, once he had said he hadn't seen the article, were

24    completely irrelevant.  Now, I do fault the SEC for not

25    objecting.  Sometimes they did.  But that's the kind of thing

O3RHSec1

1    that went on and on and on.

2           MR. PATTON:  Your Honor, I don't think somebody who's

3    at a very wealthy institutional organization like a venture

4    capital fund or now we have somebody from Galaxy, the single

5    biggest player in the crypto space, saying you did diligence on

6    these things and to explore the fact that Terra was out there

7    with all sorts — engaging with all sorts of discussions about

8    risks, and these discussions were out there in places like *The*

9    *Wall Street Journal*, and Terraform and Do Kwon were engaging

10   with those criticisms, to have somebody at Galaxy —

11          THE COURT:  I'm sorry, that's not in accordance with

12   something as basic as the Rules of Evidence.  If he says he

13   hasn't seen the article, wasn't a question of not being

14   refreshed or anything like that, he hasn't seen the article,

15   that's the end of it.

16          MR. PATTON:  And I think —

17          THE COURT:  If you want to present it to another

18   witness, fine.  You tried it, if I recall, your colleagues,

19   with all three witnesses.

20          MR. PATTON:  Your Honor, we've obviously argued that

21   point before.  I think that was the end of it.  So I don't

22   think we've belabored things where your Honor has sustained an

23   objection to going beyond that.

24          THE COURT:  Well, OK.  I'm now concerned it's already

25   9:45, so I think we need to bring in the jury, finish with the

O3RHSec1

1    witness who is on the stand, and then we'll see where we go

2    from there.

3              So bring in the jury and bring in the witness.

4              MR. PATTON:  Your Honor, could we at some point —— we

5    don't have to do it right at this moment —— but at another

6    break could we perhaps follow up with your Court on the

7    possibility of a curative instruction?

8              THE COURT:  Sure.  I'm happy to do it right now with

9    the jury if you want me to, but if you don't want me to, that's

10   fine.

11             MR. PATTON:  I think it would be easier if we had a

12   concrete proposal for your Honor.

13             THE COURT:  I'll tell you the instruction I always

14   give, which is that, ladies and gentlemen, you've heard my

15   questions.  Please be aware I have no opinion about any issue

16   in this case.  My questions are just designed for clarification

17   or to move things forward.

18             MR. PATTON:  We would certainly appreciate that, your

19   Honor, but I think we might also want something that's more

20   specific to the issue we raised.

21             THE COURT:  All right.  Well, I'll wait to see what

22   you come up with.

23             MR. PATTON:  Thank you, your Honor.

24             (Continued on next page)

25

1            (Jury present)

2            THE COURT:  Good morning, ladies and gentlemen.

3    Please be seated.

4            Thank you once again for your promptness.  Counsel and

5    I were having so much fun discussing other matters that we

6    barely could tear ourselves away.  But we're ready to continue

7    now, so let's get the witness on the stand.

8            Go ahead.

9            MR. KORNBLAU:  Thank you, your Honor.

10   JONATHAN MOSHE KOL, resumed.

11   CROSS-EXAMINATION CONTINUED

12   BY MR. KORNBLAU:

13   Q.  Good morning, Mr. Kol.

14   A.  Good morning.

15   Q.  We haven't spoken since you finished testifying yesterday,

16   is that right?

17   A.  That's right.

18   Q.  Did you speak to the SEC?

19   A.  No.

20   Q.  As part of your due diligence at Galaxy, Mr. Kol, did you

21   listen to Do Kwon speak on any podcasts?

22   A.  I can't recall if they were podcasts specifically, but

23   certainly there were things that were similar to a podcast.

24   Maybe a YouTube —— YouTube talk or a live stream or something

25   of that sort.

O3RHSec1                         Kol - Cross

1    Q.  Just a quick question.  Do you remember any podcasts or

2    YouTube with gentleman named Anthony Pompliano?

3    A.  Yes.  But that I can tell you distinctly I very unlikely to

4    have listened to.

5    Q.  Did not.  OK.  Thank you.

6           We spent some time yesterday, do you remember,

7    Mr. Kol, talking about the white paper from 2018?

8    A.  Yes.

9    Q.  And we're not going to go over a lot of details there

10   again, but I think you said yesterday that at that time that

11   was before the launch of the Terra blockchain, is that correct?

12   A.  Correct.

13   Q.  And so would it be fair to describe that white paper as a

14   proposal?

15   A.  Sort of.  It is a —— it's a description of what they're

16   going to build.  So I think you can consider it a proposal.

17   Q.  I guess I want to go through quickly.

18          Do you recall they actually used the word "we propose"

19   in the white paper?

20   A.  Yes.  It's a standard kind of academic language where the

21   author says we propose this construction to do these things.

22   Q.  Thank you.

23          All right.  Now, in your direct testimony, the SEC

24   showed you the memo that you wrote at Galaxy when you were

25   recommending that Galaxy purchase Luna, correct?  Do I have

O3RHSec1                          Kol - Cross

1    that right?

2    A.  Correct.

3    Q.  And that is Plaintiff's Exhibit 8.

4            Can we, Mr. Aquino, just bring that up.  It's already

5    in evidence.

6            Is this that memo?

7    A.  Yes.

8    Q.  Again, I'm going to try to just move quickly through this.

9            If we go to page 8, there was a description — you had

10   a description of risks involving the purchase of Luna, is that

11   right?

12   A.  Yes.

13   Q.  And if you look under the paragraph there that says "Luna

14   supply expansion risk," there's a reference to a risk of a

15   downward spiral in Luna price.  Do you see that?

16   A.  Yes.

17   Q.  Is that the same risk we were discussing yesterday in the

18   2018 white paper?

19   A.  We discussed a couple, but I would say this is in line with

20   the risk outlined in the white paper.

21   Q.  And that was presented to Mr. Novagratz when he made the

22   decision to buy Luna on behalf of Galaxy, isn't that correct?

23   A.  Correct.

24   Q.  OK.  Then, again, I don't want to spend a lot of time on

25   this, but the next paragraph, Luna liquidity risk, you wrote in

O3RHSec1                          Kol – Cross

1    your memo that there was a risk if users are not able to easily

2    sell Luna received for stablecoin deposits, the peg mechanism

3    is at risk.

4            You wrote that, right?

5    A.  Yes.

6    Q.  Can you just explain briefly what that means for everyone

7    so we can understand it and in maybe simple terms.

8    A.  Of course.  As we talked about yesterday, there was this

9    mechanism, this system, what we call the algorithm.  And for it

10   to be able to function, it does require that there will be

11   liquidity in these assets, because if you —— if you give it one

12   thing and it gives you another and its —— its success at the

13   task of maintaining the peg depends on your doing that or some

14   agent doing that, then you need to be able to sell the thing

15   that it gives to you.  And that really does depend on there

16   being a market for it.

17           So that's what I mean by liquidity, is there someone

18   who is willing to buy this thing for you?  And so it was a risk

19   that as someone who was observing this as a perspective

20   investment really needed to understand.

21   Q.  Thank you.

22           Mr. Aquino, can we put up for identification

23   Plaintiff's Exhibit P-9.

24           And while you're doing that, Mr. Kol, was there an

25   agreement signed by Terraform Labs and Galaxy regarding the

O3RHSec1                    Kol - Cross

1   purchase of the Luna tokens?

2   A.  Yes.

3   Q.  And if we can just — you see the front page of this

4   document that I'm showing you?

5   A.  Yes.

6           MR. KORNBLAU:  And if, Mr. Aquino, again — don't read

7   anything in it yet.

8           Mr. Aquino, if you can just turn to the very last page

9   that shows the signatures.

10  Q.  Do you see that, Mr. Kol?

11  A.  Yes.

12  Q.  Is this the — what is this?

13  A.  This is the — what's known as the signature block.

14  Q.  The whole document, what is the document?

15  A.  This is the document that outlines the terms of the

16  investment.  It in a general sense talks about how much the

17  purchaser will be purchasing, at what price, and what the

18  seller is obliged to give to the purchaser.

19          MR. KORNBLAU:  OK.  Again, we're not going to spend

20  much time on this document, but if we can go to, Mr. Aquino,

21  it's the page that's numbered 23.  I don't know what the PDF

22  number is.  Says "Schedule 5" at the top.

23          MS. MEEHAN:  Objection, your Honor.  This document is

24  not evidence.

25          MR. KORNBLAU:  Excuse me.  You're right.  I offer it

O3RHSec1                          Kol - Cross

1   in evidence.

2               MS. MEEHAN:  No objection to it coming in.

3               THE COURT:  Received.

4               MR. KORNBLAU:  Apologies.  Thank you for that.

5               (Plaintiff's Exhibit 9 received in evidence)

6   BY MR. KORNBLAU:

7   Q.  So there's a list of risk factors.  It begins on page 23

8   and it goes all the way to page 29.

9               Yeah, we can publish it to the jury, please.  We can

10  start on page 23.

11              Getting sloppy.  I had this yesterday.

12              All right.  Can the jury —— is it now published?  OK.

13  Thank you.

14              So starting on page 23, Mr. Kol, risk factors, you see

15  that, Schedule 5?

16  A.  Yes.

17              MR. KORNBLAU:  If we click through, Mr. Aquino.

18  Q.  They go all the way to page 29, is that correct?

19  A.  Correct.

20  Q.  So Galaxy was aware of the details of this document, is

21  that fair?

22  A.  Yes.

23  Q.  And so just to wrap up, so when Galaxy made the decision to

24  buy the $4 million of Luna, it was aware of the risks in your

25  memo, in the sale agreement, the results of your diligence.  It

1    took that all into account, correct, when it made that

2    decision, Galaxy?

3    A.  That is correct.

4    Q.  And would it be fair to say that the judgment was that the

5    potential upside outweighed the risks?

6    A.  That is correct.

7            MR. KORNBLAU:  No further questions, your Honor.

8            THE COURT:  Redirect.

9    REDIRECT EXAMINATION

10   BY MS. MEEHAN:

11   Q.  Just very briefly, your Honor.

12           Mr. Kol, yesterday my adversary, Mr. Kornblau, asked

13   you a number of questions about Defense Exhibit No. 4.

14           Mr. Haywood, if you could please pull that up for the

15   witness and the jury.

16           And, Mr. Kol, if we could just direct you to page 15

17   of that document.  It's Section 4.3.

18           If you recall, Mr. Kol, Mr. Kornblau asked you a

19   number of questions about what's contained in the first

20   paragraph here, is that right?

21   A.  That's right.

22   Q.  But what he did not ask you about was what follows in the

23   second paragraph here, right?

24   A.  I believe so.

25   Q.  Could you please read the first sentence of that second

O3RHSec1                         Kol - Redirect

1  paragraph for me, please.

2  A.  "As argued in the earlier sections, the stability reserve

3  is guaranteed to maintain a reserve ratio of at least 1 almost

4  consistently."

5  Q.  And if you could just continue through the next two or

6  three sentences ending at "Terra's collateral."

7  A.  "A price shock would trigger a strong transaction fee hike

8  that would offer significantly increased cash flow to Luna

9  holders for a predictable period of time.  This guarantee is

10  strengthened by the nature of Terra's collateral."

11  Q.  Thank you.

12         And if I could just turn — direct your attention to

13  page 19.  There's a section there that's called "Conclusion."

14  Is this section also something that you would have read when

15  you read this document, Mr. Kol?

16  A.  Absolutely.

17  Q.  And can you just read for me there the first paragraph of

18  the conclusion of this 2018 white paper.

19  A.  "Terra is the first price-stable cryptocurrency that can

20  make a guarantee of solvency with a reserve made up of

21  decentralized assets.  The price stability of such a regime

22  cannot be taken away by centralized actors nor attacked by

23  speculators.  Terra is an improvement on both fiat currencies

24  and Bitcoin, since it is safe from both speculative volatility

25  and political pollution of its monetary policy."

O3RHSec1                          Kol – Recross

 1  Q.  Thank you.

 2        You can take that exhibit down.  And, Mr. Haywood, if

 3  you could pull up Plaintiff's Exhibit 9.

 4        Looking at page 23, the section that Mr. Kornblau

 5  directed you to which discussed the risk factors, and if you

 6  could just take a minute to review those again, Mr. Kol.

 7        Do the risk factors included here include Terraform

 8  not being truthful to investors?

 9  A.  No.

10        MR. FERRARA:  Objection.

11        THE COURT:  Overruled.

12        MS. MEEHAN:  No further questions, your Honor.

13        MR. KORNBLAU:  Your Honor, maybe two questions on

14  redirect, if I may — recross, if I may?

15        THE COURT:  Go ahead.

16        MR. KORNBLAU:  Sorry.

17  RECROSS EXAMINATION

18  BY MR. KORNBLAU:

19  Q.  Mr. Kol, the 2018 white paper, that was a proposal,

20  correct?

21  A.  As we discussed before, I think you can say that.

22  Q.  Yeah.  And the counsel from the SEC pointed you to some

23  paragraphs that she just read, and I won't go over those again,

24  but in — two years later in 2020 when you recommended to

25  Galaxy to purchase $4 million of Luna, you still thought there

O3RHSec1                          Kol - Recross

1   was a risk of this downward spiral, correct?

2   A.  Yes.

3   Q.  And that was clear, right?

4   A.  Yes.

5            THE COURT:  Anything else?

6            MR. KORNBLAU:  That's all.  Thank you.

7            THE COURT:  No, anything else from the SEC?

8            MS. MEEHAN:  No, your Honor.

9            THE COURT:  So just so I'm clear and the jury is

10  clear, there are relatively different levels of risk, yes?

11  Some cryptocurrency investments are highly volatile, others are

12  more stable, yes?

13           MR. FERRARA:  Objection, your Honor.

14           THE COURT:  Overruled.

15           Is that right?

16           THE WITNESS:  Yes.

17           THE COURT:  And that's why you have a term

18  "stablecoin," yes?

19           MR. FERRARA:  Objection.

20           THE COURT:  Overruled.

21           THE WITNESS:  Yes.

22           THE COURT:  What is meant by stablecoin?

23           THE WITNESS:  Generally, it is meant that you have an

24  asset here that is meant to keep a value stable with some

25  relative sense of that meaning that any deviations it has from

O3RHSec1                          Kol - Recross

what is meant to be the stable value, whether it's $1, one

Korean won, that those deviations should be short-lived.  That,

for all intents and purposes, the value of that asset should

revolve around a certain expected number.

             THE COURT:  All right.  Anything else?  I'm sorry?

             MS. MEEHAN:  No, your Honor.

             THE COURT:  You may step down.  Thank you very much.

             (Witness excused)

             THE COURT:  Counsel, come to the sidebar.

             (Continued on next page)

O3RHSec1                          Kol - Recross

1            (At sidebar)

2            THE COURT:  My suggestion is we go forward with the

3   next witness and take up what we were going to originally take

4   up this morning about the stuff in the pretrial consent order

5   later today.  Is that agreeable?

6            MR. CONNOR:  Yes.

7            MR. KORNBLAU:  I didn't hear you.  To go forward with

8   the witness now?

9            MR. CONNOR:  The next is going to be the video of the

10  corporate designee.

11           (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O3RHSec1                          Kol - Recross

```
 1                 (In open court; jurors present)
 2                 MR. KORNBLAU:  Your Honor, can I have just a brief
 3      moment to confer about what's coming next?
 4                 THE COURT:  Yes.
 5                 MR. KORNBLAU:  I apologize.
 6                 (Counsel confer)
 7                 MR. KORNBLAU:  Thank you, your Honor.
 8                 MR. CONNOR:  Your Honor, the SEC calls as its next
 9      witness Terraform's corporate designee Ashwin Mathialagan.  He
10      will be testifying by video.
11                 THE COURT:  OK.
12                 MR. CONNOR:  Before he takes the stand, your Honor, we
13      have three exhibits that are discussed in his video testimony
14      that we would offer into evidence at this time.  The first is
15      PX 137.  I understand there's no objection to that exhibit, so
16      we would move to admit that document.
17                 THE COURT:  Received.
18                 MR. KORNBLAU:  No objection.
19                 (Plaintiff's Exhibit 137 received in evidence)
20                 MR. CONNOR:  The second document is PX 143, which is a
21      conversation between Terraform employees.  We would offer that
22      into evidence as well.
23                 MR. KORNBLAU:  Object on relevance grounds, your
24      Honor.
25                 THE COURT:  I can't tell yet, but I'll reserve on
```

1  that.  When it is referenced, if I feel it's irrelevant, I'll

2  strike it then.

3          MR. CONNOR:  I'll note, your Honor, the objections

4  have already been resolved on the 30(b)(6) testimony, and this

5  document was referenced in that testimony.  I don't know that

6  relevance was an objection at that time.

7          THE COURT:  OK.

8          MR. CONNOR:  And the final document is PX 145, which

9  is similarly a conversation between Terraform employees that we

10  would also move into evidence.

11          MR. KORNBLAU:  Same objection, your Honor, and there's

12  no requirements to state relevance objections at depositions.

13          THE COURT:  That's correct.  Defense counsel is

14  correct, but I can't really rule on that until I see how it's

15  being used.  So I'll reserve ruling on it until I see it, and

16  then if I have to strike it, I will.

17          MR. CONNOR:  Thank you, your Honor.

18          With the Court's permission, may we play the cued up

19  portions of the video testimony?

20          THE COURT:  Yes.  Yes.

21          So, ladies and gentlemen, sometimes witnesses are not

22  available for one reason or another.  So you can treat this

23  just as if the witness were here.

24          Go ahead.

25          MR. KORNBLAU:  And for that reason, your Honor, I

1    guess we need to be able to object before the answer is stated.

2    So there's some awkwardness there with the video, but we'll do

3    the best we can.

4          THE COURT:  OK.  When there's objections stated, put

5    the video on hold at that moment so we can deal with the

6    objection.

7          (Video played)

8          THE COURT:  Wait a minute.  I'm sorry.  Forgive me.

9    We need to have his name identified before we start the —— just

10   state it for the record.

11         MR. CONNOR:  Yes, your Honor, his name is Ashwin,

12   A-s-h-w-i-n, and his last name is Mathialagan, spelled

13   m-a-t-h-i-a-l-a-g-a-n.

14         THE COURT:  I think all objections were previously

15   presented to the Court, so I don't think there's anything I

16   have to rule on in that regard.

17         MR. KORNBLAU:  Only the exhibits, your Honor.

18         THE COURT:  OK.  Very good.  Go ahead.

19         (Video played)

20         THE COURT:  Hold.

21         So, ladies and gentlemen, let me explain that a little

22   bit more.

23         Before a trial begins, both sides can take the

24   testimony of witnesses, including witnesses from the other

25   side.  These are called depositions.  They occur not in a

O3RHSec1                          Kol - Recross

1    court, but they occur in an office.  Questions are put, then if

2    the party wants to offer some of that testimony in evidence at

3    trial because the witness is not available because, like, he's

4    out of the country or something like that, then both sides

5    state their objections to me and I rule on them, and then

6    what's left is what you're about to see.

7              The 30(b)(6) witness ── don't worry about these

8    numbers.  This is just lawyer talk ── but a 30(b)(6) witness is

9    different from other witnesses in that what he or she has to

10   say is binding on the company.  So everything this witness says

11   is binding on Terraform.  He is the representative of Terraform

12   for purposes of this.  Now, that doesn't mean you have to

13   accept his testimony.  That's up to you whether you accept it

14   or not.  But it, in your consideration, can be treated as

15   statements of a company itself.

16             So go ahead.

17             (Video played)

18             (Continued on next page)

19

20

21

22

23

24

25

O3RASEC2

1            (Video played)

2            MR. CONNOR:  Your Honor, before the witness discusses

3    this exhibit, we wanted to again offer PX 143a into evidence.

4    It's a conversation with Do Kwon and another Terraform employee

5    and I think the Court -- I have a copy here.  I think the Court

6    will find that the content is relevant.  So we would ask it be

7    admitted and that the (30)(b)(6) witness be allowed to speak

8    about it.

9            MR. KORNBLAU:  Your Honor, let me save you some

10   effort.  We don't object.

11           THE COURT:  Very good.  Received.

12           (Plaintiff's Exhibit 143a received in evidence)

13           (Video played)

14           MR. KORNBLAU:  That wasn't designated, your Honor.  We

15   object to that section.

16           MR. CONNOR:  Yes, your Honor.  I think we did not

17   intend to read that.  So we can strike that answer.  Thank you.

18           THE COURT:  Okay.  Stricken.

19           (Video played)

20           MR. KORNBLAU:  Can we pause just for a sec.

21           THE COURT:  Pause.  Thank you.

22           MR. KORNBLAU:  Your Honor, just to avoid confusion,

23   would it be okay if I just stated that GiGi Kwon is not related

24   to Do Kwon.

25           MR. CONNOR:  Yes.  And the SEC agrees.

O3RASEC2

1          THE COURT:  That's fine.  Thank you.  Go ahead.

2          (Video played)

3          MS. LANDOW:  Your Honor, there's an errata correction

4     here.

5          THE COURT:  So let me explain to the jury what an

6     errata is, and then you can read it.

7          So after a deposition is taken, the witness gets a

8     chance to make corrections, and those are called errata.  And

9     it's up to you whether you choose to accept his original

10    testimony or the change in the errata.  That's entirely your

11    discretion, but you should consider both and make your

12    determination.  So here there was an errata.  Go ahead.

13         MS. LANDOW:  The company does not know what regulatory

14    issue the reporter was referring to.

15         The reason:  Consulted company records, which did not

16    provide a basis for the company's understanding of the

17    reporter's opinion.

18         THE COURT:  Okay.  Go ahead.

19         (Video played)

20         MS. LANDOW:  There's a correction here.

21         THE COURT:  Go ahead.

22         MS. LANDOW:  Chai transactions were integrated with

23    the Terra blockchain in June 2019.

24         The reason:  Closer review of Plaintiff's Exhibit 143b

25    deposition, Plaintiff's Exhibit 11, and blockchain transaction

O3RASEC2

1   data connected to Chai transactions.

2           THE COURT:  Go ahead.

3           (Video played)

4           MS. LANDOW:  Correction here.  Chai transactions were

5   integrated with the Terra blockchain in June 2019.

6           Reason:  Closer review of Plaintiff's Exhibit 143b,

7   deposition Exhibit 11, and blockchain transaction data

8   connected to Chai transactions.

9           (Video played)

10          MR. CONNOR:  Your Honor, at this time before we get

11  into the substance of the documents, we wanted to move to admit

12  PX 145b, which is the translated version.

13          MR. KORNBLAU:  No objection.

14          THE COURT:  Received.

15          (Plaintiff's Exhibit 145b received in evidence)

16          (Video played)

17          MS. LANDOW:  Your Honor, there's a correction here.

18          THE COURT:  Go ahead.

19          MS. LANDOW:  Chai transactions were integrated with

20  the Terra blockchain as of September 2019 as well.

21          The reason:  Closer review of Plaintiff's Exhibit

22  143b, deposition Exhibit 11, and blockchain transaction data

23  connected to Chai transactions.

24          THE COURT:  Okay.

25          (Video played)

O3RASEC2

1              THE COURT:  Is that it?

2              MR. CONNOR:  Yes.  That's it, your Honor.

3              THE COURT:  Very good.  Why don't we give the jury

4    their mid-morning break at this time.  We'll reconvene in 15

5    minutes.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O3RASEC2

1          (In open court; jury not present)

2          MR. KORNBLAU:  Your Honor, your Honor may have items.

3     I just had one housekeeping matter.

4          THE COURT:  Go ahead.

5          MR. KORNBLAU:  I didn't want to interrupt you.

6          THE COURT:  Go ahead.

7          MR. KORNBLAU:  Your Honor did give an overview at the

8     beginning about a 30(b)(6) deposition.  We would request just

9     for clarification to the jury to what they just saw, if the

10    Court would also explain that when Mr. Mathialagan was

11    testifying, he was basing his testimony on review of company

12    records and that many of the relevant employees were no longer

13    at the company.

14         THE COURT:  Well, I thought he said repeatedly that he

15    was basing it on relevant records, so I'm not sure what's added

16    there.

17         MR. KORNBLAU:  Just that -- it's not intuitively

18    obvious, your Honor, I think to a juror that a (30)(b)(6)

19    witness wouldn't have personal knowledge of the items.

20         THE COURT:  Oh, okay.  All right.

21         MR. KORNBLAU:  Puts it in context --

22         THE COURT:  I'll say something along those lines.

23         MR. FERRARA:  And when your Honor does that, would it

24    be possible, just because there are two parties here, that the

25    (30)(b)(6) witness speaks for the company but not -- is not a

O3RASEC2

1    representative of Mr. Do.

2             THE COURT:  Okay.

3             MR. FERRARA:  Thank you, your Honor.

4             THE COURT:  So when they come back, remind me and

5    we'll do that right away while it's still fresh in their mind.

6             MR. KORNBLAU:  Thank you.

7             THE COURT:  Now, we didn't get to this morning, but we

8    need to get to now, the defense wants to go through the

9    specific statements that are in the pretrial consent order that

10   are alleged to be false to see, number one, whether there are

11   any that the SEC is no longer pursuing, and number two, whether

12   there's any that there's no basis for pursuing.

13            So I think we begin on page 17 of the pretrial consent

14   order.

15            MR. CONNOR:  Your Honor, I apologize for interrupting.

16   Would it be okay if members of the SEC use the restroom?  I

17   will be here addressing this, but other members would like to

18   use the restroom.

19            THE COURT:  Generally impudent request, but okay.  And

20   that goes for any members of the defense team that are not

21   involved in this discussion.

22            So on my own quick review of the first group of

23   statements that are listed under 4a, beginning on page 17 and

24   going onto page 18, there was some statements there that seem

25   to me just rhetorical.  For example, Kwon stated the following:

1    "It's interesting that cockroaches only come out when the night

2    is darkest."

3          Now, that might be challenged as inaccurate by any

4    person who resides in a New York apartment, but nevertheless, I

5    don't see why that is a false material statement.

6          MR. CONNOR:  We agree, your Honor.  And we are

7    offering this, the thrust of what the false statement is, is in

8    the summary.  The rest, it's a 29-tweet thread.  And it's all

9    in the same statements.  These are not statements made

10   different days and different times.  It's all a part of one

11   document.

12         So the thrust of the misleading nature of what we

13   allege here is that Kwon is saying that, you know, nobody could

14   believe that the growth could be manipulated, how the protocols

15   are responded, how none of the fundamentals have changed.  And

16   our position is the fundamentals absolutely had changed because

17   Kwon at that time knew that the algorithm was not going to work

18   on its own and that he needed to strike a secret side deal with

19   Jump.

20         So that's sort of the nature of the misstatements

21   here.  We're not saying each and every statement here is false

22   and misleading, but taken together in one document, these are

23   the false and misleading statements.  And we tried to summarize

24   what, again, the thrust of it was in subparagraph (a).

25         MR. PATTON:  Your Honor, I would just say that's not

O3RASEC2

1    what's, until just now, been represented.  And we asked them

2    again because the Court suggested we go back and do this, if

3    they were withdrawing any of these or if they could provide

4    further clarification and they declined.

5         THE COURT:  Well, but now they have.  That's why we're

6    having this discussion.

7         MR. PATTON:  Agreed.  But I just wonder -- I mean, I'm

8    happy to do this, but perhaps the SEC can take another look and

9    decide which of these --

10         THE COURT:  I don't have any problem with giving both

11    of you a little more time as long as, number one, we continue

12    with the trial of the witnesses.  And, number two, if a

13    question comes up, such as we talked about this morning, where

14    you think you have to ask a whole bunch of questions on cross

15    because of something that's here, that you then consult with

16    them right then and there before you put those questions to

17    make sure they're still pursuing that so that we don't waste

18    time, which was part of the problem I was concerned with.

19         MR. PATTON:  Understood.  I mean, your Honor is

20    obviously flagging why this is important to do.  So maybe we

21    should just proceed.  Because it is important for us to get

22    clarification on what they're saying is false.

23         THE COURT:  Well, with respect to this paragraph,

24    basically what they just said was, if I understand it, is that

25    the statements they're pursuing as false are the statements

O3RASEC2

1  that nothing has changed, when in fact, they say Kwon knew that

2  material things had changed, and that's why he needed to

3  involve Jump.  Do I have that right?

4          MR. CONNOR:  Yes, that's correct.

5          THE COURT:  So --

6          MR. PATTON:  So I guess then is the idea that none of

7  the bullet points are false statements that you're alleging?

8          MR. CONNOR:  No, that's not correct.  There are, I

9  mean, there is a bullet point that says, "is UST growth

10  manipulated by Terraform Labs."  Nobody who has used Mirror

11  Anchor could believe this.

12          And we allege that in fact that is exactly what

13  Terraform Labs and Kwon were doing.

14          MR. PATTON:  I guess my point is then you're saying

15  some of the bullet points are part of your claims and some are

16  not.  So we're just seeking clarity on which of these many

17  statements is the SEC claiming are false.

18          MR. CONNOR:  And, your Honor, we're happy to confer

19  with defense counsel at lunch break.  I think it's important

20  though -- it's all part of one document, one statement.  These

21  are not disbursed statements different days, different

22  documents.  This is one document.  So we're happy to confer

23  with defense counsel on a lunch break on that.

24          THE COURT:  I mean, that's fine with me, subject to

25  the two limitations I just mentioned.

O3RASEC2

1          MR. PATTON:  That's fine, your Honor.

2          THE COURT:  Very good.

3          MR. PELLEGRINO:  Your Honor, if I may, it's very

4  quick.

5          THE COURT:  Yeah.

6          MR. PELLEGRINO:  As your Honor will recall, you

7  authorized discovery in London which was ongoing.  Some

8  additional discovery came in --

9          THE COURT:  That was only so you could have a nice

10  trip to London, no other reason.

11          MR. PELLEGRINO:  It was lovely, but cold, your Honor.

12          So some additional discovery has come in, and

13  according to the high court in London, that needs to be served

14  on the Court and the SEC with a deadline of today.  It's

15  protected.  We're not seeking to admit anything.  The parties

16  will look at it and deal with anything they need to deal with

17  it.  But if we may submit to your e-mail address and serve the

18  SEC, and then it should be protected under the amended

19  protective order until such time as people look at it and

20  decide if there's anything to do with it in this proceeding or

21  any later proceeding.

22          THE COURT:  That's fine.  This is from English

23  witnesses?

24          MR. PELLEGRINO:  Yes, your Honor.  They were English

25  witnesses, but it was a U.S. style deposition.

O3RASEC2

1                THE COURT:  I'm wondering if it's in "English

2      English," do I need an interpreter?

3                MR. PELLEGRINO:  Your Honor, it's in code, computer

4      code, so someone will have to interpret it.

5                THE COURT:  Very good.  Okay I think we can take a

6      five-minute break and then we'll resume.

7                MR. PELLEGRINO:  Thank you, your Honor.

8                THE COURT:  Oh, I'm sorry.  Here.  I neglected

9      yesterday to give you the rulings on the Paul Kim additional

10     designation by defense.  So here are my rulings.

11               MR. PELLEGRINO:  Thank you.  On that, your Honor, we

12     have professional readers that we wanted to address with the

13     Court.

14               THE COURT:  Pardon?

15               MR. PELLEGRINO:  We have professional readers to read

16     these designations, your Honor.

17               THE COURT:  Oh, okay.  Very good.

18               (Recess)

19               (In open court; jury no present)

20               THE COURT:  On Friday at 2:00 p.m., the approximately

21     20 students in the seminar I teach at NYU Law School on Science

22     in the Courts are coming to watch this trial.  This of course

23     is an independent reason for denying the mistrial motion.  And

24     of course they'll watch whatever is going on.  But I was sort

25     of hoping that maybe that would be a good time to put the

O3RASEC2

 1    plaintiff's expert on the stand because they've been studying a

 2    lot about experts.  So I just mention that for your

 3    consideration.  If we can do it on Friday afternoon, that would

 4    be great.

 5          Okay.  Please call your next witness.

 6          MR. PELLEGRINO:  Your Honor, just again very briefly,

 7    the designations you handed back with Paul Kim do not include

 8    the defendants' designations.  Still those were in our binder,

 9    but I have copies of that I showed to the SEC.  We can hand

10    those up to the Court.

11          THE COURT:  I'm sorry.  I thought I had done the ones

12    from the defense binder.  Neil?

13          THE LAW CLERK:  I thought so too, but let's take a

14    look at what they have I guess.

15          THE COURT:  Let me see what you have.

16          MR. PELLEGRINO:  We have copies here, your Honor.

17          THE COURT:  Go ahead.

18          MR. PELLEGRINO:  May I?

19          THE COURT:  Yeah.

20          All right.  No, I don't want to take time now.  We'll

21    sort this out.

22          Please call your next witness.

23          MS. STAREN:  Your Honor, before we call Mr. Myung, I

24    just had a couple of housekeeping items to address with respect

25    to his testimony.

O3RASEC2

1          First, I think as you recall, the defendants had a

2     motion *in limine* to exclude any evidence related to the Korean

3     prosecution.  We have since met and conferred and I think we've

4     come to an agreement that the SEC will not put in any evidence

5     related to the Korean prosecution provided that the defense

6     agrees that they won't open the door.  And just so that we're

7     all clear, our view is that any specific question relating to

8     any specific communication or event that happened after May of

9     2022, which is when Mr. Myung became aware of the Korean

10    prosecution, that in our mind could potentially open the door.

11    But I think we've agreed that we're going to try to steer clear

12    of those topics.

13         So we will, on our direct, not get into any such

14    evidence including the Korean prosecution.

15         THE COURT:  Okay.  You ready to call the witness?  I'm

16    sorry?

17         MR. KORNBLAU:  Should I mention the other item?

18         MS. STAREN:  Just one more thing.  I think we gave

19    your court deputy a hard copy of the witness binder that we

20    would like to have for Aaron, for the witness.

21         THE COURT:  That's good because I don't have enough

22    volumes up here, so this will keep me occupied.

23         MR. CARNEY:  Your Honor, and that binder was for the

24    witness to look at.

25         THE COURT:  Oh, it's for the witness.

O3RASEC2

1          MR. CARNEY:  Thank you, your Honor.

2          THE COURT:  Good.

3          MR. CARNEY:  Apologies, your Honor.

4          MR. MOREL:  If I may, your Honor, one more

5    housekeeping item.  Chris Morel, counsel for Do Kwon.  The next

6    witness is a witness for both counsel for the company and

7    counsel for Do Kwon intend to present cross-examination, but

8    our cross-examination would be very brief.  No more than five,

9    ten minutes.

10          THE COURT:  Okay.

11          MR. MOREL:  Thank you.

12          THE COURT:  Let's bring in the jury.

13          MR. KORNBLAU:  Wait, wait.  Please, please, please.

14   Very quick.  Two points.  One, I hereby respectfully remind the

15   Court about the 30(b)(6) clarification.

16          THE COURT:  Yes.  Thank you very much.

17          MR. KORNBLAU:  And, two, it's not time for cross yet

18   and I don't know when that will be, but just to give the Court

19   a heads up, it depends what Mr. Myung says, but there is a

20   possibility, which frankly I'm going to try to avoid, but there

21   is a possibility that we might need to refresh his memory on a

22   certain point with a recording.  So the trick there, of course,

23   is if you don't want the jury to hear the recording --

24          THE COURT:  Right.  Right.

25          MR. KORNBLAU:  So let me do a little free thinking and

O3RASEC2

1    your Honor will just tell me what to do.  Depending if we're

2    near a break or something, we can just wait to the break and

3    then let the jury go out and do it.  If it's not near a break,

4    we do have ear plugs, laptops with the recording on it that we

5    could give to your Honor or give to the witness.  It's

6    cumbersome, and I would like to avoid it, but it just depends

7    what is he says.  So just to flag that that might happen.

8           THE COURT:  Okay.  Another possibility would be just

9    to bring counsel and the witness and the Court into the robing

10   room, and we could do it there so.

11          MR. KORNBLAU:  Great idea.  Thank you.

12          THE COURT:  Okay.  Let's bring in the jury and let's

13   get the witness on the stand.

14          (Continued on next page)

1           (Jury present)

2           THE COURT:  Please be seated.  Ladies and gentlemen,

3    before we swear in the next witness, I just wanted to add two

4    things about the (30)(b)(6) witness that you just saw.

5           This is probably obvious, but a (30)(b)(6) witness is

6    not testifying from personal knowledge, he's testifying from

7    his review of the records.

8           And, secondly, while his answers are binding on the

9    company, Terraform, they're not binding on the codefendant, Do

10   Kwon.  Just binding on the company.

11          Okay.  Let's swear in the next witness.

12   AARON MYUNG,

13        called as a witness by the Plaintiff,

14        having been duly sworn, testified as follows:

15   DIRECT EXAMINATION

16   BY MS. STAREN:

17   Q.  Thank you, Mr. Myung.  Good morning.

18          Where do you currently live?

19   A.  I live in Seoul, Korea.

20   Q.  And where are you from?

21   A.  I was born in Los Angeles, but mostly from the Midwest.

22   Q.  Okay.  And did you attend college?

23   A.  Yes, at the University of Michigan Ann Arbor.

24   Q.  Did you graduate?

25   A.  Yes.

O3RASEC2                          Myung – Direct

1   Q.  And what degree did you obtain?

2   A.  Computer science.

3   Q.  And after you graduated from Michigan, what did you do?

4   A.  I worked as a software engineer at Palm.

5   Q.  And how long were you at Palm?

6   A.  I was there about one and a half years making smart phones,

7   pre-iPhone.

8   Q.  Okay.  And what did you do after you left Palm?

9   A.  I went to go work for a company called Salesforce.  It's

10  one of the largest companies in San Francisco doing business

11  software.

12  Q.  Okay.  And were you a software engineer there as well?

13  A.  Yes, I was.

14  Q.  Okay.  And after -- sorry.  How long were you at

15  Salesforce?

16  A.  I was there for seven years.

17  Q.  Okay.  And after you left Salesforce, where did you go

18  next?

19  A.  I created my own start-up.

20  Q.  Okay.  And what was the name of that start-up?

21  A.  It was called Hello Cafe.

22  Q.  And what was the business of Hello Cafe?

23  A.  So it was like around the time of like Uber, so it was like

24  a way to meet like English tutor at your local cafe.  So this

25  is in Korea.

O3RASEC2                         Myung – Direct

1   Q.  Okay.  And approximately how long did you operate Hello

2   Cafe?

3   A.  About two and a half years or so.

4   Q.  Okay.  And after you left Hello Cafe, where did you go

5   next?

6   A.  I went to go to Korbit, which is the first Bitcoin

7   exchange.

8   Q.  The first Bitcoin exchange --

9   A.  Oh, the first Bitcoin exchange in Korea.  So I headed

10  products there.

11  Q.  I'm sorry, you headed what?

12  A.  I headed the product team.

13  Q.  Okay.

14  A.  Yeah, the entire product team, which is inclusive of design

15  and engineering.

16  Q.  Okay.  And approximately how long were you at Korbit?

17  A.  About two years.

18  Q.  Okay.  Are you familiar with a company called Chai

19  Corporation?

20  A.  Yes.

21  Q.  And what is Chai Corporation?

22  A.  It's basically like PayPal, but for Korea.  So as a user,

23  you can pay merchants really easily through your app.

24  Q.  Okay.  And were you ever employed with Chai?

25  A.  Yes.

O3RASEC2                          Myung - Direct

1    Q.   Approximately when were you employed with Chai?

2    A.   From January 2021 until January 2022.

3    Q.   And where is Chai located?

4    A.   It's located in Seoul, Korea, although the holding company

5    is in Singapore.

6    Q.   And where did you live when you worked at Chai?

7    A.   I lived in Seoul, Korea.

8    Q.   And what positions did you hold at Chai?

9    A.   First, I was a senior advisor, and I was promoted to chief

10   product officer at the company.

11   Q.   Okay.  Let's talk about your position as senior advisor.

12        What was your role as senior advisor at Chai?

13   A.   I advised the CEO on products, like work structure and

14   things like that.

15   Q.   And who was the CEO at that time?

16   A.   His English name is Daniel Shin.  Korean name Shin Hyun

17   Sung.

18   Q.   And, I'm sorry.  Can you tell me again, you advised him on

19   what topics?

20   A.   On just like generally product technology, design, and

21   generally the kind of like business structure, team structures

22   and processes.

23   Q.   Okay.  And how frequently did you communicate with Mr. Shin

24   in that role?

25   A.   Every day.

O3RASEC2                        Myung – Direct

1    Q.  And what language did you and Mr. Shin generally use when

2    the two of you communicated?

3    A.  Pretty much always English.

4    Q.  Okay.  Do you speak Korean?

5    A.  Yes, I do.

6    Q.  Do you have an understanding as to whether Mr. Shin speaks

7    Korean?

8    A.  Yeah, he does.  He's perfectly bilingual.

9    Q.  As senior advisor, did you supervise anyone?

10   A.  No, I did not.

11   Q.  And approximately how long were you in the role of senior

12   advisor?

13   A.  Up until about May.

14   Q.  And is that --

15   A.  Like actually up until about April, yeah.

16   Q.  Is that in 2021?

17   A.  Yes.

18   Q.  And at that point did you transition to become chief

19   product officer?

20   A.  Yes, in May.

21   Q.  And what was your role as chief product officer?

22   A.  So I headed all the product and engineering groups.  So all

23   of product engineering and design report to me.

24   Q.  So you said product engineering and design groups reported

25   to you?

O3RASEC2                          Myung - Direct

1    A.  Yeah.  I had two heads of engineering, one head of design,

2    and nine product managers.

3    Q.  Okay.  Let's talk about the two heads of engineering, of

4    the engineering teams.  Who were those?

5    A.  The first one is Ji'Hoon Kim.  He was head of engineering

6    for the Chai wallet.  And one was Dooho Chang.  He was head of

7    engineering for i'mport.

8    Q.  And those two individuals reported to you?

9    A.  Yes.

10   Q.  And then you mentioned -- oh, what was the function of the

11   engineering team within Chai?

12   A.  So it was just to take care of all the engineering, like

13   design and the programming of the software code.

14   Q.  And did that include programming code for Chai's payment

15   systems?

16   A.  Yes, all of it, yeah.

17   Q.  Okay.  Let's talk about the design team.  Who led that

18   team?

19   A.  It was Justin Huang.

20   Q.  And what was the function of the design team at Chai?

21   A.  They created the -- like the user interfaces of the

22   products, or like the website design, things like that.

23   Q.  Okay.  So when you say the user interface, does that

24   include the application itself?

25   A.  Yes.

1    Q.   And then let's talk about the product management teams.

2    Did you say that there were nine product managers that reported

3    to you?

4    A.   Yes, there was.

5    Q.   Okay.  And what was the function of those product

6    management teams?

7    A.   So they would manage like the road maps and the priorities

8    of each of the subsections of the products at the company.

9    Q.   And who did you report to as chief product officer?

10   A.   To the CEO Daniel Shin.

11   Q.   And in your roles as senior advisor and then as chief

12   product officer, did you have any visibility into Chai's

13   product lines?

14   A.   Yes, all of them.

15   Q.   Okay.  And what were Chai's products?

16   A.   So it was a Chai e-wallet and the Chai card and then the

17   i'mport business.

18   Q.   Okay.  And let's go through each one of those in a little

19   bit of detail, starting with the Chai e-wallet.  What was that?

20   A.   So that's like the PayPal kind of portion of it, where like

21   a user can send money to a merchant.

22   Q.   And can you explain how that application worked?

23   A.   Yeah.  So like a user will just go to the app store, they

24   would download it, and they would link their bank account, and

25   they'll -- let's say if they go to like an E-commerce shopping

1    site.  So say if you're buying shoes or something like that,

2    you add to your basket.  And at checkout, there's all these

3    different checkout options like credit card and like whatever.

4    And Chai would be one of those payment options.  You press that

5    button and the Chai app would come out, and you just press pay

6    and everythings done.

7    Q.  And the currency that Chai customers used, what was that?

8    A.  It was in Korean won.

9    Q.  And what is Korean won?

10   A.  It's the national currency of Korea.  Similar to USD for

11   America.

12   Q.  When you say USD what --

13   A.  Oh, U.S. dollar.

14   Q.  Okay.  And is the Korean won a type of fiat currency?

15   A.  Yes, it is.

16   Q.  And just to be clear, is the Korean won a crypto asset?

17   A.  No, it's not.

18   Q.  And how do you know that Chai customers were paying using

19   Korean won?

20   A.  Because they were like linking their bank accounts and

21   saying to users and we had contracts with merchants and that we

22   settle -- we settle with them on approximately monthly basis,

23   sometimes less, sometimes more.

24   Q.  And did you get information -- or how did you get

25   information about how Chai customers were paying?

1   A.  Well, so like the whole product experience, like we design

2   that entire experience step by step.  So and also I was a user

3   myself.  You know, because I have to get familiar with the

4   product.  And also, like one of the product managers, they like

5   managed like it's called the admin console, so all the

6   settlement logs are there.

7   Q.  Okay.  And so I think you touched a little bit on this, but

8   maybe you can answer.

9        How were the merchants that participated in Chai, how

10  were they paid through Chai's e-wallet?

11  A.  So Chai, from their accounts, through the bank, would

12  transfer money through the bank to their bank account.

13  Q.  Okay.  And were Chai merchants paid in Korean won?

14  A.  Yes, they were.

15  Q.  And I think you mentioned that there was some time period

16  between when a Chai customer would make a payment and the

17  merchant was then actually paid to their bank account.

18  Approximately how long was that time?

19  A.  It's about like every month.  But sometimes it's less if

20  the -- if those amounts are larger, and sometimes it would be

21  longer, like quarterly for some merchants.

22  Q.  Okay.  And did Chai settle with any of these merchants on

23  the blockchain?

24  A.  Never.

25  Q.  Did Chai settle with any of these merchants in crypto

1    assets?

2    A.  Never.

3    Q.  And how do you know that merchants were not getting paid in

4    crypto?

5    A.  Because all the product teams reported to me.  I worked on

6    the product on a day-to-day basis.  I got familiar with all the

7    systems and I saw all the logs of settlements.

8    Q.  You mentioned earlier something called an admin console;

9    what is that?

10   A.  So it's an internal tool that we developed so that we can

11   basically monitor all the payments that we make to merchants.

12   Q.  And you had access to that administrative console?

13   A.  Yeah.  And like the purpose of that also is to also manage

14   the deals.  So like each merchant had a different deal

15   structure.  So like in the process of settlements, it's very

16   complex, so like we would have to like net out all the money,

17   and then what's ever that we have to pay the merchants, we

18   would do that through the console.

19   Q.  Okay.  I think you testified earlier that you can speak

20   Korean; is that right?

21   A.  Yes.

22   Q.  Can you also read Korean?

23   A.  Yes, I can.

24         MS. STAREN:  Mr. Maywood, could you please pull up

25   Plaintiff's Exhibit 138a for the witness, please.

1    Q.  And you also have a copy of this exhibit, Mr. Myung, in the

2    binder in front of you.

3             Is this document in Korean?

4    A.  Yes, it is.

5    Q.  Are you able to read this document?

6    A.  Yeah.

7    Q.  Do you recognize this document?

8    A.  Yes, I do.

9    Q.  What is it?

10   A.  It's a Chai service agreements between Chai and Yanolja.

11            MS. STAREN:  And this agreement or this exhibit has

12   been stipulated to.  We would move to admit Plaintiff's Exhibit

13   138a into evidence.

14            MR. KORNBLAU:  No objection.

15            THE COURT:  Received.

16            (Plaintiff's Exhibit 138a received in evidence)

17            MS. STAREN:  Mr. Haywood, you can publish to the jury.

18   Q.  Mr. Myung, were you involved at all in the execution or

19   negotiation of this agreement?

20   A.  No, I wasn't.

21   Q.  Was Yanolja a Chai merchant during your time as senior

22   advisor and then chief prodcut officer of Chai?

23   A.  Yes, they were.

24            MS. STAREN:  Mr. Haywood, could you please go to the

25   last page and pull out the date, or what I believe is the date.

1   Q.  Could you please read that date, Mr. Myung?

2   A.  Yeah.  So August 23, 2019.

3            MS. STAREN:  Could you please show the witness only

4   Plaintiff's Exhibit 138b.

5   Q.  Was there translation made of this document, Mr. Myung?

6   A.  Yes.

7   Q.  And is this a true and accurate translation of the Yanolja

8   contract we just looked at in Korean?

9   A.  Yes.

10           MS. STAREN:  This translation has also been stipulated

11  to.  We would move to admit Plaintiff's Exhibit 138b into

12  evidence?

13           MR. KORNBLAU:  Objection.  I mean, no objection.

14  Sorry.

15           THE COURT:  Received.

16           (Plaintiff's Exhibit 138b received in evidence).

17           MS. STAREN:  Thank you.  You can publish it to the

18  jury, Mr. Haywood.

19           Could you please turn to I guess it's page two of the

20  exhibit, but it's the first page of the document and pull out

21  the title in the first paragraph.

22  Q.  Mr. Myung, could you please read the title of this

23  document?

24  A.  Yes.  It says "Chai Service Agreement."

25  Q.  And can you please read the first paragraph?

O3RASEC2                        Myung – Direct

1   A.  Yeah.  It says Yanolja Co., Ltd. (hereinafter referred to
2   as "Party A") and Jigu Electronic Payment Corporation
3   (hereinafter referred to as "Party B") have made an entered
4   into the following Service Agreement (hereinafter referred to
5   as this "Agreement") in connection with the use of electronic
6   financial transaction services that use the Electronic
7   Prepayment Means issued and managed by Party B (hereinafter
8   referred to as the "Service").
9   Q.  Okay.  So that was a lot of legalese.  Let's try to break
10  that down a little bit.
11         First, what is Yanolja again?
12  A.  So Yanolja is basically like an Expedia or like a
13  hotels.com of Korea.
14         MR. KORNBLAU:  Objection.  Relevance.
15         THE COURT:  Overruled.
16  Q.  And is Yanolja the company identified as Party A here?
17  A.  Yes.
18  Q.  And what is Jigu Electronic Payment Corporation?
19  A.  That's Chai.
20  Q.  And is Chai the company identified as Party B here?
21  A.  Yes.
22  Q.  And what does this agreement relate to?
23  A.  It's an agreement for Chai to pay Yanolja for selling the
24  transactions on behalf of Yanolja's customers.
25  Q.  Okay.  Could you please turn to page eight of this

1    document, and focusing on the section titled article eight.

2    Could you please read the highlighted section starting with

3    "settlement of payment amount."

4    A.  Yeah.  It says, "Settlement of Payment Amount."  "Party B

5    shall pay party A the amount of payment for the normal

6    transactions carried out using the Service after deducting all

7    fees, such as the fee under Article 9, value-added tax, etc.

8    (hereinafter referred to as the 'Settlement Amount.')"

9         Number two, "Settlement Date."  "D, which is payment

10   date, plus 14 days (or the following business day if the

11   settlement date is a Saturday or a holiday.)"

12        Number three, "Payment of Settlement Amount."  And the

13   section (b) of that is "Party B shall pay the Settlement Amount

14   to the below account designated by Party A, on the settlement

15   date."

16   Q.  And can you please read -- no, no.  Platform and bank

17   please.

18   A.  Yeah, so the platform is Yanolja, and the bank is Woori.

19   It's a big bank in Korea.

20   Q.  Okay.  And, again, that was a lot of legalese.  Could you

21   please explain what your understanding is how -- sort of in

22   layman's terms, how Yanolja was getting paid under this

23   agreement?

24   A.  Yeah.  So every 14 days or thereabouts, Chai would be

25   paying Yanolja to their bank account listed there below, to

1    settle the payments.

2    Q.  And what was the currency that was used to make these

3    payments?

4    A.  Korean won.

5    Q.  Okay.  And is this consistent with how you understood that

6    Yanolja was getting paid during your time as senior advisor and

7    chief product officer at Chai?

8    A.  Yes.

9            MS. STAREN:  And actually, Mr. Haywood, could you go

10   to the last page of this translation, please, or this exhibit,

11   please.  And could you highlight the signature block there.

12   Q.  Mr. Myung, could you tell me who signed on behalf of Jigu

13   Electronic Payment Corporation or Chai?

14   A.  Yeah.  It's Chang-Jun Han.

15   Q.  Do you know whether Chang-Jun Han was ever known by any

16   other name?

17   A.  People called him CJ.

18   Q.  And do you know who CJ Han is?

19   A.  Yeah, he was CFO at Terraform Labs, and also the first CEO

20   at Chai Corporation.

21           MS. STAREN:  Okay.  Thank you. You can take that down,

22   Mr. Haywood.

23   Q.  Mr. Myung, you also mentioned a product called the Chai

24   card; can you tell me what that is?

25   A.  Yeah, it's like a debit card by BCcard.  It's a company,

1    card company, and basically it uses the Chai wallet to settle

2    the funds for the card transactions.

3    Q.  Okay.  So when you say it uses the Chai wallet, is that the

4    Chai e-wallet that we just talked about?

5    A.  Yes, it is.

6    Q.  Okay.  And what currency did Chai card users to make their

7    payments?

8    A.  I'm sorry?

9    Q.  What currency did Chai card users use to make their

10   payments?

11   A.  Oh.  Care W, Korean won.

12   Q.  And what currency was used to pay the merchants that

13   accepted the Chai card?

14   A.  Care W, Korean won.

15   Q.  I think the last product line you described was something

16   called the i'mport business; could you describe what that is?

17         MR. KORNBLAU:  Objection.  Relevance.

18         THE COURT:  Overruled.

19   A.  Yeah.  It's a business-to-business service where we make

20   it -- or Chai made it easy for merchants to accept payment

21   because it's like really hard to integrate with payment

22   gateways, so Chai just made it very simple to make that

23   integration.

24   Q.  And just to be clear, when you say "business to business,"

25   what does that mean?

O3RASEC2                          Myung - Direct

1    A.  It means that Chai is working with the merchants

2    themselves, so because they're both businesses, that's a

3    business-to-business transaction.

4    Q.  Okay.  And what currency was used to make these payments

5    through these payment gateways?

6    A.  It was in Korean won.

7    Q.  Okay.  Did there come a time when you learned of something

8    called a KRT top-up program?

9    A.  Yes.

10   Q.  And approximately when did you learn of that?

11   A.  Some time towards the middle of my employment there.

12   Q.  Okay.  And was that 2021?

13   A.  Yeah.

14   Q.  Okay.  And what is KRT?

15   A.  So KRT is the stablecoin for KRW.

16   Q.  And who offered KRT?

17   A.  Terraform Labs.

18   Q.  And, sorry, just to go back.  You said KRW; what is that?

19   A.  So KRW is the paper currency and KRT is the stablecoin for

20   KRW.

21   Q.  And just to be clear for the jury's edification, KRW stands

22   for what?

23   A.  Korean won.

24   Q.  Okay.

25   A.  Yeah.

O3RASEC2                          Myung - Direct

1    Q.  And then what did you understand the KRT top-up program

2    was?

3    A.  It was basically like a beta test program.  So that's like

4    users could basically, you know, top-up or add KRT stablecoins

5    to Chai wallet up to about $40.

6    Q.  Okay.  And how did you learn about the KRT top-up program?

7    A.  I learned it through my head of engineering.

8    Q.  And who was that?

9    A.  Ji'Hoon Kim.

10   Q.  Okay.  And when, approximately when, did you understand

11   that this beta program was in operation?

12   A.  Actually towards the end of my employment, like middle to

13   end.

14   Q.  Of 2021?

15   A.  Yes.

16   Q.  And do you have any understanding as to how long the

17   program was offered?

18   A.  Like a few months max.

19   Q.  And during this time did you see the KRT top-up option used

20   very frequently?

21   A.  I never saw it.  I managed the product and also used the

22   product, but I don't know of any customers that used it.

23   Q.  Okay.  And apart from the KRT top-up program that we just

24   discussed, did Chai's e-wallet business use crypto for any

25   payment transactions?

O3RASEC2                          Myung – Direct

1    A.  Never.

2              (Continued on next page)

O3RHSec3                          Myung - Direct

1    BY MS. STAREN:

2    Q.  Did the Chai card business use crypto for any payment

3    transactions?

4    A.  No, never.

5    Q.  Did Chai's i'mport business use crypto for any payment

6    transactions?

7    A.  Never.

8    Q.  Apart from those three business lines — the e-wallet, the

9    Chai card, and i'mport — did Chai have any other products?

10   A.  No.

11   Q.  Did any Chai merchants get paid in crypto?

12   A.  Never.

13   Q.  And how do you know that?

14   A.  Because all the teams reported to me, and, you know, I knew

15   the products in and out.

16   Q.  I'm sorry.  Can you say that again.

17   A.  Because I knew the products inside and out as the chief

18   product officer.

19   Q.  And this understanding, was that consistent with what you

20   understood when you first joined Chai?

21   A.  No.

22   Q.  What was your understanding when you first joined Chai?

23   A.  My understanding was that Chai used the Terra blockchain to

24   make transaction fees cheaper for merchants, and the company

25   would basically save — pass down those savings in the form of

1   deals for customers.

2   Q.  And how did you get that understanding?

3   A.  Through Daniel Shin.

4   Q.  Anyone else?

5   A.  Well, Do Kwon, but initially Daniel Shin.

6   Q.  OK.  Let's switch gears a little bit.  How did you come to

7   learn about Chai Corporation?

8   A.  Through my investment in The Encore Company.

9   Q.  What is The Encore Company?

10  A.  It's an investment fund that invested in startup companies.

11  Q.  How did you get connected with The Encore Company?

12  A.  Through Daniel Shin who was the CEO.

13  Q.  And what investments did The Encore Company have?

14  A.  A lot of various just, like, startups, which probably

15  didn't really do well, but their biggest one was in Terra.

16  Q.  OK.  How did they invest in Terra?  What was their

17  investment in the form of?

18  A.  Like, what do you mean "in the form of"?

19  Q.  Sorry.  What did The Encore Company actually own?

20  A.  Oh, so The Encore Company, to my understanding, owned Luna.

21  Q.  And what is Luna?

22  A.  Luna is essentially the equity of the Terra ecosystem.

23  Q.  Is Luna a crypto asset?

24  A.  Yes, it is.

25  Q.  Maybe you already said this, but who offered Luna?

O3RHSec3                         Myung – Direct

1    A.  Terraform Labs.

2    Q.  OK.  And in connection with your investment in Encore, did

3    you receive communications about Terraform Labs?

4    A.  Yes, many.

5    Q.  Is it OK if I refer to Terraform Labs as just Terraform?

6    A.  Yes.

7    Q.  Based on those communications, what did you understand that

8    Terraform was?

9    A.  Well, it was a stablecoin backed by Luna.  So Terra and

10   Luna, they kind of balance each other out.

11   Q.  Sorry.  Let me just restate that.

12          What did you understand Terraform, the company, was?

13   A.  Oh, Terraform Labs the company.  Yeah, so they offered

14   Luna, and they helped build and maintain the ecosystem around

15   the cryptocurrencies.

16   Q.  OK.  Did you gain an understanding from these

17   communications as to who controlled Terraform?

18   A.  Most of it is Do Kwon.

19   Q.  OK.  And anyone else at that time?

20   A.  At the time, Dan Shin.

21   Q.  OK.  And did you have an understanding — or what was your

22   understanding of their respective roles with respect to

23   Terraform?

24   A.  So Do Kwon had the leading role of the company.

25   Q.  And based on these communications — sorry, when you say

1    "the company," which company?

2    A.  For Terraform Labs, the company.

3    Q.  Based on these communications, did you come to any

4    understanding as to the relationship between Chai and Terraform

5    Labs?

6    A.  Yeah, they were basically the same company at first;

7    cofounded by the same two people.

8    Q.  Just to be clear, you're saying Terraform and Chai were

9    cofounded by the same two people?

10   A.  Yes.

11   Q.  Who were those?

12   A.  Do Kwon and Dan Shin.

13          MS. STAREN:  OK.  Mr. Haywood, could you please pull

14   up Plaintiff's Exhibit 104A for the witness, please.

15   Q.  Can you review this document, Mr. Myung, and tell me if you

16   recognize it.

17   A.  Yes, I do.

18   Q.  What is it?

19   A.  It's an investment update from Encore, Encore Company.

20   Q.  OK.  And is this an email?

21   A.  Yes, it is.

22   Q.  OK.  And is this a true and accurate copy of the email that

23   you received?

24   A.  Yes.

25          MS. STAREN:  At this time we would move to admit

1    Plaintiff's Exhibit 104A into evidence.

2              MR. KORNBLAU:  Objection.  Hearsay.

3              THE COURT:  Overruled.

4              (Plaintiff's Exhibit 104A received in evidence)

5    BY MS. STAREN:

6    Q.  Mr. Haywood, you could publish to the jury.

7              Could you please —— looking at the first page and that

8    top email from Daniel Shin, could you please read the date of

9    that email for me, please, Mr. Myung.

10   A.  Yes.  January 3, 2019.

11   Q.  And is this an email you received as an investor in Encore?

12   A.  Yes.

13   Q.  And can you please go to the section titled "Terra" and

14   read the fourth bullet.

15   A.  Says, "For further details, please see an update we sent to

16   Terra investors attached."

17   Q.  Did you receive this attachment?

18   A.  Yes.

19              MS. STAREN:  OK.  Mr. Haywood, could you please show

20   the witness Plaintiff's Exhibit 104B.

21   Q.  Mr. Myung, do you recognize 104B?

22   A.  Yes.

23   Q.  What is it?

24   A.  It's an update for Terra investors.

25   Q.  OK.  Is this the attachment to the email we just looked at?

1    A.  Yes.

2    Q.  And is this a true and accurate copy of that attachment?

3    A.  Yes.

4            MS. STAREN:  OK.  We move at this time to admit

5    Plaintiff's Exhibit 104B into evidence.

6            MR. KORNBLAU:  Objection.  Relevance.

7            THE COURT:  Overruled.

8            (Plaintiff's Exhibit 104B received in evidence)

9            MS. STAREN:  OK.  Mr. Haywood, you can please publish

10   to the jury.

11   Q.  Could you take a look at the very first line and read that

12   for me, please.

13   A.  Says, "Dear Terra investor."

14   Q.  And then can you please go to the section titled "Product

15   Remand" and read the first sentence of that for me, please.

16   A.  Yeah.  It says:  "In an effort to separate the branding for

17   the payment service with that of the underlying blockchain

18   technology, we've decided to rebrand TerraPay to Chai."

19   Q.  Is this the first time you've seen Chai referenced?

20   A.  Yes.

21   Q.  What did you understand the relationship was between Chai

22   and Terraform from this document?

23   A.  So Chai was the payments product for Terra.

24           MS. STAREN:  OK.  Could you please go to, Mr. Haywood,

25   go to the third page and highlight just that last two lines.

1   Q.  Mr. Myung, could you please read that.

2   A.  It says, "Thanks, Dan & Do."

3   Q.  Who are Dan and Do?

4   A.  Dan Shin and Do Kwon.

5   Q.  What was your understanding as to why those two individuals

6   were signing this document to Terra investors?

7   A.  Because they were the cofounders.

8           MS. STAREN:  OK.  Mr. Haywood, could you please pull

9   up Plaintiff's Exhibit 107, for the witness only.

10  Q.  Mr. Myung, do you recognize Plaintiff's Exhibit 107?

11  A.  Yes.

12  Q.  What is it?

13  A.  It's another Encore update.

14  Q.  OK.  Is this an email from Dan Shin?

15  A.  Yes, it is.

16  Q.  Is this a true and accurate copy of that email?

17  A.  Yes.

18          MS. STAREN:  We would move to admit Plaintiff's

19  Exhibit 107 into evidence.

20          MR. KORNBLAU:  Objection.  Hearsay.

21          THE COURT:  Overruled.

22          (Plaintiff's Exhibit 107 received in evidence)

23  BY MS. STAREN:

24  Q.  Mr. Myung, could you please, looking at the top email from

25  Daniel Shin, read the date of this email.

1    A.  It says September 24, 2019.

2    Q.  And I think you may have mentioned, is this another email

3    you received as an investor in Encore?

4    A.  Yes.

5    Q.  OK.  Can you turn to page 2, please.  Do you see where it

6    says "Forwarded message"?

7    A.  Yes.

8    Q.  Is this a message that Dan Shin was forwarding to you?

9    A.  Yes, it was.

10   Q.  Who was this forwarded message from?

11   A.  From Do Kwon.

12   Q.  Can you please read the email address that Do Kwon was

13   using.

14   A.  Yes.  It's do@terra.money.

15   Q.  What is the date of this email?

16   A.  September 23, 2019.

17   Q.  Can you please read the subject line of the email from Do

18   Kwon.

19   A.  Says, "Terra August/September investor update."

20   Q.  Can you please read the highlighted text starting with,

21   "Dear Terra investor."

22   A.  It says:  "Dear Terra investor, this month calls for a

23   bumper update to recap over August and September activity.

24   After three months we are currently the third most used

25   blockchain after Bitcoin and Ethereum."

1   Q.  What did you understand Do Kwon meant when he said "we are

2   currently the third most used blockchain after Bitcoin and

3   Ethereum"?

4   A.  I took it as it's the literal third most used blockchain

5   after Bitcoin and Ethereum.

6   Q.  OK.  Was it your understanding that that was significant to

7   be the third most used blockchain?

8   A.  Yes, because that means it has utility.

9   Q.  When you say "it has utility," what are you referring to

10  it?

11  A.  The Terra blockchain.

12  Q.  And if you turn to page 4, the second paragraph, starting

13  — it's one, two, three, four — fifth line down, starting

14  "with these new partners on board," could you please read that

15  sentence for me, please.  Starting "with these new partners on

16  board."

17  A.  Could you highlight that, please.

18  Q.  It's the one, two, three, four — fifth line down.

19  A.  Oh, OK.

20          "With these new partners on board, Terra will strive

21  to become the first blockchain payments network accepted

22  everywhere, ringing truth to our slogan, 'Korea runs on

23  Terra.'"

24  Q.  Did you have an understanding as to what Do Kwon meant when

25  he said "Korea runs on Terra"?

1   A.  Yeah.  So the Terra blockchain ── so Korea ── I mean, so,

2   like, basically 5 percent of Korea runs on the Terra blockchain

3   for e-commerce payments is what he was saying.

4   Q.  Sorry.  Is what he was saying?

5   A.  Yeah.  Like, that's what he would say to me.

6   Q.  And when ── did you understand whether he was referring to

7   Chai?

8           MR. MOREL:  Objection.  Speculation.

9           THE COURT:  Overruled.

10  A.  Yeah, because it's Korea runs on Terra.

11          MR. KORNBLAU:  Objection here, your Honor.  It's

12  outside the scope of the pretrial order as we discussed.

13          THE COURT:  Hang on a minute.

14          Overruled.

15          MS. STAREN:  Could you please go to page 6 of this

16  document.

17  Q.  Tell me who signed this email.

18  A.  Says, "Sincerely Do & Dan."

19  Q.  Is that Do Kwon and Dan Shin again?

20  A.  Yes.

21          MS. STAREN:  You can take that down, Mr. Haywood.

22  Q.  Did there come a time, Mr. Myung, when you discussed the

23  possibility of employment with Dan Shin?

24  A.  Yes.

25  Q.  And when was that?

1  A.  It was like when I was coming into Korea.

2  Q.  Do you remember approximately what time frame that was?

3  A.  I think it was at the end of 2019.

4  Q.  What did you discuss?

5  A.  I just wanted to catch up at that time and see if there was

6  any opportunities that he knew of.

7          MS. STAREN:  Could you please pull up Plaintiff's

8  Exhibit 108A for the witness, please.

9  Q.  Do you recognize —— sorry.  Do you recognize this exhibit,

10 Mr. Myung?

11 A.  Yes.

12 Q.  What is it?

13 A.  It's email exchange between me and Dan.

14 Q.  And is this a true and accurate copy of the email exchange

15 between you and Mr. Shin?

16 A.  Yes.

17         MS. STAREN:  OK.  We would move to admit Plaintiff's

18 Exhibit 108A into evidence.

19         MR. KORNBLAU:  Objection.  Hearsay, relevance.

20         THE COURT:  Overruled.

21         (Plaintiff's Exhibit 108A received in evidence)

22         MS. STAREN:  So let's focus on the first email on the

23 very last page.  Sorry, it's the last email, but it's just the

24 first of the chain.  Thank you.

25 BY MS. STAREN:

1    Q.  Could you please read the date of that email.

2    A.  Yeah, it said November 5, 2019.

3    Q.  And who is this email from?

4    A.  It's from me.

5    Q.  And who is this email to?

6    A.  It's to Dan.

7    Q.  Can you please read the —— sorry, when you say "Dan," is

8    that Dan Shin?

9    A.  Yes, Dan Shin.

10   Q.  Can you please read the first line starting with "Hi Dan"

11   and then that first paragraph.

12   A.  Yeah.  It's "Hi Dan, how's going?  It's been cool to see

13   the progress in your companies.  My two-year Korea ban is

14   finally coming to an end this month, and I'm moving back to

15   Korea."

16   Q.  What was the Korea ban you're referring to here?

17   A.  I had, like, a visa issue related to my start with Hello

18   Cafe.

19   Q.  What was that visa issue?

20   A.  So Hello Cafe was, like, a marketplace for, like, native

21   English speakers.  So they needed, like, visas to actually

22   meet, like, Korean people to speak in English in cafes.  So

23   because of that, I got a fine, and because of the fine, I had

24   an automatic two-year ban.

25   Q.  And approximately when was this fine?

1    A.  This was like around 2018.

2    Q.  And did you —

3    A.  Or '17, something like that, yeah.

4    Q.  And did you, in fact, pay the fine?

5    A.  Yes.

6    Q.  OK.  And why are you contacting Dan Shin at this time?

7    A.  Because I'm able to come back to Korea now, and I want to

8    settle in.

9    Q.  OK.  Can you please go to page 1, and focusing on the

10   bottom email, who is this bottom email from?

11   A.  It's from me.

12   Q.  And who is it to?

13   A.  To Dan.

14   Q.  And can you please read the date of this email.

15   A.  It is November 9, 2019.

16   Q.  And can you please read that first paragraph that you

17   write.

18   A.  Yeah.  It says:  "I am curious about Terra because I'm not

19   sure what to think of it.  I can understand that sellers

20   benefit by using a stablecoin, but what's in it for the

21   consumers (buyers)?"

22   Q.  When you say Terra here, what are you referring to by the

23   word "Terra"?

24   A.  It's the Terra stablecoins.

25   Q.  Are you referring to a specific Terra stablecoin?

1    A.  For Korea, it would be the KRT.

2    Q.  I'm sorry, say that again.

3    A.  So for Korea, it would be KRT.

4    Q.  OK.  And when you talk here about sellers benefiting by

5    using a stablecoin, what sellers are you talking about there?

6    A.  It's talking about the merchants.

7    Q.  The merchants with Chai?

8    A.  Yes, the merchants with Chai.

9    Q.  And what led you to think that Chai merchants were using

10   Terra stablecoins at this point in time?

11   A.  Yeah, because instead of paying large fees for transaction

12   fees, through Terra, it'd basically be super low transaction

13   fee.

14   Q.  And who told you that?

15   A.  Dan Shin.

16   Q.  Anyone else?

17   A.  Do Kwon.

18   Q.  Were there any other sources saying that?

19   A.  I mean, like mainly those two, but, like, Nicholas Platias.

20   Q.  Going to the top of this first page and focusing on that

21   top email, who is this email from?

22   A.  It's from Daniel Shin.

23   Q.  And can you please read Daniel Shin's email address there.

24   A.  Yeah.  Daniel@terra.money.

25   Q.  Do you have an understanding as to why Mr. Shin had a

1  terra.money email address at that time?

2  A.  Speaking at the time, Do and Dan were mainly about Terra

3  and Terraform Labs.  Chai came later.

4  Q.  And what is the late of this email?

5  A.  November 10, 2019.

6  Q.  Can you please read the first paragraph of Dan Shin's

7  response to you.

8  A.  Says, "Hey Aaron, the benefit for the merchants is cheaper

9  transaction fees.  This is a huge problem for e-retail

10  platforms that run on razor thin margins."

11  Q.  Can you please read the last sentence of —— yes, right

12  there, starting with "hope this is helpful."

13  A.  "Hope this is helpful.  Also attaching a quick deck on Chai

14  to paint an overview."

15  Q.  Did you receive the attachment?

16  A.  Yes.

17        MS. STAREN:  Could you please show the witness

18  Plaintiff's Exhibit 108B.

19  Q.  Do you recognize Plaintiff's Exhibit 108B?

20  A.  Yes, I do.

21  Q.  What is it?

22  A.  It's an investor presentation.

23  Q.  Is this a complete and accurate —— sorry.

24        Was this the attachment to the email we just looked

25  at?

1    A.  Yes.

2    Q.  Is this a complete and accurate copy of that attachment?

3    A.  Yes.

4            MS. STAREN:  We would move to admit Plaintiff's

5    Exhibit 108B into evidence.

6            MR. KORNBLAU:  Objection.  Hearsay.

7            THE COURT:  Overruled.

8            (Plaintiff's Exhibit 108B received in evidence)

9            MS. STAREN:  Mr. Haywood, you could publish for the

10   jury.

11   BY MS. STAREN:

12   Q.  Mr. Myung, what did you understand this document was again?

13   A.  It was an investor presentation.

14   Q.  For what company?

15   A.  For Chai.

16   Q.  And if you could please read the title of this document.

17   A.  It says, "chai:  A disruptive payment solution for an

18   exploding Asian e-commerce market."

19   Q.  Can you read what's written in the lower left-hand corner.

20   A.  It says, "Powered by Terra."

21   Q.  What did you understand that meant?

22   A.  That the Chai payment product was powered by Terra.

23   Q.  Could you please ——

24   A.  Terra blockchain.

25   Q.  Thank you.

1          Could you please go to page 7 of this slide deck and

2     read the highlighted language on the left, please.

3     A.   It says, "Chai delivers a low processing fee by replacing

4     the cluttered payment value chain with a single blockchain

5     layer."

6     Q.   What did you understand that to mean?

7     A.   Well, so typically for payments, it's super complicated.

8     There's a lot of banks and a bunch of different companies in

9     between.  So to finally settle payment, it's just, like,

10    really, really cluttered and complex.  But through the

11    blockchain, you can just remove all those intermediate layers

12    and all those intermediate fees, and go straight between the

13    user and the merchant really quickly, easily, and cheaply.

14    Q.   Is that your understanding of what is being reflected in

15    these two figures to the right?

16    A.   Yes.

17    Q.   And according to these figures, were they representing that

18    Chai used any bank accounts at all for its payment processing?

19    A.   Not in the picture there, no.

20          MS. STAREN:  OK.  Could we go to page 22, please.

21    Q.   Can you please read the text at the top of this.

22    A.   Yeah.  "Chai is steered by serial entrepreneurs and a team

23    with deep industry experience in payments and financial

24    services."

25    Q.   And who are the two serial entrepreneurs being listed here?

1    A.  Daniel Shin and Do Kwon.

2    Q.  Can you please read the description under Daniel Shin.

3    A.  Yeah.  So it says, "Co-founder.  Leads business development

4    and investor relations."

5    Q.  And can you please read the description under Do Kwon.

6    A.  Yeah.  It says, "Co-founder.  Leads engineering and

7    research efforts."

8    Q.  And is this consistent with your understanding of Do Kwon's

9    and Dan Shin's respective roles at Chai?

10   A.  Yes.

11   Q.  Did there come a time when you met Do Kwon?

12   A.  Yes.

13   Q.  And approximately when was that?

14   A.  It was either at the end of 2019 or early 2020 was the

15   first time.

16            MS. STAREN:  Mr. Haywood, could you please pull up

17   Plaintiff's Exhibit 660, just for the witness, please.

18   Q.  Mr. Myung, do you recognize Plaintiff's Exhibit 660?

19   A.  Yes.

20   Q.  What is it?

21   A.  It's Do Kwon.

22            MS. STAREN:  We would move to admit Plaintiff's

23   Exhibit 660 into evidence.

24            MR. MOREL:  No objection.

25            THE COURT:  Received.

```
 1              (Plaintiff's Exhibit 660 received in evidence)

 2              MS. STAREN:  Thank you, Mr. Haywood.  You can publish

 3    to the jury.

 4    BY MS. STAREN:

 5    Q.  Mr. Myung, who is this a photo of again?

 6    A.  It's a photo of Do Kwon.

 7    Q.  And how do you know that?

 8    A.  Because I met him.

 9    Q.  OK.  Did you meet with Do Kwon on more than one occasion?

10    A.  Yeah.  Some time, less than ten.

11    Q.  OK.  And where did these meetings take place?

12    A.  Usually cafes or —— but most —— actually, like, in the

13    beginning, mostly at the Chai office.

14    Q.  At the Chai office.

15              Was that different than Terraform's offices?

16    A.  No, they were the same office.

17    Q.  OK.  And what language did you and Do Kwon primarily

18    communicate in?

19    A.  English.

20    Q.  And what did you discuss with Do Kwon in these meetings?

21    A.  Just, like, products, technology, Chai just, like, you

22    know ——

23    Q.  OK.  Did that include engineering issues with respect to

24    Terraform and Chai?

25    A.  Yeah.
```

1  Q.  And during any of these meetings, did Do Kwon discuss

2  engineering issues with respect to Chai's payment system?

3  A.  Yeah.  I mean, like, we would go over them, like, on a

4  whiteboard and kind of draw it out.

5  Q.  OK.  And what did Do Kwon tell you about how Chai was

6  processing and settling its payments?

7  A.  He told me that it was all through the Terra blockchain.

8  Q.  OK.  Was anyone else present during any of these meetings?

9  A.  Yeah.  So Nicholas Platias and Ji'Hoon Kim.

10  Q.  And who was Nicholas Platias?

11  A.  Nicholas Platias, he cowrote the Terra white paper, and he

12  was also an employee of Chai and Terra.

13  Q.  OK.  And what about Ji'Hoon Kim?

14  A.  I'm sorry?

15  Q.  What about Ji'Hoon Kim?  Can you tell me about him?

16  A.  Ji'Hoon Kim was engineering manager originally from

17  Terraform Labs, but he came over to Chai, and he was

18  engineering manager there.

19  Q.  OK.  Now, you've testified that at least at first, before

20  you started at Chai, your understanding was Chai was treated as

21  part of Terraform, is that right?

22  A.  Yes.

23  Q.  OK.  And what led you to that understanding again?

24  A.  They shared the same office, had the same support staff,

25  had the same cofounders, had the same first go-to-market

O3RHSec3                          Myung - Direct

1    product.  They represented themselves to me as basically, you

2    know, part of the same team, so . . .

3    Q.  OK.  Did there come a time when that changed?

4    A.  Yeah.  So in 2020, they had a split.

5    Q.  And how did you learn of this split?

6    A.  So Justin Huang at a cafe, he told me that ——

7            MR. KORNBLAU:  Objection.  Hearsay.

8    Q.  You can just tell me his name.

9    A.  Oh.  Justin Huang.

10   Q.  Sorry.

11           Just to clarify, when we're talking about a split, are

12   we talking about a split of Chai from Terraform?

13   A.  Yes, those two companies separated.

14   Q.  And what did you understand at the time was the reason for

15   the separation?

16           MR. KORNBLAU:  Objection.  Foundation.

17           THE COURT:  Sustained.

18           MR. MOREL:  Objection.  Hearsay.

19           MS. STAREN:  I'll rephrase.

20   Q.  Did you have an understanding about the reason for the

21   separation between Chai and Terraform?

22   A.  Yeah.  For, like, legal reasons ——

23           THE COURT:  No, no, just answer that yes or no.

24           MR. KORNBLAU:  Objection.

25   Q.  Just say yes or no.

1   A.  Oh.  Yes.

2           THE COURT:  What was the basis for that foundation?

3   In other words, is that based on conversations?  Is it based on

4   documents?  If it's conversations, conversations with whom?

5   How'd you form this understanding?

6           THE WITNESS:  Because they told me directly.

7           THE COURT:  Who?

8           THE WITNESS:  Justin Huang.

9           MR. KORNBLAU:  Objection.  Hearsay.

10          THE COURT:  Sounds like it.  Sustained.

11  BY MS. STAREN:

12  Q.  Did there come a time when Chai and Terraform separated

13  offices as well?

14  A.  Yes.

15  Q.  Approximately when was that?

16  A.  That was in that same year of 2020.  So Terraform Labs

17  moved down the street a few blocks.

18  Q.  And what about Chai's offices?

19  A.  It stayed the same.

20  Q.  After the split, did you continue to discuss possible

21  employment with Do Kwon and Dan Shin?

22  A.  Yeah, so I interviewed with them separately, both of them.

23  Q.  And did there come a time when you decided to join Chai?

24  A.  Yes.

25  Q.  What led to that decision?

O3RHSec3                       Myung - Direct

1   A.  Well, I have a history with Dan, so I preferred to work

2   with him.

3   Q.  Approximately when was that that you accepted the offer to

4   join Chai?

5   A.  January of 2021.

6   Q.  OK.  When you were hired at Chai, were you paid a salary?

7   A.  Yes.

8   Q.  And approximately how much?

9   A.  Well, as senior adviser, it was about $100,000, and as

10  chief product officer, I think it was like about $200,000.

11  Q.  OK.  Were you promised anything else in connection with

12  your employment?

13  A.  Yes, stock.

14  Q.  OK.  Can you tell me about that.

15  A.  Yeah.  So I was promised a $20 million stock grant that

16  would vest over —— it was either four or five years, and there

17  was like a —— like a performance component to it.  So if the

18  company would grow, then based on certain milestones, I would

19  get certain portions of that stock grant.

20  Q.  And who promised you those —— the stock grant?

21  A.  Dan Shin.

22  Q.  And did you ever receive any stock?

23  A.  No, I did not.

24  Q.  I think you testified earlier, when you first joined Chai,

25  you thought Chai was using the blockchain, is that correct?

1    A.  Yes.

2    Q.  At some point after working at Chai, did there come a time

3    when your understanding changed?

4    A.  Yes.

5    Q.  And what changed about your understanding?

6    A.  Well, that there was no blockchain being used to process or

7    settle transactions at the company.

8    Q.  And how did you come to that understanding?

9    A.  Well, once you start to work on the products and technology

10   long enough, you start to see the, you know, press, and you see

11   a disconnect between what's marketed outside and what's the

12   reality inside.

13   Q.  And when you came to this understanding that you weren't

14   seeing Chai use the blockchain, what did you do next?

15   A.  I brought it up to the CEO.

16   Q.  And was that Dan Shin?

17   A.  Yes.

18   Q.  Approximately when was this?

19   A.  It was around, like, the middle of my employment in the

20   year 2021.

21   Q.  OK.  How did Mr. Shin respond?

22   A.  He told me that he has a gentleman's agreement with Do

23   Kwon.  Basically, for two years not going to mention each other

24   and the reality of the blockchain not being used at Chai.

25   Q.  And what did you understand the purpose of this gentleman's

1   agreement was?

2            MR. KORNBLAU:  Objection.  Basis?  Foundation.

3            THE COURT:  Overruled.

4   A.  Well, I mean, like, all the executives and the founders

5   came over from Terraform Labs, and they had a lot of Luna, like

6   life-changing amounts.  So by keeping quiet about Chai not

7   using the blockchain, they can fully vest and make lots of

8   money.

9   Q.  What did you think about the gentlemen's agreement?

10           MR. KORNBLAU:  Objection.  Relevance.

11           THE COURT:  Well, that depends on what's going to be

12  inquired into on cross.  So I will sustain the objection right

13  now, but it may be the subject of rebuttal, depending on the

14  cross.  Sustained.

15           MS. STAREN:  Your Honor, could we have a sidebar?

16           THE COURT:  Sure.

17           (Continued on next page)

18

19

20

21

22

23

24

25

1              (At sidebar)

2              MS. STAREN:  So my expectation is that they're going

3    to bring up the fact that he was a whistleblower.  He

4    complained about this.

5              THE COURT:  Well, that's why I ruled the way I did,

6    because I figured that this might very well come —— be relevant

7    to cross, but ——

8              MR. KORNBLAU:  Not clear I'm going to be bringing up

9    this gentlemen's agreement on cross.  So let's see.  If the

10   door is opened, the door is opened.

11             MS. STAREN:  But are you going to ask about the fact

12   that he's a whistleblower and say that he's only in it for the

13   money?

14             MR. KORNBLAU:  That's certainly possible.

15             MS. STAREN:  Then I think we are entitled to get in

16   his view that he actually thought this was legitimately bad, he

17   thought this was a fraud, and he wanted to report it because he

18   thought it was a significant issue that they were lying to the

19   public about what Chai was doing.

20             THE COURT:  OK.  Yes.

21             (Continued on next page)

22

23

24

25

1           (In open court; jurors present)

2   BY MS. STAREN:

3   Q.  Sorry about that.  Let me just go back and repeat the

4   question.

5           I think what I asked you is what did you think about

6   the gentlemen's agreement that you heard about from Mr. Shin?

7   A.  I thought it was very sketchy.

8   Q.  Why is that?

9   A.  Because clearly there's no technology internally, but that

10  technology's being marketed as existing, that transactions were

11  happening on the blockchain for Chai payments, and that's

12  clearly not the case.  But —— yeah, I mean, I can understand

13  why they wanted to keep that silent.

14  Q.  Did there come a time when you communicated with Mr. Shin

15  about this gentlemen's agreement again?

16  A.  Yes.

17  Q.  What led to that communication?

18  A.  So at first he told me that they're not going to mention

19  each other, you know, which basically means they're not going

20  to lie going forward.  But I saw an article from Do Kwon on the

21  Internet.  It was an interview, and he was touting Chai using

22  the Terra blockchain to process and settle transactions, which

23  is very not true.

24          MS. STAREN:  OK.  Mr. Haywood, could you please pull

25  up Plaintiff's Exhibit 100 for the witness, please.

1   Q.  Mr. Myung, do you recognize this exhibit?

2   A.  Yes.

3   Q.  What is it?

4   A.  It's the article, the interview.

5   Q.  OK.  Is this a true and accurate copy of that interview you

6   saw?

7   A.  Yes.

8           MS. STAREN:  OK.  We would move to admit Plaintiff's

9   Exhibit 100 into evidence.

10          MR. KORNBLAU:  Just a moment, please.

11          MR. MOREL:  Your Honor, we don't necessarily object.

12  We just believe some extraneous information in the exhibit

13  should be redacted.  We're happy to confer with SEC counsel.

14          THE COURT:  We can do that at the next break.

15          MR. KORNBLAU:  Same, your Honor.  Thank you.

16          THE COURT:  Very good.  Received subject to possible

17  redactions.

18          MR. MOREL:  Thank you.

19          (Plaintiff's Exhibit 100 received in evidence)

20          MS. STAREN:  Thank you, Mr. Haywood.  You could

21  publish to the jury.

22  BY MS. STAREN:

23  Q.  Could you please read the title of this article, Mr. Myung.

24  A.  It says, "Interview: Terra CEO discusses Luna, Mirror,

25  Chai, Terraswap, More "

O3RHSec3                          Myung – Direct

1    Q.  Can you read the next part of that title.

2    A.  "Luna as surged over 2000 percent over the last 60 days.

3    We sat down with Terra's CEO for a deep dive into all things

4    Terra."

5    Q.  Could you please go to page 3 and read the paragraph at the

6    bottom starting with "Do Kwon."

7    A.  Yeah, it says:  "Chai is one of South Korea's most popular

8    payments apps that recently raised a $60 million Series B.

9    Through an API called i'mport, Chai enables merchants to accept

10   payments via 20 different options (e.g., debit, credit, PayPal,

11   etc.), with low fees and fast settlements.  On the back end,

12   Chai uses Terra's blockchain stablecoin to settle transactions

13   faster and cheaper than legacy counterparts."

14   Q.  Then could you go to page 4 and read the paragraph at the

15   top starting with "Do Kwon."

16   A.  It says, "Last year Chai processed more than $2 billion in

17   transaction volume with more than 2.5 million users, making it

18   one of the most successful and widely adopted applications that

19   uses blockchain technology and is not purely speculative in

20   nature."

21   Q.  So, Mr. Myung, what about Do Kwon's statements here led you

22   to communicate with Mr. Shin again about that gentlemen's

23   agreement?

24   A.  Well, it said that with Terra Chai ——

25           MS. STAREN:  You can leave it up, Mr. Haywood, sorry,

1    if he needs to refer to it.

2    A.  Yeah, it was the quote before that.  Could you pull that

3    up.

4            Yeah.  It was specifically about that Chai uses

5    Terra's blockchain to settle transactions faster and cheaper

6    than legacy counterparts.

7    Q.  What about that statement made you or led you to

8    communicate with Mr. Shin again?

9    A.  It's just completely false, so I brought it up with him

10   again.

11   Q.  OK.

12           Mr. Haywood, could you please show the witness

13   Plaintiff's Exhibit 118A.

14           Mr. Myung, do you recognize this document?

15   A.  Yes.

16   Q.  What is it?

17   A.  It's Slack chat between me and Dan.

18   Q.  And did you capture this image?

19   A.  Yes.

20   Q.  OK.  Is this a true and accurate copy of the Slack chat

21   that you captured?

22   A.  Yes.

23           MS. STAREN:  OK.  We would move to admit Plaintiff's

24   Exhibit 118A into evidence.

25           MR. KORNBLAU:  Objection.  Hearsay.

1              THE COURT:  Overruled.

2              (Plaintiff's Exhibit 118A received in evidence)

3              MS. STAREN:  Thanks.  Mr. Haywood, you can publish to

4     the jury.

5     BY MS. STAREN:

6     Q.  Mr. Myung, can you please explain, what is Slack?

7     A.  Slack is a business chatting software.

8     Q.  It's a way to communicate messages back and forth?

9     A.  Yeah, within the company.

10    Q.  OK.  Did you use Slack often to communicate with Mr. Shin?

11    A.  Yes, every day.

12    Q.  Let's start with your message to Mr. Shin at the top.  Can

13    you please read the date of that message.

14    A.  Yeah, it's August 13, 2021.

15    Q.  Can you please read your message.

16    A.  Yeah.  It says, "This is an interview of Do from Tokenist

17    regarding Chai in March 2021.  He says that 'Chai uses Terra's

18    blockchain to settle transactions faster and cheaper than

19    legacy counterparts.'"

20    Q.  Can you please tell me what these two images are below.

21    A.  Yeah, it's a screenshot from that article.

22    Q.  And did Mr. Shin respond to you?

23    A.  Yes.

24    Q.  What was the date of his response?

25    A.  August 14, 2021.

1    Q.  Was that the next day?

2    A.  I think so.  Yes.

3    Q.  And can you please read his response to you.

4    A.  He says, "Yeah, as I said, we have a look-the-other-way

5    handshake (confidential) for two years."

6    Q.  What did you understand Mr. Shin was referring to when he

7    said "a look-the-other-way handshake (confidential)"?

8    A.  That was the gentlemen's agreement that we had discussed

9    that he told me about.

10   Q.  And underneath his message, it says "edited" in

11   parentheses.  Do you have an understanding as to what that

12   refers to?

13   A.  Yeah.  So the sender of a message can edit their own

14   message.

15   Q.  And is that something particular to Slack?

16   A.  Well, like, a lot of messaging apps have that, but Slack

17   has that, yeah.

18   Q.  OK.  And when you say the sender of the message, in this

19   case was that Dan Shin?

20   A.  Yes.

21   Q.  Do you recall Dan Shin editing his message?

22   A.  I do.

23   Q.  And do you recall what was different about his previous

24   message and this one?

25   A.  It was a more detailed contents of our gentlemen's

1    agreement.  He just simplified it down to one sentence.

2    Q.  OK.  So the prior —— just to clarify, the prior message was

3    a more detailed ——

4    A.  Yes.

5    Q.  —— description?

6    A.  Yes.

7    Q.  OK.  Can you please read your response.

8    A.  Yeah.  Says, "I'm OK with a moratorium.  I just thought

9    that it would be both sided and not one sided."

10   Q.  What did you mean by that?

11   A.  Well, this gentlemen's agreement, I thought basically Chai

12   and Terra both would just be silent about the reality of the

13   fake transactions.  But seeing the news article come out,

14   clearly Do has been talking about it.  So that's what it means

15   by both sided and one sided.

16   Q.  OK.  Did you continue to have concerns about this

17   gentlemen's agreement?

18   A.  Yes.

19          MS. STAREN:  Mr. Haywood, could you please show

20   Mr. Myung Plaintiff's Exhibit 119.

21   Q.  Mr. Myung, do you recognize Plaintiff's Exhibit 119?

22   A.  Yes.

23   Q.  And what is it?

24   A.  It's another Slack chat between me and Dan.

25   Q.  And is this also something you captured on your phone?

O3RHSec3                          Myung - Direct

1    A.   Yes.

2    Q.   And is this a true and accurate copy of the Slack chat that

3    you captured?

4    A.   Yes.

5            MS. STAREN:  We would move to admit Plaintiff's

6    Exhibit 119 into evidence.

7            MR. KORNBLAU:  Objection.  Hearsay.

8            THE COURT:  Overruled.

9            (Plaintiff's Exhibit 119 received in evidence)

10           MS. STAREN:  Let's start with the chat at the top from

11   Aaron.  Could you pull that one out, please, Mr. Haywood.

12   BY MS. STAREN:

13   Q.   Mr. Myung, what is the date of this top chat from you?

14   A.   It's August 15, 2021.

15   Q.   Could you please read your first sentence here.

16   A.   Yeah.  It says, "It could be possible to have it as our

17   lowest possible priority which we never get around to doing,

18   but it could be consistent with the narrative that Do is

19   projecting."

20   Q.   What are you referring to here?

21   A.   I am basically saying that we should at least have it on a

22   roadmap to use blockchain technology for payments because that

23   is Do —— because Do is already —— because Do Kwon is already

24   marketing it as something that already exists in reality.

25   Q.   OK.  Could you please read at the bottom Dan Shin's —— or

1    Dan's response.

2    A.  Yeah.  It says, "I'd rather not spend my energy here.

3    Really a low priority item for me and not something I can place

4    on my plate right now."

5              MS. STAREN:  I'm sorry.  Mr. Haywood, could you

6    please, it looks like it continues on to the next page.  Can

7    you pull up the next section, the top paragraph.

8    A.  He says, "Terra narrative really only penetrates the

9    blockchain followership, which I believe is quite narrow in the

10   broader sense of things."

11   Q.  What did you understand Dan Shin meant by that?

12   A.  He doesn't really want to get this on our roadmap because

13   this is really —— that narrative, you know, is really only,

14   like, relevant to the crypto investors.

15             MR. MOREL:  Objection.  Foundation.  Move to strike.

16             THE COURT:  Hang on.

17             Overruled.

18   Q.  And if you go to the —— his response at the bottom of that

19   section, that page, did Mr. Shin provide further explanation

20   about the gentlemen's agreement there?

21   A.  Yeah.  He said, "The idea was that as Terra becomes more

22   diversified, he would have less and less reason to mention

23   Chai.  Not a lot of people read Coin Media, especially in

24   English, so let's wait and see."

25   Q.  Now, here when Mr. Shin is saying "he would have less and

1    less reason," who is "he"?

2    A.   That's Do Kwon.

3    Q.   OK.   What did you understand Mr. Shin was saying here?

4    A.   It means that over time Terra does not have to rely on Chai

5    for its value.   It's going to go and create different products.

6    And basically the people who read the Coin Media, I mean,

7    especially in English, he says, so people outside of Korea will

8    read it, and they can invest based on Coin Media, so . . .

9    Q.   OK.   Did you have any understanding about whether Chai

10   transactions were somehow reflected on the Terra blockchain?

11   A.   Yeah.   So once the payments are actually executed through

12   the centralized databases through Chai, that transaction

13   history would just be basically copied and pasted onto the

14   Terra blockchain to make it seem as if the transactions

15   actually happened on the blockchain.

16   Q.   And ——

17            MR. KORNBLAU:   Objection.   Foundation.   Move to

18   strike.

19            MS. STAREN:   If it helps, your Honor ——

20            THE COURT:   The objection on lack of foundation is

21   sustained, but if you can lay a foundation, please do so.

22            How do you know what you just told us?

23            THE WITNESS:   Well, my conversations with him.   But,

24   specifically, this Slack chat is he's spelling out exactly the

25   idea.

1          THE COURT:  OK.  So this is based on your experience

2     and knowledge and familiarity with the company.  This is the

3     inference you drew from what he's saying there.  Do I have that

4     right?

5          THE WITNESS:  Yeah, from his direct language.

6          THE COURT:  All right.  The objection is overruled.

7     BY MS. STAREN:

8     Q.  Can you tell me, was there a way that the public could go

9     online and see the Chai transactions reflected on the Terra

10    blockchain?

11    A.  Yeah.  So there was something called ChaiScan, and if you

12    went on ChaiScan, it's a website, and it shows basically, like,

13    these charts, you know, like all these real-time transactions.

14    And I put that in quotes.  Basically, it represents that these

15    are Chai's transactions happening on the blockchain.

16    Q.  OK.  Did you have an understanding as to whether Terraform

17    had any role in publicizing ChaiScan?

18    A.  Yeah, it was on their homepage.

19    Q.  When you say "it was on their homepage," do you mean

20    Terraform's homepage?

21    A.  It was on the terra.money homepage.  It was on the front

22    page, big button, that says "see metrics."

23    Q.  And if you clicked that button, where did you go?

24    A.  It goes to ChaiScan.

25    Q.  OK.  I think you mentioned earlier that you learned at some

1    point that Chai transactions were being copied onto the Terra

2    blockchain, is that right?

3    A.  Yes.

4    Q.  OK.  How did you learn this?

5    A.  I learned through Ji'Hoon Kim.

6          MS. STAREN:  At this point, Mr. Haywood, could you

7    show the witness only Plaintiff's Exhibit 121.

8    Q.  Mr. Myung, do you recognize Plaintiff's Exhibit 121?

9    A.  It's not on my screen yet.

10   Q.  Oh, you're right, it's not.

11   A.  Yes.

12   Q.  What is this?

13   A.  It's a Slack chat between me and Ji'Hoon.

14   Q.  Again, is this a screenshot that you took?

15   A.  Yeah.

16   Q.  And is this a true and accurate copy of the screenshot that

17   you took?

18   A.  Yes.

19         MS. STAREN:  We would move to admit Plaintiff's

20   Exhibit 121 into evidence.

21         MR. KORNBLAU:  Objection.  Hearsay, your Honor.

22         THE COURT:  Overruled.

23         (Plaintiff's Exhibit 121 received in evidence)

24   BY MS. STAREN:

25   Q.  OK.  Let's focus on the first email —— or first chat from

1    you, Aaron.

2              What is the date?

3    A.  It's September 30, 2021.

4    Q.  Who are you writing to?

5    A.  Ji'Hoon Kim.

6    Q.  And can you please read your message to Mr. Kim.

7    A.  Says, "This is confidential, but I may be going into more

8    crypto route at Chai with the bolt.  Currently, how integrated

9    is Terra with Chai?  In my understanding, the payments are sent

10   and managed through the centralized database, though the

11   transactions are mirrored separately on Terra."

12   Q.  What is the centralized database that you're referring to

13   there?

14   A.  That's just the Chai systems.

15   Q.  What currency was used by Chai to make the payments from

16   that centralized database?

17   A.  Korean won.

18   Q.  And when you said "though the transactions are mirrored

19   separately on Terra," what did you mean by that?

20   A.  It just means that transactions are copied onto the

21   blockchain to pretend that it's real.

22   Q.  Did you have an understanding as to how Terra received

23   information about the Chai transactions?

24   A.  Yeah, through the LP server.

25   Q.  OK.  Did Ji'Hoon Kim respond to your question here about

1  how —— I think you said how integrated is Terra with Chai?  Did

2  Ji'Hoon Kim respond?

3  A.  Say again.

4  Q.  Did Ji'Hoon Kim respond to your question how integrated is

5  Terra with Chai?

6  A.  Yeah, looks like it.

7  Q.  So if you go to the bottom and pull out Ji'Hoon Kim's

8  response, could you please read that.

9  A.  Yeah.  It says, "Only Chai transaction history is mirrored

10  to Terra network, so there is no wallet or token concept in

11  Chai."

12  Q.  Again, what did you understand he meant by "only Chai

13  transaction history is mirrored to Terra network"?

14  A.  So the transaction history is copied and pasted onto the

15  Terra blockchain, and at Chai there is no wallet, no crypto

16  wallet and no crypto token concept in Chai.

17  Q.  And what did you understand that means, there's no wallet

18  or token concept in Chai?

19  A.  There's no crypto, period, at Chai.

20  Q.  OK.  Now, apart from Dan Shin, did you communicate with

21  anyone else about your concerns with Do Kwon's representations

22  about Chai?

23  A.  Yes.

24  Q.  And who, generally, did you communicate these concerns

25  with?

1    A.  To executives and investors.

2    Q.  And you're referring to executives and investors with Chai?

3    A.  Yes.

4    Q.  And did you tell any of these Chai executives and investors

5    your understanding that Chai was not using the blockchain?

6    A.  Yes.

7              MR. MOREL:  Objection.  Leading.

8              THE COURT:  I'll allow it, but be careful about

9    leading.

10   Q.  Did any of these individuals express any surprise?

11   A.  No.

12   Q.  Were these verbal, mostly verbal, or written

13   communications?

14             MR. KORNBLAU:  Objection.  Leading.

15   A.  They were all verbal.

16             THE COURT:  No, when there's an objection, you need to

17   wait.

18             THE WITNESS:  I'm sorry.

19             THE COURT:  Overruled.  So the answer was they were

20   all verbal.  Go ahead.

21   Q.  Did there come a time when you began to record your

22   conversations?

23   A.  Yes.

24   Q.  Approximately when was the first time that you began to

25   record conversations?

1    A.  Towards the end of 2021.

2    Q.  And when you recorded these conversations, did you tell the

3    other person you were recording them?

4    A.  No, I did not.

5    Q.  Why did you record these conversations?

6    A.  Because I needed to protect myself because these are all

7    fake transactions happening on the blockchain.

8    Q.  I think you said you first started recording towards the

9    end of 2021, is that right?

10   A.  Yes.

11   Q.  Did there come a time when you recorded a conversation with

12   Ji'Hoon Kim?

13   A.  Yes.

14   Q.  OK.  And do you recall approximately when that was?

15   A.  It was towards the end of the year.

16   Q.  And where did this conversation take place?

17   A.  It happened at the Chai office.

18   Q.  Was anyone else present during this conversation?

19   A.  Just me and him.

20   Q.  And approximately how long was this conversation?

21   A.  About an hour.

22   Q.  Did you record this conversation?

23   A.  Yes.

24   Q.  Did you record the entirety of the conversation?

25   A.  Yes.

1   Q.  So at this time I want to ask, Mr. Myung, were you, I

2   guess, played a recording of that Ji'Hoon Kim conversation?

3   A.  I'm sorry?

4   Q.  Sorry.  Have you been played a recording of that Ji'Hoon

5   Kim conversation?

6           THE COURT:  Did you review that recording?

7   A.  Oh, yes.

8   Q.  OK.  And we marked it as Plaintiff's Exhibit 122A, and you

9   reviewed that, the full recording, is that correct?

10  A.  Yes.

11  Q.  OK.  And did you recognize that recording as the recording

12  you made with Ji'Hoon Kim?

13  A.  Yes.

14  Q.  OK.  Was that a complete and accurate copy of that

15  recording?

16  A.  Yes.

17  Q.  OK.  Do you know whether a transcript was made of that

18  recording?

19  A.  Yes.

20  Q.  Did you have an opportunity to review that transcript?

21  A.  Yes.

22  Q.  Was that a true and accurate transcript of the Ji'Hoon Kim

23  recording?

24  A.  Yes.

25          MS. STAREN:  OK.  So I think at this time we would

1    move to admit Plaintiff's Exhibit 122A, which is the recording,

2    the Ji'Hoon Kim recording, into evidence.  And we would intend

3    to play only short clips from it with a relevant portion of the

4    transcript rolling over.

5              MR. KORNBLAU:  Objection.  Hearsay, your Honor.

6              THE COURT:  The objection to hearsay is overruled.

7    The underlying recording is received.  The transcripts are

8    received only as an aid to the jury.  In other words,

9    ultimately, it's the recording that's in evidence, but you can

10   use the transcript to help you follow the recording.

11             So go ahead, counsel.

12             MS. STAREN:  Thank you, your Honor.

13             (Plaintiff's Exhibit 122A received in evidence)

14   BY MS. STAREN:

15   Q.  Before we get to the first clip, Mr. Myung ——

16             THE COURT:  Bear in mind, we're going to give the jury

17   their lunch break in five minutes, so you might want to adjust

18   to that fact.

19             MS. STAREN:  Oh, boy.  OK.

20             THE COURT:  Do you want ——

21             MS. STAREN:  Let's stop here, actually.

22             THE COURT:  Yes, I thought you might pick up the hint.

23             All right.  So, ladies and gentlemen, we'll give you

24   your lunch break now.  Resume at five minutes before 2:00.

25             (Jury excused)

O3RHSec3                          Myung – Direct

1                    (Continued on next page)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    (Jury not present)

 2                    THE COURT:  Please be seated.

 3                    OK.  So you have copies of the transcript for the ——

 4       do you have it for the jurors?

 5                    MS. STAREN:  Oh.

 6                    THE COURT:  Or it will appear on the screen?

 7                    MS. STAREN:  Yeah, we're going to have it roll over

 8       the screen.

 9                    THE COURT:  Very good.  Anything else we need to take

10       up now?

11                    MR. PELLEGRINO:  Just briefly, your Honor, more on

12       that professional reader issue that I mentioned.  The SEC has

13       responded that they would prefer to use an SEC law clerk.  We

14       object to that.  We think it's a time-honored tradition of

15       having someone neutral read it.  The issue here is that we're

16       both proponents of this evidence.  So our proposal is that the

17       reader comes in and whichever designations and

18       counter-designations the Court has allowed, the reader would

19       simply read those.  Rather than having someone who works for

20       the SEC, this person is neutral.  They wouldn't know which side

21       is designated what.  We think this has been done since time

22       immemorial.  It's done less often ——

23                    THE COURT:  I don't about time immemorial.  I am, of

24       course, the person in this courtroom who's the best expert on

25       time immemorial.
```

O3RHSec3

1          MR. PELLEGRINO:  Certainly.

2          THE COURT:  But anyway, so who's paying?

3          MR. PELLEGRINO:  Well, we are, your Honor.  But they

4    have no knowledge of the case.  They don't know which side has

5    designated what.  These are people who are actors or do books

6    on tape.  They just read it.  And given the content, we think

7    the jury could appreciate someone doing that rather than having

8    someone just read about LP server and NAVER Cloud, and so on.

9          THE COURT:  Yeah, I don't see the problem with that,

10   so OK.

11         MR. PELLEGRINO:  Thank you, your Honor.

12         THE COURT:  All right.  We'll see you all five minutes

13   before 2:00.  I made the final, I hope, Paul Kim ruling.  So

14   we'll hand that out to you now as well.

15         (Lunch recess)

16

17

18

19

20

21

22

23

24

25

O3RHSec3

```
 1                         Afternoon session
 1                           2:11 p.m.

 2          (In open court; jury not present)

 3          THE COURT:  Just so everyone knows, we're going today

 4   and tomorrow until 3:30 and on Friday to 4:30 and we'll start

 5   each day at 9:30, except you guys may have to come in at

 6   9:00 but we'll think about that.

 7          Yes?

 8          MR. CARNEY:  Your Honor, can I raise two quick expert

 9   issues and then I think my colleague has an issue too.

10          THE COURT:  Yes.

11          MR. CARNEY:  The SEC had planned to call our

12   blockchain expert tomorrow, Dr. Edman, but we're mindful of

13   your Honor's request, and we recall your students here at the

14   Daubert hearing, and we want to give them the opportunity to

15   see the next stage.

16          THE COURT:  Different group.

17          MR. CARNEY:  A different group of students, but we're

18   mindful for that, so we are making some calls to see if we can

19   move things around.  I can't promise --

20          THE COURT:  As I say, it's a request, but certainly

21   not an order.  If you can't do it, you can't do it.  Thank you.

22          MR. CARNEY:  Thank you, your Honor.  And separate

23   expert request, and we just wanted to seek your Honor's

24   guidance with respect to rebuttal testimony.  We understood

25   that your Honor wanted all testimony that could be induced in
```

O3RASEC4

1     the case in chief, to do it then.  But with respect to our one

2     expert, Dr. Bruce Mizrach, your Honor might recall the

3     defendants have an expert who was retained specifically to

4     address his model and his testimony and we just wanted to

5     understand if your Honor expected Professor Mizrach to address

6     Professor Hendershott's criticisms when he's on direct in our

7     case in chief, or whether he would have an opportunity to come

8     back in rebuttal and speak to those critiques.

9               THE COURT:  I think I'd prefer to have him address

10    that on your case in chief.

11              MR. CARNEY:  Thank you, your Honor.

12              MS. CUELLAR:  And then, your Honor, just one issue.

13    The parties have conferred on the witnesses for the adverse

14    inference for the *LiButti* factors.  We understood the Court's

15    direction that the witnesses should come here absent of the

16    agreement.  We have consulted with the counsels for those two

17    witnesses and they have said they will move to quash the

18    subpoena.  So we just wanted to get your final instruction that

19    the two witnesses do indeed have to come here to establish the

20    factors, and we'll let them know and they can call the Court

21    and do what they may.

22              THE COURT:  That's fine.  So I think that will --

23    that's a good -- that is certainly something that should occur

24    at 9:00 on the relevant day or days so that we don't waste the

25    jury's time with that.

O3RASEC4

1           MS. CUELLAR:  Understood, your Honor.  Thank you.

2           MR. KORNBLAU:  Your Honor, may we have a continuing

3    objection on hearsay grounds to the recordings by Mr. Myung so

4    I don't have to keep interrupting the flow.

5           THE COURT:  Yes.  Although I didn't really understand

6    in some of your earlier objections to some of the documents.

7    So the most of his conversations were with a Terraform

8    principal.  So the Terraform principals' statements were

9    statements of a party adversary.  And most of the witness's

10   statements were really often just questions, which are never

11   hearsay.  A question doesn't assert any fact, just ask the

12   question.

13          So I wasn't quite sure what the basis of your

14   objection was.

15          MR. KORNBLAU:  There were different issues, your

16   Honor.  But one was that, you know, we take the view that Chai

17   is a different company, so a statement by Chai or a Chai

18   employee --

19          THE COURT:  I see.

20          MR. KORNBLAU:  Is hearsay.

21          THE COURT:  I think I've already indicated that for

22   the purposes offered here that they reviewed as

23   co-conspirators.  So there was the co-conspirator exception as

24   well as other hearsay objections.

25          MR. KORNBLAU:  And I understand that, your Honor.  We

O3RASEC4

1    just want to make our record that we object.

2            THE COURT:  No, I like your idea of a continuing

3    objection.  That's fine.

4            MR. PATTON:  Your Honor, just one further point, which

5    is I passed up to your deputy our proposed curative

6    instruction.

7            THE COURT:  Oh.  Only two single spaced pages.

8            MR. PATTON:  Well, in our defense, one of those pages

9    is just to provide your Honor what Judge Seibel gave in the one

10   that I referenced in the argument this morning.  So it's one

11   page.  Attached is basically an exhibit.

12           THE COURT:  Well, I can tell you right now, I'm not

13   going to give this.  I will look at it and see if there's

14   individual sentences I might adopt.  But the first paragraph

15   looks like what I normally give.

16           MR. PATTON:  The remainder relates to the issue of the

17   hypothetical about if you had known, which was the subject of

18   the Judge Seibel curative instruction that I was referencing

19   earlier.

20           THE COURT:  So, I'm sorry.  So these are two --

21   there's first your version and then there's her version, but

22   you're not asking for both?  You're asking for one or the

23   other; is that it?

24           MR. PATTON:  One page is our requested curative

25   instruction.  The other page is just for your reference, the

O3RASEC4

1    actual curative instruction that Judge Seibel gave.

2              THE COURT:  Yeah.  By the way, I'm not at all sure

3    that I agree with what you seem to have indicated was her

4    initial -- was her rejection of her initial view.  But maybe I

5    misunderstood.

6              If I become aware that the, in this case, the

7    cofounder of a company is intentionally lying to me about the

8    company, why isn't that material alone?  As opposed to whether

9    he's lying about material element.

10             MR. PATTON:  Well, I guess I would start with the

11   premise that I don't think that's part of the SEC's claim.

12             But I think that the Second Circuit, and I'll have to

13   take a look at this, but has talked about in places that the

14   substance of the misrepresentations still has to be material.

15   It's not just the fact of a misrepresentation.

16             THE COURT:  Well, I would distinguish -- but I'll be

17   happy to look at any case you have.  I don't think we'll

18   necessarily have to reach it in this case in any event, but

19   just out of curiosity, I would think it would depend in part on

20   whether you understand that the lie was told intentionally, and

21   that it's being -- by the head of the company.  That seems to

22   me to be a different kind of situation from where the question

23   is whether some mid-level person unintentionally told a lie

24   about some peripheral matter.

25             But in any case, I think it's going to be moot in this

O3RASEC4

1   case because the SEC is the -- the lies I've seen so far, the

2   alleged lies, I understand you're disputing that, are all about

3   material matters.  But I'm just curious now, if I were a

4   reasonable investor and it's an objective test, and I knew that

5   the head of the company was purposely lying to me about some,

6   in the hypothetical, minor aspect of the company's business,

7   why would I nevertheless regard that as material, because how

8   could I make an investment in a company where the head guy

9   purposely sets out to deceive me.

10          MR. PATTON:  I just don't think that's the law, your

11  Honor.

12          THE COURT:  If it's not the law, then it's not.  And I

13  will, you know -- that's to say I think it's going to be moot

14  in this case anyway.  But now you've got my curiosity going.

15          Okay.  Let's bring in the witness and let's bring in

16  the jury.

17          MR. FERRARA:  Your Honor, could we mark that as Court

18  Exhibit 1.

19          THE COURT:  No, because I already marked the

20  preliminary instruction as Court Exhibit, but if you'd like to

21  mark it as Court Exhibit 2.

22          MR. FERRARA:  Pardon me.  Yes.  Thank you, your Honor.

23          THE COURT:  Okay.

24          (Continued on next page)

25

O3RASEC4                          Myung – Direct

1           (In open court; jury present)

2           THE COURT:  Please be seated.  Ladies and gentlemen,

3    we're going only to 3:30 p.m. today because of some other

4    matters I have, and that will also be true tomorrow.  On

5    Friday, however, we will go until 4:30.  So I just wanted to

6    give you a heads up.  And each of those days we'll start at

7    9:30.

8           So go ahead, counsel.  There you are.

9           MS. STAREN:  Thank you, your Honor.

10   AARON MYUNG, resumed.

11   DIRECT EXAMINATION CONTINUED

12   BY MS. STAREN:

13   Q.  Good afternoon, Mr. Myung.

14          Before we took our break we had just introduced

15   Plaintiff's Exhibit 122a, which was the conversation that you

16   had recorded with Mr. Ji'Hoon Kim; is that right?

17   A.  Yes.

18   Q.  Could you please describe generally what you and Mr. Kim

19   were discussing in that conversation?

20   A.  We were talking about how Chai uses, you know, like the

21   whole, like the mirroring process of the Chai transaction data

22   being copied onto the blockchain.

23          MS. STAREN:  Okay.  Mr. Haywood, could you please play

24   clip one.  I'm sorry, Plaintiff's Exhibit 122a, clip one.

25          MR. KORNBLAU:  Your Honor, we have our continuing

1    objection, right?

2                THE COURT:  Yeah.

3                MR. KORNBLAU:  We'll just leave that.

4                (Video played)

5    BY MS. STAREN:

6    Q.  Okay.  And just for clarification purposes, the first voice

7    on that recording, who was that?

8    A.  That's Ji'Hoon Kim, the head of engineering.

9    Q.  Okay.  And the second voice was?

10   A.  That's me.

11   Q.  Okay.  And in the recording, what did you understand

12   Ji'Hoon Kim when he said, "actually there's no crypto going on

13   within Chai?"

14   A.  He meant that there's no crypto going on in Chai.

15   Q.  Okay.  And was that consistent with what you had observed

16   working at Chai?

17   A.  Yes.

18   Q.  And he said -- do you know what he -- Mr. Ji'Hoon Kim meant

19   when he referred to "it's in mirror?"

20   A.  Oh, so mirror is a euphemism for copy, so you copy it onto

21   the blockchain.

22   Q.  And when you say you copy it onto the blockchain, what was

23   being copied on to the blockchain?

24   A.  The transaction data.

25   Q.  Is that the Chai transaction data?

O3RASEC4                        Myung - Direct

1   A.  Yeah, the Chai transaction data.

2           MS. STAREN:  Okay.  Mr. Haywood, could you please play

3   Plaintiff's Exhibit 122a, clip two.

4           (Video played)

5           MS. STAREN:  Thank you, Mr. Haywood.

6   Q.  So, Mr. Myung, in this clip, Ji'Hoon Kim mentions something

7   called an LP server.  Had you heard reference to an LP server

8   before this?

9   A.  Not really.  I mean, like vague references maybe, but this

10  is the first time I got clarity on it.

11  Q.  Okay.  And what did you understand Ji'Hoon Kim was saying

12  about the LP server's role with respect to copying Chai

13  transactions on the blockchain?

14  A.  So the transaction data is sent to the LP server and the LP

15  server just literally just replays the transactions on the

16  blockchain as if they were the real transactions.  So these are

17  like carbon copies.

18  Q.  Okay.  And so when Ji'Hoon Kim said the LP server's job is

19  to send this transaction data to Terra and then "it's their job

20  to write or create a block for these."

21          Who did you understand was their -- whose job was it

22  that you understood?

23  A.  Terraform Labs.

24  Q.  And did you have an understanding of who sent Chai

25  transaction data to Terraform Labs?

O3RASEC4                        Myung - Direct

1   A.   I'm not really sure about that portion.

2   Q.   Okay.  Did you directly interact with the LP server in the

3   course of carrying out your role as chief product officer at

4   Chai?

5   A.   No.  I had no reason to.

6   Q.   And what about this legal issue that Ji'Hoon Kim was

7   referring to?  What did you understand that meant?

8   A.   In Korea, you cannot use a blockchain to process or settle

9   transactions.

10  Q.   And there was a reference here to October of 2019 for the

11  timeframe in which Terraform and Chai split.  Is that -- was

12  that accurate?

13  A.   Well, he said last year and the year before was 2020.

14  Q.   Okay.  So what is your testimony as to when Chai and

15  Terraform split?

16  A.   That was 2020.

17  Q.   Okay.

18          MS. STAREN:  Mr. Haywood, could you please play

19  Plaintiff's Exhibit 122a, clip three.

20          (Video played)

21  Q.   So here, who was that, by the way?

22  A.   That was Ji'Hoon Kim, head of engineering.

23  Q.   Okay.  And his statement that Chai is not using blockchain

24  technology at all, was that consistent with your understanding

25  of what you learned as senior advisor and chief product officer

1   at Chai?

2           MR. KORNBLAU:  Objection.  Leading.

3           THE COURT:  Overruled.

4   A.  Yes.

5   Q.  Okay.  Did there come a time when you recorded a

6   conversation with an individual named Jinny Baek?

7   A.  Yes.

8   Q.  Who was Jinny Baek?

9   A.  He was a chief financial officer, the CFO.

10  Q.  For Chai?

11  A.  Yes.

12  Q.  And do you recall approximately when that conversation

13  occurred?

14  A.  It was approximately same time period, at the end of 2021.

15  Q.  Okay.  And where did that conversation take place?

16  A.  Happened in a cafe in Seoul.

17  Q.  Was anyone else present during that conversation?

18  A.  No.

19  Q.  And approximately how long was that conversation?

20  A.  Approximately an hour.

21  Q.  And did you record the entirety of that conversation?

22  A.  Yes.

23  Q.  Okay.  So earlier did you have an opportunity to review

24  the -- a copy of the recording of your conversation with Jinny

25  Baek with the SEC?

1   A.  Yes.

2   Q.  And that was marked as Plaintiff's Exhibit 123a.  Did you

3   recognize that recording?

4   A.  Yes.

5   Q.  And was that recording a complete and accurate copy of the

6   recording that you made of your conversation with Jinny Baek?

7   A.  Yes.

8   Q.  Do you know whether a transcript was made of that

9   recording?

10  A.  Yes.

11  Q.  And did you have an opportunity to review that transcript?

12  A.  Yes.

13  Q.  And was that a true and accurate transcript of the Jinny

14  Baek recording?

15  A.  Yes.

16          MS. STAREN:  Okay.  Your Honor, at this time we would

17  move to admit Plaintiff's Exhibit 123a into evidence.

18          THE COURT:  Any objection?

19          MR. KORNBLAU:  Objection.

20          THE COURT:  Oh, on the same grounds.  I'm sorry.  Just

21  on the continuing ground.

22          MR. KORNBLAU:  Yes, your Honor.

23          THE COURT:  Yeah.  I'm sorry.  Overruled.  It's

24  received and the transcript is not received as evidence.  But

25  can be used as an aid to the jury.

O3RASEC4                     Myung - Direct

1              MS. STAREN:  Thank you, your Honor.

2              (Plaintiff's Exhibit 123a received in evidence)

3     Q.  Before we play the first clip, can you just describe

4     generally what you and Jinny Baek discussed during that

5     conversation?

6     A.  Yeah.  We were just talking about the misrepresentations

7     that's being made in the public regarding the transactions.

8     And that no blockchain is ever being used.  And I'm trying to

9     get Jinny on my side to try to like clean up these

10    misrepresentations.

11             MS. STAREN:  Mr. Haywood, could you please play the

12    clip from Plaintiff's Exhibit 123a.

13             (Video played)

14             MR. KORNBLAU:  Can we pause please?  Your Honor, we

15    object to this.  It's completely incomprehensible.

16             THE COURT:  I don't think so.  Overruled.

17             MS. STAREN:  You can continue, Mr. Haywood.

18             THE COURT:  I thought you were going to make a

19    different objection, which was that it's not in furtherance of

20    the conspiracy.

21             MR. KORNBLAU:  Well, we've definitely made that

22    argument for all of these, your Honor.

23             THE COURT:  I don't know but this is very different

24    from the -- well, come to the side bar.

25             (Continued on next page)

1          (At sidebar)

2          THE COURT:  So it's one thing when the witness is

3   having a conversation with previous folks and they're basically

4   trying to convince him to continue the conspiracy or at least

5   giving false exculpatory responses.  Those would all come in.

6   And plus there's statements against interest in many respects.

7          Here, as I understand it, as he just testified, he's

8   trying to convince this person to expose the fraud, the alleged

9   fraud, and the person is maybe resisting.  I didn't find it

10  incomprehensible at all.  But why is that in furtherance of the

11  conspiracy?

12         MS. STAREN:  So I think our position is that he's

13  saying, well, yeah, we know there's no connection between Chai

14  and Terra, but nobody at Chai is saying anything.  So it's not

15  an issue for us, and I think that that is a statement in

16  furtherance of that gentleman's agreement, which is the idea

17  that.

18         THE COURT:  I see.

19         MS. STAREN:  As long as Chai doesn't say anything

20  we're going to be --

21         THE COURT:  So he's trying to promote the gentleman's

22  agreement is what you're saying?

23         MS. STAREN:  That's my understanding what he's saying

24  here.

25         MR. KORNBLAU:  Your Honor, we might want to make a

O3RASEC4                          Myung - Direct

1    record if possible whether Mr. Myung himself believes he's part

2    of a conspiracy or furthering a conspiracy, rather than

3    collecting evidence to provide to the SEC, which is a different

4    thing.

5              THE COURT:  Well, putting that aside, at this point

6    was he acting as an agent of the SEC?  No, right?  This is well

7    before.

8              MS. STAREN:  No.

9              MR. KORNBLAU:  No, this is after he filed

10   whistleblower complaint, absolutely.

11             MS. STAREN:  But he didn't speak until May of 2022,

12   but he filed a complaint on October --

13             MR. KORNBLAU:  Second.

14             THE COURT:  In any event, no one is suggesting he's a

15   co-conspirator.  The question is whether the other person is a

16   co-conspirator.

17             MR. KORNBLAU:  The question is whether the statement

18   is in furtherance of to him.

19             THE COURT:  Right.

20             MS. STAREN:  Which I think it is because that's where

21   he's saying --

22             THE COURT:  So during the course of the conspiracy,

23   someone who is skeptical of conspiracy says, you know, what

24   about this, what about that.  And one of the co-conspirators

25   says, oh, this is fine, this is how we're working it, or says

O3RASEC4                        Myung - Direct

1    anything designed to further it, that's a statement of

2    furtherance, the conspiracy by that other person.  But this may

3    be different because here, he's trying to convince her to --

4                    MR. KORNBLAU:  Come to his side.

5                    THE COURT:  To withdraw from the conspiracy.

6                    MS. STAREN:  But he's saying no, nobody here from

7    Chai --

8                    THE COURT:  He's resisting.  All right.  Tentatively

9    I'm going to rule, allow it to stay in, but if we have to

10   strike it, I'll think about it over the next few minutes.

11                   While we're at the side bar -- well, no, where is

12   Mr. Patton?

13                   MR. FERRARA:  You want me to grab him?

14                   THE COURT:  I'll tell you and you can repeat it to

15   him.  I've looked now at Court Exhibit 2, and I don't think it

16   is even right on the law in many of the respects offered.  And

17   nor do I think the situation is at all the same as apparently

18   confronted Judge Seibel.  I will give the first few sentences

19   along the lines I already indicated I will give, and I will

20   give them at the appropriate opportunity.  But the rest of it

21   is denied.

22                   MR. FERRARA:  Your Honor, you invited us to maybe show

23   you something --

24                   THE COURT:  I can't hear you.

25                   MR. FERRARA:  I'm sorry.  Your Honor had invited us to

1    maybe show you a case or two on the topic.  May we still

2    tomorrow morning?

3              THE COURT:  Tomorrow morning is fine.

4              MR. FERRARA:  And, your Honor, we may ask of a limited

5    instruction on the use of these recordings because Mr. Myung

6    himself is doing a lot of the talking.  And unless it's adopted

7    by the co-conspirator thing, I don't think that portion will

8    come in for the truth.

9              THE COURT:  Well, that's an interesting point too.

10   Maybe tonight someone can give me a copy of this transcript and

11   I'll take a more detailed look at it.  But for now, let's go

12   forward.

13             MR. PATTON:  Your Honor, for the record, could we mark

14   our proposed instruction as a Court Exhibit?

15             THE COURT:  No, at your college request, I've already

16   marked it.  You really need to listen.

17             (Continued on next page)

18

19

20

21

22

23

24

25

1          (In open court; jury present)

2          MS. STAREN:  Mr. Haywood, you can continue playing the

3   video.

4          (Video played)

5          MS. STAREN:  Thank you.

6   Q.  Mr. Myung, when Jinny Baek said here -- actually let's back

7   up.

8          Could you please explain what you and Jinny Baek were

9   discussing when you referred to Chai's connection with Terra?

10  A.  It's about Chai using the Terra blockchain to process the

11  transactions.

12  Q.  Okay.  And then when Jinny Baek said, "in that case, I

13  think it's a misrepresentation by Do."  What is the "it's" that

14  you understood he was saying was the misrepresentation by Do?

15  A.  Like the fact that Chai has anything in relation with Terra

16  processing transactions.

17  Q.  Okay.  Did there come a time, when you recorded a

18  conversation with Daniel Shin?

19  A.  Yes.

20  Q.  And just to clarify, Daniel Shin was the CEO of Chai; is

21  that right?

22  A.  Yes.

23  Q.  And do you recall when the first time was that you recorded

24  Mr. Shin?

25  A.  Could have been towards the tail end of 2021.  Or, hold on.

1    Yeah, yeah, yeah.  Or early 2022.

2    Q.  Okay.  And where did that conversation take place or how

3    did that conversation take place?

4    A.  So we were talking about like how these are being

5    misrepresented so that was --

6    Q.  Sorry.  I'm going to stop you.  I was just asking, you

7    know, was it in person conversation or was it something

8    different?

9    A.  I'm trying to get like a timeline.  So like in terms of

10    like the recordings or like actual conversations?

11    Q.  The recording, the first recording you made.

12    A.  Oh, the recordings.

13    Q.  Yeah.

14    A.  Okay.  That's either late 2021 or early 2022.

15    Q.  Okay.  Do you recall whether it was a video call?

16    A.  Yeah, it was a video call.

17    Q.  Okay.  Did anyone else participate?

18    A.  No.

19    Q.  And do you know approximately how long the conversation

20    was?

21    A.  Approximately one hour.

22    Q.  And did you record the entirety of that video call?

23    A.  Yes.

24    Q.  Okay.  Did you have an opportunity to review that Dan Shin

25    recording that the SEC marked as Plaintiff's Exhibit 124a?

1    A.  Yes.

2    Q.  And when you reviewed that Dan Shin recording, was it a

3    complete and accurate copy of the recording that you made?

4    A.  Yes.

5    Q.  And do you know whether a transcript was made of that

6    recording?

7    A.  Yes.

8    Q.  And did you have an opportunity to review that transcript?

9    A.  Yes.

10   Q.  And was that a true and accurate transcript of the Daniel

11   Shin recording?

12   A.  Yes.

13             MS. STAREN:  At this time, we would move to admit

14   Plaintiff's Exhibit 124a into evidence.

15             THE COURT:  And so the continuing objection is

16   overruled.  The transcript is received not in evidence, but

17   only as an aid to the jury, but the recording is received.

18             (Plaintiff's Exhibit 124a received in evidence)

19             MS. STAREN:  Okay.  Mr. Haywood, could you please play

20   the clip for Plaintiff's Exhibit 124a.

21             (Video played)

22   BY MS. STAREN:

23   Q.  Okay.  Just for clarification purposes, Mr. Myung, can you

24   tell me who is the first voice that spoke on that recording?

25   A.  I think that was Dan Shin, the CEO.

O3RASEC4                        Myung – Direct

1    Q.   Okay.  And the other voice was you?

2    A.   Yes.

3    Q.   And can you describe generally what you were discussing

4    with Mr. Shin?

5    A.   So, by this point, I had left Chai and created Chai Labs.

6    So we agreed that we would actually create the stablecoin

7    technology for a cross-border payments.  And I had told him

8    that we need to actually clear up this narrative of this, you

9    know, like blockchain actually being used or stablecoins

10   actually being used.  Because for me, I wanted to actually

11   build that technology.  So if investors and the public already

12   believe that the technology exists, then literally what am I

13   doing?  It doesn't make any sense.  It's very confusing.

14   Q.   So when you guys are discussing this narrative, that Dan

15   Shin said that it bothers me somewhat morally that the

16   narrative is off.  What is the "narrative" specifically?

17   A.   So crypto investors think that Chai already uses the Terra

18   blockchain to process and settle transactions and has

19   real-world adoption.  And, you know, obviously that's fake, but

20   he wanted to keep that narrative going, which is the lie

21   essentially.

22   Q.   Okay.  And what did you understand Dan Shin meant when he

23   told you that the narrative is "off?"

24   A.   That it's a lie.

25   Q.   Okay.  And what did you understand Dan Shin meant when he

1  said, "it's not your problem and it's not my problem.  It's

2  Do's problem?"

3  A.  Well, you know, I wanted to -- Dan to take some

4  responsibility and try to help, you know, fix this.  But he's

5  disclaiming any responsibility for this and pushing this on Do

6  Kwon saying, you know, he is the only person to take

7  responsibility and to fix this.

8  Q.  Okay.  Did there come a time when you recorded a

9  conversation with an individual named GiGi Kwon?

10 A.  Yes.

11 Q.  Who was GiGi Kwon?

12 A.  He was head of marketing for Terraform Labs before she left

13 business and eventually became CEO of Chai Corporation.

14 Q.  Okay.  And do you recall approximately when you recorded a

15 conversation with GiGi Kwon?

16 A.  I think it was early 2022.

17 Q.  And --

18        MR. KORNBLAU:  Just make clear, no relation to Do

19 Kwon.

20 Q.  And you're not aware of any relationship between GiGi Kwon

21 and Do Kwon, correct?

22 A.  I don't think they're family related.

23 Q.  Okay.  And where did this conversation take place?

24 A.  Well, it was -- I was at the Chai office, but it was on a

25 video call she was working from home.

1   Q.  And did anyone else participate in this call?

2   A.  No.

3   Q.  And approximately how long was this conversation?

4   A.  About an hour.

5   Q.  And did you record the entirety of this conversation?

6   A.  Yes.

7   Q.  Okay.  Did you have an opportunity to review with the SEC

8   the GiGi Kwon recording which we marked as Plaintiff's Exhibit

9   125a?

10  A.  Yes.

11  Q.  And was that a complete and accurate recording of your

12  conversation with GiGi Kwon?

13  A.  Yes.

14  Q.  And do you know whether a transcript was made of that

15  recording?

16  A.  Yes.

17  Q.  And did you have an opportunity to review that transcript?

18  A.  Yes.

19  Q.  And was that a true and accurate transcript of that GiGi

20  Kwon recording?

21  A.  Yes.

22          MS. STAREN:  Okay.  At this time we would move to

23  admit Plaintiff's Exhibit 125a into evidence.

24          THE COURT:  Yeah.  So the continuing objection is

25  overruled subject to reconsideration after I hear the

1    recording.  The transcript is received only as an aid, but the

2    recording is received in evidence.

3            (Plaintiff's Exhibit 125a received in evidence)

4            MS. STAREN:  Thank you, your Honor.

5            Mr. Haywood, could you please play Plaintiff's Exhibit

6    125a, clip one.

7            (Video played)

8    BY MS. STAREN:

9    Q.  So, Mr. Myung, what did you understand GiGi Kwon meant when

10   she referenced the conflict around Terra versus Chai?

11   A.  She's referencing the gentleman's agreement that was made.

12   So like basically lie about the relationship of Terra and Chai.

13   Q.  And what did you understand she meant when she said it was

14   a Dan Do question?

15   A.  It means that Dan Shin and Do Kwon are the only ones who

16   are able to fix the lie about, you know, like the reality that

17   there's no blockchain being used.

18   Q.  Okay.  And you mentioned the gentleman's agreement, and she

19   mentioned the gentleman's agreement.  What did you understand

20   she was referring to there?

21   A.  She meant the same thing that Dan meant to me.  It was

22   basically a two-year handshake agreement where they would not

23   mention each other.  They would not mention, you know, like the

24   reality of the blockchain, or like the lack there of, of Chai.

25   Q.  Okay.  And when she says "we're honoring that so far," what

1   did you understand that to mean?

2   A.  It means that they're -- she's allowing and like they're

3   allowing that to the public to think that Chai is using the

4   blockchain for real-world use case of, you know, payments

5   through the crypto.

6   Q.  And just to be clear, when she says, "we're honoring that

7   so far," what is that that they're honoring?

8   A.  That is the gentleman's agreement.

9   Q.  Okay.

10          MS. STAREN:  Mr. Haywood, could you please play

11   Plaintiff's Exhibit 125a, clip two.

12          (Video played)

13   BY MS. STAREN:

14   Q.  Okay.  And here, again, GiGi Kwon mentions this term

15   gentleman's agreement.  Is that the same thing we've been

16   talking about?

17   A.  Yes.

18   Q.  Okay.  And what did you understand GiGi Kwon was saying

19   here when she said, "changed stances really come from Dan and

20   Do?"

21   A.  That they are the ultimate decision makers for this

22   agreement.

23   Q.  And just to be clear, that's Dan Shin and Do Kwon?

24   A.  Yes.

25   Q.  Okay.

1          MS. STAREN:  Mr. Haywood, could you please play

2     Plaintiff's Exhibit 125a, clip three.

3          (Video played)

4     BY MS. STAREN:

5     Q.  So, once again, the gentleman's agreement is the same one,

6     right?

7     A.  Yes.

8     Q.  And what did you understand GiGi Kwon meant here when she

9     said, "Terra obviously has gained a lot more through the

10    gentleman's agreement?"

11    A.  So like all the Terra insiders, they made boatloads of

12    money promoting this narrative.  So, you know, like in terms of

13    like Chai stock, they're not really getting much through the

14    company, but through crypto it's, you know, like super huge

15    amounts of money there.

16    Q.  And did you agree with the statement that Terra obviously

17    gained a lot more through the gentleman's agreement?

18    A.  Yeah.  I mean, Terra, yeah, made way more, you know, like

19    up to billions dollars more.

20         MS. STAREN:  Mr. Haywood, could you please play

21    Plaintiff's Exhibit 125a, clip four.

22         (Video played)

23    BY MS. STAREN:

24    Q.  Okay.  So here, when GiGi Kwon references Terra being

25    "utilized for Chai transactions," what did you understand that

O3RASEC4                          Myung - Direct

1    meant?

2    A.  I mean, maybe she's talking about the top-up program.  I'm

3    not sure.  But, you know, there was no transactions ever

4    settled through the blockchain for users and merchants, so I

5    think they're sort of kind of trying to stretch that word as

6    much as possible.

7    Q.  And when she says, you know, for us to say it's not, it

8    would be going against what they are saying, what they've been

9    saying so far.  Who is the "they" she's talking about?

10   A.  It's --

11              MR. MOREL:  Objection.  Leading.

12              THE COURT:  Overruled.

13   A.  Can you say the question again?  Sorry.

14   Q.  Sure.  Sure.

15              When she says for us to say that it's not, it would be

16   going against what they've been saying so far.  Who is the

17   "they" that she's talking about?

18   A.  Don Kwon, Dan Shin, all the Terraform Labs insiders.

19   Q.  Okay.  And what did you understand GiGi Kwon was saying was

20   the "whole point of the gentleman's agreement?"

21   A.  To lie.

22   Q.  About --

23   A.  About the reality of the relationship between Chai and

24   Terra.

25   Q.  Okay.  Mr. Myung, did there come a time, when you

O3RASEC4                        Myung - Direct

1  communicated directly with Do Kwon about your concerns with

2  Chai not using the blockchain?

3  A.  Yes.

4  Q.  Do you recall approximately when that was?

5  A.  It was some time towards the tail end of 2021.

6  Q.  Okay.  And did there -- did you have a phone call with

7  Mr. Do Kwon?

8  A.  Yes.

9  Q.  And what did you say to Do Kwon in that call?

10 A.  Well, I talked to him about some of these

11 misrepresentations.  Among like other kind of, you know,

12 company issues in general.

13 Q.  And in that discussion, did you tell Do Kwon your

14 understanding that Chai was not actually using crypto?

15          MR. MOREL:  Objection.  Asked and answered.  And

16 leading.

17          MS. STAREN:  It's for effect on listener.

18          THE COURT:  Overruled.

19          MS. STAREN:  Thank you.

20          THE COURT:  You may answer.

21 A.  Can you ask that again?  Sorry.  I just got --

22 Q.  Sure.  In that discussion did you tell Do Kwon your

23 understanding that Chai was not actually using crypto for its

24 transactions?

25 A.  Yes.

1    Q.   And did Do Kwon act surprised?

2    A.   No.

3    Q.   Did Do Kwon disagree with you?

4    A.   He just said why do you even care.

5    Q.   What else did he say?

6    A.   He said I don't give a fuck about Chai.

7    Q.   Okay.  After this conversation, did you have any further

8    discussions with Do Kwon about your concerns about Chai not

9    using the blockchain?

10   A.   Yes.

11   Q.   And how did you communicate with Do Kwon?

12   A.   It's through KakaoTalk, which is a Korean messaging app.

13   Q.   Okay.

14       MS. STAREN:  Mr. Haywood, could you please pull up

15   Plaintiff's Exhibit 20 for the witness please.

16   Q.   And, Mr. Myung, can you take a look at this document and

17   let us know whether you recognize Plaintiff's Exhibit 120.

18   A.   Yes.

19   Q.   And what are these, what is Plaintiff's Exhibit 120?

20   A.   This is my KakaoTalk log with Do Kwon.

21   Q.   Okay.  Are these all of your Kakao messages with Do Kwon?

22   A.   Yes.

23       MS. STAREN:  At this point we would move to admit

24   Plaintiff's Exhibit 120 into evidence.

25       MR. MOREL:  No objection, subject to a discussion we

1  had with counsel about a redaction.

2           THE COURT:  Received.

3           (Plaintiff's Exhibit 120 received in evidence).

4           MS. STAREN:  Thank you.

5  Q.  Was Kakao an application that you could access from your

6  phone?

7  A.  Yes.

8  Q.  Okay.  Could you please, looking at page two, at the bottom

9  of that page, there is a message dated 2022-01-15.  Could you

10 please read that for me?

11 A.  Yeah.  It says, "for Chai Labs in its current form, it

12 conflicts with a narrative of Terra and Chai.  I'll need to

13 clear it up before I raise external capital.  Are you available

14 for a call tomorrow."

15 Q.  And what is the "narrative of Terra and Chai" that you're

16 referring to here?

17 A.  The lie that Chai uses Terra stablecoins for processing and

18 selling transactions.

19 Q.  And did Do Kwon respond to your request on January 15th?

20 A.  Looks like he did not.

21 Q.  Okay.  Did you message him again about your concerns?

22 A.  Yes.

23           MS. STAREN:  Okay.  Could you please pull out from

24 page four the chats starting 2022-03-19, 19:20:50.

25 Q.  Mr. Myung, could you please read your first message?

O3RASEC4                        Myung - Direct

1    A.  Said "it's all related because the reason for misalignments

2    were due to the narrative of Chai and Terra, where Chai doesn't

3    actually use blockchain tech.  I wanted to actually build the

4    tech being promoted whether at Chai or Chai Labs.  The

5    narrative change needs support from TFL and hashed etc."

6    Q.  And can you please read Do Kwon's response?

7    A.  He said, "but I don't care about Chai.  That sounds like I

8    need to spend my time, of which I have very little."

9    Q.  Did Do Kwon ever agree to tell the truth about Chai?

10   A.  No.

11          MS. STAREN:  You can take that down, thank you.

12   Q.  Did there come a time when you were asked to leave Chai?

13   A.  Yes.

14   Q.  And approximately when was that?

15   A.  Towards the end of 2021.

16   Q.  And who asked you to leave Chai?

17   A.  Dan Shin.

18   Q.  Did Mr. Shin tell you why he was asking you to leave Chai?

19   A.  He did not give me official reason.

20   Q.  Do you have any understanding as to why you were asked to

21   leave Chai?

22          MR. KORNBLAU:  Objection.  Foundation.

23          THE COURT:  Sustained.

24   Q.  Did you end up leaving Chai?

25   A.  Yes.

1   Q.  And when did you leave Chai?

2   A.  My official date I believe was January 17, 2023 -- it was

3   either 17th or 18th of 2023.

4   Q.  I'm sorry.  What was the year again?

5   A.  2020 -- hold on.  2022.

6   Q.  Thank you.

7           And did there come a time when you filed a complaint

8   with the SEC?

9   A.  Yes.

10  Q.  And do you recall approximately when that was?

11  A.  Towards the end of 2021, around October-ish.

12  Q.  Okay.  And what led you to file that complaint with the

13  SEC?

14  A.  Well, because it's lies.  And I really thought that the

15  whole system was going to collapse.

16  Q.  When you say the -- did you say the old system?

17  A.  The whole system, like the entire -- the whole just like

18  Luna, Terra, it was all built on lies.  So I was just very

19  worried because I had even like family who would invest in

20  Terra because I was a chief product officer at Chai, and I just

21  had just a lot of concerns around that.

22  Q.  Okay.  And did you file that complaint as a whistleblower?

23  A.  Yes.

24  Q.  What does it mean to be a whistleblower for the SEC?

25  A.  It means that you get protection from the SEC and you can

O3RASEC4                        Myung - Direct

1   also qualify for rewards.

2   Q.  Okay.  Did you make more than one whistleblower filing?

3   A.  I made several.  I think I made maybe four.

4   Q.  Okay.  Why did you make four whistleblower complaints with

5   the SEC?

6   A.  I was trying my best to alert the SEC, because this is like

7   a huge, huge scheme.

8   Q.  Okay.  And do you recall when the last whistleblower

9   complaint was that you filed?

10  A.  Sometime like early 2022, but not exact date.

11  Q.  Okay.  And do some of these complaints reflect a loss

12  amount?

13  A.  They might.

14  Q.  Okay.  And do you have an understanding as to why you put a

15  loss amount on some of those?

16  A.  You know, like I filled it out without a lawyer and those

17  SEC forms are kind of complex.

18  Q.  Sorry.

19  A.  I just try to fill it out as best I could.

20  Q.  As a whistleblower, are you eligible to receive a payment

21  from the SEC for the information you provide?

22  A.  It's my understanding that it's somewhere between 10 and

23  30 percent.

24  Q.  Was that a factor in your decision to file a whistleblower

25  complaint?

1   A.  It was one of the factors.

2   Q.  Okay.  In connection with your whistleblower filing, did

3   you provide materials to the SEC?

4   A.  Yes.

5   Q.  Okay.  And how did you decide what materials to provide to

6   the SEC?

7   A.  Just anything relevant to the scheme.

8   Q.  And what do you mean by "the scheme?"

9   A.  Just all the misrepresentations that's being made like

10  internally as to like why this information is not reaching the

11  investors.

12  Q.  Okay.  Have you been promised anything from the SEC for

13  participating as a witness at trial?

14  A.  No.

15  Q.  Have you been promised anything by the SEC for being a

16  whistleblower?

17  A.  No.

18          MS. STAREN:  I have no further questions.

19          THE COURT:  Cross-examination.

20  CROSS-EXAMINATION

21  BY MR. KORNBLAU:

22  Q.  Good afternoon, Mr. Myung.  My name is David Kornblau.  I'm

23  one of the lawyers for Terraform Labs in this case.

24          We've never met before; is that correct?

25  A.  Yes.

O3RASEC4                      Myung - Cross

1   Q.  You have met with the SEC before, correct?

2   A.  Yes.

3   Q.  And you've been cooperating with the SEC since May of 2022,

4   or thereabouts; is that fair?

5   A.  I believe so.

6   Q.  Almost two years?

7   A.  Yeah.  It's been a long journey.

8   Q.  And how many times have you met in person with the SEC?

9   A.  Several times.  I don't know the exact number.  But it's

10  been several.

11  Q.  Can you do a little better than several?

12  A.  Well, this past week, met I think four times or -- past

13  month around like four or five times.  No, no, no, hold on.  I

14  came to New York last week, so hold on.  Met twice this past

15  week.

16  Q.  And going back to approximately May 2022, how many times

17  have you met with the SEC?

18  A.  Well, around May I was in Korea so it was all over Zoom.

19  Q.  How many Zoom calls?

20  A.  Quite a lot.

21  Q.  Ten, 15, 20?

22  A.  Approximately, around that range I guess.

23  Q.  Any in-person meetings before this trial was, you know,

24  coming up?

25          MS. STAREN:  Objection.  Asked and answered.

O3RASEC4                    Myung - Cross

1              THE COURT:  You mean other than the ones he's already
2      described.
3      Q.  Before, yeah, before the trial prep, yes.
4      A.  Well, I was in D.C. for my deposition.  The SEC was present
5      there.
6      Q.  And did you meet with the SEC before your deposition?
7      A.  I was in New York in this district when they met with the
8      DOJ.
9      Q.  Were you meeting with the SEC?
10     A.  I'm not sure who I was officially meeting with.  But both
11     the SEC and the DOJ were present.
12             MR. KORNBLAU:  Your Honor, can we have a side bar,
13     please?
14             THE COURT:  Sure.
15             (Continued on next page)
16
17
18
19
20
21
22
23
24
25

1          (At sidebar)

2          MR. KORNBLAU:  Your Honor, we had a motion *in limine*,

3    and we've been very explicit with the SEC to tell Mr. Myung not

4    to mention other law enforcement.

5          THE COURT:  Yeah.  But the point was you kept pressing

6    him and he can't give a false answer.  And I don't know why.

7    You had already elicited from him that he had numerous meetings

8    both in person and by Zoom.  And I assume when we get to the

9    charging conference that the SEC will want me to include my

10   standard instruction about how it's perfectly proper for a

11   witness to meet with lawyers in advance of their testimony.

12   But in this case, he would not have given this answer if you

13   had not honed in in the way you did.  So I don't think he

14   violated any agreement.  But I also think no further reference

15   should be made to this in any argument made to the jury.

16         MS. STAREN:  Great.

17         MR. KORNBLAU:  Your Honor, can we have that stricken

18   because my -- you know what, let me think about that.

19         My questions were about meetings only with the SEC.

20   They did not --

21         MS. STAREN:  But he has to give a complete answer.

22         MR. KORNBLAU:  Just yes or no.

23         THE COURT:  You really brought this on yourself.  You

24   had everything you possibly could have wanted.  But you

25   persisted in pushing him and he's not going to lie under oath.

O3RASEC4                         Myung — Cross

1    So when you —— when it came to that meeting where the DOJ was

2    also present, he had to give an honest answer.  So but I also

3    think that I have no problem having it stricken if that's what

4    you want.  But now you're saying you want to think about it.

5            MR. KORNBLAU:  I'm not sure.  It might just draw more

6    attention to it.

7            THE COURT:  Well, that's probably right.

8            MR. FERRARA:  Your Honor, we could have it stricken

9    from the record without a reference to the jury.  So if the

10    testimony were to go back, that would not be included.

11            THE COURT:  Fine.

12            MR. KORNBLAU:  That's good, thank you.

13            (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1              (In open court; jury present)

2    BY MR. KORNBLAU:

3    Q.   Mr. Myung, you mentioned some meetings I think you said

4    was it earlier this week or last week with the SEC?

5    A.   Sorry.  I'm just like losing track.  I'm like kind of jet

6    lagged.  But as soon as I landed, it's been like a week, I met

7    with them I think it was twice.

8    Q.   Okay.  And you were rehearsing questions for trial?

9              THE COURT:  Sustained.

10   Q.   Did you discuss possible cross-examination?

11   A.   I was with my lawyer and the SEC and we were discussing

12   like the facts of the case.

13   Q.   Do any practice --

14             THE COURT:  So I think I do need at this point to let

15   the jury know it is standard American practice for lawyers who

16   are presenting witnesses at trial to meet with their witnesses

17   in advance and go over questions they're going to ask and

18   possible cross-examination they may face.  This is both sides

19   routinely do this in virtually every trial in the American

20   system.

21             Go ahead.

22   BY MR. KORNBLAU:

23   Q.   Mr. Myung, the SEC is not your lawyers, correct?

24   A.   My lawyer is over there.  The SEC is not my lawyer.

25   Q.   Now, on direct --

O3RASEC4                      Myung - Cross

1           THE COURT:  Not sure who you're pointing to, but

2     we'll -- oh, you want to identify yourself for the record.

3           MS. FISET:  I am Rachel Fiset of Zweiback, Fiset &

4     Zalduendo, and I am Mr. Myung's lawyer.

5           THE COURT:  Pleasure to have you.

6           Go ahead.

7     BY MR. KORNBLAU:

8     Q.  Mr. Myung, so in your direct testimony, you mentioned a --

9     what you called a visa issue.  Do you remember that discussion?

10    A.  Yes.

11    Q.  Now, isn't it a fact, Mr. Myung, that that was a criminal

12    conviction in Korea?

13    A.  I don't think it's criminal.  I think it's like sort of

14    more like a parking ticket kind of thing.

15    Q.  Your testimony is it was like a parking ticket?

16    A.  I mean, it's more closer to that.  It's a visa.  It's a

17    visa issue.

18    Q.  And it wasn't your own visa we're talking about, correct?

19    A.  No, it was the visas of the foreigners who were teaching

20    English.

21    Q.  Okay.

22          MR. KORNBLAU:  Can we, Mr. Aquino, bring up

23    Defendants' Exhibit 305 for identification.

24    Q.  Mr. Myung, this is in Korean.  Can you see that it is a

25    copy -- can you see what it is?

O3RASEC4                              Myung - Cross

1    A.  Yes, I see it.

2    Q.  What is it?

3    A.  It's a fine for -- related to the employment of foreigners.

4    Q.  Okay.  And there is an English -- certified English -- a

5    translation beginning on page nine.

6            Do you see that in front of you?

7    A.  Yes, I do.

8            MR. KORNBLAU:  Your Honor, we offer Exhibit D305 which

9    includes both the Korean version and the English translation

10   into evidence.

11           MS. STAREN:  Your Honor, we have no objection subject

12   to obviously --

13           THE COURT:  I'm sorry?

14           MS. STAREN:  Sorry.  We have no objection subject of

15   course to the arguments we've made in motion *in limine*.

16           THE COURT:  Yeah.  Okay.  Received.

17           (Defendant's Exhibit 305 received in evidence)

18           MR. KORNBLAU:  All right.  If we can publish to the

19   jury, the English version starting on page nine.

20   Q.  So, Mr. Myung, this is a decision and order of the Seoul

21   Central District Court; is that correct?

22   A.  Yes.

23           MR. KORNBLAU:  Show us the top of the document,

24   Mr. Aquino.

25   Q.  And it's dated November 8th, 2017; is that correct?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O3RASEC4                      Myung - Cross

1    A.  Yes.

2    Q.  And the defendant is Myung Aaron Hong; is that yourself?

3    A.  That's correct.

4    Q.  And then going down below, there's the order and you

5    referred to a fine; do you see that?

6    A.  Yes.

7    Q.  And then if we scroll further down there's a section called

8    facts of the crimes.  Do you see that?

9    A.  Sure.  That's the translation, but yeah.

10   Q.  And the translation is "crime," correct?

11   A.  Sure.  It's probably more like infraction, but yeah.

12   Q.  That's your word "infraction?"

13   A.  Doesn't really matter.  It's Korean.

14   Q.  Yeah, well, the word of the court's order is "crime."

15   Isn't that correct?

16        MS. STAREN:  Objection, your Honor.  This is a

17   translation and Mr. Myung has not testified that he accepts it

18   or that it's true and correct translation.  He's being asked

19   to -- apologies.

20        THE COURT:  Well, you did not make an objection to the

21   translation's accuracy when it was offered.  You referenced

22   another objection you had made that I had dealt with

23   previously.  So that doesn't prevent you from asking this

24   witness on redirect whether he agrees with that translation,

25   but at least for now it will stand as is.

O3RASEC4                    Myung - Cross

1   A.  So the word in Korean is--

2   Q.  There's no question here.  So let me wait until I ask a

3   question, Mr. Myung, and then you can answer it.

4              MR. KORNBLAU:  If we can turn to page 12, Mr. Aquino.

5   Q.  So you see here the Court's decision and order includes a

6   schedule on these two pages; do you see that, Mr. Myung?

7   A.  Yes.

8   Q.  And the name of it is "crime schedule."  Isn't that right?

9   A.  It's funny I mean the Korean word is "joe".

10             MS. STAREN:  Objection, your Honor.

11  A.  But you know --

12             THE COURT:  Just so we can move this along.  Tell me

13  about the Korean word.

14             THE WITNESS:  The Korean word is "joe", which is like

15  more accurately translates to wrongdoing.  But, you know, in

16  the American system, "crime" almost seems like, you know,

17  criminal thing, but anyway.

18  BY MR. KORNBLAU:

19  Q.  You remember you took your deposition, Mr. Myung, in this

20  case?

21  A.  Yes.

22  Q.  Didn't you say in there that you actually couldn't fully

23  understand the Korean version of the conviction?

24  A.  Well, I mean, I understand Korean enough to run business in

25  Korean.

1           MR. KORNBLAU:  Can we pull up that section of the

2    deposition so the jury can see.

3           THE COURT:  All right.  So just for both sides, when a

4    deposition is being offered for impeachment, before you show it

5    to the jury, you need to show it to the Court and identify the

6    page and line number so your adversary can object if they want

7    to object.

8           MR. KORNBLAU:  If I can phone a friend for the page

9    and line, I'd like to do that.

10          We can come back to it if it's not handy.  I don't

11   want to slow things down.

12          THE COURT:  We're going to stop in five minutes, so

13   you'll have obviously plenty of time if you don't find it in

14   the next five minutes.

15          MR. KORNBLAU:  We'll come back.  It's a point easily

16   made.

17   Q.  Mr. Myung, you had a trial in Korea over this crime or

18   whatever you think it was?

19          MS. STAREN:  Objection, your Honor.

20          THE COURT:  Ground?

21          MS. STAREN:  403.

22          THE COURT:  I think we need to excuse the jury for the

23   day and we'll take up these questions.

24          So, ladies and gentlemen, we will see you at 9:30

25   tomorrow.  You've been terrific.  You've been so good on time

O3RASEC4                         Myung - Cross

1    and we will try to meet you fully and be ready for you at 9:30

2    as well.  So we will see you tomorrow.

3             (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (In open court; jury not present)

2              THE COURT:  Please be seated.  You may step down, and

3    we'll see you at 9:30.

4              So my recollection is that when we discussed this in

5    connection with the motion *in limine*, I was told by defense

6    counsel that they were just going to put in the certified copy

7    of the conviction, and now I'm hearing questions about going

8    well beyond that.

9              MR. KORNBLAU:  Your Honor, that was my plan until he

10   testified on direct that it was just a visa issue.

11             THE COURT:  Well --

12             MR. KORNBLAU:  I'm entitled to challenge that because

13   I don't think that's an accurate characterization.  It's an

14   attempt to diffuse the cross as it were, but I think it's

15   misleading.

16             (Continued on next page)

17

18

19

20

21

22

23

24

25

O3RHSec5

```
1              THE COURT:  Well, I mean, you brought out twice that
2      it's — the translation says "crime."  I would want to know,
3      but not in front of the jury, whether this is a violation, a
4      misdemeanor, or what.  For example, not that any of you ever
5      had a parking ticket, but if you have a parking ticket in
6      New York, you have to plead guilty if you just want to send in
7      your money because it's technically a criminal violation.  And
8      I hope that none of you have ever engaged in such criminal
9      violations.  So I think we need to know more about this before
10     I can let it go further.
11              I understand you responded to his initial claim that
12     it was just a visa thing by saying, well, here it says crime
13     and there it says crime, and I let you do that.  But now you
14     want to go well beyond what you had represented was going to be
15     introduced on this issue.
16              And what is it you are going to bring out from his
17     trial?
18              MR. KORNBLAU:  Nothing, your Honor.  I was just trying
19     to make it clear that this is not a parking ticket, that this
20     was serious, and in fact, it was punishable by more than one
21     year in prison.  And the parking tickets I've gotten ——
22              THE COURT:  That was the reason ——
23              MR. KORNBLAU:  —— haven't involved that kind of
24     sanction.  So I really think this attempt to underplay the
25     seriousness of it is really off base.  So I'm not really
```

O3RHSec5

1   planning to really do much more, other than I think his ability

2   to read and understand Korean seems to vary depending on the

3   circumstances.  So that may be something I need to explore.

4           THE COURT:  Well, if all parties are agreed, I'm

5   perfectly happy to instruct the jury that this involved a

6   misconduct that was punishable by more than a year in prison,

7   but if you're going to do more than that, we'll need to talk a

8   bit.

9           MR. KORNBLAU:  Your Honor, I don't think any further

10  guidance is needed on it because it is a crime, and I wouldn't

11  want to understate that by avoiding the word "crime."  But I'm

12  going to move on.

13          THE COURT:  OK.

14          MR. KORNBLAU:  So I don't really think we need to talk

15  about the nature of it anymore.  I do think I need to get in

16  the two-year entry ban, which was part of the sanction, the

17  punishment for the crime, which is a separate document, but I

18  can do that very fast.

19          THE COURT:  All right.  Well, we'll take it one step

20  at a time, but that's fine.

21          Let me give you what I hope and pray is the final Paul

22  Kim designations.  We've gone through them several times now.

23          I think we should reconvene at 9 o'clock tomorrow

24  because something tells me we'll have things to discuss.  There

25  was a transcript — there was only one of the recordings that I

1    had any question about, but someone was going to get me a

2    transcript of that particular recording.  So get it to my law

3    clerk.  I'm going to run off for other matters, but get it to

4    my law clerk sometime this evening, and he'll get it to me.

5            I had tentatively indicated that I was only going to

6    give the first few lines of the proposed instruction, but

7    counsel said they wanted to explore the case law on that, so

8    I've held off.  I think it's to your advantage for me to give

9    this instruction sooner than later, so give me whatever you

10   want to give me in that regard by 9 o'clock tomorrow.

11           MR. FERRARA:  Yeah, first thing.  Would your Honor

12   rather we sort of emailed a case or citation to chambers or

13   just come in prepared to ——

14           THE COURT:  So I am —— I teach criminal law at

15   Columbia Law School, and I need to leave here for 3:30 to be

16   way up at Columbia, and then after that —— I know you will

17   consider this quite frivolous —— my wife and I go dancing

18   because our hobby is ballroom dancing.

19           MR. FERRARA:  I knew that.  I knew that.

20           THE COURT:  So I won't be really available till about

21   11 o'clock, but if you want to send something to my clerk, and

22   I'll come in before 9 o'clock tomorrow to look at it then as

23   well.

24           MR. FERRARA:  Did your Honor also want us to provide

25   copies of the transcripts of some of the recordings that

1    Mr. Myung put in?  I think, because we had had that issue

2    about ——

3            THE COURT:  That's what I was referring to.  The only

4    one I had an issue about was that one witness where he said he

5    was trying to convince her to change her position.  So there

6    are two questions there.  One was whether it's in furtherance

7    —— her statements are in furtherance of the conspiracy, but

8    also you raised, I thought quite adroitly, the notion that many

9    of his statements would be, unlike in the other cases where

10   it's like just questions or things like that, he might be

11   asserting a bunch of facts, and then it would still be hearsay

12   as to those statements.  So that's the transcript I want to

13   see.

14           MR. FERRARA:  Right.  I guess what I was going to say

15   is I think the point I was trying to make would apply, I think,

16   to all of the recordings because I don't think he's acting in

17   furtherance of the conspiracy at all for any purpose.

18           THE COURT:  No, no, there's no suggestion that he's

19   acting in furtherance.

20           MR. FERRARA:  So if he's incorporating facts in any of

21   those conversations ——

22           THE COURT:  Yes, I listened carefully, and I didn't

23   think that was a problem with the others.  But on the one

24   you're referencing, I do want to see that, and so just give me

25   that one transcript.

O3RHSec5

1           MR. FERRARA:  Yes, your Honor.

2           THE COURT:  Very good.  We'll see you tomorrow.

3           (Adjourned to March 28, 2024, at 9:00 a.m.)

<pre>
 1                       INDEX OF EXAMINATION

 2   Examination  of:                           Page

 3   JONATHAN MOSHE KOL

 4   Cross By Mr. Kornblau . . . . . . . . . . . 427

 5   Redirect By Ms. Meehan . . . . . . . . . . . 433

 6   Recross By Mr. Kornblau . . . . . . . . . . 435

 7   AARON MYUNG

 8   Direct By Ms. Staren . . . . . . . . . . . . 458

 9   Direct By Ms. Staren . . . . . . . . . . . . 530

10   Cross By Mr. Kornblau . . . . . . . . . . . 557

11                       PLAINTIFF EXHIBITS

12   Exhibit No.                              Received

13    9   . . . . . . . . . . . . . . . . . . . 432

14    137  . . . . . . . . . . . . . . . . . . . 439

15    143a   . . . . . . . . . . . . . . . . . . 443

16    145b   . . . . . . . . . . . . . . . . . . 445

17    138a   . . . . . . . . . . . . . . . . . . 468

18    138b   . . . . . . . . . . . . . . . . . . 469

19    104A   . . . . . . . . . . . . . . . . . . 481

20    104B   . . . . . . . . . . . . . . . . . . 482

21    107  . . . . . . . . . . . . . . . . . . . 483

22    108A   . . . . . . . . . . . . . . . . . . 487

23    108B   . . . . . . . . . . . . . . . . . . 492

24    660  . . . . . . . . . . . . . . . . . . . 495

25    100  . . . . . . . . . . . . . . . . . . . 504
</pre>

1    118A    . . . . . . . . . . . . . . . . . 507

2    119    . . . . . . . . . . . . . . . . . 510

3    121    . . . . . . . . . . . . . . . . . 514

4    122A    . . . . . . . . . . . . . . . . . 520

5    123a    . . . . . . . . . . . . . . . . . 536

6    124a    . . . . . . . . . . . . . . . . . 543

7    125a    . . . . . . . . . . . . . . . . . 547

8    120    . . . . . . . . . . . . . . . . . 553

9                        DEFENDANT EXHIBITS

10    Exhibit No.                          Received

11    305    . . . . . . . . . . . . . . . . 564

12

13

14

15

16

17

18

19

20

21

22

23

24

25