O3SASEC1

```
1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   SECURITIES AND EXCHANGE
    COMMISSION
4
                Plaintiff,
5
                v.                      23 Civ. 1346 (JSR)
6
    TERRAFORM LABS PTE LTD. , et
7   al.

8               Defendants

9   ------------------------------x
                                    New York, N.Y.
10                                  March 28, 2024
                                    9:08 a.m.
11
    Before:
12
                    HON. JED S. RAKOFF
13
                                    District Judge
14                                  –and a Jury–

15
                        APPEARANCES
16
    UNITED STATES SECURITIES AND EXCHANGE COMMISSION
17       Attorneys for Plaintiff
    By:  JAMES P. CONNOR
18       DEVON STAREN
         CARINA CUELLAR
19       LAURA E. MEEHAN
         CHRISTOPHER J. CARNEY
20       ROGER LANDSMAN

21

22

23

24

25
```

O3SASEC1

1                        APPEARANCES (Cont'd)

2     DENTONS US LLP
           Attorneys for Defendant Terraform
3     BY:  LOUIS A. PELLEGRINO III
           DAVID KORNBLAU
4          MARK CALIFANO
           DOUGLAS W. HENKIN
5          MATTHEW A. LAFFERMAN
           AMIANNA STOVALL
6          ALYSSA LANDOW
           MELISSA GOMEZ NELSON
7
      KAPLAN HECKER & FINK LLP
8          Attorney for Defendant Kwon
      BY:  MICHAEL FERRARA
9          CHRISTOPHER MOREL
           DAVID E. PATTON
10         ANDREW CHESLEY
           SEAN HECKER
11

12    Also Present:

13    Shadow Haywood, SEC Trial Assistant
      Armando Aquino, Defense Trial Assistant
14    Mark E. Bini, Esq.
      Wayne Stansfield, Esq.
15    Rachel Fiset, Esq.

16

17

18

19

20

21

22

23

24

25

O3SASEC1

1          (Trial resumed; jury not present)

2              THE COURT:  Please be seated.  So I thank defense

3     counsel for providing me with indications that even when the

4     false statement is made intentionally, it doesn't constitute

5     securities fraud if it's not also related to a material matter.

6              All the cases that they cite there are private

7     security cases, and I think an argument, but I'm not going to

8     pursue it.  But I think an argument could be made that it's

9     different in a securities fraud case brought by the SEC where

10    the issue is the integrity of the marketplaces as opposed to

11    damages to individual plaintiffs.  But, nevertheless, I had

12    already instructed the jury in effect in my preliminary

13    statement that materiality was an element.  I don't think my

14    question the other day in any way inferred or implied the

15    opposite.  So I don't see a need for further curative

16    instruction other than the portions I agreed to give, which

17    I'll give then when the jury comes in this morning.  But I will

18    make clear once again, my final instructions to the jury that a

19    required element is materiality.

20             Okay.  Secondly --

21             MR. FERRARA:  And, your Honor, understood.  We'll just

22    note our objection for the record.

23             THE COURT:  Yes.

24             MR. FERRARA:  Thank you.

25             THE COURT:  Secondly, I went over Plaintiff's Exhibit

1    123b, the recording with Jinny Baek.  And I think the

2    statements by Ms. Baek are receivable both as statements of a

3    coconspirator in furtherance of the conspiracy and also in

4    many, perhaps all cases, statements contrary to interest.  The

5    statements of Mr. Myung I think are receivable just for setting

6    the context of Ms. Baek's responses.  So if this is referred to

7    on summation, for example, his statements could only be used

8    for setting the context for her statements and not otherwise.

9           Okay.  Those are I think the only things that were on

10   my list.  What can I do for you folks?

11          MR. FERRARA:  Your Honor, we would ask that

12   instruction or that argument -- the Court's instruction apply

13   to all -- we think it should apply to all of the Myung

14   transcripts because at no point was he acting as a

15   co-conspirator when he made them.  I understand I raised this

16   with the Court yesterday --

17          THE COURT:  Yeah.  One problem.  And I think that's

18   fair, but I should say you raised it after many of the tapes

19   had been played and your colleague had already made a

20   continuing hearsay objection, and then finally after it was

21   originally -- I interrupted on this one and said there might be

22   an additional issue as to this one, and then you said, yes, and

23   we also think his statements should not come in for the truth.

24   And then even later than that you finally said and we think

25   that's true of all of them.  And so going forward, I'm going to

O3SASEC1

1    treat that as a waiver.  I will, in the interest of making the

2    process move forward, accept that for now.  So the statements

3    of Mr. Myung on the tapes, in any of the tapes, can only be

4    used as statements setting the context for the responses.  But

5    going forward, you don't make an objection at the right time,

6    you waive it.

7                MR. FERRARA:  Your Honor, thank you.

8                MR. KORNBLAU:  Your Honor, all those objections were

9    made in our motions *in limine*.

10                THE COURT:  No, that doesn't preserve them for the

11    specific playing of the tapes.  That's why you asked for on the

12    hearsay objection a continuing objection.  And I granted that.

13    You didn't ask for a continuing objection on all your other

14    objections.  And just so you understand, anything raised in the

15    motions *in limine* if I've overruled the motions *in limine* are

16    not treated as continuing objections unless you raise them

17    specifically at the time the evidence was offered.  Understood?

18                MR. KORNBLAU:  Yes, sir.

19                THE COURT:  Okay.  Anything else?

20                MS. CUELLAR:  Yes, Carina Cuellar on behalf of the

21    SEC.  We have a potential privilege issue.

22                THE COURT:  Oh, yes.  Is there some lawyer here on

23    that?

24                MS. CUELLAR:  Yes, your Honor.

25                THE COURT:  So who is the witness and who is the --

O3SASEC1

| | |
|---|---|
| 1 | MS. CUELLAR:  The witness is Brian Curran, the former |
| 2 | head of communications for Terraform Labs.  We're not sure if |
| 3 | it's privileged, but the potential privilege would be |
| 4 | attorney/client. |
| 5 | THE COURT:  All right.  So why don't you come to the |
| 6 | side bar so we can take this up on a sealed basis. |
| 7 | Do you want to identify yourself for the record. |
| 8 | MS. GOMEZ NELSON:  Melissa Gomez Nelson, counsel for |
| 9 | Terraform, your Honor. |
| 10 | THE COURT:  Okay.  And this is Terraform's privilege |
| 11 | being asserted? |
| 12 | MR. PELLEGRINO:  Correct, your Honor. |
| 13 | MS. GOMEZ NELSON:  Yes, your Honor. |
| 14 | THE COURT:  I don't need five attorneys. |
| 15 | MR. FERRARA:  I am definitely the least necessary. |
| 16 | MR. BINI:  Your Honor, we are the general counsel who |
| 17 | is also may be referenced in this privilege issue may we |
| 18 | approach as well. |
| 19 | THE COURT:  You're counsel for? |
| 20 | MR. BINI:  Marc Goldich, former general counsel for |
| 21 | Terraform Labs. |
| 22 | THE COURT:  Well, who are these folks representing?  I |
| 23 | thought they represented Terraform. |
| 24 | MR. PELLEGRINO:  We do. |
| 25 | MR. BINI:  Yes, we represent the individual former |

O3SASEC1

1   employee.

2             THE COURT:  You're representing him, not Terraform?

3             MR. BINI:  Yes.  We represent Marc Goldich.

4             THE COURT:  I see, all right.

5             MR. BINI:  Thank you, your Honor.

6             THE COURT:  In that case, since there's so many of us,

7   go into the robing room.

8             (Continued next page)

9             (Pages 584 through 593 SEALED)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O3SASEC1

1          (In open court; jury not present)

2          THE COURT:  So it is apparent to the Court and I think

3     to counsel as well, that I cannot definitively resolve the

4     assertion of privilege on this specific item raised until I've

5     had a chance to question Mr. Curran outside the presence of the

6     jury in a sealed proceeding.  So when we get to that part of --

7     is he your next witness?

8          MS. CUELLAR:  No, your Honor.

9          THE COURT:  So when he's around and you're around and

10    we have a good opportunity, let me know and we'll talk.  Okay?

11         MS. CUELLAR:  Yes, your Honor.

12         THE COURT:  So let me ask the courtroom deputy, how

13    are we doing jury wise?

14         THE DEPUTY CLERK:  All here.

15         THE COURT:  All here, what a jury.  So let's get the

16    witness and let's bring in the jury.

17              (Continued on next page)

18

19

20

21

22

23

24

25

O3SASEC1                          Myung - Cross

1              (In open court; jury present)

2              THE COURT:  So I was just saying to counsel what a

3    good jury.  You're here so prompt.  It is terrific.  You don't

4    mind if we extend the trial another six months, do you?

5              MR. KORNBLAU:  Objection, your Honor.

6              THE COURT:  Sustained.

7              Actually, I do want to mention, from time to time

8    during the trial I've asked questions of witnesses.  I want you

9    to understand that when I ask a question, it's just simply to

10   move things forward rapidly or to clarify something I think you

11   may have been not clear about.  And it's not because I have any

12   opinion about any issue in this case because that's your job is

13   to decide the case, not mine.

14             So if I ask questions, don't think that reflects any

15   view on my part.  Let's continue with this witness.

16   AARON MYUNG, resumed.

17   CROSS-EXAMINATION CONTINUED

18   BY MR. KORNBLAU:

19   Q.  Good morning, Mr. Myung.  Mr. Myung excuse me.  Good

20   morning, Mr. Myung.  Am I pronouncing that right?

21   A.  Myung, yeah, close enough.

22   Q.  Thank you.  We're not going to go back to the conviction

23   document we talked about yesterday.  But just so the record is

24   clear, those violations of Korean law, you agree that had

25   nothing to do with Terraform Labs or Do Kwon or Chai

O3SASEC1                        Myung - Cross

1   Corporation, correct?

2   A.  Yes.  They had nothing to do with Terraform or Chai or

3   anything like that.

4   Q.  Thank you.  Now, in your direct testimony with the SEC you

5   also mentioned that you were subject to a two-year entry ban by

6   Korea, correct?

7   A.  Yes.

8           MR. KORNBLAU:  Okay.  Can we please show the witness

9   for identification Defendants' Exhibit 0306b, please.  And can

10  we start with page seven.  And if you can scroll from seven

11  through page 11 so the witness can see sort of just quickly --

12          MS. STAREN:  Objection.  Oh.  Sorry.  Sorry.

13  Q.  And that's a Korean language document; is that fair,

14  Mr. Myung?

15  A.  I see a notary on my screen.

16  Q.  Right.  Starting on page seven.  Just trying to get through

17  this quickly.

18  A.  Oh, okay.  Yeah.  Yeah.  I'm sure it's correct.

19  Q.  And then if we look at pages one through six of the same

20  exhibit it's a certified English translation.  Do you see that?

21  A.  Yes.

22  Q.  And is this a copy of fine payment instructions,

23  certificate of payment of fine, receipt, and notice of entry

24  ban?

25  A.  Yes, I see that.

O3SASEC1                        Myung – Cross

1              MR. KORNBLAU:  Your Honor, we offer Exhibit 306b into

2     evidence.

3              MS. STAREN:  Objection.  Your Honor, it's beyond the

4     609 purpose of this document.

5              THE COURT:  It's beyond what?  I didn't hear you.

6              MS. STAREN:  It's beyond the impeachment purpose.

7              THE COURT:  No, I'll allow it.  Overruled.

8              (Defendant's Exhibit 306b received in evidence)

9              MR. KORNBLAU:  If we can display page six, please.

10    Publish for the jury.

11    BY MR. KORNBLAU:

12    Q.  Mr. Myung, is this the notice of entry refusal ordered by

13    the Incheon Airport Immigration Office?

14    A.  Yes, this is related to the Hello Cafe, the English

15    conversation thing.

16    Q.  And just so we can get through this.  And the document says

17    it has been ordered in accordance with provisions of article

18    10, 11, and 12 of the Korean immigration law, that you be

19    deported to USA.  Your entry is prohibited; is that correct?

20    A.  Yes, that was in fact.

21    Q.  And this is what happened that led to the two-year ban,

22    right?

23    A.  Yeah.  I was not aware of a two-year ban until I entered

24    Korea on a business trip and I could not gain entry, so I went

25    back to California.

1          MR. KORNBLAU:  Okay.  Thank you.  We can take that

2    down.

3    Q.  So I want to ask you a question or two just about your

4    Korean fluency, Mr. Myung.

5          Yesterday, without getting into the details of it

6    again, you disagreed with the English translation of the

7    decision and order of the Seoul Central District Court; do you

8    remember that?

9    A.  I remember our conversation from yesterday.

10   Q.  Yeah.  And you disagreed with a translation of a word; do

11   you remember that?

12   A.  Sure.

13   Q.  And do you remember that you gave a deposition in this case

14   last year?

15   A.  Yes, in D.C.

16   Q.  And that was October 11th of last year?

17   A.  Somewhere around that timeframe, yes.

18   Q.  And just so the jury understands, at a deposition you're

19   under oath to tell the truth, correct?

20   A.  Sure.

21   Q.  And in your deposition --

22          THE COURT:  Now remember, counsel, the way you have to

23   do this is you have to identify the page and the line numbers,

24   put it on the screen before you read it, and then if there's an

25   objection, I'll hear the objection.

1              MR. KORNBLAU:  Will do, your Honor.

2    Q.  You testified six months ago in your deposition that your

3    ability to read Korean language --

4              MS. STAREN:  Objection your Honor.

5              THE COURT:  No, no, that's --

6              MR. KORNBLAU:  I'm just asking about his memory.

7              THE COURT:  Sustained.

8    Q.  You testified -- do you recall, Mr. Myung, that you

9    testified?

10             MS. STAREN:  Objection.

11             THE COURT:  Sustained.

12             MR. KORNBLAU:  Oh, sustained.

13             THE COURT:  Now you're using a deposition for

14   something that you -- that's not impeachment at all.

15             MR. KORNBLAU:  Okay.  All right.

16   BY MR. KORNBLAU:

17   Q.  In fact, Mr. Myung, six months ago, you had trouble reading

18   a Korean document, correct?

19             MS. STAREN:  Objection.

20             THE COURT:  Well, just to cut through this, so how

21   good is your Korean?

22             THE WITNESS:  It's pretty good.  It's not perfectly --

23   I'm not perfectly bilingual.  But my native language is

24   English.  So in Korean, I can -- for example, my girlfriend is

25   Korean.  We chat in Korean.  We speak in Korean.  I can, you

O3SASEC1                          Myung - Cross

1      know, read the news in --

2                  THE COURT:  Well, we certainly don't want to hear

3      about those conversations.

4                  MR. KORNBLAU:  Sustained.

5                  THE WITNESS:  I'm just trying to give you an idea of

6      my Korean level.  I did business at Chai, all Korean meetings,

7      all the presentations are in Korean.  So if that gives you an

8      idea.  Like I don't know what your definition of good is, but

9      that was my level.

10                 THE COURT:  All right.

11     BY MR. KORNBLAU:

12     Q.  And it's a fact, isn't it, Mr. Myung, that six months ago

13     you could not --

14                 MS. STAREN:  Objection.

15     Q.  -- read in Korean language the Korean --

16                 MS. STAREN:  Objection.

17     Q.  -- for a violation of the Korean Immigration Control Act;

18     isn't that correct?

19                 THE COURT:  Sustained.

20                 THE WITNESS:  Sustained?

21                 THE COURT:  Means you don't answer.

22     BY MR. KORNBLAU:

23     Q.  Mr. Myung, in your direct testimony yesterday -- I'm going

24     to change topics.

25                 The SEC asked you questions about a Chai service

O3SASEC1                    Myung – Cross

1    agreement with a Chai merchant called Yanolja Company; do you

2    remember that generally?

3    A.  Yes.

4    Q.  And the SEC showed you a contract that you took a look at;

5    do you remember that?

6    A.  Yes.

7    Q.  And that contract was signed by Chai on one hand and the

8    Chai merchant Yanolja on the other hand, correct?

9    A.  Yes.

10   Q.  Now, didn't that same merchant Yanolja sign another

11   contract that was also signed by Chai and Terraform Labs?

12   A.  I'm not sure.  That wasn't presented to me on the screen

13   here.

14   Q.  It wasn't.  It's a different question.

15           It's just do you recall that there is another

16   agreement called a Chai service promotion support agreement

17   that's signed by the merchant, Yanolja, Chai, and Terraform

18   Labs?

19   A.  I don't recall, but I am happy to see it right now.

20   Q.  Let me show you for identification Defendant's Exhibit 319.

21           And, again, just to try to do this quickly, Mr. Myung,

22   if we look at pages 7 through 11, that's in Korean.  So we'll

23   just quickly take a look at that so you can see it.  Right?  Do

24   you see that's the Korean language version?

25   A.  Yes.

O3SASEC1                        Myung – Cross

1    Q.  And then if we look at pages 2 through 6, there's a

2    certified English translation of the same document; do you see

3    that?

4    A.  Yes, I see that.

5    Q.  Okay.

6            MR. KORNBLAU:  So now let's go to the first page of

7    the English translation.  I think that's page 2 of the

8    document, Mr. Aquino.  So this is the Chai service promotion

9    support agreement; is that correct?

10   A.  It's entitled that, yes.

11   Q.  And if we turn to page 6, what companies signed this

12   agreement?

13           MS. STAREN:  Objection.

14           THE COURT:  Ground?

15           MS. STAREN:  Documents not in evidence.

16           THE COURT:  Well, he's laying a foundation to put it

17   into evidence.  Overruled.

18   BY MR. KORNBLAU:

19   Q.  Just the companies, Mr. Myung, so we can get through this,

20   that are signatories on this document.

21   A.  Sorry.  What's the question?

22   Q.  Just which companies signed this document?

23   A.  Oh, okay.  Party A, company name Yanolja Co., Ltd.  Party B

24   company name, Chai Corporation.  Party C company name,

25   Terraform Labs Pte. Ltd.

O3SASEC1                    Myung – Cross

1              MR. KORNBLAU:  Your Honor, we offer Defendant's

2    Exhibit 319 in evidence.

3              MS. STAREN:  Your Honor, we don't object to the

4    document being admitted into evidence -- could we have a side

5    bar, please.

6              THE COURT:  Pardon?

7              MS. STAREN:  Could we have a side bar please.

8              THE COURT:  Sure.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O3SASEC1                         Myung - Cross

1              (At sidebar)

2              MS. STAREN:  So we don't object to the document coming

3     in, but I think we need to establish that he's seen it before

4     he asks the question.

5              MR. KORNBLAU:  What?

6              MS. STAREN:  We don't object to the document coming

7     in, but I think we need to establish that he's seen it and

8     knows what it is before he asks questions about what it's

9     about.

10             THE COURT:  Well, you're saying -- if he has not seen

11    it before, then the only -- I don't think there are any

12    questions that can be put to this witness about it.  It's

13    evidence, you can use it later.  But the objection would be the

14    document speaks for itself.

15             MR. KORNBLAU:  That's fine.

16             THE COURT:  Okay.

17             MR. KORNBLAU:  While we're here, your Honor, back on

18    that deposition thing, was the problem that I didn't cite the

19    page and line numbers?

20             THE COURT:  Well, that was part of the problem.  The

21    real problem was that what you really were trying to do, though

22    thinly veiled, was to impeach him as to his knowledge of

23    Korean, when that was not something he had testified to.  So

24    that's why I asked the question, to try to set it up, was how's

25    your knowledge of Korean.  And he said good, but not great.

O3SASEC1                          Myung – Cross

1    And then I don't think there's anything in the deposition that

2    you were trying to get at that is contrary to it.  So there's

3    no impeachment.

4              MR. KORNBLAU:  Depends what good but not great is, but

5    I'm moving on.

6              THE COURT:  Okay.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O3SASEC1                          Myung - Cross

1              (In open court; jury present)

2              MR. KORNBLAU:  May I resume, your Honor.

3              THE COURT:  By the way, just to complete your side

4     bar, also the point you made was also part of the problem.  So

5     there were the two problems.

6              MR. KORNBLAU:  Yes, your Honor.

7              So if we can put back up just for identification

8     Defendant's Exhibit 319.  I think where we left off was we

9     offered that in evidence.

10             THE COURT:  Yes.  So that's received.

11             (Defendant's Exhibit 319 received in evidence)

12    Q.  Okay.  Mr. Myung, do you remember this agreement?

13    A.  I may have seen it, but like very vaguely.

14    Q.  Do you remember this type of agreement with Chai merchants?

15    A.  Like not like specific agreements, but I've -- I know that

16    these exist, like merchant agreements.

17    Q.  All right.  If we can take a look at page two and there's a

18    paragraph towards the bottom called article three promotions

19    support.

20             MS. STAREN:  Objection.  Lack of foundation.

21             THE COURT:  Well --

22             MR. KORNBLAU:  It's in evidence.

23             THE COURT:  It's in evidence, yeah.  And the witness

24    has indicated he has some recollection, but vague, of these

25    agreements.  So let's see what the question is.

O3SASEC1                        Myung - Cross

1    BY MR. KORNBLAU:

2    Q.  Mr. Myung, without getting into the legalese, if you can

3    read this, does this provision say that Chai and Terraform Labs

4    make a monthly payment to merchants?

5    A.  Are you asking about these article three --

6              THE COURT:  Well, I think the objection is sustained

7    as to that question.

8              When what it says is "the parties agree to determine

9    the promotion discount rates (hereinafter referred to as

10   discount rates) in consideration of Party A's monthly revenue

11   and the usage rate of Party B's services, and, accordingly,

12   Party B and Party C agree to provide Party A with the costs

13   needed in promotions every month as support."

14             Aren't you glad you're not lawyers?  Anyway, go ahead

15   counsel.

16             MR. KORNBLAU:  Yeah, I was trying to avoid it, your

17   Honor.

18   Q.  But that last sentence, Mr. Myung, the last part of the

19   sentence about Party B and Party C agreeing to provide Party A

20   with the costs needed and promotions every month as support.

21             Mr. Myung, did that reflect that merchants received

22   monthly payments?

23             MS. STAREN:  Objection, your Honor.

24             THE COURT:  Yeah.  I'll rephrase the question.

25             Were you familiar with this clause?

O3SASEC1                      Myung - Cross

1              THE WITNESS:  Me?

2              THE COURT:  Yeah.

3              THE WITNESS:  I am familiar with kind of like what it

4    entails.  I mean, like legalese wise I'm, not an expert on it,

5    but...

6    BY MR. KORNBLAU:

7    Q.  Can you just tell us in plain English what it means?

8    A.  Yeah.  So basically like Chai makes deals with merchants

9    for promotions for deals.  So there's like, in the Chai app,

10   there's something called like a boost.  So it's like these like

11   deals, like discounts.  So the merchants, so let's say if it's

12   like Nike, they'll be like okay, we'll fund like -- we'll give

13   you we'll provide our users like 40 percent discounts up to

14   like 50 bucks or something or like some predetermined amount.

15             And so basically, so like the users would use the

16   coupon basically, and then purchase on the site through the

17   Chai app.  And then like at the end of a month or some

18   period -- and it's different for each merchant.  So basically,

19   so Chai, you know, on centralized database, will actually

20   calculate, okay, up to what amount of like the deal, with like

21   what percentage of like the discount, and then, you know, we

22   subtract out all the taxes and stuff like that.

23             And then so we do like this like very complex

24   settlement process.  And then at the very end, what the

25   merchant is left with is, you know, like the amount of money

O3SASEC1                     Myung – Cross

1    from the users, minus the discount, you know, and like minus

2    the taxes.  And we send a lump sum to the merchant.

3    Q.  And, Mr. Myung, would you agree that Terraform Labs is also

4    making a monthly payment to the merchant?

5    A.  I'm not sure if Terraform Labs made any payments.

6    Q.  Okay.  Can we go to page six of this document, please.

7            Do you see Party C is identified as Terraform Labs

8    Pte. Ltd.?

9    A.  I do see Party C named Terraform Labs Pte. Ltd.

10   Q.  And Party A is the merchant Yanolja, right?

11   A.  Yes, I see that.

12   Q.  Now can we go back to page two.  It says, Party C, that's

13   Terraform Labs, agrees to provide Party A, that's the merchant,

14   with the costs needed in promotion every month as support.

15           Did I read that right?

16           THE COURT:  Well, it says Party B and Party C.

17           MR. KORNBLAU:  Correct.  It's Chai and Terraform Labs.

18           THE COURT:  So you've read it correctly.  Put a

19   question.

20           MR. KORNBLAU:  Yeah.

21   Q.  So is it accurate, Mr. Myung, that Terraform Labs in

22   addition to Chai is making monthly payments to Chai merchants?

23   A.  There's no way for me to verify that.  I can only verify

24   what Chai pays the merchant.

25   Q.  Okay.

O3SASEC1                      Myung – Cross

1          THE COURT:  Did you ever see or hear of a payment

2    coming from Terraform as part of one of these deals?

3          THE WITNESS:  No.  In fact, Chai was losing $1 million

4    a week in funding these deals.  So I know that a huge amount of

5    money was going to these merchants from Chai.  And it was all

6    in fiat too.  So these merchants never received any kind of

7    stablecoin or crypto.

8          MR. KORNBLAU:  Your Honor, I move to strike as

9    nonresponsive.

10         THE COURT:  Overruled.

11   BY MR. KORNBLAU:

12   Q.  Okay.  Mr. Myung, I'm going to change topics again.

13         I think you'll agree based on your testimony yesterday

14   that you're hoping for a big payday from this case?

15         MS. STAREN:  Objection your Honor, argumentative.

16         THE COURT:  I don't recall his saying that.  I recall

17   your saying that.  Sustained.  Put another question.

18   BY MR. KORNBLAU:

19   Q.  All right.  Let's put it this way, Mr. Myung, are you

20   hoping for a big payday from this case today?

21   A.  If I really wanted to make money, I would have stayed

22   silent like everybody else.

23   Q.  So, no, you're not hoping for a big payday from this case?

24   I just want to be clear about what you're saying.

25   A.  Well, after two years of getting attacked by, you know,

O3SASEC1                          Myung - Cross

1    lawyers and, you know, all these different companies for

2    blowing the whistle, if there's a payday at the end of, you

3    know, this road, I'm all for it.

4    Q.  Right.  Okay.  So you are hoping for a big payday?

5               MS. STAREN:  Objection, your Honor.  Asked and

6    answered.

7               THE COURT:  Sustained.  And also I want to remind the

8    jury that the determination of whether there are going to be

9    any financial penalties in this case is going to be my

10   determination, not yours.  But that's true only of course if

11   you find the defendants liable.  And if you don't find the

12   defendants liable, there will be no payday so far as the claims

13   before you are concerned.

14   BY MR. KORNBLAU:

15   Q.  So, Mr. Myung, to pick up on your Honor's point, your

16   ability to get an award depends on the outcome of this case;

17   isn't that right?

18   A.  My understanding is that if there's successful enforcement.

19   Q.  And if they're not successful, you get nothing, right, as a

20   whistleblower?

21   A.  Well, it's only if justice is served in the right way.

22   Q.  So if the SEC doesn't win, you get nothing, right?

23              MS. STAREN:  Objection, your Honor.  Asked and

24   answered.

25              THE COURT:  Well, there's a nuance there that you

1    should be aware of things that are not before the jury, but I

2    think it's a proper question within the context of what we're

3    talking about here.

4    A.   So what was the question?

5             THE COURT:  I'll put the question just to move things

6    along.

7             MR. KORNBLAU:  If the SEC doesn't -- oh, I'm sorry.

8             THE COURT:  You understand that the amount of money

9    you get, if any, will be determined at least in part by the

10   jury's determination of this case?  You understand that?

11            THE WITNESS:  Yes, in part.  Also --

12            THE COURT:  No, no.  You've answered the question.

13            THE WITNESS:  Okay.

14   BY MR. KORNBLAU:

15   Q.   Okay.  You submitted four different whistleblower

16   complaints to the SEC, Mr. Myung?

17   A.   That's my understanding, yeah.

18   Q.   And as I recall yesterday you said that one of the factors

19   for filing these complaints was because you wanted to get a

20   monetary award; is that fair?  Did I get that right?

21   A.   I mean, that's what we've just been discussing is, yeah.

22   Q.   And I think you also said yesterday, correct me if I'm

23   wrong, that you hope to qualify for 10 to 30 percent of any

24   money won by the SEC in this case?

25   A.   That's the rules of the program to blow the whistle.

1          THE COURT:  Yeah.  Ladies and gentlemen, the

2     percentage given to a whistleblower is determined partly by

3     statute, which sets rules in that range.  But then again, the

4     Court determines much of what is effected by this.

5     BY MR. KORNBLAU:

6     Q.  Now, Mr. Myung, you cooperated with the SEC in their

7     investigation before they filed this case, correct?

8     A.  By that do you mean the complaint or?

9     Q.  The complaint, exactly?

10    A.  So I sent in the complaints in and then --

11    Q.  Just answer the question, Mr. Myung.

12         THE COURT:  No, no.  I think there's ambiguity on the

13    use of the word complaint.

14         MR. KORNBLAU:  So let me rephrase.

15         THE COURT:  Yeah.

16    BY MR. KORNBLAU:

17    Q.  Before the SEC filed its complaint in this action last

18    year, you were cooperating with the SEC in their investigation;

19    is that right?

20    A.  Yes, I've been cooperative in their investigation.

21    Q.  And that went back to 2022, right?

22    A.  2022 -- hold on.  So after the crash was like the main kind

23    of gist of my cooperation.  So I think that was May 2022.

24    Q.  And during that cooperation, do you recall asking the SEC

25    to confirm your official role as an SEC whistleblower?

1          MS. STAREN:  Objection, your Honor.

2          THE COURT:  Overruled.

3    A.  Yeah, well I had no lawyer with me.  I didn't know how the

4    program works.  I didn't really know how to sign the forms.  Or

5    even how to deal, or, you know, talk to SEC officials.  You

6    know, that was my first time in life talking to anyone from the

7    SEC.  You know, so I have to ask clarifying questions.

8          MR. KORNBLAU:  Your Honor, I move to strike as

9    nonresponsive.

10         THE COURT:  No, I think it is.

11         MR. KORNBLAU:  Well, let me just ask it again.

12   Q.  Didn't you ask the SEC to confirm your official role as an

13   SEC whistleblower?

14         MS. STAREN:  Objection.  Asked and answered.

15         THE COURT:  Well, my understanding, but correct me if

16   I'm wrong, you were saying you did so, but you did so on the

17   advice of counsel, yes?

18         THE WITNESS:  No.  I asked because I did not have

19   counsel.

20         THE COURT:  Oh, I'm sorry.  Thank you for your

21   correction.  Okay.

22         THE WITNESS:  I just don't know what are the relevant

23   questions to ask with no lawyer.

24   BY MR. KORNBLAU:

25   Q.  So you didn't have a lawyer, you filed your SEC

O3SASEC1                        Myung - Cross

1  whistleblower --

2            THE COURT:  I really think I have to give the jury

3  some legal context here.

4            A whistleblower brings information that the SEC

5  ultimately brings an action as a result, they're entitled to

6  some compensation.  But they're not entitled to some

7  compensation if the SEC already knows about the alleged

8  misconduct.  So if, for example, the SEC filed a lawsuit saying

9  such and such has occurred and then someone came forward and

10  said, oh, I'm going to tell you about that, they would not be

11  entitled to a whistleblower payment.  The point is to encourage

12  people to come forward before the SEC knows about it.

13            So that's what this all relates to.

14            Go ahead.

15            MR. KORNBLAU:  Thank you, your Honor.

16  BY MR. KORNBLAU:

17  Q.  Mr. Myung, so you didn't hire a lawyer to file your

18  whistleblower complaints, correct?

19  A.  That's correct.

20  Q.  You did it on your own?

21  A.  Yes.

22  Q.  And so you went and looked for information about the SEC

23  whistleblower program that the Court explained?

24  A.  Yeah, like I searched on Google.

25  Q.  And did Google take you to the SEC's website?

O3SASEC1                       Myung – Cross

1   A.  Yes, it took me to the SEC's website.

2   Q.  And there's a whistleblower section of the SEC website,

3   correct?

4   A.  Yes, there is a section like that on the SEC website.

5   Q.  And you took a look to learn about how that works, right?

6   A.  Yes, I took a look at that section on the website.

7   Q.  And, in fact, the complaints that you filed were on an SEC

8   form, correct?

9   A.  Yeah.  There was like a button or a link there, said like

10  submit a tip or something like that.  Yeah, it was like a form.

11  Q.  Tips, complaints, and referrals; was that the form?

12  A.  Something to that effect.

13  Q.  And you submitted those complaints through a portal on the

14  SEC's website, right?

15  A.  Like what do you mean by portal?

16  Q.  You tell me.  I mean you had to submit it through the SEC

17  electronically.  Was there some kind of link through the

18  website?

19  A.  Yeah, it was like a site.  It was an SEC site.  And it was

20  a link to the form on the site.

21  Q.  Okay.  Now, when you were reviewing the SEC website, is

22  that where you learned about the 10 top 30 percent as a

23  potential reward?

24          MS. STAREN:  Objection, your Honor.  Cumulative.

25          THE COURT:  Overruled.

O3SASEC1                         Myung – Cross

1    A.   I think it was on the SEC's website that I learned about

2    it.

3    Q.   It has all the details right on the SEC website, right,

4    about the whistleblower program?

5             THE COURT:   Sustained.  I don't know how anyone could

6    ever answer that question.

7    Q.   Lots of details about the SEC whistleblower program on the

8    SEC website; isn't that correct?

9    A.   Yeah, it's very complicated.

10   Q.   Yeah.  Now, on that website there are also links about to

11   show whistleblower rewards in other cases; is that right?

12   A.   I'm not sure.  There probably would be I guess.

13   Q.   All right.  And did you see any awards that were --

14            MS. STAREN:   Objection.

15   Q.   -- issued in other cases?

16            MS. STAREN:   Objection.  Relevance.

17            THE COURT:   All this is inquiry about alleged bias.

18   Overruled.

19   A.   I'm not sure if I saw on the SEC case -- website.  But I

20   mean, I've heard of like, you know, rewards in the past for,

21   you know, you know, like fraud and stuff like that.

22   Q.   Yeah.  How much?  How much did you read about those

23   rewards?

24   A.   I can't recall like a specific case, but they can be pretty

25   large for large scale fraud.

O3SASEC1                        Myung - Cross

1    Q.  Like millions?

2    A.  Sure.

3    Q.  Would it be fair to say, Mr. Myung, that you want to do

4    everything you can to help the SEC get a big win?

5    A.  I have been cooperative.  But, you know, my entire

6    motivation was to try to prevent this whole thing from

7    collapsing in the first place.  I filed it well before the

8    collapse.

9    Q.  So you said it was your entire motivation or was one of the

10   factors the SEC --

11   A.  Well, at that time my primary motivation was to prevent

12   this whole thing from collapsing because everything was based

13   on fake technology.

14   Q.  But one of the factors was the award, right?  You've

15   already said that.

16   A.  Sure.

17   Q.  Yeah.  Okay.  And just to go back to my question, isn't it

18   fair to say that you want to do everything you can to help the

19   SEC get a big win?

20          THE COURT:  Sustained.

21   Q.  Well, didn't you say that to the SEC?

22          MS. STAREN:  Objection.  Argumentative.

23          THE COURT:  Overruled.

24   A.  Say again?

25   Q.  Did you say to the SEC, as a whistleblower, I want to do

O3SASEC1                         Myung - Cross

1  everything I can to help you get a big win?

2  A.  I may have said that.  I'm not really sure.  We've had

3  hundreds, if not, you know, thousands of e-mails.  Probably

4  hundreds of e-mails.

5  Q.  Do you remember one way or the other?

6  A.  Not exactly those words, but I may have said that.

7  Q.  Well, do you remember sitting here today whether you made

8  that statement?

9           MS. STAREN:  Objection.

10           THE COURT:  Asked and answered.  Sustained.

11           MR. KORNBLAU:  Okay.  Well, can I refresh his

12  recollection, your Honor?

13           THE COURT:  Yeah.

14           MR. KORNBLAU:  Can we show just for identification

15  Defendant's Exhibit 1257, please.  And we're going to zoom in

16  on an e-mail September --

17           THE COURT:  No, no.  You don't show -- just show him

18  the document.

19           MR. KORNBLAU:  Page 14.

20           THE COURT:  You just show him the document but not

21  identify it beyond the document number.

22           MR. KORNBLAU:  Sure.

23  Q.  Page 14.  There's a pull out.  You can see.  Just read that

24  to yourself.  Don't say a thing.  And just let us know if that

25  refreshes your memory about whether you made the statement that

1    I asked you about.

2    A.   Sure.  I see it written there.

3    Q.   So you did make that statement to the SEC?

4    A.   Sure.

5    Q.   And that's true today?  That was sometime ago.  And today

6    you still hope that a big win for the SEC would mean a big

7    award for you?

8    A.   If it only means that the scammers get justice.

9    Q.   And also a big award for Mr. Myung; correct, Mr. Myung?

10   A.   I've had way more losses than the rewards that you're

11   inferring.

12   Q.   I guess if you could just answer the question, Mr. Myung.

13   I'm trying to get through this.

14           You're also hoping today for a big win because that

15   could mean a big award for you, right?  Today.  Right now.

16   A.   It's kind of like theater what you're doing, but, but yeah,

17   I mean, if there's a reward, I'm all for it.

18   Q.   All right.  Yesterday, Mr. Myung, you testified that you

19   were asked to leave Chai; do I remember that right?

20   A.   Yes.

21   Q.   And that means you were fired from Chai, right?

22   A.   Yes.

23   Q.   And that firing was done by Mr. Shin, the CEO of Chai,

24   correct?

25   A.   Yes. I was fired after raising concerns about the fraud.

O3SASEC1                          Myung - Cross

1    Q.  And you believed at that time getting fired cost you

2    millions of dollars of Chai stock; isn't that right?

3    A.  Yeah.

4    Q.  And that's right around the time that you applied for

5    your -- filed your first complaint for an SEC whistleblower

6    award, correct?

7    A.  Yeah.  If I would have stayed silent, like the others, I

8    would have gotten rich like everyone else.

9    Q.  And around that same time you also tried to get millions

10   from Chai by threatening Mr. Shin; isn't that also right?

11              MS. STAREN:  Objection, your Honor.

12              THE COURT:  Ground?

13              MS. STAREN:  Argumentative.

14              THE COURT:  Yeah, I think that's fair.  Why don't you

15   rephrase it in a more neutral way.

16   BY MR. KORNBLAU:

17   Q.  Well, around the same time, Mr. Myung, weren't you also

18   trying to get millions of dollars by threatening Mr. Shin?

19              MS. STAREN:  Objection.

20              THE COURT:  Well, that's the same question.  Why

21   don't, instead of using broad categorical terms, why don't you

22   do something more specific.

23              MR. KORNBLAU:  Why don't I come back to it, your

24   Honor, when we get to the details.

25              THE COURT:  Okay.

O3SASEC1                          Myung - Cross

1           MR. KORNBLAU:  So let's do that.

2    BY MR. KORNBLAU:

3    Q.  So Chai first informed you around September 2021 that you

4    were going to be terminated; is that correct?

5    A.  I'm not sure of the exact date, but towards the end of the

6    year.

7    Q.  But September you started having a sense that things were

8    not going well for you at Chai; is that accurate?

9    A.  I mean, it's like thereabouts, like towards the end of the

10   year, like I don't know the exact date.

11   Q.  Well, in fact, Mr. Myung, you knew your future at Chai was

12   in jeopardy by September 26, 2021, right?

13   A.  Yeah, I refused to be a team player for this scheme.

14   Q.  And because on -- do you remember sending an e-mail to

15   Mr. Shin and Mr. Kwon and the subject line was "my future at

16   Chai."

17          MS. STAREN:  Objection.

18   Q.  Do you remember that e-mail?

19          THE COURT:  I'm sorry, what was your objection.

20          MS. STAREN:  He's referring to something that's not in

21   evidence.

22          MR. KORNBLAU:  I'm asking if he remembers.

23          THE COURT:  That's permissible on cross.  Overruled.

24          MR. KORNBLAU:  Yeah.  Let me try again, Mr. Myung.

25   Q.  So do you remember sending an e-mail to Mr. Shin and Do

1   Kwon with the subject line "my future at Chai?"

2   A.  Yes.

3   Q.  And that was on September 26, 2021.

4   A.  I'm not sure the exact date, but you're probably correct.

5   Q.  Well, I'd like to get the date down.  Let me see if I can

6   refresh your memory.

7            MR. KORNBLAU:  Can we, for identification purposes,

8   put Plaintiff's Exhibit 134 on the screen.  Maybe zoom in on

9   top to make it easier for Mr. Myung.

10  Q.  So your e-mail to Mr. Shin and Mr. Kwon about your future

11  at Chai, that -- you sent that on -- does this refresh your

12  recollection on the date you sent that e-mail?

13  A.  Sure.  I see it clearly printed right there.

14  Q.  Yeah.  September 26, 2021?

15  A.  Yes.

16            MR. KORNBLAU:  Okay.  We can take that down.

17  Q.  So at that time you were trying to persuade Mr. Shin to let

18  you keep working at Chai; is that fair?

19  A.  I'm not sure what the exact purpose was.

20  Q.  Well, you were proposing new responsibilities you might

21  have that were different at Chai in that e-mail, correct?

22  A.  Well, I think it's talking about the future.  Like what

23  possibilities there could be.

24  Q.  Are for you at Chai, right?

25  A.  Well, sure.  Well, Chai or anything Chai related.

O3SASEC1                          Myung - Cross

1    Q.  And you met with Mr. Shin about a week later; do you

2    remember that?  Approximately.

3    A.  I mean, I met with him all the time, so that's likely true.

4    Q.  And do you remember recording a conversation where you were

5    talking about this subject with Mr. Shin at that meeting?

6    A.  I'm not sure if it was specifically about that e-mail, but

7    because I do remember Dan telling me he felt uncomfortable

8    including Do on that chain.

9    Q.  And do you remember him telling you in that meeting that

10   you recorded that he wanted a -- he thought that there should

11   be a clean break from the relationship between you and Chai?

12   A.  Like what's the context of that?

13   Q.  Well, you had sent the e-mail with some ideas for things

14   you could do and he wanted a clean break; am I getting that

15   right?

16   A.  I mean, so like what's the context of the clean break?

17   Clean break from Chai.

18            THE COURT:  It's nice that you're having an

19   interactive conversation where he's asking you questions and

20   you're responding, but last I remember that's not the way the

21   rules allow.  Put another question.

22            MR. KORNBLAU:  Yes, your Honor.  Will do.

23   BY MR. KORNBLAU:

24   Q.  So in that conversation that you recorded, Mr. Myung, did

25   Mr. Shin say to you that contrary to what you wrote in your

O3SASEC1                          Myung - Cross

1    e-mail he wanted a clean break?

2    A.  I mean, it's possible.

3    Q.  But so without getting into the exact words, you knew that

4    he wanted you out; you were trying to persuade him to keep

5    working with you?  Just to try to get through this.

6    A.  Well, he preferred I create a start-up company to go pursue

7    the venture separately so that -- because I had issue with the

8    stablecoin technology not existing at Chai.  So he said why

9    don't you just create like a, you know, startup and, you know,

10   create it there because you're so concerned about this fraud.

11   Q.  So, Mr. Myung, again, I'm trying to get through this.  He

12   wanted a clean break for you from Chai at that time, and in the

13   recorded conversation; isn't that right?

14   A.  Sure.  And I just told you what the clean break ended up

15   being, so I'm not sure what your question is.

16   Q.  Well, what he said at that time was the clean break; that's

17   what he wanted, correct?

18            MS. STAREN:  Objection.  Asked and answered.

19            THE COURT:  Sustained.

20   Q.  All right.  And so you submitted your first whistleblower

21   complaint to the SEC on October 2, 2021; is that the right

22   date?

23   A.  Yes.  I think that's about -- that's the right one.

24   Q.  And that was about a week after you sent your e-mail to

25   Mr. Shin and Do Kwon about your future at Chai, right?

O3SASEC1                    Myung - Cross

1    A.  Sure.  I guess so.  I send a lot of e-mails.

2    Q.  Right.  And that e-mail on September 26th was about one

3    week before your first SEC whistleblower complaint on October

4    2, 2021?  Just want to get the timeline down, Mr. Myung.

5    A.  Sure, if that's the timeline.

6    Q.  And at that time you believed you had a deal that you

7    testified about yesterday where you would get, if you earned

8    it, $12 million of Chai stock, right?

9    A.  I don't recall a 12 million-dollar something.

10   Q.  Well, it was 10 percent of the stock of Chai, correct?

11   A.  No, that was 20 million.

12   Q.  20 million?

13   A.  Yeah.

14   Q.  Sorry.  I misstated it.  My mistake.  I apologize.  Start

15   again.

16          You thought at that time that you were owed by Chai

17   $20 million of Chai stock?

18   A.  Well, that was actually promised to me.

19   Q.  Right.

20   A.  So it's not, you know, under dispute.

21   Q.  It was promised to you with vesting if you hit certain

22   targets, right?  There were details there?

23   A.  Yes.  Time and performance based.

24   Q.  And that agreement, that was not in a written contract,

25   right?

O3SASEC1                      Myung - Cross

1    A.  It was over, you know, chats and verbal and repeated

2    conversations, and I think even like a recording as well.  I'm

3    not sure.

4    Q.  And you called it a handshake deal, right?

5    A.  I'm not sure if I called it a handshake deal.

6    Q.  Well, would you call it that today?  It was a handshake

7    deal, that's your view?

8    A.  I mean, there was no actual signed written contract.  But

9    it was what was promised to me when I became chief product

10   officer.

11   Q.  Now, when Mr. Shin -- yeah, Mr. Shin told you he wanted a

12   clean break, he didn't give you any stock in Chai, right?

13   A.  I mean, that's getting into settlement territory if you

14   want to know about that.

15   Q.  No, no, no.  This is just what's happening in early

16   October 2021.  And the question is you were terminated at that

17   time, October 2021, without any payment of your equity

18   compensation at that time; isn't that right?

19   A.  On that specific October -- no, I did not get stock on that

20   specific date you're talking about.

21   Q.  And so at that time you thought when Mr. Shin fired you

22   that you had lost out on a lot of stock?

23   A.  I lost out on that and many things for not wanting this

24   fraud to occur.

25   Q.  All right.  And so at that time, would it be fair to say,

O3SASEC1                          Myung – Cross

1   you were angry with Mr. Shin?

2   A.  Sure.  I was angry, I was frustrated, and also pretty

3   scared too.

4   Q.  And you went out and you hired a law firm in Korea, right?

5   A.  Yes.

6   Q.  And you had the law firm send a memo or a letter to

7   Mr. Shin; isn't that right?

8   A.  Yeah, I was -- I was basically telling the company please

9   stop the fraud.

10  Q.  And you sent -- the law firm sent that memo on March 10,

11  2022; isn't that right?

12  A.  Like around that date, yes.

13  Q.  Okay.  And you authorized that memo, right, that your

14  lawyers sent, right?

15  A.  Sure.  They're my lawyer.

16  Q.  And your lawyers, you know, in that memo asked Chai to

17  provide them for you an explanation regarding whether Chai

18  utilized Terra KRT; do I have that right?

19  A.  Yeah.  Because I knew that they would not be able to

20  provide any explanation about this technology existing in the

21  first place.

22  Q.  And your lawyers at your direction told Chai if they did

23  not provide that explanation, you threatened to initiate an

24  investigation or inspection of the matter; is that correct?

25  A.  Well, it's like a lawsuit, but, yeah.

O3SASEC1                        Myung - Cross

1    Q.  All right.  Ten days, about ten days after your lawyers

2    sent that memo to Mr. Shin, you chatted with Do Kwon about that

3    same topic; is that right?  Do you remember that?

4    A.  I think so, like thereabouts.

5    Q.  Yeah.  And you went to Mr. Kwon and you asked him for

6    support in your case against Mr. Shin and Chai?

7    A.  Yeah, I mean, it was just like a lot of like just shady

8    things being done.

9    Q.  And just so we can have the timeline down, you approached

10   Mr. Kwon on that topic on March 16, 2022?

11   A.  I think -- are you referring to the KakaoTalk chat?

12   Q.  Exactly.  I'm trying to get through it quickly, you know,

13   but we can refresh you if you need it, but yes.

14   A.  Sure.  Yeah.

15   Q.  And the next day after, so March 17th, you told Mr. Kwon

16   that you didn't want your potential litigation against Mr. Shin

17   and Chai to spill over to Mr. Kwon or Terraform Labs; isn't

18   that what you told him?

19   A.  I'm not sure if that's the exact words I used.  It could

20   be.

21   Q.  Yeah.

22          MR. KORNBLAU:  Let's look at Plaintiff's Exhibit 120,

23   which is in evidence, page 3.  There's an entry on

24   March 17th at 21:40:32.

25   Q.  You said to Mr. Kwon in this chat, I'm letting you know

O3SASEC1                    Myung - Cross

1    about the potential litigation because I don't want it to spill

2    over to you, Mr. Kwon, or TFL, right?

3    A.   Yeah, I said I don't want it to spill over to you.

4    Q.   Right.  You don't want it to, that's what you said?

5    A.   Yeah, I don't want it to.

6    Q.   Yeah.  And then a couple of days later -- we can take that

7    down.

8            You told Mr. Kwon that you thought it would be in

9    everybody's best interest, everybody's best interest, to find a

10   way to settle your case against Mr. Shin and Chai before it

11   escalates out of control.  Isn't that what you said to

12   Mr. Kwon?

13   A.   Well, I mean, it would be pretty -- fireworks if the news

14   of the fake transactions were to get out there and $50 billion

15   were to collapse, so yeah.

16   Q.   So you wanted Mr. Kwon -- you wanted Do Kwon to know that

17   it would be in everybody's interest including his own for you

18   to work out your issues with Mr. Shin and Chai, correct?

19   A.   Well, I mean, it's good to work things out.

20   Q.   And weren't those threats, Mr. Myung?

21           MS. STAREN:  Objection.

22   A.   No, they were not threats.

23           THE COURT:  I'm sorry.  Anyway, I'll let the answer

24   stand, but you got to be a little louder in your objections.

25           MS. STAREN:  Apologies.

O3SASEC1                    Myung – Cross

1    BY MR. KORNBLAU:

2    Q.  Now, Mr. Kwon, he refused to help you with that case,

3    correct?

4    A.  Yeah, he said, again, over the phone, he doesn't give a

5    fuck about Chai, so...

6    Q.  And he told you in that chat that you looked at yesterday

7    he was not really involved at Chai at all at that point; didn't

8    he tell you that?

9    A.  I mean, he's disclaiming any involvement but he was a

10   majority share -- well, he's the second largest shareholder and

11   a board member, and I took his role at Chai, so he's super

12   involved.

13   Q.  So you disagreed with him.  But he did tell you that he was

14   not involved, correct?

15   A.  He can believe whatever he wants.

16   Q.  Right.  But he told you he wasn't involved, right?

17   A.  Sure.  He can -- he also says he didn't commit fraud, so,

18   you know.

19            MR. KORNBLAU:  Your Honor, it's nonresponsive.

20            MR. MOREL:  Objection.  Move to strike.

21            MR. KORNBLAU:  Rule 403, everything.

22            THE COURT:  Well, I do think we're getting -- I think

23   the witness needs to be careful not to volunteer.  Sustained.

24   BY MR. KORNBLAU:

25   Q.  Now, Mr. Kwon didn't try to stop you from seeking your

1  20 million from Chai and Mr. Shin, correct?

2  A.  Like what do you mean by stopping me?

3  Q.  He said do what you feel like you need to do; isn't that

4  what he told you?

5  A.  No.  If you pull it up, I'll read to you exactly what he

6  told me.

7  Q.  Sure.

8          MR. KORNBLAU:  Plaintiff's 120.  Can we please pull

9  that up at page four.  March 19th at 19:20, rows 19 to --

10          THE COURT:  Well, are you offering this?

11          MR. KORNBLAU:  This is already in evidence, your

12  Honor.

13          THE COURT:  It's already in evidence.  Very good.

14  BY MR. KORNBLAU:

15  Q.  So we will take a look at this, and Mr. Kwon said to you,

16  "yeah, not sure how I can help-wasn't part of the company when

17  you joined so not privy to the deal terms and conflict.  I

18  really am not involved at the company at all at this

19  point-don't even go to board meetings lol.  Look man, do what

20  you feel like you need to do."

21          Isn't that what he told you?

22  A.  Yeah.  I mean, if you read what he says down below, it's

23  pretty telling what --

24  Q.  Okay.  We're going to keep going, Mr. Myung.

25          So after he told you to do what you feel like you need

O3SASEC1                        Myung – Cross

1    to do, you continued and told him that if your lawsuit against

2    Mr. Shin and Chai blew up, it could significantly impact

3    Terraform Labs; that's what you told Mr. Kwon at that time,

4    right?

5    A.  Well, I mean, it would impact TFL.

6    Q.  And that's what you told him that it could significantly

7    impact Terraform Labs, right?

8    A.  Yeah, he also told me that he would personally end my

9    career for the rest of my life.

10           MR. MOREL:  Objection.  Move to strike.

11           THE WITNESS:  It's right there in the transcript.

12           THE COURT:  When there's objection, you have to wait

13   until I rule.

14           THE WITNESS:  Oh.

15           THE COURT:  Sustained.  When you're asked the

16   question, just answer the question put.  There will be a chance

17   on redirect for SEC counsel to ask you for further

18   elaborations, but just answer the questions put.

19           THE WITNESS:  Got it.

20           THE COURT:  Go ahead, counsel.

21           (Continued on next page)

22

23

24

25

O3SHSec2                        Myung - Cross

1   BY MR. KORNBLAU:

2   Q.  All right.  After you told Mr. Kwon that your lawsuit

3   against Chai could significantly impact Terraform Labs, he

4   still refused to help you, isn't that fair?

5   A.  Yeah, because he said I don't care ——

6   Q.  Isn't that fair, yes or no, Mr. Myung, please?

7   A.  I'm telling you exactly what he said.  You don't want to

8   hear that?

9   Q.  Didn't he refuse to help you?

10  A.  Yeah.  The way he said it was:  I don't care.  I don't

11  care.  I don't care.  I don't care about Chai.

12  Q.  He said ——

13  A.  And then he made that threat to me.

14  Q.  He said you were barking up the wrong tree, man, right?

15  A.  Yeah, I think that's what he said, just like, you know, Dan

16  said the same thing.  Everyone else said the same thing.

17  Q.  Now, changing topics, Mr. Myung, yesterday you talked about

18  recording conversations with some of your colleagues at Chai.

19  You remember that testimony?

20  A.  Yes.

21  Q.  You made your first recording at Chai on October 1, 2021,

22  isn't that right?

23  A.  Yeah, something around there.

24  Q.  And just so that we all can —— there's a lot of dates.  So

25  just so we can have the timeline in our minds, you had sent

1    that email to Mr. Shin and Mr. Kwon about your future at Chai.

2    That was September 26, 2021, right?  We got that down, right?

3    You remember that date?

4    A.   Yeah.  This is, like, all kind of similar around that time.

5    Q.   It's the same time period.  So it's about five days later

6    that you start making recordings of colleagues at Chai, right?

7    A.   It's around that time where I started making recordings.

8    Q.   And then October 2, the day after you made that first

9    recording, that's when you filed your first SEC whistleblower

10    complaint, right?

11    A.   I knew that nobody would believe me if they didn't hear it

12    with their own ears.

13    Q.   Right.  So the question, Mr. Myung, was just about dates.

14    OK?  So, I mean, I would ask you to just answer the questions.

15            So the dates were, that you filed your first SEC

16    whistleblower complaint, the day after you started making

17    recordings of your colleagues at Chai, right?

18    A.   Yeah, something like that.

19    Q.   Isn't it — well, withdraw that.

20            Now, you didn't tell your colleagues that you were

21    recording them, correct?

22    A.   I did not tell them.

23    Q.   And they didn't consent to being recorded?

24    A.   That's correct.

25    Q.   They weren't aware that you were recording them?

1    A.  That's correct.

2    Q.  Now, you made some of the recordings with a Sony device, is

3    that right?

4    A.  Yes.

5    Q.  And it was shaped like a pen?

6    A.  Something like that.

7    Q.  And with that device you recorded conversations with the

8    device in your pocket, right, some of them?

9    A.  Either in my pocket or in my shoe.

10   Q.  Yeah.  So, like, shirt pocket up here?

11   A.  I think it was my jacket.

12   Q.  Like a jacket pocket like that?

13   A.  Something like that.

14   Q.  Yeah.  Or you had the —— you had this pen device in your

15   shoe with your foot in the shoe?

16   A.  Yeah.  I mean, it was different each time probably.

17   Q.  OK.  So you were kind of playing secret spy?

18          MS. STAREN:  Objection.

19          THE COURT:  Overruled —— I mean sustained.

20   Q.  Now, you also recorded some conversations using an app on

21   your phone, right?

22   A.  Yeah.

23   Q.  And also secretly, nobody knew about it, right, other than

24   you?

25   A.  Sure.

O3SHSec2                        Myung – Cross

1   Q.  Now, to get one of your colleagues to talk, you were

2   willing to lie, isn't that correct?

3   A.  I'm not sure.  I mean, you have to show me, but . . .

4   Q.  Well, you lied to your Chai colleague named Justin Huang,

5   didn't you?

6   A.  I don't recall, but I don't think I did.

7   Q.  So you don't think you did?

8   A.  I may have prompted some responses.  But, you know, like, I

9   didn't, like, lie for the purpose of lying.

10  Q.  Right.  So to prompt some responses, you lied to Justin

11  Huang, right?

12  A.  For Justin Huang, I don't think so, but ⸺

13          THE COURT:  OK.  Counsel, if you're going to confront

14  him with something specific, you need to do so.

15          MR. KORNBLAU:  Will do, your Honor.

16  Q.  So let's just try to refresh your memory first, to try to

17  keep this simpler.

18          Let's put up Exhibit D-1257 at page 7.  There's an

19  email chain, November 1, 2022, at 11:59 p.m.  There's a

20  highlighted section there.  Please don't say anything.  It's

21  not in evidence.  Just read it, read it to yourself.  Tell me

22  if you've read it.

23  A.  Yes.

24          MR. KORNBLAU:  For the record, your Honor, I misstated

25  the date.  So I just want to correct that.

1    Q.   It's actually November 15, isn't that right, Mr. Myung?

2    A.   Yes.

3            MR. KORNBLAU:   OK.   We can take that down.

4    Q.   Now, Mr. Myung, did that refresh your recollection on

5    whether you lied to Justin that you had found some Luna, so you

6    could — so he could repeat back to you what you had discussed

7    over lunch several months before?

8    A.   Yeah, because he had insider tips from the CFO of Terraform

9    Labs for insider trading.

10   Q.   And, in fact, you had not found any Luna when you said you

11   had to Mr. Huang, is that right?

12   A.   I wanted him to repeat back to me exactly what he said

13   about insider trading, that he made 10 to $20 million off that.

14   Q.   Right.   So you lied to him, right, Mr. Myung?   Let's just

15   try to get through this.

16   A.   Yeah, sure.   I lied to him, yes.

17   Q.   It's kind of funny, right?

18   A.   It's not funny.

19   Q.   It is kind of funny, right, lying to your colleagues —

20   A.   It's not funny at all.

21   Q.   — to get them to talk?

22            MS. STAREN:   Objection.

23            THE COURT:   Sustained.

24   Q.   Now, after that, in that email you told the SEC about that

25   lie in that same email, correct?   That's what that was?

1   A.  Yeah.  And I specifically told them about the scenario and

2   how I got the information.

3   Q.  Right.  So they knew you were a liar?

4        MS. STAREN:  Objection.

5        THE COURT:  Sustained.

6   A.  Well ——

7        THE COURT:  Sustained.

8   Q.  The recordings on your phone, Mr. Myung, those were

9   automatically backed up to your laptop?

10  A.  I think so.  I think that's how iCloud probably works.

11  Q.  And the pen device, the one you put in your shoe or your

12  pocket, that was not automatically backed up, correct?

13  A.  Yeah, it's a standalone device.

14  Q.  And you didn't save all of those recordings from that Sony

15  device, did you?

16  A.  I think I saved them all.

17  Q.  Okay.  And for all your recordings, you decided which ones

18  to give to the SEC during the investigation before the

19  complaint was filed and which ones not to give to the SEC,

20  right?

21  A.  I gave all the information that was relevant to the case.

22  Q.  Right.  And you decided what was relevant, right?

23  A.  I guess so.  I'm the one filing the report.

24  Q.  Right.  And one of the recordings you decided to give just

25  a clip of the recording to the SEC during the investigation,

O3SHSec2                          Myung – Cross

1    correct?

2    A.   I provided clips and full recordings.

3    Q.   For one of them it was just the clip that you provided

4    during the investigation, right?

5    A.   I have provided clips and full recordings.

6    Q.   OK.  And so I'm going to show you and I'm going to offer

7    into evidence a stipulation between the parties in this case.

8    It's been marked as Defendants' Exhibit 1945.  I'm just going

9    to go ahead and offer that because it's a stipulation.

10           Can we put that up for identification so the Court can

11   see it.  Then just so the Court can see it, there's also an

12   attachment or appendix connected to it, exhibit, yeah.

13           THE COURT:  All right.  So you're offering all the

14   exhibits reflected in the stipulation?

15           MR. KORNBLAU:  Correct, your Honor.

16           THE COURT:  OK.

17           MS. STAREN:  No, your Honor.  We're not offering the

18   —— maybe we need a sidebar.

19           THE COURT:  Well, because —— all right.  Let's have a

20   sidebar.

21           (Continued on next page)

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O3SHSec2                              Myung – Cross

```
1                 (At sidebar)

2                 THE COURT:  Someone have a copy of the stipulation?

3                 MR. KORNBLAU:  I think I do.  Let me just pull it out

4      of my binder.  Yes.

5                 THE COURT:  Thank you.

6                 All right.  So this is —— stipulation is that the

7      attached Exhibit A accurately reflects information concerning

8      audio files of conversations produced by Aaron Myung, and then

9      Exhibit A indicates which were produced to the SEC and which

10     were produced in litigation in response to defendants'

11     subpoena.  So some exhibits are both produced to the SEC during

12     the investigation and produced in litigation in response to

13     defendants' subpoena, and others are not produced during the ——

14     to the SEC during the investigation but are produced to the

15     defendants in response to the subpoena.

16                So if the jury's going to make any sense of this, you

17     need to put the —— not only put the stipulation in evidence but

18     to show them the relevant portions of A when you're ——

19                MR. KORNBLAU:  Absolutely, your Honor, that's my plan.

20                MS. STAREN:  Your Honor, we do not stipulate to the

21     admissibility of the underlying recordings.  All that we agreed

22     to stipulate to was that certain recordings were provided in

23     the investigation and the remainder were provided ——

24                THE COURT:  Yes, I agree.  It doesn't automatically

25     mean —— and that's why I'm glad we had the sidebar, because I
```

O3SHSec2                          Myung – Cross

1    was under a misimpression.  So none of these exhibits are

2    necessarily received in evidence.  They may be or they may not

3    be.  That's an independent question.  This is just on the

4    question of which were produced when, so to speak.

5              OK.  Thank you.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (In open court; jurors present)

2              THE COURT:  So you're offering that stipulation?

3              MR. KORNBLAU:  Yes, your Honor.

4              THE COURT:  Give me the number again.

5              MR. KORNBLAU:  Defendants 1945, D-1945.

6              THE COURT:  Received.

7              (Defendants' Exhibit 1945 received in evidence)

8              MR. KORNBLAU:  All right.  If we can publish this for

9     the jury, please.

10    BY MR. KORNBLAU:

11    Q.  Mr. Myung, I know you may not have seen this document

12    before.  I understand that, but just so we can explain to the

13    jury what it is.

14             So the first page —— look at the second page.  Those

15    are the agreements with the lawyers.  Let's continue to the

16    next page.  So there's an Exhibit A that has three pages.

17             Can we just show everybody that there are —— is it

18    three or two?  Three pages, yeah, three, four, and five.

19             So, Mr. Myung, at the top of Exhibit A, you see that

20    this is information about audio files that you produced,

21    correct?

22    A.  I guess so.  I've never seen this before.

23             THE COURT:  I don't think this witness has seen it, so

24    I'll just tell the ladies and gentlemen.  This is a chart

25    indicating when certain recordings were produced respectively

1   to the SEC and to the defense because, after a case is filed,

2   the defense can also subpoena a party for production of its

3   records.  And this chart shows that some of the recordings were

4   produced both to the SEC during its investigation and to the

5   defense in response to the subpoena, and some were only

6   produced in response to the subpoena.

7          So go ahead.

8          MR. KORNBLAU:  Thank you, your Honor.

9   Q.  Now, Mr. Myung, aside from the details here, I do want to

10  ask you one question from your own memory.

11         Do you remember that you voluntarily shared some of

12  your recordings with the SEC during their investigation before

13  the complaint was filed?

14  A.  Yeah.

15  Q.  And do you remember that after the litigation was filed,

16  after the complaint in this case was filed, you received a

17  subpoena from the defense for —— that included requests for

18  your recordings?  Do you remember that just generally?

19  A.  Yes.

20  Q.  Do you remember that when you got that subpoena, you

21  produced additional recordings that had not —— you had not

22  previously given to the SEC during the investigation?

23  A.  Yeah, I gave everything necessary.

24  Q.  Right.

25         OK.  So now to go down to this chart, if we can look

O3SHSec2                          Myung – Cross

1     at the —— take down the pullout.  We're going to have some

2     graphics.  I'm going to ask you to do some counting, but

3     there's going to be some graphics that are just to help you

4     with the counting so we don't sit here for too long while

5     you're counting.

6              So the first question is, as reflected on this chart,

7     looking at the whole chart, does this show that you recorded ——

8     you made a total of 62 audio files?

9     A.  Sure.  I mean, if that's what it says.

10    Q.  And then looking at the column about providing to the ——

11             THE COURT:  I assume this is not being shown to the

12    jury.

13             MR. KORNBLAU:  I think it is, your Honor.

14             THE COURT:  Well, it cannot be.

15             MR. KORNBLAU:  Shouldn't do that.  OK.  We won't do

16    that, your Honor.  We'll just show this to the witness, just to

17    follow the Court's direction.

18    Q.  And so the column on providing files to the SEC during the

19    investigation, that's the third column, again, just doing some

20    counting, there were only 24 audio files that you gave the SEC

21    during the investigation.  Have we counted that up correctly?

22    A.  I guess so.

23    Q.  And then also looking at that same third column, so there

24    were 38 recordings that you did not give the SEC during its

25    investigation, is that right?

O3SHSec2                              Myung - Cross

1    A.  So on my computer?  My phone?

2    Q.  All.  All.

3             MS. STAREN:  Objection, your Honor.  I just want to

4    clarify something.  Maybe we need a sidebar so I can ask

5    defense counsel.

6             THE COURT:  All right.

7             (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O3SHSec2                         Myung – Cross

1              (At sidebar)

2              MS. STAREN:  So you keep calling them recordings, but

3     they're audio files.  As you know, he produced multiple

4     versions of some recordings.  So it's not as if there are 64

5     recordings here.  He produced clips of some; he produced full

6     versions of some.  So please refer to them as audio files,

7     which is what we called them in the stipulation.

8              MR. KORNBLAU:  Happy to.

9              THE COURT:  I think it's important that that be

10    clarified because that makes a whole difference.  Frankly, I

11    have a question in my mind as to whether this exercise is

12    meaningful in any respect given that no one knows what's on

13    these various recordings.

14             But, in any event, just keep in mind we're going to

15    take a midmorning break in about five minutes.

16             MR. KORNBLAU:  Perfect, your Honor.  Thank you.

17             (Continued on next page)

18

19

20

21

22

23

24

25

O3SHSec2                         Myung - Cross

1              (In open court; jurors present)

2              MR. PELLEGRINO:  Your Honor, may we take our break

3    now?

4              THE COURT:  OK.  So, ladies and gentlemen, we'll give

5    you a 15-minute break at this time.

6              (Jury excused)

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O3SHSec2                            Myung - Cross

1              (Jury not present)

2              THE COURT:  You may step down.  We'll see you in 15

3    minutes.

4              (Witness temporarily excused)

5              THE COURT:  Please be seated.

6              Go ahead.

7              MR. PELLEGRINO:  Your Honor, thank you for taking the

8    break now.  Apologies for doing this a little early.

9              We need to bring an important matter to the Court's

10   attention.  Yesterday, Mr. Myung's attorney identified herself

11   to the jury, so they are aware who she is.  Throughout the

12   duration of this morning's testimony, she has been making

13   nonverbal cues, including laughing, sighing.  I just went up to

14   the podium, and when I came back, I saw her give a thumbs-up to

15   Mr. Myung and give him nonverbal cues.  There are at least six

16   or seven members of my team who heard or saw this.  I heard it

17   myself.  And I would ask your Honor to instruct her not to

18   engage with her witness.  And in addition, your Honor, Juror

19   No. 5 observed this.

20             THE COURT:  Well, first of all, where is counsel for

21   —— there you are.  So is that correct?

22             MS. FISET:  I don't know if I gave a thumbs-up.

23             THE COURT:  I'm sorry?

24             MS. FISET:  I did laugh at the spy shoe.  That was

25   funny.

O3SHSec2                          Myung – Cross

1              MR. PELLEGRINO:  No.

2              THE COURT:  Excuse me.

3              MR. PELLEGRINO:  Sorry.

4              THE COURT:  Just going forward, just keep a stone face

5       and don't supply any cues to your client.  OK?

6              MS. FISET:  Yes.

7              THE COURT:  Now, I'm not sure what your application is

8       with respect to Juror No. 5.

9              MR. PELLEGRINO:  My application is simply that she be

10      instructed not to attempt to communicate ——

11             THE COURT:  I just did that, and she's agreed.

12             MR. PELLEGRINO:  Understood, your Honor.

13             THE COURT:  OK.

14             MS. FISET:  I'd also like to represent to the Court

15      that he has never seen this document that they're —— like, this

16      is a legal stipulation that I have not shown him.  He would not

17      have access to this.  So that —— I mean, I think that's

18      relevant to this line of questioning that he's never seen it.

19             THE COURT:  Well, that may be, but that is none of

20      your concern in terms of giving ——

21             MS. FISET:  I'm not giving him cues.  I'm just saying

22      he's never seen it.  So because we're on a line of

23      questioning ——

24             THE COURT:  I think it's clear he's never seen it.

25      And you weren't at the sidebar, but I expressed some questions

O3SHSec2                         Myung – Cross

1    about the inferences that were being suggested to the jury with

2    regard to this document, and defense counsel kindly agreed to

3    clarify some of the questions.

4            So very good.  We'll see you all in 15 minutes.

5            (Recess)

6            THE COURT:  Please be seated.  Let's get the witness

7    back on the stand.

8            When we had that contract involving party A and party

9    B, it did remind me of the Marx Brothers where they're tearing

10   off the clauses.  You know what I'm talking about.

11           MR. PELLEGRINO:  This is why we're bringing you the

12   readers, your Honor, to return the favor.

13           MR. CARNEY:  Was that the same one we saw at the

14   *Daubert* hearing?

15           THE COURT:  Yeah, exactly.

16           MR. CARNEY:  I remember.

17           THE COURT:  Yes, there is no sanity clause.

18           (Continued on next page)

19

20

21

22

23

24

25

1          (Jury present)

2          THE COURT:  Please be seated.  Let's get the witness

3     back on the stand.

4          All right, counsel.

5          MR. KORNBLAU:  Thank you.

6     BY MR. KORNBLAU:

7     Q.  All right.  Just so we can reset, Mr. Myung, I'm just going

8     to put back up so the jury can see Defendants' Exhibit, in

9     evidence, 1945, just the Exhibit A so everybody can remember

10    what we're talking about.

11         Again, Mr. Myung, you've never seen this chart before

12    today, correct?

13    A.  Yeah, first time.

14    Q.  You understand that it's information that's been agreed

15    upon between the parties to the case, correct?

16    A.  Yeah, looks like it.

17    Q.  OK.  All right.

18         So let's take that down, as the judge asked, and then

19    we can just show to the witness, to do the counting, the other

20    versions.

21         So just to try to get through this quickly, Mr. Myung,

22    you had a total of 62 audio files on your —— that were recorded

23    on your phone and your pen device, correct?

24    A.  I guess so.  Like, I turned everything to my lawyer who

25    did, you know, discovery, so . . .

1   Q.  Right.  Mr. Myung, this is just a question about counting.

2           OK.  So there was a total of 62, as reflected on this

3   chart, audio files as agreed upon with the SEC that you had and

4   produced in response to the subpoena from your pen device and

5   your phone, right, 62?

6   A.  So, I mean, I don't know if these are the actual audio

7   files, like the names from my computer, but I can read off the

8   number on the screen, if that's what you need me to do.

9   Q.  Right.  So the last column on the screen, as you can see in

10  the chart, is Produced in Litigation in Response to Defendants'

11  Subpoena.  Do you see that column heading?

12  A.  Yes.

13  Q.  And there are 62 yeses for audio files under that column,

14  right?

15  A.  Yeah, so my lawyer would have produced, like, all these.

16  Q.  OK.  You can keep commenting, Mr. Myung, or we can just do

17  the numbers.  But these were produced in response to the

18  defendants' subpoena in this case, correct?

19          THE COURT:  Well, he doesn't know that, but the

20  stipulation says that.

21          MR. KORNBLAU:  Fair enough, your Honor.  Let me just

22  try to get through this.

23  Q.  Okay.  And then looking at the third column, this relates

24  to the audio files that you provided to the SEC during the

25  investigation before the case was filed, and there were 24 of

1    those, right?

2    A.  Yeah, if they got 24, then this is correct.

3    Q.  Right.  So 38 are the noes in that same column.  These were

4    audio files that you had but did not provide to the SEC during

5    the investigation, correct?

6    A.  I mean, like, are these, like, MP3s?  It could be any audio

7    file on my computer.

8    Q.  These are audio files from your Sony device and your phone

9    that you ultimately produced to the defendants in the case,

10   right?  So 38 of them you did not share with the SEC during the

11   investigation?

12            MS. STAREN:  Objection.

13            THE COURT:  Well, let me just —— maybe counsel can

14   clarify so we can move on.  Let me ask counsel for the SEC,

15   what were included in the —— this stipulation?

16            MS. STAREN:  Yes, your Honor.  So what was included in

17   this stipulation were audio files provided to the SEC.

18            THE COURT:  And these are —— I guess I'm not getting a

19   sense, and maybe the jury's not getting a sense.  Are some of

20   these like two minutes and some of these are like two hours?  I

21   mean, is there a variation there?

22            MS. STAREN:  There is.

23            THE COURT:  OK.

24            MR. KORNBLAU:  Glad your Honor raised that question.

25   BY MR. KORNBLAU:

O3SHSec2                          Myung - Cross

1    Q.  So, Mr. Myung, you see the second column shows the length
2    of the audio file?  Do you see that information, Mr. Myung?
3    A.  Yes.
4    Q.  So another counting question.  Do you see that some of them
5    are a few minutes but some are an hour?  I see one —— a couple
6    that are over two hours.  All different lengths, correct?
7    A.  Sure.  I don't know what they refer to.  I don't recognize
8    names of these files, but, yeah, if you want me to count the
9    rows, I can count the rows.
10   Q.  Right.  OK.
11          So looking at that column B, the length column, would
12   you agree that 34 of the recordings that you did not give the
13   SEC during the investigation were more than 30 minutes long?
14          MS. STAREN:  Objection.
15          THE COURT:  Sustained.
16          Let me ask you this:  How did you determine which
17   recordings to give to the SEC and which not to?
18          THE WITNESS:  So it was anything relevant to the fake
19   transactions that was going on at Chai.
20          THE COURT:  And how did you determine, or was this
21   left to your attorney, how to produce the recordings in
22   response to the subpoena?
23          THE WITNESS:  So before the complaint, it was just
24   anything relevant to the fake transactions, and then after the
25   subpoena, I turned over to my lawyer who produced every kind of

1    file on my computer and my phone.

2              THE COURT:  Go ahead, counsel.

3    BY MR. KORNBLAU:

4    Q.  OK.  So before the case was filed, you decided on your own

5    which ones you thought were relevant that should be shared to

6    the SEC, correct?

7    A.  Yes, who would find, who would make that determination.

8    Q.  Before you got the subpoena, did the SEC ask you to send

9    them all of the recordings, audio files, that you had on your

10   phone and on your pen recording device?

11   A.  I'm not sure if they used those exact words, but I sent in

12   everything that was relevant to the case.

13   Q.  Right.  So the SEC didn't ask you to give —— turn over all

14   of your audio files on those devices during the investigation,

15   correct?

16             MS. STAREN:  Objection.  Relevance.

17             THE COURT:  Well, if I understand, but correct me if

18   I'm wrong, what you're saying is you turned over to them

19   everything that you thought was relevant to the allegations you

20   were making, but that when you got the subpoena from the

21   defense, you turned over everything —— any recording of any

22   kind that you had ever made using these devices.  Do I have

23   that right?

24             THE WITNESS:  Yes.

25             THE COURT:  OK.  Go ahead.

1   BY MR. KORNBLAU:

2   Q.  And, yeah, to just try to sum up here, so it would be fair

3   to say that the SEC took your word for it for what was relevant

4   and what wasn't in their investigation?

5              MS. STAREN:  Objection.

6              THE COURT:  Sustained.

7              MS. STAREN:  Speculation.

8              THE COURT:  No, no, he's not in a position to opine on

9   the state of mind of someone else.

10  BY MR. KORNBLAU:

11  Q.  Well, they didn't ask him for all of it, right, Mr. Myung?

12  A.  I sent in every piece of information that I thought was

13  relevant to the case.

14  Q.  OK.  Now, let's change topics.

15             In addition to providing audio files, you gave the SEC

16  other information in your whistleblower complaint, correct?

17  A.  Sure.

18  Q.  You included false information in your SEC whistleblower

19  complaints, didn't you?

20  A.  Like what kind of false —— I don't recall that.

21  Q.  Well, in two of your SEC whistleblower complaints, you

22  admitted that you didn't lose any money, but in two other

23  complaints you sent to the SEC, you claimed you lost half a

24  million dollars, isn't that right?

25  A.  I didn't know how to fill out that, that form, the SEC

1    form.

2    Q.  All right.  Before you get to the reasons, though, that's a

3    fact, right?  Twice you said I didn't lose any money and twice

4    you said, actually, I lost half a million bucks, right?

5    A.  I was trying to alert the SEC.

6    Q.  I didn't ask you why.  I just asked you what you said in

7    your SEC complaints, and what you said was twice zero and twice

8    half a million bucks.  Isn't that what you put in your SEC

9    whistleblower complaints?

10   A.  I may have put some number on a form, but it's very hard to

11   decipher this SEC form without a lawyer.

12   Q.  Yeah.  OK.  So let's take a look at those in your first

13   whistleblower complaint.  So let's show you what's Exhibit, for

14   identification, D-0346.

15           And, your Honor, we've redacted information here to

16   focus on the impeachment material, so your Honor can see it.

17           Let me just ask, Mr. Myung, other than the blackouts,

18   is this a copy of the first whistleblower complaint you

19   submitted to the SEC on October 2, 2021?

20   A.  Looks like it.

21           MR. KORNBLAU:  Your Honor, we offer this as

22   impeachment evidence.  I can direct ——

23           THE COURT:  I understand your offer.

24           Any objection?

25           MS. STAREN:  Yes, your Honor.  If they are offering

O3SHSec2                        Myung - Cross

1    this as an admitted exhibit, this is completely incomplete.

2    Everything has been blacked out except what they want to show

3    the jury.

4            THE COURT:  So I don't know how to rule on that

5    without seeing the unredacted copy.

6            MR. KORNBLAU:  Well, your Honor, maybe I can —— maybe

7    if we look at —— just for identification if we turn to page 2

8    and you can just see the very top of page 2 is the relevant

9    piece, just for my impeachment.

10           THE COURT:  No, no, it's proper to inquire about this

11   for impeachment.  But if you want to offer a document, then the

12   question is whether the redactions are appropriate or not, and

13   I can't decide that if I don't see what's being redacted.

14           So I'll tell you what.  Just to move this along, we

15   will receive it for now subject to the entire unredacted

16   document coming into evidence if, after seeing it and hearing

17   from counsel, I decide the entire document should come in.

18           MR. KORNBLAU:  Thank you, your Honor.

19           (Defendants' Exhibit 346 received in evidence)

20           MR. KORNBLAU:  So if we can publish the redacted

21   version to the jury D-346.

22   BY MR. KORNBLAU:

23   Q.  So, Mr. Myung, just looking at the date on the top, so

24   everybody's on the same page here, this was your SEC

25   whistleblower complaint filed on October 2, 2021, at

1    3:22:54 a.m., is that correct?

2    A.   Sure.

3    Q.   And if you can pull down —— take away the pullout.  And if

4    we look at page 2 at the top, there's a question:  "Did you

5    suffer a loss?"  And your answer was "No."

6             Do you see that?  Did I read that right?

7    A.   That's what it says.

8    Q.   If we turn to the page 12 of the complaint, if we can zoom

9    in there, the information you submitted in your complaint,

10   Mr. Myung, was made under the penalty of perjury, correct?

11   A.   Sure.

12   Q.   Now, if we can go back to page 2 at the top there.  So this

13   Q&A here, that's the complicated part you need the lawyer for,

14   Mr. Myung?

15   A.   Well, I mean, how do you quantify a personal loss on this?

16            MS. STAREN:  Object.

17   A.   My career is over.

18   Q.   Right.  But just answer the question.

19            MS. STAREN:  Objection, your Honor.

20   Q.   That's the complex ——

21            MS. STAREN:  Argumentative.

22            THE COURT:  No, no, no.  The objection is overruled.

23   The answer will stand.  Put another question.

24            MR. KORNBLAU:  Now, we can take that exhibit down.

25   Q.   After you filed that complaint in October, Mr. Myung, the

1    SEC did not respond to that initial complaint, isn't that

2    correct?

3    A.   That's true.

4    Q.   And you knew if the SEC didn't respond, you had no chance

5    at a whistleblower award, right?

6    A.   I knew that there would be no chance for them to prevent

7    this crazy collapse that's about to come.

8    Q.   And you knew there was no chance you'd get an award, isn't

9    that also true?

10   A.   I mean, sure.

11   Q.   You wanted to catch the SEC's attention, right?

12   A.   I did want to notify them and alert them.

13   Q.   So two weeks later, you filed a second whistleblower

14   complaint.  And let's just ask that question.  Isn't that

15   accurate?

16   A.   Yes.

17          MR. KORNBLAU:  And if we can pull up the redacted

18   version of Defendants' 348.

19   Q.   Is this the second whistleblower complaint, Mr. Myung, that

20   you filed on October 16, 2021?

21   A.   It's all blacked out, but, I mean, I'll just —— yeah, sure.

22          MR. KORNBLAU:  We offer this in evidence on the same

23   reasons as the prior one.

24          MS. STAREN:  Objection, your Honor.  This is supposed

25   to be impeachment, and ——

1              THE COURT:  No, no, I'm going to receive it but with

2     the same caveat.  The entire document may come in after I've

3     had a chance to look at it at the next break.

4              (Defendant's Exhibit 348 received in evidence)

5     BY MR. KORNBLAU:

6     Q.  Let's turn to page 2.  Do you see on page 2 there is a

7     question:  "Did you suffer a loss?"  And you answered, "Yes."

8     See that?

9     A.  Yeah.

10    Q.  And then the next question is "Enter amount of loss to

11    nearest dollar without characters," and you put in "500000,"

12    correct?

13    A.  Yes.

14    Q.  And that one was also under penalty of perjury, Mr. Myung,

15    correct?

16    A.  Yes.

17    Q.  So now let's take a look at your third whistleblower

18    complaint.

19              That was filed, Mr. Myung, 15 minutes after your

20    second complaint, right?

21    A.  Yeah, I wasn't sure if it was submitted or not, so ——

22    Q.  The second and third were right almost one after the other,

23    right?

24    A.  Yeah.

25    Q.  And then in the third one —— let's put that on the screen

O3SHSec2                        Myung - Cross

1    for identification, please, Defendants' 0349, also redacted as

2    before.

3              Mr. Myung, is this a copy of the SEC whistleblower

4    complaint that you filed on October 16, 2021, at 11:31:04 p.m.?

5    A.  Again, this is all blacked out, but, yeah, sure.

6    Q.  And then on the second page, same as in the second one,

7    "Did you suffer a loss?"  "Yes."  "Enter amount of loss to

8    nearest dollar without characters.  500,000," right?

9    A.  Yes.

10   Q.  And so after you filed these two complaints, you still

11   didn't hear from the SEC, right?

12   A.  That's correct.

13   Q.  And so that was frustrating to you, right?

14   A.  Well, there's a huge fraud going on.

15   Q.  Yeah.  From your perspective, the SEC was still ignoring

16   you, correct?

17   A.  I — I don't think they were ignoring me.  Maybe they were

18   busy.  I don't know.  I can't speculate on their state of mind.

19   Q.  So you filed a fourth whistleblower complaint several

20   months later on February 25, 2022, is that right?

21   A.  Yeah, it was the fourth one.  It's not on my screen, but —

22   Q.  Yeah, we'll take a look.

23   A.  Yeah.

24              MR. KORNBLAU:  Please bring up Defendants' Exhibit 355

25   for identification, also redacted.

O3SHSec2                          Myung - Cross

1    Q.  So this is the fourth one, February 25, 2022, at

2    3:45:26 a.m.  Do you see that?

3    A.  Yes.

4    Q.  And if we go to page 2, "Did you suffer a loss?"  "No."  So

5    you're back to zero loss on your fourth complaint, right?

6    A.  Yeah, I didn't know how to quantify my loss.

7    Q.  Right.  So I guess the question, Mr. Myung, is ——

8    withdrawn.

9             Now, you said the form was complex, and you didn't

10   hire a lawyer, right?

11   A.  That's true, yep.

12   Q.  You've got a college degree in computer technology,

13   correct?

14   A.  Computer science.

15   Q.  Computer science, excuse me.

16             So just so I understand your testimony, your testimony

17   is you needed a lawyer to answer those questions about your

18   loss.  That's your testimony today?

19   A.  It's not as fancy as your law degree, I guess.

20             MR. KORNBLAU:  Move to strike that insult.

21             THE COURT:  I'm going to ask the witness just to

22   answer the question.

23             MR. KORNBLAU:  You know what, your Honor, I —— I

24   failed to offer 346 in evidence.

25             THE COURT:  Received on the same terms as the

O3SHSec2                         Myung - Cross

1    previous.

2              MR. KORNBLAU:  And 349.

3              THE COURT:  Ditto.

4              (Defendants' Exhibits 346 and 349 received in

5    evidence)

6    BY MR. KORNBLAU:

7    Q.  OK.  Now, this question about your loss on the

8    whistleblower forms, do you remember you were asked about that

9    topic in your deposition last year?

10   A.  Yes.

11   Q.  And in your deposition, you gave two completely different

12   answers —

13             MS. STAREN:  Objection.

14             THE COURT:  Sustained.

15   Q.  — to that question, isn't that right?

16             THE COURT:  Sustained.  Sustained.

17             MR. KORNBLAU:  OK.  Just for the Court — not the

18   video, just the transcript — can we pull up exhibit page 232,

19   lines 4 through 8, please.

20             THE COURT:  OK.  So if you want to use that for

21   impeachment, which I think is permissible, the way to do it is

22   simply to say:  At your deposition did you give — after

23   identifying the page and lines — did you give this — were you

24   asked this question and did you give this answer?  And then

25   we'll see if there's any objection.

 1            MR. KORNBLAU:  Yes, your Honor.  I'd like to play the

 2     video clip.

 3            THE COURT:  That's fine.

 4            MR. KORNBLAU:  How shall I do that?

 5            THE COURT:  Well, I think let's just find out.

 6            Is there any objection to this being introduced as

 7     impeachment?

 8            MS. STAREN:  Yes, your Honor.  This is not proper

 9     impeachment.

10            THE COURT:  Why not?

11            MS. STAREN:  Because it's not inconsistent with what

12     he said.

13            THE COURT:  I think it is arguably.  The test is

14     whether it's arguably inconsistent.  Let me maybe explain this

15     to the jury.

16            So you've heard before that before a case gets going,

17     civil case, the parties get to take the testimony of any

18     relevant witness, and they can ask him any sort of questions.

19     If a witness on the stand is asked a question and gives an

20     answer and the answer is arguably different from the answer he

21     gave at his deposition, then the other side can introduce the

22     deposition testimony.

23            However, after it's introduced, you may say, well,

24     maybe it's not really inconsistent, or you may say, yes, it

25     definitely is inconsistent.  And if you decide it is

O3SHSec2                        Myung – Cross

1    inconsistent, you may decide, well, the testimony he gave

2    previously is the right answer or the one he gave here today is

3    the right answer or neither.  So all those options are

4    available to you.

5              So you can go ahead and play that portion of the

6    testimony.

7              MR. KORNBLAU:  Mr. Aquino, can you just play the video

8    clip from page 232, lines 4 through 8.

9              (Video played)

10   BY MR. KORNBLAU:

11   Q.  So, Mr. Myung, in that clip we just saw, you were

12   suggesting it was a mistake, a typo, right?

13   A.  Well, I'm not going to speculate on my state of mind at

14   that time, but I wasn't really sure how to fill out that form.

15   Q.  I'm not asking you to speculate.  It's your own thinking,

16   Mr. Myung.

17             THE COURT:  No, no, no, counsel, even though I've

18   admonished the witness just to answer your questions, I've got

19   to admonish you just to put questions.

20   Q.  So, Mr. Myung, isn't it a fact, as we saw, that you put

21   $500,000, not $50,000, as your loss in two different complaints

22   to the SEC, right?

23   A.  Sure, looks like I put 500,000 on two of them and then zero

24   on two of them just based on my understanding at the time.

25   Q.  Right.  You didn't put 50,000 on any of them, right?

O3SHSec2                        Myung - Cross

1    A.  Well, sure.  I —— well, looks like I didn't.  Says 500,000

2    there.

3            MR. KORNBLAU:  Now, I'm going to try to follow your

4    Honor's guidance.  So can we just put up on the screen, not for

5    the jury, deposition page 232, and now we're going to go from

6    lines 4 all the way to lines 18.

7            THE COURT:  Any objection?

8            MS. STAREN:  Yes, your Honor.  It's improper

9    impeachment.

10           THE COURT:  Because?

11           MS. STAREN:  It's not inconsistent.

12           THE COURT:  Well, I think the lines 15 through 18 are

13   not inconsistent, but the rest I think is.  So you may play it

14   through line 14.

15           MR. KORNBLAU:  Mr. Aquino, can you do that?  No.  I'll

16   just read it because ——

17           THE COURT:  When I say "inconsistent," ladies and

18   gentlemen, that doesn't mean I've made a determination it is

19   inconsistent.  It's just arguably inconsistent.

20           MR. KORNBLAU:  So may I show the lines up to that

21   point to the jury and to the witness?

22           THE COURT:  Yes.

23           MR. KORNBLAU:  Yes.  So let's put that up.

24   BY MR. KORNBLAU:

25   Q.  So at your deposition, Mr. Myung, you were under oath,

O3SHSec2                          Myung – Cross

1  correct?

2  A.  Yes.

3  Q.  And you were asked:

4  "Q.  And also in this complaint, you indicate that you suffered

5  a loss, and you entered an amount of $500,000, is that correct?

6  "A.  I think I may have meant 50,000, but I'm not sure why I

7  put 500.

8  "Q.  Well, what were you referring to?

9  "A.  I think at the time I was referring to —— I had already

10  sold the small amount of Terra —— or, no, Luna that I had, and

11  like, the amount had gone up exponentially after that.  I may

12  have been referencing that."

13          So did you give those answers to those questions in

14  your deposition?

15  A.  Yeah.  And I was just saying, like, what I felt —— I was

16  speculating on my state of mind at the time.  So that could

17  have been true.

18  Q.  Was it true, Mr. Myung, what you said in your deposition?

19  A.  I said I think and I may.  You know, I was speculating.  I

20  wasn't stating any facts.

21          MS. STAREN:  Your Honor, for completeness, would

22  request that the rest of his answer be provided.

23          THE COURT:  The other three lines, you're talking

24  about?

25          MS. STAREN:  Yes, your Honor.

O3SHSec2                         Myung - Cross

1          THE COURT:  OK.  Since —— yeah.

2          MR. KORNBLAU:  In that case, your Honor, can we just

3   play the video, because that covers that?

4          THE COURT:  OK.

5          MR. KORNBLAU:  We'll play the clip.

6          THE COURT:  So now it goes down through the line 18.

7          (Video played)

8   BY MR. KORNBLAU:

9   Q.  So you gave that testimony, Mr. Myung, in your deposition?

10  That was you, right?

11  A.  Yes.

12  Q.  And your testimony today is that was true?

13  A.  Yeah.  I was just saying, like, what I thought at the time.

14  Q.  Isn't it a fact that when you gave your testimony, you

15  actually couldn't remember what your reason was?

16  A.  I was trying to remember and I was trying to be helpful as

17  much as I could.

18  Q.  But you couldn't remember, right?

19  A.  I'm not really sure why I put 500.

20          MR. KORNBLAU:  Can we show to the Court, please, not

21  the jury for identification, his deposition page 233, lines 8

22  through 18.

23          THE COURT:  Any objection?

24          MS. STAREN:  Yes, your Honor.

25          THE COURT:  Yes, sustained.

O3SHSec2                          Myung - Cross

1   BY MR. KORNBLAU:

2   Q.  Mr. Myung, just to wrap this all up, you made up a

3   half-million-dollar loss on your whistleblower complaints

4   because you thought it would help get the SEC's attention,

5   isn't that a fair summary?

6   A.  I was just trying to get the SEC's attention by filing the

7   complaint itself.  I don't know if the number itself was

8   relevant to the attention portion of what you're implying.

9   Q.  Right.  But just —— you made up the $500,000 number, right,

10  just to get their attention, isn't that fair?

11  A.  Well, through this fraud I did feel that I had a loss.  I

12  wasn't really —— I just wasn't sure how to quantify that

13  without a lawyer.

14  Q.  You didn't know whether it was zero or half a million,

15  that's your testimony?

16  A.  Or something in between.  How do you quantify that?

17          MS. STAREN:  Objection.  Argumentative.

18          THE COURT:  You've got to do your objections quicker.

19  So overruled.

20          MR. KORNBLAU:  Your Honor, my colleagues remind me

21  that I also forgot to move in Defendants' 355.  Can we please

22  offer that one?

23          THE COURT:  Yeah, that's another of the ones —— of the

24  impeachment redaction exhibits, yes?

25          MR. KORNBLAU:  Yes.

1          THE COURT:  OK.  So it's received on the same terms.

2          (Defendant's Exhibit 355 received in evidence)

3   BY MR. KORNBLAU:

4   Q.  All right.  New topic.

5          THE COURT:  Let me remind defense counsel, someone's

6   going to need to give me over lunch the unredacted copies so I

7   can rule on that.

8          MR. KORNBLAU:  Yes, sir.

9   Q.  Yesterday when you were being questioned by the SEC,

10  Mr. Myung, you testified about a conversation that you recorded

11  with JiHoon Kim.  Do you remember that generally?

12  A.  Yes.

13  Q.  And just to refresh everybody's memory, JiHoon Kim was

14  Chai's head of engineering, correct?

15  A.  Yes, and former TFL manager, yeah.

16  Q.  I didn't hear the answer.

17  A.  Yes, and former TFL engineering manager.

18  Q.  And you made that recording around October 8, 2021, is that

19  correct?

20  A.  Yeah, around that date, thereabouts.

21  Q.  Now, one of the topics that you discussed with JiHoon Kim

22  in that conversation was whether Chai transactions were settled

23  on the Terra blockchain, right?  You talked to him about that?

24  A.  Yeah, something related to that topic, yeah.

25  Q.  In that conversation, JiHoon Kim told you that he thought

1    that Chai transactions did settle on the Terra blockchain,

2    correct?

3    A.  I don't think so.

4    Q.  JiHoon Kim, in that conversation with you that you

5    recorded, distinguished between settlement of transactions and

6    payment of transactions; isn't that what JiHoon Kim told you in

7    that conversation?

8    A.  I'm not sure.  You'd have to reference it directly.

9    Q.  He told you, didn't he, that Chai transactions were

10   settling on the Terra blockchain, just not paying; isn't that

11   what he told you?

12   A.  Yeah, he also says mirror, it's copied onto the blockchain.

13   Q.  So you agree —— just so this record is very clear, because

14   this is obviously an important point, Mr. Myung, that JiHoon

15   Kim told you that Chai transactions were settling on the Terra

16   blockchain just not paying?

17   A.  Yeah, there's no funds going from users to merchants.

18   There was no actual payments happening through the blockchain,

19   right, so these were just copies.  So the copies are settling,

20   yeah, the fakes —— the fake transactions are settling, that's

21   correct.

22            MR. KORNBLAU:  Move to strike as nonresponsive.

23            THE COURT:  No, I don't think so.  Actually, I think

24   that was responsive.

25            MR. KORNBLAU:  OK.  Well, I'd like to play a clip from

1  that recording.  It's in evidence, your Honor, from Plaintiff's

2  Exhibit 122B.  We're going to play a portion from page 42,

3  line 12, to 43, line 2.

4          MS. STAREN:  Your Honor, just by way of clarification,

5  I'm assuming you're playing the audio, which is 122A.

6          MR. KORNBLAU:  The audio, yes.  Audio, I'm sorry.

7          THE COURT:  Go ahead.

8          (Audio played)

9  BY MR. KORNBLAU:

10 Q.  Now, in that clip, Mr. Myung, you're doing most of the

11 talking, right?

12 A.  Yes.

13 Q.  And then JiHoon Kim said:  "And from Terra's perspective,

14 the transaction has mirror, so I think they are settling, just

15 not paying," correct?

16 A.  Yeah.  Like, the transactions are copied, right.  The

17 copies are settling, but they're not actually being used for

18 payments.  That's what he's saying.

19 Q.  And you said "Yeah," didn't you?

20 A.  They're the copies.  They're not actually meant for

21 payment.  They're fakes.

22 Q.  Now, in your direct testimony, Mr. Myung, you testified

23 that Chai settled with merchants on approximately a monthly

24 basis, sometimes less, sometimes more, isn't that what you said

25 yesterday?

1   A.  Yes.

2   Q.  And do you remember you submitted a written declaration to

3   the Court last year and made a similar statement?

4   A.  Yes.

5   Q.  You mentioned —— in that statement you referenced

6   settlement on a monthly basis, correct?

7   A.  Yeah, most merchants, to my understanding, were on a

8   monthly basis.

9   Q.  Right.  Isn't it a fact that Chai settled with merchants on

10  a daily basis?

11  A.  Well, I mean, on their centralized server things are

12  happening daily, sure.

13  Q.  So daily, not monthly, right?

14  A.  Settlements happening with the merchants are happening

15  every monthly.

16  Q.  Well, when you talked to JiHoon Kim, he told you that the

17  merchants were settling daily, right?

18  A.  I think you're also kind of confused here, because later on

19  he's the one who actually says monthly.

20  Q.  Well, you asked him in that conversation if Chai settled

21  with merchants once a month or once a quarter, and he said it

22  was not once a month or once a quarter.  Didn't he tell you

23  that?

24  A.  I'm not sure what that's referencing.  But I mean, like, on

25  our Chai servers, on the centralized database, it's happening,

1    you know, like, all the time, like daily.

2              (Continued on next page)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              MR. KORNBLAU:  Your Honor, we're going to again play

2      the recording.  It's in evidence.  Plaintiff's 122b, and this

3      is page 11, lines 12 through 25 on the transcript.  And page

4      12, lines 1 through 2.

5              THE COURT:  Okay.

6              (Video played)

7      BY MR. KORNBLAU:

8      Q.  So, again, Mr. Myung, you're doing most of the talking in

9      that conversation, right?

10     A.  Yes.

11     Q.  And Mr. Kim, JiHoon Kim, said, "we settle every day,"

12     didn't he?

13     A.  On our centralized database, we settle every day but in

14     order to send the bank transfer, which he also mentioned,

15     that's monthly.  The full settlement happens on a monthly

16     basis.  Sometimes more, sometimes less.  Through paper money,

17     not through the blockchain.

18     Q.  Now, you mentioned in your testimony yesterday that you

19     first learned about this LP server in your meeting with JiHoon

20     Kim, or at least the first time in any clarity?

21     A.  Yes.

22     Q.  Is that right?

23              And the LP server you learned is the software that

24     records Chai transactions on the Terra blockchain; is that an

25     accurate statement?

1  A.  It's a system, yeah, includes software, yes.

2  Q.  And in that meeting that you recorded with JiHoon Kim, he

3  told you that the LP server resided in the Chai server; didn't

4  he tell you that?

5  A.  He said "Chai uhm server," yeah, but I mean, don't think he

6  really knew like what he was talking about there.

7  Q.  Your testimony is that JiHoon Kim didn't know what he was

8  talking about on the engineering of the Chai payment system?

9  A.  That's not what I said.

10  Q.  Okay.  All right.  I thought it was.  But let's take a

11  listen.

12          MR. KORNBLAU:  This time we're going to listen to a

13  portion of Plaintiff's 122b, from page 17, line 24, through

14  page 18, line 9 in evidence.

15          Oh, 122a.  My mistake.

16          (Video played)

17  BY MR. KORNBLAU:

18  Q.  So you heard him say -- that was Mr. JiHoon Kim talking,

19  that the LP server was still in Chai?

20  A.  When Chai and Terraform Labs share the same building, and

21  I'm not sure exactly what LP server is, but it was not at Chai.

22  It was like some affiliated company either Terraform Labs or

23  Gaza Labs or Kernel Labs.  It's like one of the affiliated

24  entities of Terraform Labs and Chai.

25  Q.  So are you disagreeing with JiHoon Kim's statement --

O3SASEC3                        Myung - Cross

1          MS. STAREN:  Objection, your Honor.  Speculation.

2          THE COURT:  I didn't hear the full question.

3    Q.  Mr. Myung, you're not disagreeing, or are you, with JiHoon

4    Kim when he said LP is just one small server that resides

5    somewhere in our server?

6    A.  He did not say "our server".  He said "uhm" in uhm -- wait,

7    what?

8    Q.  "In our uhm server?"

9    A.  Yeah, yeah, yeah. I think he says --

10   Q.  Are you disagreeing with him?

11   A.  Well, it looks like he said that.

12   Q.  Now, in the conversation where we just played these

13   recordings from portions of and we heard some yesterday, you

14   and JiHoon Kim were together in a room, right?

15   A.  Yes.

16   Q.  Where were you again?

17   A.  The Chai office.

18   Q.  And when you were having that conversation, were you

19   standing in front of a white board?

20   A.  I think so.

21   Q.  And in many of these conversations, he and you are talking

22   about things that are on the white board; is that fair?

23   A.  Sure.

24   Q.  So in the clip we just played, for example, I don't think

25   we need to play it again, JiHoon Kim said, "we sent this action

1   like this from something else."  He's pointing to a white

2   board.  This one over here, that one over there.  That's the

3   kind of conversation you were having at the Chai office; isn't

4   that right?

5   A.  Well, we're drawing things on the board.

6   Q.  Yeah.  And a white board, just so everybody knows, it's a

7   white board you can use, you take a marker and you can draw on

8   it and erase it; that's what a white board is, right?

9   A.  Yes.

10  Q.  And that's very common with engineers, right, to talk and

11  use visual representations on white boards to clarify the

12  discussion, right?

13  A.  Sure.

14  Q.  Now, after this conversation with JiHoon Kim you didn't

15  take a picture of that white board, did you?

16  A.  I'm not sure.

17  Q.  Did you produce a picture of that white board to the SEC?

18  A.  I'm not sure.  I don't think I had took a picture, but

19  everything that was in subpoena, my lawyer produced everything.

20  Q.  Right.  So did you make a video that showed that white

21  board, Mr. Myung?

22  A.  I don't think so.  I don't take videos of --

23  Q.  So no one in court can see the diagrams that you and JiHoon

24  Kim were pointing to on that white board during your

25  discussion; isn't that fair?

O3SASEC3                        Myung – Cross

1   A.  Even if we were to have it, I don't think you would

2   understand.

3   Q.  And we don't have it, right?

4   A.  I don't think so, no.

5   Q.  Now, on your direct testimony yesterday answering questions

6   from the SEC, I remember you saying that as -- well, let me

7   rephrase.  I shouldn't talk about myself.

8           When you were answering questions from the SEC

9   yesterday, didn't you say that as chief product officer at

10  Chai, you knew Chai's products inside and out, right?

11  A.  Yeah.

12  Q.  And that's how you knew, in your point of view, that Chai

13  e-wallet transactions did not settle on the Terra blockchain.

14  That's the basis of your testimony, correct?

15  A.  Yeah.  It just as JiHoon said, all the payments were done

16  not on the blockchain, right?

17  Q.  Well, he just said that they did settle on the blockchain.

18  We played that recording, right?

19          MS. STAREN:  Objection.  Argumentative.

20          THE COURT:  Well, it was prompted by the witness's

21  response, which went beyond what the question called for.  So

22  we'll just leave it as it is.  But put another question.

23  Q.  Now, Mr. Myung, you have no personal knowledge about

24  whether Chai did or did not use the Terra blockchain; isn't

25  that fair?

O3SASEC3                           Myung - Cross

1    A.  I have personal knowledge of all the products at Chai, and

2    none of them used blockchain technology.

3    Q.  According to your personal knowledge, Mr. Myung, did

4    consumers who purchased goods using Chai, were they offered

5    discounts due to the Terra blockchain?

6    A.  It was not because of any blockchain savings.  It was from

7    the investor funds.

8    Q.  So I just want to understand.  Were discounts offered to

9    consumers who purchased goods using Chai due to the Terra

10   blockchain?

11   A.  No.

12   Q.  And according to your knowledge, Mr. Myung, would a Chai

13   app transaction be approved until the corresponding blockchain

14   transaction information is properly added to the LP server?

15   A.  Could you say that again?  That's a confusing question.

16   Q.  Sure.

17          A Chai app transaction would not be approved until the

18   corresponding blockchain transaction information is properly

19   added to the LP server?

20          MS. STAREN:  Objection.  Vague.

21   A.  All Chai transactions between users and merchants do not

22   need blockchain at all to complete.

23   Q.  Right.  So I just want to get a clear answer to this

24   question.

25          Would a Chai app transaction be approved before the

1    corresponding blockchain transaction information is added to

2    the LP server queue?

3            MS. STAREN:  Objection.  Asked and answered.

4            THE COURT:  Well, I'm not sure about that, but I think

5    it's unclear what you mean by approved.  So put another

6    question.

7    Q.  Would a Chai app transaction be processed before a

8    corresponding blockchain transaction information is properly

9    added to the LP server queue?

10   A.  If the entire Terra blockchain were to suddenly go down,

11   all app transactions would happen as normal.

12   Q.  I'm trying to get an answer to this question, Mr. Myung.

13   So let's just try it again.

14           THE COURT:  Let me see if I can move this along.

15           So as I understand your testimony, the -- instead of

16   Chai actually utilizing Terraform, it would just mimic it, or

17   in terms the jury previously heard, "mirrored it," by adding a

18   corresponding indication of important to show the blockchain

19   being involved; do I have that right? *

20           THE WITNESS:  So everything that goes on the

21   blockchain are basically copies, or as I say mirrors, or

22   basically fakes.  It's pretending that these transactions were

23   happening on the blockchain, but the blockchain does not need

24   to exist at all.  This LP server, all it does is just wait

25   there and just copy transactions all day.

O3SASEC3                        Myung - Cross

1          THE COURT:  So but the defense is contending that

2     actually these weren't fakes and, therefore, the -- and one

3     thing they're asking about is whether the blockchain notation

4     had to be added before the transaction went through; is that

5     what you're asking?

6          MR. KORNBLAU:  Yes, your Honor.  It's a sequencing

7     question.

8          THE COURT:  Yes.  So what's the answer to that?

9          THE WITNESS:  Well, I mean, if the blockchain was used

10    at all, it would be really easy to show that if it were real,

11    you could show that one merchant accepted the stablecoin.  But

12    not a single merchant ever did.

13         MR. KORNBLAU:  Move to strike as nonresponsive.

14         THE COURT:  No, I think that's the -- I think that is

15    fairly responsive to the overall issue being raised.  But

16    please put another question.

17         MR. KORNBLAU:  With respect, your Honor, it's not

18    responsive to my question, which is about sequencing.

19         THE COURT:  No.  Let me try again then.

20         Putting aside the question for the moment of whether

21    these are fakes or real, was it your understanding that before

22    the transaction would be processed to completion, the

23    corresponding notation on the blockchain had to be inputted; is

24    that --

25         THE WITNESS:  No, that's not true.

1          THE COURT:  Okay.  Why not?

2          THE WITNESS:  Because you could actually pay instantly

3    or you could swipe your Chai card and like literally it would

4    be done like that.  Like you could go to convenience store,

5    make a purchase, and you're like out of there.

6          On the blockchain, you would have to wait at least for

7    the Terra blockchain like six seconds at least for everything

8    to settle.  But, you know, it -- you know, if the entire Terra

9    blockchain were just to not exist at all, like completely

10   vanish, all the payments would go through.

11         THE COURT:  Go ahead, counsel.

12   BY MR. KORNBLAU:

13   Q.  So it sounds like you're disagreeing with the proposition I

14   was putting to you, right?

15   A.  Sure.

16         MR. KORNBLAU:  Little water.

17   Q.  Now, when you worked at Chai, Mr. Myung, I think you

18   already said JiHoon Kim was the chief engineer?

19   A.  JiHoon Kim was the head of engineering for the Chai

20   product.

21   Q.  And he was responsible, among other things, for maintaining

22   and overseeing the operation of the Chai payment source code,

23   right?

24   A.  Sure, as was I.

25   Q.  And he reported to you, right?  You were his boss?

O3SASEC3                          Myung - Cross

1   A.  Yes.

2   Q.  And just so everybody is on the same page here, source

3   code, that refers to the computer programming of how the system

4   actually operates, right?

5   A.  Sure.  There's many things other than source code, but from

6   a software perspective, yes.

7   Q.  Now, you supervised a total of 13 people, correct, at Chai

8   when you were chief product officer?

9   A.  I think it was 12, maybe 13.  Yeah.

10  Q.  And, now, you didn't know all the things about Chai that

11  all of those 12 or 13 people under you knew; isn't that a fair

12  statement?

13  A.  Maybe for very specific things, but probably on earth I

14  would know more about Chai than anybody else on earth.

15  Q.  So would you know more about Chai's engineering than JiHoon

16  Kim?

17  A.  For specific knowledge about engineering, he would have

18  more in-depth knowledge.

19  Q.  I mean, Mr. JiHoon Kim, he had been at Chai from the early

20  days, correct?

21  A.  Yes, since Terraform Labs.

22  Q.  You were there for less than a year, right?

23  A.  I was there for exactly one year.

24  Q.  And JiHoon Kim was involved in writing the source code for

25  the Chai payment system, correct?

1   A.  I'm not sure exactly what portion that he wrote.

2   Q.  And you weren't -- you weren't involved in the writing of

3   the Chai payment source code, correct?

4   A.  C-level people typically don't write the code.

5   Q.  So you didn't, right?

6   A.  Didn't what?

7   Q.  Write that code for the Chai payments system?

8   A.  Sure.  I did not write the code in the same way that Steve

9   Jobbs does not write the code for the iPhone.

10  Q.  You're like Steve Jobbs, is that --

11  A.  No, that's not what I'm -- I'm much less than him.

12  Q.  And you also did not work on the LP server, correct?

13  A.  I did not work on the LP server.

14  Q.  And you already told us you didn't even really learn about

15  the LP server until your -- near the end of your time at Chai,

16  correct?

17  A.  Yeah, sure.  Because LP server was not needed to make any

18  payments between users and merchants at all.

19  Q.  And so you never examined the code for the LP server,

20  right?

21  A.  I don't look at any servers as not relevant to the products

22  that I manage.

23  Q.  Now, on direct, you said you were not sure how Chai sent

24  transaction data to Terraform Labs; did I hear that correctly?

25  A.  Not like exactly.

O3SASEC3                          Myung - Cross

1    Q.  Didn't you say that you weren't sure how Chai sent

2    transaction data to Terraform Labs?

3    A.  Well, it depends on granularity, you mean like how that

4    data gets sent between Chai and Terra, right?  Get to very

5    low-level depths here.

6    Q.  So down in the detail, in the granular details, you didn't

7    know how that worked, did you?

8    A.  I don't know how the bits are traveling through the wire

9    between Chai and Terra.

10   Q.  Now, Mr. Myung, when you met with JiHoon Kim in that

11   conference room at Chai and recorded the conversation, didn't

12   you admit to him that you did not have any understanding of how

13   Chai used crypto?

14   A.  Well, I wanted to prompt him for his detailed explanation,

15   which he did.

16   Q.  We're going to play again in evidence Plaintiff's 122b.  Is

17   it a?  122a.  And this is from the transcript page 3, lines 1

18   through 11.

19            (Video played)

20   Q.  That was your voice, Mr. Myung, there?

21   A.  Yes, I was prompting him.

22   Q.  Were you telling the truth there, yes or no?

23   A.  Well, of any crypto that's being used at Chai, which there

24   is none of, I knew of that, yes.

25   Q.  So what you're saying wasn't true; is that what you're

O3SASEC3                    Myung - Cross

1    saying?

2    A.  This is a very confusing word game.

3    Q.  Mr. Myung, only a few more questions.

4              You're in this case for the money, Mr. Myung; isn't

5    that correct?

6              MS. STAREN:  Objection.

7              THE COURT:  Sustained.

8    Q.  Well, you claim, Mr. Myung, that you became aware of a

9    fraud at Chai in May of 2021; is that correct?

10   A.  I mean, like towards the middle of my employment.  Like

11   around the middle of the year, yeah.  Like I don't know the

12   exact date of when I became aware, but around the middle.

13   Q.  Let me show you a Defendant's Exhibit 355 in evidence.

14   This is the redacted version.  This is your fourth SEC

15   whistleblower complaint from February 25, 2022.  And if we go

16   to page 2, you were asked, when did you become aware of the

17   conduct and the answer is May 15, 2021.

18             So did you write that, Mr. Myung?

19   A.  Yeah, seems very consistent with what I just said.

20             MR. KORNBLAU:  And we can take that down.  Thanks.

21   Q.  That was a few months after you started working at Chai?

22   A.  Yes.

23   Q.  And that's when yesterday in your direct testimony you said

24   that Mr. Shin told you about a gentleman's agreement with Do

25   Kwon, right?

1    A.  Yes.

2    Q.  And you said that you thought at the time that agreement

3    that you described was sketchy?

4    A.  Sure.  It was very sketchy.

5    Q.  And you didn't submit an SEC whistleblower complaint in May

6    of 2021, did you?

7    A.  I filed that whistleblower complaint in I think it was

8    October you said.

9    Q.  Right.  And in May, you knew that if the SEC investigated,

10   sued Chai, that would hurt Chai, right?

11   A.  I'm not sure what you're --

12   Q.  Well, would that be good for the business of Chai to have

13   the SEC investigating and suing Chai?

14   A.  Well, from that point on, I was trying to get him to stop

15   lying.  Right?

16   Q.  Right.  My question --

17   A.  I was raising this concern with everyone and trying to get

18   them to stop lying about this.

19   Q.  Right.  In May of 2021, Mr. Myung, an SEC investigation or

20   action against Chai would have not been good for Chai, correct?

21          MS. STAREN:  Objection.  Speculation.

22          THE COURT:  Sustained.

23   Q.  Well, at that time, Mr. Myung, you were still working

24   towards your 20 million-dollar stock grant; isn't that right?

25   A.  I mean, for anyone employed they're working towards their

O3SASEC3                    Myung - Cross

1  stock grants, right.

2  Q.  Including you, right?

3  A.  Including me.

4  Q.  Would it be fair to say that an SEC action wouldn't have

5  been good news for your stock grant?

6          MS. STAREN:  Objection.

7          THE COURT:  Sustained.

8  Q.  You didn't contact the SEC in June or July of 2021,

9  Mr. Myung, did you?

10  A.  I was trying to get them to stop the fraud.  I don't just

11  immediately go to law enforcement once I discover something is

12  off.

13  Q.  And yesterday in your testimony you said in August of

14  2021 -- and I think you're saying it right now -- you had

15  continued to have concerns, right?

16  A.  Yes, of course.  It's big concerns about this ginormous

17  fraud.

18  Q.  And you didn't submit any whistleblower complaint to the

19  SEC in August or September 2021, did you?

20          MS. STAREN:  Objection.  Cumulative.

21          THE COURT:  I'll allow it.

22  A.  Can you say that again?

23  Q.  Sure.  You didn't submit any SEC whistleblower complaint in

24  August or September of 2021, correct?

25  A.  I'm not obligated to whistle blow.

O3SASEC3                        Myung - Cross

1    Q.  Mr. Myung, the question was pretty simple.

2              You did not submit any complaint to the SEC in August

3    or September 2021; isn't that correct?

4    A.  Yes, I did not submit until October.

5    Q.  And that was four and a half months after you said you

6    first learned of what you thought was a fraud at Chai, right?

7    A.  Well, you know, like I am in a very confused state, if you

8    can imagine.  Right?  It's everyone in the company, all the

9    executives are gaslighting you, basically saying that, you

10   know, it's okay, it's okay to just copy, you know, like all

11   these transactions onto the blockchain.

12             But, you know, like for me, like I thought I was

13   literally going crazy just being gaslit.  But, I mean, now that

14   I look back on it, right, they're making like tens of millions

15   of dollars, so it completely makes sense that they would want

16   to keep this under wraps.  I mean, and like tens of millions of

17   dollars like people below me, right?  So people above me are

18   making billions of dollars, right?  So it's a very confusing

19   and kind of a scary state of things.

20             MR. KORNBLAU:  Move to strike as nonresponsive.

21             THE COURT:  Granted.

22   Q.  So let's try it again.  It's a question about dates and

23   timing, Mr. Myung.

24             When you filed your first SEC whistleblower complaint,

25   that was about four and a half months after you say you first

1    learned about fraud at Chai, right?

2    A.  Yes.

3    Q.  And that was the time around the time when you were getting

4    let go from Chai, right?

5    A.  For raising concerns about the fraud.

6    Q.  And that was the time when you learned you weren't getting

7    your $20 million of stock grants from Chai, correct?

8    A.  Yeah.  I would have gotten more paid to stay silent.

9    Q.  And that's when you started filing your SEC whistleblower

10   complaints; isn't that the sequence, Mr. Myung?

11   A.  Yes.

12          MR. KORNBLAU:  No further questions at this time, your

13   Honor.

14          THE COURT:  All right.  I understand there's some

15   questions from the codefendant.

16          MR. MOREL:  Yes, your Honor.

17   CROSS-EXAMINATION

18   BY MR. MOREL:

19   Q.  Good afternoon, sir.  I just have a few questions.

20   A.  Hello.

21   Q.  You first contacted Daniel Shin for a job sometime in late

22   2019 early 2020; is that right?

23   A.  Hold on.  Yes.

24   Q.  And it's fair to say you did not initially contact Do Kwon,

25   correct?

1   A.  Yes.

2   Q.  And it was Daniel Shin who ultimately offered you a job at

3   Chai, correct?

4   A.  Yeah, I interviewed with both.  Ultimately I accepted the

5   job at Chai through Dan.

6   Q.  But it was Daniel Shin who offered you a job at Chai,

7   correct?

8   A.  That's correct.

9   Q.  And you were hired as a senior advisor to Daniel Shin,

10  right?

11  A.  Yes.

12  Q.  And --

13  A.  Well, to the Chai Corporation, Daniel Shin.

14  Q.  You did not advise Do Kwon, fair?

15  A.  That's true.

16  Q.  Now, you have provided some audio recordings to the SEC in

17  connection with this case, correct?

18  A.  Yes.

19  Q.  And during your direct testimony yesterday, you replayed

20  some of those recordings, correct?

21  A.  Yes.

22  Q.  I just have a few questions about those recordings.

23      You were played part of a conversation that you

24  recorded with JiHoon Kim, correct?

25  A.  Yes.

O3SASEC3                        Myung - Cross

1    Q.  And at the time of that recording, JiHoon Kim was

2    associated with Chai, not Terraform Labs, correct?

3    A.  At the time of the recording you're asking?

4    Q.  That's correct.

5    A.  He may have been dual employed, but to my understanding he

6    was a Chai employee.

7    Q.  And was Mr. Kwon part of your conversation with JiHoon Kim?

8    A.  At the time of the recording?

9    Q.  At the time of the recording, yes.

10   A.  No, he was not.

11   Q.  You were also played a conversation that you recorded with

12   Jinny Baek, correct?

13   A.  Yes.

14   Q.  And Jinny Baek was employed with Chai, not Terraform Labs,

15   correct?

16   A.  To my understanding, yes.

17   Q.  Was Mr. Do Kwon involved in your conversations with Jinny

18   Baek at that time?

19   A.  No.  It was just me and him.

20   Q.  And you were also played a recording with Daniel Shin,

21   correct?

22   A.  Yes.

23   Q.  And at that time, Daniel Shin was a part of Chai, not

24   Terraform Labs, correct?

25   A.  It depends on how you define that.

O3SASEC3                         Myung - Cross

1    Q.  CEO of Chai, correct?

2    A.  Or executive -- I mean, he may have been a director at

3    Terraform Labs, but I don't know.  I can't attest to that, but

4    he was a CEO of Chai Corporation.

5    Q.  Fair.  And was Do Kwon part of that conversation with

6    Daniel Shin?

7    A.  No.

8    Q.  And you also recorded a conversation with GiGi Kwon,

9    correct?

10   A.  Yes.

11   Q.  And just to be clear, to your knowledge there is no

12   relationship between Do Kwon and GiGi Kwon, correct?

13   A.  Not that I'm aware of.

14   Q.  And at that time, GiGi Kwon was associated with Chai,

15   correct?

16   A.  May have been both, but to my personal knowledge, Chai.

17   Q.  Yeah.  And was Do Kwon part of that conversation?

18   A.  No.

19   Q.  So is it fair to say that Do Kwon was not part of any of

20   the recordings that the SEC played during your direct

21   testimony; is that fair?

22   A.  Yeah.

23   Q.  Sir, you were also shown by the SEC during your direct

24   testimony a chat between you and Daniel Shin dated August 13,

25   2021; do you recall that?

1    A.  The Slack chat?

2    Q.  Yes.

3    A.  Yes.

4    Q.  Was Mr. Kwon involved in that chat?

5    A.  No.  It was just me and Dan.

6    Q.  And you were also shown a Slack chat between you and Daniel

7    Shin dated August 15, 2021; do you recall that?

8    A.  Yes.

9    Q.  Was Do Kwon part of that conversation?

10   A.  No.

11   Q.  And, sir, you were also shown a Slack chat between you and

12   JiHoon Kim dated September 30, 2021; do you recall that?

13   A.  Yes.

14   Q.  Was Do Kwon involved in that Slack chat?

15   A.  He was not in that chat.

16          MR. MOREL:  No further questions.  Your Honor.

17          THE COURT:  All right.  Redirect.

18   REDIRECT EXAMINATION

19   BY MS. STAREN:

20   Q.  Good afternoon.  Good morning, Mr. Myung.  I forget what

21   time it is.

22          THE COURT:  No, I think it's afternoon.

23   Q.  Mr. Myung, on cross you were asked a number of questions

24   regarding the timing of events leading to your first

25   whistleblower complaint; do you recall that?

1   A.   Yes.  It was a lot of dates.

2   Q.   Okay.  And some set of those questions related to your

3   being fired from Chai towards the end of 2021; do you recall

4   that?

5   A.   Yes.

6   Q.   And I think that you testified that you were upset about

7   that firing; is that correct?

8   A.   Yes.

9   Q.   Why were you upset?

10  A.   Because I had raised concerns about the fake transactions,

11  and like, nobody would listen.  And, yeah, it was a very

12  confusing time.

13  Q.   Okay.  And just to be clear, were you fired before or after

14  you raised your concerns about Chai not using crypto?

15  A.   I raised the concerns well before I was fired.

16  Q.   Okay.  And you were also asked on cross a number of

17  questions regarding your whistleblower complaints that you

18  filed with the SEC; do you remember that?

19  A.   Yes.

20  Q.   And in particular, you were asked about the fact that you

21  had filed four different whistleblower complaints; do you

22  remember that?

23  A.   Yes.

24  Q.   Okay.  Why did you file four whistleblower complaints?

25  A.   Because I just had to get the attention of the SEC because

1    the project at the peak was like $100 billion project and, you

2    know, everyone thought that real transactions were happening in

3    Korea for commerce, and that was just simply a lie.  And I knew

4    that the only thing giving stability to the coin was real-world

5    activity.  Right?  Well, the purported real-world activity.

6    And because I knew that that was fake, I knew that there was no

7    actual support for the stablecoin, and so I knew that it would

8    eventually collapse.

9    Q.   Okay.

10             MR. MOREL:  Objection, your Honor.  May we approach?

11             THE COURT:  No.

12             Go ahead.

13   Q.   And you were also asked about losses that were claimed on

14   some whistleblower complaints, but not others; do you recall

15   that?

16   A.   Yes.

17   Q.   And can you please explain why you gave different

18   whistleblower -- or sorry, different loss amounts on the

19   different whistleblower complaints?

20   A.   Yeah.  I wasn't really sure like what to put there.  I

21   didn't have a lawyer or anything.  I was just trying to do it

22   myself.

23   Q.   And when you were asked questions about this during your

24   deposition, you gave certain answers.  Why did you give those

25   answers?

O3SASEC3                          Myung - Redirect

1    A.  I was just I guess speculating, trying to be helpful.

2    Q.  And when you say you were trying to be helpful, sorry, what

3    do you mean?

4    A.  Like try to come up with a reason why -- you know, like I

5    just found a number.

6    Q.  Okay.  And, again, when you -- did you file your

7    whistleblower complaints before or after you raised your

8    concerns within Chai about Chai not using crypto?

9    A.  So I raised the concerns and then I filed the whistleblower

10   complaint.

11   Q.  Okay.  And you testified earlier that you were filing the

12   whistleblower complaints because you were trying to get the

13   SEC's attention; is that right?

14   A.  Yes.

15   Q.  And I think you mentioned, you just mentioned, your concern

16   of some sort of catastrophic loss; is that accurate?

17   A.  Yes.

18   Q.  And did there come a time when there was such a

19   catastrophic loss?

20   A.  Yes.

21          MR. KORNBLAU:  Objection.  Objection.

22          THE COURT:  Overruled.

23   A.  Yes.  Just like within three months of my last complaint,

24   everything collapsed.  $50 billion went to zero.

25   Q.  And approximately when was that?

O3SASEC3                         Myung - Redirect

1    A.  In May of 2022.

2    Q.  Okay.  You were also asked on cross if you recall about

3    your Kakao chats with Do Kwon; do you recall?

4    A.  Yes.

5            MS. STAREN:  Okay.  Could you please put up,

6    Mr. Haywood, Plaintiff's Exhibit 120, which are those Kakao

7    chats and they're already in evidence.

8    Q.  And I believe you were asked a question on cross relating

9    to -- can you please include the -- no, you have it.

10           Relating to your statement if a lawsuit blows up with

11   Dan and Chai, it would significantly impact Terra.

12           Do you see that?

13   A.  Yes.

14   Q.  Okay.  And you were not asked about all of Do Kwon's

15   responses; is that right?

16   A.  That's true.

17   Q.  Okay.  So let's go through them now.  Can you please read

18   Do Kwon's responses to you?

19   A.  He says "now you're just being crazy."  Says, "dude, I

20   don't care.  Seriously.  I don't care at all.  Is that hard to

21   understand.  You are barking up the wrong tree man."  And then

22   he goes onto say, "sue or not sue, I really don't care.  I

23   can't see how that impacts my life.  But threaten me again and

24   I will personally make sure you don't have a career for the

25   rest of your life."

1  Q.  Mr. Myung, did you intend to threaten Do Kwon?

2  A.  No.

3          MS. STAREN:  You can go ahead and take that down,

4  Mr. Haywood.

5  Q.  You were also shown on cross a list of audio files that you

6  produced in this case; do you remember that?

7  A.  Yes.

8  Q.  And just for the record, had you ever seen that document

9  before?

10  A.  First time seeing it.

11  Q.  Okay.  And I believe you testified that you provided some

12  of those audio files to the SEC during the investigation, but

13  not all of them; is that accurate?

14  A.  Yes.

15  Q.  Okay.  Why did you not produce every audio file you had to

16  the SEC?

17  A.  Because I only produced things that were relevant to the

18  case and the fraud.

19  Q.  Okay.  And did there come a time when you were served with

20  a subpoena by the defendants?

21  A.  Yes.

22  Q.  And did that subpoena demand that you produce all of your

23  audio files?

24  A.  Yes.

25  Q.  And did you comply with that subpoena?

1    A.  Yes.

2    Q.  And did you produce all of your audio files?

3    A.  Yes.

4    Q.  Now, you were asked a number of questions regarding certain

5    recordings that you had made with Mr. JiHoon Kim; do you recall

6    that?

7    A.  Yes.

8    Q.  And you were asked regarding certain statements that

9    Mr. JiHoon Kim made regarding settling transactions; do you

10   recall that?

11   A.  Yes.

12   Q.  Okay.  Do you know what Mr. JiHoon Kim was referring to

13   when he used the word "settlement?"

14   A.  No.

15   Q.  Okay.  But do you have an understanding as to whether Chai

16   was actually settling in crypto?

17   A.  Well, yes, it wasn't using crypto at all.  So settlements

18   typically mean from the user, from the consumer, to the seller,

19   which is the merchant.  And basically you are settling

20   everything between these two parties.  So that's typically what

21   it means.  That's my understanding.  And in order to settle

22   between the user and the merchant, crypto or the blockchain was

23   never used as part of that process.

24   Q.  And was it your -- and JiHoon Kim agreed with you on that,

25   correct?

1   A.  Yes.

2          MS. STAREN:  Okay.  Mr. Haywood, could you please play

3   clip 3 from Plaintiff's Exhibit 122a.

4          (Video played)

5   Q.  And again, that's consistent with your understanding; is

6   that right?

7   A.  Yes.

8   Q.  Okay.  But I think you testified also that you had seen --

9   your understanding is that Do Kwon and Terraform were making

10  statements inconsistent with that?

11  A.  Yeah.  I mean, like Do Kwon was saying that, you know,

12  real-world transactions were happening through Chai in Korea.

13  That like merchants were settling with the users, like faster

14  and cheaper than legacy counterparts or something like that,

15  yeah.

16         MS. STAREN:  Mr. Haywood, could you please pull up for

17  the witness only Plaintiff's Exhibit 93a.  Yeah.  It's hard to

18  read.

19  Q.  Mr. Myung, have you ever seen this?

20         MR. KORNBLAU:  Objection.  Beyond the scope.

21  A.  That was my first time --

22         THE COURT:  No, hold on.

23         Can you have it blown up.

24         Overruled.

25         MS. STAREN:  Okay.  This document is actually

1  stipulated as admissible and we would like to admit Plaintiff's

2  Exhibit 93a at this time.

3        THE COURT:  Received.

4        (Plaintiff's Exhibit 93a received in evidence).

5  BY MS. STAREN:

6  Q.  Could you please tell me -- this is what -- just read the

7  title across the top.

8        MS. STAREN:  Apologies, Mr. Haywood, could you please

9  highlight.

10  Q.  Could you please read that for me, Mr. Myung?

11  A.  Yes, it says, "DoKwon#4161 posted on discord four years

12  ago."  And that was Terra Classic.

13  Q.  Okay.  And then could you please read the first sentence of

14  that second main paragraph?

15  A.  Yeah.  It says, "right now Chai has 12 merchants, all of

16  who get settled in KRT on the Terra blockchain."

17  Q.  And, Mr. Myung, can you tell me in your experience as the

18  senior officer and chief senior advisor and later chief product

19  officer for Chai, is that statement accurate?

20  A.  No.

21  Q.  Why not?

22  A.  Merchants never got KRT.  No transactions were ever settled

23  in KRT with the merchant.

24        MS. STAREN:  Thank you.  I have no further questions.

25        THE COURT:  Any recross?

O3SASEC3                          Myung - Recross

1              MR. KORNBLAU:  Yes, your Honor.

2    RECROSS EXAMINATION

3    BY MR. KORNBLAU:

4    Q.  Mr. Myung, going back to your chat with Do Kwon, what's the

5    name of that app again?

6    A.  KakaoTalk.

7    Q.  KakaoTalk, yes.  You had pushed Mr. Kwon to the limit

8    before he made that threat that you described with SEC's

9    counsel, correct?

10             MS. STAREN:  Objection.

11             THE COURT:  Sustained.

12             MR. KORNBLAU:  All right.  Can we put up Plaintiff's

13   Exhibit 120.  And if we could zoom in on page 2, right at the

14   bottom.  March 16,2022, 18:57:49.

15   Q.  So this is where you're telling Mr. Kwon that you've

16   started legal procedures against Dan and Chai and you cared

17   about Chai; isn't that correct?  That was on March 16, right?

18   A.  Yes.

19   Q.  And if we can go to page 3.  I'm not going to read all the

20   detail, but you give him a lot of information.  And on

21   March 17th, so the next day at 21:38:23, Mr. Kwon said "I see,

22   thanks for the intel," right?

23   A.  I see that's written there, yep.

24   Q.  That was pretty polite, wouldn't you say?

25   A.  Sure.  I guess it's polite.

O3SASEC3                        Myung - Recross

1   Q.  And, now, if we go down just a couple minutes later at

2   21:40:32, that's when you say to Mr. Kwon in the chat, "I'm

3   letting you know about the potential litigation because I don't

4   want it to spill over to you or TFL."

5           That's when you say that to Mr. Kwon, right?

6   A.  Looks like that's what I say, yeah.

7   Q.  And then you say, "Dan fired me before vesting."  You see

8   that?  That was shortly right after that.  You see that?

9   A.  Yeah.

10  Q.  And then Mr. Kwon said, "oh, wouldn't worry about that.

11  Besides being a board member, we have no formal partnership."

12          Is that what Mr. Kwon said?

13  A.  Yes.

14  Q.  Pretty mild, wouldn't you say?

15          THE COURT:  Sustained.  Just forget the

16  characterization.

17  Q.  All right.  So we're going to now go down to March 17,

18  22:49:48.  And Mr. Kwon said, "why don't you pick up a new

19  project?  I think payments adjacent projects are not that

20  interesting anyway?"

21          MS. STAREN:  Objection.

22  Q.  Didn't he?

23          THE COURT:  Overruled.

24  A.  Can you say that again.

25  Q.  So on March 17th at 22:49:08.  Can we get that for the

1    witness to make this easier.

2              Mr. Kwon said, "why don't you pick up a new project?

3    I think payments adjacent projects are not that interesting

4    anyway."

5              Didn't he say that to you?

6    A.  Yeah, I think he maybe wanted me to do something other than

7    payments.

8    Q.  All right.  Now let's turn to page 4.  At the top there, so

9    now this is March 19th, a couple days later.  Let's just look

10   if you can pull out that top entry there that's at 09:58:13.

11   And you say to Mr. Kwon, "I do feel sorry for bothering you

12   about this though.  Just hard for me to reconcile that Chai's

13   CPO got zero stock and zero Luna for helping the ecosystem.

14   Seems like your relationship with Dan isn't warm and fuzzy

15   either, but I wonder if it's in everybody's interest to try to

16   find a way to settle this together before it escalates out of

17   control."

18             Is that what you said to Mr. Kwon?

19   A.  Yes.

20   Q.  And he said -- now this is at 19:47.  "Yeah, not sure how I

21   can help, wasn't part of the company when you joined so not

22   privy to the deal terms and conflict."

23             Isn't that his answer then?

24   A.  Yes.

25   Q.  Now, we scroll -- if we look down, now it's 19:22:21,

O3SASEC3                          Myung - Recross

1   that's about 22 minutes later.  And now you say to Mr. Kwon,

2   "if a lawsuit blows up with Dan and Chai, it would

3   significantly impact Terra."

4           That's what with you said, right?

5   A.  Yes.

6   Q.  And that's when Mr. Kwon said, "now you're just being

7   crazy."

8           Right?

9   A.  That's what he said.

10  Q.  And if we now scroll down to the sentence that you were

11  focusing on with the SEC counsel, 19:27:07.  Let's just pull

12  that out.  I don't want any mistakes about this.

13          So Mr. Kwon starts this sentence, "but threaten me

14  again".

15          He said that, right?

16  A.  Sure.  I didn't mean to threaten him, but yeah --

17  Q.  So Mr. Kwon was telling you he felt threatened, right?

18  A.  I'm sure he did.

19  Q.  And that's when he threatened you?

20  A.  Yeah.

21          MR. KORNBLAU:  No further questions, your Honor.

22          THE COURT:  All right.  Anything else?

23          MR. MOREL:  Nothing further, your Honor.

24          THE COURT:  Anything else?

25          MS. STAREN:  Nothing further, your Honor.

O3SASEC3                          Myung - Recross

1              THE COURT:  Thank you very much.  You may step down.

2              All right.  I think this is probably a good

3    opportunity to let you have your lunch break, so we will take

4    an hour for lunch and resume at ten minutes before 2:00.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O3SASEC3                          Myung – Recross

1                    (In open court; jury not present)

2                    THE COURT:  Anything else counsel needs to raise with

3         the Court?  Very good.  We'll see you at ten minutes before

4         2:00.

5                    (Lunch recess)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                          AFTERNOON SESSION

 2                              1:55 p.m.

 3              (In open court; jury not present)

 4              THE COURT:  Who's the next witness?

 5              MS. MEEHAN:  Your Honor, at this time we call

 6    Christopher Ferrante.

 7              THE COURT:  Let's get the jury, and let's get the

 8    witness on the stand.

 9              MS. CUELLAR:  Yes, your Honor.

10              (Jury present)

11              THE COURT:  Please be seated.

12    CHRISTOPHER FERRANTE,

13          called as a witness by the Plaintiff,

14          having been duly sworn, testified as follows:

15              THE COURT:  Counsel.

16              MS. CUELLAR:  Thank you, your Honor.

17    DIRECT EXAMINATION

18    BY MS. CUELLAR:

19    Q.  Afternoon, sir.  Where do you live?

20    A.  I live in Nassau County, New York.

21    Q.  Where are you from?

22    A.  I was born and raised in Brooklyn, New York.

23    Q.  Did you attend college?

24    A.  I did.

25    Q.  What did you study?
```

1   A.   I studied business administration with a concentration in

2   finance.

3   Q.   And what year did you graduate?

4   A.   2001.

5   Q.   What did you do after graduating?

6   A.   I went to work for the SEC.

7   Q.   Do you still work for the SEC?

8   A.   I do.

9   Q.   What is your official title?

10  A.   Senior accountant.

11  Q.   And if you could briefly summarize your career at the SEC.

12  A.   Sure.  I started in the enforcement division, and that's

13  where I continue today, and I investigate violations of the

14  federal securities laws.

15  Q.   And how do you do that?

16  A.   I do analysis on trading records, bank records, phone

17  records, and document review.

18  Q.   Now, did there come a time when you were assigned to the

19  case here today?

20  A.   Yes.

21  Q.   And around when was that?

22  A.   January 2024.

23  Q.   Were you at all involved in the investigation?

24  A.   No, I was not.

25  Q.   So what has been your involvement in this case?

1    A.  Sure.  I reviewed certain public statements concerning

2    Terraform and Chai.  I looked at certain documents indicating

3    when Luna was listed on certain platforms, and I helped prepare

4    and review the summary chart.

5    Q.  Now, did you review any public statements made by Do Kwon

6    about Chai?

7    A.  Yes.

8            MS. CUELLAR:  And if we could please display for the

9    witness Plaintiff's Exhibit 87.

10   Q.  Do you recognize this exhibit?

11   A.  Yes.

12   Q.  What is it?

13   A.  It's a post to Medium.

14           MS. CUELLAR:  Your Honor, the parties have stipulated

15   to the admissibility of this exhibit, and at this time we move

16   to admit Plaintiff's Exhibit 87.

17           THE COURT:  Received.

18           (Plaintiff's Exhibit 87 received in evidence)

19           MS. CUELLAR:  Thank you, your Honor.

20   BY MS. CUELLAR:

21   Q.  Focusing on the top, first of all, what is Medium?

22   A.  Sure.  Medium is an online publishing platform where users

23   can post content.

24   Q.  Who posted this particular content?

25   A.  It's posted by Do Kwon.

O3SHSec4                         Ferrante - Direct

1    Q.   And what date was it posted?

2    A.   June 21, 2019.

3    Q.   And can you please read the title of this document.

4    A.   "June 2019 — Terra Community Update."

5    Q.   What does Do Kwon generally discuss in this follow-up

6    update?

7    A.   Talks about the first ten days of Chai being active.

8    Q.   And if we could please turn to page 2.

9             Now, focusing on the section beginning with or

10   entitled "Chai Winning," what is generally conveyed in this

11   section?

12   A.   That Chai is doing well.

13   Q.   And does Do Kwon ever discuss how Chai is linked to the

14   blockchain?

15   A.   Yes.  Yes.

16   Q.   If we could please go to the second paragraph beginning

17   with "We've been getting a lot of questions."

18            Sir, can you please read that paragraph.

19   A.   "We've been getting a lot of questions regarding how

20   Chai" ——

21            MR. CHESLEY:  Objection, your Honor.  Improper summary

22   witness testimony.

23            THE COURT:  Overruled.

24   Q.   If you could maybe start again at "quite."

25   A.   Sure.

1          "Quite simply, Chai runs, records transactions, and

2    manages account balances on Terra's Columbus mainnet.  Unique

3    for blockchain services, it is integrated with most major banks

4    in Korea such that the user can checkout with just a few clicks

5    instead of having to manage wallet addresses, QR codes, or

6    private keys."

7    Q.  And then if you could now go to the paragraph underneath

8    beginning with "Chai batches all user purchase actions," what

9    is generally discussed here?

10   A.  How Chai uses the blockchain.

11   Q.  And if you could please read that paragraph.

12   A.  "Chai batches all user purchase actions in a 10-15 second

13   time window and submits the batched tx to the Columbus

14   blockchain.  Each of these transactions pay a percent stability

15   fee which gets rewarded each block to network stakeholders.

16   Over the last two days, around 26,000 batch transactions have

17   been made over Chai."

18   Q.  Thank you.

19          You could take it down, Mr. Haywood.

20          Now, did you review any other statements made by Do

21   Kwon about Chai?

22   A.  Yes.

23          MS. CUELLAR:  And if we could please display for the

24   witness Plaintiff's Exhibit 88.

25   Q.  Do you recognize this exhibit?

O3SHSec4                      Ferrante - Direct

1    A.  Yes.

2    Q.  What is it?

3    A.  It's also a post to Medium.

4            MS. CUELLAR:  And, your Honor, the parties have

5    stipulated to the admissibility of this exhibit, and at this

6    time we move to admit Plaintiff's Exhibit 88.

7            THE COURT:  Received.

8            (Plaintiff's Exhibit 88 received in evidence)

9            MS. CUELLAR:  Thank you, your Honor.

10   BY MS. CUELLAR:

11   Q.  Now, what is the title of this document?

12   A.  "July 2019 Terra Community Update."

13   Q.  And who posted this?

14   A.  Do Kwon.

15   Q.  And what date was it posted?

16   A.  July 26, 2019.

17   Q.  And approximately how long after the previous post was this

18   one posted?

19   A.  It's about one month.

20   Q.  And what is generally discussed in this article?

21           MR. CHESLEY:  Objection, your Honor.

22           MS. STOVALL:  Objection.

23           MR. CHESLEY:  Improper summary witness testimony.

24           THE COURT:  Overruled.

25   BY MS. CUELLAR:

1  Q.  Do you need me to repeat the question?

2  A.  No.  This Medium post discusses the first 40 days of Chai

3  being active.

4  Q.  Does anywhere in this article discuss what Chai is?

5  A.  Yes.

6  Q.  If you could please read the first sentence.

7  A.  "It's been 40 days since Chai launched using Terra

8  Protocol, and already it is one of the most heavily used

9  blockchain applications in existence."

10  Q.  Does the article describe Chai's popularity?

11  A.  Yes, it does.

12  Q.  Can you please read the next paragraph.

13  A.  "In one month, Chai's total transaction volume has cranked

14  up by 667 percent since last month to hit over 10 billion KRW

15  (8.5 million USD) as of this Wednesday.  Cumulative users have

16  hit over 240,000, and 1 billion KRW of daily transaction volume

17  was hit on Monday.  Not bad, considering that it took three

18  years for Venmo to acquire 3,000 users.  Check out our neat

19  infographic attached which summarizes Chai usage stats in its

20  first 40 days."

21  Q.  Now, what is KRW?

22  A.  It's the Korean won.

23  Q.  And is the infographic on the next page?

24  A.  It is.

25  Q.  If we could please turn the page.

1       What is the title here?

2  A.  "First 40 Days With. . ." and there's a symbol.

3  Q.  And if you could please read this paragraph.

4  A.  "Blockchain services have struggled to build a meaningful

5  user base, but from the moment it launched, Terra's

6  blockchain-powered payments app started drawing in a crowd.  On

7  its first day, it gained over 11,000 users who simply added

8  their bank accounts to start paying with blockchain technology.

9  That number continues to grow rapidly, allowing anyone to

10  easily buy their morning coffee with Terra.  We are just

11  getting started."

12  Q.  Now, were fees discussed anywhere in this article?

13  A.  Yes.

14  Q.  And if we could please display page 6.

15       Focusing on the bottom, beginning with "no doubt" and

16  on to the next page, can you please read that.

17  A.  "No doubt Chai's seamless UI has a role to play in driving

18  such great adoption, which you can experience for yourself

19  here.  Growing transaction volume means more intermediary fees

20  saved for Chai's e-commerce partners, more discounts for end

21  users, and increased staking rewards for our Luna stakers ——

22  it's a win-win scenario."

23  Q.  Thank you.

24       Mr. Haywood.  You can take it down.

25       Now, thus far you've discussed articles.  Did you have

O3SHSec4                         Ferrante - Direct

1   an opportunity to review any interviews?

2   A.  Yes.

3   Q.  And did you review a CNBC interview with Do Kwon?

4   A.  Yes.

5   Q.  Is that Plaintiff's Exhibit 102B?

6   A.  Yes.

7           MS. CUELLAR:  Your Honor, the parties have stipulated

8   to the admissibility of this exhibit, and at this time we move

9   to admit Plaintiff's Exhibit 102B.

10          THE COURT:  Received.

11          (Plaintiff's Exhibit 102B received in evidence)

12  BY MS. CUELLAR:

13  Q.  Now, do you know, was ⸺ Mr. Haywood, we don't need to

14  display it yet.  Sorry.

15          Do you know, was a transcript prepared of this

16  interview?

17  A.  Yes.

18  Q.  And did you have an opportunity to review the transcript

19  while listening to the interview?

20  A.  Yes.

21  Q.  And is that transcript 102B?

22  A.  Yes, it is.

23  Q.  And was it a true and accurate transcription of the CNBC

24  interview?

25  A.  Yes.

1    Q.  And was a video prepared that included the transcript

2    scrolling at the same time?

3    A.  Yes.

4    Q.  Now, did Do Kwon ever discuss Chai during this interview?

5    A.  Yes, he does.

6    Q.  And what does he generally say?

7            MS. STOVALL:  Objection.

8            THE COURT:  Overruled.

9    A.  He describes how Chai works.

10   Q.  Was a clip prepared?

11   A.  Yes.

12           MS. CUELLAR:  Your Honor, at this time we'd ask to

13   play the clip.

14           THE COURT:  Yes.  So, again, this will include also

15   the transcript, so the ——

16           MS. CUELLAR:  Yes, your Honor.

17           THE COURT:  —— the clip itself is the evidence.  The

18   transcript is an aid to the jury.

19           Go ahead.

20           MS. CUELLAR:  Thank you, your Honor.

21           (Video played)

22   BY MS. CUELLAR:

23   Q.  Now, did you have an opportunity to review any other public

24   statements made by Terra on social media platforms?

25   A.  Yes, I did.

1    Q.  Did any of these statements discuss Chai merchants?

2    A.  Yes.

3          MS. CUELLAR:  If we could please display, just for the

4    witness, Plaintiff's Exhibit 98, please.

5    Q.  Do you recognize this exhibit?

6    A.  Yes, I do.

7    Q.  What is it?

8    A.  It's a tweet.

9    Q.  Were you able to locate this tweet online?

10   A.  Yes, I was.

11   Q.  Is this exhibit a true and accurate copy of the tweet you

12   located?

13   A.  Yes, it is.

14         MS. CUELLAR:  Your Honor, at this time we move to

15   admit Plaintiff's Exhibit 98.

16         MS. STOVALL:  No objection.

17         THE COURT:  Received.

18         (Plaintiff's Exhibit 98 received in evidence)

19         MS. CUELLAR:  If we could please display it,

20   Mr. Haywood.

21   BY MS. CUELLAR:

22   Q.  Now, what date was this tweet?

23   A.  October 30, 2020.

24   Q.  And what account posted the tweet?

25   A.  It's @terra_money.

O3SHSec4                          Ferrante – Direct

1   Q.  And what does this tweet concern?

2   A.  The merchants on Terra.

3   Q.  And if you can, can you please read the tweet.

4   A.  "Eighteen new merchants integrated with Chai."

5          MR. CHESLEY:  Objection.  Improper ——

6          THE COURT:  Ground?

7          MR. CHESLEY:  Can I have a brief sidebar, your Honor?

8          THE COURT:  All right.

9          (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (At sidebar)

2           MR. CHESLEY:  It's our understanding he's testifying

3    pursuant to Rule 1006 as a summary witness.  He can summarize

4    voluminous writings that cannot be reviewed in court.  These

5    writings are not voluminous.  They can be reviewed in court.

6    They do not require summarization by a summary witness.

7           THE COURT:  So I take it that's no different than the

8    objections you previously made that I overruled?

9           MR. CHESLEY:  That's correct.

10          THE COURT:  So, first, I'm not sure he's been

11   designated solely a summary witness.  Most of these documents,

12   in fact, I think all of them so far, have been documents that

13   the parties have stipulated will come into evidence, yes?

14          MR. CHESLEY:  That's right, your Honor.

15          THE COURT:  So if they're in evidence, they can be

16   read by anyone, by the janitor, by —— or when you want to read

17   things, it will be by a professional reader.  So I don't see

18   why they can't have them read by this gentleman.

19          In addition, we're talking about lots of documents,

20   and so what they're basically doing is they're moving in all

21   these documents, and they're bringing to the attention of the

22   jury what they want the jury to focus on in those documents.  I

23   think that's all for the benefit of the jury.  You will have

24   similar opportunity on cross to say to the witness:  Well, what

25   about paragraph 7?  Would you please read that, etc.

O3SHSec4                           Ferrante - Direct

1              So the objection is overruled.

2              (Continued on next page)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O3SHSec4                          Ferrante - Direct

1          (In open court; jurors present)

2    BY MS. CUELLAR:

3    Q.  Sir, if you can, can you please read the post.

4    A.  "Eighteen new merchants integrated with Chai alongside

5    No. 1 convenience store CU; meaning, Chai can now be used at

6    nearly 18,000 offline stores across Korea.  Furthering

7    accessibility for Chai's 2 million-plus-strong user base

8    generates real-world transaction fees for Luna holders."

9    Q.  Thank you.

10         Now, did you have an opportunity to review any other

11   interviews?

12   A.  Yes.

13   Q.  What was this interview?

14   A.  It was an interview on The Defiant podcast.

15   Q.  And is this Plaintiff's Exhibit 101A?

16   A.  Yes.

17   Q.  Were you able to personally locate this podcast on the

18   Internet?

19   A.  Yes.

20   Q.  And did you listen to the entire podcast?

21   A.  Yes, I did.

22   Q.  Is Plaintiff's Exhibit 101A a complete and accurate copy of

23   the podcast that you listened to?

24   A.  Yes.

25         MS. CUELLAR:  Your Honor, at this time we move to

1    admit Plaintiff's Exhibit 101A into evidence.

2                THE COURT:  Received.

3                (Plaintiff's Exhibit 101A received in evidence)

4    BY MS. CUELLAR:

5    Q.  Now, sir, what is The Defiant?

6    A.  It's a decentralized finance podcast.

7    Q.  What was the format of the podcast?

8    A.  It was question and answer.

9    Q.  And approximately how long is the podcast?

10   A.  It's about one hour long.

11   Q.  And during this interview, does Do Kwon ever discuss

12   payments on the Terra blockchain?

13   A.  Yes.

14   Q.  And was a clip prepared of this section of the interview?

15   A.  Yes.

16                MS. CUELLAR:  And if we could please play the first

17   clip for Plaintiff's Exhibit 101A. video.

18                (Audio played)

19   Q.  And after this discussion on the importance of payments to

20   creating a use case, does Do Kwon discuss Chai?

21   A.  Yes, he does.

22   Q.  And was a clip prepared of this portion of the interview?

23   A.  Yes.

24                MS. CUELLAR:  And we could please play clip two.

25                (Audio played)

1  Q.  Now, sir, did you have an opportunity to help prepare and

2  review a summary chart?

3  A.  Yes, I did.

4        MS. CUELLAR:  If we could please display, just for the

5  witness, Plaintiff's Exhibit 169.

6  Q.  Do you recognize this exhibit?

7  A.  Yes, I do.

8  Q.  And what is it?

9  A.  This is a summary chart that I helped prepare and I

10  reviewed.

11  Q.  Is this chart an accurate reflection of the public

12  statements that you just testified to and others that have been

13  admitted at trial?

14  A.  Yes, it is.

15  Q.  What else does the chart include?

16  A.  It also includes certain documents that indicate when Luna

17  was listed on certain platforms and certain purchases of Luna.

18        MS. CUELLAR:  Now, your Honor, at this time I offer

19  Plaintiff's Exhibit 169 into evidence, as well as the remaining

20  source documents, which are at the bottom of the exhibit and

21  include Plaintiff's Exhibit 223, 350, 224, 351, and 352.

22        THE COURT:  Any objection?

23        MS. STOVALL:  Objection, your Honor.  We object to ——

24        THE COURT:  Ground?

25        MS. STOVALL:  —— 169 as —— 1006, improper summary.

O3SHSec4                          Ferrante – Direct

1    Several of the documents that were read we also object to:

2    PX 223, prejudice.

3              THE COURT:  Are there any documents on this chart that

4    are not in evidence?

5              MS. CUELLAR:  Yes, your Honor.  I was moving into

6    evidence Plaintiff's Exhibit 223, 350, 224, 351, and 352.

7              THE COURT:  All right.  So let's deal with each of

8    those.  So take it one at a time and put it on the screen.

9              MS. CUELLAR:  Yes, your Honor.

10             If we could please display, obviously not for the

11   jury, Plaintiff's Exhibit 223.

12             THE COURT:  OK.  What's the objection to this exhibit?

13             MS. STOVALL:  403, 602, 802, your Honor.

14             THE COURT:  Overruled.  Exhibit —— what's the number

15   again?

16             MS. CUELLAR:  This exhibit, your Honor, is 223.

17             THE COURT:  223 is received.

18             (Plaintiff's Exhibit 223 received in evidence)

19             THE COURT:  Go to the next one.

20             MS. CUELLAR:  Plaintiff's Exhibit 350.

21             THE COURT:  OK.  Any objection?

22             MS. STOVALL:  No objection.

23             THE COURT:  Received.

24             (Plaintiff's Exhibit 350 received in evidence)

25             MS. CUELLAR:  Plaintiff's Exhibit 224.

1           THE COURT:  Any objection?

2           MS. STOVALL:  Yes.  Prejudice, 602, 802, your Honor.

3           THE COURT:  Blow it up, please.

4           Overruled.  Received.

5           (Plaintiff's Exhibit 224 received in evidence)

6           MS. CUELLAR:  Plaintiff's Exhibit 351.

7           THE COURT:  Any objection?

8           MS. STOVALL:  No objection, your Honor.

9           THE COURT:  Received.

10          (Plaintiff's Exhibit 351 received in evidence)

11          MS. CUELLAR:  And Plaintiff's Exhibit 352, your Honor.

12          THE COURT:  Any objection?

13          MS. STOVALL:  No objection, your Honor.

14          THE COURT:  Received.

15          (Plaintiff's Exhibit 352 received in evidence)

16          THE COURT:  All right.  So given that they've now all

17   been received, the Court overrules the objections to the chart.

18   What's the chart number?

19          MS. CUELLAR:  Plaintiff's Exhibit 169, your Honor.

20          THE COURT:  169 is received.

21          (Plaintiff's Exhibit 169 received in evidence)

22          MS. CUELLAR:  Thank you, your Honor.

23          If we could please display it for the jury.

24   BY MS. CUELLAR:

25   Q.  And, Mr. Ferrante, can you explain what this exhibit is.

1    A.  Yeah, it's a timeline.

2    Q.  And what does the blue line represent?

3    A.  Those are the dates.

4    Q.  And what is the time period?

5    A.  May 2019 through January 2022.

6    Q.  And what is displayed above the blue line?

7    A.  Those are public statements concerning Terraform or Chai.

8    Q.  And what is displayed below the blue line?

9    A.  Those are listings of Luna on certain platforms as well as

10   purchases of Luna.

11   Q.  Now, were these listing and purchases during the same time

12   period of the defendants' statements about Chai?

13   A.  Yes.

14   Q.  Now, sir, did you take part in the investigation?

15   A.  I did not.

16   Q.  Do you have any personal knowledge of whether these

17   statements are true or false?

18   A.  I do not.

19             MS. CUELLAR:  No further questions, your Honor.

20             THE COURT:  Cross-examination.

21             MS. STOVALL:  Good afternoon, your Honor.

22   CROSS-EXAMINATION

23   BY MS. STOVALL:

24   Q.  And, Mr. Ferrante, my name Amianna Stovall.  I'm with

25   Dentons.  We represent Terraform.

O3SHSec4                        Ferrante - Cross

1              We've never met before, right, Mr. Ferrante?

2    A.  No, we have not.

3    Q.  And you testified that, with respect to the Chai timeline,

4    you looked at the a subset of documents provided to you by the

5    SEC and put them in chronological order and put them on the

6    timeline, correct?

7    A.  Yes, I helped prepare the chart.

8    Q.  And who assisted you with that?

9    A.  The trial team.

10   Q.  OK.  And you were not asked to do this until two months

11   ago, right?

12   A.  Yes, I started working on the investigation in January ——

13   on the litigation in January of 2024.

14   Q.  OK.  Prior to that, you had no involvement in this matter,

15   correct?

16   A.  That's correct.

17   Q.  OK.  Now, the Chai timeline starts with the first box

18   labeled May 2019 and goes through the last box which has a

19   January '22 date on it, correct?

20   A.  Yes.  I don't see the chart, but, yes, I think that's

21   correct.

22              MS. STOVALL:  Mr. Aquino, can you bring it up.

23   A.  Yeah, that's correct.

24   Q.  Your answer stands.  OK.

25              Oh, can you publish, please.

O3SHSec4                      Ferrante - Cross

1          OK.  And you testified that above the timeline there
2     are documents and statements attributed to Terraform and Do
3     Kwon, correct?
4     A.  That's correct.
5     Q.  OK.  And below the timeline you've included the dates that
6     Luna was listed on various exchanges and the months that Galaxy
7     Digital and Republic Capital purchased Luna, correct?
8     A.  Yeah, when it was listed on certain platforms, Luna was
9     listed on certain platforms and those two purchases you
10    mentioned.
11    Q.  OK.  And the SEC lawyers gave you the documents that they
12    wanted you to put on the timeline, and that's what you did, you
13    put them on the timeline, correct?
14    A.  That's correct.
15    Q.  And you didn't make any decisions about which documents or
16    events got put on the Chai timeline, correct?
17    A.  That's correct.
18    Q.  OK.  And you didn't review all of the documents that the
19    SEC collected in connection with this matter, correct?
20    A.  I did not.
21    Q.  You didn't interview any witnesses in connection with this
22    case, right?
23    A.  I didn't perform any interviews.
24    Q.  OK.  And you didn't attend any depositions in connection
25    with this case?

1    A.  No, I did not.

2    Q.  OK.  And you were not assigned as an investigator in this

3    case, correct?

4    A.  I was assigned as an investigator for the litigation.

5    Q.  So just for the last two months to look at —— to create the

6    timeline, correct?

7    A.  Correct.

8    Q.  OK.  So you have no firsthand knowledge and no personal

9    knowledge about the facts of this case, correct?

10   A.  That's correct.

11   Q.  OK.  And you've never spoken to any current and former ——

12   or former employees of TFL?

13   A.  No.

14   Q.  Have you ever talked to Paul Kim?

15   A.  No.

16   Q.  Just to be clear, you've never spoken to any current or

17   former employees of Terraform, correct?

18   A.  No.

19   Q.  Have you ever spoken to any employee of Chai?

20   A.  I have not.

21   Q.  Have you ever spoken with anyone from Galaxy Digital about

22   Terraform or Do Kwon?

23   A.  I have not.

24   Q.  Have you ever spoken with anyone from Republic Capital

25   about Terraform or Do Kwon?

O3SHSec4                        Ferrante - Cross

1   A.  I have not.

2   Q.  And to be clear, the SEC lawyers prepared you to give the

3   testimony we just heard, correct?

4   A.  We met prior to my testimony.

5   Q.  OK.  How many times did you meet?

6   A.  Two.  Two —— two or three.

7   Q.  OK.  And you were not involved —— with respect to the

8   documents on P-169, you were not involved in the publication or

9   creation of any of the documents on the timeline, correct?

10  A.  No.

11  Q.  And you didn't read any of the articles or documents on ——

12  at the time they were published that are on your timeline,

13  correct?

14  A.  No, I read them between January 2024 and today.

15  Q.  Right.  You'd read them just between —— in the past two

16  months, right?

17  A.  Correct.

18  Q.  And you didn't listen to the Do Kwon interview on your Chai

19  timeline at the time it was given, right?

20  A.  No, same, it was between January 2024 and today.

21  Q.  OK.  Did the SEC lawyers ask you to put specific

22  information on your timeline from each of the documents that

23  you went through?

24  A.  I just helped prepare this.  I didn't fill out every box.

25  Q.  OK.  So, for example, if we pull up PX 223, Mr. Aquino, in

1    evidence, this is the December —— Terra's December 30, 2019,

2    Medium post, Terra 2019 —— Year in Review, correct?

3    A.  Yes.

4    Q.  OK.  And that's the first box on your timeline, correct?

5    A.  Can I see the timeline again?

6    Q.  Sure.

7    A.  Yes.

8    Q.  If you take a look at the first page of PX 223 —— I'm

9    sorry, the second page with the graphic on it where it says

10   "May," is that where you pulled the information for your

11   timeline, CoinOne Luna listing?

12   A.  Can I see 169 again?

13   Q.  Sure.

14   A.  Yes.

15   Q.  There's other information on that graphic with regard to

16   Chai that you don't include in your timeline, correct?  If you

17   take a look at June, it says:  "Mobile payment service Chai

18   launches, pushing Terra's adoption forward."

19              Do you see that?

20   A.  I see it.

21   Q.  You didn't include that, right?

22   A.  It only includes listing on certain platforms.

23   Q.  OK.  And you looked at, right under that for October, you

24   see that "Chai gains over 500,000 users with 54 million

25   transactions to date."

1          Do you see that?

2    A.   I do.

3    Q.   You didn't include that in your timeline, correct?

4    A.   It's not included, yeah, because this is not a listing on a

5    platform.

6    Q.   OK.  And for December, which kind of gets cut off and moves

7    onto the third page, it says:  "Terra launches payments in

8    Mongolia."

9          Do you see that at the top of the page?

10   A.   I see it, yes.

11   Q.   You didn't include that information on your timeline

12   either, right?

13   A.   I did not, and this is not a listing on a platform.

14   Q.   OK.  So you were only focused on listings from a platform

15   —— on platforms from this document?

16   A.   Certain —— certain platforms.

17   Q.   And you ignored the rest of the information in this

18   document for purposes of your timeline?

19   A.   I didn't ignore them.  They don't —— they don't fit the

20   criteria.

21   Q.   OK.  Well, there's other Chai information in this document,

22   right?  You didn't include that?

23   A.   Yeah, that's correct.  I didn't include every bit of

24   information about Chai.

25   Q.   OK.  And you have no personal information as to whether

O3SHSec4                         Ferrante - Cross

1    Luna was, in fact, listed on CoinOne in May 2019, do you?

2    A.  No.  I just know it's listed in the documents.

3    Q.  OK.  Let's take a look at page 4 of this document under

4    "Expansion, expansion, expansion."  Do you see that?

5    A.  I do.

6    Q.  Can you read the first bullet point under that.

7    A.  Sure.

8           "Terra payments are live in Mongolia.  Through a

9    partnership with a local messenger app, MemeChat, we launched

10   MemePay which enables instant stablecoin payments at cabs, gas

11   stations, and department stores.  Check out the CoinDesk

12   article or watch the intro video for more details."

13   Q.  You didn't include Terra's —— Terraform's MemePay launch in

14   Mongolia on your timeline, right?

15   A.  No, I did not.

16   Q.  Did the SEC lawyers give you any documents relating to

17   events concerning other mobile payment systems that used the

18   Terra blockchain?

19   A.  Can you repeat that again, please.

20   Q.  Sure.

21          Did the SEC lawyers give you any documents relating to

22   events concerning other mobile payment systems that used the

23   Terra blockchain?

24   A.  I've looked at this document.  Is that what you're asking?

25   Q.  I'm asking, in addition to this document, did the SEC give

O3SHSec4                        Ferrante - Cross

1    you any other documents?

2    A.  I'm sure.  I don't know completely.  There was lots of

3    information in all the documents.  But like this one, yeah, it

4    discusses a —— another mobile payment application.

5    Q.  OK.  So to be clear, Mr. Ferrante, this is not a listing of

6    all Chai-related information posted by Do Kwon or Terra,

7    correct?

8    A.  What are you referring to?

9    Q.  I apologize.  P-169.

10   A.  No, that's not all information.  It's ——

11   Q.  OK.  It's just a subset of documents that the SEC asked you

12   to put in chronological order and put on a timeline, correct?

13   A.  That's correct.

14   Q.  OK.  And it's not a chronology of all events concerning

15   Chai or Terra between May ——

16           MS. CUELLAR:  Objection, your Honor.  Asked and

17   answered at this point.

18           THE COURT:  I didn't hear the end of the question.

19   Q.  Sorry.  And it's not a chronology of all event concerning

20   Chai or Terraform between May 2019 and January 2022, right?

21           THE COURT:  Overruled.

22           You may answer.

23   A.  Yeah, this timeline's not every event concerning Terraform

24   or Chai.

25           MS. STOVALL:  OK.  Thank you, Mr. Ferrante.

1           THE COURT:  Any other examination from the defense?

2           MR. CHESLEY:  No, your Honor.

3           THE COURT:  Anything further from the government, from

4    the SEC?

5           MS. CUELLAR:  Not for this witness, your Honor.

6           THE COURT:  Thank you so much.  You may step down.

7           (Witness excused)

8           THE COURT:  Please call your next witness.

9           MS. CUELLAR:  Your Honor, at this time may we read

10   three stipulations into the record?

11          THE COURT:  Couldn't be more thrilled.

12          MS. CUELLAR:  I get all the fun.

13          Stipulation 12:  Terraform created, maintained, and

14   operated Twitter accounts under the usernames @terra_money,

15   @lfg_org, and @anchor_protocol.

16          Stipulation 13:  In early 2020, Mr. Kwon and Daniel

17   Shin decided to separate the business of Chai from the business

18   of Terraform.  Korean regulations were a factor in this

19   decision.

20          Stipulation 14:  From on or about September 10, 2019,

21   through on or about May 18, 2022, Mr. Kwon sat on Chai's board

22   of directors.

23          Thank you, your Honor.

24          THE COURT:  All right.  Next?

25          MR. CARNEY:  Your Honor, our next witness is going to

1    be the reading of the testimony of Paul Kim, but could we

2    request a brief sidebar first?

3              THE COURT:  Yes.

4              MR. CARNEY:   Thank you.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O3SHSec4                          Ferrante - Cross

1          (At sidebar)

2          MR. CARNEY:  Thank you, your Honor.

3          We were looking through your Honor's rulings on the

4     objections, and we just have one point that we wanted to raise.

5          Paul Kim is currently a defendant in Korea in relation

6     to Chai.

7          THE COURT:  Yeah, and I excluded that.

8          MR. CARNEY:  You excluded that.  But we just wanted to

9     bring up the fact that we think ── we're not trying to impugn

10    his character generally because he's on trial, it's the fact

11    that he's on trial related to the transactions at issue in this

12    case.  And the jury is being asked to believe that this is just

13    an honest ──

14         THE COURT:  I excluded that on 403 grounds.  I think

15    the prejudicial effect outweighs the probative value, so I

16    continue with that ruling.

17         MR. PELLEGRINO:  Sorry.  I didn't mean to interrupt.

18         THE COURT:  You want to talk me out of my ruling in

19    your favor?

20         MR. PELLEGRINO:  I don't, your Honor, I really don't.

21    I wanted to tell you about logistics, but let's cover this.

22         THE COURT:  No, I think we're through, yes.

23         MR. CARNEY:  Yes, your Honor.  I just want to make

24    clear it was going to bias.

25         THE COURT:  I understand that.  And it clearly goes to

1   bias, and that's why the ruling is under 403.  The probative

2   value —— he has many biases operating here, so that would just

3   be one of them.  But in this case implicitly is that there has

4   been a determination by another government that he has

5   committed crimes in connection with all this, and that is

6   highly prejudicial, I think, to the defendants and outweighs

7   substantially the probative value.  So that's why I ruled that

8   way.

9              MR. CARNEY:  Thank you, your Honor.

10             MR. PELLEGRINO:  OK.  Logistics, your Honor.  What we

11  have proposed is that we have the reading.  And they're color

12  coded.  And what we propose is that the SEC would read the

13  designations that they have made and also the ones that we've

14  both designated, and then we would read only our designations,

15  but we would do it in order, which would require each side to

16  sort of go back and forth.

17             THE COURT:  I don't care who does the reading, but

18  what I don't want is going back and forth between pages.

19             MR. PELLEGRINO:  We would do it in order.

20             MR. LAFFERMAN:  Sequential order.

21             THE COURT:  So why don't you just have one reader who

22  is, in effect, Mr. Kim.

23             MR. PELLEGRINO:  We have one reader.

24             THE COURT:  OK.

25             MR. PELLEGRINO:  It's who asks the questions.

O3SHSec4                        Ferrante - Cross

1              THE COURT:  Oh, I see.  So they all know who's asking

2      the questions.

3              MR. PELLEGRINO:  Correct, your Honor.

4              THE COURT:  I see.  OK.  That's fine.

5              MR. CARNEY:  Your Honor, just — not to press my luck

6      on this, but —

7              THE COURT:  Go ahead.

8              MR. CARNEY:  With respect, one of the designations

9      regarding the criminal charges was the fact that he was advised

10     by his lawyers when answering questions to avoid using terms

11     like "copying," "mirroring," and I don't know if there's a way

12     to get that across without the part about it being in

13     connection with the criminal trial.

14             THE COURT:  No, unfortunately for you, I interrupted

15     the Argentine tango last night to do all this.

16             MR. CARNEY:  We apologize.

17             THE COURT:  And my wife is very grateful to you, but,

18     anyway, I adhere to my ruling.

19             MR. CARNEY:  Thank you.

20             (Continued on next page)

21

22

23

24

25

O3SHSec4                          Ferrante – Cross

1              (In open court; jurors present)

2              THE COURT:  I understand one of the jurors needs a

3     quick break, so why don't we take a five-minute break.

4              (Jury excused)

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O3SHSec4

```
1            (Jury not present)

2            THE COURT:  All right.  Please be seated.

3            I can't imagine any of you need a break, but just in

4    case, why don't we give you a five-minute break as well.

5            MR. CONNOR:  Thank you, your Honor.

6            (Recess)

7            THE COURT:  OK.  Let's bring in the jury.

8            (Jury present)

9            THE COURT:  Please be seated.  Sorry.

10           All right.  Counsel.

11           MR. LANDSMAN:  Yes, we would like to read the

12   testimony of Paul Kim into the record.  Before we do so, we

13   would like to admit some exhibits.  First, defense is going to

14   list some exhibits that we've agreed to be admitted.

15           THE COURT:  Are these all agreed to?

16           MS. LANDOW:  Yes.

17           THE COURT:  All right.  Go ahead.

18           MS. LANDOW:  Your Honor, at this time we'd like to

19   move the following exhibits into evidence:

20           Defendants' Exhibit 1215, Defendants' Exhibit 1039,

21   Defendants' Exhibit 1016, Plaintiff's Exhibit 148A, and

22   Plaintiff's Exhibit 148B, Defendants' Exhibit 325, Defendants'

23   Exhibit 323, Defendants' Exhibit 324, Plaintiff's Exhibit 152A

24   and Plaintiff's Exhibit 152B, Plaintiff's Exhibit 158, and

25   Plaintiff's Exhibit 163.
```

O3SHSec4

```
1          THE COURT:  Received.

2          (Plaintiff's Exhibits 148A and 148B, 152A and 152B,

3    158, and 163 received in evidence)

4          (Defendant's Exhibits 1215, 1039, 1016, 325, 323, 324

5    received in evidence)

6          MR. LANDSMAN:  And, your Honor, we would like to move

7    in Plaintiff's Exhibit 155.

8          THE COURT:  Received.

9          MR. LANDSMAN:  They have an objection to.

10          THE COURT:  I'm sorry, there's an objection.

11          MS. LANDOW:  Objection.  Hearsay.

12          THE COURT:  Let me see it.  We could have done all

13    this during the break.

14          I'm sorry.  Go back to who this is from and who ——

15    overruled.  Received.

16          (Plaintiff's Exhibit 155 received in evidence)

17          MR. PELLEGRINO:  Your Honor, I think we would need an

18    instruction to the jury as to this gentleman.

19          THE COURT:  You want an instruction as to what he's ——

20    how bored he's been having to sit around here all day?

21          MR. PELLEGRINO:  There is that, your Honor, and his

22    status as a reader.

23          THE COURT:  So, anyway, so this is a fellow who will

24    read the answers given by Mr. Kim who's not available as a

25    witness.  So you can consider his testimony as if it were being
```

O3SHSec4                           "Kim"

1    given here in court.  And the way we'll work it is the

2    questions that were put at his deposition by the SEC will be

3    put by the SEC lawyer here, and the questions that were put by

4    Terraform counsel will be put by Terraform counsel here.  So

5    this is a way of giving you a sense of how it played out since

6    it wasn't videotaped.  So we have to, in fact.

7                Recreate.  Go ahead.

8                MR. LANDSMAN:  If it's all right, your Honor, we're

9    both going to do it sitting down by our microphones so we're

10   not ——

11               THE COURT:  OK.

12               MR. LANDSMAN:  Or you want me ——

13               THE COURT:  No, that's all right.  All I want to do is

14   get on with it.

15               MR. LANDSMAN:  I understand.

16               THE COURT:  Go ahead.

17               (Reading)

18   "Q.  I will ask a question to witness Han Ju Kim.  It is a

19   question related to the background of this case.  'Terraform'

20   means Terraform Lab PTE Ltd., the Singaporean corporation.

21   'Chai' is sort for Chai Corporation.  This is question number

22   1.  Please state and spell your full legal name for the record.

23   "A.  My name is Han Ju Kim.

24   Q.  Please include any English and Korean nicknames.

25   A.  Yes.  My English nickname is Paul Kim.  Paul Kim, P-a-u-l,

O3SHSec4                        "Kim"

1    K-i-m.

2    Q.  What is your highest level of education?

3    "A.  I quit high school.

4    "Q.  Yes, it would suffice to mention your title, changes in

5    your affiliation, and duration of employment.

6    "A.  After working as a server programmer at Young Technology,

7    my final title at a game company called Ymir Entertainment was

8    CTO, after which I briefly worked as a game company called

9    Paranoid Joy as the head of engineering team.  Next, I founded

10   a company called Styleket where I worked as CTO, after which I

11   joined Gaza Labs, a company related to the Terra project as the

12   head of engineering and worked there.  Would this be enough?

13   "Q.  At what point did you join Terraform?

14   "A.  I never joined Terraform, but I joined Gaza Labs in

15   October 2019.

16   "Q.  Do you mean you've never joined the Singaporean company

17   Terraform, but you joined in October 2019 a Korean company

18   called Gaza Labs Inc., which was related to Terraform?

19   "A.  Yes, correct.  But I think it was October 2018.

20   "Q.  Then how did you learn about Terraform?  What brought you

21   to Gaza Labs?

22   "A.  In early 2018, an investor of Styleket introduced me to

23   Daniel Shin.  I met Daniel Shin, and it was like, 'there's this

24   project, so try meeting with Do Kwon.'  Then in early 2018, I

25   met Do Kwon through Daniel Shin and heard an explanation about

O3SHSec4                    "Kim"

1    this project.

2    "Q.  So when you say you've heard an explanation about this

3    project, you mean you have met Daniel Shin, then met Do Kwon

4    through Daniel Shin, and heard an explanation about this Terra

5    project from Do Kwon?

6    "A.  It wasn't a detailed explanation but just an overall gist

7    of it.  So it was like a first get-together, to get to know

8    what kind of person each other was.

9    "Q.  You were hired by Gaza Labs.  Was it Do Kwon who hired you

10   at Gaza Labs?

11   "A.  To be precise, I belong to a company called Styleket,

12   which was acquired, so I came to join Gaza Labs.

13   "Q.  So you founded and worked at Styleket, but as Styleket

14   became acquired by Gaza Labs, your affiliation naturally

15   changed to Gaza Labs.  Is that the correct way to put it?

16   "A.  Yes, that is the correct way to put it.

17   "Q.  What is the relationship between Gaza Labs and Terraform

18   PTE Ltd.?

19   "A.  What relationship they have isn't what . . . I worked as

20   an engineer, so I don't know their relationship, but it is true

21   that Gaza Labs engaged in the development of the Terra project

22   in a way.  Perhaps it was something like consignment?  People

23   working in Korea needed an entity in Korea to be directly

24   employed to rather than the Singapore entity.

25   "Q.  So the equity structure or the corporation Gaza Labs

O3SHSec4                        "Kim"

1    itself is unrelated to Terraform?

2    "A.  That is something I have no knowledge of how, it is

3    arranged.

4    "Q.  Gaza Labs, the company you were affiliated with, was

5    acquired.  Then who was the person actually in control at Gaza

6    Labs?

7    "A.  I thought Do Kwon and CEO Daniel Shin were jointly

8    managing it.

9    "Q.  So from how you saw it, Gaza Labs was jointly managed by

10   Daniel Shin and Do Kwon?

11   "A.  The CEO was someone else — well, precisely.

12   "Q.  You mean although you don't know who the nominal CEO was,

13   the acquisition happened via introduction by Daniel Shin and Do

14   Kwon, and you thought Daniel Shin and Do Kwon were technically

15   exercising some sort of influence?

16   "A.  Yes, that's how I saw it.

17   "Q.  According to the news, Gaza Labs Inc. at some point was

18   renamed to the current Kernel Labs, is this correct?

19   "A.  Yes, I believe so.

20   "Q.  Do you consider Do Kwon a friend?

21   "A.  He is not a friend.

22   "Q.  Do you have a close relationship with him?  What

23   relationship do you have?

24   "A.  He was a coworker I used to work with.

25   "Q.  Do you consider him a coworker or a boss?

O3SHSec4                         "Kim"

1    "A.   The company had a horizontal corporate culture.  So it's

2    not like if you don't do it, I'm going to fire you.  But I

3    don't know.  We're not friends.  I consider him a coworker.

4    "Q.   A colleague at work?

5    "A.   Yes.

6    "Q.   The only time you worked in relation to the Terra project

7    was at Gaza Labs, right?

8    "A.   While I was working at Gaza Labs, I transferred to Chai

9    Corporation in November 2018.

10   "Q.   So you completely left Gaza Labs in November '18?

11   "A.   I did not completely leave.  Later on I rejoined Kernel

12   Labs.  Anyway, I transferred to Chai Corporation in

13   November 2018.

14   "Q.   The original name of Chai Corporation was Earth Electronic

15   Payment Co., right?

16   "A.   Yes, correct.

17   "Q.   The company was initially founded as Earth Electronic

18   Payment Co., Ltd., and registered a business name to Chai

19   Corporation in September 2019 based on my research.  Is this

20   correct?

21   "A.   Oh, then that would mean I joined Chai Corporation.

22   Anyway, yes, that's right.

23   "Q.   So you initially worked at Gaza Labs and later moved to

24   Earth Electronic Payment, which is now Chai Corporation.  Were

25   your duties at Gaza Labs different from your duties at Chai

O3SHSec4                    "Kim"

1   Corporation?  Please explain what your duties were.

2   "A.  They were a bit different.  When I joined Gaza Labs, I

3   spent time developing a bit more on blockchain and exploring

4   the technology.  After joining Chai Corporation, my duties

5   focused more on linking mobile payment service with blockchain

6   and developing the server for Chai Pay.

7   "Q.  You were mainly in charge of the program development,

8   right?

9   "A.  Yes, correct.

10  "Q.  How did your title change?

11  "A.  I didn't have a specific title at Gaza Labs.  Ah!  I think

12  it was head of engineering at Gaza Labs, and the same title at

13  Chai Corporation.

14  "Q.  Could that be interpreted as you having the ultimate

15  responsibility and authority regarding technology development?

16  "A.  What do you mean by 'authority'?

17  "Q.  Regarding program development.

18  "A.  Yes, I had much relevant experience.

19  "Q.  You were the person in charge who had authority and

20  responsibility with regard to engineering work?

21  "A.  Yes, but Do Kwon was above me at Gaza Labs, while I was

22  the person in charge at Chai Corporation.

23  "Q.  You were the responsible person when it came to

24  engineering?

25  "A.  Yes.

1  "Q.  Did you end up receiving the Luna as compensation for the
2  purchase?
3  "A.  Yes, I did later on.  Not the full amount, but I did.
4  "Q.  You received it partially, so how much did you receive?
5  "A.  I think it was around 1.5 million coins.
6  "Q.  So you received 1.5 million Lunas after the Luna coin was
7  launched, right?
8  "A.  Yes.
9  "Q.  So you joined Gaza Labs and then moved to Chai
10  Corporation.  Until when did you work there?
11  "A.  I think I worked until March/April 2020 at Chai
12  Corporation.
13  "Q.  You worked at Chai until March or April 2020?
14  "A.  I think it was March.
15  "Q.  At Gaza Labs, you reported to Do Kwon since he was your
16  boss, and after moving to Chai Corporation, you did not have to
17  report to anyone since you were the top person in charge,
18  correct?
19  "A.  Since the company had a horizontal corporate culture,
20  people did not exactly report to other people, but by rank.  Do
21  Kwon was of a higher rank than myself at Gaza Labs and at Chai
22  Corporation.  Daniel Shin was above me in terms of rank.  It
23  wasn't a relationship where I had to make reports to them.
24  "Q.  When you faced engineering-related issues that you were
25  not comfortable deciding on your own, did you consult someone

O3SHSec4                          "Kim"

1    in a meeting or have meetings with someone?

2    "A.  Do Kwon and Daniel Shin did not speak much during official

3    meetings.  The people who worked on the task together, then

4    there was the PM, and I did have meetings with the PM.  I

5    barely talked to Daniel Shin and with Do Kwon.  Occasionally,

6    there were instances where questions like "How do I make this?"

7    "What is the intention behind it?" were asked.

8    "Q.  Who had final say over engineering matters?  This seems to

9    overlap, but Do Kwon must have had the final say at Gaza Labs,

10   right?

11   "A.  Yes.

12   "Q.  I mean, you were the head of engineering?

13   "A.  Yes.

14   "Q.  So although you were the chief technology officer on the

15   engineering side, even for the CTO, when it comes to the most

16   important and essential matters, ultimately, the company's CEO

17   or regarding the registration of the company CEO . . . someone

18   who is like the practical owner of the company must be

19   consulted for final agreement.  There must be a person like

20   that, right?  So who was that person at Chai?

21   "A.  Daniel Shin was in the lead.

22   "Q.  Did Daniel Shin play that role?

23   "A.  Yes.

24   "Q.  So Do Kwon was not involved at all when you worked at

25   Chai?

O3SHSec4                    "Kim"

1    "A.  He was.  He wasn't completely uninvolved.  He was involved

2    since Chai had the feature of being linked to the Terra

3    blockchain, but Daniel Shin was more interested in the mobile

4    payment service, and Do Kwon was more interested in the Terra

5    blockchain.  So there was that difference, I believe.

6    "Q.  To rephrase it, you said that Daniel Shin had the final

7    say over your engineering work at Chai Corporation, but can't

8    we say that even when you were working at Chai Corporation, it

9    wasn't Daniel Shin solely making the final calls related to

10   engineering but Do Kwon was technically making joint decisions

11   with Daniel Shin, or rather, when it comes to

12   technology-related matters, Do Kwon was more heavily involved

13   and therefore the ultimate decision-maker?

14   "A.  Do Kwon could not have been the final decision-maker

15   because Do Kwon is less experienced than I am, and he knew less

16   about mobile payment service than me.  He doesn't have

17   experience of service development.  I had experience of making

18   games, so for most of the engineering work, especially

19   development, I was mainly the person in charge.  This was how

20   things worked.  It was, rather, Daniel Shin or Do Kwon who were

21   asking me how to make something, "Just go ahead and build it."

22   This was the vibe.

23        "Kangjoon Lee was the PM.  Kangjoon Lee in fact did

24   not know much about mobile payment service, so to me and

25   Hyunjoong Alex Kim, the CEO of Styleket: "Kangjoon, you have

O3SHSec4                        "Kim"

1    to take care of this task if you're the PM."  This is how

2    things worked.  Our company's atmosphere wasn't one where

3    someone would decide and someone would report to another.  This

4    is how I would explain it.

5    "Q.  When it comes to engineering, how deeply was Do Kwon

6    involved in Chai?

7    "A.  He was interested in the service itself.  He was not in a

8    position to take responsibility over engineering matters.

9    That's how I would like to put it.

10   "Q.  So it was a partnership with another company?

11   "A.  Chai and Terra project were in a partnership.

12   "Q.  Just a partnership?

13   "A.  Yes.

14   "Q.  It's difficult to say it was a relationship where he

15   exercised influence internally?

16   "A.  I don't think he exercised much influence over the Chai

17   service internally.

18   "Q.  You said you moved to Terraform Labs Korea.  When did you

19   move to Terraform Labs Korea while working at Chai Corporation?

20   "A.  I remember it to be around March 2020.

21   "Q.  You moved to Terraform Labs Korea in March 2020.  Was the

22   Terraform Labs Korea office in the building different from the

23   building in Seongsu-dong where you worked while you were

24   affiliated with Chai Corporation?

25   "A.  Yes, it was a different building.

O3SHSec4                        "Kim"

1    "Q.  In March 2020, there was the company Terraform Labs Korea,

2    and Chai Corporation also still existed.  Then in March 2020

3    did you move to a different office as your affiliation changed

4    from Chai Corporation to Terraform Labs Korea?

5    "A.  Yes, that is right.

6    "Q.  You said you moved to Terraform Labs Korea.  What were

7    your duties in Terraform Labs Korea after you moved there?

8    "A.  I was in charge of managing the Terra blockchain public

9    infrastructure, then server development tasks, blockchain code

10   review tasks, duties like that.

11   "Q.  Chai launched the Chai Pay service sometime around

12   June 2019?

13   "A.  Yes.

14   "Q.  When the mobile payment service Chai Pay was launched,

15   what was the relationship between Chai and Terraform?  Here

16   Chai means Chai Corporation, and Terraform refers to the big

17   Singaporean company.  What was the relationship between Chai

18   and Terraform?

19   "A.  The two were in a mutually cooperative relationship as

20   Chai mobile payment service is linked to the Terra blockchain.

21   "Q.  Chai Pay is a mobile payment service launched by Chai

22   Corporation, and Terraform Labs Korea is the company that does

23   blockchain.  So the two were in a cooperative relationship, is

24   that what you're saying?

25   "A.  Yes.

O3SHSec4                    "Kim"

1    "Q.  You just answered that Terra coin was launched in between

2    October 2018 and April 2019, right?

3    "A.  Yes, it was April 2019.

4    "Q.  Terra coin, the stablecoin, was released from October 2018

5    through April 2019, and Chai Pay was launched two months later

6    in June 2019.  Terra coin was launched and the mobile payment

7    service business Chai Pay was also launched, meaning the

8    development period for the two largely overlapped.  So you were

9    engaged in both sides, is this a correct summary?

10   "A.  If you are asking whether I engaged in both, then I did

11   engage in both.  With regards to the period, I believe the

12   development of Terra was already ongoing, but there was an

13   overlap in the period anyhow.

14   "Q.  You were in charge of infrastructure development in the

15   Terra project related to Terra coin?

16   "A.  Yes.

17   "Q.  You were involved in the part that was integrated in the

18   work you were doing for the mobile payment services

19   development, right?

20   "A.  Yes, correct.

21   "Q.  There were parts of the development engineering work on

22   both sides where you had no choice but to engage in it, right?

23   "A.  Yes.

24   "Q.  Do you know someone by the name of William Chen?

25   "A.  Yes, I do.

O3SHSec4                    "Kim"

1   "Q.  Where did he work, and what was his role?

2   "A.  We worked together in Korea.  When working for Terraform

3   Labs Korea, William Chen was in the Dev-Relations Team where

4   his duty was to write SDKs that would make it easier for

5   developers to develop, especially writing documents for

6   developers.

7   "Q.  To summarize, William Chen worked at Terraform Labs Korea,

8   and his role was, in order to with developers —— what was that

9   earlier?  Develop SDK?

10  "A.  Yes, SDK development.  It is short for software

11  development kit.

12  "Q.  Do you know Etienne Napoleone?

13  "A.  Yes, I do.

14  "Q.  Where did this person work and what was this person's

15  role?

16  "A.  Likewise, he worked at Terraform Labs Korea and his title

17  was DevOps Engineer.  His duties entailed infrastructure

18  monitoring and management.

19  "Q.  Is Chai a service payment provider of the Republic of

20  Korea?

21  A.  Yes, it is, although the goal was to go global.

22  Q.  It seems like Chai and Terraform collaborated.  How did

23  they do so?

24  "A.  Chai and Terraform were in a collaborative relationship

25  where transactions occurring on Chai were generated on the

O3SHSec4                          "Kim"

1    Terra blockchain as KRT transactions.  I'm speaking in

2    technical terms.

3    "Q.  To repeat that, a transaction that occurred on Chai ——

4    once a transaction was made via Chai Pay, that transaction was

5    moved to the Terra blockchain.  Was this the task?

6    "A.  No, it wasn't transferring but converting into and

7    creating a KRT transaction.  This explanation is from my

8    engineering perspective.  Chai and Terraform had a

9    collaborative relationship because Chai was designed from the

10   beginning as a service linked to the Terra blockchain.  I would

11   put it that way."

12              (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

O3SASEC5                         "Kim"

1    "Q.  You mean, once a transaction takes place on Chai Pay, this

2    was converted into a KRT transaction, right?

3    "A.  Yes.

4    "Q.  How should I understand what it means to convert a

5    transaction that occurred on Chai into a KRT transaction?

6    Payments on Chai were made through traditional currency or

7    traditional payment methods, right?

8    "A.  What do you mean by traditional?

9    "Q.  Traditional payment methods are the most general ones such

10   as paying cash or paying with a credit card.  When consumers

11   make transactions through Chai Pay, I am aware that consumers

12   usually make payments with cash or card or the likes, the

13   traditional payment methods, right?  That's how things worked

14   in Chai Pay?

15   "A.  I think you're referring to other mobile payment services

16   when you say traditional.  At the time, there were a lot of

17   mobile payment services being launched.  So, I don't think they

18   were traditional, but anyway, the difference is that it was

19   linked to the Terra blockchain.  It worked that way in the

20   backend, meaning it had an additional element on top of the

21   traditional part you mentioned.

22   "Q.  Did Chai also provide mobile payment services that did not

23   use Terra?

24   "A.  Yes.

25   "Q.  What was the proportion?  Approximately what was the total

O3SASEC5                       "Kim"

1   proportion for mobile payment service that used the Terra

2   blockchain technology?

3   "A.  100% of the transaction information on Chai's ledger was

4   converted into KRT transactions...what is the intention behind

5   the question...?

6   "Q.  When it comes to mobile payments, mobile payment service

7   using blockchain was available, and other mobile payments using

8   mobile phones or credit cards which were not linked to

9   blockchain technology were also available.  If, as you just

10  mentioned, Chai offered to consumers both those that used

11  blockchain and those that did not, approximately what did the

12  proportion look like?  We're asking what percentage of

13  transactions were made using blockchain versus not using

14  blockchain?

15  "A.  It was 100% linked to the Terra blockchain in the backend.

16  I don't know what the percentage was when it comes to user

17  top-up, but there was a function that allowed users to top-up

18  Chai points with KRT.  I don't know the percentage of use but

19  there was such a function.

20  "Q.  Then, can I take it that everything that was offered used

21  blockchain?

22  "A.  Yes, it is a service where all of Chai's ledger

23  information uses and is linked with the KRT Terra blockchain

24  ledger.

25  "Q.  When it comes to mobile payment service in Chai Pay, the

O3SASEC5                          "Kim"

1    payment is made with the Terra blockchain.  Can you say so?

2    "A.  Chai and Terra are linked.  The Chai mobile payment

3    service and Terra blockchain are linked.  I'm using this

4    expression repeatedly.

5    "Q.  When you say they were linked, does it mean that payments

6    are made by the Terra blockchain?  Linkage is when two things

7    are connected together, and you keep using the word link.  When

8    you say Chai Pay and Terra blockchain were linked, do you mean

9    transactions were actually made with the Terra blockchain?  Or

10   does it mean that while payments were made traditionally on

11   Chai Pay, it was simply linked in the backend so they were

12   linked?  What do you mean by link?

13   "A.  It was not merely connected on the backend.  I rigorously

14   developed the algorithm and I personally made enormous efforts

15   to link it to the Terra blockchain from the beginning, so it

16   should be seen as one whole thing in its entirety, included in

17   the whole payment process.

18   "Q.  Could you explain the linkage system you developed in

19   simpler terms regarding how blockchain is used from the point a

20   consumer makes payment to the point where it is processed?

21   Let's say I paid for a good that is 1,000 KRW using the Chai

22   linkage program.  What happens next?

23   "A.  Yes, in that case, you have created your account and you

24   have Chai points topped-up.

25   "Q.  What do I top-up Chai points with?

O3SASEC5                          "Kim"

1    "A.   There are two ways.  One is to link to a bank.

2    "Q.   A bank account?

3    "A.   Yes, and then, there's the function of topping-up with KRT

4    by connecting with the Terra station.  These were the two ways.

5    "Q.   What exactly is KRT?

6    "A.   KRT is a stablecoin that corresponds 1:1 with the Korean

7    Won.

8    "Q.   So, it is a coin made by Terraform?

9    "A.   Yes.

10   "Q.   Let's say I purchased a good by topping-up with KRT and a

11   bank account.  Then, what happens in the program?

12   "A.   If the user makes the final approval, then, the Chai app

13   sends certain approval request to the Chai API server over the

14   internet.  Afterwards, the Chai API server receives it on its

15   end, and after verifying everything like "the information sent

16   by this person is correct.  This person is the user," it

17   verifies all those information and then checks whether "there

18   is or isn't remaining Chai points balance," after which,

19   proceeds with a remaining approval process.  Programmatically.

20   Then, at that point, data in the Chai database is looked up to

21   make sure that it's all correct, after which, under the same

22   function is a concept called LP, the concept of LP server.

23   That is where this data is, there is a concept called LP queue,

24   registered on the LP queue on Chai's end.

25          The reason for registering on the LP queue is to

O3SASEC5                         "Kim"

1    transmit the data in the queue layer to the LP server - the LP
2    server managed by Gaza Labs.  After doing so, the LP server
3    receives the data, wakes a wallet if it needs to, a crypto
4    currency wallet.  It makes a wallet - it makes it through the
5    symmetric algorithm in order to quickly digest the data, uses
6    the multisend function of the Terra blockchain to create a KRT
7    transaction, which is uploaded on the blockchain.  This is how
8    linkage works.
9    "Q.  You just said there are two methods of payment.  One is,
10   from the customer's standpoint, simply connecting to a bank
11   account to put money into Chai Pay, which means, in the end,
12   the customers bank account money goes in.  Next, the second
13   method is where KRT is used to top-up, KRT coin instead of
14   money is topped up and what is topped up in Chai Pay is used to
15   make payment.  Earlier, you said you didn't know the percentage
16   of top-ups using KRTs - do you really have no idea?
17   "A.  When the KRT top-up was made, I was working at Terraform
18   Labs Korea, I wasn't working at Chai, so honestly, I don't know
19   the exact proportion.  But, since I personally heavily used
20   that function, and since the Terra community in Korea greatly
21   welcomed this function, from my standpoint, I thought "it is
22   heavily used.  This is very rewarding."  So I don't know the
23   exact proportion.
24   "Q.  I will skip item d of number 34 for now.  Did Terraform
25   and Chai have overlapping employees and shared office space?

O3SASEC5                      "Kim"

1    For this one, the same office was shared until the separation,

2    split early 2020, and as they split, the offices were both in

3    the same Seongsu-dong but separate with a distance of 10 to 15

4    minutes by foot in between, correct?

5    "A.   Yes.

6    "Q.   Number 35, who were the main employees that worked at Chai

7    in 2019?

8    "A.   Chai's main employees were Daniel Shin, Do Kwon, Changjoon

9    Han... Up to whom can be deemed as main?

10          THE COURT:  I think unfortunately we've reached as far

11   as we can go today, so we'll continue tomorrow.

12          So, ladies and gentlemen, good work.  Tomorrow we'll

13   start at 9:30, so we'll see you then.

14          You can step down.  We'll see you at 9:30.

15          THE WITNESS:  Thank you.

16          (Continued on next page)

17

18

19

20

21

22

23

24

25

O3SASEC5

1           (In open court; jury not present)

2           THE COURT:  Please be seated.  So my law clerk will

3   hand out to counsel my rulings on the Do Kwon submissions.  I

4   took a look at the un-redacted copies of those four complaints

5   that had been introduced during Mr. Myung's testimony and I

6   conclude that impeachment in the original form, the redacted

7   form, is proper and that completeness does not require the

8   inclusion of anything else.  So those will stand as is.  And

9   I'll give my law clerk the copies of the un-redacted exhibits

10  to return to defense counsel.

11          I received a memorandum of law and a motion to quash

12  the trial subpoena from Kanav Kariya.  What he's mainly

13  complaining about is having to come from Illinois here.  That

14  can be solved by having him appear remotely.  He also mentions

15  that he was under the impression, which I understand, there's

16  going to be a stipulation, but apparently there is not.

17          So unless counsel have reached some other agreement,

18  we'll just have to have him appear by video or by some virtual

19  Zoom or other process at the appropriate time, and we'll need

20  to be able to notify him in advance of what that is.  I think

21  there's going to be a similar motion from another witness,

22  though I haven't received it yet.

23          So any thoughts on any of that?

24          MS. CUELLAR:  No, your Honor.  The SEC is fine with

25  remote appearance.

O3SASEC5

1          THE COURT:  Okay.

2          MR. CALIFANO:  Your Honor, the government hasn't been

3    able to reach an agreement with the SEC on a pure stipulation,

4    so this is the way we'll have to proceed with those two

5    witnesses I think.

6          THE COURT:  Okay.  So now when is the SEC planning to

7    call this witness?

8          MS. CUELLAR:  Your Honor, we had hoped for Monday.

9          THE COURT:  Yeah.

10          MS. CUELLAR:  With the current schedule, it may be

11    Tuesday.  I'm sorry.  It's hard to predict the length.  We can

12    only predict direct, your Honor.

13          THE COURT:  Well, the only possible way out of that is

14    to sit on Sunday.

15          MS. CUELLAR:  I don't know that our jury would like

16    that, your Honor, but the rest of us from D.C. wouldn't mind.

17          THE COURT:  Well, maybe we will not do that.  So,

18    okay.  Figure out with your adversary.  I want to be able to

19    give these witnesses a fairly tight time.  And also work with

20    my law clerk and my courtroom deputy to arrange the video or

21    the transmission rather.  And we'll take them Monday or Tuesday

22    as the case may be.

23          MS. CUELLAR:  And for clarity, your Honor, this is the

24    hearing outside the jury for you to determine if the *LiButti*

25    factors are met.

O3SASEC5

1          THE COURT:  Well, if that's the only issue, and then

2     you would enter the stipulation, I didn't understand that was

3     defense counsel's position.

4          MS. CUELLAR:  What the SEC would like is the

5     stipulation and then the video designations -- the video played

6     of the designations that your Honor has ruled -- or we

7     anticipate, you said you're leaning towards ruling, are

8     admissible.

9          THE COURT:  So my question is this, assuming the

10    factors are met, either side would have a right to have him

11    take the stand and take the 5th as to any and all questions.

12    An extraordinary waste of time to say the least.

13         MS. CUELLAR:  Right.

14         THE COURT:  But that's, you know.  But if you're not

15    going to or if you don't want to do that, you're happy -- if I

16    rule that his testimony is admissible under the four factors

17    you mentioned, then my understanding is at that point, you're

18    willing to have the jury just hear the stipulation, plus the

19    taking the 5th in the deposition.

20         MS. CUELLAR:  Yes, that is what the SEC would prefer,

21    your Honor.  And we understand the need to move with alacrity,

22    so we were actually working to reduce the amount of the video

23    to be played to make it less prejudicial.

24         THE COURT:  That's music to my ears.  So what's the

25    defense view in all of this?

O3SASEC5

1          MR. CALIFANO:  Your Honor, the defense view was that

2     what is relevant and probative to the jury is the assertion of

3     the 5th, not the questions that these witnesses are being

4     asked.  And, frankly, one of the difficulties with the

5     recordings of that deposition are there may have been questions

6     that the SEC asked that were directly pertinent to what they

7     were trying to discover.  But with respect to the questions

8     that defendants had asked, they were mostly with respect to

9     *LiButti* factors, not with respect to any of the ultimate issues

10    here.  And we'd like that opportunity, especially if we're not

11    going to be able to agree to just a straight stipulation, which

12    is what we think is the least prejudicial and carries all the

13    probative value of an assertion.

14         THE COURT:  So I guess the question is this, assuming

15    other factors are met, I would normally instruct the jury that

16    they can, if they wish but are not required to, draw an adverse

17    inference against the witness, and assume that he is refusing

18    to answer because the answers would indeed be favorable to the

19    offering party, in this case, the SEC.

20         Now, if you're uncomfortable with that all, then

21    that's fine.  But I wasn't clear that that was what you were

22    comfortable with.

23         MR. CALIFANO:  If I understand the Court, if we are in

24    a situation, your Honor, where the SEC is going to play

25    selected video pieces of the deposition --

O3SASEC5

1          THE COURT:  No.  I'm talking if we went the route

2    you're recommending, just a stipulation that he will take the

3    5th as to all questions.

4          But I think in those circumstances, given that this is

5    someone the SEC is -- that the offer is from the SEC, that the

6    jury should then be told that you can, if you wish, you don't

7    have to, draw an adverse inference that the reason he's taking

8    the 5th is that his testimony would support the position of the

9    SEC.  Now, if you don't want anything that broad, then I think

10   we do get into having specific questions.

11         MR. CALIFANO:  Your Honor, I believe we're still in

12   the latter situation.  But could I have a moment to consult

13   with counsel?

14         THE COURT:  I'll tell you what, I've got to leave for

15   the usual reasons.  So think about this we'll see you all at

16   9:00 tomorrow and take it up then.

17         (Adjourned to March 28, 2024, at 9:00 a.m.)

18

19

20

21

22

23

24

25

1                        INDEX OF EXAMINATION

2      Examination  of:                              Page

3      AARON MYUNG

4      Cross By Mr. Kornblau . . . . . . . . . . . 595

5      Cross By Mr. Morel . . . . . . . . . . . . 693

6      Redirect By Ms. Staren . . . . . . . . . . 697

7      Recross By Mr. Kornblau . . . . . . . . . . 706

8      CHRISTOPHER FERRANTE

9      Direct By Ms. Cuellar . . . . . . . . . . . 712

10     Cross By Ms. Stovall . . . . . . . . . . . 731

11                       DEFENDANT EXHIBITS

12     Exhibit No.                                Received

13      306b   . . . . . . . . . . . . . . . . . 597

14      319   . . . . . . . . . . . . . . . . . . 606

15      1945   . . . . . . . . . . . . . . . . . 643

16      346   . . . . . . . . . . . . . . . . . . 659

17      348   . . . . . . . . . . . . . . . . . . 662

18      346 and 349  . . . . . . . . . . . . . . 665

19      355   . . . . . . . . . . . . . . . . . . 672

20      1215, 1039, 1016, 325, 323, . . . . . . . 747

21             324

22                       PLAINTIFF EXHIBITS

23     Exhibit No.                                Received

24      93a  . . . . . . . . . . . . . . . . . . 705

25      87   . . . . . . . . . . . . . . . . . . 714

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

 1    88       . . . . . . . . . . . . . . . . . 717

 2    102B      . . . . . . . . . . . . . . . . 720

 3    98       . . . . . . . . . . . . . . . . . 722

 4    101A      . . . . . . . . . . . . . . . . 727

 5    223      . . . . . . . . . . . . . . . . . 729

 6    350      . . . . . . . . . . . . . . . . . 729

 7    224      . . . . . . . . . . . . . . . . . 730

 8    351      . . . . . . . . . . . . . . . . . 730

 9    352      . . . . . . . . . . . . . . . . . 730

10    169      . . . . . . . . . . . . . . . . . 730

11    148A and 148B, 152A and . . . . . . . . . . 747

12              152B, 158, and 163

13    155      . . . . . . . . . . . . . . . . . 747

14

15

16

17

18

19

20

21

22

23

24

25