O3TASEC1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

SECURITIES AND EXCHANGE
COMMISSION

          Plaintiff,

        v.                        23 Civ. 1346 (JSR)

TERRAFORM LABS PTE LTD. , et
al.

          Defendants

------------------------------x

                          New York, N.Y.
                          March 29, 2024
                          9:29 a.m.

Before:

               HON. JED S. RAKOFF

                        District Judge
                        -and a Jury-

                 APPEARANCES

UNITED STATES SECURITIES AND EXCHANGE COMMISSION
    Attorneys for Plaintiff
By:  JAMES P. CONNOR
    DEVON STAREN
    CARINA CUELLAR
    LAURA E. MEEHAN
    CHRISTOPHER J. CARNEY
    ROGER LANDSMAN

O3TASEC1

1                              APPEARANCES (Cont'd)

2  DENTONS US LLP
        Attorneys for Defendant Terraform
3  BY:  LOUIS A. PELLEGRINO III
        DAVID KORNBLAU
4       MARK CALIFANO
        DOUGLAS W. HENKIN
5       MATTHEW A. LAFFERMAN
        AMAIANNA STOVALL
6       AYLSSA LANDOW
        MELISSA GOMEZ NELSON

7

8  KAPLAN HECKER & FINK LLP

9       Attorney for Defendant Kwon
   BY:  MICHAEL FERRARA
10      CHRISTOPHER MOREL
        DAVID E. PATTON
11      ANDREW CHESLEY
        SEAN HECKER

12

13  Also Present:

14  Shadow Haywood, SEC Trial Assistant

15  Armando Aquino, Defense Trial Assistant

16

17

18

19

20

21

22

23

24

25

O3TASEC1

```
 1                (In open court; jury not present)

 2                (Case called)

 3                THE COURT:  Please be seated.  All right.  Where do we

 4      stand on the 5th Amendment.

 5                MS. CUELLAR:  Your Honor, I believe -- oh the 5th

 6      Amendment.  The parties are still discussing.  We don't have a

 7      resolution I believe on the issue yet.  The SEC's position is

 8      still that it would prefer to have the stipulation and play the

 9      video clips, which we have cut down substantially.  And all

10      together, for the three witnesses, I think we'd like to keep it

11      to 45 minutes or less.

12                However, the stipulation that we understand the Court

13      proposed yesterday would also be acceptable to the SEC and then

14      we would not play video.  But our understanding is the

15      defendants would like a different type of stipulation and we

16      would not agree to the type of stipulation they would like.

17      And I can ask them to represent the type of stipulation.

18                THE COURT:  Yeah, let me hear from defense counsel.

19                MR. CALIFANO:  My apologies, your Honor.  I want to

20      make sure I understand the proposal that the Court had on the

21      stipulation because I don't want to pass an opportunity to try

22      to resolve this.  So I think if Ms. Cuellar could just confirm

23      for me, my understanding, I'm not sure I understand what

24      exactly the terms of the Court's stipulation would be.  Our --

25                THE COURT:  I haven't suggested any stipulation.
```

1          MR. CALIFANO:  Okay.

2          THE COURT:  I just left it to you guys.

3          MR. CALIFANO:  I'll make it very clear, your Honor, to

4     put a point on it.  The stipulation that the defendants would

5     agree to would be the stipulation that indicates that these

6     witnesses, particularly Mr. Kariya and Mr. DiSomma, intend to

7     assert the 5th to any questions asked.  We had proposed, and

8     that is part of what the stipulation that the SEC has, we would

9     propose that with respect to the SEC's desired framed specific

10    questions, we would be willing to have the SEC include those

11    questions in the stipulation, provided we are able to include

12    our own questions in response to that to properly frame this.

13    That's what's important, your Honor.  If we had a written

14    stipulation like that, the defendants would be fine with that.

15    And we would be happy to do it for the witnesses involved in

16    the case.

17         THE COURT:  Well, I'm not sure.  These are questions

18    that both you and the SEC put at the deposition?

19         MR. CALIFANO:  Your Honor, the problem is, at the

20    point in time at which we had those depositions, a lot of

21    information that we have gathered since that point about what

22    jumped in and how it did, was not available.  And the questions

23    we asked during the deposition were primarily used to frame the

24    LiButti issue.  We were not able to ask all the questions we

25    would like to ask about the ultimate issues.

1          That's the problem with using the deposition video

2     because we don't have those questions to respond to those.  We

3     would like that opportunity and we feel that's a fair thing to

4     ask given this is going to be argued before the jury, about

5     whether or not the jury may find an inference.

6          THE COURT:  What I'm confused about is are you saying

7     that you want to put in the stipulation that the witness would

8     take the 5th with respect to a question where it was never put

9     to the witness?

10          MR. CALIFANO:  Yes, your Honor.  That's what we

11     would -- if that's not appropriate, your Honor, then we'll have

12     to call the witnesses because we don't have those questions in

13     the deposition.

14          THE COURT:  Yeah.

15          MS. CUELLAR:  Your Honor, it's our position that the

16     defendants don't get to ask the questions because they have not

17     met the LiButti factors, so they would not rate the inference.

18     Therefore, any answers to their questions are irrelevant and

19     not probative.

20          THE COURT:  I'm sorry, because?

21          MS. CUELLAR:  Because they do not rate the inference

22     because they have not met the LiButti factors.  Any answers to

23     their questions are irrelevant.

24          THE COURT:  In what way have they not met the factors?

25          MS. CUELLAR:  Well, your Honor has said that you are

1    leaning in the direction of finding that the SEC has met the

2    LiButti factors.

3         THE COURT:  Yeah, I'm still leaning that way.

4         MS. CUELLAR:  So if we met the LiButti factors, the

5    defendants can't possibly meet the LiButti factors because --

6    because we've met the LiButti factors.  It's sort of a zero-sum

7    game.

8         THE COURT:  Well, I guess the question is this,

9    normally, and by which I mean in the relatively few cases where

10   this issue has arisen, it's been a waste of time to call the

11   witnesses because all they do is sit there and take the 5th as

12   to every question.  And inevitably in that situation, the one

13   side, the side calling him says "isn't it true that X," and

14   they take the 5th, thereby giving rise to the permissible

15   inference that the answer would have been yes.  And then the

16   other side says "and isn't it true that non-X."  And they take

17   the 5th again.  And then the defense says, well, you see

18   there's no basis for raising an inference because they're

19   taking the 5th across the board.

20         There is case law, though it's quite limited is my

21   recollection, that suggests that nevertheless because of how

22   the witnesses are positioned, the inference is really only

23   available to one side.  And that would be the subject of a

24   court instruction.  But I don't know that that requires

25   anything more than a stipulation, that in my hypothetical,

O3TASEC1

1    Jones was the executive vice president of company X.  Company X

2    is the defendant in my hypothetical case.  Jones, it's

3    stipulated by the parties and by his counsel, would take the

4    5th to all questions involving any alleged fraud at the X

5    company.  And the jury may if it wishes infer an adverse

6    inference, but they're not required to.  Something like that.

7    That's what I think the law is but I'm willing to be educated

8    to the contrary if someone has some case law to the contrary.

9         MS. CUELLAR:  Your Honor, we concur with your

10   assessment of the case law, as of course your Honor knows a

11   tremendous amount about the case law.  I think the SEC is

12   comfortable with the verbiage that you were proposing to

13   instruct the jury.  It does not believe the witnesses need to

14   attend.

15        THE COURT:  Okay.  So let me see what defense has to

16   say about all of this.

17        MR. CALIFANO:  Your Honor, if we look at -- first of

18   all, I think, your Honor, that case law like *650 5th Avenue*

19   clearly counsels that stipulations are a preferred form of

20   presenting this to the jury.

21        THE COURT:  Yeah.  Although, I mean there's nothing in

22   that case that says if the parties can't stipulate that you

23   can't call the witness.  They suggest that a stipulation is

24   preferable, but they don't say, you know -- no court in the

25   world can require a party to stipulate.

1          MR. CALIFANO:  I understand that, your Honor.  And I

2     think the concern we have, even with the stipulation that

3     you've described, especially the end of that stipulation, which

4     is to suggest that any questions asked with respect to the

5     alleged fraud means that -- it's still a framing issue and the

6     problem with the framing and with the questions of any lawyer

7     are they are not evidence.  The evidence here is that

8     assertion.

9          The reason we have a problem with the way that

10    stipulation is phrased is because it is focused on the fact

11    that questions asked about the fraud would be responded to by

12    an assertion of the 5th.  And if that's the case, we want to

13    call those witnesses so that we have the opportunity to at

14    least ask a few questions to complete the framing.  Because

15    really what we're talking about once that happens is the

16    framing of that issue before the jury.

17         THE COURT:  Yeah.  So I think we need to move on.  We

18    can't take more time right now.  Why don't we do the following,

19    I know you were planning to spend the weekend going clubbing,

20    but in the alternative, why don't you send me each your

21    proposed stipulations and any case law that you want many me to

22    take a look at.

23         Again, I can't force a stipulation, so if we have to

24    call these witnesses -- now, the witnesses have moved to quash

25    the subpoenas.  Two of them.  And so we at least need to let

O3TASEC1

1    them know where things stand.  But what I'll do is I'll have my

2    law clerk advise them that the matter will be resolved one way

3    or the other no later than Monday.  And if they have to appear,

4    they'll need to appear say by Wednesday latest.  And then I'll

5    take a look at the stipulations and the case law and then we

6    can discuss it first thing Monday and see where we stand.

7         Okay.  Anything else?

8         MR. PELLEGRINO:  Yeah, just briefly, your Honor.  I

9    have a motion related to Paul Kim who's being examined now.

10   It's a small, but important motion for reconsideration on one

11   objection that your Honor considered.  And may I hand something

12   up related to that, your Honor?

13        THE COURT:  Yeah.

14        MR. PELLEGRINO:  So, your Honor, on the left side --

15        THE COURT:  Hold on.  Hold on.  Let me just take a

16   look at this.

17        MR. PELLEGRINO:  Sure.

18        THE COURT:  Okay.  Go ahead.

19        MR. PELLEGRINO:  Let me start with the right side,

20   your Honor.  On the right side, that is an excerpt from

21   Mr. Kim's deposition who's about to continue his testimony in a

22   moment.  Your Honor excluded that on the grounds of leading,

23   argumentative, and speculation.  Those were the grounds the SEC

24   asserted.  We can talk about those objections.  But my motion

25   is to reconsider particularly based on what was admitted on the

O3TASEC1

1    left-hand side, which was Mr. Myung's testimony yesterday going

2    to the ultimate issue about whether Chai was in fact real or

3    not real.  He says that Chai never settled with any of those

4    merchants in crypto assets.  Mr. Kim, on the right-hand side

5    directly addresses that in his deposition.

6            Again, it's the ultimate issue in the case and we've

7    been talking about opening the door throughout this week.  So

8    our motion is based on the fact that Mr. Myung testified about

9    this issue and I believe, as you said yesterday, the jury

10   should be allowed to hear evidence on both sides and weigh the

11   assertions as to whether Chai was in fact --

12           THE COURT:  As you can see from my rulings on all

13   these depositions, I've if anything leaned over backwards to

14   include over objection a great deal of what the defense

15   offered.  For example, with respect to Do Kwon, I approved

16   every single suggestion from the defense notwithstanding the

17   nonfrivolous objections made by the SEC.

18           So, remind me, because I don't have it in front of me.

19   The objections to this -- this was a question put by defense

20   counsel?

21           MR. PELLEGRINO:  Yeah, it was our representative who

22   put the question to him, your Honor.

23           THE COURT:  Yes.  And so it is flagrantly leading.

24   It's also a multipart question.  Although I'm not sure there

25   was an objection on grounds of form, and that might be

O3TASEC1

1    therefore waived.

2            And something that the jury has already heard a lot

3    of, but from witnesses who could be more cross-examined about

4    it because they're right here in court, is the ambiguity that

5    has emerged as what "settlement" means in this context.  So why

6    isn't this a flagrantly leading question?

7            MR. PELLEGRINO:  Well, your Honor, as we've already

8    heard because we've seen half of his testimony roughly, the way

9    the questions were put to this witness in Korea, almost all of

10    them are compound or leading.  I think we just have to deal

11    with the way that they're put to that witness in Korea.

12            THE COURT:  Again, because I don't have in front of me

13    what were the other objections that were raised.

14            MR. PELLEGRINO:  They were leading, argumentative,

15    calls for speculation.

16            THE COURT:  Yeah.  Well, it doesn't call for

17    speculation.  I think it is argumentative.  Any question that

18    begins with the words "to sum up" is argumentative on its face.

19            But let me ask SEC counsel, because again, I don't

20    have the transcript right in front of me:  Why aren't those

21    arguably objections to form?  And if they weren't raised at the

22    time then they've been waived.

23            MR. CARNEY:  Your Honor, because to me, it's not clear

24    that that proceeding, which took place before a Judge in

25    Korea --

O3TASEC1

1          THE COURT:  You're right.  So you weren't there to

2     make an objection, or at least it's a much more awkward

3     situation.  The only time it's not awkward to object to a

4     Judge's question is in this trial.

5          MR. CARNEY:  Your Honor, yeah, what I was suggesting

6     is that from reviewing that transcript, it did not appear that

7     there were any objections made to any questions.  So it wasn't

8     clear to us that there was even an opportunity, but your Honor

9     might recall that our objections to the testimony they

10     designated were sparring, I'd say, and this one stood out

11     because for the reason --

12          THE COURT:  I think the bottom line is that this is

13     really just a summation masquerading as a question, and I'm not

14     going to permit that.  So the objection is sustained.

15          MR. CARNEY:  Thank you, your Honor.

16          MR. PELLEGRINO:  May we mark that as a Court Exhibit,

17     your Honor, please.

18          THE COURT:  Yes, of course.

19          MR. PELLEGRINO:  Thank you.

20          THE COURT:  This is Court Exhibit 3.  As opposed to

21     Plaintiff's or Defendants' Exhibits 2,745.  I'll give to it to

22     my law clerk.

23          I take it the jury is here?

24          THE DEPUTY CLERK:  Yes.

25          THE COURT:  Let's bring in the jury and continue with

O3TASEC1

1    the playing of the deposition.

2              (Continued on next page)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O3TASEC1                          "Kim"

1             (In open court; jury present)

2             THE COURT:  Good morning, ladies and gentlemen.

3     You're so good at being on time.  You may wonder why we are

4     starting 15 or 20 minutes late.  The answer is we all get

5     together at 9:00 a.m. and discuss legal matters and sometimes

6     those are difficult to resolve until we've heard fully from

7     both sides.  So you have to forgive us for not starting

8     promptly at 9:30, but we are ready to proceed now.  And I will

9     note for the record the really smashing outfit of Juror No. 8.

10    I'm blown away by it.

11            Let's continue.

12            MR. LANDSMAN:  So we're going to continue with the

13    testimony of Paul Kim.

14            THE COURT:  Paul Kim, yes.

15            MS. LANDOW:  Good morning.  I'll introduce myself

16    Alyssa Landow, counsel for defendant Terraform Labs.

17            (Reading)

18    "Q. Do Kwon practically did not involve in the work going on at

19    Chai Corporation after the split in early 2020?

20    "A. That is not an area of my knowledge.  I don't think he did

21    because he was too busy.  I saw him every day in the office.

22    "Q. Are you saying he "was not involved"?  Or "you were engaged

23    in development only that you did not know what the bosses were

24    up to – whether he was involved or not?"

25    "A. I'm not him so I don't know 100 percent.  But that is my

O3TASEC1                     "Kim"

1    opinion, at least.  "I think he was not involved."

2    "Q. You explained earlier that when the two companies split,

3    they parted ways due to their different pace as Terra

4    blockchain had to be quick and active while the Chai mobile

5    payment business operated within the regulatory laws under a

6    license or registration from the Financial Supervisory Service.

7    In that case, were there ever talks internally along the lines

8    of "this is the only way due to this regulatory issue.  This

9    regulatory issue makes it is difficult to bring Chai Pay

10   along?"

11   A.  I don't really know about those things since I was busy

12   with work.  There wasn't such a vibe.  Within my work scope.

13   "Q. Are you saying that you were not involved in talks about

14   regulatory issues since you only engaged in technical matters

15   and you never heard talks about "splitting up due to

16   regulations?"  How can we summarize your stance?

17   "A. To explain precisely, in order to be a mobile payment

18   service provider, the regulation compliance requirements are

19   quite strict, and it was my first time.  So, on a personal

20   level, since the technical aspects and infrastructure

21   management had to comply with regulations, I put in my utmost

22   effort to comply with the regulations such as network

23   separation.  Despite extremely uncomfortable circumstances for

24   a computer engineer, I tried so hard at Chai to comply with

25   regulations as I recall, and this was my personal experience.

O3TASEC1                    "Kim"

1    "Q. Were you the lead of the infrastructure team?

2    "A. Yes.

3    "Q. Did the infrastructures team's work include building a

4    robust technical foundation for the Terra ecosystem?

5    "A. Yes, correct.

6    "Q. I will move onto the question about the LP server.  Number

7    42, what is the LP server?

8    "A. LP server is a project that receives ledger information

9    from Chai and generates KRT transactions on the Terra

10   blockchain.

11   "Q. It receives ledger information from Chai and generates KRT

12   transactions on the blockchain?

13   "A. Yes.  To add to that, it was designed that way since the

14   initial phase of the Chai Pay design.  But the operator of the

15   LP server was Gaza Labs.

16   "Q. What are the processes and resources, such as code,

17   databases, server hosting services, hardware, etc., that were

18   required or used for the LP server's functionality?

19   "A. As I've mentioned earlier, the LP server was run on the

20   Naver Cloud Platform, and then there were components necessary

21   to run the LP server on Chai's end, and on Chai's end, the

22   components required for running the LP server were operated

23   together within Chai's infrastructure.  Do I have to tell you

24   the specs too?  In the Linux operating system.

25   "Q. In your role as Terraform's chief engineer, did you

O3TASEC1                              "Kim"

1   interact with the LP server?

2   A.  As a member of Terraform Labs Korea, I did monitoring,

3   maintenance and repair of the LP server.

4   "Q. You continued to handle maintenance and repair tasks even

5   after moving to Terraform Labs Korea.  That is what you are

6   saying, correct?

7   "A. Yes, correct.

8   "Q. In fact, you created the LP server, correct?

9   "A. Yes, I wrote the code.

10  "Q. Then who asked you to create the LP server?

11  "A. As I've already told you, in the initial ideation phase,

12  when it comes to the design itself, be it database design or

13  API server development, Chai was developed with the linkage to

14  the Terra blockchain in mind.  No one asked me to create it.

15  We discussed "how can we make this"?  And then, "for this, can

16  I do it this way?" I asked one by one, "can I do it this way,

17  can I do it that way?"  This is how decisions were made, and I

18  wrote the server implementation code accordingly.  Rather than

19  someone giving me a direction or a request, it was a

20  prerequisite, so I made it on my own without anyone asking me

21  to.

22  "Q. Did anyone else help you?

23  "A. Someone helped me with a little bit of bug fixes.  When

24  something didn't work well, Yun Yeo gave almost 1% help and I

25  made the entire 99 percent.

O3TASEC1                          "Kim"

1    "Q. What was the LP server's purpose?

2    "A. The purpose of the LP server is to play the role of

3    receiving changes to the ledger information from Chai and

4    uploading KRT transactions on the Terra blockchain.

5    "Q. Did you say KRT transactions were generated by receiving

6    changes to the ledger information from Chai?

7    "A. Yes.

8    "Q. What does it mean to generate KRT transactions?  The entire

9    ledger is in Chai, right?

10   "A. No, the KRT ledger for Chai is on the Terra blockchain, and

11   the ledger for Chai is on Chai's database server.

12   "Q. But you said the LP server receives ledger information from

13   Chai, right?

14   "A. Yes.

15   "Q. The ledger information is in Chai – doesn't this mean that

16   the ledger is Chai's ledger?

17   "A. Yes.  Withdrawal, top-up, cancellation, things related to

18   settlement with merchants in addition to payments. . . all such

19   information makes changes to Chai's ledger.  Such changes are

20   received by the LP server, which then creates a linked KRT

21   transaction.  A transaction function called multisend is used

22   to rearrange the information, and there is a special algorithm.

23   It plays the role of making such information into a blockchain

24   transaction.

25   "Q. What I want to know is, the LP server receives the

1    transactions that are already on Chai's ledger and brings over

2    the transactions to express them on the blockchain.  To put it

3    in simpler terms, I will just change the question.  If KRT

4    transactions on the blockchain or the LP server don't exist,

5    does the payment not go through on Chai?  If the LP server is

6    down or nonexistent, would this cause disruption for ordinary

7    people making transactions on Chai or not?

8    "A. Some parts would be disrupted, yes, they would.  This is

9    where I would put in a lot of work as an engineer.  Especially,

10   in case Chai or Terra faces failure or disaster, or in case

11   either of them has a bug, in order to ensure that at least this

12   ledger information remains perfect and that the function runs

13   perfectly, I created queues on both sides.  Such steps required

14   way too much effort to be underestimated.  I designed and

15   created a robust structure, so it is not something that can be

16   underestimated.

17   "Q. Where were the various components of the LP server located

18   or stored?

19   "A. It sounds like a redundant question.  There is something

20   called LP dispatcher within the Chai infrastructure, and there

21   is a queue for that LP dispatcher.  Next, there is an LP module

22   in Chai's API server.  There are a total of three things.  If

23   Chai's API server enters data into the LP queue, the queue

24   layer, through the LP module, the component called LP

25   dispatcher transmits the data in the queue layer to the LP

O3TASEC1                    "Kim"

1   server on Gaza Labs' hosting server, puts the data on a

2   different queue layer on LP's end, which is called WAL.  Write

3   Ahead Log.

4   "Q. Could you repeat?  W . . .

5   "A. WAL, Write Ahead Log.  This queue layer is called WAL in

6   engineering terms.  WAL, write ahead log.

7   "Q. Could you repeat one more time?  W . . .

8   A.  Write ahead log.  That is where the data goes before the LP

9   server digests or processes the data.  That was how things were

10  located and operated.

11  "Q. Did you say there were three LP components?  Could you name

12  them once again?

13  "A. I think there were a total of five.

14  "Q. Five?  Could you just simply name the five components once

15  again?

16  "A. There is the LP library module in the API server within

17  Chai's infrastructure, and on Chai's end, the LP queue, queue

18  layer in a database called Redis server.  The LP queue that

19  played the role of Write Ahead Log.

20  "Q. Where were the components above hosted?

21  "A. Chai was on Chai's Naver Cloud Platform, and on Gaza Labs'

22  end, there is a Naver Cloud Platform.  There was a Naver Cloud

23  Platform that was owned by each.

24  "Q. Both used the Naver Cloud Perform.  Anyway the respective

25  hosting account was under each one's name.  There was one under

O3TASEC1                         "Kim"

1   Chai Corporation's name, another under Gaza Labs' name.  Is
2   this what you are saying?
3   "A. I think I would be able to answer better if I you clarify
4   the intention of your question.  If I get into it completely
5   technically, there are some differences to be exact.  It is
6   true that we did something with the Naver Cloud Platform, but
7   Chai Corporation did something called a hosting service rack
8   lease, which is a slightly different arrangement.  Do you need
9   this level of details in the answer?  If I understand your
10  intention, then I can. . .
11  "Q. Who did you communicate with about the LP server?
12  "A. I talked to Do Kwon about how it should be linked only and
13  I handled all the actual development work.
14  "Q. Did Do Kwon supervise the creation of the LP server?
15  "A. He was not involved in writing the code for the LP server
16  at all, but simply told me the specs.  He didn't supervise.
17  Since what I made is transparently public on the blockchain, do
18  Kwon simply checked whether I did a good job.
19  Q.  Did Do Kwon explain why he was so interested in the LP
20  server?
21  "A. The reason for him being so interested.  Interested. . .
22  "Q. The purpose of the LP server. . .
23  A.  I think he must have been interested because the LP server
24  played the role of linking Chai's mobile payment service to the
25  Terra blockchain.

O3TASEC1                         "Kim"

1    "Q. What was the relationship between the LP server and Chai?

2    "A. As for the LP server, Chai's API server through the LP

3    module . . . it is actually the same question.  It was there

4    because the data that was passed on through the LP module,

5    through the LP dispatcher to the LP server was processed on the

6    Terra blockchain.

7    "Q. You're saying that the answer is the same as what was asked

8    before.  I will take it as that.  For number 47, the answer to

9    the earlier question will do.  In that case, did the LP server

10   copy transactions onto the Chai blockchain?

11   A.  No.  You can't deem it as simple copying.  Should I explain

12   why?

13   "Q. If it's not copying, why can't we see it as copying?

14   "A. If the purpose was to simply copy, I would not have worked

15   so hard to make the algorithm.  All the complex process of

16   designing against all potential failure, connectivity issues,

17   put WAL queue and queue layers on both ends, and then the

18   multisend . . . Take blockchain for instance, since blockchain

19   at the time did not have such great capacity for processing

20   transactions there was the batch algorithm.  We couldn't make

21   that without the batch algorithm that created multisends.  This

22   is not something that can be reduced to simply copying.

23   "Q. Are you saying that it wasn't copying because there was a

24   conversion process that used a certain blockchain technology or

25   algorithm?

1   A.  Yes, even the originals are different.  For instance, when

2   you say copying, if you copy a document, the two documents

3   should have the same content, right?  But since Chai had a lot

4   of additional information for mobile payment service and the

5   blockchain only handles the pure ledger information, the two

6   data have different raw data.  The form is different, the data

7   structure, content structure are different.

8   "Q. You mean it was not mere copying because there was a

9   process where information is extracted and converted?

10  "A. Yes.

11  "Q. Who provided you or Terraform Chai's transaction data?  Who

12  provided Chai's server data in relation to the LP server?

13  "A. At the time of Chai's launch I was affiliated with Chai

14  Corporation, and as a member of Chai Corporation I developed

15  the LP server.  But after I left, the person in charge of

16  engineering related to the LP server, the part that is linked

17  to Terra, was JiHoon Kim, at Chai.  I worked with Kim, when I

18  was still working at Chai, I worked with JiHoon Kim, and JiHoon

19  Kim took over my work after I moved to Terraform Labs.

20  "Q. For this one, can you explain the process of how what's

21  been approved goes to the merchants?

22  "A. Merchants?  Oh, with the merchants, yes.  Chai must have

23  had a settlement process when it comes to the merchants, right?

24  A feature that I made for that function is where Chai's admin

25  presses a button once a settlement is complete, the person in

O3TASEC1                        "Kim"

charge does so.  Once the button is pressed, there is an

identical settlement function on Chai's API server, and once

that function is called, the changes to Chai's ledger

information in that function are processed, and likewise, it is

made so that a Terra transaction that corresponds to the

settlement on Chai's end is generated identically through the

LP module.  This is how you can see it.

"Q. Did the LP server receive and process in real-time Chai's

transaction data involving customers and merchants?  Or was

there a time gap?

"A. The goal was to process in real-time.

"Q. If that was the goal, in reality, was it processed in

real-time?  Or were changes done and made after the transaction

was already finished?

"A. No.  I don't know what the criteria for real-time is, but I

made it so that it would be done within a few seconds.  When

there was some sort of a failure or an upgrade of the main

Terra blockchain or Chai's maintenance, during such maintenance

periods, of course it didn't happen.  But in a normal

situation, it was processed in real-time.

"Q. You used the term normal situation, meaning that there were

abnormal situations.  As you just said, I am aware that there

were quite a few times where the LP server did not operate due

to an upgrade or a failure.  Then, in such cases, did

transactions all take place with absolutely no connection to

O3TASEC1                              "Kim"

the LP server or the blockchain, and the completed transactions
were used to create KRT transactions much later in a
retroactive manner?

"A. No, they weren't made retroactively.  As I said earlier,
WAL, I made queue layers on both sides for what is called
durability in English of the content.  If you search up WAL,
its purpose will come up.  In case such failure situations
arise, in computer engineering, we use such content structure
or architecture so that the data would not be lost and so that
KRT transactions can catch up with all the data on Chai's
ledger information once the abnormal situation is resolved.
This was the design by which it operated.  Also, for instance,
if the data is not entered in the queue layer in the API
server, the payment fails.  Therefore, input into the queue
layer includes ensuring that there won't be a problem in such
failure situations.

"Q. Do you mean, in those cases, that payment itself was
rejected at Chai?

"A. I don't know about that, but I think there were instances
where Chai did not send over the data, the dispatcher stopped
working.  So, since the LP server couldn't receive the data and
didn't have the raw data or any information, it wasn't able to
make the Chai KRT transaction.  So, at the time, I told JiHoon
Kim "I don't think the data is coming over," and JiHoon Kim
said "I'll check," and the problem was solved as far as I

O3TASEC1                          "Kim"

1   remember.

2   "Q. You said it was copied in a multisend method transaction.

3   Well, what is the multisend method?

4   "A. Multisend method, where is this term coming from?

5   "Q. Multisend.

6   "A. In order to transfer crypto tokens from one wallet to

7   another a transaction called send -- just send, not multi -- is

8   generally used, and multisend is a function that allows you to

9   arrange multiple sends in a batch so that they can be processed

10  together in a single transaction.

11              (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O3T5sec2                        "Kim"

1    "Q  From June 2019 to May 12, 2022, Chai transactions appeared

2    on the Terraform blockchain because you mirrored or recorded

3    Chai transactions on the blockchain using KRT; correct?  You

4    testified earlier that Chai transactions eventually appeared on

5    the Terraform blockchain after a bit of variation.  Isn't this

6    because Chai transactions were mirrored or recorded on the

7    blockchain using KRT?

8    "A  As I explained repeatedly, it was not just Chai

9    transactions.  Inside Chai database there is a ledger table,

10   and "LP" is short for ledger processing, and the ledger table

11   has a line-by-line data and these line items are transferred

12   and put into the queue layer and alternative algorithm

13   MultiSends are generated.  This is not simple.  Remember

14   arrangement functionality.  In order to optimize and digest

15   transactions, i.e. ledger information as quickly as possible on

16   the blockchain, a special algorithm that I designed was used to

17   turn this information into MultiSends to transmit KRT

18   transactions into Terra, MultiSend Terra transactions, which

19   were then uploaded on the blockchain.  As such, there were

20   numerous steps involved so words like "mirroring" or "copying"

21   are not appropriate.  The right expression would be that KRT

22   transactions were generated.  Transactions on the blockchain.

23   "Q  You programmed the LP Server to bring Chai transactions,

24   the transactions made on Chai, into the Terraform blockchain?

25   "A  Yes.

1    "Q  You programmed the LP Server, correct?

2    "A  Yes.

3    "Q  Using a MultiSend method to send transaction as in a batch

4    instead of sending them one by one, does this mean that you

5    made such an algorithm, MultiSend transactions?

6    "A  Yes.

7    "Q  Then, when a transaction occurs on Chai pay and settlement

8    is made, is settlement made using the blockchain?  For example,

9    when people do this with cash or money in a bank account, you

10   send the information -- you said the information gets extracted

11   and that would be extracted to a blockchain transaction and be

12   uploaded after a bit of variation.  The most essential thing

13   here is the transaction being treated as paid and payment being

14   made.  But the LP Server was not involved in payment; was it?

15   "A  It is true that it is linked, but as far as I know

16   merchants receive payments in Korean Won, in my view, because I

17   was not asked to develop technology.  It is true that I did

18   design the system in a way that it would have been possible.

19   "Q  So the question is, when it comes to a merchant, i.e., the

20   merchant who receives payment in the end for selling its

21   product, the settlement was made regardless of the blockchain

22   from the merchant's perspective; correct?

23   "A  No.  They are linked together.

24   "Q  They're linked meaning?

25   "A  In the same process just like payment, cancellation, and

1   others like top-up, subscription, and so on.  The whole process

2   is linked the LP Server across the board.

3   "Q  Weren't all merchants settled in Korean Won?

4   "A  In Korean Won.  It is true.  It is true, but...

5   "Q  Did they receive a converted amount?

6   "A  Yes, I think so.  I'm not a person in charge of that but I

7   think so, yes.

8   "Q  When you designed the program, was there no merchant that

9   selected coins that go into a transaction wallet as their

10  preference and received payments in coins?

11  "A  At that time it was possible to make that function but the

12  work, in terms of timing, was deprioritized.  I was told that

13  there is no need to develop it now so I did not develop it.

14  "Q  So you did not proceed to that point even though it was

15  possible to develop the function?

16  "A  No, I did not.

17  "Q  A wallet is needed for the LP Server to generate Chai

18  transaction data on the blockchain; correct?

19  "A  Yes, that is correct.

20  "Q  Who controlled the wallet?  Who had those wallets?

21  "A  They were in the LP Server program database.  Who

22  controlled -- who controlled -- oh, I had access to them.

23  "Q  You had access to the wallets and did anyone else have

24  access?

25  "A  I had access to the LP Server so I knew that the data of

O3T5sec2                          "Kim"

1  such wallets were stored in the LP Server, but I did not exert

2  control over them as in examining them one by one or trying to

3  manipulate them in any way.  That should never be done because

4  then --

5  "Q  That is not what he meant by controlled.  Did you have

6  access which would allow you to manage the wallet data?

7  "A  Yes.

8  "Q  In terms of having access, you had access to the LP Server

9  and the wallets.  And who else?

10  "A  All I did was keep a passcode or access-related information

11  somewhere in case I died or something.  But as far as I know,

12  there was nobody who actually accessed it, only I did.

13  "Q  Does it mean that you always had access to the LP Server

14  despite the change in your affiliation?

15  "A  Yes.

16  "Q  So the concept of the wallets is that you need a wallet in

17  relation to blockchain and cryptocurrency; correct?

18  "A  Yes, that is correct.

19  "Q  Only you had access to the wallets and you continued to

20  have access to the wallets even after you left Chai Corporation

21  and you transferred to Terraform Labs.  Didn't Chai Corporation

22  have any wallets at all?  Can you say that it did not have any

23  wallets or access to the wallets?

24  "A  I think I would have naturally given Daniel Shin or Do Kwon

25  the access if they had asked for it.  None of them had.

O3T5sec2                        "Kim"

1    "Q  Then were Daniel Shin and Do Kwon aware that you were the

2    only one who had access to the wallets?

3    "A  Yes.

4    "Q  Even after you changed your affiliation to Terraform, the

5    access was still in your possession.  This would be a fair

6    description?

7    "A  Yes.  I had it as an engineer.

8    "Q  You explained earlier that KRT is a crypto token that is

9    pegged to the Korean Won; a crypto token that is connected to

10   the Korean Won?

11   "A  Yes.

12   "Q  You said that once the transaction takes place at Chai, a

13   KRT transaction is generated in the end.  KRT is a crypto

14   token.  Where was it coming from?  Did someone provide it?

15   With regards to the LP Server, the crypto token should have

16   come in for the KRT transaction to be made and work somehow;

17   right?  Who provided it?  Where did it come from?

18   "A  I received it from Chang-Joon Han from the finance team, by

19   asking for it.

20   "Q  Chang-Joon Han was at Earth Electronic Payment which later

21   changed its name to Chai Corporation, and his role at Earth

22   Electronic Payment was a CFO based on my understanding; is this

23   correct?

24   "A  Yes, yes, yes.  I think I asked him for it when he was the

25   CFO of Chai Corporation.

O3T5sec2                          "Kim"

1    "Q   You mean you asked Chang-Joon Han, the CFO of Chai

2    Corporation, for the KRT, and he gave it to you?

3    "A   Yes.  I got confused going back and forth in time.  I will

4    try to stay focused while giving you answers.

5    "Q   You received the KRT from Chang-Joon Han and generated KRT

6    transactions using the LP Server; correct?

7    "A   Yes.

8    "Q   Does that mean the KRT eventually came from Chai

9    Corporation?

10   "A   Yes, finance.  Yes.

11   "Q   You received it from the CFO of Chai Pay Corporation, not

12   Terraform, so you received the KRT from Chai Corporation.  Is

13   this a fair way of understanding?  I am asking you item A of

14   no. 55, where did KRT come from?  Were it from Terraform or

15   Chai?  Please give a precise answer.

16   "A   I really do not know where it came from.  I made a request

17   to Chang-Joon Han and received the KRT in the wallet, the LP

18   wallet.  This is all I know.

19   "Q   No. 58.  Was Chai making payments to merchants only in

20   Korean Won?

21   "A   Yes, in Korean Won.  I'm not a person in charge of that

22   matter but merchants were paid in Korean Won, based on my

23   knowledge.

24   "Q   There was no case where Chai merchants were paid in

25   blockchain because that was just not made and settlement was

O3T5sec2                         "Kim"

1   only done in Korean Won; correct?

2   "A   Technology-wise that was possible, but as far as I know,

3   merchants were paid in Korean Won.  I think they were paid in

4   such a way.

5   "Q   No. 62.  You said earlier that there were no merchants that

6   accepted payment in Terraform assets like KRT; correct?

7   "A   Yes.  About what?

8   "Q   You said earlier that there were no merchant that was paid

9   in Terraform assets, cryptocurrencies.

10  "A   You mean, about Chai.

11  "Q   Is it correct that there was none with regard to Chai Pay?

12  "A   Yes.  I think so.

13  "Q   Please briefly explain the top-up program.  How does it

14  work?

15  "A   Yes.  When a user opens the Chai app, they are supposed to

16  select a top-up method, and one of the top-up options they have

17  is Terra.  When they choose Terra as their top-up method, Terra

18  station, a wallet app in their mobile phone opens, and there

19  Chai requests for the top-up with the KRT in the wallet.  The

20  user receives a pop-up message asking if they approve, and when

21  the user selects "yes", that is how the Terra station wallet,

22  as a top-up method, becomes connected with the Chai server.

23  After that, when the user tries to buy something, for example,

24  a product at a merchant, the merchant selects the payment

25  method as Chai and the user opens the Chai app, the app opens,

O3T5sec2                        "Kim"

1   and the payment approval gets processed there.  If the user

2   does not have enough Chai points, meaning the Chai points they

3   have fall below the due amount, a transaction is generated to

4   transfer the KRT from the user's wallet for the purpose of

5   top-up.  When the transaction succeeds, Chai points get topped

6   up and are used for the payment.

7   "Q  Are there people that you communicated or discussed with

8   about, say, the existence of the LP Server and the making of

9   the LP Server or the detailed operations of the LP Server?

10  "A  Do Kwon talked to me about the specs for linking Chai

11  mobile payment service to the Terra blockchain.  When it comes

12  to writing code, configuring architecture, setting up

13  components like making queue layers on both sides, etc., I did

14  it all by myself.

15  "Q  Then, for question no. 65, about the people who knew or

16  were aware of the LP Server, is it fair to say that it was only

17  one person, just Do Kwon, who knew the detail content?  Would

18  this be your answer?

19  "A  Do you mean about the LP Server itself?  Who knew about the

20  link with Terra?  Everyone knew that.  And about the existence

21  of the LP Server, well, answers may vary depending on the

22  scope.  First off, the name of the LP Server.  It could be that

23  Do Kwon did not know the name because I made that name.  I

24  think there were some people who knew that something like that

25  was running somewhere, like Hyunjoong Alex Kim, having some

O3T5sec2                        "Kim"

knowledge about this, about its existence, but when it comes to

how it operated, no one understood no matter how hard I tried

to explain, so there was no one I had such conversations with.

"Q  Despite having over 1 million users and 142 merchants,

there were time periods where there were no transactions.  How

come?

"A  I think you are saying that there are 26 days, or around

that number of days, where Terra transactions did not occur.

The reasons why, and the process of how such situations came to

be could vary widely and some of them I remember clearly.  Some

others less so, but let me just share with you what is clear.

In the Terra blockchain there were names of the main net

ranging from Columbus 2 to Columbus 5.  When the name

subsequently changed from 2 to 3, to 4, and to 5, the

blockchain temporarily stopped operating and took some time to

reoperate.  When going from Columbus 2 to 3, the blockchain's

implementation approach changed a bit so the existing Terra

user wallets, the wallets linked to the users, somehow had to

be modified -- I mean cleaned, which took a very long time.

So, it was between Columbus 2 and 3 that reoperation -- I mean,

the blockchain was actually up and running but it took a long

time to sort out, tidy up the content.  Later, as for 3, 4, and

5, similar context came into play causing Terra Chai payment

ledger data not to be delivered to the Terra blockchain in

real-time, I think, context-wise.

O3T5sec2                          "Kim"

1    "Q   Did transactions occur during these time periods?

2    "A   Chai transactions?  Yes.  Yes.  Chai transactions occurred

3    as long as the LP module worked.

4    "Q   And the data of those transactions were later transferred

5    to Terraform?

6    "A   Yes.  Yes.  Correct.

7    "Q   How were the transactions that occurred during those time

8    periods sent to Terraform later?

9    "A   Among what I said earlier, there is the LPQ on the Chai

10   said which plays the WAL function.  That gets stored there

11   first and the LP Server receives such data as long as the

12   LP Server is in operation.  I mean, the blockchain may have

13   stopped operating but does not mean that the LP Server stopped

14   operating.  So the LP Server received such data in real-time

15   and there is this queue layer inside the LP Server which

16   ensures that the data is stored and not lost when the

17   blockchain faces problems and the data gets stored there.  And

18   then, when the blockchain reoperates, the process resumes, the

19   data gets converted to multi-send, and gets uploaded.

20   "Q   There was a process to do such system processing?

21   "A   Yes, yes; from that point of view.

22   "Q   No. 1.  William Chen, he was mentioned in the direct

23   examination earlier.  Was he involved in the operation of

24   Chai's payment application?  For example, in terms of

25   engineering or coding?  William Chen?

O3T5sec2                          "Kim"

1    "A  Chai's?

2    "Q  Involved in its operation.

3    "A  He was not involved with Chai at all.

4    "Q  Did William Chen and Aaron Myung work on matters related to

5    the LP Server?

6    "A  I do not know who Aaron Myung is and William Chen was not

7    involved at all.

8    "Q  No. 5.  Chai Pay business launched in the first half of

9    2019 while the two entities, Chai and Terraform Labs, split up,

10   so to speak, in the first half of 2020; correct?

11   "A  Yes, correct.

12   "Q  Are you familiar with Project Santa?  Have you heard of it?

13   "A  Yes, I have.

14   "Q  Please briefly explain it, Project Santa.

15   "A  Based on my recollection, Project Santa was a project where

16   Terra delegators -- I mean Luna delegators, in fact -- the Luna

17   delegators in the Terra network, the people who delegated their

18   Luna tokens to validators received some Luna, I think it was

19   Luna, via something like AirDrop.

20   "Q  So it was sort of a project to offer incentives to Luna

21   holders to participate as validators at an earlier stage -- at

22   an early stage of the Terra project.  Is this understanding

23   correct?

24   "A  Yes, yes, yes.  I think so.

25   "Q  So Project Santa is unrelated to the generation of Chai

O3T5sec2                          "Kim"

1    transactions, i.e., transactions that occur on the Chai app?

2    "A  Yes.  Completely.  That is --

3    "Q  Separate, correct?

4    "A  Yes.

5              MR. LANDSMAN:  Mr. Aquino, can you please pull up

6    Exhibit A which is D-1215?

7              MR. LANDSMAN:  (Reading)

8    "Q  This is an e-mail retrieved from Terraform.  Have you seen

9    this e-mail?

10   "A  Yes.  Yes, yes.  I have seen it.

11   "Q  When you were working for Chai and Terraform Labs, did you

12   sometimes receive e-mails like this one?

13   "A  Yes.  I received e-mails of this kind.

14   "Q  If you look at the subject line it says:

15   Chai-finance/API-server.

16              What does this mean?

17   "A  Chai-finance in the front is like a handle in GitHub, a

18   service where you manage the source so it refers to the name of

19   the organization, in a way, and the following "api-server"

20   means the api-server project of Chai-finance.

21   "Q  This kind of e-mail -- you should know this well because

22   you are an engineer -- is sent to you and other people when

23   there is a commit or pull request or a comment or a change

24   related to the code in the storage, the storage like the

25   api-server; correct?

O3T5sec2                    "Kim"

1    "A   Yes, correct.

2    "Q   What is shown here, what is shown in this e-mail contains

3    an accurate explanation of a comment or change or a commit that

4    is made to Chai source code.  Can we view it this way?

5    "A   Yes.

6    "Q   This is an e-mail sent and received among the relevant

7    people at the time so it naturally contains an accurate

8    account; correct?

9    "A   Yes.

10   "Q   Was the code for the LP Server that was used in connection

11   with Chai's payment business published and managed on GitHub?

12   "A   Yes.  Correct.

13   "Q   There was a storage called LP-server in Terra GitHub.  Did

14   you know this?

15   "A   Yes.

16   "Q   The LP Server?

17   "A   Yes, yes; there was the LP Server.

18   "Q   Is that storage where the code and updates for the

19   LP Server were stored?  LP Server?

20   "A   Yes, correct.

21   "Q   The source code in the LP-server storage in Terra GitHub

22   which I mentioned just now is what is used to operate the

23   LP Server; correct?

24   "A   Yes.  Correct.

25   "Q   And these e-mails that you see now, these e-mails also seem

O3T5sec2                        "Kim"

1   to discuss proposal to change of function in the source code.

2   Is this correct?

3   "A  Yes; correct, but this one is not about the LP Server

4   storage but the api-server.

5   "Q  At the top of this e-mail there is a part written in blue

6   highlighted in yellow now.  The part in blue at the top reads:

7   Src/lib/payment/confirm.ts, and on the bottom there is

8   something similar in blue which reads:

9   Src/user/registration.ts.  For both parts the content that

10  comes afterwards is above the updates related to the API code

11  and the Chai payment app; correct?

12  "A  Yes.  Correct.

13  "Q  Looking at this e-mail now you naturally know this?

14  "A  Yes.  Yes.

15  "Q  If you look at this part you know this well because you are

16  an engineer.  If you look at this part highlighted in yellow it

17  reads:  Lp.claimDON.  What does this mean?  Please explain it

18  in layman's terms so that the general listeners can understand

19  the lp.claimDON.

20  "A  I think it would be better to start explaining from the

21  top.

22       If you look at the first line there is a function

23  defined as processConfirm.  It says function, so it is a

24  function.  When this processConfirm function is called -- by

25  the way not all content pertinent to this function is in the

1    bottom part, but the content above is excluded.  And in the

2    bottom part there is lp.claimDON.  "LP" here means the LP

3    module in the api-server that I mentioned earlier.  This,

4    again, calls a function defined as claimDON in the LP module so

5    consecutive calling of the functions happens.  When the

6    claimDON function is called, the following items such as

7    payment.user.id, merchant.id and billing amount, go into the

8    LPQ layer, the one that he said plays the role of WAL.

9    "Q  When Chai app's API executes this lp.claimDON function, the

10   inputs necessary for the user's transaction such as amount,

11   from, and to, are put into the end point on the LP Server side;

12   is this correct?

13   "A  Yes.  Correct.  They go into the queue for standby.

14   "Q  Such input process happens on the Chai application;

15   correct?  At least up to this point?

16   "A  Yes.  Correct.

17   "Q  Therefore, when the user makes a payment or conducts a

18   transaction, or does the top-up which you mentioned using the

19   Chai app, Chai app's API sends over the data needed to conduct

20   a blockchain transaction in the equivalent amount to the end

21   point on the LP Server side?

22   "A  Yes.  Correct.

23   "Q  What has been explained so far is only a rough overview but

24   this process kicks in every time transactions occur on the Chai

25   app, this kind of process; is this correct?

O3T5sec2                          "Kim"

1    "A   Yes.

2    "Q   Without such input from the Chai app the LP Server is

3    unable to execute a blockchain transaction that is equivalent

4    to the transaction on the Chai app; correct?

5    "A   Yes.

6    "Q   Such data like you said earlier?

7    "A   Yes.  It was unable to do so.

8    "Q   That is what you said continuously in the direct

9    examination; correct?

10   "A   Yes.  Correct.

11   "Q   When a customer uses the Chai app to purchase from a

12   merchant, the customer uses the Chai app.  In a normal

13   condition, the LP Server executes a corresponding blockchain

14   transaction within a few seconds; right?  In a normal condition

15   without any failure?

16   "A   Yes.  Yes, correct.

17   "Q   According to the code related to the blue

18   src/lib/payment/confirm.ts part, Chai API had a function to put

19   the Chai app payment on hold without granting approval until

20   the data for the blockchain transaction is equivalent to the

21   Chai app payment were put into the queue layer of the

22   LP Server; correct?

23   "A   Yes, correct.

24   "Q   That is what you tried to explain earlier as shown in away

25   lp.claimDON on the bottom; right?

O3T5sec2                          "Kim"

1    "A   Yes.  Yes.

2    "Q   This function was put in place to ensure that when a

3    transaction is made on the Chai app, a corresponding blockchain

4    transaction goes into the queue layer of the LP Server without

5    fail; correct?

6    "A   Yes.

7    "Q   This is what you explained earlier, correct?

8    "A   Yes.  It is the same.

9    "Q   To sum up, this paragraph J, the reason where a Chai app

10   transaction would not be approved until the corresponding

11   blockchain transaction information is properly added to the

12   LP Server queue was to ensure that a corresponding blockchain

13   transaction always takes place for each Chai app transaction;

14   correct?

15   "A   Yes.  Correct.

16   "Q   You have given us a quick explanation so far on what you

17   told us happens only when a Chai customer makes a transaction

18   on the Chai app; correct?  It would not just randomly happen if

19   there were no transaction?

20   "A   Yes.  Correct.

21   "Q   In other words, to look at the same thing from a different

22   perspective, what is shown on Exhibit A demonstrates that the

23   LP Server is actually used when Chai's API processes a

24   transaction?

25   "A   Yes.

O3T5sec2                          "Kim"

1    "Q  The fact that it is used, the Chai API is Chai's process of

2    processing its transactions on the Chai app -- let me start

3    over.

4            All of those things are contained in Chai's API and

5    this Chai API is an integral part of Chai's process of

6    processing its transactions on the Chai app; correct?

7    "A  Yes.  They are included in the whole process.

8    "Q  If you have a look at Exhibit A, underneath the writing in

9    blue there is a part that says something like

10   src/user/registration.ts.  What is this?  It seems to be about

11   the wallet.  What is this about?

12   "A  This is the source code in Chai's path name, like.  So this

13   is a function that is called when a user subscribes to the Chai

14   app.

15   "Q  It is a code that is called when a new user subscribes to

16   the Chai app you mean?

17   "A  Yes.

18   "Q  When there is a new Chai user, does the LP Server create a

19   Terra wallet for that new Chai user on the blockchain?

20   "A  Yes.  It calls a certain LP-related module claimDON

21   function to launch, open, launch a Terra wallet, connect to the

22   Chai user on the blockchain.

23   "Q  Is the ultimate function or the purpose of that function to

24   create a Terra wallet for the user on the blockchain when there

25   is a new Chai user?

O3T5sec2                         "Kim"

1    "A  Yes.

2    "Q  After the user's wallet is created, the wallet remains

3    connected to the user's Chai account; correct?

4    "A  Yes.  Correct.

5          MR. LANDSMAN:  For the court reporter, I'm Roger

6    Landsman.  I knew you had asked to identify ourselves.

7          Mr. Aquino, if you can take down that exhibit and put

8    up Exhibit C, which is D-1016?

9          MR. LANDSMAN:  (Reading)

10   "Q  Do you remember this?  This is a conversation that took

11   place on the messenger called Slack.

12   "A  October 9, 2020, so that was when I worked for Chai.  No.

13   Terraform Labs, Korea.

14   "Q  It is a conversation between you and someone called

15   Etienne.

16   "A  Yes.  Yes, I remember what the conversation was about, to a

17   certain extent.

18   "Q  Please roughly explain what the context or background was

19   behind this conversation, based on your recollection.

20   "A  Yes.

21          Around this time I think there was a situation where

22   the LP Server operation or KRT -- I mean the KRT transactions

23   that correspond with Chai transactions, due to Chai, did not

24   occur.  In other words, a situation that was ascribed as down.

25   If you look at the first line, Paul Kim is myself.  LP-Watcher

O3T5sec2                        "Kim"

1   is a project that plays the role of in case there is an

2   incident like this one in giving you an alert indicating that

3   KRT transaction is not working so you should look into this.

4   It is a project like that.

5   "Q  Notifying that a problem occurred?

6   "A  Yes, yes, yes.  That was the background to this

7   conversation.

8   "Q  If you look at the yellow highlighted part in the middle

9   starting with "in short" you wrote that the LP Server basically

10  replicates Chai transactions.  What did you mean by this?

11  There were a lot of discussions on this point earlier so to

12  sort things out, could you please explain what you meant by

13  replicating from your point of view?

14  "A  Yes.  At first I tried to explain, but as Etienne is also a

15  DevOps engineer, I wanted to quickly move to a conversation as

16  engineers, casual explanation.  There is a database term called

17  "database replication".  Etienne is a dev ops engineer so of

18  course he has a certain level of knowledge about the database,

19  and the purpose of database replication is to enhance the

20  stability of certain data as well as failure response,

21  coordination, in the face of failure and data accessibility and

22  things like that.  Storing the data in multiple databases for

23  such purposes is described as replicating.  This is the intent

24  behind what I said there.

25  "Q  From an engineer's point of view, does the word "replicate"

O3T5sec2                         "Kim"

have a different meaning from "copy" in layman's terms?

"A   Yes.  From an engineering standpoint, the word would not be

understood as simple as duplicating or copying.  The word would

be understood to entail the purpose of enhancing stability,

coordination, in the face of failure and accessibility.

"Q   Were the blockchain transactions that were generated in

accordance with the Chai transactions real transactions or were

they a mere copy of the records?

"A   They were real KRT transactions and not a mere copy.

"Q   In that case, is it true that certain value, value was

transferred between the user's wallet and the merchant's

wallet, in other words, an account of some sort?

"A   Yes.  They are transfer records of KRT token stablecoins.

"Q   Is it correct that, using blockchain technology, an

accurate ledger about various information such as buy,

discount, refund, reward, and merchant payment, was gained from

Chai?

"A   Yes, from Chai.  From Chai.

"Q   Thanks to, by using such blockchain technology?

"A   Yes, yes, yes.  It is correct that it was used.

"Q   Looking at this conversation once again, Etienne goes:  So

basically, Chai was still working but no transactions on the

blockchain so no rewards.  The part that starts with:  So

basically Chai was still working...  He says this, and your

answer:  Correct.

O3T5sec2                          "Kim"

1              "What was your understanding of his statements that

2     basically Chai was still working but there were no rewards

3     because there were no transactions on the blockchain?  How

4     shall we understand this statement?

5     "A  When the LP Server stops, KRT transactions are not uploaded

6     to the blockchain.  There is no problem on the Chai side but

7     there would be no transactions because of a problem of stoppage

8     on the side.  As a result, the gas fee for the Luna stakers is

9     not distributed.  This is how you can understand the statement.

10    "Q  There is no problem with Chai transactions but when the

11    blockchain transactions are suspended, the resulting gas fee is

12    not generated and therefore there are no rewards.  Is this the

13    correct way to understand this?

14    "A  Yes, yes.  There is an omitted part after "no rewards"

15    which is "to the delegators."  So no rewards to the Luna

16    delegators.

17    "Q  So according to your explanation, if the Terraform

18    blockchain is down or the LP Server is down and not in

19    operation during that time, the rewards, as Etienne put it, are

20    not generated as Etienne mentioned; correct?

21    "A  Yes.  During that --

22    "Q  During that time?

23    "A  Yes.  Yes.

24    "Q  If you look at the line below you said:  We have two queue

25    layer in both Chai and Terra.

1          "What does this mean?

2    "A  I think I explained this earlier.  Queues were made on both

3    sides to make sure that even when failure or something happens,

4    the content does not get lost and Terra transactions, the Terra

5    transactions that correspond with the Chai ledger information,

6    are generated later in case a long time elapsed.  It was

7    something that played this role.

8    "Q  That means there were queue layers on both sides?

9    "A  Yes.

10   "Q  Then Chai's internal ledger and the transaction and

11   settlement information on the Terraform blockchain are the

12   same; correct?  Because there are queue layers and all

13   information gets matched?

14   "A  It is true that the corresponding ledger has the same

15   amount and other information, though the format is different.

16   "Q  This is blockchain and that is not blockchain so the format

17   is different, but the necessary information contained in the

18   two is the same; correct?

19   "A  Yes, yes.  Yes.

20   "Q  You used the word "mirror" here to mean that the

21   transaction and settlement information in both Chai and Terra

22   is identical.  Is this a correct understanding of the meaning?

23   "A  No.  This is what Etienne said to explain how he understood

24   it.  Of course, internally, mirroring, I mean it is too

25   difficult for me to explain this so these kinds of words, some

1    people said "mirroring" and some people I don't know how they

2    said it, but I think Etienne here seems to be saying this to

3    mean that.

4    "Q   Sir, are you saying you used the word "mirror" to explain

5    the concept easily for the benefit of the other?

6    "A   Yes.  Between him and I, because I explained briefly, he

7    goes, *ah, yes, OK,* and continues.  Right?  He wanted to check

8    with him if his understanding was correct.

9    "Q   Understood.  Let me ask you this to sort things out because

10   there was a lot of complex back and forth during the direct

11   examination.  If the Terraform blockchain went down, or the

12   LP Server did not operate, the rewards resulting from the

13   transactions may not have been generated during that time;

14   correct?

15   "A   Correct.

16   "Q   Because during that time blockchain transactions were not

17   generated; correct?

18   "A   Yes.

19   "Q   I have some questions about the MultiSend method.  You

20   explained this earlier but to get things straight I will skip

21   no. 13 itself and start from the second paragraph.  At that

22   time recording transactions on the blockchain took a

23   significant amount of time, in general, so from a practical

24   standpoint there were many difficulties in applying it directly

25   to the payment business; is this correct?

O3T5sec2                        "Kim"

1    "A   Yes.  That is correct.

2    "Q   For other blockchains except Terra?

3    "A   Yes.

4    "Q   However, at that time Terraform developed an applied

5    advance technologies like MultiSend to overcome such

6    difficulties; is this correct?

7    "A   Yes.  Correct.

8    "Q   Please briefly explain to sum up how MultiSend overcame

9    such time limitations and why this was such advanced.  In other

10   words, tell us this is what MultiSend does.

11   "A   Because KRT transactions among multiple wallets are handled

12   together in a single transaction.  Well, originally, when a

13   transfer happens on a general blockchain, a single transaction

14   includes a single transfer.  But, when you use this MultiSend

15   function, multiple transfer functions can be performed in one

16   transaction.

17   "Q   They are performed in a batch so speed goes up?

18   "A   Yes.

19   "Q   The MultiSend technology was developed and applied to

20   replicate transaction data in real-time with an aim to not just

21   merely copy Chai transaction data but generate and execute

22   actual blockchain transactions corresponding to Chai

23   transactions on the Terra blockchain?  This seemed to be your

24   intent, correct?  In other words, why would we have done this

25   in such a complicated way if we just wanted simple copying?  We

1    did it in a complicated way in order to accurately replicate

2    the transaction data in real-time?  Would that be an accurate

3    understanding of your point?

4    "A  For one thing, here the word "replication" is a database

5    term and the actual backhand logic, as you said, the algorithms

6    or the queues or such complicated setup were implemented to use

7    the MultiSend method.

8    "Q  So you mean all of this was not needed if you were just

9    simply copying Chai transaction data?

10   "A  Correct.  If it was just simple copying, well then --

11   "Q  When transaction data is replicated, so to speak, let me

12   drop the word "mirrored" here, replicated on the blockchain,

13   the intrinsic characteristics of blockchain arrives, i.e., the

14   data remains on the blockchain permanently and people who

15   participate in the blockchain can check and verify its

16   accuracy; is this correct?

17   "A  Yes.  That is a general understanding.

18   "Q  This is another slightly general one.  The applications

19   that are based on the blockchain, in general, not just

20   Terraform, they sometimes use a centralized database to simply

21   process a huge amount of transactions before executing the

22   transaction on the blockchain; correct?

23   "A  Yes.  Correct.  For example, precisely exchanges --

24   exchanges also do them.

25   "Q  By exchanges do you mean a securities exchange?

O3T5sec2                          "Kim"

1    "A   No.  Cryptocurrency exchange.

2    "Q   Chai also used middle stage or an intermediary stage to

3    record the transactions in fiat currency between the customers

4    and the merchants; correct?

5    "A   Yes.

6    "Q   But on the other hand, Chai also had a goal which is to

7    build a system where stablecoins can be used in transactions

8    without customers necessarily having to know the complex

9    process; right?

10   "A   Yes, it did.

11            MR. LANDSMAN:  Mr. Aquino, can you please pull up D1

12   which is Plaintiff's Exhibit 148-A?

13   "Q   Let me show you Exhibit D.  D1 is an original Korean

14   version so I think you can have a look at D1.  If you look at

15   it from the middle there is a conversation between you and Do

16   Kwon slightly below the middle to the next page, and you can

17   see it on the screen from the bottom part of the both.  This a

18   conversation between you and Do Kwon from December 11, 2019?

19   "A   Yes, correct.

20   "Q   At the lower part of the page Do Kwon asked you:  After 14

21   days, the coins automatically return to the LP Server; right?

22            Was he referring to KRT here?

23   "A   Yes.

24   "Q   Here, Do Kwon was referring to the KRT that moved from the

25   merchant's wallet on the Terra network to the LP Server wallet;

O3T5sec2                        "Kim"

1    correct?

2    "A   Yes, correct.

3    "Q   And the 14 days that Do Kwon mentioned here was a typical

4    settlement period of Chai merchants; correct?

5    "A   It was a settlement cycle.

6    "Q   So put them all together, was Do Kwon asking here what the

7    LP Server did with the KRT did once the merchant received a

8    payment?  Is that what he was asking?

9    "A   A lot of the context is omitted here.  What he wanted to

10   know was what happens to the KRT and the merchant's

11   corresponding Terra wallet when a merchant receives a payment

12   after 14 days.

13   "Q   He was asking about what happens to the KRT in the

14   merchant's wallet?

15   "A   Yes.

16   "Q   There you answered:  It's not automatic, it's manual.  Chai

17   is doing it that way as of now because the LP Server

18   specification is actually implemented identically to Chai.

19            "And Do Kwon asked:  Oh, then the finance team has to

20   manually withdraw everything and move it again to the

21   LP Server?  It seems a bit tight.  LOL.

22            "To this question you answered:  No.  That's not it.

23   You have to press the button in the admin already and the

24   processing happens together at that time.  It is just pressing

25   a button.  Haha.  Each store is already doing it.

O3T5sec2                        "Kim"

1      "A   Yes.

2      "Q   Let me ask you step by step, after the merchant makes a

3      transaction with a customer, 14 days is a settlement cycle as

4      you said earlier.  At the end of the settlement cycle, when the

5      merchant gets paid, a Chai employee should press something like

6      a button and Chai's internal program.  Did I understand this

7      correctly?

8      "A   Yes.  A responsible Chai employee on the finance team

9      should press the button.  Timing-wise, that person presses the

10     button when they complete the settlement process.

11     "Q   Pressing the button in Chai's internal management system;

12     correct?

13     "A   Yes.

14     "Q   Once the payment is made to the merchant on the Chai

15     system, accordingly, a blockchain transaction takes place where

16     the corresponding amount of KRT in the merchant's wallet moves

17     to the LP Server wallet; correct?

18     "A   Yes.

19     "Q   I would like to ask you about the top-up.  Chai users were

20     able to convert the KRT they had to Chai money points using the

21     KRT top-up program; correct?

22     "A   Yes, correct.

23     "Q   In that case KRT is converted to Chai money and the Chai

24     money is used for a transaction, so in the end it could be said

25     that one could make a Chai transaction purchasing goods, etc.,

1    using the KRT.  Is this understanding correct?

2    "A  Yes, it is.

3    "Q  When you said you used the KRT top-up very much, you meant

4    you did this; correct?

5    "A  Yes, because I used it.  I used it too.

6    "Q  Chai must have calculated and reported the KRT amount that

7    the customers paid to charge, i.e., top-up their Chai money;

8    correct?

9    "A  Yes, I think it did.

10   "Q  When the KRT was used to top up the Chai money, naturally,

11   a corresponding transaction would have occurred on the

12   Terraform blockchain; was this the case?

13   "A  Yes, it was.

14   "Q  And Terraform Labs and Chai are the companies that are

15   related to this work so Terraform Labs and Chai must have

16   shared, given, and received the data resulting from such top-up

17   transactions on a regular basis; correct?

18   "A  What was going on beyond my knowledge -- since I am an

19   engineer -- but I think I was able to expect that such work

20   existed.

21   "Q  Your testimony earlier was left a bit unorganized because

22   of the complexity so I would like to ask you this question to

23   clarify.  Please listen:  Plaintiff's argued earlier that there

24   were five instances, between October 2021 and March 2022, when

25   no transactions occurred on the Terraform blockchain, but it

O3T5sec2                          "Kim"

1    would not have been possible for the Chai application to have

2    been non-functional during those periods.  Please briefly

3    explain to us, once again, how Chai transactions could still be

4    processed even when the blockchain did not operate.

5    "A  Many safety measures such as the queue layer and dispatcher

6    were added so that the whole process, the whole system would

7    work and not collapse, even during such instances.

8    "Q  That is why it was still possible?

9    "A  Yes.  That is how.

10          MS. LANDOW:  This is Defendant's Exhibit 9, in

11   evidence.

12          MR. LANDSMAN:  I don't believe that you introduced

13   Defendant's Exhibit 9.  It might be corresponding Plaintiff's

14   Exhibit?  This is Plaintiff's Exhibit 137, which is in

15   evidence.

16          MS. LANDOW:  This is Plaintiff's Exhibit 137 in

17   evidence.

18          MS. LANDOW:  (Reading)

19   "Q  This is an article published on June 11, 2019 on

20   Terraform's official Medium page.  Have you seen this kind of

21   material often?  What is Medium?

22   "A  I think this Medium service was used to upload news on the

23   internet for public viewing, something like a blog.

24   "Q  Is it correct to understand that Chai and Terraform Labs

25   divided work in the following way?  Chai provided the

O3T5sec2                        "Kim"

1    traditional infrastructure of a payment gateway and Terraform

2    Labs provided the blockchain infrastructure.

3    "A  Yes, correct.

4    "Q  When did this division of work start, roughly, in terms of

5    timeline.

6    "A  From the beginning.

7    "Q  From the beginning of the Chai Pay business?

8    "A  Yes.

9    "Q  I will skip the next paragraph.  All the blockchain

10   transactions corresponding to Chai transactions that were

11   conducted on the Terra network were real transactions; correct?

12   "A  Yes, they were real transactions.

13   "Q  And this was briefly mentioned earlier, but blockchain

14   wallet addresses, QR codes, personal keys, etc., were all

15   created and managed on the back end so users did not need to

16   manage them separately; correct?

17   "A  Yes.  Correct.

18   "Q  In fact, customers do not need to know those things, do

19   they?

20   "A  If they knew, it would not be a mobile payment service.

21   "Q  If the customers knew every single thing and managed them

22   then it would not be called a mobile payment service?

23   "A  Correct.

24   "Q  Was this the same for the merchant wallets?

25   "A  Yes.

O3T5sec2                    "Kim"

1          MS. LANDOW:  We have new material, this is Defendant's

2     Exhibit 325, in evidence.

3          MS. LANDOW:  (Reading)

4     "Q  This is a one-page document about Seigniorage marked F1.

5     Please have a look.  Do you remember this Seigniorage funding

6     proposal?

7     "A  Yes, I do.

8     "Q  This is a proposal that was proposed, voted, and approved

9     by the people with vetting rights on the Terra network;

10    correct?

11    "A  Yes, all delegators had voting rights.

12    "Q  Delegators had voting rights and was this proposal

13    something that was proposed, voted, and approved by them?

14    "A  Yes.

15    "Q  This proposal and simply was to pay back the Seigniorage

16    that was created by the transactions on the Terra network to

17    Chai; correct?

18    "A  Yes, I remember this.  It is correct.

19    "Q  This is to pay back to Chai, so did Chai receive funding

20    based on this proposal?  Some sort of payback?

21    "A  If you look at the timeline at the bottom, this was

22    submitted on March 18th, and passed on April 1st, so I think

23    the funding was given.

24    "Q  Are you saying that the proposal would have been

25    implemented accordingly?

O3T5sec2                      "Kim"

1    "A   Yes.

2              (Continued on next page)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O3TASEC3                          "Kim"

1    "Q. Then, let me ask you this way although this may sound

2    abstract.  It is said that the consumers who purchased goods

3    using Chai were offered discounts due to the Terra blockchain.

4    Is this accurate, or are you not familiar with this topic?

5    "A. As a person who worked on both sides, that is how I

6    understood things worked.

7    "Q. You do not know the details, but in light of your

8    experience working in both companies, that seemed to be the

9    case?

10   "A. Yes.

11   "Q. One more follow-up question on the exhibit.  If you look at

12   the description part of the seigniorage proposal, it says in

13   the parentheses 3 and 4 that the seigniorage is allocated to

14   Chai and used as a budget for discounts, and therefore,

15   consumers benefit from it.  Are you saying that the proposal

16   was made and executed according to this description in your

17   view?

18   "A. Yes, I am.

19   "Q. This is the next material.  This is Defendants' Exhibit 323

20   in Korean.  We have Defendants' 324, which is the certified

21   English translation.

22        Please have a look at the following pages, too.  About

23   2 to 3 pages would be enough.  Paragraph a.  Do Kwon ran a kind

24   of contest for Chai users to find the merchant wallet

25   addresses.  Are you aware of this?

1    "A. Yes, I am aware of this event.  I see October 2020.

2    "Q. How did you come to know about this?

3    "A. I heard about it from someone else that Do Kwon is doing

4    something like that there.

5    "Q. Did you hear about this at that time?

6    "A. Yes.

7    "Q. The process was making a purchase on the Chai app, finding

8    the purchase history on the Terra blockchain, and matching the

9    two to identify which wallet address belonged to which

10   merchant.  Is this technically possible?

11   "A. Yes.  Because, technically speaking, there is a KRT

12   transaction that corresponds with a Chai transaction.  Imagine

13   that you paid a certain amount, say, 1,560 Korean Won at a CU

14   convenience store or something.  After that payment, if you go

15   to the Terra blockchain and keep on searching, there should be

16   1,560 Korean Won somewhere, right?  You check if that is

17   matching, and make another payment.  This time, 1,600 Korean

18   Won.  Then, there should be 1,600 Korean Won after 1,560 Korean

19   Won.  This way, you can find out your wallet address.  This is

20   the case technically.

21   "Q. Based on your knowledge about how Chai and Terra blockchain

22   worked, the users at the time must have been able to accurately

23   identify the merchant, correct?  If they worked hard on it?

24   "A. Yes, once you find out your wallet address, you know that

25   this address is connected to a Chai account.  After that, if

1    you try making a payment at different merchants, let's say,

2    first at Yanolja, and then at TMON, and then at Bungae Janger,

3    there should be matching accounts, right?  That way, you can

4    look up which merchant wallet the KRT is transferred to.  This

5    is how you can find out.

6    "Q. When a customer makes a purchase on the Chai app, how fast

7    does the LP server generate and conduct a transaction on the

8    blockchain in general?

9    "A. Normally 3 seconds, and up to around 10 seconds when it is

10   slow.

11   "Q. But, of course, the merchant does not get paid right away,

12   correct?  The merchants would not be paid in 3 or 10 seconds?

13   A.  No, because there is a settlement cycle.  Not right away.

14   Q.  The settlement cycle is typically 14 days after the

15   purchase.  Ever since Chai opened, there were continuous

16   transactions, so, as a result, this kind of settlement

17   transaction amount must have happened every day between the

18   merchants and Chai, correct?

19   "A. Yes.  It must have started 14 days after launch.  Yes,

20   correct.

21   "Q. There is this thing called ChaiScan, and the transactions

22   marketed on ChaiScan are also real transactions on the

23   blockchain, correct?

24   "A. Yes.

25   "Q. Let me show you Plaintiff's Exhibit 152a in evidence.  This

O3TASEC3                          "Kim"

seems to be a thread of Slack messages in Korean.  Let me show

you Plaintiff's Exhibit 152b in evidence.  This is a certified

English translation of Plaintiff's Exhibit 152a.

          This is also sent by you.  Please see the last page

where you talk about putting money back into the merchant

wallet in reverse.

"A. Yes, I have seen it.

"Q. In the conversation dated April 21, 2020, you said "it

might be better to just put money back into the merchant wallet

in reverse," and also said, "if the merchant's balance becomes

zero, there's an issue where cancellations become impossible."

Were you saying that there is an issue with a blockchain

transaction not being executed if a transaction is canceled on

Chai, so, taking a certain approach might be better to resolve

the issue?  Trying to find a solution?

"A. Yes, correct.

"Q. Could you please briefly explain the context?

"A. I think this conversation started probably because there

was an issue of the LP server going down.  So, if you look at

the top, I sent a link to Yun, since Yun was a blockchain

technology expert and was in charge of maintenance and repair,

and we discussed how to solve the issue.  The issue occurred, I

said things like, 'there seems to be something strange with a

wallet,' 'maybe not a user wallet,' investigating. . . and from

7:48, I did some research, and I said that 'this might be a

1    negative transaction case,' and added that 'travel agencies

2    like Tourvis have certain days where settlements become

3    negative.'  Let me explain.  The settlement cycle is 14 days,

4    but sometimes, cancellation is made after the settlement cycle.

5    This was during the pandemic.  During the pandemic.  This

6    Tourvis that I mentioned is a travel agency, and they sell

7    flight tickets and stuff like that, and people tend to make

8    payments one or two months prior when they travel.  Because of

9    COVID-19, however, there was sudden mass cancellations, say,

10   two months after the payment.  As a result, the amount to be

11   settled for Tourvis on Chai's ledger became negative.  You can

12   understand this, right?  But it is not technically possible to

13   make a negative ledger on the Terra blockchain.  So we went

14   'how should we deal with this', it is not possible to put a

15   negative value on the blockchain, so maybe, for now, putting

16   the KRT in the merchant wallet first and sending a recall sign

17   afterwards might be an option.  And the conversation finished

18   with an opening saying that 'it might be better.'

19            THE COURT:  Counsel, how much more do we have?

20            MR. LANDSMAN:  There's about ten more pages with --

21   five more pages with most of it that we have to read through

22   and then some sparring interchanges, so I guess another 15

23   minutes.

24            THE COURT:  All right.  We'll take our mid-morning

25   break now then.  So we'll take a 15-minute break at this time.

O3TASEC3                           "Kim"

1                    (Continued on next page)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O3TASEC3                              "Kim"

1          (In open court; jury not present)

2          THE COURT:  Those matters that I requested you send me

3     over the weekend on the stipulation issue should be sent to my

4     law clerk's e-mail and by no later than noon on Sunday.

5          Now, what do we have?  I know we have the expert at

6     2:00.  What do we have the rest of this morning?

7          MS. MEEHAN:  Your Honor, we have James Hunsaker and

8     then another investor witness.  They both need to testify today

9     because of scheduling issues.

10          THE COURT:  Well, at 2:00 we're starting the expert.

11          MS. MEEHAN:  Understood, your Honor.

12          THE COURT:  Keep that in mind.  All right.  Very good

13     I'll see you in 15 minutes.

14          (Recess)

15          THE COURT:  Couple things.  First, I was here before

16     9:00 a.m. because I had been told among other things that the

17     lawyer and client for the privilege issue would be here and

18     then I was told that you guys had negotiated a resolution; is

19     that right?

20          MR. CONNOR:  Your Honor, I believe that that's

21     correct.  Ms. Cuellar, who handled that issue, is not here, but

22     I believe we resolved that issue and inquiry won't be required.

23          THE COURT:  All right.

24          MR. CONNOR:  Thank you.

25          THE COURT:  Secondly, if you have any doubts about how

O3TASEC3                          "Kim"

1  long these other two witnesses are going to take, let's put

2  them on the stand now and we can always resume the deposition

3  of Mr. Kim later.

4          MR. PELLEGRINO:  Exactly our conversation, your Honor.

5  And if I might adjust one thing to that, before we release this

6  witness for that purpose for now, we were wondering if you

7  could just instruct the jury the context, something like you

8  had authorized this deposition in Korea, it was translated from

9  Korean into English, the questions were put in writing,

10 something like that, because I think it may be unclear to them

11 exactly why they're formatted the way they are.

12         THE COURT:  You talking about Mr. Kim?

13         MR. PELLEGRINO:  Yeah.  I'm saying before I guess you

14 would have to give the jury an instruction that he's going to

15 come back later and finish his testimony, and oh, by the way,

16 this is the context of how that happens.

17         THE COURT:  I see.  All right.  Very good.  Let's

18 bring in the jury but not the -- well, do we have one of the

19 other witnesses here?

20         MS. MEEHAN:  Yes, your Honor.

21         THE COURT:  All right.  Why don't you get him on the

22 stand.

23         (Continued on next page)

24

25

1              (In open court; jury present)

2              THE COURT:  Please be seated.

3              THE DEPUTY CLERK:  Take the witness stand.

4              THE COURT:  Don't swear him in yet.

5              THE DEPUTY CLERK:  Okay.  Please remain standing.

6              THE COURT:  So, ladies and gentlemen, we have two

7    witnesses coming up who have their own scheduling issues so

8    we're going to interrupt the Kim deposition and hear from these

9    other witnesses, and then we'll resume the Kim deposition.

10             One thing I did want to mention about the Kim

11   deposition that you've heard, the way it works when there is a

12   foreign witness is that the deposition in accordance with

13   international law really is taken by a judge, but some of the

14   questions are ones that reflect what the SEC wanted to ask, and

15   some of the questions are what the defendants wanted to ask,

16   and that's why we've had two different people asking the

17   questions, so you know that difference.  But it has to be then

18   translated into Korean.  It's whole hassle.  But it's done for

19   your benefit.

20             Okay.  Let's swear in the new witness.

21   JAMES HUNSAKER,

22        called as a witness by the Plaintiff,

23        having been duly sworn, testified as follows:

24   DIRECT EXAMINATION

25

1    BY MS. MEEHAN:

2    Q.  Thank you, your Honor.

3            Good morning, Mr. Hunsaker.

4    A.  Good morning.

5    Q.  Where do you currently live?

6    A.  New Jersey.

7    Q.  Are you currently employed?

8    A.  Yes.

9    Q.  Where are you currently employed?

10   A.  Monad Labs.

11   Q.  What kind of a company is a Monad Labs?

12   A.  It's a blockchain software company.

13   Q.  What is your position there?

14   A.  I'm CTO and cofounder.

15   Q.  When did you found the company?

16   A.  April 2022.

17   Q.  What is the highest level of education that you have

18   obtained?

19   A.  Master's Degree.

20   Q.  What did you get your Master's Degree in?

21   A.  Computer science.

22   Q.  What year did you obtain your Master's Degree?

23   A.  2005.

24   Q.  And from where did you get your Master's in computer

25   science?

O3TASEC3                          Hunsaker - Direct

1   A.   University of Iowa.

2   Q.   Just very briefly, describe your professional experience

3   prior to founding Monad Labs?

4   A.   I had a few positions after college, and then in 2010 I

5   started in finance trading at an investment bank, and then 2014

6   I moved to high frequency trading.

7   Q.   What firm did you move to in 2014?

8   A.   Jump Trading.

9   Q.   What is Jump Trading?

10   A.   Jump is a high-frequency trading firm.  So they -- their

11   primary vantage is speed versus other trading firms.

12   Q.   Can you just explain a little bit more in layperson's terms

13   what that means when you say their primary advantage is speed;

14   what specifically are you referring to?

15   A.   So they're able to react to changes in the market quicker

16   than other participants are able to react, so they have a speed

17   advantage.  So, historically, that was their advantage in the

18   market so they could make money that way basically.

19   Q.   What type of assets does Jump Trading engage in trading in?

20   A.   Jump trades pretty much every asset in the world:  Stocks,

21   bonds, futures, options.

22   Q.   Where are Jump Trading headquarters located?

23   A.   Chicago, Illinois.

24   Q.   I believe you said that you joined Jump Trading in 2014; is

25   that correct?

1   A.  That's correct.

2   Q.  What was your position when you joined?

3   A.  I joined the trading team as a senior software engineer.

4   Q.  What types of things did you do as a senior software

5   engineer?

6   A.  I was responsible for all the technology for our trading

7   team so that includes like the trading model logic, the code

8   that runs the trades on the exchanges.  The alpha logic, so

9   like when -- what is going to tell you to react, send an order

10  or, you know, how the model is going to behave.  The research

11  infrastructure, so there's like machine learning, AI sort of

12  stuff for building the models.  So any software that's needed

13  for like a trading team.

14  Q.  And when you say you were responsible for it, what do you

15  mean by that?

16  A.  I was like the architect, so I was like designing the

17  software, implementing the software, telling other members of

18  the team like how to implement the software.  Yeah.

19  Q.  Focusing now on 2021, did there come a time when you began

20  working for a division at Jump known as Jump Crypto?

21  A.  Yes, in spring of 2021.

22  Q.  What was Jump Crypto?

23  A.  Jump Crypto is like an external name.  Internally in Jump

24  it was called Team Illini.  Illini is like the University of

25  Illinois basically mascot or something.  It was a team that was

1    devoted exclusively to trading crypto and it was the only team

2    at Jump that could trade crypto.

3    Q.  When you moved over to Jump Crypto, did you move as part of

4    a sub team?

5    A.  Yeah.  So when we moved in spring 2021, the HFT team that I

6    was on, which was around eight to ten people became a sub team

7    of Jump Crypto.  So the whole team shut down our HFT trading

8    and moved over inside Jump Crypto.

9    Q.  And just to be clear, when you say HFT you are referring to

10   high-frequency trading?

11   A.  Our high-frequency trading team, correct.

12   Q.  What was your role on the team?

13   A.  When we moved to Jump Crypto initially, like it was a very

14   gradual, over the span of a few months.  So initially I was

15   just trying to take our HFT software and import it so that Jump

16   Crypto team could use that.  We had a number of different

17   projects on that team.

18   Q.  What do the other members of your team do?

19   A.  Our sub team is called Team Harvest and that name -- or

20   Project Harvest.  That name came from the fact that we were

21   trying to make sure that they were fulfilling all the deals

22   that Jump Crypto was responsible for.  So we had, we had just a

23   number of different responsibilities looking at like market

24   making deals, whether we're fulfilling those sorts of deals.

25   We were developing software for off-chain.  One project was for

1    Terra.  So there was just a number of different
2    responsibilities.
3    Q.  Mr. Hunsaker, if you could just keep your voice up and
4    speak into the microphone?
5    A.  Okay. Sorry.
6    Q.  Thanks.  You mentioned market making in your answer, what
7    is market making?
8    A.  Market making is a form of trading where you're basically
9    buying and selling the same asset and you don't really have a
10   view on what that -- if the price is going to move.  So, you
11   know, you basically buying from one person and selling to
12   another constantly, and you're collecting the difference
13   between those prices.
14   Q.  How did you come to that understanding of what market
15   making is?
16   A.  I've implemented market making algorithms for Goldman Sachs
17   and J.P. Morgan and Jump Trading.
18   Q.  Getting back to your sub team within Jump Crypto, how did
19   you communicate with the other members of your team?
20   A.  There was a number of different ways.  Obviously in person
21   in the office if we're in the office together.  We would have
22   Zoom calls.  So Zoom is like a video conferencing application.
23   We had Slack, which is a like a messaging application that you
24   can chat with other people on the team.  We had e-mail
25   obviously, but that wasn't used very frequently.  We had like

1  Wiki, like Wikipedia sort of thing where people could like

2  store stuff that they want to store longer term.

3  Q.  You mentioned Slack, how frequently did you use the Slack?

4  A.  Slack was like constant, all day every day.

5  Q.  And the Zoom, how did you use Zoom at Jump Crypto?

6  A.  Jump Crypto had what's called like an Always On, and the

7  Always On is a Zoom meeting that just runs 24 hours a day,

8  seven days a week, people will hop in and out of it but

9  generally, everybody -- most of the team is on it while they're

10  working.

11          And the idea of the Zoom call is that it feels like

12  you're in the same room, so there's like a lower barrier of

13  communication.  You're more willing to like reach out and chat

14  with somebody.  So it's just like -- the team is kind of spread

15  across the U.S. and the world, so it's just like trying to make

16  everybody feel like they're working together.

17  Q.  You mentioned that this Always On Zoom was on seven days a

18  week?

19  A.  Yes.

20  Q.  And 24 hours a day?

21  A.  Yes.

22  Q.  How did you use the Always On Zoom?

23  A.  So there was daily sort of like kickoff meetings for the

24  team.  So when I would wake up in the morning, the first thing

25  I would do is sign on the Always On Zoom.  There would be Jump

1  Crypto, like team wide meeting.  It was I believe it was

2  9:00 a.m. eastern time, 8:00 a.m. Chicago, and then we had a

3  Singapore team, so that would be like their evening.  And

4  everybody would go around, give updates.  There was somebody

5  who was telling the team check in and status.  People would

6  discuss deals.  Software developers would discuss maybe

7  something they're working on, this sort of thing.

8  Q.  How were you alerted to other discussions on this Always On

9  Zoom that you have described?

10 A.  Well, when I was awake or working, it was always on.  I was

11 usually connected to it listening in to what's going on.  But

12 there was also Slack, you know, people would mention in Slack

13 that they want to discuss something, so people would hop on the

14 Always On Zoom to discuss it.

15 Q.  And you mentioned that there was a kickoff meeting in the

16 morning.  Who led that kickoff meeting?

17 A.  The meeting was led by a guy named Simon Johansson, who was

18 like kind of just like a project coordinator sort of role.

19 Q.  Who else typically participated in that meeting?

20 A.  Bill DiSomma who ran the team, and then, you know, just

21 whoever was giving an update for their area, their

22 responsibility.

23 Q.  Tell me, who is Bill DiSomma?

24 A.  Bill DiSomma is one of the two owners of Jump Trading.

25 Q.  And how frequently did you interact with Mr. DiSomma?

1    A.  He hired me in 2013, 2014.  So I've known him since then.

2    Q.  And how did you typically communicate with him?

3    A.  In person.  I've seen him many times in person.  The Zoom

4    calls, meetings, slack sometimes.

5           MS. MEEHAN:  Mr. Haywood, if you could please pull up

6    Plaintiff's Exhibit 65 just for the witness please.

7    Q.  Mr. Hunsaker, do you recognize that?

8    A.  Yes, that's Bill DiSomma.

9           MS. MEEHAN:  At this time, the plaintiffs offer

10   Plaintiff's Exhibit 659 into evidence?

11          MR. HENKIN:  No objection.

12          THE COURT:  Received.

13          (Plaintiff's Exhibit 659 received in evidence)

14          MS. MEEHAN:  Thank you.  You can take it down,

15   Mr. Haywood.

16   BY MS. MEEHAN:

17   Q.  Mr. Hunsaker, how involved was Mr. DiSomma in your day to

18   day at Jump Crypto?

19   A.  He ran that team.

20   Q.  When you say "he ran the team," what types of things did he

21   do?

22   A.  He basically approved like deals, any sort of deal

23   strategy.  He directed the lead trader on what to, you know,

24   how trading strategies -- he set strategy for the team in like

25   what people were going to work on, strategic initiatives.

1   Yeah, he managed the team.

2   Q.  Are you also familiar with an individual known as Kanav

3   Kariya?

4   A.  Yes.

5   Q.  Who is Kanav Kariya?

6   A.  He was one of the original, or he was an early member of

7   Jump Crypto.  And at some point he became president of Jump

8   Crypto.

9   Q.  During the time period that you were working within Jump

10  Crypto, how frequently did you interact with Mr. Kariya?

11  A.  I had meetings with him both in person and on Zoom.

12          MS. MEEHAN:  Mr. Haywood, could you please pull up

13  Plaintiff's Exhibit 658, just for the witness.

14  Q.  Mr. Hunsaker do you recognize that picture?

15  A.  Yes, that's Kanav.

16          MS. MEEHAN:  At this time, the SEC offers Plaintiff's

17  Exhibit 658 into evidence.

18          MR. HENKIN:  No objection.

19          THE COURT:  Received.

20          (Plaintiff's Exhibit 658 received in evidence)

21          MS. MEEHAN:  Thank you, Mr. Haywood.  You can take

22  that down.

23  Q.  In his role as President of Jump Crypto what types of

24  things did Mr. Kariya do?

25  A.  I observed him mostly making business -- he's like more

1    like a business development person, salesperson.  He was making

2    deals with projects.  He was kind of the public face of Jump

3    Crypto.  So, you know, he would interface with other teams in

4    the crypto community.  Yeah.  Generally that was his

5    responsibility.

6              MS. MEEHAN:  And I apologize, Mr. Haywood, I'm not

7    sure if I displayed Plaintiff's Exhibit 659 for the jury, so if

8    you could just please display that one for the jury so they

9    could see it.

10             And you can take it down.  And if you could also

11   please just display Plaintiff's Exhibit 658 for the jury so

12   they can look at it briefly.  And you can take it down.  Thank

13   you.

14   BY MS. MEEHAN:

15   Q.  I believe you said you moved over to Jump Crypto in

16   approximately spring 2021?

17   A.  Yes, that's correct.

18   Q.  Do you recall what month that was?

19   A.  No.  It was a gradual transition.  So it started like early

20   year and then it took a few months for us to -- because we were

21   still running HFT stuff, so we had to take time to shut it down

22   and gradually move over.

23   Q.  So during the time that you moved over and began working

24   with Jump Crypto, did there come a time when you became

25   familiar with a company known as Terraform Labs?

1    A.   Yes.

2    Q.   When did you first become familiar with Terraform Labs?

3    A.   It was early when we started, it was spring of 2021.

4    Q.   How did you become familiar with them?

5    A.   Bill DiSomma was telling us about a project that Jump was

6    building for Terra called Project Nebula.  And he was

7    explaining, you know, why we're doing the project and what the

8    whole purpose of it was.

9    Q.   What did he tell you about the project?

10   A.   So the project is meant to create an ETF sort of

11   functionality on blockchain.  ETF is like an exchange traded

12   fund.  So, you know, people are most familiar with like index

13   ETFs, like S&P 500, you might have like a retirement account,

14   something like that.  So Jump was building this project for the

15   Terra blockchain.  And he explained that the reason we're

16   building it is because we want to incentivize UST adoption.

17   And why would we want to do that?  Because Jump had a deal with

18   Terra to have increased UST adoption.

19   Q.   Did you have any understanding of what that means,

20   increased UST adoption?

21   A.   That the total amount of UST, like in circulation is

22   higher.

23   Q.   Apart from this conversation with Mr. DiSomma, did you have

24   any other basis for your familiarity with Terraform Labs?

25   A.   Yeah.  I mean, personally I looked at the blockchain, the

O3TASEC3                         Hunsaker - Direct

software, looked into the mechanism for the stablecoin.  Just

explored things, and also had discussions with other team

members.

Q.  When you say the mechanism what are you specifically

referring to?

A.  The mechanism by which the UST stablecoin is supposed to

maintain its peg to a dollar.

Q.  And what is your understanding of how that worked?

A.  So there's two tokens on the Terra blockchain, one is UST,

which is meant to be worth one U.S. dollar.  And then there's

another token called Luna.  And basically within the software

it's program that you could always exchange $1 of UST for $1 of

Luna or vice versa, $1 of Luna for $1 of UST.  So if UST is

ever not worth a dollar, like less or more, you can -- there's

an arbitrage opportunity.  Arbitrage means like it's almost

zero risk.  You just execute some instructions, make some

money.

       So if UST deviates from a dollar, you can -- let's say

like UST is less than a dollar.  You can buy UST for let's say

90 cents.  You can convert that to $1 of Luna and then sell

that for a dollar so you've made 10 cents.  You bought it for

90 cents, sold it for a dollar.  So that's an arbitrage

opportunity.  It's almost no risk.  And you can do it

instantaneously and that buying pressure for UST will cause the

price to go up.  The idea is the buying pressure will cause the

1    price to go up and then UST will be eventually be worth a

2    dollar again.

3    Q.  Directing attention on or about May 19th, 2021.  Did there

4    come a time when you became aware that the UST stablecoin

5    dropped below it's $1 peg?

6    A.  Yes.

7    Q.  How did you first become aware of this?

8    A.  There was some -- there was just some chatter in our Slack

9    chat application.

10   Q.  Was it notable to you that UST depegged from $1?

11   A.  Yeah.  I went and looked at the market data myself and saw

12   that it was worth less than $1 and was curious about it.

13   Q.  You said you were curious about it?

14   A.  Curious about it, yeah.

15   Q.  Why was that?

16   A.  Because it should be worth a dollar if the mechanism is

17   working.

18   Q.  Did there come a point later in time when the price of UST

19   dropped more substantially from $1?

20   A.  Yeah, it dropped several cents a few days later, you know

21   over the span of a few days.

22   Q.  And was that amount of a drop significant to you?

23   A.  Definitely because the more that the -- the more it drops,

24   the more that arbitrage opportunity is there, so the more money

25   you can make to restore it.  And so it didn't make sense that

1   it would drop that much because the natural like economics

2   should restore the price back to a dollar.

3   Q.  Were there any other reasons why the drop of the UST below

4   $1 was significant to you at that time?

5   A.  Yeah, it was an important deal for Jump.  For Jump had, you

6   know, two major deals, and Terra was one of those two major

7   deals, so.

8   Q.  On the day that this more significant drop in the price of

9   UST happened, did you join the Zoom meeting that day?

10  A.  Yes.

11  Q.  What prompted you to join the meeting?

12  A.  There was, again, there was chatter on -- there was some

13  conversation on the Slack application that they were going to

14  talk on Zoom about the price decrease in Terra and what to do

15  about it.

16  Q.  Do you recall what day of the week this was?

17  A.  I think it was the weekend, but yeah, I don't recall

18  exactly.

19  Q.  This was the Always On Zoom that you joined?

20  A.  The Always On Zoom, yes.

21  Q.  After you joined the call, what do you recall about what

22  happened?

23  A.  Bill DiSomma was discussing with some other team members

24  about Terra and what was going on and the status of things.

25  Q.  Approximately how many people were on the call?

1    A.  At least 10, but it was not the whole team.

2    Q.  I'm sorry.  I didn't hear.

3    A.  At least 10, but it was not the whole team.

4    Q.  And did you join with your video on?

5    A.  No.  I -- the Always On, usually people had their -- they

6    definitely usually had their microphones muted, and usually

7    they had their video off.

8    Q.  Did Mr. DiSomma have his video on?

9    A.  I don't believe so.

10   Q.  How could you identify that it was Mr. DiSomma speaking?

11   A.  So Zoom, you know, has a box for each person and if their

12   video is on, then obviously the video is there.  But if it's

13   not, it's just the person's name and then when someone is

14   speaking it highlights the box and so it shows who's speaking

15   at that moment.  But I also know his voice, so. . .

16   Q.  Did there come a time at some point when Mr. Kariya joined

17   the same Always On Zoom?

18   A.  Yeah, at some point in the meeting a few minutes later

19   Kanav joined the call.

20   Q.  Tell me what happened after Kanav Kariya joined the call?

21   A.  He joined the call and very quickly said to Bill, I spoke

22   to Do, he's going to vest us.

23   Q.  And how did you identify that it was Mr. Kariya speaking?

24   A.  Same thing, I know his voice and also the square with his

25   shape was highlighted.

1    Q.  Had you ever heard that "word" vest before?

2    A.  Yes.  Vest just means like conditions by which the deal is

3    fulfilled.  So you know --

4    Q.  And -- sorry.

5    A.  Yeah.  So if you like if you have a deal with somebody,

6    then there's like conditions by which if you fulfill those

7    conditions, then you'll get the payment.  So that's the vesting

8    conditions and so that's what he meant.

9    Q.  So when Mr. Kariya said I spoke to Do and they're going to

10   vest us, based on your experience, what did you understand that

11   to mean?

12   A.  That the previous vesting conditions no longer applied, and

13   if Jump helped with the depeg, that the deal would be

14   fulfilled.

15           MR. HENKIN:  Objection.  Move to strike.  Lack of

16   foundation.

17           THE COURT:  Overruled.

18   BY MS. MEEHAN:

19   Q.  After Mr. Kanav made this statement on the Zoom call, what

20   happened next?

21   A.  Bill started directing actions to basically start trading

22   UST, and so he was giving instructions to the traders and kind

23   of like what the plan was and that sort of thing.

24   Q.  How did he give those instructions?

25   A.  At that time he gave them over Zoom and then the Zoom call

1    ended and over the next few days he gave them over Zoom and

2    Slack.

3    Q.  But you were not a trader yourself, correct?

4    A.  Correct.

5    Q.  So how did you know that this was going on?

6    A.  I have access to all the -- I had access to all the Slack

7    channels, so I could see -- so channels is like different

8    conversations, and there can be different people on different

9    channels.  So even though I wasn't a trader, I was in the

10   trading channel so I could see what the traders were talking.

11   I could see like the automated notifications they got from the

12   models.  So even though I wasn't a trader, I could see

13   everything that was happening.

14   Q.  And what types of instructions was Mr. DiSomma giving to

15   the traders?

16   A.  He was telling them how to adjust the models so that they

17   could trade differently.

18   Q.  Can you provide a little more detail about that?  What do

19   you mean when you say he was telling them to adjust the models?

20   A.  So the models have parameters, and the parameters are like

21   how the model behaves.  The Jump Crypto models were pretty

22   simple market making models.

23        So a parameter might be like how much do you want --

24   how big of orders do you want to send, or how closely those

25   orders should be like to the market, these sorts of things.  So

he would tell them adjust the parameters, and the model would

then send bigger orders or move the orders around in price,

that sort of thing.

So when he's telling them adjust the parameters,

they're basically going to the GUI, they change the parameter,

and the software changes like what the market -- what the Jump

market making models were doing.

Q.  What were these orders for?

A.  For buying UST, buying and selling UST.

Q.  And you mentioned a "GUI," what were you referring to when

you said GUI?

A.  There's a trading GUI that traders use.  It shows, you

know, like the different models.  It shows like what their

position is.  Position is like how much UST they own.  It

shows -- it can show them order books, so like what does it

look like on the exchange and where are the models orders on

the exchange.  So it can -- it just basically shows all the

information you need to like manage a trading operation.

Q.  Did you personally look at the trading GUI at that time?

A.  Yes. I had access to the trading GUI, and I also looked at

that.

Q.  What did you observe when you looked at the trading GUI?

A.  It just seemed like the models were more aggressive.  They

were not behaving in typical sort of like market making style,

which is to basically, you know, not really take a position and

just behave in a way where you're just trying to make money off

the spread, rather than like the movement of the asset.

Q.   I'm sorry, did you say it was not consistent with that?

A.   It was not consistent with typical market making, what you

would see.

Q.   In what way was it not consistent?

A.   It was just more aggressive, and the orders were more

bigger, the trading was more aggressive.  It was accumulating

positions.

Q.   What type of position was it accumulating?

A.   It was UST.  It was buying UST.

Q.   Did there come a time later when the -- when the UST's peg

was eventually restored to $1?

A.   Yeah, a few days later.  It took a couple days for it to be

pushed back up.

Q.   After that peg was restored, did Mr. DiSomma give any

further instruction to the traders with regard to UST?

A.   Yeah.  At that point, Jump had accumulated a large position

of UST.  And so some of the traders were instructed basically

to sell it, because he didn't want to own that much UST.  But

he was saying sell it very carefully not to cause like another

depeg event.  Because if Jump just started dumping the UST on

the market, it would also cause the price of UST to drop again,

so he didn't want to that happen.

Q.   And during these few days when you were making these

1  observations about Jump's trading and what Mr. DiSomma was

2  directing, did you hear anything else about the amount of money

3  that Jump was willing to spend with respect to UST?

4  A.  Yeah.  On one of those morning meetings during those days,

5  Bill was, like he often did, gave sort of philosophical

6  statements about Jump Crypto, trading, that sort of thing --

7          MR. HENKIN:  Objection.  Hearsay.

8          MS. MEEHAN:  Your Honor.  It's statement against

9  interest, and it's also admissible under 8033, in furtherance

10  of conspiracy.

11          THE COURT:  Yeah.  The objection is overruled.

12  A.  So, yeah, he was saying that -- because, number one, Terra

13  was a big important project to Jump.  He was willing to risk up

14  to a couple hundred million dollars to do this, and also as an

15  add-on, it was important for Jump to show that like they're,

16  you know, a strong partner, and that they're, you know,

17  important in the crypto community, so. . .

18  Q.  Mr. Hunsaker, after these events occurred in May 2021, did

19  there come a time later when you learned more about the

20  business relationship between Terraform and Jump Trading?

21  A.  Yeah.  I learned more details about what the actual deal

22  was.

23  Q.  Let me stop you there.  And how did you learn that?

24  A.  I saw -- so Jump had a deal tracking system.  The deal

25  tracking system was a website that showed all the deals that

O3TASEC3                          Hunsaker - Direct

1    Jump had made.  Terra was just one of many, many deals.  And,

2    you know, I saw on that website that basically --

3    Q.  Let me just ask you a few questions about that deal

4    tracking system.

5          Based on your experience, was it Jump's practice to

6    keep information in its systems in the regular course of its

7    activities?

8    A.  Yes.

9    Q.  And maintaining this information, did Jump maintain this

10   information in its systems in the regular course of its

11   activities?

12   A.  Yes.

13   Q.  And maintaining this information, was the information

14   entered at or around the times that these deals were executed?

15   A.  Yes.

16   Q.  So what did you learn when you looked at the deal tracking

17   system with respect to Terraform and Jump Trading?

18   A.  Yeah.  So the deal tracking system, like I said, was like a

19   website.  It had -- it was kind of like a spreadsheet almost.

20   So columns like who the deals with, the terms of the deal, you

21   know, the different columns.  And so there was a row for Terra

22   and it was like Terra -- Jump is receiving approximately

23   1 million Luna a month and, you know, that they had vested and

24   then it had columns about like what Jump was going to do with,

25   you know, the different tokens they were receiving from

1  different projects.

2  Q.  Did there come a time when you left Jump Trading?

3  A.  Yes.

4  Q.  When was that?

5  A.  February of 2022.

6  Q.  And around that time did there come a time when you

7  personally purchased UST?

8  A.  Yes. I purchased UST either January or February of 2022

9  through April of 2022.

10  Q.  What did you do with the UST that you purchased?

11  A.  So Terra had this protocol called Anchor.  Anchor was -- is

12  basically a lending and borrowing protocol, and it was paying

13  approximately 20 percent interest.  And so I deposited -- I

14  purchased UST for the purpose of putting it in Anchor and

15  earning 20 percent interest.

16  Q.  How much did you invest in the Anchor protocol?

17  A.  In total -- I invested over those several months, so it

18  wasn't all at once.  But I think the total accumulated position

19  was about $200,000.

20  Q.  And in light of what you knew about Jump's trading during

21  these May 2021 events, did you have any concerns about the

22  stability mechanism of UST?

23  A.  Yeah.  I didn't -- didn't believe that it would work.

24  Q.  So why did you choose to invest in the Anchor protocol?

25  A.  It was paying 20 percent interest.  And that funding was

1    basically from VC money, so it was kind of, you know, an easy

2    way to earn 20 percent.  But I also knew that like, with my

3    experience in watching the UST, that I could get out of it if I

4    needed to quickly.

5    Q.  And when you say get out of it quickly, did you mean that

6    you would be able to withdraw your fends?

7    A.  Yes, correct.

8    Q.  And for how long a period of time did you keep your UST

9    assets deposited in the Anchor protocol?

10   A.  Kept it through first week of May.

11   Q.  And when did you withdraw?

12   A.  I believe it was around May 8th.

13   Q.  And why did you withdraw?

14   A.  The -- over those months, the economics started even

15   looking worse and worse.  And just watching closely, somebody

16   had forwarded me like a Twitter post that the economics were

17   getting worse, and I looked at it and said I'm going to be

18   conservative about this and take my money out, and it had

19   started to depeg a little bit.

20   Q.  Did you lose any money on your investment?

21   A.  I think in aggregate I had made money, but I did give back

22   some of my earnings because I sold UST at less than a dollar.

23   Q.  Did there come a time when you filed a complaint with the

24   SEC regarding these events in May 2021 that we've just

25   discussed?

1    A.  Yes.

2    Q.  When was that?

3    A.  Mid August of 2022.

4    Q.  What led you to file that complaint?

5    A.  When I saw the, you know, the impact to like all the

6    victims in May 2022 depeg, I tried to like basically, you know,

7    try to ensure that there was some sort of justice or

8    restitution could happen for the people who lost their money.

9    And I tried to -- tried to post this information like

10   anonymously online.  I created like a temporary Reddit account.

11   And tried to post it.  The Reddit rejected that because it was

12   a new account.  So, you know, I gave it to somebody who was on

13   Twitter and they were posting some of that information.  But I

14   didn't feel like that that was really getting traction or that

15   the government or people would actually respond to Twitter

16   posts.  So that's when I decided to -- shortly thereafter, I

17   decided to -- I had to some way to get it to the government

18   basically.

19   Q.  Are you aware of any potential benefit from your contacting

20   the SEC in this case?

21   A.  Yeah, there's a whistleblower program so there's a reward

22   for whistleblower.

23   Q.  Was that part of the reason that you filed your complaint?

24   A.  No.  I didn't -- didn't have any expectation.  I was just

25   trying to do the right thing.

1    Q.  Have you been promised anything by the SEC for your

2    participation as a witness in this trial?

3    A.  No.

4    Q.  You said that you filed your complaint with the SEC in

5    August 2022; is that right?

6    A.  Correct.

7    Q.  At any point prior to filing your complaint with the SEC,

8    did you ever raise any concerns about these events with anyone

9    else at Jump?

10   A.  No.

11   Q.  Why not?

12   A.  There were times when I was in Jump Crypto where I had

13   raised, not even concerns, but just questions about, you know,

14   some of the projects we were doing, and Bill got upset at me so

15   I just didn't feel like it would be, you know, good for my

16   career while I was still at Jump Crypto to raise these

17   concerns.

18            MS. MEEHAN:  No further questions.

19            THE COURT:  Cross-examination.

20   CROSS-EXAMINATION

21   BY MR. HENKIN:

22   Q.  Good afternoon, Mr. Hunsaker.  My name is Douglas Henkin.

23   I represent Terraform Labs.

24            I assume you remember me from our deposition, taking

25   your deposition?

1    A.  Yes.

2    Q.  And is that the only time that we've met?

3    A.  Yes.

4    Q.  During your direct testimony you were talking about the

5    mint burn mechanism; do you recall that testimony?

6    A.  Yes.

7    Q.  Now, that mint burn mechanism only works if people are

8    willing to engage with it; is that right?

9    A.  Yes.

10   Q.  Now, you, at the very end of your testimony, were talking

11   about investing or purchasing UST and depositing it into

12   Anchor; that's correct?

13   A.  Correct.

14   Q.  And you withdrew it on May 7, 2022; is that correct?

15   A.  I don't remember the exact date.

16   Q.  Do you have any reason to disagree with me?

17   A.  I would say May 7th or May 8th.

18   Q.  Okay.  And when you withdrew it, you withdrew $207,000; is

19   that correct?

20   A.  I don't know the exact number, but approximately, yes.

21   Q.  Okay.  And during the time that you had your UST deposited

22   with Anchor, you received all the interest that you were

23   expecting to earn from having deposited with Anchor, correct?

24   A.  I would guess so, yes.

25   Q.  Do you have any reason to think that you didn't?

1   A.  I never -- I didn't double check the math.

2   Q.  And when you -- strike that.

3        You mentioned losing -- that you thought you didn't

4   get all the money that you could have in your direct.  Isn't it

5   true that the only money that you think you lost was due to bad

6   trading that you did from UST back to USDC?

7   A.  What do you mean by bad trading?

8   Q.  Did you ever state in a Twitter direct message:  I didn't

9   lose any money less than one-month interest, but that was my

10  bad trading from UST to USDC?

11  A.  I was probably referring to that I didn't sell it quickly

12  enough.

13  Q.  Now, all the things that you were discussing about Jump's

14  activities during the May 2021 depeg, that all happened in

15  May 2021, right?

16  A.  Yes.

17  Q.  And the additional information that you claim that you

18  learned, you claim you learned that in the -- around the same

19  time period, right?

20  A.  What additional information are you referring to?

21  Q.  About the supposed deals, the deal tracking system that you

22  were --

23  A.  That would have been during that summer, later.

24  Q.  Okay.  And you didn't say anything to the SEC at that

25  point, correct?

1    A.  Correct.

2    Q.  Or, in fact, at any time during 2021, right?

3    A.  Correct.

4    Q.  And you never raised any internal questions about what you

5    claimed to have learned while you were at Jump; is that

6    correct?

7    A.  About the -- about the restoring the depeg?

8    Q.  Yes.  About anything relating to Terra.

9    A.  I mean, I raised questions about the Nebula Project, but

10   that's separate.

11   Q.  Right.  So and when you say the Nebula Project, what you

12   mean is you asked questions about how to implement and do the

13   work that was relating to Project Nebula; is that right?

14   A.  No.  As I described there was one example where Bill got

15   upset at me and that was when I questioned like whether the

16   Nebula Project was really like a viable project.

17   Q.  And when you say that Bill got upset at you, was that a

18   situation where it was a group meeting?

19   A.  That was a group meeting, and then subsequently after the

20   group meeting he was complaining.

21   Q.  But with respect -- other than with respect to the Nebula

22   Project, did you raise any concerns internally within Jump

23   regarding the May 2021 depeg or any other alleged deal with --

24   between Terraform and Jump?

25   A.  No.

1    Q.  And you talked about a little bit about Monad and starting

2    it after you left Jump; do you recall that?

3    A.  Yes.

4    Q.  You're the chief technology officer; is that right?

5    A.  Correct.

6    Q.  And the CEO of Monad is Keone Hon; is that right?

7    A.  That's correct.

8    Q.  And Mr. Hon is somebody that you worked with at Jump, isn't

9    he?

10   A.  Yeah, we worked together since February 2014 on the same

11   HFT team.

12   Q.  And he's one of your cofounders of the Monad, right?

13   A.  Yes, we left Jump together to form Monad.

14   Q.  And I think you said in your direct that you formed Monad

15   in April, 2022?

16   A.  That's correct.

17   Q.  Okay.  And you didn't even decide to contact the SEC about

18   this matter until after May 2022, correct?

19   A.  That's correct.

20   Q.  Now, building a start-up like Monad requires money, doesn't

21   it?

22   A.  Yes.

23   Q.  And you needed -- and you solicited investors for funds to

24   start up and operate Monad, didn't you?

25   A.  That's correct.

O3TASEC3                    Hunsaker - Cross

Q.  And, in fact, Monad solicited funds from investors, started

soliciting funds right after being founded, right?

A.  Yes.

Q.  And am I correct that Monad raised about $19 million from

investors in its initial round in 2022?

A.  That's correct.

Q.  So 9 million in May 2022, and 10 million later in the year?

A.  I don't remember the exact amounts and dates but -- it was

19 million by the end of 2022 I believe.

Q.  Okay.  And you're still raising funds today; isn't that

right?

            MS. MEEHAN:  Objection.  Relevance.

            MR. HENKIN:  Your Honor, this goes to credibility.

            THE COURT:  I'll let it go a couple more questions.

I'm not seeing the relevance yet, but I'll let you give it a

shot.

            MR. HENKIN:  I actually think I only have one more

question on it.

            THE COURT:  Okay.  Go ahead.

            MR. HENKIN:  After this one.

Q.  You're still raising funds as we speak, correct?

A.  We just completed a fundraise.

Q.  And the fundraise that you just completed would value Monad

at $3 billion; is that right?

A.  That's correct.

O3TASEC3                          Hunsaker - Cross

1    Q.   And is it correct that you don't have any documents or

2    recordings to prove anything that you complained to the SEC

3    about in your whistleblower report?

4    A.   I didn't take any documentation or recordings from Jump.

5    Q.   Isn't it true that you wrote in a Twitter direct message

6    that you don't have any documents or recordings to prove

7    anything?

8    A.   Probably true.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    BY MR. HENKIN:

2    Q.  When you filed your whistle-blower complaint, did you tell

3    the SEC -- well, let's go back to your UST approaches.  That

4    was substantially all of your liquid assets at the time; wasn't

5    it?

6    A.  I don't recall.  It was money from a bonus from Jump that I

7    had temporarily, yes.  I don't recall.

8    Q.  Do you recall writing in a Twitter direct message:  I had

9    most of my liquid assets in Anchor.

10   A.  I might have.  I don't recall that.

11   Q.  Let's see if we can refresh your recollection.

12           MR. HENKIN:  Can you bring up, just for the witness,

13   D-1624 at page 12?

14           THE COURT:  I want to instruct the witness and also

15   caution counsel, because we have had, with various witnesses on

16   both sides, a misuse of this procedure.  The question for any

17   witness on refreshing recollection is whether a document -- and

18   they can be shown any document -- sparks an independent

19   recollection in their own mind of such and such a factor, not

20   simply that a document not in evidence is then read, in effect,

21   into evidence, which would never be proper.

22           So, after you have looked at this document, the

23   question is, having looked at it, do you have an independent

24   recollection that you sent that message?  If you did.

25           THE WITNESS:  I don't understand.  What do you mean

O3T5sec4                          Hunsaker - Cross

1    independent recollection?

2                 THE COURT:  So put the document off the screen.

3                 Now, in your mind right now, if I were to ask you --

4                 What is the date of the message?

5                 MR. HENKIN:  It is May -- one second -- May 23, 2022.

6                 THE COURT:  Do you now, having looked at that

7    document, have an actual memory of what you said in that

8    document?

9                 THE WITNESS:  I -- vaguely.  I mean I might have said

10   that.

11                THE COURT:  OK.

12   BY MR. HENKIN:

13   Q.  Do you have any reason to doubt that is what you said?

14                THE COURT:  Sustained.

15   Q.  At the time you filed your whistle-blower complaint, did

16   you tell the SEC you started Monad labs and were raising money?

17   A.  I don't recall.

18   Q.  At the time that you -- strike that.

19                Do you recall discussing, in Twitter direct messages

20   on May 24, 2022, having spoken with the lawyer who became your

21   whistle-blower counsel?

22                MS. MEEHAN:  Objection, your Honor; best evidence.

23                MR. HENKIN:  I am asking about his recollection.

24                THE COURT:  I am sorry.  Let me look at the question.

25   So, the problem I have with the question is it is a little

1    vague, but --

2              MR. HENKIN:  I can clarify it if you want, your Honor.

3              THE COURT:  Go ahead.

4    Q.  Mr. Hunsaker, do you recall sending a Twitter message, a

5    Twitter direct message on May 24, 2022, describing a

6    conversation with a lawyer who you were then consulting with in

7    which you --

8              THE COURT:  No, no.  Stop.

9    Q.  Let me stop there.  Do you recall that?

10   A.  Maybe.

11             THE COURT:  Well, what do you mean by maybe?

12             THE WITNESS:  Well, I definitely discussed that I had

13   spoken with a lawyer in the message.

14             THE COURT:  So regardless of the date, around that

15   time you recollect sending a Twitter message referring to a

16   discussion you had had with your lawyer?

17             THE WITNESS:  Yes.

18             THE COURT:  Go ahead, counsel.

19   BY MR. HENKIN:

20   Q.  Do you recall that one of the things that you said was:  I

21   think two things.  He is not sure it is illegal --

22             MS. MEEHAN:  Objection, your Honor.

23             THE COURT:  Yes.  Sustained.

24   Q.  Do you have any recollection of the specifics of your --

25             THE COURT:  No, no, no.  It calls for hearsay.

1    Sustained.

2              MR. HENKIN:  No, it is not hearsay, your Honor,

3    because it is what Mr. Hunsaker was saying.

4              THE COURT:  No, but it is only being offered, if I

5    understand the offer, for the truth of what the lawyer said.

6              MR. HENKIN:  No.  It is being offered for the fact

7    that Mr. Hunsaker said it.

8              THE COURT:  No.

9              MR. HENKIN:  I will move on, your Honor.

10             THE COURT:  Very good.

11   BY MR. HENKIN:

12   Q.  Mr. Hunsaker, you were talking, during your direct

13   testimony, about certain documents that you say you later

14   learned of after the May 2021 depeg.  Do you recall that?

15             MS. MEEHAN:  Objection.  Vague.

16             THE COURT:  No, I will allow it.

17   Q.  Do you recall that?

18   A.  What do you mean by documents?

19   Q.  You were talking specifically about what you called the

20   deal tracker interface?

21   A.  Deal tracking system.

22   Q.  Deal tracking system.  Do you recall that?

23   A.  Yes.

24   Q.  Prior to May 2021, I think you agree that you learned that

25   Terraform and Jump had a business relationship; is that

1    correct?

2    A.   Yes.

3    Q.   And you called it a market-making relationship; is that

4    right?

5    A.   No.  I didn't call it that.

6    Q.   What was your understanding of the relationship when you

7    first started moving over to Jump crypto?

8    A.   That they had a deal to increase the adoption of UST.

9    Q.   And was part of that deal Project Nebula as well?

10   Developing Project Nebula?

11   A.   Project Nebula was a possible project that would achieve

12   that, help achieve that goal.

13   Q.   And you, yourself, never saw any documents relating to any

14   business transactions or any deals between Terraform and Jump;

15   is that correct?

16   A.   Outside of what you had shown me and the SEC had shown me,

17   no.

18   Q.   And when you say outside of what I had shown you, what do

19   you mean?

20   A.   During my deposition you showed me documents.

21   Q.   OK, so let me rephrase the question.

22          During the time that you were at Jump, you never saw

23   any documents relating to any business deals between Terraform

24   and Jump?

25   A.   I didn't see any contractual documents, no.

1    Q.  And I think you testified during direct that Jump

2    considered its relationship with Terraform important from the

3    perspective of Jump's business?

4    A.  Not exactly.  It was an important deal.

5    Q.  So let me ask the question again.  Did Jump consider its

6    relationship with Terraform an important relationship from the

7    perspective of Jump's business?

8                MS. MEEHAN:  Objection.  Speculation.

9                THE COURT:  Speculation; also effectively asked and

10    answered.  Sustained.

11    Q.  Now, in your direct testimony you asserted that you heard

12    from Mr. DiSomma that Jump's reputation as a reliable partner

13    was essential to securing future deals in the crypto industry;

14    is that right?

15                MS. MEEHAN:  Objection.  Misstates the testimony.

16    Q.  Is that something that you say you heard from Mr. DiSomma?

17                THE COURT:  If it is not accurate just correct it,

18    but --

19                MR. HENKIN:  No.

20                THE COURT:  -- but say whatever it is that is in that

21    ballpark, so to speak.

22                THE WITNESS:  Sorry.  Can you repeat the question?

23    BY MR. HENKIN:

24    Q.  Would you agree with me that Mr. DiSomma discussed, over

25    Zoom, how much money he was willing for Jump to put at risk to

1    help restore UST's $1 peg?  To the best of your recollection,

2    DiSomma said that he was willing for Jump to risk about

3    $200 million to help restore the peg because Jump's reputation,

4    as a reliable partner, was essential to securing future deals

5    in the crypto industry.

6            THE COURT:  What is your question?

7    Q.  Would you agree with that?  Is that what you have stated in

8    this case?

9    A.  Yeah, that was one reason for him to risk that money.

10   Q.  And during your direct testimony -- strike that.

11           For Jump's relationship with Terraform to be relevant

12   to its reputation as a reliable partner, that relationship

13   would have to be public; wouldn't it?

14           MS. MEEHAN:  Objection.

15           THE COURT:  Overruled.

16   A.  No.

17   Q.  During your day-to-day work at Jump Crypto, you didn't

18   interact with any employees at Terraform, did you?

19   A.  I might have had a couple meetings with them relating to

20   the Nebula Project but I don't recall them specifically.

21   Q.  Did you have any day-to-day interactions with anyone from

22   Terraform?

23   A.  On a daily basis?  No.

24   Q.  You did you ever speak directly with anybody from

25   Terraform?  When I say directly I just mean you,

1    person-to-person.

2    A.  Later.

3    Q.  Later when?

4    A.  When one of the Project Nebula team members left and he

5    joined Terraform and I spoke to him.

6    Q.  But other than that, did you ever speak, person-to-person,

7    with anybody at TFL?

8    A.  No.

9    Q.  Did you ever speak directly or person to person with

10   Mr. Kwon?

11   A.  No.  There was a Q & A session but I didn't speak to him

12   directly.

13   Q.  So that was just a group meeting?

14   A.  Group meeting, correct.

15   Q.  And you were listening?

16   A.  Yes.

17   Q.  And just going back to the question, the Q & A we had a few

18   minutes ago about contractual documents, the ones that you

19   referenced being shown by the SEC and at your deposition; you

20   have no idea who drafted any of those documents, do you?

21   A.  No.

22   Q.  And you never discussed any of those documents with anyone

23   at Jump; did you?

24   A.  No.

25   Q.  Now, you talked about the deal tracking system.  You don't

1    know for sure that you saw anything about a deal between Jump

2    and TFL and Terraform on the deal tracking system, do you?

3              MS. MEEHAN:  Objection; vague.

4              THE COURT:  Sustained.

5    Q.  You don't know the last time that you looked at the deal

6    tracking system at Jump, do you?

7    A.  2021.

8    Q.  And you have no personal knowledge of how information gets

9    entered into the deal tracking system, do you?

10   A.  No.  I presume that the PD team enters it.

11   Q.  I don't know what you want to presume, I want to know what

12   you know.

13   A.  I have never seen anybody type into the deal tracking

14   system.

15   Q.  And the deal tracking system wasn't a secret within Jump,

16   was it?

17   A.  I don't understand the question by secret.

18   Q.  In other words, anybody from Jump Crypto could access it.

19   A.  I don't know that.

20   Q.  Did anybody ever tell you not to look at it?

21   A.  No.

22   Q.  As far as you know, did anybody at Jump Crypto ever tell

23   anybody else at Jump Crypto not to look at it?

24   A.  No.

25   Q.  For that matter, did anybody at Jump or Jump Crypto ever

1  tell you not to look at any document?

2  A.  No.

3  Q.  And you don't have any records from the deal tracking

4  system; is that correct?

5  A.  It would be improper for me to take Jump records when I

6  left Jump.

7  Q.  You talked during your direct testimony about vesting.  Am

8  I correct that you would agree with me that the word that you

9  used was your understanding but you don't have any personal

10  knowledge about what actually happened with respect to what you

11  called vesting?

12  A.  I don't understand that question.

13  Q.  Do you have any personal knowledge about how any deals

14  between Terraform and Jump worked?

15  A.  As I said, the vesting requirement, as explained to me

16  originally, was a UST adoption.

17  Q.  Now, you testified about certain trading that occurred

18  during the May 2021 depeg.  You were never a trader at Jump;

19  right?

20  A.  Correct.

21  Q.  And none of the systems that you testified seeing, like the

22  graphical user interface, for example, were systems that you

23  operated; is that right?

24  A.  I would develop those type of systems so I didn't operate

25  them.

1  Q.  Meaning you didn't operate them on a day-to-day trade basis

2  to actually do trades?

3  A.  The Jump Crypto-specific ones?  I never operated them but

4  as part of the HFT team, yes, I would do that.

5  Q.  But at Jump Crypto, no?

6  A.  Correct.

7  Q.  And it is correct that you don't know what the book stacker

8  is; right?

9  A.  I recognize the name.

10  Q.  But you don't know what it is?

11  A.  Yes, it is a trading system, as far as my recollection.

12  Q.  But other than that you don't know anything about it?

13  A.  It's layering the book on the -- placing orders, layering

14  the book on the exchange, so that's where the name comes from.

15  Q.  And it is correct that you never reviewed any records of

16  Jump's actual trading of UST in May 2021; correct?

17  A.  No.  I did see the trading notifications from the engines

18  and Slack.

19  Q.  Ah.  I didn't say trading notifications, I said trading

20  records?

21  A.  I don't know what you mean by records then.

22  Q.  So did you review what trades had actually been made by

23  Jump Crypto in UST after those trades were made?

24  A.  Historically?  They were showing up in the Slack, that's

25  where they would be notified.

1  Q.  But did you review trading records to look at what Jump's

2  positions were, for example, on May 24, 2021?

3  A.  No.

4  Q.  And you understand that prior to the restoration of the

5  peg, Jump was market-making for UST; is that correct?

6  A.  That's my understanding.

7  Q.  Now, the traders who --

8          THE COURT:  Counsel, how much more do you have?

9          MR. HENKIN:  Probably about 15 minutes.

10          THE COURT:  OK.  Go ahead.

11          MR. CHESLEY:  Your Honor, apologies.  Andrew Chesley

12  for Do Kwon.  We have about two questions for Mr. Hunsaker.

13          THE COURT:  All right.

14  BY MR. HENKIN:

15  Q.  Josh Suiter was one of the traders who participated in

16  actual UST trading; is that right?

17  A.  He was the team leader of the traders.

18  Q.  And Chris Drew was also on that team?

19  A.  Sorry?

20  Q.  Chris Drew was also on that team?

21  A.  I don't recognize that name.

22  Q.  You don't recognize the name Chris Drew?

23  A.  No.

24  Q.  And Mr. Han was also on that trading team; right?

25  A.  No.  Mr. Han was on my team.

1   Q.  So you are saying that there was a separate team that was

2   the UST team and that your team was not involved in trading

3   UST?

4   A.  No.  There was no team involved specific with UST.  Some

5   members of Team Harvest, which was the team I was on, also did

6   some UST trading.

7   Q.  OK.  And have you told Mr. Han about your whistle-blower

8   report?

9           MS. MEEHAN:  Objection; relevance.

10          THE COURT:  Sustained.

11  Q.  In your whistle-blower report is -- let me ask a different

12  question.

13          Was any of the trading that you reported in your

14  whistle-blower report done by Mr. Han?

15          MS. MEEHAN:  Objection; lacks foundation.

16          THE COURT:  Sustained.

17  Q.  Was any of the trading that you reported in your

18  whistle-blower report done by someone who is a current employee

19  of Monad?

20          MS. MEEHAN:  Objection.

21          THE COURT:  Sustained.

22          MS. MEEHAN:  Relevance.

23          THE COURT:  Sustained.  I am sustaining the last one

24  not on the grounds of relevance, necessarily, but on the

25  grounds of lack of foundation.  If you wanted to lay a

1  foundation you might be able to ask that question.

2  BY MR. HENKIN:

3  Q.  Did you discuss with Mr. Han that you had filed a

4  whistle-blower complaint?

5           MS. MEEHAN:  Objection; relevance.

6           MR. HENKIN:  This is part of laying the foundation,

7  your Honor.

8           MS. MEEHAN:  The Court already sustained this

9  objection.

10          THE COURT:  No, I think that's -- so I will allow that

11 question.

12 A.  He found out on his own after your law firm published my

13 name.

14 Q.  Why did you not tell him?

15          THE COURT:  Sustained.

16 Q.  Was the reason that you did not tell Mr. Han yourself about

17 your whistle-blower complaint that some of the trading that you

18 reported in it was done by Mr. Han?

19          MS. MEEHAN:  Objection.

20          THE COURT:  Sustained.

21 Q.  Is it correct that -- so you talked about hearing a

22 conversation, hearing people say on the always-on Zoom that

23 Terraform had vested Jump; is that correct?

24 A.  No.  I said Kanav said that he spoke to Do and he is going

25 to vest us.

O3T5sec4                        Hunsaker – Cross

1   Q.  And that's the only basis that you have for your testimony;
2   is that correct?
3           MS. MEEHAN:  Objection; vague.
4   Q.  You have not seen any documents that say it, all you know
5   is that you heard Kanav say it?
6           MS. MEEHAN:  Objection; vague.
7           THE COURT:  I will allow it.
8   A.  Well, the payments started so I was aware of the payments.
9   Q.  When you say the payments started, what do you mean?
10  A.  While I was still at Jump we were receiving the 1 million
11  Luna a month.
12  Q.  Wasn't Jump receiving a million Luna a month prior to that?
13  A.  I'm not aware.
14  Q.  So you don't know whether the million Luna that you saw was
15  just a continuation of something that had started previously?
16  A.  It was new to me and it was discussed new to me.
17  Q.  So you don't know, one way or another, whether the million
18  Luna that you saw coming in each month -- that you say you saw
19  coming in each month after May 2021, had also been coming in
20  monthly prior to May 2021?
21          MS. MEEHAN:  Objection; asked and answered.
22          THE COURT:  Sustained.
23  Q.  You had no one-on-one conversations with Mr. Kariya about
24  the May 2021 depeg; isn't that right?
25  A.  That's correct.

1    Q.  And you had no one-on-one conversations with Mr. DiSomma

2    about the May 2021 depeg; is that right?

3    A.  That's correct.

4    Q.  And you don't recall what time of day what you think you

5    heard on the always-on Zoom occurred; is that right?

6    A.  I don't recall specifically, no.

7    Q.  And I think you said during your direct that there were

8    eight to 10 people on the call at that time?

9    A.  That's not what I said.

10   Q.  How many people were on the call at that time?

11   A.  I said there were at least 10.

12   Q.  At least 10.

13          Do you remember who else was on the call?

14   A.  No, I don't.

15   Q.  And you don't recall Mr. Kariya, during that part of the

16   call, saying anything about Jump's trading; do you?

17   A.  That's correct.

18   Q.  And in fact you don't recall if Mr. Kariya or Mr. DiSomma

19   said anything about trading during that part of the call; do

20   you?

21   A.  Bill started describing actions for trading.

22   Q.  But not prior to that?

23   A.  Not prior to what?

24   Q.  Not prior to what you say is the vesting comment.

25   A.  Correct.

1  Q.  And you don't -- strike that.

2  A.  Sorry.  I don't recall whether he said something about

3  trading in general.

4  Q.  And during the always-on Zoom, do you recall there being

5  statements made about Jump being a good partner with Terraform?

6  A.  Under what circumstance?

7  Q.  I'm asking if you recall.

8  A.  Around that time?

9  Q.  Yes, around that time.

10 A.  I think I already said that that was one of the reasons

11 that Bill was willing to risk money.

12 Q.  You have no firsthand knowledge about whether Mr. Kwon ever

13 reached out to Jump for help during the May 2021 depeg; do you?

14 A.  I was never on a call with Do Kwon.

15 Q.  And you never heard anyone say that the vesting was in

16 exchange for anything; did you?

17 A.  It was implied.

18 Q.  But you never heard anyone say it; did you?

19 A.  No.  I told you what he said.

20 Q.  And that was your inference from what he said?

21 A.  Yes.

22 Q.  And the vesting would have modified -- strike that.

23       There are no notes or recordings of any of the

24 conversations that we have been talking about, are there?

25 A.  I don't have any notes.

1    Q.  In fact, you never took any notes of any conversations that

2    you had at Jump Trading or Jump Crypto; isn't that right?

3    A.  Like I said in my deposition, if I took notes I would

4    e-mail them to myself so this would be on the Jump e-mail

5    server somewhere.

6    Q.  And you don't recall -- strike that.

7            So you are relying entirely on your memory for

8    everything that you testified to?

9    A.  Generally, yes; and public market data for dates.

10   Q.  And when you say "public market data" you are just talking

11   about UST prices; right?

12   A.  Exactly.

13   Q.  You solicited Jump to invest in Monad, didn't you?

14   A.  No.

15   Q.  You didn't?

16   A.  No.  There was a conversation between Keone and Bill, but I

17   was not part of the conversation.

18   Q.  So Mr. Han solicited Jump to invest in Monad?

19   A.  I don't believe that is an accurate description of what

20   happened.

21   Q.  Did Monad speak to Jump -- so, did Monad speak to Jump

22   about potentially investing in Monad?

23   A.  My understanding of the conversation is that Bill offered,

24   and once Keone said that we were going to leave to start Monad

25   that Bill offered to invest.  And there was some, like,

1    preliminary sort of discussions and they had a preliminary,

2    like, agreement.

3    Q.  And did that ever happen?

4    A.  No.  They decided that Jump was not a good crypto VC and so

5    we went back to them to modify the agreement.

6    Q.  You just said you decided that Jump was not a good crypto

7    VC.  Isn't it true that Jump stopped doing VC investing?

8              MS. MEEHAN:  Objection.  Mischaracterized the

9    testimony.

10             THE COURT:  It does.  It definitely mischaracterizes.

11             MR. HENKIN:  No, no.

12             THE COURT:  It is not what he said.  Put another

13   question, counsel.

14   Q.  Is the reason that Jump did not invest in Monad that Jump,

15   itself, stopped doing VC investing?

16   A.  No.  That's not true.

17   Q.  What are you saying happened?

18   A.  I just told you.  We decided that they weren't a good VC,

19   it wasn't their specially, Jump was a trading firm and there is

20   other VCs that have more capability such as offering expertise

21   with hiring, marketing, all that sort of stuff.  Jump didn't

22   have that.  So we went back to Jump and asked for a new deal

23   and we couldn't come to terms.

24             MR. HENKIN:  Give me one minute, your Honor?

25             THE COURT:  Yes.

1              (Counsel conferring)

2              MR. HENKIN:  Thank you, Mr. Hunsaker.

3              THE COURT:  Go ahead.

4    CROSS-EXAMINATION

5    BY MR. CHESLEY:

6    Q.  Good afternoon, Mr. Hunsaker.  My name is Andrew Chesley.

7    I am the attorney for Do Kwon.  I just have a couple of

8    questions for you.

9    A.  OK.

10   Q.  At the end of your direct examination you said that you

11   didn't report your concerns about the May 2021 depeg at Jump

12   because at other times you had raised concerns about Jump

13   projects to Mr. DiSomma and he had gotten angry with you.

14             Do you recall that testimony?

15   A.  Yes.

16   Q.  Can you tell us about those other Jump projects that you

17   raised concerns about?

18   A.  Well, the example that I remember the most objection was

19   Project Nebula.

20   Q.  Do you recall any other examples?

21   A.  No.  I would have to think.  Off the top of my head, no,

22   but there were a couple times that Bill DiSomma and I kind of

23   butted heads on what strategy or this sort of thing.

24   Q.  But you don't recall specific examples besides Project

25   Nebula?

O3T5sec4

1   A.  Not as I sit here right now, no.

2   Q.  What were your concerns about Project Nebula?

3   A.  It was a de-centralized ETF protocol and it didn't make

4   economic sense to me.  I felt like a centralized thing like

5   people would trust binance to do the same sort of

6   functionality, binance as a crypto change, to do the same sort

7   of functionality, and so, like, the de-centralized nature of

8   this didn't really make sense to me.

9   Q.  But it is fair to say that your concerns about Project

10  Nebula were not related to what you testified about today about

11  the May 2021 depeg?

12  A.  My concerns about Project Nebula were just about the

13  project itself.

14  Q.  So that's a yes, it was not related to your concerns

15  about --

16  A.  Not related to depeg.

17          MR. CHESLEY:  Thank you, Mr. Hunsaker.

18          THE COURT:  Redirect?

19          MS. MEEHAN:  No redirect, your Honor.

20          THE COURT:  Thank you very much.  You may step down.

21          THE WITNESS:  Thank you.

22          (Witness excused)

23          THE COURT:  Please call your next witness.  Or,

24  actually, come to the side bar.

25          (Continued next page)

O3T5sec4

1          (At side bar)

2          THE COURT:  Now, I feel badly burned because I had

3     requested, and the SEC was kind enough to respond favorably to

4     my request, that we have the expert testify beginning at 2:00

5     today so that my students at NYU could observe that.  The SEC

6     had flagged, in the pretrial consent order, there were two

7     witnesses who had to appear today, and although I don't know

8     the reason for that, I had assumed that if they reasonably felt

9     they were going to take more than a few minutes we would have,

10    this morning, put off the rest of the Paul Kim deposition until

11    we had heard from those two witnesses.  But that's not what

12    happened.

13          Now, who is the other witness?

14          MS. CUELLAR:  Sir, his name is Nader George, your

15    Honor, and I can promise you I have gotten his direct down to

16    15 to 20 minutes and I understand the cross is not very long.

17          MR. CHESLEY:  Roughly the same length or short.

18          MS. CUELLAR:  And I will cut even more if I can.

19          THE COURT:  We will not take him at 2:00, we will take

20    him after the expert.

21          MS. CUELLAR:  Understood, your Honor.  Thank you, your

22    Honor.

23

24

25

O3T5sec4

1          (In open court)

2          THE COURT:  All right, ladies and gentlemen.  Counsel

3     have talked me into giving you a full hour and 12 minutes for

4     lunch, so we will give you your lunch now but we do want to

5     start promptly at 2:00.  You are always prompt but, anyway, so

6     be back a few minutes before 2:00 and we will start then.

7          (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (Jury not present)

2              THE COURT:  Be seated.

3              A couple of follow-up questions from side bar.  How

4    long is the SEC expected to be on direct with the expert?

5              MR. CARNEY:  Your Honor, I would expect two hours but

6    I'm hoping --

7              THE COURT:  Two hours on direct?

8              MR. CARNEY:  On direct, but I'm hoping I can cut it

9    down to less than that.  I just didn't want to underestimate.

10             THE COURT:  Well, let me ask one other question.  What

11   is the reason the other witness can't come any other day but

12   today?

13             MS. CUELLAR:  Your Honor, he lives in Southern

14   California.  He is a pharmacist.  He works at an independent

15   pharmacy and if he is not back for Monday, he will have to

16   close.  He tried to get somebody else to cover but they will be

17   working at another pharmacy so no matter what, the one of the

18   pharmacies must close.  He came on a red-eye last night because

19   this is his only day off.

20             THE COURT:  We certainly want to take him late today

21   so he can net a nap before that.

22             Well, I reiterate that I feel badly burned by how this

23   was all handled by counsel but it sounds like we will do the

24   direct of the expert but we won't get to his cross, and then we

25   will take the other witness right after the direct of the

O3TASEC5

1    expert, and if you can cut it down from less than two hours,

2    that is fine, but it sounds like the other witness will only

3    take a half hour so it should all work out.

4            Now, we will want to give the jury a brief break, I

5    will try to keep it to 10 minutes, around 3:00 or so, 3:00,

6    3:15.  Very good.  We will see you at 2:00.

7            (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                      Afternoon session.

 2                         2:00 p.m.

 3          (In open court; jury not present)

 4          THE COURT:  Before we bring in the expert witness, let

 5   me just mention to counsel, it used to be the practice that

 6   after you had given the expert's credentials, you would say to

 7   the Court "we move to qualify him as an expert on X, Y, and Z."

 8   The Second Circuit has disapproved that, in my view correctly

 9   disapproved it.  That really suggests that the Court is somehow

10   backing the expertise of the witness.  So don't do that and we

11   won't have any problem.

12          Okay.  Let's bring in the next witness.

13          MR. CALIFANO:  Your Honor, one thing we just wanted to

14   motion.  As you recall there was a motion in limine to limit

15   certain questioning by the defense about whether or not

16   Dr. Edman had examined very specific components, actual

17   components, and I wanted to just describe it because we have

18   reached an agreement so the Court understands what we're doing.

19          THE COURT:  Okay.

20          MR. CALIFANO:  So the understanding is that

21   Dr. Edman --

22          THE COURT:  You've reached an agreement?  Oh, my God.

23   Wait a minute, I better call my cardiologist.  Go ahead.

24          MR. CALIFANO:  The agreement is this, your Honor:

25   Dr. Edman, as part of his examination, has examined the source
```

1    code for the LP server.  Defense counsel will not cross-examine

2    him on his failure to examine the actual LP server.  However,

3    and this is different, defense counsel is entitled without

4    opening the door to examine him on the fact that he did not

5    examine the source code for the Chai system or the source code

6    for -- excuse me.  Or the Chai system itself, or the

7    transaction data from the Chai system.

8         THE COURT:  Which would have been available you're

9    saying?

10        MR. CALIFANO:  Well, whether it would have been

11   available or not, your Honor, both parties attempted to get

12   that from Chai Corporation and were not successful.  So that's

13   just a fact that that limitation is one that is not in dispute

14   because we both tried and failed.  I will still away from his

15   failure to examine the actual LP server.

16        THE COURT:  The LP server, we've been through that and

17   I'm delighted you resolved that.  But I don't want any

18   suggestion, given what you just told me, that he somehow failed

19   to get something that was available when you're telling me it

20   wasn't available.

21        MR. CALIFANO:  I think, your Honor, it is important

22   that we be able to cross-examine him on the fact that his

23   analysis does not take into account the fact that the LP server

24   was part of the larger Chai system.

25        THE COURT:  That's fair game.  All I'm saying is what

O3TASEC5

1  you need to stay away from is any suggestion that -- you can

2  say, as part of your data, you never included X.  But you can't

3  say anything that suggests and why didn't you get X.

4          MR. CALIFANO:  Understood, your Honor.  We're not

5  going to do that.

6          THE COURT:  Okay.  Very good.

7          MR. CALIFANO:  The only other thing, your Honor, I

8  don't know if it will come up here, but I understand, your

9  Honor, I want to make sure.  There may be an occasion for a

10  voir dire, but if the Court would prefer that that voir dire be

11  very limited, or that it conduct voir dire, I just wanted to

12  understand that before I raised that request.

13          THE COURT:  No, you can do a voir dire.  I do think

14  that given the extensive *Daubert* hearings and all that it

15  should be fairly limited, but if you wanted to do a voir dire

16  you're welcome to do so.

17          MR. CARNEY:  And, your Honor, since I won't be asking

18  for the Court to qualify him, should I indicate when the

19  appropriate time where I'm done with the background

20  qualifications --

21          THE COURT:  Just move on.  Put the next question.  If

22  that's the point where they have their voir dire.

23          MR. CARNEY:  He'll stand up.

24          THE COURT:  He'll stand up and have it.

25          MR. CARNEY:  Thank you, your Honor.

O3TASEC5

1          MR. FERRARA:  Your Honor, Michael Ferrara for Do Kwon.

2   I'm not in any way casting aspersions of the witness at all.

3   In Dr. Edman's deposition he would at times frequently

4   volunteer that he was -- that when he was asked about the

5   server, he sort of volunteered, "we requested that from the

6   defense and it was not provided."  I just want to make sure

7   that the SEC has sort of instructed him that he shouldn't

8   volunteer that.

9          MR. CARNEY:  Dr. Edman has been advised of the

10  compromise that I've reached with Mr. Califano.

11         THE COURT:  Okay.  Very good.  Let's bring in the jury

12  and let's bring in the witness.

13         (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1              (In open court; jury present)

2              THE COURT:  I couldn't see what was on the back of

3    Juror No. 4 T-shirt.  Turn around.  Don't be shy.  All right.

4    There we go.  Okay.  Please be seated.

5              THE DEPUTY CLERK:  Please remain standing.

6    MATTHEW EDMAN,

7         called as a witness by the Plaintiff,

8         having been duly sworn, testified as follows:

9              THE COURT:  Counsel.

10             MR. CARNEY:  Thank you, your Honor.  And before I

11   begin, your Honor, I just want to let you know that we have

12   prepared some demonstratives that have been produced to the

13   defendants that I would ask permission to display to the jury

14   at the appropriate times.

15             THE COURT:  Yes.

16             MR. CARNEY:  Thank you.

17   DIRECT EXAMINATION

18   BY MR. CARNEY:

19   Q.  Good afternoon, Dr. Edman.  Where are you currently

20   employed?

21   A.  I am currently a partner and cofounder of a firm called

22   NAXO.  We are a cybersecurity and blockchain investigations

23   firm based here in New York.

24   Q.  And can you please describe the nature of your client

25   engagements at NAXO?

1  A.  Pretty much all of my client engagements involve blockchain

2  analysis and investigations.  I primarily work with law

3  enforcement, legal teams, companies and individuals on disputes

4  and investigations related to crypto assets in the context of

5  civil or criminal litigation.  I also do work with individuals

6  and companies on matters related to lost and stolen crypto

7  assets and support referrals to law enforcement.

8  Q.  Now, Dr. Edman, did you prepare a demonstrative summarizing

9  your background and education?

10  A.  I did.

11        MR. CARNEY:  And, Mr. Haywood, can you please pull up

12  Edmond Demonstrative 1.  And we can publish it to the jury.

13  Q.  Dr. Edman, can you please describe your educational

14  background?

15  A.  Sure.  So pretty much all of my education is in computer

16  science.  I have a bachelor of science in computer science from

17  Baylor University, master of science in computer science from

18  Rensselaer Polytechnic Institute and PhD also in computer

19  science also from Rensselaer.

20  Q.  So how many years of study in total were your bachelors

21  your masters and your PhD?

22  A.  It was about ten years.

23  Q.  And did you have any area of focus in your graduate

24  studies?

25  A.  The focus of my graduate studies generally was security and

1    applied cryptography, and specifically focused a lot on

2    anonymous communication systems on the internet.

3    Q.  And did you study blockchain technologies in connection

4    with your graduate work?

5    A.  So when I was in graduate school, a lot of that time

6    predated modern blockchain networks like Bitcoin, but a lot of

7    the same fundamental constructs that underlie anonymous

8    communication systems also form the building blocks for modern

9    blockchain networks; things like public-key cryptography,

10   peer-to-peer networks, and mixes and mix networks.

11   Q.  And those topics you just mentioned, did you publish any

12   papers related to those topics?

13   A.  I did.

14   Q.  And can you just describe those?

15   A.  Sure.  So I published I guess several papers related to the

16   design and analysis of anonymous communications systems in

17   peer-reviewed conferences and journals.  I also published, as

18   part of my research qualifier, it was a survey, which is kind

19   of like an overview or review of prominent papers in the field,

20   which was also published in a peer-reviewed journal.

21   Q.  And so after completing your PhD, where were you employed?

22   A.  My first job after completing my PhD was for a federally

23   funded research and development center called the Mitre

24   Corporation.

25   Q.  And what sort of work did you do at Mitre?

1    A.  So Mitre supports various aspects of the federal

2    government.  I principally supported the Federal Bureau of

3    Investigations remote operations unit based out of Quantico,

4    Virginia.

5    Q.  And what type of work were you doing that at Quantico?

6    A.  So given my background in applied cryptography and

7    anonymous communication systems, most of my work for Mitre in

8    support of the FBI related to supporting investigations related

9    to darknet markets, which are sort of like hidden websites that

10   allow individuals to buy and sell illegal -- say illegal

11   narcotics firearms, hacking materials, various things like

12   that.

13   Q.  And that work you just described, did that relate at all to

14   blockchain and crypto asset analysis?

15   A.  It did, yeah.  So most, if not all, of the darknet markets

16   that we were investigating used crypto assets, Bitcoin

17   primarily at the time, to facilitate buying and selling of

18   illegal items.

19   Q.  And were any of the investigations you supported while at

20   Mitre conducted here in the Southern District of New York?

21   A.  Yes.  Probably one of the most notable cases that I worked

22   on when I was supporting the FBI was an investigation into, it

23   was a notorious darknet market called Silk Road.  It

24   facilitated billions of dollars of transactions related to

25   primarily illegal narcotics.  I worked with agents up here in

1    the Southern District of New York to help identify where that

2    site was hosted.

3    Q.  And, Dr. Edman, what was your role in the Silk Road

4    investigation?

5              MR. CALIFANO:  Your Honor, objection just on relevance

6    because -- I'll leave it there.

7              THE COURT:  I do think we don't need to get into great

8    length, but I'll allow him to answer that question, but then I

9    think we need to move on.

10             MR. CARNEY:  Thank you, your Honor.

11             THE COURT:  What was your role?

12             THE WITNESS:  So my work on that kind of had a couple

13   different components.  One was developing the tools and

14   techniques that law enforcement used to find out where that

15   site was hosted so they could seize it.  And then also in

16   connection with that case I analyzed various blockchain Bitcoin

17   transactions associated with buyer and seller activity on the

18   site, as well as reviewed source code associated with the

19   marketplace to determine scope of functionality, how it

20   interacted with the Bitcoin blockchain, and how it facilitated

21   and processed transactions between buyers and sellers.

22   Q.  And you mentioned source code, what is source code?

23   A.  So source code generally is sort of a series of

24   instructions that a computer follows.  It dictates when you run

25   a program, like an app on your phone or on your computer, what

O3TASEC5                           Edman - Direct

1    series of steps it follows and what functionality that

2    application has.

3    Q.  And so let's move on from Mitre.

4         What was your next professional experience?

5    A.  After Mitre, I worked for a company based here in New York

6    called Bloomberg.  They're a global financial services and

7    media company.

8    Q.  And just very quickly, could you just give an overview of

9    the type of work you did at Bloomberg?

10   A.  Yeah.  I was a member of the vulnerability analysis team.

11   And my work was focused on reviewing source code networks

12   applications that Bloomberg software developers and network

13   engineers were developing and deploying, analyzing that

14   software and systems, and, you know, identifying

15   vulnerabilities before -- essentially before the bad guys do.

16   Q.  And where did you go after Bloomberg?

17   A.  After Bloomberg I went to a consulting firm called FTI

18   Consulting as a member of the global risk and investigations

19   practice.

20   Q.  And while you were at FTI, did you do any work related to

21   crypto assets?

22   A.  I did.

23   Q.  Can you just briefly describe that type of work?

24   A.  Yeah.  So an example of one of the cases that I worked on

25   was in relation to the prosecution of an individual who created

1    a virtual currency exchange.  That was being investigated and

2    was seized by the secret service in connection with money

3    laundering investigations.

4    Q.  And so after FTI, where did you go?

5    A.  After FTI I went to another consulting firm with the same

6    group.  It was called Berkeley Research Group.

7    Q.  And did any of your work at Berkeley Group relate to crypto

8    asset investigations?

9    A.  Yes.  I worked on several investigations related to crypto

10   assets.

11   Q.  And could you just give one example quickly of a type of

12   case you worked on at Berkeley?

13   A.  Sure.  So another example, fairly similar to the previous

14   example, it was a case here in the Southern District of New

15   York related to an individual who was accused of creating and

16   operating an unregistered Bitcoin exchange.

17   Q.  And did any of your work in that case relate to traditional

18   payment systems in addition to crypto assets?

19   A.  It did.  So in that case, there were -- part of the case

20   were allegations that the operator of this exchange was

21   accepting credit card payments in exchange for Bitcoin.  And

22   then mis-categorizing those credit card payments.  And so my

23   work in that case involved analyzing the source code associated

24   with this exchange, reviewing various databases of transactions

25   that occurred on that exchange, reviewing blockchain data

1   associated with those transactions, as well as how it

2   interacted with credit card payment systems.

3   Q.  And aside from the case you just described, have you worked

4   on any other engagements related to payment systems?

5   A.  Yeah.  There have been a few.  You know, as an example, in

6   connection with my cybersecurity work, I was retained by a

7   payment processing company that they had fallen victim to a

8   hack.  And we provided incident response and investigative

9   capabilities.  And part of my role in that case was analyzing

10  the source code of sort of the backend systems of this payment

11  processor, identifying the vulnerabilities, how the bad guy got

12  in, and then scoping to determine what information they

13  accessed and remediating the vulnerabilities.

14  Q.  Okay.  And after Berkeley Research Group, where did you go?

15  A.  Left with my team and we started our own firm called NAXO.

16  Q.  And you mentioned earlier that most of your work at NAXO

17  relates to blockchain investigations.  Have you testified in

18  any of those cases?

19  A.  I have.  Since we've started NAXO, I've submitted written

20  testimony in a number of cases including here in the Southern

21  District of New York.  Also testified at trial.  It was a

22  criminal case related to an individual.  He worked for a -- it

23  was an NFT marketplace called OpenSea.  And he was accused of

24  using information that he learned in connection with his job

25  for OpenSea to sort of secretly make place trades on the

O3TASEC5                           Edman - Direct

1    platform and profit from them.

2    Q.  And what were you asked to analyze in that case?

3    A.  I was asked to analyze materials from a variety of sources.

4    In addition to analyzing the defendant's activity, on the

5    OpenSea exchange I reviewed blockchain transactions associated

6    with that activity, certain crypto asset, wallets that the

7    defendant maintained.  I reviewed log files from web servers

8    associated with this platform.  Also reviewed source code

9    associated with basically the process of buying and selling

10   NFTs on that platform.

11   Q.  And, Dr. Edman, in addition to your computer science

12   degrees, do you have any professional certifications related to

13   blockchain analysis and investigations?

14   A.  I do.  I have a few certifications from a firm called

15   Chainalysis, which is sort of an industry standard blockchain

16   forensics tool firm.  I have a Chainalysis investigative

17   specialist certification, which is their highest level of

18   certification, in addition to certifications specific to the

19   Etherum blockchain as well as some of the software products

20   that Chainalysis offers.

21   Q.  And just very briefly, how do these certifications relate

22   to blockchain analysis?

23   A.  So these certifications relate to blockchain analysis

24   because they provide both basic and advanced knowledge of how

25   blockchains operate, how to conduct investigations on

1    blockchains, and essentially various aspects of the various

2    blockchain protocols.

3    Q.  And so aside from these Chainalysis certifications you have

4    listed here, do you have any other certifications?

5    A.  I do.  I also have an access data certified examiner

6    certification, which is a certification in the field of digital

7    forensics.

8    Q.  And what is digital forensics?

9    A.  It's essentially the investigation analysis of electronic

10   data.  So, for example, images or copies of cell phones,

11   reviewing documents, computer images, things like that.

12   Q.  And were you retained as an expert in this case?

13   A.  I was.

14   Q.  And who hired you?

15   A.  I was retained as an independent expert on behalf of the

16   SEC.

17   Q.  Are you being compensated for your work on this matter?

18   A.  I am.

19   Q.  At what rate?

20   A.  I believe my time is billed at 1,190 per hour.

21   Q.  Does your compensation depend at all on the outcome of this

22   case?

23   A.  It does not.

24   Q.  Dr. Edman, did you prepare a demonstrative summarizing what

25   you were retained to analyze in this case?

1    A.  I did.

2           MR. CARNEY:  Mr. Haywood, can we please put up Edmond

3    Demonstrative 2.

4    Q.  And can you just walk us through what you were retained to

5    analyze?

6    A.  Sure.  So my analysis in this case fell into two different

7    buckets.  The first bucket was I was asked to review the souce

8    code associated with an application called the LP server.  I

9    was asked to review that source code to determine the extent or

10   scope of that application's functionality, identify how and to

11   what extent this LP server application related to or may have

12   interacted with the Terra blockchain.  And then I was also

13   asked to review a history of changes made to the LP server

14   source code over time, both to determine how its capabilities

15   may have changed over time and also who implemented those

16   changes.

17   Q.  And in connection with that analysis, were you also asked

18   to review Terra blockchain data?

19   A.  I was.

20   Q.  And did you prepare a demonstrative summarizing what you

21   were asked to review regarding the Terra blockchain data?

22   A.  I did.

23          MR. CARNEY:  Mr. Haywood, could we please put up

24   Edmond Demonstrative 3, and can you please describe what you

25   were asked to do with respect to the Terra blockchain?

1   A.  So in connection with my review and analysis of Terra

2   blockchain data, I was asked to first identify purported Chai

3   user merchant transactions, that based on my review of the LP

4   server source code, I determined were likely to have been

5   created by the LP server.  And then analyze the overall

6   activity on the Terra blockchain to determine what proportion

7   of that activity is attributable to the LP server.

8           And then, finally, I was asked to, based on this

9   analysis of the LP server source code as well as the Terra

10  blockchain data, to provide an opinion as to whether those

11  Terra blockchain transactions represented processing and

12  settlement of transactions between Chai customers and

13  merchants.

14  Q.  And did you prepare a demonstrative summarizing what

15  materials you considered in connection with your analysis in

16  this case?

17  A.  I did.

18          MR. CARNEY:  Mr. Haywood, I ask you to please put up

19  Edmond Demonstrative 4.

20  Q.  And, Dr. Edman, could you just walk us through the sources

21  of data that you considered in forming your opinions in this

22  case?

23  A.  Sure.  So I reviewed and considered data from a variety of

24  sources.  I mentioned the source code for the LP server as well

25  as the publicly available Terra blockchain data, but I also

1    reviewed sort of a history or record of changes made to the

2    source code derived from the tools that were used to develop

3    and store that source code.  I also reviewed internal

4    communications between Terraform employees regarding the role

5    and operation and development of the LP server, in addition to

6    public statements that were made by Terraform employees

7    regarding its relationship with Chai.  And in connection with

8    this case, I also reviewed deposition testimony provided by

9    other witnesses.

10   Q.  And can you summarize what skills and experience you relied

11   on in analyzing that data?

12   A.  I relied on my skills and experience related to blockchain

13   analysis investigations and source code review.

14   Q.  And, Dr. Edman, based on the information you reviewed, do

15   you have a demonstrative summarizing your high level opinions

16   regarding the LP server source code?

17   A.  I do.

18            MR. CARNEY:  And, Mr. Haywood, if we can please put up

19   Edmond Demonstrative 5, and if you can just walk us through a

20   summary of your opinions as it relates to the LP server?

21   A.  Sure.  So specific to the LP server, after reviewing and

22   considering the materials I just described, I determined that

23   the LP server application was developed by Terraform Labs

24   employees.  After reviewing the source code, I determined that

25   it controlled what are called private keys associated with the

1    purported Chai transactions that occurred on the Terra

2    blockchain.  And that its functionality was to replicate Chai

3    user merchant transactions onto the Terra blockchain.

4    Q.  And do you also have a demonstrative summarizing your

5    high-level opinions regarding your analysis of the Terra

6    blockchain?

7    A.  I do.

8            MR. CARNEY:  And, Mr. Haywood, if we can please put up

9    Edmond Demonstrative 6.

10   Q.  And can you walk us all through your summary of opinions

11   related to the Terra blockchain?

12   A.  Sure.  So my high-level opinions after reviewing the LP

13   server source code in connection with the public Terra

14   blockchain data was that the purported Chai transactions on the

15   terra blockchain were created by this LP server application,

16   rather than by users of the terra blockchain.  These

17   transactions on the terra blockchain that were created by the

18   LP server comprised over 45% of token transfers or exchanges

19   between users on the terra blockchain during the period of

20   June 2019 to May 2022.

21           These transactions, since the LP server controlled all

22   of the private keys associated with the wallets involved in

23   these transactions, just represented transfers between

24   addresses controlled by Terraform Labs.

25           And based on all of this, I determined that the

1    transactions generated by the LP server on the terra blockchain

2    did not represent processing settlement of Chai transactions

3    between users and merchants.

4    Q.  And you've talked a bit about Chai here.  Let me ask you,

5    Dr. Edman, in connection with your analysis, did you review any

6    source code or other materials from Chai?

7    A.  I reviewed some sort of automatically generated e-mails

8    that were related to source code that was stored by Chai, but

9    those repositories were not public and were not available for

10   review.

11   Q.  And do you believe that the fact that they were not

12   available for review impacted your ability to form the opinions

13   you just summarized?

14   A.  No.  Based on the materials that were available for review,

15   my opinion is that there were -- there was no other application

16   or system separate from what was available that was relevant to

17   my ability to answer the question of whether Chai transactions

18   were processed and settled on the terra blockchain.

19        MR. CARNEY:  And, Mr. Haywood, can we please take down

20   this demonstrative now.

21        THE COURT:  So just to make sure that everyone is

22   clear, including the jury and the Court, is it your opinion

23   that Chai users were not using Terra to execute their

24   transactions, but that Terra was simply recording certain data

25   to mirror those transactions; do I have that?

1          THE WITNESS:  Correct.

2          THE COURT:  Okay.  Go ahead.

3          MR. CARNEY:  Thank you, your Honor.

4     BY MR. CARNEY:

5     Q.  So, Dr. Edman, before we get into the substance of your

6     opinions, could you just describe for us what you mean by

7     crypto assets?

8     A.  Yeah.  So crypto assets sometimes called cryptocurrencies

9     refer to a digital asset, exists only in electronic form.  You

10    can kind of think of it -- there's a variety of different types

11    of crypto assets, but you can think of it generally like a form

12    of electronic money that you can send and receive over the

13    internet without relying on a trusted intermediary, like a bank

14    or a third-party application like Venmo or CashApp.

15    Q.  And you've mentioned a few times so far, the term

16    "blockchain," can you just describe what is a blockchain?

17    A.  A blockchain is how transfers of crypto assets are

18    recorded.  You can think of it kind of like a ledger in your

19    checkbook, although fewer and fewer people have those these

20    days, so I might have to come up with a new analogy.  But the

21    idea is that, you know, like your checkbook, the ledger records

22    transfers to and from your account, except the difference is

23    that on a blockchain, everybody shares the same ledger and that

24    this ledger is public.

25          So anybody can access this blockchain.  They can

1    review transactions not only that they created but that anybody

2    else created, and it's all secured by cryptography where each

3    set of transactions is cryptographically linked to the previous

4    set of transactions so that everybody can verify that, for

5    example, nobody has tried to spend crypto assets that they

6    didn't have, or that nobody has tampered with the blockchain.

7    Q.   And are there examples of some common blockchains that

8    folks might have heard of?

9    A.   Some of the more commonly known blockchains include like

10   Bitcoin and Etherum.

11   Q.   And please just remind us what blockchain were you asked to

12   analyze in this case?

13   A.   The Terra blockchain.

14   Q.   What does someone need to have in order to be able to send

15   or receive crypto assets?

16   A.   To send and receive crypto assets on the blockchain,

17   typically you use what's called a wallet.  It's a software

18   application on your computer or on your phone.  Sometimes it's

19   a hardware device.  It looks kind of like a little thumb drive.

20   But your wallet takes care of all the complex cryptography

21   involved in creating that transfer of crypto assets on a

22   blockchain applying what's essentially a digital or electronic

23   signature to that transfer, and then sending that transaction

24   to the blockchain to be appended to this public ledger.

25   Q.   And, Dr. Edman, did you prepare a demonstrative to show how

1    a crypto wallet relates to the blockchain?

2    A.  I did.

3            MR. CARNEY:  Mr. Haywood, can we please put up Edmond

4    Demonstrative 7.

5    Q.  And can you sort of walk us through what you're showing on

6    your demonstrative?

7    A.  Sure.  So on the left, the picture of a wallet, you have a

8    number of what are called wallet addresses.  They look sort of

9    random, but you can kind of think of them like an account

10   number on the blockchain.  Each of those wallet addresses

11   generally has what's called a private key associated with it.

12   And a private key is a concept from cryptography where it's

13   basically a really big random number that only you know and

14   that you keep secret.  And when you want to transfer crypto

15   assets from your wallet to somebody else on the blockchain,

16   your wallet software, you create the transaction that

17   specifies, you know, I want to send this amount from this

18   address within my wallet to somebody else.  And then you use

19   your private key associated with that address to

20   cryptographically sign that net transaction.

21           So once it's sent to the blockchain, anybody can look

22   at the ledger and they can verify that this transaction has a

23   valid signature corresponding to that wallet address.  And

24   each -- within a wallet, you can have multiple wallet

25   addresses.  It's kind of like, you know, in your wallet you

1    might have multiple credit cards or debit cards, each of which

2    has a unique account number.  And so, similarly, your wallet

3    you can have multiple wallet addresses, each may represent a

4    different account.

5    Q.  And so can I safely give someone else my wallet address?

6    A.  You can give them your wallet address.  That's information

7    that can be public.  It's derived from the private key in a way

8    such that given the wallet address you can't work backwards to

9    determine the private key.  But you can verify that this

10   transaction was validly signed by a secret associated with that

11   address.

12        Now, if you give somebody your private key, however,

13   then they can control the crypto assets in your wallet.

14   Q.  If I don't have a copy of my private keys, can I still

15   control my crypto assets?

16   A.  In some scenarios, yes.  There's a concept called a

17   custodial wallet where somebody else basically assumes the

18   complexity of managing private keys and crypto assets and

19   interactions with the blockchain on your behalf instead of you

20   running this software on your computer or on your phone.  And,

21   in that case, you -- an example may be like Gemini or Coinbase

22   could be examples of a custodial wallet.

23        MR. CARNEY:  Mr. Haywood, we could take this

24   demonstrative down.  Thank you.

25   Q.  What are some types of crypto assets on the Terra

1   blockchain?

2   A.  The Terra blockchain had a variety of crypto assets, which

3   included UST and Luna.

4   Q.  And are you familiar with the concept of a validator?

5   A.  Yes.  So validators are sort of special notes on the Terra

6   blockchain network.  They have the ability to aggregate,

7   validate, and verify transactions created by other users of the

8   Terra blockchain, and then essentially add those transactions

9   once they've been validated to the Terra blockchain.  In

10  exchange for doing that, they receive sort of rewards in the

11  form of transaction fees paid by the other users.

12  Q.  And are you familiar with a concept called the delegator?

13  A.  So running a validator can be somewhat complex.  You have

14  to run special software on a computer that is basically

15  available and online all the time.  So it's not something that

16  you can really run on your phone or on your laptop all that

17  reliably.

18          So there's a concept of a delegator where instead of

19  running the validator software yourself, you basically -- you

20  delegate some of your Luna tokens to one or more validators,

21  which acts kind of like a vote for that validator.  And

22  validators that either have put up their own Luna or staked

23  their own Luna in combination with Luna that the delegators

24  have delegated to that validator.  They are sort of chosen

25  proportionally to validate and add transactions to the Terra

1  blockchain.

2  Q.  And did delegators receive any benefit for delegating their

3  tokens?

4  A.  They do.  They receive sort of a portion of the rewards

5  earned by the validators to which they have staked their

6  tokens.

7  Q.  Do validators and delegators benefit from an increased

8  volume of transactions on the Terra blockchain?

9  A.  Of course.  Since validators and delegators sort of receive

10  rewards in the form of transaction fees paid by users on the

11  Terra blockchain, if there are more transactions and more fees,

12  and more fees equals more rewards.  If there aren't any

13  transactions to validate, then there aren't really rewards to

14  earn.

15  Q.  And what crypto assets on the Terra blockchain did you

16  analyze in this case?

17  A.  In this case, my analysis was focused on a crypto asset

18  called KRT.

19  Q.  And what is KRT?

20  A.  KRT is what's called a stablecoin, where it's value was at

21  least intended to correspond to the Korean won.

22  Q.  And earlier you mentioned that your opinions in this case

23  related to a service called Chai.  What is your understanding

24  of what Chai was?

25  A.  My understanding of what Chai was is it was a Korean

1    payment processor, sort of like a Korean PayPal.

2    Q.  And in your opinion is it accurate to say that Chai ran its

3    payment services on the Terra blockchain?

4    A.  No.  Based on my analysis of the materials in this case,

5    it's my opinion that Chai transactions were not processed and

6    settled on the Terra blockchain.

7    Q.  When you say transactions were not processed and settled on

8    the Terra blockchain, what do you mean by that?

9    A.  I mean that Chai merchants were not paid by their customers

10   in KRT on the Terra blockchain.

11   Q.  How were Chai merchants paid then?

12   A.  My understanding is that they were paid in fiat currency,

13   basically Korean won.

14   Q.  So if in your opinion Chai users and merchants were not

15   paying each other on the Terra blockchain, then what were the

16   supposed Chai transactions on the Terra blockchain

17   representing?

18   A.  My opinion is that the Chai transactions on the Terra

19   blockchain were just sort of mirroring or replicating

20   transactions that occurred on Chai.

21   Q.  Let's talk about the LP server.  What is the LP server?

22   A.  The LP server was a piece of software that essentially

23   received information about Chai transactions and then generated

24   blockchain transactions on the Terra blockchain corresponding

25   to those Chai transactions.

1    Q.   And do you know what LP stands for by the way?

2    A.   In the context of crypto assets, LP usually stands for

3    liquidity provider or liquidity pool.  It's just kind of like a

4    group of crypto assets used to facilitate certain types of

5    transactions.

6    Q.   And, Dr. Edman, what did you review in forming your

7    opinions regarding the LP server?

8    A.   Regarding the LP server, I reviewed primarily the LP server

9    source code itself or how it was programmed.  I reviewed

10   history of changes made to the LP server, including who made

11   those changes, and I also reviewed Terra blockchain

12   transactions created by the LP server.  I also reviewed various

13   internal -- called Slack conversations.  It's sort of like a

14   chat application.  Involving the development and the role of

15   the LP server.

16   Q.   And do you have an understanding as to where the LP server

17   source code you reviewed was stored?

18   A.   The LP server source code I reviewed was stored on a

19   website called GitHub.

20   Q.   And what is GitHub?

21   A.   GitHub is -- it's a publicly available website or service

22   that companies and individuals can use to share and collaborate

23   on the development of source code.

24   Q.   And does it use a particular computer program?

25   A.   Yes.  So GitHub, as the name suggests, it uses a program.

1    It's called Git, which is a software tool for storing not just

2    source code, but also metadata about the source code like the

3    history of changes that were made to the source code, what

4    lines were modified in the source code, how were they changed,

5    and when were they changed.

6    Q.  How does Git do that, store this information you just

7    described?

8    A.  Git stores this information in kind of its own little form

9    of a database called a repository.

10   Q.  Is there a name for a group of changes made to a Git

11   repository?

12   A.  A related set of changes to source code in a Git repository

13   is called a commit.

14   Q.  Was the LP server repository on GitHub publicly available?

15   A.  No.  The LP server GitHub repository was a private GitHub

16   repository within a Terraform Labs GitHub account.

17   Q.  In this case, did you review the history of changes, or as

18   you described them "commits" made to the LP server at Git

19   repository?

20   A.  I did.

21   Q.  And did you prepare a chart summarizing the history of

22   changes to the LP server source code?

23   A.  I did.

24          MR. CARNEY:  Mr. Haywood, if I can ask you just

25   display to the witness, not to the jury, Plaintiff's Exhibit

1    203.

2    Q.  Dr. Edman, do you recognize this exhibit?

3    A.  I do.

4    Q.  And without getting into the content or the details of it,

5    what is it?

6    A.  It shows the sort of timeline of changes made to the LP

7    server GitHub repository.

8    Q.  Did you prepare this chart?

9    A.  I did.

10   Q.  And what was the source of the data that you relied on?

11   A.  The source of the data was the LP server Git repository

12   that was produced in discovery.

13   Q.  And how did you prepare this chart?

14   A.  I used the Git software to extract the history of changes

15   made to the repository, aggregated that information, and then

16   created this timeline.

17   Q.  And is this chart an accurate summary of the history of

18   changes made to the LP server at GitHub repository?

19   A.  It is.

20          MR. CARNEY:  Your Honor, at this time I would move for

21   the admission of Plaintiff's Exhibit 203.

22          THE COURT:  Any objection?

23          MR. CALIFANO:  No objection, your Honor.

24          THE COURT:  Received.

25          (Plaintiff's Exhibit 203 received in evidence)

1          MR. CARNEY:  Thank you.  Mr. Haywood, you may publish

2     it.  Thank you.

3     BY MR. CARNEY:

4     Q.  Dr. Edman, what sort of information is included in this

5     GitHub commit history data?

6     A.  Well, on the top is sort of a timeline of changes made to

7     the LP server Git repository aggregated by month.  And then at

8     the bottom, it is a table showing the different contributors or

9     authors of changes to this Git repository.  When they made

10    their first change to the repository, when they made the last

11    change or commit to the repository, and the total number of

12    commits that each account made to the LP server GitHub

13    repository.

14    Q.  And based on your analysis, when was the LP server software

15    server created?

16    A.  So you can see in the bottom table, in the first commit

17    column, the first commit to the LP server Git repository was

18    made on June 10, 2019.

19    Q.  And who created that commit?

20    A.  It was created by Paul Kim.

21    Q.  Do you know who Paul Kim is?

22    A.  Based on my analysis of materials in this case, he was the

23    primary developer of the LP server.

24    Q.  And if we look at the bottom of Exhibit 203, it says

25    Paul@terra.money, what does that indicate to you?

1    A.  So each account on GitHub or used to create or commit to a

2    Git repository has an e-mail address associated with it and

3    also like a human readable name.

4            So in this case, it shows that the account used to

5    create this commit was associated with the e-mail address was

6    Paul@terra.money.

7    Q.  And do you have an understanding of what company the

8    terra.money domain is associated with?

9            MR. CALIFANO:  Objection, your Honor.  Foundation.

10           THE COURT:  Well, lay a foundation.

11   Q.  Dr. Edman, do you have a reason to understand the company

12   that uses the terra.money web domain?  Without answering, but

13   do you have a basis for knowing that?

14   A.  Yes.

15   Q.  And what is that basis?

16   A.  The basis is the various materials that I reviewed in this

17   case, which included in addition to this Git repository,

18   e-mails, Slack communications from individuals associated with

19   Terraform Labs in which they used this terra.money domain.

20           MR. CARNEY:  And so if I may ask the question again,

21   your Honor.

22   Q.  What company do you understand to be associated with the

23   terra.money domain?

24           MR. CALIFANO:  Objection, your Honor.  Foundation and

25   timing particularly.

1           THE COURT:  No.  I think you can inquire on cross, but

2     I think there's sufficient *prima facie* basis there to put that

3     question.  You may answer.

4     A.  It's my understanding that the terra.money domain is

5     associated with Terraform Labs.

6     Q.  And, Dr. Edman, when does it say the most recent commit was

7     made to the LP server Git repository?

8     A.  The most recent commit is in the last commit column and

9     that was also made by Paul Kim using the account

10    Paul@terra.money.  And that was Thursday, December 9 in 2021.

11    Q.  And right below the box that you've highlighted, it says,

12    Han Ju Kim as an author.  Do you have an understanding as to

13    who Han Ju Kim is?

14    A.  My understanding is Han Ju Kim is the same person.  Paul

15    Kim is like his English nickname.  And you can see that the

16    e-mail addresses are the same with both accounts.  And so it

17    indicates that it's associated with the same GitHub account.

18    Q.  And so how many total commits were made to the LP server

19    GitHub repository?

20    A.  There were 45 total commits between June 2019 and

21    December 2021.

22    Q.  And how many of those commits were made by Paul Kim?

23    A.  All but one of them.

24    Q.  Well, who made the other commit?

25    A.  It was an individual who I understand to be named Yun Yeo.

1    Q.   And what was his e-mail address?

2    A.   His e-mail address was Yun@terra.money.

3    Q.   So, Dr. Edman, in your opinion who was primarily

4    responsible for creating the LP server software?

5    A.   Paul Kim was primarily responsible for creating and

6    developing the LP server software.

7    Q.   And what GitHub company account was used to store the LP

8    server source code?

9    A.   It was Terraform Labs' GitHub company account.

10        MR. CARNEY:  Mr. Haywood, I'm going to ask you to

11   display just to the witness Plaintiff's Exhibit 297.

12   Q.   Dr. Edman, is this one of the files you reviewed in the LP

13   server Git repository?

14   A.   This is.

15   Q.   And without getting into any of the details of the file,

16   what generally is this file?

17   A.   This file generally is what's often called the license file

18   which provides -- it's commonly included in Git repositories or

19   with software to show who, you know, created the software and

20   any sort of terms of use or licensing information associated

21   with that software.

22   Q.   And how did you obtain the data shown in this exhibit?

23   A.   I used the Git software to extract it from the LP server

24   Git repository.

25   Q.   So the data that we see here in Plaintiff's Exhibit 297, is

1   that information that was contained within the LP server Git

2   repository?

3   A.  It was.

4          MR. CARNEY:  Your Honor, at this time I would move for

5   the admission of Plaintiff's Exhibit 297 into evidence.

6          MR. CALIFANO:  I'm just going to object to relevance,

7   your Honor.

8          THE COURT:  Well, given the very broad definition of

9   relevance, under Rules 401 and 402, I think it passes.

10  Received.

11         (Plaintiff's Exhibit 297 received in evidence)

12         MR. CARNEY:  Thank you, your Honor.

13         You may publish it, Mr. Haywood.  Thank you.

14  BY MR. CARNEY:

15  Q.  Dr. Edman, who created this file in the LP server Git

16  repository?

17  A.  So you can see on the left this file was created by Paul

18  Kim on June 10, 2019.

19  Q.  And what does the top of the license file itself say?

20  A.  The top of the file on the right says Terraform Labs

21  confidential.

22  Q.  And does it contain a copyright notice?

23  A.  It does.

24  Q.  And who does that copyright belong to?

25  A.  It says copyright 2018 to present, Terraform Labs Inc.

1          MR. CARNEY:  You can take this exhibit down, please.

2     Thank you, sir.

3     BY MR. CARNEY:

4     Q.  In addition to the LP server's license file, did you review

5     the source code of the LP server itself to determine how it

6     operated?

7     A.  I did.

8     Q.  And, Dr. Edman, you mentioned that there were 45 commits or

9     changes to the LP server between June 2019 and December 2021.

10    Did its functionality change significantly over time?

11    A.  It did.  After reviewing the series of changes made to the

12    LP server source code, I determined that the functionality of

13    the LP server software changed significantly in December 2019,

14    compared to how it operated when it was created in June of

15    2019.

16    Q.  Okay.  So let's start with how the LP server operated when

17    it was created in June 2019, so before December 2019.  Have you

18    prepared a demonstrative to show how the LP server operated

19    when it was created?

20    A.  I did.

21          MR. CARNEY:  Mr. Haywood, I would ask that you please

22    put up Edmond 8.

23    Q.  So we have your demonstrative up here, Dr. Edman, it's a

24    fairly complex looking diagram.  Can you sort of walk us

25    through what you're showing on here?

1   A.   Sure.  So it does look complex, but really there are only

2   three main components to focus on.

3        One, on the left is what's called a rest API.  And API

4   is basically a way for computer programs to talk to each other.

5   On the top there's a component called batch terra, and then on

6   the bottom there's a component called batch Tempura.

7        So the rest API on the left receives information about

8   Chai transactions, such as the user ID, the merchant ID, and

9   transaction amount.  And depending on which API end point is

10  called, it will send that information either to the top

11  component, batch Terra, or to the bottom component, batch

12  Tempura, or sometimes both.

13       The batch Terra component, for example, will look at

14  the user ID that was provided to the application and it will

15  check a database that it keeps alongside the source code of

16  wallets, of Chai user wallets, and it will look up this user ID

17  in that database to see if it has a wallet and private key

18  associated with that ID.  If it doesn't, I will create one and

19  then store it in the database.

20       The batch Terra component will aggregate all of the

21  inputs that it's received over a period of time from the rest

22  API, and then use the private keys that it either pulled from

23  the database or that it created to create and cryptographically

24  sign two transactions.  One, sending KRT from a special wallet,

25  called the LP wallet, to the Chai user wallets from the

1    database.  At the same time, it will also create a second

2    transaction sending KRT from the Chai user wallets back to the

3    LP wallet.  And it will send both of those to the Terra

4    blockchain.

5            The batch Tempura component on the bottom operates

6    basically the same way except instead of sending transactions

7    to the Terra blockchain, it sends transactions to the Tempura

8    blockchain.

9    Q.  And, Dr. Edman, based on your analysis of the LP server

10   source code, who or what controlled the private keys associated

11   with these wallets?

12   A.  The LP server controlled all of the private keys.  They

13   were stored in the little cylinder labeled wallets on the

14   graph.

15   Q.  And could Chai users access their private keys associated

16   with their wallet addresses on the Terra blockchain?

17   A.  No.  Not based on the evidence I have seen.

18   Q.  All right.  So if users couldn't access their private keys

19   to create Chai transactions, what created the Chai transactions

20   on the Terra blockchain?

21   A.  The Chai transactions on the Terra blockchain were created

22   by the LP server software.

23   Q.  And in your description here of how the LP server operated,

24   why didn't you mention anything about transactions to or from

25   Chai merchant addresses?

1    A.  So during this time period, even though the rest API

2    received both a users ID and a merchant ID, it essentially

3    ignored the merchant ID and it only created transactions

4    involving Chai user wallets.

5    Q.  And you also have mentioned on here a batch Tempura

6    component.  What is your understanding of what "Tempura" refers

7    to?

8    A.  Well, at least in this context my understanding is that

9    Tempura refers to a private blockchain.

10   Q.  And what is a private blockchain?

11   A.  So a private blockchain, in contrast to a public blockchain

12   like Bitcoin, refers to a blockchain that's usually used just

13   internally within an organization since it's private and not

14   everybody can view the transactions on that blockchain.

15   Q.  In the documents you reviewed in this case, did you

16   identify any other references to this private Tempura

17   blockchain?

18   A.  I did.

19         MR. CARNEY:  Mr. Haywood, I'm going to ask that you

20   display to the witness and the jury Plaintiff's Exhibit 143a

21   which has already been admitted.

22         Have you seen this --

23         THE COURT:  Counsel, keep in mind that because it is

24   Friday afternoon.  I want to give the jury a ten-minute break

25   in around 3:00.  So pick an appropriate time.

1              MR. CARNEY:  This would be a great time, your Honor.

2              THE COURT:  Okay.  So, ladies and gentlemen, I do want

3     to hold it to ten minutes, so let's take a ten-minute break.

4              Step down.  We will see you in ten minutes.

5              (Jury not present)

6              THE COURT:  Please be seated.  All right.  We'll see

7     you all in ten minutes.

8              (Recess)

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  Let's bring in the jury and get the

2    witness back on the stand.

3          How much longer do you have on direct?

4          MR. CARNEY:  I am more than halfway through my

5    outline, your Honor, so I am really aiming for that 4:00.

6          THE COURT:  Yes, because as you know, we need to.

7          MR. CARNEY:  I am going to cut on the fly, if I can.

8          (Continued on next page)

1           (Jury present)

2           THE COURT:  Please, be seated.

3           Go ahead, counsel.

4           MR. CARNEY:  Thank you, your Honor.

5           Mr. Haywood, could you please bring up again

6    Plaintiff's Exhibit 143-A, which has already been admitted into

7    evidence?

8    BY MR. CARNEY:

9    Q.  Dr. Edman, is this one of the documents that you reviewed

10   in connection with your analysis?

11   A.  It is.

12   Q.  And what is this document, to your understanding?

13   A.  This is a transcript of a Slack conversation involving Do

14   Kwon.

15   Q.  How did this Slack conversation factor into your opinions?

16   A.  It involves Do Kwon talking about the Terraform blockchain

17   chain and the Tempura blockchain.

18           MR. CARNEY:  If you can please turn to the third page?

19   Q.  And I would ask you to please read the fifth and sixth

20   entries.

21   A.  Do Kwon says:  We are not using any Terra blockchain

22   technology, we are using a private blockchain called Tempura.

23   Q.  How did that factor into your analysis?

24   A.  Well, based on the context of this conversation and my

25   review and consideration of the various materials, Do Kwon is

1    saying that Chai is not using any Terraform blockchain

2    technology but is, instead, using a private blockchain called

3    Tempura.

4    Q.  If you can please skip to the last page and I would ask you

5    to read the fourth and fifth entries from the bottom.

6    A.  Do Kwon says:  Already lots of people figured out their own

7    wallet addresses and some have (this is harder, so not sure

8    how) discovered evidence of the Tempura blockchain, too.

9    Q.  Let me ask you, Dr. Edman, in your experience as a

10   blockchain expert, is it necessary for people to have to figure

11   out their own wallet addresses on the blockchain?

12   A.  No.  So your wallet address is usually just provided to you

13   by your wallet software, or if you are using a custodial wallet

14   like CoinBase, for example, they will tell you a deposit

15   address associated with your account, you don't have to try to

16   figure it out and guess.

17   Q.  Did you analyze any Chai transactions created by the

18   LP Server on the Tempura blockchain?

19   A.  No.  The Tempura blockchain was not available for review.

20   Q.  Do you believe that impacted your ability to form your

21   opinions in this case?

22   A.  No.  The scope of my analysis was related to whether or not

23   Chai transactions were processed and settled on a Terra

24   blockchain, not the Tempura blockchain.

25   Q.  Dr. Edman, you just walked us through a demonstrative where

1    you showed us how the LP Server worked before December 2019.

2    Did you prepare a demonstrative showing how the LP Server

3    worked after December 2019?

4    A.  I did.

5          MR. CARNEY:  And Mr. Haywood, if we could put up Edman

6    demonstrative 9, please?

7    Q.  If you can quickly walk us through this, explain the

8    differences from what you said before.

9    A.  Sure.  So the main difference here is pretty much the

10   entire bottom of the chart is gone.  The references and the

11   functionality related to the Tempura blockchain was removed and

12   the LP Server only interacted with the Terra blockchain.  The

13   rest of API was also modified so instead of receiving

14   information including user and merchant ID, it was changed to

15   only receive a "from" ID and "to" ID, and then the transactions

16   that it created on the Terra blockchain modified where as

17   before it created two, here it only creates one.

18   Q.  Great.

19         MR. CARNEY:  We can take this one down, please.

20   Q.  Did you analyze any Chai transactions created by the

21   LP Server on the Terra blockchain?

22   A.  I did.

23   Q.  Did the Terra blockchain data publicly available?

24   A.  It is.

25   Q.  Did you prepare a demonstrative showing how you prepared

1  the Terra blockchain data?

2  A.  I did.

3        MR. CARNEY:  Mr. Haywood, if we can please put up

4  Edman demonstrative 10.

5  Q.  If you could just quickly walk us through how you obtained

6  the Terra blockchain data?

7  A.  Sure.  So I obtained and analyzed Terra blockchain data

8  from multiple independent sources.  The first was a website

9  called Terra Finder, which is a publicly accessible -- it is

10  called a block explorer, which is a website that lets you view

11  and sort of interact with a blockchain, just kind of like you

12  are interacting with a normal website.  I also reviewed public

13  snapshots of public Terra blockchain data from a website called

14  quicksync.io which archives snapshots of various blockchain,

15  including Terra, at various points in time.  I also reviewed

16  data from, it is called a Google BigQuery database which is a

17  database for large data analysis.  That was created by a

18  consultant for the SEC and it was populated from data from

19  Terra Finder.  So I reviewed the data that was used to populate

20  that database and including the software and tools that were

21  used to extract and populate that database.  And then I looked

22  at these various sources of data to ensure that they were

23  consistent with each other.

24        MR. CARNEY:  We can take that down.  Thank you.

25  Q.  Once you obtained the Terra blockchain data, how did you

1    identify the Chai transactions created by the LP Server on the

2    Terra blockchain?

3    A.  So based on my review of the LP Server source code,

4    identified a number of properties associated with the

5    transactions that the LP Server generated on the Terra

6    blockchain, and then I searched through and analyzed the Terra

7    blockchain data to identify those transactions, based on those

8    properties.

9    Q.  Do you have demonstrative showing how you identified those

10   Chai transactions?

11   A.  I do.

12        MR. CARNEY:  If we could please pull up Edman

13   demonstrative 11?

14   Q.  Dr. Edman, if you could kind of quickly walk us through how

15   you identified the characteristics of these transactions?

16   A.  Sure.  So, as I mentioned, these transaction

17   characteristics were derived from reviewing the LP Server

18   source code.  In general, all of the transactions used a

19   particular message type called Message MultiSend, which

20   compared to what is called a Message Send Transaction that lets

21   you just send crypto assets from one address to another

22   address, a Message MultiSend lets you send crypto assets from

23   several input addresses to several output addresses all within

24   the same transaction.  All of the transactions used KRT as the

25   crypto asset.  The special LP wallet controlled by the

O3T5sec6                          Edman - Direct

1   LP Server had a unique wallet address that was always the

2   input, output, or both in a transaction.  All of the same --

3   all of the transactions had the same number of inputs and

4   outputs and the input amount and the output amount were equal.

5   And then, prior to the changes that I mentioned to the

6   LP Server in December 2019, they all included a memo field that

7   was either Terra batch:  LP to user, or Terra batch:  User to

8   LP.

9   Q.  Did you do anything to verify the characteristics of the

10  LP Server transactions that you just described that they were

11  accurate?

12  A.  I did.

13  Q.  And what did you do?

14  A.  I reviewed public statements that Do Kwon made in

15  Terraform's public discord channel, which is another chat

16  application, and compared those transactions that Do Kwon

17  identified as Chai transactions to these properties.

18          MR. CARNEY:  And Mr. Haywood, if you could just please

19  display to the witness Plaintiff's Exhibit 302?

20  Q.  Do you recognize this document?

21  A.  I do.

22  Q.  What is it?

23  A.  It's a screenshot of Do Kwon's Discord message identifying

24  certain transactions as Chai transactions.

25  Q.  And what is Discord?

1    A.  It is a chat application, sort of like Slack or WhatsApp.

2    Q.  And how did you obtain this document?

3    A.  I viewed Terraform's public Discord channel and then I had

4    a colleague take a screenshot of this particular message.

5          MR. CARNEY:  Your Honor, this exhibit has been

6    stipulated to as admissible, so I would move for the admission

7    of Plaintiff's Exhibit 302.

8          THE COURT:  Received.

9          (Plaintiff's Exhibit 302 received in evidence)

10   BY MR. CARNEY:

11   Q.  Dr. Edman, could you please read the message at the bottom

12   of this exhibit into the record?

13   A.  At the bottom Do Kwon says:  Transactions from Chai

14   committing to the chain well.  Check out blocks starting from

15   block 70K on terra.stake.id.  Will write a blog post soon

16   regarding.

17   Q.  What do the four squares displayed in the message show?

18   A.  Those are thumbnails of screenshots of Terra blockchain

19   transactions that Do Kwon is identifying as Chai transactions.

20   Q.  Were you able to review those screenshots?

21   A.  I was.

22   Q.  Did you analyze the transactions that Do Kwon identified as

23   Chai transactions?

24   A.  I did.

25          MR. CARNEY:  I'm going to ask Mr. Haywood if you could

1    just display to the witness Plaintiff's Exhibits 309 and 310.

2    Q.  Did you review these documents in forming your opinions?

3    A.  I did.

4    Q.  And what is this?  What are they?

5    A.  These are page captures from the Terra Finder websites that

6    correspond to the transactions that Do Kwon identified as Chai

7    transactions.

8    Q.  And how did you obtain them?

9    A.  I viewed the public Terra Finder website myself and created

10   the page captures.

11   Q.  And I think you talked a little bit about Terra Finder

12   earlier but can you quickly remind us what Terra Finder is?

13   A.  It is just a publicly available block explorer that lets

14   you view information about and on the Terra blockchain just

15   like a normal website so you can view transactions, wallet

16   addresses, and various activity on the blockchain.

17   Q.  And do you have an understanding as to who operates Terra

18   Finder?

19   A.  My understanding is that Terraform Labs operates Terra

20   Finder.

21   Q.  Is there anything on Plaintiff's Exhibits 309 and 310 that

22   shows its relationship to Terraform Labs?

23   A.  At the bottom it has the URL or the address of these

24   particular page captures and you can see that the domain is the

25   Terra.money domain.

1              MR. CARNEY:  Your Honor, at this time I would move for

2      the admission of Plaintiff's Exhibits 309 and 310 into

3      evidence.

4              MR. CALIFANO:  No objection, your Honor.

5              THE COURT:  Received.

6              (Plaintiff's Exhibit 309 and 310 received in evidence)

7      BY MR. CARNEY:

8      Q.  How did these -- first of all, can you just describe, now

9      that the jury is able to see Plaintiff's Exhibits 309 and 310,

10     what is shown here?

11     A.  Sure.  So these are just page captures or basically like

12     printouts from the Terra websites.  Each of these pages

13     corresponds to a transaction from Do Kwon's Discord message.

14     Q.  So the Discord message that we looked at a few minutes ago,

15     these were two of the transactions in that message?

16     A.  Correct.

17     Q.  And based on your review of the LP Server source code, are

18     the transactions Do Kwon identified as Chai transactions

19     consistent with the criteria that you previously described in

20     your demonstrative as the characteristics of LP Server

21     transactions?

22     A.  Yes, they are.

23     Q.  And did you prepare a demonstrative comparing the

24     transaction that we see here in Plaintiff's Exhibit 309 to the

25     LP Server source code?

1    A.  I did.

2              MR. CARNEY:  Can we please put up Edman demonstrative

3    12?  And we can take 309 down, please.

4    Q.  It looks like there is a lot going on in this

5    demonstrative.  Can you break down, at a high level, what you

6    are showing here?

7    A.  Yes.  So, on the left is sort of a subset of the source

8    code from the LP Server, and then on the right are sections

9    from the Terra Finder page capture.  And the arrows show

10   relationships between parts of the source code that create

11   certain properties of the transaction and then on the right is

12   how those properties will look on the Terra Finder website.

13   Q.  And what is the timestamp of this transaction?

14   A.  The timestamp is at the top on the right-hand side, it is

15   June 11, 2019 at 3:38:02 a.m. in Eastern Time.

16   Q.  And can you remind us, when was the first commit to the

17   LP Server git repository?

18   A.  It was the day before; June 10, 2019.

19   Q.  What does the memo field say in this transaction over on

20   the right side?

21   A.  So, the memo, which was just highlighted previously in the

22   source code and then now on the right side in the Terra Finder

23   page corresponding to that transaction, it says Terra batch:

24   LP to users.

25   Q.  What is the memo field in the Terra blockchain used for?

1    A.  It was sort of like a freeform field.  You can enter

2    basically whatever information you want to sort of add context

3    or information to a transaction.

4    Q.  And what is your understanding of what is represented by

5    the memo:  Terra batch:  LP to users, in this transaction?

6    A.  So, based on my review of the source code, the memo Terra

7    batch:  LP to users represents or indicates a transaction

8    sending KRT from the LP wallet to the purported Chai user

9    wallets.

10   Q.  And what is the LP wallet?

11   A.  The LP wallet is sort of a special wallet controlled by the

12   LP Server and it contains the KRT used to fund these

13   transactions on the Terra blockchain.

14   Q.  And looking at the next transaction that you had mentioned,

15   Plaintiff's Exhibit 310, did you prepare a demonstrative for

16   that transaction as well?

17   A.  Yes.

18        MR. CARNEY:  Could we please pull up Edman

19   demonstrative 13?

20   Q.  And what is the timestamp of this transaction?

21   A.  This is also June 11, 2019, 3:38:33 a.m.

22   Q.  About how long after the previous transaction that we

23   looked at did this transaction occur?

24   A.  It was about 30 seconds.

25   Q.  And what is the memo of this transaction?

1    A.  The memo of this transaction is Terra batch:  Users to LP.

2    Q.  And how does that compare to the memo we saw in the

3    previous transaction?

4    A.  The previous memo was Terra batch:  LP to users.

5    Q.  And what do the inputs and outputs show here?

6    A.  The inputs and the outputs here sort of shown on the right

7    from the Terra Finder capture, you can see the inputs are all

8    addresses, the first one is the LP wallet address and then this

9    is a subset of the inputs, but the rest are addresses

10   associated with purported Chai wallets.  And then the outputs,

11   if you can bring those up as well, you can see that the outputs

12   are essentially going back to the LP wallet and the amounts are

13   the same.

14   Q.  And you mentioned a little while ago that these two

15   transactions that we just looked at were 30 seconds apart.

16   What is the significance of that time difference?

17   A.  The significance is that the LP Server was just generating

18   transactions that send funds from the LP wallet to the

19   purported Chai user wallets and then right back to the LP

20   wallet.

21   Q.  And did you analyze how frequently this cycle of sending

22   KRT from the LP wallet to Chai user wallets and back to the LP

23   wallet occurred?

24   A.  I did.

25   Q.  Did you prepare a demonstrative describing this analysis?

1    A.  I did.

2             MR. CARNEY:  Can we please pull up Edman demonstrative

3    14?

4    Q.  What does this demonstrative show, Dr. Edman?

5    A.  This demonstrative shows that prior to the changes made to

6    the LP Server source code in December 2019, the general flow of

7    funds corresponding to the Chai transactions, there were over

8    a million transactions that sent KRT from the LP wallets to the

9    purported Chai user wallets and then right back to the LP

10   wallet.

11   Q.  And based on your analysis, how many of those transactions

12   involve Chai merchants?

13   A.  None of them.  The LP Server source code, prior to December

14   2019, just ignored the merchant identifier.

15   Q.  So, did you also prepare a chart summarizing Chai merchant

16   transactions after December 2019?

17   A.  I did.

18             MR. CARNEY:  Mr. Haywood, if you could just show to

19   the witness what has been marked as Plaintiff's Exhibit 209?

20   Q.  First of all, Dr. Edman, this chart, did you prepare it?

21   A.  I did.

22   Q.  And what is this?  Without getting into details, what does

23   this summary chart show?

24   A.  This summary chart shows the volume of transactions

25   generated by the LP Server that did involve merchant addresses

O3T5sec6                          Edman - Direct

1    over time.

2    Q.  And what is the source of the data that you used to create

3    this summary?

4    A.  I used actually data from the Terra blockchain.  I also

5    used data sources that I identified in the LP Server source

6    code repository, as well as other documents produced in

7    discovery that identified certain Terra blockchain wallet

8    addresses, as well as Chai merchant addresses.

9    Q.  Is this an accurate summary of the volume of Chai merchant

10   transaction volume over time?

11   A.  It is.

12        MR. CARNEY:  Your Honor, I move for the admission of

13   Plaintiff's Exhibit 209 into evidence.

14        MR. CALIFANO:  No objection, your Honor.

15        THE COURT:  Received.

16        (Plaintiff's Exhibit 209 received in evidence)

17        MR. CARNEY:  We can publish this now, Mr. Haywood.

18   BY MR. CARNEY:

19   Q.  Dr. Edman, what did your analysis show that is reflected in

20   Plaintiff's Exhibit 209?

21   A.  My analysis shows that prior to the changes made to the

22   LP Server software in December 2019, there were no transactions

23   on the Terra blockchain that involved Chai merchant addresses.

24   How did that relate, if at all, that your analysis prior to

25   December of 2019 the LP Server source code did not use merchant

1  identifiers?

2          MR. CALIFANO:  Objection.  Foundation.

3          THE COURT:  Overruled.

4  A.  My analysis of the Terra blockchain transactions involving

5  Chai merchant addresses is consistent with my analysis of the

6  LP Server source code that ignored merchant identifiers prior

7  to December 2019.

8  Q.  So how is it you are able to identify which Terra

9  blockchain transactions were Chai merchant transactions?

10  A.  I principally relied on two data sources, one of them was

11  certain source code in the LP Server source code repository

12  that contained a list of Terra blockchain wallet addresses

13  identified as Chai merchant addresses.  I also reviewed

14  database files from a website called Chai Scan, that inside

15  those files also contained a list of Chai merchant addresses.

16  And so, I compared and combined those files to derive a list of

17  Chai merchant addresses on the Terra blockchain.

18  Q.  You just mentioned a website called Chai Scan.  What is

19  Chai Scan?

20  A.  Chai Scan was sort of a data visualization website that

21  purported to show statistics and volume information related to

22  Chai transactions on the Terra blockchain.

23  Q.  And based on your analysis and review of documentation in

24  this case, do you have an understanding as to who provided

25  funding for the development of Chai Scan?

O3T5sec6                          Edman - Direct

1    A.  Based on the documents I reviewed, my understanding is that

2    Terraform Labs provided the funding to develop Chai scan.

3    Q.  Based on your analysis, were Chai merchants able to

4    withdraw the KRT in their Chai merchant wallets?

5    A.  No, not based on the evidence I have reviewed.

6    Q.  So who then, in your opinion, controlled the Chai merchant

7    wallets?

8    A.  All the Chai merchant wallets were controlled by the

9    LP Server.

10   Q.  Dr. Edman, did you analyze the volume of all of Chai

11   transactions on the Terra blockchain generated by the

12   LP Server, not just merchant transactions?

13   A.  I did.

14   Q.  Did you prepare a summary chart showing the volume of these

15   LP Server transactions over time?

16   A.  I did.

17           MR. CARNEY:  And, Mr. Haywood if you could please just

18   display to the witness Plaintiff's Exhibit 205?

19   Q.  Did you prepare this chart, Dr. Edman?

20   A.  I did.

21   Q.  Without getting into the details, what does it show?

22   A.  It shows the daily volume of purported Chai transactions

23   created by the LP Server over time.

24   Q.  How did you prepare this?

25   A.  I prepared it by using the characteristics of an LP Server

1    transaction that I described earlier in connection with

2    analyzing the public Terra blockchain data to identify the Chai

3    transactions and then sort of aggregate or show the volume over

4    time.

5    Q.  And what is the source of the data in this chart?

6    A.  It is my analysis of the LP Server source code plus the

7    Terra blockchain data.

8    Q.  Is this an accurate representation of the LP Server

9    transaction volume over time?

10           MR. CALIFANO:  Objection; characterization,

11    foundation.

12           THE COURT:  Overruled.

13   A.  It is.

14           MR. CARNEY:  Your Honor, at this time I would move for

15    the admission of Plaintiff's Exhibit 205 into evidence.

16           MR. CALIFANO:  No objection, your Honor.

17           THE COURT:  Received.

18           (Plaintiff's Exhibit 205 received in evidence)

19           MR. CARNEY:  If we could please publish this chart?

20   BY MR. CARNEY:

21   Q.  If you could quickly walk us through what this chart shows?

22   A.  This generally shows how many transactions the LP Server

23    was generating each day on the Terra blockchain.

24   Q.  It appears that there is white lines some places along your

25    chart.  What do those represent?

1  A.  Those represent days during which the LP Server didn't

2  generate any transactions on the Terra blockchain.

3  Q.  Does that mean that there were no Chai transactions on

4  those days?

5  A.  No, not necessarily.

6  Q.  Did you also compare the volume of transactions generated

7  by Terraform's LP Server to the volume of all transactions

8  generated by other users on the Terra blockchain?

9  A.  I did.

10  Q.  Did you prepare another summary chart showing your

11  analysis?

12  A.  I did.

13         MR. CARNEY:  If we could please just display to the

14  witness Plaintiff's Exhibit 206?

15  Q.  Is this the summary chart you prepared?

16  A.  This is.

17  Q.  What does this chart show?

18  A.  It shows the percentage of token transfers on the Terra

19  blockchain that were created by the LP Server compared to other

20  non-LP Server transactions.

21  Q.  And what is the source of this data?

22  A.  The source of the data is, my analysis is the LP Server

23  source code along with the public Terra blockchain data.

24  Q.  Is this chart that you prepared accurate?

25  A.  It is.

O3T5sec6                              Edman - Direct

1          MR. CARNEY:  Your Honor, I would move for the

2    admission of Plaintiff's Exhibit 206 into evidence.

3          MR. CALIFANO:  Your Honor, may I voir dire for a

4    minute?

5          THE COURT:  All right.

6    VOIR DIRE EXAMINATION

7    BY MR. CALIFANO:

8    Q.  Dr. Edman, when you mean accurate, what exactly are the

9    numbers on -- how did you calculate the numbers again?  Could

10   you just explain that?

11   A.  So these numbers are calculated based on analyzing the

12   public Terra blockchain data to identify all native token

13   transfers, essentially Message Send and Message MultiSend token

14   transfers on the Terra blockchain, and then comparing that

15   amount to transactions Message MultiSend transactions created

16   by the LP Server.

17   Q.  So, in other words, the chart we are looking at here is a

18   calculation of the number of transactions by the LP Server

19   wallets compared to the total number in each of those time

20   periods at the bottom?

21   A.  They involve wallets controlled by the LP Server but it is

22   transactions or transfers created by the LP Server.

23          MR. CALIFANO:  No further questions, your Honor.

24          THE COURT:  Received.

25          (Plaintiff's Exhibit 206 received in evidence)

1          MR. CARNEY:  Has it been admitted, your Honor?

2          THE COURT:  It just was.

3          MR. CARNEY:  Thank you.

4    BY MR. CARNEY:

5    Q.  Can you just describe to us what this chart shows,

6    Dr. Edman?

7    A.  So this shows the proportion of token transfers or native

8    token transfers on the Terra blockchain created by the

9    LP Server over time compared to all native token transfers.

10   So, on the left you can see that in June and July 2019, over 90

11   percent of the native token transfers on the Terra blockchain

12   were created by the LP Server.

13   Q.  When you say over 90 percent were created by the LP Server,

14   versus what?

15   A.  Versus users of the Terra blockchain.

16   Q.  Dr. Edman, based on the materials you reviewed and your

17   analysis, was the LP Server necessary for Chai to process

18   transactions?

19   A.  No.

20   Q.  What is the basis for that opinion?

21   A.  The basis for that opinion is, based on my review, the Chai

22   transactions on the Terra blockchain, along with the LP Server

23   source code, the LP Server was essentially just replicating or

24   mirroring Chai transactions onto the Terra blockchain as

25   opposed to processing and settling those Chai transactions.

1    Q.  In connection with your work in this case, were you able to

2    review the deposition testimony of Paul Kim?

3    A.  I did.

4    Q.  And at a high level, could you just give us your

5    understanding of Paul Kim's testimony?

6    A.  So my understanding of Paul Kim's testimony, and

7    considering it in the context of all of the other evidence that

8    I reviewed in this case, was that Chai maintained its own sort

9    of internal ledger, sort of like a traditional database that IT

10   used for verifying Chai users and transactions, account

11   balances, things like that.  The role of the LP Server was to

12   receive changes to that Chai ledger from Chai and then

13   replicate those changes in the form of the KRT transactions on

14   the Terra blockchain.  There were several instances in which

15   either the LP Server went down or wasn't functioning, or the

16   Terra blockchain wasn't operational, but Chai was still able to

17   process transactions from Chai customers.  And then the Chai

18   merchants were just settled in fiat currency, Korean Won, as

19   opposed to KRT in the Terra blockchain.

20            MR. CALIFANO:  Your Honor, I want to make a reference

21   to our earlier motion *in limine* because I have noted that there

22   was no testimony from Paul Kim on the beginning of Dr. Edman's

23   answer and I would ask that that be struck because that is

24   characterization.

25            THE COURT:  Well, we will take that up at the break.

1          MR. CARNEY:  Thank you, your Honor.

2     BY MR. CARNEY:

3     Q.  Did your review of Mr. Kim's testimony cause you to change

4     any of your opinions in this case?

5     A.  No.

6     Q.  Why not?

7          MR. CALIFANO:  Your Honor, I just want to note a

8     continuing objection.

9          THE COURT:  No, I think this is fair for two different

10    reasons.  One is of course the jury has already heard a

11    substantial amount or portion of that deposition testimony, but

12    also because I think it is fairly anticipating

13    cross-examination and objections that would otherwise be

14    raised, so overruled.

15         MR. CARNEY:  Thanks, your Honor.

16         MR. CALIFANO:  Your Honor, my apologies.  I should

17    have referenced the MIL but I understand your ruling.

18    BY MR. CARNEY:

19    Q.  Do you need me to restate the question?

20    A.  If you could, please.

21    Q.  I was asking you whether your review of Mr. Kim's testimony

22    caused you to change any of your opinions, and I think you said

23    no, and then I asked why not.

24    A.  So my understanding, in consideration of Mr. Kim's

25    testimony and my understanding of Chai's relation to the Terra

1    blockchain, was that the way he described or the way I

2    understood him describing the system operating was consistent

3    with my opinion that Chai transactions were not processed and

4    settled on the Terra blockchain.

5    Q.  And you mentioned a little while ago Chai continuing to

6    operate if the LP Server or the Terra blockchain were down.

7    How is that possible?

8    A.  My understanding is that there was a component within Chai

9    called the LP module, and this component was primarily

10   responsible for sending Chai transaction information over to

11   the LP Server, the changes to the internal Chai ledger I

12   mentioned earlier.  If the LP Server wasn't operational, the LP

13   module would just queue those transactions until the LP Server

14   came online again and then it would send all of that over later

15   even though Chai had been continuing to process customer

16   transaction.

17   Q.  Did you analyze where the LP Server got the KRT to send to

18   the Chai wallets?

19   A.  I did.

20          MR. CARNEY:  Mr. Haywood, if I could ask you to please

21   display to the witness Plaintiff's Exhibit 300?

22   Q.  Did you review this document in connection with your

23   analysis?

24   A.  I did.

25   Q.  And what is this document?

1    A.   This is another page capture from the public Terra Finder

2    website showing a transaction to the LP wallet.

3    Q.   What is the significance of this particular transaction, if

4    any?

5    A.   The significance of this particular transaction is that it

6    is a transfer to the LP wallet and the memo field within this

7    transaction says --

8    Q.   Before you get into the content of it, what transaction

9    does this relate to?

10   A.   Based on my analysis of the Terra blockchain data this was

11   the initial funding for the LP wallet.

12   Q.   How did you obtain this document?

13   A.   By visiting the public Terra Finder website.

14         MR. CARNEY:  Your Honor, I would move for the

15   admission of Plaintiff's Exhibit 300 into evidence.

16         MR. CALIFANO:  No objection.

17         THE COURT:  Received.

18         (Plaintiff's Exhibit 300 received in evidence)

19         MR. CARNEY:  If we can please publish that,

20   Mr. Haywood?

21   BY MR. CARNEY:

22   Q.   What is the date of this transaction?

23   A.   This is, it is at the top; June 10, 2019.

24   Q.   Please remind us again, when was the first commit to

25   Terraform's LP Server git repository?

1    A.  That was also on June 10, 2019.

2    Q.  What does the memo associated with this transaction say?

3    A.  The memo says:  Seed funding for the LP node.

4    Q.  And what address received the seed funding?

5    A.  It was the LP wallet address.

6    Q.  Is that the one that begins Terra1FEX9F?

7    A.  Yes, it is.

8    Q.  What address sent the seed funding?

9    A.  You will have to go to the next page, it is under the

10   "from" address, it is the address:  Terra16VS16.

11   Q.  Did you review any documentation regarding who controls

12   that address?

13   A.  I did.

14   Q.  What did you review?

15   A.  I reviewed a spreadsheet, that I understand the defendants

16   produced in discovery, identifying crypto wallets that either

17   they or the Luna Foundation Guard represented that they

18   controlled.

19        MR. CARNEY:  Mr. Haywood, if you could please display

20   to the witness, Plaintiff's Exhibit 331.

21   Q.  What is this document, Dr. Edman?

22   A.  It is an Excel spreadsheet associating or attributing

23   certain wallet addresses to either the Luna Foundation Guard or

24   Terraform labs.

25   Q.  How did you obtain this document?

1   A.  My understanding is it was produced in discovery.

2         MR. CARNEY:  Your Honor, I would move for the

3   admission of Plaintiff's Exhibit 301 into evidence.

4         MR. CALIFANO:  Your Honor, the defendants have no

5   objection to just the line that identifies the specific wallet.

6   The rest of it is irrelevant.

7         MR. CARNEY:  Your Honor, I don't know that it is

8   irrelevant because there could come other points in the case

9   where other wallet addresses are relevant.  I mean, this

10  particular address --

11        THE COURT:  No, he is saying he has no objection to

12  the address, it is just that he doesn't think the rest of the

13  exhibit is relevant.

14        MR. CARNEY:  So, your Honor --

15        THE COURT:  Well, do you want to stipulate to this as

16  an address that was a Terraform-controlled address?  Or what.

17        MR. CALIFANO:  Your Honor, we are not going to object

18  to that.

19        THE COURT:  OK.

20        MR. CALIFANO:  We will be fine with that address.

21        THE COURT:  That's all you want, right?

22        MR. CARNEY:  That's fine, your Honor.  Thank you.

23        THE COURT:  So, so stipulated.

24  BY MR. CARNEY:

25  Q.  So focusing on that address that's been identified or

1  stipulated as a Terraform address, what conclusion did you draw

2  from the fact that it was a Terraform address sending this

3  transaction to the LP Server?

4  A.   I concluded that Terraform Labs provided the initial seed

5  funding for the LP Server.

6         THE COURT:  Pursuant to that question I am going to

7  admit the entire exhibit now that I see the broader context.

8  So, the exhibit is received.

9         MR. CARNEY:  Thank you, your Honor.

10        (Plaintiff's Exhibit 301 received in evidence)

11        THE COURT:  How much more do you have on direct?

12        MR. CARNEY:  I am trying to finish in nine minutes.

13        THE COURT:  What I am thinking is --

14        Ladies and gentlemen, you should understand that

15  unfortunately we have one out-of-town witness who will take no

16  more than a half hour but we have to get him in today because

17  he has to go back to California.  So I am inclined maybe to

18  break now with this witness and you can conclude the direct on

19  Monday and then we will have cross on Monday as well.

20        MR. CARNEY:  OK.

21        THE COURT:  So, you can just step down and we will see

22  you again on Monday.

23        MR. CARNEY:  Thank you, your Honor.

24        THE COURT:  Monday at 9:30.

25        THE WITNESS:  Thank you.

1          THE COURT:  Why don't you call the next witness.

2     NADER GEORGE,

3          called as a witness by the Plaintiff,

4          having been duly sworn, testified as follows:

5     DIRECT EXAMINATION

6     BY MS. CUELLAR:

7     Q.  Good afternoon, sir.  What is your city and state of

8     residence.

9     A.  Cypress, California.

10    Q.  Are you currently employed?

11    A.  Yes.

12    Q.  How?

13    A.  I work as a pharmacist.

14    Q.  Did you attend school for that?

15    A.  Yes.

16    Q.  Where did you go to school?

17    A.  Back home in Cairo, Egypt.

18    Q.  Now, at some point did you hear about a company called

19    Terraform Labs?

20    A.  Yes.

21    Q.  Did you hear about an individual named Do Kwon?

22    A.  Yes.

23    Q.  Who did you understand Do Kwon to be?

24    A.  I understood him to be the CEO of the company.

25    Q.  If you can, can you please tell the jury how you first

1    learned of Terraform Labs?

2    A.   That was around January or February of 2022 when I was

3    looking for a more stable kind of investment that I can invest

4    my money in and I was looking into to different stablecoins and

5    I came to UST.

6    Q.   And how did you learn of UST?

7    A.   I was researching for a stablecoins and I used to read

8    articles online and watch YouTube videos and that's where I

9    heard about it.

10   Q.   And what did you hear?

11   A.   Well, I heard that it is a stablecoin that is always pegged

12   to the dollar through a mathematical equation -- that I didn't

13   really understand -- and that it offers people, who buy UST, a

14   20 percent interest on their investment.

15   Q.   After learning that, did you go to the Terraform website?

16   A.   I did.

17   Q.   What did you see on the website?

18   A.   I saw exactly what I heard on YouTube, that UST was

19   advertised as a stablecoin and that there was something called

20   Anchor protocol which is part of the project, that if you

21   deposit your USD in it you will gain a 20 percent annual

22   interest.

23   Q.   How did what you saw on the website influence you?

24   A.   It influenced me to start investing in UST.  Especially

25   that I had tried investing in stocks before and I didn't get

1    the returns that I hoped for, so I thought investing in a

2    stablecoin that is basically pegged to the dollar, meaning that

3    it has no risk, will be safer for me to invest my money.

4    Q.  And was there anything else on the website you saw that

5    reassured you?

6    A.  On the website itself that is all I remember; is mentioning

7    that UST is a stablecoin and it is always pegged to the dollar.

8    Q.  And were you aware of whether other people had invested in

9    it?

10   A.  I went to the Anchor protocol, actually, to see how much

11   money is invested in it, and I was surprised to see that at the

12   time I checked it was $40 billion invested in Anchor protocol,

13   which gave me an indication that, you know, many people all

14   around the world are confident in this project.

15   Q.  Now, while you were researching UST and the Anchor

16   protocol, was there anything you learned that gave you pause?

17   A.  Yes.  I usually look at the history of the charts and

18   looking at different stablecoins, I came to understand that

19   sometimes they depeg from the dollar very briefly and as long

20   as they repeg back to the dollar, then that should be OK.  So I

21   saw that UST had depegged from the dollar around May of 2021

22   but then it pegged back very quickly, after which made me think

23   that this is normal for stablecoins.

24   Q.  Based on everything you learned from Terraform and the

25   Anchor protocol from its website and other sources, what did

1    you decide to do?

2    A.   I decided to try investing in UST so I started with small

3    amounts totaling around maybe $10,000 or $12,000, just to see

4    how it works and see if I am going to get the return that was

5    promised, and during that time I was thinking to invest more

6    but I wanted to take it slowly to make sure that I am doing the

7    right thing and that was around March, February and March of

8    2022.  And I saw a Tweet by Do Kwon on Twitter reassuring

9    investors that for UST to depeg from the dollar it is

10   mathematically impossible and that the depeg risk is

11   impossible.  So, that reassured me more that I chose the right

12   project to invest in.

13            MS. CUELLAR:  Mr. Haywood, if we can display, just for

14   the witness, Plaintiff's Exhibit 83.

15            (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1    BY MS. CUELLAR:

2    Q.  And, sir, if you could look at that computer screen.  You

3    may see it.  Do you recognize what is there?

4    A.  Yes.

5    Q.  And what is that?

6    A.  That's the tweet I saw around March 11th.  That says if

7    there's any confusion left at this point --

8    Q.  Please don't read it yet.  I'm sorry.

9    A.  Okay.  Sorry.

10   Q.  Is that the tweet you were just speaking about?

11   A.  Yes.

12          MS. CUELLAR:  And, your Honor, at this time we move to

13   admit Plaintiff's 83.

14          MR. LAFFERMAN:  Objection.  Relevance.  403.

15          THE COURT:  Clearly relevant.  Clearly not 403.

16   Received.

17          (Plaintiff's Exhibit 83 received in evidence)

18          MS. CUELLAR:  And, Mr. Haywood, if we could please

19   display to the jury.

20   Q.  So, sir, after seeing your returns and seeing this tweet,

21   what if anything did you do?

22   A.  I decided to take a loan for $400,000.  And around

23   April 1st and 2nd of 2022, I used that amount of money to buy

24   UST and deposit it into the Anchor protocol.

25   Q.  And after doing that did you keep track of your investment?

1   A.  Yes.  I used to look at my investment every single day,

2   making sure that it is accumulating the daily returns that was

3   promised.

4   Q.  And what if anything happened next?

5   A.  Everything was going fine until around May 9th of 2022, I

6   started getting notifications from YouTube channels saying that

7   the UST is depegging from the dollar.

8   Q.  And what if anything did you do next?

9   A.  The first thing that came to my mind is that that's

10  probably the same that happened the year before and it's going

11  to peg back to the dollar very quickly, and I was reassured by

12  tweets from Do Kwon himself saying, for example, "deploying

13  capital-steady lads" and that he's working on restoring the

14  peg.

15          MS. CUELLAR:  And, Mr. Haywood, at this time if we

16  could just display for the witness Plaintiff's Exhibit 353.

17  Q.  Sir, do you recognize that exhibit?

18  A.  Yes.

19  Q.  What is it?

20  A.  It's that tweet that I saw on May 9th reassuring investors

21  that Do Kwon is working on restoring the peg to the dollar.

22          MS. CUELLAR:  And, your Honor, at this time we move to

23  admit Plaintiff's Exhibit 353.

24          MR. LAFFERMAN:  No objection.

25          MR. CHESLEY:  No objection.

1          THE COURT:  Received.

2          MS. CUELLAR:  And if we could please display to the

3   jury.

4   BY MS. CUELLAR:

5   Q.  So, sir, what happened next?

6   A.  At that time, I didn't really believe that my -- I'm going

7   to lose my investment, and I believed Do Kwon that like what

8   happened in 2021, this should be a brief depeg.  So I kept on

9   holding to my UST for a few more days until I -- until I saw

10  that it's falling really away from the dollar.

11  Q.  And what if anything did you do at that point?

12  A.  At that point, I had to move all my UST to a cryptocurrency

13  exchange and sell all of my UST to try to save any of my

14  investment.

15  Q.  And what happened next?

16  A.  After I sold, I kept on seeing tweets again from Do Kwon

17  reassuring that he's very close to having a recovery plan.

18          MR. CHESLEY:  Objection.  Relevance.

19          THE COURT:  Overruled.

20  A.  So I kept on panic buying and panic selling because I was

21  hopeless at that moment.  And my whole body was shaking

22  thinking what have I done to my family, I wanted to use this

23  money to help my kids with their education.  And now I'm seeing

24  it being, you know, lost in front of my eyes.

25  Q.  And, sir, how much do you have left of your $400,000

O3TASEC7                    George - Direct

1  investment?

2  A.  I was able to recover only $28,000.

3          MS. CUELLAR:  Mr. Haywood, we can take down the

4  exhibit.

5  Q.  Sir, when you chose to invest in UST, did you believe your

6  investment would be stable?

7  A.  Yes.

8  Q.  Why?

9  A.  Because that's the definition of a stablecoin and that's

10 what Do Kwon had reassured many times through different tweets

11 that the depeg risk of UST is mathematically impossible.

12 Q.  Now, sir, did you know when you invested that a third party

13 had intervened in May 2021 to purchase large amounts of UST in

14 an effort to help restore UST's peg to $1?

15         MR. CHESLEY:  Objection, your Honor.

16         THE COURT:  Overruled.

17 A.  I had no idea.

18 Q.  Is that information you would have wanted to know prior to

19 investing?

20 A.  Of course.

21 Q.  Why?

22 A.  Because if I had known that the depeg that happened in 2021

23 was restored through anything else other than the algorithm

24 itself, I wouldn't have invested in UST.

25         MS. CUELLAR:  No further questions, your Honor.

1           THE COURT:  Cross-examination.

2           MR. CHESLEY:  Yes, your Honor.

3   CROSS-EXAMINATION

4   BY MR. CHESLEY:

5   Q.  Good afternoon, Mr. George.  My name is Andrew Chesley.

6   I'm an attorney for Do Kwon.

7   A.  Good afternoon.

8   Q.  I want to make sure that we are clear on the reasons that

9   you bought and held UST.

10          The first reason was that you were unhappy with the

11  return you got on the stock market and thought you might do

12  better in crypto?

13  A.  I might do better with stablecoins.

14  Q.  Yes.  And another reason was that you saw lots of people

15  online putting money into Anchor; is that fair?

16  A.  Correct.

17  Q.  And you learned about UST initially from YouTube; is that

18  right?

19  A.  Correct.

20  Q.  I know it's been a couple of years, but can you recall any

21  specific YouTube channels where you first learned about UST?

22  A.  I don't remember.  I just search on YouTube and whatever

23  came out I started watching.

24  Q.  You also said that you read some things online about UST

25  before you went to Terraform's website?

1    A.  Correct.

2    Q.  Do you recall any of the things that you read online or

3    where those were from before you went to Terraform's website?

4    A.  No.  It was just a Google search.

5    Q.  And you said on direct examination that you wanted to buy

6    just a small amount of UST to take it slow; is that right?

7    A.  Correct.

8    Q.  And after you bought your first $10,000 of UST and staked

9    it in Anchor, you saw returns that you expected and that caused

10   you to decide to buy more?

11   A.  Correct.

12   Q.  You also testified on direct that you saw a tweet in

13   March 2022 in which Mr. Kwon said that Terraform would keep

14   growing reserves until a depeg becomes mathematically

15   impossible; is that right?

16   A.  Correct.

17   Q.  And you relied on that tweet in deciding to purchase more

18   UST after your initial purchase?

19   A.  Yes.

20   Q.  And those are all the reasons that you initially purchased

21   UST?

22   A.  Those are the reasons that I chose UST over other

23   stablecoins, yes.

24   Q.  Did I leave any reasons that you choose UST over any other

25   stablecoins out?

```
 1   A.  The 20 percent interest that was promised, because other
 2   stablecoins did not have this kind of return.
 3   Q.  So besides the reasons that I gave and the 20 percent
 4   interest, did I leave any other reasons out?
 5   A.  No.
 6   Q.  And then you testified that during the May 2022 depeg you
 7   decided to hold onto your UST because of the tweet that you saw
 8   and that you were shown on direct examination in which Mr. Kwon
 9   said that he was deploying capital to defend the peg; is that
10   right?
11   A.  Correct.
12   Q.  Mr. George, you filed a lawsuit against a cryptocurrency
13   exchange in 2022, correct?
14            MS. CUELLAR:  Objection, your Honor.  Relevance.
15            MR. CHESLEY:  It will be brief, your Honor.
16            THE COURT:  Overruled.
17   Q.  Do you need me to repeat the question, Mr. George?
18   A.  Please.
19   Q.  You filed a lawsuit against a cryptocurrency exchange in
20   2022, correct?
21   A.  Correct.
22   Q.  That crypto exchange was called Okcoin?
23   A.  Correct.
24   Q.  You bought some of your UST on Okcoin, correct?
25   A.  Yes.
```

1    Q.  In your lawsuit against Okcoin, you claim that Okcoin

2    misled you about the stability of UST?

3    A.  Yes.

4    Q.  And you stated in your lawsuit that you relied on Okcoin's

5    definition of a stablecoin?

6    A.  To buy from Okcoin, yes.

7    Q.  To your knowledge, Okcoin has no relationship with

8    Terraform Labs or Do Kwon?

9    A.  Yes.

10   Q.  Mr. George, are you familiar with a Korean mobile payments

11   company called Chai?

12   A.  No.

13   Q.  And, Mr. George, on direct you testified that before buying

14   UST you learned that UST had briefly lost its dollar peg; do

15   you recall that testimony?

16   A.  Yes.

17   Q.  And you also learned that UST regained its peg a couple of

18   days after it depegged?

19   A.  I don't remember how many days, but very quickly, yes.

20   Q.  Understood.  And you took that repegging, the recovery of

21   the peg, as a sign that UST's peg was stable and reliable?

22   A.  Yes.

23   Q.  At the time you were purchasing UST in early 2022, you

24   didn't know how UST regained its peg in May 2021?

25   A.  Yes.

1   Q.  At the time that you were purchasing UST in early 2022, you

2   don't recall any statements from Terraform Labs or Do Kwon

3   explaining why UST regained its peg in May 2021?

4   A.  No, I don't recall any.

5   Q.  You testified on direct that at some time after you

6   purchased you came to understand -- my apologies.  Strike that.

7           You testified on direct that you would not have

8   purchased -- you may not have purchased UST had you known that

9   a third-party company intervened to defend the peg; do you

10  recall that testimony?

11  A.  Yes.

12  Q.  You've never spoken to Do Kwon, have you, Mr. George?

13  A.  Never.

14  Q.  You've never spoken to any employee of Terraform Labs?

15  A.  Never.

16  Q.  You've never -- have you ever heard of a company called

17  Jump Crypto?

18  A.  I have heard of it afterwards, yes.

19  Q.  But at the time -- or strike that.

20          You've never spoken to any employee of Jump Crypto?

21  A.  No.

22  Q.  You've never examined any computer code from Terraform Labs

23  or from Jump Crypto?

24  A.  No.

25          MS. CUELLAR:  Objection, your Honor.  Relevance.

1        THE COURT:  Marginal, but I'll allow it.

2        MR. CHESLEY:  Do you need me to repeat the question,

3  Mr. George?

4        THE COURT:  No.  He said no.

5        MR. CHESLEY:  Thank you, your Honor.

6  Q.  So it's fair to say, Mr. George, that you have no direct

7  knowledge that a third-party company intervened to defend the

8  peg in May 2021?

9  A.  Correct.

10        MR. CHESLEY:  Thank you, Mr. George.  No further

11  questions.

12        THE COURT:  Okay.  Any redirect?

13        MS. CUELLAR:  Briefly.

14  REDIRECT EXAMINATION

15  BY MS. CUELLAR:

16  Q.  Sir, when you were panic buying and selling, did you

17  believe UST would regain its peg?

18  A.  At that moment, I had lost any hope that it will regain the

19  peg because it was going down so fast.

20  Q.  When it first started depegging in May of 2022, did you

21  believe UST would regain its peg?

22  A.  In the beginning, yes, that's why I waited for a few days.

23  Q.  Why did you believe it would repeg?

24  A.  Depending on the -- what happened in 2021 and relying on Do

25  Kwon's tweets reassuring that he's working on restoring the

O3TASEC7                        George - Redirect

1    peg.

2    Q.  Now, if you had known a third party had intervened in May

3    of 2021 --

4              MR. CHESLEY:  Objection.  Asked and answered.

5              THE COURT:  Yeah, I think that was asked on direct.

6              MS. CUELLAR:  It was asked, your Honor.  I think cross

7    made it unclear.  I was just clarifying.

8              THE COURT:  No, I think it was asked and answered.

9              MS. CUELLAR:  Okay.  No further questions.  Thank you.

10             THE COURT:  All right.  Very good.  Thank you very

11   much.  You may step down.

12             THE WITNESS:  Thank you, your Honor.

13             THE COURT:  So I see Juror No. 5 looking at her watch.

14   Is this guy going to let us go finally or not.  And the answer

15   is yes.  So thank you for your good service, ladies and

16   gentlemen.  We'll resume at 9:30 on Monday.  On Monday, we'll

17   again go to 4:30.  On Tuesday and Wednesday, we'll probably

18   only go to 3:30.  So just to give you a heads up.  Have a very

19   good weekend, a Happy Easter, and we will see you on Monday.

20             (Continued on next page)

21

22

23

24

25

1              (In open court; jury not present)

2              THE COURT:  All right.  Anything counsel needs to

3    raise?

4              MR. PELLEGRINO:  Briefly, your Honor.  We have a brief

5    motion regarding Plaintiff's Exhibit 83 if we can pull that up.

6    We just want to clarify something, your Honor.

7              THE COURT:  Okay.

8              MR. PELLEGRINO:  So this was the one that

9    Mr. Lafferman objected on 401 and 403 grounds.  Your Honor very

10   forcefully responded it's relevant.  I think we were trying to

11   adhere to your Honor's rules, but we probably should have added

12   a one sentence thing that the objection was a reference to the

13   pretrial order and it not being a false statement in the

14   pretrial order.  I understand why it comes in.  He said he

15   relied on it or considered it.  Our motion would be that they

16   not close on it or at least not reference it as a false

17   statement.  It's not one that's listed in the pretrial order.

18             THE COURT:  Ah, okay.  That is a different point than

19   the one I considered when I made the rulings.  So let me think

20   about that over the weekend.

21             MR. PELLEGRINO:  Thank you.  And that was our fault.

22   We were trying to figure how to do we clarify that without --

23             THE COURT:  Yeah.  Remind me on Monday and I'll rule

24   before the jury comes in.

25             MR. PELLEGRINO:  Thank you, your Honor.

1            MR. FERRARA:  Your Honor, the same is true as to

2      Plaintiff's 353 as well, the second exhibit they showed to

3      Mr. George.

4            THE COURT:  I want to think about it but just to flag

5      it for you.

6            MS. CUELLAR:  Your Honor, they did not --

7            THE COURT:  There's a difference I think between a

8      statement that they are relying on as a false statement to make

9      out their claims of fraud, in other statements that the jury

10     could consider as bearing on intent, even though they are not

11     themselves forming one of the essential elements of the claims.

12     So I'm not sure there's anything in the motion *in limine* that

13     precludes the admission.  But I'll think about it some more.

14     We can discuss it more on Monday.

15           Now, I would suggest that you spend a portion of the

16     weekend reading the extremely interesting opinion by Judge

17     Failla in Securities and *Exchange Commission v. Coinbase*, which

18     came out two days ago, which you might find of some interest.

19           Anyway, anything else we need to take up today?  Very

20     good.  Thanks so much.

21           (Adjourned to April 1, 2024, at 9:30 a.m.)

22

23

24

25

```
 1                     INDEX OF EXAMINATION

 2   Examination of:                        Page

 3   JAMES HUNSAKER

 4   Direct By Ms. Meehan . . . . . . . . . . . . 843

 5   Cross By Mr. Henkin  . . . . . . . . . . . . 868

 6   Cross By Mr. Chesley . . . . . . . . . . . . 894

 7   MATTHEW EDMAN

 8   Direct By Mr. Carney . . . . . . . . . . . . 904

 9   NADER GEORGE

10   Direct By Ms. Cuellar  . . . . . . . . . . . 967

11   Cross By Mr. Chesley . . . . . . . . . . . . 975

12   Redirect By Ms. Cuellar  . . . . . . . . . . 980

13

14

15

16

17

18

19

20

21

22

23

24

25
```

PLAINTIFF EXHIBITS

Exhibit No.                                          Received

659     . . . . . . . . . . . . . . . . . 851

658     . . . . . . . . . . . . . . . . . 852

203     . . . . . . . . . . . . . . . . . 928

297     . . . . . . . . . . . . . . . . . 933

302     . . . . . . . . . . . . . . . . . 946

309 and 310     . . . . . . . . . . . . . 948

209     . . . . . . . . . . . . . . . . . 953

205     . . . . . . . . . . . . . . . . . 956

206     . . . . . . . . . . . . . . . . . 958

300     . . . . . . . . . . . . . . . . . 963

301     . . . . . . . . . . . . . . . . . 966

83     . . . . . . . . . . . . . . . . . 971