O41HSec1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

SECURITIES AND EXCHANGE
COMMISSION

        Plaintiff,

        v.                  23 Civ. 1346 (JSR)

TERRAFORM LABS PTE LTD. , et
al.

        Defendants

------------------------------x

                  New York, N.Y.
                  April 1, 2024
                  9:05 a.m.

Before:

            HON. JED S. RAKOFF

                  District Judge
                  -and a Jury-

            APPEARANCES

UNITED STATES SECURITIES AND EXCHANGE COMMISSION
    Attorneys for Plaintiff
By:  JAMES P. CONNOR
    DEVON STAREN
    CARINA CUELLAR
    LAURA E. MEEHAN
    CHRISTOPHER J. CARNEY
    ROGER LANDSMAN

O41HSec1

1                         APPEARANCES (Cont'd)

2   DENTONS US LLP
         Attorneys for Defendant Terraform
3   BY:  LOUIS A. PELLEGRINO III
         DAVID KORNBLAU
4        MARK CALIFANO
         DOUGLAS W. HENKIN
5        MATTHEW A. LAFFERMAN
         AMAIANNA STOVALL
6        ALYSSA LANDOW
         MELISSA GOMEZ NELSON

7   KAPLAN HECKER & FINK LLP
         Attorney for Defendant Kwon
8   BY:  MICHAEL FERRARA
         CHRISTOPHER MOREL
9        DAVID E. PATTON
         ANDREW CHESLEY
10       SEAN HECKER

11

12  Also Present:

13  Shadow Haywood, SEC Trial Assistant
    Armando Aquino, Defense Trial Assistant
14

15

16

17

18

19

20

21

22

23

24

25

O41SHSec1

1          (Trial resumed; jury not present)

2          THE COURT:  So my courtroom deputy received a phone

3     call from our Juror No. 5 saying she's sick, she's dizzy, she's

4     not feeling well, and she doesn't think she can make it in

5     today.  My courtroom deputy explained to her that that meant

6     she would be probably excused, and she was not thrilled about

7     that, but she's sick.  So I think we need to excuse Juror

8     No. 5, and we'll just move everyone else down.

9          Any objection?

10         MR. CALIFANO:  No, your Honor.

11         MR. CONNOR:  No objection.

12         THE COURT:  Very good.  Now, I received on Sunday the

13    proposed stipulations and argument of the SEC and nothing from

14    the defense, from which I infer the defense does not wish to

15    stipulate.

16         MR. CALIFANO:  Your Honor, I believe Ms. Cuellar is

17    about to tell you that the defense has stipulated to both of

18    these stipulations' language.  There was some changes I think

19    they're processing, but we should be able to do that today.

20         THE COURT:  Great.  Terrific.  OK.

21         Is that right?

22         MS. CUELLAR:  Yes, your Honor.

23         THE COURT:  Has he anticipated correctly what you had

24    to say?

25         MS. CUELLAR:  I'm drafting it right now, and we'll

1    send it to the parties, your Honor.

2            THE COURT:  OK.  So that's great.  I'll wait to see

3    that, and then we'll discuss anything further relating to that.

4            We'll continue with the expert, and then we'll have

5    the remaining of the deposition that we had almost completed.

6    What do we have after that?

7            MR. CONNOR:  Your Honor, after that we have Brian

8    Curran, who's the former Terraform employee, and then after

9    that we have reading of the testimony of Do Kwon.  And the SEC

10   does have an item that we'd like to discuss regarding the

11   testimony of Kwon.

12           THE COURT:  Just before you do that, when —— this is

13   not binding, but give me your best estimate —— do you expect to

14   rest?

15           MR. CONNOR:  We believe tomorrow, your Honor.  That's

16   our best estimate.

17           THE COURT:  That seems right to me.  Good.

18           All right.  Yes, go ahead.

19           MR. CONNOR:  The application we have on the Do Kwon

20   testimony is we designated certain testimony from Do Kwon from

21   his investigative testimony which took place before any

22   discovery had occurred in this case, and the defendants'

23   counter-designated large swaths of what we view to be

24   self-serving testimony, and ——

25           THE COURT:  Of course it's self-serving.  Why else

1    would they designate it?

2            MR. CONNOR:  Agreed, your Honor.

3            And the reason we bring it up is that Federal Rule of

4    Evidence 804 is very clear that the only party that can offer

5    testimony from an unavailable witness is an adverse party.  We

6    can designate the testimony from Do Kwon because he is adverse,

7    and under 804(b) it is offered against the witness.  What

8    they're seeking to do, which is antithetical to the Federal

9    Rules of Evidence, is to read in large portions of self-serving

10   testimony that the SEC does not have the opportunity to cross

11   Mr. Kwon on.  So, essentially, what the defendants have done in

12   this case, they've procured their witness' own unavailability,

13   and then they seek to read in self-serving — and I won't

14   sugarcoat it.  We don't believe this testimony is accurate, and

15   we don't have an opportunity to cross-examine Mr. Kwon on this

16   testimony.  So we think it is inappropriate and the Court

17   should exclude all of the counter-designations by the defense.

18           THE COURT:  Well, I must admit that I had not focused

19   on the fact when I looked at the Kwon stuff that this — make

20   sure my memory is correct.  This was not a deposition that was

21   a court inquiry?

22           MR. CONNOR:  It was investigative testimony that the

23   SEC conducted before we filed our case.  So this was in —

24           THE COURT:  So it was investigative testimony in which

25   questions were put by you —

1              MR. CONNOR:  Yes.

2              THE COURT:  —— as to which he gave self-serving

3     answers, and that's what they're now designating?

4              MR. CONNOR:  That's correct.

5              THE COURT:  So you had full opportunity to cross him

6     on it.

7              MR. CONNOR:  Well, we didn't, your Honor, because that

8     happened before any of the discovery occurred in this case.  We

9     have one particular exhibit in particular in which Mr. Kwon is

10    talking about faking blockchain transactions one month before

11    Chai was launched, and we didn't have an opportunity to present

12    that document to him because I don't believe we had that

13    document yet.  That was produced in discovery.

14             So we didn't have any of the material that was

15    provided in discovery in this case.  And furthermore, your

16    Honor, I was one of the attorneys that asked some of the

17    questions related to the Jump piece, but with respect to the

18    Chai piece, that was an investigative attorney who is not

19    involved in the litigation at all, and there was no thought

20    that this was going to be used at trial.  This was SEC

21    investigative testimony that we do to gather facts sufficient

22    to file a case.  There was no thought at that time that this

23    would be introduced at trial as a deposition would be.

24             THE COURT:  Well, here's 804(b):  The following are

25    not excluded by the rule against hearsay if the declarant is

1    unavailable as a witness:  (1) former testimony, testimony that

2    (a) was given as a witness at a trial, hearing, or lawful

3    deposition, whether given during the current proceeding or a

4    different one, and (b) is now offered against the party who had

5    or, in a civil case, whose predecessor in interest had an

6    opportunity and similar motive to develop it by direct, cross,

7    or redirect examination.

8           So now that I look at that, I'm not totally sure how

9    you fit into that situation.  You're offering it against ——

10   you're offering your part against Do Kwon and Terraform who

11   didn't have an opportunity to develop it by direct, cross, or

12   redirect examination.  Now, maybe you say it comes in under a

13   separate exception to the hearsay rule, the statement of a

14   party adversary.

15          MR. CONNOR:  Yes, that's correct, your Honor.

16          THE COURT:  So if it comes in against a party

17   adversary, then Rule 806 is, you're saying, irrelevant.

18          MR. CONNOR:  Yes.

19          THE COURT:  It's not really a question of whether they

20   qualify under it, it's that it's irrelevant.

21          But now let's look at it from the other standpoint.

22   They're offering their parts against the SEC which had an

23   opportunity and similar motive to develop it by direct, cross,

24   or redirect examination, and these are questions that you, the

25   SEC, put to the witness.  So nothing stopped you from saying,

O41SHSec1

1    well, how can you say that when X, or, now you're saying, well,

2    we didn't know everything we now.  Of course, if that were the

3    case, then there would never be testimony from unavailable

4    witnesses in the great majority of cases where that's clearly

5    not what the rule contemplates.

6            MR. CONNOR:  I think where we get hung up is we're

7    offering against Kwon.  It was his statement.  What they're

8    doing is ——

9            THE COURT:  The Court is very grateful that Mr. Patton

10   has decided to join us.

11           MR. PATTON:  Your Honor, I have all the confidence in

12   the world in my colleagues.

13           MR. CONNOR:  Again, your Honor, just the idea under

14   the rules that a party can just, like, read in self-serving

15   testimony from the defendant in the case when he, in our view,

16   procured his own unavailability and we don't have the

17   opportunity to cross him, we think that's prejudicial.  That's

18   not the way trials are supposed to work, in my opinion.

19           THE COURT:  All right.  Let me rethink this, but let

20   me hear from defense counsel.

21           MR. FERRARA:  Thank you, your Honor.

22           We think this comes in in multiple ways.  We take your

23   Honor's point, so let's talk about 804.  We are offering it

24   against a party that had a chance to cross-examine on this

25   topic.  And as your Honor pointed out, in an investigative, I

1    guess, testimony taking, we have no opportunity to ask any

2    sorts of questions in that situation.  That's not —— that's not

3    how this works.  It's not a deposition where we go back and

4    forth.  OK?

5            The cases they cite in their motion *in limine* actually

6    talk about Federal Rule of Civil Procedure 32, and under 32,

7    it's 32, I believe, (a) ——

8            THE COURT:  Let me just pull that out for a second.

9            MR. FERRARA:  Sure.

10           THE COURT:  Well, this relates to depositions.

11           MR. FERRARA:  Agreed.  And I mention it because the

12   SEC cited it, I believe, in their motion *in limine*.  They cited

13   *FTC v. Vyera Pharmaceuticals*, which I don't think it has an F

14   cite, but it's 2021 WL 5236333.

15           THE COURT:  I don't see that depositions apply.  You

16   cited Rule 32 also in some of your papers.  I don't see how it

17   applies to —— this was not a deposition.

18           MR. FERRARA:  We think it applies sort of as a *cf*

19   cite, your Honor, because it contemplates that when one party

20   offers a deposition, the other party may offer other parts of

21   that deposition.  I take your Honor's point, this is not a

22   deposition, not suggesting that, but I am very much suggesting

23   that between Rule —— Federal Rule of Evidence 804 and Federal

24   Rule of Civil Procedure 32, that we are entitled to offer

25   portions of this deposition against the SEC to complete what

1    they have designated.

2             MR. CONNOR:  Your Honor, if I could just respond.

3    Counsel said that in investigative testimony, that they're not

4    offered an opportunity to ask questions.  That's just wrong,

5    and it's in the deposition itself.  We specifically asked

6    Mr. Henkin, who's the counsel right now, if they had any

7    questions.  "Mr. Henkin:  We are not going to ask any

8    questions, and we deem this complete."  The suggestion they did

9    not have an opportunity to ask questions is wrong.

10            THE COURT:  The point, I think the main point, I was

11   referring to under 804 was that you had the opportunity to ask

12   questions to follow up on all the stuff you say is

13   self-serving.  It must be commonplace for the SEC, in taking

14   investigative testimony, to hear people give what you

15   characterize as self-serving testimony; meaning, they're

16   asserting that you got it wrong or they're asserting that you

17   don't understand what was really going on.  And then if you're

18   — you would think if it's investigative, you would then

19   question them in more detail.

20            MR. CONNOR:  I think that's right, your Honor, but I

21   just would want to clarify the difference between the

22   investigative testimony.  In the investigative phase, we're not

23   thinking this is, like, coming in at trial.  We're just trying

24   to gather evidence to figure out if we're going to file a case.

25   There's no suggestion at the investigative phase that this is

1    going to be the testimony that's going to be put in at trial.

2    So we're not trying to disprove things he's saying.  We're just

3    sort of getting all the information, gathering the documents,

4    going back and completing our investigation to see if we want

5    to file a case.  It's very different from a deposition or trial

6    testimony where we're challenging him on things he's saying.

7    That is not sort of the thrust of what the investigative

8    testimony is for.  It's more as a fact-gathering exercise.

9            THE COURT:  Well, but surely the very fact that you're

10   taking his testimony is because you have some concerns as to

11   whether his activity was consistent with the securities laws or

12   not, and so you would think you're going to therefore inquire

13   into anything that sounds questionable.

14           Well, let me ask you this, because I must admit this

15   exact issue has not come up before me in the past:  Is there no

16   case law on this?

17           MR. CONNOR:  Your Honor, we did cite case law, and I

18   want to be forthright with the Court.  We did cite case law in

19   our motion *in limine* where we argued that his testimony in the

20   investigative testimony should come in.

21           THE COURT:  Your testimony's coming in.  That's not,

22   to me, an issue.  The issue is whether they can then offer

23   other things he said, and you're saying that they can't, in

24   effect, because you're saying an investigative testimony is

25   different from a grand jury or a deposition because it's taken

O41SHSec1

1    at an early stage.  You're still just trying to find out what

2    the parties' positions are.  You haven't made any determination

3    as to whether you're going forward at all, let alone on what

4    claims, etc., etc.  I hear you on that, but I'm asking, is

5    there any case law on that?

6          MR. CONNOR:  Your Honor, I am not aware of any case

7    law sitting here, but we will undertake that effort at the

8    lunch break and bring it to your Honor's attention.

9          THE COURT:  OK.

10         MR. FERRARA:  Your Honor, at the SEC's motion *in

11   limine* dated March 10 of this year, and it's page 17 of the

12   motion, page 33 of the PDF, the SEC wrote:  "Courts have also

13   held that designated portions of SEC investigative testimony,

14   transcripts, are admissible at trial under Federal Rule of

15   Civil Procedure 32," and then they have a *see, e.g.,* cite to ——

16         THE COURT:  Oh, now, that's interesting.  So you're

17   back in 32-land.

18         MR. FERRARA:  Your Honor, if Mr. Connor's unhappy with

19   how his colleagues developed the record at the testimony, he

20   can walk away from it, and we will walk away from it too.  But

21   under 32 or 804, if they put it in, we get to put it in too.

22         THE COURT:  Well, let's look at 32 again, given what

23   you just quoted.

24         MR. FERRARA:  And I would direct your Honor, as your

25   Honor flips, to 32(a)(8).

1          THE COURT:  Oh, shucks.

2          MR. FERRARA:  Pardon me, (a)(6).

3          THE COURT:  I can't read (1) through (5)?

4          MR. FERRARA:  You're welcome to.

5          THE COURT:  You're kind.

6          I'll start with the familiar 32(a)(4), unavailable

7      witness:

8          "A party may use for any purpose the deposition of a

9      witness, whether or not a party, if the Court finds:  (A) that

10     the witness is dead, (b) that the witness is more than

11     100 miles from the place of hearing or trial or is outside the

12     United States unless it appears that the witness' absence was

13     procured by the party offering the deposition, (c) that the

14     witness cannot attend or testify because of age, illness,

15     infirmity or imprisonment; (d) that the party offering the

16     deposition cannot procure the witness' attendance by subpoena;

17     or (e) on motion of notice that exceptional circumstances make

18     it desirable in the interest of justice and with due regard to

19     the importance of law and testimony in open court to permit the

20     deposition to be used."

21         That's (a)(4).  Now, (a)(6):

22         "If a party offers in evidence only part of a

23     deposition, an adverse party may require the offeror to

24     introduce other parts that in fairness should be considered

25     with the parts introduced, and any party may itself introduce

1    any other parts."

2              See, all of that makes perfect sense when we're

3    talking about a deposition.  What I'm not familiar with is

4    whether there's case law regarding how any of this applies,

5    either this rule or 804, to investigative testimony.  So why

6    don't we do this:  Why don't you get me and — you could just

7    send the citations to my law clerk over lunch, and we'll take

8    this up shortly before we resume this afternoon.  I don't think

9    we'll get to the Kwon testimony before that.

10             MR. CONNOR:  We agree.  Thank you, your Honor.

11             THE COURT:  All right.  Interesting.  It's a shame

12   having good lawyers in a case.  They raise difficult questions.

13             OK.  Let's — anything else?

14             MR. PELLEGRINO:  Just briefly, your Honor, with regard

15   to the Kwon testimony, there were several corrections that we

16   think are appropriate for the transcript.  We can take that up

17   later, but we wanted to flag that for you.  They're just what

18   we think are obvious transcription errors that the parties are

19   all familiar with.  I understand SEC opposes, but my sense is

20   it may be just based on the fact that a transcript can't be

21   changed.  Again, I think we can take that up later.

22             And then we had one brief motion regarding a document,

23   which is a new document that they've presented to us.  So

24   Saturday afternoon — Saturday evening at 9:30 they sent us a

25   document that's an interview of Do Kwon from 2021 on a show

1  called "Terra Bites," and they're seeking to introduce that

2  document, I think, at some point today.  I don't know exactly

3  when.  That document, they allege, contains false statements by

4  Mr. Kwon, and it's not contained within the pretrial order.

5  Your Honor ordered that by 11:59 p.m. on March 22 all false

6  statements had to be included in the pretrial order, and, of

7  course, under Rule 16 the pretrial order governs which

8  statements are to be tried in this case.  So that's the first

9  reason why we think it would not be admissible.

10         THE COURT:  Hang on, because this also came up in the

11  testimony of the last witness who testified.

12         MR. PELLEGRINO:  Right.  Those were exhibits ⸺

13         THE COURT:  I just want to get out the pretrial

14  consent order.

15         MR. PELLEGRINO:  Sure.

16         THE COURT:  I'm sorry.  I've got the earlier one.

17  Maybe my law clerk has the amended one.

18         MR. PELLEGRINO:  Those were Exhibits 83 and 353, your

19  Honor, from last Friday.

20         THE COURT:  Yes.  I'm sort of drowning in paper here.

21  Here we go.  OK.

22         Well, I want to go ⸺ there are two things:  First of

23  all, with respect to the statements that were mentioned in the

24  testimony of the witness on Friday, it looks to me that either

25  they are identical to or virtually substantively the same as

O41SHSec1

1    some of the statements that are specifically referenced in the

2    pretrial —— amended pretrial consent order.  So I'm not sure

3    what the argument is there.

4            I also want to go back and see the exact wording of

5    what my law clerk sent to you when he asked you to include this

6    in the amended order because my intent —— but my intent does

7    not govern; it's what was said that governs —— was to make sure

8    that the defense had before it all the statements on which the

9    SEC would premise a specific finding by the jury that this

10   statement was a basis for meeting the essential element of

11   misrepresentation in its claims in this case.  It was not

12   intended to exclude 404(b) evidence of other lies of a similar

13   nature that could be admitted on the issue of intent even if

14   they could not themselves support by themselves liability.

15   That was my intent, but I may not have been express in those

16   terms.  So I want to go back and see the email.

17           I'm sorry.  Does my law clerk have that email?

18           THE LAW CLERK:  Yes, I do.

19           THE COURT:  You want to read it.

20           THE LAW CLERK:  Yeah.

21           "The Court requires that the SEC file an amended

22   pretrial order that lists every statement it argues is

23   independently sufficient to support liability for fraud.  The

24   SEC must make every effort to do so in advance of the pretrial

25   conference on Friday, but must do so by 11:59 p.m. on Friday,

O41SHSec1

1    March 22."

2                THE COURT:  Yes, so I think that supports what I just

3    said, and that is ⸺ so I think you may be entitled to a 404(b)

4    statement.  I actually think the ones ⸺ you'll have to point

5    me where they're not mentioned in the pretrial consent order,

6    the ones on Friday.  But assuming they're not, I would admit

7    them under 404(b), and then if you want an instruction about

8    that to the jury, I'll give it.

9                But, now, what's the one on ⸺ that you say you just

10   received?

11               MR. PELLEGRINO:  Right.  Even understanding that

12   ruling, your Honor, I'll call it the "Terra Bites" interview,

13   it's an interview from May 2021.  This is the first time it's

14   ever been raised in any context.  It's not ⸺ it was not on the

15   pretrial order, but it's also not on the exhibit list.  And, in

16   fact, it was not raised in discovery.  To the best of my

17   knowledge, no one was questioned about it during any

18   depositions.  Again, it's a public statement that was made

19   three years ago, so I don't think even the 404(b) issue would

20   qualify here because we've never seen it before.

21               THE COURT:  You're saying it's surprise, in effect.

22               MR. PELLEGRINO:  Exactly.  In fact, they said in their

23   communication to us "we just came across this."  So this is the

24   first time the parties have contemplated it even being a part

25   of this case.

O41SHSec1

1          THE COURT:  OK.  So let me hear from the SEC.

2          MR. CONNOR:  Your Honor, first, with respect to the

3     tweets that were shown to Mr. George, the investor, as much as

4     the defense wants to recast our claims, we have scheme

5     liability claims and misrepresentation claims.  That tweet was

6     part of the scheme to defraud, the course of conduct that

7     operated as a fraud, so it's definitely relevant and should be

8     admitted as substantive evidence not just as 404(b).

9          THE COURT:  Yes, but to support a scheme to defraud

10    has to be a scheme to obtain money or property by means of

11    false or fraudulent representations or statements that were

12    materially misleading.  The scheme to defraud is, of course, a

13    term developed in 1872, as doubtless you recall, as part of the

14    mail fraud statute which was itself copied after the English

15    false pretenses statute of 1757, which even I recall.  And in

16    the *McNally* case, Supreme Court said that the broad expansion

17    of scheme to defraud that had been used for a number of years

18    by many courts was overbroad and overextension and that fraud

19    had —— while it wasn't bound by all the common law

20    requirements, it did —— scheme to defraud meant a scheme to

21    obtain money or property by means of falsehoods.  The

22    Securities Act amended that in Rule 10b-5, amended that by

23    making clear that the falsehoods could include, not just

24    affirmatively false representations but also statements that

25    were misleading in the terms specified by the rule.  So you

O41SHSec1

still have to have a statement on which liability is premised,
and calling it a scheme doesn't excuse that requirement.

It is true that also you have to show scienter, and
for scienter you need to show intent.  And for intent, you can
show intent through lots of ways.  And just to make the point
more clear, if you had a claim, in my hypothetical, that said
defendant X made the following false statement but did so as
part of a broader scheme to defraud, you could not have
liability without proving that that statement was false, but
you could have lots of other evidence to prove intent.  And
that's exactly what I was after when I asked the SEC to amend
the case management plan.  I felt it was unfair to the defense
not to know the specific statements on which you were premising
the misrepresentation portion of your claim, but I didn't say a
word about intent.  And so whether you call it 404(b) or call
it part of the scheme, or whatever, this other stuff still
comes in.

But now —— so that's settles the problem as to Friday.
And also, independently, I think it is really, what he said,
almost identical to some of the statements you do list, and
there is no surprise or anything like that.  Now they're
claiming there's surprise as to a document that was just
produced belatedly.  Has nothing to do with whether it's the
smoking gun or just an irrelevancy.  Their main claim is that
it's unfair to hit them with something that was not produced

1    previously, not listed previously, etc.

2              MR. CONNOR:  Yes, your Honor.  The reason it's not

3    unfair are twofold:  Number one, we asked in discovery for the

4    defense to produce and identify for us all public statements

5    that Do Kwon or Terraform employees made about the May 2021

6    depeg.  They didn't identify this document.  We weren't aware

7    of it.  Had we been aware of it, certainly, we would have

8    alerted the defense.  We became aware of it on Saturday.

9    That's the reality of it.

10             These are false statements, false and misleading

11   statements, and there's no prejudice to the defense.  These are

12   public statements that they —— surely their client knew about

13   because he was the one that gave them, and they're out in the

14   public domain.  So there's absolutely no prejudice to the

15   defense, and we added it to the exhibit list when we became

16   aware of it.  And there's similar misstatements.  It's not like

17   they're different in kind from the misstatements that are

18   already identified.

19             THE COURT:  So let me ask defense counsel.  So was

20   this called for in discovery and not produced?

21             MR. PELLEGRINO:  Your Honor, they asked for all

22   statements, but to be clear, this is a show.  It's an

23   interview.  It's a public statement.  So as you know from this

24   case, the defendants and others have made hundreds, if not

25   thousands, of public statements in social media, in postings,

O41SHSec1

1    in Twitter.  So this was equally available to everyone.  We

2    would have made ──

3              THE COURT:  Did you respond to their request for all

4    statements from Do Kwon by saying we're producing everything

5    except publicly available statements?

6              MR. PELLEGRINO:  I'm going to have to check what we

7    said.  That was before I was on the case, your Honor.

8              THE COURT:  Yeah.

9              MR. PELLEGRINO:  We're going to check, your Honor.

10             THE COURT:  I tell you what.  I assume all the jurors

11   are here except the missing juror, so we'll take this up

12   further at the next break.

13             MR. PELLEGRINO:  OK.  Thank you, your Honor.

14             THE COURT:  All right.  Let's get the witness on the

15   stand.

16             MR. CARNEY:  May I go to the podium, your Honor?

17   Thank you.

18             (Continued on next page)

19

20

21

22

23

24

25

O41HSec1                        Edman - Direct

1          (Jury present)

2          THE COURT:  Please be seated.

3          Good morning, ladies and gentlemen.  I'm sorry that

4     one juror had to be excused because of illness, but on the

5     other hand, it means that Juror No. 6 is now Juror No. 5, Juror

6     No. 7 is now Juror No. 6, etc.  Congratulations on your

7     promotion.

8          Also, I think it was very clever of counsel to arrange

9     for you to have good weather over the weekend and lousy weather

10    today so you don't mind being stuck here in court.

11         So we are ready to continue.  Go ahead, counsel.

12         MR. CARNEY:  Ready to proceed.  Thank you, your Honor.

13    MATTHEW J. EDMAN, resumed.

14    DIRECT EXAMINATION

15    BY MR. CARNEY:

16    Q.  Good morning, Dr. Edman.

17    A.  Good morning.

18    Q.  I think, since it's been just a few days, I'm going to try

19    and have you remind everyone where we left off on Friday.

20         Mr. Haywood, if you could please pull up Plaintiff's

21    Exhibit 300 and Plaintiff's Exhibit 301 that we were looking

22    at.

23         So, first of all, Dr. Edman, Plaintiff's Exhibit 300,

24    which has been admitted, is on the screen in front of you.

25    Could you just remind us, since it's been a few days, what

1    Plaintiff's Exhibit 300 is.

2    A.   This exhibit is a page capture from Terra Finder showing a

3    transfer of KRT to the LP wallet.

4    Q.   What was the significance of this particular transfer?

5    A.   The significance of this transfer was the memo associated

6    with this transfer indicates seed funding for the LP node, and

7    the address that sent this KRT to the LP wallet was an address

8    that Terraform has represented they control.

9    Q.   Can you tell us what the date of this transfer was?

10   A.   This was June 10, 2019.

11   Q.   And when did —— how does that relate to the date of the

12   first commit to Terraform's LP server Git repository?

13   A.   The first commit to the LP server Git repository was also

14   June 10, 2019.

15   Q.   If we could just please look at Plaintiff's Exhibit 301

16   again, and this has been admitted.

17        Can you remind us of what this document is.

18   A.   This document is a spreadsheet that defendants have

19   represented these addresses are controlled or associated with

20   Terraform Labs or the Luna Foundation Guard.

21   Q.   And if we could please just look at row 107 of Plaintiff's

22   Exhibit 301.

23        Can you remind us the significance of that address.

24   A.   This is the address that sent the initial seed funding to

25   the LP wallet.

1    Q.  And then what conclusion did you draw from the fact that

2    this address is the same address on the transaction that we

3    just looked at?

4    A.  I concluded that Terraform Labs provided the initial seed

5    funding for the LP server.

6    Q.  And, Dr. Edman, did you review any other KRT transfers to

7    the LP wallet?

8    A.  I did.

9    Q.  Did you prepare a demonstrative summarizing those KRT

10   transfers?

11   A.  Yes, I did.

12       MR. CARNEY:  Mr. Haywood, if we could please put up

13   Edman demonstrative 15.

14   Q.  Dr. Edman, could you explain what you're showing here on

15   your demonstrative.

16   A.  This demonstrative shows sort of a high-level flow of

17   funds.  You have the LP server in the middle with the LP wallet

18   address and then the other Chai user merchant wallets

19   controlled by the LP server.  And on the left you have

20   transfers of KRT from wallet addresses that are either

21   controlled by or associated with Terraform Labs to the LP

22   wallet, and then on the right you have transfers from the LP

23   wallet to addresses controlled by Terraform Labs.

24   Q.  What is the significance of the facts that you just

25   discussed?

1   A.  The significance is that the only transfers associated with

2   the wallets controlled by the LP server are either among

3   addresses controlled by the LP server or to or from the LP

4   wallet involving only addresses that were controlled by or

5   associated with Terraform Labs.

6   Q.  In your experience, are there certain types of crypto

7   wallets that store and manage crypto assets on behalf of users?

8   A.  Yeah.  Last week we talked a little bit about custodial

9   wallets, which are wallets, typically like Coinbase, where they

10  manage the crypto assets on your behalf.

11  Q.  Did you consider that maybe the LP server was a custodial

12  wallet for Chai users and merchants?

13  A.  I have.  And based on the materials I reviewed, as well as

14  my experience conducting investigations involving custodial

15  wallets, the LP server is not consistent with a custodial

16  wallet.

17  Q.  And why not?

18  A.  It lacks most of the features you would expect of a

19  custodial wallet.  For example, Chai users had no ability,

20  based on what I've seen, to deposit funds into their supposed

21  Chai wallet.

22  Q.  And in your analysis, did you identify any deposits of KRT

23  to a Chai wallet from another wallet that wasn't controlled by

24  the LP server?

25  A.  No.  All transfers involving Chai user wallets just

1    involved addresses, other addresses, controlled by the LP

2    server.

3    Q.  And we can take this one down for a second.

4            Besides allowing customers to deposit crypto assets,

5    in your experience, is there any other functionality that a

6    custodial wallet typically provides?

7    A.  Probably the most important functionality is the ability to

8    withdraw your crypto assets from that custodial wallet.

9    Q.  Did you identify any withdrawals from any of the Chai

10   wallets to an address that wasn't controlled by the LP server?

11   A.  No.  The only withdrawals associated with the LP server

12   were from the LP wallet to addresses controlled by Terraform

13   Labs.

14   Q.  So, Dr. Edman, in your opinion, is the LP server consistent

15   with a custodial wallet for Chai users and merchants?

16   A.  No.

17   Q.  Was there any way at all for Chai users to credit their

18   account using KRT?

19   A.  There was briefly a program called KRT Topup, or Terra

20   Topup, that essentially allowed users, Chai users, to sort of

21   link their Chai app to a self-custody wallet that they

22   controlled on their mobile device, their phone, something like

23   that.  And the way that it would work is, essentially, this

24   link granted another address associated with the Terra Topup

25   server the ability to withdraw, effectively, an unlimited

1   amount of funds from that user's wallet and then transfer it to

2   another address.

3   Q.  Did you analyze those transactions?

4   A.  I did.

5   Q.  Did you prepare a demonstrative summarizing your analysis?

6   A.  Yes.

7          MR. CARNEY:  Mr. Haywood, if we could please put up

8   Edman demonstrative 16.

9   Q.  What did your analysis show, Dr. Edman?

10  A.  My analysis showed that the Terra Topup program only

11  existed for about a year, around March 2021 to March 2022, and

12  it was a fairly insignificant amount of activity compared to

13  the transactions generated by the LP server.

14  Q.  So let me ask you a question, then, Dr. Edman.  I'm looking

15  at your chart here, and it appears at the bottom that Terra

16  Topup transactions are in orange, is that right?

17  A.  That's correct.

18  Q.  Where on —— if we can zoom out for a second —— where on the

19  chart are the orange bars?

20  A.  It's tough to see, but if you look between March 2021 and

21  March 2022 and zoom in, and maybe squint a little bit, you can

22  see little orange bars at the bottom.

23  Q.  What do those orange bars represent with respect to the

24  blue bars?

25  A.  So the orange bars represent the volume of Terra Topup

1  transactions, and you can see it's a very small portion

2  compared to the blue bars which represent LP server

3  transactions.

4  Q.  And did you analyze where the Terra Topup KRT was sent?

5  A.  I did.

6  Q.  And where was it sent?

7  A.  All of the KRT associated with the Terra Topup transactions

8  just went to the same address.  Those funds never left that

9  address.  There were never transfers from or associated with

10 the Terra Topup program to, for example, the Chai user wallets

11 controlled by the LP server or to the Chai merchant wallets

12 controlled by the LP server.

13         MR. CARNEY:  Mr. Haywood, we could take that

14 demonstrative down.

15 Q.  Dr. Edman, I want to go back to something you said on

16 Friday.  You had mentioned that, in your opinion, Chai

17 transactions were not processed and settled on the Terra

18 blockchain.  Can you remind us again what you meant by

19 "processed and settled."

20 A.  I mean the transfer of funds from the possession of the

21 Chai user to the Chai merchant.

22 Q.  Did the Terra blockchain transactions generated by the LP

23 server indicate that merchants were settled in KRT on the Terra

24 blockchain?

25 A.  No.  Based on the evidence that I've reviewed, nothing

O41HSec1                        Edman - Direct

1    indicates that merchants ever actually received KRT on the

2    Terra blockchain.  All of the settlement just occurred in

3    Korean won or fiat currency via traditional banking methods.

4    Q.  In your opinion, what was the role of the LP server?

5    A.  In my opinion, the role of the LP server was just to

6    receive Chai transaction information and then replicate or

7    mirror those transactions onto the Terra blockchain.

8    Q.  Did you review, as part of your analysis in this case, any

9    conversations including the developer of the LP server, Paul

10   Kim, regarding the role of the LP server?

11   A.  I did.

12        MR. CARNEY:  And, Mr. Haywood, I would ask if you

13   would please put up Defendants' Exhibit 1016, which has already

14   been admitted into evidence.

15   Q.  Dr. Edman, are you familiar with this document?

16   A.  I am.

17   Q.  Is this one you considered as part of your analysis?

18   A.  It is.

19        MR. CARNEY:  If we could please turn to the second

20   page and read this conversation starting from the sixth entry

21   from the top.

22   A.  Etienne Napoleone says:  "Can you quickly explain me what's

23   the role of LP server?  Is it just tracking rewards?  Or is it

24   actually triggering the distribution of them."

25        Paul Kim says:  "LP server creates multi-send

O41HSec1                          Edman - Direct

1    transactions by receiving transaction information from Chai.

2         "In short, it basically replicates Chai transactions."

3         Etienne says:  "Ahh, yes, OK.  This is mirroring Chai

4    traffic on chain kinda."

5         Paul Kim says:  "Yes."

6         Etienne:  "So, basically, Chai was still working but

7    no tx on chain, so no rewards."

8         Paul Kim says:  "Correct."

9    Q.  We can stop there.

10        Dr. Edman, based on your analysis of the materials you

11   described in your testimony, did you form an opinion as to

12   whether you agreed with the statements by Paul Kim in that

13   document?

14   A.  Yes.  Based on the materials I reviewed, I agree that the

15   role of the LP server was to replicate, or mirror, Chai

16   transactions on the Terra blockchain.

17   Q.  And did you prepare a demonstrative summarizing the basis

18   for your opinion?

19   A.  I did.

20        MR. CARNEY:  Mr. Haywood, if we could please put up

21   Edman demonstrative 17.

22   Q.  So can you just walk us through this demonstrative showing

23   the summary of your opinions.

24   A.  In summary, the LP server was a software application

25   developed by Terraform Labs.  It controlled all of the private

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

O41HSec1                         Edman - Cross

1    keys associated with the purported Chai users and merchants.

2    Its role was to receive transaction information from Chai and

3    then generate or mirror those transactions onto the Terra

4    blockchain.  However, those transactions just represented

5    transfers between wallet addresses controlled by the LP server

6    as opposed to processing settlement of Chai user merchant

7    transactions on the Terra blockchain.

8              MR. CARNEY:  No further questions, your Honor.

9              THE COURT:  Cross-examination.

10   CROSS-EXAMINATION

11   BY MR. CALIFANO:

12   Q.  Good morning, Dr. Edman.

13   A.  Good morning.

14   Q.  Dr. Edman, yesterday —— I mean, Friday, when you testified

15   about your hourly rate on direct, you said 1190 per hour.  You

16   meant $1,190 per hour, is that right?

17   A.  Correct.

18   Q.  In your investigation of a Terra blockchain, you testified

19   that you identified transactions generated by the LP server

20   from June 2019 including up to September 2019 as part of your

21   analysis, right?

22   A.  That was part of the analysis, yes.

23   Q.  One of the resources you relied upon was the Terra block

24   explorer, is that correct?

25   A.  I believe you're referring to Terra Finder, but yes.

1    Q.  Thank you.  Terra Finder.

2           So Terra Finder is a public website that allows

3    anybody to access and browse blockchain data from their web

4    browser, right?

5    A.  Correct.

6    Q.  And you stated that the transactions generated by the LP

7    server in the period June 2019 to December 2019 included a memo

8    that said Terra: Users to LP were Terra: LP to users, is that

9    correct?

10   A.  I don't believe that's exactly correct, but you have the

11   general idea.

12   Q.  OK.  You also testified this morning about the fact that at

13   least one of those memos included the notation about seed

14   funding, is that correct?

15   A.  Correct.

16   Q.  OK.  And the memo field is also accessible on Terra Finder,

17   is that right?

18   A.  It is.

19   Q.  So the block explorer called Terra Finder, which is

20   publicly available, that means that anybody can look and read

21   those memo entries, can't they?

22   A.  If they identify the correct transactions, yes, they can.

23   Q.  So if the goal was to obscure the fact that these

24   transactions were generated by the LP server, adding a memo

25   that described the transactions wouldn't be a very good way of

1    accomplishing that goal, would it?

2    A.  It may not be, but there's nothing in the memo that overtly

3    associates those transactions with Chai.  Just says Terra batch

4    LP to users or Terra batch users to LP.

5    Q.  In your review of the LP server source code, you determined

6    that the LP server controlled the private keys of the wallet

7    addresses involved in the blockchain transactions.  That's

8    server generated, is that right?

9    A.  Correct.

10   Q.  So a Chai user would not have been required to manage any

11   private keys associated with that Terra blockchain address,

12   would it?

13   A.  Based on my review, they had no access to those private

14   keys and therefore could not manage them.

15   Q.  So a Chai user would not have been required to manage

16   wallet addresses on the Terra blockchain, would they?

17   A.  No, they had no ability to do so.

18   Q.  And Chai is a consumer mobile payments app, is that

19   correct?

20   A.  That's my understanding.

21   Q.  It's similar to PayPal or Venmo, as I understand it?

22   A.  Correct.

23   Q.  You've used Venmo?

24   A.  I have.

25   Q.  So when you're using Venmo, if you want to pay somebody,

O41HSec1                          Edman - Cross

1   you have to enter in the person you want to pay and the amount

2   you want to pay them, is that right?

3   A.   To the best of my recollection, yes.

4   Q.   Because Venmo isn't going to pay somebody on its own, will

5   it?

6   A.   I don't know how Venmo operates internally.

7   Q.   Well, I mean, unless you tell Venmo to pay somebody and

8   tell Venmo how much to pay them, Venmo is not going to pay that

9   person, correct?

10  A.   To the best of my recollection, no, in Venmo you have the

11  ability to request payment as opposed to just initiate it, but

12  I believe there is an approval process required regardless.

13  Q.   The other thing is that you can't pay anybody with Venmo

14  unless they're also using Venmo, isn't that correct?

15  A.   I don't know the full extent to which —— to Venmo's payment

16  options, but I think that the general use case is that, yes,

17  you use Venmo to pay other Venmo users.

18  Q.   And you're familiar with how somebody uses their phone to

19  transfer funds from their bank account to somebody else's bank

20  account, correct?

21  A.   Yes.

22  Q.   When you open your app for your bank account and enter the

23  information to transfer funds, the funds are in the bank's

24  control, and the bank systems do the transfer, isn't that

25  correct?

1    A.  They do.

2    Q.  OK.  So if I were to transfer money to your bank account,

3    you would consider that money to be in your control or would

4    you consider it to be in the control of the bank?

5    A.  There may be a difference between custody and control.  I

6    mean, certainly, with respect to the money that I have in my

7    bank account, I have some agency in directing transfers of

8    those funds.

9    Q.  You have never designed a mobile payments app for

10   consumers, have you?

11   A.  No.

12   Q.  And you've never built a consumer mobile payment system,

13   have you?

14   A.  No.

15   Q.  Prior to your testimony concerning Chai and the LP server,

16   you have never testified as an expert about what represents

17   processing and settlement on a consumer mobile payment system,

18   have you?

19   A.  I've testified in matters involving blockchain payment

20   systems, but if you're referring specifically to applications

21   like Venmo, then, no, I have not.

22   Q.  When you were conducting your analysis to form your

23   opinion, did you examine any consumer mobile payment systems

24   like PayPal?

25   A.  No.

1          MR. CALIFANO:  I want to put in something, your Honor.

2     It's the demonstrative that Dr. Edman used a little earlier.  I

3     have PDX Edman 08, and I'm not sure which is the proper exhibit

4     number.

5          THE COURT:  Yes, you need to — you've got it —

6          MR. CALIFANO:  Sideways.  I apologize, your Honor.

7          MR. CARNEY:  You want us to put it up?

8          MR. CALIFANO:  That's OK.

9     BY MR. CALIFANO:

10    Q.  Dr. Edman, that's a copy of your diagram, is that right?

11    A.  Looks like it.

12    Q.  Now, as you testified earlier, one of the primary

13    components for the LP server is the REST API function, is that

14    correct?

15    A.  That is one of the components, yes.

16    Q.  And that function allows software applications like the LP

17    server to send information between it and another system, is

18    that right?

19    A.  A REST API allows an application to receive information.

20    Q.  It also allows communication by the application back in the

21    other direction, doesn't it?

22    A.  In its response, I suppose, yes, it does.

23    Q.  OK.  And the LP server was receiving information on

24    transactions from the Chai system, wasn't it?

25    A.  That's my understanding.

1    Q.  So if we were to draw the functioning of the API endpoint,

2    in order to note that they communicate in both directions, we'd

3    want to put an arrow back towards Chai, wouldn't we?

4    A.  You might, but the only thing that that arrow represents is

5    just a response, which is usually used to indicate, like, this

6    was an invalid request or this request wasn't formatted

7    correctly.

8    Q.  Or it was accepted successfully, correct?

9    A.  Correct.

10   Q.  OK.  Dr. Edman, when the LP server — thank you very much

11        When the LP server started operations and started

12   executing transactions on the Terra blockchain, the Terra

13   blockchain was running something called the Columbus-2 version,

14   wasn't it?

15   A.  I believe so.

16   Q.  And in December of 2019, the Terra blockchain upgraded to

17   the columbus-3 version, is that correct?

18   A.  I believe so.

19   Q.  Now, the source code for both of those versions of the

20   blockchain are publicly available, aren't they?

21   A.  They are.

22   Q.  But you didn't examine those in your analysis, did you?

23   A.  They used that source code in connection with my analysis,

24   but I don't believe that there was any need to review the

25   details of the Terra blockchain source code in connection with

O41HSec1                          Edman - Cross

1    my analysis, only the Terra blockchain transactions.

2    Q.  So you didn't examine whether the Columbus-2, that earlier

3    version, was configured in a way that prevented the use of

4    merchant wallets in this process, did you?

5    A.  That wouldn't make any sense.  The wallet address is

6    treated equally, essentially, on the Terra blockchain whether

7    it's a purported Chai user wallet or Chai merchant wallet.

8    Q.  But that wasn't my question.  My question was did you

9    examine the Columbus-2 source code blockchain to determine

10   whether it would prevent the use of merchant wallets in the

11   execution of blockchain transactions in the LP server process?

12   A.  No, I did not, because I did not believe it was relevant.

13   Q.  Now, the blockchain transactions that the LP server

14   executes on the Terra blockchain are real blockchain

15   transactions, is that correct?

16   A.  They are.  They really exist on the Terra blockchain.

17   Q.  And each time one of those transactions gets executed, the

18   validators get paid a small portion of that transaction if they

19   validate a block of transactions, is that correct?

20   A.  That is correct.

21   Q.  Isn't it also the case that a portion of the transaction

22   fee is also paid to the community?

23   A.  I think that depends on what you mean by "community."

24   Certainly, the delegators, to the extent that they delegated

25   crypto assets to the validators, they would receive a portion

1    of the rewards as well.

2    Q.  I'm referring to whether or not you're aware that a portion

3    of those fees were paid into a community pool of funds for use

4    by the community.

5    A.  I guess I'm not sure what you mean by "the community."

6    Q.  The Terra blockchain community.

7    A.  I'm still not sure what you mean by "the Terra blockchain

8    community."

9    Q.  OK.  In any event, all of those fees are real fees that

10   were paid to the validators and whoever else they were paid to,

11   is that correct?

12   A.  I believe so, yes.

13   Q.  You determined from your review of the commit history and

14   the nature of the commits that Paul Kim was the primary

15   developer of the LP server source code, is that right?

16   A.  That is correct.

17   Q.  Dr. Edman, on direct when you discussed the LP server, you

18   testified that, based on your experience, the letters LP in LP

19   server usually stands for liquidity provider or liquidity pool,

20   is that right?

21   A.  That is correct.

22   Q.  And you had no idea what the LP server was named after when

23   you formed your opinion, did you?

24   A.  Not directly.  I don't think there was a glossary that

25   provided the definition.  But based on my experience in

O41HSec1                    Edman - Redirect

1    blockchain analysis and investigations, as well as in

2    connection with crypto assets, the role of the LP wallet was

3    consistent with the terms that LP is commonly used to

4    represent.

5    Q.  So, in your professional opinion, did LP server provide

6    liquidity?

7    A.  I believe so, in the sense that it provided the KRT used to

8    fund the Chai user merchant transactions on the Terra

9    blockchain.

10   Q.  But the LP in LP server is actually named after ledger

11   processor, "L" for ledger, "P" for processor, isn't that right?

12   A.  I'm aware of testimony from Paul Kim to that effect.

13   Q.  So you wouldn't want to change your testimony on that

14   point?

15   A.  No.  In my opinion, it's still consistent with the role of

16   liquidity provider or liquidity pool.

17               MR. CALIFANO:  OK.  Your Honor.  May I have one

18   minute?

19               THE COURT:  Yeah.

20               MR. CALIFANO:  No further questions, your Honor.

21               THE COURT:  Any redirect?

22               MR. CARNEY:  Very brief, your Honor.

23               THE COURT:  All right.

24   REDIRECT EXAMINATION

25   BY MR. CARNEY:

1    Q.  Dr. Edman, at the start of cross-examination, Mr. Califano

2    asked you about whether the Terra Finder website was publicly

3    available.  Do you recall that?

4    A.  I do.

5    Q.  And he asked you some questions about the memo fields on

6    the Terra Finder transactions.  Do you remember that?

7    A.  Yes.

8    Q.  Would you have been able to conduct your analysis in this

9    case if you had only looked at the Terra Finder website?

10   A.  Possibly.  I still think it is better to do as I did and

11   rely on multiple sources of information.

12   Q.  In order to understand the role of the LP server, did you

13   feel it was important to look at the LP server source code?

14   A.  Yes.

15   Q.  You were also asked —— you were asked whether you had

16   examined any consumer mobile payment apps as part of your work

17   here.  Do you recall that?

18   A.  I do.

19   Q.  And you had said no, is that right?

20   A.  Correct.

21   Q.  And why did you not review any consumer —— or mobile

22   payment apps?

23   A.  Because the scope of my analysis was regarding whether or

24   not Chai used the Terra blockchain to process and settle

25   transactions between Chai users and merchants.  It wasn't, for

1  example, how Venmo processes transactions.

2  Q.  Do you recall that Mr. Califano drew on your demonstrative

3  and he wrote "Chai" over on the left side?

4  A.  I do.

5  Q.  To form your opinions in this case, do you believe that you

6  had all of the information that you needed to conclude what you

7  did regarding the LP server?

8  A.  I do.

9  Q.  Mr. Califano also asked you about whether you reviewed the

10  Columbus-2 blockchain source code.  Do you remember that?

11  A.  I do.

12  Q.  And you had said that, as I wrote down here, that you

13  didn't feel it was relevant, is that right?

14  A.  Correct.

15  Q.  Why was it not relevant?

16  A.  Because I was reviewing the blockchain transactions.  The

17  underlying mechanics of how the Terra blockchain processed

18  those transactions was not relevant.  And my understanding,

19  based on that analysis, is that there was no difference between

20  the Chai user and merchant addresses and how the Terra

21  blockchain treated those.

22  Q.  And finally, Mr. Califano asked you about whether Mr. Kim

23  referred to the LP server as ledger processing.  Do you

24  remember that?

25  A.  I do.

O41HSec1                          Edman - Redirect

1    Q.  Does knowing what LP might have stood for in Paul Kim's

2    mind change your opinions in this case?

3    A.  No.

4    Q.  Why not?

5    A.  You can call it whatever you want.  Still, the analysis was

6    focused on the LP server source code and the Terra blockchain

7    transaction to determine whether it represented processing,

8    settlement of Chai transactions on the Terra blockchain.

9            MR. CARNEY:  Thank you.  No further questions, your

10   Honor.

11           THE COURT:  Anything else?

12           MR. CALIFANO:  No, your Honor, other than to mark this

13   one little exhibit as a demonstrative.

14           THE COURT:  None of these have been received as

15   exhibits.  These were all offered as demonstrative aids.  If

16   you want to mark it as a demonstrative aid, that's fine.

17   They're not part of the evidence in the case.  They were just

18   introduced to help the jury follow the verbal statements in

19   this complicated area.

20           MR. CALIFANO:  Thank you, your Honor.  I will find a

21   number and let the Court know.

22           THE COURT:  Very good.

23           All right.  Thank you very much.  You may step down.

24           (Witness excused)

25           THE COURT:  Now, ladies and gentlemen, you may recall

O41HSec1                         "Kim"

1    that we were playing the deposition of Paul Kim, and there was

2    a portion that we had not yet gotten to.  So we'll play that

3    final portion now.

4            Get our reader back on the stand.

5            MR. LANDSMAN:  Your Honor, before we continue reading,

6    we want to read in stipulation 15.

7            THE COURT:  OK.

8            MR. LANDSMAN:  Stipulation 15:  Terraform employees

9    were involved in managing the LP server.

10           THE COURT:  Go ahead.

11           (Reading of the Paul Kim deposition continued)

12   "Q.  Understood.  So even though there was a technical

13   difficulty issue with making a transaction on the blockchain,

14   the transactions, system-wise had to be made through the

15   blockchain at that time and that is why you had this kind of

16   discussion to solve the issue, correct, in the end?

17   "A.  Yes, correct.

18   "Q.  This issue occurred precisely because the blockchain

19   transactions were closely linked with how transactions flowed

20   on the Chai side, didn't it?

21   "A.  Yes, it did."

22           MS. LANDOW:  We'll present Exhibit —— Plaintiff's

23   Exhibit 158 in evidence, Slack records as September 22, 2020.

24   "Q.  This is also a one-page document in English.  According to

25   this document, you and Nicholas Andreoulis discussed if you had

O41HSec1                        "Kim"

1    a list of all the wallets associated with Chai, including

2    merchants and customers.  At that time, there actually were

3    Terra wallets that were associated with Chai merchants and

4    customers, correct?

5    "A.  Yes.

6    "Q.  This could be checked through the blockchain as well,

7    correct?

8    "A.  Yes.

9    "Q.  It may have very difficult for you to come here today to

10   testify as a witness.  It may not have been an easy decision to

11   make.  How did you decide to take the stand?

12   "A.  I have been constantly contacted by people around me about

13   what on earth the LP server is, and this matter seemed to be a

14   key issue in dispute.  As a person who is involved in a related

15   case and was working on this matter in the company, I felt

16   obligated to explain this.  That is why I decided to testify.

17   "Q.  What you have testified so far is all based on facts

18   according to your experience and recollection, correct?

19   "A.  Yes, that is correct.

20   "Q.  You testified about the lp.claimDON in Defendants'

21   Exhibit 1215 in evidence.  My first question is it is my

22   knowledge that this LP.don is not related to the Terra

23   blockchain but to the Tempura blockchain.  Which one is

24   correct?

25   A.  At the very beginning, there were several approaches to

O41HSec1                    "Kim"

1  make linkages, which I ideated before the actual final
2  implementation.  I said earlier that there were about five to
3  six components related to the LP, and in the middle of the
4  process, there was another component that used the concept of
5  Tempura.  The component was called Tempura back then, and it
6  was put in somewhere in the middle.  The name was made during
7  the development process, but while working on the actual
8  implementation, I realized that the — that the implementation
9  could be sufficiently done without this Tempura concept, so I
10  just removed it.  Tempura means a deep-fried fish in Japanese,
11  right?  It means something deep fried.  DON is — well, it is a
12  bit awkward to say this in court, but DON comes from Gyudon,
13  Katsudon, those rice-bowl dishes topped with toppings.  You can
14  think of it as a program — program code name, but its
15  operation is about the KRT blockchain transactions, so you can
16  think of it by substituting it like that.  It is just a
17  function name.
18  "Q.  Exhibit A in the deposition, Defendants' Exhibit 1215 is
19  dated December 12, 2019, right?  And DON here came from Donburi
20  rice bowls and Tempura was — anyway, it is true that DON was
21  related to the Tempura blockchain.  Isn't it correct that that
22  was before the Terra blockchain was made, so as a middle step
23  that was done, not on the Terra blockchain but on the Tempura
24  blockchain?
25  "A.  No, that is not correct.  Tempura was never actually made

O41HSec1                    "Kim"

1    in reality.  It was just there as a code name.  Tempura was

2    never once used.

3    "Q.  Then is it correct that the Tempura blockchain is only a

4    code name, and this refers to the Terra blockchain?

5    "A.  Yes, that turned out to be the case in the end.  Tempura

6    was initially in the plan but was removed, so it never actually

7    ran.  In the end, the LP.claimDON function was computed,

8    playing the role of linking with the Terra blockchain.

9    "Q.  I have a second question on this topic.  Then this DON,

10   the transactions on Chai are recorded on the ledger, correct?

11   A.  Yes.

12   "Q.  Afterwards, the information moves to the LP server.  Do

13   the transactions on the Chai ledger get recorded first before

14   they move to the LP server, or do they already move to the LP

15   server even before they move to the LP server or in that

16   process?  How does it work timing-wise?

17   "A.  If the data does not go into the queue that guarantees the

18   data's transferred to the LP server, the transaction fails.  So

19   they are in the same function across the whole process.

20   Indeed, when there is a function in any program, if its data is

21   not fully executed, it is incomplete, right?  When it is

22   incomplete, the transaction should fail.  That is a basic

23   specification of a payment, a transaction.  The function of

24   putting the data in the LP server queue is part of the whole

25   process, so I think I can explain it — explain in this way.

O41HSec1                        "Kim"

1     If putting the data into the queue fails, the transaction

2     fails.  The same logic applies to registration and the same to

3     settlement.

4     "Q.  My third question is, with regard to LP.claimDON, this is

5     related to the merchants, right, I mean, Chai's merchants?  On

6     Chai, there are Chai users and Chai's merchants who do business

7     there.  So was it in December 2019 that this service called

8     claim appeared with regard to the merchants through

9     lp.claimDON?

10    "A.  The source code was changed on a date that was shown there

11    in 2019.

12    "Q.  If you look at this date, you made the Donburi, the DON

13    claim, whatever, in December 2019.  Is this understanding,

14    correct?

15    "A.  Are you asking if I wrote the code then?

16    "Q.  Yes, writing a code or ——

17    "A.  Yes.

18    "Q.  Then looking at this the other way around, if a certain

19    claim service with regard to the merchants finally came to be

20    made in December 2019, isn't it correct that the functions

21    related to the merchants did not exist on the Chai app or

22    things like that before then?

23    "A.  No, that is not correct.  They existed.

24    "Q.  What are they?

25    "A.  May I see the material again?  Are you asking if the

O41HSec1                     "Kim"

1   function did not work before December 12, 2019?  Because the

2   source code was only put in place on that date.  Did I

3   understand your question correctly?  In June 2019. . .

4   "Q.  Yes.  Before this was introduced —— is this the first time

5   that this function was introduced?  When was this function

6   made?

7   "A.  Chai launched in June 2019, right?  It has been operating

8   since then.  First of all, the Terra blockchain was linked

9   right from the beginning.  Please have a look at the source

10  code here.  I requested JiHoon Kim to review the change to the

11  source code, and this email contains the details of that

12  change.  I requested a review on the source code change.

13          It was, like, 'This change would not cause a problem

14  to our server, right?  It should not,' and I tried to verify

15  that.  There is @devilcoke, and at the top in the 'from' line

16  of the email, there is 'JiHoon Kim.'  The first line of the

17  email body reads '@devilcoke,' and this is JiHoon Kim's ID.

18  After that it reads 'approved this pull request.'  This means

19  that I sent a pull request, and JiHoon Kim approved the pull

20  request that I sent.  And moving on to the content, in the

21  lib/payment/confirm.ts file, there are lines that start with

22  dash, and this means that those lines are deleted from the

23  source code.  There are lines that start with plus, and this

24  means that those lines are added to my source code.  Therefore,

25  the lines that are headed by minus or dash are lines that were

O41HSec1                        "Kim"

1    originally in the API server.  There you can see that

2    lp.claimDON was still called, right?  The same call to the

3    users.  'Amount,' 'merchant.id,' all of these were called in

4    the same way.  Thus, the source code was originally written

5    before June 2019, before the launch of Chai.

6    "Q.  Mr. Kim, during your testimony today, if you testified

7    about experiences that you did not have as if you did or

8    memories that you did not have as if you did, even if they were

9    not inconsistent with the substantive truth, you may face

10   criminal punishment for perjury.  Are you aware of this?

11   "A.  Yes.

12   "Q.  Please hand over the oath once again.  Please take the

13   oath once again.

14   "A.  I swear that I will tell the truth, the whole truth, and

15   nothing but the truth in good conscience and that if lie, I

16   will do so under the penalty of perjury.  Witness:  Han Ju Kim.

17   "Q.  I have one last question for you.  During today's witness

18   examination that lasted for over five hours, did you tell the

19   truth in good conscience based on your memory?

20   "A.  Yes, I did."

21           THE COURT:  Is that it?

22           MR. LANDSMAN:  Yes, your Honor.

23           THE COURT:  Thank you very much.

24           Please call your next witness.

25           MS. CUELLAR:  Your Honor, our witness just went to the

O41HSec1                        "Kim"

1    restroom.

2              THE COURT:  Sounds like appropriate witness

3    preparation.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O41Wter2                        Curran - Direct

 1   BRIAN CURRAN,

 2        called as a witness by the Plaintiff,

 3        having been duly sworn, testified as follows:

 4   DIRECT EXAMINATION

 5   BY MS. CUELLAR:

 6   Q.  Good morning, sir.  What is your state of residence?

 7   A.  California.

 8   Q.  And where are you originally from?

 9   A.  Virginia.

10   Q.  And what is your highest level of education?

11   A.  A bachelor's degree.

12   Q.  And what did you study?

13   A.  Biology.

14   Q.  And where did you graduate from?

15   A.  Virginia Tech.

16   Q.  And what year did you graduate?

17   A.  2014.

18   Q.  And what did you do after graduating?

19   A.  I worked at Lombardi Cancer Center at Georgetown doing

20   applied therapeutics for late-stage cancer patients.

21   Q.  Where is Georgetown located?

22   A.  In Washington, D.C.

23   Q.  How long did you work there?

24   A.  Roughly two, three years.

25   Q.  And so around what year did you leave?

O41Wter2                        Curran - Direct

1  A.  It would have been 2018, around then.

2  Q.  And what did you do next?

3  A.  I started working part time in crypto, mostly writing,

4  while I still had that job and then transitioned into full

5  time.

6  Q.  And if you can, can you just raise your voice a little.

7  A.  Yeah.

8  Q.  And what drew you to crypto?

9  A.  I thought it was fascinating.  Bitcoin in particular, just

10  kind of kept popping up, and it was a hobby that I loosely

11  followed that kind of evolved into full-time work.

12  Q.  And so how long did you do this?

13  A.  Roughly two years.

14  Q.  What specifically were you doing in the crypto area during

15  that time?

16  A.  Mostly working as a contractor with PR agencies, marketing

17  firms, for crypto clients, content, social media, stuff like

18  that.

19  Q.  What does PR stand for?

20  A.  Public relations.

21  Q.  Now, at some point, did you hear about a company called

22  Terraform Labs?

23  A.  Yes.

24  Q.  And around when was that?

25  A.  Around Thanksgiving 2020.

1   Q.  And how did you hear about it?

2   A.  On a cryptocurrency job board.

3   Q.  And was there a job opening?

4   A.  Yes.

5   Q.  What was the job opening?

6   A.  PR lead.

7   Q.  And again, what does PR stand for?

8   A.  Public relations.

9   Q.  Did you end up applying to this job?

10  A.  Yes.

11  Q.  And did you get an interview?

12  A.  Yes.

13  Q.  And who did you interview with?

14  A.  Initially, Jeff Kuan, who is the head of business

15  development.

16  Q.  You said initially.  Did you interview with someone else?

17  A.  Yes.  After Jeff, Do Kwon.

18  Q.  Who is Do Kwon?

19  A.  He's the cofounder and CEO of Terraform Labs.

20  Q.  How did your interview go?

21  A.  Decent.  It was a challenging interview, kind of generic

22  questions, hard to answer.

23  Q.  And did Mr. Kwon give you any ideas for what your job would

24  entail?

25  A.  Yeah.  Mostly just he gave me a brief of the Terra brand

1  and its state at the time, some of the internal communication

2  problems between the different teams.  That was about the gist

3  of it.

4  Q.  And where were you interviewing from?

5  A.  My apartment.

6  Q.  And what state is that located in?

7  A.  California.

8  Q.  Where did you understand Mr. Jeff Kuan to be?

9  A.  San Francisco.

10  Q.  And where did you understand Mr. Do Kwon to be?

11  A.  Seoul, South Korea.

12  Q.  And so were you ultimately hired?

13  A.  Yes.

14  Q.  And when were you hired?

15  A.  Like, first, second week of December 2020.

16  Q.  And for how long did you work for Terraform?

17  A.  A little over a year.

18  Q.  And where were you working when you worked for Terraform?

19  A.  Remotely, out of my apartment.

20  Q.  And how much were you paid?

21  A.  60,000 UST a year.

22  Q.  And during that time period, how much was UST worth?

23  A.  A dollar.

24  Q.  Was one UST worth approximately one dollar?

25  A.  Yes.

1   Q.  Now, what were your overall job responsibilities at

2   Terraform?

3   A.  Liaising with our PR firm, social media, block content,

4   feedback from the community on product, questions, stuff like

5   that.

6   Q.  You said community.  What's the community?

7   A.  It's kind of unique in crypto.  It's very dedicated group

8   of people that are very active in ecosystem building,

9   investing, trading, providing product feedback.

10  Q.  And how did you interact with the community?

11  A.  Primarily on Discord and Telegram but also on Twitter.

12  Q.  And what would you do on those applications?

13  A.  Sorry.  What do you mean?

14  Q.  Well, how would you interact on Discord with the community?

15  A.  Oh.  Discord has a ton of people in it, so we would have,

16  like, box and moderators that would drive, like, constructive

17  product feedback conversations, stuff like that.  Those

18  moderators would then -- could serve as a filter to people at

19  the company to, like, basically triage that feedback.

20  Q.  Now, did anyone report to you?

21  A.  Sarah Kim.

22  Q.  And where was she located?

23  A.  In the Seoul office, in South Korea.

24  Q.  And was she also in PR or communications?

25  A.  Yes.

O41Wter2                          Curran - Direct

1    Q.  And how did you manage that time difference?

2    A.  She mostly handled Asia hours, since she was in Seoul.  I

3    mostly handled U.S. hours initially.

4    Q.  And how often did you speak to Do Kwon in your role?

5    A.  Occasionally, he was very active on the company Slack and

6    various channels and then a handful of times one-on-one per

7    month.

8    Q.  And how did Terraform employees primarily communicate with

9    each other?

10   A.  On Slack.

11   Q.  Any other ways that Terraform employees communicated?

12   A.  On Telegram occasionally.  That was mostly for

13   communicating with third parties.

14   Q.  And again, if you could just speak up a little.

15   A.  Yeah.

16   Q.  And did Terraform employees use email?

17   A.  Yes.

18   Q.  Now, could you briefly describe what Terraform did as a

19   company?

20   A.  Yeah.  It had multiple business lines, so Terra launched

21   the open-source Terra blockchain.  It also built and maintained

22   applications on top of it, such as Anchor and Mirror.  It ran a

23   validator program, and it had a -- multiple products, such as

24   the stablecoin UST, and other stablecoins as well.

25   Q.  Did it also have a crypto asset known as Luna?

O41Wter2                    Curran - Direct

1    A.  Yes.

2    Q.  And what was the relationship, if you can, between UST and

3    Luna?

4    A.  Luna was, like, the reserve asset of the network that was

5    used to both have voting rights and governance and also market

6    make UST and absorb the short-term volatility.

7    Q.  And if you can, can you explain that a little more?

8    A.  Yeah.  Basically, Luna and UST were intertwined in terms of

9    if there was more demand for UST and the supply increased, the

10   Luna supply would decrease because Luna would be burned, and

11   vice versa.

12   Q.  When you say burned, what does that mean?

13   A.  You basically send the tokens to an address that's no

14   longer accessible.

15   Q.  Is that equivalent to destroyed?

16   A.  Yes.

17   Q.  Now, did you hear of something called wrapped Luna?

18   A.  Yes.

19   Q.  And what was wrapped Luna?

20   A.  It's just like a tokenized version of Luna on Ethereum,

21   which is another blockchain.

22   Q.  Based on your knowledge from working at Terraform, how

23   could members of the public purchase UST?

24   A.  Over time, through various third-party exchanges, such as

25   KuCoin.  They could also use the Terra wallet to swap between

O41Wter2                          Curran - Direct

1    different assets on the Terra network.  You could use widgets,

2    on-ramps like Transac or MoonPay.

3    Q.  And how could the public purchase Luna?

4    A.  Similar to UST, on exchanges, both decentralized,

5    centralized, like KuCoin, and swap through the Terra station

6    wallet.

7    Q.  And how could the public purchase wrapped Luna?

8    A.  Mostly just on Ethereum.

9    Q.  And what is Ethereum?

10   A.  It's another public smart contract chain.

11   Q.  Now, as head of communications or PR, did you also help

12   promote Terraform's bit projects?

13   A.  Yes.

14   Q.  And what were some of those big projects?

15   A.  So, when I was on-boarding, Mirror was in its launch phase,

16   so that was really my on-boarding experience.  And then later

17   Anchor and some of the other products, like UST and -- yeah.

18   Q.  And you mentioned Anchor.  Was that known as the Anchor

19   protocol?

20   A.  Yes.

21   Q.  And what was the Anchor protocol?

22   A.  It's a de-fi money market, allows people to borrow against

23   their collateral and also earn interest on deposits for UST.

24   Q.  You said de-fi.  What is that?

25   A.  It's a term we use for decentralized finance.

O41Wter2                    Curran - Direct

1   Q.  You said they could earn interest.  During your time at

2   Terraform, what was the interest?

3   A.  On Anchor?

4   Q.  Yes.

5   A.  19, 20 percent.

6   Q.  Around when was that Anchor protocol launched?

7   A.  March 2021.

8   Q.  And how did you promote the Anchor protocol to the public?

9   A.  Initially, with just a series of tweets and blogs, might

10  have done a press release.

11  Q.  Now, did the Anchor protocol prove successful for

12  Terraform?

13  A.  Yes.

14  Q.  How so?

15  A.  It grew very rapidly.  I think a few months after it had

16  launched, there was a few billion dollars of total value locked

17  into Anchor, which is a common metric we use.

18  Q.  And what is total value locked?

19  A.  It's the amount of capital that's locked in to the

20  application either for borrowing or depositing.

21  Q.  Now, as head of communications, did you also hear of

22  something called Chai?

23  A.  Yes.

24  Q.  And how did you learn about Chai?

25  A.  Initially, during my interview process.

O41Wter2                          Curran - Direct

 1   Q.  And from whom did you learn?

 2   A.  Primarily Do Kwon.

 3   Q.  And what did Do Kwon tell you?

 4   A.  He told me that it was a payment-like Venmo app in Korea

 5   that was getting adoption that used Terra to settle

 6   transactions and it had cheaper fees and was faster.

 7   Q.  And did you speak to anyone else in the company about Chai?

 8   A.  Yeah.  Most of my understanding from Chai came from

 9   employees in the Korea office.

10   Q.  And what did you learn from them?

11   A.  Pretty much the same.

12   Q.  And what's -- when you say the same, what's the same?

13   A.  That it was a payment-like app, like Venmo, that used Terra

14   to settle transactions.

15   Q.  Now, do you have any personal knowledge of whether Chai

16   used the Terra blockchain?

17   A.  No.

18   Q.  Now, in your role, did you ever include Chai in some of

19   your blog posts or public messaging?

20   A.  Yeah.  Prior to me starting, the company would include it

21   in what we call boilerplate kind of "about" sections for

22   co-marketing or blog posts, where basically we would highlight

23   it within, like, a paragraph describing Terra as one of the

24   primary-use cases.

25   Q.  What do you mean by primary-use case?

O41Wter2                          Curran - Direct

1    A.   So, Do had this thing where Terra was, you know, solve for

2    the primitives of finance, like investing payments and savings,

3    and so Chai was the payments kind of use case of Terra.

4            THE COURT:  I think you need to stop using terms of

5    art and use everyday English.  What do you mean primitives of

6    finance?

7            THE WITNESS:  Oh.  Just, like, basic user activities

8    that they can use, you know, any kind of financial application.

9            MS. CUELLAR:  Thank you, your Honor.

10   Q.   Now, did you work at Terraform in May of 2021?

11   A.   Yes.

12   Q.   Was there a significant event that you remember from that

13   month?

14   A.   Yes.

15   Q.   And what is that event?

16   A.   UST depegged from its $1.

17   Q.   And how did you find this out?

18   A.   Initially, through Jeff Kuan on Slack.

19           MS. CUELLAR:  And if we can please display just for

20   the witness Plaintiff's Exhibit 71.

21   Q.   Do you recognize this exhibit?

22   A.   Yes.

23   Q.   And what is it?

24   A.   It's the Slack conversation between Jeff and I.

25   Q.   And were you and Jeff Kuan both employed by Terraform at

O41Wter2                          Curran - Direct

 1   the time?

 2   A.  Yes.

 3   Q.  And were you both discussing the activities within the

 4   scope of your employment at Terraform?

 5   A.  Yes.

 6   Q.  And was this communication maintained by Terraform in the

 7   normal course of its business?

 8   A.  Yes.

 9   Q.  And is this a complete and accurate copy of your discussion

10   with Jeff Kuan on May 23, 2021?

11   A.  Yes.

12           MS. CUELLAR:  Your Honor, at this time we move to

13   admit Plaintiff's Exhibit 71 into evidence.

14           MR. PATTON:  No objection, your Honor.

15           THE COURT:  Received.

16           (Plaintiff's Exhibit 71 received in evidence)

17           MS. CUELLAR:  And if we could please display.

18   Q.  And focusing on the top, what was the date of this

19   conversation?

20   A.  May 23, 2021.

21   Q.  And who was it with?

22   A.  Jeff Kuan.

23   Q.  Was this the same Jeff Kuan you interviewed with?

24   A.  Yes.

25   Q.  And what was his official role?

1    A.  Head of business development.

2            MS. CUELLAR:  And if we could please turn to the next

3    page.

4    Q.  Now, if you recall, what day of the week was this

5    conversation?

6    A.  A Sunday.

7            MS. CUELLAR:  And if we could focus on the top two

8    lines there.

9    Q.  What time is this message shown in, in the document?

10   A.  Greenwich Mean Time.

11   Q.  And what time zone were you in?

12   A.  U.S. Pacific Time.

13   Q.  So when it says 5/23, 2021, 8:31 p.m., approximately what

14   time was it in the Pacific Time zone?

15   A.  Around 1:30 p.m.

16   Q.  And focusing out now, if we can, based on your experience

17   in working in Terraform, around what time would it have been in

18   South Korea?

19   A.  Roughly, like, 5 a.m.

20   Q.  The next day?

21   A.  Yes.

22   Q.  And if we can here, if you can read Brian Curran's role and

23   I will read Jeff Kuan's role, and then we'll stop and ask

24   questions.

25   A.  Yeah.  "Can you hop on a call in like 45 minutes?  I'm in a

O41Wter2                              Curran - Direct

1    car on my way back home right now, trying to digest everything

2    happening from my phone."

3    Q.  Jeff Kuan:  "Yeah.  We need like an emergency task force

4    meeting or something, lol."

5    A.  "Yeah.  There's a ton of infighting in the community leader

6    Telegram chat, problems with mAsset pegs, liquidations,

7    everything because the UST pegged."

8    Q.  "Yeah.  I think the biggest issue is that nobody knows what

9    is going on."

10   A.  "I don't have any specific info about what we're doing on

11   the back end, though, to help."

12   Q.  "I think we employees should have some idea of what's going

13   on, but we don't."

14   A.  "Finance team activities completely opaque to me."

15   Q.  "Same.  I think it's true for everyone."

16       So here, in the conversation, you said you were on your way

17   back home.  Where were you on your way back home from?

18   A.  I was camping.

19   Q.  And so at this time was Jeff Kuan the first person you

20   spoke to?

21   A.  Yes.

22   Q.  And what were you just realizing in this conversation?

23   A.  Through some of the concern he expressed and checking

24   Coingecko that UST had depegged below a dollar.

25   Q.  And what is Coingecko?

O41Wter2                          Curran - Direct

1    A.  It's a large data provider in our industry that shows

2    prices and other metrics.

3    Q.  And we've been using that term a lot, but when you say

4    "depeg," what do you mean?

5    A.  UST's target price is $1, so a depeg is when it moves off a

6    dollar.

7    Q.  And you expressed that you were in a car.  Is that correct?

8    A.  Yes.

9    Q.  So how were you able to access Slack?

10   A.  They have a mobile application on your phone.

11   Q.  And focusing on your line at 8:39, you mention there was a

12   ton of infighting in the community leader Telegram chat.  What

13   is that?

14   A.  It's primarily a Telegram group with some of the original

15   Terra community members that were very active, similar to the

16   moderators that often function as, like, a filter for feedback

17   from the broader community.

18   Q.  So these were not Terraform employees?

19   A.  No.  There were Terraform employees in the chat, though.

20   Q.  Were you one of them?

21   A.  Yes.

22        MS. CUELLAR:  And if we could move to the next page.

23   Q.  Now, focusing on the top four lines, if you could read

24   yourself and I'll read Jeff Kuan?

25   A.  "What market makers do we use besides Jump?"

1   Q.  "That's the only one I know."

2   A.  "Is Jump willing to publicly disclose the relationship with

3   us, though?  Seems like they're pretty private."

4   Q.  "I mean."

5       So here, you mentioned Jump.  Had you heard of Jump?

6   A.  Yes.  When I first joined the company, there was an ongoing

7   integration of Wormhole that Jump was building.  Wormhole is a

8   bridge that connects different blockchains.

9   Q.  And what was Jump's role in that?

10  A.  They had built the bridge and to integrate it on to Terra

11  blockchains, kind of speak different languages, so requires

12  development effort on both sides.

13  Q.  Now, you said what market makers do we use besides Jump?

14  What did you mean by the term "market maker"?

15  A.  Professional trading firms that profit from arbitrage and

16  are highly specialized in their fields, using automated

17  trading.

18  Q.  There's a lot of terminology there.  What do you mean by

19  "arbitrage"?

20  A.  Basically, they profit from small price differences on an

21  exchange, providing liquidity to both sides of the order book.

22  Q.  And so what made you think of a need for a market maker

23  here?

24  A.  So, I originally understood Jump's role as a market maker

25  when, a few months prior, we had an exchange integration for

1   Anchor and Jeff Kuan had mentioned that, when they asked what

2   market makers do we use, that we use Jump.

3   Q.  And is Anchor the Anchor protocol you discussed?

4   A.  Yes.

5   Q.  And specifically, why did you think a market maker was

6   needed here?

7   A.  It's -- stablecoins are all about liquidity at the peg, so

8   market makers can be, on Terra, anyone that mints or burns UST.

9   But yeah, it seemed like liquidity was an issue at the time.

10  Q.  And again, just for the sake of terminology, what do you

11  mean by "mints and burns" USTs?

12  A.  Increase and decrease the supply of UST.

13  Q.  And what did you think the impact to the market maker would

14  be in this situation?

15  A.  I think that they would have helped.

16  Q.  How so?

17  A.  Well, with stablecoins being about liquidity at the peg,

18  providing liquidity around the peg is highly useful.

19  Q.  How is it useful?

20  A.  Because it provides more liquidity for people to trade

21  against.

22  Q.  And would that impact the price of UST?

23  A.  Yes.

24  Q.  How so?

25  A.  It would help stabilize the peg during volatility.

O41Wter2                        Curran - Direct

1    Q.  And what do you mean by stabilize?

2    A.  Approach the $1 target peg.

3    Q.  You also said here you understood that Jump was private.

4    What made you say that?

5    A.  I had tried to find out information about them publicly.

6    It was very limited.  They didn't really have any kind of

7    public profile that I was able to find.

8    Q.  Now, if we could go down the page and just focus on the

9    line where you say agreed, and if you could just read the line

10   that begins with "agreed."

11   A.  "Agreed.  I just need more info about the peg management

12   and liquidity plus some clarification on the systemic risk of

13   the above from someone like Do or CJ.  We'll respond in the OPS

14   Comms channel soon."

15   Q.  Who was Do here?

16   A.  Do Kwon.

17   Q.  Who was CJ?

18   A.  CJ Han.  He was the chief financial officer of TFL.

19   Q.  You say will respond in the OPS Comms channel soon.  What's

20   the OPS Comms channel?

21   A.  It was just like a company Slack channel for tracking

22   ongoing developments.

23   Q.  And was that internal to Terraform employees?

24   A.  Yes.

25   Q.  Now you said you wanted clarification.  Did you receive

O41Wter2                          Curran - Direct

1    any?

2    A.  To a certain extent, yes.

3    Q.  From whom?

4    A.  Initially, Do Kwon.

5    Q.  And what did Do Kwon tell you?

6    A.  He told me that he was speaking with Jump and that they

7    were helping to deploy liquidity through Jump.

8    Q.  And did he tell you an amount?

9    A.  He said, like, 100 to 200 million.

10   Q.  And was this a voice call?

11   A.  Yes.

12   Q.  Now, what did you understand the purpose was for Jump to

13   coin 100 or 200 million?

14   A.  To help stabilize the peg.

15   Q.  Now, focusing on the rest of the page, and again, if you

16   could read yourself and I'll read for Jeff Kuan.

17   A.  "Hey, can you loop me into any chats with teams I'm not in

18   that are worried about the peg?  Just want to get a

19   handle/context on things."

20   Q.  "You're in the Nerve one.  Curve, I just have DM going with

21   one of the guys on their team."

22   A.  "OK.  Cool."

23   Q.  First of all, why did you want to be included in the chats?

24   A.  A large part of my job is intaking and filtering

25   information.

O41Wter2                        Curran - Direct

1          THE COURT:  First of all, I apologize, but I should

2     have mentioned this.  I have a short matter I have to take in

3     chambers at 11, so we're going to take our midmorning break at

4     11 in a couple of minutes.

5          But just, Mr. Witness, so I understand what you said

6     about your conversation with Mr. Do Kwon and so the jury

7     understands, so the UST was pegged at a dollar; yes?

8          THE WITNESS:  Correct.

9          THE COURT:  And it had now gone below a dollar; yes?

10          THE WITNESS:  Yes.

11          THE COURT:  And so the object was to get it back to at

12     least a dollar; yes?

13          THE WITNESS:  Yes.

14          THE COURT:  Because it was marketed as a stablecoin

15     pegged at a dollar; yes?

16          THE WITNESS:  Yes.

17          THE COURT:  So Do Kwon said that he had had

18     conversations with Jump?

19          THE WITNESS:  Yes.

20          THE COURT:  And that they were investing 100 to $200

21     million to bring it up to a dollar?

22          THE WITNESS:  Correct.

23          THE COURT:  OK.

24          Maybe we'll take our break then at this time.

25          MS. CUELLAR:  Thank you, your Honor.

O41Wter2                          Curran - Direct

1          MS. GOMEZ NELSON:  Please note our objections to those

2     questions for the record.

3          THE COURT:  Yes.  We'll take this up after the jury

4     takes their break.

5          (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O41Wter2                          Curran – Direct

```
 1                   (Jury not present)

 2                   THE COURT:  You may step down.

 3                   (Witness not present)

 4                   THE COURT:  What is the ground of that objection?

 5                   No.  There's one lawyer who made the objection.

 6      What's her objection?

 7                   MS. GOMEZ NELSON:  Your Honor, just noting our

 8      continuing objections to questions that the Court is --

 9                   THE COURT:  Oh, so the Court is not supposed to ask

10      any questions?  So here, we have a witness who can only speak

11      in terms of art, and the Court, in order to make sure that the

12      jury understands what he's saying in plain English, is not

13      permitted to ask questions to bring out what he's saying?  I

14      reject that position altogether.

15                   We'll see you in 15 minutes.

16                   (Recess)

17                   THE COURT:  Bring in the jury, and let's get the

18      witness back on the stand.

19                   MS. CUELLAR:  Your Honor, we just didn't know if now

20      would be the right time to resolve exhibit 663, because we

21      might use it with this witness, your Honor.

22                   THE COURT:  Which is exhibit 663?

23                   MS. CUELLAR:  That is the new podcast interview that

24      we discovered that was given May 29, 2021, shortly after the

25      depeg by Do Kwon, your Honor.
```

O41Wter2                          Curran - Direct

1              MR. PELLEGRINO:  Your Honor, I do have a response to

2     the pending question that the Court asked, and that is that

3     there's probably four document requests that were propounded on

4     us that might encapsulate that document.  For each of them we

5     had a response that we object to the extent that the request

6     calls for production of publicly available recordings and

7     transcripts, which are equally available to or already in the

8     possession of plaintiff.  I will note that that was -- maybe

9     that was in the general objections, but it's in the specific

10    objections as well, and in this case in particular, it's not

11    mere boilerplate.  It was very specifically contemplated

12    because, as the Court has seen, there are Medium posts, Discord

13    posts, Twitter, interviews, podcasts, all types of social

14    media, and it would not be possible really to scour the

15    internet and obtain an item such as this one, which has been

16    publicly available to both parties for three years.

17             MS. CUELLAR:  Your Honor, the party that is best in

18    position to know of an interview by the defendant is the

19    defendant.  Our investigative staff did thoroughly search and

20    did not locate this.  As far as we know, this is the only audio

21    interview available of the defendant close in time to what

22    happened, and as the defendants will know, because we gave it

23    to them as soon as we found it, there's nothing surprising in

24    there.  It's the continuing statements that Do Kwon makes in

25    public after this event.  It's certainly within the four

O41Wter2                    Curran - Direct

1    corners of the pretrial order and, to your Honor's ruling

2    earlier this morning, is certainly 404(b).

3              MR. PELLEGRINO:  Your Honor, I guess if it's --

4              THE COURT:  Well, I will exclude it from direct, but I

5    may allow it on redirect.  We'll see whether the door is opened

6    or not.

7              Bring in the jury.

8              MS. CUELLAR:  Thank you, your Honor.

9              MR. CALIFANO:  Your Honor, briefly for the benefit of

10   the court reporter and your clerk, the demonstrative exhibit is

11   Defendants' Exhibit 1963 for identification purposes only.  I

12   just wanted to put that on the record.

13             THE COURT:  Thank you.

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1          (Jury present)

2          THE COURT:  Please be seated.

3          MS. CUELLAR:  Thank you, your Honor.

4          Mr. Haywood, if we could please bring back up

5    Plaintiff's Exhibit 71, page 3, focusing on the bottom five

6    lines.

7          And just to remind the Court, before the break, I'll

8    read the first line.  You said:  "Hey, can you loop me into any

9    chats with teams I'm not in that are worried about the peg,

10   just want to get a handle/context on things."

11   Q.  First of all, what are these chats?

12   A.  These are separate Telegram groups with different projects.

13   Q.  And when you say different projects, what do you mean?

14   A.  Not TFL projects, so third-party companies.

15   Q.  So who would be in these chats, then?

16   A.  Well, I only remember the Curve team.  Curve is the largest

17   stablecoin exchange on Ethereum, so it would have typically

18   their founder's business development people and other people on

19   their team in the chat.

20   Q.  And just generally, what is an exchange?

21   A.  It allows users to swap assets, such as the U.S. dollar for

22   Bitcoin or crypto for other crypto assets.

23   Q.  And when Jeff Kuan says, "Curve, I just have DM going,"

24   what is DM?

25   A.  Direct message.

O41Wter2                        Curran - Direct

1   Q.  And why did you want to be included in these chats?

2   A.  A large part of my job is information gathering, trying to

3   get context on what's happening.

4   Q.  And if you recall, were you included in these chats?

5   A.  I don't -- I don't think so.  Maybe the Curve one.  I don't

6   remember Nerve, though.

7          MS. CUELLAR:  Thank you.  And if we could please go to

8   the next page.

9   Q.  And focusing on the top five lines, if you could read the

10  first line and I will read for Jeff Kuan.

11  A.  "Do called members of the community cockroaches on Twitter.

12  SMH.  Never going camping again.  LOL."

13  Q.  "OK.  Do just randomly called me, so the situation is 20 to

14  30M worth of UST sales daily.  100M of sales yesterday.  Right

15  now peg is at where the swap spreads are at.  Markets are

16  trading where that is, 6 to 7 percent off.  We're speaking to

17  Jump about a solution.  I suggested we do some coms around it.

18  He said to hold tight.  I think we can talk about it during our

19  HQ."

20  A.  "OK.  Yeah, I will begin accumulating and filtering

21  information that needs to be addressed."

22  Q.  So focusing on Jeff Kuan's first line, what did you

23  understand when he said 20 to 30M worth of UST and 100M of

24  sales; what is M?

25  A.  Million.

1    Q.  He uses some jargon here in such way he says, "right now

2    peg is at where the swap spreads are at.  Markets are trading

3    where that is, 6 to 7 percent off."  Can you try to explain

4    that in layman's terms, please?

5    A.  Yeah.  So, on the Terra blockchain, it allows people to

6    swap UST for Luna.  The system was designed to handle $20

7    million in swaps at 2 percent spreads, which is kind of the

8    cost of swapping between the two.  As these spreads became

9    larger, to 6 to 7 percent, it became more costly to swap UST

10   and Luna.

11   Q.  And what happens, based on your knowledge, when it becomes

12   more costly?

13   A.  The primary incentive to arbitrage UST begins to decline,

14   which can cause the peg to dislocate from $1.

15   Q.  What does that mean, to dislocate from $1?

16   A.  To go below a dollar.

17   Q.  And at this point in time, based on your knowledge of the

18   event, was the price of UST below $1?

19   A.  Yes.

20   Q.  On the next line, Jeff Kuan says, "I think we can talk

21   about it during our HQ."  What is he referring to here?

22   A.  We would have a weekly team call on Sundays, my time.

23   Q.  And what was your time?

24   A.  It was usually around eight or 9 p.m. my time.

25   Q.  And is that Pacific Time?

O41Wter2                          Curran - Direct

1    A.  Yes.

2    Q.  And who would attend these meetings?

3    A.  Roughly 10 to 15 employees, usually multiple people from

4    all the different internal teams at the company.

5    Q.  And who led the meeting?

6    A.  Do Kwon.

7    Q.  Now, focusing on the next three lines, which are -- no.

8    Excuse me.  Beginning with: "Spoke with Do.  We're going to

9    deploy."

10   A.  "Spoke with Do.  We're going to deploy 250 million from

11   stability reserve through Jump to stabilize the peg.  Going to

12   wait on making official statement until after discussion during

13   weekly HQ call to decide whether to give real-time update or

14   wait and do a longer post mortem once things settle down."

15   Q.  So, you indicate here in the first line that you spoke with

16   Do.  Is that Do Kwon?

17   A.  Yes.

18   Q.  And was this a voice call?

19   A.  Yes.

20   Q.  And you say we're going to deploy 250 million from the

21   stability reserve.  What is the stability reserve?

22   A.  It was a base of capital controlled by the company that

23   they had control over since the launch of the network.

24   Q.  And what kind of capital?

25   A.  It was called SDR, which stands for special drawing rates,

O41Wter2                         Curran - Direct

1   which is like an international basket of currencies.

2   Q.  And so what would that mean in layman's terms?

3   A.  Basically, the company was providing money from this

4   reserve to Jump Trading.

5   Q.  And what did you understand the purpose was?

6   A.  To help stabilize the peg.

7   Q.  And when you say stabilize the peg, how was that supposed

8   to impact the price of UST?

9   A.  Bring it closer to $1.

10  Q.  Now focusing now on the last six lines on the page, if you

11  could please read your role and I will read Jeff Kuan.

12  A.  "Spreads for on-chain swaps are like 7 to 9 percent right

13  now for UST, Luna, which is pretty wild.  I think like 100

14  million UST was swapped for Luna plus sold in the last 12 hours

15  at massive slippage.  Do says we can relay the stability

16  reserve deployment through market makers to Nerve plus Curve to

17  ease their concerns.  Jump has already started buying.  May not

18  need entire 250 million."

19  Q.  OK.  So you say, I think like 100 million UST was swapped

20  for Luna and sold in the last 12 hours at massive slippage.

21  What does that mean in layman's terms?

22  A.  It means that people were selling UST at increasing costs,

23  slippage being primarily a cost that you pay for a swap.

24  Q.  And to your understanding, what was the impact on UST?

25  A.  It was applying downward pressure on the peg.

O41Wter2                          Curran - Direct

1    Q.  And what does that mean to the price of UST?

2    A.  That it is going below a dollar.

3    Q.  In the next line you say, Do says we can relay the

4    stability reserve deployment through market makers to Nerve and

5    Curve.  Who is Nerve?

6    A.  I don't remember specifically.

7    Q.  And who was Curve?

8    A.  It's the largest stablecoin exchange on Ethereum.

9    Q.  And why was this information relayed to Curve?

10   A.  So, Curve has these pools of stablecoins that allow people

11   to swap between them at very cheap prices.  So when a

12   stablecoin depegs, it impacts their project so they reach out

13   with questions about how it's being resolved or addressed.

14   Q.  And were you directly interacting with Curve?

15   A.  Not that I remember, no.

16   Q.  You also relay, Jump has already started buying.  May not

17   need entire 250 million.  Who told you that?

18   A.  Do Kwon.

19   Q.  Was that in a voice call?

20   A.  I think that was in Slack messages on the company channels,

21   but I'm not sure.

22   Q.  And again, what did you understand the purpose of that 250

23   million to be?

24   A.  To help bring the peg back to $1.

25   Q.  Now, you and Jeff Kuan discussed that weekly HQ call.  Did

1    that actually take place?

2    A.   Yes.

3    Q.   And around what time did it take place?

4    A.   It would have been shortly after that conversation.

5    Q.   So was that Sunday, Pacific Time?

6    A.   Yes.

7    Q.   And based on your experience and working at Terraform,

8    approximately what time would that then have been in South

9    Korea?

10   A.   I believe they're 12 to 15 hours ahead, so it would have

11   been early afternoon.

12   Q.   And did you attend this meeting?

13   A.   Yes.

14   Q.   And do you recall what was generally discussed?

15   A.   Yeah.  It was kind of a round-robin of all the different

16   teams describing the different issues they were encountering

17   from the depeg.

18   Q.   And do you recall who attended the meeting?

19   A.   Yeah.  Similar to the weekly HQs, 10 to 15 people from all

20   of the different teams at TFL.  Considering the circumstances

21   it might have been slightly more than that, on average.

22   Q.   And who do you at this point in time recall attending the

23   meeting besides yourself and Jeff Kuan?

24   A.   Ryan Clark, EJ, MacIntery, SJ Park, Do Kwon, the ecosystem

25   team; also Sarah Kim, Paul Kim; the infrastructure team, which

O41Wter2                    Curran - Direct

1    was located in Korea.  They usually sat in front of one camera,

2    multiple people.

3        Probably missing a few people.

4    Q.  Now, did you take any notes of this meeting?

5    A.  Yes.

6            MS. CUELLAR:  And if we could please display just for

7    the witness Plaintiff's Exhibit 72.

8    Q.  Do you recognize this document?

9    A.  Yes.

10   Q.  And what is it?

11   A.  I would take shorthand notes of the meetings, so this is my

12   shorthand notes from that meeting.

13   Q.  And did you take these notes actually while the HQ meeting

14   was going on?

15   A.  Yes.

16   Q.  And why did you prepare these notes?

17   A.  I typically prepared notes for these calls.

18   Q.  And did you -- and were these notes prepared in your

19   capacity as Terraform's head of communications?

20   A.  Yes.

21   Q.  And in your capacity as head of communications, did you

22   share these notes with others in the company?

23   A.  Yes.  I would have structured them a bit better, but yes, I

24   shared them.

25   Q.  And why did you share them with people in the company?

O41Wter2                          Curran - Direct

1    A.  It was just regular practice for us to share meeting notes

2    from the weekly HQ call.

3    Q.  And were these notes kept in the regular course of

4    Terraform's business?

5    A.  Yes.

6    Q.  And are these notes a fair and accurate recitation of what

7    was said at the meeting by Do Kwon and other Terraform

8    employees?

9    A.  Yes.

10           MS. CUELLAR:  Your Honor, at this time we move to

11   admit Plaintiff's Exhibit 72 into evidence.

12           MS. GOMEZ NELSON:  No objection, your Honor.

13           THE COURT:  Received.

14           (Plaintiff's Exhibit 72 received in evidence)

15           MS. CUELLAR:  And if we could please publish for the

16   jury.

17   Q.  Now, focusing on the top, it says weekly HQ call 5/23.  Did

18   this meeting take place on May 23, Pacific United States time?

19   A.  Yes.

20   Q.  And in it, it says Do colon.  What does that indicate?

21   A.  It indicates that what follows is my shorthand of what he

22   says during the call.

23   Q.  And who is "he" here?

24   A.  Do Kwon.

25   Q.  And during this call -- well, first of all, backing up a

1   little bit, how actually is the called held?  Is it a video

2   call?

3   A.  Yeah.  It's held on Google Meet, so it's voice and video.

4   Not everybody turns on their video, though.

5   Q.  Could you recognize the voices during the call?

6   A.  Yes.

7   Q.  And did you recognize Do Kwon's voice?

8   A.  Yes.

9   Q.  And did Do Kwon discuss the situation at the time, the UST

10  depeg?

11  A.  Yes.

12  Q.  And is that what is captured in the first paragraph of your

13  notes there, beginning with "UST peg issue"?

14  A.  Yes.

15  Q.  Can you please slowly read that paragraph?

16  A.  "UST peg issue -- discount to the dollar.  If you recall

17  the stability mechanism is swapping UST to Luna while the peg

18  is due to stress, inflating the swap spread.  System designed

19  to handle $20 million of redemptions with a 2 percent spread.

20  80 to 100 million in volume on KuCoin, Curve, etc., for why the

21  swap spread has increased so much -- 500 to 700 basis points.

22  Peg had to be defended."

23  Q.  First of all, what is KuCoin?

24  A.  It's a cryptocurrency exchange.

25  Q.  And I think you already testified to this, but is Curve one

1    as well?

2    A.  Yes.

3    Q.  All right.  So obviously this is shorthand, and it has

4    jargon.  Can you try to explain this in layman's terms?

5    A.  Yeah.  Basically, the selling volume of UST had surpassed

6    the 2 percent spread threshold on the Terra blockchain.  So

7    it -- judging by the numbers here, it was roughly four to five

8    times more, so that was causing these spreads to increase and

9    to apply pressure on the peg to go below a dollar.

10   Q.  Now, continuing down, under contingency measures, can you

11   please read that?

12   A.  "Jump deploying 100 million to buyback UST.  They don't

13   know how much UST is outstanding in the market.  Will be

14   consistently augmenting UST buys with out own reserves."

15   Q.  Now, just focusing on that end there, it says, "UST buys

16   with out own reserves."  Do you have a typo there?

17   A.  Yes.  I believe it should say our.

18   Q.  So do you recall Do Kwon saying this during the team

19   meeting?

20   A.  Yes.

21   Q.  And here, he says, Jump's deploying 100 million to buy back

22   UST.  I think you had previously testified to having

23   conversations where Do Kwon discussed 200 or 250 million.  Why

24   the difference?

25   A.  The number kept changing.  I didn't have any firsthand

1    knowledge of what was being discussed with Jump, so it was what

2    Do was relaying to the company.

3    Q.   So were you on any of the calls with Jump?

4    A.   No.

5    Q.   So is your knowledge based on what you heard from Do Kwon?

6    A.   Yes.

7    Q.   And other Terraform employees?

8    A.   Yes.

9    Q.   Now, what did you understand the purpose was for Jump

10   deploying 100 million to buy back UST?

11   A.   To stabilize the peg at $1.

12   Q.   And if we could please turn to the second page.  In the

13   middle there's a line that says, Jeff wants more information --

14   internally more help for addressing community concerns.  Who is

15   Jeff here?

16   A.   Jeff Kuan.

17   Q.   And what did you understand he meant here?

18   A.   In our initial conversation it seemed like nobody really

19   had a good understanding of what was happening.  There was a

20   lot of things going on, a lot of information that people were

21   trying to take in.  So he had suggested, like, formalizing a

22   kind of crisis situation management for the company moving

23   forward.

24   Q.   And "he" here is Jeff Kuan?

25   A.   Yes.

O41Wter2                          Curran - Direct

```
 1    Q.  And based on your own experience at the time, did the

 2    community have concerns?

 3    A.  Yes.

 4    Q.  And what were some of those concerns?

 5    A.  There were several.  I think the UST peg being below a

 6    dollar caused problems across the ecosystem, including various

 7    applications on Terra.  They also wanted to have, like, a, you

 8    know, simpler summary of how the Terra protocol worked.  It's

 9    open source, but most people aren't developers, so they can't

10    read the code.

11    Q.  And when you say "they" here, do you mean the community?

12    A.  Yes.

13    Q.  You've used this term multiple times, "ecosystem."  Can you

14    briefly explain what you mean by ecosystem?

15    A.  Yeah.  So, Terra is a public blockchain network, like

16    Ethereum.  That means it allows anyone to build an application

17    on top of it.  You know, it could be something simple or

18    complex.  But pretty much with the public blockchain, as long

19    as you, you know, use the coding language and developer kit for

20    that network, you can build any kind of application.

21    Q.  And just briefly, what do you mean by application?

22    A.  In de-fi it's usually financial applications, like

23    payments, savings, stuff like that.

24    Q.  And again, you used the term "de-fi."  What is de-fi?

25    A.  Decentralized finance.
```

O41Wter2                    Curran - Direct

1    Q.  Briefly, what does that mean?

2    A.  It's just a term that we use for shorthand for the

3    cryptocurrency industry and all of the different applications

4    on different blockchains.

5    Q.  And what is meant by this term?

6    A.  It's meant to differentiate itself from traditional finance

7    or financial technology that existed before blockchains.

8            MS. CUELLAR:  And if we could turn to the third page.

9    Q.  Focusing on the top, under primary community concerns, can

10   you please read that?

11   A.  "UST peg deviation and the downward reflexivity induced in

12   Luna's price.  Transparency about how stability reserve is

13   deployed."

14   Q.  So, what was meant here?

15   A.  There were questions for people who're not familiar with

16   the difference between algorithmic stablecoins and the more

17   traditional centralized stablecoins about how Luna's price was

18   impacted by the UST depeg.

19   Q.  And it also says, transparency about how stability reserve

20   is deployed.  Was it your understanding the community wanted

21   more information about that?

22   A.  Yes.  Since I had originally joined the company, Ayush, at

23   the company, who managed our community, would bring this up on

24   multiple occasions, asking Do for clarity on it.  So it was a

25   recurring question that we were already getting by the time I

O41Wter2                        Curran - Direct

1    joined the company.

2    Q.  And at this point in time, was the company transparent

3    about the stability reserve?

4    A.  I'm not sure.  I don't really remember.

5    Q.  Now, in your position as head of communications, did you

6    ever release information to the public about the May 2021

7    depeg?

8    A.  Yes.

9    Q.  And if you recall, where did you do so?

10   A.  On Twitter.

11        MS. CUELLAR:  And if we could please display for the

12   witness Plaintiff's Exhibit 57.

13   Q.  Now, sir, do you recognize this exhibit?

14   A.  Yes.

15   Q.  And what is it?

16   A.  It's the tweet thread post mortem of what happened during

17   the UST depeg at the time.

18        MS. CUELLAR:  And your Honor, the parties have

19   stipulated to the admissibility of this exhibit, and we move at

20   this time to admit and publish Plaintiff's Exhibit 57.

21        THE COURT:  Received.

22        (Plaintiff's Exhibit 57 received in evidence)

23        MS. CUELLAR:  Thank you, your Honor.

24   Q.  Now, focusing on the top, what account were these tweets

25   posted from?

1    A.  The primary Terra_Money account.

2    Q.  And who controlled this account?

3    A.  The company.

4    Q.  And who could post from it?

5    A.  We stored the password and log-in information internally,

6    so pretty much anyone, but primarily myself, Sarah Kim and then

7    people who would later join the Comms team.

8    Q.  And who published these specific tweets?

9    A.  I did.

10   Q.  And what was the primary purpose of these tweets?

11   A.  To provide a summary of what had happened, also a brief

12   summary or refresher on how the Terra protocol worked.

13   Q.  And who prepared these tweets?

14   A.  It was a combination of different teams' input from the

15   weekly HQ call.  So we have a post mortem.  It's basically

16   after some kind of significant event.  It's usually expected

17   that you provide, like, a breakdown of what happened, what's

18   being done to resolve it and just more clarity on the issue.

19   Q.  And ultimately why did you release these tweets?

20   A.  It was just industry standard to follow up and be

21   transparent about what happened.

22   Q.  And if we can focus on tweet thread 2, overall in this

23   tweet thread, how do you begin the tweet thread; what are you

24   explaining?

25   A.  Just the simplified way of how the UST supply and Luna

1  supply are interrelated.

2  Q.  And if you could please read this tweet.

3  A.  "Let's start with the basics.  The Terra protocol mechanism

4  is quite simple:  When the supply of Terra stablecoins (like

5  UST) goes up, the Luna supply goes down.  When the supply of

6  Terra stablecoins goes down, the Luna supply goes up."

7          MS. CUELLAR:  And if we could turn to the next page.

8  Q.  Focusing on tweet thread 3, if you could read that?

9  A.  "As an algorithmic stablecoin network, Terra is akin to a

10  decentralized open-source central bank.

11  Q.  What is being explained here?

12  A.  Basically just a simplified explanation that was taken from

13  a well-known blog post on the different types of stablecoins.

14  Q.  And what is actually being explained, though?  There's

15  quite a bit of jargon there.

16  A.  Just an analogy of how Terra's elastic money supply is

17  similar to a central bank.

18  Q.  How so?

19  A.  Because the money -- the supply of both UST and Luna can go

20  up and down, similar to how a central bank issues money.

21  Q.  And if we can now focus on tweet thread 4, if you could

22  please read that.

23  A.  "Assets (Luna) and liabilities (UST) maintain parity by the

24  Terra protocol acting as a market maker, inflating the Luna

25  supply during UST contractions and deflating the Luna supply

O41Wter2                    Curran - Direct

1   during UST expansions."

2   Q.  What is being explained here?

3   A.  Similarly, basically describing how more demand for UST

4   increases the UST supply, which decreases the Luna supply, and

5   vice versa.

6           MS. CUELLAR:  And if we could please turn to the next

7   page.

8   Q.  Now, here, do your tweets begin to explain why the UST

9   price was under pressure?

10  A.  Yes.

11  Q.  And if we could focus on tweet thread 5, can you please

12  read that?

13  A.  "Terra primarily achieves this via the on-chain swap

14  mechanism that is baked into the protocol.  Users can always go

15  to protocol to swap $1 worth of Luna for 1 UST and vice versa.

16  The system is designed to handle 20 million of redemptions (UST

17  to Luna) with a 2 percent spread."

18  Q.  Now, focusing on that final paragraph, the system -- final

19  sentence, excuse me.  The system is designed to handle 20

20  million of redemptions (UST to Luna) with a 2 percent spread,

21  what does that mean?

22  A.  It means that in a given 24-hour period, that the cap on

23  redemptions going from UST to Luna on-chain is 20 million at 2

24  percent spreads, and then they begin increasing.

25  Q.  And what happens when it begins increasing?

1  A.  It reduces the open arbitrage incentive that is important

2  for UST to maintain its peg.

3  Q.  And what does that mean?

4  A.  To maintain its peg closer to $1.

5  Q.  You used this term "on-chain."  What does that mean?

6  A.  It's what we refer to as on the blockchain.  So any

7  transactions that are conducted on a blockchain, shorthand we

8  just say on-chain.

9  Q.  Are there transactions that happen not on the blockchain?

10  A.  Yeah.

11  Q.  What are those called?

12  A.  I mean it would depend on the context.  If it was on an

13  exchange trades or just in traditional finance, transactions,

14  payments.

15  Q.  And have you heard that called something off-chain?

16  A.  Yes.

17  Q.  And were there transactions for UST off-chain?

18  A.  Yeah.  Wherever UST would be listed on exchanges, trading

19  also happens off-chain.

20  Q.  Now, focusing on tweet thread 6, if you could please read

21  that.

22  A.  "The sharp price declines in Luna were compounded by the

23  sell-off of Luna due to large amounts of liquidations on Anchor

24  protocol.  During the market volatility redemptions from Luna

25  to UST exceeded 80 million at times, forcing UST to trade at a

O41Wter2                        Curran - Direct

1  discount on multiple venues."

2  Q.  What does that mean, to trade at a discount on multiple

3  venues?

4  A.  To trade below $1 on other exchanges.

5  Q.  And what impact does that have on UST's price?

6  A.  It lowers the price below a dollar.

7  Q.  And if we can now focus on tweet thread 7, if you could

8  please read that.

9  A.  "This is primarily because the on-chain swap spreads

10  inflated to 7 to 9 percent during the worst period, making the

11  classic time-based arb opportunity fundamentally unprofitable

12  on-chain since redemption slippage exceeded expected profits

13  from the arbitrage."

14  Q.  And so what were the consequences when on-chain redemption

15  became too expensive?

16  A.  Again, it would cause pressure on the UST peg to go below a

17  dollar.

18          MS. CUELLAR:  And if we could turn to the next page.

19  Q.  And focusing on the top, on tweet thread 9, could you

20  please read that?

21  A.  "However, with swap spreads so large, the incentive to

22  perform the time-based arb was curtailed significantly.  At a

23  spread of 500 to 700 basis points for much of the day, the peg

24  needed to be defended, but the incentive to do so via the

25  on-chain swap mechanism was low."

O41Wter2                          Curran - Direct

1   Q.  Why was the incentive low?

2   A.  Because the spreads were high.

3   Q.  What does that mean?

4   A.  It's more costly to swap UST for Luna on-chain.

5   Q.  Does that make it less profitable?

6   A.  For someone performing arbitrage, yes.

7              MS. CUELLAR:  And now if we could focus on tweet

8   thread 11.  And actually, if we could include the graphic from

9   the next page.

10  Q.  It seems you were responding to this below tweet thread.

11  Could you please read the tweet thread there?

12  A.  The top one or the bottom one?

13  Q.  The bottom one, the Terra UST stablecoin.

14  A.  "The Terra UST stablecoin could collapse in a bank run

15  effect.  UST is backed by an endogenous collateral Luna.

16  Current Luna market cap has fallen to arguably less than

17  outstanding UST.  We are now in a dangerous spiral as users

18  panic out of UST.  This reinforces the Luna crash further."

19  Q.  And how did you respond?

20  A.  "The death spiral and the bank run applied to Terra's

21  seigniorage shares-style monetary policy is not an

22  apples-to-apples comparison."

23  Q.  What did you mean by that?

24  A.  I'm not quite sure.  I asked the research team for many

25  parts of these descriptions.

```
 1              MS. CUELLAR:  And if we could take that down.  And if
 2      we could go now to the next page.
 3      Q.  And focusing on 14, can you please read that?
 4      A.  "Plagued by the cumbersome nature of stress-induced
 5      decision-making of human agents in times of market volatility,
 6      it's why central banks are exploring CBDCs.
 7      Algorithmic-calibrated adjustments of economic parameters are
 8      more effective than faxes and suits in meetings."
 9      Q.  What are CBDCs?
10      A.  Central bank digital currencies.
11      Q.  What was the point of this tweet thread?
12      A.  To display that open-source protocols are more predictable
13      in their nature.
14      Q.  And why?  Why was that included here?
15      A.  I think mostly just kind of as a simplified analogy or
16      summary of how Terra worked.
17              MS. CUELLAR:  And if we could turn to the next page.
18      Q.  If you could please read tweet thread 15.
19      A.  "Currently, Luna can easily shoulder the outstanding
20      liabilities of UST.  It just needs time to recalibrate and
21      confidence restored -- something that will take more than a
22      weekend."
23      Q.  And what does this mean here?
24      A.  I'm not quite sure.
25      Q.  Was Jump's role mentioned here?
```

O41Wter2                          Curran - Direct

1    A.  No.

2    Q.  Why not?

3    A.  I had asked Do Kwon if we could mention the Jump aspect in

4    the post mortem, and he said no.

5    Q.  Did he explain why?

6    A.  No.

7    Q.  Did you accept that?

8    A.  Yeah.  In any professional work environment, there needs to

9    be an implicit degree of trust between employers and employees,

10   so I assume there was some valid reason as to why not.

11   Q.  But why did you originally ask to include Jump?

12   A.  It seemed relevant based on what he was telling people at

13   the company.

14   Q.  And what was he telling people in the company?

15   A.  That Jump was deploying large amounts of capital to help

16   stabilize the peg.

17   Q.  Now, if we could move down to tweet thread 16, if you could

18   please read that.

19   A.  "UST's demand is not a function of speculation like many

20   other algo stables either.  Instead, it serves as a linchpin

21   for the entire ecosystem, where the demand for using Terra

22   envelops the demand for UST."

23               (Continued on next page)

24

25

1    BY MS. CUELLAR:

2    Q.  What does it mean to say UST is the linchpin?

3    A.  It was the primary stablecoin and quote currency on Terra.

4    So pretty much all of the applications would use UST in some

5    form or another.

6    Q.  And was it important that UST maintain its $1 price?

7    A.  Yes.

8    Q.  Why was that?

9    A.  When it goes below or above a dollar, it can cause problems

10   with liquidations, Oracle pricing.  Across different

11   applications, some of those issues could be pretty unique;

12   others more consistent across different applications.

13   Q.  And if we could now move to tweet thread 17.

14           If you could please read that.

15   A.  "As long as we create useful applications that people use

16   on top of Terra, a strong locus of demand will always exist."

17   Q.  Why were useful applications important?

18   A.  Similar to what I mentioned, most of the applications on

19   Terra used UST.  So if those applications were useful to

20   anybody that was using Terra, there would be demand for those

21   applications, which would correlate to demand for UST.

22   Q.  Why was that good?

23   A.  It would increase the supply of UST and the overall

24   liquidity of the stablecoin.

25   Q.  And if we could turn to the next page.

O41HSec1                    Curran - Direct

1        Focusing on 18, could you please read that.

2   A.  "In the use cases already there, Chai has more than

3   2 million active users in Korea.  Mere protocol offers

4   synthetic exposure to equities for people in financially

5   disenfranchised regions, and Anchor continues to offer a

6   high-yield savings vehicle.

7   Q.  Why was Chai mentioned here?

8   A.  Similar to, as I mentioned before, it was commonly

9   highlighted as a —— one of the primary use cases of Terra.

10        MS. CUELLAR:  And if we could please turn to the next

11   page.

12   Q.  Now, here, do your tweets begin to focus on the peg's

13   recovery?

14   A.  Yes.

15   Q.  And, again, is Jump's role mentioned in that recovery?

16   A.  No.

17   Q.  Why not?

18   A.  Because I had asked Do Kwon if we could mention them.  He

19   said no.

20   Q.  If we could focus on tweet thread 20, and if you could

21   please read that.

22   A.  "The protocol will keep arb opportunities open.  Even if

23   the incentives to do so are dislocated during ephemeral market

24   turmoil, the incentives eventually realign, and the system

25   heals."

1    Q.   What does that mean "the incentives eventually realign, and

2    the system heals?"

3    A.   The protocol had various mechanisms when UST would depeg,

4    such as increase the tax rate on transactions that would go to

5    validators, which was designed to boost the incentive to stake

6    and hold Luna, which would help absorb the sell pressure of

7    UST.

8    Q.   And was Jump's role in helping the system realign mentioned

9    here?

10   A.   No.

11   Q.   Why not?

12   A.   Again, Do Kwon had said not to mention them.

13   Q.   And if we could please read tweet thread 22.

14   A.   "We just went through one insane market shock.  But guess

15   what?  The peg is gradually normalizing again and will continue

16   to do so as volatility subsides.  Remember, volatility at the

17   scale is ephemeral, not permanent."

18   Q.   So can you explain this tweet?

19   A.   Pretty much my understanding at the time was that it was a

20   pretty significant volatility event, which isn't the status

21   quo.  It just happens occasionally in short bursts.

22   Q.   If we could now move down to tweet thread 24, and if you

23   could read that.

24   A.   "The drawdown in the price of Luna, UST peg deviation, and

25   collateral effects across the ecosystem in such extreme market

1    volatility is about as intense of a stress test in live

2    conditions as can ever be expected.  We just experienced a

3    black swan."

4    Q.  What is a black swan?

5    A.  It's a phrase used to define an unexpected significant

6    volatility event.

7    Q.  Is Jump's role mentioned here?

8    A.  No.

9    Q.  Why not?

10    A.  Again, because once asked, Do Kwon had said no.

11    Q.  If we could move to tweet thread 25, and if you could read

12    that, please.

13    A.  "Despite sharp dislocations, the on-chain swap spread is

14    mending, UST peg is normalizing, and UST's role as a

15    centerpiece of demand for the Terra ecosystem has not changed

16    — buttressing the growth of the Terra economy as the system

17    bounces back from distress."

18    Q.  Was Jump's role mentioned here?

19    A.  No.

20    Q.  Now, in this entire tweet thread, did you ever mention

21    Jump's role?

22    A.  Not that I see, no.

23    Q.  And why didn't you?

24             MR. PATTON:  Objection, your Honor.  Asked and

25    answered.

1          THE COURT:  Overruled.

2     A.   Because once asked, Do Kwon said no.

3     Q.   But if we could turn the page and focus on tweet thread 28,

4     can you read this.

5     A.   "Just look at Jump Trading's recent proposal now live as

6     Prop 90, which will significantly dampen the downward

7     reflexivity experienced during the recent market volatility.

8     The proposal is already past the threshold quorum with

9     100 percent of votes reporting yes."

10    Q.   Briefly, what was this proposal?

11    A.   It was a public governance proposal from Jump to increase

12    the on-chain redemption capacity from 20 million to

13    100 million.

14    Q.   What does that mean, the on-chain capacity?

15    A.   The amount of UST that could be swapped for Luna at

16    2 percent spreads.

17    Q.   And what was to be the purpose of that proposal?

18    A.   It would help UST absorb larger volatility shocks moving

19    forward.

20    Q.   So why could Jump's proposal be mentioned but not its role

21    in helping restore the peg?

22          MR. PATTON:  Objection.

23          THE COURT:  Overruled.

24    A.   The proposal was already public on the Terra governance

25    research forum and also on the Terra Station wallet where

O41HSec1                         Curran - Direct

1    delegates and validators could vote on it.

2              MS. CUELLAR:  And if we could take down the exhibit.

3    Q.  Now, in your capacity as head of communications, were you

4    familiar with whether Do Kwon had a Twitter account?

5    A.  Yes.

6    Q.  And did he post around the period of the May depeg event?

7    A.  Yes.

8              MS. CUELLAR:  And if we could please display for the

9    witness Plaintiff's Exhibit 75.

10   Q.  Do you recognize this exhibit?

11   A.  Yes.

12   Q.  And what is it?

13   A.  It's a tweet from Do Kwon on May 24, 2021.

14             MS. CUELLAR:  Your Honor, the parties have stipulated

15   to the admissibility of this exhibit, and at this time we move

16   to admit Plaintiff's Exhibit 75.

17             THE COURT:  Received.

18             (Plaintiff's Exhibit 75 received in evidence)

19             MS. CUELLAR:  And if we could please publish,

20   Mr. Haywood.

21   BY MS. CUELLAR:

22   Q.  If you could read this.

23   A.  It is quoting a Coingecko price chart of UST, and it says:

24   "I see.  Back to work."

25   Q.  Is Jump's role mentioned here?

1  A.  No.

2          MS. CUELLAR:  And you can take down the exhibit.

3  Q.  Now, in your capacity as head of communications, were you

4  familiar with Terra's Medium account?

5  A.  Yes.

6          MS. CUELLAR:  And if we could please display for the

7  witness Plaintiff's Exhibit 58.

8  Q.  Do you recognize this document?

9  A.  Yes.

10  Q.  What is it?

11  A.  We would do monthly community updates, so this is the one

12  for the May 2021 period.

13  Q.  And did this cover the depeg?

14  A.  Briefly, yes.

15          MS. CUELLAR:  Your Honor, at this time we move to

16  admit Plaintiff's Exhibit 58 into evidence.

17          MR. PATTON:  No objection.

18          THE COURT:  Received.

19          (Plaintiff's Exhibit 58 received in evidence)

20          MS. CUELLAR:  And if we could please display,

21  Mr. Haywood.

22  BY MS. CUELLAR:

23  Q.  Now, focusing on the top, when was this published?

24  A.  June 2, 2021.

25  Q.  And who published it?

O41HSec1                    Curran - Direct

1    A.  Sarah Kim.

2    Q.  And what was her role?

3    A.  She worked on the communications team.

4    Q.  And if we could please move down to the first paragraph.

5            If you could please read ending at "Conditions" down

6    at the bottom.

7    A.  "May has been quite the month for the Terra community ——

8    the UST peg has healed after a period of high volatility for

9    the market across the board.  Industry-wide volatility

10   stress-tested the stability mechanism of the Terra protocol and

11   posed unprecedented challenges to the Anchor protocol but has

12   also been an incredible test of the protocol's ability to

13   continue providing stable yields under extreme conditions."

14   Q.  Is Jump's role mentioned here?

15   A.  No.

16           MS. CUELLAR:  And we could take down the exhibit.

17   Q.  Now, sir, did you ever speak to Do Kwon again about Jump's

18   role in helping restore the UST peg?

19   A.  Yes.

20   Q.  And around when was this?

21   A.  September 2021, several months later.

22   Q.  And what led to this discussion?

23   A.  Originally, he had called me one day to write a blog post

24   for something called Project Dawn, which I'd only heard a few

25   things mentioned about before.

1    Q.  And you say "he" called you.  Who's "he"?

2    A.  Do Kwon.

3    Q.  And what had you heard about Project Dawn?

4    A.  That it was a Cosmos infrastructure project.  So,

5    basically, Terra had grown relatively quickly to other chains

6    in the Cosmos, so we were encountering scaling issues that

7    others weren't.  So it was a program to provide funding, like

8    grants for developers and validators and other engineers.

9    Q.  So in this first call, if you could please explain, what

10   did Do Kwon ask you to do?

11   A.  He asked me to draft a blog post about it.  He didn't

12   provide much information at all.  I think he wanted it, like,

13   by the end of the day.

14   Q.  And so what did you do next?

15   A.  I created an outline and drafted a few paragraphs.

16   Realizing I didn't really have much to work with, I followed up

17   with questions.

18   Q.  How did you follow up?

19   A.  On Slack.

20   Q.  And what kind of questions were you asking?

21   A.  I realized the size of the money being used for the token

22   unlocks for the grants was quite significant.  It was around

23   $150 million at the time.  So anticipating community questions,

24   I followed up with, you know, how are these going to be

25   categorized into different grants and buckets, details like

O41HSec1                          Curran - Direct

1    that that I figured the community would ask from the get-go.

2    Q.  Let's unpack that a little.

3           You said you realized the token unlocks were around

4    $150 million.  What's a token unlock?

5    A.  The company had Luna holdings in their wallets.  Those

6    wallets are public and often tagged by analysts.  So whenever

7    you move money from company-controlled wallets, usually follow

8    with some kind of explanation of where the money is going.

9    Q.  So when you realized this was approximately $150 million

10   worth of unlocks, why did that cause you to ask questions?

11   A.  It seemed abnormally large, and the unlocks were supposed

12   to continue for the foreseeable future every month.

13   Q.  And if you recall, how much every month?

14   A.  It was 3 to 5 million Luna.

15   Q.  And approximately how much was that worth at the time?

16   A.  I think 5 million Luna was around $150 million, so anywhere

17   between that and whatever the price was at 3 million Luna.

18   Q.  So when you sent your questions to Do Kwon, what happened

19   next?

20   A.  He was mostly dismissive of them.

21   Q.  And what do you mean by dismissive?

22   A.  He acted like they weren't important to be answered.

23   Q.  And so what did you do next?

24   A.  Well, he would later tell me that Project Dawn was not

25   actually for an infrastructure project; it was for something

1    else.

2    Q.  Focusing on that, were you —— backing up a little, were you

3    able to draft the post?

4    A.  I only drafted a few introductory paragraphs, and then he

5    took that and modified it and published it.

6    Q.  And who's "he"?

7    A.  Do Kwon.

8    Q.  So after he published it, what happened next?

9    A.  He informed me that the upcoming unlocks were not for

10   Project Dawn.

11   Q.  So how did this conversation come about?

12   A.  He called me again.

13   Q.  And what happened in the phone call?

14   A.  In the phone call, he basically disclosed to me that Jump

15   Trading and Terraform Labs had a prior contractual agreement

16   dating back years.  There was three conditions in this contract

17   that had to be met.  One of the last conditions, the third one,

18   was that they would step in in a liquidity crisis such as in

19   May 2021.  So they had fulfilled the contract.  He elaborated

20   on the extent of their relationship and involvement in May 2021

21   and told me that if they had not stepped in, we might have been

22   fucked.

23   Q.  So backing up a little, you said that Do Kwon elaborated on

24   Jump's involvement.  What did he convey?

25   A.  Basically, the extent and scope of how they intervened in

O41HSec1                        Curran - Direct

1    2021.

2    Q.  Was this new information to you?

3    A.  Yes.

4    Q.  Well, how so?

5    A.  I had no idea that we had a prior contractual arrangement

6    with them, especially of that size, nor was I aware of the

7    extent of their involvement in May '21.

8    Q.  What do you mean about extent of the involvement?

9    A.  How they deployed the capital or how much of an impact it

10   actually had.

11   Q.  Now, focusing on the impact it had, what did Do Kwon say

12   about that?

13   A.  He said that had they not stepped in, that we might have

14   been fucked.

15   Q.  And did Do Kwon tell you who the token unlocks were

16   actually for?

17   A.  For Jump Trading.

18   Q.  Now, at this point how did you feel?

19   A.  I was fairly angry because I realized he had tried to

20   deceive me to write a post that he knew to be false.

21   Q.  So as head of communications, did this conversation change

22   your understanding of Jump's role?

23   A.  Yes.

24   Q.  Well, you had known that Jump had deployed $100 million, so

25   how did it change your understanding?

O41HSec1                        Curran - Direct

1   A.  The number that was quoted in Jump deploying kept changing.

2   I also didn't realize that they were receiving large

3   compensation for the company for specific events or market

4   making, so yeah.

5   Q.  And you said that Do Kwon said if Jump hadn't intervened

6   "we might have been F'd."  Did you appreciate that Jump's

7   intervention was that important in May of 2021?

8   A.  At the time, I didn't realize it was that severe or that

9   they had played that large of a role.  I had initially heard we

10  were having banking issues, and that's why they were helping.

11  Q.  So as head of communications, was transparency to the

12  public important to you?

13  A.  Yes, always.

14  Q.  Now that you knew this information, did you tell anyone in

15  the public about Jump's role?

16  A.  No, I was directed not to.

17  Q.  Now, was Project Dawn actually posted?

18  A.  Yes.

19  Q.  And who posted it?

20  A.  Do Kwon.

21      MS. CUELLAR:  If we could please display for the

22  witness Plaintiff's Exhibit 76.

23  Q.  Do you recognize this exhibit?

24  A.  Yes.

25  Q.  What is it?

1    A.  It's the Project Dawn blog post.

2          MS. CUELLAR:  Your Honor, at this time we move to

3    admit Plaintiff's Exhibit 76.

4          MS. GOMEZ NELSON:  No objection.

5          THE COURT:  Received.

6          (Plaintiff's Exhibit 76 received in evidence)

7          MS. CUELLAR:  And if we could please display.

8    BY MS. CUELLAR:

9    Q.  Now, focusing on the top, what is the title?

10   A.  "Introducing Project Dawn."

11   Q.  And who posted this?

12   A.  Do Kwon.

13   Q.  And on what date?

14   A.  September 9, 2021.

15   Q.  And if we could go down to the bottom paragraph, can you

16   please read this.

17   A.  "In the spirit of transparency, TFL is announcing the

18   launch of Project Dawn —— a new funding initiative for critical

19   infrastructure improvements and core technologies to supplement

20   the accelerating growth of the Terra ecosystem."

21   Q.  And did you write this?

22   A.  I know I wrote some initial paragraphs, but he modified it.

23   I don't remember specifically.

24   Q.  And if we could move to the third page.

25          Focusing on the bottom, it says:  "Project Dawn has

O41HSec1                        Curran - Direct

1    commenced as of today with a 5 million Luna unlocked and

2    distributed by the TFL genesis wallet (market value 150M)."

3          What did you understand the "M" to be?

4    A.  Million.

5    Q.  Who were these token unlocks for?

6    A.  Jump Trading.

7    Q.  Does that say this here?

8    A.  No.

9    Q.  Now, focusing on the first sentence in the next paragraph,

10   if you could please read this.

11   A.  "Further to Project Dawn, TFL's committing to unlock at

12   most 3 million Luna per month for all operating costs with

13   details around each unlock transparently relayed to the

14   community."

15   Q.  Who were these 3 million Luna per month for?

16   A.  For Jump Trading.

17   Q.  And who told you that?

18   A.  Do Kwon.

19         MS. CUELLAR:  And we can take that down.

20   Q.  Now, considering what Do Kwon told you about Jump's role

21   and about the token unlocks for Jump, did this cause you to

22   reevaluate the information that had been presented to the

23   public?

24   A.  Yes.

25   Q.  How so?

O41HSec1                          Curran - Direct

1    A.  I think it was the most visceral instance of the sense that

2    I got that I was not receiving full accurate information on

3    critical things on multiple occasions, and it seemed much more

4    relevant to include Jump's involvement in May 2021.

5    Q.  And if we could please display Plaintiff's Exhibit 57.  If

6    we could go to page 6 in the document and focusing on tweet 14.

7             In light of what you learned, do you consider this

8    tweet misleading?

9             MR. PATTON:  Objection.

10            THE COURT:  Sustained.

11   Q.  In light of what you learned, do you believe Jump's role

12   should have been mentioned here?

13            MR. PATTON:  Objection.

14            THE COURT:  Sustained.

15   Q.  If you knew what you knew about Jump's role, which you

16   learned in September, would you have included Jump's role here?

17            MR. PATTON:  Objection.

18            THE COURT:  Overruled.

19   A.  Yes, I would have preferred to disclose Jump in the first

20   place so this —— yeah.

21            THE COURT:  Why?

22            THE WITNESS:  Because it was relevant to what was

23   happening at the time.

24   Q.  Now, after realizing that you didn't include Jump's role in

25   your earlier public statements, did you correct yourself

O41HSec1                    Curran – Direct

1    publicly?

2    A.  No.

3    Q.  Why not?

4    A.  I was directed not to.

5           MS. CUELLAR:  And you could take down the exhibit.

6    Q.  Now, did you ever tell anyone ⸺

7           THE COURT:  I'm sorry.  When you say you were directed

8    not to, by whom?

9           MS. CUELLAR:  Your Honor, can we have a sidebar,

10   please?

11          THE COURT:  Sure.

12          (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O41HSec1                          Curran - Direct

1              (At sidebar)

2              MS. CUELLAR:  I'm sorry, your Honor.  This is probably

3     our fault for not filling you in in our agreement.  The lawyers

4     told him not to, and so the parties agree that he would just

5     say he was directed not to.

6              THE COURT:  OK.  That's fine except that ——

7              MS. CUELLAR:  I apologize.

8              THE COURT:  Well, that's all right.  Why is that ——

9     that doesn't sound privileged.  Well, the parties have agreed.

10    But, of course, the trouble of that agreement is the jury would

11    naturally want to know ——

12             MS. CUELLAR:  Yes.

13             THE COURT:  —— who told him, which is why I asked the

14    question because, contrary to the view of defense counsel, I

15    think it's important to keep the jury apprised of what's going

16    on and not be confused.  But if there's an agreement, there's

17    nothing I can do about it.  It doesn't sound privileged to me,

18    but there it is.

19             MS. CUELLAR:  I apologize, your Honor.

20             THE COURT:  All right.

21             MS. GOMEZ NELSON:  Thank you.

22             (Continued on next page)

23

24

25

 1              (In open court; jurors present)

 2     BY MS. CUELLAR:

 3     Q.   Now, sir, I think I had asked now did you ever tell anyone

 4     in the company about what you learned from Do Kwon?

 5     A.   Yes.

 6     Q.   And who?

 7     A.   The general counsel and Jeff Kuan.

 8     Q.   And Jeff Kuan.

 9              If we could please display Plaintiff's Exhibit 73 for

10     the witness.

11              Do you recognize this exhibit?

12     A.   Yes.

13     Q.   What is it?

14     A.   It is a series of Telegram messages between Jeff Kuan and

15     I.

16     Q.   Were both you and Jeff Kuan employed by Terraform at the

17     time?

18     A.   Yes.

19     Q.   And did Terraform employees use Telegram in the normal

20     course of their employment?

21     A.   Yes.

22     Q.   And in your experience, was it common for employees to

23     sometimes mix personal and work topics together in

24     conversations on both Slack and Telegram?

25     A.   Yes.

O41HSec1                        Curran - Direct

1    Q.  Were both you and Jeff Kuan discussing activities within

2    the scope of your employment?

3    A.  Yes.

4    Q.  And was this communication maintained by Terraform in the

5    normal course of its business?

6    A.  Yes.

7    Q.  And is this a complete and accurate copy of your discussion

8    with Jeff Kuan on May 23, 2021 — or excuse me, on October 6,

9    2021?

10   A.  Yes.

11              MS. CUELLAR:  And, your Honor, at this time we move to

12   admit Plaintiff's Exhibit 73.

13              MS. GOMEZ NELSON:  No objection.

14              THE COURT:  Received.

15              (Plaintiff's Exhibit 73 received in evidence)

16              MS. CUELLAR:  And focusing on the top, if we could

17   please publish, Mr. Haywood.

18   Q.  What was the date of this conversation?

19   A.  October 6, 2021.

20   Q.  And who were you speaking with?

21   A.  Jeff Kuan.

22              MS. CUELLAR:  If we could please move to the second

23   page.

24   Q.  Focusing on the bottom four lines, if you could please read

25   for you, and I will read for Mr. Kwon.

O41HSec1                          Curran - Direct

1              (Reading)

2              "Curran:  LOL.  Apparently, during the May crash,

3     TFL's withdrawals from institutions were blocked because of the

4     size and urgency that would have been used to market make the

5     peg.  So Do said if Jump hadn't stepped in, we may actually

6     might have been fucked."

7              "Kwon:  Yeah, I know.  They saved our ass."

8              "Curran:  Indeed."

9     Q.  So what are you conveying here to Jeff Kuan?

10    A.  What Do had told me following Project Dawn.

11             MS. CUELLAR:  And if we could please take down the

12    exhibit.

13    Q.  Now, after Do Kwon admitted that the token unlocks were for

14    Jump, did you continue to work at Terraform?

15    A.  Yes.  Sarah Kim had just resigned.  I had actually planned

16    on resigning shortly myself but had to hire two people to

17    replace us.

18    Q.  And who did you hire?

19    A.  Zion Schum and Mark Chan.

20    Q.  And did you continue to work at Terraform?

21    A.  Yes, for a few more months.

22    Q.  You said a few more months.  Did you resign at some point?

23    A.  Yes.

24    Q.  And around when was that?

25    A.  January 2022.

O41HSec1                          Curran – Direct

1   Q.  Why did you resign?

2              MR. PATTON:  Objection.

3              THE COURT:  Overruled.

4   A.  There was a similar, event kind of a crisis, where my sense

5   was that I was not being told the full truth of what was

6   happening.  And considering that I had been planning to resign

7   and Zion and Mark were fully onboarded, that was really just

8   the proverbial straw that broke the camel's back.

9              MR. PATTON:  Your Honor, objection and move to strike.

10  Can we approach, please?

11             THE COURT:  All right.

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

O41HSec1                         Curran - Direct

1          (At sidebar)

2          MR. PATTON:  Your Honor, he is saying that the reason

3     he resigned had to do with some other instance where he felt he

4     was — I don't know what his exact words were, but being lied

5     to or not given the straight scoop.

6          What's that?

7          THE COURT:  Yeah, so what's your objection?  What he

8     said was this was a continuation of what he had come to believe

9     was a lack of candor being conveyed to him in his role as the

10    director of communications.  So it sounds to me like it goes to

11    intent.

12         What's your objection?

13         MR. PATTON:  Your Honor, my understanding, but I don't

14    think it should be explored, is that it had nothing to do with

15    claims that — it has nothing to do with the claims that the

16    SEC is making.

17         THE COURT:  Well, I don't know one way or the other,

18    but they haven't gone into it in any detail.

19         MS. CUELLAR:  And, your Honor, for the record, we

20    won't go into it.  As I discussed with defense counsel, it's

21    because it concerns other criminal conduct, and so we're

22    keeping that out.  But, obviously, it's credible for why the

23    witness resigned.  So I thought we had an agreement that he

24    would just say something like that and I would move on.

25         MR. PATTON:  But I don't know what the — it could

O41HSec1                         Curran - Direct

1    just be our misunderstanding of what the question and answer

2    was going to be.  I thought he was simply going to say he

3    resigned.  But to talk about other alleged misconduct is just

4    not relevant.

5              THE COURT:  Well, in any event, it seems to me that

6    it's clearly relevant as to intent, not his intent, the

7    company's intent, which is one of the issues in the case.  It

8    might be, again, 404(b), but since apparently there's an

9    agreement not to go into it in more detail, we'll just leave it

10   as is.  Overruled.

11             MS. CUELLAR:  Thank you.

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

O41HSec1                        Curran – Direct

1         (In open court; jurors present)

2    BY MS. CUELLAR:

3    Q.  Now, sir, after this other event, did you decide to resign?

4    A.  Yes.

5    Q.  And who did you convey that to?

6    A.  Do Kwon.

7    Q.  And how did he take it?

8         MR. PATTON:  Objection.

9         THE COURT:  Yes, sustained.

10   Q.  So after you resigned, what did you do?

11   A.  I spent time outside with my girlfriend.

12   Q.  And what did you do next in your career?

13   A.  I had actually planned to leave the crypto space, but the

14   company, after several weeks, had reached out to me to see if I

15   wanted to return.

16   Q.  And if you could just speak more into the microphone.

17   A.  Yeah, I had planned to leave the industry.  The company had

18   reached out several weeks after I had resigned.

19   Q.  And who reached out?

20   A.  Jeff Kuan.

21   Q.  And what happened next?

22   A.  He was pretty much gauging my interest to see if I would

23   return.  My immediate reaction was no, and then over the course

24   of a couple weeks, he kept asking.

25   Q.  And did you decide to return?

O41HSec1                          Curran - Direct

1    A.  Yes.

2    Q.  Why?

3    A.  I had put, you know, blood, sweat, and tears into Terra for

4    a long time.  I felt that abandoning the company on short

5    notice was kind of, you know, letting them down.  I had also

6    received assurances that an internal investigation was

7    conducted into the events that inspired me to leave and no

8    wrongdoing was found, and we also had more corporate structure

9    with indemnification in our contracts.

10   Q.  Now, did there come a point when the UST peg came under

11   pressure again?

12   A.  Yes, in May 2022.

13   Q.  And did you work at Terraform at the time?

14   A.  Yes.

15   Q.  And how did you find out about this?

16   A.  I was about to depart for the airport to go to Singapore

17   for a company meeting, and I received a call from Do saying

18   that the company was going to use the LFG to deploy

19   $750 million to support the peg.

20   Q.  And is "Do" Do Kwon?

21   A.  Yes.

22   Q.  And what is the LFG?

23   A.  The Luna Foundation Guard.  It was a nonprofit entity set

24   up by the company to support the peg and provide grants to the

25   ecosystem.

O41HSec1                        Curran - Direct

1    Q.  And what happened next?

2    A.  He called me about five, ten minutes later saying that

3    instead of $750 million, it was going to be $1.5 billion.

4    Q.  And what happened next?

5    A.  We wanted —— they wanted to publish comms around it, so we

6    published a tweet from the LFG account while I was on my way to

7    the airport.

8    Q.  And did you ultimately go to Singapore?

9    A.  Yes.

10   Q.  And what happened when you were in Singapore?

11   A.  Terra started depegging while I was in flight over the

12   Pacific.  So when I landed, I was a bit dazed and confused as

13   to what was happening, and the Terra peg was significantly

14   below $1.

15   Q.  And where did you go when you landed?

16   A.  To my hotel.

17   Q.  And did you ever meet with other Terraform employees?

18   A.  Yes.  We had a conference room at the Park Royal hotel.

19   Q.  And what meetings were being conducted?

20   A.  It was kind of a company round-robin about any creative

21   solutions to try and save Terra.

22   Q.  And did you propose anything?

23   A.  Not that I remember.  It's a bit out of my wheelhouse.

24   Q.  What happened next?

25   A.  Ultimately, Terra collapsed.

1    Q.  And did you propose anything to do with the money?

2              MR. PATTON:  Objection.

3              THE COURT:  It's a little vague.

4              MS. CUELLAR:  I can clarify, your Honor.

5              THE COURT:  All right.

6    Q.  So when you were in Singapore, did you offer any

7    suggestions?

8              MR. PATTON:  Objection.  Asked and answered.

9              THE COURT:  Overruled.

10   A.  Not while I was in Singapore, no.

11   Q.  Did you at a later point?

12   A.  Yes.

13   Q.  And what was your suggestion?

14             MR. PATTON:  Objection.

15             THE COURT:  To whom did you offer the suggestion?

16             THE WITNESS:  Internally, at the company.

17             THE COURT:  Overruled.

18   Q.  And what was your suggestion?

19   A.  I suggested that we use company funds to help compensate

20   angry users who had lost a lot of money and that we urgently

21   release a transparency report on what happened to the LFG funds

22   because public pressure was mounting significantly, and I had a

23   firsthand row to what was a Twitter mob at that point.

24   Q.  What's a Twitter mob?

25             MR. PATTON:  Objection, your Honor.  Move to strike.

O41HSec1                          Curran - Direct

1           Could we approach?

2           THE COURT:  Well, I hope it's called for.  Yes.

3           (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At sidebar)

2          MR. PATTON:  Your Honor, I don't understand the

3    relevance of Mr. Curran making suggestions about what Terraform

4    should do with its funds post the May 2022 collapse.  It has

5    nothing to do with Chai or the '21 depeg or any alleged false

6    statements.

7          THE COURT:  Once again, all this goes to intent, and

8    with respect to intent, something Terraform did yesterday would

9    be admissible if it otherwise shows something about their

10   intent.

11         MS. CUELLAR:  And, your Honor, I just want to add,

12   because the witness can only appear once, it's also coming up

13   because Mr. Patton in his opening made a very big deal about

14   the fact that Terraform did everything it could for people when

15   it collapsed; that it went out of its way to take all of these

16   measures.

17         THE COURT:  So you think he opened the door?

18         MS. CUELLAR:  Yes, your Honor, very much so.  And

19   they're going to call witnesses who are going to testify to

20   this, we anticipate, and we can't call Brian Curran back.

21         MR. PATTON:  Your Honor, I said absolutely nothing

22   about trying to make people who lost money whole.  What I said

23   was they poured an awful lot of money, which we just heard

24   about, to help restore the value of the currencies as they were

25   falling, to the extent that they lost an enormous amount of

O41HSec1                        Curran - Direct

money, which is, in fact, true and consistent with what the

witness said about the crash and the Luna Guard putting money

into it.

THE COURT:  What's he going to say?  Tell me the rest

of what he's going to say.

MS. CUELLAR:  We're almost done.  I'm going to ask,

did he continue to work at Terraform?  No, because Do Kwon

called him up and said his idea was completely unacceptable and

demoted him, and then he left.

MR. PATTON:  Your Honor, the relevance of Do Kwon not

listening to his communications head on how to distribute the

dwindling funds of Terraform is just not relevant.

MS. CUELLAR:  In fact, what he'll testify is Do Kwon

said:  We can't have crazy ideas like using our money to make

people whole.  Your implication was there from the opening, it

really was.

THE COURT:  I think there's something to what defense

counsel is saying, but because you can't recall this witness,

what is it that you're going to be saying, if anything, with

your witnesses about what the company did after the May '22

depeg?

MR. PATTON:  I don't think there will be any testimony

from our end about efforts ——

MR. PELLEGRINO:  Well ——

MR. PATTON:  Maybe Mr. Pellegrino knows.

O41HSec1                         Curran – Direct

1          MR. PELLEGRINO:  Mr. Amani would be able to testify

2    that funds were deployed and then tokens were airdropped, which

3    was an effort to remedy the situation.

4          MS. CUELLAR:  But not using their money.  So the

5    implication's there, your Honor.

6          THE COURT:  I don't think you can have it both ways.

7    If you're not going to offer that, I will exclude this.  If you

8    are going to offer that, I will include this.

9          MR. PELLEGRINO:  Can I just confirm for one moment,

10   your Honor?

11         MR. PATTON:  That's fine.

12         (Counsel confer)

13         MR. PELLEGRINO:  I think we would offer it, your

14   Honor, so —

15         THE COURT:  All right.  So theirs comes in.

16         MR. PELLEGRINO:  Thank you, your Honor.

17         (Continued on next page)

18

19

20

21

22

23

24

25

O41HSec1                        Curran - Direct

1                    (In open court; jurors present)

2    BY MS. CUELLAR:

3    Q.  Just backing up a little, I think you had mentioned using

4    company funds for the Anchor protocol users, is that correct?

5    A.  Yes.

6    Q.  Who are the Anchor protocol users?  What type of investors?

7    A.  Mostly retail.

8    Q.  And so did you continue to work for Terraform Labs?

9    A.  No, I was told to call Do Kwon shortly after.  He said I

10   was being demoted to a community moderator role, what was

11   clearly for my suggestions.  They wanted to retain me long

12   term.  It was just more of the same of the previous crisis, so

13   I resigned shortly after.

14   Q.  And did he explain why he was demoting you?

15   A.  Yes.

16   Q.  And what did Do Kwon say?

17   A.  He said that my suggestions were "manic" or something.

18             MS. CUELLAR:  Thank you, your Honor.  No further

19   questions.

20             THE COURT:  Cross-examination.

21             MR. PATTON:  Your Honor, I just want to give the Court

22   a heads-up.  This is one of those witnesses we discussed ——

23             THE COURT:  Yes.

24             MR. PATTON:  —— a while ago.

25             THE COURT:  I would have been heartbroken if you

O41HSec1                    Curran - Cross

1    weren't asking a few questions, Mr. Patton, so thank you for

2    letting me know.

3              MR. PATTON:  Thank you.

4              THE COURT:  Go ahead, counsel.

5              MS. GOMEZ NELSON:  Thank you.

6    CROSS-EXAMINATION

7    BY MS. GOMEZ NELSON:

8    Q.  Good afternoon, Mr. Curran.

9    A.  Good afternoon.

10   Q.  We've met only once before, correct?

11   A.  Yes.

12   Q.  And that was at your deposition in this case, correct?

13   A.  Yes.

14   Q.  I think you know, I represent Terraform, the company,

15   correct?

16   A.  Yes.

17   Q.  You testified that you joined Terraform around December of

18   2020, is that right?

19   A.  Yes.

20   Q.  And you came to Terraform because you were interested in

21   cryptocurrency, right?

22   A.  Yes.

23   Q.  You found crypto fascinating, right?

24   A.  Correct.

25   Q.  And Terraform was really doing something revolutionary,

1    right?

2    A.  Yeah, it was pushing the concept of a decentralized

3    stablecoin, which is important.

4    Q.  And its goal was to make cryptocurrency useful in the

5    world, wouldn't you say?

6    A.  Yes.

7    Q.  And you were drawn to that, weren't you?

8    A.  Yeah.  Primarily, my interest was to get away from

9    contracting, which is a hassle in itself.  So I was mostly

10   looking for a stable job at that point.

11   Q.  And you wanted to be the spokesperson for Terraform,

12   correct?

13   A.  Not initially when I applied for the job.  It was just the

14   only open position that was relevant to what I was looking for.

15   Q.  Well, your title was head of communications or PR lead,

16   right?

17   A.  Yes.

18   Q.  And in your role, you mentioned on direct that Terraform

19   employees communicated on Telegram, is that right?

20   A.  Yes.

21   Q.  And what is Telegram?

22   A.  Similar to WhatsApp.  It's like a user-friendly way for

23   people to communicate in groups or individually or through

24   broadcast.

25   Q.  Telegram is encrypted, right?

1  A.  Yes.

2  Q.  And why did Terraform employees communicate using Telegram?

3  A.  It's widely used within our industry as the primary means

4  of communication between different projects.

5  Q.  And in your role, did you engage with —— excuse me, in your

6  role, you did engage with Terraform community members, correct?

7  A.  Yes.

8  Q.  And you engaged with them using the Terra network Telegram

9  channel, correct?

10  A.  The official Telegram group.

11  Q.  Yes.

12  A.  Yes.

13  Q.  And in your role you issued public communications on behalf

14  of the company, correct?

15  A.  Yes.

16  Q.  And by "communications," this includes tweets, articles,

17  posts, and social media posts, is that correct?

18  A.  Yes.

19  Q.  You issued hundreds of posts while at Terraform, right?

20  A.  Most likely, yes.

21  Q.  It was a big job, wasn't it?

22  A.  It was time-consuming.

23  Q.  Yeah.  And you testified earlier that you poured your

24  blood, sweat, and tears into it, correct?

25  A.  Yes.

O41HSec1                          Curran - Cross

1    Q.  And so your role was to transmit information in

2    understandable terms to the public, right?

3    A.  Yes.

4    Q.  And you were doing your best genuinely with these

5    statements, right?

6    A.  Yes.  There was often a large communication barrier, and

7    it's difficult to talk to engineers, but yes.

8    Q.  Yeah.  And you were trying to accurately explain things to

9    the community, correct?

10   A.  Yes.

11   Q.  And you believed in the company's mission, didn't you?

12   A.  Yes.

13   Q.  And Terraform had, what, 40 or more employees when you

14   worked there, is that right?

15   A.  Correct.

16   Q.  And, Mr. Curran, you don't know how to read or write code,

17   do you?

18   A.  No.

19   Q.  You're not trained in cryptography, are you?

20   A.  No.

21   Q.  And at Terraform you never personally reviewed any code,

22   right?

23   A.  No.

24   Q.  You didn't review any code for Project Dawn, correct?

25   A.  No.

1  Q.  And isn't it a fact that you weren't part of the team

2  responsible for Project Dawn?

3  A.  I wasn't aware there was a team responsible for Project

4  Dawn.

5  Q.  But isn't it true that you were not part of a team

6  responsible for Project Dawn?

7  A.  Yes.

8  Q.  And similarly, you weren't responsible for preparing

9  Terraform's financial statements, correct?

10  A.  No.

11  Q.  You weren't responsible for Terraform's financial

12  accounting, correct?

13  A.  No.

14        MS. GOMEZ NELSON:  Mr. Patton.

15  CROSS-EXAMINATION

16  BY MR. PATTON:

17  Q.  Good afternoon, Mr. Curran.

18  A.  Good afternoon.

19  Q.  My name is David Patton.  I represent Do Kwon.

20        We've never met before, correct?

21  A.  No.

22  Q.  You're represented by counsel, correct?

23  A.  Yes.

24  Q.  You've met with the SEC quite a number of times to prepare

25  for your testimony here today, correct?

O41HSec1                        Curran – Cross

1   A.  Yes.

2   Q.  And you're aware that we had requested of your counsel to

3   also have similar discussions with you?

4   A.  Yes.

5   Q.  And you declined, correct?

6   A.  Correct.

7   Q.  You talked about market makers generally, right, in your

8   direct testimony?

9   A.  Yes.

10  Q.  A market maker is basically some sort of entity that offers

11  to buy and sell an asset, correct?

12  A.  Yes, in DeFi, it can be characterized other ways, too, LP

13  on AMM.

14  Q.  Meaning automatic, right?

15  A.  Yes.

16  Q.  But there are also living, breathing market makers,

17  correct?

18  A.  Yes.

19  Q.  I think we talked about Jump as an example was a market

20  maker for Terraform, correct?

21  A.  Yes.

22  Q.  Market makers are a common feature in any market of trading

23  assets, correct?

24  A.  Based on my understanding, yes.

25  Q.  They create liquidity, right?

1  A.  Yes.

2  Q.  And what that means is they make it easier and possible for

3  people to buy and sell an asset?

4  A.  Correct.

5  Q.  If there aren't enough people on the buy or sell side,

6  things get out of whack, correct?

7  A.  Yes.

8  Q.  And the UST protocol that we've talked a lot about here

9  that was meant to keep UST at or near a dollar, that protocol

10  incentivized people to trade in ways that would keep UST's

11  value at or near a dollar, correct?

12  A.  Correct.

13  Q.  But it required people to actually take the protocol up on

14  those incentives, correct?

15  A.  Yes.

16  Q.  As we saw with some of the depeg situations, if everybody's

17  rushing for the exits, it's not going to work, correct?

18  A.  Yes.

19  Q.  If there's too much sell side pressure and not enough

20  buyers, the price is going to plummet, correct?

21  A.  Yes.

22  Q.  Market makers play an important role in keeping a peg by

23  providing liquidity, right?

24  A.  Yes.

25  Q.  And one of the things liquidity does is it keeps the swap

1   spread narrow, correct?

2   A.  On the Terra protocol?

3   Q.  On any.  I'm just speaking generally.  Right?

4   A.  Generally, yes.

5   Q.  And that's important, right, because the wider the bids and

6   offers get, the more expensive it is to trade an asset,

7   correct?

8   A.  Yes.

9   Q.  And that then can drive the price of an asset down,

10  correct?

11  A.  Yes, it can make it more volatile.

12  Q.  And this can have a little bit of a cyclical effect, right?

13  The wider it gets, the fewer people are willing to engage, and

14  the price can plummet further, correct?

15  A.  Yes.

16  Q.  And you can end up in a liquidity crisis, correct?

17  A.  Correct.

18  Q.  I want to talk to you now a little bit about what Terraform

19  was saying to people outside of the company about Jump.  OK?

20          Could we — let's see here.  Just checking to see if

21  this is — no, it's not.  Could we pull, just for the witness

22  only, Plaintiff's Exhibit 407.  And if we could just — thank

23  you for pulling that up.

24          Do you recognize this as a Slack conversation on the

25  Terra system?

O41HSec1                        Curran - Cross

1  A.  Yes.

2  Q.  This again, as you've discussed repeatedly, this was a

3  system that was used in the regular course of business at

4  Terraform, correct?

5  A.  Correct.

6  Q.  And maintained by Terraform?

7  A.  Yes.

8  Q.  And this is a conversation involving you and some others,

9  correct?

10  A.  Yes.

11         MR. PATTON:  Your Honor, I offer Plaintiff's 407.

12         MS. CUELLAR:  No objection.

13         THE COURT:  Received.

14         (Plaintiff's Exhibit 407 received in evidence)

15  BY MR. PATTON:

16  Q.  So this is — if we could publish that for the jury.

17         So this is a Slack message dated May 23, 2021, right?

18  A.  Yes.

19  Q.  And again, to orient everyone, this was the day you learned

20  about the depeg in 2021?

21  A.  Correct.

22  Q.  If we could go to the next page, and if we could just pull

23  up — this is a message from you at the top of the page here at

24  9:35.  Again, that's Greenwich Mean Time, right?

25  A.  Yes.

1   Q.  On May 23.

2           And if we could just highlight's Mr. Curran message

3   here, the top half of this page.

4           And you say:  There's a lot happening right now

5   because of the extreme market volatility and how it's affecting

6   different aspects of the Terra ecosystem.  To better align

7   everyone and help us organize and clarify the moving parts, can

8   team leaders please provide the following ASAP.

9           Do you see that?

10  A.  Yes.

11  Q.  So you're reaching out to the various team leaders at

12  Terraform, asking for certain information, right?

13  A.  Yes.

14  Q.  One, you're asking them to identify the most significant

15  problems induced by the recent market volatility in their

16  respective area, right?

17  A.  Yes.

18  Q.  And then, two, how teams are addressing the issues in

19  number one, right?

20  A.  Yep.

21  Q.  And then you also had, three, critical questions that

22  anyone might have, right?

23  A.  Yes.

24  Q.  So, now, if we could blow up one of the responses here from

25  one of the team leaders below, and that's from Jeff Kuan,

1  right?  So this is just a couple hours later he is responding,

2  right?

3  A.  Yes.

4  Q.  And the first he sort of —— it looks like he's numbered

5  them in response to the questions you asked above one, two, and

6  three, right?

7  A.  Yes.

8  Q.  And in response to one, he's saying:  "UST off peg.

9  Partners are asking why, and if they should be concerned,"

10  right?

11  A.  Yes.

12  Q.  And you understood that people outside of the company were

13  concerned about the depeg, right?

14  A.  Yes.

15  Q.  And they were asking questions about it, correct?

16  A.  Yes.

17  Q.  And Jeff Kuan is conveying this to you, right?

18  A.  Yes.

19  Q.  And, two, Jeff Kuan, in terms of what he's doing about it,

20  tells you, "Told them we're working on it."

21          You understand that's referring to these outside

22  partners, correct?

23  A.  Yes.

24  Q.  "Have deployed stability funds through MM."

25          And you understood "MM" meant market maker, correct?

O41HSec1                    Curran - Cross

A.  Correct.

Q.  And then right after market maker, the next sentence is "Sent post of Jump's new proposal to mitigate future problems," right?

A.  Yes.

Q.  So Jeff Kuan is telling you that he has told people outside of Terraform that one of the reasons their concerns should be alleviated is that Terraform is deploying stability funds through a market maker, right?

A.  Yes.

Q.  And he's also sending them Jump's new proposal, right?

A.  Yes.

Q.  And we'll talk a little bit more about that in a moment, but this was ——

        THE COURT:  Yeah.  Well, I'm getting a little concerned that we're getting close to our 1 o'clock break.

        MR. PATTON:  I'm happy to break at any moment.

        THE COURT:  You tell me.

        MR. PATTON:  Now is fine.

        THE COURT:  OK.  So, ladies and gentlemen, we'll take our lunch break at this time and resume at 2 o'clock.

        (Jury excused)

        (Continued on next page)

O3SHSec4

1    (Jury not present)

2    THE COURT:  You can go.

3    Please be seated.

4    So I don't know if anyone found me any case law

5    regarding the admissibility of investigative evidence.  I

6    looked back —— since defense counsel had reminded me, I looked

7    back at the SEC's initial memorandum of law in support of its

8    motions *in limine*, and motion *in limine* No. 4 was to admit

9    designated portions of Kwon's investigative testimony into

10   evidence beginning at page 15 of the memorandum, and the SEC

11   initially says this:

12   "Defendants may argue that Kwon's testimony is

13   inadmissible because it was taken during an SEC investigation

14   not in a deposition conducted under Federal Rule of Civil

15   Procedure 30.  Any such argument would have no merit because

16   investigative testimony is 'clearly admissible at trial as

17   party admissions under Federal Rule of Civil Procedure

18   801(d)(2),'" and then they cite two cases to that effect.

19   Well, that, of course, is true, but that would mean

20   that the portion offered by the defense would not come into

21   evidence because, if it's only being offered as statements of a

22   party, of an adversary party, then that doesn't open the door

23   to other statements.

24   Now, the SEC then went on to say:  "Even if Federal

25   Rule of Evidence 801(d)(2) did not foreclose any challenge to

1    the admission of Kwon's investigative testimony, which it does,

2    the Federal Rules of Civil Procedure allow admission of the

3    testimony," and they then make an argument to the effect that

4    it's like it's really sort of sufficiently similar to a

5    deposition to be admitted.  But the only citation given for

6    that second argument is *SEC v. Goldstone*, 2016 WL 4487896, a

7    decision of the court in the District of New Mexico in 2016.

8    Now, I'll certainly take a look at that, but that seems perhaps

9    less than plenary authority.

10           So if there's other authority that either side wants

11   to bring to my attention or other case law bearing on use of

12   investigative testimony by one side or another as something

13   other than a party admission —— statement of a party adversary,

14   I'll certainly be glad to look at that.

15           Yes, sir.

16           MR. FERRARA:  Your Honor, we had sent your Honor's law

17   clerk an email with —— it cited the *Goldstone* case that your

18   Honor just mentioned, as well a case *SEC v. Michel*, which,

19   again, the cite is in the email.  I'm happy to read it, but

20   it's in the email to your Honor's law clerk.  And we also

21   called your Honor's attention to our briefing on this topic,

22   which is ECF 192, and we provided the cites to your Honor's law

23   clerk where we briefed this.

24           THE COURT:  I'll take a look at all that, but all by

25   way of saying why don't we reconvene at a quarter of 2:00 so we

don't waste the jury's time on this subject.

Now, the other question I had was for the SEC, since I
need to get you any further deposition rulings, if there's
anyone else you're introducing the deposition of in your case
between now and when you close hopefully tomorrow, is there any
other deposition testimony that I need to look at?

MR. CONNOR:  No, your Honor.

THE COURT:  Music to my ears.

OK.  Very good.  Oh, yes.

MR. PELLEGRINO:  Your Honor, just briefly, and I raise
it now because it's a time-sensitive matter, and that is we are
moving rapidly through the witnesses.  We were talking to SEC
about who might come next.  I think Professor Mizrach could
possibly be today, if not, certainly tomorrow.  We wanted to
briefly revisit your Honor's ruling on Rule 615 on what we
think is a fair and equal basis, and that would be with regard
to experts only.

Our particular motion would be to reconsider excluding
Professor Hendershott because he is a rebuttal witness.  And I
have four cases, your Honor, two from the Second Circuit, one
from the Southern District, and one from the Fourth Circuit
regarding rebuttal experts.  May I hand those up, your Honor?

THE COURT:  Sure.  Have you given copies to your
adversary?

MR. PELLEGRINO:  I did, your Honor, yes.  Just to be

O3SHSec4

1    clear, just now, your Honor.

2            THE COURT:  Well, I certainly need to hear —— give

3    your adversary a chance to respond.  I don't think —— we are

4    going to 4:30 today, but we'll have another break around 3:00.

5    So should this be —— I have a feeling that probably we're not

6    going to reach this tomorrow, but if we do reach —— in danger

7    of reaching it today, we'll take it up at the midafternoon

8    break.

9            MR. PELLEGRINO:  Yeah, I just wanted to make clear the

10   contours of the motion, your Honor.  It's simply that Professor

11   Hendershott be available in court to here Professor Mizrach's

12   testimony.  If they wanted Professor Mizrach to be present for

13   any aspect of the testimony ——

14           THE COURT:  I have never, since they revised the rule

15   on experts, what, at least ten years ago, I think it was more

16   than that ——

17           MR. CARNEY:  2010, your Honor.

18           MR. PELLEGRINO:  About 2010, your Honor.

19           THE COURT:  —— I have not allowed experts in the

20   courtroom because experts are strictly limited to their report,

21   otherwise you have the impossible situation of having to

22   challenge an expert's rebuttal testimony that came up at the

23   last minute, and it's hard enough to prepare to counter an

24   expert since it involves all sorts of questions about

25   methodology and data, and the like.  It's something even worse

O3SHSec4

1    when you have to do it on extremely short notice.

2              I do in my individual rules, of course, give the

3    parties an opportunity to apply for rebuttal reports, so they

4    can do it then.  But I don't see — I'll look at these cases,

5    but I don't see any basis for having an expert present in court

6    while another expert is testifying given the way the rule now

7    reads.

8              MR. PELLEGRINO:  Well, it's equally hard, I think, for

9    a rebuttal expert to rebut when the expert's unable to review

10   or even consider the testimony that was previously presented.

11             THE COURT:  No, no, no, but that's not true because

12   the expert testimony that any expert can present is limited to

13   what's in his or her report.  Those reports are issued weeks

14   ago, if not months ago.  So there's — if you want to rebut it,

15   the time to do it is then.

16             MR. PELLEGRINO:  Well, true, the reports were issued

17   months ago, but it's my experience that, inevitably,

18   hypotheticals are posed, questions are asked by the parties or

19   the Court to these witnesses when they're on the —

20             THE COURT:  Well, if a hypothetical is put by the

21   party calling a witness that is not fairly within the bounds of

22   his report, then you can object.  If the hypothetical is put by

23   — on cross, you take your chances.  So I don't see that as

24   being any reason to change.  I think the rule is clear, and I

25   think — I want to go further and say there has been a shift in

O3SHSec4

1    the federal rules, not only civil but criminal, over the last

2    20 years, most recently represented by the very recent

3    amendments to the federal criminal expert disclosure rules ——

4              MR. PELLEGRINO:  Right.

5              THE COURT:  —— to make sure that no one gets

6    sandbagged, and so you prepare and issue your reports well

7    before trial.  The other side has a chance to decide whether

8    they want to challenge it with their own expert, and under my

9    rules, you even have a chance to put in rebuttal reports.  And

10   all of that's done well before trial so no one's surprised.

11             MR. PELLEGRINO:  Well, we have that issue in this case

12   because Dr. Edman talked about processing and settling.  He

13   said originally he was not going to talk about that.  We've

14   moved several times on that issue.  So that's a situation in

15   which the expert testimony is evolving, and we don't want to

16   have a similar situation with regard to Professor Hendershott.

17             THE COURT:  I don't agree with that characterization,

18   but in any event, we'll raise all this at the midafternoon

19   break.  But right now I want to focus on the other issue, and

20   we'll see you at —— well, now that we've wasted all this time,

21   why don't we come back at ten minutes to 2:00.

22             (Lunch recess)

23

24

25

O41Wter4

                        AFTERNOON SESSION

                            1:50 p.m.

            THE COURT:  Please be seated.

        I want to thank counsel for giving me something to
keep me occupied during the lunch break, and I appreciate your
submissions.

        I'm going to reverse my prior ruling and exclude the
designations from the defense from the Kwon investigative
statements.  I think it basically is not covered by Rule 32,
and therefore, all that comes in are statements by a party
adversary, which is what the SEC is offering -- that will come
in -- but not the offerings made by Kwon and Terraform, which
are hearsay with respect to them.

        I might add that even assuming *arguendo* that Rule 32
was relevant, I think that there's an argument that the
witness's absence here at trial was procured by Do Kwon and
inferentially Terraform and, therefore, would not be admissible
in any event.  This was argued previously in terms of whether
an adverse inference was available, and I said that I would not
allow that because I felt it chilled his raising legal issues
in Montenegro, although I indicated I thought it was a close
call.  But under Rule 32, I think I have to look at the broader
picture.

        He, as I understand it, fled and has been on the lam,
in effect, ever since, only he got caught in Montenegro with a

O41Wter4

1    false passport, and so he spent some time there by his own

2    misconduct in their jail, for which, as I understand, he was

3    recently released.  In any event, that's a fallback, however.

4    I think that the basic ruling is that Rule 32 doesn't apply and

5    that, therefore, only the offerings from the SEC come in.

6            Yes.

7            MR. FERRARA:  Your Honor, just to -- I think I

8    understand we lost on certain issues.  I will say, on 804 --

9    sorry, on Rule 32, for what it's worth, as precedential value,

10   in the first Carroll v. Trump trial, before Judge Kaplan, we

11   had a similar issue, and Mr. Trump, of course, didn't appear

12   simply because he did not want to appear.  And Judge Kaplan

13   nevertheless allowed the defense to mark certain portions of

14   his deposition, which in fairness ought to have been considered

15   along with what we, the plaintiff, had designated in that

16   matter.

17           THE COURT:  Well, that was because, I'm sure, Judge

18   Kaplan realized there was no way Roberta Kaplan was going to be

19   anything but successful, given her great ability, so he just

20   wanted to make a modest show of evenhandedness.

21           MR. FERRARA:  I can't argue with your remarks about my

22   partner's capabilities, for sure.

23           What about, your Honor, and as to, did your Honor sort

24   of think about 804?  Because we understand that they have the

25   adverse -- that they're offering it against an adverse party.

O41Wter4

1    We understand that, but we had discussed before the break 804,

2    the unavailability exception, and the idea that --

3              THE COURT:  Yes, and that dovetails with what I just

4    said about Rule 32.  I think it's one thing to say that they

5    should not be able to argue to the jury an adverse inference

6    from his unavailability, which is the issue I narrowly -- and

7    this was all argument in terms purely of the Montenegro

8    extradition.  But here, I think one has to take the broader

9    view.

10             MR. FERRARA:  Fair enough, and we won't -- your Honor,

11   as your Honor, I'm sure -- you won't begrudge me for saying we

12   sort of disagree on the facts of how you -- but we understand

13   your point, and we don't need to get into that.

14             THE COURT:  OK.

15             MR. FERRARA:  May we at least, your Honor, have the

16   opportunity to go back into what was designated just to the

17   extent there is a rule of completeness issue?

18             THE COURT:  Yes, and I'm glad you raised that, because

19   I didn't address completeness at the time I made my rulings,

20   because I didn't have to, because I was taking the broader

21   view.

22             MR. FERRARA:  Understood.

23             THE COURT:  So there might be something that's still

24   admissible under the rule of completeness.

25             MR. FERRARA:  Thank you, your Honor.

O41Wter4

1          MR. PELLEGRINO:  Your Honor, just to make clear, to

2    the extent the ruling is based on Mr. Kwon's unavailability in

3    Montenegro, the ruling would prejudice Terraform, as there's no

4    allegation, and there could be no allegation, that Terraform

5    had anything to do with that unavailability.

6          THE COURT:  Well, as of the time he fled -- that's the

7    time I'm now focusing on, not the Montenegro situation, but the

8    actual flight -- was he still the controlling person in

9    Terraform?

10          MR. PELLEGRINO:  I think that's correct, your Honor,

11    but there's no allegation that that was a corporate act.

12          THE COURT:  Well, it's hard at that stage to

13    distinguish Terraform from the person who called all the shots.

14          MR. PELLEGRINO:  Yeah, I mean he took whatever actions

15    he took, but again, I think there would need to be a connection

16    between Terraform, the company --

17          THE COURT:  Well, what was his excuse for fleeing?

18          MR. PELLEGRINO:  I don't know, your Honor.

19          THE COURT:  If he said it was to do business, then

20    that would, of course, implicate Terraform.

21          MR. PELLEGRINO:  I don't know if he said on that.

22          THE COURT:  Yes.  I don't know.

23          Does the SEC have any information?

24          MR. CONNOR:  Your Honor, we do know he's still the 92

25    percent owner of the company.

O41Wter4

1          THE COURT:  I'm sorry.

2          MR. CONNOR:  We do know he's still the 92 percent

3    owner of the company.

4          THE COURT:  Yes.

5          MR. CONNOR:  As far as why he fled, I mean I think

6    it's pretty apparent why he fled.  I think he was, as I

7    understand it, he was indicted in Korea, which is why he fled.

8    And so I don't think there's really any dispute.

9          THE COURT:  Yes, indicted for his activity vis-à-vis

10   Terraform.

11         MR. CONNOR:  Yes.

12         MR. PELLEGRINO:  But that action doesn't respect the

13   corporate form.  The corporation is a separate corporation, and

14   it's still a defendant because the SEC has chosen to make them

15   a defendant.  But there's no allegation that the corporation

16   itself committed any wrongdoing or assisted in any way.

17         THE COURT:  All right.  Well, let's take a look at 804

18   one last time.

19         All right.  The point with respect to Do Kwon, I think

20   it's clear that 804, unavailability "does not apply if the

21   statements proponent procured or wrongfully caused the

22   declarant's unavailability as a witness."

23         That's Do Kwon, but that's not the point you're

24   raising.  I understand.

25         MR. PELLEGRINO:  Well, right, that the corporation --

O41Wter4

1          THE COURT:  I understand.

2          MR. PELLEGRINO:  Yes, yes.

3          THE COURT:  Now I'm looking at the rest.

4          Former testimony -- this is 804(b) -- the following

5     are not excluded by the rule against hearsay if the declarant

6     is a unavailable as a witness.  One, former testimony,

7     testimony that (a) was given as a witness at a trial, hearing

8     or lawful deposition, whether given during the current

9     proceeding or a different one.  So that clearly includes the

10    investigative hearing.  And (b), is now offered against a

11    party -- in other words, against the SEC is what you're talking

12    about -- who had an opportunity and similar motive to develop

13    it by direct, cross or redirect examination.

14          And what the SEC is saying is they didn't have the

15    motive at that time to make an inquiry, but you're saying,

16    well, but they put the questions.

17          MR. PELLEGRINO:  All of them, and that's exactly our

18    point.  And so then it becomes an exercise -- earlier, as you

19    heard SEC suggested, well, these statements should come in

20    because we designated them.  But these are self-serving, as

21    they put it.  But that's an exercise in a value judgment that

22    they're making in saying these are the ones we like, these ones

23    we consider self-serving, but our suggestion is that the facts

24    are in doubt; the jury should weigh them.

25          THE COURT:  None of the case law that you provided me

O41Wter4

1    with, all of which relates to Rule 32, addresses this issue.

2    So there is an argument, maybe, for it coming in on behalf of

3    Terraform but not on behalf of Do Kwon, although I wonder

4    whether there's a 403 problem there of how's the jury going to

5    reasonably make that distinction when it's Do Kwon's testimony?

6            MR. PELLEGRINO:  I know your Honor could instruct them

7    and that that's often the solution, and that's what we suggest.

8            THE COURT:  Yes, but this is really a tough one to

9    have a meaningful solution, when it's his own testimony as

10   opposed to third-party testimony that comes in against one

11   party but not another, where an instruction is easy to follow.

12           Yes.

13           MR. CONNOR:  Your Honor, if I could just be heard on

14   this?

15           I think the key is, under 804(b), the witness needs to

16   be unavailable, and that goes to your Honor's point, that Do

17   Kwon procured his own unavailability.

18           THE COURT:  You're saying I don't even reach the --

19           MR. CONNOR:  You don't even reach it.  He procured his

20   own unavailability.

21           THE COURT:  But they're saying Terraform did not

22   procure it.  That's their point.

23           MR. CONNOR:  Your Honor, corporations only act through

24   their agents.  Do Kwon is the 92 percent owner and CEO.

25           THE COURT:  The indictment was against him personally,

O41Wter4

 1    not against the company?

 2              MR. PELLEGRINO:  Yes.  Well, in the United States,

 3    yes.

 4              THE COURT:  I'm talking about in Korea.

 5              MR. PELLEGRINO:  Someone else -- I don't know the

 6    answer to that.

 7              MR. CALIFANO:  Your Honor, for the Korean, there was

 8    no public charge whatsoever.  When he was apprehended or at

 9    least detained, the Koreans had apparently a charge that was

10    put under a red notice, so there was no public notice of any

11    charge.  But it was an arrest warrant for Mr. Kwon.

12              MR. CONNOR:  And your Honor, the other point is that

13    Terraform has been paying all his legal fees, all the legal

14    fees to challenge the extradition here.  He could have been

15    here.  They're paying the lawyers to challenge that so that

16    he's not here.

17              THE COURT:  Where is Terraform incorporated?

18              MR. PELLEGRINO:  Singapore, your Honor.

19              THE COURT:  I don't know what Singapore law is.  If

20    they were incorporated in Delaware, they would have no choice

21    but to pay the fees.  That's *United States v. Stein*.

22              MR. CALIFANO:  Your Honor, there is a similar

23    obligation under Singaporean law.

24              THE COURT:  Yes.  I'm not surprised.

25              Well, I don't want to spend ages on this.  One thing

O41Wter4

1  I'm sure of is, No. 1, Rule 32 does not apply, and even if it

2  did, it wouldn't help.  For the reasons that I mentioned, it

3  wouldn't help the defense.  804 allows the SEC to put in what

4  it wants.  It does not allow Do Kwon to put in what he wanted

5  for the question of procured unavailability.  So we're down to

6  whether it comes in on behalf of Terraform, and I think the

7  real problem there, putting aside alter ego issues and all like

8  that, is that I don't really see how the jury could

9  meaningfully distinguish it.  Moreover, the identity, for all

10  practical purposes, between Do Kwon and the company has been

11  well established during the case for the period that's relevant

12  for what we're talking about.  So I'll think about it.

13          When are we getting to this deposition?

14          MR. CONNOR:  I believe he's next.

15          THE COURT:  Sorry?

16          MR. CONNOR:  I believe he is the next witness.

17          THE COURT:  The next witness.  OK.  I'll think about

18  it for another five minutes while we go forward, and then I'll

19  let you know at the sidebar my conclusion.

20          Anything else anyone wanted to say on this?

21          MR. PELLEGRINO:  Well, we would need time to make sure

22  that we have the designations correct, including for the rule

23  of completeness.  That's one issue.

24          THE COURT:  That's true.  How long is that going to

25  take?

O41Wter4

```
1          MR. CONNOR:  I believe we could resolve it if we took
2     a short break after Mr. Curran's deposition, perhaps.
3          THE COURT:  OK.
4          MR. CONNOR:  -- testimony.
5          THE COURT:  All right.  Let's at least move forward so
6     we don't waste the afternoon.
7          Let's bring in the jury and bring in the witness.
8          (Jury present)
9          THE COURT:  Please be seated.
10         Counsel, come to the sidebar.  I'm sorry.
11         (At sidebar)
12         THE COURT:  I think the only way to handle this,
13    particularly because of the possibility of some completeness
14    issues, is when the SEC introduces the statements from the
15    investigation, it will just be the SEC statements this
16    afternoon.  But if I rule that something else comes in, that
17    can be presented as part of the defense case or even tomorrow
18    before the SEC case ends.  So that way you won't be prejudiced,
19    but I don't want to make the particular ruling.  I think I have
20    everything I need to make the other ruling, but on
21    completeness, you'll need to go back and look.  So for this
22    afternoon's purposes, if we reach Kwon, it will just be the
23    SEC's part.  And if there's something more, we can do it
24    tomorrow or on the defense case.
25         (Continued on next page)
```

O41Wter4                          Curran – Cross

1                    (In open court)

2                    MR. PATTON:  May I proceed, your Honor?

3                    THE COURT:  Please.

4      CROSS-EXAMINATION

5      BY MR. PATTON:

6      Q.  Mr. Curran, when we left off before lunch, we were talking

7      about this Slack conversation between you and Jeff Kuan, and

8      Jeff Kuan, in response to your requests for information about

9      what team leaders were doing, told you that he was letting

10     concerned partners know that Terraform had deployed stability

11     funds through a market maker and sent a post of Jump's new

12     proposal to mitigate future problems.

13          Is that a fair summary of where we left off?

14     A.  Yes.

15                   MR. PATTON:  OK.  I want to show you now what you

16     reviewed in your direct testimony, Plaintiff's Exhibit 71.  And

17     that's in evidence, so we can show that.  And if we could go to

18     the last page of that exhibit.

19     Q.  Do you recall reviewing this in your direct testimony?

20     A.  Yes.

21     Q.  Starting near the top there, where you say:  OK.  Do just

22     randomly called me.  So the situation is 20 to 30 million worth

23     of UST sales daily, 100 million of sales yesterday.  Right now

24     peg is at where the swap spreads are at.  Markets are trading

25     where that is -- 6 to 7 percent off.  We're speaking to Jump

O41Wter4                          Curran - Cross

1    about a solution.  Do you see that?

2    A.  Yes.

3    Q.  So you were aware, on May 23, that Do was talking about

4    speaking to Jump about a solution, correct?

5    A.  Yes.

6    Q.  And some of these figures that you have in this particular

7    text -- we'll get to the details of why in a moment, but they

8    relate to why Jump was proposing proposal 90, correct?

9    A.  Yes.

10   Q.  Fair to say that proposal was an effort to at least help in

11   some way solve some of what's going on here?

12   A.  Correct.

13   Q.  OK.  And then if we go down to another few lines where it

14   begins with spoke with Do; we're going to deploy $250 million

15   from stability reserve through Jump to stabilize the peg.  Do

16   you see that?

17   A.  Yes.

18   Q.  And I believe you said that the stability reserve was

19   something called SDR, right?

20   A.  Based on my understanding, yes.

21   Q.  And that, I believe, you described was a base of capital

22   controlled by Terraform, right?

23   A.  Yes.

24   Q.  So Do is telling you that we're using some reserves to help

25   try to defend the peg, correct?

O41Wter4                          Curran - Cross

 1   A.  Yes.

 2            MR. PATTON:  And if we go down further, to Do says we

 3   can relay, if we can pull that up.

 4   Q.  Do says we can relay the stability reserve deployment

 5   through market makers to Nerve and Curve to ease their

 6   concerns, right?

 7   A.  Yes.

 8   Q.  And again, remind us, what are Nerve and Curve?

 9   A.  I'm not sure what Nerve is, but Curve is the largest

10   stablecoin exchange on Ethereum.

11   Q.  But these are folks outside of the company, correct?

12   A.  Yes.

13   Q.  These are people who work in the crypto space but who are

14   not part of Terraform, the company, correct?

15   A.  Correct.

16   Q.  And Do is telling you that you can relay this stability

17   reserve deployment to these people outside of the company,

18   right?

19   A.  Yes.

20   Q.  And that letting them know that, the expectation is that

21   will help ease their concerns about the depeg, correct?

22   A.  Yes.

23   Q.  And then, below that, you say, Jump has already started

24   buying, right?

25   A.  Yes.

1  Q.  And below that, may not need entire 250 million, right?

2  A.  Yes.

3  Q.  And I believe there was some discussion in your direct

4  testimony about the fact that sometimes the numbers -- you

5  weren't entirely clear on the number being deployed, correct?

6  A.  Correct.

7  Q.  And that's because there was uncertainty, correct?

8  A.  Yes.

9  Q.  This was a moment of great volatility, right?

10 A.  Yes.

11 Q.  Prices were fluctuating, correct?

12 A.  Yes.

13 Q.  So it wasn't clear what amount would be needed to help

14 defend the peg, correct?

15 A.  Based on my understanding, yes.

16 Q.  And at this point Do was saying we're -- basically, we're

17 willing to deploy $250 million, but we may not need to deploy

18 all of it, correct?

19 A.  Yes.

20        MR. PATTON:  OK.  Could we pull up plaintiff's 72,

21 which is also in evidence.

22 Q.  And these are your notes of this meeting, also on May 23,

23 so same day, right?

24 A.  Yeah.

25 Q.  So depeg crisis still going on, right?

O41Wter4                     Curran - Cross

1    A.  Yup.

2    Q.  Same day as the chats we've been looking at between you and

3    Jeff Kuan, right?

4    A.  Yup.

5    Q.  And I believe you said there were roughly 10 to 15 people

6    on this call --

7    A.  Right.

8    Q.  -- where Do was talking about what was going on?

9    A.  Yes.

10   Q.  And you're taking notes of what Do is talking about on this

11   call with 10 to 15 people, right?

12   A.  Yes.

13   Q.  Now, these are people within Terraform, right; this is

14   within the company?

15   A.  Yes.

16   Q.  So in contrast to, say, Do saying you can talk to folks

17   outside of the company, like Curve, this is internal

18   discussion, right?

19   A.  Yes.

20   Q.  And you start off there, in the first paragraph, again,

21   talking about spreads, right?

22   A.  Yes.

23   Q.  One of the things you say is system designed to handle $20

24   million of redemptions with 2 percent spread, right?

25   A.  Yes.  These are notes paraphrasing Do.

O41Wter4                        Curran - Cross

1  Q.  Yeah.  But again, I just want to tee up, this is, again --

2  relates to the issue that Jump's public proposal, prop 90, was

3  meant to address, correct?

4  A.  Yes.

5  Q.  If we go, then, to the third page, you talked about, on

6  direct, what some of the primary community concerns were here,

7  right?

8  A.  Yes.

9  Q.  And the first sentence under that is:  UST peg deviation

10 and the downward reflexivity induced in Luna's price.

11 Transparency about how stability reserve is deployed.  Correct?

12 A.  Yes.

13 Q.  In essence, people in what you've described as the

14 Terraform community wanted to know how Terraform was using the

15 reserve to defend the peg, correct?

16 A.  Correct.

17 Q.  And you knew that because there was discussion in these,

18 all the various Terraform-related community forums, right?

19 A.  Yes.  The questions regarding the stability reserve had

20 been around prior to this.

21 Q.  People wanted to know that -- they felt like there wasn't

22 enough transparency about how the reserve might be used to

23 defend the peg, correct?

24 A.  Yes.

25 Q.  And in fact, later in that year, 2021, Terraform did

O41Wter4                          Curran - Cross

1    address that concern, correct?

2    A.  Yes.

3    Q.  Terraform ended up initiating a public governance proposal

4    modifying the stability reserve, correct?

5    A.  Yes.

6    Q.  And that was, in part, in response to community concerns

7    about wanting to know how the reserve might be used, correct?

8    A.  Yes.

9           MR. PATTON:  If we could pull up plaintiff's 57, which

10   is also in evidence.

11   Q.  And do you recall this is the very lengthy, like -- I don't

12   know exactly, but roughly, like, 30-part tweet series on May

13   24; so this is now the following day --

14   A.  Yes.

15   Q.  -- where you're going through and giving a whole series of

16   explanations about the depeg and how the protocol works, right?

17   A.  Yes.

18   Q.  And again, just so we're clear, this is from @Terra_Money;

19   this is the company Twitter account, right?

20   A.  Correct.

21   Q.  That you and your team had primary responsibility for,

22   correct?

23   A.  Correct.

24   Q.  And this one you wrote with input from other people at

25   Terraform, correct?

O41Wter4                          Curran - Cross

1    A.  Yes.

2    Q.  And just to be clear, your team, the members of your team

3    that worked on the Terra_Money account were you, Sarah Kim and

4    later on Zion Schum and Mark Chan, correct?

5    A.  Yes.

6    Q.  Anyone else?  Did I miss anyone?

7    A.  Not off the top of my head, no.

8    Q.  Now, other managers and employees of Terraform had their

9    own personal social media accounts as well, right?

10   A.  Yeah, some of them.

11   Q.  And they would sometimes also tweet or issue statements

12   about Terraform-related things, correct?

13   A.  Yes.

14   Q.  So for example, Do Kwon had an account, a Twitter account,

15   @stableKwon, right?

16   A.  Yes.

17   Q.  And sometimes he would issue statements as well, correct?

18   A.  Yes.

19   Q.  But this was the company account, right?

20   A.  Yes.

21   Q.  If we could go to the fifth tweet, I believe it's on the

22   third page:  Terra primarily achieves this via the on-chain

23   swap mechanism that is baked into the protocol.  Users can

24   always go to the protocol to swap a dollar's worth of Luna for

25   one UST, and vice versa.  The system is designed to handle $20

O41Wter4                        Curran - Cross

1  million of redemptions with a 2 percent spread.  Right?

2  A.  Yes.

3  Q.  This is similar to what is noted in your notes of that

4  meeting with Do on the 23rd, right?

5  A.  Correct.

6  Q.  Again, this is sort of indicating there's a little bit of a

7  limitation in terms of maintaining the peg in terms of this $20

8  million of -- the system being designed to handle $20 million

9  of redemptions, right?

10 A.  Yes.

11 Q.  And again, this Jump proposal 90 was meant to enlarge that,

12 right?

13 A.  Correct.

14 Q.  To make it easier to defend the peg, right?

15 A.  Yes.

16 Q.  So that a market maker, like Jump, would have more ability

17 to help defend the peg, correct?

18 A.  Yes.

19 Q.  If we look now at tweet No. 9, I won't read all of this,

20 but again -- well, sorry.  I'm going to go back on that:

21 However, with swap spreads so large, the incentive to perform

22 the time-based arbitrage --

23     It's A-R-B, but that means arbitrage, right?

24 A.  Yes.

25 Q.  -- was curtailed significantly.

So the protocol is meant to create these incentives, right?

A.  Yes.

Q.  And -- but the incentives were not so enticing to people, given what was going on, correct; that's what this is talking about?

A.  Yes.

Q.  That it was a very large spread, right?

A.  Correct.

Q.  And that large spread is an indication of a lack of liquidity, right?

A.  Yes.

Q.  And then if we look at tweet No. 11, here, you say, the death spiral of a bank run applied to Terra's seigniorage shares-style monetary policy is also not an apples-to-apples comparison, right?

A.  Yeah.

Q.  And you were responding to some outsider's tweet about the possibility of a death spiral, right?

A.  Yes.

Q.  And this wasn't the first time the term "death spiral" had been used among people in the Terra community talking about what could possibly happen to UST, correct?

A.  Correct.

Q.  This was a topic of discussion among community members in all the various social media platforms we've talked about?

O41Wter4                          Curran - Cross

1    A.  Yes.

2    Q.  If we could now go to tweet No. 20, here, again, you're

3    talking about the protocol will keep arbitrage opportunities

4    open; even if the incentives to do so are dislocated during

5    ephemeral market turmoil, the incentives eventually realign and

6    the system heals.  Do you see that?

7    A.  Yes.

8    Q.  So again, it's emphasizing that the protocol is meant to

9    incentivize certain behavior among people purchasing and

10   selling UST and Luna, correct?

11   A.  Correct.

12   Q.  And in fact, this time, anyway, the May 2021 depeg event,

13   the protocol ultimately worked, correct?

14   A.  Yes.

15   Q.  The protocol was, in fact, restored close to or near --

16           MS. CUELLAR:  Your Honor, objection.  This calls for

17   an expert opinion.  He's not qualified.

18           MR. PATTON:  Your Honor --

19           MS. CUELLAR:  And also relevance.  We could discuss

20   that at sidebar.

21           THE COURT:  Well, I think the question as phrased is

22   ambiguous, so before we get to the more basic questions, why

23   don't you rephrase the question.

24           MR. PATTON:  Your Honor, I'm going to move on.

25           THE COURT:  OK.

O41Wter4                    Curran - Cross

1           MR. PATTON:  Let's go to tweet No. 28.

2    Q.  Here, you say --

3           THE COURT:  Just so the record's clear, the last

4    answer, that is excluded.

5           MR. PATTON:  Thank you, your Honor.

6           THE COURT:  Go ahead.

7    BY MR. PATTON:

8    Q.  Here, you say:  Just look at Jump Trading's recent proposal

9    now live as prop 90, which will significantly dampen the

10   downward reflexivity experienced during the recent market

11   volatility.  The proposal is already past the threshold quorum

12   with 100 percent of votes reporting yes.  Correct?

13   A.  Yes.

14   Q.  And again, this is the proposal that was meant to solve, or

15   help solve, anyway, some of the problems we've been discussing

16   in terms of how the peg might come under stress, correct?

17   A.  Correct.

18          MR. PATTON:  Enough said.  Let's go to plaintiff's

19   355.  This is not in evidence, so if we could just show this to

20   the witness.

21   Q.  And Mr. Curran, do you recognize this as an email from Jeff

22   Kuan, from his Terra email account, to some sort of what

23   appears to be a Listserv, and you are cc'd on your Terra

24   account?

25   A.  Yes.

O41Wter4                         Curran – Cross

1    Q.  And this was sent on June 4, 2021?

2    A.  Correct.

3    Q.  And again, this was an email about Terraform business,

4    correct?

5    A.  Yes.

6    Q.  And it was kept in the normal course of Terraform's

7    business?

8    A.  Yes.

9            MR. PATTON:  Your Honor, I offer plaintiff's 355.

10            MS. CUELLAR:  Objection.  Relevance, your Honor.

11            THE COURT:  I need to have it blown up.

12            MS. CUELLAR:  Your Honor, we could explain our theory

13    at sidebar.

14            THE COURT:  All right.

15            (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1           (At sidebar)

2           MS. CUELLAR:  Apologies, your Honor.

3           This gets back to why we objected in the previous

4    plaintiff's exhibit, 57, when he asked whether the protocol

5    worked.  The dispute in this case is whether the trading

6    occurred on-chain or off-chain.  On-chain is the protocol.

7    Off-chain is not.  Mr. Curran has no knowledge whether Jump did

8    it on or off-chain, and this entire questioning is confusing

9    the issue.

10          THE COURT:  Well, I didn't have to reach that on your

11   previous objection because I sustained the objection on grounds

12   of vagueness, and counsel wisely chose not to try to re-form

13   the question.  But I think that was the ambiguity that was in

14   the prior question, which was, are we talking about just

15   operations of the marketplace, which is the defense position,

16   or are we talking about a secret deal, which is the

17   government's position, the SEC's position.

18          I just began to take a look at this document, because

19   it had to be blown up, but what's the relevance of this

20   document?

21          MR. PATTON:  Your Honor, this is communications that

22   Mr. Curran's a part of, going to people outside of Jump,

23   including the investors that the SEC called as witnesses, as

24   supposed victims because they were unaware of certain things,

25   and it goes into information about Jump.  The SEC's perfectly

O41Wter4                      Curran - Cross

1    free to argue, like, this is something different, this is not

2    what we're talking about; it's not our position.  We think that

3    this goes to the heart of what the SEC is saying was not

4    disclosed, and they can --

5              THE COURT:  I guess, as at earlier points in this

6    trial, I have some concern about keeping the jury focused on

7    the issue.  Am I right that the issue here is whether the Jump

8    investment was something procured as a special deal but not so

9    revealed to the public or was simply the operation of the

10   marketplace?

11             MR. PATTON:  No.  We take issue with that claim by the

12   SEC.

13             THE COURT:  Well, that's what I'm saying.  That's the

14   issue, right?  It's either you're saying Jump operated just out

15   of economic self-interest, right?

16             MR. PATTON:  We're saying a number of things.  One,

17   we're saying Jump's role as a market maker was well-known to

18   people outside of Terraform, including alleged victims who are

19   investors.

20             THE COURT:  But that's separate.  If one is a market

21   maker and it independently makes a decision, that's one thing.

22   That's your position.  If instead a secret deal is cut, that's

23   different.

24             MR. PATTON:  And we take issue with that.

25             THE COURT:  I understand, but that's the dispute.

O41Wter4                    Curran - Cross

1    Right?  I'm having trouble with how any of this is relevant to

2    that dispute.

3                MR. PATTON:  Because the SEC is claiming that Jump's

4    role as a market maker, as injecting a lot of money and

5    liquidity into the repeg is part of what Terraform and Do Kwon

6    did not disclose, and we're saying they did disclose that.

7                THE COURT:  No.  They're saying that, as I understand

8    it, but I'll hear from the SEC.  They're saying that it was

9    something that was not the operation of the marketplace but

10   something that was procured through a special deal.

11               MR. PATTON:  Well, I'll let the SEC speak for itself.

12               THE COURT:  OK.

13               MS. CUELLAR:  We agree with what you're saying, your

14   Honor.

15               THE COURT:  I'm sorry?

16               MS. CUELLAR:  We agree with you, your Honor, and that

17   is what we're saying.  But this on-chain off-chain thing is

18   very important, because as Boris Revsin testified -- he was our

19   second witness -- the public can see on-chain trades.  It

20   cannot see off-chain trades through central exchanges.  He

21   specifically testified to that.  Our expert is going to testify

22   to that, and this confusion of on and off is significant.

23               THE COURT:  Well, again, though, if that wasn't

24   procured, what does it matter?

25               MS. CUELLAR:  Right.  I mean we agree with you on our

O41Wter4                    Curran - Cross

1  claim.

2           THE COURT:  All right.  So now going back to this

3  document --

4           MR. PATTON:  Your Honor, I would note, first of all,

5  this is a document they marked.

6           THE COURT:  Pardon?

7           MR. PATTON:  This is a document they marked as an

8  exhibit.  This is a plaintiff's exhibit.  They're certainly

9  free to make their arguments about why this doesn't, in fact,

10  rebut their claim.

11          THE COURT:  We that had that argument, where that only

12  goes to authenticity.  When I made that same point with respect

13  to this is an argument, a document defense had raised or

14  marked, excuse me, and the position was yes, that conceded

15  authenticity but did not concede that it was definitely going

16  to be put into evidence.  But anyway, go ahead.

17          MR. PATTON:  Understood, but it's certainly odd to

18  object to it on relevance grounds, when it's -- there may be

19  other grounds, but relevance is an extremely low threshold.

20  This is a document --

21          THE COURT:  Does someone have a hard copy of this

22  thing?

23          MR. PATTON:  Sure.

24          (In open court)

25          THE COURT:  You're having fun, right, waiting for us?

O41Wter4                        Curran - Cross

1        (At sidebar)

2        THE COURT:  This is why I don't like sidebars.

3        MS. CUELLAR:  Understood.

4        THE COURT:  All right.  There we go.

5        I'm going to receive it.

6        (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court)

2          THE COURT:  Ladies and gentlemen, I think it is worth

3     focusing you on some of the discussion we just had at the

4     sidebar.  As you may gather from everything from the opening

5     statements on, the SEC's position is that the reaction to the

6     May 2021 depeg was the result of a secret, undisclosed deal

7     with Jump.  The position of the defense is that that's not

8     true; it was the operation of the marketplace and the natural

9     instincts, if you will, of a market maker to come in at that

10    point.

11         So those are the competing positions, and this

12    document arguably bears on the defense position, so it will be

13    received.

14         (Plaintiff's Exhibit 355 received in evidence)

15         MR. PATTON:  If we could put up plaintiff's 355 for

16    the jury.

17    Q.  So again, Mr. Curran, this is an email from Jeff Kuan to a

18    group called investment@Terra.Money, correct?

19    A.  Yes.

20    Q.  And you had been on emails in the past to this email

21    address where people had replied, correct?

22    A.  Yes.

23    Q.  And so you knew that this included people like venture

24    capital funds that had invested in Terraform, correct?

25    A.  Yes.

O41Wter4                          Curran - Cross

Q.  These were –– and the email begins with "dear investors,"
correct?

A.  Yes.

Q.  And generally speaking, fair to say this was a group of
people who wanted assurance following the depeg that steps were
being taken to maintain the peg?

A.  Yeah, I think that's fair.

Q.  It was in their interests that UST roughly maintain the
peg, correct?

A.  Yes.

        MR. PATTON:  And if we go down to the section that's
called stablecoins, and if we could –– yeah, there we go.

Q.  It starts with, our top priority as a firm is to maintain
the stability and trust in our stablecoins.  This is going to
the fact that it's addressing these investors, correct?

A.  Yes.

Q.  And the very first thing it says after that is, as a first
step, Jump Trading has introduced a community proposal to
adjust the liquidity parameters of Terra assets to make the
expansion and contraction of the stablecoin money supply more
efficient, right?

A.  Yeah.

Q.  And then the next paragraph goes on to explain the details
of this proposal, which was called prop 90, right?

A.  Yes.

O41Wter4                         Curran - Cross

1    Q.  And correct me if I'm getting this summary wrong, but

2    rather than try to get into the technical aspects of it, the

3    proposal would allow for the injection of more liquidity to

4    help defend the peg in times of stress, correct?

5    A.  Yeah.  My understanding is that it would just be able to

6    absorb larger volatility events.

7    Q.  Right.  And here, it says expanding the capacity to a

8    hundred million as compared to what I think we saw you saying

9    earlier and Do saying earlier about the capacity being 20

10   million, right?

11   A.  Yes.

12   Q.  So this would help buttress times when there was more

13   sell-side pressure, right?

14   A.  Correct.

15   Q.  You'd have more funds to deploy to help defend the peg,

16   correct?

17   A.  On-chain, yes.

18   Q.  And if we go to -- actually, just sort of big picture,

19   we've now seen -- so this is Jeff Kuan less than --

20          THE COURT:  I'm sorry.  In your last answer, what did

21   you mean by on-chain?

22          THE WITNESS:  The proposal is specific to the Terra

23   protocol, which is on-chain.

24          THE COURT:  So that needs to be distinguished to

25   off-chain; yes?

O41Wter4                          Curran - Cross

1              THE WITNESS:  Yes.  So it wouldn't affect off-chain

2       liquidity, just on-chain liquidity.

3       BY MR. PATTON:

4       Q.  Right.  This goes to the on-chain protocol, correct?

5       A.  Yes.

6       Q.  And just zooming out a little bit here, so this is Jeff

7       Kuan, a little less than two weeks after the May '21 depeg

8       event, trying to address some of the concerns of investors,

9       right; about steps Terraform is taking to help the stability,

10      correct, of UST?

11      A.  Yes.

12      Q.  And earlier, remember you had that exchange with him on May

13      23, where he was saying one of the things he was doing was

14      reaching out to partners, and one of the things he mentioned

15      there was Jump's proposal, correct?

16      A.  Yes.

17      Q.  Is it fair to say just as a general matter Jump was

18      considered sort of one of the more sophisticated players in the

19      cryptocurrency space?

20      A.  Yeah.  As, like, a trading firm, they're very specialized

21      in what they do.

22      Q.  And for instance, one of the interesting things about them

23      as a trading firm was that they also sometimes provided

24      technical partnership and expertise, correct?

25              MS. CUELLAR:  Objection.  Foundation.

1            THE COURT:  Sustained.

2    BY MR. PATTON:

3    Q.  Well, Mr. Curran, you talked about the fact that Jump had

4    been working with Terraform on something called Wormhole,

5    right?

6    A.  Yes.

7    Q.  That was not a trading project so much as an actual

8    technical assistance, correct?

9    A.  Yes.  It's called a bridge.

10   Q.  To allow people to exchange different -- stablecoins that

11   are located on different blockchains, right?

12   A.  It can be any asset, not just stablecoins.

13   Q.  Got it, but it would allow exchanging of cryptocurrencies

14   on different blockchains, correct?

15   A.  Correct.

16   Q.  And one of the things, it would enhance Terraform's

17   credibility in the cryptocurrency space to let people know,

18   like investors and partners, that Jump was working with

19   Terraform, right?

20           MS. CUELLAR:  Objection.  Speculation.

21   BY MR. PATTON:

22   Q.  If you know.

23           THE COURT:  No, no.  By its very nature, it's really

24   not a question to put to a fact witness.  Sustained.

25   BY MR. PATTON:

O41Wter4                          Curran - Cross

Q.  Well, let me ask you this, Mr. Curran.  You're included on

this email that's going out to investors, right?

A.  Yeah.

Q.  Part of your job as the head of communications included

communications with investors and partners, correct?

A.  Not so much investors.  Mostly -- yeah.  So, like, anytime

somebody would publish something, they would ask me to do,

like, a grammar edit.  So this would happen dozens of times a

day.

Q.  But in fact, you were in contact with Jump PR people as

well, and you had some communications with them, didn't you?

A.  They didn't have a PR firm or presence at the time.

Q.  Well, hold off on that.  Just to go back to the investors

piece of this, you were aware that one of the pitches that

Terraform made to Republic Capital and somebody named Boris

Revsin, one of the things Terraform touted in seeking funding

from Republic Capital was that Jump was involved, correct?

A.  I don't remember that firm.

Q.  You're not aware that one of the investors in Terraform was

Republic Capital and that Jump was one of the selling points

for them?

        MS. CUELLAR:  Asked and answered, your Honor.

        THE COURT:  Sustained.

BY MR. PATTON:

Q.  If we could pull up Plaintiff's Exhibit 71 again.  We've

O41Wter4                          Curran - Cross

1   reviewed some parts of this.  Again, it's this May 23 Slack

2   conversation between yourself and Jeff Kuan, right?

3   A.  Yes.

4   Q.  And -- pardon me.

5       If we go to the second page, and you ask what market makers

6   do we use besides Jump, right?

7   A.  Yes.

8   Q.  You're asking Jeff Kuan this question, right?

9   A.  Right.

10  Q.  And this is on May 23, right?

11  A.  Yes.

12  Q.  So you were not aware of other market makers besides Jump,

13  correct?

14  A.  Correct.

15  Q.  You only knew of Jump as one of Terraform's market makers,

16  correct?

17  A.  I knew that they were market making for a certain project

18  but not, like, on a regular basis.

19  Q.  Well, you knew to ask Jeff Kuan this question, what market

20  makers do we use besides Jump, indicating you knew Jump was a

21  market maker, correct?

22  A.  Yes.

23  Q.  And Jeff responds, that's the only one I know, right?

24  A.  Correct.

25  Q.  And then you say:  Is Jump willing to publicly disclose

O41Wter4                          Curran - Cross

1   their relationship with us, though?  Seems like they're pretty

2   private.  Right?

3   A.  Yeah.

4   Q.  One of the reasons you're asking that question is because

5   in this time of volatility, when you're trying to ease concerns

6   of the outside world about the stability of UST, is you'd like

7   to be able to talk about Jump, correct?

8   A.  Yes.

9   Q.  And -- but you were worried that Jump would not be thrilled

10  about that, correct?

11  A.  My position was mostly that I didn't know much about their

12  public persona.  They didn't really seem to have one at the

13  time.

14  Q.  You didn't know what aspects of their business they wanted

15  kept confidential and what they didn't, correct?

16  A.  Yes.

17  Q.  And you didn't know any of the details of their agreement

18  with Terraform, correct?

19  A.  Yes.

20  Q.  In terms of what Jump insisted on being confidential and

21  what they didn't, correct?

22  A.  Yeah.  I mean I'm not aware of what they insisted on, but

23  generally, yes.

24  Q.  So you didn't know if Jump had concerns about the public

25  knowing, for instance, how much money they made, correct?

O41Wter4                        Curran - Cross

1          MS. CUELLAR:  Your Honor, this is speculation and --

2          THE COURT:  Sustained.

3          MR. PATTON:  Could we show for the witness only

4     Plaintiff's Exhibit 428.

5     Q.  Do you recognize this as an email exchange on your Terra

6     work email between you and someone named Anthony Ramirez at

7     Jump Trading?

8     A.  Yes.

9     Q.  And this was dated in July of 2021, July 21, 2021?

10    A.  Yes.

11    Q.  And again, this involved Terraform business, correct?

12    A.  Yes.

13    Q.  And this is a document maintained in the regular course of

14    business activity by Terraform Labs?

15    A.  Yes.

16         MR. PATTON:  Your Honor, I offer Plaintiff's Exhibit

17    428.

18         MS. CUELLAR:  Your Honor, I don't understand the

19    relevance here.

20         THE COURT:  Well, I can't rule on that until someone

21    blows it up so I can read it.

22         Thank you.

23         MS. CUELLAR:  And your Honor, just to clarify, I think

24    he asked if it was a Terraform business document.  This was

25    actually produced by Jump, and it says time Ashwin.

1              MR. PATTON:  I think my questions were still accurate.

2              THE COURT:  Which part of this are you focusing on,

3    Mr. Patton?

4              MR. PATTON:  So, there are two pages to it, and I'm

5    focused on the first page here that we're looking at.

6              THE COURT:  The message to Mr. Curran or from

7    Mr. Curran?

8              MR. PATTON:  Both.

9              THE COURT:  Well, I think it's only very marginally

10   relevant, but I will allow it.  Received.

11             (Plaintiff's Exhibit 428 received in evidence)

12   BY MR. PATTON:

13   Q.  If we could go, so that we're reading it in order here, to

14   your message to Anthony Ramirez.  So again, he's somebody at

15   Jump Trading, correct?

16   A.  Yes.

17   Q.  Do you know what his position there was?

18   A.  I think it was business development for Wormhole.

19   Q.  OK.  And you've obviously had some conversation with him

20   before, right; you say:  Yeah, great chatting?

21   A.  Yeah.

22   Q.  And there is some discussion about Wormhole up top,

23   correct?

24   A.  Yes.

25   Q.  And then in the paragraph that begins "further," you say:

1    Further, we maintain relationships with media reporters

2    directly through TFL, our investors and via our contracted PR

3    firm, Melrose, who's been great.  If you need help to amplify

4    major news stories, feel free to reach out.  We're also

5    currently putting together an interview and marketing pipeline

6    for ecosystem projects and partners for some podcasts,

7    influencers and shows.  So if Jump is interested in getting

8    more exposure via visual and audio mediums, we'd also be happy

9    to help facilitate those opportunities as they arise.  It would

10   be great to get you guys some exposure for Jump Crypto once the

11   news breaks to help define the differentiation between Jump

12   Crypto and Jump Trading across these mediums.  Correct?

13            MR. PATTON:  Sorry.  That was a mouthful.

14   A.  Yes.

15   Q.  You recall that this was part of -- this was at a time when

16   Jump Crypto was on the verge of sort of becoming more public

17   about its role in cryptocurrency?

18   A.  Yes.  They were launching a new brand, Jump Crypto.

19   Q.  And you were proposing sort of some synergistic efforts

20   that Terraform Labs and Jump Crypto could work together on some

21   publicity, correct?

22   A.  Yes.  They asked fairly amateur questions about publicity,

23   so I provided some boilerplate answers for them.

24   Q.  You had more experience in the PR world of cryptocurrency,

25   correct?

O41Wter4                          Curran - Cross

1   A.  From my experience, yes.

2   Q.  It at least seemed like it to you, correct?

3   A.  Yes.

4   Q.  And then if we go up to Mr. Ramirez's response, he says:

5   Thanks for all the extra context here, Brian.  Re your

6   community's interest in Jump, we hope to provide some more

7   details soon.  Smiley face.  Right?  Excited about Comms

8   collaboration between Jump and TFL.  Sounds like mutually

9   beneficial synergy.  Please let me know how we can be additive

10  to you guys.  And then it ends, re podcasts, will definitely

11  get back to you here when it's time to throw Kanav Kariya out

12  in the wild.  Smiley face.  Do you see that?

13  A.  Yes.

14  Q.  Is it fair to say he's sort of politely saying sure, this

15  stuff would be good, but --

16          MS. CUELLAR:  Objection.  Speculation, your Honor.

17          THE COURT:  Well, let me hear the question.

18  Q.  -- but not quite yet?

19          THE COURT:  Well, if you're asking was that

20  Mr. Curran's understanding, you can answer that question.

21  A.  Yeah.  It seems that way.

22          THE COURT:  OK.  Are we through with this document?

23          MR. PATTON:  Yes, your Honor.

24          THE COURT:  All right.  I think we'll give the jury

25  their midafternoon break, because we're going until 4:30 today,

O41Wter4                         Curran - Cross

1   so we'll take a 15-minute break.

2                    (Continued on next page)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O41Wter4                        Curran - Cross

1           (Jury not present)

2           THE COURT:  You may step down as soon as the jury

3   leaves.

4           (Witness not present)

5           THE COURT:  Please be seated.

6           How much more do you have on cross?

7           MR. PATTON:  Five to ten minutes, your Honor.

8           THE COURT:  All right.

9           With respect to whether the Kwon investigative

10  testimony offered by Terraform can come in on the ground that

11  they had allegedly nothing to do with his flight and

12  disappearance, I think it still can't come in.  I don't see how

13  the jury can meaningfully distinguish between Do Kwon and the

14  company for virtually anything in this case and certainly not

15  for these purposes.  It would be an impossible task, and it

16  clearly is not admissible as offered by Do Kwon, so it won't

17  come in for Terraform either.

18          That still leaves the question of whether any specific

19  answer comes in under completeness, and you'll need to get me,

20  sometime this evening, whatever you want me to look at in that

21  regard.  And as I mentioned previously, if we have to play it

22  separately later on, we will, if any of it comes in.

23          Anything else we need to take up right now?

24          MR. CARNEY:  Your Honor, can I just alert you to one

25  timing issue that we want to get your consideration on?

1          We sort of moved quicker today than expected.

2          THE COURT:  That's good.  I'll try to do better.

3          MR. CARNEY:  And in part, the expert cross-examination

4    was a little shorter than we expected, and now with the Do Kwon

5    testimony that's going to be read in, it's going to be a lot

6    shorter.  So our next witness originally that -- we have two

7    more witnesses.  We had originally intended to put in a summary

8    witness, who's a short witness, and then our final witness was

9    going to be our expert.  But if --

10         THE COURT:  Being myself five foot six, I'm all for

11   short witnesses.

12         MR. CARNEY:  But if we were going to move forward

13   today with another witness --

14         THE COURT:  My apologies to Mr. Patton in that regard.

15         Go ahead.

16         MR. CARNEY:  So your Honor, if we were going to move

17   forward today with another witness after the Kwon testimony, we

18   would intend to go out of order and put our professor on, but I

19   did want to make the Court aware that because we thought he was

20   going tomorrow, we've only turned over the demonstratives to

21   the defendants today instead of the normal 7 p.m. the night

22   before.  So I just wanted your Honor to be able to take that --

23         THE COURT:  Well, let me ask defense counsel.

24         You might prefer for them to start their testimony of

25   this expert today just as you had the whole weekend to prepare

O41Wter4                         Curran - Cross

1    your cross for the other expert, and that was fortuitous; it

2    wasn't by any plan, but it worked out that way.  But if you

3    prefer not to have his direct testimony today, then we'll maybe

4    end early.  But what's your preference?

5              MR. PELLEGRINO:  Your Honor, I'd prefer more for

6    Professor Hendershott to be present to hear the testimony.

7              THE COURT:  No.  I've already --

8              MR. PELLEGRINO:  We didn't think you had ruled on

9    that, your Honor.

10             THE COURT:  Oh, I'm sorry.  I looked at the cases.

11   Thank you very much for saying that.  You're right.

12             I looked at the cases you presented.  They say that

13   it's still within the discretion of the Court even under the

14   amended rule, but for the reasons I've indicated, I think it's

15   inconsistent with the policy of the rule, and therefore, he

16   cannot be present.

17             MR. PELLEGRINO:  OK.  Because I didn't read those

18   cases in the record, could you just mark that as a court

19   exhibit, please, your Honor?

20             THE COURT:  I can't, but my law clerk can.

21             Here we are.  OK.  We're up to No. 4, I think, Court

22   Exhibit 4.

23             OK.  It's now marked as Court Exhibit 4.  If the SEC

24   wants to put in anything, even though I've already ruled in

25   your favor, if you want to put in some case law, we'll mark

O41Wter4                           Curran - Cross

1    that as Court Exhibit 5.

2              MR. CARNEY:  Thank you, your Honor.

3              MR. PELLEGRINO:  Thank you, your Honor.

4              In answer to your prior question, we will proceed

5    today if your Honor would like to.  We just have one summary

6    exhibit objection that needs to be dealt with, and that could

7    be dealt with whenever the Court would like.

8              MR. CARNEY:  And just to clarify, your Honor, we were

9    saying that we could go out of order and that summary witness

10   would not go on today.

11             THE COURT:  Yes.  They want to start with their other

12   expert.

13             MR. LAFFERMAN:  Your Honor, Matthew Lafferman for

14   Terraform Labs.

15             The issue with the exhibit is we have an objection to

16   the summary exhibit.

17             THE COURT:  No, no, no.

18             MR. LAFFERMAN:  We want to give them a chance, your

19   Honor --

20             THE COURT:  Wait.  We're not getting to the summary

21   witness today.  We're getting out of order to the other expert.

22             MR. LAFFERMAN:  Yes, your Honor, but we just wanted to

23   raise our objection so that if --

24             (Indiscernible overlap)

25             THE COURT:  Well, you'll have plenty of opportunity to

O41Wter4                        Curran - Cross

1    do that, but not right now, when we're trying to deal with the

2    immediate question, which is -- so I take it that given my

3    ruling on Mr. Hendershott, that the preference of the defense

4    is that we move forward with the other expert witness today;

5    yes?

6              MR. PELLEGRINO:  We should proceed, your Honor.

7              THE COURT:  Very good.  OK.

8              All right.  Yes.

9              MS. CUELLAR:  Apologies, your Honor.  I know we all

10   need a brief restroom break, but I just wanted to flag that

11   based on the cross-examination, we do believe the door has been

12   opened to Plaintiff's Exhibit 663.

13             THE COURT:  Yes, let me see that, because I knew you

14   were going to say that.  So let me just see the exhibit.

15             MS. CUELLAR:  It's a podcast, and we intend to play a

16   clip, your Honor.  I believe Mr. Haywood can play the clip for

17   you.

18             THE COURT:  Yes.  Can you do that right now?

19             MS. CUELLAR:  Before he does, your Honor, the argument

20   is Mr. Patton went over in detail with the witness about

21   partners are asking why and Jeff Kuan is reaching out to

22   partners.  And here, Do Kwon is asked, about halfway through,

23   whether partners reached out, and he says they didn't.

24             (Audio played)

25             MS. CUELLAR:  This is an interview.  So this is one of

1  the interviewers from terabyte asking a question, and then you

2  have Mr. Do Kwon's response, your Honor.

3          THE COURT:  OK.  Continue.

4          (Audio played)

5          THE COURT:  OK.  Any objection?

6          MR. PELLEGRINO:  Yes, your Honor.

7          Go ahead.

8          MR. PATTON:  Your Honor, I'll just say it.  It's

9  not -- I believe the SEC was saying that this in some way is, I

10 don't know, impeaching something.  I mean just because Jeff

11 Kuan is saying I'm reaching out to partners and giving them

12 information to allay their concerns doesn't mean that this is

13 contradicting that.  We have no idea what Do and Jeff were

14 saying about that, and it's also very vague.  I mean he's sort

15 of saying not really.  Like what -- it's just, it's hardly door

16 opening that a discussion between Brian Curran and Jeff Kuan

17 about what was being provided to partners and investors is

18 contradicted in some way by this.  It's actually fairly

19 consistent.

20         THE COURT:  Well, if it's fairly consistent, of

21 course, you withdraw your objection and welcome it, right?

22         MR. PELLEGRINO:  Well, no.  I think, your Honor, the

23 objection --

24         MR. PATTON:  Now I'll let my cocounsel take over.

25         MR. PELLEGRINO:  The objection stands, your Honor.  As

O41Wter4                          Curran - Cross

we've pointed out in our responses to the requests for

production, we did not commit to producing publicly available

documents.  This has been publicly available for three years.

It was not tested in discovery.

THE COURT:  The question is much more narrow than what

you're addressing.  On the grounds of failure to produce this

earlier, I excluded it from the direct.  A document is never

excluded if the door is then opened to the document.  You can

have it in your back pocket and never have shown it to your

adversary, but if the adversary opens the door, then in the

interest of truth, the document then comes in.  That's sort of

101 rules of evidence.  It's the same reason why you never have

to mark in a pretrial consent order what you're using on

cross-examination.  So the real question then is whether the

door has been opened.

Let me hear the SEC on that.

MS. CUELLAR:  If we could display Plaintiff's Exhibit

71, please, and go to the last page and focus on the final four

lines.

I don't believe it's displayed here.

And if we focus on the line that says Do says, your

Honor, Mr. Patton specifically went over this with Mr. Curran:

Do says we can relay the stability reserve development through

market makers to Nerve plus Curve to ease their concerns.  He

specifically went over this.  He specifically went over that

O41Wter4                        Curran - Cross

1    they were easing partners' concerns, and we just heard what Do

2    Kwon said in that podcast.  It directly contradicts this and

3    the testimony that Mr. Patton is getting out on the witness

4    stand.

5              MR. PATTON:  Your Honor, I guess two things to say.

6              One, I don't think it does contradict it.  But

7    secondly, the SEC introduced that document and asked questions

8    about those statements before I crossed on it.

9              THE COURT:  Yes, but I warned defense counsel that in

10   their cross they should not open the door to anything else, and

11   you went further into that.

12             I will allow this document to be used.  My reason for

13   that is that I think it contradicts the overall picture that

14   has been portrayed on cross, and of course, I agree that its

15   relevance is somewhat limited because there are things in it

16   that are consistent with the defense, but then there's no

17   prejudice to that extent.  Also, since I have very broadly

18   interpretive relevance in allowing in the most recent document

19   offered by the defense, I think it's only fair to take an

20   equally broad view of relevance on redirect.  So that's my

21   ruling.

22             We'll take no more than five minutes and then

23   reconvene.

24             (Recess)

25

1           THE COURT:  Please be seated.  Let's bring the jury in

2    and let's bring in the witness.

3           (Jury present)

4           THE COURT:  Please be seated.

5           All right, counsel.

6           MR. PATTON:  Could we please have, for the witness

7    only, Plaintiff's Exhibit 86.

8    BY MR. PATTON:

9    Q.  Mr. Curran, I realize there's no year date on this, but

10   you've seen this document before in the course of this

11   litigation, correct?

12   A.  Yes.  I don't remember it, though.

13   Q.  This is a Slack conversation?

14          MS. CUELLAR:  Your Honor, objection.  The witness

15   doesn't remember the document and cannot authenticate it.

16          MR. PATTON:  Your Honor, may we approach?

17          THE COURT:  All right.

18          (Continued on next page)

19

20

21

22

23

24

25

O41HSec5                          Curran - Cross

1           (At sidebar)

2           MR. PATTON:  So, your Honor, I thought we had just

3    resolved the issue that plaintiff's exhibits were ——

4           THE COURT:  Were authenticated?

5           MR. PATTON:  Yes, exactly.

6           MS. CUELLAR:  Mr. Curran has no memory of this

7    conversation.  He actually —— we put it on exhibit list.

8           THE COURT:  Let me ask you a question.  I understand

9    that you're saying he's irrelevant to this is what you're

10   saying.  That's a different question than authentication.  But

11   let me ask you this:  Has he heard the podcast that I've now

12   said you can ——

13          MS. CUELLAR:  (Nods head.)

14          THE COURT:  So he has knowledge of that.

15          MS. CUELLAR:  I had him listen to it yesterday, your

16   Honor.

17          THE COURT:  So ——

18          MS. CUELLAR:  But Mr. Curran was saying ——

19          THE COURT:  Assuming authentication, I think you're

20   right that that has been established by the plaintiffs putting

21   it on their list.  If he knows nothing about it, what's the

22   point of questioning him?

23          MR. PATTON:  Your Honor, he did respond to questions

24   on this in his deposition.

25          MS. CUELLAR:  No, he didn't.

O41HSec5                        Curran – Cross

1              THE COURT:  Well, from personal knowledge?

2              MR. PATTON:  I believe so.  I believe this was a

3    deposition ——

4              MS. CUELLAR:  No, he didn't.

5              MS. MEEHAN:  It wasn't produced to us.

6              MS. CUELLAR:  It wasn't produced to us until January,

7    after the close of discovery.

8              MR. PATTON:  Then my mistake.  I thought this was

9    shown to him in the deposition.

10             THE COURT:  There we go.  Sounds like it's irrelevant.

11             (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court; jurors present)

2          THE COURT:  So, ladies and gentlemen, you may wonder

3     why we have sidebars, and we will try to keep them more limited

4     than today.  At a sidebar, before I can rule on whether to

5     admit testimony, what I hear is what's going to follow, what

6     are going to be the next four or five or six things that are

7     going to come up, and if I then determine that it's not

8     admissible, then you would have heard five minutes or ten

9     minutes of testimony that you would have to somehow exclude

10    from your mind, which is not an easy thing to do.

11         So rather than put you into that awkward situation, we

12    sort it all out at the sidebar.  And then if I say it is

13    admissible, of course, then you hear it right away; and if I

14    say it's not admissible, then you never hear it.  And that

15    prevents you having to kind of —— there are occasions when a

16    jury is instructed:  Now, what you just heard for the last ten

17    minutes you should put out of your mind, but it's not so easy

18    to do, and this avoids it.  That's why we have sidebars, but

19    we'll to keep them to a minimum.

20         Go ahead, counsel.

21         MR. PATTON:  Thank you, your Honor.

22    BY MR. PATTON:

23    Q.  You believed, well into your return to Terraform Labs after

24    you had left and come back, that Jump didn't bail out UST; they

25    just provided sufficient liquidity ——

1          MS. CUELLAR:  Objection.  Relevance, your Honor.

2          THE COURT:  Let me hear the whole question.

3   Q.  They just provided sufficient liquidity when Terraform

4   wasn't able, on short notice, to provide that liquidity due to

5   the banking issues, correct?

6          THE COURT:  I don't think his belief is relevant.

7   Sustained.

8   Q.  Even after the conversations you had with Do in 2021 about

9   Jump's role in the repeg in 2021, you understood that Jump's

10  role in the repegging was to provide liquidity, correct?

11  A.  Yeah, that's what market making is.

12         MR. PATTON:  I want to pull up Plaintiff's Exhibit 73

13  that's in evidence, and if we could go —— yes.

14  Q.  Mr. Curran, you recall being questioned on direct about

15  this statement here:  "LOL, apparently during the May crash,

16  TFL's withdrawals from institutions were blocked because of the

17  size and urgency that would've been used to market make the

18  peg.  So Do said if Jump hadn't stepped in, we actually

19  might've been F'd.  LOL," correct?

20  A.  Yes.

21  Q.  And that was on October 6, 2021, right?

22  A.  Yes.

23  Q.  So this was roughly a month or so beyond the conversation

24  you described with Do about Project Dawn, right?

25  A.  Correct.

O41HSec5                          Curran - Cross

1   Q.  And can you walk me through this exchange.  This is with

2   Jeff Kuan, right?

3   A.  Yes.

4   Q.  And it looks like it begins here at 6:39.  And assuming

5   that's Greenwich Mean Time, right?

6   A.  Yes.

7   Q.  With some sort of phone call, right?

8   A.  Yes.

9   Q.  And then there are a couple of exchanges about didn't get

10  any and sold out instantly.  Fair to assume that was about

11  some, like, I don't know, non-Terraform business matter?

12  A.  Yeah.  I think it was about, like, some stupid NFT that he

13  was trying to buy.

14  Q.  OK.  And then you say, "LOL," and he says, "I am FAO."

15  Remind me of my social media acronyms.  What does that mean?

16  If it contains an obscenity, you can shorten it however you

17  like.

18  A.  Yeah, just laughing my FA off.

19  Q.  Got it.  I'm laughing my FA off.  Fair enough?

20  A.  Yes.

21  Q.  OK.  And then three minutes later is where you then talk

22  about —— well, comes your text that I read, right?

23  A.  Yes.

24  Q.  Do you know —— like, would you agree with me it doesn't

25  seem to follow from the previous texts there?

O41HSec5                     Curran - Cross

1   A.  Yeah, I mean, we discussed several things on the call.  So

2   I could see how, from a third-party view, it might look like

3   that.

4   Q.  Do you recall what prompted that, you to say that?

5   A.  Yes, my conversation with Do Kwon.

6   Q.  That you had had a conversation with Do around October 6?

7   A.  Yes.

8   Q.  And so you were relaying something he was telling you right

9   around this time?

10  A.  Yes.

11  Q.  I want to talk to you about the Luna Foundation Guard.

12          OK.  We talked about one of the responses that

13  Terraform took in response to community concerns about the

14  depeg was that it provided, ultimately, some more transparency

15  about the use of stability reserves, correct?

16  A.  Could you repeat the question.

17  Q.  Yeah, sorry.  That was a long one.

18          We had some questioning a little while ago.  If you

19  remember, you were talking about some community concerns about

20  how Terraform was using stability reserves to defend the peg,

21  correct?

22  A.  Yes.

23  Q.  And that was right around the time of the May '21 depeg,

24  correct?

25  A.  Correct.

1    Q.  And, ultimately, in response to those concerns, we talked

2    in a little more detail about it, but — but Terraform issued a

3    public governance proposal, right?

4    A.  Yes.

5    Q.  That was meant to address some of these transparency

6    concerns about the use of a stability reserve, correct?

7    A.  Yes.

8    Q.  Another thing it did with respect to discussing reserves to

9    defend the peg was to talk about the establishment of something

10   called the Luna Foundation Guard, correct?

11   A.  Correct.

12   Q.  Generally referred to as LFG, right?

13   A.  Yes.

14   Q.  And that was something that was — the development was

15   begun in the fall of 2021, right?

16   A.  Yes.  From my understanding, it took quite a while to

17   actually get up and running.

18   Q.  I think it was ultimately announced in the winter of 2022,

19   correct?

20   A.  Winter of — yes.

21   Q.  Right?

22   A.  Yeah.

23   Q.  The LFG was created as a reserve fund meant to provide

24   resources and liquidity in the event the peg needed defending,

25   correct?

1    A.  Generally, yes.

2    Q.  And it raised money from venture capitalists, right?

3    A.  Yes.

4    Q.  And the fundraising was public, correct?

5    A.  Yes.

6    Q.  And there were, ultimately, press releases about it, right?

7    A.  Yes.

8    Q.  And this was all prior to the 2022 depeg, correct?

9    A.  Correct.

10          MR. PATTON:  And could we pull up, for the witness

11   only, Plaintiff's Exhibit 48.

12   Q.  Do you recognize it as an email from you in January —— on

13   January 20, 2022, from your Terra email account to a number of

14   other Terra employees and somebody at Tribe Capital?

15   A.  Yes.

16   Q.  And this is about the Luna Foundation Guard and Forex

17   reserve announcements, right?

18   A.  Yes.

19   Q.  And, again, this was an email discussing Terraform

20   business, correct?

21   A.  Yes.

22   Q.  And this was kept in the normal course of Terraform's

23   business?

24   A.  Yes.

25          MR. PATTON:  Your Honor, I offer Plaintiff's

```
1   Exhibit 48.

2              MS. CUELLAR:  No objection.

3              THE COURT:  Received.

4              (Plaintiff's Exhibit 48 received in evidence)

5   BY MR. PATTON:

6   Q.  And this is an exchange between —— sorry.  Oh, OK.  Thank

7   you.

8              This is an exchange between yourself and someone named

9   Matt Tolve at Tribe Capital, correct?

10  A.  Yes.

11  Q.  What's Tribe Capital?

12  A.  I think it's a venture capital firm.

13  Q.  And they are involved in the formation of LFG, correct?

14  A.  I think they were just investors looking to do joint PR.

15  Q.  Correct.  They were investing money in LFG, and this is an

16  email exchange about the public announcement of that, correct?

17  A.  Correct.

18  Q.  And if we go to the second page, Jeff Kuan here is talking

19  about, first, one of the things to consider is that the

20  announcement will be broken down into two parts.  First, there

21  will be the formation of the Luna Foundation Guard (LFG), its

22  intended mission/objective, and the LFG website; and then, two,

23  the UST Forex reserve announcement by the LFG.

24             Do you see that?

25  A.  Yes.
```

1  Q.  And, in fact, this ended up taking place, correct, these

2  announcements?

3  A.  Yes.

4  Q.  The plan down below:  We're announcing the formation of the

5  LFG in the Republic of Singapore tomorrow, Wednesday,

6  January 19, at 4:30 p.m. Pacific Standard Time, correct?

7  A.  Yes.

8  Q.  And then there's some further discussion about hold off on

9  announcing the UST Forex reserve because LFG is going to

10  announce that after they've been announced, correct?

11  A.  Yes.

12  Q.  And, again, this was a stability reserve meant to be used

13  in the event that it was needed to help defend the peg,

14  correct?

15  A.  Yes.

16  Q.  And, ultimately, during the May 2022 depeg event, as you

17  discussed on direct, this reserve was, in fact, used, correct?

18  A.  Yes.

19  Q.  To the tune of more than a billion dollars, correct?

20  A.  Yes.

21          MR. PATTON:  If we could pull up Plaintiff's 353

22  that's in evidence.

23  Q.  Do you recall you were shown this tweet by Do Kwon on

24  May 9, 2022, when you were on your direct examination?

25  A.  Yes.

1    Q.  And this was during the — the sort of what ended up being

2    sort of the catastrophic depeg in 2022, correct?

3    A.  Correct.

4    Q.  And in the midst of it, Do Kwon tweets out, "Deploying more

5    capital — steady, lads," correct?

6    A.  Yes.

7    Q.  In fact, that was true, capital was, in fact, being

8    deployed in what ended up being a failed effort to sustain the

9    peg, correct?

10   A.  Correct.

11           MR. PATTON:  No further questions, your Honor.

12           THE COURT:  Redirect.

13   REDIRECT EXAMINATION

14   BY MS. CUELLAR:

15   Q.  Now, on cross — or, actually, the Court asked you a

16   question about on-chain and off-chain.  What is the difference

17   between on-chain and off-chain?

18   A.  On-chain means anything settled on a blockchain.  Off-chain

19   refers to any other type of financial transaction not settled

20   on a blockchain.

21   Q.  Would that include central exchanges?

22   A.  Yes.

23   Q.  So were you on any of the calls with Jump and Do Kwon?

24   A.  No.

25   Q.  Do you have any personal knowledge of how Jump used its

O41HSec5                        Curran - Redirect

1    approximate hundred million?

2    A.  No.

3    Q.  Do you know whether it was on-chain?

4    A.  No.

5    Q.  Do you know whether it was off-chain?

6    A.  No.

7         MS. CUELLAR:  And if we could please display

8    Plaintiff's Exhibit 407, page 2, and if we could focus on that.

9    Q.  Do you recall being asked questions about this on cross?

10   A.  Yes.

11   Q.  And, in fact, do you recall being asked questions under

12   Jeff Kuan:  "No. 2, told them we're working on it.  Have

13   deployed stability funds through MM.  Sent post of Jump's new

14   proposal to mitigate future problems."

15         What's MM here?

16   A.  Market maker.

17   Q.  And what was Jump's new proposal?

18   A.  It was the Prop 90 to increase on the on-chain redemption

19   capacity.

20   Q.  Is that the one you talked about quite a bit on direct and

21   cross?

22   A.  Yes.

23   Q.  Does, here, Jeff Kuan say deploying a hundred million

24   dollars through Jump?

25   A.  No.

O41HSec5                          Curran - Redirect

 1  Q.  And who does he say he's speaking to here?

 2  A.  Just partners.

 3  Q.  Are partners retail investors and the public?

 4          MR. PATTON:  Objection.

 5          THE COURT:  Overruled.

 6  A.  No.

 7          MS. CUELLAR:  We can take that down, and if we can go

 8  to Plaintiff's Exhibit 57.

 9          Don't worry.  We won't make anyone go through all this

10  again.

11  Q.  If we can go to the last page, and if we could focus on

12  tweet 28.

13          Is this the only mention of Jump Trading in these

14  tweets?

15  A.  Yes.

16  Q.  So does the only mention of Jump Trading concern their

17  proposal?

18  A.  Yes.

19  Q.  Did you ask Do Kwon whether you could include Jump's

20  intervention in buying of UST?

21  A.  Yes.

22  Q.  And what did he say?

23  A.  He said no.

24  Q.  Now, do you know whether Do Kwon gave an interview shortly

25  after the depeg event in May of 2021?

O41HSec5                        Curran - Redirect

1    A.  He gave a lot of interviews, so it would have to be a

2    specific one.

3    Q.  Did you have an opportunity to review an interview on a

4    podcast called "Terra Bites"?

5    A.  Yes.

6    Q.  Now, who was interviewed in this podcast?

7    A.  Do Kwon.

8    Q.  And is that Plaintiff's Exhibit 663?

9    A.  I don't ——

10             THE COURT:  Are you asking him that?

11             MS. CUELLAR:  I'm sorry.  Apologies.

12   Q.  Did you have an opportunity to review the entire podcast?

13   A.  Yeah.  I skimmed through some parts, but . . .

14   Q.  Did you recognize Do Kwon's voice?

15   A.  Yes.

16             MS. CUELLAR:  And, your Honor, at this time we move to

17   admit Plaintiff's Exhibit 663.

18             THE COURT:  Yes, the objections made at the sidebar

19   are preserved, but the exhibit is admitted.

20             (Plaintiff's Exhibit 663 received in evidence)

21             MS. CUELLAR:  And, Mr. Haywood, could we please play

22   the clip that was prepared.

23             (Audio played)

24             THE COURT:  Excuse me.  Excuse me.

25             MS. CUELLAR:  Apologies.

O41HSec5                        Curran - Redirect

1            THE COURT:  The person who's talking now is the

2     interviewer, is that right, as opposed to Do Kwon?

3            THE WITNESS:  Yes.

4            THE COURT:  OK.

5            MS. CUELLAR:  Thank you, your Honor.

6            (Audio played)

7     BY MS. CUELLAR:

8     Q.  And here, Mr. Curran, did Do Kwon mention Jump's role in

9     purchasing tens of millions of UST?

10    A.  No.

11    Q.  Did he mention Curve's concerns or questions?

12    A.  No.

13    Q.  And I think, finally, on cross you were asked about

14    Plaintiff's Exhibit 355.

15            If we could display it.

16            I think you were asked whether this is an email Jeff

17    Kuan sent to investors.  Do you remember that?

18    A.  Yes.

19    Q.  Does anywhere in this email does Jeff Kuan tell the

20    investors that Jump intervened to purchase tens of millions of

21    UST?

22    A.  Not that I see, no.

23    Q.  Do you need a moment to review?

24    A.  Yes, please.  No.

25            MS. CUELLAR:  No further questions, your Honor.

O41HSec5                           Curran - Recross

1              THE COURT:  Anything else?

2              MR. PATTON:  Yes, your Honor.

3     RECROSS EXAMINATION

4     BY MR. PATTON:

5     Q.  Mr. Curran, by the way, you say you skimmed this podcast.

6     Do you recall about how long this podcast interview is?

7     A.  About an hour.

8     Q.  About an hour.

9              So in the clip that the SEC just played for you, one

10    of the things that Do Kwon says in response to a fairly, would

11    you agree with me, lengthy question by the interviewer, the

12    response we just heard there?

13    A.  What about the response?

14             THE COURT:  No, no, he's asking —— I think we can take

15    judicial notice that it was an endless question.

16             MR. PATTON:  Thank you, your Honor.

17    Q.  And in response, Do Kwon says:  "Yeah, although I think

18    there's a version of the world where UST would have done even

19    better during market crashes.  So if we were able to inspire

20    confidence and able to set up clear contingency plans around,

21    like, market pressures of this magnitude, I think we could have

22    provided pathways for people, for capital, to fly into the

23    Terra ecosystem instead of flying out," right?

24    A.  That's what he said, yes.

25    Q.  And, in fact, some of the steps that Terraform took very

O41HSec5                        Curran - Recross

1    publicly later in 2021 and in 2022 were meant to do just what

2    he's talking about here, correct?

3    A.   Some of them, yes.

4    Q.   Providing more transparency around the stability reserves,

5    right?

6    A.   Yes.

7    Q.   And creating very publicly the Luna Foundation Guard,

8    right, with its very express purpose of creating a reserve to

9    help defend the peg, correct?

10   A.   Correct.

11              MR. PATTON:  No further questions, your Honor.

12              THE COURT:  Anything else?

13              MS. CUELLAR:  No, your Honor.

14              THE COURT:  Thank you very much.  You may step down.

15              THE WITNESS:  Thank you, your Honor.

16              THE COURT:  Please call your next witness.

17              (Witness excused)

18              MS. CUELLAR:  Can I first read a stipulation, your

19   Honor?

20              THE COURT:  Yes.

21              MS. CUELLAR:  This is a stipulation regarding Jeffrey

22   Kuan's invocation of his rights under the Fifth Amendment to

23   the Constitution of the United States.

24              In 2021, Jeffrey Kuan was the head of business

25   development for Terraform Labs PTE Ltd.  Mr. Kuan's attorney

1    has advised the parties that if Mr. Kuan were called to testify

2    at trial, Mr. Kuan would invoke his Fifth Amendment rights and

3    decline to answer questions about events that happened during

4    his employment at Terraform Labs.

5           Thank you, your Honor.

6           THE COURT:  I should mention, ladies and gentlemen,

7    and I will give you much more detailed instructions on this

8    later, when someone invokes their Fifth Amendment

9    constitutional right not to testify in a civil case, and this

10   is a civil case, the jury may, but is not required to, draw an

11   adverse inference against that person on the theory that

12   they're invoking the Fifth because, if they gave the truthful

13   answers, it would incriminate them with respect to the

14   allegations made.

15          I'll give you much more detailed instructions on that

16   later.  For now, I just want to flag for you you can draw that

17   inference if you choose, but you are also free not to draw that

18   inference.

19          Go ahead.  Next.

20          MR. CONNOR:  The SEC calls the deposition testimony of

21   Do Kwon.

22          THE COURT:  OK.  So this is testimony that was given

23   by Do Kwon at an earlier stage before the SEC, and we've got a

24   reader.

25          MR. CONNOR:  Your Honor, I apologize, but could we

O41HSec5                          Curran - Recross

1    have a two-minute sidebar with defense counsel before we get

2    started with the questions?

3              THE COURT:  Yes.  OK.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O41HSec5                        Curran - Recross

1              (At sidebar)

2              MR. CONNOR:  One of the things that we were planning

3     on doing as part of this testimony was introducing, under 609,

4     the passport forgery conviction of Mr. Kwon, and I understand

5     defense counsel has an objection, but I didn't want to raise

6     that before the jury.

7              MR. FERRARA:  Given your —— I'm sorry.

8              THE COURT:  Go ahead.

9              MR. FERRARA:  Given your Honor's sort of

10    reconsideration on the designations, we think that it changes

11    the admissibility analysis on the conviction.  We understood

12    that your Honor was admitting the conviction to impeach.

13             THE COURT:  My recollection was that I had asked

14    counsel at the time everything was coming in, I'd ask SEC

15    counsel to indicate to what specific answers this was

16    impeachment, and they never did that.  So how is the jury going

17    to evaluate this if we don't know —— some of you indicated from

18    the beginning that some of what you're asserting he's saying is

19    truthful; you're offering for its truth as admissions.  So how

20    do they know what the impeachment applies to?

21             MR. CONNOR:  I could point that out as —— like, when

22    we get to that part of the transcript, I can't point it out.

23             THE COURT:  Is it the kind of thing where it's all one

24    or all the other, or it goes back and forth?

25             MR. CONNOR:  It goes back and forth.  A lot of it is

O41HSec5                          Curran - Recross

1    background information we want to get in front of the jury, so

2    it's not all impeachment.

3              MR. FERRARA:  May I raise a related problem?  Your

4    Honor, when we were designating, I understood the point that it

5    impeaches certain things that perhaps we think is truthful; the

6    SEC does not.  And this is not a point about the SEC —— gave

7    objection to that, but one could see that if a party was

8    allowed to designate, it could result in gamesmanship by a

9    party to allow them to designate certain portions of a

10   deposition only for the purpose of introducing a conviction to

11   impeach him.  So we think just ——

12             THE COURT:  Now let me ask you this:  If I allow in

13   some of the testimony you've offered on the grounds of

14   completeness, would you then agree that if I otherwise exclude

15   the conviction, that it then comes in?

16             MR. FERRARA:  If your Honor excludes the conviction, I

17   promise your Honor we would be very judicious about what we

18   would suggest ——

19             THE COURT:  No, no, that's not the question.  The

20   question is much more specific, and it's to both of you.

21             If I exclude the conviction, are you withdrawing all

22   of your claims of completeness?

23             MR. PELLEGRINO:  Do you want to take a minute?

24             MR. FERRARA:  For example, your Honor, for example,

25   one of the ——

1          THE COURT:  I know I can't get a yes-or-no answer on

2     this.

3          MR. FERRARA:  The answer is probably.  For instance,

4     if your Honor said, well, you think that Do Kwon's explanation

5     of how Chai worked needs to be offered for completeness, I

6     understand the point and probably wouldn't offer that.  On the

7     other hand, if, for instance, one designation I thought for

8     completeness is that he had a particular director who was also

9     —— who stepped in for a director who left.

10         THE COURT:  All right.  Here's what I'm going to do

11    now:  I'm going to tell the jury now that some of what's being

12    offered is being offered for its truth, and some of it the SEC

13    believes were false statements.  I'm not going to be putting in

14    the conviction right now.  I will reconsider that, and I'm

15    leaning very strongly towards letting it in if you persuade me

16    that any of the other stuff that you've marked comes in, but

17    I'm not making a final decision on that.

18         MR. CONNOR:  Your Honor, the only thing, I don't want

19    to overstate what we're doing in terms of putting in false

20    statements.  I don't want to overstate what we're doing in

21    terms of putting in what we view to be false statements.  I

22    think in large part what we're putting in is background

23    contracts, stuff like that.  I would suggest can we just read

24    the testimony, and then we can figure it out afterwards?

25         THE COURT:  OK.

O41HSec5                         Curran - Recross

1            MR. FERRARA:  Thank you, your Honor.

2            (Continued on next page)

O41HSec5                         "Kwon"

1                    (In open court; jurors present)

2                    THE COURT:  This is called recidivism.

3                    MR. CONNOR:  (Reading)

4    "Q.  Please state your first name and spell it for the record.

5    "A.  Do Hyeong Kwon, last name K-w-o-n."

6                    THE COURT:  I'm sorry, counsel.  I think we need to

7    tell the jury when this occurred.

8                    MR. CONNOR:  Yes.  This occurred on August 24, 2022.

9                    THE COURT:  OK.

10   "Q.  Are you known by any other names?

11   "A.  I'm known by most people as Do Kwon, D-o, K-w-o-n.

12   "Q.  And then I believe you said after that you started

13   Terraform Labs, is that correct?

14   "A.  Correct.

15   "Q.  When was that?

16   "A.  Late 2017 through early 2018.

17   "Q.  And did you start it with anyone?

18   "A.  I started Terraform Labs with Daniel Shin.

19   "Q.  And you said that you started it in late 2017 or early

20   2018, and then it became incorporated near the end of 2018, is

21   that correct?

22   "A.  I don't recall the precise timeline of incorporation.

23   "Q.  At the time of incorporation, what was the ownership?

24   "A.  I owned 50 percent of Terraform Labs.

25   "Q.  And who owned the other 50 percent?

O41HSec5                          "Kwon"

1    "A.   Daniel Shin.

2    "Q.   And just so the record is clear, is this Terraform Labs

3    PTE Limited?

4    "A.   Yes.

5    "Q.   What is the current ownership structure of Terraform Labs?

6    "A.   I own 92 percent of Terraform Labs.   Daniel Shin owns

7    8 percent.

8    "Q.   Who were the directors of Terraform Labs at the time of

9    incorporation?

10   "A.   Myself, Dan Shin, and a nominee director appointed by a

11   corporate secretarial service in Singapore.

12   "Q.   Who are currently the directors of Terraform Labs?

13   "A.   Just myself.

14   "Q.   When did Mr. Shin stop being a director of Terraform Labs?

15   "A.   Sometime in 2020.   I don't recall the exact timeline.

16   "Q.   And you're also the chief executive officer of Terraform

17   Labs, correct?

18   "A.   Correct.

19   "Q.   And you're the final decision maker for Terraform Labs.

20   "You may answer, Mr. Kwon.

21   "A.   Has the objection been resolved?

22   "Q.   You may answer, Mr. Kwon.

23   "A.   OK.   Yes, for matters that are brought to my attention, I

24   would be the final decision maker.

25   "Q.   And Terraform Labs Limited BVI, that's 100 percent owned

O41HSec5                         "Kwon"

1    by Terraform Labs PTE Ltd., correct?

2    "A.  Yes.

3    "Q.  OK.  How many luna tokens were minted when it launched?

4    "A.  One billion.

5    "Q.  At the time of launch, how much tokens did you own?"

6          MR. CONNOR:  Directing your attention to page 131, on

7    line 4.

8    "A.  I purchased 70 million tokens from Terraform Labs, which

9    haven't been delivered yet.

10   "Q.  At what price did you purchase them?

11   "A.  I'm not sure.  A few cents.

12   "Q.  Did TFL sell Luna to investors?

13   "A.  We — yes, we did have a presale of Luna tokens, yes.

14   "Q.  Did it sell additional Luna tokens after the presale?

15   "A.  It did.

16         MR. CONNOR:  Turning your attention to the second

17   volume of the transcript.

18   "Mr. Kwon, I'm showing you what has been marked as Exhibit 72.

19   It is a screenshot of a Signal conversation between Kanav

20   Kariya and yourself.

21   "A.  Mr. Landsman:  Is there a way to rotate it 90 degrees?

22         MR. CONNOR:  Your Honor, at this time we would move

23   for the admission of Exhibit 576, which was the deposition

24   Exhibit 72.

25         MS. STOVALL:  Objection.  401, 403, your Honor.

O41HSec5                           "Kwon"

1          THE COURT:  Overruled.  Received.

2          (Plaintiff's Exhibit 576 received in evidence)

3          MR. CONNOR:  Directing your attention to page 174,

4    line 24.

5    "A.  Mr. Landsman, is there a way to rotate it 90 degrees?

6    "Q.  I do not know.  Let me see if I can.  I don't believe

7    there is.  But given that it's just short lines, I don't think

8    it should be a big issue"

9          MR. CONNOR:  Directing your attention to line 11.

10   "A.  OK.  I see the screenshot.

11   "Q.  And this is a conversation between you and Mr. Kariya from

12   — well, part of a conversation.  This was on March 8, and you

13   write — or, sorry.  Mr. Kariya writes:

14          "'You guys aren't holding 540 Luna, though, right?'

15          "And I assume that's 550 million.  And you write:

16          "We are.  Just can't use all of that on discretion.

17   We have mandates to use 200 million for market stabilization

18   purposes.

19   "A.  Who is this with, the conversation?

20   "Q.  It's between you and Mr. Kariya, Kanav Kariya, at Jump

21   Trading.

22   "A.  OK.  OK.  I don't recall this conversation.

23   "Q.  And you indicate that — you indicate that Luna's holdings

24   on the 540 million Luna, is that correct?

25   "A.  Well, that's the — the recipient of this conversation is

O41HSec5                          "Kwon"

1    saying that.

2    "Q.  Does that sound in the ballpark figure of the amount of

3    Luna that TFL held in March of 2021?

4    "A.  I don't recall."

5              MR. CONNOR:  Directing your attention to page 186,

6    line 7.

7    "Q.  Do you know that Terraform Labs had a Binance account?

8    "A.  Yes, Terraform Labs did have a Binance account."

9              MR. CONNOR:  Directing your attention to page 263,

10   line 2.

11   "Q.  OK.  Is that your email address @terra.money?

12   "A.  It is."

13             MR. CONNOR:  Turning your attention to page 287,

14   line 7.

15   "Q.  And what services, if any, did Jump Trading provide to

16   Terraform Labs?

17   "A.  It was — so over the years, from 2019, I had developed a

18   personal relationship with several officers and employees of

19   Jump Trading.  I'd run into them at conferences.  I just

20   started to hang out with several of the staff.  They worked

21   with us in a number you have different capacities.  There were

22   major purchases of the ANC token.  They ended up acquiring a

23   lot of purchase options for Luna.  And my understanding was,

24   even though it wasn't a contractual relationship, that they

25   were heavy traders of a lot of the assets in the Terra

O41HSec5                          "Kwon"

1    ecosystem.

2    "Q.   And did Terraform Labs loan Luna tokens to Jump Trading?

3    "A.   Yes.

4    "Q.   Who is Bill DiSomma?

5    "A.   He is one of the two cofounders of Jump Trading.

6    "Q.   And do you know Mr. DiSomma personally?

7    "A.   Yes.

8    "Q.   Did you negotiate any of the agreements that Terraform

9    Labs entered into with Jump Trading with Kanav Kariya?

10   "A.   Yes.

11   "Q.   And do you recall in May 2021 the price of UST went below

12   $1?  Do you recall that?

13   "A.   May of which year?

14   "Q.   2021.

15   "A.   Yes, it often went below $1.

16   "Q.   Do you recall it went down to .93 cents?

17   "A.   That sounds like the right ballpark, yes.

18   "Q.   So you think it's probably likely that you did talk to

19   Mr. Kariya about the drop of UST price from $1 to .93 cents, is

20   that right?

21   "A.   I think it likely would have been a topic of conversation,

22   yes.

23   "Q.   Let me show you what's been marked as Exhibit 49.  This is

24   an email from you to Terra investor relations dated January 13,

25   2021.  Do you recognize this email?

O41HSec5                        "Kwon"

1    "A.  Yes, I do.

2    "Q.  And this was an email that you wrote, right?

3    "A.  Yes.

4    "Q.  And that's your email address, do@terra.money?

5    "A.  Yes."

6             MR. CONNOR:  And at this time, your Honor, we would

7    offer into evidence Plaintiff's Exhibit 282.

8             MS. STOVALL:  No objection.

9             THE COURT:  Received.

10            (Plaintiff's Exhibit 282 received in evidence)

11            MR. CONNOR:  (Reading)

12   "Q.  And the subject is regarding liquidity partnerships, is

13   that right?

14   "A.  Yes.

15   "Q.  What liquidity partnerships were you referring to there?

16   "A.  I — I suppose filling the order books on the bid and

17   offer side so that Terra Luna would become more liquid.

18   "Q.  And the partnership you were referring to is the

19   partnership with Jump Trading, right?

20   "A.  Yes.

21   "Q.  And the first sentence reads:  'I am circulating email

22   among Terra's leading investor group to notify you of an

23   important arrangement we've entered into with Jump Trading.'.

24            "That's what you wrote, right?

25   "A.  Yes.

O41HSec5                    "Kwon"

1    "Q.  The second sentence you say:  Jump's trading's request —

2    Jump's requests keeping this arrangement strictly

3    confidential.'.

4            "I want to stop there.  Who asked you from Jump to

5    keep your arrangement with Jump strictly confidential?

6    "A.  I believe it was Kanav Kariya.

7    "Q.  And then it says:  'Jump is rewarded with call options for

8    Luna out of the gold market prices, .30 cents, .40 cents,

9    .50 cents over the next three years to allow incentives to

10   improve markets.'

11           "Was Jump rewarded those call options?

12   "A.  Yes.

13   "Q.  And you mention at above-market prices.  Do you see that?

14   "A.  Yes.

15   "Q.  So that means the price of Luna at this time was below

16   those prices, right?

17   "A.  Yes.

18   "Q.  And the next line says:  'To provide initial liquidity,

19   Terraform has loaned Jump Trading 30 million Luna.'  That's a

20   true statement, right, Terraform Labs did loan Jump Trading

21   30 million Luna, correct?

22   "A.  Correct.

23   "Q.  And then you say:  'This represents a significant

24   departure from our previous strategy of staying neutral for our

25   token's secondary market conditions.'.

O41HSec5                     "Kwon"

1          "Why was this a departure from staying neutral?

2     "A.  Well, because we are actually loaning tokens to a

3     high-frequency trading firm with the expectation that they're

4     going to fill bids and offers to improve the liquidity of Luna

5     in secondary markets.

6     "Q.  And your top five investors knew about this partnership,

7     right?

8     "A.  Yes.

9     "Q.  But you didn't let anyone else know about it, right?

10    "A.  Correct.

11    "Q.  Let's turn to Exhibit No. 50.  I'm showing you an email

12    that's been marked as Exhibit 50 dated September 2, 2020.  Do

13    you recognize this email?

14    "A.  Yes."

15          MR. CONNOR:  Your Honor, at this time we move for the

16    admission of Plaintiff's Exhibit 284 into evidence.

17          MS. STOVALL:  No objection.

18          THE COURT:  Received.

19          (Plaintiff's Exhibit 284 received in evidence)

20          MR. CONNOR:  (Reading.)

21    "Q.  And what is it?

22    "A.  It's an email between —— among CJ Han, who was then the

23    CFO at Terraform Labs, with Kanav Kariya, who was then employed

24    at Jump Trading and Tak Fujishima, who's also employed at Jump

25    Trading.  And they're discussing a proposal for Jump to be able

O41HSec5                          "Kwon"

1    to unlock options of Luna tokens based on net stablecoin

2    creation tiers and Jump Trading volume across decentralized

3    exchanges.

4    "Q.  We're going to turn to Exhibit 51.  This is a loan

5    confirmation dated September 8, 2020.  If you go to page 6, do

6    you recognize your name and signature there?

7    "A.  May I read the agreement?

8    "Q.  Sure."

9              MR. CONNOR:  Your Honor, at this time we move for the

10   admission of —— and, Mr. Haywood, if we could just turn to the

11   first page of this document —— we move for the admission of

12   Plaintiff's Exhibit 60 into evidence.

13             MS. STOVALL:  No objection.

14             THE COURT:  Received.

15             (Plaintiff's Exhibit 60 received in evidence)

16             MR. CONNOR:  Directing your attention to line 22.

17   "Q.  Mr. Kwon, can you just let me know when you're finished,

18   please.

19   "A.  Sure.  OK.  Done.

20   "Q.  This is an agreement that Terraform Labs Limited entered

21   into with Tai Mo Shan, is that right?

22   "A.  Yes.

23   "Q.  And you signed the agreement, right?

24   "A.  Yes.

25   "Q.  Tai Mo Shan, is that an entity affiliated with Jump

O41HSec5                              "Kwon"

1    Trading?

2    "A.   Yes.

3    "Q.   And under the agreement Terraform Labs —— I'm sorry,

4    Terraform Labs Limited, agreed to loan up to 65 million Luna to

5    Tai Mo Shan, is that correct?

6    "A.   Yes.

7    "Q.   And the repayment price was what on page 1?  Do you see

8    the .40 cents there?

9    "A.   Yes.

10   "Q.   And if you —— you've looked at the document, but the terms

11   are generally consistent with the email that we just looked at

12   in terms of the conditions upon which Terraform Labs Limited

13   would loan Luna to Jump Trading, is that correct?

14   "A.   Yes.

15   "Q.   So, in other words, for the first —— for the first seven

16   tranches, Tai Mo Shan Limited would be loaned to Luna if it met

17   of a condition of creating a certain number of USTs, is that

18   right?

19   "A.   Yes.

20   "Q.   And this structure was designed to incentivize Jump

21   Trading to create and trade UST, right?  That was the purpose

22   of it?

23   "A.   Yes.

24          MR. CONNOR:  Turning your attention to page 317,

25   line 6.

O41HSec5                       "Kwon"

1    "Q.  Did —— remember the loan confirmation that we looked at

2    earlier?  Do you recall looking at that?

3    "A.  Yes.

4    "Q.  And do you recall that there were certain conditions that

5    Jump Trading needed to meet to get the Luna?  Do you recall

6    that?

7    "A.  Yes.  But, ultimately, I think we just effectuated the

8    loans without looking too much at the trigger conditions.

9    "Q.  So, in other words, you took the conditions out, right?

10   "A.  Yes.

11   "Q.  Did you ever convey publicly that you agreed to loan Jump

12   Trading Luna at .40 cents?

13   "A.  No.

14          MR. CONNOR:  Directing your attention to page 333.

15   "Q.  This is an email, Exhibit 64, dated July 7, 2021, Bates

16   stamped SEC-JumpTrade-E0001325.  Do you recognize this

17   document?

18   "A.  OK.

19   "Q.  This is an email that you wrote to Kanav Kariya, the

20   bottom email.  Do you see that, July 5, 2021?

21   "A.  Yes.

22   "Q.  I'm sorry.  And I want to focus on the June 30 email, and

23   I want to specifically focus on" ——

24          MR. CONNOR:  And I'll pause here.  Your Honor, at this

25   time we move for the admission of PX 64 in evidence.

1          MS. STOVALL:  No objection.

2          THE COURT:  Received.

3          (Plaintiff's Exhibit 64 received in evidence)

4          MR. CONNOR:  (Reading.)

5     "Q.  And I want to specifically focus on when it says 'Luna

6     loan agreement.'  Do you see that?

7     "A.  Was there multiple pages?

8     "Q.  Yeah.  It's on page 2.

9     "A.  Oh.  Cool.  Yes.

10    "Q.  And do you see paragraph 3 you say:  'In light of this,

11    you proposal we issue the loan agreement to 1.2 million Luna

12    per month until the total number of expected tokens has been

13    delivered.'  Do you see that?

14    "A.  OK.  Yes.

15    "Q.  OK.  Well, we will get to the agreement in a second.  But

16    the 1.3 million per month, that was something that Terraform

17    Labs proposed to Jump Trading in this email, right?

18    "A.  Yes.

19          MR. CONNOR:  Directing your attention to page 340,

20    line 5.

21    "Q.  OK.  So was Jump Trading required to do anything under

22    this agreement other than just pay .40 cents per Luna?

23    "A.  It was not.

24    "Q.  I want to turn to 66.  This is an email from CJ Han to you

25    dated September 9, 2021.

O41HSec5                          "Kwon"

1   "A.  Which page?

2   "Q.  The first page."

3           MR. CONNOR:  And I'm going to pause there.  And, your

4   Honor, we offer for admission PX 67 into evidence.

5           MS. STOVALL:  No objection.

6           THE COURT:  Received.

7           (Plaintiff's Exhibit 67 received in evidence)

8           MR. CONNOR:  (Reading)

9   "Q.  The first page.  I'm sorry.  To CJ from Simon Johansen.

10  Do you see that?

11  "A.  Yes.

12  "Q.  And this is Jump Trading confirming that they would

13  receive 4.8 million September of 2020 at .40 cents, right?

14  "A.  Yes.

15  "Q.  And, in fact, Terraform Labs sent 4.8 million Luna to Jump

16  Trading in September of 2021, right?

17  "A.  Correct.

18  "Q.  And Terraform Labs did not disclose this to the public at

19  all, right?

20  "A.  It did not.

21  "Q.  Let's turn to 67.  This is an email from Ja Rapesh at Jump

22  Trading —— I'm sorry, from Simon Johansen at Jump Trading to

23  you as a cc and CJ Han dated October 21, 2021.  Bates stamped

24  is SEC-JumpTrade-E001960.

25          "And please take a moment to review this document.

O41HSec5                    "Kwon"

1    And, again, let me know when you're done, and I'm just going to

2    ask you a question about the first page.

3    "A.  Yes."

4              MR. CONNOR:  Your Honor, at this time we move for the

5    admission of PX 67 into evidence.

6              THE COURT:  Received.

7              MS. STAREN:  You're reading the wrong numbers.

8              MR. CONNOR:  I'm sorry, your Honor.  My mistake.  I'm

9    reading the depo exhibits.  We offer Plaintiff's Exhibit 263

10   into evidence.

11             THE COURT:  Any objection?

12             MS. STOVALL:  No objection.

13             THE COURT:  Received.

14             (Plaintiff's Exhibit 263 received in evidence)

15             MR. CONNOR:  Directing your attention to page 341,

16   line 25:

17   "Q.  OK.  This is Jump — this is Jump Trading repaying the

18   Luna loan, is that correct?

19   "A.  Yes.

20   "Q.  And I can just represent for the record that — that on

21   this date on October 22, 2021, which is the day after this — I

22   wasn't able to get data for this specific day — Luna was

23   trading at $43.61.  So Jump Trading paid 65 million Luna on

24   this day, right?

25   "A.  Yes.

O41HSec5                        "Kwon"

1    "Q.  And what is 65 million times .4, or .40 cents?  I can just

2    represent it's 26 million.

3    "A.  I'll take your word for it.

4    "Q.  And do you know what 65 million Luna were trading at in

5    the open market?

6    "A.  I — I do not.

7    "Q.  So 65 million times $43 is $2.8 billion.

8    "A.  OK.

9    "Q.  And Jump received, I think, 4.8 million Luna Jump had

10   already received, is that correct?

11   "A.  Yes.

12   "Q.  And they — what was the price that they paid for that

13   4.8 million?

14   "A.  I don't know.

15   "Q.  Well, wouldn't it be .40 cents?

16   "A.  Sure.

17   "Q.  And just accepting my representation that the market price

18   was $43.61, that 4.8 million would be over $200 million in the

19   open market, is that right?

20   "A.  Once again, I'll take your word for it.

21   "Q.  So based on that 4.8 million Luna just in September of

22   2021, Jump Trading made over $200 million, right?

23   "A.  Well, if they sold it.

24   "Q.  Does Terraform Labs currently have assets of at least

25   10,000 Bitcoin?

O41HSec5                          "Kwon"

1   "A.  Yes."

2              MR. CONNOR:  We have no further questions.

3              THE COURT:  OK.  So I think this is a good place to

4   stop for the day, ladies and gentlemen.

5              Just to let you know, notwithstanding all the

6   sidebars, we are still right on schedule.  The likelihood is

7   that the SEC will complete its case sometime tomorrow, and then

8   we'll turn to the defense case.

9              So have a very good evening, and we'll see you

10  tomorrow ── or tomorrow we'll start at 9:30, but we're only

11  going to 3:30 tomorrow.  So see you then.

12             (Jury excused)

13             (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

O41HSec5

```
 1                (Jury not present)

 2                THE COURT:  Please be seated.

 3                Now, I have a sentencing coming up in five minutes, so

 4     I'm going to need to ask you to quickly vacate the premises

 5     when we're through today.  You can leave your stuff on the

 6     table, but we need to have the tables for the sentencing

 7     matter.

 8                Defense counsel will let me know by sometime this

 9     evening whether they still want to pursue the completeness in

10     any respect.  And if I don't hear from you, I'll assume the

11     answer is no.

12                Anything else we need to take up today?

13                MS. MEEHAN:  Yes, your Honor, just one housekeeping

14     matter.  We just wanted to inquire as to how much time you

15     would allow for closings.

16                THE COURT:  For closing?  Well, we're not there yet

17     because the defense is going to have a case.

18                MS. MEEHAN:  Understood, your Honor.  We just wanted

19     to get an idea for how long you would allow us.

20                THE COURT:  OK.  So there are two questions there.

21     One is — we'll be with you right shortly.

22                That's the prison guards.  They come for counsel.

23                Usually in a private civil case I don't allow

24     rebuttal, whereas in a criminal case, of course, it's required

25     to have rebuttal.  A government civil case, I think, presents a
```

O41HSec5

1    more open question about whether there should be rebuttal.  So

2    one thing you need to think about is whether you want rebuttal

3    time.

4            I always allow, in total, the same amount for both

5    sides.  So if, for example, the SEC went an hour on their

6    immediate summation but were allowed a rebuttal and went 20

7    minutes on rebuttal, then the defense would have an hour and 20

8    minutes total for their summation.  So unlike opening

9    statements, where I think it's critical to keep things to a

10   half-hour or less because it's hard for the jury to absorb that

11   much, I'm much more flexible about summations.  But I'm

12   thinking, just off the top of my head, and very much subject to

13   hearing whatever anyone has to say, I would think no more than

14   two hours for each side, but you may want less than that.

15           And at the close of the SEC's case, presumably

16   tomorrow, we'll take a short break to hear any motions from the

17   defense, and then we'll immediately start with the defense

18   case.  So defense counsel should have their first witnesses

19   available.

20           Are there any depositions I need to review for the

21   defense?

22           MR. PELLEGRINO:  Yes, Evgeny Gaevoy, your Honor.

23           THE COURT:  That's the only one?

24           MR. PELLEGRINO:  I believe that's right.  If someone

25   tells me there's another one, we'll let the Court know this

O41HSec5

1    afternoon.

2            THE COURT:  Very good.

3            MR. PELLEGRINO:  Your Honor, I had mentioned that one

4    summary exhibit objection.  I wanted to raise that because it

5    may require a slide to be redone.

6            THE COURT:  Yes, go ahead.

7            MR. LAFFERMAN:  Yes, your Honor.  So, your Honor,

8    P-280 is a demonstrative ——

9            THE COURT:  Can someone put that on the screen?

10           MR. LAFFERMAN:  —— that the government intends to

11   introduce.  They have overlaid —— sorry.

12           MR. CARNEY:  Do you have a hard copy you can put on

13   the ELMO?

14           MR. LAFFERMAN:  I have a hard copy.

15           THE COURT:  Just hand that up.

16           MR. PELLEGRINO:  May I, your Honor?

17           THE COURT:  Yes.

18           MR. PELLEGRINO:  Thank you.

19           MR. LAFFERMAN:  Apologies, your Honor.

20           So as you can see from the demonstrative, the SEC

21   intends to introduce this demonstrative —— or present this

22   demonstrative tomorrow to the summary witness.  You'll see the

23   market value of Luna, which is in blue, and the market value of

24   UST, which is in orange, is behind or —— and there's a series

25   of events overlaid that arise in market value.  We believe that

1    this is improper for a summary exhibit because it implies some

2    sort of correlation or causation between the events and the

3    resulting changes in market value that Mr. Lambert, who is the

4    summary witness, cannot testify to because he's not testifying

5    to it as an —— or testifying as an expert.

6            THE COURT:  Well, what are the documents he is

7    summarizing?

8            MS. MEEHAN:  Yes, your Honor.  He's going to be

9    summarizing public statements made by Terraform and Do Kwon

10   relating to the depeg event, public statements relating to

11   their listings, public statements relating to the launch of the

12   Anchor protocol, and then he reviewed certain investor

13   purchases.

14           And the information that Mr. Lafferman is referring to

15   about the prices, that's just pulled from a Coinmarketcap data

16   website, and he is —— he's not testifying about any kind of

17   correlation or causation.  He's just testifying that these are

18   statements that were made at certain points in time.  And the

19   underlying information is just market value information that

20   was pulled from a website that the parties have stipulated is

21   an accurate source of market value data.

22           MR. LAFFERMAN:  And, your Honor, just to be clear on

23   our position, we would have no objection if the SEC separated

24   the market value into one chart and the statements into

25   another.  It's the combination that implies a correlation or

O41HSec5

1    causation between the two.

2            MS. MEEHAN:  Your Honor, it's just a summary graph and

3    timeline.  He's not going to be testifying to any causation or

4    any correlation between the ——

5            THE COURT:  Well, I mean, I'm looking, for example, at

6    May 24, 2021, in which the insert is, the little box is,

7    May 24, 2021, "Terra powered by Luna and Do Kwon," and then

8    there's reference to various tweets.

9            Isn't that a statement of causation?

10           MS. MEEHAN:  No.

11           THE COURT:  No.  What does it mean, then?

12           MS. MEEHAN:  Those are the statements that Do Kwon and

13   Terraform made relating to the May 2021 depeg event.

14           THE COURT:  I'm sorry.  What their statements ——

15           MS. MEEHAN:  It's like the Twitter threads, your

16   Honor, so ——

17           (Continued on next page)

18

19

20

21

22

23

24

25

O41Wter6

```
 1              THE COURT:  I'm sorry.  Forgive me.

 2              The statements, I take it then, are -- I'm not sure

 3    what the statements are.  The statements are what, ones you're

 4    introducing as misleading?

 5              MS. MEEHAN:  Correct, your Honor.

 6              THE COURT:  OK.  And the statements are to the effect

 7    that it was this algorithm that worked; is that the point?

 8              MS. MEEHAN:  Yes, in substance.

 9              THE COURT:  And how is that correlated?  You're

10    showing there that it goes back up to $1?

11              I'm finding this a very difficult chart to follow.

12    I'll tell you what.  I'll look at it overnight, and we'll talk

13    about it at 9 o'clock tomorrow morning.

14              MS. MEEHAN:  OK.  Thank you, your Honor.

15              (Adjourned to April 2, 2024, at 9:00 a.m.)

16

17

18

19

20

21

22

23

24

25
```

1                    INDEX OF EXAMINATION

2    Examination  of:                              Page

3    MATTHEW J. EDMAN

4    Direct By Mr. Carney . . . . . . . . . . . .1007

5    Cross By Mr. Califano  . . . . . . . . . . .1016

6    Redirect By Mr. Carney . . . . . . . . . . .1025

7    BRIAN CURRAN

8    Direct By Ms. Cuellar  . . . . . . . . . . .1037

9    Cross By Ms. Gomez Nelson  . . . . . . . . .1117

10   Cross By Mr. Patton  . . . . . . . . . . . .1121

11   Redirect By Ms. Cuellar  . . . . . . . . . .1195

12   Recross By Mr. Patton  . . . . . . . . . . .1200

13                    PLAINTIFF EXHIBITS

14   Exhibit No.                               Received

15    71    . . . . . . . . . . . . . . . . . . .1048

16    72    . . . . . . . . . . . . . . . . . . .1069

17    57    . . . . . . . . . . . . . . . . . . .1075

18    75    . . . . . . . . . . . . . . . . . . .1089

19    58    . . . . . . . . . . . . . . . . . . .1090

20    76    . . . . . . . . . . . . . . . . . . .1097

21    73    . . . . . . . . . . . . . . . . . . .1103

22    407   . . . . . . . . . . . . . . . . . . .1125

23    355   . . . . . . . . . . . . . . . . . . .1163

24    428   . . . . . . . . . . . . . . . . . . .1172

25    48    . . . . . . . . . . . . . . . . . . .1193

1    663    . . . . . . . . . . . . . . . . . . . .1198

2    576    . . . . . . . . . . . . . . . . . . . .1211

3    282    . . . . . . . . . . . . . . . . . . . .1214

4    284    . . . . . . . . . . . . . . . . . . . .1216

5    60    . . . . . . . . . . . . . . . . . . . .1217

6    64    . . . . . . . . . . . . . . . . . . . .1220

7    67    . . . . . . . . . . . . . . . . . . . .1221

8    263    . . . . . . . . . . . . . . . . . . . .1222

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25