O43HSec1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

SECURITIES AND EXCHANGE
COMMISSION

            Plaintiff,

         v.                     23 Civ. 1346 (JSR)

TERRAFORM LABS PTE LTD. , et
al.

            Defendants

------------------------------x

                       New York, N.Y.
                       April 3, 2024
                       12:15 p.m.

Before:

               HON. JED S. RAKOFF

                       District Judge
                       -and a Jury-

                APPEARANCES

UNITED STATES SECURITIES AND EXCHANGE COMMISSION
    Attorneys for Plaintiff
By:  JAMES P. CONNOR
    DEVON STAREN
    CARINA CUELLAR
    LAURA E. MEEHAN
    CHRISTOPHER J. CARNEY
    ROGER LANDSMAN

O43HSec1

APPEARANCES (Cont'd)

DENTONS US LLP
     Attorneys for Defendant Terraform
BY:  LOUIS A. PELLEGRINO III
     DAVID KORNBLAU
     MARK CALIFANO
     DOUGLAS W. HENKIN
     MATTHEW A. LAFFERMAN
     AMIANNA STOVALL
     ALYSSA LANDOW
     MELISSA GOMEZ NELSON

KAPLAN HECKER & FINK LLP
     Attorney for Defendant Kwon
BY:  MICHAEL FERRARA
     CHRISTOPHER MOREL
     DAVID E. PATTON
     ANDREW CHESLEY
     SEAN HECKER

Also Present:

Shadow Haywood, SEC Trial Assistant
Armando Aquino, Defense Trial Assistant

O43HSec1

1          (Trial resumed; jury not present)

2          THE COURT:  Please be seated.

3          All right.  Let's talk about scheduling, and then

4    we'll talk about summations.

5          I will have for you by sometime tomorrow morning my

6    proposed charge and verdict form, but, of course, then we have

7    to have a charging conference.  If the evidence concludes by

8    3:30 on Thursday —— we'll sit tomorrow from 9:30 to 3:30 ——

9    then we would have to have the charging conference tomorrow

10   because summations would then be on Friday.  If the evidence

11   doesn't conclude, then we would have summations on Monday and

12   then the charging conference on Friday, and we'd just give the

13   jury Friday off or have them come in for whatever small amount

14   of evidence still has to be and then excuse them.  So it's

15   largely in your hands, so to speak.

16          But here's the one unfortunate thing.  Because I teach

17   at Columbia Tuesday, Wednesday, and Thursday from 4:10 to 6:10,

18   what I think we would have to do is either we could have the

19   charging conference by telephone starting at about 6:20 on

20   Thursday or we could all come back to the courtroom and have it

21   at 7 o'clock, and either way we'd have to arrange for a court

22   reporter.  So that cuts a little bit in favor, perhaps, of

23   having summations on Monday.  On the other hand, it's not a

24   matter I feel strongly about.  It's really pretty much your

25   collective call.

O43HSec1

1      In terms of summations, I thank both sides for their
2  letters, and I see that some judges do, apparently, ordinarily
3  allow rebuttals in cases like this, and I've even occasionally
4  had rebuttals, as my civil rules indicate.  But I think, here,
5  what I'm always most concerned with is making sure that the
6  jury keeps their eye on the ball and is not confused, and I'm
7  attracted, therefore, to the notion that the —— there would be
8  a joint defense summation from one attorney, as I understand
9  it, for 75 minutes, whereas the SEC would have its summation 90
10  minutes but without a rebuttal.  And I think that will have a
11  tendency to clarify the issues for the jury.
12      Moreover, another element that enters into my thinking
13  is burden of proof.  The reason, in my view, the law requires a
14  rebuttal in a criminal case is because the burden of proof on
15  the proponent is so high, proof beyond a reasonable doubt.  In
16  some civil cases where the burden is clear and convincing
17  evidence, I can see the argument for rebuttal.  I think the
18  argument is weaker where, as in this case, it's a preponderance
19  standard.
20      Now, the one thing that cuts the other way and has
21  made it a close call, in my mind, is that this is not as simple
22  a case as many routine commercial cases where I've had jury
23  trials.  But, on the other hand, the complexities have been
24  very well voiced by both sides, and so I'll hear any further
25  argument anyone wants to make.  At least as of now, I am

O43HSec1

1  leaning towards granting the defense proposal.  So there would

2  be a single opening by the SEC for 90 minutes and a single ——

3  excuse me, a closing by the SEC for 90 minutes and a single

4  closing by the defense for 75 minutes, but I'll hear anything

5  else anyone wants to say on that.

6        MR. CONNOR:  Your Honor, we, of course, understand

7  your Honor's ruling.  I guess our last pitch would be to do a

8  rebuttal that this is a unique case in that the defendant is

9  not here, and that sort of lends a lot of uncertainty into a

10  lot of the evidence.  And what our concern is is that the

11  defense is going to get up in their, you know, rebuttal and,

12  due to all that uncertainty, may sort of —— not intentionally,

13  but there may be some confusion on the jury's part, and we

14  believe it's very important that we have the opportunity to

15  clarify the issues.

16        THE COURT:  Well, as I said, I think that the nature

17  of this case is what is the strongest argument on your side.

18        One thing I'll say, which I'm sure is already obvious,

19  if I go the way I'm indicating but defense counsel, in their

20  summation, says something that is totally unexpected or could

21  not be reasonably foreseen, then, of course, I would grant a

22  rebuttal limited to that.  But I would grant that —— I do in

23  every case when that happens.  It's rare that that happens, but

24  sometimes it does.

25        Well, all right.  I'll think about it one more time,

O43HSec1

1    but I think we need to resolve it by the end of today.

2            Anything else anyone wanted to raise?  Yes.

3            MR. PATTON:  Just on that point, your Honor, we don't

4    intend to discuss at all Mr. Kwon's lack of appearance.

5            THE COURT:  No, but I think the point that the SEC is

6    making, which I thought about last night, is in some ways

7    they're somewhat handicapped, even on a preponderance standard,

8    by the fact that so many people took the Fifth.  And so

9    evidence that they normally would have had, or at least

10   potentially could have had through depositions, they don't

11   have.  But in the end, I'm still leaning the way I am, but I

12   will think about this one more time.

13           MR. CONNOR:  Thank you, your Honor.

14           MR. PELLEGRINO:  I'll just mention, from our

15   standpoint, your Honor, we feel equally constrained.  We had

16   sought to take the deposition of CJ Han when it first became

17   available just before trial.  We would have loved to have that

18   deposition.  It didn't happen.  We understand the Court's

19   ruling.  But I think both sides have experienced some

20   difficulty and frustration with the number of parties who have

21   been overseas or unavailable, so we're in the same position,

22   your Honor.

23           MR. CONNOR:  Your Honor ——

24           THE COURT:  Of course, I will give the jury my

25   standard instruction, as I do before openings, nothing that

1    defense counsel says is evidence.  It's just argument.  But

2    maybe we should go further and say:  Ladies and gentlemen, for

3    the next two hours you can just go to sleep, and then I'll give

4    you my charge.

5            Anyway, go ahead.

6            MR. CONNOR:  I was just going to the final point.  CJ

7    Han is their own employee, and so —— and he's also under

8    criminal indictment in Korea on the Chai fraud, which is why

9    he's not here.  I think that argument is maybe a little bit

10   much.

11           And then the final point, your Honor, just in

12   anticipation of the testimony today, we did have a motion *in*

13   *limine* to exclude Terraform's witnesses about testifying about

14   matters upon which they have no personal knowledge.  Mr. Amani

15   was not at the company for any of the relevant events.

16   Mr. Schum, their second witness, was not at the company for any

17   of the relevant events, and Mr. Cantieri had a marginal

18   involvement in the relevant events.

19           And what we see happening here, your Honor, is they're

20   essentially bolstering the company and putting on completely

21   irrelevant testimony, trying to say that this is sort of a

22   relevant company or that this is somehow a legitimate company.

23   And as an example, your Honor, I'll give a demonstrative which

24   they have all the different supposed business lines that this

25   company is involved in, which is, of course, totally irrelevant

O43HSec1

1    to the case.

2           And so if this testimony's allowed in, the door is

3    wide open on Mr. Kwon.  I mean, they are basically bolstering

4    this company when this company was run by someone who was on

5    the lamb for basically a year.  So that is going to come out on

6    cross-examination, and, frankly, they've already opened the

7    door.  So we are —— it's our position we are entitled to ask

8    Mr. Amani that the reason he became CEO was that Mr. Kwon was

9    arrested and he was on the lamb, and that's why he became CEO.

10   They can't have it both ways here.  They can't seek out and ——

11   seek to exclude all this clearly relevant knowledge about

12   Mr. Kwon's character traits of truthfulness and then have their

13   witnesses get on the stand and talk about how great a company

14   Terraform was, which Mr. Amani's already done.

15          So we think that the door is wide open.  We intend,

16   with the Court's permission, to ask Mr. Amani those sorts of

17   questions.  But, of course, we wanted to flag it with the

18   Court.

19          MR. PELLEGRINO:  Your Honor, first of all, that

20   argument has been waived.  I mean, we've been having

21   discussions for two days with the Court about perspective

22   witnesses and when we might finish, and they have not until

23   just now sought to renew that motion and suggest that these

24   witnesses shouldn't be allowed to testify.  We're halfway

25   through Mr. Amani's testimony.

O43HSec1

1          But specifically with regard to Mr. Amani, he's going

2     to talk very little about Do Kwon, if at all.  There is a

3     conversation about how he gets hired.  It's not going to his

4     credibility.  He's not going to bolster Do Kwon.  He's barely

5     even going to mention him.  Towards the end, when we talk about

6     —— and this is consistent with what your Honor allowed when

7     Mr. Curran talked about what happened after the 2022 depeg,

8     perhaps he would say something.  I don't expect him to mention

9     Do Kwon, but you're going to hear very little about him.  His

10    purpose is not to bolster Do Kwon.

11         Now, specifically about what he will testify about,

12    and we're about to get into that now.  Yes, there's a

13    demonstrative.  He talks about some products that ran on the

14    Terra blockchain.  That's going to be super fast, your Honor.

15    We think the jury has heard that.  There's going to be a couple

16    targeted questions, and then we're going to move on.  We're not

17    going to belabor it.

18         And then as we have said in our motion *in limine*

19    consistently, Mr. Amani was a member of the community before he

20    was CEO.  He bought UST and Luna.  He was in the exact same

21    position that the investor witnesses were that they put on.  He

22    saw the depeg happen.  He doesn't know firsthand the inner

23    workings, but he saw it from the outside.  He knew about the

24    proposals that were made after the depeg, and then he joined

25    the company.  He also has firsthand knowledge about Mr. Curran

O43HSec1

leaving the company.  These are all relevant topics.  They've

opened the door to them.  He's going to be brief on them.

We're going to move through them, and those are some of the

main things he's going to talk about, including concluding with

what he heard and saw after the 2022 depeg.

Mr. Curran testified that he wanted to refund amounts

to customers.  He can talk about that.  That's all firsthand,

602 knowledge, your Honor.  He's going to go through that

quickly.  And they should have raised that motion a long time

ago — renewed it, rather.

THE COURT:  Well, I don't think they're untimely

raising as to anyone other than Mr. Amani, because the other

people haven't testified.  With respect to Mr. Amani, they can

make objections, of course, as to relevance as he gives his

testimony.  I'll rule on them individually.

On the question of whether the door has been opened as

to why Mr. Amani became — why there was a vacancy and

Mr. Amani assumed the position of CEO, I'm going to think about

that.  I'm not saying yes or no yet.

MR. PELLEGRINO:  He has not said anything about that,

and we do not intend to elicit that other than —

THE COURT:  No, but the point is he's being, as he has

throughout this case because he sat at counsel table because he

was the corporate representative, he is being portrayed as, in

some sense, the company.  And of course, he's now testified or

O43HSec1

```
 1    will be testifying that —— I think he already has —— that he is

 2    the CEO.  And so I think how he became the CEO, it wasn't just

 3    because he had an interest in cryptocurrency.

 4             MR. PELLEGRINO:  Well, the answer is, your Honor, it's

 5    because Do stepped down.  He could give that answer if he felt

 6    compelled to give that.  That's what happened, Do stepped down,

 7    and he became the CEO.  He has said nothing about Do's

 8    credibility to bolster him in any way.  That's not his purpose.

 9    And we have not opened the door about why Do is where he is or

10    anything about these other charges.

11             THE COURT:  I've leaned over backwards in favor of

12    Mr. Kwon.  I have kept out his conviction, although there were

13    strong arguments for its admissibility.  I've kept out his

14    flight, though there were strong arguments for a missing

15    witness instruction.  But there certainly comes a point where

16    the jury is being misled into what was going on.  But let me

17    think about it, and we'll see.

18             MR. PELLEGRINO:  Your Honor, just to add one more

19    point, your Honor, as we've discussed before, they opened ——

20    and I understand this is not evidence but the jury heard it ——

21    on the fact that the company was a house of cards.  That was

22    their opening.  So they opened the door to that topic, and we

23    don't really intend to get into that other than to say there

24    are things still happening at the company; they sought to

25    remedy the situation.  Really has nothing to do with Do.
```

O43HSec1

```
 1              THE COURT:  Fine.  I'll think about it some more.
 2              Let's bring in the —— I'm sorry, there's something
 3     else?
 4              MR. CALIFANO:  Your Honor, I just wanted to make sure
 5     that the Court understood that Mr. Schum, who is a witness
 6     who's going to testify after Mr. Amani, is somebody who was a
 7     validator in the Terra blockchain ecosystem.  So he can testify
 8     to his firsthand knowledge about being a member of the
 9     community and those things that were discussed in the community
10     in the proposals.
11              And there's another thing, your Honor, I think that's
12     important.  Mr. Schum is also a member of the communications
13     group that Mr. Curran headed.  Mr. Schum is aware, because
14     Mr. Curran talked to him, about the reasons he actually left
15     the company the first time.  Those are the things that
16     Mr. Schum would testify about.  All firsthand information, your
17     Honor.  And the other thing is Mr. Schum will not testify in
18     any way about Mr. Kwon.
19              MR. CONNOR:  Your Honor, if I could respond to that.
20     If Mr. Schum testifies, the door is absolutely wide open.
21     Mr. Schum gave interviews in which Do Kwon, while he was on the
22     lamb, while he was wanted by the Korean prosecutors, was
23     "actively involved in the day-to-day operation of the firm."
24     So if Mr. Schum is going to testify, the door is wide open to
25     us asking those questions.  There's no way that we should be
```

O43HSec1

1    hamstrung.  So if he takes the stand, we do intend to ask those

2    questions.

3              THE COURT:  All right.

4              MR. CALIFANO:  I apologize.

5              THE COURT:  We're going to take a midafternoon break.

6    Let's get at least this witness finished.  Let's bring in the

7    jury.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O43HSec1

1            (Jury present)

2            MR. PATTON:  Your Honor, we don't have to go into the

3    details now, but we would just ask to be heard separately on

4    behalf of Mr. Kwon if your Honor's revisiting this topic.

5            THE COURT:  Sure.  I just want to be absolutely sure I

6    have the proposal on the summations.  It will be one person for

7    the defense, though collectively representing both defendants?

8            MR. PELLEGRINO:  Correct, your Honor.

9            (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            (Jury present)

2            THE COURT:  Please be seated.

3            Good afternoon, ladies and gentlemen.  I know you were

4   thrilled to come to court today in this beautiful weather.

5   But, on the other hand, now you get to avoid this weather for

6   the next few hours.

7            So let's get the witness back on the stand.

8   CHRIS AMANI, resumed.

9   DIRECT EXAMINATION

10  BY MR. PELLEGRINO:

11  Q.  Good afternoon, Mr. Amani.

12  A.  Good afternoon.

13  Q.  We haven't spoken since your testimony, since you took the

14  stand yesterday?

15  A.  That's right.

16  Q.  And so on that note, I got a word from some people in the

17  back that they couldn't hear you well.  I'm just going to ask

18  you to pull your microphone forward.

19  A.  How's this?

20  Q.  Good, I think.  And if we could just speak slowly for the

21  court reporter, please.

22            All right.  So I want to reorient you to where we

23  were.  We were talking about social media yesterday.  Do you

24  remember that?

25  A.  I do.

1  Q.  OK.  Just a few more questions on that, then we're going to

2  move on.

3          In one of your last answers yesterday, you mentioned

4  that social media could be argumentative.  How so?

5  A.  I think I was explaining this.  Just the nature of crypto

6  is such that, you know, the participants have to take a lot of

7  responsibility for the assets that they hold and the protocols

8  that they interact with because there are a lot of risks,

9  whether it's losing the crypto equivalent of your password and

10  there's no "forgot password" button, or interacting with an

11  application like an Anchor protocol that's a smart contract.

12  There could be bugs in the smart contract.  There could be

13  hacks.

14          And so, like I said, you have to do a lot of your own

15  research.  You have to really dig in.  And part of that is that

16  you expect that the teams that release those protocols are the

17  teams that are supporting the blockchain are going to be

18  available to you to answer your questions.

19          THE COURT:  Well, I think — forgive me.  I think I

20  need to instruct the jury in this regard because I don't want

21  them to be misprised.

22          The same laws that govern fraud in security cases

23  apply here, just as they would in other cases.  There is no

24  special exception for the cryptocurrency market that says

25  investors have to do more research or have to exercise greater

1    care than would be required from any reasonable investor with

2    any investment.  It's the same.  So I'm sure that wasn't the

3    suggestion being made, but I don't want there to be any

4    misunderstanding.  The same disclosure obligations apply to the

5    offerers and the same responsibilities or non-responsibilities

6    apply to investors.

7            Go ahead.

8            MR. PELLEGRINO:  OK.

9    Q.  I want to turn to your interest in Terra, Mr. Amani.

10           Did there come a time when you began interacting in

11   person with members of Terraform?

12   A.  I did, yes.  I was invited to an event that Terra was

13   throwing in New York in September of 2021 and showed up to that

14   event and met some people that worked at Terraform Labs.

15   Q.  And what came about from that event?

16   A.  I just got more engaged in the community.  I got to learn

17   more.  I got to meet more people, people who were —— like TFL

18   people who were community members who were using the protocol

19   and teams that were building on Terra.

20   Q.  And did you have further interaction with Terraform

21   employees after that?

22   A.  I did.  I went to another event in Portugal where I ran

23   into a lot of those same employees again.

24   Q.  Did there come a time when you had discussions about

25   actually going to work at Terraform?

1  A.  There was.  So I remember specifically, because it was

2  Thanksgiving morning, I had seen an article that came out about

3  working at TFL, and it was employees kind of complaining about

4  how challenging it was to work there: long hours, heavy

5  demands, inconsistent compensation between individuals.  And so

6  I got on Twitter.  I had met Do previously.  I don't think he

7  remembered who I was.  I sent him a note:  Building –– building

8  great companies is hard.  Let me know if you need help?  And I

9  posted the link to that article, and I posted my LinkedIn

10  profile.

11  Q.  And you mentioned about it being hard to work there.  The

12  article had suggested something to that effect.  Why would you

13  be interested in working in an environment like that?

14  A.  Fast-growing startups are always hard to work at.  They

15  always have those complications.  So someone like me, with my

16  experience, it's my job to come in and fix those things.  So I

17  saw an opportunity to join and help a company that I cared

18  about.

19  Q.  Did there come a time when you were officially hired by

20  Terraform?

21  A.  Yes, I joined in January of 2022.

22  Q.  What was your title when you hired?

23  A.  Head of operations.

24  Q.  And what, if anything, were you hired to do as the head of

25  operations?

1    A.  Primarily to fix those problems that had been outlined in

2    the — in the article, among other things.  I was responsible

3    for HR, ensuring clear communication, working with Do to

4    implement compensation policies that were fair.  I worked with

5    the community as well.  Since I was a part of the community, I

6    was hired to engage with the community and to try to grow —

7    grow community specifically in person, in-person events.

8    Q.  Did you take any steps to improve the workplace along the

9    lines of what you were hired to do?

10   A.  We did.  We built out a human resources function.  We did

11   employee surveys.  We put together compensation, like a

12   compensation framework so that, when we brought people into the

13   company, we could slot them into, like, their specific roles

14   and would have consistent compensation across consistent roles.

15   All the things that you would see in like a larger company, we

16   needed to implement in TFL.

17   Q.  About how many people were working at Terraform when you

18   started?

19   A.  I don't know the exact number.  Somewhere — I would say

20   somewhere in, like, the 60, 70 range.

21   Q.  And were all these people located in the same place?

22   A.  They were not.

23   Q.  And how did they communicate with one another?

24   A.  Just kind of like remote companies now:  Google Meets,

25   email, Slack, Signal, Telegram.  I think that was it.

1    Q.  Why did they communicate using those platforms?

2    A.  Well, like, email and Slack are, like, standard platforms

3    used inside of a company.  Telegram and Signal are applications

4    that are used a lot within crypto, so those were mostly used

5    when you were trying to communicate with, like, another team

6    outside of your company.  Slack doesn't work really well for

7    that.  So all of the teams — not all of the teams.  A large

8    portion of the teams in crypto that we were partnering with

9    would have Telegram accounts as well and Signal accounts as

10   well, so we would use those for kind of like cross-company

11   communications.

12           MR. PELLEGRINO:  I'm going to ask Mr. Aquino to pull

13   up what I think is going to be Defendants' Exhibit 1804, just

14   for the witness and for the parties.  And, your Honor, this is

15   going to be a demonstrative, not an exhibit.

16   Q.  Mr. Amani, can you see that on your screen?

17   A.  Yes, I can.

18   Q.  Just briefly, have you seen this document before?

19   A.  I have.

20   Q.  And briefly, just very high level, what is it?

21   A.  Yeah.  So it looks like it's a Terra blockchain in the

22   middle, and surrounding it are various, you know, applications

23   or protocols, partners of teams that had built on top of the

24   Terra blockchain and teams that had integrated into it.

25   Q.  I'm going to pause you right there.

1          Is it true and accurate?

2    A.   It's a subset.  It's a subset of the application — every

3    application on here was one that was integrated with the Terra

4    blockchain, but it doesn't have everything.  There are many

5    more.

6    Q.   Got it.

7          Your Honor, may we publish?

8          THE COURT:  OK.

9          MR. PELLEGRINO:  I'm sorry.  I didn't hear.  Was there

10   a response?

11         THE COURT:  I'm sorry.  I said yes.

12         MR. PELLEGRINO:  Thank you, your Honor.

13         Could we publish that for the jury, please.

14   BY MR. PELLEGRINO:

15   Q.   OK.  So, just generally, at the top it says "Terra

16   Blockchain Ecosystem."  Do you see that?

17   A.   I do.

18   Q.   What's the Terra blockchain ecosystem?

19   A.   So the ecosystem — typically, when you refer to a crypto

20   ecosystem, you're talking about, like, the businesses that are

21   operating on that blockchain or integrated with that blockchain

22   or partnered with the applications that do build on that

23   blockchain.  So think of this as like the — like the business

24   side of the blockchain versus, like, the community, which are

25   like the users.

1    Q.  OK.  And what's at the center of the diagram?

2    A.  It looks like the Terra blockchain.

3    Q.  Have you heard the term "open source" before?

4    A.  I have.

5    Q.  What does that mean?

6    A.  So open source refers to when an application's code is

7    public for anyone to see.  There are different versions of it,

8    but, essentially, it means that, you know, anyone who wants to

9    look at the code that's being run for that software can inspect

10   it themselves or have someone that they trust inspect it for

11   them.

12   Q.  Was the Terra blockchain open source?

13   A.  Yes, it was.

14   Q.  OK.  And tell us again, not in detail but just

15   collectively, what are the logos around the center of the

16   diagram?

17   A.  The logos represent ——

18           MR. CONNOR:  Relevance, your Honor.

19           THE COURT:  Well, I'll allow a little bit into this

20   area, but I think it is not —— it's only marginally connected

21   with the issues in the case, but I'll allow a little bit.

22           MR. PELLEGRINO:  It's going to be brief, your Honor.

23   Thank you.

24   Q.  Just quickly, what are those?

25   A.  Yeah.  The logos represent applications that were built on

1  top of or integrated into the Terra blockchain.

2  Q.  OK.  And does Terra own or launch all of these

3  applications?

4  A.  Terra launched some of them.  A lot of them were launched

5  by third parties.

6  Q.  OK.  Does someone need permission to launch a product on

7  the Terra blockchain?

8  A.  They do not.

9  Q.  Why not?

10  A.  Because it's permissionless.  Anyone can launch an

11  application on the blockchain.

12       MR. PELLEGRINO:  You can take that down, Mr. Aquino.

13  Q.  Now, when people interact with these protocols, who are

14  they interacting with?

15  A.  They're interacting with the protocol itself.  So the

16  protocol is like this, for lack of a better term, this code

17  that runs — once it's been launched, this code runs

18  autonomously on the blockchain.  So when you interact with

19  those applications, you're interacting with autonomous computer

20  code, essentially.

21  Q.  If someone buys UST on an exchange, are they buying that

22  UST from Terraform Labs?

23  A.  No.

24  Q.  Someone deposits money into Anchor, are they depositing

25  money into Terraform Labs?

1    A.  No, they're depositing into the smart contract.  It doesn't

2    go to Terraform Labs.

3    Q.  Where does it go?

4    A.  It just gets locked in the code, essentially, on the Terra

5    blockchain.

6    Q.  Can Terraform Labs access that money?

7    A.  No.

8    Q.  Now, turning your attention to January 2022, what was your

9    job title at that time?

10   A.  Head of operations.

11   Q.  As head of operations, did human resources report to you in

12   that role?

13   A.  Yes.

14   Q.  What are the areas of focus of human resources?

15   A.  Hiring, firing, performance reviews, compensation,

16   policies.

17   Q.  Do you know Brian Curran?

18   A.  Yes.

19   Q.  Who was Brian Curran?

20   A.  Brian Curran was at times while I was there the head of

21   communications.

22   Q.  And did there come a time when Brian Curran left Terraform

23   for the first time?

24   A.  Yes.

25   Q.  Were you serving as head of operations when that happened?

O43HSec1                         Amani - Direct

1   A.  Yes.

2   Q.  In that capacity, did you come to understand why Brian

3   Curran left the company?  Just a yes or no.

4   A.  Yes.

5   Q.  How did you learn that information?

6   A.  He told me.

7   Q.  OK.  And did he tell you directly?

8   A.  Yes.

9   Q.  What, if anything, did he tell you about why he left?

10          MR. CONNOR:  Objection.  Hearsay.

11          THE COURT:  Sustained.

12          MR. PELLEGRINO:  Your Honor, may we sidebar?

13          THE COURT:  Sure.

14          (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1          (At sidebar)

2          MR. PELLEGRINO:  Your Honor, their objection before

3   was that he was not giving relevant testimony.  This is

4   directly relevant ——

5          THE COURT:  No, no, the objection now is hearsay.

6          MR. PELLEGRINO:  Well, they've opened the door to it,

7   so it's now material.  I mean ——

8          THE COURT:  No, no, it's a statement being offered for

9   its truth by an out-of-court witness.

10         MR. PELLEGRINO:  It's not ——

11         THE COURT:  Now, did you —— I don't recall —— confront

12  Mr. Curran with this statement?  I don't think you did.

13         MR. CONNOR:  No.

14         THE COURT:  If you had, then it might come in under

15  the discretionary exception for extrinsic impeachment, but

16  since he wasn't confronted with this and didn't have the

17  opportunity to admit or deny or otherwise explain the

18  statement, it's classic hearsay.  Sustained.

19         (Continued on next page)

20

21

22

23

24

25

1                    (In open court; jurors present)

2    BY MR. PELLEGRINO:

3    Q.  Mr. Amani, did you own UST or Luna before you worked for

4    Terraform?

5    A.  I did.

6    Q.  And earlier we had discussed that you had researched Terra

7    for several years before joining the company, is that right?

8    A.  About one year.  I started researching in 2021 and then

9    joined right at the beginning of 2022.

10   Q.  OK.  In or around that time period, did you own UST or

11   Luna?

12   A.  In 2021, I did.

13   Q.  What information did you look at, if any, before purchasing

14   UST or Luna at that time?

15   A.  You know, the website, the white papers, the YouTube videos

16   both by TFL and by others, podcasts with Do.  Trying to think

17   if there's anything else.  I was on Discord and Telegram, the

18   governance forums as well.

19   Q.  Did you consider any risks when investing in UST or Luna?

20   A.  I did.

21   Q.  What are some of the risks you considered?

22   A.  For UST the risk —— yeah, like, the risk-reward or —— the

23   risk-benefit of UST was always kind of the depeg risk, right?

24   When thinking about using a stablecoin, you have centralized

25   stablecoins that are backed by dollars in the bank, and they

1  give you certain characteristics, like a better sense that it's

2  going to maintain the peg, but you lose the benefits of

3  decentralization.  Evaluating the risks and benefits of UST was

4  about whether the decentralization benefits you were going to

5  get from UST outweighed the risk of the depeg.

6  Q.  Now, do you know the term "use case"?

7  A.  Yes.

8  Q.  What does that mean?

9  A.  It just means, like, from like a product application

10 perspective, like building products, it means, like, what

11 problem or what usage you expect the product to solve.

12 Q.  And from your research, did you learn about any use cases

13 for the Terra blockchain?

14 A.  Yes.

15 Q.  What are some of those use cases?

16 A.  Well, UST, first and foremost.  When I was getting

17 involved, there was Anchor, Mirror, there was Kado.  Kado would

18 allow you to buy things on Amazon using UST.  There were

19 launchpads.  There were money markets.  It had, like, a full

20 suite of the typical applications you would find on a

21 blockchain.

22 Q.  Did you ever buy anything with UST?

23        MR. CONNOR:  Objection.  Relevance.  Lack of

24 foundation.

25        THE COURT:  The objection on lack of foundation is

1  denied.  The objection on relevance is sustained.

2  Q.  Did you have any personal knowledge as to whether Chai used

3  the Terra blockchain?

4  A.  I don't.

5  Q.  What was the status of Chai, the company, when you joined

6  Terraform?

7          MR. CONNOR:  Objection.  Lack of foundation.

8          THE COURT:  I also don't even know what's meant by

9  "status" in the context of that particular question.

10  Sustained.

11          MR. PELLEGRINO:  I'll rephrase, your Honor.

12  Q.  When you joined the company, was Chai, the company, part of

13  Terraform, the company?

14  A.  No.

15  Q.  Are you aware of the event in May 2021 when UST lost its

16  peg?

17  A.  I am.

18  Q.  Do you have knowledge of the May 2021 depegging event?

19  Just yes or no?

20  A.  Yes.

21  Q.  What is the basis for your knowledge?

22  A.  I was a user of Terra, and I was observing as a user.

23  Q.  Was this before you worked for Terraform?

24  A.  Yes.

25  Q.  What did you observe as a user of Terra?

1  A.  I don't remember all of the particular details of what was

2  going on at the time, but a couple of things stand out in my

3  mind at the time.  I wasn't deep into Terra.  I wasn't deep

4  into the ecosystem.  I was very curious about Terra based on

5  what I had learned, and so this was an interesting — I was

6  observing to see what would happen, if it would repeg.  There

7  is that aspect of it.  And then I remember the forum posts

8  after the depeg, looking at those at, like, how they were

9  attempting to, you know, change the parameters of the protocol

10  to make sure that it would function more efficiently in the

11  future.

12  Q.  OK.  Can you explain what the forum posts were?

13  A.  Yeah.  So Terra had a governance forum where anyone could

14  go post new ideas for discussion about how to make the

15  blockchain better.  And so there was one particularly from Jump

16  Trading talking about how some of the parameters could be

17  changed to make the mint-burn mechanism — I believe it was the

18  mint-burn mechanism — work more effective and efficiently

19  during a depeg.

20          MR. PELLEGRINO:  OK.  I'm going to ask Mr. Aquino if

21  you would pull up Defendants' Exhibit 32, just for the witness

22  and the parties, please.

23  Q.  Mr. Amani, can you see that?

24  A.  Yes.

25  Q.  Showing you what's been marked as Defendants' Exhibit 32

O43HSec1                          Amani – Direct

1   for identification, do you recognize this?

2   A.  I do.  I remember seeing this around the time of the depeg.

3   Q.  OK.  And did you review it in or around that time?

4   A.  Yes.

5   Q.  Did you form an impression about the content of that

6   document at that time?

7   A.  Yeah.  At the time I had ——

8   Q.  Just yes or no.

9   A.  Yes.

10  Q.  And do you recall that impression as you sit here today?

11  A.  Yes.

12  Q.  And did the document cause you to take any further steps

13  regarding your understanding of UST?

14  A.  Just led me to ——

15              MR. CONNOR:  Objection.  Vague.

16              THE COURT:  Sustained.

17              MR. PELLEGRINO:  Your Honor, we offer Defendants'

18  Exhibit 32 for identification.

19              MR. CONNOR:  Objection.  Hearsay.

20              THE COURT:  Sustained.

21  BY MR. PELLEGRINO:

22  Q.  You mentioned the forums that were the basis of discussion

23  after the 2021 depeg.

24  A.  Yes.

25  Q.  Were there any propositions or proposals that were made

1   that came out of those forums?

2   A.  There was a lot of discussion on those forums.

3   Q.  OK.  Do you have an understanding of what governance

4   proposals are?

5   A.  Yes.

6   Q.  What are they?

7   A.  A governance proposal is when some participant in the ——

8   well, this is across multiple ecosystems.  It's not specific to

9   Terra.  But in this case, when a participant in the Terra

10  ecosystem has a proposal to change the parameters of the

11  blockchain or to spend money from the community pool —— there

12  are a number of different things they can accomplish with this,

13  but I think, for this context, to change the parameters of the

14  blockchain, someone can, anyone can, if they put a deposit of

15  Luna down, submit a proposal for the ecosystem to vote on based

16  on their staked Luna.

17  Q.  And did you observe in or participate in any of those

18  proposals after the May 2021 depeg?

19  A.  I observed.  I don't remember specifically if or which ones

20  I voted in.

21  Q.  What proposals do you recall as you sit here today?

22  A.  I mean, I remember —— I remember the proposal that went on

23  the chain for —— I think I remember the one that went on the

24  chain for that Jump Trading alteration of parameters.

25  Q.  What would that proposal —— or what was the intent of that

O43HSec1                          Amani – Direct

1    proposal —— or let me rephrase.

2              MR. CONNOR:  Objection, your Honor.  He's trying to

3    elicit the same testimony that your Honor sustained the

4    objections on.

5              MR. PELLEGRINO:  I'm just asking his recollection,

6    your Honor, which he says he has.

7              THE COURT:  No, no, the objection is you're asking him

8    now to describe someone else's intent.  Sustained.

9    Q.  Do you recall when UST's peg broke in 2022?

10   A.  I do.

11   Q.  What was your role at Terraform at that time?

12   A.  I was still head of operations.

13   Q.  How long had you worked at Terraform before the 2022 depeg

14   happened?

15   A.  Right over five months.

16   Q.  And do you recall what you were doing at the time of that

17   event?

18   A.  Yeah.  The event lasted a couple of days, I believe.  I

19   don't remember the exact amount of time.  A few days.  I had

20   flown in to Singapore for a company executive team off-site

21   that I was planning, and so I was there in Singapore with a lot

22   of other people from our leadership team watching, essentially

23   watching with everyone else.

24   Q.  Was there an effort by Terraform to defend the peg?

25   A.  Yes.

1    Q.   What was that effort?

2    A.   The primary effort was to deploy the LFG capital that had

3    been raised to defend the peg, and I believe TFL deployed a

4    portion of their own capital as well.

5    Q.   And after the peg was lost, what happened next —— excuse

6    me.  Let me rephrase.

7            Did the peg ultimately fail?

8    A.   The peg failed.

9    Q.   After the peg failed, what happened next?

10   A.   It was fortuitous that we had a lot of our team there in

11   one place.  So we got in a conference room, and we were talking

12   to community members who had lost money, we were talking to

13   protocols that had built on Terra that were —— that had lost

14   money and were worried about how they were going to survive,

15   and we started to evaluate plans for what we could do next

16   based on the feedback we were getting from the community and

17   the builders.

18   Q.   Did Terraform lose money after this depeg event?

19   A.   Yes.

20   Q.   Approximately how much?

21   A.   Hundreds of millions of dollars.

22   Q.   And after the peg was lost, were there reserves left over?

23   A.   There were.

24   Q.   Did Terraform make a decision about what it should do with

25   these reserves?

O43HSec1                          Amani – Direct

1         MR. CONNOR:  Objection.  Lack of foundation and

2    relevance.

3         THE COURT:  Well, the objection for lack of foundation

4    is overruled.  I'm not clear yet on what the relevance is.  You

5    want a sidebar on that?

6         MR. PELLEGRINO:  Please, your Honor.

7         THE COURT:  All right.

8         I know you would have been really disappointed if we

9    didn't have another sidebar.

10        (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O43HSec1                        Amani - Direct

1              (At sidebar)

2              MR. PELLEGRINO:  If you turn to the highlighted

3      portion, this is exactly the deal that was struck yesterday,

4      for lack of a better term.  Sorry.  It begins at 1114, your

5      Honor.  It's highlighted.  They asked to put on Mr. Curran's

6      testimony.

7              THE COURT:  All right.  Hang on.

8              MR. PELLEGRINO:  Yes.

9              THE COURT:  OK.  The objection is overruled.

10             MR. PELLEGRINO:  Thank you, your Honor.

11             MR. CONNOR:  Thank you, your Honor.

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1     (In open court; jurors present)

2  BY MR. PELLEGRINO:

3  Q.  OK.  Mr. Amani, my previous question related to whether

4  Terraform made a decision about what it should do with its

5  reserves, but let me ask you, first, do you have personal

6  knowledge of what it decided to do?

7  A.  Yes.

8  Q.  And what, if anything, did Terraform decide to do with its

9  reserves?

10  A.  We evaluated a lot of different options.  Ultimately, what

11  we decided to do was to give it to community vote to decide

12  what to do.  So we put a proposal up on the governance forums

13  we discussed earlier asking the community, the people who had

14  lost money in UST and Luna, if they wanted us to try to

15  relaunch the chain without the stablecoin for their benefit.

16  And the idea —— there was a lot of discussion on that.  The

17  idea was that TFL had treasury left over.  We could still

18  build.  We still had a team, and we could give away all of the

19  tokens in the new chain to people who had lost money in UST or

20  in Luna and try to rebuild for their benefit.

21  Q.  And just very briefly, what does it mean to put out a

22  governance proposal for a vote?

23  A.  So two steps on that, I should be clear.  One was to put a

24  proposal out for discussion.  So there was a lot of debate ——

25  it's all on the Internet now, a lot of debate about the

1    parameters of what — how it should work.  And then there's a

2    second step, which is to actually put it up for a vote, which

3    means, OK, discussion's been had.  We feel like we have

4    consensus on this.  And that's what I meant earlier when I said

5    put it on chain.  That means it goes onto the chain, becomes,

6    like, official record, and everyone who held UST or Luna prior

7    to the depeg had an opportunity now to go vote on what TFL did

8    next.

9    Q.   And what effect would the proposal have had if it was

10   adopted?

11   A.   The effect would be —

12            MR. CONNOR:   Calls for speculation.

13            THE COURT:   Sustained.

14   Q.   Do you have personal knowledge of what the proposal was?

15   A.   Yeah, the proposal was to take, I believe it was, a hundred

16   billion — or a billion tokens, have them vest over the course

17   of a number of years, so meaning that people would be dropped

18   these tokens, they would vest over a number of years, and they

19   would be given to people who had — one bucket would be people

20   who had lost money on UST and Luna.  Another bucket would be

21   going into the community pool, so that would be a pool of money

22   that the community, those same people, could control and they

23   could decide to give to other teams to help rebuild.  Then

24   there's another bucket that went to a lot of the teams and

25   applications and businesses that were built around Terra that

1    were struggling.  They couldn't make payroll.  They were having

2    all kinds of difficulty.  We wanted to get tokens to them as

3    well so they could sustain their companies.

4    Q.  How did the community vote on that proposal?

5    A.  They voted —— over 60 percent voted for the proposal.  I

6    think only 12 percent voted against and the remaining

7    abstained.

8    Q.  After that vote, what, if anything, did Terraform do?

9    A.  We did exactly what the proposal said we would do, we

10   launched the new blockchain, and we gave away those tokens.

11   Q.  And why did it do that?  Why did Terraform do that?

12   A.  Because we had this community that had believed in us, and

13   —— and it failed.  And we wanted to continue to work for them

14   on their behalf.

15   Q.  Did you consider refunding people's money instead?

16   A.  There were definitely conversations about that.

17   Q.  Did you decide to do that?

18   A.  We did not.

19   Q.  Why not?

20   A.  The community wasn't asking us to.  And number two, a lot

21   of money was lost, right?  And the amount of money we had left

22   in our treasury, like, if you try to split it up among every

23   single person who lost money, it was going to be like a

24   meaningless amount.  And so that's why this —— there was debate

25   about this in the community, in the community proposal that we

O43HSec1                    Amani – Cross

1    put out, but, ultimately, the community felt it would be more

2    beneficial for them and we would have more success if TFL just

3    kept building, kept building useful products.  They believed in

4    our mission.

5    Q.  And what was the outcome of the option Terraform chose?

6    A.  The outcome is TFL still —— is still working to build for

7    those people today.  We still have a community, they have their

8    tokens, and we continue on.

9              MR. PELLEGRINO:  No further questions at this time,

10   your Honor.

11             THE COURT:  Cross-examination.

12   CROSS-EXAMINATION

13   BY MR. CONNOR:

14   Q.  Good morning, Mr. Amani.  My name is James Connor, and I'm

15   an attorney with the Securities and Exchange Commission.

16             I want to start off by talking about your background

17   at Terraform Labs.  You said this on direct, but you didn't

18   start at Terraform Labs until January of 2022, is that right?

19   A.  That's right.

20   Q.  And you also testified on direct about the circumstances

21   upon which you became the CEO.  Do you recall that?

22   A.  Yes.

23   Q.  And you became the CEO in March of 2023.  That's correct,

24   right?

25   A.  I think that's right.

O43HSec1                         Amani - Cross

```
 1   Q.  And before you were the CEO, Do Kwon was the CEO?
 2          MR. PELLEGRINO:  Objection, your Honor.
 3          THE COURT:  No, that I'll allow.
 4   Q.  Is that correct?
 5          THE COURT:  You may answer.
 6   A.  That's right, I took over from Do.
 7   Q.  And he's not the CEO any longer, but he is the 92 percent
 8   owner of the company, right?
 9   A.  That's right.
10   Q.  Now, Terraform's lawyer asked you questions on direct
11   examination.  Do you recall that?
12          THE COURT:  Just a second ago.
13   A.  Yes, yes.
14   Q.  And you met with Terraform's counsel before your testimony
15   today, right?
16   A.  Yes.
17   Q.  And you have a personal lawyer as well, correct?
18   A.  I do.
19   Q.  And Terraform Labs pays the fees for that personal lawyer?
20          MR. PELLEGRINO:  Objection.
21          THE COURT:  No, I think that's legitimate.  You can
22   redirect on that, but I think that is a proper question.
23   A.  They do.
24   Q.  And I want to talk about some of the things that you spoke
25   about on direct about your knowledge.
```

1    You were not at Terraform when UST's price dropped

2    below a dollar in May of 2021.  That's correct, right?

3    A.  That's right.

4    Q.  And you've never had discussions with anyone at Terraform

5    regarding UST's drop in price in May of 2021, right?

6    A.  That's right.

7    Q.  And, in fact, you have no personal knowledge whatsoever

8    about how UST regained its $1 peg in May of 2021, right?

9    A.  Correct.

10   Q.  As for Jump's role in the May 2021 depeg, the only

11   understanding you have is things you learned through

12   Terraform's lawyers, right?

13   A.  I think that's right.

14   Q.  And you talked about this on direct, but you had no

15   involvement whatsoever with Chai while you were at Terraform?

16   A.  That's right.

17   Q.  And your position, I think you said it was head of

18   operations?

19   A.  Yeah, for a portion of the time.

20   Q.  And you had no involvement whatsoever with Chai in that

21   role, right?

22   A.  No.

23   Q.  I want to now talk about how Terraform communicated with

24   the investing public about its crypto assets.  I think you

25   talked about on direct that Terraform had social media

O43HSec1                         Amani - Cross

1    accounts, is that right?

2    A.  That's right.

3    Q.  And Terraform communicated with the investing public about

4    its crypto assets regarding Anchor protocol, Luna, and UST,

5    right?

6    A.  Yes.

7    Q.  And about Chai, right?

8    A.  Yes.

9    Q.  And specifically, Terraform Labs communicated with the

10   public through Twitter, right?

11   A.  That was the primary way, yeah.

12   Q.  And Terraform Labs' Twitter account was Terra.money.

13   You're aware of that, correct?

14   A.  Yeah, I think that's it.

15   Q.  And so tweets that came from that address were tweets from

16   Terraform Labs, correct?

17   A.  Yes.

18   Q.  Terraform Labs also used Medium to communicate with the

19   public, right?

20   A.  Correct.

21   Q.  And Terraform would use Medium when the information that it

22   wanted to convey with the public was longer than it could

23   convey through Twitter, right?

24   A.  That's right.

25   Q.  And Terraform would also post information on its website,

O43HSec1                          Amani - Cross

1    correct?

2    A.  Yes.

3    Q.  And when Terraform communicated with the public, it

4    understood it had an obligation to be truthful, correct?

5    A.  Yes.

6    Q.  Mr. Amani, you've been here for the entire trial, right?

7    A.  With the exception of yesterday, yes.

8    Q.  And so you've seen the testimony and you've seen the

9    exhibits, correct?

10   A.  Yes.

11   Q.  And you've heard testimony that was read into the record by

12   someone named Paul Kim.  Do you recall that?

13   A.  I do.

14   Q.  And just so the record's clear, that person on the stand,

15   that was not Paul Kim, right?

16   A.  That's right.

17   Q.  That was a professional reader that Terraform hired, right?

18           MR. PELLEGRINO:  Objection.

19           THE COURT:  Overruled.

20   A.  Yeah, I don't know if, like —— I'm not trying to split

21   hairs.  I don't know who, like, hired them, but I think they

22   were hired by our law firm.

23   Q.  When you say "our law firm," you're referring to Dentons

24   law firm?

25   A.  Yeah, I don't know who —— I don't know who specifically

O43HSec1                         Amani - Cross

1    hired them.  But, yeah, we wanted someone to read, yes, I

2    believe.

3             THE COURT:  Ladies and gentlemen, you should

4    understand that it is commonplace when a deposition is read to

5    have someone play the role of the witness and someone else play

6    the role of the questioner, and so forth, so that you can

7    distinguish between the questions asked and the answers given.

8    So that was all done with the permission of the Court.

9    Q.  And as far as Mr. Kim, you've never met Mr. Kim in person,

10   right?

11   A.  Not in person.

12   Q.  And we've also heard about an individual named Jeff Kuan?

13   A.  Yes.

14   Q.  Do you recall that?

15            And Jeff Kuan had a pretty senior role at Terraform,

16   right?

17   A.  He did.

18   Q.  And like Mr. Kim, Jeff Kuan also has not appeared at the

19   trial, right?

20   A.  That's right.

21   Q.  Now, you were also in court when you heard the video

22   deposition of Ashwin Mathialagan.  Do you recall that?

23   A.  Yes.

24   Q.  And you understand that he was the corporate designee of

25   Terraform Labs?

1  A.  Yes.

2  Q.  And Mr. Mathialagan currently works at Terraform Labs right

3  now, right?

4  A.  He does.

5  Q.  And, in fact, he is one of only three directors of the

6  company, right?

7  A.  Yes.

8  Q.  And like Mr. Kim and like Mr. Kwon, he also didn't come to

9  the trial, right?

10  A.  Right.

11  Q.  And similarly, we heard the testimony read into the record

12  by Do Kwon.  Do you recall that?

13  A.  I do.

14  Q.  And I think this is fairly obvious, but the person on the

15  stand, that was not Do Kwon, right?

16  A.  That's right.

17          MR. PATTON:  Your Honor, may we have a sidebar?

18          THE COURT:  Why?  Well, all right.  Come on.

19          (Continued on next page)

20

21

22

23

24

25

1           (At sidebar)

2           MR. PATTON:  Thank you, your Honor.  The previous line

3    of questioning with the other witnesses was ——

4           THE COURT:  I'm sorry?

5           MR. PATTON:  The previous line of questioning with the

6    other people he was going through, Paul Kim, Jeff Kuan, led to

7    "and they didn't come here to testify, did they?"

8           THE COURT:  And I'm sorry?

9           MR. PATTON:  They didn't come here to testify.

10          THE COURT:  Yeah.

11          MR. PATTON:  And I think your Honor has already

12   instructed the jury on this topic, and I don't know whether you

13   plan to again, but that should be what they're told about this.

14   I don't think there should be any —— any questioning that goes

15   into his ——

16          THE COURT:  So I understand that.  I'm not sure why

17   you wanted —— why you just didn't say objection, but ——

18          MR. PATTON:  Because there wasn't a question.  I just

19   wanted to clarify before we got into the questions.

20          THE COURT:  So do you want me to instruct the jury

21   that subpoenas are available, and so forth?  No?

22          MR. PATTON:  No, your Honor.  I just wanted to make

23   sure we were not going to do the same thing that he had just

24   done with Paul Kim and Jeff Kuan about our client.

25          THE COURT:  About?

O43HSec1                        Amani – Cross

1           MR. PATTON:  About Do Kwon.

2           MR. PELLEGRINO:  Do Kwon.

3           THE COURT:  Oh, I see.

4           MR. PATTON:  I just wanted to head that off at the

5   pass.

6           THE COURT:  I'm sorry.  I misunderstood.

7           Are you planning to do that?

8           MR. CONNOR:  No.

9           THE COURT:  OK.

10          (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O43HSec1                        Amani - Cross

1              (In open court; jurors present)

2      BY MR. PELLEGRINO:

3      Q.  Mr. Amani, do you recall that you talked on direct

4      examination about things that Terraform did in the wake of the

5      May 2022 collapse?  Do you recall?

6      A.  Yes.

7      Q.  And those were things that Terraform Labs, the company,

8      did, right, that you talk about?

9      A.  Yeah.  I'm trying to think of any specifics, but generally,

10     yes.

11     Q.  You're aware of an entity called the Luna Foundation Guard?

12     A.  Yes.

13     Q.  That was an entity that was controlled by Terraform Labs,

14     right?

15     A.  I believe Terraform Labs had a service agreement with LFG

16     to deploy capital on their behalf, but LFG also had a board.

17     Q.  And Terraform Labs controlled the wallet addresses of Luna

18     Foundation Guard, isn't that right?

19              MR. PELLEGRINO:  Objection.  Scope.

20              THE COURT:  Overruled.

21     A.  Can you say that again.

22     Q.  Terraform Labs controlled the cryptocurrency wallet

23     addresses for Luna Foundation Guard, right?

24     A.  I believe so, yes.

25     Q.  And you talked about on direct that, in crypto, who

1    controls the keys is a very important consideration, right?

2    A.  That's right.

3    Q.  And for the Luna Foundation Guard, Terraform Labs

4    controlled the keys, right?

5    A.  That's right.

6    Q.  So, essentially, Terraform Labs controlled the money of

7    Luna Foundation Guard, right?

8                MR. PELLEGRINO:  Objection.

9                THE COURT:  Ground?

10               MR. PELLEGRINO:  Relevance.

11               THE COURT:  Overruled.

12   A.  I think my understanding —— and I don't have a perfect

13   understanding of this because I wasn't involved in any of this

14   —— is that, yes, without a doubt TFL had the ability to send

15   money, like to move money, although I think there was also

16   conversations with the board members to get their approval

17   before doing so.  So —— but, yeah, go ahead.

18   Q.  When you talked about —— on direct when you were talking

19   about things that Terraform Labs did to —— I think you used the

20   word "defend" the peg.  Do you recall that?

21   A.  Why.

22   Q.  Those were —— the moneys that were spent, Terraform Labs ——

23   I think it was your testimony that Terraform Labs did that?

24   A.  Yeah, that's true.

25   Q.  And you held yourself out as a representative of the Luna

O43HSec1                        Amani - Cross

1    Foundation Guard, right?

2    A.   In what time period?  When you say "you," do you mean me or

3    the company?

4    Q.   Meaning you.

5    A.   Oh, gosh.  Maybe.  I don't know.  You might have to refresh

6    my memory on that.

7    Q.   OK.  I'm going to show you, just for the witness, what's

8    within marked as PX 579, and I'm going to refer you to the

9    third page.

10        Does that refresh your recollection as to whether you

11   held yourself out as a representative of the Luna Foundation

12   Guard?

13   A.   Yeah, I think — yeah.

14   Q.   So just apologies, I just want to make sure the record's

15   clear.

16        You did hold yourself out as a representative of the

17   Luna Foundation Guard, right?

18   A.   I think I was, yeah, operating on behalf of TFL under the

19   service agreement for the LFG.

20   Q.   But when you provided your contact information and your

21   email address, you put LFG.org in there, right?

22   A.   Well, that's not my email address.  That's an email address

23   for LFG.  That's not my email address.  I told them they should

24   email it to LFG.

25   Q.   I want to now talk about how Terraform Labs makes money.

1        I think you talked about — in your demonstrative you

2   had an icon on there about how the Terra blockchain was

3   launched in April of 2019.

4   A.  Right, the icon at the center of the slides.

5   Q.  And when this occurred, Terraform created 1 billion Luna

6   tokens on the blockchain, right?

7   A.  Let me clarify.  Are you asking about Terra 1 or Terra 2?

8   Q.  I'm asking about your demonstrative where you said

9   Terraform blockchain launched April 2019.  Do you recall that?

10  A.  Yes.

11  Q.  And at that time Terraform Labs created 1 billion Luna

12  tokens, right?

13  A.  I don't know for sure.  That was before I was there

14  Q.  And Terraform allocated to itself 400 million of those

15  tokens, right?

16  A.  Again, I wasn't there.  I don't know that for a fact.

17  Q.  And you do know that Terraform sold Luna tokens to

18  investors, right?

19  A.  Yes.

20  Q.  And when it sold Luna tokens to investors, it did so to

21  United States investors?

22  A.  Again, I don't know.  I don't think I was at TFL when those

23  token purchases — when those token sale agreements went into

24  place.

25  Q.  And Terraform also sold Luna to investors through what's

1   known as crypto asset trading platforms, correct?

2   A.  I don't know.

3           MR. CONNOR:  If we could pull up Plaintiff's Exhibit

4   325, just for the witness.

5   Q.  Mr. Amani, you recognize this document, correct?  Without

6   reading it into the record, I'm just asking if you recognize

7   it.

8   A.  I kind of recognize it.  It looks like —— all these legal

9   docs look the same to me.

10  Q.  And I could just turn your attention to page 11 with your

11  signature.  Do you see that?

12          THE COURT:  I'm sorry.

13  A.  I'm at 8 right now.

14          THE COURT:  Where is the relevant page?

15          MR. CONNOR:  Page 11, Mr. Haywood, please.

16          THE COURT:  All right.  There we are.

17  A.  OK.  Yeah, I see that.

18  Q.  I want to turn your attention to ——

19          THE COURT:  I'm sorry.  Go back to the first page and

20  blow it up, please.  OK.  Go ahead.

21  Q.  And I want to turn your attention to the response to

22  interrogatory No. 19, which is on page 8 of the document.  See

23  that?

24          THE COURT:  Are you offering this?

25          MR. CONNOR:  Your Honor, this is the subject of a

1    stipulation.  I understand defense counsel has an objection to

2    this, which is why I'm not particularly offering it right now,

3    but I want to give the witness ——

4            THE COURT:  Well, are you going to read it or have him

5    read it?  At least that portion has to be offered into

6    evidence.

7            MR. CONNOR:  Yes, your Honor, we would offer for

8    admission the response to interrogatory No. 19.

9            THE COURT:  OK.  Any objection?

10           MR. PELLEGRINO:  Yes, your Honor.  Is it being offered

11   as evidence?

12           THE COURT:  An interrogatory answer can be evidence,

13   yes.  I'll explain in a minute what it is.  But any objection?

14           MR. PELLEGRINO:  Yes, your Honor.  This is a corporate

15   document, and he's testifying from personal knowledge.

16           THE COURT:  Overruled.  He signed this.

17           So just so that we're clear, ladies and gentlemen,

18   before a case goes to trial, in addition to depositions,

19   there's something called interrogatories where certain

20   questions can be put to, in this case, Terraform and then they

21   have to provide an answer, and you can consider that as

22   evidence in the case.  And in this case, the answers were

23   signed off on by the witness.  So it is binding on the

24   defendant, Terraform.

25           Go ahead.

1    MR. PELLEGRINO:  Your Honor, if I may, this is one

2    that we stipulated to, so they should show the stipulation.

3    THE COURT:  OK.

4    MR. CONNOR:  Your Honor, the problem with that is that

5    we read the stipulation into the record, so there's no copy of

6    it.  I can just show the witness the words here, which are the

7    exact words of the stipulation.

8    THE COURT:  I'll permit that.  Go ahead.

9    BY MR. CONNOR:

10   Q.  The question —— are you at interrogatory No. 19?

11   A.  I am.  I recognize this document now that we've gotten into

12   the words.  I remember doing the interrogatory, yeah.  I just

13   couldn't tell from the cover page.

14   MR. CONNOR:  May we publish this to the jury, your

15   Honor, interrogatory No. 19?

16   THE COURT:  Yes.

17   BY MR. CONNOR:

18   Q.  Mr. Amani, it states:  Identify the name of all trading

19   platforms through which Terra sold Luna from April 2018 through

20   April —— through May 2022.  Do you see that?

21   A.  I do.

22   Q.  And could you please read the response to yourself first.

23   A.  Yes.

24   Q.  And so just following up on my previous question, Terraform

25   did sell Luna through trading platforms to investors?

O43HSec1                          Amani - Cross

1    A.  Yeah.  I understand what you mean now, yes.

2    Q.  I want to make sure the answer to my question is correct.

3            Terraform did sell Luna through crypto asset trading

4    platforms to investors, correct?

5    A.  Yes.

6    Q.  Thank you.

7            I now want to talk about efforts that Terraform took

8    to make Luna and UST available to investors for purchase.  One

9    of the things that Terraform did to do that was to enter into

10   contracts with crypto asset trading platforms so that investors

11   could purchase UST and Luna, correct?

12   A.  Can you say that again.

13   Q.  Terraform entered into agreements with crypto asset trading

14   platforms to allow those platforms to sell Terraform's crypto

15   assets to investors, right?

16           MR. PATTON:  Your Honor, objection.  May we have a

17   sidebar on this?

18           THE COURT:  OK.

19           (Continued on next page)

20

21

22

23

24

25

1          (At sidebar)

2          MR. PATTON:  It very well could be that I'm missing

3     something, but it sounds to me like this whole line of

4     questioning is going to a securities registration issue which

5     is not part of this trial, which your Honor's already ruled on.

6     So my objection is relevance outside of the registration issue.

7          THE COURT:  Well, the previous questions were not

8     about that, but is the pending question about that?

9          MR. CONNOR:  It's about the "in connection with"

10    requirement of our fraud charges.  I think that's what we're

11    trying to —

12         THE COURT:  So that's permissible for that purpose.

13    He has to show that these various things that are complained of

14    in the 10b-5 count were in connection with the purchase and

15    sale of securities.

16         MR. PATTON:  Understood, your Honor.

17         THE COURT:  He's not going to ask the question, were

18    you registered to sell securities?

19         MR. CONNOR:  Right.

20         THE COURT:  He's not going to ask that question.

21         MR. CONNOR:  And, your Honor, if we could raise one

22    other point, which is he has now talked about that they have

23    issued another token called Luna 2.0 to investors, and that

24    re-raises the question about the relevance of the unregistered

25    securities offerings in Luna.  They're doing Luna 2.0 —

O43HSec1                          Amani – Cross

1          THE COURT:  No, I'm keeping that — the jury's got

2     enough to deal with without dealing with that.

3          MR. CONNOR:  Thank you, your Honor.

4          (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O43HSec1                    Amani - Cross

1           (In open court; jurors present)

2    BY MR. CONNOR:

3    Q.  Mr. Amani, apologies.  I'm not sure exactly where we left

4    off, but the pending question I had was whether Terraform Labs

5    entered into agreements with crypto asset trading platforms to

6    allow those platforms to sell UST and Luna to investors?

7    A.  You mean —— can I clarify?

8    Q.  Yes, please.

9    A.  You mean like an exchange, like Binance?

10   Q.  That's correct.

11   A.  I wanted to make sure we're talking about the same thing.

12   I believe so.

13   Q.  And a crypto asset trading platform or, in your words, an

14   exchange is a place where investors can go to purchase UST and

15   Luna?

16   A.  That's right.

17   Q.  Mr. Amani, I now —— this will be my final line of inquiry.

18   I now want to talk about the May 2022 events that I think you

19   talked about on direct examination.

20           You were working at Terraform Labs in May of 2022, is

21   that right?

22   A.  That's right.

23   Q.  And I think you talked about on direct that Terraform took

24   steps to try to restore the peg in 2022.  Do you recall that?

25   A.  Yes.

O43HSec1                         Amani - Cross

1  Q.  I just want to be clear about something.  You personally

2  had no role in trying to restore the peg, right?

3  A.  That's right.

4  Q.  And in May of 2022, UST's price dropped again from $1 as it

5  had in May of 2021, right?

6  A.  Yes.

7  Q.  But this time the price didn't recover?

8  A.  That's right.

9  Q.  And investors, including investors in the United States,

10  lost billions of dollars, right?

11  A.  Investors lost billions of dollars?  I don't know.  I don't

12  have a breakout by country.

13  Q.  You mentioned that you're a very close follower of social

14  media posts on Twitter related to crypto.  Do you recall that?

15  A.  Yes.

16  Q.  And you recall about that time that there was a lot of such

17  posts about the devastating losses that investors had suffered

18  as a result of the collapse of Terraform Labs' UST?

19  A.  That's right, yes.

20  Q.  But Terraform, on the other hand, continues to operate as a

21  company to this very day, right?

22  A.  That's right.

23  Q.  And I think you testified that Terraform has now created

24  another token, something it calls Luna 2.0, is that right?

25  A.  Yeah, we call it Luna now.  But, yeah, it's a second

1   version.

2   Q.  And Terraform Labs is to this very day selling that Luna

3   2.0 to investors through liquidity pools, right?

4           MR. PELLEGRINO:  Objection.

5           THE COURT:  Overruled.

6   A.  I don't know if I would characterize it that way.  I don't

7   know that putting in a liquidity pool ── we are providing

8   liquidity for it.

9   Q.  You're providing the Luna to the liquidity pool from which

10  the investor purchases it, right?

11  A.  Maybe you can put it that way.

12  Q.  Now, you talked a lot about on direct about how much money

13  that Terraform Labs spent to, I think you used the word, defend

14  the peg.  Do you recall that?

15  A.  Yes.

16  Q.  Terraform Labs didn't spend all its money to defend the

17  peg, right?

18  A.  It did not.

19  Q.  And Terraform Labs currently has over $150 million in

20  assets, right?

21  A.  Yeah, I don't know the exact number, but, yeah, roughly.

22  Q.  And you personally, what is your salary?

23           MR. PELLEGRINO:  Objection, your Honor.

24           THE COURT:  Overruled.

25           MR. PELLEGRINO:  May we sidebar?

| | |
|---|---|
| 1 | THE COURT:  No. |
| 2 | A.  My salary is 3 million a year. |
| 3 | Q.  Now, you were in the courtroom when you heard the testimony |
| 4 | of Do Kwon read into the record by the reader.  Do you recall |
| 5 | that? |
| 6 | A.  Yes. |
| 7 | Q.  And one of the things that Do Kwon testified to was that in |
| 8 | August of 2022, Terraform Labs had assets of 10,000 Bitcoin, |
| 9 | right? |
| 10 | A.  What's the date again? |
| 11 | Q.  August of 2022. |
| 12 | A.  I don't remember the specific statement.  I remember the |
| 13 | 10,000 Bitcoin. |
| 14 | Q.  OK.  So it's fair to say those 10,000 Bitcoin were not used |
| 15 | to defend the peg because Terraform Labs still had them, right? |
| 16 | A.  That's right. |
| 17 | Q.  And 10,000 Bitcoin in August —— do you recall what the |
| 18 | approximate price of Bitcoin was in August 2022? |
| 19 | A.  I don't. |
| 20 | Q.  Now, in addition to the $150 million in assets that |
| 21 | Terraform Labs has, the Luna Foundation Guard also owns |
| 22 | hundreds of millions of dollars in crypto assets, right? |
| 23 | A.  I don't know if that number is correct, but it has millions |
| 24 | of dollars in assets.  I don't know —— I don't know that it's |
| 25 | over a hundred million.  (Continued on next page) |

O43ASEC2                      Amani - Redirect

1   BY MR. CONNOR:

2   Q.  And so those monies were not used to defend the peg, right?

3   A.  No.

4   Q.  And those monies, your 150 million, the million that Luna

5   Foundation Guard, none of that money was used to repay

6   investors, right?

7   A.  No.

8   Q.  No, it was not used?

9   A.  No, it was not.

10          MR. CONNOR:  No further questions.  Thank you.

11          THE COURT:  Any redirect?

12          MR. PELLEGRINO:  Just one moment, your Honor, please.

13   REDIRECT EXAMINATION

14   BY MR. PELLEGRINO:

15   Q.  Mr. Amani, is Terraform Labs currently operating in or out

16   of bankruptcy?

17   A.  In bankruptcy.

18          MR. PELLEGRINO:  Thank you, your Honor.  No further

19   questions.

20          THE COURT:  Anything else?

21          MR. CONNOR:  No, your Honor.

22          THE COURT:  Thank you very much.  You may step down.

23   Ladies and gentlemen, we'll give you a short 10-minute break at

24   this time, and then we'll move forward until 3:30 today.

25          (Continued on next page)

O43ASEC2

```
 1              (In open court; jury not present)
 2              THE COURT:  So now let me hear anything anyone further
 3    wanted to say about the next witness.  The government -- the
 4    SEC has moved to exclude that witness as I understand?
 5              MR. CONNOR:  That's correct.
 6              MR. CALIFANO:  Excuse me, your Honor.  That witness
 7    was never part of a motion in limine.  So I guess this is a new
 8    motion by the SEC.
 9              THE COURT:  Okay.  So it's a new motion.  So as I
10    understand, the motion is they don't believe he has any
11    personal knowledge of anything relevant to the case.  Is that
12    the motion?
13              MR. CONNOR:  Yes, your Honor.
14              THE COURT:  All right.
15              MR. CALIFANO:  Your Honor, Mr. Schum has been a member
16    of the community well before he actually joined TFL.  He was
17    one of the validators for the Terraform blockchain.  In that
18    position he has direct knowledge of the way the blockchain
19    operated, of the role of that validator, and how governance
20    worked in the community, all of which are very relevant to
21    exactly what we're seeing.
22              And most importantly, your Honor, Mr. Schum is one of
23    the members of the community that was aware in dealing with all
24    of the issues on the risks of UST and the mint-burn mechanism,
25    which is central to our defense of this case.
```

O43ASEC2

 1          THE COURT:  So let me make sure I fully understand the

 2    defense on the claims here.  The two claims that the jury has

 3    to consider are that the defendants intentionally either

 4    affirmatively lied or materially misrepresented a material fact

 5    of importance to investors in order to obtain or retain money

 6    or property in connection with a purchase or sale of

 7    securities, or in the section 17, in the purchase or sale of

 8    securities.

 9          So the defense is that they didn't lie, right?

10          MR. CALIFANO:  The defense, your Honor, I want to go

11    back to the claim, part of the claim was a material omission

12    that they omitted the involvement of Jump.

13          THE COURT:  Yeah, that's right.  That's one of the --

14    although that's coupled to the statement by the company and by

15    Mr. Do Kwon that we have this algorithm that's going to keep

16    everything stable because you can exchange it for Luna, etc.,

17    etc.  And when, as I understand the SEC's position on that

18    claim is that when the May 2021 depeg occurred, there was a

19    secret deal with Luna and that's what enabled the peg to go

20    back to a dollar.  And that without that, as their expert

21    testified, the peg would not have returned, indeed it would

22    have dropped.

23          So let me make sure I understand where the defense is

24    with respect to that.

25          MR. PATTON:  Your Honor, I do think it's important

O43ASEC2

```
 1    when the SEC is making claims about statements that Do Kwon
 2    made or Terraform made that are misleading and they've
 3    specified those in the pretrial order what those statements
 4    were.  I think it's extremely important that the jury have the
 5    context for those statements to understand whether or not they
 6    were in fact misleading.
 7              So, for instance, some of the statements that they've
 8    alleged are something along the lines of, you know, the
 9    protocol worked, take the '21 depeg, and they're saying that's
10    misleading because they were under an obligation to explain
11    that there was actually reserves coming in on secondary markets
12    bolstering the on-chain mint-burn mechanism.
13              THE COURT:  No, they're saying more than that.
14    They're saying that that was a manipulation by Do Kwon that he
15    reached out to Jump and made a secret agreement.  It's not that
16    Jump on its own made the decision to enter.  But rather that it
17    was induced to enter by an arrangement with Do Kwon and
18    Terraform.
19              MR. PATTON:  Understood, your Honor.  Obviously we
20    dispute those things.
21              THE COURT:  Correct.  I understand you.  But I want to
22    make sure I understand what the defense is.  Is the defense,
23    that as we've heard some testimony that suggesting from the
24    defense, that Jump acted on its own?  That would be a defense.
25    But I don't see it as a defense that if Mr. Kwon knew that he
```

1    had induced Jump to come in, that his statement, oh, yeah, the

2    protocol is just working just like we said it was, was not

3    materially misleading, although the jury of course will make

4    that ultimate determination.

5         MR. PATTON:  I think this goes back to something we

6    talked about towards the beginning of the trial, which is the

7    defense depends on what the claim is about why those statements

8    are misleading.  If the claim is that any role by Jump needed

9    to be disclosed, well, that extends beyond, you know, what the

10   SEC claims --

11        THE COURT:  No, the claim is, as I understand it, the

12   SEC will correct me if I'm wrong, it is that there had, for

13   that statement, those numerous statements about how the

14   protocol worked and all like that, were misleading, were

15   materially misleading, unless there was disclosed that Jump was

16   solicited through a secret deal to jump in.

17        MR. CALIFANO:  Your Honor, taking your point.

18        THE COURT:  Yeah.

19        MR. CALIFANO:  I want to start back at the statements

20   that the SEC alleges are false.

21        THE COURT:  I'm still not -- that's all fine and

22   I'm -- but I do think, gentlemen, you are not answering my

23   question.  My question is:  What's your defense?

24        MR. CALIFANO:  My defense, our defense, your Honor, in

25   the first instance is that the statements that the SEC has

O43ASEC2

1  alleged are false are not false, especially in the context of

2  the other statements and information that was available to the

3  public and in the community at the time those statements were

4  made.  Our second part of our defense --

5         THE COURT:  All right.  Let me just stop on that.

6         So if a person intentionally makes a mis- --

7  especially the CEO, makes a misleading statement to an investor

8  about a material matter, is it your position that the law does

9  not make that illegal under Section 17 or 10b-5, if a

10  reasonable investor who knew everything that was being

11  disclosed to the market would have interpreted that statement

12  differently from what the intent of the -- from what it is on

13  its face.  Is that your position?

14         MR. CALIFANO:  If, your Honor, intent was frozen and

15  not contested, that might be my position.  But that's not our

16  position.  We do not believe that that intent exists.

17         THE COURT:  Well, I understand that.  But I thought

18  you were just saying that -- I've always understood that you

19  had two defenses.  One was that the statements were not false

20  or misleading and the second was that they were not about a

21  material matter.  But now you're saying something different.

22  If I understood the last comments you made, you're saying that

23  even if they were intentionally made about a material matter,

24  that is still not actionable if an investor who was fully

25  versed in the entire context would have seen that they couldn't

1    be taken literally.  I don't think the law says that's the

2    defense.

3    　　　　　MR. CALIFANO:  But I don't think that's our position,

4    your Honor.

5    　　　　　THE COURT:  Okay.  All right.

6    　　　　　MR. CALIFANO:  Because we would contend that the

7    intent was to make all of the statement and that the complete

8    communication includes other statements made at the same time.

9    So we would --

10   　　　　　THE COURT:  Okay.  So statements made by Do Kwon or

11   statements made -- are we talking about the whole mass of

12   statements made by the company?

13   　　　　　MR. CALIFANO:  The statements made by the company and

14   by Do Kwon were made almost simultaneously especially following

15   the May 2021 depeg.

16   　　　　　THE COURT:  All right.  And at some point you seem to

17   be suggesting that there was also -- that a reasonable investor

18   would take into account the quotation from a Canadian academic

19   that appeared in a snippet of a *Wall Street Journal* article and

20   even put a question, which I think the objection was sustained.

21   But anyway, did the marketplace know what this professor was

22   saying?  That can't be the law.

23   　　　　　MR. CALIFANO:  Well, your Honor, I would say that the

24   Court may not agree with us that that is part of the mix.  And

25   I understand that disagreement.  But we do have plenty of other

O43ASEC2

1    items coming directly from the company, especially explanations

2    that were given to the community and people who were using

3    these protocols and buying these tokens.  So their

4    understanding of those terms, especially in the mix, is very

5    relevant.

6        THE COURT:  Is that what the next witness is supposed

7    to testify on?

8        MR. CALIFANO:  Yes, that is part of what the next

9    witness is going to testify to, your Honor.

10       THE COURT:  And what's he going to say?

11       MR. CALIFANO:  The witness is going to say, because

12   the witness was a member of the community for a period of time

13   before the witness joined TFL as part of their communications

14   group.  As a member of the community that witness operated a

15   validator.  A validator is one of those nodes that validates

16   transactions on the blockchain.  The witness was a member of

17   the community both as a validator and as a person who bought

18   and used UST and Luna.  The person followed all those

19   discussions that were had both on the governance channel, that

20   person voted and participated in governance, and that person

21   also followed the discussions the company had.

22       THE COURT:  Fine.  So if he is asked on cross -- I

23   just want to make sure I understand.  If he's asked on cross:

24   Did you know that Do Kwon had solicited Jump in a secret deal

25   to enter in a very major way towards restabilizing the peg of

O43ASEC2

1  UST, what's he going to say?

2          MR. CALIFANO:  Your Honor, I imagine he would say that

3  he was unaware of that.

4          THE COURT:  Okay.  Then, if he's then asked would that

5  have been material to you, what's he going to say?

6          MR. CALIFANO:  Your Honor, you mean after I object and

7  am overruled?

8          THE COURT:  After you've objected and been overruled,

9  right.

10          MR. CALIFANO:  I do not know how he would answer

11  that --

12          THE COURT:  And I'm glad you anticipated the ruling.

13          MR. CALIFANO:  I don't know how that witness would

14  answer the question, your Honor.

15          THE COURT:  All right.  Well, so let me go back to the

16  SEC since we don't know how the witness would answer that

17  question.  Why isn't this witness's testimony at least

18  potentially relevant?

19          MR. CARNEY:  Your Honor -- and I'll let Mr. Connor

20  address this witness specifically, but I think some of the

21  points that your Honor raised go to what the SEC's concerns are

22  here about the testimony that's continuously being elicited by

23  defendants.  And this goes back to the testimony you heard from

24  Dr. Mizrach yesterday that the SEC's allegations about Jump

25  working to restore the peg had to do with Jump's trading

O43ASEC2

off-chain and he focused in on KuCoin and other centralized

exchanges.  And the allegation is that under the secret

agreement, Jump went off-chain, where no one in the public

could possibly see --

THE COURT:  Right.  I understand.  And that's

obviously strong evidence of your position.  But what if this

witness were to say -- and I forbid, by the way, any discussion

between this witness and counsel before he testifies.

MR. CALIFANO:  Understood.

THE COURT:  What if this witness says, well, I didn't

know that, but even if I had known it, I think it was still

within the ballpark of how the protocol as I understood it was

to operate.  Yes, there may have been some nudging in this

case, but the basic idea was that the -- you know, Jump didn't

make this investment that you're telling me now for the first

time about, says the witness, out of the goodness of its heart,

they saw an economic opportunity and that was consistent with a

broader context of the protocol.

So if he were to say all that, why isn't that

relevant?

MR. CARNEY:  So obviously in response to that, we've

never heard the defense make that argument, but we would say --

THE COURT:  No, but I think that's sort of what he was

arguing in general terms before, if I have defense counsel's

position correct.  That you think in the context of the overall

O43ASEC2

1    disclosure about the protocol, this was not inconsistent with,

2    and I think that's their point.  Do I have that wrong, defense

3    counsel?

4        MR. PATTON:  No, that's correct, your Honor.

5        THE COURT:  Okay.

6        MR. CARNEY:  So we would think that's a terrible

7    argument because --

8        THE COURT:  Well, that may be.  That's not the

9    question I asked.

10        MR. CARNEY:  Exactly.  But putting that argument

11    aside.

12        THE COURT:  Yeah.

13        MR. CARNEY:  Our concern is the testimony that the

14    defense has elicited has been designed, maybe not purposefully,

15    but to confuse the jury by putting things out there about

16    govern --

17        THE COURT:  Well, I've been worried about that

18    throughout this case, and that is also, I'm still ultimately

19    reserving on rebuttal, and that's the only reason I'm reserving

20    on rebuttal is that very fear.  But I think maybe what we

21    should do, before we hear from this witness before the jury, is

22    bring him in and put the questions to him that I just put and

23    see what he says.  Because if he says something like in my

24    totally speculative hypothesis, then it seems to me that his

25    testimony is relevant.

O43ASEC2

1          MR. CARNEY:  Your Honor, if I could just finish that

2     point.

3          THE COURT:  Yeah.

4          MR. CARNEY:  They've put in a lot about governance

5     proposals that came out after the depeg, which obviously

6     because the laws of the space-time continuum, could not have

7     affected the depeg before.  They've put in a lot of things

8     about what's going on on-chain in Jump's role on-chain being

9     disclosed --

10         THE COURT:  I like space-time continuum.  You've been

11    watching Oppenheimer obviously.

12         MR. CARNEY:  So we think the jury might get confused

13    when they say, oh, they disclosed all this stuff about Jump,

14    but all that stuff about Jump had nothing to do with this

15    off-chain trading, and that's our concern about confusion.

16         THE COURT:  All right.  Let's bring in the witness and

17    I'll question the witness.

18         MR. CONNOR:  Your Honor, the last thing we wanted to

19    raise is the whole opening the door.  I mean, if this witness

20    takes the stand, the door is open, and we would like to --

21         THE COURT:  The door is open to what?

22         MR. CONNOR:  To questioning the witness about Do Kwon,

23    his arrest, I mean, the witness has talked about --

24         THE COURT:  No, I'm not sure about that.  But let's

25    take it one step at a time.  Let's bring in the witness.

O43ASEC2

1          (Zion Schum sworn)

2          THE COURT:  So, Mr. Schum, you were an investor in UST

3    at the time of the May 2021 depeg?

4          THE WITNESS:  Yes.

5          THE COURT:  And you followed what the company was

6    saying about it?

7          THE WITNESS:  Yes.

8          THE COURT:  Were you ever told by the company that the

9    main reason the depeg was corrected was that the company had

10   entered into a secret agreement with Jump for Jump to put very

11   substantial amounts of money into UST and to do so in a way

12   that cannot easily be detected?  Were you ever told that?

13         THE WITNESS:  Not that I recall.

14         MR. CALIFANO:  Your Honor, my apologies.  Just for the

15   record, I just want to note an objection from the defense.

16         THE COURT:  Yeah.  Yeah.  This is -- I'm not saying

17   that in fact happened, I'm just saying that's an allegation.

18         Okay.  But if you had been told that, would that have

19   been important to you in determining what to do with your

20   investment?

21         THE WITNESS:  It depends.

22         THE COURT:  It depends on what?

23         THE WITNESS:  It depends on whether or not Jump would

24   have engaged in using UST Luna mint-burn mechanism without any

25   sort of like extrinsic reward beyond just the economic benefit

O43ASEC2

1    that they gain.

2              THE COURT:  So if they had received an extrinsic

3    reward, that would have been important to you?

4              THE WITNESS:  If -- well, it depends on whether or not

5    the extrinsic reward -- in my personal view, it depends on

6    whether or not the extrinsic reward that they're getting was

7    them trying to, you know, kind of squeeze that out of, you

8    know, as like a market participant, you know, engaging in kind

9    of like, you know -- essentially trying to like squeeze out

10   extra money from TFL versus --

11             THE COURT:  So let me put to you two alternatives, and

12   tell me which one if either would have been important to you.

13             THE WITNESS:  Sure.

14             THE COURT:  Alternative number one is:  Do Kwon goes

15   secretly to Jump and says we want you to spend hundreds of

16   millions restabilizing the peg and we -- it's a good deal for

17   you because now you can make some money out of this, just be

18   sure to do it in a way that no one knows.  So he's not offering

19   any bribe in effect, but he's saying you can make a ton, but we

20   don't want anyone to know about it.

21             Would that have been important to you or not?

22             THE WITNESS:  Yes.

23             THE COURT:  Okay.  Now, conversely, supposing he

24   doesn't talk to them at all and they just decide on their own

25   this is a great chance to make a ton of money, so we're going

O43ASEC2

```
1    to put a ton of money into it.  Would that have been important
2    to you?
3              THE WITNESS:  In just making a decision as to whether
4    or not I should --
5              THE COURT:  Yeah.
6              THE WITNESS:  No.
7              THE COURT:  No, okay.  So you've clarified for me.
8    You can go back to the witness room.  We'll call you back in a
9    minute.
10             THE WITNESS:  Okay.
11             (Witness excused)
12             THE COURT:  So let me ask the SEC, this witness, given
13   the answers he just gave, says in effect if he had known what
14   the SEC says were the facts, it would have been important to
15   him, and if he -- and if those facts are wrong, it would not
16   have been important to him in terms of materiality in the
17   protocol and the disclosures and so forth.
18             So, I mean, now you might want to call him.  But why
19   isn't that relevant testimony?
20             MR. CARNEY:  Your Honor, the only clarification I
21   would make is that in response to your Honor's question, when
22   you asked about if Jump had done this, the witness assumed that
23   you were talking about going through the mint-burn mechanism
24   online as opposed to -- and that was the witness's assumption.
25             THE COURT:  I mean, I just used your formulation of
```

O43ASEC2

1    offline and so forth.  You know, not detectable.  You can get

2    into more details obviously in cross.  I'm not saying -- given

3    that testimony, I'm not saying that it's irrelevant testimony.

4    Defense counsel may not want to call him, but that's their

5    choice.  So I will allow it.

6              MR. CARNEY:  Thank you.

7              MR. CALIFANO:  So --

8              THE COURT:  And all those questions I asked, I'm going

9    to allow the defense to ask, and more questions along that

10   line.  So I wasn't quite sure what your objection was, but

11   those questions will be allowed.

12             MR. CALIFANO:  I noted our continuing objection for

13   the record, your Honor.  I understand that.

14             THE COURT:  Okay.  Very good.

15             MR. CONNOR:  Your Honor, I've been remained by my

16   colleagues to mention one more time, we mentioned it before, on

17   the conviction issue.  This witness was at Terraform Labs.  He

18   was an employee, and he's quoted the head of communications

19   that he's actively involved, meaning Do Kwon, in the day-to-day

20   operations of the company.  There does come a point at which,

21   there does come a point at which --

22             THE COURT:  Yes, but we're not there yet.  You have

23   certainly warned your adversary to be careful, and they have

24   been so far with respect to the last witness.  And but I

25   understand that if they open the door even a crack, you're

O43ASEC2

1    going to want to jump in.

2              All right.  Let's take five minutes and then we'll

3    continue.

4              (Recess)

5              THE COURT:  Let's bring in the jury and bring in the

6    witness.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O43ASEC2

 1              (In open court; jury present)

 2              THE COURT:  Let's get the next witness on the stand.

 3              MR. PATTON:  Apologies for the delay, your Honor, but

 4    I think you'll be pleased with the reason for the delay.

 5              MR. CALIFANO:  Your Honor, given the colloquy, the

 6    discussion we had when we had the break, the defense is going

 7    to move on to another witness.

 8              THE COURT:  Very good.

 9              MR. CALIFANO:  We have an issue.  My apologies.  But

10    we do need to deal with one issue because this is a witness on

11    video.  This would be of Evgeny Gaevoy, so if I think we can go

12    to sidebar for a moment.

13              THE COURT:  Yes.  Okay.  The jury was hoping you would

14    say that because we don't want to break tradition here.

15              (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1            (At sidebar)

2            THE COURT:  So we're talking about page 65 of Mr. --

3    is it Mr. or Ms?

4            MR. CALIFANO:  Mr.

5            THE COURT:  Mr. Gaevoy's deposition, lines 5 through

6    19.

7            MR. CALIFANO:  We're actually going to narrow it, your

8    Honor, lines 10 to 19.

9            THE COURT:  Yes, because it seems to be clear that 5

10   through 9 have to be excluded.  That, just for the record, 5

11   was question:  Why don't I ask you, in your own words, what was

12   the goal of the strategy?  There was an objection to form.  But

13   the answer was:  When you say strategy, which strategy are you

14   referring to?

15           Which really was the point of the objection as well,

16   so all that is excluded.

17           Okay.  Question:  I am referring to the "battle plans"

18   that the article refers to at the bottom of 64, and then at the

19   top of 65 several steps are listed that Wintermute took during

20   the February to May 2022 time period.

21           Answer:  Sure.  So as for battle plans, I don't

22   necessarily remember what they implied.  As for integration,

23   that was basically integrating with the Terra blockchain, as it

24   says in the article.

25           Now, I excluded that on objection raised by the

O43ASEC2

1    defense, and I put aside the fact that the question was

2    blatantly improper as to form, but no objection to form was

3    raised as to that question.  So that objection is waived and

4    wasn't made in what was presented by the SEC.

5         But the first part of the answer is that he doesn't

6    remember it.  And I didn't think it was relevant that he

7    doesn't remember.  And I also thought there is grave danger

8    here of bringing in under the rubric of his not remembering the

9    hearsay contained in that article.

10        Now, as for the second part of that sentence, I didn't

11   think it was up to the Court to parse through this as to

12   portions of that answer.  So I only got as far as the first

13   sentence and didn't reach the second sentence.  So I continue

14   to exclude this.

15        MR. CALIFANO:  Okay, your Honor.  Thank you.

16        MR. CARNEY:  Thank you, your Honor.

17        (Continued on next page)

18

19

20

21

22

23

24

25

O43ASEC2

1          MR. CALIFANO:  Your Honor, we're prepared with some

2     help from Mr. Aquino to play the video of Mr. Gaevoy.

3          THE COURT:  Once again, this is a deposition but it

4     was videotaped so you can see the witness as well as hear what

5     the witness has to say.

6          (Video played)

7          THE COURT:  So you do need to tell the jury who this

8     witness is.  At the moment, he's an unknown name and unknown

9     person.

10          MR. CALIFANO:  My apologies, your Honor.

11          In addition, and I was just reminded, there are four

12     exhibits that are discussed in this testimony.  Defendants'

13     Exhibit 51, which is a *Forbes* article.  Defendants' Exhibit

14     1034, which has been stipulated into admission, Defendants'

15     Exhibit --

16          THE COURT:  Wait a minute.  So 1034 is received on

17     consent.  This article, though, there may be objection.

18          (Defendant's Exhibit 1034 received in evidence)

19          MR. CARNEY:  Objection.  Hearsay, your Honor.

20          THE COURT:  Yeah, sustained.

21          MR. CALIFANO:  Defendants' 1964 is the order from the

22     High Court of Justice King's Bench Division, just directing the

23     witness to testify.  And then Defendants' 1961 are the Slack

24     chats to which the witness is testifying, your Honor.

25          THE COURT:  Okay.  So any objection to the high court

O43ASEC2

1    order?

2            MR. CARNEY:  No objection to the high court order,

3    your Honor.

4            THE COURT:  Okay.  That's received.

5            (Defendant's Exhibit 1964 received in evidence)

6            MR. CARNEY:  And to the Slack chats, we would object

7    on hearsay grounds.

8            THE COURT:  I think it may turn on -- to the extent I

9    allowed in testimony that's referring to those Slack chats,

10   they are to that extent admissible.  But anything else would

11   not be admissible.  So you have to -- you'll have to redact it

12   when we present it to the jury so that it's only the portions

13   referred to in the testimony I permitted.

14           MR. CARNEY:  Thank you, your Honor.

15           (Defendant's Exhibit 1961 received in evidence)

16           MR. CALIFANO:  Just so we're clear, your Honor, during

17   the testimony the portions that are being referred to are shown

18   next to the witness.  To the extent we have a document that

19   goes into the jury, only those portions will be provided to the

20   jury.

21           THE COURT:  Correct.  You got it.

22           MR. CALIFANO:  The second thing, your Honor, just to

23   be clear, is that when the article was objected to earlier,

24   that objection had been overruled.

25           THE COURT:  I don't recall that.  But in any event, in

O43ASEC2

1    this case, the way it was used as reflected in my rulings, was

2    largely for hearsay purposes, and therefore not admissible.  To

3    the extent that I allowed a question about a specific sentence

4    in the article, then that sentence can be received.

5          MR. CALIFANO:  Understood, your Honor.  That wouldn't

6    be considered evidence.  That would be considered part of the

7    question.

8          THE COURT:  Yes, yes.

9          MR. CALIFANO:  That's the only -- I think that's what

10   we're going to do.  I just want to make sure we have that.

11         So, your Honor, what we've done, just to make sure

12   that the Court understands, with respect to a question being

13   read, only the portion of the article with respect to that

14   question appears on the screen.

15         THE COURT:  That's it.

16         MR. CALIFANO:  All right.  Thank you, your Honor.

17         THE COURT:  Okay.  Would you like to identify this

18   mystery witness to the jury, please.

19         MR. CALIFANO:  Evgeny Gaevoy is the CEO of the

20   Wintermute Trading Firm and he is testifying obviously to

21   pursuant to court order.

22         THE COURT:  Yeah, this occurred in London?

23         MR. CALIFANO:  Yes, your Honor.

24         THE COURT:  I express my apologies, ladies and

25   gentlemen, that neither you nor I got to go to London for this

O43ASEC2

1    testimony.

2            (Evgeny Gaevoy deposition video played)

3            MR. CARNEY:  Can we pause.  Can I request a brief

4    sidebar?

5            THE COURT:  Okay.

6            MR. CARNEY:  My apologies.

7            (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O43ASEC2

1                    (At sidebar)

2                    MR. CARNEY:  So, your Honor, coincidentally and

3       unfortunately, both of Terra's depegs happened in May, one in

4       May of 2021, one in May of 2022.  They have brought in this

5       testimony from London, on their theory of what caused the 2022

6       depeg, obviously the SEC's case --

7                    THE COURT:  So do you want to just stipulate to say

8       that to the jury so they'll understand?  Is that good for the

9       defendants?

10                   MR. CALIFANO:  That's fine, your Honor.

11                   THE COURT:  Okay.  Good.  So why don't you mutually

12      inform the jury.

13                   (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

O43ASEC2

| 1 | MR. CALIFANO:  Your Honor, just to clarify for the

members of the jury what Mr. Gaevoy is talking about is trading

with respect to the May 2022 depeg.

THE COURT:  Right and my understanding is all counsel

have agreed that's what he's talking about, not the May 2021.

There was the coincidence that May was involved in both depegs,

but here he's only talking about the 2022.  Okay.  Go ahead.

(Video played)

MR. CARNEY:  Your Honor, pause.  I'm sorry.  I didn't

see the last set of lines in the designations on the chart.

Page 89.

MR. CALIFANO:  I think those are your

counter-designations on that.

MR. CARNEY:  Fair enough.  I'll take your word.

(Video played)

MR. CALIFANO:  That's the end of the video, your

Honor.

THE COURT:  Very good.  Please call your next witness.

MR. CALIFANO:  Your Honor, the defense will call

Mr. Terrance Professor Terrence Hendershott.  I have to go get

him, your Honor.

THE COURT:  Okay.

MR. CARNEY:  Your Honor, could I just note for the

record that we were not expecting that professor would be

testifying today so --

1          THE COURT:  Well, I have a feeling he's going to have

2    more than a half hour on his direct, so we'll have the whole

3    evening to prepare your cross.

4          MR. CARNEY:  Thank you.

5          MR. HENKIN:  And, your Honor, in an abundance of

6    caution with regard to that, we did send the SEC the

7    demonstratives that we may use earlier today, so they've had

8    them for several hours at this point.

9          THE COURT:  Very good.

10          THE DEPUTY CLERK:  Please remain standing and raise

11   your right hand.

12   TERRENCE HENDERSHOTT,

13        called as a witness by the Defendants,

14        having been duly sworn, testified as follows:

15          MR. HENKIN:  Your Honor, may I?

16          THE COURT:  Please.

17   DIRECT EXAMINATION

18   BY MR. HENKIN:

19   Q.  Professor Hendershott, are you an expert in this case?

20   A.  Yes.

21   Q.  What is the field of your expertise?

22   A.  I study financial markets in particular an area that's

23   often referred to as market microstructure.

24   Q.  Are you being compensated for your work as an expert in

25   this case?

1    A.  I am.

2    Q.  How much?

3    A.  $1,500 and –– $1,525 an hour.

4    Q.  Is your compensation in any way dependent on the outcome of

5    this case?

6    A.  No, it's not.

7    Q.  You described your expertise as financial markets.  What is

8    a financial market?

9    A.  This is where buyers and sellers come together to trade

10   assets, so it is could be stocks, bonds, currencies.  The

11   crypto market is a type of financial market.

12   Q.  And you also mentioned market microstructure.  What is

13   market microstructure?

14   A.  Well, it's really about how trading is conducted, how the

15   rules of trading matter, and how trading affect the prices that

16   investors get.

17   Q.  Did you prepare a set of demonstratives to assist the jury

18   in connection with your testimony?

19   A.  Yes, I did.

20   Q.  So we'll get to those demonstratives in a few minutes.

21   But, first, what was your primary assignment in this case?

22   A.  My primary assignment was to review and evaluate

23   Dr. Mizrach's opinions.

24   Q.  And what did you conclude about Dr. Mizrach's opinions?

25   A.  Well, I concluded that his opinion about the Jump trading

1  causing the 2021 repeg is incorrect.

2  Q.  And what is the opinion that you just stated based on?

3  A.  That's based on my review of the documents and the records

4  in this case and the trading data and Dr. Mizrach's reports.

5  Q.  Did you have help preparing the report that you filed in

6  this case?

7  A.  Yes, I used a firm.

8  Q.  And what firm did you use?

9  A.  I use Cornerstone Research.

10  Q.  What is Cornerstone Research?

11  A.  They're a well-known economic and financial analyst,

12  analysis consulting firm.

13  Q.  Is it common practice for experts doing what you did in

14  this case to use a firm like Cornerstone?

15  A.  Yes.  Most experts use firms.  I use them in my other

16  cases.  When I worked for the SEC in a case I used a firm like

17  Cornerstone.

18  Q.  Before we get into your opinions, let's start by telling

19  the jury a little bit more about yourself.

20        MR. HENKIN:  At this point, your Honor, I would like

21  to start moving to the demonstratives.  And could we bring up

22  D-1807 slide one, but only for the witness and the Court

23  please.

24        And, your Honor, with your permission I would like to

25  publish this to the jury.  I don't know whether there are any

1    objections.

2          THE COURT:  That's fine.  Ladies and gentlemen, I

3    remind you as I did with respect to the other expert witness,

4    that these demonstratives are just aids to helping you follow

5    his testimony.  They're not themselves evidence.  Go ahead.

6          MR. HENKIN:  May I publish?

7          THE COURT:  Yeah.

8          MR. HENKIN:  Thank you.

9    Q.  So, Professor Hendershott, what education have you

10   received?

11   A.  So I got my undergraduate degree at Miami University in

12   Ohio, and then I went on and got my PhD at the business school

13   at Stanford University.

14   Q.  And specifically what was the area in which your PhD was

15   awarded?

16   A.  Well, the PhD is in business.  They have different groups

17   or areas within the business school, and the one I was in is

18   called operations, information.  And technology.

19         MR. HENKIN:  And can we pull up slide two, please but

20   not publish it yet.  And request permission to publish this to

21   the jury.

22         THE COURT:  Yeah.  As you pull these up, if there's

23   any objection, just say.  Otherwise, we'll assume they're okay.

24         MR. CARNEY:  Yes, your Honor.  I only had a chance to

25   glance at them briefly earlier, but thank you.

 1          THE COURT:  Okay.  All right.  You may publish.

 2          MR. HENKIN:  Thank you, your Honor.

 3   BY MR. HENKIN:

 4   Q.  Professor, let's talk about some of your academic

 5   appointments.  Prior to 2001, and after getting your PhD, did

 6   you work anywhere other than the Berkeley School?

 7   A.  I worked at the University of Rochester.

 8   Q.  Okay.  And then when did you work at the University of

 9   Rochester?

10   A.  From 1998 through 2001.

11   Q.  Okay.  And then please give the jury the background of your

12   work history since then?

13   A.  Oh, I started as an assistant professor at the University

14   of California at Berkeley in the business school.  Haas is the

15   name of the business school.  Then six years later I got

16   promoted to associate professor, and I got tenure.  And then

17   after that, I received the Cheryl and Christian Valentine

18   Chair.  That was a chair for technology management.  And they

19   give you a chair as some sort of a recognition for –– that

20   you're doing well, that you're recognized in the profession.

21          Then I became a full professor, and then –– a couple

22   years later.  And I've been on the chair of the group in

23   operations and information technology management at the

24   business school.  And then a couple of years after that, I got

25   a chair in banking and finance.

1  Q.  So you've been at UC Berkeley Business School at this point

2  for about almost 23 years?

3  A.  Yeah, pretty much my whole career.

4  Q.  And what do you do as part of -- what do you do as part of

5  being a professor at the Berkeley Business School?

6  A.  So I conduct research.  I write papers and conduct

7  research.  I teach students, and I do some administrative work

8  to help run the school.  So I'm the faculty director of an

9  academic program we have that's called the master of financial

10  engineering.

11  Q.  Do you teach courses?

12  A.  I do.

13  Q.  Graduate, undergraduate or both?

14  A.  I've taught both.  I'm currently just teaching a graduate

15  class because I'm doing some more administrative work.  And

16  it's a class that's about -- it's in the masters of financial

17  engineering, and it's teaching them about financial markets,

18  about market making, arbitrage.  I teach students who have gone

19  to work for firms that trade crypto and different types of

20  assets.

21  Q.  Who oversees the curriculum for the business -- for the

22  Berkeley Business School at this point?

23  A.  Oh, well, I oversee it for the masters of financial

24  engineering program.

25  Q.  And as part of your work, do you also conduct research and

1    write papers?

2    A.  I do.

3    Q.  Do you sit on any committees or boards?

4    A.  I sit on -- I've done a number of -- I've been on a number

5    of boards and committees.

6            MR. HENKIN:  Can we publish, but without for the jury,

7    slide three.  Can we put up slide three without publishing it

8    yet.  Any objection?

9            MR. CARNEY:  No.

10           THE COURT:  Your Honor, may we publish to the jury?

11           THE COURT:  Yes.

12           MR. HENKIN:  Thank you.

13   Q.  Professor, are these some of the committees and other

14   positions that you've had?

15   A.  Yes, they are.

16   Q.  So can you tell the jury what it means to be a visiting

17   economist to the New York Stock Exchange?

18   A.  The New York Stock Exchange had a program for a number of

19   years where they had one economist come in and visit with the

20   research department.  I lived here in New York for a year and

21   worked at the stock exchange and went onto the trading floor

22   and I got to analyze their trading data.  It was a great

23   experience.

24   Q.  Did any -- did you write any papers that came out of that

25   work?

O43ASEC2                    Hendershott - Direct

1   A.  I wrote a whole series of papers based on the data I got

2   from the stock exchange.

3   Q.  And what does it mean to be on the NASDAQ Economic Advisory

4   Board?

5   A.  Well, it's sort of the a similar thing.  So NASDAQ, they

6   formed a board to help advise them from some economists about

7   how they might run their market better or what rules for how

8   trading works would be better for investors.

9   Q.  What's the high-frequency trading subcommittee of the

10  technology advisory committee of the CFTC?

11  A.  So I did some work for the CFTC, both as a consultant in

12  their office of the chief economist, and I also served on a

13  committee.  So that they had a committee of outside people to

14  provide some advice to them, and then I served on the part of

15  that that dealt with high-frequency trading.

16  Q.  Is that different from what appears above it, the

17  consultant to the office of the chief economist?

18  A.  It is different, but they're both for the same agency.

19  Q.  And what did you do as a consultant in the office of the

20  chief economist for the CFTC?

21  A.  I talked to the researchers there.  I gave presentations.

22  I got access to their data.

23  Q.  Did any papers -- did you write any papers as a result of

24  any of these other assignments?

25  A.  No, not on the -- not from the CFTC.

O43ASEC2                           Hendershott – Direct

1   Q.  And what is the Market Surveillance Advisory Group for the

2   Financial Industry Regulatory Authority?

3   A.  Well, so FINRA is the self-regulatory organization for the

4   U.S. -- for U.S. financial firms.  And they started an advisory

5   group.  They wanted to talk to some academics about how they

6   could better surveil their markets and prevent market abuse and

7   market manipulation.

8   Q.  And what is the university -- there's a listing at the top

9   of this for the listing of University of California Retirement

10  System.  Can you tell the jury about the work that you do in

11  that position?

12  A.  Oh, sure.  We have a retirement system for the University

13  of California.  It's actually ten different universities all in

14  one system.  We have about $100 billion in assets that we need

15  to help pay what we owe our retirees, both now and in the

16  future.  And this is a board that reports to the president of

17  the university to provide advice, to make sure that the system

18  is being run well, we're providing the benefits in the best way

19  possible to our members.

20        MR. HENKIN:  We can take this down please.

21  Q.  Let's talk about publications.  Are you yourself a

22  published author?

23  A.  Yes.

24  Q.  How many academic articles have you published?

25  A.  I probably have published about 40, and then I have some

1    working papers, which I hope will get published.  It can be a

2    long process.  I've written book chapters and things like that.

3    Q.  And what have your publications been about?

4    A.  Oh, they've been about what we talked about before.  Market

5    microstructure.  So they're generally almost all of them are

6    about trading, they're trading in different financial markets.

7    And I've always really been interested in how technology

8    effects trading.

9    Q.  Do your papers deal with price discovery in any way?

10   A.  Price discovery, liquidity, basically how trading relates

11   to the prices people in the markets get.

12   Q.  What would be an example of something that you've published

13   related to this case?

14   A.  So there was a survey article that I wrote a few years ago,

15   the editor of a journal called *Information Systems Research*.

16   He wanted an -- he wanted a special issue on financial

17   technology.  And because I've done some work in this area, he

18   asked me along with some other people to solicit papers and

19   edit them and then we wrote an introduction to that that talked

20   about the research that was being done in a number of different

21   areas related to financial technology.  And one area was crypto

22   and blockchain technology.

23   Q.  And when was that article published?

24   A.  I think it was 2021.

25   Q.  Are you an editor for any publications?

1    A.  I serve on the editorial board of a number of journals.

2              MR. HENKIN:  Can we bring up but not publish for the

3    jury yet slide four, please.

4              Any objection?

5              MR. CARNEY:  No objection.

6              MR. HENKIN:  Your Honor, may I?

7              THE COURT:  Yes.

8              MR. HENKIN:  Thank you.

9    Q.  Professor Hendershott, are the journals that are shown on

10   the slide that are currently -- that is currently in front of

11   you the ones that you're on the editorial board of?

12   A.  They're the ones I'm currently on the editorial board of.

13   I've been on other ones.  So the top two are well-known

14   journals in financial economics.  *The Journal of Finance*, *The

15   Journal of Financial Economics*.  The one on the bottom *The

16   Journal of Financial Markets* really specializes in trading and

17   financial markets.

18   Q.  And you've been on the editorial board of that one since

19   2012?

20   A.  Yes.

21   Q.  And what other journals have you been on the editorial

22   boards of?

23   A.  I was on for information systems research, the journal I

24   just mentioned that I published an article in, management

25   science.  So there have been a couple of other journals.

1  Q.  How many in total have you been on the editorial board for?

2  A.  I'm not sure.  Maybe seven.

3  Q.  Let's talk about research.  Have you conducted research?

4  A.  Yes.

5  Q.  Just tell the jury a little bit about the research that

6  you've conducted?

7  A.  Well, we've talked about it several times.  So it's about

8  how technology effects financial markets, how trading works,

9  how trading effects prices, how costly it is to trade.

10 Q.  Have you previously testified as an expert witness in other

11 cases?

12 A.  Yes.

13 Q.  How many times have you been retained as an expert witness

14 by the SEC?

15 A.  Three times.

16 Q.  Has the SEC reached out to you about serving as an expert

17 in any cases other than the three that you just mentioned?

18 A.  Yes.  From time to time they'll contact me and we'll talk

19 about the case and, you know, what the facts are.  They may

20 send me the complaint and we'll have a discussion.  And we're

21 primarily trying to see if I agree with the SEC's view of the

22 case and if I have any conflicts in the case.  And if I have

23 conflicts or I don't agree with that, then I don't end up doing

24 the case.  Or if they want to use somebody else I won't.

25 Q.  Has the SEC reached out to you to ask about any crypto

O43ASEC2                    Hendershott - Direct

1    cases?

2    A.  Yes.

3    Q.  How did Jump -- let's move into some background.

4            How did Jump trade around the May 2021 depeg?

5    A.  So Jump did two types of trading around May 2021.  So they

6    had their normal market making and arbitrage trading, where

7    they were usually buying in the same amount of UST.  And then

8    they also had bought through what they called bookstacker.

9    They built a position there, a long position, so they acquired

10   UST.

11   Q.  And are you just going to refer to bookstacker UST as

12   bookstacker?

13   A.  Yes, I will.  Thank you.

14   Q.  Okay.  Did market making and arbitrage cause Jump to build

15   a long position?

16   A.  No.  They were buying in one account and selling in another

17   account in almost the exact same amount.

18   Q.  Do you have a demonstrative that illustrates this?

19   A.  I do.

20           MR. HENKIN:  Can we bring up number five, please, but

21   not publish it.

22           Any objections?

23           MR. CARNEY:  No objection.

24           MR. HENKIN:  Your Honor, may I?

25           THE COURT:  Yes.

1          MR. HENKIN:  Thank you.

2    Q.  Professor Hendershott, can you explain this demonstrative

3    to the jury?

4    A.  Well, so the demonstrative has two lines on it.  So along

5    the bottom of it, that's time.  So that starts on May 23rd, and

6    then it goes on for a number of days.  And then the two lines

7    represent their positions in these two different accounts.  The

8    names are given on the right.  And you can see the top line,

9    this represents their buying of UST.  And so they bought UST

10   steadily over this time period.  That line always goes up.  And

11   you see the line on the bottom, this is the UST they sold, or

12   they either sold in the market or they burned, they used the

13   mint-burn mechanism for.

14          And you can see, the two lines are basically mirror

15   images of each other.  They're pretty much exactly that.  So

16   they were buying and selling or buying and selling and burning

17   the same amounts so they weren't acquiring -- whatever they

18   acquired, they also got rid of right around the same time.

19   Q.  And was the books -- we can take this down.

20          Was bookstacker different?

21   A.  Yes, it was.

22   Q.  Do you have -- and was bookstacker how Jump built the long

23   position that the jury has heard about?

24   A.  Yes.

25   Q.  Do you have a demonstrative that illustrates this?

1    A.  Yes, I do.

2            MR. HENKIN:  Can we bring up slide six, please.

3            Any objection?

4            MR. CARNEY:  No objection.

5            MR. HENKIN:  May I, your Honor?

6            THE COURT:  Yes.

7            MR. HENKIN:  Thank you.

8    Q.  Professor, can you explain this slide to the jury, please?

9    A.  So this is a similar graph to the one you saw before, but

10   there's only one line on it because there's only one account.

11   But it has the same scale and it goes for the same time period.

12   And you can see the green line just goes up over time.  So they

13   were buying and they did not sell over this time period.  So

14   they bought this and they held it and they later disposed of

15   it.

16   Q.  And that's not shown on this chart because it ends on May

17   26th; is that right?

18   A.  That's correct.

19           MR. HENKIN:  We can take this down.

20   Q.  Did Dr. Mizrach's opinion characterize bookstacker as the

21   primary method by which Jump intervened to restore the peg?

22   A.  Yes.  He and I agree on that.

23   Q.  And when you say you agree on that, does that mean you

24   agree with his opinion?

25   A.  I agree that it was the way they acquired the long position

1    as we've been talking about.

2    Q.  In your opinion, how should Jump's trading be analyzed if

3    you're trying to understand whether Jump was responsible for

4    causing the repeg?

5    A.  So you should focus, right -- I had just showed two

6    different graphs.  So there was one that was market making and

7    arbitrage, which is what they did around the depeg and which

8    they did at other times.  And then there was bookstacker, which

9    did something different, which is not something they normally

10   did in terms of building a long position.  So if you're looking

11   what Jump did that was unusual, it should be about bookstacker.

12   So you should focus on that.

13   Q.  Professor, it's Dr. Mizrach's opinion that Jump's trading

14   was the reason that the price of UST returned to a dollar; do

15   you agree?

16   A.  No, I don't.

17   Q.  Can you explain a little bit more about why you disagree?

18   A.  Well, I don't agree because, you know, they were just

19   buying over time and the price of UST sometimes, it was going

20   up before they started to buy, so it was buying before they

21   bought.  Sometimes it went down while they were buying.  So

22   there's really just not a lot of evidence to directly show that

23   it was the bookstacker buying that caused the repeg.  And then

24   I have a whole variety of criticisms of his model that tries to

25   do that.

1          MR. HENKIN:  And can we bring up slide seven, please,

2    but not yet publish it.

3          Any objections?

4          MR. CARNEY:  No objection.

5          MR. HENKIN:  May I, your Honor?

6          THE COURT:  Yeah.

7          MR. HENKIN:  Thank you.

8    Q.  Professor, does this slide summarize the reasons that you

9    disagree with Professor Mizrach?

10   A.  Yes, this summarizes a number of them.

11   Q.  Is this the entirety?  Are these all the reasons you

12   disagree with Professor Mizrach?

13   A.  There are more details, especially on part D.  But the

14   first one, as I already mentioned, that they -- times -- prices

15   had already increased.  So it's not that all of UST's price

16   increase was attributable to bookstacker.  It was a small

17   fraction of all the buying in the market.  They were largely

18   passive, which we'll talk about later.  And trading passively

19   has less of a price impact, and then we'll talk more later

20   about the errors that caused him to overstate what the price

21   impact of Jump's trading was.

22   Q.  And for each of the opinions that are A, B, C -- each of

23   the descriptions that are stated here, A, B, C, and D, can you

24   explain to the jury what your opinions relating to these are

25   based on?

O43ASEC2                         Hendershott – Direct

A.   So my opinions are based on, you know, all of my

experience.  And I've analyzed trading and prices in a whole

variety of markets.  So it's based on my academic training, my

experience in terms of doing this both for my academic

publications and for -- in some of my consulting I do.

              THE COURT:  We need to find time in the next minute or

two to let the jury go for the day, so find a good spot.

              MR. HENKIN:  I think this is that time, your Honor.

              THE COURT:  Yeah.  Okay.

              So, ladies and gentlemen, tomorrow we're back on

normal schedule.  Starting at 9:30 and going to 3:30, so we'll

see you tomorrow morning.  Stay dry as best you can.

              You can step down.  We'll see you tomorrow morning.

              MR. HENKIN:  Your Honor, would you like Professor

Hendershott to leave the courtroom?

              THE COURT:  Yes.

              (Continued on next page)

1      (In open court; jury not present)

2      THE COURT:  Please be seated.

3      So this is just a ballpark, not binding, but

4    approximately how much more do you have on direct?

5      MR. HENKIN:  It's probably around an hour, your Honor.

6      THE COURT:  Okay.  And who if anyone do you have

7    after?

8      MR. CALIFANO:  Your Honor, we have one, maybe two

9    custodians of records, which we are going to try to work out an

10   agreement with the SEC on.  One of them had a family emergency

11   and we have a system, if we can't reach agreement with the SEC.

12   To have him testify briefly in the morning on video, but we're

13   going to try to avoid that.

14     THE COURT:  Anyone else?

15     MR. CALIFANO:  Other than those two, I do not believe

16   so, your Honor.

17     THE COURT:  So it sounds like you will rest tomorrow.

18   And it sounds like we might even be able to have the charging

19   conference before 3:30.  I need to leave at 3:30 for teaching.

20   If not, we'll have to have it in the evening and then we'll

21   have summations on Friday.  And I will think one last time

22   about the rebuttal issue, but at least as of now I'm again

23   still leaning towards not allowing rebuttal.

24     So anything else we need to take up today?

25     MS. CUELLAR:  Briefly on the jury instructions, your

1    Honor.

2              THE COURT:  Yes.

3              MS. CUELLAR:  Your Honor has during the trial provided

4    real time instructions to the jury, and one included on the

5    SEC's whistleblower program.  We wondered if we might use your

6    instruction as inspiration to draft a whistleblower instruction

7    tonight.

8              THE COURT:  Sure.  And then actually there's something

9    else you might want to -- both sides might want to do tonight.

10   And that's an instruction on a proposed instruction on the

11   witnesses who invoke the 5th.

12             Now, I looked at the definitive treatise, *Sand, et al*,

13   and I'm very fond of "al."  And it's quite short.  Maybe too

14   short.  I think maybe there has to be a slight explanation

15   distinguishing some of those witnesses by their position.  But

16   in any event, take a look at it.  And if you want me to

17   consider an instruction on that other than beyond the *Sand*

18   instruction, get that to me by 8:00 tonight.

19             Anything else?

20             MR. PELLEGRINO:  Just two very brief housekeeping

21   measures, your Honor.  One is, I think we're in agreement on

22   this.  Yesterday Mr. Henkin put in a document.  I think the

23   transcript referenced it as D-1260.  And I think the parties

24   agree that it should be D-1262, and I think that's just a

25   transcription --

1          THE COURT:  Okay.

2          MR. PELLEGRINO:  I see some nodding, so it sounds like

3     that's not controversial.

4          THE COURT:  Good.

5          MR. PELLEGRINO:  And as we previously discussed, we

6     can reconcile -- actually we discovered this because we are

7     reconciling the exhibits --

8          THE COURT:  We will need to give to the jury when they

9     begin their deliberations on Friday the -- did I say summations

10    on Thursday?  I meant Friday.  We will need the index of all

11    exhibits.  So be sure to coordinate between the two of you, and

12    also the hard copies to send into the jury room.

13         MR. PELLEGRINO:  Great.  And then, your Honor, the

14    other thing was earlier in the trial I had mentioned we wanted

15    to discuss the contours of the stipulation.  This is on 258B.

16    That relates to Mr. Kanav's phone, this was that scrolling

17    video.  So that's already come in in evidence.  We're not

18    objecting.  Part of the stipulation I wanted to inform the

19    Court about is that the parties agreed that because it's in

20    evidence, either side could do a pull out from it.  You've

21    already seen one such example, that was 258A, which was the

22    still image.  We may have some or not, but wanted to make that

23    clear because in the past sometimes the Court was not aware of

24    the contours of the parties' agreement.

25         THE COURT:  Okay.  Thank you very much.

O43ASEC2                        Hendershott – Direct

1              MR. PELLEGRINO:  Thank you, your Honor.

2              THE COURT:  Okay.  We'll see you all tomorrow.  Why

3      don't we say, you know, inevitably something will occur to you

4      overnight, so why don't we say 9:15 tomorrow.

5              MR. PELLEGRINO:  Don't encourage them, your Honor.

6              (Adjourned to April 3, 2024, at 9:15 a.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                      INDEX OF EXAMINATION

 2   Examination  of:                              Page

 3   CHRIS AMANI

 4   Direct By Mr. Pellegrino . . . . . . . . . .1444

 5   Cross By Mr. Connor  . . . . . . . . . . . .1469

 6   Redirect By Mr. Pellegrino . . . . . . . . .1492

 7   TERRENCE HENDERSHOTT

 8   Direct By Mr. Henkin . . . . . . . . . . . .1518

 9                      DEFENDANT EXHIBITS

10   Exhibit No.                              Received

11    1034    . . . . . . . . . . . . . . . . .1512

12    1964    . . . . . . . . . . . . . . . . .1513

13    1961    . . . . . . . . . . . . . . . . .1513

14

15

16

17

18

19

20

21

22

23

24

25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300