O45HSec1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

SECURITIES AND EXCHANGE
COMMISSION

              Plaintiff,

           v.                    23 Civ. 1346 (JSR)

TERRAFORM LABS PTE LTD. , et
al.

              Defendants

------------------------------x

                           New York, N.Y.
                           April 5, 2024
                           9:00 a.m.

Before:

                HON. JED S. RAKOFF

                           District Judge
                           -and a Jury-

                 APPEARANCES

UNITED STATES SECURITIES AND EXCHANGE COMMISSION
    Attorneys for Plaintiff
By:  JAMES P. CONNOR
    DEVON STAREN
    CARINA CUELLAR
    LAURA E. MEEHAN
    CHRISTOPHER J. CARNEY
    ROGER LANDSMAN

O45HSec1

```
 1                        APPEARANCES (Cont'd)

 2   DENTONS US LLP
          Attorneys for Defendant Terraform
 3   BY:  LOUIS A. PELLEGRINO III
          DAVID KORNBLAU
 4        MARK CALIFANO
          DOUGLAS W. HENKIN
 5        MATTHEW A. LAFFERMAN
          AMAIANNA STOVALL
 6        ALYSSA LANDOW
          MELISSA GOMEZ NELSON
 7
     KAPLAN HECKER & FINK LLP
 8        Attorney for Defendant Kwon
     BY:  MICHAEL FERRARA
 9        CHRISTOPHER MOREL
          DAVID E. PATTON
10        ANDREW CHESLEY
          SEAN HECKER
11

12   Also Present:

13   Shadow Haywood, SEC Trial Assistant
     Armando Aquino, Defense Trial Assistant
14

15

16

17

18

19

20

21

22

23

24

25
```

O45HSec1

1      (Trial resumed; jury not present)

2      THE COURT:  Good morning.  Please be seated.

3      I made all the changes that the parties recommended

4  last night.  Slight different wording for the SEC's proposal;

5  exact wording for the defense proposals.

6      Is the jury here?

7      THE DEPUTY CLERK:  They are not.

8      THE COURT:  They are not.

9      OK.  I don't think we have anything to discuss.  We

10  could sit here and discuss the extraordinary start of the

11  Yankees season.  So as soon as the jury is here, though, we

12  will start, and we'll go —— the SEC's opening up to 90 minutes,

13  then we'll take a 15-minute break, then the defense opening 75

14  minutes, and then I think we'll go straight into charge so they

15  can have the —— they can begin their deliberations even during

16  lunch.

17      And I forgot to ask my courtroom deputy.  You have a

18  menu for them to order lunch?

19      (Discussion off the record)

20      THE COURT:  What a courtroom deputy.  So anyway, OK.

21  You want to check and see how many are here.

22      Let me say since, obviously, when the verdict is

23  reached one side will be happy and one side will be

24  disappointed —— or maybe both sides will be disappointed.

25  That's always a possibility —— I thought this was a very well

O45HSec1

1   lawyered case, and I appreciate the excellent work of all

2   counsel in this case.

3          Let me mention something else while we're waiting.

4   After the jury starts its deliberation, I will give counsel an

5   hour for lunch, but after that we need to have at least one

6   counsel from each of the parties present in court or right

7   outside so if any note comes in, we can deal with it

8   immediately.

9          And I have other matters, oral arguments and motions,

10  starting at 2 o'clock, but if we get a note from the jury,

11  we'll just interrupt those other matters and take the note

12  right away.

13         I think we must be missing a juror because my

14  courtroom deputy is probably calling the cell phone right now.

15         We're missing one juror who's coming from the Bronx.

16  I can't understand why the juror's late since we all know the

17  subways always run perfectly.

18         So, Mr. Patton, the matter I have at 2 o'clock is an

19  oral argument in which the defense is represented by an obscure

20  organization called the Federal Defenders.  So you may want to

21  stick around, see that.

22         MR. PATTON:  I was aware of that, your Honor.

23  Ms. Brown, as a fellow Yankee traveler, was trying to figure

24  out how to work opening day into the ——

25         THE COURT:  Yes, it's a conflict of interest,

O45HSec1

1    obviously.

2            MR. PATTON:  I have to say as, a Nationals fan, it's a

3    little painful to see the Soto on the back of the Yankees

4    uniform.

5            THE COURT:  Well, there's no accounting for your

6    taste.

7            Best laid plans.  So Juror No. 3 thought we were

8    starting at 9:30, even though I don't think it could have been

9    more clear.  I asked them if they had any problems starting at

10    9:00.  They all said no problem.  And then I reminded them at

11    the very end to be here at 9:00.  But OK.

12            So is he on his way?

13            THE DEPUTY CLERK:  Yes.

14            THE COURT:  Does he have an ETA?

15            THE DEPUTY CLERK:  He thinks he'll be here for 9:30.

16    He's stuck on the train.

17            THE COURT:  All right.  There's nothing we can do

18    about it.  Why don't we take a break till, let's say, 9:25 in

19    case he arrives a few minutes early.

20            MR. FERRARA:  Does your Honor think it makes sense for

21    someone on your Honor's side or I could go to see if the

22    marshals will escort the jurors in sooner if there's a line?

23            MR. HENKIN:  It's naturalization today.

24            MR. FERRARA:  It might save 10 or 15 minutes.

25            THE COURT:  That's a good idea.  We'll figure

1    something out.

2              (Recess)

3              THE COURT:  Please be seated.

4              The missing juror has arrived, so we will bring in the

5    jury and begin.

6              (Jury present)

7              THE COURT:  Please be seated.

8              So, ladies and gentlemen, we're now going to hear

9    closing arguments from counsel.  I want to remind you, as I did

10   before opening statements, nothing that counsel says is

11   evidence.  The evidence, which is now fully before you,

12   consists of the testimony, the exhibits, and I think there was

13   one or two stipulations.  All of that is evidence in this case.

14   But it may be helpful before you make your determinations to

15   hear what counsel thinks the evidence shows or fails to show,

16   so this is their opportunity.

17             Because the SEC bears the burden of proof as the

18   plaintiff, they go first.  So we'll hear now from the SEC.

19             MS. MEEHAN:  Thank you, your Honor.

20             For nearly four years defendants Terraform and Do Kwon

21   lied to investors about two fundamental aspects of their

22   business:  First, they misrepresented to investors that Terra

23   was more successful than it actually was.  Defendants told the

24   public that the Chai payment application used the Terraform

25   blockchain for settling payments between customers and

1    merchants.  Why?  Because if Terra had been able to process

2    transactions in this way, that would have been a breakthrough

3    for the crypto industry.  It would have set Terraform apart

4    from other crypto blockchains and made it more valuable, which

5    was important to investors.

6          But what the evidence showed at trial is that the

7    Terra blockchain was not, in fact, processing these Chai

8    transactions.  Instead, the defendants created the LP server to

9    fake transactions and make it appear as though the Terraform

10   blockchain was more successful and valuable than it actually

11   was.

12         Second, Do Kwon and Terraform told investors that

13   their business, specifically UST, was more stable than it was

14   and that their mechanism that kept UST pegged to $1 was

15   self-correcting and stable.  This too was important to

16   investors because UST was called the linchpin of the Terra

17   system.  If UST failed, then the entire ecosystem would

18   collapse as well.

19         Despite its unquestionable importance, Do Kwon and

20   Terraform never told the public about Jump's involvement in a

21   May 2020 event when the UST lost its depeg —— lost its peg to

22   the dollar, excuse me.  Instead, defendants went on a

23   misleading and deceiving victory lap and told people that their

24   UST stability mechanism had "automatically self-healed," but

25   defendants never disclosed that a single large institution,

1    Jump Trading, stepped in to buy up tens of millions of UST to

2    help stabilize it and that Do Kwon had incentivized Jump to do

3    so with a secret deal.

4           Why did they do this?  Because disclosing Jump's role

5    and the deal that Kwon made to entice Jump will call into

6    question the fundamentals of the entire ecosystem.  That's a

7    word that Do Kwon used himself to promote the stability of UST,

8    and he knew that no one would want to invest in a business

9    whose fundamentals didn't work.

10          Investors poured their money in, but in May 2022, the

11   entire Terra ecosystem collapsed, and it collapsed because it

12   was built on cards.  As my colleague, Devon Staren told you ——

13   it was built on lies.  As my colleague Devon Staren told you,

14   it was a house of cards.  When Ms. Staren stood up here at the

15   beginning of the case, she told you that the SEC would present

16   evidence to show that the defendants made false statements to

17   investors about Terra's success and stability and that these

18   facts that they lied about were important to investors and that

19   the defendants knew it.

20          Ladies and gentlemen, the evidence is now in, and we

21   have proven to you that these defendants are liable.  The core

22   dispute in this case is whether the defendants lied, whether

23   what they said was false.  The answer is clear:  Defendants

24   lied over and over again.  They misled the public by

25   withholding critical facts.  They knew they were faking

O45HSec1                    Summation - Ms. Meehan

transactions on the blockchain.  They knew their stability

mechanism for UST did not work.  You have sat through this

trial, and you've seen all the evidence.  You can use your

common sense to guide you.  It is clear.

I'm going to get to the evidence now and why the SEC

has proved its case, but before I do, I just want to make one

comment.  In opening statements, the defense got up here and

they told you that failure doesn't equal fraud.  But if you

swing big and you miss and you don't tell people that you come

up short, that is fraud, and that's exactly what happened in

this case.  Defendants told people that their Chai payment

application used the blockchain to facilitate financial

transactions.  Defendants told people that Terraform's UST was

stable and that its stability mechanism worked to maintain its

value at $1.  But what they didn't tell people was what was

happening behind the scenes.  They were copying transactions

and not processing them.  They were —— secretly struck a deal

with a major trading partner, Jump, to stabilize the peg during

the May 2021 crisis.  Ladies and gentlemen, that's not failure,

that's fraud.

So here are the SEC's claims.  We have proven that the

defendants are liable for securities fraud under Section 10(b)

and Section 17(a) for each of the Chai and the Jump fraud and

also that Do Kwon is a liable control person under

Section 20(a) of the securities laws.

1      So I'm just going to give you briefly a roadmap for

2  what we're going to talk about this morning.  I'm going to walk

3  through the evidence showing you that the defendants lied to

4  investors, and then I'm going to talk to you about the specific

5  charges in this case, what the SEC has to prove, and what the

6  evidence, in fact, proves, each of the elements of those

7  charges.

8      Before I do that, I just want to remind you that this

9  is not a criminal case.  It is a civil case.  And what that

10 means is that the SEC's burden of proof is what is called a

11 preponderance of the evidence.  The judge is going to instruct

12 you fully on what this means, and you should listen carefully

13 to what he says.  But what I expect the judge to tell you is

14 that the test is this:  Do you think it is more likely than not

15 that the defendants engaged in securities fraud?  One way to

16 think about this is by reference to a set of scales.  If you

17 find that the scales tip, just even slightly in the SEC's

18 favor, you must find for the SEC.

19     Now I'm going to talk about why the SEC has proved

20 every element by a preponderance of the evidence, and you'll

21 see why the evidence even greatly exceeds that standard.

22     Before I get started, as I walk through the evidence

23 for each of the schemes, I'm going to be quoting from some of

24 the witness testimony, and I'm going to be showing you

25 plaintiff's exhibits.  If you want to see the testimony when

1    you deliberate, you should write down the transcript number,

2    which will be at the bottom of the slide, and I will also state

3    the exhibit numbers out loud.  If you make a note of it, you'll

4    know what to ask for when you go back for your deliberations.

5            Just as a reminder, this PowerPoint that I'm using

6    will be the one thing that you won't have in the jury room, but

7    you will have the actual exhibits and the transcripts.

8            So the first fraud that I'm going to walk through is

9    the Chai fraud.  What was the Chai fraud?  In short, defendants

10   told investors that the Terra blockchain was being used to

11   settle Chai transactions on the backend to lower costs and

12   speed up settlement of payment transactions between merchants

13   and consumers.  But in reality, Chai wasn't using the

14   blockchain to process and settle payments at all.  Defendants

15   rigged up a system that copied transactions controlled by their

16   own LP server onto the blockchain to make it appear that these

17   Chai transactions were independently settling there.

18           And you heard about the gentlemen's agreement that Do

19   Kwon had with his co-founder Daniel Shin for Chai to look the

20   other way about defendants' statements regarding Chai and its

21   purported use of the blockchain for two years.  Why did they do

22   this?  They wanted the Terraform blockchain to seem like it had

23   more users and more value than it actually had so that they

24   could get that venture capital investment from investors like

25   Jonathan Kol at Galaxy Capital, who you heard from during this

O45HSec1                    Summation – Ms. Meehan

1   trial.

2           So I'm going to walk you through the elements of the

3   secured securities for 10b-5 and 17(a), but let's start with

4   what's not in dispute.  You're going to be given the

5   instructions for each of the elements of these claims, and

6   you're going to see that Section 10 requires a purchase and

7   sale of securities and Section 17 is an offer and sale of

8   securities.  This element cannot be disputed.  You heard from

9   several investors who all purchased securities, Luna and UST.

10  And remember the testimony of Terraform's CEO Chris Amani who

11  told you that defendants offered and sold securities in

12  secondary markets through crypto trading platforms and

13  exchanges where investors are able to go and purchase them.

14          The next element that cannot be disputed is the

15  element of interstate commerce.  First of all, the blockchain's

16  on the Internet, but also defendants' false and misleading

17  statements were made on Twitter through blog posts on the

18  Internet, through podcasts published on the Internet, and a

19  CNBC interview published on the Internet.

20          So here is the definition of a false and misleading

21  statement.  A statement is false if it is untrue.  A statement

22  is misleading if, even if it is true, it omits material

23  information necessary to make the statement made, in the

24  circumstances in which it was made, not misleading.  Conduct is

25  misleading if it creates the equivalent of a misleading

O45HSec1                         Summation - Ms. Meehan

1    statement.

2              So what were defendants' false statements?  I'm going

3    to walk you through each of the specific statements regarding

4    Chai's purported use of the Terra blockchain that the SEC has

5    proven are false and misleading.

6              This is Plaintiff's Exhibit 87.  This is a June 2019

7    Terra Community Update that was published on their Medium blog

8    post.  In it Do Kwon is telling people that Chai runs, records

9    transactions, and manages account balances on Terra's

10   blockchain.

11             This is Plaintiff's Exhibit 88.  This is another

12   July 2019 Terra Community Update also published in Terra's

13   channel on Medium.  Kwon says:  "It's been 40 days since Chai

14   launched using Terra protocol, and already it is one of the

15   most heavily used blockchain applications in existence."

16             He goes on to talk about Chai's total transaction

17   volume, how high it is, and then he says, "Not bad considering

18   that it took three years for Venmo to acquire 3,000 users.

19   Check out our neat infographic attached which summarizes Chai

20   usage stats in the first 40 days."  He's not telling people

21   this by accident.  He's intentionally telling people that the

22   increase in the transaction volume is due to Chai and Chai's

23   use of the Terra blockchain.

24             Here is an October 2019 video where Do Kwon is giving

25   a presentation, and you can hear for yourself ── I'm going to

1    play the clip —— what he says to the public.

2              (Video played)

3              MS. MEEHAN:  Listen to what he said.  He said Terra

4    settled in six seconds.  He's talking about the Terra

5    blockchain and payment transactions.

6              February 9, 2020, this is a Discord post by Do Kwon:

7    "right now Chai has 12 merchants, all of whom get settled in

8    KRT" —— remember, that's one of their stablecoins —— "on the

9    Terra blockchain."

10             Plaintiff's Exhibit 100, March 19, 2021, another blog

11   post, again Do Kwon.  This time he's talking again about

12   transaction volume for Chai, and again he's making it appear

13   that Terra's blockchain is more valuable and more used than it

14   actually is, calling Chai "one of the most successful and

15   widely adopted applications that uses blockchain technology and

16   is not purely speculative in nature."

17             You also heard from investors who read or heard these

18   representations about Chai.  Jonathan Kol, he was the

19   individual who was here from Galaxy Capital.  He was the one

20   who diligenced the investment recommendations for Galaxy, and

21   he recommended that Galaxy invest in Luna in 2020.  Here is

22   Kol's testimony.  You heard him say that Do Kwon told him in

23   2020 that the Terra blockchain would be used as a sort of

24   backend for the settlement of transactions that are happening

25   through other payment apps.  Do Kwon told him that the actual

1   exchange of funds happens and is facilitated on the Terra

2   blockchain.

3          You also heard from Boris Revsin.  He was the investor

4   from Republic Capital.  He also talked about Chai and what he

5   understood from the deck on the Terra website and other public

6   materials.  He invested in January 2022, and his understanding

7   was that Terra would facilitate settlement of payments ——

8   payments platform on chain.

9          All right.  Now I'm going to move on to the next

10  element that the SEC has to prove, which is falsity, and here

11  I'm going to explain to you why all these statements were false

12  and why we have proved that all these statements are false.

13         You heard from Dr. Matthew Edman.  He is an expert in

14  blockchain technology and digital forensics, and he offered the

15  only analysis in this case of the blockchain data and the

16  source code of the LP server.  His conclusion was that Chai did

17  not use the Terraform blockchain to process or settle

18  transactions, and his testimony in that regard is completely

19  unchallenged by the defense.  He told you:

20         "I determined that the LP server application was

21  developed by Terraform Labs' employees.  After reviewing the

22  source code, I determined that it controlled what are called

23  private keys associated with purported Chai transactions that

24  occurred on the Terra blockchain, and that its functionality

25  was to replicate Chai user merchant transactions onto the Terra

1    blockchain."

2         He said the purported Chai transactions on the Terra

3    blockchain were created by this LP server application rather

4    than by users of the Terra blockchain.  So what he's saying

5    there is that consumers and merchants are not independently

6    making these transactions on the blockchain, and these

7    transactions that were actually replicated by the LP server

8    comprised over 45 percent of token transfers or exchanges

9    between users on the Terra blockchain during the period of

10   June 2019 to May 2022.

11        So let's pause on that for a second, because we want

12   to think about this in the context of why this is all

13   important.  The pitch to investors like Jonathan Kol was that

14   the increased usage meant more activity on the blockchain,

15   which meant more value to Luna holders.  That the LP server,

16   which was created by Terraform employees, controlled the

17   private keys for all of these transactions and that those

18   transactions comprised 45 percent of the volume of all the

19   transfers and exchanges between users on that Terra blockchain

20   is a massive lie.  Defendants are telling people that this

21   application that they have, Chai, is gaining traction, that

22   it's growing, that people are using it, but the reality is that

23   these are all just transactions that are controlled by

24   Terraform Labs.

25        Why else is it false?  You also heard from Aaron

1    Myung.  This is on top of Dr. Edman's unchallenged opinions.

2    Aaron Myung is a former insider at Chai.  As the chief product

3    officer at Chai, Mr. Myung had a front row into what Chai was

4    doing.  That means he would have known if Chai was using the

5    blockchain to settle transactions in crypto assets.  His

6    testimony on that point was very clear.  Chai never used

7    crypto.  It never used the Terra blockchain.  He said, "I have

8    personal knowledge of all the products at Chai and none of them

9    used blockchain technology."

10        He told you:  "everything that goes on the blockchain

11   are basically copies or, as I say, mirrors or basically fakes.

12   It's pretending that these transactions were happening on the

13   blockchain, but the blockchain does not need to exist at all.

14   This LP server, all it does is just wait there and copy

15   transactions all day."

16        "If the entire Terra blockchain were just to not exist

17   at all, like completely vanish, all the payments would go

18   through."  So what he's telling you there is that the Terra

19   blockchain could completely go down, it could go out, and these

20   Chai payment transactions, they would still process and settle

21   as normal through traditional financial payment means

22        Mr. Myung has text messages and recordings

23   contemporaneous to his time at Chai that prove that Chai did

24   not use the blockchain and that corroborate his testimony.

25   Here is one of the text messages between Mr. Myung and Daniel

1    Shin.  Remember, Daniel Shin is Do Kwon's co-founder of

2    Terraform.  This is Plaintiff's Exhibit 118A.  Daniel Shin here

3    is telling Mr. Myung that he and Kwon had a gentlemen's

4    agreement to look the other way on these false statements that

5    Mr. Kwon was making for two years.

6            Mr. Myung also made contemporaneous recordings while

7    at Chai that corroborate his testimony.  Hearing firsthand from

8    a person's mouth in real time is sometimes the best evidence

9    there is, and you can hear that.  This is hard evidence, and

10   what I mean by that is that the recordings speak for

11   themselves.  So here is a recording from JiHoon Kim.  He was an

12   engineering manager at Chai.

13           (Audio played)

14           MS. MEEHAN:  "Chai is not using blockchain technology

15   at all."

16           And here is Daniel Shin again.

17           (Audio played)

18           MS. MEEHAN:  That's Plaintiff's Exhibit 124A, and he

19   says, "I think it's Do's problem."  He's talking about Do Kwon.

20           There's other corroboration in Aaron Myung's

21   testimony.  There's very damning documents that back up what he

22   said.  Here is an email, an internal Chai email, between two

23   executives at Chai, and it says:  "Or follow the same structure

24   as Chai to process transactions outside blockchain but write a

25   record on Terra blockchain in parallel."

1          And here is a chat between Paul Kim and another

2    individual who worked at Terraform, and we'll get more on Paul

3    Kim later, but I just want to highlight this as — this exhibit

4    D-1016, because this also corroborates both Dr. Edman and Aaron

5    Myung.  Paul Kim here is saying to someone who asks him to

6    explain to him what's the role of the LP server, and Paul Kim

7    says:  "LP server creates multisend transactions by receiving

8    transaction information from Chai.  In short, it basically

9    replicates Chai transactions."

10          "Ahh, yes, OK, this is mirroring Chai traffic on

11   chain, kinda?"

12          Paul Kim responds:  "Yes."

13

14          This is in October 2020.

15          Now, a few minutes about Mr. Myung because I do expect

16   that the defense will get up here and tell you why you

17   shouldn't believe him.  The defendants spent hours

18   cross-examining Mr. Myung because they know how damaging his

19   testimony and these recordings are to their defense.  They

20   tried to make a big deal out of the fact that Mr. Myung

21   provided certain recordings initially to the SEC and then later

22   provided more to the defendants when they followed up and

23   subpoenaed him, and he got a lawyer to help him respond to that

24   subpoena.

25          But there's no claim from the defense that he withheld

O45HSec1                    Summation – Ms. Meehan

1    any recordings from the defendants when they subpoenaed him or

2    that somehow the ones that he produced later were helpful to

3    the defendants.  They never even chose to play any of those

4    other recordings.  Do you know why that is?  Because they don't

5    help the defendants.  Mr. Myung is a whistleblower.  He has

6    submitted a whistleblower claim with the SEC, and he hopes to

7    recover an award when this case is over.  He told you that.

8            As with most whistleblowers, however, he did suffer

9    losses as a result of raising these concerns at Chai.  He was

10   fired from his job, and he lost expected compensation as a

11   result.  And you know what?  Mr. Myung came to the SEC because

12   he was concerned that the UST's price was going to collapse.

13   He told you that he saw it coming.  He came forward because he

14   wanted to do something to try to prevent that collapse.

15           At the end of the day, it's up to you to decide

16   whether you believe Mr. Myung and how much of his testimony you

17   want to believe, but I submit to you that Mr. Myung came here

18   in court and sat through hours of cross-examination, and during

19   that lengthy cross-examination, the defense never really

20   challenged him on what the core issue is in this case, which is

21   the falsity of the defendants' statements that Chai used the

22   blockchain.  They never challenged his testimony, truly

23   challenged his testimony, that Chai never used crypto and that

24   Chai never used the Terra blockchain.  And there's a reason for

25   that; they can't.

1          But, again, Mr. Myung's testimony that he gave on

2    these critical events was corroborated by the other evidence

3    that we just walked through.  It's backed up by contemporaneous

4    recordings, text messages.  It's also corroborated by

5    Dr. Edman's testimony who told us that Chai didn't use the

6    blockchain to process and settle transactions, and it's also

7    corroborated by those internal emails at Chai and documents and

8    testimony of other witnesses.

9          So I want to pause for a second because in their

10   opening the defense came up here and they told you that the SEC

11   has it wrong.  They told you that this was all true.  But let's

12   talk for a minute about the people at Terraform who don't know

13   anything about Chai.

14         This is Ashwin Mathialagan.  He is the corporate

15   representative from Terraform.  And I want to ask you this,

16   because this is also common sense, and numerous other witnesses

17   like Dr. Edman have told you that the blockchain is immutable

18   and public.  That means that anyone can see it.  If that's the

19   case, then why can't the defense challenge the core of

20   Mr. Myung's testimony?  Why can't they challenge Dr. Edman's

21   analysis and opinions about Chai not using the blockchain?

22         So you heard from Terraform's corporate designee

23   Mathialagan.  He couldn't tell you anything about Chai and

24   whether Chai was using the blockchain to process and settle

25   transactions.  Remember that when he was asked about this, he

1    was asked specifically whether Chai used the blockchain, he

2    paused for 30 seconds before he could answer, and he ultimately

3    could not answer.

4            And not only that, Terraform lawyers then later tried

5    to correct his testimony through what's known as an errata

6    sheet.  That's a correction after the fact.  They tried to tell

7    you through that errata sheet that Chai transactions were

8    "integrated to the Terraform blockchain."  Ladies and

9    gentlemen, I submit to you that the use of the word

10    "integrated" is not by accident.  It's intentionally designed

11    to confuse and mislead

12            You also heard from Terraform's CEO Chris Amani, and

13    he also could not tell you anything about Chai's use of the

14    Terraform blockchain.  He told you that he gets paid 3 million

15    a year, but he doesn't know anything about Chai.  Remember,

16    this is the company whose CEO for a period of years touted Chai

17    as their breakthrough use case in crypto, but no one knows

18    anything about it.

19            Let's talk for a minute about Paul Kim.  Now, you

20    heard testimony from Paul Kim.  This is a witness who gave

21    testimony in Korea.  His testimony was very —— admittedly, very

22    lengthy and very confusing, and I fully expect that the

23    defendants are going to get up here and tell you that Paul Kim

24    said that Chai used the Terra blockchain.  And I submit to you

25    again that Paul Kim's testimony was very hard to follow by

1  design.

2          When you look at what Paul Kim actually said, however,

3  nowhere does he tell you that Chai settled and processed

4  transactions on the Terra blockchain.  He created this whole

5  system, the LP server, and he says it could have been used with

6  blockchain technology.  But then he concedes that merchants

7  were never paid in crypto.  He says they were paid in Korean

8  won and that he wasn't in charge of that and that he never

9  developed the function that merchants be paid in crypto.  He

10  said, "I am not a person in charge of that.  There is no need

11  to develop it now, so I did not develop it."

12          Dr. Edman also reviewed Paul Kim's testimony.  He's

13  the only expert in this case who can speak to whether Chai used

14  the blockchain, and he considered Paul Kim's testimony in the

15  context of all the evidence, and his analysis of that evidence

16  concluded that the role of the LP server was to receive changes

17  to the Chai transactions, to that Chai ledger from Chai, and

18  then replicate those in the form of KRT transactions on the

19  Terra blockchain.  He said —— and remember what Mr. Myung

20  testified about as well —— there were several instances in

21  which either the LP server went down or wasn't functioning or

22  that the Terra blockchain wasn't operational, but Chai was

23  still able to process transactions from Chai customers.  And

24  then the Chai merchants were just settled in fiat currency,

25  Korean won, as opposed to KRT in the Terra blockchain.  And

1    this is specifically where he's talking about how he understood

2    Paul Kim's testimony and considered it in the context of all

3    the other evidence that he reviewed in this case.

4            Now I'm going to talk to you about the next element

5    that the SEC has to prove, which is materiality, basically, why

6    are these statements important.  These statements were

7    important because this was a breakthrough for crypto.  Remember

8    the testimony of Jonathan Kol?  He's from Galaxy.  He said, "I

9    would say the holy grail of crypto is always having an impact

10   outside the industry."  He said that Chai represented the best

11   evidence that Terra, through the Chai app, is having a

12   meaningful impact outside of the realms of cryptocurrency.

13           Kol invested in the promise that blockchain technology

14   could reduce costs and increase speed of settlement of

15   transactions, and he was told —— and he told you that if that

16   was not the case, that transactions were not actually effected

17   on the blockchain, that it was unclear whether these benefits

18   that he had talked about, the faster settlement times and the

19   reduced costs, whether they could actually happen at all.  And

20   he told you that, and so if that wasn't the case, we would

21   absolutely want to know that and that would absolutely affect

22   our investment decision.

23           Boris Revsin gave you another —— another example.  He

24   told you why it was important to him and his company, the Chai

25   piece of their investment.  He said, "Less activity means less

1    interest in the protocol, and ultimately for an investor, less

2    interest in buying the token and increasing the price."

3        Do Kwon also knew it was important.  This is

4    Plaintiff's Exhibit 88.  Here he's talking about "Blockchain

5    services have struggled to build a meaningful user base.  But

6    from the moment it launched, Terra's blockchain-powered

7    payments app started drawing in a crowd.  On the first day, it

8    gained over 11,000 users who simply added their bank accounts

9    to start paying with blockchain technology.  That number

10   continues to grow rapidly, allowing anyone to easily buy their

11   morning coffee with Terra."

12       He knew that that was important, that people wanted to

13   know that his technology was having an impact outside of the

14   crypto industry.

15       So now you've seen that we've proven that the

16   defendants made false or misleading statements or conduct

17   regarding a material matter.  The next element that the SEC has

18   to prove is what's known as state of mind, and this is that the

19   defendants acted intentionally, recklessly, or negligently.

20   Excuse me.

21       All right.  So here's how you know that the SEC has

22   proved these elements going to state of mind, which basically

23   means that the defendants knew that these statements were

24   false.

25       Here is Plaintiff's Exhibit 143A.  June 13, 2019, Do

O45HSec1                    Summation - Ms. Meehan

1    Kwon:  "we are not using any Terra blockchain technology."

2              Plaintiff's Exhibit 150A, March 2, 2020, Do Kwon:

3    "post split, Chai will double down on growing as a successful

4    payments company within the bounds of regulatory tolerance.

5    Much of that will have nothing to do with Terra."

6              He's saying it for himself.  He's telling people

7    internally that Chai does not use the Terraform blockchain at

8    the same time that he's parading around marketing its use to

9    investors to get those venture capital funds.

10             May 9, 2019, this is a chat between Do Kwon and his

11   co-founder Daniel Shin.  This is Plaintiff's Exhibit 140.  This

12   is about one month before the launch of Chai.  Defendants had

13   announced that Chai was launched on June 11, 2019, and this is

14   May 9, 2019.

15             And let me pause here because this is very strong

16   evidence of Do Kwon's intent, what this is showing you.  Do

17   Kwon says here:  "I can just create fake transactions that look

18   real which will generate fees, and we can wind that down as

19   Chai grows."

20             Daniel Shin:  "wouldn't people find out it's fake?

21   Why not just do what others do and give out inflation of

22   Terra?"

23             Do Kwon:  "Because for the latter, that breaks our

24   stability mechanism."

25             And then he goes on:  "all the power to those who can

prove it's fake, because I will try my best to make it

indiscernible.  I won't tell if you won't"


        What this is telling you and what this is showing you

is that Do Kwon knew how to create fake transactions for the

blockchain, that he was willing to do it, and that he had no

problem hiding that from the public.

        I expect the defendants are going to get up here and

they're going to try and explain away this document because

it's so damning to them, and they're going to tell you, oh,

this wasn't actually talking about Chai.  But it's very

important because it shows about what Do Kwon was thinking in

his head, and he's thinking about faking transactions.  He

knows how to do it.  He's willing to do it.

        A word just briefly about recklessness.  You're going

to hear more about that from the judge.  But when a defendant

makes a statement recklessly, it is when it is made with the

deliberate purpose to disregard the high probability that the

statement would be false or misleading to a reasonable

investor.  Here is the CEO of Terraform, Do Kwon, and he's

repeatedly telling the world that Chai transactions are settled

on the blockchain in six seconds, that Chai uses Terra to

facilitate transactions on the backend, but he never verifies

that such information is true.  That's the definition of

reckless behavior.  Before soliciting millions from investors,

O45HSec1                    Summation - Ms. Meehan

an ordinary person would verify that their claims about a

principal key use case for their blockchain is, in fact, true.

And as we've discussed, still no one at Terraform can verify

Chai ever used the blockchain to ever process and settle

transactions.

So, ladies and gentlemen, I submit to you that the SEC

has proven each of the elements for both 10b-5 and 17(a) with

respect to the Chai fraud based on all of this evidence.

Now I'm going to walk you through the elements for the

second fraud, which involved a secret deal with Jump Trading.

So what was the fraud involving Jump?  Defendants told

investors that their algorithm for UST solved for volatility

and reliably ensured that UST's price would remain right around

$1.  Then in May 2021, the price of UST dropped dramatically

below $1 where it was supposed to remain "pegged."  We used

that term a lot.

After a few days the peg was restored, meaning that

UST's price went back to a dollar.  As UST's price stabilized

and in the months and year that followed, defendants told

investors repeatedly that the Terra algorithm for UST worked

and helped to naturally restore UST's price to $1.  Then they

touted the restoration of the peg as proof that their algorithm

itself was reliable.  This was a lie, and the defendants knew

it.  In reality, Do Kwon had brokered a secret deal with Jump

Trading to have it jump in and assist with restoring the peg by

O45HSec1                    Summation - Ms. Meehan

1    buying tens of millions of UST off the blockchain on

2    centralized exchanges.  In return for Jump's assistance, Do

3    Kwon agreed to lift what's known as these remaining vesting

4    conditions that they had on agreements the defendants had with

5    Jump.  Jump thus helped UST survive and reaped a large

6    windfall.

7            So I'm going to walk you through the evidence, and

8    we'll begin again with the false statements.  But let me begin

9    by discussing an instruction that we anticipate the Court will

10   provide to you.

11           We anticipate that the Court will instruct you that an

12   omission is material if a reasonable investor would have viewed

13   the disclosure of the omitted fact as significantly altering

14   the total mix of information available in determining whether

15   to buy or sell UST, Luna, or wrapped Luna.  And this is

16   absolutely critical here because when the defendants spoke

17   about the May 2021 depeg event, they almost always omitted ——

18   or they did, excuse me, sorry, they did always omit the secret

19   deal and Jump's role in purchasing these tens of millions of

20   Luna off chain in centralized exchanges.  And you heard from

21   investors, you heard from Arash Vakil, Nader George, and Boris

22   Revsin, that they absolutely would have wanted to know about

23   Jump's intervention, but we'll talk more on that later

24           So here again, the offer and sale and the purchase and

25   sale element of the SEC's claims is easily established for the

O45HSec1                    Summation - Ms. Meehan

1    reasons that we've already talked about.  You heard from

2    investors who purchased Luna and UST, and you heard that

3    defendants offered and sold Luna and UST through exchanges and

4    crypto trading platforms.  And we also met the element of

5    interstate commerce because of the repeated use of the Internet

6    for their blog posts, tweets, and of course the blockchain is

7    on the Internet

8        So let's walk through the misstatements.  This is a

9    May 24, 2021, tweet thread from the Terra account, Terra

10   Powered by Luna@terra_money.  This is the tweet posted by Brian

11   Curran, who was the head of PR and communications from

12   Terraform Labs.  You heard from him.  This is the day after the

13   crisis with the UST peg where the UST dropped significantly

14   below $1.

15       All of the tweets —— this is Plaintiff's Exhibit 57.

16   All of the tweets in this thread that you heard about are clear

17   misstatements, but I just want to call out for you a couple of

18   them.  So tweet thread No. 14, here Terraform tells the public:

19       "Plagued by the cumbersome nature of stress-induced

20   decision-making of human agents in times of market volatility,

21   it's why central banks are exploring CBDCs" —— that's central

22   bank digital currency that they're referring to ——

23   "algorithmic-calibrated adjustments of economic parameters are

24   more effective than faxes and suits in meetings."

25       This is the day after the May 23, 2021, depeg crisis

O45HSec1                    Summation - Ms. Meehan

1   when they had a major single large institution step in and buy

2   tens of millions of UST, and then they're posting about

3   algorithmic-calibrated adjustments of economic parameters being

4   more effective than faxes and suits in meetings.

5          July 24:  "The drawdown in the price of Luna UST peg

6   deviation and collateral effects across the ecosystem in such

7   extreme market volatility is about as intense of a stress test

8   in live conditions as can ever be expected.  We just

9   experienced a black swan."

10          The lone mention of Jump in this thread relates to a

11   proposal that Jump made concerning the swap fees for the

12   stabilization mechanism.  That was a public proposal that Jump

13   made proposing to increase the swap fees for the stabilization

14   mechanism.  But there is nothing in this thread about Jump's

15   activities the day prior purchasing tens of millions of USTs

16   off chain on centralized exchanges.  so here's there's a

17   selective disclosure.  So it was OK for Terraform to mention

18   Jump in the context of this proposal to increase the swap fees,

19   but it wasn't OK for them to mention Jump's role in purchasing

20   large amounts of UST to help restore the peg.

21          Here you have Do Kwon on Twitter on May 24, 2021.

22   Again, the day after this UST depeg crisis, he says:  "I see.

23   Back to work," and he links a Coingecko chart showing that the

24   price of UST is at $1.  This is a critical omission because it

25   implies that the UST recovered its peg on its own and nothing

O45HSec1                    Summation - Ms. Meehan

1    had changed.  In reality, the algorithm had failed to properly

2    function.

3            Here we are on June 2, 2021.  This is Plaintiff's

4    Exhibit 58.  This is a community update posted in Terra's

5    Medium blog post by Sarah Kim who worked in the communications

6    department.  She says:

7            "May has been quite the month for the Terra community.

8    The UST peg has healed after a period of high volatility for

9    the market across the board.  Industry-wide volatility stress

10   tested the stability mechanism of the Terra protocol and posed

11   unprecedented challenges to the Anchor protocol but has also

12   been an incredible test of the protocol's ability to continue

13   providing stable yields under extreme conditions."

14           Again, right after the May 23, 2021, depeg.  Again, no

15   mention of Jump Trading.

16           Plaintiff's Exhibit 74, May 24, 2021, Terraform's

17   Twitter account:  "Terra is not going anywhere, friends.  One

18   dollar parity on UST already recovered."  Coingecko price ——

19   link to Coingecko price chart.  No mention of Jump Trading and

20   its role in restoring the peg.

21           Plaintiff's Exhibit 59B, this is Do Kwon's podcast

22   interview.  It was the Ship Show podcast interview that he gave

23   on March 1, 2022.  Here, he specifically discussing the

24   May 2021 event, and he says:

25           "Similar to what happened in May of 2021, where there

O45HSec1                        Summation - Ms. Meehan

were too many UST redemptions that were looking to happen

against Luna, in which case the AMM slippage costs rose the

other way, and it took a few days for the slippage cost to

naturally heal back to spot.  So that's another feature of the

market module where, when the exchange rate has deviated from

the peg, the protocol automatically self-heals the exchange

rate back to whatever the spot price is being quoted by the

oracle.  So that's why it took several days for the peg to

recover."

          No mention of Jump.  What he does say, though — this

is a blatant false misstatement — that the protocol, that's

the stability mechanism that he's talking about, automatically

self-heals.

          So how do we know that these statements were false and

misleading?  The evidence overwhelmingly establishes that Do

Kwon and Jump entered into a secret agreement for Jump to

intervene and support UST's peg.  So first let's begin with

what happened on May 23 through 25, 2021.  Here you heard from

two witnesses, Brian Curran, who was Terraform's then head of

communications, and James Hunsaker, who worked for Jump Crypto.

Again, critically, neither man was challenged on their

testimony, and their testimony is corroborated by memorialized

conversations written contemporaneously with these events as

they were occurring.

          Let's begin with Mr. Curran, who was at Terraform

O45HSec1                    Summation - Ms. Meehan

1    while all this was happening.

2           This is Plaintiff's Exhibit 71.  You don't have to

3    look behind Brian Curran and Jeff Kuan's text messages on that

4    day to determine that Do Kwon sought out the assistance of Jump

5    Trading to assist in supporting the peg on May 23, 2021.  Jeff

6    Kuan says:  "OK.  Do just randomly called me.  We're speaking

7    to Jump about a solution."

8           Brian Curran responds:  "Spoke with Do.  We're gonna

9    deploy 250 million from stability reserve through Jump to

10   stabilize the peg."

11          Brian Curran:  "Jump has already started buying."

12          This is on May 23, 2021.  Then you have Brian Curran's

13   contemporaneous notes of this weekly headquarters call that

14   Terraform's employees had every week.  They had this later that

15   evening in Pacific Time on May 23, 2021, and these

16   contemporaneous notes show that Do Kwon specifically said to

17   other Terraform employees:  Jump was deploying 100 million to

18   buy back UST on May 23, 2021.

19          Now I want you to go back for a minute to Brian

20   Curran's testimony in your mind.  Remember that he was

21   questioned by the defendants.  And, again, Mr. Curran was never

22   confronted on these statements, not once.  These statements are

23   uncontroverted.  And of course, there's no way for the

24   defendants to challenge these statements.  Brian Curran and

25   Jeff Kuan were clearly messaging each other in real time as

1  they both spoke to Do Kwon on that day.  There can be no

2  question that they were messaging what they knew to be

3  happening in real time.

4          And the same is true of Brian Curran's notes.  He

5  testified that he always took notes of these weekly HQ meetings

6  and he posted them for others to see, that the accuracy of his

7  notes was very important, and they are contemporaneous with the

8  events as they are happening.

9          So let's be clear.  Mr. Curran's documents and his

10  testimony alone establish the defendants turned to Jump and

11  asked Jump to deploy significant UST to help restore the peg's

12  price

13          Now let's talk about Mr. Hunsaker, who was working at

14  Jump on May 23, 2021.  Remember Mr. Hunsaker's testimony about

15  what happened at Jump on that day?  He learned that UST's price

16  began to depeg sometime around May 19.  He then began paying

17  more attention to events because he knew that Terraform was a

18  very important business relationship to Jump Trading.  He told

19  you that it was one of Jump's two most important deals.

20          He then recalls on May 23 — this is the same day that

21  Brian Curran and Jeff Kuan are messaging about Do Kwon telling

22  them that Jump was intervening to purchase 100 million UST —

23  Hunsaker joins an always on zoom call at Jump.  During this

24  call, he hears Kanav Kariya, who's the president of Jump

25  Crypto, come on the call, and he says to Bill DiSomma, who is

1    the founder of Jump Trading:  "I spoke to Do, and he's going to

2    vest us."  As you heard from Hunsaker, based on his extensive

3    experience at Jump, he knew that "vesting" is a word that

4    refers to fulfilling a condition in a contract.  That meant

5    when Do Kwon said this, that meant that whatever previous

6    vesting conditions applied to the agreements between Terraform

7    and Jump, the deal was now fulfilled.

8            What happens next?  Actually, before we get to that ——

9    no, we'll talk about what happens next.

10            All right.  So Mr. Hunsaker then tells you he observed

11    what happened with Jump's trading models specifically

12    thereafter.  He told you that he went into what was known as

13    the training GUI internally at Jump, and he could see the

14    models.  He said:  It just seemed like the models were more

15    aggressive.  They were not be behaving in typical sort of,

16    like, market making style.  And this is at the same time that

17    he's hearing Bill DiSomma give instructions to the traders at

18    Jump about how to purchase UST.  And he said:  Hunsaker told

19    you this now new trading, this new aggressive trading

20    activities, these new aggressive trading models, it was not

21    consistent with typical market making, what you would see.

22            He was asked:  "In what way was it not consistent?"

23            "It was just more aggressive.  It Was accumulating

24    positions.  It was UST.  It was buying UST."

25            Now, I expect that the defense is going to get up here

1    and tell you that Hunsaker doesn't have personal knowledge of

2    any of this.  But Hunsaker was there that day, and he overheard

3    what he did.  And he was an employee at Jump, and he personally

4    observed Jump's trading strategies and he observed them change

5    in the immediate aftermath of what he heard Kanav say about Do

6    vesting Jump

7          And, really, Jump has no witness to refute this

8    testimony because the two witnesses who would have been privy

9    to these conversations, Kanav Kariya and Bill DiSomma, they

10   didn't show up.  You heard that they chose to invoke their

11   Fifth Amendment privilege against self-incrimination.  Now, the

12   judge is going to instruct you on what this means, but what you

13   heard —— what he's going to tell you is that from that you may

14   draw an inference that Kariya and DiSomma's answers would have

15   been unfavorable to the defendants if they had come here to

16   answer questions.

17         I submit to you that you should draw that inference

18   here.  They didn't come here.  Look how self-serving they were

19   in this instance.  They had the audacity to enter into this

20   secret deal, execute their trades through centralized exchanges

21   where people couldn't see what they were doing, and then also

22   put out this proposal on the same day publicly that they were

23   going to increase the swap fees, which was meant to try to help

24   fix the algorithm.  They put out that proposal to protect their

25   own investment in Luna.  They pushed it out to people in the

community while denying those same community members the right
to know that they were also engaging in self-dealing.

Let's get back to Mr. Hunsaker for a minute.
Mr. Hunsaker, like Mr. Myung, is also a whistleblower.  And
unlike Mr. Kariya and unlike Bill DiSomma, he did show up.  He
told you that his motivation in coming forward was that he
thought someone should be held accountable for the losses that
occurred by people like Nader George.  Nader George, do you
remember him?  He was the pharmacist from California who lost
$400,000 in the May 2022 crash.

Hunsaker told you he was not motivated by any monetary
whistleblower reward, and that makes complete sense because
when he was cross-examined by the defense, it became clear that
his new company is worth billions.  In fact, Mr. Hunsaker has a
lot to lose by coming forward with this story.  He's still in
the crypto industry, and his reputation can suffer.  He doesn't
stand to gain anything by coming forward in a case like this.
He told you that he was just trying to do the right thing.  And
I submit to you that everything about the record here is
consistent with that notion and that you can and you should
rely on his testimony.

But you can also rely on his testimony because it too
is corroborated.  This is Plaintiff's Exhibit 68.  This is an
internal chat message from Jump Trading on May 23 and May 24,
2021.  Here is Bill DiSomma talking about what happened on that

1    day.  He's explaining Jump's actions.

2              He says:  "Needed to support UST directly on KuCoin."

3              Another Jump employee responds:  "Seems like the prop

4    to Do was well timed.  Did we get him to vest us?"

5              He's talking about Do Kwon.  He's talking about the

6    vesting of the conditions for the agreements between Jump and

7    Terraform.  So you absolutely know this happened.  You

8    absolutely know that James Hunsaker heard what he heard.

9              There is also overwhelming corroborating evidence that

10   supports the testimony of both Mr. Curran and Mr. Hunsaker.

11   Additional evidence includes the following:  There are facts

12   and stipulations.  Defendants' admission that Do Kwon spoke to

13   Kariya on May 23, 2021.  Defendants also admit that Do Kwon and

14   Kanav Kariya had discussions regarding UST's depeg.  These are

15   facts that are not in dispute.  Here is Plaintiff's

16   Exhibit 258.  This is a screenshot of the calls that happened

17   between Kanav Kariya and Do Kwon on May 23, 2021.  This is from

18   a video taken of Kanav Kariya's phone.  That's also in evidence

19   as PX 258A.

20             Here you can see Kanav called Do on May 23 at

21   9:10 a.m.  He called him again at 9:58 a.m.  Do called Kanav at

22   3:22 p.m., called him again at 4:25 p.m., and he called him

23   again at 4:35 p.m.  Remember also that you heard testimony from

24   Do Kwon, and he told you:  "Ultimately, I think that we just

25   effectuated the deals without looking too much at the trigger

O45HSec1                    Summation - Ms. Meehan

conditions." That's what he said. That also corroborates what

Mr. Hunsaker's testimony was about the vesting of these

agreements between Terraform and Jump.

          And it cannot be disputed that Jump actually did

engage in this trading immediately on May 23, 2021. Dr. Bruce

Mizrach, the SEC's expert, testified about Jump's trading

records, and the trading records are clear and they corroborate

what Mr. Hunsaker said that he observed happened. Dr. Mizrach

told you the big green lines began on May 23, and this is when

Jump changes their trading posture from being a market maker to

being more of a directional trader, making a decision to

actually become a large purchaser of UST.

          Then he goes on to say: We see that there's a

surprising change in Jump's trading posture to purchase, just

in one half-hour, approximately 10 million UST and that net

purchase at that time between —— in that half-hour, was the

equivalent of what Jump had traded typically on two entire

days. So two entire days of trading are now concentrated in

just one half-hour period on May 23. This is contemporaneous

with Kanav Kariya and Do Kwon's discussions. And there were

additional large purchases of UST by Jump also at the end of

the day.

          Even Terrence Hendershott, the defense's own expert,

agrees on that point. Both professors agree that Jump bought

UST in an attempt to restore the peg. Just want to comment on

O45HSec1                      Summation - Ms. Meehan

1   Dr. Hendershott for a moment because I expect that the defense

2   is going to get up here and talk to you a lot about the dispute

3   between these two experts, which is whether or not Jump's

4   trading actually succeeded in restoring the peg.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O45ASEC2                    Summation - Ms. Meehan

1              MS. MEEHAN:  But whether or not Jump actually in fact
2     succeeded in restoring the peg to $1 is not an element of the
3     SEC's claims here.  So, in other words, the SEC does not need
4     to prove that Jump's trading in fact restored the peg.  So if
5     the defense gets up here and tries to argue that, it's just a
6     smokescreen.
7              What's important is that Jump had a conversation --
8     Kanav Kariya had a conversation with Do Kwon, they struck a
9     deal, and Jump immediately changed their trading strategy in an
10    effort to attempt to help restore the peg, and that fact, that
11    deal, was never disclosed to investors.
12             All right.  So I just want to summarize what we've
13    been talking about because it's a lot and it can be a little
14    bit confusing, but here's a timeline that should help you.
15             So here we have from Plaintiff's Exhibit 258A,
16    9:10 a.m. this is central time, Kanav Kariya calls Do Kwon.
17    9:30 a.m. central time, Jump begins purchasing UST, engages in
18    aggressive trading, changes from its market making strategy,
19    which is a more neutral strategy.  9:56 a.m. central time,
20    Kanav Kariya calls Do again.  That's from the screenshot from
21    the phone, Plaintiff's Exhibit 258.
22             10:00 a.m.  By 10:00 a.m., Jump has accumulated nearly
23    10 million UST through trading on KuCoin.  3:32 p.m., again,
24    Kanav Kariya's phone, Plaintiff's Exhibit 258, Do calls Kanav.
25    This is all May 23rd.  4:05 p.m. now here you have the Brian

O45ASEC2                    Summation - Ms. Meehan

1   Curran Jeff Kuan chat.  Do said he's speaking to Jump about a

2   solution, Plaintiff's Exhibit 71.  4:25 p.m. central time, Do

3   calls Kanav again, Plaintiff's Exhibit 258A.  4:47 p.m., now

4   you have Brian and Jeff talking again.  Do told me we will

5   deploy 250 million from stability reserve through Jump to

6   stabilize the peg.  That's Plaintiff's Exhibit 71.  5:00 p.m.

7   shortly thereafter, Jump again starts making bulk purchases of

8   UST.

9           So what you can see here is every time that Kanav and

10  Do speak, Jump begins purchasing UST.  And they're not just

11  purchasing UST in a way that's consistent with what they've

12  done in the past.  This is a massive change from what they've

13  done in the past.  And then you can see that Brian Curran and

14  Jeff Kuan, their chats are layered in here, and they're telling

15  you what Do was talking to Kanav about.  He's saying at 4:00

16  I'm speaking to Jump about a solution, and then you see they

17  talk again at 4:25.  And then at 4:47, Do told me we'll deploy

18  250 million from stability reserve through Jump.  And then at

19  5:00 p.m., they start purchasing again and they make bulk

20  purchases of UST.

21          All right.  Now, what I expect the defense is going to

22  do is they're going to get up here and they're going tell you

23  that this was just a normal business relationship between Jump

24  and Terraform, and actually Terraform just agreed to lift these

25  vesting conditions later in the agreement that they entered

O45ASEC2                    Summation - Ms. Meehan

1    into July 2021, and that was just normal course.

2            And what you can see here from this timeline, which is

3    Plaintiff's Exhibit 81 -- 84, excuse me.  Is that that's not

4    the case.  So Jump had already entered into an agreement in

5    September 2020 with Terraform for a loan of 65 million Luna.

6    And in order to receive this Luna, again, Jump had to meet

7    certain vesting conditions.  Jump received about 3 million Luna

8    under these agreements starting in January 2021 by April 2021.

9            And then they amend the agreement in April 2021 to

10   increase the vesting conditions to make those vesting

11   conditions that Jump had to meet more difficult.  Between

12   January and May, you can see here there were routine e-mails

13   correspondence back and forth between Jump and Terraform

14   reporting on these vesting conditions and reporting on the

15   deliveries of Luna.  And you can see this in the Luna delivery

16   schedule as well.  Jump is receiving Luna starting in

17   January 2021 through April 2021.  And then, at that point,

18   these e-mail correspondence, they stop.  And the Luna

19   deliveries, they stop.  And that's all right before May 23,

20   2021, when Do Kwon communicates with Kanav Kariya regarding the

21   UST depeg.

22           So the deal wasn't reached in July.  The deal was

23   reached on May 23, 2021.  And that's reflected by these

24   contemporaneous documents and e-mails and it's reflected by the

25   agreements as well.

1    So now we're going to move to materiality and why this

2    is all important.  And here is why we have proved that this is

3    material to the investors.

4        Plaintiff's Exhibit 73.  First of all, Do Kwon knew it

5    was important.  He told Brian Curran that:  Terraform would

6    have been F'ed, actually might have been F'ed if Jump hadn't

7    stepped in.  And Jeff Kuan respond:  Yeah, I know, they saved

8    our ass.

9        And, by the way, you also heard that Jeff Kuan

10   declined to answer certain questions on the grounds of his 5th

11   Amendment privilege against self-incrimination.  And, again,

12   the Judge will instruct you on this, but from that you may draw

13   an inference that his answers may have been unfavorable to the

14   defendants.  I submit to you that you should draw that

15   inference here.  You can tell from his answer even in this chat

16   that his answers would have been unfavorable to defendants.  He

17   knew that Jump had saved Terraform.

18       Here's materiality again.  This is May 24, 2021 tweet

19   from the Terraform Twitter account.  They call UST themselves

20   the lynchpin for the entire ecosystem.  This is Plaintiff's

21   Exhibit 57.

22       You also heard from investors that they would have

23   wanted to know this information and why they would want to know

24   this information.

25       This is the testimony of Boris Revsin.  He was asked:

1          "Were you aware whether a third party had stepped in

2    and purchased significant amounts of UST to stabilize its

3    price?"

4          Answer, "no."

5          "Would you have wanted to know this information prior

6    to investing?"

7          Answer, "yes."

8          And then he goes onto explain to you why:  The typical

9    way that the arbitrage mechanism should work is that many

10   people or institutions would come in and restabilize the peg.

11   It is not supposed to be, our understanding was, that it was

12   not supposed to be one major institution that would come in and

13   backstop the peg.

14         And he said:  It was our understanding that there was

15   a community and a community of users around the ecosystem that

16   would restabilize the peg.  He's talking about a community of

17   people that would engage in this incentivize algorithm to all

18   use this algorithm that was meant to stabilize the peg, the

19   automatic algorithm.  And that was what would restabilize it,

20   and not one large institution making tens of millions of

21   dollars of purchases in UST off-chain on centralized exchanges

22   when no one knew they were doing it.

23         Arash Vakil said the same:  Because I wouldn't know if

24   they were -- I wouldn't know if they were available again —

25   he's talking about that one large party, Jump Trading — in the

1  future.  Or I would have, I would not have invested as much as

2  I did had I known that there was a third party involved.

3          He says he wouldn't have done that because he would

4  have not had as much faith in the stabilization mechanism and

5  that it actually worked to restore the peg because they needed

6  Jump to come in and provide the support.

7          Nader George, this is the pharmacist from California.

8  And he was asked:

9          "Now, sir, did you know when you invested that a third

10  party had intervened in May 2021 to purchase large amounts of

11  UST in an effort to help restore UST's peg to $1?"

12          Answer, "I had no idea."

13          "Is that information you would have wanted to know

14  prior to investing?"

15          "Of course."

16          "Why?"

17          "Because if I had known that the depeg that happened

18  in 2021 was restored through anything else other than the

19  algorithm itself, I would not have invested in UST."

20          I want to talk about Nader George for a second.  He

21  wanted to invest in something stable.  He went to the Terraform

22  website.  He listened to YouTube videos.  He saw and he

23  invested in the Anchor protocol.  He saw he was getting

24  returns.  He looked at the charts of the UST price peg and he

25  believed that the algorithm worked to restore the peg.  He

O45ASEC2                    Summation - Ms. Meehan

1    believed that the algorithm worked to restore the peg, and so

2    he went out and got a $400,000 loan.  And he believed the peg

3    worked in May 2021, and that was why he held on too long in

4    May 2022 and lost almost all of his money, but here he's

5    testifying very clearly, quite clearly, that if he had known

6    about these events that occurred in May 2021 where Do Kwon

7    brokered this deal with Kanav Kariya to step in to help restore

8    the peg, he would not have invested.

9              Now, I also expect that the defendants are going to

10   get up here and they're going to talk a lot about the fact that

11   Do Kwon later prepared a reserve backing for the peg mechanism

12   in an effort to alleviate concerns about the functionality of

13   UST stability mechanism.  And they're going to try to argue

14   that this somehow made their lies and omissions less important.

15   As an initial matter, something that happened later doesn't

16   somehow erase or cure your earlier lies.

17             But even beyond that, remember that investors like

18   Boris Revsin told you that the reserve backing did not impact

19   their belief in the fundamental premise, which was that the

20   stability mechanism for UST worked.  Remember, Terraform itself

21   said that this was the lynchpin of the Terraform ecosystem.

22   And as Boris Revsin told you, that fundraise, that reserve

23   backing was just an additional benefit and would potentially

24   allow investors globally to feel even more faith in the

25   ecosystem.

O45ASEC2                    Summation - Ms. Meehan

1          I would ask you to consider the following

2     hypothetical:  You go to a car dealership.  You want to buy a

3     used car.  The dealer tells you that there are seat belts and

4     airbags in the car, but the dealer doesn't tell you that the

5     brakes in the car don't work.  The seat belts don't make the

6     omission, the airbags don't make the omission that the brakes

7     don't work any less important.  That is information that you

8     want to know when you're purchasing that car.

9          So now we've proven to you through the evidence that

10    defendants made false or misleading statements or conduct

11    regarding a material matter with regard to this Chai -- excuse

12    me, this Jump fraud.

13         Now I want to talk about defendants' state of mind.

14    Here is all the evidence that proves that defendants knew that

15    their statements and omissions regarding Jump were false and

16    misleading.

17         Plaintiff's Exhibit 56.  This is a Twitter thread on

18    the morning of May 23, 2021.  This is 3:31 a.m. eastern time.

19    Do Kwon says:  Is UST growth manipulated by Terraform Labs?

20    Nobody who has used mirror or Anchor could believe this.

21         He goes onto say:  In my view none of the

22    fundamentals -- he's talking about UST, in the UST stability

23    mechanism.  None of the fundamentals in this ecosystem have

24    changed.  The ecosystem is significantly de-risked for having

25    survived one of the worst market crashes in crypto.

1      Now, consider, this is hours before he gets on the

2    phone with Kanav Kariya and he starts talking about this deal

3    that they broker with Jump for Jump to step in and assist with

4    restoring the peg.  So this tells you he knew how important it

5    was to the public that the stability mechanism worked, that it

6    functioned.  He's telling you none of the fundamentals in the

7    ecosystem have changed.

8      Brian Curran, he was asked to post the Twitter thread

9    from May 24, 2021, where Terraform disclosed nothing about

10   Jump's role in stepping in to purchase tens of millions of UST.

11   And he told you:  I had asked Do Kwon if we could mention the

12   Jump aspect in the post mortem and he said no.

13     Now he was asked:  Now, in this entire tweet thread,

14   did you ever mention Jump's role?  Not that I see, no.  And why

15   didn't you?  Because once asked, Do Kwon said no.

16     Do Kwon told him not to disclose to the public Jump's

17   role in purchasing the UST.  Why do you think that is?  Because

18   he didn't want anyone to know.  Because it would impact his

19   business.  It would impact the pitch to investors that his

20   stability mechanism was stable.

21     I want to stop for a minute and talk about Project

22   Dawn.  This is something that you heard about from Brian

23   Curran.  And I want to talk about this because we've talked

24   about a lot of evidence so far this morning, but you could stop

25   here and you could pause on the testimony relating to Project

O45ASEC2                    Summation - Ms. Meehan

1   Dawn and this is all you really need to find that defendants

2   are liable relating to this fraud for Jump.  Because here you

3   have Do Kwon admitting to Mr. Curran that he brokered a deal

4   with Jump and agreed to lift the vesting conditions in exchange

5   for Jump's assistance in restoring UST to $1.

6           So this is the Project Dawn post that Do Kwon asked

7   Brian, initially asked Brian Curran to publish.  And it's

8   talking about token unlocks for Luna.  And those token unlocks

9   for Luna had a market value of 150 million.  This is

10  September 2021 post.  Nothing in here tells you that these are

11  token unlocks for Jump.  So what does Mr. Curran say about

12  this?

13          He's told by Do Kwon to drop this post.  He says:  I

14  realized the size of the money being used for the token unlocks

15  for the grants was quite significant.  It was around

16  150 million at the time.  So I anticipated community questions,

17  I followed up with, you know, how are these going to be

18  categorized into different grants and buckets, details like

19  that that I figured the community would ask from the get-go.

20          So this is a massive amount of money and it raises

21  some questions in Mr. Curran's mind, and he starts asking those

22  questions to his boss, Do Kwon.

23          So when you realize this was approximately 150 million

24  worth of unlocks, why did that cause you to ask question?  It

25  seemed abnormally large and the unlocks were supposed to

O45ASEC2                 Summation - Ms. Meehan

1  continue for the foreseeable future every month.

2          So then he goes and he asks Do Kwon, his boss, more

3  details about this massive amount of money that Terraform is

4  willing to unlock, and Do Kwon is dismissive of him.  He acted

5  like his questions weren't important.  This is 150 million in

6  market value and Do Kwon is brushing off his employee who is

7  asking questions about what to put in a public post.  Okay.

8  That is strong evidence that Do Kwon knew what he was doing was

9  wrong.

10         So now here you have Do Kwon's full confession to

11  Brian Curran.  Brian Curran keeps asking.  Do Kwon informs him

12  upcoming unlocks were not for Project Dawn.  Do Kwon tells

13  Brian Curran:  In the phone call he basically disclosed to me

14  that Jump Trading and Terraform Labs had a prior contractual

15  agreement dating back years.  There were three conditions in

16  this contract that had to be met.  One of the last conditions,

17  the third one, was that they would step in in a liquidity

18  crisis such as in May 2021.  So they had fulfilled the

19  contract.  He elaborated on the extent of their relationship

20  and involvement in May 2021 and told me that if Jump had not

21  stepped in, we might have been fucked.

22         And you can rely on this testimony because it's

23  memorialized in Plaintiff's Exhibit 73.  Here it is again.

24  October 6, 2021, Brian telling Do Kwon -- Brian telling Jeff

25  Kuan:  So Do said if Jump hadn't stepped in, we actually might

1  have been F'ed.  Yeah, I know, they saved our ass, Jeff Kuan

2  says.

3          So these statements by Do Kwon, he knew Jump's role,

4  he knew what he had asked them to do, he knew the deal that he

5  had brokered with them, and he was making these statements to

6  the public anyway through Terraform's Twitter account, through

7  Do Kwon's Twitter account, and he's not disclosing any of it to

8  the public.  That's deliberate.  It's intentional behavior.

9  There's no real question there.

10         So now we've proved to you state of mind elements,

11  intentionally recklessly or negligently.  I just want to pause

12  to you for a minute to just speak about negligently for a

13  moment.  The Judge is going to give you an instruction what

14  negligence means, and when you hear that instruction you're

15  going to see that the evidence in this case greatly, greatly

16  exceeds that standard.

17         The SEC has also brought control person claims, and

18  what this means is that Terraform violated Section 10b.  We've

19  already talked about that.  We've talked about all the evidence

20  that shows that Terraform violated all the elements of Section

21  10b, that do Kwon directly or indirectly controlled Terraform.

22  The Judge is going to instruct you on that and he's going to

23  tell you that that's the case.  And that Do Kwon was the

24  culpable participant in Terraform's fraud.  He was the CEO.  He

25  was the leader of this.  He knew exactly what he was doing and

1  he was making all these statements through Twitter posts and

2  directing his employees to make all these statements.

3            So, ladies and gentlemen, I want to thank you for your

4  time and attention over the past two weeks, and also for your

5  time and attention this morning.  You've heard a lot of

6  evidence and when you go back for your deliberations, you have

7  everything that you need, all the tools that you need to find

8  that the defendants are liable for securities fraud.  And you

9  should hold them accountable for their actions.  Defendants'

10 lied for years.  They lied about the success and the value of

11 their blockchain and they did it so that they could get

12 investment money to pour in.  They lied about the stability of

13 their UST peg.  And, again, investors money poured in.  And

14 when it all came crashing down in May 2022, it was people like

15 Nader George that suffered.  Defendants deceive sophisticated

16 investors like Jonathan Kol from Galaxy and Boris Revsin,

17 people like Nader George didn't stand a chance.  And instead of

18 paying back people like Nader George, they're instead still

19 parading themselves around like they're a real company, like

20 they're legitimate.

21           Fortunately, you now have the chance to hold

22 defendants accountable for their actions.  We ask when you go

23 back for your deliberations you consider the evidence and you

24 return the only verdict that justice requires.  You should find

25 the defendants are liable for securities fraud.  Thank you

O45ASEC2                    Summation – Ms. Meehan

 1    again.

 2                THE COURT:  Thank you very much.  Ladies and

 3    gentlemen, we'll give you a 15-minute break at this time.

 4                (Continued on next page)

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O45ASEC2                    Summation - Ms. Meehan

1          (In open court; jury not present)

2          THE COURT:  You may have noticed that for a couple of

3    seconds the slight shaking.  There are two possible causes.

4    One, according I'm sure to the SEC, is the force of their

5    arguments.  However, according to news reports, there was an

6    earthquake in Tewksbury, New Jersey a few minutes ago.  But GSA

7    has already tested our building and our building is fine, so

8    you can take your break with ease of mind.

9          Did you have something?

10         MR. PATTON:  I did, your Honor, but I'm happy to wait

11   until your Honor finishes.

12         THE COURT:  No, go ahead.

13         MR. PATTON:  We just we wanted to object.  I thought

14   it would get cleared up at some point during the SEC's

15   summation, but there was a slide that they repeatedly showed

16   that had all of the mental states with the title for both the

17   17 and 10b-5 claims.

18         THE COURT:  Well, there can be no misunderstanding by

19   the jury because not only do I clear that up in my

20   instructions, and I have a feeling maybe defense counsel will

21   also say something about that in his summation.  But at the

22   defense request, I amended the verdict form to make crystal

23   clear that the negligently cause of action only applies to 17

24   and not to 10b-5.  So I don't think it could be more clear.

25         MR. PATTON:  I think that's absolutely right with

O45ASEC2                    Summation - Ms. Meehan

1   respect to the instructions in the verdict form.  But I mean

2   that slide is just -- if they had put up a slide with the wrong

3   burden of proof or something else, I think it would require a

4   curative instruction.

5          THE COURT:  I don't think the slide was misleading.  I

6   think the slide of course was accurate as to the Section 17

7   count.  And any confusion in that regard, which I think is

8   nonexistent, will be cleared up by my instructions in the

9   verdict form, which are crystal clear in this respect.  So I

10  don't think any curative instruction is necessary, but you have

11  your record.

12         We'll see you all in 15 minutes.

13         (Recess)

14         MR. KORNBLAU:  Your Honor, may we raise an issue

15  before the jury comes in?

16         THE COURT:  Yeah.

17         MR. KORNBLAU:  We believe there was a statement --

18         THE COURT:  Why didn't you raise this before the

19  break?

20         MR. KORNBLAU:  Your Honor, we had to go find some

21  materials to make sure that we were right, and now I have that.

22         THE COURT: All right.  Go ahead.

23         MR. KORNBLAU:  So I would like to bring it to the

24  Court's attention, in the closing summation, Ms. Meehan was

25  summarizing testimony of Paul Kim, and we believe made a

1    significant misstatement.

2            She said that Mr. Kim, when you look at his testimony,

3    nowhere does he tell you that Chai settled and processed

4    transactions on the Terra blockchain.  And as your Honor may

5    recall, Mr. Kim testified in his deposition at page 80, to sum

6    up Chai utilized -- this is a question:  To sum up, Chai

7    utilized the blockchain technology to process and settle

8    transactions through partnership with Terraform Labs; is this

9    understanding correct?

10           Answer:  Yes, correct.

11           The SEC objected to that question which we -- answer,

12   which we designated.  Your Honor sustained that objection.  So

13   the jury was not read that testimony.  But to then say that he

14   never said it, that is false.

15           THE COURT:  No, this is a comment on what's before the

16   jury.  And moreover, there were numerous reasons I sustained

17   that objection, but one reason was he was using a term

18   "settlement" in an artificial way that is not at all like the

19   way it's normally used or the way SEC counsel was using it.

20   Overruled.  Bring in the jury.

21           MR. PELLEGRINO:  Your Honor, may we just instruct the

22   jury that we're doing one closing.

23           THE COURT:  Yes, I will.

24           MR. PELLEGRINO:  Thank, you your Honor.

25           (Continued on next page)

1              (In open court; jury present)

2              THE COURT:  So, ladies and gentlemen, we'll now hear

3      from the defense.  The defendants have elected to have one

4      lawyer present arguments for both defendants.  Please go ahead.

5              MR. PELLEGRINO:  Thank you, your Honor.

6              They told you that it was a house of cards.  They said

7      that Terraform and Do Kwon lied about Chai running on the

8      blockchain.  They said that Terraform and Do Kwon lied about

9      the stability of UST.  And they said that defendants lied to

10     investors and used those lies to obtain millions of dollars in

11     profits.  None of this was true.

12             In this trial, you saw that Terraform was a real

13     company with real products.  And if you learned one thing, you

14     learned that building new products based on these new

15     technologies is hard.  Terraform and Do Kwon never tried to

16     hide their failures from you.  Terraform's current CEO admitted

17     that the 2022 depeg caused devastating losses to buyers when

18     UST collapsed.  No one tried to fool you into thinking that

19     purchasers did not lose money from this event.  But you heard

20     that Terraform lost millions of dollars too.  And that's

21     because hedge funds launched a devastating short attack on

22     Terra, something that just now Ms. Meehan did not mention in

23     her closing.

24             It was a terrible situation for everyone involved.

25     Yes, we told you in our opening that failure is not fraud.

O45ASEC2                    Summation – Mr. Pellegrino

1    Because it's not.  And now, the SEC is trying to punish that

2    failure.  And to do that, they have shown you a complicated

3    selection of cherrypicked statements made by Do Kwon or

4    Terraform, but none of them support the SEC's allegations.

5            First, not a single statement was false.  They were

6    true.  Second, there was no secret deal.  There was a real

7    enforceable written agreement with Jump for it to serve as

8    something called a market maker, and that was entirely legal.

9    And no one has been able to explain to you the terms of this

10   alleged secret agreement.  No one has shown you any proof of

11   what the secret agreement supposedly was.  The only reason they

12   call it secret is to try to explain why they don't have any

13   evidence to show you of it.

14           Now, third, Chai worked.  The SEC's own witness Paul

15   Kim testified that Chai ran on the blockchain, and people in

16   Korea used it to buy real products using an app on their

17   phones.  And, lastly, by now you have seen that purchasing

18   crypto, like any other investment, carries risk.  But these

19   were fully disclosed.

20           All reasonable purchasers knew about the risks,

21   including that death spiral that you heard about.  One of the

22   SEC's own witnesses, Jonathan Kol, admitted he knew of these

23   risks from information that the defendants made available to

24   anyone who looked for it.

25           Now, before we dive into the evidence, I want to say a

O45ASEC2                        Summation – Mr. Pellegrino

1    word about the burden of proof in this case, which you first

2    heard about moments ago.

3            It's the SEC's obligation to prove their case.  That's

4    why we say they have the burden.  As you heard, they must prove

5    all the essential elements of their claims by a preponderance

6    of the credible evidence.  What does this mean?  You must find

7    the defendants not liable unless you determine for each element

8    that they talked about with you that the SEC's argument is more

9    likely than true.  Importantly, you only need to consider

10   credible evidence.  So if you did not find the SEC's witnesses

11   believable, you would not credit their testimony.  For example,

12   if you thought a witness was biased or had reasons to lie, you

13   can take that into account.

14           The SEC is not entitled to any presumption of truth.

15   You should not assume that their evidence is true just because

16   they're a government agency or because they have made the

17   allegations that they've raised in this case.

18           Instead, carefully evaluate it using your own

19   judgment.  As I said in our opening statement two weeks ago,

20   the government doesn't always get it right.  And as the

21   defendants, we do not have the same burden.  We are not

22   required to prove or to disprove anything.  We're not required

23   to put on a defense.  But here, we did put on a defense.  And

24   using the SEC's own witnesses, we showed you that the SEC's

25   case has serious flaws.  And now we're going to show you why.

O45ASEC2                       Summation - Mr. Pellegrino

1              So what did you learn in this case?  First, we don't

2    spend much time on this.  You've already heard all about the

3    technology, but Terraform was a revolutionary company, and

4    instead of easy profits, Do Kwon was looking to focus on

5    building the harder things in crypto.  Which you see on your

6    screen.  Do developed UST, a stablecoin, to help keep

7    cryptocurrency values from fluctuating, then he tried to create

8    a real-world use for the blockchain, and you know that became

9    Chai.

10             Now, when you heard and saw figures like millions or

11   billions of dollars being discussed in this case, that's

12   because people all over the world knew that Terra was making

13   these products and they wanted to be a part of them.  That's

14   why everything was so public so that members of the community

15   could participate.  And you heard that they did participate.

16   They helped build products, and they controlled these products

17   by voting on what to do with them next.  Those were called

18   governance proposals and you heard about those.  That

19   democratic process in part is why Terra was not a fraud and not

20   a house of cards.

21             Now, by this point you may have heard more about

22   cryptocurrency than you may have ever wanted to know.  So let's

23   get right into the two categories of alleged false statements.

24   First, let's talk about Chai.

25             I'll begin with the alleged false statements.  Now,

1    the SEC has alleged that nine selectively chosen statements are

2    false about Chai.  We won't go through them one at a time, but

3    when you go back into the jury room to deliberate, you should

4    look at each and every one of them carefully and completely.

5    And when you deliberate, you will see that the SEC has shown

6    you only pieces of a statement and not the whole thing.  The

7    first thing to remember about these statements is that they are

8    just a handful out of hundreds.  Not a single one of the SEC's

9    purchaser witnesses testified that they ever heard or

10   considered any of these statements, much less that they relied

11   on them.  But even if they did, we only need to walk through a

12   few of them to show you that each of these statements is

13   actually true.

14           And let's start with this one.  This is Do Kwon's

15   June 21, 2019 Medium post where he says that:  Terraform has

16   been getting a lot of questions regarding how Chai uses Terra's

17   blockchain.  And then he explains, quite simply, Chai runs,

18   records transactions, and manages account balances on Terra's

19   Columbus mainnet.

20           The SEC, as you know, claims that this is a false

21   statement, but it is true.

22           The Columbus mainnet was the name that Terraform used

23   for the system that hosted the Terra blockchain.  You learned

24   that in this trial.  Here it is right here:  Chai batches all

25   the user purchase actions in a 10 to 15 second time window and

O45ASEC2                    Summation - Mr. Pellegrino

submits the batched tx, that's transactions, to the Columbus
blockchain.

And you heard the SEC's own witness, Paul Kim, explain
that Chai uses the blockchain exactly how Do Kwon explained it
in the statement we just showed you.

Is it correct that using blockchain technology and
accurate ledger about various information, such as buy,
discount, refund, reward, and merchant payment was gained from
Chai?  He says:  Yes, from Chai.  And at the top he says:  They
were real KRT transaction and not a mere copy.

Just to remind you, KRT, you learned in this case, is
the Korean stablecoin.  It's a cryptocurrency.  It's pegged to
the Korean won, which is their regular currency.

So the statement that I just showed you in Do Kwon's
Medium post is not false.  It is true.

Now let's look at another one of the Chai statements
that the SEC claims is false.  This is from the March 19, 2021
interview of Do Kwon.

Do Kwon says:  On the backend, Chai uses Terra's
blockchain, stablecoins, to settle transactions faster and
cheaper than legacy counterparts.  Notably, users of Chai are
never actually exposed to interfacing with Terra directly.  The
user interface is smooth and conducive to mass adoption.

Now, you heard Paul Kim corroborate this too.  He said
it was 100 percent linked to the Terra blockchain in the

1    backend.

2             Here he is again:  It was not merely connected on the

3    backend.  I rigorously developed the algorithm and I personally

4    made enormous efforts to link it to the Terra blockchain from

5    the beginning.  So it should be seen as one thing in its

6    entirety, included in the whole payment process.  Which is what

7    I told you in our opening two weeks ago.  You have to consider

8    the context and the statements in their entirety and you have

9    to consider the process of payment between Chai and the Terra

10   blockchain in its entirety.

11            Let's look at another statement that the SEC claims is

12   false.  This is a Do Kwon Discord post from February 9, 2020.

13   You saw this one in the SEC's closing.  And it says:  Right now

14   Chai has 12 merchants, all of whom get settled in KRT on the

15   Terra blockchain.

16            Now, the SEC said that Do Kwon wanted Chai to appear

17   more popular to the public than it really was.  But if that was

18   so, why would Do Kwon issue a statement or Terraform issue a

19   statement that says there's only 12 merchants who are settled

20   in KRT on the Terra blockchain?  Wouldn't they say 120 or

21   1,200?  So nothing about this statement is false.  It's

22   demonstratively true as the statements from Paul Kim have shown

23   you.

24            In addition, there was statements about the –– the SEC

25   has also said, included another statement in which they say the

1  defendants lied by saying that Chai merchants were going to be

2  paid in KRT, which is that Korean cryptocurrency that I told

3  you about.  But even their own investor witness, Jonathan Kol

4  from Galaxy Digital, he knew that that was not the case.  He

5  told you:  Many transactions might occur in stablecoin, but at

6  some point at the end of it they're meant to receive fiat so

7  that they can continue to pay their bills and conduct their

8  operations.

9          And just a reminder that fiat is just another word for

10 paper money or the currency that a country uses.  It's regular

11 money.  Not cryptocurrency.  That's their own witness

12 explaining his understanding that the merchants would be paid

13 with regular money.

14         So now let's talk about the remaining statements that

15 SEC has asked you to consider.  They really boil down to:  Was

16 Chai real or was it fake?  And what I mean is, did it run on

17 the blockchain or did it not?  Well, it was real.  It ran on

18 the blockchain.  And you have all the evidence you need to know

19 about that.  Because as we promised in our opening, you heard

20 from Paul Kim.  He's the one we called the architect.  Paul Kim

21 is the guy.  He's the one that built the bridge between Terra,

22 the LP server, and Chai.

23         What the SEC knows, and what you know, is that even

24 though Paul Kim was not here in person, his testimony was real

25 testimony from a real witness.  The Court told you you should

O45ASEC2                    Summation - Mr. Pellegrino

1    evaluate his testimony exactly as you would any other witness.

2              Now, the reality is, even the SEC's own witness, their

3    expert, Dr. Edman acknowledges that Paul Kim is the architect.

4    He says:  Paul Kim was primarily responsible for creating and

5    developing the LP server software.

6              No one seems to disagree about that.

7              Now, if you'll recall, Dr. Edman also showed you this

8    slide.  He showed you this slide in which he analyzed computer

9    code relating to that thing called the LP server, and in that

10   analysis, he looked at something called commits.  You see that

11   at the top and on the right-hand side where he's talking about

12   commits.  And you learned at this trial that commits are

13   basically changes of record -- record of changes to a computer

14   code.

15             Well, look who has almost all the commits on Chai,

16   according to Dr. Edman their own witness.  It's Paul Kim.  And

17   as a matter of fact, you learned at this trial that Paul Kim

18   and Hanju Kim are the same person.  They share the same e-mail.

19   It's Paul Kim.  So when you add those two together, you see

20   that Dr. Edman analyzed that there were 41 plus 3, that's 44

21   commits for Paul Kim, and an individual named Yun had one.  44

22   commits.  So what does that tell you?  It tells you that Paul

23   Kim engineered, created, and ran the code.  So as we've been

24   saying all along to you, Paul Kim is like the architect.

25             Now let's talk exactly about what the architect built.

O45ASEC2                    Summation - Mr. Pellegrino

1    You should think of what Paul Kim built as being like a bridge.

2    Paul Kim built the bridge known as the LP server process.

3    Something like this.  You see Chai on the right-hand side, the

4    Terra blockchain on the left-hand side, and that thing in the

5    middle called LP, and that's the LP server process which linked

6    Chai to the Terra blockchain, because Chai and the Terra

7    blockchain were separate applications that needed to be joined

8    together.  You heard that.

9             And to do that, you heard about this thing called the

10   LP server.  Now, all you really need to know about that is it

11   was the system that linked Chai to the Terra blockchain so that

12   these two separate components could talk to each other.  And

13   there was a lot of talk about how Chai worked, but you can

14   really think of it in one way.  Chai and the blockchain were

15   linked together by the LP server process, the same way a bridge

16   links one piece of land to another.  Paul Kim built that bridge

17   and one part of that bridge was right inside Chai.  The

18   blockchain wasn't.  But the part that says LP is what linked

19   them together.  This bridge was how Chai used the blockchain.

20            Now, the SEC says there was no bridge.  They say it

21   was more like a mirror, a mirror that had no purpose.  But you

22   learned that this bridge actually worked.  What you heard was

23   that on the right-hand side of this diagram where you see Chai,

24   people in Korea could buy stuff with their phone, buy a cup of

25   coffee, go into a store, use their phone and that purchase

O45ASEC2                    Summation – Mr. Pellegrino

1    would be queued up in the yellow section where it says Chai,

2    and then it would be transmitted across the bridge through that

3    LP server where it was registered on the blockchain on the

4    left-hand side.  Then a message was sent back to Chai that the

5    transaction had been publicly recorded.

6         And you learned this bridge had a purpose.  A real

7    purpose.  It was built for a reason.  It had at least four

8    purposes actually.  So let's look at that now.

9         The first was discounts and refunds.  By connecting

10   Chai through the LP server to the blockchain, customers could

11   earn discounts and they could obtain refunds provided by Chai.

12   That's what you see right here in Defendants' Exhibit 319.

13        Second, the bridge ensured the stability of the

14   system.  This is from Paul Kim's testimony.  He says:  The

15   purpose of the database replication is to enhance the stability

16   of certain data as well as failure response, coordination, the

17   face of failure, and data accessibility and things like that.

18        He's saying that the purpose of this was to ensure

19   that there were multiple records of the transactions.  Not just

20   on the Chai ledger, but also on the blockchain side.

21        Third, you heard about this thing called the top-up.

22   Well, what was the top-up?  Well, if the consumer wanted to, he

23   or she could fill up their account by using KRT, again, that

24   Korean cryptocurrency, to pay for things that they wanted to

25   buy.  And Chai worked on Chai points.  If they didn't have

O45ASEC2                    Summation - Mr. Pellegrino

1    enough points in their account, they could add KRT,

2    cryptocurrency in their account.  That's Paul Kim talking about

3    the Chai points and the KRT process in his testimony right

4    there.

5             And, lastly, there was liquidity.  And this example

6    comes from the SEC's own expert, Dr. Edman.  He was asked:  So

7    in your professional opinion did LP server provide liquidity?

8    He says:  I believe so.

9             What he's saying there, is that every transaction

10   executed on the Chai -- every transaction that Chai executed on

11   the blockchain provided liquidity to the blockchain.  Adding

12   more liquidity to the blockchain made the blockchain more

13   stable.

14            Now that you know the purpose of the bridge, how do

15   you know that Chai ran on the blockchain?  Well, that's easy.

16   Paul Kim's testimony told you that over and over that he had

17   designed the LP server process so that Chai would run on the

18   blockchain.  Paul Kim told you that this is a process that

19   begins in Chai and ends on the blockchain.

20            Here he is here:  The purpose of the LP server is to

21   play the role of receiving changes to the ledger information

22   from Chai and uploading KRT transactions on the Terra

23   blockchain.  Again, it was not merely connected on the backend.

24   I rigorously developed the algorithm and I purposely made

25   enormous efforts to link it to the Terra blockchain from the

1  beginning so that it should be seen as one thing in its

2  entirety, one whole thing in its entirety, included in the

3  whole payment process.

4          And finally, the LP server was not a mirror.  He says

5  they were real KRT transactions and not a mere copy.  He's

6  directly addressing that allegation there.

7          Now, to go back to the -- there's one more slide from

8  Mr. Kim:  If the purpose was to simply copy, I would not have

9  worked so hard to make the algorithm.

10          So again, addressing the mirror allegation.  And words

11 like "mirroring" or "copying" are not appropriate.  He said it,

12 as I said, over and over again in his testimony and that's why

13 his testimony is so important, ladies and gentlemen.

14          So to go back to the bridge analogy, the LP server

15 also had something like a toll booth.  And you can think of

16 that as existing right around where that arrow is indicated on

17 that diagram.  Now, all purchases traveled across the bridge

18 and back.  Just like a tollbooth might stop some traffic.  It

19 was the tollbooth so to speak right there that stopped Chai

20 from being just a mirror the way SEC claims that it was.

21 Because a mirror does nothing.  It just reflects.  A mirror

22 doesn't execute transactions.  But the Chai LP server process

23 would not allow Chai to actually execute transactions or pay

24 merchants if the transaction was not put into the LP server

25 queue.  What does that mean?

O45ASEC2                        Summation - Mr. Pellegrino

1          Basically if the data does not go into the queue, the
2     transaction fails.  That means if Chai does not send this
3     purchase information to the blockchain, you would not be able
4     to buy that cup of coffee.  That's your tollbooth example right
5     there.  And it's not a mirror.  So, again, that's why Paul Kim
6     insists words like "mirroring" or "copying" are not
7     appropriate.  Paul Kim designed the LP server process to use
8     the blockchain from the very beginning.  It was intentional and
9     not simply a mirror.
10         Now let's talk about the SEC's evidence.  We've
11    already talked about how Dr. Edman agrees that Paul Kim
12    designed the system.  And they said that we've never challenged
13    Aaron Myung's testimony.  Well, we disagree with that.  But if
14    not, let's make sure we're clear about it now.
15         Paul Kim was a witness offered by the SEC, but then
16    they also offered Aaron Myung, and he contradicts Paul Kim.  So
17    who should you believe:  The so-called whistleblower that we
18    told you was looking for a big payday, or the guy that everyone
19    seems to agree built the system?
20         And what did we learn about Aaron Myung?  We learned
21    that he was a practiced liar.  He filed four separate
22    whistleblower complaints with the SEC.  He filed these under a
23    warning that he was required to make true statements, but he
24    made up nonexistent losses of half a million dollars.  Why?  To
25    get the SEC's attention so that he could qualify for a possible

1    multimillion dollar whistleblower award.

2            He tried to explain this to you by saying he didn't

3    have a lawyer.  But these questions were not asking him to put

4    any words down.  They simply asked him to enter the amount of

5    loss to the nearest dollar, and he changed that number back and

6    forth, entering zero, and 500,000, because it was all about the

7    money for Aaron Myung.  It was the money he cared about.

8            And remember, that's because Aaron Myung was fired and

9    he was angry about being fired because he was fired before he

10   could receive his $20 million in Chai stock from the Chai

11   company.  So he became a whistleblower.  He admitted he only

12   gets paid if the SEC wins.  And he said if there's a reward,

13   I'm all for it.  And he admitted that he told the SEC he had

14   lied to Justin Huang when he reported him.  He even told the

15   SEC that he lied to a colleague that he recorded in order to

16   trick him into talking.

17           "So you lied to him, right, Mr. Myung?"

18           "Yeah, sure.  I lied to him, yes."

19           And Aaron Myung had an outside sense of his own

20   importance.  Here's where he says:  That C-level people

21   typically don't write the code.  He said:  I do not write the

22   code in the a same way Steve Jobbs does not write the code for

23   the iPhone.

24           Now of course, the C-level people are people like the

25   CEO or the CFO, executives at the company.  And Aaron Myung

1    admitted that he surreptitiously recorded colleagues when he

2    was trying to help the SEC.  And why did he make these

3    recordings?  Because he himself did not know the first thing

4    about Chai or whether it ran -- the first thing about whether

5    Chai ran on the blockchain.

6           So he tried to trap others into saying things for him.

7    Remember, he was the guy with the pen in his shoe or in his

8    pocket.  Picture him walking into some person's office, with

9    some sort of recording device hidden in his shoe, bothering

10   them about Chai, lying to them.  As you see on your screen he

11   made more than 60 of these recordings.

12          Now of course, that's not what Aaron Myung told you.

13   He told you, "probably on earth, I would know more about Chai

14   than anybody else on earth".  But when it comes to the

15   blockchain, that claim was another bold-faced lie.

16          How do we know that?  Well, you already saw that he

17   admitted that he didn't write code the same way Steve Jobbs

18   didn't write code, and here he tells you I did not work on the

19   LP server.  And Paul Kim, head of engineering at Chai, had this

20   to say about Mr. Myung, "I do not know who Aaron Myung is."

21   He's never heard of him.

22          Again, to go back to this slide for a moment,

23   Dr. Edman's slide analyzing who committed the code to the LP

24   server, this is the SEC's own exhibit.  And do we see Aaron

25   Myung's name on Dr. Edman's slide anywhere?  No.  No.  Because

O45ASEC2                  Summation – Mr. Pellegrino

1   Dr. Edman did not analyze any type of coding by Aaron Myung

2   because Aaron Myung was never involved in making sure that Chai

3   ran on the blockchain.  Dr. Edman looked only at what these two

4   people did, and Aaron Myung was not one of those two.

5           And so Aaron Myung's testimony is completely

6   discredited by Paul Kim and Dr. Edman, two witnesses that were

7   also called by the SEC.

8           Now, what about his recordings?  Remember, Paul Kim

9   recorded Dan Shin, GiGi Kwon, JiHoon Kim, and Jinny Baek, among

10  others.  But the recordings don't matter because Aaron Myung

11  was running around setting up people who had no actual

12  knowledge of how Chai worked.

13          Looking one more time at Dr. Edman's slide, the SEC's

14  expert shows that nearly every recording Aaron Myung tried to

15  make is irrelevant.  None of the people I just mentioned appear

16  on this list of commits, who as we said are the people who

17  worked on the computer code for the LP server.

18          So none of those people he recorded have firsthand

19  knowledge about whether Chai ran on the blockchain, except for

20  JiHoon Kim, and I'll talk about him in a moment.  In fact, Paul

21  Kim told us that not even Do Kwon knew the specifics of how

22  Chai was connected to the blockchain.  He says:  He was not

23  involved in writing the code for the LP server at all, but

24  simply told me the specs.  There it is right there.

25          So that leaves JiHoon Kim.  He was the engineer that

O45ASEC2                       Summation - Mr. Pellegrino

1    replaced Paul Kim at Chai.  And if you remember the recording

2    of JiHoon Kim, the recording of JiHoon Kim, you will remember

3    that it was Aaron Myung who did almost all the talking.  He was

4    asked that question.

5             "You're doing most of the talking, right?"

6             "Yes."

7             "So again, Mr. Myung, you're doing most of the talking

8    in that conversation, right?"

9             "Yes."

10            So let's look at the transcript.  Again, this was from

11   that recording where Aaron Myung was talking to JiHoon Kim.

12   He's the engineer that replaced Paul Kim.  And JiHoon Kim was

13   drawing on a white board to explain himself, but Myung didn't

14   take a photo of it so we couldn't see it.  When you go back to

15   the jury room, you should listen to this recording.  It's

16   Plaintiff's Exhibit 122B.  You'll hear that Aaron Myung does

17   almost all of the talking, and you'll hear JiHoon Kim

18   responding like he just wants Aaron Myung to get out of his

19   office.  That's why you see all the "mm-hmms" and the "uhms".

20   JiHoon Kim is mostly not agreeing with the things Aaron Myung

21   is saying.  He's agreeing to be agreeable, to be a nice guy.

22   But when you listen to that recording in the deliberation room,

23   you will hear, ladies and gentlemen, that that is what is

24   happening between Aaron Myung and JiHoon Kim.

25            Now, the SEC also brought up Mr. Amani and Ashwin

O45ASEC2                    Summation - Mr. Pellegrino

1    Mathialagan.  I apologize.  Everyone just called him Ashwin in
2    this case.  But both Ashwin and Mr. Amani joined the company
3    after Chai became a separate company.  So yes, they had no
4    knowledge about how Chai worked, and nobody ever said that they
5    did.

6          And so their testimony was not presented to you on
7    anything to do with Chai.  So what's left to talk about with
8    Chai?  Well, first, let's look at this e-mail, which the SEC
9    showed you, and which they said Do Kwon says we are not using
10   any Terra blockchain technology.

11         Now, we told you in the opening that the SEC was
12   taking selected documents out of context.  This is PX 143A.  To
13   be clear, when I say "X" I mean exhibit.  So Plaintiff's
14   Exhibit 143A.  This is one of those out of context statements
15   that we talked about at the beginning of this trial, and it's a
16   document that you need to review in its entirety.

17         In our opening we told you that Do Kwon was talking
18   here about a small part of the overall system.  And when you
19   look at this document in person, if you scroll further down or
20   if you look at it on paper, you'll see that it explains that
21   the transactions were actually clearing on the Columbus
22   mainnet.  You see that right there.  "And chain tx is being
23   committed to Columbus", tx is transactions.  And the Columbus
24   mainnet, as we've told you before and as you learned in this
25   trial, is what they call the Terra blockchain system.

1         When you're deliberating in the jury room, you should

2    read this document for yourself.  And you will see that Do is

3    talking about seeing the transactions right on the blockchain.

4    This is the same document.  He says:  Just out of curiosity,

5    it's super easy to figure out Chai transactions are mapped to

6    transactions on Columbus.  Again, the blockchain.  That's the

7    same exhibit.  And that's why, ladies and gentlemen, you need

8    to read the entire exhibit before making a decision about a

9    false statement.

10        Now, here's another one that they showed you, except

11   you didn't see it this way, ladies and gentlemen.  In fact, it

12   was very clever how the SEC presented it to you.  It was on a

13   slide.  You didn't see the document the way you're seeing it

14   here.  This is PX 140, Plaintiff's Exhibit 40.  And notice that

15   they didn't show you the actual document.  They made up a

16   slide, and they pulled out certain quotes, but they never

17   showed you the document itself.

18        That, ladies and gentlemen, is an omission, which is

19   what this case is about.  And what part was omitted?  This

20   discussion here:  Generating staking returns of SDT, and

21   further conversation about SDT.

22        So as you'll recall, because we've talked about it

23   several times already, transactions on Chai involved KRT, which

24   was that Korean stablecoin, not SDT.  There's no evidence in

25   this case about SDT.  So there's no evidence of any fake

O45ASEC2                    Summation - Mr. Pellegrino

transactions involving Chai, and not even any evidence as to

what they were discussing when they were talking about SDT

here.  But SDT is not KRT, the Korean stablecoin.  That was

part of Chai.

        Finally, you saw this document relating to the

supposed handshake agreement.  Here's where you learned about

that in this case.  The two companies had originally operated

together when they were founded.  And then the cofounders

decided to separate the operations and each became CEO of one

of the companies.  Dan Shin wasn't saying here that Do's

statement is false.  He was simply saying he's not going to

comment on it.  And, thus, ladies and gentlemen, there were

never any false statements about Chai.

        Now let's talk about the 2021 depeg.  And let's try to

make this really simple.  Let's recap what you know at a very

high level.

        Number one, you heard about crypto tokens called

stablecoins.  They're supposed to stay at around $1 so that

their price does not fluctuate.

        Number two, Terra's stablecoin was called UST.

        And, three, people describe a stablecoin as being

pegged, so UST was pegged to the U.S. dollar.  And if UST

started to lose its value, like fall below a dollar, then

that's what the depeg was.

        And, finally, you heard about another token called

O45ASEC2                    Summation - Mr. Pellegrino

1     Luna.  Luna was the counterpart to UST.  And you heard all

2     about the algorithm.  It was also called the mint-burn

3     algorithm or the mechanism.  That mechanism was how UST would

4     remain pegged to $1.

5            Now basically, you know that the mechanism would allow

6     you to sell UST or buy Luna, and that buying and selling was

7     designed to keep UST stable at $1.  Now I'm not going to recap

8     for you how that mechanism worked, because all you need to know

9     now is that the mechanism was not a computer that functioned on

10    its own.  Instead, it required people to interact with it.  It

11    was not some magical machine that worked all by itself.  And

12    everybody knew this.  How do we know that?  Because the SEC's

13    own witnesses told you so.  Here's Boris Revsin of Republic

14    Capital:

15           "You understood at that time that minting and burning

16    had to be done by institutions and people, right?"

17           "Yes."

18           "The algorithm, when we talk about mint and burn, the

19    algorithm doesn't do it itself magically, right?"

20           "Correct."

21           Here's Jonathan Kol from Galaxy Digital:

22           "The algorithm was there but market participants still

23    had to take advantage of it."

24           "That is correct, people still have to use the

25    program."

1           The only thing you need to remember is that the

2    defendants never claimed that there was no third-party

3    involvement in the mechanism.  Even their own witnesses told

4    you that.  Do Kwon or Terraform never said that the mint-burn

5    mechanism was all algorithm and no other human factors.  Even

6    their witnesses recognize that.  So watch out for statements

7    like these, which the SEC claims are false but are not.  This

8    is Do Kwon's May 24, 2021 Twitter feed.  And this is the

9    statement I'm referring to, which you saw in their closing.

10          Algorithmic calibrated adjustments of economic

11   parameters --

12          (Interruption)

13          THE COURT:  I told you not to play that tape.

14          MR. PELLEGRINO:  Does that count against my time, your

15   Honor.

16          THE COURT:  Go ahead.

17          MR. PELLEGRINO:  You've seen this one before.  This is

18   not a false statement.  They're trying to confuse you by

19   suggesting that it's somehow false when it's not.

20          Do is saying that the mechanism was better than suits

21   and faxes, but he was not saying that the mechanism was all

22   computer and no humans.  And of course there's some hyperbole

23   in there because hardly anyone uses fax machines anymore.  It's

24   clearly not meant to be taken that seriously.  But in any

25   event, it's not false because the evidence shows that

O45ASEC2                Summation – Mr. Pellegrino

1   everybody, including the SEC's witnesses, understood that human

2   involvement was required to make the mechanism work.

3           Now, just like we did with Chai, let's look at the

4   claims that the SEC points to as alleged false or misleading

5   statements about the stability of UST and Jump's intervention

6   to restore the peg.  And again, when you deliberate, look

7   carefully at the statements they claim are false.  Each of them

8   are true.  There are no statements that say what the SEC

9   alleges.  None of the statements claim the algorithm worked

10  perfectly to restore the peg on its own.  All on its own.  None

11  of these statements claim there was no third-party

12  intervention.  And now you know the algorithm doesn't work on

13  its own as well.  It requires people and institutions to trade

14  to make it work.

15          And when you view these statements in context with

16  that in mind, you will see that none of them are false.  And

17  we're going to look at just a few of them.  Let's start by

18  quickly looking at this, the May 23, 2021 Twitter feed.  These

19  are Mr. Kwon's tweets about the supply and demand functions of

20  the mechanism.  I don't think they showed you this one in their

21  closing, but it is one that they allege is false.

22          But this statement is true, as many witnesses have

23  told you when they discussed how the mechanism works.  And

24  Mr. Kwon's view, which is being expressed right here, his view

25  is that the system was significantly de-risked.  But it's just

1    that, it's his view.  That's his opinion.  And there's no

2    evidence that he did not honestly hold that opinion at the time

3    that he sent that tweet.

4         And let's also take a very close look at this same

5    exhibit, because this series of tweets began at 3:31 a.m. on

6    May 23rd eastern time.  This is hours before UST hit its low

7    price shortly after 9:00 a.m. that morning.  And it was hours

8    before the SEC even alleges any supposed secret deal was struck

9    with Jump.  The SEC must prove the statement was false at the

10   time it was made.  And here they clearly cannot.

11        Let's look at another example.  You saw this one in

12   their closing as well.  Here, on May 24, Terraform tweeted that

13   the price of UST was at $1 with a screenshot showing the price.

14   They claim that was false.  The price was at $1.  That was a

15   true statement.  Nobody has proved otherwise.

16        Now, this next statement or series of statements is

17   one that I would ask you to pay particularly close attention

18   to, because you were shown bits and pieces of this document

19   throughout the trial and they were taken out of context.  This

20   is PX, Plaintiff's Exhibit 57.  And you can see that this is a

21   Twitter thread.  And by now you probably know that these

22   Twitter threads, when they have a number and a slash next to

23   them, like this, are one long thought that are meant to be read

24   together.  So you read the entire statement in context.  And in

25   particular, you should look at this portion of the tweet,

1    "slash 9," tweet number 9.

2            And in fact, this is one that they did not focus on at

3    all in their closing.  You only briefly saw it at the trial.

4    Now, they showed you in their closing 2, 3, 4, 6, 14, 15, 16,

5    17, all from the same document.  But they did not show you this

6    one.  And now I'll read it.

7            "However, with swap spreads so large, the incentive to

8    perform the time based arb was curtailed significantly.  At a

9    spread of 500-700bp for much of the day, the peg needed to be

10   defended but the incentive to do so via the on-chain swap

11   mechanism was low."

12           Now, what does that mean?  Well, the SEC claims that

13   Terraform and Mr. Kwon misled the public that the algorithm

14   automatically healed the peg.  But that is misleading because

15   in this tweet, the one they did not show you on closing,

16   Terraform told the public that the algorithm wasn't working

17   perfectly, the peg needed to be defended, and actually

18   explained what the cause was.  "Swap spreads so large."  So

19   what is that?

20           Well, you heard about fees that were used to keep the

21   mint-burn mechanism working properly.  Those fees went up and

22   down to keep the mechanism functioning.  You may recall that

23   was that discussion where they were compared to New York City

24   congestion pricing.  So here the defendants are reporting

25   accurately that at that moment, the fees were too large, that

1    meant there was not enough profit incentive to encourage people

2    to use the mechanism, and then this is what they called

3    slippage.  And slippage was mentioned back here, two tweets

4    before, tweet number seven.  You can see it right there.

5    Slippage exceeded expected profits from the arbitrage.

6           So going back to tweet number 9, this tweet occurred

7    on the day after the 2021 depeg.  One day later.  This is

8    precisely, precisely where Terraform told the world that the

9    peg needed to be defended.  It's right here in the document

10    that they showed you, but they did not show you this tweet on

11    their closing.  And that meant it had to be defended from the

12    outside, by a trading individual or a firm.  And Terraform

13    disclosed that the incentive to do so via the on-chain swap

14    mechanism was low.  What does that mean?  Meaning that

15    Terraform told the public about that off-chain trading that

16    they spent a fair amount of time talking about during this

17    case, that off-chain trading that they say, the SEC claims,

18    that they told no one about.  So mark this down.  Plaintiff's

19    Exhibit 57, tweet number 9.  This is the tweet that the SEC did

20    not want to explain to you, because in context, it shows that

21    the defendants disclosed what was happening to the peg in real

22    time.

23           Now, there's more to this same thread.  Let's go to

24    tweet 28.  This same tweet points out Jump's proposal, and you

25    heard about this, prop 90.  And the proposal was to fix the

O45ASEC2                    Summation - Mr. Pellegrino

1    slippage issue we just told you about, to improve the function

2    of the mechanism going forward the day after the depeg.

3          And you heard about this proposal from Chris Amani

4    because he saw it when he was a member of the Terra community

5    before he joined Terraform as an employee.  And he talked about

6    it right here.

7          Now, why was prop 90 important?  Because it tells you

8    that while the depeg was happening, there were already

9    proposals to make the mechanism better, just as Do Kwon said in

10   the podcast interview that the SEC played for you.  This means

11   that the defendants had no intent to defraud anyone because

12   this information was available to anyone who purchased tokens

13   after the 2021 depeg.  No one tried to hide what happened.

14   They were acknowledging what happened and taking steps to try

15   to improve the system.  This tweet in its entirety is not

16   false.  Review it in the jury room.  You will see that it's the

17   key to understanding that Terraform disclosed that the peg

18   might need to be defended and it did it in realtime as the

19   events were evolving.

20         Now I want to talk also about this June 2021 community

21   update on Medium.  This is another statement the SEC alleges is

22   false, and you saw that on their closing as well.  It says:

23   The UST peg has healed after a period of high volatility.

24         But in June 2021, the peg had healed, and it was back

25   at $1.  And by the way, this quote goes on to talk about the

O45ASEC2                    Summation – Mr. Pellegrino

1    Anchor protocol, which you've also heard about in this case.

2    You see the reference there to stable yields of 18 to

3    20 percent.  We should be clear, there is no allegation in this

4    case that the Anchor protocol didn't pay interest.  Arash Vakil

5    and James Hunsaker told you they received returns from the

6    Anchor protocol.  Here's Professor Vakil:

7            "When you invested your UST into the Anchor protocol,

8    were you able to see your returns?"

9            "I was able to, yes."

10            "When you refreshed each time," meaning his screen,

11    "were you seeing that you were getting the interest that you

12    expected?"

13            "Yes."

14            James Hunsaker as well:

15            "You received all the interest that you were expecting

16    to earn from having deposited with Anchor."

17            "I would guess so, yes."

18            But James Hunsaker told you that he made $7,000 in

19    just a few months, exactly as the Anchor protocol was supposed

20    to work.

21            Now, you also heard audio from a March 2022 Twitter

22    talk show.  The SEC claims that in this Twitter audio clip, and

23    what you're seeing on your screen is a transcript, the

24    defendants falsely claimed that the protocol automatically

25    self-healed.  But again, the SEC is cherrypicking words out of

O45ASEC2                    Summation – Mr. Pellegrino

1    context.  So read the words carefully or listen to the audio.

2    Remember, that the SEC's own witnesses told you that the

3    mechanism doesn't work without people using it.

4                (Continued on next page)

O45HSec3                    Summation – Mr. Pellegrino

1          MR. PELLEGRINO:  (Continued) The statement they were

2     referring to is about slippage costs.  It's right there on your

3     screen.  Remember, those are the fees we talked about that make

4     it less profitable to use the protocol, and that's what Do Kwon

5     is saying self-healed.  "It took a few days for the slippage

6     cost to naturally heal back to spot," that's what Do Kwon is

7     talking about when he's talking about naturally healing, and

8     that's exactly what happened.

9          And the SEC's own expert, Dr. Edman, told you that.

10    You may recall this chart.  It's Plaintiff's Exhibit P-196, and

11    you see that spike followed by that cliff that drops off there

12    on the right-hand side, that's where the slippage costs healed.

13         Excuse me.  This slide was from Dr. Mizrach, not

14    Dr. Edman.

15         Now, they did not explain what Do was saying here

16    about slippage costs was a reference to what Dr. Mizrach was

17    saying here in his slides.

18         Now, the SEC also alleges that the defendants failed

19    to disclose a supposedly secret agreement with Jump Crypto, and

20    you've heard a lot about that.  But the only things that the

21    SEC has alleged is that there was a "deal" and that it was

22    secret, but there is no evidence of a secret agreement.

23         First, Jump's relationship with TFL was never hidden.

24    Just take a look at the SEC's evidence of Do Kwon's interview

25    on the "Ship Show."  You heard about this on their closing.  It

O45HSec3                    Summation – Mr. Pellegrino

1    was a series on Twitter.  That was hosted by Jump, and it

2    featured various crypto builders.  It was hosted by a community

3    manager, and the host himself commented:  "Kanav and Do, you

4    both play a huge role in this ecosystem."  That was broadcast

5    to the public.

6            Kanav said:  "Jump's doing a whole bunch of things in

7    this space.  One of the most exciting things we're involved in

8    is the Terra ecosystem."

9            And Do says:  We first connected in, I think, 2019.

10           Does this look like the relationship is being hidden

11   from the public?

12           And you learned that TFL and Jump had a contractual

13   relationship with each other beginning well before the May 2021

14   depeg.  This is their written agreement from September 2020.

15   And their relationship was such that Jump was a market maker

16   for Terraform.  You've heard that phrase in this trial, and

17   that meant that Jump provided liquidity.  And there's nothing

18   wrong with that.

19           Brian Curran:  "You understood that Jump's role in the

20   repegging was to provide liquidity, correct?"

21           "Yeah, that's what market making is."

22           "In fact, he told you market makers are a common

23   feature in any market of trading assets, correct?"

24           "Based on my understanding, yes."

25           And as a matter of fact, market making in general was

1    even discussed in the April 2019 white paper.  There it is

2    there:  "It's important, however, for Terra currencies to have

3    access to shared liquidity."

4         Now, Jump's written contract with Terraform was

5    designed to support the liquidity of UST and Luna so that the

6    mint-burn mechanism could function better, and the SEC says

7    there was a secret agreement.  And they told you in their

8    closing it was made on May 23, 2021, and they said that Jump

9    received a benefit for allegedly defending the peg, but there

10   was no secret agreement because you saw no evidence of a secret

11   agreement.

12        First, there's no written agreement.  You saw the

13   written agreement here, and there were others, but none of them

14   reference the terms that they claim were part of the secret

15   agreement.  This one is PX 60.

16        Second, all they showed you were five phone calls

17   between Do and Kanav on May 23, and they showed you that

18   exhibit on closing.  But all that exhibit shows you is that Do

19   and Kanav spoke, and that is not surprising, since Jump was an

20   important market maker for Terraform.  And, in fact, Do and

21   Kanav spoke on the phone all the time, both before and after

22   the May 23 depeg.  That's what this exhibit here is,

23   Defendants' Exhibit 1960.  And you saw earlier that they even

24   did a Twitter podcast together.

25        Now, this exhibit is screenshots from Kanav's phone.

O45HSec3                    Summation - Mr. Pellegrino

1    You should look at these exhibits in the deliberation room, or

2    you can look at PX 258B, which is the original video of Kanav's

3    phone from which these screenshots were taken.  That was the

4    one that was initially put up sideways and then it was

5    reoriented 90 degrees.  If you watch that original video or

6    just look at these screenshots, you will see that Do and Kanav

7    spoke to each other literally hundreds of times.  So those five

8    phone calls discussed by the SEC on May 23 prove nothing.

9         Now, the SEC also noted that Kanav and DiSomma took

10   the Fifth Amendment and refused to answer questions posed by

11   the party related to their claims —— to the claims asserted in

12   this case.  But the judge will instruct you that you may, but

13   are not required to, draw an inference that the testimony of a

14   particular witness would be unfavorable to a party closely

15   associated with that witness.  You should not do that here.  It

16   would be unfair to make the defendants responsible for DiSomma

17   and Kanav's assertion of their constitutional rights.

18        Now, next the SEC tries to say that on May 23, 2021,

19   Hunsaker allegedly overheard Kanav say that Do "vested" Jump on

20   that day.  The SEC tried to tell you that this was the payoff,

21   but Hunsaker does not describe what was allegedly vested.  They

22   also said that no one can refute Hunsaker's testimony.

23        They said that Hunsaker knew that the vesting was true

24   because he saw something in the Jump deal system confirming it,

25   and then says he saw Luna start getting delivered to Jump in

1    June.  But Hunsaker is wrong.  Remember yesterday when a long

2    series of dates were read into the record and then the Court

3    took a break for other business, and when we resumed, the

4    additional stipulation that was read into the record showed

5    that Hunsaker was wrong because the SEC stipulated that Jump

6    did not receive any Luna between April 27 and September 9,

7    2021.

8         Now, Hunsaker had claimed that he saw Luna being

9    delivered to Jump in June on the deal system.  But the

10   stipulation that was read into the record yesterday, which is

11   evidence and you can refer it or examine it, just like any

12   other evidence in this case, shows that Luna was delivered on

13   April 27, one Luna on September 9, and then additional Luna on

14   September 11, 2021.  Nothing in this stipulation shows that

15   there was any Luna delivered in June, which is what Hunsaker

16   told you happened.  And so that stipulation is dispositive.  It

17   tells you there was no Luna delivered in June, as Hunsaker

18   claimed there was.

19        And then they showed you this email in which someone

20   at Jump wrote:  "Did we get them to vest us?"  That was

21   Plaintiff's Exhibit 68.  And Ms. Meehan said:  You absolutely

22   knew this happened.  You absolutely know it happened because of

23   that question.  But if you look at that document, Plaintiff's

24   Exhibit 68, you will see all it is is a question, the question

25   posed was, "Did we get them to vest us?" and there is no answer

O45HSec3                    Summation - Mr. Pellegrino

1  to that question.  They never showed you an answer.  There is

2  no answer in this case.  If there was, someone would have

3  showed it to you.  So whatever that person was thinking, they

4  have no information about any alleged secret deal, and there's

5  no information to suggest there was any vesting on May 23,

6  2021, or any other time, outside the contours of the agreement

7  that Jump and Terraform had entered into.

8         Now, in my last section, I want to talk about some of

9  the elements that the SEC has to prove.  You'll hear them in

10  Judge Rakoff's instructions of law in just a few minutes.

11  Instructions 13 and 14 are the most important.  The first

12  element is ─── I want to talk about is that the SEC must prove a

13  false or misleading statement, and we've already shown you that

14  the SEC has failed to prove this element.  The defendants'

15  statements about Chai's use of the blockchain and the May 2021

16  depeg were true, and they were not misleading.  If you make

17  that finding, you are done.  The defendants are not liable.

18         But, even if you found a false or misleading

19  statement, the SEC has to prove more.  Judge Rakoff will

20  instruct you that the SEC must also prove materiality.  So what

21  is that?  Judge Rakoff will instruct you that for omitted

22  information to be material, it must significantly alter or

23  change the total mix of available information.  This total mix

24  of information includes all the public information available to

25  purchasers.  This is about everything that's available, not

O45HSec3                    Summation - Mr. Pellegrino

1    about what any one individual might have actually considered or

2    did not consider.  That total mix includes everything Terraform

3    and Do Kwon put out on the Internet or in other public forums.

4         You saw in this case lots of information was available

5    to reasonable purchasers about UST and Luna.  You know that's

6    true because you heard from actual purchasers like Mr. Revsin

7    from Republic, Mr. Kol from Galaxy.  They had no problem

8    finding the white papers and other important information about

9    UST and Luna.  And the total mix in this case shows that the

10   supposed secret agreement was not material.  That's because the

11   total mix included numerous statements explaining that the

12   mint-burn algorithm only worked if people and firms in the

13   marketplace actually traded.  You've heard that before.  So

14   trading by institutional third parties was well-known here and

15   was in the mix of information, and Jump's on-chain trading was

16   publicly available.  That's also in the mix of information.

17        The total mix also included the disclosures by the

18   defendants of the risk that UST could lose its peg or could

19   lose some or all of its value.  You remember the defendants

20   told potential purchasers of UST that it was subject to the

21   risk of a shorting attack and death spirals.  Defendants'

22   Exhibit 4, this one says stablecoins that appear to be

23   perfectly healthy can get wiped out like this.  And as you

24   heard, this is an additional one, most currencies enter a

25   spiral they can't get out of when a prolonged recession starts

1    to take place.  You've heard that disclosure since the

2    beginning of this case.  And as you heard from Mr. Kol from

3    Galaxy, those risks were well understood in the marketplace.

4             This is his memo approving —— recommending approval

5    for purchase of Luna.  He says:  "Continues downward deviations

6    from the peg will lead to supply expansion for Luna and may

7    lead to a downward spiral in Luna price."  He's talking about

8    the same risks that we just showed you that Terraform published

9    publicly.  No reasonable investor thought that stablecoins like

10   UST were guaranteed to remain at their peg and could not lose

11   value.  The SEC's own witness is showing you that he was aware

12   of the total mix of information that was available.

13            So Professor Mizrach was wrong that Jump caused the

14   repeg because that's what Professor Hendershott told you

15   yesterday, and that's the slide he showed yesterday explaining

16   the at least four reasons Professor Mizrach was wrong that

17   Jump's UST trading caused the price to restore to $1.

18            And you also know that this supposed secret agreement

19   was not material for another reason.  As Professor Hendershott

20   demonstrated, the SEC failed to prove that Jump's trading

21   actually restored UST's peg in May 2021.  So whether or not

22   Jump agreed to trade at that time, it made little or no

23   difference to the repeg.  That's what Professor Hendershott

24   told you.  It was irrelevant, which is just another word for

25   immaterial or not material.

1           Now, for Chai, what mattered to a reasonable purchaser

2    was that Chai used the Terra blockchain, and as you've seen,

3    Paul Kim, the only witness with personal knowledge of the code

4    and the LP server, confirmed that Chai did use the blockchain.

5    The technical details about settlement and processing did not

6    matter to a reasonable purchase, and, again, they therefore

7    were not material.

8           You've also heard about this concept: no fraudulent

9    intent.  So the SEC has not proved a false or misleading

10   statement, and they have not proved materiality.  But even if

11   you found for the SEC on those two elements we just reviewed,

12   the SEC would still have to prove more to establish liability.

13          And if you look or listen to instruction No. 13 that

14   Judge Rakoff will give you in a few minutes, that will explain

15   to you that the SEC has to prove a second element which

16   concerns the defendants' state of mind.  The SEC has to prove

17   one of three types of state of mind to establish liability:

18   fraudulent intent, recklessness, or negligence.  Not all of

19   those apply to all of the claims, and he will explain that to

20   you.  The instructions define each of those terms for you.

21          Now, the SEC has failed on all three types of those

22   states of mind.  The defendants did not intend to defraud

23   anyone, they were not reckless about their statements, and they

24   were not negligent about how they made their statements.  What

25   the evidence shows is that Do Kwon and Terraform were open and

O45HSec3                    Summation - Mr. Pellegrino

1    transparent about their idea to create a financial system for

2    the whole world that did not depend on banks or on traditional

3    financial institutions or on high fees.  They published white

4    papers describing their products and their ideas in great

5    detail.  They gave you the upsides and the downsides.  You have

6    seen those, and so did investors like Republic and Galaxy.

7            Now, when the May 2021-depeg happened, Do and

8    Terraform were careful about how they described it.  They never

9    said that the recovery happened exclusively because of a

10   computerized algorithm.  You heard Do say on a podcast that a

11   lesson he learned from the Do peg —— excuse me, from the depeg

12   was the importance of having adequate reserves to defend the

13   peg.  He didn't say the computer program made all the risks

14   disappear.  Just the opposite.

15           Now, thinking about intent from the other direction,

16   the defendants honest intent was revealed again in May 2022,

17   one year after the first depeg.  As I said earlier, Terraform

18   was just as devastated by the failure of the peg as everyone

19   else was.  They lost hundreds of millions of dollars.

20           But why did the second depeg happen?  The protocol

21   didn't fail.  Terraform suffered a short attack.  That's where

22   a trading firm tries to make money by pushing down the value of

23   an asset.  You'll remember this gentleman.  And you may have

24   been wondering, why did we see this man on a video testifying

25   at a deposition in London?  Well, you learned that Evgeny

O45HSec3                    Summation - Mr. Pellegrino

Gaevoy, he's the head of the British trading firm Wintermute,
and he trades cryptocurrency.  And Wintermute was part of the
short attack that destroyed Terraform's value.  They did it
solely to make money because they bet —— they bet that the
price of UST would go down, and then they made that happen.

        Gaevoy told you how he did it.  At the top, first,
Wintermute set up to trade against Terraform.  That's what this
conversation was about.  And you see it right there.  Gaevoy
and Marina Gurevich, his wife and Wintermute's chief operating
officer, made battle plans.  They're talking about Terra's
blockchain technology, battle plans.

        Then at the bottom of the slide, the next step,
Wintermute took up a short position on UST.  That means they
bet that UST would go down, and they did it even though they
said it would be a bad look for us to publicly short Luna.

        What happened next?  Wintermute sold off UST starting
on May 7, 2022.  They sold off their UST to push the price
down, and here's where he admitted to doing that.  "Luna FUD,"
that's Luna fear, uncertainty, and doubt.  You learned that in
this trial.  "Luna fear and uncertainty and doubt, getting a
bit louder on Twitter.  Let's start reducing UST exposure."
That's Evgeny Gaevoy, directing his team.

        And at the bottom of the slide, when the price began
to fall, Wintermute, as planned, dumped entire holdings,
pushing the price of UST down into that death spiral that you

1    heard about.

2            And you know what this slide was about, ladies and

3    gentlemen, from yesterday?  Other firms did the same thing, as

4    you heard yesterday.  Those firms included Celsius and Jane

5    Street.  That's what this slide is about, and the result?

6    Hedge funds made profits and Terraform lost hundreds of

7    millions of dollars, which was not their fault.  Terraform did

8    not cause the second depeg.  Trading firms like Wintermute did.

9            Now, as Mr. Amani told you, this attack was

10   devastating to Do Kwon, to Terraform, to the entire Terra

11   community.  It destroyed the original Luna token.  It caused a

12   massive crash.  Mr. Amani told you Terraform lost hundreds of

13   millions of dollars.  But what Terraform did next highlights

14   its honest intent.  They let the hold Terra community decide

15   what to do after the depeg.  They put it up for a vote.  That's

16   what you see on your screen.

17           Now, Chris Amani considered giving money directly to

18   the members of the Terra community, but he told you there

19   wasn't enough money to pay anything more than a meaningless

20   amount to all the purchasers around the world.  So they let the

21   entire community vote, and the vote came back at over

22   60 percent, he told you.  What the community voted for was to

23   start over, to launch a new blockchain, and to give away all of

24   the remaining tokens.  Here he says "all of the tokens in the

25   new chain to people who had lost money in UST or in Luna and to

O45HSec3

1    try to rebuild for their benefit."

2          And that is exactly what he told you Terraform did.

3    Terraform is still here, trying to make things better for

4    members of the community.  And when you go back into the jury

5    room, as you look at the SEC's false statements, you should

6    consider those facts.  When you consider whether either

7    defendant intended to make false statements, ask yourself:  Are

8    these the actions of people that intended to commit fraud?  You

9    should remember that the community itself, those who were most

10   affected by the fall of this company, voted to rebuild it.  If

11   Terraform lied to the community, would anyone seriously vote to

12   try to rebuild the company?  But that's exactly what happened.

13   Terraform is still out there trying to rebuild and to make

14   purchasers whole.  These are not the actions of fraudsters or

15   scam artists, and that's why Terraform is no house of cards.

16         Ladies and gentlemen, when you go back into the jury

17   room and you consider these facts, you should check the only

18   verdict that's consistent with the evidence.  You should check

19   not liable as to all claims for both defendants.

20         THE COURT:  Thank you very much.

21         All right.  Ladies and gentlemen, we'll give you a

22   ten-minute break now, and then you'll hear my instructions.

23         (Jury not present)

24         THE COURT:  Please be seated.

25         Now, where do we stand on the exhibits in the various

O45HSec3

1    forms that we're going to send them into the jury?

2                   MS. STAREN:  Your Honor, we have gone over the exhibit

3    binders with the defendants and reviewed them both, and we have

4    an iPad containing all of the native audio-video and Excel

5    files.

6                   THE COURT:  So you should right now give all that to

7    my courtroom deputy who will keep them with herself until the

8    very end of my instructions, and then we'll take them into the

9    jury room.

10                   All right.  We'll see you in ten minutes.

11                   (Recess)

12                   THE COURT:  All right.  Please bring in the jury.

13                   (Jury present)

14                   THE COURT:  Please be seated.

15                   All right.  Ladies and gentlemen, you each have a copy

16    of my instructions of law.  We're going to read them together

17    now, but you could also take them with you back to the jury

18    room to help you during your deliberations.

19                   And if you look at the overview on page 2, you'll see

20    the instructions are divided into three parts:  First, there

21    are general instructions that pretty much apply to all civil

22    cases; then there are, under the heading Liability,

23    instructions that spell out the particular claims in this case;

24    and then there's some concluding instructions about how you

25    fill out your verdict form, and things of that sort.

O45HSec3

1           So let's begin with instruction No. 1 on page 3.

2           We are now approaching the most important part of this
3   case, your deliberations.  You have heard all the evidence in
4   the case, as well as the final arguments of the lawyers for the
5   parties.  Before you retire to deliberate, it is my duty to
6   instruct you as to the law that will govern your deliberations.
7   These are the final and binding instructions, which entirely
8   replace the preliminary instruction I gave you at the start of
9   the case, which you should now discard.

10          Regardless of any opinion that you may have as to what
11  the law may be or ought to be, it is your sworn duty to follow
12  the law as I give it to you.  Also, if any attorney or other
13  person has stated a legal principle different from any that I
14  state to you in my instructions, it is my instructions that you
15  must follow.

16          Because my instructions cover many points, I have
17  provided each of you with a copy of them, not only so that you
18  can follow them as I read them to you now, but also so that you
19  can have them with you for reference throughout your
20  deliberations.  In listening to them now and reviewing them
21  later, you should not single out any particular instruction as
22  alone stating the law, but you should instead consider my
23  instructions as a whole.

24          Your duty is to decide the fact issues in the case and
25  arrive, if you can, at a verdict.  You, the members of the

O45HSec3

jury, are the sole and exclusive judges of the facts.  You pass upon the weight of the evidence, you determine the credibility of the witnesses, you resolve such conflicts as there may be in the testimony, and you draw whatever reasonable inferences you decide to draw from the facts as you determine them.

In determining the facts, you must rely upon your own recollection of the evidence.  To aid your recollection, we will send you the exhibits at the start of your deliberations, together with an index to help you find what you want.

Let me pause there for a minute.  We're going to be fortunate in this case.  We'll send you both hard copies and a computerized group of the exhibits with a laptop so you can access them either in a hard copy or in computer form, whichever is easier for you.

If you need to review particular items of testimony, we can also arrange to provide them to you in transcript or readback form.

Please remember that none of what the lawyers have said in their opening statements, in their closing argument, in their objections, or in their questions is evidence.  Nor is anything I may have said evidence.  The evidence before you consists of just three things: the testimony given by witnesses that was received in evidence, the exhibits that were received in evidence, and any stipulations of the parties as to matters in evidence.

O45HSec3

1          Testimony consists of the answers that were given by

2     the witnesses to the questions that were permitted to be asked

3     here in court.  Please remember that questions, although they

4     may provide the context for answers, are not themselves

5     evidence.  Only answers are evidence, and you should therefore

6     disregard any question to which I sustained an objection.

7     Also, you may not consider any evidence that I directed you to

8     disregard or that I directed be stricken from the record.

9     Likewise, you may not consider anything you heard about the

10    contents of any exhibit that was not received in evidence.

11         More generally, you should be careful not to speculate

12    about matters not in evidence.  Your focus should be solely on

13    the evidence that was presented here in court.

14         It is the duty for each ── it is the duty of the

15    attorney for each side of a case to object when the other side

16    offers testimony or other evidence that the attorney believes

17    is not properly admissible.  Counsel also have the right and

18    duty to ask the Court to make rulings of law and to request

19    conferences out of the hearing of the jury.  All such questions

20    of law must be decided by me.  You should not show any

21    prejudice against any attorney or party because the attorney

22    objected to the admissibility of evidence, asked for a

23    conference out of the hearing of the jury, or asked me for a

24    ruling on the law.

25         I also ask you to draw no inference from my rulings or

O45HSec3

from the fact that on occasion I asked questions of certain

witnesses.  My rulings were no more than applications of the

law, and my questions were only intended for clarification and

to expedite matters.  You should understand that I have no

opinion as to the verdict you should render in this case.

You are to perform your duty of finding the facts

without bias or prejudice or sympathy or hostility as to any

party, for all parties are equal under the law.  You are to

perform your final duty in an attitude of complete fairness and

impartiality.  You are not to be swayed by rhetoric or

emotional appeals.  It must be clear to you that if you were to

let extraneous considerations interfere with your thinking,

there would be a risk that you would not arrive at a true and

just verdict.  So do not be guided by anything except clear

thinking and calm analysis of the evidence.

As you know, this is a civil case.  In a civil case, a

party who is making a claim against another party has what we

call the burden of proof, which is the burden of establishing

each of the essential elements of that claim.  Here, the

plaintiff, the Securities and Exchange Commission, which I will

refer to as the SEC, has asserted various claims against

Terraform Labs PTE Ltd., which I will refer to as Terraform,

and against Do Hyeong Kwon, who I will call Mr. Kwon, and who,

as you know, is out of the country and unavailable for trial.

The SEC therefore has the burden of proof as to those claims.

O45HSec3

1          I will describe the essential elements of the SEC's

2    claims shortly, but for now, keep in mind that for any given

3    claim you are considering, the SEC must prove each of the

4    essential elements of that claim by a preponderance of the

5    credible evidence.  The "credible evidence" means such evidence

6    as you find worthy of belief.  To establish an element of a

7    claim by a preponderance of the credible evidence means to

8    prove that that element is more likely true than not true.

9          When assessing whether a party has met its burden of

10   proof or failed to do so, the question is not which party

11   called the greater number of witnesses or how much time one

12   party or another spent during the trial.  The focus must be

13   always be on the quality of the evidence, its persuasiveness in

14   convincing you of its truth.

15         One of the defendants in this case, Terraform, is a

16   company.  Obviously, a company has no capacity to think or act

17   except through its officers, employees, and other agents, and

18   whether a company knows, intends, states, or does something is

19   therefore a function of what the company's officers, employees,

20   and other agents know, intend, state and do.  A company is

21   responsible for the acts of its officers, employees, and other

22   agents performed within the scope of their authority.

23         In deciding whether a party meets its burden of proof,

24   you may consider both direct evidence and circumstantial

25   evidence.

O45HSec3

1           Direct evidence is evidence that proves a fact

2   directly.  For example, where a witness testifies to what he or

3   she saw, heard or observed, that is called direct evidence.

4           Circumstantial evidence is evidence that tends to

5   prove a fact by proof of other facts.  To give a simple

6   example, suppose when you came in the courthouse today the sun

7   was shining.  It was a nice day, but the courtroom blinds were

8   drawn, and you could not look outside.  Later, as you were

9   sitting here, someone walked in with a dripping wet umbrella,

10  and soon after somebody else walked in with a dripping wet

11  raincoat.  Now, on our assumed facts, you cannot look outside

12  the courtroom, you cannot see whether it is raining, so you

13  have no direct evidence of that fact.  But on the combination

14  of the facts about the umbrella and the raincoat, it would be

15  reasonable for you to infer that it had begun raining.

16          That is all there is to circumstantial evidence.

17  Using your reason and experience, you infer from established

18  facts the existence or the nonexistence of some other fact.

19  Please note, however, it is not a matter of speculation or

20  guess; it is a matter of logical inference.

21          The law makes no distinction between direct and

22  circumstantial evidence.  Circumstantial evidence is of no less

23  value than direct evidence, and you may consider either or both

24  and may give them such weight as you conclude is warranted.

25          It must be clear to you by now that counsel for the

O45HSec3

opposing parties are asking you to draw very different

conclusions about various factual issues in the case.  An

important part of that decision will involve making judgments

about the testimony of the witnesses you have listened to and

observed.  In making these judgments, you should carefully

scrutinize all of the testimony of each witness, the

circumstances under which each witness testified, and any other

matter in evidence that may help you decide the truth and the

importance of each witnesses' testimony.

Your decision to believe or not believe a witness may

depend on how that witness impressed you.  How did the witness

appear to you?  Was the witness candid, frank, and forthright,

or did the witness seem to be evasive or suspect in some way?

How did the way the witness testified on direct examination

compare with how the witness testified on cross-examination?

Was the witness consistent or contradictory?  Did the witness

appear to know what he or she was talking about?  Did the

witness strike you as someone who was trying to report his or

her knowledge accurately?  These are examples of the kinds of

commonsense questions you should ask yourselves in deciding

whether a witness is or is not truthful.

How much you choose to believe a witness may also be

influenced by the witness' bias.  Does the witness have a

relationship with any of the parties that may affect how he or

she testified?  Does the witness have some interest, incentive,

O45HSec3

loyalty, or motive that might cause him or her to shade the
truth?  Does the witness have some bias, prejudice, or
hostility that may cause the witness to give you something
other than a completely accurate account of the facts he or she
testified to?

         You should also consider whether the witness had an
opportunity to observe the facts he or she testified about and
whether the witness' recollection of the facts stands up in
light of the other evidence in the case.

         In other words, what you must try to do in deciding
credibility is to size up a person just as you would in any
important matter where you were trying to decide if a person is
truthful, straightforward, and accurate in his or her
recollection.

         At various times excerpts from the depositions of
several witnesses were read into evidence.  A deposition is
simply a procedure where prior to trial the attorneys may
question a witness under oath before a court stenographer.  You
may consider the testimony of a witness given at a deposition
according to the same standards you would use to evaluate the
testimony of a witness given live at trial.

         The law permits parties to offer testimony for
witnesses who are not involved in the underlying events of the
case but who by education or experience profess to have
expertise in a specialized area of knowledge.  In this case,

O45HSec3

the expert witnesses who testified were Bruce Mizrach and

Dr. Matthew Edman, called by the SEC, and Dr. Terrence

Hendershott, called by the defendants.  Specialized testimony

is presented to you on the theory that someone who is learned

in the field may be able to assist you in understanding

specialized aspects of the evidence.

However, your role in judging credibility and

assessing weight applies just as much to these witnesses as to

other evidence.  When you consider the specialized opinions

that were received in evidence in this case, you may give them

as much or as little weight as you think they deserve.  For

example, a specialized witness necessarily bases his or her

opinions, in part or in whole, on what the witness learned from

others, and you may conclude that the weight given the

witnesses' opinions may be affected by how accurate or

inaccurate that underlying information is.  More generally, if

you find that the opinions of a specialized witness were not

based on sufficient data, education, or experience, or if you

should conclude that the trustworthiness or credibility of such

witness is questionable, or if the opinion of the witness is

outweighed, in your judgment, by other evidence in the case,

then you may, if you wish, disregard the opinions of that

witness entirely or in part.

On the other hand, if you find that a specialized

witness is credible and that the witness' opinions are based on

O45HSec3

sufficient data, education, and experience, and that the other

evidence does not give you reason to doubt the witness'

conclusions, you may, if you wish, rely on that witness'

opinion and give them whatever weight you deem appropriate.

In this trial, you have heard witnesses Jeffrey Kuan,

former head of business development for Terraform, Kanav

Kariya, the president of Jump Crypto, and William DiSomma, a

co-founder of Jump Crypto, decline to answer certain questions

on the grounds of their Fifth Amendment privilege against

self-incrimination.

The Fifth Amendment of the United States Constitution

affords every person the right to decline to answer any

questions if he or she believes that the answers may tend to

incriminate them.  However, in civil cases you are permitted,

but not required, to draw the inference that the withheld

information would have been unfavorable to one or more of the

defendants.  Specifically, if a nonparty, such as one of these

witnesses, invoked their Fifth Amendment privilege against

testifying, you may, but are not required to, draw an inference

that the testimony of a particular witness that invoked the

Fifth Amendment privilege would have been unfavorable to one or

more parties in this case who are closely associated with the

witness.  You should consider each witness separately.

With these general instructions in mind, let me now

turn to the specific claims in this case that the plaintiff,

O45HSec3

1    the SEC, brings against the defendants, Terraform and Mr. Kwon.

2    The SEC alleges that each of the defendants engaged in each of

3    two fraudulent schemes involving false or misleading statements

4    or misleading conduct, as described below, designed to deceive

5    Terraform investors about material matters.

6         The first alleged scheme is that the defendants

7    falsely conveyed to investors that if the price of UST fell

8    below $1 (known as the "peg"), it would correct to $1 through

9    the operation of a Terraform algorithm when, in fact, when the

10   price of a UST token fell below $1 in May 2021, the defendants

11   secretly agreed with a company called Jump to have Jump make

12   large undetectable purchases of UST to return the price to $1.

13        The second alleged scheme is that the defendants

14   deceived investors into believing that a company called Chai

15   used Terraform's blockchain when, in fact, the Chai

16   transactions were simply copied onto Terraform's systems to

17   make it appear as though Chai was using Terraform's blockchain.

18   Both defendants deny these allegations.

19        In order to establish liability for a given defendant,

20   the SEC must prove that the defendant engaged in at least one

21   of these schemes but is not required to prove both schemes.

22   Even one such scheme, if proved, will be sufficient for

23   liability.  Based on these allegations, the SEC brings various

24   claims to be described in the following instructions.

25        In assessing the given claim against a given

O45HSec3

1    defendant, you must determine, in accordance with my

2    instructions, whether the SEC has proved each of the essential

3    elements of the claim against the given defendant you are

4    considering by a preponderance of the credible evidence.  This

5    is known as establishing liability on that claim.  If you find

6    liability against a given defendant on a given claim, then the

7    Court will determine what money or other relief should be

8    awarded on the claim.  The determination of such relief is for

9    the Court and should not play any part in your deliberations.

10          Each of the claims brought by the SEC involves the

11   purchase or sale of what are called "securities."  I instruct

12   you as a matter of law that the tokens known as UST, Luna, and

13   wLuna are securities.

14          The SEC's first claim is that the defendant violated

15   what is known as Section 17 of the Securities Act of 1933.  To

16   prove that a given defendant is liable on such a claim, the SEC

17   must prove by a preponderance of the evidence three essential

18   elements:

19          First, that the defendant you are considering, in the

20   offer or sale of UST, Luna, or wLuna, made at least one false

21   or misleading statement or misleading conduct regarding a

22   material matter for the purpose of obtaining money or property;

23          Second, that in so doing, the defendant acted

24   intentionally, recklessly, or negligently; and

25          Third, that in so doing, the defendant caused to be

O45HSec3

1    used the mails or an instrumentality of interstate commerce.

2              With respect to the first element, a statement is

3    false if it is untrue when made.  A statement is misleading if,

4    even if it is true, it omits material information necessary to

5    make the statement made in the circumstances in which it was

6    made not misleading.  A statement is material if it relates to

7    something a reasonable investor in UST, Luna, or wLuna would

8    consider important in determining whether to buy or sell these

9    securities.  An omission is material if a reasonable investor

10   in UST, Luna, or wLuna would have viewed the disclosure of the

11   omitted fact as significantly altering the total mix of

12   information available in determining whether to buy or sell

13   these securities.  Conduct is misleading if it creates the

14   equivalent of a misleading statement.

15             In its closing argument, the SEC specified the

16   statements and conduct made by one or both defendants that it

17   claims are misleading.  In order for the SEC to satisfy the

18   first element of its Section 17 claim, it must prove that at

19   least one of these specified statements or conduct was either

20   materially false or materially misleading.  However, you must

21   be unanimous as to the given statement or conduct that you find

22   satisfies the first element.

23             A statement or conduct, even if false or misleading,

24   does not satisfy the first element unless it is made for the

25   purpose of obtaining money or property.  Also, to prove that a

O45HSec3

1    defendant's false or misleading statement or conduct occurred

2    in the offer or sale of UST, Luna, or wLuna, please note that

3    an offer includes negotiations to buy or sell securities,

4    publicity efforts that stimulate investor interest in the

5    security, or attempts to produce the sale by urging or

6    persuading another to act.

7        The phrase "offer or sale" can include the entire

8    selling process and does not require that conduct occurred in a

9    particular phase of buying or selling transactions.  Moreover,

10   proof of a completed purchase or sale is not required.

11   Accordingly, in deciding whether statements cited by the SEC

12   were made in the offer or sale of UST, Luna, or wLuna, you may

13   consider whether these statements were made to urge investors

14   to invest in Terraform securities.  No actual investment is

15   required, and the SEC is not required to prove that any

16   investor actually relied on any false or misleading statement

17   or conduct.

18       The second element relates to the state of mind with

19   which the materially false or materially misleading statement

20   or conduct was made by the maker.  There are three

21   possibilities here, from the highest in terms of fault to the

22   lowest.  The first possibility is that a defendant made the

23   statement intentionally and fraudulently, that is, for the

24   purpose of obtaining money or property with knowledge that it

25   was false and with an intent to materially impact investors in

O45HSec3

UST, Luna, or wLuna in the offer or sale of such securities.

      The second possibility is that the defendant made such a statement recklessly, that is, with a deliberate purpose to disregard the high probability that the statement would be false or misleading to a reasonable investor in UST, Luna, or wLuna.

      The third possibility is that the defendant made a false or misleading statement or engaged in misleading conduct negligently, that is, without the carefulness as to the accuracy of the statement or the impression created by the conduct that a reasonable maker of such statement and conduct would exercise in such circumstances.  In this situation the maker of the statement must have actually received money or property to be liable.  In other words, in the negligence situation, there must be actual receipt of money or property, but not in the other two situations involving intent or recklessness.

      As between these three possibilities, you must be unanimous as to which you find, if any, and you will be asked on your verdict form to specify the highest you found, that is, that the defendant you are considering actually —— acted intentionally, the highest; recklessly, in between; or just negligently, the lowest.

      As to the third element, the SEC must also prove by a preponderance of the evidence that a defendant's false or

O45HSec3

misleading statement was distributed by the use of the mails or
an instrumentality of interstate commerce.  An instrumentality
of interstate commerce includes, for example, telephone,
Internet, email, or any other electronic communication or any
other interstate or international delivery system.  It is not
necessary that the defendant you are considering be directly or
personally involved in the use of mails or an instrumentality
of interstate commerce, but only that defendant directly or
indirectly caused the distribution of the statements by the
mails or by an instrumentality of interstate commerce.

          The SEC's second claim is that the defendants violated
Rule 10b-5 which prohibits fraud in connection with the
purchase or sale of securities.  While in some cases there are
some differences between a Section 17 claim and a Rule 10b-5
claim, on the facts of this case, there is only one difference:
a 10b-5 claim requires proof of fraudulent intent or
recklessness and cannot rest on negligence.  Accordingly, if
you find a defendant liable on the Section 17 claim for acting
intentionally or recklessly, you must also find that defendant
liable on the 10b-5 claim.  But if you find a defendant is
liable on the Section 17 claim only by reasons of negligence or
if you find a defendant not liable at all on the Section 17
claim, then you must find the defendant not liable on the Rule
10b-5 claim.

          The SEC's third and final claim is that if you find

O45HSec3

Terraform liable on the 10b-5 claim discussed previously, then,
even if you find Mr. Kwon not personally liable for the 10b-5
claim, Mr. Liable is still liable as a control person for
Terraform's violation of Rule 10b-5.  To prove the control
person liability, the SEC must prove by a preponderance of the
evidence each of the following elements:

First, that Terraform itself violated Rule 10b-5;

Second, that Mr. Kwon directly or indirectly
controlled Terraform; and

Third, that Mr. Kwon was a culpable participant in
Terraform's violation of Rule 10b-5.

I instruct you as a matter of law that the SEC has
already proved that Mr. Kwon directly or indirectly controlled
Terraform during the time of Terraform's alleged fraud.  To
show that Mr. Kwon was a culpable participant in any violation
by Terraform of Rule 10b-5, the SEC must prove by a
preponderance of the evidence that Mr. Kwon knew or reasonably
should have known that Terraform was engaging in the fraudulent
or deceptive conduct at issue but did not take steps to prevent
it.

If you find that the SEC has proven each of the above
three elements by a preponderance of the evidence, you must
then determine whether defendants have proven by a
preponderance of the evidence that Mr. Kwon acted in good faith
and did not directly or indirectly induce Terraform's violation

O45HSec3

1    of Rule 10b-5.  If the defendants have so proven, then you must

2    find Mr. Kwon not liable for the claim of control person

3    liability.

4          You will shortly retire to the jury room to begin your

5    deliberations.  As soon as you get to the jury room, please

6    select one of your number as the foreperson to preside over

7    your deliberations and to serve as your spokesperson if you

8    need to communicate with the Court.

9          You will be bringing with you into the jury room a

10    copy of my instructions of law and a verdict form on which to

11    record your verdict.

12          And let me pause there and show you the verdict form.

13    It's a simple two-page document, and on each claim it asks you

14    whether you find liable or not liable.  And if you find liable,

15    it asks you whether it was intentional or reckless or whatever.

16    So after you've reached your verdict, your foreperson will sign

17    the verdict form, date it, and seal it in this envelope

18    cleverly marked "Verdict."  And then that will be brought to

19    me, but I will not open it and will not read it until you're

20    all back here in the room.  And we will then open it and read

21    it and ask each of you whether that's your verdict to be

22    absolutely sure we got your verdict as you decided.

23          Back to the instructions.

24          In addition, we will send into the jury room all the

25    exhibits that were admitted into evidence, along with an index

O45HSec3

1    so you can locate what you want.  If any of you want —— if you

2    want any of the testimony, that can also be provided, either in

3    transcript or readback form.  But please remember it's not

4    always easy to locate what you might want, so be as specific as

5    you possibly can be in requesting portions of testimony.  Also,

6    if you want any of the videotapes replayed —— I guess there is

7    really just one.  Is that on what we're sending into the jury?

8            MR. LANDSMAN:  Yes, your Honor.  Only the video and

9    audio and Excel files are on the iPad.

10           THE COURT:  I see.  The only thing that's on the iPad

11   is not the hard copies but things shown in other forms.  Thank

12   you for clarifying that.

13           And so this sentence is no longer —— you don't have to

14   come back into the courtroom to see that.  You can use the

15   laptop to do that.

16           Any of your requests, in fact, any communication with

17   the Court, should be made to me in writing, signed by your

18   foreperson and signed to —— and given to the marshal who will

19   be available outside the jury room throughout your

20   deliberations.  And after consulting with counsel, I will

21   respond to any question or request you have as promptly as

22   possible, either in writing or by having you return to the

23   courtroom so that I can speak with you in person.

24           You should not, however, tell me or anyone else how

25   the jury stands on any issue until you have reached your

O45HSec3

1    verdict and recorded it on your verdict form.

2             Each of you must decide the case for yourself, after

3    consideration with your fellow jurors of the evidence in the

4    case, and your verdict must be unanimous.  In deliberating,

5    bear in mind that while each juror is entitled to his or her

6    opinion, you should exchange views with your fellow jurors.

7    That's the very purpose of jury deliberations —— to discuss and

8    consider the evidence, to listen to the arguments of fellow

9    jurors, to present your individual views, to consult with one

10   another, and to reach a verdict based solely and wholly on the

11   evidence.

12            If, after carefully considering all the evidence and

13   the arguments of your fellow jurors, you entertain a

14   conscientious view that differs from the others, you are not to

15   yield your views simply because you are outnumbered.  On the

16   other hand, you should not hesitate to change or modify an

17   earlier view that, after discussion with your fellow jurors,

18   now appears to you erroneous.  In short, your verdict must

19   reflect your individual views and must also be unanimous.

20            This completes my instructions of the law.

21            You will note for the record that all objections to

22   the charge that were made during the charging conference are

23   deemed to be renewed at this point and are ruled on the same as

24   they previously were ruled on.

25            All right.  So we will now swear in the marshal.  You

O45HSec3

will then go into the jury room.  You will have your lunch.

I'm going to excuse counsel for one hour so they can have their

lunch.  So any questions you send in before 2 o'clock will not

be answered until after 2 o'clock.

       If you reach a verdict before 4:30, we'll take the

verdict.  If you reach a verdict ── if you want, at 4:30, to

stay later, as I mentioned to you earlier, we can arrange for

you to stay as late as 7 o'clock, but you need to tell us by

4 o'clock that you want to do that.  And if you otherwise go

home or haven't reached a verdict at any time today, then

you'll come back at 9:30 on Monday.  And whoever is your

foreperson will then make sure that you don't resume

deliberations until all of you are back in the jury room.

       So we'll swear in the marshal.

       (Marshal sworn)

       THE COURT:  OK.  So please follow the marshal into the

courtroom.

       (At 1:00 p.m., jury deliberations began)

       (Jury not present)

       THE COURT:  OK.  Please be seated.

       So, as I mentioned, all counsel are excused till

2 o'clock, but then we need to have at least one counsel from

each party who could respond to any notes that we get.  Also at

2 o'clock I have another matter, and you may see a lot of

people present because I invited my first-year criminal law

O45HSec3

1  class at Columbia to come see the 2 o'clock matter.  So if you

2  see a lot of very happy people, it's because they're still only

3  1Ls.

4          Anyway, I thank all counsel again.  We'll see you at

5  2 o'clock.

6          (Recess pending verdict)

7          (Continued next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O45ASEC4

1          THE COURT:  We have a verdict.  Let's bring in the

2    jury.

3          (In open court; jury present)

4          THE COURT:  So, ladies and gentlemen, I have your

5    verdict envelope.  I will open it in a minute and will take the

6    reading of the verdict.  I will not comment on your verdict

7    because the determination of the verdict is your job, not mine.

8    But I do want to comment on the fact that this was really a

9    terrific jury.  I always watch you carefully out of the corner

10   of my eye and you were all very attentive, taking careful notes

11   and listening very carefully to all the witnesses.  So I am

12   very grateful for your service in this case.

13         All right.  We'll open the envelope.

14         So the verdict is in proper form.  We will give it to

15   your foreperson, originally my courtroom deputy.

16         Will the foreperson rise, please.

17         On the SEC's first claim, under Section 17, does the

18   jury find the defendant Terraform Labs liable or not liable?

19         JUROR:  We the jury find the defendant Terraform Labs

20   liable.

21         THE COURT:  And having found Terraform liable on the

22   first claim, do you find that Terraform acted intentionally,

23   recklessly, or negligently?

24         JUROR:  We the jury find that Terraform acted

25   recklessly.

O45ASEC4

1      THE COURT:  On the SEC's first claim, under Section

2   17, with respect to defendant Kwon, do you find the defendant

3   liable or not liable?

4      JUROR:  We the jury find defendant Do Kwon liable.

5      THE COURT:  One, having found him liable, do you find

6   that he acted intentionally, recklessly, or negligently?

7      JUROR:  We the jury find that Kwon acted

8   intentionally.

9      THE COURT:  On the SEC's second claim, for intentional

10  or reckless violation of Rule 10b-5, do you the jury find that

11  Terraform is liable or not liable?

12     JUROR:  We the jury find defendant Terraform liable.

13     THE COURT:  And on the SEC's second claim, for

14  intentional or reckless violation of 10b-5, do you find the

15  defendant Kwon liable or not liable?

16     JUROR:  We the jury find defendant Kwon liable.

17     THE COURT:  And finally, on the claim for control

18  person liability regarding Terraform's violation of Rule 10b-5,

19  do you find the defendant on that theory liable or not liable?

20     JUROR:  We the jury find defendant Kwon liable.

21     THE COURT:  Very good.  Let me get my courtroom deputy

22  to take the verdict form from you.  Let me have it.  Thank you.

23     So, ladies and gentlemen, you have, on the SEC's first

24  claim, found Terraform liable for acting recklessly.  You have

25  found defendant Kwon liable for having acted intentionally.  On

O45ASEC4

the second claim, you have found both Terraform and Kwon

liable.  And on the third claim, you have also found defendant

Kwon liable.

            Juror No. 1, is that your verdict?

            JUROR:  Yes.

            THE COURT:  Juror No. 2, is that your verdict?

            JUROR:  Yes.

            THE COURT:  Juror No. 3, is that your verdict?

            JUROR:  Yes.

            THE COURT:  Juror No. 4, is that your verdict?

            JUROR:  Yes.

            THE COURT:  Juror No. 5, is that your verdict?

            JUROR:  Yes.

            THE COURT:  Juror No. 6, is that your verdict?

            JUROR:  Yes.

            THE COURT:  Juror No. 7, is that your verdict?

            JUROR:  Yes.

            THE COURT:  Jury polled, verdict unanimous.

            Ladies and gentlemen, again, let me express my very

great thanks.  You are excused.  By the way, while lawyers in

the case often are tempted to talk to jurors, under the law of

the governance here, they can only talk to you with my

expressed prior permission.  So they won't talk to you now as

you're leaving the courtroom.

            Members of the press, I can't control.  We all know

O45ASEC4

1    the press is completely uncontrollable.  But even then, with

2    apologies to these very fine reporters, I recommend not talking

3    to them because it invades the privacy of your deliberations.

4    But that's your choice in terms of the reporters.

5            So many thanks again, and you are now excused.

6            (Continued next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O45ASEC4

```
 1                 (In open court; jury not present)
 2                 THE COURT:  So it will now be my job to determine what
 3     penalties or other relief needs to be awarded on all the
 4     counts.  So I need to receive prompt briefing from both sides
 5     on that.  And my thought would be to have simultaneous
 6     immediate briefs and then simultaneous responding briefs.
 7                 So let's start with the SEC.  When do you think you
 8     could get your brief in?
 9                 MR. CONNOR:  Your Honor, would three weeks from today
10     suffice?
11                 THE COURT:  Three weeks?
12                 MR. CONNOR:  I'm sorry.  Two weeks.  We could do one
13     week if necessary.
14                 THE COURT:  Turned one week, oh.
15                 MR. CONNOR:  Two weeks.  Two weeks.
16                 THE COURT:  Two weeks.  All right.  I'll give you two
17     weeks.  Now, does that also work for the simultaneous brief
18     from the defense?
19                 MR. HENKIN:  Yes, your Honor.
20                 THE COURT:  Okay.  Very good.  So today is the 5th, so
21     that would be the 19th.  And then we'll say that should be
22     limited to 15 double-spaced pages per side.  And then for a
23     response from each side, limited to 10 double-spaced paged.
24     Another week?
25                 MR. CONNOR:  Yes, your Honor.
```

O45ASEC4

1    THE COURT:  And another week?

2    MR. HENKIN:  Yes, your Honor.

3    THE COURT:  So that would be the 26th.  And I will

4    endeavor to get you my ruling by no later than the end of the

5    first week of May.

6    Okay.  As I said earlier today, whenever there's a

7    verdict, one side is happier than the other, but I do want to

8    commend all counsel in this case.  I thought this was a very

9    well-tried case.  And the great beneficiary of that, among in

10   addition to the jury, is the Court.  So you have the Court's

11   great thanks.  So that concludes this proceeding.

12   MR. PATTON:  Your Honor, may I raise one issue about

13   speaking with jurors.  Do we have permission?  And we --

14   THE COURT:  No, I don't think so.  But I'll tell you

15   what I would allow.  I don't have any problem with your talking

16   to jurors as they're leaving the courthouse.  They may already

17   be gone.  But about how you did and what you could have done

18   better and things like that.  As I read Second Circuit law

19   though, you can't talk about the merits except with express

20   prior permission of the Court, and there I would need a reason

21   why you wanted to talk.  Like if you wanted to get in questions

22   about did you find Jones credible, did you find -- that kind of

23   thing I think is off limits.

24   What you can talk to them is how could you have done

25   better, or how could you have improved, things like that.  So

O45ASEC4

1  that, if you want to limit yourself to that, I will allow you

2  to do that if they haven't already left.

3          MR. PATTON:  Thank you, your Honor.

4          THE COURT:  And that goes obviously for any lawyer

5  here, but anything else you'll need to apply specifically to

6  the Court.  Very good.  Thanks.

7          (Adjourned)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25